# Exhibit 1

Laura J. Lederer & Christopher A. Wetzel, *The Health Consequences of Sex Trafficking and Their Implications for Identifying Victims in Healthcare Facilities*, Annals of Health Law, Winter 2014 at 61

# Annals of Health Law

Volume 23
Issue 1 *Winter 2014*

Article 5

2014

## The Health Consequences of Sex Trafficking and Their Implications for Identifying Victims in Healthcare Facilities

Laura J. Lederer

Christopher A. Wetzel

Follow this and additional works at: https://lawecommons.luc.edu/annals

 Part of the Health Law and Policy Commons

### Recommended Citation

Laura J. Lederer & Christopher A. Wetzel *The Health Consequences of Sex Trafficking and Their Implications for Identifying Victims in Healthcare Facilities*, 23 Annals Health L. 61 (2014).
Available at: https://lawecommons.luc.edu/annals/vol23/iss1/5

This Article is brought to you for free and open access by LAW eCommons. It has been accepted for inclusion in Annals of Health Law by an authorized editor of LAW eCommons. For more information, please contact law-library@luc.edu.

Case 2:22-cv-00223-Z   Document 1-2   Filed 11/18/22   Page 3 of 33   PageID 120

# The Health Consequences of Sex Trafficking and Their Implications for Identifying Victims in Healthcare Facilities

Laura J. Lederer* and Christopher A. Wetzel**

## INTRODUCTION

[W]hen I turned 13 I'd had enough of the abuse in home and I ran away. I didn't know where to go so I went to the center of town and stood by the town hall.  A man saw me hanging around there and he said that he was looking for a 'protégé.' I didn't know what it was but it sounded fine to me.  He said that I could stay at his house if I didn't have a place to stay. . . .  When we got to his house he pulled out a bottle of gin and had me drink and drink.  The next thing I remember is waking up drunk in his bed all wet and hurt.  He took me out on the street and told me what to do . . . During that time I saw 10 to 20 men a day.  I did what he said because he got violent when I sassed him.  I took all kinds of drugs— even though I didn't really like most of them . . .  Over the years I had pimps and customers who hit me, punched me, kicked me, beat me, slashed me with a razor.  I had forced unprotected sex and got pregnant three times and had two abortions at [a clinic].  Afterward, I was back out on the street again.  I have so many scars all over my body and so many injuries and so many illnesses.  I have hepatitis C and stomach and back pain and a lot of psychological issues.  I tried to commit suicide several times.

–Kayla, survivor[1]

Kayla's story is typical of women and girls trafficked for commercial sex

---

*    President, Global Centurion; Subject Matter Expert, U.S. Department of Defense; Adjunct Professor of Law, Georgetown Law Center; Senior Advisor on Trafficking, Office of Global Affairs, US Department of State, 2002 –2009.

**    J.D. Candidate, University of Virginia, 2015; B.A., Grove City College, 2012.

The authors would like to acknowledge the following for their support in the course of this investigation: Abolition International; Charlotte Lozier Institute; The Giving Fund; The Greenbaum Foundation; Gulton Foundation, Inc.; Vanguard Charitable Endowment Program; and an anonymous donor.

1.    All survivor names have been changed to protect their privacy.

61

in the United States. Experiences like the ones she describes were reported by trafficking survivors who answered questions about their trafficking experience in a series of focus groups. Her story represents not the worst that occurs in sex trafficking, but rather, the common experience of women and girls trafficked into commercial sex by a criminal industry that generates an estimated $33.9 billion per year worldwide.[2]

This paper explores the health consequences and healthcare experiences of women and girls trafficked in the United States for commercial sex. The paper is based on an original study of over one hundred domestic sex trafficking victims and survivors. It provides evidence that women and children who are trafficked into prostitution are physically, mentally, and emotionally devastated by the crime, and this devastation is lasting – with injuries, illnesses, and impairments continuing for decades. It illustrates how our healthcare system is failing trafficked women and children. It makes the case that health care providers of all kinds – in emergency wards, healthcare clinics, and private practices – are seeing trafficking victims but failing to identify them, thereby unwittingly contributing to continuing criminal activity and exacerbating both public and private physical and mental health problems for this segment of the population. It offers recommendations on ways that public policy and healthcare practice can combat sex trafficking by more readily identifying victims and catalyzing rescues. Finally, it argues that law, policy, and protocols must change in order to adequately address the health consequences of sex trafficking.

Section I briefly summarizes previous studies on health and human trafficking and puts the current study in context. Section II describes the current study, including methodology used to collect information from survivors. Section III presents the results of the study, detailing findings on survivors' physical and mental health issues. In addition, it describes victims' contact with healthcare providers during the time they were trafficked. Section IV summarizes critical issues in the provision of health care for sex trafficking victims, with particular attention to reproductive health care. Finally, Section V sets forth recommendations for legislators, policymakers, and healthcare professionals.

## I.    PREVIOUS LITERATURE AND CONTEXT

The current study fills a gap in the growing body of literature on health and violence in the context of sex trafficking. A majority of trafficking-

---

2.   Patrick Belser, *Forced Labor and Human Trafficking: Estimating the Profits* 14 (Int'l Labour Office, Working Paper No. 42, 2005), available at http://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1016&context=forcedlabor.

Lederer and Wetzel: The Health Consequences of Sex Trafficking and Their Implications

related studies have focused on trafficking outside of the United States. These studies have often concentrated narrowly on one or two aspects of sex trafficking, such as the prevalence of sexually transmitted diseases/infections (STDs/STIs)[3] or mental health issues,[4] though a few took a more comprehensive approach to examining the health and violence-related experiences of women in the commercial sex industry.[5] International studies established that trafficking victims are subject to a myriad of physical and psychological symptoms stemming from extensive abuse.[6]

Recently, some researchers have undertaken domestic studies on sex trafficking as well.[7]  Three early studies surveyed 100 or more women and

---

3.  See, e.g., Audrey E. Pettifor et al., Increased Risk of Chlamydial and Gonococcal Infection in Adolescent Sex Workers in Madagascar, 34 SEXUALLY TRANSMITTED DISEASES 475 (2007); Jay G. Silverman et al., HIV Prevalence and Predictors Among Rescued Sex-Trafficked Women and Girls in Mumbai, India, 43 J. ACQUIRED IMMUNE DEFICIENCY SYNDROMES 588 (2006); Jay G. Silverman et al., Syphilis and Hepatitis B Co-Infection Among HIV-Infected, Sex-Trafficked Women and Girls, Nepal, 14 EMERGING INFECTIOUS DISEASES 932 (2008); see also Arun Kumar Acharya, Sexual Violence and Proximate Risks: A Study on Trafficked Women in Mexico City, 12 GENDER, TECHNOLOGY & DEVELOPMENT 77 (2008).

4.  See, e.g., Geetha Suresh et al., An Assessment of the Mental Health of Street-Based Sex Workers in Chennai, India, 25 J. CONTEMP. CRIM. JUST. 186 (2009); Hyunjung Choi et al., Posttraumatic Stress Disorder (PTSD) and Disorders of Extreme Stress (DESNOS) Symptoms Following Prostitution and Childhood Abuse, 15 VIOLENCE AGAINST WOMEN 933 (2009); See, e.g., Mazeda Hossain et al., The Relationship of Trauma to Mental Disorders Among Trafficked and Sexually Exploited Girls and Women, 100 AM. J. PUB. HEALTH 2442 (2010);

5.  See, e.g., Melissa Farley et al., Prostitution and Trafficking in Nine Countries: An Update on Violence and Posttraumatic Stress Disorder, 2 J. TRAUMA PRAC. 33 (2003); See, e.g., Cathy Zimmerman et al., The Health of Trafficked Women: A Survey of Women Entering Posttrafficking Services in Europe, 98 AM. J. PUB. HEALTH 55 (2008).

6.  Olga Gajic-Veljanoski & Donna E. Stewart, Women Trafficked into Prostitution: Determinants, Human Rights, and Health Needs, 44 TRANSCULTURAL PSYCHIATRY 338, 352-53 (2007).

7.  See, e.g., Celia Williamson & Michael Prior, Domestic Minor Sex Trafficking: A Network of Underground Players in the Midwest, 2 J. CHILD & ADOLESCENT TRAUMA 46 (2009); KEVIN BALES & STEVEN LIZE, TRAFFICKING IN PERSONS IN THE UNITED STATES: A REPORT TO THE NATIONAL INSTITUTE OF JUSTICE 16-17 (2005), available at https://www.ncjrs.gov/pdffiles1/nij/grants/211980.pdf.; Rochelle L. Rochelle L. Dalla, Night Moves: A Qualitative Investigation of Street-Level Sex Work, 26 PSYCHOL. WOMEN Q. 63 (2002). These studies are qualitative in nature, communicating important narratives but not providing quantitative data.  Other literature focuses on experiences of violence and/or substance abuse among victims but does not provide substantial data on victims' physical and mental health consequences.  See, e.g., Steven P. Kurtz et al., Sex Work and "Date" Violence, 10 VIOLENCE AGAINST WOMEN 357 (2004) [hereinafter Kurtz et al., Violence]; Jody Raphael & Deborah L. Shapiro, Violence in Indoor and Outdoor Prostitution Venues, 10 VIOLENCE AGAINST WOMEN 126 (2004) [hereinafter Raphael & Shapiro, Violence]; Amy M. Young et al., Prostitution, Drug Use, and Coping with Psychological Distress, 30 J.

