# Exhibit 4

Declaration of Dr. Donna Harrison

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients,<br>　　　　Plaintiffs,<br><br>v.<br><br>**U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA**, in his official capacity as Secretary, U.S. Department of Health and Human Services,<br>　　　　Defendants. | Case No. _____ |

1

## DECLARATION OF DR. DONNA HARRISON

I, Donna Harrison, a citizen of the United States of America and a resident of Berrien Center, Michigan, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.
2. I am a board-certified obstetrician and gynecologist.
3. I received my medical degree from the University of Michigan and completed my residency at a University of Michigan affiliate hospital, St. Joseph Mercy Hospital.
4. I am a diplomate of the American Board of Obstetrics and Gynecology.
5. I serve as the Chief Executive Officer of Plaintiff American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG).
6. I also serve as the President of Plaintiff Alliance for Hippocratic Medicine (AHM).
7. I am familiar with AAPLOG, its members, their fields of practice, and AAPLOG's policies and positions, including as set forth in the complaint, which I have reviewed.
8. AAPLOG is the largest organization of pro-life obstetricians and gynecologists ("OB/Gyns") in the world and is headquartered in Indiana. AAPLOG includes OB/Gyns and other physicians, with more than 7,000 medical professionals nationwide and more than 300 members in Texas.

2

AAPLOG members oppose elective abortion and are committed to the care and well-being of their patients including both pregnant women and their unborn children. AAPLOG members are concerned about the adverse impacts of chemical abortion on their practice of medicine.

9. AAPLOG's mission includes advocating on behalf of its members, including in litigation.

10. AAPLOG sues in this case on behalf of itself and its members.

11. I am also familiar with AHM, its members, their members' fields of practice, and AHM's policies and positions, including as set forth in the complaint, which I have reviewed.

12. AHM is a nonprofit organization that upholds and promotes the fundamental principles of Hippocratic medicine. AHM is incorporated in the State of Texas and has its registered agent in Amarillo, Texas.

13. AHM's members include the membership of the American Association of Pro-Life Obstetricians and Gynecologists, American College of Pediatricians, Catholic Medical Association, Christian Medical and Dental Associations, and Coptic Medical Association of North America. In opposing chemical abortion, AHM's members are concerned about the safety and well-being of pregnant women and girls, their preborn children, and chemical abortion's adverse impacts on the practice of medicine.

14. AHM sues in this case on behalf of itself and its members.

15. I am familiar with chemical abortion drugs, their use, and the complications that accompany chemical abortion.

16. As part of my duties and responsibilities at AAPLOG, I have authored several studies on the approval of mifepristone as an abortifacient. Among these, I co-authored two studies with other physicians and scholars examining the adverse events associated with the use of mifepristone. Our studies of the real-world use of mifepristone concluded that significant morbidity and mortality have occurred following the use of mifepristone as an abortifacient. We recommended that a pre-abortion ultrasound should be required to rule out ectopic pregnancy and confirm the gestational age of the unborn child. We concluded that the FDA's adverse event reporting system is grossly inadequate to evaluate real-world complications and significantly underestimates adverse events from mifepristone. One major reason that the FAERS database does not reflect real world complications is that FDA only required the manufacturer to report complications, and the manufacturer in turn obtains data from the abortionists. However, as our studies of the FAERs database indicate, most complications are not handled by the abortion provider, but rather by the Emergency Department, and the Emergency Department physician has no knowledge of the reporting process or obligation to report those complications to the manufacturer or to the FDA. *See* Kathi Aultman, et al., *Deaths and Severe Adverse Events After the Use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 36

Issues L. Med. 3 (2021), https://pubmed.ncbi.nlm.nih.gov/33939340/; Margaret M. Gary & Donna J. Harrison, *Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient*, 40 Ann. Pharmacother. 171 (2006), https://pubmed.ncbi.nlm.nih.gov/16380436/.

