# Exhibit 8

Declaration of Dr. Ingrid Skop

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

**ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients,
    Plaintiffs,

v.

**U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services,
    Defendants.

Case No. _____

1

# DECLARATION OF DR. INGRID SKOP

I, Ingrid Skop, a citizen of the United States and a resident of San Antonio, Texas, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.

2. I am a board-certified obstetrician and gynecologist working for OB Hospitalist Group with privileges in the Baptist Hospital System.

3. I also serve as a Senior Fellow and Director of Medical Affairs at the Charlotte Lozier Institute.

4. I am a member of Plaintiff American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG), where I served as a member of the board from 2018-2020. I am also a member of the Christian Medical & Dental Associations.

5. I received my medical degree from Washington University School of Medicine in 1992 and completed my residency in obstetrics and gynecology at the University of Texas Health Sciences Center at San Antonio in 1996.

6. My current practice involves delivering babies and performing surgeries in a hospital setting as an obstetric hospitalist. In my prior 25-year career in a large single-specialty OB/GYN practice, I also provided clinic-based obstetric and gynecologic care to women and girls.

7. I have provided written and oral expert testimony about chemical abortion to several state legislatures and to the United States Congress.

8. I have also published the peer-reviewed articles "Chemical Abortion: Risks Posed by Changes in Supervision" and "Medical Abortion: What Physicians Need to Know" in the Journal of American Physicians and Surgeons.

9. The articles I published reflect the research I have performed on the risks associated with unsupervised chemical abortion—a practice that is becoming more common.

10. A chemical abortion includes providing patients with a combination of two drugs. One drug—mifepristone—blocks hormonal support, killing the unborn child, while the other—misoprostol—induces uterine contractions to expel the unborn child and the pregnancy tissue.

11. The drugs mifepristone and misoprostol may cause serious complications for the women and girls who take them.

12. In my practice, I often treat patients who are admitted through the hospital's emergency department with complications from chemical abortions.

13. In my practice, I have cared for several dozen women in the emergency department who were totally unprepared for the pain and bleeding they experienced due to chemical abortion.

14. In my experience caring for women who have gone through chemical abortion, the doctors who prescribed or administered chemical abortion drugs

to these women often did not adequately prepare them for the drugs' effects, so these women could not have truly achieved informed consent.

15. At least a dozen patients have expressed significant emotional distress to me when they viewed the body of their unborn child in the toilet after the chemical abortion.

16. I have treated patients who have experienced trauma and emotional distress because of complications from chemical abortion. Those women were not anticipating that complications were possible and likely did not have sufficient informed consent to proceed with chemical abortion.

17. In my practice, I have cared for at least a dozen women who have required surgery to remove retained pregnancy tissue after a chemical abortion. Sometimes this includes the embryo or fetus, and sometimes it is placental tissue that has not been completely expelled.

18. I have cared for approximately five women who, after a chemical abortion, have required admission for a blood transfusion or intravenous antibiotics or both.

19. Complications from chemical abortion are not uncommon. In fact, chemical abortions involve more complications than surgical abortions.

20. The FDA's actions in 2016 and 2021 have increased the frequency of complications from chemical abortion.

21. Given my experience, I expect to see and treat more patients presenting with complications from chemical abortion.

22. For example, in one month while covering the emergency room, my group practice admitted three women to the hospital. Of the three women admitted in one month due to chemical abortion complications, one required admission to the intensive care unit for sepsis and intravenous antibiotics, one required a blood transfusion for hemorrhage, and one required surgical completion for the retained products of conception (*i.e.*, the doctors had to surgically finish the abortion with a suction aspiration procedure).

23. In my office, I treated one young woman who had been bleeding for six weeks after she took the chemical abortions drugs given to her by a doctor at a Planned Parenthood clinic. After two follow-ups at Planned Parenthood, during which she was given additional misoprostol but not offered surgical completion, she presented to me for help. I performed a sonogram, identified a significant amount of pregnancy tissue remaining in her uterus, and performed a suction aspiration procedure to resolve her complication.

