# Exhibit 9

Declaration of Dr. Nancy Wozniak

IN IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients, | Case No. _____ |
| Plaintiffs, | |
| v. | |
| **U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services, | |
| Defendants. | |

1

## DECLARATION OF DR. NANCY WOZNIAK

I, Nancy Wozniak, M.D., a citizen of the United States and a resident of Fishers, Indiana, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.

2. I am a board-certified obstetrician and gynecologist practicing in the greater Indianapolis area. My practice includes obstetrics at two Indianapolis-area hospitals.

3. I am a member of the Board of Directors of Plaintiff American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) and serve as AAPLOG's Secretary. I am familiar with AAPLOG, its policy positions, its members, the members' interests and concerns. AAPLOG and its members oppose elective abortions, both surgical and chemical.

4. I am familiar the approval of mifepristone and misoprostol as chemical abortion drugs by the U.S. Food and Drug Administration (FDA) and with the FDA's Risk Evaluation and Mitigation Strategy (REMS) for the use of mifepristone and misoprostol for chemical abortions.

5. A REMS is a drug safety program that the FDA can require for certain medications with serious safety concerns to help ensure the benefits of the medication outweigh its risks.

6. Under the REMS established by the FDA in 2016 for mifepristone and misoprostol, the agency eliminated (a) the in-person administration requirement, (b) mandatory post-abortion follow-ups, and (c) the requirement that prescribers report all adverse events except death.

7. In 2016, the FDA also expanded the gestational age for approved mifepristone use to 70 days (or 10 weeks) from 49 days (or 7 weeks).

8. The FDA's actions harm patients and practitioners like me.

9. Mifepristone and misoprostol are dangerous drugs that can harm women. Without the appropriate supervision, women taking these drugs are at risk of serious complications and even death in the worst cases.

10. I believe the FDA's expansion of the approved timeframe for mifepristone and misoprostol use to 10 weeks of gestation harms women. An abortionist should never prescribe these drugs to any woman for an abortion after 8 weeks' gestation because I have seen so many women get into trouble with bleeding past that gestational age.

11. Few people die from chemical abortions because of the excellent care they receive from OBGYN doctors, but the infrequency of deaths conceals the danger that these drugs pose to women and girls—especially when administered without proper supervision.

12. In my experience, most of the complications related to the use of mifepristone and misoprostol for chemical abortions result in "near misses" due to the timely intervention of healthcare providers.

3

13. Recently many states like Indiana have enacted laws to regulate abortions more carefully. To circumvent those laws, abortion providers are relying on increased access to chemical abortion drugs through mail-order schemes or telemedicine.

14. The increasing number of chemical abortions through mail-order or telemedicine methods means that more women will suffer complications from unsupervised use of mifepristone and misoprostol.

15. The risk of complications from chemical abortions is four to seven times greater than from surgical abortions.

16. Currently, many women are now being prescribed mifepristone and misoprostol without a sonogram to verify the gestational age of the unborn child or to rule out ectopic pregnancies or other potential complications.

17. Women have the potential to present to the emergency department with torrential bleeding due to taking mifepristone and misoprostol for a chemical abortion without accurate dating and appropriate supervision. This places enormous stress and pressure on physicians and OB/Gyns who work in hospitals.

18. In my observation, incidents of women presenting to emergency departments with complaints of bleeding are becoming increasingly more common.

19. Due to the FDA's elimination of the adverse event reporting requirements, however, it is impossible to know how frequently women and doctors are facing these complications.

20. The FDA's elimination of the adverse event reporting requirements for non-fatal complications harms doctors' ability to practice evidence-based medicine and to provide their patients about the risks of chemical abortion and obtain their informed consent. Doctors are only as good as the information that they receive.

21. These physicians must treat women in emergency situations without an existing relationship with the patient, without a known gestational age, and without any known medications that the patient may have been prescribed. This dynamic also increases doctors' exposure to allegations of malpractice and potential liability.

22. The FDA's loosening of regulations related to chemical abortions harms hospitalists by putting them in higher-risk situations with less critical information about patients, which increases their exposure to allegations of malpractice and potential liability.

23. In the last six months, I had an experience treating a woman that illustrates how dangerous and damaging the FDA's actions are to women and practitioners.

24. One of my patients, who was about nine weeks pregnant, had previously been treated by hospital staff for a pulmonary embolism with anti-coagulants. She was advised that she could not seek a chemical abortion because it was contraindicated due to the medications; yet the woman left the hospital and sought an abortion at Planned Parenthood of Indiana. The woman was given

mifepristone by the doctor at Planned Parenthood and took the drug. The woman called an Uber for a ride home from Planned Parenthood. The woman began to experience bleeding and other adverse side effects from the mifepristone. The woman's Uber driver did not take her home because she was so ill and instead brought her to the hospital's emergency department. At the hospital, the woman came under my care. The woman had not yet taken the second abortion drug, misoprostol. I treated the patient for the adverse effects she suffered and told her not to take the misoprostol given to her by Planned Parenthood because of the grave risk that she could bleed out and die. The woman had a subsequent ultrasound, which showed that her unborn child was still alive. I advised the internists treating this patient to avoid administering certain medications that could harm the patient and her unborn child.

25. This experience that I had illustrates one of many "near misses" where women and girls face potentially deadly situations, but they are saved by intervention at a hospital's emergency department.

26. Under the FDA's current reporting requirements, this experience need not be reported as an adverse event. I attempted to report this event to the Indiana Department of Public Health, but my report was rejected because the State said it was not a "true" adverse event because the patient ultimately recovered.

27. In my experience with the patient I just described, I spent a significant amount of time that day working to save her life from unnecessary complications due to the irresponsible administration and use of mifepristone and misoprostol. As a result of the significant time that I devoted to that patient, my time and attention was taken away from my other patients, who also need my care.

28. I also know that many women who are suffering complications from chemical abortions tell their doctors that they are experiencing miscarriages. This phenomenon—regardless of why it occurs—means that doctors cannot be certain of what their patients have taken or are experiencing. The lack of information makes it extremely difficult to provide proper treatment to these patients. This inaccurate information also means that the true number of incidences of complications from chemical abortions are significantly underreported or not fully known.

29. Given my experience, I expect to see and treat more patients presenting themselves with complications from chemical abortion.


Executed this November ⎣⎣, 2022.

By: _____

Nancy Goodwine-Wozniak, M.D.


7