# Exhibit 32

FDA, Center for Drug Evaluation and Research,
Summary Review of Application Number:
020687Orig1s020 (March 29, 2016)

(2016 Summary Review)

# CENTER FOR DRUG EVALUATION AND RESEARCH

## *APPLICATION NUMBER:*

# 020687Orig1s020

# <u>SUMMARY REVIEW</u>

Summary Review for Regulatory Action

| | |
|---|---|
| Date | March 29, 2016 |
| Subject | Summary Review |
| NDA #/Supplement # | 20687/S-020 |
| Applicant name | Danco Laboratories, LLC |
| Date of submission | May 28, 2015 |
| Date of submission receipt | May 29, 2015 |
| PDUFA goal date | March 29, 2016 |
| Proprietary name/established name | Mifeprex/mifepristone |
| Dosage form/strength | Oral tablet/200 mg |
| Dosage regimen | Mifeprex 200 mg tablet orally followed in 24-48 hours by 800 mcg buccal misoprostol |
| Proposed indication | Mifeprex is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation |
| Action | Approval |

1

EX. 32 pg. 02

1. **Introduction**
2. **Background**
3. **CMC**
4. **Nonclinical Pharmacology/Toxicology**
5. **Clinical Pharmacology**
6. **Clinical Microbiology**
7. **Efficacy/Statistics**
8. **Safety**
9. **Advisory Committee Meeting**
10. **Pediatrics**
11. **Other Relevant Regulatory Issues**
12. **Labeling**
13. **Decision/Action/Risk Benefit Assessment**

**1.  Introduction**

Danco Laboratories, LLC, referred to hereafter as the Applicant, submitted an efficacy supplement (S-020) to NDA 20687 for Mifeprex (mifepristone). The Applicant sought the following changes to its approved application:

1.            (b) (4)    Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally; see below:

   - Day One: Mifeprex Administration (oral)
     One 200 mg tablet of Mifeprex is taken in a single oral dose
   - After a 24-48 hour interval: Misoprostol Administration (buccal)(minimum 24-hour interval between Mifeprex and misoprostol)
     Four 200 mcg tablets (total dose: 800 mcg) of misoprostol are taken by the buccal route

2. Removal of the instruction that administration of misoprostol must be done in-clinic, to allow for administration at home or other location convenient for the woman
3. Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex
4. Follow-up, although still needed, not restricted to in clinic at 14 days after Mifeprex
5. Increase in the maximum gestational age from 49 days to 70 days
6. Change of the labeled time for expected expulsion of pregnancy from 4-24 hours to 2-24 hours post misoprostol administration
7. Addition that a repeat 800 mcg buccal dose of misoprostol may be used if needed
8. Change of "physician" to "healthcare provider" in the label and Risk Evaluation and Mitigation Strategies (REMS) document
9. Change in the indication statement to add reference to use of misoprostol: "Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of pregnancy through 70 days gestation."
10. Removal of references to "under Federal law" from the Prescriber's Agreement under the REMS

2

Reference ID: 3909594

11. Labeling changes addressing the pediatric requirements under the Pediatric Research Equity Act

This efficacy supplement submission includes information from published studies, review articles and additional information from the authors of some of the publications. These published studies evaluated reproductive age women in the U.S. and outside the U.S. who had early medical termination with mifepristone, in a regimen with misoprostol, including women up through 70 days of gestation.

This memorandum serves as the Division's decisional memorandum for the efficacy supplement.

## 2.  Background

The active ingredient of Mifeprex, mifepristone, is a progestin antagonist.  Mifeprex, in a regimen with misoprostol, is approved for the medical termination of pregnancy up through 49 days' gestation.  The approved dosing regimen is currently labeled as follows:

- Day 1: The patient takes three 200 mg tablets of Mifeprex in a single oral dose in the clinic, medical office, or hospital.
- Day 3: The patient returns to the clinic, medical office, or hospital and takes two 200 mcg tablets of misoprostol orally.
- Day 14: The patient returns for a follow-up visit to confirm that a complete termination has occurred.

At the time of the September, 2000 approval, FDA restricted distribution of Mifeprex under 21 CFR 314.520, requiring that Mifeprex be dispensed only by or under the supervision of a physician who meets certain qualifications.  With the passage of FDAAA in 2007, Mifeprex was deemed to have in effect an approved REMS. The Applicant submitted a formal REMS, which was approved on June 8, 2011 and consisted of the following: a Medication Guide, elements to assure safe use (ETASU A [special certification of healthcare providers who prescribe Mifeprex], ETASU C [dispensing only in certain healthcare settings], and ETASU D [safe use condition of a signed Patient Agreement]), an implementation system and a timetable for assessments. The goals of the REMS were 1) To provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug and 2) To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications. The REMS for Mifeprex incorporated the restrictions under which the drug was originally approved.

Since 2011, the Applicant has submitted two REMS assessment reports.  The Agency review of these reports determined that the REMS goals were being met and that no modifications were required to the REMS at that time.

3

FDA held a pre-NDA meeting with the Applicant on January 29, 2015, to discuss proposed labeling and REMS changes to be submitted in this efficacy supplement.  These changes were submitted with the efficacy supplement.

The Applicant submitted published literature and supportive information to support changes to the dose, dosing regimen, gestational age, revisions to labeling, modifications to the REMS document, and to address PREA requirements.  The Agency accepts the use of peer reviewed literature as primary data for an application under the framework of a 505(b)(2) application.

### 3.  CMC

No new CMC information was submitted with this efficacy supplement. The CMC team determined no additional review or inspections were required. The CMC team completed a review of the labeling and found the CMC sections of labeling (sections 3, 11 and 16) acceptable (See review dated March 29, 2016).  The CMC review team recommends approval of the efficacy supplement; refer also to the CMC review of the separate supplement proposing a single tablet blister pack for Mifeprex, dated January 11, 2016. There are no outstanding CMC issues or postmarketing commitments or requirements.

***Comment:*** *On March 10, 2016, a separate CMC supplement was approved that allowed the packaging of individual 200 mg tablets of mifepristone; previously packaging consisted of three 200 mg tablets per blister pack (a total of 600 mg Mifeprex as administered under the originally approved dosing regimen).*

### 4.  Nonclinical Pharmacology/Toxicology

No new nonclinical information was submitted in this supplement. The Pharmacology/Toxicology team revised labeling to conform to the Pregnancy and Lactation Labeling Rule.  There are no outstanding nonclinical issues.  The Pharmacology/Toxicology review team recommends approval of the efficacy supplement; refer to the Pharmacology/Toxicology review dated March 4, 2016.

### 5.  Clinical Pharmacology

The Applicant did not conduct any new clinical pharmacology studies pertaining to the proposed ⬛⬛ (b) (4) regimen, but provided information on pharmacokinetics (PK) of misoprostol following various routes of administration.   The PK of the 200 mg Mifeprex tablet has not been characterized in women, but data are available in men and were submitted in the original NDA.  The Clinical Pharmacology review team determined that the PK data were appropriate for inclusion in labeling.   Review of the labeling pertinent to the Clinical Pharmacology sections is complete and labeling relevant to pharmacokinetics and pharmacodynamics is acceptable. There are no outstanding Clinical Pharmacology issues or postmarketing commitments or requirements. The clinical pharmacology review team recommends approval of the efficacy supplement; refer to the Clinical Pharmacology review dated March 29, 2016.

