# Exhibit 35

2019 Citizen Petition of Am. Ass'n of Pro-Life
Obstetricians & Gynecologists to FDA (Mar. 29, 2019)

## Citizen Petition

March 29, 2019

The undersigned submit this petition to request the Commissioner of Food and Drugs to: (I) restore and strengthen elements of the Mifeprex regimen and prescriber requirements approved in 2000, and (II) retain the Mifeprex Risk Evaluation and Mitigation Strategy (REMS), and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

## A.  Action Requested

I.  RESTORE AND STRENGTHEN ELEMENTS OF THE MIFEPREX REGIMEN AND PRESCRIBER REQUIREMENTS APPROVED IN 2000.

Current language and requested language for the Mifeprex Label and the Mifeprex *Risk Evaluation and Mitigation Strategy* (REMS) are included in Exhibit A.[1] Requests include:

**A. Indications and Usage**. Mifeprex, in a regimen with misoprostol, for the termination of intrauterine pregnancy, should be limited to 49 days' gestation.

**B. Dosage and Administration.**

1.  Mifeprex should be administered by or under the supervision of a physically present and certified physician who has ruled out ectopic pregnancy.

2.  The use of Mifeprex and misoprostol for the termination of pregnancy should require three office visits by the patient.

**C. Contraindications.** Mifeprex use is contraindicated for patients who do not have convenient access to emergency medical care.

**D. Adverse Event Reporting.** Certified prescribers, emergency medical personnel, physicians treating complications, and Danco Laboratories should report to FDA's MedWatch Reporting system any deaths, hospitalizations, blood transfusions, emergency room visits, failures requiring surgical completion, ongoing pregnancy, or other major complications following the use of Mifeprex and misoprostol.

---

[1] Other documents will require corresponding modifications, including the Mifeprex Medication Guide, Prescriber Agreement Form, and Patient Agreement Form.

1

**E. Additional studies.** The Mifeprex REMS should require a formal study of outcomes for at-risk populations, including: patients under the age of 18; patients with repeat Mifeprex abortions; patients who have limited access to emergency room services; and patients who self-administer misoprostol.

II.   <u>RETAIN THE MIFEPREX RISK EVALUATION AND MITIGATION STRATEGY (REMS), AND CONTINUE LIMITING THE DISPENSING OF MIFEPREX TO PATIENTS IN CLINICS, MEDICAL OFFICES, AND HOSPITALS, BY OR UNDER THE SUPERVISION OF A CERTIFIED PRESCRIBER.</u>

**A. Retain the Mifeprex REMS.**

**B. Continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.**

1. <u>Mifeprex should be dispensed only in clinics, medical offices, and hospitals.</u>

   **a. The "TelAbortion" Direct-to-Consumer Mifeprex Study**

   **b. The Mifeprex through Pharmacy Dispensing Study**

   **c. Beyond the Current Studies**

2. <u>Mifeprex Prescribers Should be Certified.</u>

EX. 35 pg. 02

## B. Statement of Grounds

I.   RESTORE AND STRENGTHEN ELEMENTS OF THE MIFEPREX REGIMEN AND PRESCRIBER REQUIREMENTS APPROVED IN 2000.[2]

   **A. Indications and Usage.** Mifeprex, in a regimen with misoprostol, for the termination of intrauterine pregnancy, should be limited to 49 days' gestation.

In 2016, FDA increased the maximum gestational age for Mifeprex use for abortion from 49 days (7 weeks) to 70 days (10 weeks), and changed the method of administration of misoprostol from oral to buccal (*i.e.*, in the cheek pouch). However drug-induced abortion[3] regimens demonstrate an increase in complications and failures after 49 days' gestation.

In a 2011 study of thousands of patients, the majority of whom had a drug-induced abortion using what is now the Mifeprex regimen, the rate of infection and the rate of failure requiring surgical intervention increased with gestational age.[4] The American College of Obstetricians and Gynecologists (ACOG) has stated: "the risk of clinically significant bleeding and transfusion may be lower in women who undergo medical abortion of gestations up to 49 days compared with those who undergo medical abortion of gestations of more than 49 days."[5]

Further, a 2015 meta-analysis examined all the existing publications on buccal administration of misoprostol, 20 studies in all, from November 2005 through January 2015. The failure rate of the buccal misoprostol regimen increased as the gestational age

---

[2] The FDA approved Mifeprex for use in the United States on September 28, 2000, with safeguards considered necessary to ensure patient safety. The drug's initial approval was for termination of pregnancy, in a regimen with misoprostol, through 49 days of pregnancy. FDA significantly modified the drug's label at the application of the manufacturer, Danco Laboratories, in 2016, extending approved use to 70 days of pregnancy. Additional changes included: a new dosage of both Mifeprex and misoprostol; permitting home administration of Mifeprex and misoprostol; a new route of administration for the misoprostol (buccal, in the cheek pouch); permitting non-physicians to become certified prescribers; a decrease from 3 to 1 mandatory office visits by the patient; and reduced reporting requirements. U.S. Gov't Accountability Office, GAO-18-292, Food and Drug Administration: Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts 4-7 (2018); Mifeprex Risk Evaluation and Mitigation Strategy (REMS), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_REMS_full.pdf; Mifeprex Medication Guide, https://www.fda.gov/downloads/Drugs/DrugSafety/ucm088643.pdf.

[3] The terms "Medication abortion," "medical abortion," "chemical abortion," and "drug-induced abortion" [or termination of pregnancy] share the same meaning and refer to the use of abortion-inducing drugs, rather than surgery, to induce abortion. The current FDA-approved regimen uses two drugs, mifepristone (a.k.a. Mifeprex or RU-486) and misoprostol.

[4] Mentula MJ, Niinimaki M, Suhonen S, Hemminki E, Gissler M, and Heinkinheimo O, *Immediate Adverse Events after Second Trimester Medical Termination of Pregnancy: Results of a Nationwide Registry Study,* Human Reproduction 26(4), 927-932 (2011).

[5] ACOG Practice Bulletin 143: *Medical Management of First-Trimester Abortion*, p. 5 (Mar. 2014, reaffirmed 2016).

increased, especially at gestational ages greater than 49 days.[6] The current FDA label also acknowledges this fact.[7]

Given the serious risks of failure, hemorrhage, infection, and ongoing pregnancy that increase as pregnancy advances, the gestational limit for the Mifeprex regimen should have never been increased.

### B. Dosage and Administration.

1. Mifeprex should be administered by or under the supervision of a physically present and certified physician who has ruled out ectopic pregnancy.

The 2000 Mifeprex regimen required Mifeprex to be "provided by or under the supervision of a *physician*" who meets qualifications discussed in this section below.[8] However, the 2016 regimen replaced "physician" with "healthcare provider," thus permitting non-physicians to apply to be certified prescribers.[9] Given the regimen's serious risks, the FDA should limit the ability to prescribe and dispense Mifeprex to qualified, licensed physicians. Physicians are better trained to diagnose patients who have contraindications to Mifeprex and to verify gestational age.

The current Mifeprex Risk Evaluation and Mitigation Strategy (REMS), discussed in Section II below, continues to provide that "Mifeprex must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, *by or under the supervision of a certified prescriber.*"[10] Yet, abortion providers today are promoting and performing "telemedicine abortions," where the certified prescriber's "supervision" of the dispensing of Mifeprex is limited to a videoconference.[11] This practice demonstrates a flagrant disregard for FDA safeguards.

To ensure true supervision, the FDA should require certified prescribers to be physically present when Mifeprex is dispensed so that they can appropriately examine patients and rule out contraindications to the use of Mifeprex. This requirement would be consistent with other requirements in the Mifeprex Label and REMS.

