# Exhibit 49

Declaration of Dr. Tyler Johnson

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients,<br>   Plaintiffs,<br><br>  v.<br><br>**U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services,<br>   Defendants. | Case No. _____ |

1

## DECLARATION OF DR. TYLER JOHNSON

I, Tyler Johnson, D.O., a citizen of the United States and a resident of Leo, Indiana, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.

2. I received my Bachelor of Science in Biology from the University of Saint Francis in Fort Wayne. I attended medical school at the Lake Erie College of Osteopathic Medicine. My residency was at Michigan State University's Kalamazoo Center for Medical Studies.

3. I am an emergency department physician certified by the American Board of Emergency Medicine. I practice in the emergency departments of hospitals in northern Indiana. My practice includes treating patients throughout rural northern Indiana into the inner-city of Fort Wayne. I am also the director of emergency medicine at Parkview Dekalb Hospital.

4. I am a member of the American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG).

5. I am familiar with the U.S. Food and Drug Administration's (FDA) Risk Evaluation and Mitigation Strategy (REMS) drug safety program. I am also familiar with the REMS issued by the FDA for the chemical abortion drugs mifepristone and misoprostol in 2016.

6. The FDA's 2016 REMS for mifepristone and misoprostol expanded the acceptable gestational age for chemical abortion, eliminated the in-person administration requirement for these dangerous drugs, eliminated mandatory post-abortion follow-up visits, and eliminated the requirement for prescribers to report all non-fatal adverse events.

7. The FDA's actions harm both women and practitioners.

8. Mifepristone and misoprostol are dangerous drugs that have serious effects on a woman's body. Without the medical supervision, women taking these drugs are at risk of serious and life-threatening complications and even death.

9. I have seen at least a dozen cases of life-threatening complications from the use of abortifacient drugs over the years. These emergency situations are becoming more common as more women are turning to chemical abortion as the FDA has relaxed its regulations.

10. In one case, for example, I treated a woman in the emergency department who had been given an abortion pill from a clinic in Chicago. She took the pill and began to experience heavy bleeding on the drive back to Fort Wayne. By the time she arrived at the hospital, she was unconscious. I performed emergent treatment and gave her a necessary blood transfusion. The patient required further evaluation and observation in the hospital. I have seen multiple cases similar to this one.

11. About a month ago, I treated an 18-year-old woman in the emergency department who was experiencing severe pain. Although the situation was not life-threatening to her, she was terrified, and it was clear to me that she did not understand what she had been given. It is not uncommon for women who take mifepristone and misoprostol to come to the emergency department because the pain is so terrible.

12. Many of the patients I have treated for complications with chemical abortion experience trauma. They usually have no follow-up with the doctors who prescribed or dispensed the abortifacient drugs, and they are not adequately prepared to understand what the drugs will do to them. In these situations, it is clear to me that these women and girls could not have given informed consent to chemical abortion.

13. In many cases, women are hesitant to tell us that they have taken chemical abortion drugs. On multiple occasions I have treated women in the emergency department who are experiencing extremely heavy bleeding even after they have already passed the unborn child. The women will sometimes eventually explain that they took abortifacient drugs, which helps us understand what is happening to them. I understand that many women are told by staff at the dispensing clinics to tell emergency department doctors that they are experiencing a "miscarriage."

14. Because of the FDA's relaxed regulation of these dangerous drugs, it is extremely easy for women to obtain mifepristone and misoprostol with little

4

or no supervision. This leaves emergency physicians like me to deal with preventable emergent and life-threatening situations after these women have taken these drugs. The unsupervised administration of chemical abortion drugs simply harms women and physicians.

15. The FDA's actions have created a culture of chaos for emergency room physicians. In my experience, patients who are given abortifacient drugs at clinics do not understand what they have taken and are often reluctant to tell emergency doctors what they have taken. This puts me and my colleagues in a position where we have to treat women in emergency situations without crucial information. This culture puts us in increasingly higher risk situations, which increases our exposure to claims of malpractice and liability.

16. The increase in women presenting in the emergency department for complications with chemical abortions harms other patients too. Because more women are unnecessarily presenting in the emergency department, more of my time and attention is taken away from other patients who need it.

17. I also believe the FDA's elimination of reporting requirements for non-fatal adverse events harms women and practitioners. I believe we are not tracking these medications closely enough to know the extent of the negative side-effects commonly experienced. This also harms physicians' ability to practice evidence-based medicine. Moreover, women and girls cannot give informed

consent to chemical abortion when they do not receive accurate information about the risks associated with mifepristone and misoprostol.

18. Given my experience, I expect to see and treat more patients presenting themselves with complications from chemical abortion.

Executed this November 11, 2022.

By: *T. Johnson* 
Tyler Johnson, D.O.

6