# Exhibit 50

Declaration of Dr. Regina Frost-Clark

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients,<br>       Plaintiffs,<br><br>v.<br><br>**U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services,<br>       Defendants. | Case No. _____ |

1

## DECLARATION OF DR. REGINA FROST-CLARK

I, Regina R. Frost-Clark, a citizen of the United States and a resident of Michigan, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.
2. I am board-certified in obstetrics and gynecology. I practice with St. John OB/Gyn Associates, part of Ascension Medical Group.
3. I received my M.D. from Wayne State University and did my residency at St. John Hospital and Medical Center in Detroit, Michigan.
4. I am in a hospital owned practice and am often called to the emergency department for consultations.
5. I am familiar with the approval and regulatory changes by the United States Food and Drug Administration (FDA) regarding chemical abortion. Specifically, I am familiar with the relaxing of supervision requirements for administering these very serious drugs, and I am familiar with the relaxed reporting requirements for adverse events related to chemical abortions.
6. I believe these FDA actions will harm women, including my patients, and my practice.
7. As an OB/Gyn, I have treated several women who have suffered complications from chemical abortions.

8. The wider availability of chemical abortion drugs will result in an increase in the frequency of complications related to the drugs' use.

9. In at least a dozen cases, I have treated women who were suffering significant bleeding after taking chemical abortion drugs. Occasionally, women have to be admitted to the hospital for observation due to bleeding complications.

10. In my experience, women who have been given chemical abortion drugs often do not know what they were given or how much of a particular drug they took.

11. In most instances where I treat women who have complications from chemical abortion drugs, they have received it from an abortion facility. Recently a woman told me she obtained these drugs by herself—likely online—and took them without any medical supervision.

12. The FDA's suspension of the in-person dispensing requirement of mifepristone and misoprostol harms women and doctors because it has resulted in an increase in complications.

13. Without an in-person dispensing requirement for chemical abortion drugs, there is a greater chance that women with a molar or ectopic pregnancy will be given drugs that will be ineffectual, leaving them exposed to potentially deadly complications like a rupture or hemorrhage.

14. Similarly, without an in-person dispensing requirement, patients may be given chemical abortion drugs without a confirmed pregnancy or for an inappropriate gestational age.

15. In these instances, patients may avoid seeking appropriate medical care because they are unaware of the risks they potentially face, which puts them in greater danger of complications.

16. Women presenting with complications from chemical abortion pose a challenging situation because I may not have access to their medical history—either because I am unable to access any medical records from prescribers of the chemical abortion drugs or because they obtained the chemical abortion drugs without any medical oversight to begin with. Additionally, the patients themselves usually do not understand what they have been given, how much they have taken, or their follow-up instructions.

17. The lack of patient history and knowledge harms my ability to treat patients. For example, with patients experiencing bleeding, the course of treatment will vary if I believe the bleeding is regular or abnormal cyclical bleeding as opposed to bleeding resulting from attempted abortion.

18. I expect to see more and more women with chemical abortion complications as the use of the drugs increases. Because of the increased complications and the limited information available to me due to the FDA's actions, I fear that I will have greater exposure to liability in my practice.

19. The FDA's actions have led to more confusion for patients and providers. The FDA has forced my colleagues and me to make decisions about patient care based on limited information. It also requires me to spend a lot of time trying to reconstruct patient medical histories to best serve my patients.

20. The FDA's actions make it difficult for patients to have informed consent. Doctors cannot confirm the pregnancy, the location of the pregnancy, or the gestational age without an examination. In abortion clinic settings, it is unclear whether patients are seeing the same physician each time. And often there are no patient follow-up visits with the dispensing facility.

21. Under the current practice by those who prescribe chemical abortion drugs like mifepristone and misoprostol, there is no follow-up or additional care provided to patients and therefore no rapport between patients and their physicians. This makes it difficult to assess who is responsible for these patients when they experience complications.

22. The FDA's removal of the adverse event reporting requirement for all adverse events except death harms my ability to perform evidence-based medicine. I am unable to assess the risks present to women because the FDA's removal of reporting requirements undermines the legitimacy of risk data. For example, Ranitidine, commonly known as Zantac, was pulled from the market due to cancer associations after years of use. Without adverse event reporting, I cannot properly assess the risks that my patients face from abortifacient drugs.

23. I have not reported adverse events that I have witnessed as a result of chemical abortions because the process is so cumbersome. In addition to the burdensome paperwork, it is difficult to file an accurate report given that in many cases I am not certain what the patient was given by the chemical abortion prescriber.

Executed this November 13, 2022.

By: *[signature]*

Regina Frost-Clark, M.D.