# Exhibit 51

Declaration of Dr. George Delgado

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients,<br>　　　　Plaintiffs,<br><br>v.<br><br>**U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services,<br>　　　　Defendants. | Case No. _____ |

1

## DECLARATION OF DR. GEORGE DELGADO

I, George Delgado, a citizen of the United States and resident of San Marcos, California, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.
2. I am board-certified in family medicine and in hospice and palliative medicine.
3. I serve as a medical advisor to the Abortion Pill Rescue Network and as director of medical affairs of Culture of Life Family Services (COLFS) Medical Clinic.
4. I received my medical degree from the University of California, Davis School of Medicine in 1988 and completed my residency at Santa Monica Hospital/ UCLA Medical Center in 1991.
5. I am a Natural Family Planning (NFP) Medical Consultant trained in NaProTechnology. I have also completed a one-year Certification Program in Health Care Ethics with the National Catholic Bioethics Center.
6. I performed the second recorded successful reversal of chemical abortion in the United States.
7. I established Abortion Pill Reversal, a program that connects women who regret taking the abortion-inducing drug, mifepristone (RU-486), and want to reverse the effects of the chemical abortion regimen.

2

8. I founded the Steno Institute, a non-profit organization, to conduct, promote and publish high-quality, morally sound health science and clinical research in pro-life areas, including chemical abortion reversal.

9. I published the first peer-reviewed article in the medical literature describing the reversal of the abortion-inducing drug, mifepristone (RU-486), using progesterone. The case study, "Progesterone Use To Reverse The Effects Of Mifepristone," presented a series of cases demonstrating successful reversal of mifepristone effects in women who chose to reverse the chemical abortion process. Four of six women who took mifepristone were able to carry their pregnancies to term after receiving intramuscular progesterone 200 mg.

10. I co-authored a peer-reviewed article, "A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone," published in Issues in Law & Medicine, Volume 33, Number 1, 2018. The results of the study concluded that the reversal of the effects of mifepristone using progesterone is safe and effective.

11. Based on my review of peer-reviewed studies, I can attest that there are higher levels of complications from chemical abortion than from surgical abortion. For example, the risk of severe bleeding with chemical abortion is five times higher than from surgical abortion.

12. In my family medicine practice, I continue to see patients one day per week while serving primarily in an administrative role.

13. I treat women with Abortion Pill Reversal in my office in addition to treating women who suffer complications from chemical abortions.

14. I see women who have a great deal of regret from undergoing the chemical abortion drug regimen. They are distressed, sad, and feel terrible about what they have done. While it is rewarding to offer these women a chance at reversing chemical abortion, this is some of the most emotionally taxing work I have done in my career.

15. For example, I spoke with one patient who sought to reverse a chemical abortion after taking mifepristone under duress by the abortion doctor. She recounted that the doctor at the abortion center rushed her to make a decision, placed the pill in her bare hand, and told her to take the pill before it melted in her hand and that it was very expensive. She took the pill because of the duress she was under and immediately regretted the decision. She successfully reversed her chemical abortion. This example illustrates how women and girls are not giving informed consent when undergoing chemical abortion and sometimes coerced into taking these drugs.

16. Given my experience, I expect to see and treat more patients presenting themselves with complications from chemical abortion and seeking reversal of mifepristone.

17. My practice renders early prenatal care to mothers and provides care to babies that are born. In doing so, my practice will bill a patient's insurance company for reimbursement for the costs of care. When my patients have

chemical abortions, there is a tangible financial loss to my practice in losing the opportunity to render professional prenatal care for the mother or to care for babies who are never born.

18. The FDA's elimination of necessary safeguards for pregnant women and girls, such as removing the requirement for an in-person follow-up examination after a chemical abortion, will increase the demands on my time in my family medicine practice and reduce the time I would like to spend with other patients. I will have to treat an increased number of patients due to abortion facilities' failure to provide follow-up care to women and girls.

19. Executed this November 14, 2022.

By: _____
George Delgado, M.D.