# Exhibit 52

Declaration of Dr. Shaun Jester

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients,<br>      Plaintiffs,<br><br>v.<br><br>**U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA,** in his official capacity as Secretary, U.S. Department of Health and Human Services,<br>      Defendants. | Case No. _____ |

1

## DECLARATION OF DR. SHAUN JESTER

I, Shaun Jester, a citizen of the United States and a resident of Dumas, Texas, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.

2. I am a board-certified obstetrician and gynecologist and am the Medical Director of Moore County Ob/Gyn in Dumas, Texas. I have been board-certified since 2007.

3. I received my medical degree in 1999 from the Texas College of Osteopathic Medicine at the University of North Texas Health Science Center at Fort Worth.

4. I have a busy medical practice. I am one of three doctors on call. My practice includes cesarean section deliveries, hysterectomies, and other women's health treatments. My practice includes about thirty deliveries each month.

5. A Risk Evaluation and Mitigation Strategy (REMS) is a drug safety program that the U.S. Food and Drug Administration (FDA) can require for certain medications with serious safety concerns to help ensure the benefits of the medication outweigh its risks.

6. I understand that the FDA approved chemical abortion drugs for use in the United States in 2000.

7. I am also familiar with the FDA's regulatory changes regarding chemical abortion drugs, especially the REMS issued in 2016 and associated with the use of mifepristone and misoprostol for chemical abortions.

8. I understand that the FDA approved the use of mifepristone up to 70 days (or 10 weeks) of gestation in 2016, which is longer than the previous standard of 49 days (or 7 weeks).

9. I am familiar with the FDA's suspension and elimination of the in-person dispensing requirements for administering these dangerous drugs in 2021.

10. I am familiar with the removal of the requirement for an in-person, post-abortion office visit, which is when a physician determines whether any fetal parts or other products of conception remain. These visits are essential to ensure that women experience no complications after chemical abortion.

11. I am also familiar with the relaxed reporting requirements for adverse events related to chemical abortions.

12. I believe these FDA actions will harm my patients, women, and women's medicine.

13. I believe that the FDA's approval for using mifepristone at a later gestational age, and the elimination of the in-person dispensing requirement and follow-up visit requirement, are especially dangerous for women.

14. Based on my experience, mothers are often mistaken about how far along they are in pregnancy. According to the Listening to Mothers III survey, 26% of women's due dates are changed.

15. Without an in-person visit to obtain an ultrasound, there is no way to be certain about the gestational age of an unborn child. Women may be further along in pregnancy than is currently acceptable for chemical abortion. Similarly, without an in-person examination, it is impossible to rule out an ectopic pregnancy, which would not be terminated by a chemical abortion and could put women at an increased risk of rupture or even death.
16. Based on my experience treating patients, I believe unsupervised chemical abortions are dangerous and potentially life-threatening especially due to increased risk of hemorrhage and/or infection the further along they are after 6 weeks' gestation.
17. For instance, I treated a woman who traveled from Texas to obtain chemical abortion drugs from Planned Parenthood New Mexico to complete an abortion at 10 weeks' gestation. The woman returned to Texas, suffered from two weeks of moderate to heavy bleeding, and then developed a uterine infection. At the hospital, I provided her with intravenous antibiotics and performed a dilation and curettage procedure. If she had waited a few more days before receiving care, she could have been septic and died. I reported this adverse event to the FDA.
18. The FDA's actions harm my practice by causing unnecessary harm to my patients that could have been avoided by retention and enforcement of the REMS.

19. Doctors like me serve patients as professional health care providers. I provide care to all women and unborn children, and I give them the best professional services possible. Just like other employed obstetrical providers, my hospital will bill for the cost of obstetrical and medical services rendered. When my patients have chemical abortions, I lose the opportunity to provide these obstetrical and medical services to care for the woman and child through pregnancy and bring about a successful delivery of a new life.

20. Additionally, the wider availability of chemical abortion drugs will result in more patients experiencing complications and the number of patients in emergency situations will rise. These situations are naturally higher risk for both the patient and for the physician providing care. In the chemical abortion case that I reported as an adverse event to the FDA, I had no existing patient relationship or prior knowledge of the patient's medical history. Such cases can be a high-pressure, high-risk situation for practitioners like me.

21. The FDA's deregulation of these dangerous drugs increases our exposure to liability.

22. There are many contraindications to prescribing mifepristone, including adrenal failure, steroid use, severe anemia, bleeding disorders, the use of intrauterine devices, undiagnosed ectopic pregnancy, and others. I do not believe telemedicine can rule out all contraindications to prescribing

mifepristone because some of these conditions can only be ascertained with an in-person examination or lab work.

23. Telemedicine does not allow for a critical ultrasound assessment to rule out ectopic pregnancies and verify that the patients are within the 70 days allowed for chemical abortions. In this way, the FDA's loosening of regulations for abortifacient drugs harms women and practitioners by exposing them to increased risk of complications.

24. I believe the relaxed reporting requirements for adverse events related to chemical abortion drugs harm women and physicians because they create an inaccurate and false safety profile for the use of mifepristone and misoprostol. Many women and girls do not fully understand the nature of chemical abortion and the risks that these drugs present to them.

25. The elimination of mandatory follow-up visits after chemical abortion drugs have been administered is also dangerous and harms women and practitioners. Without follow-up visits, physicians cannot identify potential complications like sepsis and hemorrhage, lingering products of conception, and others until the patient is at a critical time or it is too late to help the patient.

26. I care for my patients and give them the best medical care and guidance that I can. I believe that chemical abortions harm women, including my patients, and harm the medical practice. The elimination of REMS critical to ensuring safe use of the chemical abortion drugs prevents doctors from fulfilling their

oath to "do no harm" by permitting the administration of abortifacient drugs to patients without full knowledge or appreciation for the impact those drugs would have on them.

27. As with my patient who suffered an adverse event, it disturbed me that she was not informed that it was not normal to bleed for multiple weeks and that if she had a routine follow-up visit, as required by past REMS, this situation could have been avoided before requiring overnight hospitalization and her being at risk for developing sepsis.

Executed this November 14, 2022.

By: _____
Shaun Jester, D.O.