# Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| Alliance for Hippocratic Medicine, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. Food and Drug Administration, *et al.*, <br><br> Defendant. | Case No. 2:22-cv-00223-Z |

**DECLARATION OF EVELYN KIELTYKA**

I, Evelyn Kieltyka, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am the Senior Vice President of Program Services for Maine Family Planning and Primary Care Services, where I have worked for nearly 25 years. In this position, which I have held since 1995, I oversee program development and quality assurance relating to all aspects of reproductive healthcare. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction in the above-captioned matter. Unless otherwise stated, the facts set forth herein are true to my own personal knowledge.

2. I am educated and trained as a family nurse practitioner ("FNP"). I was certified as an FNP by the American Nurses Credentialing Center in 1995 and recertified most recently in 2020. I currently hold an active registered nurse and an Advanced Practice Registered Nurse Practitioner license in Maine. I received a Master's of Science in Maternal-Child Health at the Harvard T.H. Chan School of Public Health and a Master's

1

in Nursing at Simmons College in 1992; and I earned my certificate as a Family Planning Nurse Practitioner at the College of Medicine and Dentistry of New Jersey in 1979. I received my Bachelor's of Science in Nursing degree at Sacred Heart University in 1987.

3. I have provided clinical care as a registered nurse and Advanced Practice Registered Nurse ("APRN") throughout my career. In 2000, I was awarded the Nurse Practitioner of Excellence Award by the American Academy of Nurse Practitioners and the Maine Nurse Practitioner Association ("MNPA"). I have also been the President of the Board of Directors of the MNPA, a position I held from 2015 to 2017 and 1995 to 1997.

I. **MAINE FAMILY PLANNING'S PROVISION OF HEALTHCARE SERVICES**

4. Maine Family Planning ("MFP") is a non-profit corporation incorporated in Maine and headquartered in Augusta, Maine. For over fifty years, Maine Family Planning has worked to ensure that people across Maine have access to high-quality, affordable reproductive healthcare. To carry out its mission, MFP directly operates eighteen health centers throughout Maine.

5. MFP's clinics are located in Augusta, Bangor, Belfast, Calais, Damariscotta, Dexter, Ellsworth, Farmington, Fort Kent, Houlton, Lewiston, Machias, Norway, Presque Isle, Thomaston, Rumford, Skowhegan and Waterville. MFP provides services in twelve counties that are more than 50% rural and eight counties that are more than 80% rural.

6. At our health centers, MFP provides a range of healthcare services, including but not limited to: annual gynecological exams; screening for cervical and breast cancer; family planning counseling; contraceptive services; preconception consultation; screening, diagnosis, and treatment of urinary, vaginal, and sexually transmitted infections;

endometrial and vulvar biopsy; hormone therapy and other services for transgender clients; services for mid-life women; and miscarriage care, as well as abortions. In addition, MFP has an extensive, well-established referral network that connects clients to comprehensive primary care and other diagnostic screenings and services, if not offered on site.

7. MFP has been providing surgical abortion care since 1997, and has been offering medication abortion services since shortly after the U.S. Food and Drug Administration approved mifepristone for use in the United States in 2000.

8. While MFP offers medication abortion to patients at each of its 18 sites, surgical or aspiration abortion is only available at its one clinic in Augusta.

9. With a medication abortion, the patient takes a series of medications to terminate the pregnancy and empty the uterus. A patient will first take mifepristone, which blocks the body's production of progesterone. Progesterone is a hormone necessary for the pregnancy to continue, and taking mifepristone terminates the pregnancy. Second, 24-48 hours after taking mifepristone, a patient will take misoprostol. This medication causes cramping and bleeding and will cause the uterus to expel its contents, similar to a miscarriage.

10. With a surgical or aspiration abortion, at least at MFP, a trained and licensed clinician sedates the patient with local anesthesia before performing the procedure. After the procedure, the patient recovers at the health center under supervision. As noted above, MFP only offers surgical abortion at its Augusta clinic, and it is available there up to 14.0 weeks as dated from the first day of the patient's last menstrual period ("LMP").

