# Exhibit 6

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| Alliance for Hippocratic Medicine, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. Food and Drug Administration, *et al.*, <br><br> Defendant. | Case No. 2:22-cv-00223-Z |

### DECLARATION OF KATHERINE B. GLASER, MD

I, Katherine Glaser, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief, and that these statements are based on my personal knowledge as well as information made known to me in the course of my medical practice:

1. I am a board-certified Obstetrician-Gynecologist ("Ob-Gyn") physician and attending physician at a regional hospital serving an indigenous population in Northern Arizona. I also serve as a Clinical Assistant Professor of Obstetrics and Gynecology at the University of Arizona, Tucson and the University of Arizona, Phoenix. I also work as an independent contractor with a clinic to provide abortion care in Northern Arizona. I am board-certified in Obstetrics and Gynecology with a sub-specialty in Complex Family Planning. In my day-to-day practice, I participate in both inpatient and outpatient management of pregnancies, which includes treating patients undergoing pregnancy loss and other complications that arise during pregnancy and delivering babies. My practice is in a rural, underserved area with high rates of poverty and

unemployment, and in the work regarding abortion, due to limited availability of abortion services in the state of Arizona, those seeking an abortion often travel many miles for these services.

2. I graduated from the University of Arizona College of Medicine in Tucson, Arizona in 2008, and completed my residency in Tucson in 2012. Additionally, I completed a fellowship in clinical research at the University of California, Davis in 2022. I have worked as an Ob-Gyn for 14 years and provided abortion services through most of those years of practice.

3. In my current position, I actively teach obstetrics to residents and medical students. I am also an active member of the American College of Obstetricians and Gynecologists ("ACOG") and have held ACOG offices in the state of Arizona, and I am currently the ACOG co-Legislative Chair for the state of Arizona. I am a Rural Director on the Board of Directors for the American Medical Association. As a fellow, I authored publications about family planning and diabetes in pregnancy. In these roles, I have 14 years of clinical experience, have an active, broad clinical practice, and am engaged in advocacy at the state and national level.

4. I am familiar with the medication mifepristone, have used it in the course of my practice, and continue to do so. I am also a certified prescriber of Mifeprex under the Mifeprex REMS Program. Because I primarily practice in a federally funded facility, abortion is only provided in relatively rare circumstances that fall within the exceptions allowed by the Hyde Amendment, *i.e.*, circumstances where the pregnancy results from rape or incest, or the patient experiences complications that could seriously threaten her life or health should the pregnancy continue. Notwithstanding the relative infrequency of abortion care in my primary practice, through my work as an independent contractor at a clinic providing abortion care, I have used and continue to use the combination of mifepristone and misoprostol for medication abortion for numerous patients.

5. For patients who choose to end a pregnancy, counseling about the options to end the pregnancy is provided. Patients are informed about a surgical abortion, which would use dilation and suction to remove the pregnancy tissue from the uterus. The option of medication abortion is also explained, and patients are informed that this would include the use of mifepristone followed by the use of misoprostol in 24-48 hours. The risks of both options are explained in full, as is the expected course of treatment.

6. In accordance with the Risk Evaluation and Mitigation Strategy (REMS) related to mifepristone, as well as Arizona state law, if a patient elects to have a medication abortion, at the first visit, the gestational age of the pregnancy is determined and options are explained. If the pregnancy is 70 days gestational age or less, medication abortion is an option. Under Arizona state law, the patient must then wait at least 24 hours before returning to the clinic for another appointment. At this appointment, the patient signs a consent form and a Patient Agreement to confirm that she has been informed about risks of mifepristone and has received the Medication Guide and Patient Agreement. She undergoes a pelvic exam, as required by state law, and then is given the mifepristone to be taken under direct observation in the clinic, as required by state law. Misoprostol is dispensed, as well as medication for nausea and a prescription for medication to help with cramping, if needed. The patient is instructed to take the misoprostol 24-48 hours after the mifepristone, and extensive counseling is given about when to call for assistance. The patient is also given a follow-up appointment. Adverse events are very rare with the mifepristone and misoprostol regimen, and the efficacy rate of the regimen is 98%.

