IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its member organizations, their members, and these members' patients, et al.,<br><br>  *Plaintiffs*,<br><br>v.<br><br>**U.S. FOOD AND DRUG ADMINISTRATION**, et al.,<br><br>  *Defendants*. | Case No. 2:22-cv-00223-Z |

**BRIEF OF *AMICI CURIAE*
TEXAS BUSINESS LEADERS
IN SUPPORT OF PLAINTIFFS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ..................................... 1

SUMMARY OF ARGUMENT ........................................................................................ 3

ARGUMENT ........................................................................................................................ 4

    I.  No Evidence Supports The Claim That Women Must Have Unfettered Access To Abort Their Children To Participate Fully In The Economy ................................................................................................. 4

    II.  Sensible Limitations On Abortion Availability Do Not Harm Business ............................................................................................................. 6

    III.  *Amici* And Other Like-Minded Businesses Are Actively Developing Resources For Women Who Become Pregnant And Wish To Continue Their Careers ............................................................. 7

CONCLUSION .................................................................................................................... 8

CERTIFICATE OF SERVICE ......................................................................................... 9

# TABLE OF AUTHORITIES

**Cases**

*Dobbs v. Jackson Women's Health Organization*,
    142 S. Ct. 2228 (2022) ............................................................................................... 1

*Planned Parenthood of Southeast Pennsylvania v. Casey*,
    505 U.S. 833 (1992) ...................................................................................... 1, 3, 4, 5

*Roe v. Wade*,
    410 U.S. 113 (1973) ............................................................................................ 1, 4, 5

**Statutes**

Equal Employment Act of 1972, Pub. L. No. 92-261, 86 Stat. 103 ............................... 4

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241 .......................................... 4

Equal Pay Act of 1963, Pub. L. No. 88-38, 77 Stat. 56 .................................................. 4

**Other Authorities**

David C. Reardon, *The Embrace of the Proabortion Turnaway Study: Wishful
    Thinking?  Or Willful Deceptions?*, 85 LINACRE Q. 204, 210 (2018) .................. 5

DIANA GREENE FOSTER, THE TURNAWAY STUDY: TEN YEARS, A THOUSAND WOMEN,
    AND THE CONSEQUENCES OF HAVING – OR BEING DENIED – AND ABORTION
    (2021) ........................................................................................................................ 5

Florida Governor Ron DeSantis, Florida's Economy Continues to Thrive (Apr. 15,
    2022), https://www.flgov.com/2022/04/15/floridas-economy-continues-to-
    thrive/ ........................................................................................................................ 7

Office of the Texas Governor, Texas Economic Development, Business Climate,
    https://gov.texas.gov/
    business/page/business-climate ................................................................................. 6

Office of the Texas Governor, *Texas Wins Site Selection's Governor's Cup For
    Record-Breaking Tenth Year In A Row* (Mar. 1, 2022),
    https://gov.texas.gov/news/post/texas-wins-site-selections-governors-cup-
    for-record-breaking-tenth-year-in-a-row .................................................................. 6

ROSALIND PETCHESKY, ABORTION AND WOMAN'S CHOICE
    (rev. ed. 1990) .................................................................................................. 4

*Women Business Owner Statistics*, NAT'L ASS'N WOMEN BUS. OWNERS,
    https://www.nawbo.org/resources/women-business-owner-statistics ............... 6

Women Scholars and Professionals, and Prolife Feminist Organizations *Amicus*
    Brief, *Dobbs v. Jackson Women's Health Organization*, No. 19-1392 (U.S.) .... 5

**INTRODUCTION AND INTEREST OF *AMICI CURIAE***

In *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992), a plurality of the Supreme Court of the United States opined that the abortion regime established by *Roe v. Wade*, 410 U.S. 113 (1973), should be upheld because of the "reliance interests" women had developed. Indeed, the plurality believed that a right to abortion was required to ensure a woman's ability to "participate equally in the economic and social life of the nation." *Casey*, 505 U.S. at 856. It is for good reason that *Casey* is no longer good law. That expression of reliance interests from *Casey* was just one of the faulty assumptions made by the plurality. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2276 (2022) ("*Casey*'s notion of reliance thus finds little support in our cases . . . .").

The *Casey* dissent pointed out that "[s]urely it is dubious to suggest that women have reached their 'places in society' in reliance upon *Roe*, rather than as a result of their determination to obtain higher education and compete with men in the job market, and of society's increasing recognition of their ability to fill positions that were previously thought to be reserved only for men." 505 U.S. at 956–57 (Rehnquist, C.J., dissenting). It *was* dubious—women had not relied on abortion in making strides to participate equally in the economic life of America. Thus while no one questions here whether women should have the ability to participate fully in the economy, unfettered abortion rights are hardly necessary for that full participation. As was the case thirty years ago, the *Casey* plurality's fears are still unfounded.