Vol 23, 2014                    Annals of Health Law                    64
HEALTH CONSEQUENCES OF SEX TRAFFICKING

touched on the problems that the instant study examines, but were each limited to a single city and examined a comparatively small number of health consequences.[8] The most comprehensive early study interviewed victims in five U.S. regions and discussed violence at length while touching on both physical and mental health consequences.[9] However, it was small and somewhat narrow in focus.[10]

While other studies have been conducted,[11] two Minnesota-based studies

---

DRUG ISSUES 789 (2000); Nabila El-Bassel et al., Correlates of Partner Violence Among Female Street-Based Sex Workers: Substance Abuse, History of Childhood Abuse, and HIV Risks, 15 AIDS PATIENT CARE & STDS 41 (2001).

8.    See Roberto J. Valera et al., Violence and Post Traumatic Stress Disorder in a Sample of Inner City Street Prostitutes, 16 AM. J. HEALTH STUD. 149, 149 (2000) (studying violence generally and PTSD, but not physical symptoms); Roberto J. Valera et al., Perceived Health Needs of Inner-City Street Prostitutes: A Preliminary Study, 25 AM. J. HEALTH BEHAV. 50, 50 (2001) (discussing five types of violence, sixteen physical symptoms, PTSD, and substance use); JODY RAPHAEL & DEBORAH L. SHAPIRO, CTR. FOR IMPACT RESEARCH, SISTERS SPEAK OUT: THE LIVES AND NEEDS OF PROSTITUTED WOMEN IN CHICAGO 4 (2005) [hereinafter RAPHAEL & SHAPIRO, SISTERS], available at http://www.impactresearch.org/documents/sistersspeakout.pdf (interviewing 222 victims in Chicago on 39 chronic physical health problems as well as experiences of violence and substance abuse, but not mental health).

9.    JANICE G. RAYMOND & DONNA M. HUGHES, COAL. AGAINST TRAFFICKING IN WOMEN, SEX TRAFFICKING OF WOMEN IN THE UNITED STATES 7 (2001), available at http://action.web.ca/home/catw/attach/sex_traff_us.pdf.

10.    Id. at 29 (interviewing only ten participants).

11.    In 2004-2005, researchers published a series of Miami-based studies focusing on drug use, social service needs and barriers to them, and the connections between an abusive past, mental health problems, and HIV risk. See Hilary L. Surratt et al., Sex Work and Drug Use in a Subculture of Violence, 50 CRIME & DELINQUENCY 43, 46 (2004); Steven P. Kurtz et al., Barriers to Health and Social Services for Street-Based Sex Workers, 16 J. HEALTH CARE POOR & UNDERSERVED 345, 345 (2005) [hereinafter Kurtz et al., Barriers]; Hilary L. Surratt et al., The Connections of Mental Health Problems, Violent Life Experiences, and the Milieu of the "Stroll" with the HIV Risk Behaviors of Female Street Sex Workers, 17 J. PSYCHOL. & HUM. SEXUALITY 23, 23 (2005). These studies saw high rates of participation and asked respondents about their overall health condition but did not discuss specific physical health symptoms and limited participation to victims who were current drug users and still active in the commercial sex trade. See, e.g., Surratt et al., supra, at 46; Kurtz et al., Barriers, supra, at 346. Another 2004 study made unique contributions to the literature, revealing disturbing mortality rates among women in prostitution in Colorado and concluding that "[w]omen engaged in prostitution face the most dangerous occupational environment in the United States." John J. Potterat et al., Mortality in a Long-term Open Cohort of Prostitute Women, 159 AM. J. EPIDEMIOLOGY 778, 780-82, 784 (2004). The study also found that "active prostitutes were almost eighteen times more likely to be murdered than women of similar age and race during the study interval." Id. at 782. The study did not, however, address specific physical and mental health symptoms. Another 2005 study examined the role of medical care providers, but interviewed only twenty-one victims in three cities and was primarily qualitative. FAMILY VIOLENCE PROT. FUND, TURNING PAIN INTO POWER: TRAFFICKING SURVIVORS' PERSPECTIVES ON EARLY INTERVENTION STRATEGIES

are especially relevant.    A 2010 survey of 117 Minneapolis women examined the impact of victims' age of entry into commercial sex on substance abuse and HIV risk.[12]   Because of these emphases, however, it discussed physical and emotional health consequences only at a high level of generality, such as whether participants "ever had an STD" or "ever experienced emotional violence."[13]    Another 2011 study of 105 Native American women engaged in commercial sex in Minnesota[14] covered a substantial range of violent experiences, physical and health symptoms, and drugs, as well as Post-Traumatic Stress Disorder (PTSD).[15]   The study contains some discussion of other mental health symptoms, but primarily in the context of determining whether the victims suffered from PTSD.

These studies set the stage for our current, more expansive study, which looks at over 200 health issues in more detail and across a broader geographic and ethnic spectrum.   As far can be determined, our study is the first to examine many of the reproductive health issues experienced by sex trafficking victims, including birth control usage, pregnancies, miscarriages, and forced and elective abortions. In addition, it analyzes health care access and interactions and collects data on symptoms experienced both during and after trafficking.

## II. METHODS

This study collected data from female sex trafficking survivors.[16]   The study used a mixed-methods approach, combining qualitative data collection from focus groups and structured interviews with quantitative analysis.   An initial feasibility study using a single focus group was conducted in November of 2011.   Following this initial focus group, a

---

(2005), available at http://www.futureswithoutviolence.org/userfiles/file/ImmigrantWomen/Turning%20Pain%20intoPower.pdf.

12.   Lauren Martin et al., Meaningful Differences: Comparison of Adult Women Who First Traded Sex as a Juvenile Versus as an Adult, 16 VIOLENCE AGAINST WOMEN 1252, 1252 (2010).

13.   Id. at 1262.

14.   MELISSA FARLEY ET AL., PROSTITUTION RESEARCH & EDUC., GARDEN OF TRUTH: THE PROSTITUTION AND TRAFFICKING OF NATIVE WOMEN IN MINNESOTA, 22 (2011) [hereinafter FARLEY ET AL., PROSTITUTION RESEARCH], available at http://www.prostitution research.com/pdfs/Garden_of_Truth_Final_Project_WEB.pdf.

15.   Id. at 28-30, 35-40.

16.   The terms "survivor" and "trafficking survivor" will be used throughout to refer to the individuals interviewed in this study. "Victim" and "trafficking victim" will refer generally to individuals who are victims of trafficking as defined by the Trafficking Victims Protection Act of 2000.   22 U.S.C.A. § 7102(15) (West, WestlawNext through P.L. 106-386).   The statute defines "sex trafficking" as "the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act."   § 7102(10).

Annals of Health Law, Vol. 23 [2014], Iss. 1, Art. 5

series of eleven similar focus groups were conducted in cities across the United States from January 2012 to December 2012.[17]  Local leaders in the anti-trafficking movement, often survivor-led service providers, were asked to assist in locating survivors in their cities who wished to participate in the study.  The focus groups included 107 participants, all domestic survivors of sex trafficking, ranging in age from fourteen to sixty.  During these focus groups, participants commented on and discussed a range of topics, including subjects such as any early childhood trauma, the age at which they were trafficked, how they were recruited, how long they were held in captivity, and the overarching health issues they experienced.  Following the focus group sessions, survivors completed an extensive health survey.[18]

The health survey included three components.  In the first component, survivors reported on more than one hundred discrete health conditions drawn primarily from the World Health Organization's Statistical Classification of Diseases and Related Health Problems.[19]  These health problems ranged from neurological and gastrointestinal symptoms to respiratory, cardiovascular, and dermatological conditions.  Survivors answered questions about conditions in categories including, general health, communicable and non-communicable diseases, dental health, substance abuse, as well as nearly thirty psychological symptoms and disorders.  The first component also asked about a range of sexually transmitted infections, gynecological and urinary tract conditions, birth control usage, pregnancy, and pregnancy outcomes.

Because of the ubiquity of violence in sex trafficking,[20] the first component also sought information about violence that the trafficking victim endured.  The questionnaire asked whether the victim had been

---

17.   The cities chosen included Columbus, Ohio; Honolulu, Hawaii; San Diego, San Francisco, and Sacramento, and Los Angeles, California; Minneapolis, Minnesota; St. Paul, Minnesota; St. Louis, Missouri; Washington, D.C.; Asheville, North Carolina; Nashville, Tennessee. The initial "feasibility" group was conducted in Washington, D.C. in November of 2011, with a pilot study in Columbus, Ohio, shortly thereafter. The average focus group size was just under nine trafficking victims, with the largest group being twenty-two participants (St. Louis), and the lowest being two participants (Los Angeles).  The participants came from survivor centered service providers and shelters including, but not limited to, Courtney's House; Breaking Free; Kwanzaa Northside Women's Space; Pacific Alliance to Stop Slavery; Save Our Adolescents from Prostitution (SOAP); Courage House; Magdalene; Generate Hope; Veronica's Voice; and On Eagles Wings.