17. In addition, as part of my duties and responsibilities at AAPLOG, I co-authored a paper comparing the published complications after use of mifepristone from Planned Parenthood in 2009 and 2010 and compared those numbers to the complications in the FDA Adverse Event Reporting System for the same time period. We found that Cleland identified 1,530 Planned Parenthood mifepristone cases with specific adverse events (AEs) for 2009 and 2010. For this period, FAERS online dashboard includes a total (from all providers) of only 664, and the FDA released only 330 adverse event reports (AERs) through Freedom of Information Act (FOIA) requests. Cleland identified 1,158 ongoing pregnancies in 2009 and 2010. FAERS dashboard contains only 95, and only 39 were released via FOIA requests. We concluded that there are significant discrepancies in the total number of AERs and specific AEs for 2009 and 2010 mifepristone abortions reported in 1) Cleland's documentation of Planned Parenthood AEs, 2) FAERS dashboard, and 3) AERs provided through FOIA. These discrepancies render FAERS inadequate to evaluate the safety of mifepristone abortions. *See* Christina A Cirucci, et al., *Mifepristone Adverse Events Identified by Planned Parenthood in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting*

*System and Those Obtained Through the Freedom of Information Act*, 8 Health Servs. Rsch. & Managerial Epidemiol. 23333928211068919 (2021), https://pubmed.ncbi.nlm.nih.gov/34993274/.

18. I also co-authored a study looking at the real-world effects of the FDA Approval of Mifeprex on Emergency Room utilization after Mifeprex abortions. The massive increased utilization of Emergency Departments to manage abortion complications is a predictable consequence of the FDA's failure to require the same qualifications of Mifeprex abortion providers as were mirrored in the clinical trial for Mifeprex approval.

19. Because the FDA abandoned the post marketing requirement that abortion providers have admitting privileges to handle their own complications and allowed abortion providers who lack the ability to handle complications to dispense Mifeprex, the predictable consequence is the explosion of Mifeprex complications including hemorrhage, adding to the current shortage of blood and blood products across the United States. *See* James Studnicki, et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999-2015*, 8 Health Servs. Rsch. & Managerial Epidemiol. 23333928211053965 (2021), https://pubmed.ncbi.nlm.nih.gov/34778493/.

20. I am familiar with the FDA's regulation of chemical abortion drugs, including mifepristone and misoprostol. As part of my duties and responsibilities at AAPLOG, I co-authored the original 2002 Citizen Petition and the 2019

Citizen Petition filed by AAPLOG and others to challenge the FDA's actions on chemical abortion drugs. As part of my duties and responsibilities at AAPLOG, I also co-authored a study detailing the aberrancies of the FDA Approval process as it affects real-world patients. *See* Byron C. Calhoun & Donna J. Harrison, *Challenges to the FDA Approval of Mifepristone*, 38 Ann. Pharmacother. 163 (2004), https://pubmed.ncbi.nlm.nih.gov/14742814/.

21. In a chemical abortion, women take mifepristone to terminate the pregnancy by killing the preborn child. Women then take misoprostol to expel all pregnancy tissues, including the preborn child, through contractions and cramping.

22. Women who take chemical abortion drugs experience more complications than those who have surgical abortions.

23. There are many intense side effects for women who take chemical abortion drugs, including cramping and heavy bleeding.

24. Since the FDA's 2000 Approval of Mifeprex (the chemical abortion drug regimen consisting of mifepristone and misoprostol), medical professionals have needed to treat women and girls who have suffered from chemical abortion and experienced complications.

25. Mifepristone and misoprostol are serious drugs that should not be administered without medical supervision. The FDA's actions to eliminate the necessary supervision of these drugs harm women and obstetrics professionals, including AHM, AAPLOG, and their members.

26. Since the FDA's 2016 Major Changes to eliminate safeguards for the use of Mifeprex, AAPLOG members have needed to treat an increasing rate of women and girls who suffer complications from chemical abortion.

27. The increase in the frequency of complications harms medical providers—including AHM and AAPLOG members—because they end up managing the increase in complications.

28. When women suffer complications from chemical abortions, it can overwhelm the medical system and consume crucial limited medical resources, including blood for transfusions, physician time and attention, space in hospital and medical centers, and other equipment and medicines.

29. The increased occurrence of complications related to chemical abortions also multiplies the workload of healthcare providers, including AHM and AAPLOG members, in some cases by astronomical amounts. This is especially true in maternity care "deserts" (i.e., geographic areas where there are not a large number of OB/Gyn providers for patients).

30. For OB/Gyn professionals, the increase in complications due to increased use of chemical abortion drugs means that the typical care given to patients goes from simple patient management to complicated patient management. Patients who suffer complications from chemical abortions require significantly more time and attention from providers than the typical OB/Gyn patient requires.

31. In my experience, many patients do not fully understand the nature of chemical abortion or the risks that these drugs present to them. This results in an increase in the frequency of women seeking emergency medical care for side effects such as cramping, heavy bleeding, and severe pain even if they are not suffering an adverse event.

32. I understand that the FDA has removed the requirement for abortionists to report all adverse events for mifepristone.