24. I have also cared for minor women below the age of 18 who have obtained chemical abortion drugs. Although mifepristone has not been studied specifically in minor women, the FDA has negligently allowed their provision to this special age group, assuming their response will be the same as adult women.

25. The FDA's actions deregulating mifepristone and expanding access to unsupervised chemical abortion harm women and their doctors, including me. Concerns about "unsafe, back-alley abortions" were used to overturn all

state abortion restrictions in 1973 and they are being recycled today to allow the abortion industry to continue perpetuating dangerous abortion methods. Yet, a clear-eyed look at the FDA's actions allowing unsupervised "mail-order abortions" shows that they are now promoting illegal, unsafe "chemical coat hangers" to the women they falsely say they want to protect.

26. The FDA's actions harm women, including my patients, because without proper oversight, chemical abortions can become even more dangerous than when they are supervised.

27. The FDA's actions harm women, including my patients, because clinics and physicians prescribing or dispensing chemical abortion drugs, or websites that provide these drugs through mail order delivery without any physician involvement, often underprepare women for the severity and risks of chemical abortion, and they often provide insufficient or no follow-up care to those women. Many women are inadequately prepared for the effects of the drugs, the severity of the pain and bleeding they will experience, the human tissue they will expel, and some are unaware that they have complicating factors such as ectopic implantation, more advanced gestation than estimated, and Rh-negative blood type. These patients are being abandoned because in many cases there is no doctor-patient relationship, so they often present to overwhelmed emergency rooms in their distress, where they are usually cared for by physicians other than the abortion prescriber.

28. Unsupervised chemical abortion—authorized by the FDA—harms women because they may have underestimated the gestational age of their unborn child. Women who should not be a candidate for chemical abortion because they are past the FDA-approved cutoff of ten weeks gestation may consume chemical abortion drugs, which will increase their chances of complications due to the increased amount of tissue, leading to hemorrhage, infection and/or the need for surgeries or other emergency care.

29. For example, approximately 2% of pregnancies are ectopic pregnancies, implanted outside of the uterine cavity. Chemical abortion drugs will not effectually end an ectopic pregnancy because they exert their effects on the uterus, which leaves women at risk of severe harm from hemorrhage due to tubal rupture, in need of emergent surgery or potentially at risk of death. Failure to perform an ultrasound prior to prescribing abortion drugs will cause some women to remain undiagnosed and at high risk for these adverse outcomes.

30. The FDA's removal of the reporting requirement for adverse events of mifepristone harms women by creating an inaccurate safety profile, and it harms my practice because it makes it more difficult to practice evidence-based medicine. The incidence of abortion-related complications remains unknown if there is no accurate system for data collection.

31. The FDA's actions also harm women because the lack of oversight will likely exacerbate human trafficking, which happens frequently in San Antonio. In

my practice, part of my care of my patients is ensuring that they are making medical decisions free of coercion. Many trafficked women experience unintended pregnancies and alert doctors serve as an important resource to intervene on behalf of women. Removing the in-person medical interaction removes an opportunity to identify and rescue these women. It also leaves them at risk of being coerced into an abortion they may not desire.

32. Deregulated chemical abortion harms my practice because it increases the number of women who come to the emergency department with complications. When I must perform surgery to deal with complications from chemical abortions, this takes attention away from my other patients. As a hospitalist, I am often supervising multiple laboring patients on labor and delivery. When I am called to the operating room to address an emergency resulting from chemical abortion, this necessarily means I may not be immediately available if an emergency should occur with one of my laboring patients.

33. Unsupervised chemical abortion is heartbreaking to me because it causes women to suffer unnecessarily, and my patients deserve quality medical care.

34. The FDA's expansion of chemical abortion also harms my conscience rights because it could force me to have to surgically finish an incomplete elective chemical abortion. I object to abortion because it ends a human life. My moral and ethical obligation to my patients is to promote human life and health.

But the FDA's actions may force me to end the life of a human being in the womb for no medical reason.

Executed this November 11, 2022.

By: _____
Ingrid Skop, MD