### 6. Clinical Microbiology

Not applicable.

### 7. Efficacy/Statistics

The Applicant submitted published literature as the primary evidence to support the efficacy (and safety) of the proposed dosing regimen (refer to the Clinical Review dated March 29, 2016, Section 9.5 for a list of submitted references). Most published articles submitted by the Applicant and reviewed by the clinical review team reported the primary efficacy endpoint as complete termination of pregnancy without further medical or surgical intervention; the Division considers this to be a clinically relevant endpoint.

The majority of the publications included a statement that the study was conducted under institutional review board (IRB) or Ethical Review Committee approval and the women gave informed consent. The clinical review team concluded that the published literature was adequate as the primary information source to support the changes proposed in the efficacy supplement. During the course of the review, the team also requested and received more detailed information from select publications from their authors via communication with the Applicant.

Although there were slight demographic differences among the published studies from the database, these differences were not expected to alter the efficacy or safety of Mifeprex. Therefore, for the majority of the proposed efficacy changes, the clinical team assessed efficacy information from a subset of publications that evaluated a given proposed change. An independent statistical review was not needed for this review of published literature.

The clinical review team identified several major proposed clinical changes in the efficacy supplement. As these major changes are interrelated, in some cases data from a given study were relied on to provide evidence to support multiple changes. These major changes as considered by the clinical team included:
1. A proposed dosing regimen consisting of mifepristone 200 mg orally followed by the buccal administration of 800 mcg misoprostol including:
   a. Use of a revised interval between mifepristone and misoprostol from 48 hours to 24-48 hours
   b. Allowing home administration of misoprostol
   c. Use of an additional dose of misoprostol
2. Support for extending the gestation age through 70 days
3. Flexibility in follow-up visit: follow-up is needed in the range of 7-14 days after Mifeprex administration; the specific nature and exact timing of the follow-up to be agreed upon by the healthcare provider and patient.
4. Change in who can provide Mifeprex from physician to healthcare provider who prescribes

5

Reference ID: 3909594

The following section summarizes the clinical review team's evaluations that supported the above proposed changes:

1. *Support for the proposed dose and dosing regimen of 200 mg of Mifeprex orally and 800 mcg of misoprostol buccally 24-48 hours after Mifeprex administration:* The clinical review team reviewed the submission and identified studies and review articles that evaluated over 35,000 women who were treated with efficacy in the 91-98% range. For additional details on the efficacy from these studies, please refer to Section 6 of the Clinical Review.

2. *Support for extending the gestational age to 70 days:* The Applicant submitted a number of published articles and systematic reviews that supported the proposed dose and dosing regimen. Four studies and one systematic review evaluated the exact proposed dosing regimen through 70 days gestation.  These include three prospective observational studies (Winikoff et al 2012[1], Boersma et al[2], Sanhueza Smith et al[3]) and one randomized controlled trial (RCT) (Olavarrieta et al[4]) that had a primary objective of evaluating medical abortion provision by non-physicians.  The systematic review by Chen and Creinin[5] covered 20 studies including over 30,000 women; all but one of the studies used the proposed regimen in gestations through 70 days (the remaining study used 400 mcg of buccal misoprostol).  For those publications that provided overall success rates, these were in the range of 97-98%.  Other relevant publications include the systematic review by Raymond[6] of 87 studies, which covered a variety of misoprostol doses and routes of administration used with 200 mg of mifepristone.  Assessing the efficacy by misoprostol dose, the paper noted that doses $\geq$ 800 mcg had a success rate of 96.8%, with an ongoing pregnancy rate of 0.7%.

---

[1] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6

[2] Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracep Reprod Health Care 2011; 16: 61-6

[3] Sanhueza Smith P, Pena M, Dzuba IG, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters 2015;  22: 75-82

[4] Olavarrieta CD, Ganatra B, Sorhaindo A, Karver TS, Seuc A, Villalobos A, Garcia SG, Pérez M, Bousieguez M, Sanhueza P. Nurse versus physician-provision of early medical abortion in Mexico: a randomized controlled non-inferiority trial. Bull World Health Organ 2015; 93: 249-258

[5] Chen MJ, Creinin MD. Mifepristone with Buccal Misoprostol for Medical Abortion Obstet Gynecol 2015; 126(1): 12-21

[6] Raymond EG & Grimes DA.  The comparative safety of legal induced abortion and childbirth in the United States.  Obstet Gynecol 2012; 119: 215-9

6

Reference ID: 3909594

The original dosing regimen specifies taking misoprostol 2 days after Mifeprex. This efficacy supplement proposes a more flexible time frame of 24 to 48 hours between Mifeprex and misoprostol administration. Data from a review article by Wedisinghe et al[7] evaluated different time intervals using administration of misoprostol after Mifeprex. A meta-analysis of all five studies found a non-significant odds ratio for failure for shorter vs. longer dosing intervals, but a trend for lower success if a dosing interval < 8 hours is used. Chen & Creinin's systematic review[8] of 20 studies including over 33,000 women, all but one using the proposed regimen, compared the success of dosing intervals of 24 hours with intervals ranging from 24-48 hours. The success rate in six studies that used a 24-hour interval through 63 days gestation was 94.2%, compared to the rate of 96.8% in 14 studies that used a 24-48 hour interval, and this difference was statistically significant. The clinical team concluded that the efficacy of the revised dosing regimen was not compromised by revising the dosing interval to 24-48 hours. In addition, they noted that the overall rate of ongoing pregnancies did not differ significantly by dosing interval.

3. *Administration of misoprostol after Mifeprex administration at home:* Currently, the dosing regimen specifies that misoprostol is taken in the clinic setting following Mifeprex administration. No specific publication evaluated treatment outcomes with use of misoprostol at home compared to in-clinic dosing. However, one large literature review (Raymond et al[9]) evaluated a variety of mifepristone treatment regimens with different misoprostol doses, routes of administration and dosing intervals used in gestations through 63 days. Roughly half of the studies included in this review did not require women to take misoprostol in-clinic. Rates of treatment failure and of ongoing pregnancy were very similar regardless of whether misoprostol was taken in-clinic or at another location. The clinical review team concluded that the review provided sufficient data to support labeling that misoprostol does not need to be restricted to in-clinic administration.