---

[6] Chen MJ, Creinin MD, *Mifepristone with Buccal Misoprostol for Medical Abortion*, Obstet. Gynecol 126 (1) July 2015 12-21.
[7] Mifeprex 2016 label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.
[8] Mifeprex 2000 label, Dosage and Administration, emphasis added.
[9] Mifeprex 2016 label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.
[10] Mifeprex 2016 REMS, emphasis added,
https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_REMS_full.pdf.
[11] *See* Planned Parenthood Releases New Educational Video on Telemedicine Abortion (Feb. 6, 2018), https://www.plannedparenthood.org/about-us/newsroom/press-releases/planned-parenthood-releases-new-educational-video-on-telemedicine-abortion.

In the Mifeprex Label, the FDA emphasizes that "Mifeprex is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS)" because of the drug's "risks of serious complications." In a bold-print box, the FDA states that before prescribing Mifeprex, a provider must inform a patient: about the risks of serious events; whom to call and what to do if certain symptoms occur; and to take the Medication Guide with her if she visits an emergency room or healthcare provider who did not prescribe Mifeprex, so that she receives appropriate, informed care.[12]

Further, a provider must sign a Provider Agreement Form, attesting that he or she can:

- **Assess the duration of pregnancy accurately.**[13] Failures and complications of Mifeprex abortion increase with increasing gestational age. Mifeprex use is approved through 70 days' gestation.[14] FDA should strengthen this requirement by mandating that gestational age be accurately assessed by ultrasound in order to both ensure compliance with FDA restrictions and adequately inform the patient of gestational age-specific risks, which rise with increasing gestational age.

- **Diagnose ectopic pregnancies**[15] (*i.e.,* extrauterine pregnancy; pregnancy outside the uterus), which Mifeprex cannot end. When an ectopic pregnancy progresses, it can rupture the fallopian tube, causing bleeding, severe pain, or death. If a woman with an extrauterine pregnancy is given Mifeprex, she may believe the symptoms for ectopic pregnancy are simply the side effects of drug-induced abortion, which are similar. As of December 31, 2017, at least 97 women with ectopic pregnancies in the United States had been given Mifeprex.[16] Of these women, at least two bled to death from an undiagnosed ectopic pregnancy.[17] They likely did not recognize that their cramps, abdominal pain, and perhaps vaginal bleeding were dangerous—not side effects expected in a Mifeprex abortion.[18]

---

[12] Mifeprex 2016 label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.

[13] Mifeprex Prescriber Agreement Form, https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_Prescriber_Agreement_Form.pdf.

[14] *See* Section I.A, *supra.*

[15] Mifeprex Prescriber Agreement Form, https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_Prescriber_Agreement_Form.pdf.

[16] Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2017, RCM # 2007-525, NDA 20-687, https://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/UCM603000.pdf).

[17] *Id.*

[18] Donna Harrison, M.D. & Michael J. Norton Testimony before the Iowa Board of Medicine, p. 3 (Aug. 21, 2013), *citing* Postmarket Drug Safety Information for Patients and Providers, Questions and Answers on Mifeprex,

- **Provide surgical intervention if needed, or has made plans to provide such care through others.**[19] He or she must assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.[20]

Clearly, a provider who does not physically meet with and examine a patient, but simply consults with the patient over the Internet, is not capable of fulfilling these requirements, or of ruling out additional contraindications (*i.e.*, circumstances that make a treatment or medication *unadvisable*) to Mifeprex use. These physical contraindications include pelvic infections, ovarian masses, cardiac arrhythmias, and liver abnormalities.[21] A physician bears responsibility to diagnose and rule out contraindications prior to Mifeprex use. It is inadequate to entrust this critical care to another healthcare provider who is not trained in diagnosis. Further, a healthcare provider who is not physically accessible to a patient cannot provide adequate follow-up care to patients, as required by the FDA Mifeprex regimen.

Thirty-four states permit only physicians to prescribe Mifeprex,[22] with nineteen states requiring the provider to be physically present with the patient.[23] For example, the law in Alabama states that the physical presence and care of a physician are necessary because "the failure and complications from medical abortion increase with advancing gestational age, because the physical symptoms of medical abortion can be identical to the symptoms of ectopic pregnancy, and because abortion-inducing drugs do not treat ectopic pregnancies but rather are contraindicated in ectopic pregnancies."[24]

Lawmakers in these states recognize that abortion providers cannot diagnose contraindications and cannot adequately care for their patients through a videoconference. Fundamentally, telemedicine "may be legitimate when it comes to discrete, document-based tasks such as reading X-rays," but it "is not the standard of care when it comes to abortion or the management of miscarriage."[25]

---

https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm492705.htm.

[19] Mifeprex Prescriber Agreement Form,
https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_Prescriber_Agreement_Form.pdf.

[20] *Id.*

[21] Harrison & Norton Testimony, p. 3.

[22] Donovan MK, *Self-Managed Medication Abortion: Expanding the Available Options for U.S. Abortion Care*, Guttmacher Policy Review, Vol. 21, p. 44 (2018).

[23] *Id.*

[24] Ala. Code § 26-23E-7.

[25] Harrison & Morton Testimony, p. 19.

2. <u>The use of Mifeprex and misoprostol for the termination of pregnancy should require three office visits by the patient.</u>

The 2016 regimen significantly diminished doctor-patient interaction. While the 2000 Mifeprex label required three patient visits with the abortion provider, women may now obtain Mifeprex at a clinic and self-administer it at home. They are no longer required to return to the clinic for the administration of misoprostol, which prevents abortion providers from ensuring that they take the drugs at the correct times. Further, providers may now "confirm" that a patient's drug-induced abortion was successful without a clinic visit,[26] increasing the threat that Rh-negative patients will not receive administration of Rhogam, which is necessary to prevent serious risks in subsequent pregnancies.

The 2016 regimen directs that patients be given or prescribed misoprostol to take 24 to 48 hours after taking Mifeprex. However, without monitoring, a patient may take misoprostol before 24 hours have passed since she consumed Mifeprex, rendering the regimen ineffective and increasing the likelihood that she will experience a failed drug-induced abortion and require surgery.

Using buccal misoprostol sooner than 24 hours after administering mifepristone leads to a significantly increased failure rate. In one study investigating the timing of buccal misoprostol after mifepristone, nearly one out of every three to four women who took buccal misoprostol shortly after mifepristone failed to abort.[27] The failure rate ranged from 27% to 31%, depending on the pregnancy gestation.[28] Given these results, the authors of this study strongly recommended that buccal misoprostol not be taken immediately after mifepristone because of the very high abortion failure rate.[29] However, with home administration of misoprostol, healthcare providers have no control over when their patients consume the drug.

A woman may also choose to swallow misoprostol rather than keep the pill between her cheek and gum for 30 minutes, converting a "buccal" administration into an "oral" administration. An oral administration of misoprostol following the lower dose of mifepristone in the current regimen is not as effective in ending the pregnancy.