11. The number of abortions MFP provides varies from year to year, but the percentage of those abortions that are provided through medication has continued to rise.

12. In 2021, MFP provided 683 abortions in total, 423 (61%) of which were medication abortions. 378 of the medication abortions that MFP provided in 2021 were provided at MFP's non-Augusta clinics, where medication abortion is the only option available.

13. In 2022, MFP provided 842 abortions in total, 595 (70%) of which were medication abortions. 486 of the medication abortions that MFP provided in 2022 were provided at MFP's non-Augusta clinics, where medication abortion is the only option available.

14. Patients may obtain a medication abortion at MFP through telehealth appointments or in-person at each of MFP's 18 health centers.

15. Patients may obtain a surgical or aspiration abortion only in person at MFP's Augusta clinic.

16. MFP ensures that its providers who perform abortions are appropriately trained and licensed. For instance, our providers who perform surgical abortion have performed more than the 25 to 50 surgical abortions with supervision. The surgical abortions that they perform at MFP's Augusta clinic maintain their hand skills, and MFP ensures that these providers work with sterilized and appropriately maintained equipment.

17. Besides MFP, the only other places in Maine where medication and surgical abortion services are publicly available (*i.e.*, generally open to new patients) are: (1) Planned Parenthood of Northern New England in Portland; and (2) the Mabel Wadsworth Center in Bangor. Both provide abortion care only one day a week (with very few exceptions). Although there are two hospitals in Maine that occasionally provide abortion services—Maine Medical Center in Portland and Central Maine Medical Center in

Lewiston—both generally only treat established patients, among other limitations on their services.

## II.     REASONS MEDICATION ABORTION IS THE PREFERRED OPTION FOR SOME PATIENTS

18.     Based on my experience, I know that there are a variety of reasons that medication abortion is the necessary and/or preferred option for many patients. Some of those reasons are medical, and others are based on the patient's non-medical circumstances (*e.g.*, timing, location, or need for privacy). As explained below, medication abortion is instrumental in removing barriers that would otherwise make it more difficult, and in some cases impossible, for MFP's patients to receive the health care they need.

19.     First, there are medical reasons why medication abortion is medically indicated for certain patients, rather than surgical abortion. This is because some patients come to MFP with pre-existing conditions that would make surgical abortion a riskier option for them over medication abortion.

20.     For example, MFP has treated patients who are allergic to anesthesia, and specifically who are allergic to lidocaine, which is the local anesthetic MFP uses when it provides surgical abortions. Allergic reactions to lidocaine can include anaphylaxis, urticaria, edema, bronchospasm, unconsciousness, hyperventilation, nausea, vomiting, and changes in heart rate or blood pressure. Because anesthesia is provided for surgical abortion, an allergy to anesthesia makes surgical abortion a riskier and more complicated method for patients with that condition.  Because medication abortion does not require the use of anesthesia, it is the preferred method for terminating such a person's pregnancy.

21.     To provide another example, based on my experience, medication is the most appropriate abortion method for patients with a bicornuate uterus. A bicornuate uterus

5

is a uterus that is shaped irregularly; instead of being pear-shaped, it has a heart-shaped appearance with a septum going down its center and appears to have two sides rather than one hollow cavity. When a patient has a bicornuate uterus, aspiration is less likely to terminate a pregnancy successfully because it is difficult to fully evacuate the uterus using suction. Accordingly, medication abortion is the best and least risky option for those patients.

22. Similarly, based on my experience, medication abortion is often the better option for patients with cervical stenosis. Cervical stenosis is a narrowing of the passageway through the cervix. This narrowing can act as a barrier to the uterine cavity, which may make surgical abortion nearly impossible or else cause severe tearing. By contrast, medication abortion allows evacuation of the uterus without that physical trauma and additional risk for patients with cervical stenosis.