7. Though medication abortion takes more time, many patients elect this method due to the desire to avoid what they may see as an invasive procedure if they select a surgical abortion. They may view the medication abortion as a more natural process. There may be other factors such as

not having a ride home from a clinic, especially if it is far from home, if they receive sedation during a procedural abortion. All factors being considered, what is important is to support patient autonomy in selecting between the methods, both of which are safe and effective, the one that best suits the patient's needs. This is a basic principle of medical ethics.

8. Prior to prescribing mifepristone, legal and medical ethics require clinicians, such as myself, to ensure that appropriate informed consent is obtained and that shared decision-making is effectuated by the patient and, if she chooses, her family members or other trusted persons. In ensuring that patients are fully informed when choosing among options, I describe all available options and the expected outcome as well as any associated risks. The patient is also, of course, screened for any of the conditions which would make medication abortion unsafe, such as inability to access emergency assistance in the rare instance it might be needed or medical conditions such as bleeding disorders, marked anemia, or porphyria, as examples. The patient and I also discuss circumstances that could make one option more appealing than another, such as lack of transportation or support at home. We discuss pros and cons of a medication or a surgical procedure. While medication means the patient can expect bleeding and cramping at home, choosing medication would allow the patient to avoid a procedure, if this is desired. Patients are also informed that the medication has a small risk of failure, so follow-up is important. Research shows that patients are most satisfied with care when they have the autonomy to choose the treatment that best suits them.

9. The information I provide to my patients is based on my years of training and experience both teaching new doctors and treating patients. I understand that all medications and medical procedures carry risks, including rare adverse events, and convey that understanding to patients as part of my regular medical practice. But the benefit of the mifepristone and misoprostol regimen

for medication abortion is that it provides a highly effective method of treatment. While complications are rare, they might involve heavier than expected bleeding or an incomplete expulsion of the pregnancy, which can be treated with additional medication or with a surgical procedure, depending on the circumstances or patient preference.

10. In my experience, I have often found that patients select medication abortion for a variety of reasons, including: privacy, control of time, and to avoid an invasive procedure. Based on my years of practice and teaching, my understanding of the published medical literature, and the requirement, described above, to ensure informed consent when counseling patients considering medication abortion, I counsel my patients about the risks of mifepristone to include significantly heavier than expected bleeding or incomplete procedure, and the very rare complication of infection. For a surgical procedure, the risks include bleeding, infection, and damage to the uterus, but the risk of an incomplete procedure is very small. As a physician, I understand that the FDA undertakes a careful assessment regarding the risks and benefits of any medication it approves, and in mifepristone's long history of use in this country and others, clinicians know that the medication is safe and efficacious and that its risks or contraindications are well known.

11. In particular, I have found that patients who are victims of abuse, including rape and incest, may find medication abortion to be a less invasive choice that avoids retraumatizing them. All patients, whether they have been abused or not, value autonomy over their bodies and making informed decisions about their health care, especially in the situation in which they may choose to end a pregnancy.

12. Those who seek abortion do so for many reasons and are of all ages and relationship statuses. I have cared for women who are young and working to achieve their educational and career goals, but experienced a failure of their chosen contraceptive method through no fault of

their own. Some already have families for which they are caring, and they know they do not have the means to support another family member. Others are victims of rape or incest, and they do not wish to continue a pregnancy resulting from that abuse. For all of these women, it is important to respect their rights and autonomy by allowing them to proceed with an abortion using the best method for them when considering their health and circumstances.

13. I understand that Plaintiffs in this suit have asked the Court to revoke FDA's approval of mifepristone. Based on my review of Plaintiffs' submissions, they appear to argue that revoking mifepristone's approval is necessary to address what they claim are risks from the use of mifepristone, but the claimed risks are unsupported by the robust literature examining the safety and efficacy of mifepristone. Eliminating mifepristone would, in my judgment, serve to worsen health outcomes, and for all the mentioned reasons, it is important to continue to allow the provision of mifepristone so that patients may obtain the care that best advances their health and well-being. Recent literature shows that restricting access to abortion worsens health outcomes and increases suicidality, as shown in an analysis of maternal death and morbidity in states that restrict access to abortion. Revoking FDA approval of a safe, effective medication would not help women as the Plaintiffs state, but would rather produce harm for women.

Dated: January 13, 2023

_____
Katherine Glaser, MD