*Amici* are a group of business leaders from across America, and Texas in particular, that work to combine traditional principles with ingenuity in the

marketplace in order to help their companies succeed both financially and morally. Together they represent thousands of employers who provide jobs to almost a million workers.

*Amicus* The Christian Employers Alliance is an alliance of Christian-owned businesses—both non-profit organizations and for-profit companies—whose mission is to unite, equip, and represent Christian-owned businesses to protect religious freedom and provide the opportunity for employees, businesses, and communities to flourish.

*Amicus* C12 Business Forums is a global operator of Christian CEO/Owner and executive peer advisory groups.  C12 serves over 3,600 members who employ more than 750,000 American workers.  The organization works with each of its members to provide innovative solutions for businesses run according to biblical values.

Decades of business experience have shown that women do not need an absolute right to abort their pre-born children at any point to participate in the Nation's economy.  Among those examples is *Amicus* Lisa Fullerton, President and CEO of A Novel Idea, LLC.  Ms. Fullerton runs a number of Auntie Anne's and Cinnabon franchises in Texas while also being the mother of two children.

Other *Amici* are Tier One Group, Inc. (and its President/CEO Shawn Fluitt); Let's Play Sports (and its President Gary Archer); and Lemburg House (and its President Ben Fuller).  These employers are committed to advancing women in the marketplace who also desire to be mothers.

2

While some businesses may benefit from liberal abortion regimes in the short term by having fewer women on maternity leave, this approach is short-sighted and ignores the expansion of women in the workforce even as abortion rates have dropped. It also ignores the health benefits that come from promoting family values and work-life balance among employees. Moreover, in an era of increased teleworking and flexible employment arrangements, there is less need than ever for a woman to abort her pre-born child to continue working.

At the same time, businesses—such as *Amici*—are working to increase the support provided to women who desire to have both children and a career. And as Texas has shown, increased protection for the unborn does not harm a state's economy.

## SUMMARY OF ARGUMENT

The *Casey* plurality was mistaken. Abortion is not and has never been a necessary condition to the economic success of women in this country. Indeed, women moved forward—both in terms of education and employment opportunities—even as abortion rates fell. And in today's modern climate of online schooling and remote working opportunities, the need for women to be physically present in either a classroom or an office is even more diminished—working mothers are able to take advantage of more accommodations than have been previously available at any time in history. All this leads to the conclusion that women—and the businesses for which they work—do not and need not rely on an unrestricted right of abortion to succeed economically.

ARGUMENT

I. **No Evidence Supports The Claim That Women Must Have Unfettered Access To Abort Their Children To Participate Fully In The Economy.**

The now-overturned *Casey* plurality argued that "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." 505 U.S. at 856. Yet the only "evidence" for this conclusion was a book footnote claiming that increased abortion rights were a *consequence* of advances in women's lives, not the *cause*. ROSALIND PETCHESKY, ABORTION AND WOMAN'S CHOICE (rev. ed. 1990). There was no support for the same argument in *Casey* that continues through to today.

In reality, the 50 years preceding *Roe* had seen a dramatic expansion in the social and economic opportunities for women. For example, in addition to women being elected to the U.S. House of Representatives, the U.S. Senate, and governorships, a raft of legislation had been passed promoting women's rights. These included the Equal Pay Act of 1963, Pub. L. No. 88-38, 77 Stat. 56 (banning sex-based wage discrimination), the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241 (banning sex discrimination in employment, education, or public accommodations), and the Equal Employment Act of 1972, Pub. L. No. 92-261, 86 Stat. 103 (requiring employers to provide equal access to jobs for similarly qualified individuals).

But women's advancements were not limited to the political realm. The half-century before *Roe* saw women's educational and occupational choices increase as dramatic cultural and social shifts took place. Because equality in the classroom and

the workplace was making substantial advances prior to *Roe*, the *Casey* plurality was wrong to argue that abortion is a necessary element of such equality.

Since that time, abortion proponents have sought to rely on a series of social studies known as the "Turnaway Studies" (so-called because they compared women denied late-term abortions—*i.e.*, who were turned away from abortion clinics—with women who received abortions earlier in their pregnancies). Supposedly, women able to abort fared better economically and educationally. DIANA GREENE FOSTER, THE TURNAWAY STUDY: TEN YEARS, A THOUSAND WOMEN, AND THE CONSEQUENCES OF HAVING – OR BEING DENIED – AND ABORTION (2021). But not only were those studies funded by abortion proponents, they also lacked proper controls, had abysmal follow-up rates, and hid their data from independent researchers (all contrary to scientific practices). *See, e.g.*, David C. Reardon, *The Embrace of the Proabortion Turnaway Study: Wishful Thinking? Or Willful Deceptions?*, 85 LINACRE Q. 204, 210 (2018). But even ignoring those glaring issues, it is unclear why the solution to these disputed studies is to abort more human beings rather than increase efforts to support mothers *and* their children. For instance, if a study showed that women fared better without unwanted *born* children, the conclusion would not be to treat those children as disposable.