18.   See infra, Appendix for a sample questionnaire completed by a survivor.

19.   See generally WORLD HEALTH ORG., INTERNATIONAL CLASSIFICATION OF DISEASES (2010), available at http://www.who.int/classifications/icd/en/.

20.   See, e.g., RAYMOND & HUGHES, supra note 9, at 63-65, 67-68, 75-77; Raphael & Shapiro, Violence, supra note 7, at 132-36; Kurtz et al., Violence, supra note 7, at 367-78; RAPHAEL & SHAPIRO, SISTERS, supra note 8, at 18-20.

subjected to physical abuse, such as being beaten, punched, kicked, raped, penetrated with foreign objects, threatened with a weapon, burned with cigarettes, strangled, stabbed, slashed, or forced to have unprotected sex. In addition to physical violence, victims indicated whether they were violated in other ways, such as being asked to participate in pornography, recreate a scene from pornographic material, or submit to abuse by a person in authority.

The second component of the survey consisted of a series of open-ended questions about health care. It asked such questions as whether and how long the victim used birth control during the time she was trafficked, where the birth control was obtained, who escorted the victim to the facility where birth control was obtained, and the type of birth control used. Because previous studies have identified health care providers as critical potential identifiers of trafficking victims,[21] the second component also asked what types of facilities survivors had visited to receive medical treatment and whether the healthcare provider asked or knew about their situations. Each victim also answered more detailed reproductive health questions, including her history of pregnancies, miscarriages, abortions and live births, where the abortions and/or births occurred, and whether she maintained custody of any children she had. With respect to abortion, the victim indicated how many abortions she had undergone, at what stage of pregnancy, and whether the abortion was coerced.

The final component of the questionnaire asked victims about the symptoms they experienced after escaping trafficking. This component covered the same range of physical and psychological symptoms as the first component. A full copy of a completed questionnaire is included in this article's Appendix.

Answers from the questionnaires were coded and entered in a spreadsheet. For questions in the first and third components where survivors circled symptoms to indicate that they had experienced them, a binary coding system (1 if circled, 0 if not) was used. For the open-ended second component, common answers were assigned a number and for questions where survivors gave an unwieldy variety of answers, the least common answers were grouped into a single "other" category.[22] When

---

21.  See, e.g., Helen Cole, Human Trafficking: Implications for the Role of the Advanced Practice Forensic Nurse, 14 J. AM. PSYCHIATRIC NURSES ASS'N 463, 466 (2009) (citing Jeffrey Barrows & Reginald Finger, Human Trafficking and the Healthcare Professional, 101 S. MED. J. 521 (2008)); ERIN WILLIAMSON ET AL., DEP'T HEALTH & HUMAN SERVS., NATIONAL SYMPOSIUM ON THE HEALTH NEEDS OF HUMAN TRAFFICKING VICTIMS: POST-SYMPOSIUM BRIEF 4-8 (2008).

22.  Coded data came almost exclusively from the questionnaires. Survivors' focus

Annals of Health Law, Vol. 23 [2014], Iss. 1, Art. 5

survivors did not answer a question, the response was coded as "N/A."

This coding system allowed the spreadsheet program to count how many survivors gave each response by counting how many cells in a column were filled with a given number. The totals were then calculated as percentages both of all survivors and of those who answered the particular question. The results section analyzes the frequency with which individual symptoms and experiences were reported by the survivors in this study as well as the percentages of victims who reported at least one symptom or experience in a given category.

### III. RESULTS

#### A. Physical Health Symptoms

> I am telling you that you have to not be in your sober mind to run these tricks—you just can't do it straight so everyone on the street is hooked on some drug. I've done drugs so long I have really hurt my body. I have kidney disease, liver problems, hepatitis C, high blood pressure, polymyositis [an inflammatory muscular disease], and fibroid tumors.
>
> –Taylor, survivor

Survivors suffered tremendously, virtually without exception. Out of 106 survivors,[23] 105 (99.1%) reported at least one physical health problem during trafficking. The most frequently reported physical problems were neurological—91.5% of respondents[24] reported at least one neurological symptom and 82.1% specifically reporting memory problems, insomnia, or poor concentration. Headaches or migraines (53.8%) and dizziness (34.0%) were also common symptoms. The trafficking experience ravaged the general health of victims as well, with 85.7% reporting at least one symptom in the general health category. In particular, the respondents' dietary health was often poor. Severe weight loss (42.9%), malnutrition (35.2%), loss of appetite (46.7%), and eating disorders (36.2%) were especially common; 71.4% of respondents reporting at least one of these diet-related symptoms.

The toll of constant commercial sexual exploitation and physical abuse on the victims led to a range of additional conditions. Physical injuries

---

group statements were consulted only in the few instances where a questionnaire answer was unambiguous and the survivor's statements clarified it.

23. One participant did not fill out the first component of the survey.

24. Because many interviewees did not answer every question, percentages given are of respondents who answered the particular question, not necessarily of all 107 interviewees.

Case 2:22-cv-00223-Z   Document 1-2   Filed 11/18/22   Page 11 of 33   PageID 128

were rampant, with nearly 70% of victims reported physical injuries, most commonly to the head or face.  Symptoms not conventionally associated with sexual abuse were only slightly less common: 67.9% of respondents experienced some type of cardiovascular or respiratory difficulty and 61.3% suffered from gastrointestinal symptoms while being trafficked.  More than half of the survivors (54.3%) reported dental problems, with tooth loss the most common problem (42.9%).  The only major health category in which less than half of respondents reported a symptom was dermatological issues, which were nonetheless reported by 27.4% of respondents.  This study's findings of widespread physical health consequences are generally consistent with the results of previous domestic studies and build on their findings by revealing a more comprehensive picture of the health issues that plague trafficking victims.[25]

Table 1. Physical Health Problems

| Category | % of respondents reporting at least one symptom[26] |
|---|---|
| Any Physical Health Problem | 99.1% (N=106) |
| Neurological | 91.7% (N=106) |
| General Health | 86.0% (N=105) |
| Injuries | 69.2% (N=102) |
| Cardiovascular/Respiratory | 68.5% (N=106) |
| Gastrointestinal | 62.0% (N=106) |
| Dental | 54.3% (N=105) |

B. Psychological Symptoms

"The mental health problems are the worst and most long lasting.  I was diagnosed with chronic depression, have anxiety, post-traumatic stress syndrome, nightmares, flashbacks, disorientation.  I've been suicidal at

---

25.  See, e.g., FARLEY ET AL, PROSTITUTION RESEARCH, supra note 14, at 29-30, 31; RAYMOND & HUGHES, supra note 9, at 79.

26.  The small differences in the number of respondents are due to some subjects electing to fill out some portions of the questionnaire but not others. Judgment occasionally had to be exercised by coders as to whether a given victim had not answered a section or had indicated not experiencing any of the symptoms. However, such judgment was required on only a small minority of surveys and was made with a presumption against selective completion of the questionnaire.

Annals of Health Law, Vol. 23 [2014], Iss. 1, Art. 5

times.  I don't think anyone is out on the street without having these long
lasting effects."

—Amanda, survivor

Survivors were overwhelmingly traumatized not only physically, but also
mentally.  The brutal treatment they endured created ongoing psychological
and mental conditions in many of these victims and exploited existing
mental instability in others.  All but two of those who responded to the
survey (104/106, 98.1%) reported at least one psychological issue during
their captivity and survivors noted an average of more than a dozen (12.11).
The most frequently reported problems included depression (88.7%),
anxiety (76.4%), nightmares (73.6%), flashbacks (68.0%), low self-esteem
(81.1%), and feelings of shame or guilt (82.1%).  The picture painted by
these surveys and the personal interviews that accompanied many of them
is one of complete mental devastation.  A substantial number of survivors
suffered from other psychological disorders, including acute stress (38.7%),
bipolar (30.2%), depersonalization (19.8%), multiple personality (13.2%),
and borderline personality (13.2%) disorders.

Two additional and particularly chilling reporting rates confirm the
extent of mental trauma that survivors suffered: 41.5% had attempted
suicide (one victim reported 9 such attempts) and 54.7% suffered from Post
Traumatic Stress Disorder.  The psychological consequences that the
trafficking victims in these focus groups reported were wide-ranging,
severe, and in some cases nearly universal.  As with physical symptoms, the
findings on the psychological consequences of trafficking are consistent
with other studies.[27]

Even the escape from their trafficking circumstances was far from a
remedy for the psychological suffering of survivors.  When reporting on
their health experiences after trafficking, 96.4% of survivors reported at
least one psychological symptom and an average of 10.5.  As the table
below indicates, there were only minor improvements in the number of
psychological problems experienced when the victims escaped from their
trafficking situations.  Sex trafficking took a lasting mental and emotional
as well as physical toll on nearly every survivor in the study.