33. Many doctors likely do not know about the need to report adverse events related to chemical abortion to the FDA. Similarly, many doctors likely do not know how to report adverse events. This means that complications handled by practitioners other than the abortionist are rarely reported to the FDA or the manufacturer.

34. I personally know of practitioners, including AAPLOG members, who have tried to report adverse events related to chemical abortion drugs to the FDA. The process is complicated, cumbersome, and time-consuming. The adverse event reporting requirements and the FAERS submission process harm medical practices by taking away significant time from a doctor to treat and meet with patients.

35. The FDA's decision not to require abortionists to report all adverse events for mifepristone harms women and girls because this deregulatory action creates an inaccurate and false safety profile for the use of mifepristone and misoprostol.

36. Without an accurate picture of the adverse effects of widespread chemical abortion drug use, physicians cannot effectively practice evidence-based medicine. If the FDA is not collecting the vast majority of adverse events to understand the true risk, healthcare providers cannot assess the risks of a particular course of treatment and inform their patients accordingly.

37. The inability of providers to adequately inform women of the known risks associated with chemical abortion drugs precludes women and girls from giving informed consent to taking these drugs. The lack of information also harms the patient-doctor relationship with all medical care providers because the patients no longer trust that their healthcare providers are telling the truth. This even harms organizations and practitioners who do not support or practice chemical abortion, including AHM, AAPLOG, and their members.

38. Due to inadequate adverse event reporting, the true rates of risks associated with chemical abortion drugs remain unknown and undercounted. This prevents AHM and AAPLOG from providing the public, their members, and their members' patients with accurate statistics and complete information regarding potential risks associated with the use of chemical abortion drugs.

39. The inability to share accurate information with member physicians, their patients, and the public on the risks of chemical abortion frustrates and complicates AHM's and AAPLOG's purpose to support women's health and to educate doctors, their patients, and the public about these dangers.

40. AHM and AAPLOG need to divert limited time, energy, and resources to compensate for this lack of information by conducting their own studies and analyses of the available data. This diversion of time, energy, and resources comes to the detriment of other advocacy and educational efforts of AHM and AAPLOG, including their efforts regarding the dangers of surgical abortion, the conscience rights of doctors, and the sanctity of life at all stages.

41. On behalf of AAPLOG and serving as the chairperson for AAPLOG's Subcommittee on Mifeprex, I submitted a Citizen Petition in 2002 challenging the FDA's approval of Mifeprex and requesting an audit of the Mifeprex clinical studies. AAPLOG, as an organization, is concerned about women's health issues and recognized that the FDA's violations of its standards and rules in approving Mifeprex put women's lives and health at risk. It took considerable time, energy, and resources to draft the 92-page petition and the 30-page response to comments letter, in addition to compiling and analyzing supporting sources and studies. This effort caused AAPLOG to divert limited time, energy, and resources from its other priorities and routine functions.

42. Similarly, AAPLOG submitted another Citizen Petition in 2019 challenging the FDA's 2016 major changes to the chemical abortion drug regimen, which I also co-authored. It also took considerable time, energy, and resources to draft the 26-page petition, in addition to compiling and analyzing supporting

sources and studies. This effort caused AAPLOG to divert limited time, energy, and resources from its other priorities and routine functions.

43. Because abortion activists continue to file their own citizen petitions and letters with the FDA asking the agency to eliminate all protections for women and girls who take chemical abortion drugs, and knowing the Biden administration's relentless, politicized efforts to push these drugs throughout the country, AHM and AAPLOG continue to expend considerable time, energy, and resources on its public advocacy and educational activities regarding chemical abortion drugs—to the detriment of other AHM and AAPLOG priorities and functions. This diversion of time, energy, and resources will not cease until the FDA's approval and deregulation of chemical abortion drugs ceases.

44. AHM and AAPLOG members are opposed to being forced to end the life of a human being in the womb for no medical reason. The objections are both ethical and medical as they stem from the purpose of medicine itself, which is to heal and not to electively kill human beings regardless of their location. The FDA's removal of REMS for safe use—which eliminates in-person evaluations and follow-up care—places our member doctors at increased risk of being forced to violate their conscience rights. The FDA's actions could force our members into a situation where they must render treatment to a woman in the emergency department suffering complications from chemical

abortion while she is still carrying a living fetus, and they must perform a D&C to treat her complications—ending the life of a human being.

Executed this November 11, 2022.

By: _____ MD.
Donna Harrison, M.D.