4. *Use of a repeat misoprostol dose, if necessary:* The Applicant submitted several published studies that supported use of a repeat misoprostol dose, when complete uterine expulsion did not occur after the initial misoprostol dose following Mifeprex. In clinical practice, the usual treatment for incomplete expulsion (retained products of conception) may include either a repeat dose of misoprostol, expectant management or a surgical procedure (suction aspiration or a dilation and curettage). Studies that specifically report the success rate of a repeat dose of misoprostol are:

---

[7] Wedisinghe L and Elsandabesee D. Flexible mifepristone and misoprostol administration interval for first-trimester medical termination. Contraception 2010; 81(4): 269-74. doi: 10.1016/j.contraception.2009.09.007. Epub Oct 29, 2009

[8] Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. MOD Study Trial Group: A randomized comparison of misoprostol 6-8 hours versus 24 hours after mifepristone for abortion. Obstet Gynecol 2004; 103: 851-859

[9] Raymond EG & Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol 2012; 119: 215-9

EX. 32 pg. 08

Reference ID: 3909594

- Winikoff et al[10] – studied the proposed regimen through 70 days gestation; of the few women who received a second dose for an incomplete abortion at follow-up, the success rate was 91% at 57-63 days and 67% at 64-70 days.
- Chen and Creinin [11] – a systematic review of 20 studies, all but one of which used the proposed regimen up through 70 days; success of a second dose ranged from 91-100%
- Boersma et al[12] – included pregnancies through 70 days treated with the proposed regimen; five of 330 women took a second dose due to absence of bleeding 48 hours after first dose; the success rate was 80%
- Louie et al[13] – studied the proposed regimen to 63 days; in 16 women (of 863) who took a second dose of misoprostol, the success rate was 100%
- Chong et al[14] – compared the proposed regimen to a lower dose of misoprostol; the success of a second dose of misoprostol was 92% overall, but the number of women in each dose arm getting a second dose was not specified.
- Winikoff et al[15] – 14 women in the proposed regimen took a second dose of misoprostol with a success rate of 92.9%.

Using the information from the above studies and other supportive data, the clinical team concluded that the available data support the efficacy of a repeat dose of misoprostol if complete expulsion has not occurred. The relatively high complete pregnancy termination rates indicate that this option is likely to reduce the need for a surgical intervention.

5. *Requirements regarding follow-up care:* Current labeling states that women will return to the clinic 14 days after Mifeprex administration for follow-up. This provision was based on the follow up regimen in the U.S. phase 3 trial that supported the initial approval in 2000. Although the Applicant submitted several studies that evaluated flexibility in the time of follow-up, the key publication identified by the review team that addressed this issue was a 2013 article by

---

[10] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6

[11] Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. MOD Study Trial Group: A randomized comparison of misoprostol 6-8 hours versus 24 hours after mifepristone for abortion. Obstet Gynecol 2004; 103: 851-859

[12] Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care 2011; 16: 61-6

[13] Louie KS, Tsereteli T, Chong E, Ailyeva F, Rzayeva G, Winikoff B. Acceptability and feasibility of mifepristone medical abortion in the early first trimester in Azerbaijan. Eur J Contracept Reprod Health Care 2014; 19(6): 457-464

[14] Chong E, Tsereteli T, Nguyen NN, Winikoff B. A randomized controlled trial of different buccal misoprostol doses in mifepristone medical abortion. Contraception 2012; 86: 251-256

[15] Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008; 112(6): 1303-1310

8

Raymond[16]. The impact of the timing of follow-up was assessed in Raymond's systematic review  of studies using various treatment regimens.  While some have posited that earlier follow-up may result in a higher rate of surgical intervention (for women who would have had complete expulsion had they been given a bit more time), Raymond's analyses found no difference in failure rates for women followed less than one week after mifepristone as compared to a week or more after mifepristone.   As follow-up was anticipated to not alter the efficacy of the proposing dosing regimen, this change is also discussed below in Section 7.

6.  *Allowing qualified healthcare providers to use Mifeprex.*

The Applicant provided data on the efficacy of medical abortion provided by non-physician healthcare providers, including four studies with 3,200 women in randomized controlled clinical trials and 596 women in prospective cohorts. These studies included a study by Warriner et al[17] that showed efficacy of 97.4% with nurses versus 96.3% by physicians.

Conclusions: I concur with the clinical review team's assessments and conclusions and these conclusions will be reflected in labeling. The data and information reviewed constitute substantial evidence of efficacy to support the proposed dosing regimen for Mifeprex for pregnancy termination through 70 days gestation.  Other proposed changes to the Mifeprex labeling, including the time interval between Mifeprex and misoprostol dosing, and use of a repeat dose, were also adequately supported by evidence.  Finally, I concur with the clinical review team that the information from the published literature also supported efficacious use of Mifeprex by non-physician providers.

***Comment:*** Discussion was held as to whether the original dosing regimen approved in 2000 (i.e., Mifeprex 600 mg and misoprostol 400 mcg up to 49 days gestation) should remain in labeling.                                                                          (b) (4)

                                                                                    the clinical review team and I concur with their              (b) (4) request to remove the current regimen from the labeling. Removal of the original dosing regimen simplifies labeling, and avoids any confusion regarding instructions.  Therefore, the revised labeling, and REMS materials accompanying the approval of this efficacy supplement, will include only the proposed dosing regimen and instructions.  It should be noted that there are no safety or efficacy concerns about the originally approved dosing regimen that led to removing it from the labeling.

---

[16]Raymond EG, et al. First-trimester medical abortion with mifepristone 200 mg and misoprostol: a systematic review. Contraception 2013;87(1):26-37.
[17] Warriner IK, Wang D, Huong NTM, Thapa K, Tamang A, Shah I et al.  Can midlevel health-care providers administer early medical abortion as safely and effectively as doctors?  A randomized controlled equivalence trial in Nepal.  Lancet 2011; 377: 1155-61.

## 8. Safety

The safety of the proposed dosing regimen for Mifeprex was supported by the evidence from submitted published literature and postmarketing experience. The focus of the safety analysis was on published studies that evaluated the proposed dosing regimen (Mifeprex 200 mg followed by 800 mcg misoprostol buccally 24-48 hours later), with comparison to the known safety profile of the currently approved dosing regimen.

*Exposure*: Per the Applicant's submission, the clinical review concluded that there have been approximately 2.5 million uses of Mifeprex by U.S. women since the drug's approval in 2000. The clinical review team estimated that exposure to the proposed dosing regimen for their safety analysis was based on approximately 30,000 patients (refer to Table 11 for a list of references used to evaluate safety). Such exposure volume is sufficient to characterize the safety profile of the proposed dosing regimen and other proposed changes in this efficacy supplement.

*Deaths:*  Deaths with medical abortion rarely occur and causality can be difficult to determine. Most of the publications did not specifically report any deaths with medical abortion with Mifeprex. Among the seven U.S. studies submitted to support the safety profile of Mifeprex and misoprostol, only one (Grossman, et al[18]) explicitly addressed deaths and noted that there were no deaths among 578 subjects evaluated in the study. Only one observational study (Goldstone, et al[19]) from Australia contained a report of a death after a mifepristone and misoprostol dosing regimen. In this retrospective review of 13,345 pregnancy terminations, the authors identified one death from sepsis. The article stated that the death was in an individual who failed to follow-up with her healthcare provider despite showing signs of illness. Based on this information, deaths in association with abortion are extremely rare.

Deaths reported from the postmarketing experience of Mifeprex are summarized below in the Postmarketing Experience section.

*Nonfatal serious adverse events*: The clinical review team identified key nonfatal serious adverse events (SAEs) associated with the proposed dosing regimen for Mifeprex.  These SAEs include: hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy. Section 7 of the clinical review dated March 29, 2016, provides a detailed discussion of reported rates of hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy.  The latter is not an adverse reaction because an ectopic pregnancy would exist prior to the Mifeprex regimen; it represents instead a failure to diagnose an ectopic pregnancy.  Overall rates identified by the clinical review team from the published literature are as follows:
- Hospitalization:  0.04-0.6% in U.S. studies of over 14,000 women; 0-0.7% in international studies of over 1,200 women

---

[18]Grossman D, Grindlay K, Buckacher T, Lane K, Blanchard K. Effectivenesss and acceptability of medical abortion provided thorugh telemedicine. Obstet Gynecol 2011;118:296-303.
[19]Goldstone P, Michelson J, Williamson E.  Early medical abortion using low-dose mifepristone followed by buccal misoprostol: A large Australian observational study. Med J Austral 2012; 197: 282-6.