Further, waiting until 24 hours after Mifeprex to administer misoprostol does not guarantee success, and the failure rate of buccal misoprostol is higher than that under the 2000 regimen. A comprehensive systematic review and meta-analysis of the existing

---

[26] *See* Mifeprex 2016 label,
https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.
[27] Lohr PA, Reeves MF, Hayes JL, Harwood B, Creinin MD, *Oral Mifepristone and buccal misoprostol administered simultaneously for abortion: a pilot study*, Contraception 76 (2007) 215-220.
[28] *Id.*
[29] *Id.*

EX. 35 pg. 07

studies of the 2016 regimen found that women who take misoprostol earlier than 48 hours after mifepristone are more likely to fail the regimen.[30]

Under the 2000 regimen, doctors were also able to provide care to patients during the most challenging and painful time in the drug-induced abortion. According to the World Health Organization, up to 90% of women will abort within 4-6 hours after taking misoprostol.[31] The 2000 regimen permitted a patient to be in a clinic for this period of time, during which she would be under the observation and care of medical personnel. This observation period is for "both patient safety and compassion. . . . This is the time when women should be in a place where their bleeding can be monitored, their vital signs can be observed by trained medical personnel, and they can receive sufficient pain medication during the most difficult part of the expulsion."[32]

Abortion complications are also more frequent when women abort at home, without the oversight of a healthcare provider. A 2018 combined retrospective and longitudinal follow-up study of complications related to induced abortion in Sweden determined that "[t]he complication frequency [of drug-induced abortion] was significantly higher among women <7 gestational weeks who had their abortions *at home*."[33]

In-person contact with a healthcare provider is critical to post-abortion care as well. Abortion providers should perform a "follow-up [physical exam] after the use of mifepristone in order to confirm abortion and rule out life-threatening infection."[34] Before FDA approved the 2016 regimen, the follow-up visit was considered "very important to confirm by clinical examination or ultrasonographic scan that a complete termination of pregnancy has occurred."[35] In fact, the 2000 label provided that "[e]ach patient must understand the necessity of completing the treatment schedule, including a follow-up visit approximately 14 days after taking Mifeprex."[36] ACOG's current policy explains that:

> Women are not good candidates for medical abortion if they … desire quick completion of the abortion process [or] are not available for follow-up contact or evaluation….[37]

---

[30] Chen MJ, Creinin MD, *Mifepristone with Buccal Misoprostol for Medical Abortion*, Obstet.Gynecol 126 (1) July 2015 12-21.

[31] World Health Organization, *Safe Abortion: Technical and Policy Guidance for Health Systems* 45.

[32] Donna Harrison, M.D., Aff. *Okla. Coalition for Reproductive Justice v. Cline*, Case No. CV-2014-1886 (Feb. 24, 2015) ¶ 136.

[33] Carlsson I, Breding K, and Larsson PG, *Complications Related to Induced Abortion: a Combined Retrospective and Longitudinal Follow-up Study*, BMC Women's Health (2018) 18:158, p. 4 (emphasis added).

[34] Harrison & Norton Testimony, p. 18.

[35] Mifeprex 2000 label, Day 14: Post-Treatment Examination.

[36] Mifeprex 2000 label, Information for Patients.

[37] ACOG Practice Bulletin 143, p. 6.

In addition to ensuring for all drug-induced abortion patients that the uterus has been emptied of retained tissue and that they are not suffering from infection, the follow-up examination is particularly critical for Rh-negative patients. These patients must be administered Rhogam in order to prevent Rh isoimmunization in subsequent pregnancies. Without follow-up, women will not receive the Rhogam after the abortion, greatly increasing their risk of subsequent Rh isoimmunization, which can endanger future pregnancies.[38]

Nonetheless, abortion advocates strongly supported the reduction in required visits, and continue to advocate for the elimination of direct provider-patient contact. Gynuity Health Projects (an organization that "has been at the forefront of efforts to increase women's access to medical abortion in settings throughout the world")[39] has conducted at least three domestic and five international studies[40] on eliminating pelvic ultrasound or exam after drug-induced abortion. Following one study, researchers determined that "[s]emi-quantitative pregnancy tests … could be used in lieu of transvaginal ultrasound and/or serum hCG at clinic-based follow-up or by women themselves for home-based follow-up."[41]

In a more recent study, researchers asserted that the "common practice of scheduling a clinical contact after every medical abortion may not be necessary to ensure safety; enabling patients to determine for themselves whether or not a contact is needed can be a

---

[38] ACOG Practice Bulletin 181*: Prevention of Rh D Alloimmunization* (Aug. 2017);
and SOGC Clinical Practice Guidelines: *Prevention of Rh Alloimmunization* (No. 133, Sept. 2003).

[39] *See* Gynuity Health Projects, Medical Abortion, https://gynuity.org/programs/medical-abortion. Founded by Beverly Winikoff, M.D, M.P.H., in 2003, Gynuity outlines on its "Medical Abortion" page the organization's research projects, including efforts to: "Develop innovative service delivery systems through telemedicine; Simplify and de-medicalize medical abortion services; Expand access to medical abortion in the 1st and 2nd trimesters of pregnancy; Conduct clinical research to develop new abortion medications; Develop a 'missed menses pill'/menstrual regulation method; Develop additional clinical indications for mifepristone." Gynuity has launched a "coalition to expand access to mifepristone in the United States," co-created a "medical abortion commodities database," "introduce[d] medical abortion in new settings," "incorporate[ed] new clinical evidence into service guidelines," and "expanded medical abortion access through education and local champions."

[40] *See, e.g., Self-Assessment of Medical Abortion Outcome Using Serial Multi-level Pregnancy Tests* [NCT02570204] (Sept. 2015 – Dec. 2016),
https://www.clinicaltrials.gov/ct2/show/NCT02570204?term=Self-Assessment+of+Medical+Abortion+Outcome+Using+Serial+Multi-level+Pregnancy&rank=1; *Exploring the Role of At-home Semi-Quantitative Pregnancy Tests for Medical Abortion Follow-up* [NCT01150279] (Aug. 2009 – May 2014),
https://www.clinicaltrials.gov/ct2/show/NCT01150279?term=Exploring+the+Role+of+At-home+Semi-Quantitative+Pregnancy+Tests+for+Medical+Abortion+Follow-up&rank=1; *De-Medicalizing Mifepristone Medical Abortion* [NCT00120224] (May 2005 – Apr. 2007),
https://www.clinicaltrials.gov/ct2/show/NCT00120224?term=De-Medicalizing+Mifepristone+Medical+Abortion&rank=1.

[41] Lynd K, et al., *Simplified Medical Abortion Using a Semi-Quantitative Pregnancy Test for Home-Based Follow-up,* Int J Gynaecol Obstet. 2013 May;121(2):144-8.

reasonable approach."[42] They reached this conclusion even with 26% of participants failing to provide sufficient follow-up information.[43]

Gynuity researchers also conducted a recent systematic review of existing studies on "the accuracy and acceptability of a strategy for identifying ongoing pregnancy after medical abortion treatment using a low-sensitivity pregnancy test (LSPT)." While the researchers acknowledged that "the LSPT strategy had *moderate* sensitivity for identifying ongoing pregnancy" and "the LSPT itself had a limited role in the detection of treatment failures [*i.e.*, ongoing pregnancy] in the studies," they stated that the "LSPT strategy shows promise for reducing the need for in-person follow-up after medical abortion. A range of home-based options should be validated to meet the varied needs of women and abortion providers in diverse settings."[44]

In reality, a de-emphasis on follow-up care increases risks of post-abortion complications. As discussed above, the 2000 regimen's requirement that women return approximately 14 days after ingesting mifepristone was considered necessary to ensure that all pregnancy tissue had been passed.[45] This determination is crucial, because retained pregnancy tissue can lead to continued bleeding and serious intrauterine infections. The return visit permits healthcare providers to ensure that a patient is not experiencing these or other complications from the abortion procedure, and that Rh negative patients are administered Rhogam to protect future pregnancies.

Abortion advocates argue that three clinic visits make accessing abortion-inducing drugs more difficult for patients with transportation challenges; however, as noted above, ACOG acknowledges that drug-induced abortion is *contraindicated* for patients who "are not available for follow-up contact or evaluation."[46] Surgical abortion is a better choice for these patients, because it "[d]oes not require follow-up in most cases."[47]

Drug-induced abortion is a longer process that requires more attention and care from healthcare providers. Three visits to a physician in the interest of patient safety should not be sacrificed for the convenience of healthcare providers or even their patients.