23. I also know that there are non-medical reasons why patients choose medication abortion, including because it offers a greater degree of privacy and/or control over the timing of their abortion than surgical abortion. Even though aspiration abortion itself takes only 5 to 10 minutes, a patient typically spends between 3 and 5 hours at the clinic, including time spent receiving counseling, giving informed consent, waiting on rooms and instruments to be prepared, and recovering under observation (usually 30 to 45 minutes). MFP also requires patients to have a designated driver to take them home once they are discharged.

24. By contrast, an in-person medication abortion appointment requires only about 25 to 40 minutes, which consists of confirming gestational age and then providing detailed counseling about the procedure and after-care instructions, answering any patient

questions, and going over the patient agreement and informed consent forms. After that, the patient receives their prescription and can take their first pill at the clinic or wait until they get home. Either way, because the patient can complete their abortion at home, there is no need to involve a third party as a designated driver.

25. Alternatively, MFP can provide the same option through a telehealth visit, which a patient can conduct from a remote location of their choosing. The medication can then be safely taken in the comfort and privacy of their own home, without the assistance of another person in visiting and leaving a health care center.

26. Based on a patient's personal circumstances, there are myriad reasons why a patient may find the privacy of medication abortion to be a better fit for their needs, either in person or through a telehealth appointment.

27. For example, medication abortion through telehealth is often a preferred option for patients who have busy work schedules, or those who have kids and would otherwise need (or be unable to obtain) childcare. Some of our patients choose telehealth because they do not have access to a car or public transportation. And some patients choose telehealth because it provides a better opportunity for confidentiality, since the patient does not have to explain their absence from work or home during certain hours.

28. On the other hand, some patients prefer to receive a medication abortion through an in-person visit, and that is an option that we always make available to them. Some patients live in small homes with other people and cannot find a private place to engage in a telehealth appointment. Some of our patients do not have access to broadband or any other Internet service. And some patients find comfort in meeting with a clinician in person.

7

29.     Even when a patient opts for an in-person visit to obtain a medication abortion, the patient still is able to take the first pill (mifepristone) and the second pill (misoprostol) later, in order to expel the contents of their uterus at a time and place that works best for them.

30.     Medication abortion is also often a better option for persons who need a less physically invasive procedure, which is often especially important for our patients who are victims of rape or abuse.

31.     Finally, the wider accessibility of medication abortion also ensures that it is more equally available to pregnant persons of lesser means.  In Maine, and in many places across the country, surgical abortion is available only at certain physical locations and at certain times. For some pregnant persons, particularly those with lower incomes, this limited availability is prohibitive. But because medication abortion can be prescribed following a telehealth visit or at a local clinic, and the drugs can be mailed to and taken at a person's home, medication abortion ensures that these services are available on a more equitable basis.

32.     A few recent examples from MFP's practice may help to illustrate some typical circumstances in which medication abortion benefits our patients.

33.     In one example, a twenty-nine-year-old patient without family support had nobody to help her with transportation to and from a surgical abortion. The patient was able to obtain a medication abortion instead at her local MFP center, where she received the care she needed without having to involve a third party.

34.     Another recent twenty-two-year-old patient chose medication abortion via telehealth because surgical abortion would have taken her away from school and interfered

with her ability to take her exams. That patient was a college student with finals approaching, and a forty-minute visit to the local MFP center site fit her needs far better than the four-hour drive, coupled with a 4-5 hour visit at a health center offering surgical abortion.

### III. IMPACT OF ELIMINATING ACCESS TO MIFEPRISTONE ON AVAILABILITY OF ABORTION CLINICS IN MAINE

35. If mifepristone, and by extension medication abortion, is no longer an option, it would dramatically affect MFP and the availability of abortion more generally in Maine and across the country.

36. To start, MFP would have no choice but to eliminate abortion services altogether at 17 of its 18 locations, leaving only its abortion practice in Augusta.