In any event, it is telling that as abortion rates declined over the period from 1990 to 2016, the percentage of women in the workforce with a college degree rose from 24.5% to 41.6%; at the same time, women's earning as a percentage of men's income rose from 70.9% to 81.9%. Women Scholars and Professionals, and Prolife

Feminist Organizations *Amicus* Brief, *Dobbs v. Jackson Women's Health Organization*, No. 19-1392 (U.S.) at 32.  The number of women-owned businesses also increased from 5.4 million in 1997 to 11.1 million in 2017.  *Women Business Owner Statistics*, NAT'L ASS'N WOMEN BUS. OWNERS, https://www.nawbo.org/resources/women-business-owner-statistics.

While poor social science has argued otherwise, there is no reason to believe the myth that women must have the ability to abort their pre-born children in order to participate fully in the economy.

**II.   Sensible Limitations On Abortion Availability Do Not Harm Business.**

Some may also claim that sensible abortion restrictions—such as enforcement of FDA regulations related to the distribution, especially by mail, of abortifacient drugs—could cause the economy to suffer or harm business in general.  This concern is likely incorrect; and regardless, it is inappropriate for the judicial inquiry.

As several states (including Texas) have seen, increased protections for the unborn have not hindered the business climate.  For example, after passing the widely discussed and disputed SB 8—known as "the heartbeat bill"—Texas has continued to attract more corporate relocations and expansions than any other state.  Office of the Texas Governor, Texas Economic Development, Business Climate, https://gov.texas.gov/business/page/business-climate.  Indeed, the state won the Governor's Cup for job creation and capital investment even after passing what some called the "most restrictive" abortion laws in the country.  Office of the Texas Governor, *Texas Wins Site Selection's Governor's Cup For Record-Breaking Tenth*

6

*Year In A Row* (Mar. 1, 2022), https://gov.texas.gov/news/post/texas-wins-site-selections-governors-cup-for-record-breaking-tenth-year-in-a-row.

Similarly, Florida has continued to see economic growth after enacting pro-life legislation. Florida Governor Ron DeSantis, Florida's Economy Continues to Thrive (Apr. 15, 2022), https://www.flgov.com/2022/04/15/floridas-economy-continues-to-thrive/. As Florida's experience confirms, companies are interested in business friendly environments that "connect[] communities, businesses, and families to the resources they need to thrive." *Id.* Businesses do not require abortion on demand and are not harmed by sensible restrictions that protect women.

### III. *Amici* And Other Like-Minded Businesses Are Actively Developing Resources For Women Who Become Pregnant And Wish To Continue Their Careers.

Finally, to the extent that there are concerns about the effects that preventing women from aborting their children will have on the economy, those concerns will be allayed by the steps *Amici* here (along with other Texas businesses) are taking to ensure that women can choose to keep both their children and their careers.

Examples of such resources provided by *Amici* include:

- Increased teleworking opportunities (already ubiquitous and easy to implement after the COVID-19 pandemic) and flexible working schedules.

- Paid maternity and paternity leave.

- Childcare reimbursement and tuition assistance.

7

*Amici* are committed to safeguarding the vital role women play in the economic life of our State and will continue working to ensure that women understand their importance in the economy in general. Indeed, as businesswomen such as Lisa Fullerton show, it is possible to be both a mother and a productive entrepreneur. Instead of treating children as a commodity to be traded for profit or accomplishment, *Amici* believe (and demonstrate) that companies can provide ways for women to be successful in both their professional and personal lives.

## CONCLUSION

The Court should grant Plaintiffs' request for an injunction.

Dated: February 10, 2023                              Respectfully submitted,

*/s/ John C. Sullivan*
John C. Sullivan
S|L LAW PLLC
Texas Bar Number: 24083920
610 Uptown Boulevard, Suite 2000
Cedar Hill, Texas 75104
(469) 523–1351 (v)
(469) 613-0891 (f)
john.sullivan@the-sl-lawfirm.com

*Attorney for Amici Curiae*

8

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2023, a true and correct copy of this Brief of *Amici Curiae* was served by CM/ECF on all counsel or parties of record.

*/s/ John C. Sullivan*
John C. Sullivan
S|L LAW PLLC
Texas Bar Number: 24083920
610 Uptown Boulevard, Suite 2000
Cedar Hill, Texas 75104
(469) 523–1351 (v)
(469) 613-0891 (f)
john.sullivan@the-sl-lawfirm.com

*Attorney for Amici Curiae*

9