---

27.    See, e.g., FARLEY ET AL., PROSTITUTION RESEARCH, supra note 14, at 31; RAYMOND
& HUGHES, supra note 9, at 83; Melissa Farley & Howard Barkan, Prostitution, Violence,
and Posttraumatic Stress Disorder, 27 WOMEN & HEALTH 37, 42 (1998), available at
http://www.prostitutionresearch.com/Farley%26Barkan%201998.pdf.

Lederer and Wetzel: The Health Consequences of Sex Trafficking and Their Implications

Table 2. Psychological Health Problems

|  | **During Trafficking (N=106)** | **After Trafficking (N=83)**[28] | **Change in % reporting** |
|---|---|---|---|
| Reported at least one psychological issue | 98.1% | 96.4% | -1.7% |
| Average number of psychological issues | 12.1 | 10.5 | -1.6 |
| Depression | 88.7% | 80.7% | -8.0% |
| Flashbacks | 68.0% | 63.9% | -4.1% |
| Shame/guilt | 82.1% | 71.1% | -11.0% |
| PTSD | 54.7% | 61.5% | +6.8% |
| Attempted suicide | 41.5% | 20.5% | -21.0% |

C. Reproductive Issues

If I hadn't had my children when I was young, I wouldn't be able to have them because I have had so many STDs and gynecological problems—including pelvic inflammatory disease, cervical infections, gonorrhea, herpes, chlamydia—I can't have children now.

–Megan, survivor

Not surprisingly, survivors also reported significant numbers of reproductive health problems while they were being trafficked. Most notably, more than two-thirds of these women (67.3%) contracted some form of sexually-transmitted disease or infection (STD/STI). Survivors reported significantly higher rates of chlamydia (39.4%) and gonorrhea

---

28.    Some respondents answered only the questions about symptoms experienced during trafficking, accounting for the difference in number of respondents for during and post-trafficking questions.

Annals of Health Law, Vol. 23 [2014], Iss. 1, Art. 5

(26.9%) than the next most common disease (Hepatitis C, 15.4%). Well over half of survivors (63.8%) reported at least one gynecological symptom other than STDs/STIs, with pain during sex (46.2%), urinary tract infections (43.8%), and vaginal discharge (33.3%) among the most common such symptoms. The extent of reproductive health issues that survivors reported is hardly surprising due to the extreme levels of sexual abuse these women endured. On average, the respondents reported being used for sex by approximately thirteen buyers per day,[29] with a median response of ten. Some respondents reported typical days of as many as thirty to fifty buyers.

Reporting problems complicated the data regarding pregnancies and their results, with some respondents answering related questions inconsistently.[30] While these reporting issues make precision impossible, the data merits concluding with confidence that pregnancy, miscarriage, and abortion were all common experiences for survivors in the study. Even without accounting for possible underreporting, forty-seven of the sixty-six women (71.2%) who gave an answer for the number of pregnancies they had during trafficking reported at least one pregnancy while being trafficked; fourteen of these (21.2% of respondents) reported five or more pregnancies. Of the

---

29.   Where victims gave a range for the number of buyers per day, the answer was coded as the median of that range, using the lower median where the range contained an even number of possibilities. For example, an answer of 5-7 was coded as 6 and an answer of 10-15 was coded as 12.

30.   For example, thirty-four respondents circled "pregnancy" as something they experienced during trafficking in the survey's first component, but an additional nineteen women gave a number of one or greater to the open-ended question "How many pregnancies did you have while being trafficked?" in the second component of the survey despite not having circled "pregnancy" earlier, bringing the total to fifty-three. There is reason to believe, however, that even the combined total of fifty-three women may underreport the number who experienced a pregnancy because many of the victims may have had different standards for what counted as a pregnancy. In some cases, the victims appeared not to count pregnancies that ended in abortion or miscarriage, reporting for example, two pregnancies, two live births, two miscarriages, and one abortion. Thus, women whose pregnancies all ended in miscarriage or abortion may not be reflected even in the combined total of fifty-three. Similar discrepancies occurred on a smaller scale with regard to miscarriages (thirty-two subjects circled, ten more did not circle but reported one or more, and two subjects who had circled nonetheless reported zero as the number they had) and abortions (thirty-nine subjects circled, three additional subjects did not circle but reported having one or more). There were additional inconsistent sequences of answers about pregnancies and pregnancy outcomes. Thirty-nine subjects reported numbers of births, miscarriages, and abortions that totaled a different number than the subject reported as her total number of pregnancies or gave otherwise conflicting answers. In most of these cases, there was no obvious explanation that accounted for the difference. Possible explanations include varying standards of what counts as a pregnancy, multiple-child births (twins, triplets, etc.), and answering different questions with reference to different periods of time (i.e., counting only pregnancies occurring during trafficking but counting all miscarriages, births, or abortions whether before, during, or after trafficking).

Lederer and Wetzel: The Health Consequences of Sex Trafficking and Their Implications

sixty-four respondents who gave an answer for the number of miscarriages they experienced, thirty-five (54.7%) had at least one miscarriage and nineteen (29.7%) had more than one.[31]  Similarly, more than half (55.2%) of the sixty-seven respondents who answered reported at least one abortion, with twenty respondents (29.9%) reporting multiple abortions.  Without accounting for possible underreporting, this subset of responding survivors reported a total of 114 abortions.

The prevalence of forced abortions is an especially disturbing trend in sex trafficking.  Prior research noted that forced abortions were a reality for many victims of sex trafficking outside the United States[32] and at least one study noted forced abortions in domestic trafficking.[33]  The survivors in this study similarly reported that they often did not freely choose the abortions they had while being trafficked.   While only thirty-four respondents answered the question whether their abortions were of their own volition or forced upon them, more than half (eighteen) of that group indicated that one or more of their abortions was at least partly forced upon them.[34]  One victim noted that "in most of [my six abortions,] I was under serious pressure from my pimps to abort the babies."  Another survivor, whose abuse at the hands of her traffickers[35] was particularly brutal, reported

---

31.   The interviewer notes that in some cases, survivors may have used miscarriage as a euphemism for abortion.

32.   S. Abdulraheem & A.R. Oladipo, Trafficking in Women and Children: A Hidden Health and Social Problem in Nigeria, 2 INT'L J. SOC. & ANTHROPOLOGY 34, 37 (2010); Acharya, supra note 3, at 90; CATHY ZIMMERMAN ET AL., THE HEALTH RISKS AND CONSEQUENCES OF TRAFFICKING IN WOMEN AND ADOLESCENTS: FINDINGS FROM A EUROPEAN STUDY 24, 51 (2003), available at http://www.oas.org/atip/Global%20Reports/Zimmerman%20TIP%20HEALTH.pdf.

33.   RAYMOND & HUGHES, supra note 9, at 18; see also U.S. v. Todd, 627 F.3d 329, 331 (9th Cir. 2009) (mentioning a forced abortion in describing how sex trafficking defendant abused his victims); U.S. v. Stokes, No. 10-00244-04 2011 WL 1585601, at *15 (W.D. Mo. 2011) (mentioning a forcible "abortion" performed by a defendant as one of the "overt acts" in furtherance of a sex trafficking conspiracy).

34.   Additionally, several survivors stated in their interviews that they felt forced to choose abortion by the circumstance of being trafficked.

35.   Street gangs are increasingly turning to sex trafficking as a source of income.  See, e.g., Laura J. Lederer, Sold for Sex: The Link Between Street Gangs and Trafficking in Persons, 4 PROTECTION PROJECT J. HUM. RTS. & CIV. SOC'Y 1, 1 (2011); KAMALA D. HARRIS, CAL. DEP'T OF JUST., THE STATE OF HUMAN TRAFFICKING IN CALIFORNIA 63-64 (2012), available at http://oag.ca.gov/sites/all/files/pdfs/ht/human-trafficking-2012.pdf; Press Release, U. S. Att'y's Office, E. Dist. of Va., Gang Leader Sentenced to 40 Years for Leading Juvenile Sex Trafficking Ring (Sept. 14, 2012), http://www.justice.gov/usao/vae/news/2012/09/20120914stromnr.html; Press Release, U. S. Att'y's Office, E. Dist. of Va., Leader of MS-13 Gang Sentenced to 50 Years in Prison for Sex Trafficking Multiple Teens (June 1, 2012), http://www.fbi.gov/washingtondc/press-releases/2012/leader-of-ms-13-gang-sentenced-to-50-years-in-prison-for-sex-trafficking-multiple-teens. For a case study of gang

seventeen abortions and indicated that at least some of them were forced on her.  Notably, the phenomenon of forced abortion as it occurs in sex trafficking transcends the political boundaries of the abortion debate, violating both the pro-life belief that abortion takes innocent life and the pro-choice ideal of women's freedom to make their own reproductive choices.

### D. Violence, Abuse, and Humiliation

> I've had a hard life during this time—16 years on the street, 10 to 20 customers per day.  I've been hit, punched, kicked, beaten, whipped with a belt, forced to have sex, threatened with a weapon, shot at, and had my head split open. . . .  One of my regulars got together with some friends and kidnapped me.  They held me against my will, put a belt around my neck, and forced me to do all kinds of horrible things.  When I said I didn't want to they said they would kill my family.