Reference ID: 3909594

EX. 32 pg. 011

- Serious infection/sepsis: 0-0.2% in U.S. and international studies of over 12,000 women
- Transfusion:  0.03-0.5% in U.S. studies of over 17,000 women; 0-0.1% in international studies of over 12,000 women

A study by Upadhyay et al[20] reported a 0.31% rate of major complications (including incomplete or failed abortion, hemorrhage, infection or uterine perforation that required hospitalization, surgery or transfusion) for medical abortions (dosing regimen unspecified) through 63 days; this was about double the rate reported for first trimester aspiration abortions and statistically significantly higher.  However, these rates were driven by higher rates of incomplete/failed abortion; rates of hemorrhage (0.14%) and infection (0.23%) did not differ from those associated with aspirations.

Only one submitted study reported an ectopic pregnancy. This study (Winikoff et al[21]) reported one ectopic among 847 women (0.12%).

*Comment:* The proposed dosing regimen has been studied extensively in the literature using U.S. and global sites. Serious adverse events including deaths, hospitalization, serious infections, bleeding requiring transfusion and ectopic pregnancy are rarely reported. The rates of these serious adverse events are well below 1% and do not suggest a safety profile different from the original approved Mifeprex dosing regimen. Although there is less serious adverse event data on women who received Mifeprex and misoprostol between 64-70 days of gestation, the data from a U.S. study of 379 women (Winikoff et al)[22] in that gestational age is reassuring that the rates of these serious adverse events are not clinically different from that of other gestational age ranges.

In summary, based on the published literature, nonfatal serious adverse events occur with Mifeprex and misoprostol use with rates generally less than 1%.  Increased gestational age (64-70 weeks) was not associated with an increased incidence of nonfatal SAEs. Other submission- specific safety issues that were evaluated including uterine rupture and angioedema/anaphylaxis are discussed in the Postmarketing Experience section below.

*Loss to follow-up:* The studies included in this safety review revealed a wide range of loss to follow-up, from 0.6% loss to follow-up in the study with telephone follow-up (Ngoc et al[23]) to 22% in the Grossman et al[24] study using telemedicine to deliver medical

[20]Upadhyay UD, Desai S, Lidar V, Waits TA, Grossman D, Anderson P, Taylor D. Incidence of emergency department visits and complications after abortion. Obstet Gynecol 2015;125(1):175-183.
[21]Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008;112(6):1303-1310.
[22]Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012;120:1070-6.
[23] Ngoc NTN, et al. Acceptability and feasibility of phone follow-up after early medical abortion in Vietnam:  A randomized controlled trial. Obstet Gynecol 2014;123:88-95.
[24] Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectivenesss and acceptability of medical abortion provided thorugh telemedicine. Obstet Gynecol 2011;118:296-303.

11

abortion services.

***Comment***: Based on these data reviewed by the clinical review team, there is no literature that suggests that follow-up modality alters safety. Therefore, labeling will not be directive regarding follow-up; that will be a decision left to the patient and provider.

*Common adverse events:* The clinical review team evaluated common adverse reaction data and compared U.S. and global study locations. The comparison revealed that there were differences in the frequency of common adverse reactions, with the reporting rates considerably higher among the U.S. studies. There is no reason to anticipate regional differences in the safety profile for the same treatment regimen, so these differences likely reflect lower ascertainment or subject reporting of adverse reactions in non-U.S. studies. Regardless, inclusion of this non-U.S. data in labeling would not be appropriate, as it is unlikely to be informative to the U.S. population of users. The data to be reported in labeling is outlined in Table 1 below:

**Table 1: Common Adverse Events (≥ 15%) in U.S. Studies of the Proposed Dosing Regimen**

| Adverse Reaction | # U.S. studies | Number of Evaluable Women | Range of frequency (%) | Upper Gestational Age of Studies Reporting Outcome |
|---|---|---|---|---|
| Nausea | 3 | 1,248 | 51-75% | 70 days |
| Weakness | 2 | 630 | 55-58% | 63 days |
| Fever/chills | 1 | 414 | 48% | 63 days |
| Vomiting | 3 | 1,248 | 37-48% | 70 days |
| Headache | 2 | 630 | 41-44% | 63 days |
| Diarrhea | 3 | 1,248 | 18-43% | 70 days |
| Dizziness | 2 | 630 | 39-41% | 63 days |

Source: Data from Middleton[25], Winikoff[26] and Winikoff[27] as outlined in Table 2 of the CDTL review dated March 29, 2016.

One concerning adverse event is severe vaginal bleeding. Severe vaginal bleeding can result in interventions such as hospitalization and transfusion and may be associated with infection. The overall rate of bleeding across publications varied between 0.5% and 4.2%. Two publications (Sanhueza Smith et al[28] and Gatter et al[29]) evaluated clinically significant bleeding by gestational age. Although the publications reported slightly different rates, there was no trend of increased bleeding requiring intervention with Mifeprex and misoprostol use with increasing gestational age.

[25] Middleton T, et al. Randomized trial of mifepristone and buccal or vaginal misoprostol for abortion through 56 days of last menstrual period. Contraception 2005; 72: 328-32

[26] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6

[27] Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008; 112(6): 1303-1310

[28] Sanhueza Smith P, Pena M, Dzuba IG, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters 2015;22:75-82.

[29] Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.

Reference ID: 3909594

*Comment:* While not all of the studies reported common adverse events, those that reported did not have unexpected rates of common adverse events. These common adverse events are included in labeling in section 6.1 (Clinical Trial Experience) in the ADVERSE REACTIONS section.

*Postmarketing experience – Spontaneous reports:*

The safety profile for Mifeprex includes over 15 years of postmarketing safety data available on Mifeprex due to the reporting requirements under the REMS.  The Year 3 REMS Assessment report was submitted by the Applicant in June, 2015. The ⬛⬛⬛ (b) (6) ⬛⬛⬛ (b) (6) ⬛⬛⬛ provided a comprehensive review of adverse event reports submitted from 2000 through November 17, 2015.  Findings include:
- No Clostridial septic deaths reported in the U.S. since 2009, and none worldwide since 2010.
- The postmarketing rates of hospitalization, severe infection, blood loss requiring transfusion and ectopic pregnancy reported from publications and remain stable and relatively low.

*Submission-specific safety issues:*
- <u>Anaphylaxis/angioedema:</u> The ⬛⬛⬛ (b) (6) ⬛⬛⬛ ( ⬛ (b) (6) ⬛ identified a safety signal of anaphylaxis and angioedema with mifepristone administration. This signal was based on a comprehensive review of adverse event reports submitted from 2000 through November 17, 2015.  A FAERS search retrieved one case of anaphylaxis and six cases of angioedema with mifepristone administration.  Six of the seven cases were seen in women using mifepristone for termination of pregnancy.  Six of the seven cases noted some type of medical intervention, such as treatment with an antihistamine, a histamine H2 antagonist, a corticosteroid, or a combination of various medications. Hospitalization was noted in three of the seven total cases; all three hospitalization cases occurred in patients who experienced angioedema. There were no additional cases of anaphylaxis or angioedema identified in the literature.