---

[42] Raymond EG, et al., *Self-assessment of Medical Abortion Outcome Using Symptoms and Home Pregnancy Tests*, Contraception 97 (2018) 324-28.
[43] *Id.*
[44] Raymond EG, et al., *Low-sensitivity Urine Pregnancy Testing to Assess Medical Abortion Outcome: A Systematic Review*, Contraception (2018), https://doi.org/10.1016/j.contraception.2018.03.013 (emphasis added).
[45] Mifeprex 2000 label, Day 14: Post-Treatment Examination.
[46] ACOG Practice Bulletin 143, p. 6.
[47] *Id*.

**C. Contraindications.** Mifeprex use is contraindicated for patients who do not have convenient access to emergency medical care.

The 2000 Mifeprex Label stated:

> Because it is important to have access to appropriate medical care if an emergency develops, the treatment procedure is contraindicated if a patient does not have adequate access to medical facilities equipped to provide emergency treatment of incomplete abortion, blood transfusions, and emergency resuscitation during the period from the first visit until discharged by the administering physician.[48]

This critical language was excluded from the 2016 Mifeprex Label. Yet, studies comparing the outcome of surgical versus drug-induced abortion "have clearly demonstrated that Mifeprex abortions have a greater risk of hemorrhage, infection, continued pregnancies, retained tissue and need for emergency reoperation than surgical abortions."[49] ACOG acknowledges that "[c]ompared with surgical abortion, medical abortion takes longer to complete, requires more active patient participation, and is associated with higher reported rates of bleeding and cramping," and has lower success rates.[50]

Drug-induced abortion is optional. If a woman does not meet the criteria necessary to use abortion-inducing drugs, then surgical abortion is still an option. For women with transportation difficulties, an abortion provider can complete surgical abortion "in a predictable period of time," and the procedure "[d]oes not require follow-up in most cases."[51]

Efforts to promote abortion-inducing drugs to women in rural areas where access to emergency medical care is scarce are detrimental to women's health. It is better for a patient in a remote region to have a surgical abortion, "which requires a single visit, and is less likely to result in serious or life-threatening complications."[52]

---

[48] Mifeprex 2000 label, Contraindications.
[49] Harrison Aff. ¶ 115.
[50] ACOG Practice Bulletin 143, p. 3 & Box 1.
[51] *Id.*
[52] Harrison & Norton p. 9.

**D. Adverse Event Reporting.** Certified prescribers, emergency medical personnel, physicians treating complications, and Danco Laboratories should report to FDA's MedWatch Reporting system any deaths, hospitalizations, blood transfusions, emergency room visits, failures requiring surgical completion, ongoing pregnancy, or other major complications following the use of Mifeprex and misoprostol.

The 2016 regimen dramatically reduced accountability for Mifeprex providers by limiting adverse event reporting (AER) requirements, a critical safety mechanism.[53] While prescribers were required to report any serious adverse event associated with Mifeprex under the 2000 label, they are now required to report only deaths associated with Mifeprex.

Even with the 2000 regimen requirements, collecting accurate and complete adverse event information was highly difficult. Adverse events were often not reported or were interpreted by emergency health care providers as the results of spontaneous abortion.[54] The Mifeprex label instructs prescribers to "[a]dvise the patient to take the Medication Guide with her if she visits an emergency room or a healthcare provider who did not prescribe Mifeprex, so that the provider knows that she is undergoing a medical abortion."[55] Yet, many Mifeprex prescribers violate FDA protocol, instructing their patients to lie to emergency medical personnel. The organization Aid Access instructs patients that if they need to go to an emergency room:

> You do not have to tell the medical staff that you tried to induce an abortion; you can tell them that you had a spontaneous miscarriage. Doctors have the obligation to help in all cases and know how to handle a miscarriage. The symptoms of a miscarriage and an abortion with pills are exactly the same and the doctor will not be able to see or test for any evidence of an abortion, as long as the pills have completely dissolved.[56]

Such deception prevents emergency healthcare providers from appropriately caring for their patients, and further decreases the likelihood that adverse events will be reported.

With reduced AER reporting requirements under the 2016 label, what was previously difficult is now virtually impossible. The FDA cannot adequately assess the safety of the current Mifeprex regimen without comprehensive information on adverse events. AERs are the only objective means by which FDA has any data whatsoever on the effects of the

---

[53] Mifeprex 2016 label.
[54] *See* GAO-18-292, pp 24-25.
[55] Mifeprex 2016 label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.
[56] Aid Access, *How do you know if you have complications, and what should you do?*,
https://aidaccess.org/en/page/459/how-do-you-know-if-you-have-complications-and-what-should-you-do.

Mifeprex regimen on women, and the voluntary and minimal nature of the current AERs means that FDA has no accurate information about the actual number of women injured by drug-induced abortion, or the nature of complications caused by this drug.

After prescribing Mifeprex and misoprostol, certified prescribers should at minimum be required to report the following directly to the FDA Medwatch reporting system, copying Danco Laboratories: deaths, hospitalizations, blood transfusions, emergency room visits, failures requiring surgical completion, ongoing pregnancy, or other major complications. Detailed information must also be included, such as pulse, blood pressure, temperature, pre- and post-transfusion hemoglobin/hematocrit, white blood count, number of units of blood transfused, surgeries, and any other pertinent laboratory or hospital course information, as well as emergency room and hospital discharge diagnoses.

Further, FDA should provide guidance to emergency healthcare providers and physicians responsible for treating complications so that they know how to distinguish complications following drug-induced abortion from complications following spontaneous miscarriage. The guidance should also instruct these providers on how to report adverse events.[57]

The abysmal quality of the current AERs received from Danco Laboratories shows the lack of concern that Danco has demonstrated for the safety of the women who have undergone drug-induced abortion. Responsible reporting is a fundamental safety mechanism that should not be sacrificed in the interest of convenience for abortion providers.

> **E. Additional Studies.** The Mifeprex REMS should require a formal study of outcomes for at-risk populations, including: patients under the age of 18; patients with repeat Mifeprex abortions; patients who have limited access to emergency room services; and patients who self-administer misoprostol.

Mifeprex was approved for use in the pediatric population in 2000 after the FDA waived, without explanation, the requirement for studies in the pediatric population. The developmental stage of puberty involves a complex interplay of both progesterone and estrogen effects on the developing female reproductive system. The use, and especially the potential multiple use, of Mifeprex, which is a powerful progesterone blocker, is

---

[57] The Self-Induced Abortion Legal Team has created a document titled "Self-Induced Abortion and the Law: What Emergency Room Staff Need to Know." This document heavily emphasizes patient privacy requirements, including the penalties that healthcare providers may face if they disclose patient information. While these concerns are valid, emergency healthcare providers should also have training on public health reporting requirements and how such reporting does not violate HIPAA or other laws regarding patient privacy. *See,* https://www.sialegalteam.org.

likely to significantly impact the developing reproductive system of the adolescent female.[58] It is irresponsible to allow the continued uninvestigated use of Mifeprex in the pediatric female population[59] without requiring long-term studies on the impact of Mifeprex use on pubertal development.

More than one out of every three abortions in the U.S. is a repeat abortion.[60] The repeat use of Mifeprex has been associated in some studies with adverse reproductive health outcomes in future wanted pregnancies.[61] This concern requires further study.

The adverse events of hemorrhage, retained tissue, and infection are common after Mifeprex use. The hemorrhage is often significant enough to warrant transfusion.  When patients lack access to emergency medical facilities, such complications could easily translate to deaths. Thus a study of deaths and of severe hemorrhages requiring transfusion should be done to compare outcomes in women with and without access to emergency medical facilities.