37. It would not be feasible for MFP to begin providing surgical abortions in the 17 satellite locations for several reasons. First, the clinicians who work at those clinics are not trained to provide surgical abortion, and it is infeasible for MFP to train providers at those clinics to do so. As noted above, the training necessary to perform aspiration abortions is intense—involving more than 25 supervised abortions—and requires upkeep. Some of our satellite clinics do not have that many abortions in any given year, and thus cannot provide the requisite opportunities for that training. We would have to bring clinicians from long distances to supervise and provide that training and/or the local clinicians from our satellite clinics would have to travel elsewhere to receive their training. That travel and associated training would be time-consuming and costly for our clinicians, and it would take those clinicians away from providing health care services (including, but not limited to, abortion services) in their regular locations. Given the demands on our clinicians' time and the critical services they provide to their communities, it would be

9

infeasible for them to acquire the training necessary to provide aspiration abortion at our non-Augusta clinics.

38.     In addition, because some of MFP's remote sites provide only a handful of abortions each year, clinicians at those remote sites would have difficulty keeping their skills and training in aspiration abortion up-to-date over time—even if we were able to train clinicians to perform aspiration abortion at our satellite locations at the outset. Indeed, some of our most rural locations only provide 1 or 2 abortions per year (although the ability to obtain an abortion is critical for those 1 or 2 patients in rural locations who would otherwise have no other options in their geographic vicinity). This would mean, clinicians from our satellite clinics would have to travel regularly to Augusta in order to practice their skills—again, taking them away from their local practice where they are often the only healthcare provider available to patients in their rural locations.

39.     Even if MFP were able to train clinicians to provide surgical abortions at our non-Augusta health centers or hire clinicians with sufficient training, it would still be infeasible (and in some cases physically impossible) for those local clinics to obtain the necessary space and equipment to provide surgical abortion. Those clinics do not currently have the requisite machinery, which costs approximately $2,000-$3,000, nor are they equipped with the other necessary instruments for dilation and anesthesia. At least three of our clinics (in some of our most rural locations, *e.g.*, Rumford and Skowhegan) are so small that the requisite equipment and materials would not even fit in the clinics' physical space.

40.     If medication abortion became unavailable, Maine would be left with just three remaining publicly-accessible health centers where a woman can obtain abortion care in Maine: (1) MFP's Augusta clinic; (2) PPNE's Portland Health Center; and (3) Mabel

Wadsworth Center, located in Bangor, Maine. This would mean that more than half of Maine women would live in the 13 remaining counties without an abortion provider, and the distances many women would have to travel to obtain an abortion would increase substantially.

41.     Under those circumstances, many patients would have to travel over 100 miles to obtain abortion care in Maine. Moreover, due to Maine's challenging weather conditions, certain roads typically are completely impassable during parts of the winter, particularly in rural Aroostook and Washington Counties. Even if patients would be able, in theory to travel to Augusta, given the lengthy distances, they may need to drive up the night before. And, because it might not be safe for them to then drive many hours home, potentially alone, after a medical procedure, it might be necessary to stay overnight again. Thus, traveling from these remote locations would be at least a two-day, and potentially a three-day, affair for many patients seeking abortion services.

42.     If MFP were unable to provide medication abortion at its 17 non-Augusta clinics, many of which are located in extremely rural areas, I believe it would be a tremendous hardship for patients seeking abortion in large swaths of the state.

43.     MFP's abortion patients routinely report that they do not have, and will not be able to find, the money they need to travel to a clinic in a different city for abortion care.

44.     Approximately 70% of MFP's patients received Medicaid coverage or otherwise needed financial support for their abortion in 2022. Our patients often work in low-wage jobs that do not offer paid time off or sick leave, and often have unpredictable schedules that may only be set a few weeks, or even just a few days in advance. Many also

have childcare responsibilities that significantly complicate and limit their scheduling options.

45. For patients who are nonetheless able to overcome the burdens associated with increased travel distances, my experience with patients has shown me that travel will still inevitably delay access to abortion. Delayed abortion care is associated with greater health risks. The risks of complications increase with increasing gestational age. Moreover, every day a woman remains pregnant, she faces the continued risks of complications of pregnancy.I declare under penalty of perjury that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed January 13, 2023

_____
Evelyn Kieltyka