> –Nicole, survivor

The survey asked survivors if they had experienced violence or abuse, listing twelve possible forms.[36]  These included being threatened with a weapon, shot, strangled, burned, kicked, punched, beaten, stabbed, raped, or penetrated with a foreign object.  The survey also asked about other kinds of abuse such as threats, intimidation, verbal abuse and humiliation.  Nearly all the survivors (92.2%) reported being the victim of at least one form of physical violence.  Many survivors had suffered more than half of these experiences.  Respondents reported an average of 6.25 of the 12 forms of violence.  Likewise, most of these abuses were the rule rather than the exception—eight of the twelve were reported by half or more of the respondents, including behaviors as extreme as strangulation.  In their interviews, survivors described additional ways they were abused.  One survivor was whipped and had bleach poured on her, while another was forced to eat feces and was hung by her arms in a closet.  As another survivor describes, "[my pimp] had his girls out on the streets every night. It was either you made the [money] for him or you got beat."  In addition to the abuses detailed below, almost all survivors reported serious verbal

---

involvement in sex trafficking near Washington, D.C., see Laura J. Lederer & Justin Davis, Street Gangs and Human Trafficking in the Greater Washington, D.C. Area (Aug. 1, 2013) (unpublished manuscript) (on file with authors).

36.    The specific forms on the survey were being threatened with a weapon, strangulation, burning with cigarettes, being kicked, punched, beaten, or beaten with an object, stabbing/slashing, rape (vaginal, oral, or anal), penetration with foreign objects, forced unprotected sex, and abuse by a person of authority.

Lederer and Wetzel: The Health Consequences of Sex Trafficking and Their Implications

abuse, including repeatedly being called derogatory names, treated as less than human, and being deprived of basic physical and emotional needs such as food, sleep, and a caring environment.

Table 3.  Violence and Abuse in Sex Trafficking

| Common Forms of Violence/Abuse | % Reporting (N=103) |
|---|---|
| Some form of violence/abuse | 95.1% |
| Forced sex | 81.6% |
| Punched | 73.8% |
| Beaten | 68.9% |
| Kicked | 68.0% |
| Forced unprotected sex | 68.0% |
| Threatened with weapon | 66.0% |
| Strangled | 54.4% |
| Abused by person of authority | 50.5% |

In addition to physical mistreatment, some victims were subjected to other forms of degradation, such as recreating scenes from pornography (29.3%) or being forcibly recorded for pornographic purposes (17.1%). Other studies confirm the prevalence of violence against trafficking victims.[37]

### E. Substance Abuse

I started doing drugs, specifically cocaine down at the local go-go bar, and eventually I tried heroin.  I was a mess, wrecked my life, wasted it on drugs because I'd been raped and I didn't think I mattered to anyone. When I was 31 years old I started dating a . . . guy who was a drug dealer.  We dealt together, did crack together, and he started prostituting me to close drug deals.

—Radeel, survivor

Many survivors were dependent on drugs or alcohol while they were

---

37.    See, e.g., FARLEY ET AL., PROSTITUTION RESEARCH, supra note 14, at 28-29; RAPHAEL & SHAPIRO, SISTERS, supra note 8, at 132-35; RAYMOND & HUGHES, supra note 9, at 75; Melissa Farley, Prostitution and the Invisibility of Harm, 26 WOMEN & THERAPY 247, 251-53 (2003).

Case 2:22-cv-00223-Z   Document 1-2   Filed 11/18/22   Page 18 of 33   PageID 135

trafficked either because the substances were forced on them as a control mechanism by their traffickers[38] or because substance use was a means of coping with the immense abuse they suffered. 84.3% used alcohol, drugs, or both during their captivity and more than a quarter (27.9%) said that forced substance use was a part of their trafficking experience. More than a quarter of victims reported injected drugs and overdoses (27.2% and 26.0% respectively). As the following table indicates, alcohol, marijuana, and cocaine were the most common substances but others were prevalent as well.

Table 5. Substance Abuse in Sex Trafficking

| Substance | % Reporting Usage (N=102) |
|---|---|
| Substance Abuse | 84.3% |
| Alcohol | 59.8% |
| Marijuana | 53.4% |
| Cocaine | 50.5% |
| Crack Cocaine | 44.7% |
| Heroin | 22.3% |
| Ecstasy | 13.6% |
| PCP | 9.7% |

Overwhelmingly, survivors were the objects of repeated and extreme violence and were frequently driven to substance abuse either by force or by their dire circumstances.

IV.   CRITICAL ISSUES IN PROVISION OF HEALTH CARE FOR
            VICTIMS OF SEX TRAFFICKING

During the time I was on the street, I went to hospitals, urgent care clinics, women's health clinics, and private doctors. No one ever asked me anything anytime I ever went to a clinic. . . . I was on birth control during the 10 years I was on the streets—mostly Depo-Provera shots which I got at the Planned Parenthood and other neighborhood clinics. I also got the morning-after pill from them. I was young and so I had to

---

38.    For instance, one survivor described how her pimp, "gave us drugs to keep us under his thumb."

Lederer and Wetzel: The Health Consequences of Sex Trafficking and Their Implications

Case 2:22-cv-00223-Z   Document 1-2   Filed 11/18/22   Page 19 of 33   PageID 136

have a waiver signed in order to get these—one of the doctors (a private doctor I think) signed this waiver when my uncle took me to see him.

–Lauren, survivor

Despite their abusive situations, most survivors did receive medical treatment at some point during their trafficking. Of those who answered the questions about their contact with healthcare (N=98), 87.8% had contact with a healthcare provider while they were being trafficked. By far the most frequently reported treatment site was a hospital/emergency room, with 63.3% being treated at such a facility. Survivors also had significant contact with clinical treatment facilities, most commonly Planned Parenthood clinics, which more than a quarter of survivors (29.6%) visited. More than half (57.1%) of respondents had received treatment at some type of clinic (urgent care, women's health, neighborhood, or Planned Parenthood).

Table 6. Victim Contact with Health Care Provider

| Treatment Source | % Reporting (N=98) |
|---|---|
| Any contact with healthcare | 87.8% |
| Any type of clinic | 57.1% |
| Hospital/ER | 63.3% |
| Planned Parenthood | 29.6% |
| Regular doctor | 22.5% |
| Urgent care clinic | 21.4% |
| Women's health clinic | 19.4% |
| Neighborhood clinic | 19.4% |
| On-site doctor | 5.1% |
| Other[39] | 13.3% |

Since pimps and traffickers[40] generally exercise nearly complete control of

---

39. Those who specified "other" treatment sources mentioned: a methadone clinic for heroin addiction, a psychiatric hospital, prisons (several mentioned treatment in prison facilities), Red Door and YouthLink (public health clinics), a therapist, a city Health Department, a pastor, the Pacific Alliance to Stop Slavery (a Hawaii anti-trafficking organization), and the grandmother of a trafficker.

40. The Oxford Dictionary defines a pimp as "a man who controls prostitutes and arranges clients for them, taking a percentage of their earnings in return." Pimp Definition,

EX. 1 pg. 018

Vol 23, 2014                    Annals of Health Law                        78
HEALTH CONSEQUENCES OF SEX TRAFFICKING

their victims,[41] these points of contact with healthcare represent rare opportunities for victim identification and intervention.[42]   In addition, because of the hearsay exception in the Federal Rules of Evidence for statements made for medical treatment (regardless of whether the declarant testifies),[43] statements by victims to healthcare professionals should usually be admissible in a trafficking prosecution.[44]

   These opportunities have largely been missed as even those healthcare professionals who recognized that victims might have been "on the street" rarely understood that they had a pimp/trafficker.  Just over half (51.9%) of respondents who answered (N=81) said that at least some of the time the doctor knew they were "on the street," while the remaining respondents did not believe doctors were aware of their situations.  Almost half of survivors (43.1%) (N=58) said the doctor asked them something about their lives,[45] but only 19.5% of those who answered (N=41) reported that the doctor knew they had a pimp.[46]  At least two prior studies have demonstrated that medical care providers are woefully unprepared to identify trafficking