  *Comment:* ⬛ (b) (6) ⬛ and the clinical review team recommended that anaphylaxis and angioedema be described in the Contraindications and Adverse Reactions sections of labeling. These labeling sections were discussed with the Applicant and labeling was revised for those sections to describe these serious adverse events.

- <u>Uterine rupture:</u> As discussed in the clinical review, the potential risk of uterine rupture was considered because the current labeling for misoprostol includes a Boxed Warning against the use of misoprostol for gestations more than 8 weeks due to the risk of uterine rupture.  Although misoprostol is used alone for various obstetric indications, including induction of labor at term, it was important to consider whether labeling about this potential risk is warranted for Mifeprex. Both the clinical reviewer and the ⬛⬛⬛ (b) (6) ⬛⬛⬛ ( ⬛ (b) (6) ⬛ reviewed the literature and ⬛ (b) (6) ⬛ searched FAERS for adverse event reports.

13

Published literature reported three case reports[30,31,32] of uterine rupture with mifepristone/misoprostol treatment in the first trimester. Of these three reports, two patients had a risk factor for uterine rupture (prior uterine surgery). The third case was in a patient who received more than two doses of misoprostol. After consideration, the clinical review team decided that labeling should include information about this event. The FAERS search did not identify any reports of uterine rupture with use of mifepristone alone.  Of 80 reports, 77 cited use of misoprostol alone, and three of mifepristone and misoprostol.  Only two reports of uterine rupture in the first trimester were identified, both using misoprostol alone; one entailed an unspecified dose and route of misoprostol at 5 weeks gestation, and one involved vaginal administration of 800 mcg misoprostol at 8 weeks gestation for cervical preparation prior to a surgical abortion in a woman with a prior uterine scar.

Based on the available safety reports of uterine rupture, the review team from (b) (6) and clinical review team concluded that these data demonstrated that uterine rupture with Mifeprex and misoprostol in the first ten weeks (70 days) of gestation is exceedingly uncommon, and occurs most often in the face of a risk factor (previous uterine surgery).

*Comment:* I agree with the clinical review team and the (b) (6) team that the risk of uterine rupture with first trimester use of mifepristone and misoprostol appears to be extremely rare, and most often associated with a prior uterine scar, a known risk factor for uterine rupture.  Labeling of these reports is included in section 2.3 of the  DOSAGE AND ADMINISTRATION and section 6.2 of the ADVERSE REACTIONS of labeling to provide additional information to healthcare providers, but no restriction of use is needed based upon this extremely rare adverse reaction.

The clinical review team also evaluated the safety for each of the following major changes proposed in this efficacy supplement:
1. Changing the dosing interval between Mifeprex and misoprostol from 48 hours to 24-48 hours
2. Home administration of misoprostol
3. Use of a repeat dose of misoprostol
4. Change in the follow-up timeframe and method of follow-up
5. Allowing providers other than physicians to provide Mifeprex

---

[30] Khan S et al. Uterine rupture at 8 weeks' gestation following 600 µg of oral misoprostol for management of delayed miscarriage. Journal of Obstet Gynaecol 2007; 27: 869-870
[31] Bika O, Huned D, Jha S, Selby K Uterine rupture following termination of pregnancy in a scarred uterus J Obstet Gynaecol 2014; 34(2): 198-9. doi: 10.3109/01443615.2013.841132
[32] Willmott F, et al. Rupture of uterus in the first trimester during medical termination of pregnancy for exomphalos using mifepristone/misoprostol. BJOG 2008;15:575-77

14

Reference ID: 3909594

To evaluate each of these changes, the reviewers evaluated the adverse event information regarding:

- *Changing the timing interval between Mifeprex and misoprostol and change in the gestational age to 70 days:* Support for the 24-48 hour interval and use up through 70 days was primarily based on a large systematic review by Shaw et al[33]. This review evaluated studies looking at different follow-up modalities and demonstrated that there are a variety of acceptable alternatives to in-clinic follow-up that can identify cases in which there is need for additional intervention. In addition, the systematic review did not identify any significant difference in adverse events with different time intervals.  Based on these findings, labeling will not be directive regarding specific details of how follow-up should be performed; this will be a decision between the patient and her healthcare provider.

- *Home administration of misoprostol:* The Applicant supplied several published studies that supported this change including Gatter et al[34] and Ireland et al[35]. These studies reported on large numbers of women in the U.S. who took misoprostol at home. The authors showed that home administration of misoprostol, as part of the proposed regimen, is associated with exceedingly low rates of serious adverse events, and with rates of common adverse events comparable to those in the studies of clinic administration of misoprostol that supported the initial approval in 2000. Given that information is available on approximately 45,000 women from the published literature, half of which incorporated home use of misoprostol, there is no clinical reason to restrict the location in which misoprostol may be taken.  Given the fact that the onset of cramping and bleeding occurs rapidly (i.e., generally within 2 hours) after misoprostol dosing, allowing dosing at home increases the chance that the woman will be in an appropriate and safe location when the process begins.

- *Use of a repeat dose of misoprostol:*  Safety reporting from studies that evaluated a repeat dose of misoprostol did not specifically assess the subset of women who received a second dose, but no unexpected findings were identified. One randomized controlled trial (Coyaji et al[36]) conducted in 300 women seeking medical abortion in India looked at a single misoprostol dose as compared to two misoprostol doses. Although there was no difference in the complete pregnancy termination rate in women who received a second misoprostol dose compared to those who did not, the repeat misoprostol dose reduced the need for surgical intervention. This study was reassuring in that  there was no significant difference in the adverse events observed—similar percentages of women experienced

[33] Shaw KA, Topp NJ, Shaw JG, Blumenthal PB. Mifepristone-misoprostol dosing interval and effect on induction abortion times. Obstet Gynecol 2013;121(6):1335-1347.

[34] Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.

[35] Ireland LD, Gatter M, Chen AY. Medical compared with surgical abortion for effective pregnancy termination in the first trimester. Obstet Gynecol 2015;126:22-8.

[36] Coyaji K, Krishna U, Ambardekar S, Bracken H, Raote V, Mandlekar A, Winikoff B. Are two doses of misoprostol after mifepristone for early abortion better than one? BJOG 2007;114:271-278.

Reference ID: 3909594

cramping (87% in the single dose group, 89% in the repeat dose group), nausea (both groups 1%), vomiting (both groups 0%), and diarrhea (0% in the single dose group versus 2% in the repeat dose group). A supportive systematic review by Gallo et al[37] also provided safety information on subjects who received repeat misoprostol. In this review, the only side effects discussed in the trials were diarrhea, which was more common on those groups receiving misoprostol orally than in those receiving it exclusively vaginally (26-27% versus 9%). Rash was reported <1%. Based on these findings, labeling will be changed because the misoprostol dose does not need to be restricted to in clinic administration to assure safe pregnancy termination using the proposed dosing regimen. Given the onset of bleeding and cramping after misoprostol, allowing home administration increases the likelihood that a woman will be in an appropriate and safe location when the pregnancy termination process begins.