II.   RETAIN THE MIFEPREX RISK EVALUATION AND MITIGATION STRATEGY (REMS), AND CONTINUE LIMITING THE DISPENSING OF MIFEPREX TO PATIENTS IN CLINICS, MEDICAL OFFICES, AND HOSPITALS, BY OR UNDER THE SUPERVISION OF A CERTIFIED PRESCRIBER.

**A. Retain the Mifeprex REMS.**

Mifeprex, when used for abortion, is subject to a Food and Drug Administration (FDA) *Risk Evaluation and Mitigation Strategy* (REMS) with *elements to assure safe use* (ETASU). FDA determined that the Mifeprex REMS is necessary to ensure the safety and efficacy of the drug, because it carries risks of life-threatening hemorrhage, infection, continued pregnancy, retained tissue, need for emergency surgery, and death. The approved Mifeprex regimen includes the use of another potent drug, misoprostol, which carries its own risks.

Under the Mifeprex REMS with ETASU, a healthcare provider must be certified to prescribe Mifeprex by reviewing the prescribing information and completing a

---

[58] Arain M, et al., *Maturation of the adolescent brain*, Neuropsychiatric Disease and Treatment, 2013:9 449-461.

[59] Because of their immaturity, minors are also less likely to understand the importance of following prescriber instruction or of recognizing when they need to seek emergency medical treatment.

[60] Jones R, et al., *Which Abortion Patients Have Had a Prior Abortion? Findings from the 2014 U.S. Abortion Patient Survey*, Journal of Women's Health, DOI: 10.1089/jwh.2017.6410 (2014).

[61] Fang L, et al., *Repeated Abortion Affects Subsequent Pregnancy Outcomes in BALB/c Mice*, PLoS ONE 7(10): e48384. doi:10.1371/journal.pone.0048384 (2012).

"Prescriber Agreement Form," attesting that they can: assess the duration of pregnancy accurately; diagnose ectopic pregnancies; and provide surgical intervention in cases of incomplete abortion or severe bleeding, or designate someone else to provide that care. Further, they must agree to follow the guidelines for use of Mifeprex.

The REMS also requires Mifeprex to "be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber." Mifeprex may not be distributed or dispensed through retail pharmacies. Also, a patient must sign a "Patient Agreement Form" and be fully informed of the risks by a certified prescriber. She must receive the Mifeprex Medication Guide, informing her that she needs a "follow-up assessment" 7 to 14 days after she has taken Mifeprex to ensure that she is well and has terminated her pregnancy.[62]

The REMS remains the lone safeguard to monitor and mitigate the risks of death and adverse events from the Mifeprex regimen. Gynuity Health Projects and researchers from the University of California, San Francisco (UCSF) obtained approval from FDA through Investigational New Drug Applications (INDs) to conduct studies that *do not* comply with the Mifeprex REMS. They intend to use the results of these studies to press for the elimination of the Mifeprex REMS.[63] [See Section II.B, below.]

The Mifeprex Medication Guide acknowledges that serious risks accompany FDA's approved regimen for drug-induced abortion, which includes the use of Mifeprex and another potent drug, misoprostol. The document improperly downplays the risks, however, stating that "*rarely*, serious and potentially life-threatening bleeding, infections, or other problems can occur following . . . medical abortion." Specifically, "in about 1 out of 100 women [administered Mifeprex and misoprostol] bleeding can be so heavy that it requires a surgical procedure."[64]

In fact, the internationally used criteria for reporting complications from drugs demonstrate that complications from drug-induced abortions are common, not rare. The Council for International Organizations of Medical Sciences (CIOMS)[65] defines the word

---

[62] GAO-18-292, pp 4-7 (2018); Mifeprex Risk Evaluation and Mitigation Strategy (REMS), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_REMS_full.pdf; 21 U.S.C. § 355-1; Mifeprex Medication Guide, https://www.fda.gov/downloads/Drugs/DrugSafety/ucm088643.pdf.
[63] *See* Daniel Grossman, MD, Research Protocol: *Alternative Provision of Medication Abortion via Pharmacy Dispensing*, Version #:1.3 (July 17, 2018) p. 14.
[64] Mifeprex Medication Guide, https://www.w.fda.gov/downloads/Drugs/DrugSafety/ucm088643.pdf.
[65] The Council for International Organizations of Medical Sciences (CIOMS) is an international, non-governmental, nonprofit organization established jointly by WHO and UNESCO in 1949. Through its membership, CIOMS is representative of a substantial proportion of the biomedical scientific community. In 2013, the membership of CIOMS included 49 international, national, and associate member organizations, representing many of the biomedical disciplines, national academies of sciences, and medical research councils.

"rare" in adverse event reporting as an event that happens in between "1 out of 1,000" to "1 out of 10,000" uses. "Common" is the uniform term used for events that happen in between "1 out of 10" to "1 out of 100" uses.[66] Given that "about 1 out of 100 women" using Mifeprex/misoprostol require surgery, serious complications are common, not rare.[67]

Also, as discussed in Section I.C above, Mifeprex abortions carry greater risks than surgical abortions.[68] A study of over 42,000 women in Finland who had abortions from 2000 to 2006 found that "overall, medical abortion had roughly four times the rate of adverse events than surgical abortion, and hemorrhaging was experienced by 16 percent of medical abortion patients compared with 2 percent of surgical abortion patients."[69]

A combined retrospective and longitudinal follow-up study of complications related to induced abortion in Sweden published in 2018 determined that the share of complications related to drug-induced abortions at less than 12 weeks *increased* significantly during 2008-2015 without an evident cause. The increase was from 4.2% in 2008 to 8.2% in 2015, with incomplete abortion as the most common complication related to drug-induced abortions at less than 12 weeks.[70]

Abortion advocates are also attacking the REMS by advocating for mifepristone use in spontaneous miscarriage management. In a small recent study, researchers compared the efficacy and safety of using mifepristone with misoprostol for the management of early miscarriages to using misoprostol alone.[71] Notably, 6-10% of study participants had a gestational age of "4-5 weeks gestation."[72] It is not clear from the authors how participants of that gestational age could meet the published guidelines for diagnosis of non-viable pregnancy recently published by the Society of Radiologists in Ultrasound multispecialty consensus panel.[73] The panel requires the crown-rump length cutoff to 7 mm for embryos without a heartbeat and the mean sac diameter cutoff to 25 mm for

---

[66] CIOMS training manual on medicine safety, http://www.who.int/medicines/areas/quality_safety/safety_efficacy/trainingcourses/definitions.pdf.

[67] *See* Mifeprex Medication Guide; CIOMS training manual on medicine safety, *supra.*

[68] *See* Harrison Aff. ¶ 115; ACOG Practice Bulletin 143, p. 3 & Box 1.

[69] GAO-18-292, p. 25, *discussing* Niinimaki M, et al., *Immediate Complications after Medical Compared with Surgical Termination of Pregnancy,* Obstetrics & Gynecology, vol. 114, no. 4 (October 2009): 795-804.

[70] Carlsson I, Breding K, and Larsson PG, *Complications Related to Induced Abortion: A Combined Retrospective and Longitudinal Follow-up Study,* BMC Women's Health (2018) 18:158.

[71] Schreiber CA, et al, *Mifepristone Pretreatment for the Medical Management of Early Pregnancy Loss*, N Engl J Med 2018; 378:2161-70.

[72] *Id.* Table 1.

[73] Doubilet PM, Benson CB, Bourne T, et al., *Diagnostic criteria for nonviable pregnancy early in the first trimester*, N Engl J Med 2013; 369:1443–1451.