OXFORD DICTIONARIES, http://oxforddictionaries.com/definition/english/pimp?q=pimp (last visited Nov. 26, 2013).  These actions fall within the TVPA's definition of sex trafficking. 22 U.S.C. § 7102(10) (West, WestlawNext through P.L. 106-386) (defining sex trafficking as "the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act.").  Pimps are, therefore, one subset of traffickers.
   41.    See POLARIS PROJECT, DOMESTIC SEX TRAFFICKING: THE CRIMINAL OPERATIONS OF THE AMERICAN PIMP 5, available at http://www.polarisproject.org/resources/resources-by-topic/sex-trafficking (last visited Nov. 26, 2013).
   42.    See, e.g., Cole, supra note 21, at 466 (citing Jeffrey Barrows & Reginald Finger, Human Trafficking and the Healthcare Professional, 101 S. MED. J. 521 (2008)); WILLIAMSON, supra note 21, at 4.
   43.    FED. R. EVID. 803(4).  The exception permits the admission of statements that are "made for—and [are] reasonably pertinent to—medical diagnosis or treatment" and describe "past or present symptoms or sensations; their inception; or their general cause."  Id.
   44.    While such statements must be "made for . . . medical diagnosis or treatment" purposes, courts have construed this requirement in a manner favorable to sexual assault and rape victims, generally permitting the admission of statements that identify an abuser because the identity of an abuser is pertinent to diagnosis and treatment in sexually abusive contexts.  See, e.g., Morgan v. Foretich, 846 F.2d 941, 948-50 (4th Cir. 1988); U.S. v. Renville, 779 F.2d 430, 435-39 (8th Cir. 1988); U.S. v. George, 960 F.2d 97, 99-100 (9th Cir. 1992); U.S. v. Tome, 61 F.3d 1446, 1450 (10th Cir. 1995); U.S. v. Chaco, 801 F. Supp. 2d 1217, 1227 (D.N.M. 2011). This rationale would logically extend to the sex trafficking context as well, especially where the victim is a minor.
   45.    Several survivors noted in the margins of their surveys that they were unable to answer questions about their lives or situations honestly either because their pimp/trafficker was present or because they feared reprisal from their pimp.
   46.    Even these numbers may overstate trafficking awareness on the part of medical personnel. One respondent indicated that the physician who treated them had an established relationship with the pimp.  If other survivors said their doctors were aware they had a pimp because of similar situations, the awareness statistic would be skewed.

Case 2:22-cv-00223-Z   Document 1-2   Filed 11/18/22   Page 21 of 33   PageID 138

victims.[47]

As noted above, pregnancy, miscarriage, and abortion were all experienced by half or more of survivors who answered questions about them. Several other survivors said that they had hysterectomies or tubal ligations either during or after trafficking and another two survivors were sold specifically for sodomy in order to avoid pregnancy. Healthcare providers who specialize in these types of care are therefore particularly likely to have opportunities for identification and intervention. Clinics that perform abortions must be especially vigilant in efforts to recognize possible trafficking victims. Roughly two-thirds (67.6%) of survivors who specified a location (N=37) identified a clinic as the site of their abortion(s), far outpacing hospitals (16.2%) and other sites (13.5%). One survivor described her situation:

I got pregnant six times and had six abortions during this time. Several of them were from a doctor who was a client—he did them 'back door'—I came in the back door after hours and paid him off the books. This kept my name off any records.… I think he felt like he was helping. At least one of my abortions was from Planned Parenthood because they didn't ask any questions. But they were expensive and on the street you didn't want to pay $250, $300, or more. So you went 'back door' where the charge was more like $150. I had so much scar tissue from these abortions because there was no follow-up and in a couple of cases I had bad infections, so bad that I eventually lost my fallopian tubes [and had to have a hysterectomy].[48]

Table 7. Where Sex Trafficking Victims Sought Abortions

| Where abortions were performed | % Identifying site (N=37) |
| --- | --- |
| Clinic | 67.6% |
| Hospital | 16.2% |
| Other[49] | 13.5% |
| Different sites at different times | 2.7% |

---

47. See J.C. Wong et al., Human Trafficking: An Evaluation of Canadian Medical Students' Awareness and Attitudes, 24 EDUC. FOR HEALTH 1, 3-5 (2011); Makini Chisolm-Straker & Lynne Richardson, Assessment of Emergency Department (ED) Provider Knowledge About Human Trafficking Victims in the ED, 14 ACAD. EMERGENCY MED. (5 SUPPL. 1) S134 (2007), http://onlinelibrary.wiley.com/doi/10.1197/j.aem.2007.03.704/pdf.

48. The abortions were arranged by a series of sex traffickers, not by the victim herself.

49. Those who specified the "other" site of their abortion mentioned an abortionist's home, doctor's offices (including an OB/GYN), and an Arkansas back alley.

Case 2:22-cv-00223-Z   Document 1-2   Filed 11/18/22   Page 22 of 33   PageID 139

Survivors also interacted with medical professionals for purposes of obtaining birth control.  A large majority (80.9%) of those who answered the question (N=73) indicated that they had used some form of birth control for some portion of their time being trafficked.  Of those who specified where they obtained the birth control (N=59), approximately half (51.7%) said they had obtained it from a doctor or clinic.  More than half (65.2%) of respondents said that they went alone to the doctor or other source where they obtained birth control.  Together, these responses indicate that a significant number of trafficking victims see healthcare providers (especially clinics and doctors) to obtain birth control without trafficker supervision, suggesting that medical staff have a rare opportunity to communicate one-on-one with victims.[50]

Table 8. Type of Birth Control Utilized During Sex Trafficking

| Birth Control Type[51] | % Reporting Usage (N=59) |
|---|---|
| Condoms | 52.5% |
| Multiple Types | 22.0% |
| Depo-Provera | 11.9% |
| Birth Control Pill | 10.2% |
| IUD | 3.4% |

## VI.   RECOMMENDATIONS

### A. General Awareness: Common Symptoms and Warning Signs

Medical professionals must be made aware of critical signals for identifying trafficking victims.  An important part of this training should be to help the health care professional understand the coercive dynamic of trafficking, especially the extreme degree of control exercised by traffickers, and the prevalence of this criminal exploitation of women and girls.  Setting up internal protocols, procedures and regulations can further

---

50.    While condoms (readily available in non-medical settings) were the most common form of birth control, nearly half of survivors (47.5%) used another type of birth control instead of or in addition to condoms.  Thus, requests for birth control by noticeably young girls who also show signs of injury or abuse could be viable warning signals of a possible trafficking situation for medical professionals.

51.    In addition to the contraceptive forms of birth control listed here, 25% of survivors who answered (N=60) reported use of the "morning-after pill."

Lederer and Wetzel: The Health Consequences of Sex Trafficking and Their Implications

these goals and assist medical care providers in their vital role as identifiers of trafficking victims.

Based on the reported symptoms of survivors, a number of particularly widespread health-related consequences of trafficking should serve as warning signs to medical professionals. The most suggestive physical symptoms are injuries from physical violence, since this was a nearly universal experience for the survivors in the study. Signs of being kicked, punched, or beaten, all of which at least two thirds of respondents reported, should be a major "red flag" along with any signs of forced sex (reported by 81.6%), and head or facial injuries (each reported by more than half of survivors). While these may also be signals of domestic violence, their presence in patients seeking multiple abortions or treatment for sexually transmitted or serious communicable diseases may help healthcare providers to distinguish possible sex trafficking situations. Indications of extreme forms of violence (such as strangulation, stabbing, cigarette burns or gunshot wounds) also may be important clues for identification since these would have far fewer alternate explanations. One researcher notes that tattoos identifying the victim as the "property" of a particular trafficker could also alert care providers,[52] though these may be difficult to recognize.

In addition, those psychological symptoms that were particularly common among trafficking victims should be useful warning signs. Depression was the most common symptom for survivors (88.7%) and anxiety, irritability, nightmares, low self-esteem, and feelings of shame/guilt were all reported by more than 70% of survivors as well. The combination of these symptoms should therefore arouse suspicion when displayed by patients who repeatedly require reproductive health services, when an older or controlling male figure is present with the patient, and when the patient also presents signs of physical abuse. The well-documented rates of PTSD in trafficking victims,[53] (54.7% of survivors in this study) make it another important clue to identifying trafficking victims. Indications of attempted or repeated self-harm would likewise be a reason for considering trafficking as a possibility in these context, since 46.2% of respondents reported suicide ideation and 41.5% had attempted suicide.

The presence of sexually transmitted diseases or infections is another major identifier because nearly two-thirds (67.3%) of survivors reported having at least one such disease. Multiple or serial cases of such diseases or

---

52.    Reena Isaac et al., *Health Care Providers' Training Needs Related to Human Trafficking: Maximizing the Opportunity to Screen and Intervene*, 2 J. APPLIED RES. ON CHILD 1, 10 (2011).

53.    See, e.g., Farley & Barkan, supra note 27, at 42 (reporting that 68% of victims met criteria for PTSD and 76% met criteria for partial PTSD).

EX. 1 pg. 022

Case 2:22-cv-00223-Z   Document 1-2   Filed 11/18/22   Page 24 of 33   PageID 141

infections is a particularly strong signal that should immediately raise the possibility of a trafficking situation in the minds of healthcare providers. Because of the overwhelming rate of substance abuse (84.3%) that survivors reported, signs of alcohol and/or drug abuse could also be a significant warning sign when observed in patients who require reproductive health services at a young age, appear to be controlled by another person, or also exhibit the physical and psychological symptoms detailed above.

Clinics and other abortion providers should be especially attentive to warning signs particularly with regard to younger patients. Multiple abortions and evidence of coercion (such as the presence of a significantly older or controlling "boyfriend," or the physical and psychological symptoms discussed above) in these patients should prompt the healthcare provider to seek more information about the patient's situation. More than half (52.9%) of survivors (N=34) indicated that at least one abortion was partly or wholly forced on them, making this concern especially grave.