- *Change in the follow-up timeframe and method of follow-up:* The Applicant submitted several articles that described different methodologies in follow-up including phone calls and standardized instructions. The clinical reviewers evaluated a study in Scotland by Cameron et al[38] that evaluated self-assessment as compared to standard follow-up methodologies (clinic visit or phone call). Most of the women chose self-assessment over an in-clinic visit or phone call, and there were no significant differences in adverse outcomes between women who underwent self-assessment of health compared to those who had a clinic visit or phone call. Among women with an ongoing pregnancy after Mifeprex and misoprostol, the majority self-identified and presented within two-weeks for care. Based on this information and the other data from the Raymond systematic article[39] that did not identify a difference in failure rate for earlier (less than one week) as compared to one week or greater of follow-up, sufficient support was provided to use a broadened window of 7 to 14 days for follow-up. This revised follow-up time frame will be included in labeling.

- *Allowing providers other than physicians to provide Mifeprex*: The current Prescriber's Agreement in the REMS specifies that "…Mifeprex must be provided by or under the supervision of a physician who meets the following qualifications…" In addition, current labeling states that Mifeprex will be supplied only to licensed physicians who sign and return a Prescriber's Agreement. However, labeling states that other healthcare providers, acting under the supervision of a qualified physician, may also provide Mifeprex to patients. Several published studies submitted by the Applicant indicate that health care providers such as nurse practitioners, nurse midwives, and physician assistants are

---

[37] Gallo MF, Cahill S, Castelman L, Mitchell EMH. A systematic review of more than one dose of misoprostol after mifepristone for abortion up to 10 weeks gestation. Contraception 2006;74:36-41.
[38] Cameron ST, Glasier A, Johnstone A, Dewart H, Campbell A. Can women determine the success of early medical termination of pregnancy themselves? Contraception 2015;91:6-11.
[39] Raymond EG & Grimes DA.  The comparative safety of legal induced abortion and childbirth in the United States.  Obstet Gynecol 2012; 119: 215-9

16

Reference ID: 3909594

currently providing abortion services. One of these studies (Kopp Kallner et al[40]) was a randomized controlled trial of 1,068 women in Sweden who were randomized to receive medical abortion care from two nurse midwives experienced in medical terminations and trained in early pregnancy ultrasound versus a group of 34 physicians with varying training and experience. Success rates were ≥ 96% regardless of gestational age. The nurse midwife group had few complications, though this was not statistically significant (4.1% for nurse midwives, versus 6.1% for doctors, p=0.14). No serious complications were reported and no blood transfusions were administered in the study. Based on this and other supportive studies, the information supports the efficacy and safety of allowing healthcare providers other than physicians can effectively and safely provide abortion services, provided that they meet the requirements for certification described in the REMS. The clinical team also felt that the term "healthcare provider who prescribes" would be the appropriate terminology as prescribing ability is a critical factor in dispensing Mifeprex.

The clinical review team concluded that the evidence demonstrated acceptable safety for each of the above proposed changes, and I concur with their conclusion. The proposed dosing regimen has a similar safety profile as the original regimen approved in 2000. Adverse outcomes of interest, such as deaths, serious infection, transfusions, ectopic pregnancies and uterine rupture, remain rare, and are not necessarily attributable to Mifeprex use. Overall, the rate of deaths and nonfatal serious adverse events are acceptably low, and data for the proposed regimen do not suggest a safety profile that deviates from that of the originally approved regimen No association between adverse outcomes and increasing gestational age was identified. Finally, the available information supports the safety of the other proposed changes, including increasing the flexibility of the time interval between Mifeprex and misoprostol, at home use of misoprostol, use of a repeat dose of misoprostol, change in the follow-up timeframe and allowing health care providers other than physicians to prescribe and dispense Mifeprex were acceptable.

## 9. Advisory Committee Meeting

Mifeprex is not a new molecular entity requiring discussion before an advisory committee. In addition, an advisory committee was not necessary as the application did not raise complex scientific or other issues that would warrant holding an AC before approval.

## 10. Pediatrics

This efficacy supplement triggered requirements under the Pediatric Research Equity Act (PREA). The Agency granted a partial PREA waiver for pre-menarcheal females ages birth to 12 years because it would be impossible to conduct studies in this pediatric population, as pregnancy does not exist in premenarcheal females.

---

[40] Kopp Kallner H, Fiala C, Stephansson O, Gemzell-Danielsson K. Home self-administration of vaginal misoprostol for medical abortion at 50-63 days compared with gestation of below 50 days. Human Reprod 2010;25(5):1153-1157.

17

Reference ID: 3909594

The Applicant fulfilled the remaining PREA requirement in postmenarcheal females by submitting published studies of Mifeprex for pregnancy termination in postmenarcheal females less than 17 years old.  Efficacy and safety information in these adolescents was based on a U.S. study in 322 postmenarcheal adolescents (Gatter et al[41]). Of the 322 adolescents, 106 of these adolescents were under 16; see Table 2 below:

**Table 2: Age and Number of Adolescents Undergoing Medical Abortion (Gatter et al[42])**

| Age of Subject | Number of Subjects evaluated |
|----------------|------------------------------|
| 11 | 1 |
| 12 | 1 |
| 13 | 2 |
| 14 | 20 |
| 15 | 82 |
| 16 | 216 |

Source: Refer to Table 17 of the Medical Officer's review dated March 29, 2016

The Gatter et al[43] study reported that postmenarchal females less than 18 years old had a 98.7% pregnancy termination rate as compared to females aged 18-24, who had a rate of 98.1%. This article reported that loss to follow-up was slightly higher in those less than 18 years old, however, age did not adversely impact efficacy outcomes.

One issue was whether adolescents would comply with at home use of misoprostol.  The Gatter[44] et al study incorporated at home use of misoprostol into the Mifeprex dose regimen given to all females, including postmenarchal females less than 18 years old. The overall efficacy in adolescents was similar to that of all older women. This information supports at home administration of misoprostol in postmenarchal females under 17.

Two other published studies provided additional efficacy on Mifeprex use by adolescents for pregnancy termination:

- Phelps et al[45] evaluated data from 28 adolescents aged 14 to 17, at ≤ 56 days gestation, using Mifeprex 200 mg followed 48 hours later by misoprostol 800 mcg vaginally.  In this study, 100% of subjects had a complete pregnancy termination, with five not requiring misoprostol.

---

[41]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[42] Ibid.
[43]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[44]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[45]Phelps RH, et al. Mifepristone abortion in minors. Contraception 2001;64:339-343.

Reference ID: 3909594

- Niinimaki et al[46] used data from a Finnish Registry from 2000-2006. An analysis of efficacy between adolescents under age 18 compared to the women ≥ age 18 indicated that the adolescent group had a lower rate of incomplete abortions as compared to adults. And efficacy outcomes in adolescents were similar to those of adult women.

The safety of Mifeprex in postmenarcheal adolescents was primarily supported by adverse event information from the Gatter et al[47] study. ████████████████ (b) (6), (b) (4)
████████████████████████████████████████████████ Supportive data from a Finnish registry (Niinimaki et al  ) from 3024 adolescent females under 18 years of age reported that, compared to adult women, the risks of hemorrhage (adjusted odds ratio 0.87 [95% confidence interval: 0.77 to 0.99]), incomplete abortion (0.69, [95% confidence interval: 0.59 to 0.82]), and surgical evacuation (0.78, [95% confidence interval: 0.67 to 0.90]) were lower in the adolescent cohort. In the Finnish registry study, a majority of adolescents and adults received both Mifeprex and misoprostol. Safety findings from the Gatter et al and Niinimaki et al studies are reassuring and indicate that the safety profile of Mifeprex is similar between postmenarcheal adolescents and adult women.