"empty" sacs, in order to minimize interventions that "interrupt a pregnancy that otherwise would have had a normal outcome."[74]

The authors admit that the study "was not powered to show differences between groups in the proportions of serious adverse events,"[75] an important consideration prior to recommending a change in spontaneous abortion management protocols. Yet, the authors incorrectly stated "such events were rare."[76] Table 3 gives a total number of serious adverse events as 3.4% for the mifepristone pretreatment group, and 2.0% for the misoprostol alone group.[77] Under the CIOMS criteria for reporting complications from drugs, discussed above, the rate of 2%-3.4% of adverse events in each study arm demonstrates clearly that adverse events are common, not rare, in both misoprostol alone and mifepristone + misoprostol miscarriage management.

Further, the Mifeprex + misoprostol arm raises a concern about the need for further study of adverse events, especially hemorrhage. Mifepristone is known to inhibit endometrial hemostasis (*i.e.*, arrest of bleeding),[78] as demonstrated by many reports of hemorrhage with transfusions reported to the FDA after use of mifepristone and misoprostol for elective abortions.[79]

Of additional concern is the vaginal route of administration of misoprostol. After reports of overwhelming sepsis following vaginal administration of misoprostol, Planned Parenthood changed the route of administration of misoprostol from vaginal to buccal,[80] with subsequent decrease in reported infections. Animal studies have demonstrated that both mifepristone[81] and misoprostol[82] can profoundly suppress innate immunity and the ability to fight infections.

---

[74] Hu M, Poder L, Filly R, *Impact of New Society of Radiologists in Ultrasound Early First-Trimester Diagnostic Criteria for Nonviable Pregnancy*, J Ultrasound Med 2014; 33:1585–1588.

[75] Schreiber, *supra* p. 2168.

[76] *Id.*

[77] *Id.* p. 2169.

[78] Miech RP, *Pathopharmacology of excessive hemorrhage in mifepristone abortions*, Ann Pharmacother 2007 Dec; 41(12):2002-7.

[79] Gary MM, Harrison DJ. "Analysis of severe adverse events related to the use of mifepristone as an abortifacient." Ann Pharmacother. 2006 Feb;40(2):191-7; Food and Drug Administration "Mifepristone U.S. Postmarketing Adverse Events Summary" 2011, https://www.minnpost.com/sites/default/files/attachments/Mifeprex_April2011_AEs.pdf.

[80] Fjerstad M, Trussell J, Sivin I, Lichtenberg ES, Cullins V, *Rates of Serious Infection after Changes in Regimens for Medical Abortion*, N Engl J Med 2009; 361:145-51.

[81] Sternberg EM, Hill JM, Chrousos GP, Kamilaris T, Listwak SJ, Gold PW, Wilder RL, *Inflammatory mediator-induced hypothalamic-pituitary-adrenal axis activation is defective in streptococcal cell wall arthritis-susceptible Lewis rats*, Proc Natl Acad Sci U S A. 1989 Apr;86(7):2374-8; Miech RP, *Pathophysiology of mifepristone-induced septic shock due to Clostridium sordellii*, Ann Pharmacother. 2005 Sep;39(9):1483-8. Epub 2005 Jul 26.

[82] Aronoff  DM et al., *Misoprostol impairs female reproductive tract innate immunity against clostridium sordellii*, 180 J. Immunol. 8222-8230 (2008).

17

Despite the clear methodological errors, including a failure to accurately diagnose fetal death according to accepted criteria as well as lack of adherence to the stated inclusion criteria, and despite the absence of power to evaluate safety, abortion advocates are calling for the routine use of mifepristone to manage spontaneous miscarriages.[83] Any change in spontaneous miscarriage management with mifepristone should require an FDA New Drug Application (NDA) with two randomized controlled trials (RCTs) comparing the arms of mifepristone and misoprostol, misoprostol alone, surgical management, and expectant management. Without blinded RCTs to evaluate not only efficacy but also safety, it is premature to remove the REMS for Mifeprex to facilitate mifepristone access for spontaneous miscarriage management.

Despite the presence of serious risks and contraindications to the Mifeprex regimen, Gynuity, the University of California, San Francisco (UCSF), and other abortion advocates want the FDA to eliminate the remaining safeguards that were enacted to ensure the safety and efficacy of Mifeprex. They are pursuing their goals through publication, advocacy, litigation,[84] and/or controversial research enabled by FDA.[85]

Further, as Section II.B below explains, lifting the REMS is only the starting point for abortion advocates.

### B. Continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

1. Mifeprex should be dispensed only in clinics, medical offices, and hospitals.

The Mifeprex REMS requires that Mifeprex "be dispensed to patients only in clinics, medical offices and hospitals, by or under the supervision of a certified prescriber." That prescriber must be capable of assessing the duration of a pregnancy accurately, diagnosing ectopic pregnancies, and providing or referring for surgical intervention in cases of incomplete abortion or hemorrhaging.[86]

Abortion advocates, however, want the FDA to permit healthcare providers to prescribe Mifeprex to pregnant patients over the Internet or phone, with the drug available at pharmacies or through the mail, and through advance provision (*i.e.*, before a patient is pregnant). Eliminating or relaxing the REMS to facilitate Internet or telephone prescriptions would be dangerous to women and adolescent girls. Healthcare providers

---

[83] Molly Walker, *Mifepristone: Better for Managing Early Miscarriage*, Medpage Today, (June 6, 2018), https://www.medpagetoday.com/obgyn/pregnancy/73336.
[84] *Chelius v. Azar*. CIV. NO. 1:17-cv-00493-DKW-KSC (Dist. Ct. HI 2018).
[85] See Section II.B, below.
[86] Mifeprex Risk Evaluation and Mitigation Strategy (REMS), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_REMS_full.pdf.

prescribing abortion-inducing drugs over the Internet or phone or before a patient is even pregnant cannot adequately evaluate patients for contraindications to the drugs.[87] Further, as discussed above, Rh-negative patients must be administered Rhogam in order to prevent Rh isoimmunization in subsequent pregnancies. Without direct patient contact, women will not receive the Rhogam after the abortion, greatly increasing their risk of subsequent Rh isoimmunization, which can endanger future pregnancies.[88] [See Section I.B.2, *supra*.]

Telemedicine abortion further distances women from the practitioners responsible for caring for them, and approval by FDA would further absolve abortion providers of responsibility for the well-being of their patients. Promoting telemedicine abortion to women and adolescent girls in rural areas with limited access to healthcare is extremely dangerous—they will have little recourse if they face known and predictable emergency complications such as severe hemorrhage.[89]

Nonetheless, Gynuity Health Projects and researchers from UCSF obtained approval from FDA through Investigational New Drug Applications (INDs) to conduct studies that *do not* comply with the Mifeprex REMS. They will use the results of these studies to press for the elimination of the Mifeprex REMS.

### a.   The "TelAbortion" Direct-to-Consumer Mifeprex Study

Gynuity Health Projects is the sponsor of the study "Feasibility of Medical Abortion by Direct-to-Consumer Telemedicine."[90] Gynuity filed an IND with the FDA.[91] The status is listed as "recruiting," with age eligibility that includes 11-year-old children and an estimated enrollment of 1,000 participants at five locations.[92] The start date is listed as March 22, 2016, and the estimated completion date was extended from June 2018 to June 2019.