These warning signs are not intended to be exhaustive or authoritative, but they build on and refine the suggestions of prior research.[54] To be sure, there are myriad other physical and psychological symptoms that could alert medical staff to the possibility that a patient is a victim of trafficking and many other contexts in which victims seek medical services. Nonetheless, the symptoms and service contexts most mentioned by survivors should prove particularly relevant to the problem of victim identification by medical professionals and may also lead to conversations that could later assist prosecutors because of their likely admissibility under the Federal Rules of Evidence.

### B. Protocols for Identifying Victims and Catalyzing Rescues

Interaction between medical care providers and victims is an extraordinarily delicate situation. Because some victims may come alone, the health provider has an opportunity, if trust level and other considerations allow, to ask questions about the possible victim's situation and to provide her with resources like contact information for rescue and other services. Existing literature and this study both provide some guidance for carefully making the most of these opportunities.

---

54.     See, e.g., Isaac et al., supra note 52, at 9-10; T.K. Logan et al., Understanding Human Trafficking in the United States, 10 VIOLENCE, TRAUMA, & ABUSE 3, 19-20 (2009); Jeffrey Barrows & Reginald Finger, Human Trafficking and the Healthcare Professional, 101 S. MED. J., 521, 522-23 (2008); Cole, supra note 21, at 468; Patricia A. Crane & Melissa Moreno, Human Trafficking: What is the Role of Health Care Provider?, 2 J. APPLIED RES. ON CHILD 1, 6-7 (2011).

Lederer and Wetzel: The Health Consequences of Sex Trafficking and Their Implications

Building trust with possible victims is a critical first step and requires patience and cultural sensitivity on the part of medical professionals:

> Building trust with trafficking victims may be a slow process and requires patience and determination.  Taking the time to build rapport is critical. . . .  The [health care provider] must have the humility to accept and acknowledge that there may be much about the victim's culture they do not understand, and that the impact of such taboos may be significant in that culture. Many small steps are needed to build trust, such as open-ended questions, few interruptions, and a private area to talk.  Often more than one visit is needed, and the victim may need to be told to return to the clinic to reevaluate a health care issue when the HCP strongly suspects trafficking and further assessment and questioning is desired to get a patient to open up.  Messages for the HCP to convey in private with a suspected victim include a focus on safety, getting healthy, and that the victim's welfare is the highest priority.[55]

Because traffickers often accompany victims to treatment and their presence may prevent truthful answers, victims should be interviewed in private if at all possible.[56]  Separation should be done discreetly,[57] perhaps by requesting that the male figure assist with paperwork or remain in the waiting room while staff obtain specimens.[58]

Asking directly whether the patient is a victim of trafficking may be meaningless and directly asking about the most traumatic aspects of trafficking is also "ill-advised."[59]  Rather, a serious of "sensitive probing questions" can help uncover or unpack the underlying trafficking situation. For example, the health care sector can borrow from the law profession. Legal aid attorneys working on custody cases noted that when gathering the facts about an abusive husband or boyfriend to help a client gain custody of her child, facts patterns emerged that made it clear that the client was a victim of sex trafficking.  The victim did not come through the door self-identifying as a trafficking victim, but slowly over the course of conversation, understood her victimization and was able to seek help from law enforcement to emerge from the trafficking situation.  Gradually working with the victim's identifiable health problems to elicit important facts about their over-arching situation is likely to be most effective and

---

55.   Crane & Moreno, supra note 54, at 7-8.
56.   Id. at 9.
57.   Cole, supra note 21, at 467.
58.   Crane & Moreno, supra note 54, at 9.
59.   Id.

Annals of Health Law, Vol. 23 [2014], Iss. 1, Art. 5

least intrusive.[60]

Additionally, where a translator is needed, care needs to be taken to identify someone the right translator to avoid the possibility of complicity with a trafficker.[61]  Especially in tight-knit communities, that someone unconnected translates is critical.   In addition, other language considerations are key to creating trust and communication.  Using informal language (sometimes even slang) rather than formal or clinical terminology may improve communication with victims, bridging conceptual or definitional gaps about trafficking generally, as well as with specific issues like violence and rape.  Specific suggested questions include asking about the patient's freedom to contact family and friends, her eating and sleeping conditions (whether basic needs are being met), her ability to come and go freely, who lives with her, and whether she feels happy and cared for.[62]  Sometimes it is possible for the provider to ask direct and specific questions about whether the patient has been drugged, raped, coerced, or hurt and get honest answers.

Regardless of the patient's comfort level and degree of cooperation, if a provider strongly suspects the patient is a victim of sex trafficking, he (or she) should call the National Trafficking Hotline.[63]  Calls can be made anonymously if necessary.   Providers need to have strategies and preparation for how to address potential sex trafficking cases, including coordination with law enforcement and with local NGO service providers.[64]  Healthcare providers can play a crucial role in the trafficking rescue process by identifying possible victims and following up on those suspicions with careful, strategic questions, and actions that catalyze rescues or help create exit strategies.

### B. Regulations: Training for Healthcare Professionals and Hotline Posting Requirements

Legislators and policymakers also have an important role to play in increasing health care providers' recognition and identification of trafficking victims.  State legislators should draft and pass laws that require healthcare providers to undergo training on trafficking generally, including the basic warning signs and indicators for victim identification, techniques

---

60.    Id.
61.    Id.; see also Barrows & Finger, supra note 54, at 522.
62.    Barrows & Finger, supra note 54, at 522; Crane & Moreno, supra note 54, at 10; and Logan et al., supra note 54, at 20.  Each of these sources provides a more complete list of suggested questions.
63.    Cole, supra note 21, at 467; Barrows & Finger, supra note 54, at 522.
64.    Cole, supra note 21, at 467.

Lederer and Wetzel: The Health Consequences of Sex Trafficking and Their Implications

for communicating effectively with possible victims to assess their situations and determine victim status, and appropriate actions to take when a victim is identified. The Obama administration has recognized the need for additional trafficking-related training for federal social service employees and law enforcement.[65] Likewise, medical professionals need training to recognize and appropriately respond to trafficking victims.

New Jersey recently adopted a statute that may serve as a baseline model for such training requirements. Under the new law, the New Jersey Department of Health will "develop, approve, and provide for a one-time training course on the handling and response procedures of suspected human trafficking activities for employees of every licensed health care facility."[66] In order to maintain their licenses, health care facilities must verify completion of the course by a subset of its employees to be defined by regulation.[67] Other states should follow New Jersey's lead by making trafficking-related training a requirement for licensing with a comprehensive definition of the facilities affected.[68] Additionally, other states can build on the New Jersey statute by providing for ongoing trainings,[69] expanding the scope of training to include recognition of victims as well as protocols for handling and response of potential victims, and by requiring that all employees participate in the training course.

Another measure that can be instituted is to require that medical facilities post information about the National Human Trafficking Resource Center

---

65. PRESIDENT'S INTERAGENCY TASK FORCE TO MONITOR AND COMBAT TRAFFICKING IN PERSONS, COORDINATION, COLLABORATION, CAPACITY: FEDERAL STRATEGIC ACTION PLAN ON SERVICES FOR VICTIMS OF HUMAN TRAFFICKING IN THE UNITED STATES 25-26 (2013), available at http://www.ncdsv.org/images/HHS-DHS-DOJ_FederalStrategicActionPlanOn ServiceForVictimsOfHumanTrafficking_4-2013.pdf.

66. N.J. STAT. ANN. § 2C:13-12(c)(1) (West, WestlawNext through L.2013, c. 169 and J.R. No. 13). Alternatively, the statute permits the state to approve an existing training course provided by a statewide nonprofit group with experience administering similar trainings. Id.

67. Id.

68. See id. (defining "health care facility" as a "facility or institution whether public or private, engaged principally in providing services for health maintenance organizations, diagnosis, or treatment of human disease, pain, injury, deformity, or physical condition," including, inter alia, hospitals, mental hospitals, maternity hospitals, outpatient clinics, diagnostic centers, and treatment centers).

69. One option in states that require Continuing Medical Education (CME) courses would be to institute a trafficking-related CME requirement. For example, the Florida Medical Association offers a CME course comparing domestic violence with human trafficking and training employees to recognize and respond to both. See Fla. Med. Ass'n, Domestic Violence with a Special Focus on Human Trafficking, http://flmedical.in reachce.com/ (follow "public health" hyperlink; then follow "Domestic Violence with a Special Focus on Human Trafficking" hyperlink) (last visited Nov. 26, 2013).

Annals of Health Law, Vol. 23 [2014], Iss. 1, Art. 5

Vol 23, 2014                    Annals of Health Law                    86
HEALTH CONSEQUENCES OF SEX TRAFFICKING

Hotline, a toll-free phone number that connects callers to law enforcement as well as other services[70]  An earlier proposed version of the 2013 TVPRA would have required the Secretary of Health and Human Services and the Attorney General to "make reasonable efforts to encourage [s]tates to adopt legislation" that requires posting of information about the hotline at a variety of establishments, including hospitals and urgent care centers.[71] Measures like this in future federal legislation could be a catalyst to state-level posting requirements.  Posting laws improve victim access to the hotline and could even spur otherwise hesitant victims to share their situation with medical staff.  In fact, California[72] and Georgia[73] have already adopted posting laws.  Other states should follow suit and expand the range of medical facilities covered by the statutes to include abortion and women's health clinics.[74]  Some survivors have that while posting laws and brochures are important, even better (or in addition) is a small business card with the hotline number as well as shelter and rescue information on it. A business card can be slipped into a handbag or even a shoe and concealed for use later on.