Additional details from this article and other published data on Mifeprex use in adolescents (females under 17) are described in the clinical review (Refer to the Medical Officer's review dated March 29, 2016).

████████████████████████ (b) (6) concurred that the efficacy and safety data in postmenarcheal adolescents less than 17 years old was sufficient to support the use of Mifeprex in this pediatric population and to fulfill the PREA pediatric study requirement. The revised Mifeprex labeling will state that that efficacy and safety are similar to adult women  in the Pediatric Use section (8.4).

## 11. Other Relevant Regulatory Issues



████████████ reviewed the Medication Guide in conjunction with the ████████ (b) (6)
████████ (████ (b) (6) Both ████ (b) (6) and ████ (b) (6) found the Medication Guide to be acceptable with recommended changes (See review dated March 29, 2016). The Division considered all of the recommendations from ████ (b) (6) in revising and updating the text in

---

[46]Niinimaki M, et al. Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study. BJM 2011;342: d2111.
[47]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[48]Niinimaki M, et al. Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study. BJM 2011;342: d2111.

EX. 32 pg. 020

the Medication Guide and incorporated appropriate changes into the final agreed upon
Medication Guide.



reviewed the Prescribing Information (PI) in addition to the joint review with
of the Medication Guide in conjunction with       After review,
provided recommended changes (See       review dated March 29, 2016). The Division
considered all of the recommendations from       in revising and updating the text in
the PI and incorporated appropriate changes into the final label.



in the         ) reviewed the proposed modifications to the REMS. The
review reflected agreement with the Applicant's proposed REMS changes which include:
- Removal of the term "under Federal law" from the Prescriber's Agreement.
- Replacement of the word "physician" with a broader term to describe appropriate
  healthcare professionals who may order, prescribe and administer Mifeprex.
        believes that the Applicant's proposed terminology of "
                is too broad and that a more appropriate description is
  "healthcare provider who prescribes," which limits acceptable healthcare
  providers to those who are licensed in their state to prescribe medications.
- Removal of the Medication Guide from the REMS. The Medication Guide
  remains an important education tool for patients. It will still be dispensed to
  each patient in accordance with 21 CFR part 208. As described in the
  Medication Guide Guidance, a Medication Guide is not necessary to ensure
  that the benefits outweigh the risks of Mifeprex.
- Modification of Element to Assure Safe Use (ETASU) A, the Prescriber's
  Agreement.       recommends changing the name of the document to the
  Prescriber's Agreement Form to be consistent with other REMS programs.
  References to "physician" should be changed to "healthcare provider who
  prescribes."
-       recommends removing the Patient Agreement from the REMS for a
  number of reasons:
  1. The established safety profile over 15 years of experience with Mifeprex is
     well-characterized, stable, and known serious risks occur rarely
  2. The Medication Guide contains the same risk information addressed in the
     Patient Agreement, and will still be provided to patients under 21 CFR part
     208
  3. The Prescriber's Agreement Form will continue to require providers to
     explain the treatment, its effects and risks associated with Mifeprex and to
     answer any questions that a patient may have
  4. Established clinical practice provides for counseling, informing the patient
     about follow-up, when to contact the provider/clinic, answering questions and
     obtaining signed informed consent before treatment. FDA has removed REMS

EX. 32 pg. 021

requirements in other programs based on the integration of the REMS safe use condition into clinical practice.

Other revisions to the REMS document will be made for consistency with changes described above and to reflect current FDA thinking and practice regarding format, language and flow in REMS documents. These changes include modification of the Mifeprex REMS goal, changes in requirements to certify prescribers (removal of the requirement to obtain a Patient Agreement) and other minor edits.

In summary, the overall (b) (6) recommendation for the REMS modification for this efficacy supplement was approval (Refer to (b) (6) review dated March 29, 2016).

## 12. Labeling



Carton and container labeling was reviewed by the (b) (6) ( (b) (6) the (b) (6) ( (b) (6) and the (b) (6) ( (b) (6) (b) (6) Their comments were conveyed to the Applicant as appropriate.

The label was submitted in the format prescribed by the PLR. Although the supplement was submitted prior to when it would otherwise have been required to comply with the PLLR requirements, the review team believed it would be of value to harmonize with this labeling standard to the extent possible.

Specific issues discussed during labeling negotiations included the selection of studies for inclusion in Section 6.1 (Clinical Trial Experience in the ADVERSE REACTIONS section) and 14 (CLINICAL STUDIES section). Only studies that evaluated the specific proposed regimen were included in these sections. For the Adverse Reactions section, examination of the common adverse reaction data by U.S. compared to non-U.S. study location revealed that there were large differences in the frequency of common adverse reactions, with the reporting rate considerably higher among the U.S. studies. This may reflect differences in ascertainment or subject reporting of adverse reactions in non-U.S. studies. Regardless, inclusion of this non-U.S. data would not be appropriate, as it is unlikely to be informative to the U.S. population of users. In the case of serious adverse reactions, the reported frequency was quite similar regardless of study location; for this reason, serious adverse reaction information from global studies is reported. Agreement on labeling was reached on March 29, 2016.

21

<u>Post-Marketing Requirement/Commitment and Risk Evaluation and Mitigation Strategies (REMS):</u>

*Postmarketing Requirements/Postmarketing Commitments*: None.

*Risk Evaluation and Mitigation Strategies (REMS)*: The Applicant proposed a REMS modification for the Mifeprex REMS program with the submission of this efficacy supplement. The review teams from the ███ (b) (6) evaluated the current Mifeprex REMS program and the proposed REMS modifications to determine whether each Mifeprex REMS element remains necessary to ensure that the benefits of Mifeprex outweigh the risks. Factors that impacted the decision included findings from two REMS assessments (the more recent REMS assessment review was completed in October 2015), an unchanged safety profile, and published literature that documented adequate safeguards in clinical practice with the use of Mifeprex in a regimen with misoprostol.

The teams determined that the following REMS modifications were warranted:

1. Revisions to the Prescriber Agreement Form to reflect the new dosing regimen and to reflect current REMS formatting and language standards
2. Removal of the Medication Guide as a REMS element, as distribution of the Medication Guide is required under 21 CFR 208
3. Removal of the Patient Agreement as a Documentation of Safe Use Condition (ETASU D)
4. Updating of the REMS goals to reflect the above 3 changes.
5. Removal of the phrase "Under Federal law" from the Prescriber's Agreement
6. Replacing the term "licensed physician" with "healthcare provider who prescribes"



The above modifications to the Mifeprex REMS program were discussed with the ███ (b) (6) ███ (b) (6) on January 15, 2016, as per ███ (b) (6) .

The ███ (b) (6) concurred with conforming changes to the Prescriber's Agreement to reflect the new dosing regimen, and with removal of the Medication Guide from the REMS. The Medication Guide would remain a part of labeling to inform patients about the risks associated with Mifeprex use. The ███ (b) (6) also concurred with revisions to the REMS goals to reflect these changes.