The study's brief summary states: "This pilot study is designed to obtain preliminary data on the safety, acceptability, and feasibility of direct-to-consumer telemedicine

---

[87] Harrison & Norton Testimony, p. 2.
[88] ACOG Practice Bulletin 181: *Prevention of Rh D Alloimmunization* (Aug. 2017); and SOGC Clinical Practice Guidelines: *Prevention of Rh Alloimmunization* (No. 133, Sept. 2003).
[89] Harrison & Norton Testimony, p. 9.
[90] (NCT02513043), https://www.clinicaltrials.gov/ct2/show/NCT02513043?term=NCT02513043&rank=1.
[91] Raymond EG, Chong E, & Hyland P, *Increasing Access to Abortion with Telemedicine*, JAMA Internal Medicine Vol. 176, N. 5 (May 2016).
[92] Hawaii – University of Hawaii Women's Options Center; Maine – Maine Family Planning; New York – Choices Women's Medical Center (active, but not recruiting according to ClinicalTrials.gov, and not listed on TelAbortion.org); Oregon and Washington – Planned Parenthood Columbia Willamette; Oregon Health and Sciences University Women's Health Research Unit. Washington State patients may also participate because an Oregon abortion provider is also licensed in Washington State. Claire Lampen, *Webcam Abortion Services Offer Crucial Access—So What's Stopping them?* Gizmodo (Apr. 17, 2018).

abortion."[93] The study's website states that "[a] TelAbortion involves all the same steps and procedures as a regular medical abortion, but you do them without going into an abortion clinic."[94]

Women who participate in the study have a video "evaluation" with the study abortion provider over the Internet, during which they can ask questions, provide medical history, and learn about the pre-abortion tests that they need. They also electronically sign consent forms for the study. Afterwards, they are required to obtain the tests and direct the reports to be sent to the study provider.

Once a patient is determined eligible, the study provider will send her a package containing Mifeprex and misoprostol, with instructions that she must follow on her own. She is also instructed to have additional tests to verify that the abortion is complete, and later have another consultation with the study provider to review the results.[95]

Obviously, a woman may *not* take the abortion drugs in the manner prescribed, nor obtain the follow-up care that is recommended. With a doctor-patient relationship limited to online chats, she has virtually no accountability or support as she navigates a complicated procedure. The responsibility of the provider of the drugs to follow up with the patient is obviated as well.

### b.  The Mifeprex through Pharmacy Dispensing Study

The University of California, San Francisco (UCSF) is the sponsor of the "Alternative Provision of Medication Abortion via Pharmacy Dispensing" study.[96] Daniel Grossman, M.D., with UCSF is listed as the study's "responsible party."[97] Like Gynuity, UCSF filed an IND with the FDA to obtain authorization for this study.[98] The status is listed as "recruiting," with July 2019 as the estimated completion date. The sponsors plan to recruit 300 patients at four study clinic sites and survey 50 pharmacists at associated study pharmacy sites.[99]

---

[93] NCT02513043, https://www.clinicaltrials.gov/ct2/show/NCT02513043?term=NCT02513043&rank=1.
[94] TelAbortion: The Telemedicine Abortion Study: FAQs, http://telabortion.org/faq/.
[95] *Id.*
[96] NCT03320057, https://www.clinicaltrials.gov/ct2/show/NCT03320057?term=NCT03320057&rank=1; Daniel Grossman, MD, Research Protocol: *Alternative Provision of Medication Abortion via Pharmacy Dispensing*, Version #:1.3 (JUL. 17, 2018) p. 5.
[97] *Id.*
[98] In a May 2018 phone conversation with a contact for the UCSF study, she stated that the study was approved through an IND application with FDA.
[99] Grossman, pp. 5-7; 16-17.

The stated aim of the study is to "investigate the feasibility, acceptability, and effectiveness of pharmacy dispensing of Mifeprex; safety data will also be collected. . . . *The results of this study eventually could lead to changes in the Mifeprex REMS. . . ."*[100]

The sponsors intend to measure "pharmacist satisfaction with dispensing Mifeprex and the proportion of pharmacists who refuse to dispense the medication to patients." They secondarily intend to assess patient satisfaction, describe clinical outcomes, including effectiveness and adverse events, and compare pharmacists' knowledge about medication abortion before and after.[101]

Patients enroll at one of the study clinic sites on Day 1, where they choose medication abortion, have an ultrasound if one has not been done, and obtain pre-abortion counseling. They then are prescribed Mifeprex, misoprostol, and anything else necessary to be filled at the associated study pharmacy site.[102] Some patients have serum hCG measured on the day of Mifeprex administration and again around eight days later "to assess for completion of the abortion."[103] The "follow-up" for patients "may include a follow-up visit or a phone call from clinic staff approximately 7-14 days after the initial visit."[104] However, as discussed extensively above, a clinician needs to perform an exam to rule out retained tissue—even if the patient has a negative serum hCG. A phone call that "may" be placed, or fail to connect, is not enough.

Notably, "[a]ll except one of [the participating] pharmacies is [sic] located within the same building as the clinic…."[105] While UCSF is using a community pharmacy not affiliated with the University, the other three study clinic sites are using affiliated pharmacies.[106]

---

[100] Grossman, p.14 (emphasis added). The sponsors dubiously assert that "pharmacy dispensing could [] help increase the number of clinicians willing and able to provide medication abortion by enabling them to avoid the associated costs and logistical challenges of stocking and dispensing the medication at their facilities." They reference a survey of Fellows of the American College of Obstetricians and Gynecologists that sought to determine if doctors not presently practicing abortion would prescribe Mifeprex if their patients could obtain the drug at a pharmacy. Fifty-four percent responded to the survey. Seventy-four percent of respondents *do not* perform abortions and nine percent perform surgical abortions only—of those, 19% said they would prescribe Mifeprex if it could be obtained at a pharmacy, and an additional 18% said they were unsure. Based on this, the sponsors claim "the proportion of obstetrician-gynecologists providing [Mifeprex] would at least double (from 14% to 29%) "if the dispensing restriction in the REMS were removed and physicians could write a prescription for Mifeprex that could be dispensed at a pharmacy." The fact that 46 percent of the fellows surveyed did not take the time to respond, however, places this conclusion in doubt. *See* Grossman, pp. 12-14.
[101] Grossman, pp. 15-16.
[102] Grossman, p. 23.
[103] Grossman, p. 23.
[104] Grossman, p. 24.
[105] Grossman, p. 20.
[106] Grossman, pp 16-17.

21

While the rationale for the study states that pharmacy dispensing of Mifeprex could "help facilitate provision of medication abortion through telemedicine,"[107] the sponsors emphasize that the only difference between this study and FDA protocol "is that the patient would obtain the mifepristone directly from the pharmacist, rather than in a clinic facility."[108] In fact, the schedules for the participating pharmacists are "mapped" to "ensure that trained pharmacists are available to dispense to study participants during business hours."[109]

The following demonstrates the extensive assistance that the sponsors offer patients in obtaining the drugs from the participating pharmacies:

> [The patient] will be told that only a limited number of pharmacies are able to dispense Mifeprex and given information about how to get to the participating pharmacy (as well as the hours during which a participating pharmacist will be working, if needed). If there are any gaps in staffing at the pharmacy, the patient will be notified of the timing of those gaps in coverage before leaving the clinic via the pharmacy directions/handout. If this will be an issue for the patient, a solution will be found at the clinic before the patient leaves or she will not be enrolled in the study. Patients will be told that if they have any problems accessing the medications at the clinic, they should come back to the clinic [where they can obtain Mifeprex].[110]

While this assistance may ensure that the study does not deviate dramatically from FDA protocol, the study *certainly* does not model the experience a patient would have outside of this controlled environment—particularly a patient who obtains Mifeprex through telemedicine and has no physical contact with her prescriber.

The physical proximity of the study pharmacy sites to the study clinic sites, the probable professional associations between participating doctors and pharmacists, and the extensive assistance offered by the clinics to ensure that patients access abortion-inducing drugs at participating pharmacies, raise questions as to whether the study is fundamentally biased and will inaccurately forecast widespread behavior and experiences if the REMS is removed. Therefore, any results of the study cannot provide a justification for permitting pharmacy distribution of Mifeprex, much less abortion through telemedicine.