Finally, both federal and state governments must commit to providing resources to aid survivors of sex trafficking regardless of age.  Although the Violence Against Women Reauthorization Act of 2013 provided significant resources for the care of trafficking victims, it only targeted these resources at victims who are minors.[75]  These resources need to be extended to cover adult trafficking victims and adult survivors, as their physical and mental health needs are just as great as those of minor sex trafficking victims. Federal and state funding of medical care and other related survivor needs should recognize this reality by eliminating age-based restrictions on funding.

---

70.    Posting the National Human Trafficking Resource Center Hotline, POLARIS PROJECT, http://www.polarisproject.org/what-we-do/policy-advocacy/capacity-building/posting-the-national-human-trafficking-resource-center-hotline (last visited Nov. 26, 2013).  This page of the Polaris Project website also provides model language for state-level posting legislation.

71.    H.R. 898, 113th Cong. § 224(c)(1)-(3) (2013).

72.    CAL. CIV. CODE § 52.6 (West, WestlawNext through Ch. 800 of 2013 Reg. Sess., 2013-2014 1st Ex. Sess. Laws, and Res. Ch 123).

73.    GA. CODE ANN. § 16-5-47 (West, WestlawNext through the end of the 2013 Regular Session).

74.    For additional public policy recommendations and more detail on state training and posting requirements, see Laura J. Lederer & Ashley Johnson, Healthcare Professionals' Role in Combating Human Trafficking (Aug. 2, 2013) (unpublished manuscript) (on file with authors).

75.    Violence Against Women Reauthorization Act of 2013, Pub. L. 113-4, 127 Stat. 136, 136-160 (2013) (codified in various sections of the U.S.C.).

Case 2:22-cv-00223-Z   Document 1-2   Filed 11/18/22   Page 29 of 33   PageID 146

## VII. CONCLUSION

Victims of sex trafficking suffer severe physical and psychological health consequences as a result of their trafficking. Victims frequently have contact with medical professionals in a variety of health care settings, including hospital emergency wards, neighborhood clinics, women's health clinics, and Planned Parenthood clinics, as well as private practices. Violence-related injuries, serious illness or disease, pregnancy, birth control, and abortion, substance abuse, addiction and overdose, as well as serious psychological problems, are all reasons why substantial numbers of victims seek treatment.

Because they are "first responders" health care providers have unique opportunities to intervene on behalf of trafficking victims. Health care institutions must develop protocols for training, identifying, and treating sex trafficking victims. Medical personnel must increase efforts to understand the nature and scope of the problem of sex trafficking in the United States in order to improve their capacity to identify victims. This is especially true when they have the ability to speak privately with victims in a context where their statements may be admissible in a later prosecution of their traffickers. To this end, medical staff, particularly in hospital emergency rooms and local clinics should be alert for the most common physical and psychological conditions and symptoms these victims experience, especially in the context of reproductive health. By doing so, the medical community can play a vital role in the ongoing fight to eliminate modern-day slavery.

EX. 1 pg. 028

Case 2:22-cv-00223-Z   Document 1-2   Filed 11/18/22   Page 30 of 33   PageID 147

# Appendix – Sample Completed Survey



Vol 23, 2014                    Annals of Health Law                    89
                    HEALTH CONSEQUENCES OF SEX TRAFFICKING



For the above listed health issues, where did you receive treatment?

Hospital/ER
Urgent Care Clinic
Neighborhood Clinic
Planned Parenthood
Women's Health Clinic
General Doctor
On-site Doctor
Other: Dr. my pimp knews

Did the doctor, nurse, health provider know you were "on the street"?
yes

If yes, did the doctor, nurse, health provider ask you anything about your life?
no

If yes, and if you had a pimp, did the health care provider know you had a pimp?
yes - only the one private Dr,

Not the health clinics- but they never
asked.

Please be aware of cultural and religious differences when administering the questionnaire

Annals of Health Law, Vol. 23 [2014], Iss. 1, Art. 5

Vol 23, 2014            Annals of Health Law                    90
              HEALTH CONSEQUENCES OF SEX TRAFFICKING

**If you circled birth control, pregnancy, miscarriage, morning after pill or abortion, please answer the following questions:**

How long were you on birth control while being trafficked?

*Never*

What kind of birth control did you use? (Condoms, Depo-Provera, Diaphragm, BCP)

*Sponge*

Who gave you the birth control? (Trafficker, doctor, clinic worker)

*I bought-*

Who took you to the clinic, doctor, or hospital where you received birth control?

How many pregnancies did you have while being trafficked?

*1 in the life / but 8 pregnancies*

Who fathered the child/children? (Male sexual buyer, boyfriend, pimp, trafficker)

How many children did you give birth to?

*two*

Where was each child delivered? (Hospital, clinic, on-site)

Do you have custody of your child?

*yes*

How many miscarriages did you have?

*1*

Were you given the morning after pill? Who supplied the drug?

*Dr. three times - not for sure if I was pregnant.*

How many abortions did you have?

*6*

At what term in your pregnancy did you have an abortion?

*1st term - everytime*

Was the abortion of your own volition or forced upon you?

*experienced both - lack of options to raise a baby*

If you had an abortion, where was the abortion performed? (Hospital, clinic, on-site)

*Dr. office - clinics*

Please be aware of cultural and religious differences when administering the questionnaire.

Lederer and Wetzel: The Health Consequences of Sex Trafficking and Their Implications

Vol 23, 2014        Annals of Health Law        91
HEALTH CONSEQUENCES OF SEX TRAFFICKING

**Health Issues Post-Trafficking: (Please circle all that apply to you)**



* Neurological symptoms
  - Headaches or migraines
  - Dizziness
  - Fainting
  - Hearing problems
  - Memory problems
  - Insomnia
  - Poor concentration
  - Nerve damage
* Gastrointestinal symptoms
  - Stomach/Abdominal pain
  - Indigestion
  - Ulcers
  - Nausea/Vomiting
  - Diarrheal disease
* Respiratory symptoms
  - Shortness of breath
  - Bronchitis
  - Pneumonia
  - Cold/flu symptoms
  - Asthma
  - Tuberculosis
* Cardiovascular symptoms
  - Rapid or irregular heartbeat
  - Chest pain
  - Breathing difficulty
* Dermatological
  - Rashes
  - Lice
  - Scabies
  - Chicken pox
  - Impetigo
  - Shingles
* Psychological symptoms
  - Depression
  - Anxiety
  - Panic attacks
  - Helplessness
  - Identity
  - Irritability
  - Flashbacks
  - Nightmares
  - Hyper-alertness

* Withdrawal/Isolation
* Frequent crying
* Low self-esteem
* Shame/Guilt
* Acute stress disorder
* Bipolar
* Delusions of Parasitosis (believe infected with parasites)
* Physical hyper-alertness
* Depersonalization disorder
* Multiple personality disorder
* Borderline personality disorder
* Somatization
* Paranoid ideation
* Dissociation
* Identity problems
* Relational problems
* Suicide ideation
* Attempted suicide
* PTSD
* Phobias: *people's motives*
* Oral health
  - Gingival disease
  - Decayed teeth
  - Abscesses
  - Throat trauma
  - Tooth loss
* General health symptoms
  - Sore throat
  - Body chills
  - Night sweats
  - Hearing loss
  - Vision problems
  - Severe weight loss
  - Malnutrition
  - Loss of appetite
  - Eating disorders
  - Poor hygiene
  - Anemia
  - Chronic fatigue
* General body pains
  - Joint pain

* Back pain
* Neck pain
* Arthritis
* Swelling of limbs
* Pain/numbness in hands/feet
* Diseases
  - Diabetes
  - Heart disease
  - Cancer
* Sexual diseases
  - STD/STI: T. vaginalis;
    N. gonorrhea; Syphilis;
    Chlamydia trachomatis;
    Genital herpes;
    Candidiasis;
    Other: _____
  - HPV
  - Hepatitis C
  - HIV/AIDS
* Substance abuse
  - Alcohol
  - Drugs: Marijuana; Cocaine;
    Crack Cocaine;
    Heroine; PCP; Ecstasy;
    Other: _____
  - Injecting drug use
  - Overdose
* Gynecological/Reproductive
  - Vaginal discharge
  - Vaginal bleeding
  - Cervical/vaginal infection
  - Urinary tract infection
  - Bladder inflammation
  - Pelvic inflammatory disease
  - Pelvic pain
  - Vaginal pain
  - Pain during sex
  - Infertility
  - Birth control
  - Pregnancy
  - Miscarriage
  - Morning after pill
  - Abortion

Please be aware of cultural and religious differences when administering the questionnaire