The ███ (b) (6) concurred with the removal of the term "under Federal law". A rationale for the original inclusion of the phrase "Under Federal law" cannot be discerned from available historical documents, nor is it consistent with REMS materials for other products. All the conditions of approval, including the REMS materials, are under Federal law; therefore, the phrase is unnecessary and it was decided that the phrase be removed from the Prescriber's Agreement.

Reference ID: 3909594

EX. 32 pg. 023

The [(b) (6)] concurred with use of the term "healthcare providers who prescribe." To support a change in the REMS that would allow qualified healthcare providers other than physicians to prescribe Mifeprex through the Mifeprex REMS program, the Applicant provided information from over 3,200 women in randomized controlled trials and 596 women in prospective cohort studies comparing medical abortion care by physicians versus other providers (nurses or nurse midwives). These studies were conducted in a variety of settings (international, urban, rural, and low-resource).  No differences in serious adverse events, ongoing pregnancy or incomplete abortion were identified between the groups. Given that providers other than physicians are providing family planning and abortion care under supervision and that the approved labeling and REMS program stipulate that prescribers must be able to refer patients for additional care, including surgical management, allowing these prescribers to participate in the Mifeprex REMS program is acceptable.

The [(b) (6)] also concurred with the teams' recommendation to remove the Patient Agreement (ETASU D) from the REMS although some [(b) (6)] members commented that additional support for the review team's rationale for this modification was needed. The review team's rationale for this change was:

APPEARS THIS WAY ON ORIGINAL

23

EX. 32 pg. 024

- The safety profile of Mifeprex is well-characterized over 15 years of experience, with known risks occurring rarely; the safety profile has not changed over the period of surveillance.
- Established clinical practice includes patient counseling and Informed Consent, and, more specifically with Mifeprex, includes counseling on all options for termination of pregnancy, access to pain management and emergency services if needed.
- Medical abortion with Mifeprex is provided by a well-established group of organizations and their associated providers who are knowledgeable in this area of women's health. Their documents and guidelines cover all the safety information that also appears in the Patient Agreement.
- ETASUs A and C remain in place: The Prescriber's Agreement under ETASU A requires that providers "explain the procedure, follow-up, and risks to each patient and give her an opportunity to discuss them." The REMS will continue to require that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals. This ensures that Mifeprex can only be dispensed under the direct supervision of a certified prescriber.
- Labeling mitigates risk: The Medication Guide, which will remain a part of labeling, contains the same risk information covered under the Patient Agreement.

The Mifeprex REMS program will have a modified ETASU REMS that will continue to ensure that Mifeprex can only be prescribed by certified prescribers and be dispensed to patients in certain healthcare settings, specifically, clinics, medical offices and hospitals. The Medication Guide will continue to be distributed to patients required under 21 CFR part 208. As required for all ETASU REMS, ongoing assessments of the Mifeprex REMS program will continue to ensure that the modified Mifeprex REMS program is meeting its goals.

### 13. Decision/Action/Risk Benefit Assessment

Decision:

All regulatory and scientific requirements have been adequately addressed in this efficacy supplement. Review teams involved in this supplement have recommended approval of the supplement from their disciplines' perspective. The submitted efficacy and safety information supported approval of the proposed dosing regimen through 70 days gestation, and other changes discussed in this summary memo. This supplement will receive an Approval action.

Benefit Risk Assessment:

This efficacy supplement provided substantial evidence of efficacy for the proposed dosing regimen through 70 days gestation. The efficacy findings were similar to those that led to the approval of the original dosing regimen in 2000. In addition, the submitted published literature supported other changes sought in this efficacy supplement that will

be reflected in labeling: 1) a more flexible time interval of 24 to 48 hours between Mifeprex and misoprostol administration, 2) the option of at home administration of misoprostol, 3) the option of repeat misoprostol dosing, if clinically indicated, 4) flexibility in the follow–up time frame of 7 to 14 days, and 5) permitting qualified healthcare providers other than physicians to prescribe Mifeprex.

The safety findings of the proposed dosing regimen were acceptable and were similar to those seen with the original dosing regimen approved in 2000.

After review of the REMS modifications proposed by the Sponsor, I concur with the clinical team and ___ (b) (6) recommendations that:

1.     The Medication Guide can be removed from the Mifeprex REMS program. The Medication Guide requirements under 21 CFR part 208 require the Medication Guide to be distributed to patients. Mifeprex will only be dispensed by a healthcare professional who will be knowledgeable and able to provide the patient instructions on appropriate use of the drug, including what potential side effects may occur or follow-up that may be required as appropriate, and who will answer any questions the patient may have. In that setting, the Medication Guide will already be a required available tool for counseling. Therefore, given the existing requirements under 21 CFR part 208, I concur that there is no reason for the Medication Guide to specifically be a part of the REMS.

2.     The Prescriber Agreement Form (ETASU A) as revised reflects current FDA format and content to conform to current REMS programs and reflect the labeling changes that will be approved in this supplement. I concur that the changes are acceptable.

3.     Revision of the Mifeprex REMS goals (ETASU C) will adequately mitigate the risk of serious complications by requiring certification of healthcare providers who prescribe and ensuring the Mifeprex is dispensed only in certain healthcare settings by or under the supervision of a certified prescriber.

4.     Removal of the Patient Agreement Form (ETASU D): I concur with the clinical review team that the Patient Agreement Form, which requires a patient's signature, does not add to safe use conditions for the patient for this REMS and is a burden for patients. It is standard of care for patients undergoing pregnancy termination to undergo extensive counseling and informed consent. The Patient Agreement Form contains duplicative information already provided by each healthcare provider or clinic. I believe that it is much more critical for the healthcare provider who orders or prescribes Mifeprex to provide and discuss informed consent derived from their own practice so that care can be individualized for the patient.

I support that the Mifeprex REMS with ETASUs A and C remain in place to support conditions critical to the use of the drug. Therefore, the implementation system and timetable for assessments should continue.

I also agree with the clinical review team that the reporting requirements should only be required for deaths. It is important that the Agency be informed of any deaths with Mifeprex to monitor new safety signals or trends. However, after 15 years of reporting serious adverse events, the safety profile for Mifeprex is essentially unchanged. Therefore, I agree that reporting of labeled serious adverse events other than deaths can be collected in the periodic safety update reports and annual reports to the Agency.

In summary, I believe that the benefit-risk profile for Mifeprex continues to be favorable and with the agreed-to labeling changes and REMS modifications, the Mifeprex REMS program will continue to assure safe use. Therefore, I support approval of this efficacy supplement and REMS modifications.

<u>Addendum:</u>

On March 28, 2016, Dr. Janet Woodcock, the Director, Center for Drug Evaluation and Research, asked ▇▇▇▇▇▇▇ (b) (6) and the ▇▇▇▇▇▇▇ (b) (6) ▇▇▇▇▇▇▇ to continue to include a Patient Agreement Form in the REMS for Mifeprex (see March 28, 2016 Memorandum from Janet Woodcock, MD, Director, Center for Drug Evaluation and Research, through the ▇▇▇▇▇▇▇ (b) (6) ▇▇▇▇▇▇▇ (6)

Therefore, the Patient Agreement Form will be retained and other changes will be made in the REMS to reflect that it is being retained.

EX. 32 pg. 027

----------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

----------------------------------------------------------------

/s/

-------------------------------------------------

(b) (6)

03/29/2016

Reference ID: 3909594