---

[107] Grossman, p. 6.
[108] Grossman, p. 6.
[109] Grossman, p. 18.
[110] Grossman, pp. 19-20.

Further, as discussed below, eliminating the REMS to enable pharmacy dispensing of Mifeprex is only the beginning of a long-term strategy to achieve over-the-counter status for Mifeprex, further diminishing patient care and abortion provider accountability.

### c. Beyond the Current Studies

A recent article by Dr. Grossman and colleagues reveals that they want Mifeprex access extended even beyond the parameters contained in their Pharmacy Dispensing study. They used an online survey to gauge women's "personal interest in and general support for three alternative methods for accessing abortion pills: (1) in advance from a doctor for future use, (2) over-the-counter (OTC) from a drugstore and (3) online without a prescription."[111]

None of the options in the survey require a healthcare provider to provide patient care comparable to even the *inadequate* care provided in the two studies discussed above. Only the first option requires a prescription from a doctor; however, the doctor would not know in advance when his patient actually becomes pregnant and chooses to use the drugs. The survey disingenuously stated that "[m]edication abortion, or the abortion pill, is a safe and effective way to terminate a pregnancy up to 10 weeks," without informing participants of a single risk associated with the regimen.[112]

Further, in a November, 21, 2018 op-ed, Dr. Grossman advocated for providing abortion pills before women are pregnant. He stated:

> The idea is simple: Give women abortion pills *before* they need them – "advance provision," as it's known – so that they can take them as soon as they discover a pregnancy. Women could get the pills from their gynecologist at the time of their annual exam, say, or the pills could be made available online.[113]

Incredibly, Dr. Grossman stated that he has "few medical concerns about handing out abortion pills in advance."[114] He asserts that evidence from advance provision research "could strengthen the case for making [abortion-inducing drugs] available without a prescription."[115]

---

[111] Biggs MA, et al, *Support for and interest in alternative models of medication abortion provision among a national probability sample of U.S. women,* Contraception (2018), https://doi.org/10.1016/j.contraception.2018.10.007.

[112] *See id.*

[113] Daniel Grossman, *American women should have access to abortion pills before they need them*, Los Angeles Times (Nov. 21, 2018).

[114] *Id.*

[115] *Id.*

In addition to his failure to address all of the dangers posed by abortion-inducing drugs, Dr. Grossman does not acknowledge the risk that women will share their abortion-inducing pills with other women. While an abortion provider may screen his patient for contraindications to Mifeprex, nothing will stop his patient from giving her stored Mifeprex to a friend who is unaware that she is Rh negative, for instance, which poses health risks for future pregnancies (See section I.B.2, *supra*).

In fact, Dr. Grossman's research program has listed a study titled "Alternative Provision of Medication Abortion Via Advance Provision" on ClinicalTrials.gov, with May 2019 listed as the estimated study start date.[116] In the study, patients who are "at risk of unintended pregnancy and with a desire to avoid pregnancy will be assessed by a clinician and provided counseling on pregnancy recognition and testing, as well as how to administer [drug-induced abortion] at home." They will then receive Mifeprex and misoprostol while *not* pregnant. If/when the patient becomes pregnant and wants to take the drugs, she is instructed to contact a study clinician for an "over-the-phone assessment of eligibility" for drug-induced abortion, "including evaluation of contraindications and gestational age" before taking the drugs, and "then attend a follow-up visit with the clinician."[117] However, it is impossible for the study sponsors to truly assess the patient for contraindications, verify gestational age, prevent patients from sharing the drugs with others, or ensure that patients attend a follow-up visit.

In a 2018 Policy Review, the Guttmacher Institute also advocated for lifting the Mifeprex REMS. However, the article did not stop there. The author argues:

> [w]hile lifting the REMS on mifepristone would open new possibilities for medication abortion access, stopping there would fall short of realizing the full potential of this method, particularly when it comes to self-managed abortion care. In a self-management model, anyone who needs to terminate a pregnancy would be able to legally access mifepristone and misoprostol without a requirement to see a health care provider or pharmacist first. . . . To fully integrate self-managed medication abortion with existing abortion practices in the United States, misoprostol and mifepristone must first become available without a prescription.[118]

These recent publications demonstrate how abortion advocates will continue to pressure FDA to eliminate the REMS and move towards over-the-counter access for Mifeprex. In spite of the serious risks and contraindications to the Mifeprex regimen, abortion advocates will not rest until Mifeprex is available to all, without a prescription

---

[116] NCT03829696, https://clinicaltrials.gov/ct2/show/NCT03829696?term=NCT03829696&rank=1.
[117] *Id.*
[118] Donovan MK, *Self-Managed Medication Abortion: Expanding the Available Options for U.S. Abortion Care*, Guttmacher Policy Review, vol. 21 (2018).

or mandatory medical management of any kind. The FDA's vigilance in protecting women from such negligence is critically important.

### 2.  Mifeprex Prescribers Should be Certified.

The 2016 regimen requires Mifeprex prescribers to be certified as qualified. This is simply common sense—only healthcare providers qualified to prescribe an abortion-inducing drug should do so. The prescriber form attests that the healthcare provider must be able to assess pregnancy duration, diagnose ectopic pregnancy, and provide or refer for surgical intervention if necessary.

Given that drug-induced abortion is contraindicated beyond 10 weeks' gestation and when the pregnancy is not in the uterus, and that *at least* 1 out of 100 women using Mifeprex need surgery,[119] these qualifications are entirely logical. Yet, abortion advocates, ignoring the best interests of their patients, claim such restrictions are onerous.[120]

CONCLUSION

The Mifeprex REMS with ETASU remains critical for patient safety. Mifeprex carries risks of life-threatening hemorrhage, infection, continued pregnancy, retained tissue, need for emergency surgery, and death. The 2000 regimen provided significantly more protections for patients than the 2016 regimen. FDA should restore and strengthen elements of the Mifeprex regimen and provider requirements, including: limiting Mifeprex use to 49 days' gestation; requiring that Mifeprex be administered only by or under the supervision of a physically present physician; requiring three office visits by a patient who has been prescribed Mifeprex; clarifying that Mifeprex use is contraindicated for patients who do not have convenient access to emergency medical care; expanding mandatory adverse event reporting; and requiring additional studies of Mifeprex use in at-risk populations.

At the very least, FDA should not further erode patient protections. The agency should retain the Mifeprex REMS, and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

---

[119] Mifeprex Risk Evaluation and Mitigation Strategy (REMS),
https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_REMS_full.pdf.
[120] Mifeprex REMS Study Group, *Sixteen Years of Overregulation: Time to Unburden Mifeprex*, N Engl. J. Med. 376;8 (Feb. 23, 2017).

## C. Environmental Impact

This petition is categorically excluded under 21 C.F.R. § 25.30.

## D. Economic Impact

Available upon Commissioner's request, pursuant to 21 C.F.R. §10.30(3).

## E. Certification

The undersigned certify, that, to the best knowledge and belief of the undersigned, this petition includes all information and views on which the petition relies, and that it includes representative data and information known to the petitioners, which are unfavorable to the petition.

**Signature:** /s/ Donna J. Harrison M.D., Executive Director

**Name of petitioner:** American Association of Pro-Life Obstetricians and Gynecologists

**Mailing address:** PO Box 395, Eau Claire, MI 49111-0395

**Telephone number:** (202) 230-0997

**Signature:** /s/ Quentin L. Van Meter, M.D., FCP, President

**Name of petitioner:** American College of Pediatricians

**Mailing address:** PO Box 357190, Gainesville, FL 32635-7190

**Telephone number:** (352) 376-1877