IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| ALLIANCE FOR HIPPOCRATIC MEDICINE, *et al.,* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:22-cv-00223-z |
| v. | ) | |
| | ) | |
| U.S. FOOD AND DRUG ADMINISTATION, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BRIEF *AMICUS CURIAE* OF FAMILY RESEARCH COUNCIL**

THE SMITH APPELLATE LAW FIRM

By:  Michael F. Smith (D.C. Bar. No. 975954)*
1717 Pennsylvania Avenue N.W.
Suite 1025
Washington, D.C.  20006
(202) 454-2860 (direct dial)
(202) 747-5630 (fax)
smith@smithpllc.com
**Counsel for *Amicus Curiae***
**Family Research Council**
* Application for admission *pro hac vice* pending

Dated: February 10, 2023

### TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES...............................................................................ii

INDEX OF ATTACHMENTS............................................................................iv

INTEREST OF *AMICUS CURIAE* IN THE LITIGATION'S OUTCOME................v

INTRODUCTION......................................................................................1

I.     President Clinton's Version of Operation Warp Speed – Get Mifepristone
       to Market......................................................................................2

II.    The Final Stretch with Roussel Uclaf......................................................11

III.   2000 – Politics Overrides Safety Concerns.............................................13

CONCLUSION/RELIEF REQUESTED.........................................................16

i

## INDEX OF AUTHORITIES

**Page**

### Cases

*Earth Island Inst. v. Hogarth*, 494 F.3d 757 (9th Cir. 2007)………………………......15

*Western Watersheds Project v. United States Forest Serv.*,
 535 F. Supp. 2d 1173 (D. Idaho 2007)……………………………………………......15


### Statute

5 U.S.C. § 706……………………………………………………………………16

28 U.S.C. § 1489……………………………………………………………………..7


### Other authorities

Kathi Aultman, Christina A. Cirucci, Donna J. Harrison, Benjamin D. Beran,
 Michael D. Lockwood, and Sigmund Seiler, "Deaths and severe adverse
 events after the use of mifepristone as an abortifacient from
 September 2000 to February 2019," *Issues L. & Med.* 36 (2021)…………………1

Citizen Petition of AAPLOG *et al.* to FDA (2002)……………………………….13-15

President William J. Clinton, "Importation of RU-486," Memorandum for
 the Secretary of Health and Human Services, *Public Papers of the
 Presidents: Administration of William J. Clinton, 1993* (Jan. 22, 1993)……..3, 4

President William J. Clinton, Letter to Dr. Edourd Sakiz (May 14, 1994)………......12

Margaret M. Gary and Donna J. Harrison, "Analysis of severe adverse events
 related to the use of mifepristone as an abortifacient." *Annals of
 Pharmacotherapy*, 40, no. 2 (2006)……………………………………………1

"Gassing Victims in the Holocaust: Zyklon-B," at https://www.jewishvirtual
 Library.org/background-and-overview-of-gassing-victims…………………………3

Jennifer Jackman, "Anatomy of a Feminist Victory: Winning the Transfer of
 RU 486 Patent Rights to the United States, 1988-1994,"
 *Women & Politics* 24, no. 3 (2002)…………………………………………3, 4, 5, 6

**<u>Other authorities (cont'd)</u>**

Rachel K. Jones et al., "Medication Abortion Now Accounts for More Than
    Half of All US Abortions," Guttmacher Institute
    (Feb. 24, 2022 updated Dec. 1, 2022)...........................................................1

"The Population Council," https://www.rbf.org/about/our-history/timeline/
    population-council (accessed Feb. 9, 2023)................................................5

Secretary Donna Shalala, Memo to Carol Rasco (Nov. 15, 1993).............8, 9, 10, 11

Sheryl Gay Stolberg, "F.D.A. Adds Hurdles in Approval of Abortion Pill,"
    *The New York Times* (June 8, 2000)........................................................14

Kevin Thurm, Memo to Carol Rasco (May 11, 1994)....................................11, 12

## <u>INDEX OF ATTACHMENTS</u>

**Exhibit 1:**   Jennifer Jackman, "Anatomy of a Feminist Victory: Winning the Transfer of RU 486 Patent Rights to the United States, 1988-1994," *Women & Politics*, vol. 24 (3) (2002)

**Exhibit 2:**   Judicial Watch, "The Clinton RU-486 Report Files: The Clinton Administration's Radical Drive to Force an Abortion Drug on America") (Washington, D.C., April 26, 2006)

## INTEREST OF *AMICUS CURIAE* IN THE LITIGATION'S OUTCOME

Proposed *Amicus* Family Research Council ("FRC") is a Washington, D.C.-based nonprofit research and educational organization that seeks to advance faith, family, and freedom in public policy from a biblical worldview. FRC recognizes and respects the inherent dignity of every human life from conception until death and believes that the life of every human being is an intrinsic good, not something whose value is conditional upon its usefulness to others or the state. FRC also recognizes the inherent dignity of every woman, and thus supports proper medical ethics and standards aimed at protecting the health and well-being of women.

FRC fully supports and concurs in the claims brought by Plaintiffs in this action, seeking to enjoin the various unlawful actions of Defendant FDA and others, as detailed in their Complaint and Motion for Preliminary Injunction. FRC files this *amicus curiae* brief to give the Court additional background regarding the unorthodox and troubling manner in which the FDA approved chemical abortion drugs in 2000, after a years-long process in which science, health and safety took a back seat to the bare-knuckles political tactics of the abortion industry and the Clinton administration.

# **INTRODUCTION**

Since the Food and Drug Administration ("FDA") approved the mifepristone-misoprostol abortion pill regimen ("mifepristone regiment") on September 28, 2000, millions of abortions using that regimen have been performed in the United States.[1] Recently, the Alan Guttmacher Institute estimated that over half of abortions performed nationally are based on a pharmaceutical regimen – presumably, the mifepristone regimen.[2] The safety of the mifepristone regimen has been called into question by two articles that reviewed the thousands of adverse event reports (AERs) filed by physicians or patients after mifepristone's use since 2000.[3] Therefore, the administrative legitimacy of the FDA's original approval of the

---

[1] Mifepristone was first marketed in the United States under the trademark name Mifeprex. Mifepristone was also labeled, by its French inventor-discoverer, Roussel Uclaf, as "RU-486" during its investigational and trial stages in France. It was commonly referred to as "RU-486" during the 1990s, but that usage has slowly waned since 2000.

[2] Rachel K. Jones et al., "Medication Abortion Now Accounts for More Than Half of All US Abortions," Guttmacher Institute (Feb. 24, 2022 updated Dec. 1, 2022), https://www.guttmacher.org/article/2022/02/medication-abortion-now-accounts-more-half-all-us-abortions.

[3] *See*, Kathi Aultman, Christina A. Cirucci, Donna J. Harrison, Benjamin D. Beran, Michael D. Lockwood, and Sigmund Seiler, "Deaths and severe adverse events after the use of mifepristone as an abortifacient from September 2000 to February 2019," *Issues L. & Med.* 36 (2021): 3-27, https://pubmed.ncbi.nlm.nih.gov/33939340/ (accessed Feb. 9, 2023); *see also* Margaret M. Gary and Donna J. Harrison, "Analysis of severe adverse events related to the use of mifepristone as an abortifacient," *Annals of Pharmacotherapy*, 40, no. 2 (2006): 191-197 (analyzing 607 RU-486 U.S. AERs filed with the FDA between September 2000 to September 2004, not duplicated by Aultman et al., *supra*).

1

mifepristone regimen in 2000 is of the utmost importance to women's health and safety.

FRC comes before this Court to present information regarding events that took place in a critical period of the mifepristone FDA administrative process that was corrupted by the political actions of the Clinton administration. This information reveals that the Clinton administration was the *de facto* drug sponsor for the mifepristone new drug application (NDA). The overwhelming involvement of the White House in the process made it clear to agency staff that this was a drug application that would not be denied. Accordingly, judicial deference to that September 2000 approval is not merited, given the exceptional political forces the administration brought in gaining its approval.

## I. President Clinton's Version of Operation Warp Speed – Get Mifepristone to Market.

In 1988, France became the first nation to license the abortifacient drug – mifepristone.[4] Aware of the drug's invention, the American pro-abortion movement and allied politicians became fully mobilized in the 1980s to gain mifepristone's use in the United States. There were two critical steps in this process. **<u>First</u>**, a drug manufacturer and marketer needed to be found that had the legal right to make and distribute the drug in the United States. Unfortunately for the pro-abortion actors, the European drug producer, Roussel Uclaf, and its German parent company, Hoechst AG, did not want to market the drug in the United States due to

---

[4] Mifepristone is used in combination with a second drug, misoprostol, as part of an abortion regimen.

several factors. They included the presence of a vocal pro-life opposition to an

abortion drug, and Hoechst's sensitivity about producing a "death pill" in light of

the fact its corporate forebear, I G Farben, produced Zyklon-B, the poison gas used

by the Nazis at Auschwitz.[5] **Second**, once a drug manufacturer and distributor

possessing the requisite legal rights was found, an NDA would have to be submitted

to and approved by the FDA. This would entail years of clinical trials and many

other dimensions of the pharmaceutical regulatory process. It is a daunting task

even for drug companies with decades of experience in this product area.

The Clinton administration was thoroughly committed to the mifepristone

project. On his second full day in office, January 22, 1993, President Clinton issued

a presidential memorandum that addressed mifepristone's regulatory status in two

ways.[6] First, the memo directed the HHS Secretary to re-examine an import ban

("Import Alert 66-47") that the Bush administration had placed on mifepristone

that prevented individuals from bringing the drug into the United States. Next, the

memo directed Department of Health and Human Services ("HHS") Secretary

---

[5] *See* Jennifer Jackman, "Anatomy of a Feminist Victory: Winning the Transfer of
RU 486 Patent Rights to the United States, 1988-1994," *Women & Politics* 24, no. 3
2002: 85. A copy of the Jackman article is attached as **Exhibit 1** *see also* "Gassing
Victims in the Holocaust: Zyklon-B," at https://www.jewishvirtuallibrary.org/
background-and-overview-of-gassing-victims (accessed Feb. 9, 2023).

[6] "Importation of RU-486," Memorandum for the Secretary of Health and Human
Services, *Public Papers of the Presidents: Administration of William J. Clinton,
1993* (Jan. 22, 1993), 11 (copy attached at Tab A to **Exhibit 2**, Judicial Watch, "The
Clinton RU-486 Report Files: The Clinton Administration's Radical Drive to Force
an Abortion Drug on America") (Washington, D.C., April 26, 2006),
https://www.judicialwatch.org/archive/2006/jw-ru486-report.pdf; also, 58 Fed. Reg. ¶
7459.

Donna Shalala to assess initiatives to "promote the testing, licensing, and manufacturing of RU-486 or other antiprogestins in the United States."[7]

Secretary Shalala and the FDA Commissioner, David Kessler, spun up a major governmental effort to find an American RU-486 (mifepristone) distributor and get the approval process for mifepristone underway. The scope of the combined private and public political mobilization was impressive.[8] It included a seemingly limitless array of non-profits, wealthy donors, scientists, institutions of higher learning, news media, state and local political actors, members of Congress, and, finally, the White House itself.[9] All were laser-focused on getting mifepristone approved for American use and defeating any opponent that might stand in their way.

In her 2002 article, Jackman offered an astute assessment of the most significant step in getting mifepristone to market:

> While FDA approval was a milestone, the pivotal juncture in the campaign to bring RU 486 to the U.S. actually occurred six years earlier, when Roussel Uclaf, the French pharmaceutical firm, and its German parent company, Hoechst AG, agreed to transfer U.S. patent rights on the drug to the Population Council. Without the transfer of patent rights, the Population Council could not have sought FDA approval.[10]

---

[7] *Id.*

[8] S*ee* **Exhibit 1**, Jackman at 81-99.

[9] Jackman at 82. Jackman's article is an indispensable guide to the overall political environment that led to mifepristone's FDA approval. Significantly, she describes a number of political threats lodged in support of the drug and against Hoechst AG and Roussel Uclaf.

[10] *Id.* at 81-82.

The greatest obstacle to the patent-rights transfer was the CEO of Hoechst AG, Prof. Wolfgang Hilger, a devout Catholic who opposed abortion.[11] Hilger retired in 1993, and a pro-mifepristone former CEO of Roussel Uclaf, Edouard Sakiz, became Roussel Uclaf's Board chairman. Dr. Sakiz then became the counterparty to HHS in the negotiations.

The pressure applied to Hoechst AG and Roussel Uclaf might have been appropriate for a mafia deal, but it was out of bounds for a pharmaceutical project with great safety implications. The campaign to get mifepristone to market included a well-planned, multi-year public relations and education campaign.[12] At its core, however, the critical component in the campaign against Hoechst AG and Roussel Uclaf was one of political coercion by both administration officials and other political figures. First, the primary regulator, the FDA, inappropriately intervened in the process. FDA Commissioner Kessler and others in the administration pressured Hoechst and Roussel Uclaf to assign its American mifepristone rights to the Population Council, a New York-based population control organization founded by John D. Rockefeller III in 1952.[13]

The U.S. Congress provided another axis for pressure. House member Ron Wyden (D-OR) heightened the political focus on mifepristone during the Bush

---

[11] Jackman at 85.

[12] Jackman at 90-91.

[13] Jackman at 92, 96; *see also* "The Population Council," https://www.rbf.org/about/our-history/timeline/population-council (accessed Feb. 9, 2023).

administration. He chaired a subcommittee on the House Committee on Small Business and used his position to hold hearings on the detrimental effects of the mifepristone import ban."[14] Additionally, Rep. Wyden and Rep. Patricia Schroeder (D-CO) "sponsored legislation mandating the FDA remove the import alert and begin clinical testing of the drug."[15] In the Senate, Sen. Paul Wellstone (D-MN) also introduced RU-486 legislation.[16] These efforts created a public drumbeat of support for RU-486.

Later, Wyden presented Hoechst AG and Roussel Uclaf with letters from three small drug manufacturers indicating their separate interest in marketing mifepristone. He also released the letters to the media. Feminist organizations announced they would set up their own drug company. That was not a feasible threat, but it showed the commitment of the parties involved and created a news cycle. According to Jackman, Roussel Uclaf had made it clear that only a *major* pharmaceutical company would be considered for licensing.[17]

These threats escalated to the point that various legal options were brandished publicly against the firms. For example, Jackman notes that in 1989 a group of law professors from California had publicly contemplated suing Roussel

---

[14] Jackman at 92.

[15] Jackman at 91-92.

[16] Jackman at 92.

[17] *Ibid*. This was not unreasonable given the scale of the endeavor, which included gaining regulatory approval in the United States, producing the drug compound, and distributing a new, complex drug regimen across North America.

Uclaf "on the grounds that their refusal to market the drug in the U.S. violated California's constitutional protection of a woman's right to privacy."[18] Abortion Rights Mobilization ("ARM"), a militant pro-abortion group founded by Lawrence Lader, argued that 28 U.S.C. § 1489 allowed "the government to seize patent rights when the public interest is at stake."[19] Additionally, a group of abortion-supporting groups held a press conference "announcing their intention to pursue the removal of patent rights."[20] While these legal theories look far-fetched in retrospect, their real purpose was to maintain unrelenting political and psychological pressure on Hoechst and Roussel Uclaf.

All of these efforts were important, but they would have come to naught had the Clinton administration not demonstrated total political commitment to the cause. The administration engineered an agreement by which its candidate, the Population Council, came to terms with Roussel Uclaf by May 1994 and obtained the intellectual-property rights at no cost. On November 15, 1993, HHS Secretary Shalala wrote a memo to the White House's Carol Rasco, Assistant to the President for Domestic Policy, describing the administration's effort to resolve the licensing and manufacturing agreement issue.[21] The memo described a critical meeting in this process:

---

[18] Jackman at 92-93.

[19] *Id*. at 93.

[20] *Ibid*.

[21] Tab B to **Exhibit 2**, Memo, HHS Secretary Donna Shalala to Carol Rasco (White House), Nov. 15, 1993, at 1 ("Shalala 1993 Memo").

In April 1993, FDA arranged a meeting between Roussel Uclaf and the Population Council, a non-profit corporation that conducts research on reproductive health issues. The meeting's purpose was to facilitate an agreement between those parties to work together to test RU-486 and file a new drug application of the drug. The Population Council was identified as the most likely group to work with Roussel Uclaf because of an existing contract between these two parties that required Roussel Uclaf to give the Population Council sufficient amounts of the drug for the Population Council to conduct clinical trials. The contract also appeared to require Roussel Uclaf to license the drug to the Population Council if Roussel Uclaf were unwilling to sell the drug in the United States.[22]

Paris-based Dr. Sakiz of Roussel Uclaf traveled to Washington, D.C., for this meeting, where he made clear that his company had a major problem that had to be solved.  Sakiz wanted legislation passed to indemnify the company "from any damages it might incur by permitting mifepristone to be marketed in the United States."[23] It was his "view that if the United States Government wanted RU-486 to be marketed in the United States, it should compensate Roussel Uclaf for any damages that the company might suffer from complying with the United States government's request."[24] Clearly, Sakiz felt that he was in a negotiation with the United States government.

However, Dr. Sakiz was told categorically that no legislation granting indemnification would take place. Nevertheless, "Dr. Sakiz committed Roussel Uclaf to negotiate with the Population Council to bring RU-486 onto the United States

---

[22] Tab B to **Exhibit 2**, Shalala 1993 Memo at 1.

[23] *Id.* at 1-2.

[24] *Id.* at 2.

market."[25] According to Secretary Shalala, Dr. Sakiz agreed to three main provisions – the last two of which are astonishing. First, Roussel Uclaf would license mifepristone to the Population Council so that it could perform a clinical trial involving 2,000 women pursuant to FDA rules for an "investigational new drug" (IND) application. Second, the Population Council "would ultimately submit a new drug application (NDA) to FDA based on the results of the clinical trial and other studies *that have been conducted by Roussel Uclaf.*" Roussel Uclaf's French data would be used to support an American drug application. And, as if that were not enough, the Population Council would select a manufacturer for the drug, with the concurrence of Roussel Uclaf, "and that Roussel Uclaf would transfer its technology for making the drug to that manufacturer."[26] As Secretary Shalala made clear, it was then left "for the Population Council and Roussel Uclaf to revise the terms of their contract, while Roussel Uclaf began sending scientific information to the FDA and the Population Council."[27]

One cannot criticize the Clinton team for lacking audacity. First, they cajoled Roussel Uclaf to hand over its intellectual property rights to the drug. Then, they told Roussel Uclaf that the firm also would have to hand over its mifepristone-related manufacturing technologies and trade secrets – essentially, a demand that the French firm prop up a potential competitor.

---

[25] **Exhibit 2**, Tab B, Shalala 1993 Memo at 2.

[26] *Ibid.* (emphasis added).

[27]  *Ibid.*

Despite all this, Roussel Uclaf returned to the subject of indemnification by mid-September 1993, and again the deal seemed to be in jeopardy. On October 5, HHS Chief of Staff Kevin Thurm and the HHS General Counsel met with lawyers for Roussel Uclaf and the Population Council. According to the Shalala Memo, "[t]he Department initiated the meeting to assess how United States Government might facilitate successful completion of the negotiations…."[28] The meeting appears to have become heated. The Roussel Uclaf attorneys were "told emphatically" that HHS "would not support its efforts to obtain federal legislation." Things took a turn when the private attorneys suggested that the United States government "could exercise its statutory of powers of eminent domain and take over the patent for RU-486 insofar as it covers abortifacient uses of the drug."[29] Roussel Uclaf's attorneys seemed to be saying in response to the pressure: "Well, just take the patents then, if you will not address our concerns."

The Population Council was doing its best to meet Roussel Uclaf's requirements. It sent a delegation to Germany to meet with top officials of Hoechst AG – not Roussel Uclaf. Shalala added, "Despite these moderately positive developments, we do not think that the negotiations will be successfully concluded *without pressure on Roussel Uclaf/Hoechst*."[30] Shalala suggested steps to get things moving again. The first was "to enlist the aid of Felix Rohatyn, or someone of

---

[28] **Exhibit 2**, Tab B, Shalala Memo at 3.

[29] *Id.* at 3-4.

[30] **Exhibit 2**, Tab B, Shalala Memo at 4 (emphasis added).

comparable stature, to negotiate with Roussel Uclaf and Hoechst on behalf of the United States Government."[31] Second, Shalala proposed "for the United States to exercise its statutory powers of eminent domain and take over the patent for RU-486, insofar as it covers the abortifacient use of the drug."[32] By November 1993, as the Shalala memo indicated, the HHS officials were extremely exasperated with Roussel Uclaf.

## II.   The Final Stretch with Roussel Uclaf

Negotiations regarding Roussel Uclaf's transfer of patent rights to the Population Council progressed slowly for six months. On May 11, 1994, five days before Roussel Uclaf announced the transfer of those patent rights to the Population Council, HHS Chief of Staff Thurm wrote a lengthy memo to the White House describing recent developments.[33]

Thurm told the White House some blunt truths. After all the negotiations, Roussel Uclaf told Secretary Shalala on May 9, 1994, of "the company's wish…to offer the RU 486 United States patent rights to the United States government" for abortion purposes only. Roussel Uclaf would assign the "free of charge, asking nothing in return."[34] If this option were chosen, the Population Council option would

---

[31] Rohatyn was a prominent Wall Street investment banker and international political actor with a background in European politics.

[32] *Id*. at 4-5.

[33] **Exhibit 2**, Tab D (May 11, 1994 Kevin Thurm Memo).

[34] **Exhibit 2**, Tab D, Thurm Memo at 1.

be closed permanently. That would make the United States government the holder of the mifepristone patent rights.[35]

On the other hand, if the Population Council option were chosen – then President Clinton would have to write a letter to the company "asking, on behalf of women in America, that the patents be assigned to a non-profit entity in this country."[36] Thurm proposed language for the letter Roussel Uclaf required from the United States.[37]

President Clinton decided in favor of the transfer of the patent rights to the Population Council. On May 14, 1994, the requisite letter was sent to Roussel Uclaf, which began with the sentence, "It is important for the health of women in the United States that they have access to the widest possible range of safe and effective medical treatments."[38] The pressure campaign had the desired effect, and on May 16, 1994, Roussel Uclaf announced that its U.S. commercial rights to mifepristone would be transferred to the Population Council.[39] Hoechst AG and Roussel Uclaf never received any promises of indemnification from the United States government.

---

[35] *Ibid.*

[36] *Ibid.*

[37] *Id.* at 1-2.

[38] **Exhibit 2**, Tab E, Letter from President Clinton to Dr. Sakiz, at 1.

[39] Thurm noted that one forcing function in the negotiations was a congressional hearing on the topic scheduled for May 16, 1994, at 10:00 a.m. This hearing would take place before Rep. Ron Wyden's subcommittee of the House Committee on Small Business. **Exhibit 2**, Tab D, Thurm Memo at 4 (section, "Background").

### III.    2000 – Politics Overrides Safety Concerns

The approval was marked with this same sort of politics until the very end. On February 18, 2000, the FDA informed the Population Council that "adequate information had *not* been presented to demonstrate that mifepristone, when marketed in accordance with the terms of distribution proposed by the Population Council, is safe and effective for use as recommended."[40] Over the next several months, the Population Council and Danco refused to supplement its distribution plan with a meaningful patient safety component.[41]

This prompted the FDA on June 1, 2000, to convey privately to the sponsor a set of proposed restrictions intended to rectify that omission.[42] The FDA proposed a list of "Qualifications for Physician Recipients," six reasonable proposals regarding physician qualifications and training needed to make the regimen safe.[43] For example, the physician would have to be trained to use ultrasound to evaluate the age of the pregnancy and confirm an intrauterine pregnancy (*i.e.*, not ectopic). These were common-sense precautions, but the predictable reaction came swiftly and with a vengeance.

---

[40]  *See* Plaintiff's Appendix 2 ("App.") filed at ECF 8, Ex 13 to Pls' Motion for Preliminary Injunction, 2002 Citizen Petition of AAPLOG *et al*. to FDA, App. 329, n.216 (citing attachment) (brackets omitted; FDA's italics).

[41]  *Id*., App. 329.

[42]  *Id*., App. 329, 332-333.

[43]  *Id*. App. 332-333, n.235.

The Population Council leaked stories to the press claiming that the FDA's proposals "would severely limit women's access to the drug if and when it is approved."[44] The American Medical Association and the American College of Obstetricians and Gynecologists aggressively intervened with the FDA.[45] Dr. Erich Schaff, an RU-486 advocate and researcher, told *The New York Times* that such restrictions would kill "the drug if it can't be used by primary care providers."[46] Schaff also made the obvious point: "The whole idea of mifepristone was to increase access."[47] Amid the ensuing vigorous political and editorial backlash, the recalcitrant Population Council not only rejected the FDA's proposal but, in what the FDA described as a "very significant change," repudiated restrictions the sponsor itself had proposed in 1996.[48]

Pro-abortion forces launched another public-private, multi-dimensional pressure campaign to beat back the agency, and it worked. The FDA staff appears to have abandoned its proposal by mid-July, and the abortion regimen was

---

[44] App. 329; 333 nn. 237-238.

[45] App. 333, n. 239.

[46] Sheryl Gay Stolberg, "F.D.A. Adds Hurdles in Approval of Abortion Pill," *The New York Times* (June 8, 2000).

[47] *Id.*

[48] App. 329 n.217 (FDA email quoting Population Council's attorney affirming that "the 1996 proposals for distribution system as presented by the Pop Council then and agreed to by the [FDA Advisory Committee] and FDA are NOT what the Pop Council wants today").

approved on September 28, 2000, without restrictions sufficient to address the agency's legitimate safety concerns.[49]

As demonstrated above, from 1993-94, the Clinton administration, politically aligned NGOs, private actors, and members of Congress forced Hoechst AG and Rousel Uclaf to hand over their intellectual property rights to mifepristone. The White House was the *de facto* drug sponsor for the mifepristone NDA. Its behavior made that clear as it grabbed Roussel Uclaf's intellectual property for the benefit of the Population Council. That bias rippled through the entire process, all the way to June 2000. At that time, it appears some brave drug reviewers dared to demand legitimate safety requirements for prescribing physicians. This step was met by public and private pressure campaigns to drop the proposal. Safety was a secondary concern compared to the political objective of increasing "access," which was the "whole idea of mifepristone," according to Dr. Schaff, *supra*.

Where an administrative process is tainted by political meddling that subverts science, the resulting outcome is arbitrary and capricious and must be rejected. *Western Watersheds Project v. United States Forest Serv.*, 535 F. Supp. 2d 1173, 1187-89 (D. Idaho 2007) (reversing the Fish & Wildlife Service's rejection of petition to list sage-grouse as endangered; Deputy Assistant Secretary repeatedly intervened to "steer the 'best science' to a pre-ordained outcome" in what OIG called "the most brazen case of political meddling he had seen"); *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 768 (9th Cir. 2007) (affirming decision vacating agency

---

[49] App. 329.

action as arbitrary and capricious where the district court "never, in its 24 years, reviewed a record of agency action that contained such a compelling portrait of political meddling…both Mexico and the United States Department of State…engaged in a persistent effort to influence both the process and the ultimate finding [and] high ranking-officials [*sic*] in the Department of Commerce were willing to heed these influences notwithstanding the scientific evidence to the contrary"); *see also* 5 U.S.C. § 706. The FDA's September 2000 politicized approval of mifepristone was arbitrary and capricious and not in accordance with law. Accordingly, the agency's 2000 approval and subsequent supplemental approvals do not merit judicial deference.

## CONCLUSION/RELIEF REQUESTED

*Amicus Curiae* Family Research Council respectfully asks the Court to grant the relief Plaintiffs request in their Complaint (ECF 1) and Motion for Preliminary Injunction (ECF 6).

Respectfully submitted,

THE SMITH APPELLATE LAW FIRM

/s/ Michael F. Smith
By:  Michael F. Smith (D.C. Bar. No. 975954)*
1717 Pennsylvania Ave. N.W.
Suite 1025
Washington, D.C.  20006
(202) 454-2860
smith@smithpllc.com
**Counsel for *Amicus Curiae***
**Family Research Council**
* Application for admission *pro hac vice* pending

Date: February 10, 2023

# Exhibit 1

# Anatomy of a Feminist Victory:
# Winning the Transfer of RU 486 Patent Rights
# to the United States, 1988-1994

## Jennifer Jackman, Feminist Majority Foundation

**ABSTRACT.** The decision of Roussel Uclaf, a French pharmaceutical firm, to relinquish its United States patent rights on RU 486 in 1994 marked a major victory for American feminist organizations which had sought the drug's U.S. introduction since 1988. Disagreements between Roussel Uclaf and its German parent company, Hoechst AG, over the fate of RU 486 made the companies vulnerable to social movement influence. Through massive petition drives, mobilization of the scientific community, and economic pressure, American feminist groups were able to neutralize the effects of anti-abortion campaigns to withhold the drug. The intervention of the Clinton administration, also at the urging of feminist groups, provided the final resource for RU 486 advocates within Roussel Uclaf to convince Hoechst AG to transfer patent rights. This case shows that strategies usually reserved for feminist advocacy in the public arena can be effective in the non-state context. However, strong relationships between feminist organizations and inside allies were necessary to movement success. *[Article copies available for a fee from The Haworth Document Delivery Service: 1-800-HAWORTH. E-mail address: <getinfo@haworthpressinc.com> Website: <http://www.HaworthPress.com> © 2002 by The Haworth Press, Inc. All rights reserved.]*

On September 28, 2000, mifepristone, known as RU 486, received final approval by the Food and Drug Administration (FDA) for marketing in the United States. While FDA approval was a milestone, the pivotal juncture in the campaign to bring RU 486 to the U.S. actually occurred six years earlier, when Roussel Uclaf, the French pharmaceutical firm, and its German

82                              WOMEN & POLITICS

parent company, Hoechst AG, agreed to transfer U.S. patent rights on the
drug to the Population Council. Without the transfer of patent rights, the
Population Council could not have sought FDA approval.

American feminist organizations, led by the Feminist Majority Foun-
dation (FMF) and including the Reproductive Health Technologies
Project (RHTP), Abortion Rights Mobilization (ARM), Planned Par-
enthood Federation of America, and the National Abortion and Repro-
ductive Rights Action League (NARAL), had urged Roussel Uclaf
since 1988 to allow the medication to be brought to the United States.
On May 16, 1994, when Roussel Uclaf announced the transfer of patent
rights to the Population Council, the Clinton administration was given
full credit for making it happen (Hyman 1994). The company in a brief
statement stated that the decision had been made "in response to ongo-
ing requests by President Clinton and Secretary [of Health and Human
Services] Shalala" (Roussel Uclaf 1994). Privately, feminist organiza-
tions were told that their pro-RU 486 campaign had been pivotal in se-
curing the transfer of patent rights to an American organization.[1]

The transfer of patent rights capped multi-faceted campaigns by
feminist organizations to free a medical advance held hostage by both
the European companies that owned RU 486 patent rights and by
anti-abortion forces which made various threats against the companies.
This research analyzes the strategies employed by feminist organiza-
tions from 1988 when RU 486 first became available in France until
1994 when the Population Council gained U.S. patent rights. One of
most significant aspects of this campaign was the fact that it was pri-
marily directed at non-state actors, Roussel Uclaf and Hoechst AG.

The primary goal of this article is to provide a historical record of the
factors that contributed to the introduction of mifepristone in the United
States. Because FDA approval occurred so recently, the history of RU
486 is only now being written (see Schroedel and Corbin in this vol-
ume). Early accounts (Bass 1998; Charo 1991; Lader 1991, 1995; Sturr
1993) have not included a complete history of the FMF's campaign and
the crucial interactions between feminist proponents of the drug and their
counterparts within Roussel Uclaf. This study explores the strategies em-
ployed by the FMF and other organizations from a social movement per-
spective. While studies (Mansbridge 1986) of feminist movement cam-
paigns are often quick to attribute losses to failures in strategy selection
without adequate appraisal of opposition forces, it is important to also
document when feminist strategies are successful.

## SOCIAL MOVEMENT THEORY, NON-STATE TARGETS, AND RU 486

Only recently have the theoretical implications of social movement activities targeted at non-state actors received scholarly attention (Ameta and Young 1999; Jasper and Poulsen 1993; Moore 1999; Pellow 2001). In the case of RU 486, from 1988 when the drug became available in France until the May 1994 transfer of patent rights, advocates had little choice but to target the drug's European manufacturers, Roussel Uclaf and Hoechst AG. Because these companies owned the patent rights, they controlled the decision whether or not to apply for FDA approval to license and market the drug in the United States. As such, the feminist campaign to convince Roussel Uclaf and Hoechst AG to allow RU 486 to be made available in the U.S. provides a unique opportunity to explore social movement strategies directed at influencing non-state targets.

Moore's (1999) study of the effect of Vietnam protests on scientific institutions is a useful starting point for analyzing the dynamic between social movement organizations and non-state targets. According to Moore (1999), non-state institutions are less susceptible to social movement campaigns because they lack the formal structures of oversight, participation and representation that exist in state institutions. This lack of formal channels, in combination with institutional vulnerability, however, sometimes can present opportunities for influence that might not exist within governmental entities. As Jasper and Poulson (1993) also observe, non-state actors have "pre-existing vulnerabilities" that make them susceptible to well-designed social movement campaigns.

Social movement researchers (Jackman 1997, 1999; Moore 1999) also suggest that insider allies can be very important. Policy scholars (Eisenstein 1996; Santoro and McGuire 1997; Schroedel and Corbin this volume; Steinberg 1986) find that alliances between women's organizations and feminist policy makers have facilitated the adoption of feminist policies. According to Steinberg (1988), the election and appointment of women to government policy making positions has created a "shift in the strategic politics of how liberal feminist reforms are fought for and achieved." In some situations, social movement organizations may seek state intervention to influence the actions of non-state targets (Ameta and Young 1999).

WOMEN & POLITICS

## RESEARCH METHODS

The Feminist Majority Foundation led the largest, sustained public campaign to bring mifepristone to the United States and was instrumental in winning the transfer of patent rights. The campaign from 1988 to 1994 was explicitly focused on convincing Roussel Uclaf and Hoechst AG to allow the drug to be introduced in the United States. Because of FMF's pivotal role, closer examination of its multi-pronged campaign is both appropriate and necessary for understanding the transfer of patent rights. The activities of other groups, such as RHTP and ARM, also will be discussed.

This analysis relies extensively on my observations as Director of Policy and Research for the FMF. I was an active participant in internal discussions of strategies and in countless formal and informal conversations with officials from Roussel Uclaf, Hoechst AG, the Population Council, and advocacy groups during much of the 1988-1994 period. While I bear sole responsibility for the content of this article, FMF President Eleanor Smeal and Board Chair Peg Yorkin shared their insights with me about strategy development and the campaign over the course of this 12-year effort. I also reviewed hundreds of media reports from this period and analyzed correspondence, notes from meetings and phone calls, press releases, fact sheets, and other materials from the FMF's private archives. Additional materials were compiled from other feminist groups, as well as publications from anti-abortion groups. FMF leaders and former Roussel Uclaf officials reviewed this manuscript to ensure its accuracy.

## INSTITUTIONAL VULNERABILITY
## AT ROUSSEL UCLAF AND HOECHST AG

Various theories have been advanced to explain the reluctance of Roussel Uclaf and Hoechst AG to market mifepristone in the United States. The most frequently voiced reasons include: fears of an anti-abortion boycott, hostility of the Bush administration, and concerns about anti-abortion violence (Tempest 1990). Others cite Hoechst AG CEO Wolfgang Hilger's personal opposition to abortion. Economic factors, such as fears that RU 486 would compete with the Roussel Uclaf's contraceptive market niche and concerns about product liability suits also are mentioned (Charo 1991; MacKenzie 1991; Smeal 1992).

Roussel Uclaf and Hoechst AG were divided over whether the drug should be marketed. RU 486 was developed under the leadership of Roussel Uclaf's former CEO, Dr. Edouard Sakiz. As the first anti-progestin to reach the market, mifepristone was on the cutting edge of reproductive health technology. Sakiz had always regretted the company's decision not to pursue and manufacture contraceptives in the 1960s and did not want to see them repeat the mistake with anti-progestins (Greenhouse 1989). Moreover, Sakiz and the company's Director of Communications and Scientific Relations Catherine Euvrard were strong advocates of women's reproductive rights. In one interview, Euvrard criticized her male colleagues as being "afraid of controversy, afraid to fight. For them, it is always the problems of politics, money and corporate image" (Pogash 1991, 15). In contrast, Hoechst AG's CEO, Wolfgang Hilger, was an ardent opponent of abortion and a close ally of the Catholic Church (Lader 1991).[2] Hilger also reportedly feared anti-abortion analogies comparing mifepristone, "the death pill," to the death gas manufactured in World War II by Hoechst AG's ancestral firm, I G Farben (Greenhouse 1989; Lader 1991). With the retirement of Sakiz in 1993 and Hilger in 1995, the internal politics of both firms changed. Sakiz became Chair of Roussel Uclaf's Board of Supervisors, but Hilger's role at Hoechst AG ended. At Roussel Uclaf, Sakiz and Euvrard retained responsibility for RU 486 and ultimately executed the transfer of patent rights to the Population Council.

### THE ANTI-ABORTION MOVEMENT'S MOBILIZATION AGAINST RU 486

The traditional constellation of anti-abortion forces–organizations such as the National Right to Life Committee (NRLC), the Catholic Church, officials within the Bush administration and anti-abortion members of Congress–quickly mobilized against allowing RU 486 into the country. They characterized mifepristone as a "death pill" and "human pesticide," and denounced it as a form of "chemical warfare against unborn babies." As a method of early abortion that works in the pre-embryonic and embryonic stages of a pregnancy, RU 486 challenged the very icon of the anti-abortion movement: the late-term fetus. Richard Glasgow of the NRLC conceded, "It's more difficult [with RU 486] to make the case that this is a developing baby if you don't have pictures of the fetus. If you can show people fingers and toes it's dynamite" (Fraser 1988, 33).

Anti-abortion activists also were afraid that RU 486 would expand abortion access. One study found that one-third of obstetricians/gynecologists who did not currently perform abortions would likely administer RU 486 (Kaiser Family Foundation 1995). By decentralizing the provision of abortion services, mifepristone would decrease the effectiveness of intimidation and threats of violence as a means of discouraging abortion.

The campaign against RU 486 in the United States began in 1988, shortly before the drug was approved in France. A range of strategies–threats of economic boycotts, an FDA import alert, and threats of violence against possible manufacturers and medical providers–were used to stall U.S. introduction (Jackman 1997). One of the most serious threats was a proposed economic boycott by Catholic hospitals of pharmaceutical products produced by manufacturers of RU 486 (Lader 1995; Palca 1989). After lobbying by Congressional opponents of abortion, FDA Commissioner Frank Young in 1989 issued an import alert that banned RU 486 from being brought into the United States (Helms 1989; Hyde 1989). The import ban's main purpose was to signal the Bush administration's opposition to Roussel Uclaf and to raise public fears about the drug's safety. Roussel Uclaf officials received bomb threats, as well as threats against their families (Henry 1988, 4A; Palca 1989). In the United States, extreme anti-abortion groups picketed clinics and the homes of physicians conducting trials of the drug. Statements and materials from Operation Rescue, ProLife Action League, Rescue America, and Advocates for Life Ministries implied that violence would occur if the drug was brought to the United States (deParrie 1993; Fraser 1988; Life Advocate 1995).

### FEMINIST MOVEMENT STRATEGIES

Since the campaign to stop RU 486 began before the drug was even available in France, U.S. feminist organizations were forced into a defensive position. They needed to counter anti-abortion efforts to intimidate Roussel Uclaf and Hoechst AG and show that there was more support for than opposition to the drug in the United States. Their strategies were shaped by the initial choices of their opponents and the vulnerabilities of the European patent holders.

Three feminist organizations–the Feminist Majority Foundation, Reproductive Health Technologies Project, and Abortion Rights Mobilization–developed independent campaigns solely dedicated to bringing

RU 486 to the United States. The largest of these was led by FMF, which was founded in 1987 by former NOW president Eleanor Smeal and feminist philanthropist Peg Yorkin.[3] FMF was committed to pursuing "cutting edge" projects that combined research and social action and were not being pursued by other groups. In June 1989, FMF launched a national public education campaign for mifepristone. The organization's aim was to influence Roussel Uclaf and Hoechst AG, as well as raise awareness of the drug. FMF started a petition drive to counter the opposition's mail campaign against it. Leading scientists were included in FMF delegations that met with Roussel Uclaf officials, as a means of signaling to the company that their American scientific and medical constituencies supported the drug. FMF also was instrumental in getting state legislatures to pass resolutions in favor of making RU 486 available in the U.S.

The Reproductive Health and Technology Project was an important clearinghouse for information about mifepristone. RHTP's working group on RU 486 included representatives from NARAL, Population Crisis Committee, National Women's Health Network, and the Population Council. The groups which participated in RHTP meetings differed in their levels of commitment to RU 486 and in their attitudes toward new reproductive health technologies in general. But, despite these differences, consensus emerged among the groups in support of RU 486 U.S. introduction (Bass 1998). The project was housed in the office of a women-owned consulting company, Bass and Howes, which conducted a 1987 survey showing strong interest among physicians, women's health activists, politicians, and the media. Based on their research, Bass and Howes recommended the development of a public education campaign to expand support so they would be able to "convince the drug companies to invest their financial resources, and the research community to continue its quest for a sage and effective progesterone antagonist" (Bass, Howes, and Faulkenberg 1987, 58).[4] Even though RHTP did not conduct the full-scale public education campaign envisioned by Bass and Howes, they generated a substantial amount of early media coverage and constituted an important forum for the exchange of information among different groups. After the drug was approved for marketing in Britain, RHTP scaled back its efforts, believing that U.S. introduction was imminent (Bass 1998).

Abortion Rights Mobilization, a group that was created by former NARAL leaders, also engaged in ongoing mobilization for RU 486. Larry Lader, ARM's guiding force, wrote two books about RU 486, which helped raise public awareness. ARM also developed a clone of

the drug and was involved in developing legal and legislative strategies to remove patent rights from Roussel Uclaf. A number of other organizations, including Planned Parenthood, NARAL, NOW, and the Center for Reproductive Law and Policy, issued press releases, prepared materials, and engaged in other actions at different junctures. However, these organizations were not as central to the transfer of patent rights as they were in later stages of the campaign related to FDA approval.

Nearly all of the feminist organizations in the United States endorsed the campaign to bring RU 486 to the country. This broad based support was largely due to efforts by FMF, RHTP, and the Population Crisis Committee to publicize medical and scientific studies showing the drug to be safe and efficacious. FMF also conducted a campaign among women's groups to gain their endorsement of a resolution in favor of RU 486. As part of this effort, FMF distributed a video, *Abortion for Survival*, that featured the drug. The combination of FMF's out-front leadership, RHTP's consensus building strategy, and anti-abortion groups drive to keep the drug out of the country helped build support among disparate women's organizations.

## THE CAMPAIGN TO INFLUENCE ROUSSEL UCLAF AND HOECHST AG

Between October 1989 and April 1994, FMF mailed eight million letters to women's rights supporters (Feminist Majority Foundation 1995) on RU 486. The letters provided basic information about the drug, described the obstacles to its introduction, and included petitions to Hoechst AG and Roussel Uclaf. The letters generated more than 700,000 petitions. Because direct mail relies on the use of donor lists from other organizations–in this case, lists from NOW, American Women's Medical Association, NARAL, Religious Coalition for Abortion Rights, Zero Population Growth, National Women's Health Network, Voters for Choice, League of Women Voters, and the National Women's Political Caucus–the FMF's direct mail campaign helped solidify support within the feminist and progressive communities (Feminist Majority Foundation 1995).

The petitions also provided powerful evidence to Hoechst AG and Roussel Uclaf that public support for mifepristone outweighed opposition. At strategic junctures, FMF delivered cartons of petitions to the companies. For example, the July 1990 FMF delegation, which was the first U.S. delegation with which Roussel Uclaf agreed to meet about RU

486, brought 800 pounds of petitions. The delegation presented the petitions to Roussel Uclaf's CEO, Dr. Sakiz, who subsequently arranged to have them shipped to Hoechst AG for the FMF's meeting with its executives. Repeated deliveries of petitions were greeted with enthusiasm by Roussel Uclaf officials and with trepidation by Hoechst AG. Representatives of Roussel Uclaf confided to FMF that the pro-RU 486 petitions consistently outnumbered the anti-RU 486 mail. Hoechst AG officials tried to dissuade FMF from bringing more petitions–a request that the organization ignored.

To gain media coverage of the drug, ARM decided to challenge the FDA's import ban by having a pregnant woman illegally bring mifepristone into the country (Lader 1995). After U.S. Customs seized the drug, the Center for Reproductive Law and Policy took the woman's case to court. A New York district court held that the import alert was based on "political considerations" rather than medical ones and ordered the drug be returned to the woman (Sifton 1992). Although the decision was overturned on appeal, the case succeeded in generating extensive media coverage. By the time the patent rights were transferred to the Population Council, nearly every major newspaper in the country had run editorials in favor of making the drug available in the U.S.

In their outreach to both the scientific community and the general public, proponents, especially the FMF, stressed the theme of right wing political interference with medical research. They also focused on the drug's potential as a treatment for meningioma, breast cancer, fibroid tumors, endometriosis, and other serious conditions. A key aim was gaining support from the scientific and medical communities that were a major constituency of Roussel Uclaf and Hoechst AG. In 1990, the American Medical Association and the American Public Health Association responded to pressure from state affiliates by passing pro-RU 486 resolutions. The following year, largely as a result of FMF efforts, the American Association for the Advancement of Science adopted a resolution stating, "AAAS encourages pharmaceutical companies and the U.S. administration to make RU 486 and related agents available for further research and use as medically indicated" (American Association for the Advancement of Science 1991). FMF instigated the passage of similar resolutions by the American Institute of Biological Sciences, American Pediatric Society, Endocrine Society, and the American Psychological Association, among others. Backing from the medical and scientific community was particularly helpful in countering the opposition from Catholic hospitals.

90                                    *WOMEN & POLITICS*

The support of key scientific and medical leaders was used as a source of leverage with Roussel Uclaf and Hoechst AG. The FMF generated more than 3,000 petitions from individual scientists and academics, including Nobel Laureates and members of the National Academy of Science (Feminist Majority Foundation 1990). They also created a national scientific advisory board to pressure the companies and counter opponents' arguments that the drug was unsafe. At its July 1990 meeting with Roussel Uclaf, the ten-member FMF delegation included not only feminists leaders such as Smeal, Yorkin, and the National Organization for Women's (NOW) Patricia Ireland, but also prominent scientists including Dr. Carl Djerassi, who synthesized the first oral contraceptive and had been a recipient of a prestigious scientific award from Roussel Uclaf, Dr. Allen Rosenfield, Dean of Columbia School of Public Health, and Dr. Myron Allukian, President of the American Public Health Association.

## TRANSFORMING ANTI-ABORTION TACTICS INTO OPPORTUNITIES

Feminist organizations directly challenged and transformed the tactics of their opponents into opportunities for pro-RU 486 mobilization and favorable publicity. Boycott threats were neutralized by demonstrating that withholding the drug would have its own economic consequences. Proponents used petition drives, state legislative resolutions, and polling data to show that they had public support and the ability to mobilize their constituencies. FMF used direct action strategies to bring this support to life for Roussel Uclaf and Hoechst AG. Support from scientific and medical organizations was used to show that these key groups would stand behind a decision to introduce mifepristone into the country. FMF distributed leaflets at stockholder meetings and held demonstrations at facilities (Feminist Majority Foundation 1992a). During a demonstration at a New York race co-sponsored by Hoechst AG and Nike, FMF activists waved banners, handed out flyers, and distributed stickers reading "Hoechst: License RU 486" to over half of the runners.

Some abortion rights supporters, such as former NOW President Molly Yard, threatened Hoechst AG with consumer boycotts of their own (Matthews 1990). New York City Comptroller Elizabeth Holtzman threatened to have the city's Health and Hospitals Corporation halt buying products from companies affiliated with RU 486 manufacturers

"until the companies make a good faith and serious effort to bring the drug into the U.S." (Holtzman 1992). A study commissioned by FMF also discredited the anti-abortion boycott strategy by showing that an anti-abortion consumer boycott was unlikely to succeed because most products manufactured by Hoechst only were ingredients in products that actually were marketed by other companies (Corporate Campaign, Inc. 1992).

Feminists turned anti-abortion threats of violence into a reason for marketing RU 486 by arguing that making the drug available in the United States would "put anti-abortion extremists out of business . . . since it can be administered in any doctor's office" (Smeal 1990). This theme was picked up by newspapers and policy makers. For example, a Portland *Oregonian* editorial stated that once mifepristone was available "a lot of reasons for noisy anti-abortion demonstrations, violence and mayhem outside of clinics will disappear" (*Oregonian* 1994).

### OVERCOMING THE LICENSING HURDLE IN THE UNITED STATES

One of the biggest hurdles that feminist groups had to overcome was the Bush Administration's opposition. Roussel Uclaf and Hoechst AG officials steadfastly maintained that RU 486 could not be licensed in any country without a formal government request. Since the Bush Administration would never make such a request, RU 486 advocates decided to mobilize support for the drug among state and local governments and members of Congress to show alternate sources of political support. FMF initiated a nationwide campaign to get state legislatures and city councils to pass resolutions of support for RU 486, following the 1991 passage of a resolution in the New Hampshire state legislature that had been initiated by a state representative who called upon the FMF for assistance. California, Maine, and Hawaii passed similar measures and at least eight more states had resolutions introduced. New York City Mayor David Dinkins spearheaded a drive that resulted in more than two dozen mayors urging the Bush Administration to rescind the import alert and for Roussel Uclaf to license the drug in the U.S. (Barron 1991).

Within Congress, Representative Ron Wyden (D-OR) used his power as chair of the Subcommittee on Regulation, Business Opportunities and Energy of the House Committee on Small Business to hold hearings on the detrimental effects of the import ban. In the House of Representatives, Wyden, as well as Representative Patricia Schroeder

(D-CO), sponsored legislation mandating the FDA remove the import alert and begin clinical testing of the drug. In the Senate, Paul Wellstone (D-MN) introduced pro-RU 486 legislation. While none of the bills reached a vote, they did signal Roussel Uclaf that there was Congressional support for the drug.

Clinton's election in 1992 put additional pressure on Roussel Uclaf to allow RU 486 to come to the United States. Just weeks after the election, FDA Commissioner David Kessler, a Bush-appointee who was seeking to keep his position in the Clinton Administration, encouraged Roussel Uclaf to submit an application for RU 486 approval (*Wall Street Journal* 1993, A14). FMF sent letters to both Sakiz and Hilger, citing Clinton's election, as well as the election of more women to Congress and the defeat of anti-abortion ballot measures, as evidence of a shift in the national climate around abortion and RU 486. Immediately after the election, feminist groups requested the new Administration's intervention to help bring RU 486 to the U.S. In a November 11, 1992 memo, FMF urged Clinton to remove the import ban and to invite Roussel Uclaf to apply to the FDA to market RU 486 in the country (Feminist Majority Foundation 1992b). Within days of his inauguration, Clinton signed an executive order instructing Secretary of Health and Human Services, Donna Shalala to "promptly assess initiatives [to] . . . promote the testing, licensing, and manufacturing in United States of RU 486 or other anti-progestins" (Clinton 1993).

After company officials publicly stated that they were having difficulties identifying a U.S. partner company, Representative Wyden presented the company with letters from three small pharmaceutical companies–Gynex, Cabot Medical, and Adeza–stating they were interested in marketing RU 486 (Wyden 1992). Wyden also released copies of the letters to the media. In the late 1980s and early 1990s, non-profit organizations, such as Planned Parenthood, and small pharmaceutical companies, had held meetings with Roussel Uclaf about licensing RU 486. In October 1991, the FMF announced that bringing the drug to the U.S. was their top priority, with Smeal and Yorkin stating that if necessary, they would create a feminist pharmaceutical company to handle the manufacturing (Williams 1991). However, Roussel Uclaf maintained that they would only consider licensing a major pharmaceutical company.

Lawyers and activists also investigated the possibility of stripping U.S. patent rights from Roussel Uclaf. In as early as 1989, legal scholars in California contemplated filing a lawsuit against Roussel Uclaf on the grounds that their refusal to market the drug in the U.S. violated the

state's constitutional protection of a woman's right to privacy (Chermerinsky 1989). ARM researchers uncovered a federal statute, Section 28 USC 1489, that allows the government to seize patent rights when the public interest is at stake (Lader 1995; Whitener 1993). At the request of Representative Jerrold Nadler (D-NY), the Congressional Research Service produced a memo on the constitutionality of possible legislative action removing patent rights (Congressional Research Service 1993). In April 1993, ARM and Physicians for RU 486, joined by FMF, NARAL, and the American Medical Women's Association, held a press conference announcing their intention to pursue the removal of patent rights. ARM also announced that they had developed an RU 486 clone. Although the prospects for legal success were never high, the possibility of facing a battle over patent rights put additional pressure on Roussel Uclaf and Hoechst AG.

In April 1993, the FDA announced that Roussel Uclaf would amend their clinical trial agreement with the Population Council to allow them to manufacture and distribute mifepristone in the U.S. Difficult negotiations between Roussel Uclaf and the Population Council continued for another year, but in the end the company decided to yield its full U.S. patent rights. FMF kept up their direct mail drive and petition delivery during this period. Health and Human Services Secretary Shalala played an active role in the discussions and convinced Roussel Uclaf and Hoechst AG that the full weight of the government was behind the effort. The announcement of the transfer of full U.S. patent rights, rather than just the license to market RU 486, came as a surprise to feminist organizations. Hoechst AG decided it did not want to be associated in any way with an abortion drug and believed that donating it "without remuneration" to a non-profit organization would allow the company to avoid appearing to make money or allowing money to be made from abortion.

## ALLIANCES BETWEEN FEMINIST ORGANIZATIONS AND ROUSSEL UCLAF

As the transfer of patent rights was announced on May 16, 1994, in the Congressional hearing room, few noticed that in the back of the room–invisible to the media–were former Roussel Uclaf CEO Sakiz and Roussel Uclaf Director of Communications and Scientific Relations Euvrard. Without fanfare, Sakiz and Euvrard witnessed the historic transfer of patent rights that their actions, in conjunction with those of feminist organizations, had made possible. Internal debates between

Roussel Uclaf and Hoechst AG over the drug's fate and feminist access to multiple players with the French firm had given rise to an unusual partnership between feminist organizations and Roussel Uclaf officials that was an important factor in the transfer.

RU 486 advocates, including FMF, RHTP, and ARM, formed alliances with numerous key players who had either formal or informal relationships with Roussel Uclaf in France. Throughout much of the 1988-1994 period, French RU 486 developer Etienne-Emile Baulieu was the drug's most visible advocate. He traveled extensively, speaking at conferences and rallies, doing media interviews, and meeting with scientists, physicians, and RU 486 advocates in an effort to promote the worldwide availability of RU 486.[5] Dr. Elizabeth Aubeny, a gynecologist who pioneered early clinical trials of RU 486, gave feminist leaders countless tours of her Paris hospital where RU 486 was administered and allowed them to speak with patients about their experiences with the medication. At the invitation of RHTP, Aubeny and Dr. Annie Bureau-Rogers came to the U.S. on numerous occasions to educate women's groups, policy makers, and the U.S. media about RU 486. Because they were not employees of Roussel Uclaf, the women physicians and Baulieu had more freedom to talk about RU 486 and to strategize openly with American RU 486 advocates. But because of their collegial relationships with Roussel Uclaf officials, they also served as important conduits of information to and from the company.

RU 486 supporters also directly negotiated with Roussel Uclaf officials. Andre Ulmann, the company's medical director, was a principle point of contact for RHTP and ARM. While FMF also had consistent contact with Baulieu and Ulmann, the organization developed a particularly important and close alliance with Sakiz and Euvrard. As a result of their July 1990 Paris meeting with Sakiz, Foundation leaders began to comprehend the full extent of Sakiz's personal commitment to RU 486. Indeed, the Roussel Uclaf CEO was very open with the organization about his support for women's reproductive rights.[6] Following the 1990 meeting, FMF remained in close contact with Sakiz and Euvrard. Frequent communication with these Roussel Uclaf officials produced informal two-way flows of information. Knowledge about possible pressure points, changes in leadership at the two companies, and scientific developments particularly aided the FMF in developing effective and timely strategies. At the same time, information on activities for and against RU 486 in the U.S. was useful to Roussel allies who needed to show Hoechst that there was demand for the product and to be able to anticipate obstacles to RU 486 availability.

## *CONCLUSION*

The transfer of patent rights for Roussel Uclaf and Hoechst AG to the Population Council demonstrates that social movement organizations can win concessions from non-state institutions. Faced with a well-organized anti-abortion campaign that threatened boycotts and violence, feminist movement organizations employed strategies that effectively neutralized their opponents' effects on Hoechst AG and Roussel Uclaf. Because they were confronting non-state actors outside of the United States, feminist organizations chose to develop several independent campaigns rather than engage in coalition-style organizing. Having multiple groups pursue media attention created a sense of momentum and helped build broad-based support. It also allowed for a range of institutional and personal relationships to be created with Roussel Uclaf. FMF, ARM, and RHTP each pursued separate strategies, which in the end were mutually reinforcing.

The primary institutional vulnerability of Roussel Uclaf and Hoechst AG was their internal conflict over RU 486, which provided many avenues and opportunities for feminist organizations to exert pressure. The two firms, along with their U.S. subsidiaries and business partners, were all susceptible to targeted actions. FMF's campaign in particular tried to take advantage of the cleavages between Roussel Uclaf and Hoechst AG.

This case study suggests that non-state targets can be influenced by many of the same factors–public opinion, media, and constituency pressures–that affect state institutions. FMF through its direct mail campaign and media stories activated hundreds of thousands of supporters to counter effectively the anti-abortion mobilization against RU 486. Its campaign among the scientific and medical communities was unprecedented and helped assuage the European firms' fears that their other medical products would be boycotted.

These strategies, however, operated somewhat differently when non-state institutions were targeted. When a state institution is targeted, public support carries with it an implicit threat of electoral reprisal, but in a non-state context, it is a means of demonstrating there was more support than opposition (i.e., the other side's threats to the non-state target could be effectively countered). Supporters at Roussel Uclaf used feminist mobilization for RU 486 to its fullest advantage in their successful efforts to convince Hoechst AG that severing the company's association with the drug and transferring full U.S. patent rights would have fewer negative consequences than keeping it off the U.S. market.

96                                    *WOMEN & POLITICS*

As Moore (1999) suggests, institutional vulnerability and disruptive strategies are a powerful and necessary combination for social movement success in dealing with non-state institutions.

This case study also highlights the importance of insider/outsider alliances. FMF, through its relationship with Roussel Uclaf officials, was able to maximize the impact of the feminist, scientific, and public support that they generated. Sakiz and his colleagues fostered these alliances to strengthen their internal campaign with Hoechst AG. This confirms Moore's (1999) contention that inside mediators are a needed precondition for social movement success with non-state actors. In fact, inside allies may serve even more critical functions for social movements seeking concessions from non-state targets that do not have democratic decision making structures.

State intervention was also an important factor in the campaign. During the Bush years, supporters of the drug kept momentum going by building support among state legislatures, city councils, mayors, and members of Congress. With the election of Clinton, the state became a powerful resource of RU 486 advocates. Clinton's election provided demonstrable evidence of a U.S. political climate shift toward RU 486. But the election returns only became meaningful to Roussel Uclaf and Hoechst AG when feminists won immediate and substantial intervention from the new Administration. Neither the Clinton Administration's actions nor Hoechst AG's decision to transfer patent rights would have occurred without ongoing pressure from feminist organizations.

## AUTHOR NOTE

The author would like to extend her profound gratitude to Jean Schroedel for her support, encouragement, and incredible editing skills, which made possible the final production of this article. This article would not have been completed without Eleanor Smeal and Catherine Euvrard's encouragement to document the real story that we all lived. The article also benefited from their reviews of draft manuscripts.

## NOTES

1. Dr. Edouard Sakiz, Chair of Roussel Uclaf's Board of Supervisors and former CEO, wrote to FMF President Eleanor Smeal that "it is mainly your own determination and that of all the Feminist Majority Foundation's members and other pro-choice supporters that largely contributed to this successful issue" (Sakiz 1994).

2. In a letter to the International Federation of Gynecology and Obstetrics, Hilger wrote, "It is my conviction that Hoechst should not market RU 486. Commercialization of a drug facilitating–and easing–abortion is against Hoechst's corporate credo" (Newman 1993, 1).

3. Smeal's leadership gave the group immediate visibility, strategic expertise, and strong connections to feminist networks and the media. Yorkin provided the needed financial resources, an endowment of $10 million, that made a sustained campaign to bring mifepristone to the U.S. a viable option.

4. In November 1988, Bass and Howes convened a meeting of abortion rights groups, women's health organizations, and population groups to create Reproductive Health and Technology Project to spearhead their campaign for RU 486.

5. One article referred to Baulieu and FMF's Smeal and Yorkin as "the generals in the crusade for the pill" in the United States (Martin 1992, 8).

6. After the July 1990 meeting, Sakiz (1990) wrote to Smeal, " . . . I have been able to fully appreciate the work which you are doing in support of our product. On the other hand, you have certainly understood our concern for women's choice, and that we will do everything we can to enable them to have the right to decide."

# REFERENCES

American Association for the Advancement of Science. 1991. "Resolution for RU 486 and Freedom of Medical Research." February 18.

Ameta, Edwin, and Michael Young. 1999. "Making an Impact: Conceptual and Methodological Implications of the Collective Goods Criterion." In *How Social Movements Matter*, eds. Marco Giugui, Dog McAdam, and Charles Tilly. Minneapolis: University of Minnesota Press.

Barron, Tom. 1991. "Mayors Join Opposition to RU 486 Test Ban." *Family Planning World* September/October: 1.

Bass, Marie. 1998. "Toward Coalition: The Reproductive Health Technologies Project." In *Abortion Wars: A Half Century of Struggle, 1950-2000*, ed. Rickie Solinger. Berkeley: University of California Press.

Bass, Marie, Joanne Howes, and Nanette Falkenberg. 1987. "A Report on RU 486 and Its Prospects for Use in the United States." Washington, DC: Bass and Howes.

"A Breakthrough on RU 486." 1994. *Oregonian*. 23 May.

Charo, R. Alta. 1991. "A Political History of RU 486." In *Biomedical Politics*, ed. Kathi E. Hanna. Washington, DC: National Academy Press.

Chermerinsky, Erwin. 1989. "Is there a possible lawsuit to compel the marketing of RU 486 in the United States?" Memorandum. University of Southern California Law School.

Clinton, William. 1993. "Memorandum for the Secretary of Health and Human Services, Subject: Importation of RU 486." January 22.

Congressional Research Service. 1993. Memo to Hon. Jerrold Nadler from American Law Division. "Whether the Statutory Addition of a Condition to the Retention of Existing Patents Effects a Constitutional Taking." Washington, DC: Library of Congress.

Corporate Campaign Inc. 1992. *Breaking the Blockade: A Strategy for Bringing RU 486 to the United States*. Washington, DC: Corporate Campaign Inc.

98                         *WOMEN & POLITICS*

deParrie, Paul. 1993. "Worldwide Demonstrations Expose Killer Drug–RU 486." *Life Advocate* (August): 12.

Eisenstein, Hester. 1996. *Inside Agitators: Australian Femocrats, and the State*. Philadelphia: Temple University Press.

Feminist Majority Foundation. 1990. "Scientists, Health Care Professionals, and Academicians for RU 486, Petition Signatories." *RU 486: The Import Ban and Its Effect on Medical Research*. Hearing Before the Subcommittee on Regulation, Business Opportunities, and Energy, Small Business Committee, House of Representatives, 101st Cong., 2nd sess.

Feminist Majority Foundation. 1992a. "Feminist Majority Foundation Demonstrates Against Operation Rescue." News Release, June 18.

Feminist Majority Foundation. 1992b. "Presidential Actions Regarding RU 486 and Fetal Tissue Research Ban." November 11.

Feminist Majority Foundation. 1994. "Feminist Majority Foundation Condemns Anti-abortion 'Politically Correct Prescriptions,'" News Release, July 7.

Feminist Majority Foundation. 1995. "RU 486 Mailing Lists." May 8.

Fraser, Laura. 1988. "Pill Politics." *Mother Jones* (June): 33.

Glasow, Richard. 1993. "Coast to Coast Protests Against RU 486." *National Right to Life News* 14 July.

Greenhouse, Steven. 1989. "A New Pill, A Fierce Battle." *New York Times Magazine* 12 February: 23.

Helms, Jesse. 1989. Letter to FDA Commissioner Frank Young, February 23.

Henry, D. 1988. "Production of Abortion Pill Ordered." *Baltimore Sun* 29 October.

Holtzman, Elizabeth. 1992. "Holtzman, Women's Groups to City: Stop Buying Products From Manufacturer of RU 486." News from New York City Comptroller Elizabeth Holtzman, 23 July.

Hyde, Henry et al. 1989. Letter to FDA Commissioner Frank Young, May 5.

Hyman, Lester. 1994. "Testimony of Roussel Uclaf." *RU 486: The Import Ban and Its Effect on Medical Research*. Hearing Before the Subcommittee on Regulation, Business Opportunities, and Energy, Small Business Committee, House of Representatives, 101st Cong., 2nd sess.

Jackman, Jennifer. 1997. "Blue Smoke, Mirrors, and Mediators: The Symbolic Contest Over RU 486." In *The Cultural Politics of Agenda Denial*, eds. Roger Cobb and Marc Howard Ross. Lawrence: University of Kansas Press.

Jackman, Jennifer. 1999. "Releasing a Medical Breakthrough for Women: Feminist Movement Strategies to Bring RU 486 to the United States." Paper presented at Women's Progress: Perspectives on the Past, Blueprint for the Future, Institute for Women's Policy Research Fifth Women's Policy Research Conference.

Jasper, James, and Jane Poulsen. 1993. "Fighting Back: Vulnerabilities, Blunders, and Countermobilization by the Targets of Three Animal Rights Campaigns." *Sociological Forum* 8:4.

Kaiser Family Foundation. 1995. *National Survey of Obstetricians and Gynecologists on Contraception and Unplanned Pregnancy*. Menlo Park, CA: Kaiser Family Foundation.

"Kessler and Clinton." 1993. *Wall Street Journal*. 12 January.

Lader, Lawrence. 1991. *RU 486*. Reading, MA: Addison-Wesley.

Lader, Lawrence. 1995. *A Private Matter: RU 486 and the Abortion Crisis*. New York: Prometheus.

Mackenzie, Rod L. 1991. "Testimony of R.L. Mackenzie, Chairman and CEO, Gynopharma, Inc." *The Safety and Effectiveness of the Abortifacient RU 486 in Foreign Markets: Opportunities and Obstacles to U.S. Commercialization*. Hearing Before the Subcommittee on Regulation, Business Opportunities, and Energy, Small Business Committee, House of Representatives, 101st Cong., 2nd sess.

Mansbridge, Jane. 1986. *Why We Lost the ERA*. Chicago: University of Chicago Press.

Martin, Antoinette. 1992. "The Politics of RU 486." *Detroit Free Press Magazine* 19 January: 7-10.

Mathews, Jay. 1990. "NOW Leaders Threaten Boycott Over Abortion." *Washington Post* 1 July.

Moore, Kelly. 1999. "Political Protest and Institutional Change: The Anti-Vietnam War Movement and American Science." In *How Social Movements Matter*, eds. Marco Giugui, Doug McAdam, and Charles Tilly. Minneapolis: University of Minnesota Press.

Newman, Barry. 1993. "Among Those Wary of Abortion Pill Is Maker's Parent Firm." *Wall Street Journal* 22 February.

Palca, Joseph. 1989. "The Pill of Choice?" *Science* 22 September.

Pellow, David N. 2001. "Environmental Justice and the Political Process: Movements, Corporations, and the State." *Sociological Quarterly* 42:1.

Pogash, Carol. 1991. "Does the Abortion Pill Have a Future in America." *San Francisco Examiner Image* 14 April.

Roussel Uclaf. 1994. Press release. May 16.

"RU 486 Testing Begins–and so Does Pro-Life Response." 1995. *Life Advocate*. January: 18.

Sakiz, Edouard. 1990. Letter to Eleanor Smeal, July 30.

Sakiz, Edouard. 1994. Letter to Eleanor Smeal, May 30.

Santoro, Wayne A., and Gail M. McGuire. 1997. "Social Movement Insiders: The Impact of Institutional Activists on Affirmative Action and Comparable Worth Policies." *Social Problems* 44:4.

Sifton, Charles. 1992. "Leona Benten against David Kessler Memorandum Decision and Order." United States District Court, Eastern District of New York, CV-92-3161 (CPS).

Smeal, Eleanor. 1990. Direct Mail Piece. January.

Smeal, Eleanor. 1992. "RU 486: The Moral Imperative." *Chemistry & Industry* 21 September.

Steinberg, Ronnie. 1986. "The Unsubtle Revolution: Women, the State, and Equal Employment." Paper presented at Work and Politics: Feminization of the Labor Force, Center for European Studies, Harvard University.

Sturr, Christopher. 1993. "Fertility and Control: The Case of RU 486." In *Gender and Public Policy: Cases and Comments*, eds. Kenneth Winston and Mary Jo Bane. Boulder, CO: Westview Press.

Tempest, Rone. 1990. "Pill: RU 486 Maker Has Declined to Apply for Marketing in the U.S." *Los Angeles Times* 11 August.

Whitener, Varina. 1993. Untitled Memo.

Williams, Marjorie. 1991. "Big Boost for Feminists: LA Woman Gives Foundation $10 Million." *Washington Post* 3 October.

Wyden, Ron. 1992. Letter to Dr. Edouard Sakiz. 2 December.

# Exhibit 2



# <u>A Judicial Watch Special Report:</u>

# The Clinton RU-486 Files



The Clinton Administration's Radical Drive to
Force an Abortion Drug on America

Judicial Watch, Inc.  ♦  501 School Street, S.W.  ♦  Washington, D.C.  20024

Tel: 202-646-5172 ♦ Fax: 202-646-5199 ♦  www.JudicialWatch.org

<u>Introduction</u>

This Judicial Watch Special Report analyzes newly uncovered documents from the National Archives at the Clinton Presidential Library in Little Rock, Arkansas, describing the Clinton administration's radical drive to introduce the abortion drug RU-486 (mifepristone) into the American marketplace.

The records include the Clinton administration's legal, political and press strategies for rushing RU-486 through the Food and Drug Administration (FDA) processes, despite the manufacturer's historical refusal to permit marketing the drug here. The legal, political and press memos articulate the Clinton administration's views regarding various players in the drug approval and marketing process -- women's groups, members of Congress, public interest groups and the media.

Judicial Watch has engaged in a five-year legal battle with the FDA for release of records under the provisions of the Freedom of Information Act (FOIA), 5 U.S.C. §552, concerning RU-486. We uncovered over 9,300 pages of documents and 840 Adverse Event Reports pertaining to the abortion drug. To date, the deaths of at least six women have been attributed to RU-486. The FDA scheduled a scientific conference for May 11, 2006 in order to study the controversial abortion drug and the circumstances leading to the deaths.

Judicial Watch promotes transparency, integrity and accountability in government, politics and the law. We make aggressive use of open records and open meetings laws as a means to obtain documents with which to educate the American public on the operations of their government and to hold public officials accountable. Judicial Watch also provides technical, research and litigation assistance to public interest groups interested in obtaining information about government activity which may not have the necessary resources or experience to pursue information on their own as part of the Judicial Watch Open Records Project.

Thomas Fitton                                                            April 26, 2006
President
Judicial Watch, Inc.

Questions or comments concerning this report should be directed to:

Christopher J. Farrell
Director of Investigations & Research
Judicial Watch, Inc.
501 School Street, SW -- Suite 500
Washington, DC  20024
Tel: 202-646-5172
cfarrell@judicialwatch.org

<u>The Clinton RU-486 Files</u>:
The Clinton Administration's Radical Drive to Force an Abortion Drug on America


<u>Executive Summary</u>


During a February 2006 research trip to the National Archives at the Clinton Presidential Library, Judicial Watch uncovered new records detailing the Clinton administration's rush to market the abortion drug RU-486 (mifepristone) to American women.  The documents include political, legal and press strategy memoranda from Health and Human Services (HHS) Secretary Donna Shalala, FDA Commissioner, Dr. David Kessler, and HHS Chief of Staff Kevin Thurm.  Some of the memoranda are addressed to the White House -- in particular, Carol Rasco, the Clinton administration Director of Domestic Policy.

Analysis of the records shows:

• President Clinton ordered HHS and FDA to coordinate and promote the marketing of RU-486 as his first official act in office.

• Within one month, the FDA Commissioner had met with the RU-486 manufacturer and their parent company.

• Official U.S. Government political, economic and diplomatic pressure was brought to bear to strong-arm the companies into changing their policies in order to make the drug available in the United States.

• The FDA was compromised in its role as objective reviewers of the safety and efficacy of the drug.

• The five standard requirements for certifying a drug "safe and effective" were circumvented to rush RU-486 to market.

• Radical, pro-abortion extremists dominated the Clinton administration's "women's health care" agenda and their reckless drive to bring RU-486 to America ultimately cost at least six women their lives and the lives of over 560,000 unborn children.

<u>The Clinton RU-486 Files</u>:
The Clinton Administration's Radical Drive to Force an Abortion Drug on America

\*     \*     \*

*"Hoechst has historically refused to permit Roussel Uclaf to seek marketing approval for RU-486 as an abortifacient in the United States.  Both Dr. Kessler* [FDA Commissioner] *and I have taken steps to persuade Roussel Uclaf and Hoechst to change their position."*

> Donna Shalala
> Health & Human Services Secretary
> Clinton Administration
> November 15, 1993
> Confidential Memo to White House

\*     \*     \*

In February 2006, Judicial Watch uncovered previously confidential files and working papers from the holdings of the National Archives at the Clinton Presidential Library in Little Rock, Arkansas that provide remarkable insight into the Clinton administration's relentless drive to market RU-486 (mifepristone), a drug used to cause abortion, to American women.  The documents offer a window into the political strategy, legal theories and media "spin" on the Clinton administration's abortion program.

RU-486 was first developed in France in 1981.  It is a manmade steroid designed to work against the hormone progesterone, which is required to promote a baby's proper growth and development.  RU-486 works to chemically destroy the unborn child's environment, cutting off nourishment and starving the baby to death in the mother's womb.  A second chemical, misoprostol, is then used to create cramping and contractions to expel the dead baby from the mother's womb.  The "procedure" must begin within 49 days of conception.  The Clinton administration considered this method of abortion part of "women's health care."  President Clinton thanked the maker of RU-486 in writing, "On behalf of the government of the United States and for the women of America. . ."[i]

On January 22, 1993, in his first official act, President Clinton issued a memorandum directing HHS Secretary Donna Shalala to promote the testing and licensing of RU-486 in the United States. (See Tab A)

Abortion was a key domestic policy item for President Clinton.  RU-486 was just one part of the overall strategy for his administration's agenda.  For example, in a

National Archives document entitled, "President William J. Clinton -- Eight Years of Peace, Prosperity and Progress," the first "accomplishment" listed reads:

> **Abolished Restrictions on Medical Research and the Right to Choose** As his first executive actions, President Clinton revoked the Gag Rule, which prohibited abortion counseling in clinics that receive federal funding to serve low-income patients.  He also revoked restrictions on a woman's legal right to privately funded abortion services in military hospitals, restrictions on the import of RU-486, and restrictions on the award of international family planning grants (the "Mexico City Policy"). The President also lifted the moratorium on federal funding for research involving fetal tissue, allowing progress on research into treatments for Parkinson's disease, Alzheimer's, diabetes and leukemia. (Executive Memoranda, 1/22/93)[ii]

The tone was set for the Clinton administration's drive towards promoting abortion as "health care."  Shalala and FDA Commissioner, Dr. David Kessler, engaged in a political, legal and economic campaign to force the French pharmaceutical firm, Roussel Uclaf, and their German parent corporation, Hoechst, A.G., to file a "new drug application" (NDA) with the FDA, and begin marketing RU-486 to American women.[iii]

In April 1993, the FDA brokered a meeting between Roussel Uclaf and the Clinton administration's anointed abortion proponent, the Population Council, a non-profit organization that conducts research on so-called "reproductive health issues." Roussel Uclaf and the Population Council already had an existing contractual relationship concerning provision of abortifacients (substances that induce abortion) for various clinical trials.[iv]  It is difficult to understand the FDA's role in bringing the parties together, other than to continue to bring official U.S. government pressure on Roussel Uclaf and to designate the Population Council as the Clinton administration's abortion drug development and marketing proxy.

The Population Council claims to be " . . . an international, nonprofit, nongovernmental organization, seeks to improve the well-being and reproductive health of current and future generations around the world and to help achieve a humane, equitable, and sustainable balance between people and resources."[v]  The organization was founded by John D. Rockefeller III in 1952.  In 2005, they projected spending over $71 million in 70 countries around the world.  Their work is funded by governments, foundations, individuals and "multilateral organizations."[vi]

According to the Clinton RU-486 files, Roussel Uclaf made the decision to use the Population Council as the administration's surrogate for forcing RU-486 on America.

There is no mention in the memoranda of Planned Parenthood or the National Abortion and Reproductive Rights Action League (NARAL). There is no mention of public disclosure, discussion, competition or bidding. One might imagine a selection process or staff discussion of the relative pros and cons for selection of another abortion group, but there is no evidence of any such discussion or consideration. In a memo by HHS Chief of Staff Kevin Thurm (discussed in detail below), the Clinton administration seems to have been predisposed to using the Population Council to carry out their abortion plans based on an existing relationship of the abortion non-profit with the maker of RU-486.

Roussel Uclaf repeatedly sought total U.S. government-sponsored indemnification from any damages it might incur by bringing RU-486 to the U.S. marketplace. Roussel Uclaf President, Dr. Edouard Sakiz, specifically expressed concerns over liability actions against his firm "if a woman had an incomplete abortion and delivered a deformed fetus." Dr. Sakiz was also particularly concerned about "consequential damages," such as the economic costs from boycotts. The Clinton administration's fervent commitment to making RU-486 part of the American abortion industry is demonstrated through Dr. Sakiz's reservations concerning legal and economic exposure. The Clinton administration's near-obsession with introducing a "safe and effective" abortion drug is revealed in Shalala's confidential memo to the White House of November 15, 1993:

> "Dr. Sakiz's view was that if the United States Government wanted RU-486 to be marketed in the United States, it should compensate Roussel Uclaf for any damages that the company might suffer from complying with the United States Government's request."

(See Tab B)

Dr. Sakiz was saying, in other words, "If _you_ want it so badly, _you_ pay the consequences." The Clinton administration was attempting to trump a business decision of the pharmaceutical company while exposing the corporation to risk for abiding by a U.S. government request.

Even Clinton FDA Commissioner Kessler understood and memorialized the controversy over the administration's aggressive efforts to introduce RU-486 when he wrote in a September 30, 1993 memorandum to Shalala:

> " . . . other Congressional members have written to Hoechst expressing their strong opposition to the marketing of RU-486 in this country. This, and the well-publicized activities of anti-abortion groups, have provided Hoechst and Roussel Ucalf with evidence that the U.S. population

lacks cohesiveness on this issue and that the abortion
debate continues."

(See Tab C)

The Clinton administration realized that attempting to enact blanket
indemnification by the U.S government of a foreign corporation for an abortion drug was
politically and practically impossible.  According to the Clinton RU-486 files, Dr. Sakiz
still went ahead and committed to negotiating with the Clinton administration surrogates
– the Population Council – agreeing:

- To license RU-486 to the Population Council which would conduct a
  clinical trial involving 2000 women pursuant to an investigational new
  drug application;

- The Population Council would ultimately submit an NDA to the FDA
  based on the results of the clinical trial and on other studies conducted by
  Roussel Uclaf; and

- The Population Council, with the concurrence of Roussel Uclaf, would
  chose a new manufacturer for the drug, and that Roussel Uclaf would
  transfer its technology for making the drug to that manufacturer because
  Roussel Uclaf did not want to manufacture the drug for sale in this
  country. [Emphasis added.]

(See Tab B)

According to the Clinton RU-486 files, over the next few months Roussel Uclaf
reiterated its desire for protective federal legislation providing blanket indemnification
from the use of RU-486.  Roussel Uclaf did not anticipate any profit from selling RU-486
in the United States; and was only entering the American market at the insistence of the
Clinton administration.  FDA representatives told Roussel Uclaf that such protection was
extremely unlikely.

In a September 30, 1993 memorandum to Shalala, FDA Commissioner Kessler
recounts a conversation he had with Jim Boynton, legal counsel for the Population
Council, concerning the Roussel Uclaf indemnification legislation.  Kessler pointed out
the recent passage of the Hyde Amendment (restricting federal funds for abortion), and
that with one exception (swine flu event), the United States had never agreed to
indemnify any drug manufacturer.  Apparently sensing that it might be perceived as
inappropriate for the FDA commissioner to be discussing indemnification with a drug
company representative for a supposedly safe drug,  Kessler tried to cover his tracks.
Kessler wrote that he, ". . . further explained that it would go far beyond FDA'S

appropriate role to seek such protection for a drug company." [Emphasis added.]
Nonetheless, the FDA offered to advance the idea within HHS.

Not satisfied with the denials of indemnification from the FDA and HHS, in
September 1993 Roussel Uclaf hired legal counsel (reportedly, Lester Hyman and John
Hoff of the firm Swidler & Berlin) to lobby the federal government for indemnification
"at levels higher than the FDA" – presumably from President Clinton and other pro-
abortion advocates in the Congress, such as Rep. Ron Wyden and Rep. Henry Waxman.
Concerned with these moves, HHS Chief of Staff Kevin Thurm and HHS General
Counsel Harriet Rabb initiated a meeting with attorneys from Swidler & Berlin.  During
that meeting Roussel Uclaf's lawyer suggested that the United States could exercise its
statutory powers of eminent domain and seize the patent for RU-486 for the abortifacient
uses of the drug.[vii]

Meanwhile, the Population Council and Roussel Uclaf pressed forward with
licensing details, and simultaneously made plans to sway the leadership of Hoechst to
allow their subsidiary to enter into an agreement with the Population Council.  Shalala's
confidential memo to the White House warns, ". . . we do not think the negotiations will
be successfully concluded without pressure on Roussel Uclaf/Hoechst."[viii]

Shalala suggested the Clinton administration bring the force of the United States
Government to bear on the Hoechst and Roussel Uclaf corporations.  She also went on to
suggest that the United States exercise its international diplomatic and economic pressure
on the German and French governments, as a means of further "influence" against the
corporations.  In a November 15 confidential memo to the White House, Shalala wrote:
"The French and German governments might be displeased to learn that their companies
are not accommodating a request made by the United States Government."

While the Clinton administration pondered exercising the full economic and
diplomatic weight of the United States Government to advance its abortion agenda, it is
important to note that Roussel Uclaf was willing to give a royalty-free license to any
major U.S. pharmaceutical company – but no U.S. company would take the license.

The Clinton RU-486 files show specualtion among administration officials
concerning delays in the negotiations between Roussel Uclaf and the Population Council.
The pending retirement of the chief executive officer of Hoechst, Professor Wolfgang
Hilger, was discussed in Kessler's September memo, noting that Prof. Hilger was "very
staunchly Catholic."  There was also a discussion of the likelihood of an international
foundation being created by the drug's inventor, Dr. Etiene Balieu, for broader marketing
opportunities.  Apparently the Clinton administration was concerned about competition
from an abortion drug "insider."[ix]

Just as the name of the Population Council "appeared" in the Clinton administration's confidential memos without a trace of how it became the administration's surrogate, so too does the recommendation for Felix Rohatyn to serve as an "expert advisor."[x]

After a review of the economic, political and diplomatic issues involved in strong-arming Hoechst and Roussel Uclaf, Dr. Kessler advanced Mr. Rohatyn's name by concluding with a political point: "We think that someone familiar to these circles would advance the Administration's goal to bring a safe and effective abortifacient to the U.S. market." Again, there is no discussion, alternatives or explanation offered for this appointment. The question of appointment of an "expert advisor" for the U.S. government is raised and answered in the space of one paragraph.

In a remarkable admission that the FDA had been thoroughly politicized in the Clinton administration's radical drive for RU-486, the agency's commissioner, Dr. Kessler, wrote in his September memo, " . . . the FDA cannot take this issue too far without compromising its role as objective reviewers of the safety and efficacy of the drug."

The Clinton RU-486 file offering the most comprehensive treatment of the administration's strategic campaign to introduce RU-486 to the American market is a memorandum dated May 11, 1994 from HHS Chief of Staff Kevin Thurm to the White House – in particular, Carol Rasco, Director of the Clinton administration Domestic Policy Council. (See Tab D)

Thurm's memo details three issues submitted for decision by the President:

- Whether the President is willing to write a letter to the maker of RU-486, asking that the U.S. patents for the drug be assigned to a non-profit entity in this country [Population Council].

- If the negotiations between Roussel Uclaf and the Population Council fail, and the "only" available option is the "gift offer," is the U.S. Government willing to accept the RU-486 patent rights, and under what conditions?

- If the government is not willing to accept the patent rights, what will be the basis for that decision, and how will it be communicated to the American public?

Thurm develops and discusses each of the factors bearing on the subject in a series of tabs and exhibits to his memo. He provides a history and background tab recounting the Clinton administration's position on RU-486; a tab discussing legal issues;

a brief marketing study addressing timing, administration, and abortion proxies; political considerations; and finally, a discussion of press strategies and concerns.

Thurm explains that on April 26, 1994, the Board of Roussel Uclaf passed a resolution authorizing the assignment of RU-486 patent rights to either the U.S. Government or to a non-profit organization. If the rights were to go to a non-profit organization [Population Council], then Roussel Uclaf demanded a letter from the President of the United States requesting RU-486 on behalf of the women of the United States. President Clinton signed exactly such a letter on May 16, 1994. (See Tab E)

President Clinton's extraordinary letter is direct documentary evidence of his personal intervention as a politician, and clear evidence that the RU-486 patent rights would never have been assigned to the Population Council without his compliance with Roussel Uclaf's demands.

President Clinton's RU-486 request letter to Dr. Edouard Sakiz of Roussel Uclaf claims that it is important for the women of the United States to have "safe and effective medical treatments." Under that rubric, President Clinton writes that he "understands" Roussel Uclaf has been in negotiations with the Population Council. Of course, the Population Council had been serving as a Clinton administration abortion "front" for several months. President Clinton closes his RU-486 request letter by stating: "On behalf of the government of the United States and for the women of America, I thank you for your work."

Thurm's memo specifically addresses the requirements for RU-486 clinical trials and the Population Council's requirements for marketing application for the FDA. The significance of speedy approval and abbreviation of various timelines is a theme throughout his analysis. Not surprisingly, the Clinton administration's radical drive to bring RU-486 to the American market manifested itself in other ways, once the patent rights were obtained by the Population Council. For example, the five standard requirements for certifying a drug "safe and effective" were circumvented to rush RU-486 to market.[xi] Probably the most reckless act by the FDA was the waiver of the normal requirement for random, double-blind, control tests for new drugs. The FDA's expedition in this process was justified with language reserved for drugs developed to cure life-threatening conditions. Certainly, pregnancy is not a disease, nor is it likely to be life threatening – so how could they have twisted the rules so dramatically? What political pressure was brought to bear?

The "political issue discussion" tab to Thurm's memo offers a glimpse into the Clinton administration's abortion politics techniques. The Clinton administration steadfastly continues the manipulation of language that seeks to forever separate the words "kill," "baby" and "abortion." Thurm states: "It is, therefore, extremely important that the decision concerning RU-486 be placed in the context of promoting women's

health and maintaining the close relationship of the administration to these ["pro-choice" and women's groups] groups."

The Clinton administration wanted a quick victory on RU-486 and was deeply concerned that RU-486 might remain a "front burner" issue through the 1996 presidential election.  They were particularly sensitive to the prospect of prolonged, intense, public attention and debate on RU-486.  Thurm advised political caution concerning unintended consequences, allowing " . . . Republicans and others opposed to the administration to focus attention on this decision and its aftermath."

The Clinton press strategy documents discuss the ramifications of accepting or rejecting the gift of the RU-486 patents.  Acceptance of the patent gifts was relegated to Secretary Shalala "on behalf of American women," but specifically as a means of "insulating the White House."  While seeking insulation, the press memo stresses the need to credit President Clinton for keeping his campaign promises and giving a major "reproductive rights victory" to American women.  The memo also contains a disturbing directive:

> " . . . there should also be a concerted effort on the part of HHS Public affairs team to place stories that outline the hurdles that must be overcome to shield the Administration against fallout from our allies in the event efforts to get RU-486 to the market become stalled in bureaucratic process, in Congress or for other reasons."[xii]

If the Clinton administration's RU-486 strategy failed all together, it appears the press response included a calculated scenario for resorting to lying to the American public.  Working through the various scenarios, the author of the memo offers an "alternative":

> " . . . another potential argument we could embrace is the position that we wanted more than the rights they were willing to grant because our interest in this drug goes beyond the issue of abortion, the need for which we are committed to making as rare as possible."[xiii]

Still worried about potential fallout and damage with abortion proponents and allied political groups, the press memo ends stating:

> "Without a doubt, a 'no' will subject the Administration to a firestorm of protest by pro-choice and women's groups; and there will be few natural political allies vocally defending this decision, particularly in light of the relative difficulty of explanation."[xiv]

**Beyond the Clinton Files -- RU-486 in 2006**

As Judicial Watch reviewed the Clinton RU-486 files, documenting the extraordinary lengths the administration went to rush the abortion drug to U.S. markets, the earliest correspondence on file at the Archives caught our attention and, in hindsight, provided some perspective for examining RU-486 matters in 2006. (See Tab F)

The file contained a handwritten letterhead note from Betsey Wright, President Clinton's former Chief of Staff, and the White House staff member charged with covering-up "bimbo eruptions."  The note reads: "To Carol Rasco.  This just got forwarded to me.  Please handle. BW 3/9/93."  There is an additional notation that reads: "cc for Shalala on Tues. MK," with the name Shalala circled and a line drawn to the words "To handle."[xv]

Betsey Wright's note was attached to a letter dated January 6, 1992, from Ron Weddington, an attorney that served as co-counsel in the infamous *Roe v. Wade* lawsuit.  Weddington attached an "open letter" to President-elect Clinton.  Weddington's letter recommends that the new president should, " . . . start immediately to eliminate the barely educated, unhealthy and poor segment of the country . . ." and that the " . . . government is going to have to provide vasectomies, tubal ligations and abortions . . . RU-486 and conventional abortions."[xvi]

Weddington states: "Condoms won't do it.  Depo-Provera, Norplant and the new birth control injection being developed in India are not a complete answer, although the savings that could be effected by widespread government distribution and encouragement of birth control would amount to billions of dollars."

The full text of Weddington's letter is a breathtakingly arrogant exegesis on the abortion lobby's culture of death.  As disturbing as the Weddington letter is to read, what is more disturbing is the fact that Betsey Wright, one of President Clinton's closest confidantes, tasked Donna Shalala to "handle" it along with the Director of the White House Domestic Policy Council, Carol Rasco.  Weddington's ravings were not relegated to a file for unsolicited constituent correspondence.  On the contrary, the Weddington letter is, chronologically and philosophically, the foundation document for the Clinton RU-486 files.

Today we are faced with the horrible results of the political and "health care" campaign to put RU-486 on the market.  Since RU-486 was approved for use in the United States in September 2000, at least six women have died after taking the abortion drug.  Only after the death of 18 year old Holly Patterson, on September 17, 2003, did the media and the FDA begin to pay attention to the dangers of RU-486.

In November 2004, following the third woman's death, the FDA elected to "strengthen the warning notice," a step that may have provided some sort of "informational" or disclaimer insulation for the FDA, but a tactic that certainly did not make RU-486 any safer for women.

Planned Parenthood, which had ignored the FDA's warnings concerning how to administer the drug regimen, played a role in the deaths of four women as the "procedure" provider. The FDA has determined that the four California women who died after taking RU-486 all suffered from a highly lethal bacterial infection -- Clostridium sordellii. The bacterium flourishes in the uterus and then enters the bloodstream, eventually leading to toxic shock.

It is quite likely that more women have died from RU-486 and their deaths have gone unreported because doctors, medical examiners and coroners are not obligated to forward reports dealing with RU-486 side effects to the FDA. This is particularly true in cases where local health officials may not associate a death with an RU-486 abortion, especially if the woman's death occurs several days or even weeks later.

Even abortion providers now have low regard for the safety of RU-486. Dr. Warren Hern, an abortionist in Denver, Colorado has stated: "I think surgery should be the procedure of choice." Pills, he said, "are a lousy way to perform an abortion." He is not alone. Dr. Damon Stutes, an abortionist from Reno, Nevada reluctantly agrees with Pro-Life critics of RU-486, stating, "the truth is the truth," and that, "The complications from RU-486 far exceed the complications of surgical abortion." [xvii]

It seems that the federal government has finally come to grips with the growing number of deaths attributed to the use of RU-486 and is prepared to take some action, however late. The government will convene a scientific conference at the Center for Disease Control in Atlanta, Georgia on May 11, 2006. More than two dozen scientists and doctors will make presentations concerning the deadly bacterial infections that killed the California women mentioned above.

## Conclusion

Judicial Watch hopes that this special report on the Clinton RU-486 files has provided the reader with sufficient documentary evidence from primary sources to illuminate the Clinton administration's rush to achieve part of its abortion agenda through bringing RU-486 to America. Armed with the long-delayed facts from Clinton insider memoranda, the reader is now equipped to evaluate policy and hold public officials accountable.

On September 28, 2000, the day RU-486 was approved for U.S. markets, the FDA Commissioner, Dr. Jane E. Henney, said in an interview, "Politics had no role in this

decision."[xviii]  The public now has copies of the the Clinton RU-486 files that unequivocally say otherwise.

**Endnotes**

[i] See Tab E: Letter from President William J. Clinton to Dr. Edouard Sakiz, Chaiman of Roussel Uclaf, dated May 16, 1994.

[ii] See:  http://clinton5.nara.gov/media/pdf/eightyears.pdf

[iii] Hoechst had a historical reason for wanting to keep a low profile concerning RU-486. Hoechst was part of a cartel connected to the infamous I.G. Farben Chemical Company, the makers of Zyklon-B -- the cyanide gas used in Nazi death camps. In 1999, Hoechst merged with another European pharmaceutical company to form Aventis.

[iv] Copies of the Roussel Uclaf – Population Council contract were not available from the Archives.

[v] See:  http://www.popcouncil.org/about/index.html

[vi] See:  http://www.popcouncil.org/mediacenter/PC_Key_Facts.html

[vii] See Tab C: FDA Commissioner Kessler's Memorandum to HHS Secretary Shalala, dated September 30, 1993.

[viii] See Tab B: HHS Secretary Shalala's Confidential Memorandum to White House Director of Domestic Policy Carol Rasco, dated November 15, 1993.

[ix] See Tab C, pages 4-5.

[x] Felix Rohatyn is a Wall Street investment banker and served as President Clinton's Ambassador to France from 1997 to 2000.

[xi] Donna J. Harrison, M.D., "Dangerous Medicine," *The New York Times*, November 19, 2004.

[xii] See Tab D:  HHS Chief of Staff Kevin Thurm's Memorandum to White House Director of Domestic Policy Carol Rasco, Subject: RU-486, dated May 11, 1994; Tab 5: Press Strategies and Concerns.

[xiii] *Ibid.*

[xiv] *Ibid.*

[xv] See Tab F:  Clinton Transition Team Director of Public Outreach Betsey Wright's correspondence file Re: RU-486 from Mr. Ron Weddington, dated 3/9/93.

[xvi] *Ibid.*

[xvii] Gardiner Harris, "Some Doctors Voice Worry Over Abortion Pill's Safety," *The New York Times*, April 1, 2006.

[xviii] Gina Kolata, "U.S. Approves Abortion Pill; Drug Offers More Privacy, and Could Reshape Debate, *The New York Times*, September 29, 2000.

# **Tab A**

Clinton Library Photocopy

THE WHITE HOUSE

WASHINGTON

January 22, 1993

MEMORANDUM FOR THE SECRETARY OF HEALTH AND HUMAN SERVICES

SUBJECT:         Importation of RU-486

In Import Alert 66-47, the Food and Drug Administration ("FDA")
excluded the drug Mifepristine -- commonly known as RU-486 --
from the list of drugs that individuals can import into the
United States for their "personal use," although the drugs have
not yet been approved for distribution by the FDA. (See FDA
Regulatory Procedures Manual, Chapter 9-71.) Import Alert 66-47
effectively bans the importation into this Nation of a drug that
is used in other nations as a nonsurgical means of abortion.

I am informed that in excluding RU-486 from the personal use
importation exemption, the FDA appears to have based its
decision on factors other than an assessment of the possible
health and safety risks of the drug. Accordingly, I hereby
direct that you promptly instruct the FDA to determine whether
there is sufficient evidence to warrant exclusion of RU-486 from
the list of drugs that qualify for the personal use importation
exemption. Furthermore, if the FDA concludes that RU-486 meets
the criteria for the personal use importation exemption, I
direct that you immediately take steps to rescind Import
Alert 66-47.

In addition, I direct that you promptly assess initiatives by
which the Department of Health and Human Services can promote
the testing, licensing, and manufacturing in the United States
of RU-486 or other antiprogestins.

You are hereby authorized and directed to publish this
memorandum in the Federal Register.

William J Clinton

# **Tab B**

THE SECRETARY OF HEALTH AND HUMAN SERVICES
WASHINGTON, D.C. 20201

NOV 15 1993

NOV 15 1993

CONFIDENTIAL

*file*

**MEMORANDUM FOR CAROL RASCO**

The purposes of this memorandum are: (1) to inform you of the Department's progress in implementing the President's directive of January 22, 1993, to "assess initiatives by which the Department of Health and Human Services can promote the testing, licensing, and manufacturing in the United States of RU-486 or other antiprogestins;" and (2) to outline the necessary next steps to accomplish the President's directive.

**Background:**  You may recall that RU-486 is manufactured by the French firm Roussel Uclaf and is approved to induce abortions in France, the United Kingdom, and Sweden.  Roussel Uclaf has stated that it can act in the United States only with the approval of its parent company, Hoechst AG, a German firm.  Hoechst has historically refused to permit Roussel Uclaf to seek marketing approval for RU-486 as an abortifacient in the United States.

Both Dr. Kessler and I have taken steps to persuade Roussel Uclaf and Hoechst to change their position.  In February Dr. Kessler met with Dr. Edouard Sakiz, the President of Roussel Uclaf, to discuss the availability of RU-486 in the United States for research and marketing.  In March I wrote to Professor Wolfgang Hilger, President of the Board of Hoechst, to ask him to permit Roussel Uclaf to begin any necessary testing of RU-486 in the United States in preparation for filing a new drug application with the FDA.  Later in March there were press reports that Roussel Uclaf would respond to the requests of the Clinton Administration to make RU-486 available in this country and that testing of the drug would begin approximately two months later (i.e., in May).

In April 1993, FDA arranged a meeting between Roussel Uclaf and the Population Council, a non-profit corporation that conducts research on reproductive health issues.  The meeting's purpose was to facilitate an agreement between those parties to work together to test RU-486 and file a new drug application for the drug.  The Population Council was identified as the most likely group to work with Roussel Uclaf because of an existing contract between these two parties that required Roussel Uclaf to give the Population Council sufficient amounts of the drug for the Population Council to conduct clinical trials.  The contract also appeared to require Roussel Uclaf to license the drug to the Population Council if Roussel Uclaf were unwilling to sell the drug in the United States.

At the April meeting, Dr. Edouard Sakiz, President of Roussel Uclaf, raised the issue of federal legislation to indemnify

Clinton Library Photocopy

Page Two -- Carol Rasco

Roussel Uclaf from any damages it might incur by permitting RU-486 to be marketed in the United States.  Dr. Sakiz was worried about product liability actions against Roussel Uclaf if a woman had an incomplete abortion and delivered a deformed fetus.  Dr. Sakiz was also concerned about consequential damages, such as the economic costs from boycotts of other Roussel Uclaf or Hoechst products, or bombings of Roussel Uclaf/Hoechst facilities by right-to-life groups.  Dr. Sakiz's view was that if the United States Government wanted RU-486 to be marketed in the United States, it should compensate Roussel Uclaf for any damages that the company might suffer from complying with the United States Government's request.

Dr. Sakiz was clearly informed at the April meeting that such legislation would never be enacted and that the FDA would not support Roussel Uclaf in seeking it.

Despite being told that there was no possibility of obtaining federal legislation to protect Roussel Uclaf from consequential damages or product liability suits, Dr. Sakiz committed Roussel Uclaf to negotiate with the Population Council to bring RU-486 onto the United States market.  Specifically, at the April meeting Roussel Uclaf and the Population Council agreed:

- That Roussel Uclaf would license RU-486 to the Population Council, which would conduct a clinical trial involving 2000 women pursuant to an investigational new drug (IND) application;

- That the Population Council would ultimately submit a new drug application (NDA) to FDA, based on the results of the clinical trial and on other studies that have been conducted by Roussel Uclaf; and

- That the Population Council, with the concurrence of Roussel Uclaf, would choose a new manufacturer for the drug, and that Roussel Uclaf would transfer its technology for making the drug to that manufacturer because Roussel Uclaf does not want to manufacture the drug for sale in this country.

It was then left for the Population Council and Roussel Uclaf to revise the terms of their contract, while Roussel Uclaf began sending scientific information to FDA and the Population Council. A tentative goal of September 15 was established for concluding the contract negotiations.  As of late July 1993, the Population Council thought that the negotiations were proceeding smoothly, though slowly.

Clinton Library Photocopy

Page Three -- Carol Rasco

## CURRENT STATUS

On August 2, 1993, the Population Council's lawyer notified FDA that **Roussel Uclaf had recently reasserted its demand for protective federal legislation.** Roussel Uclaf insisted that the Population Council obtain a commitment from the United States Government that: 1) legislation would be enacted making it a crime for any person to hurt or harass any doctor administering RU-486, their patients, or the drug's manufacturers, distributors, and salespersons; 2) the Department of Justice publicly commit to enforce this law, if enacted; 3) legislation would be enacted indemnifying Roussel Uclaf for any product liability exposure resulting from the use of RU-486 in this country, or, as an alternative, a prohibition of any product liability actions against Roussel Uclaf for RU-486; 4) as part of any legislation, indemnification for consequential damages.

In exchange Roussel Uclaf would give the Population Council a royalty-free license because it has decided to forego any profit from entering the United States market. **In short, Roussel Uclaf's position is that it should not incur any liability exposure as a result of making RU-486 available in this country** as an abortifacient because it does not anticipate any profit from selling RU-486 for that use in the United States and is entering the American market only at the request of the United States Government. Roussel Uclaf remains willing to exploit its patent for non-abortifacient uses of RU-486, should any other use be found to be safe and effective.

FDA advised the Population Council's lawyer that it could not make a commitment to seek such legislation and that its enactment was extremely unlikely, both for political reasons and because the United States had never agreed to indemnify any drug manufacturer, with the exception of the swine flu precedent. The FDA also communicated that seeking such protection for a drug company far exceeded FDA's appropriate role, but that the agency would discuss the situation with the Department.

In mid-September Roussel Uclaf hired legal counsel, Swidler and Berlin, to lobby the federal government at levels above FDA to obtain the legislation described above. On October 5, Kevin Thurm, the Department's Chief of Staff, and Harriet Rabb, the Department's General Counsel, met with lawyers from Swidler and Berlin to discuss the situation. The Department initiated the meeting to assess how the United States Government might facilitate successful completion of the negotiations between Roussel Uclaf and the Population Council. At that meeting, the company reiterated its concerns about obtaining indemnification for potential losses and was again told emphatically that the Department would not support its efforts to obtain federal legislation. Roussel Uclaf's lawyer then suggested that the

Clinton Library Photocopy

Page Four -- Carol Rasco

United States could exercise its statutory powers of eminent domain and take over the patent for RU-486 insofar as it covers abortifacient uses of the drug.

The Population Council appears to be attempting to meet those demands of Roussel Uclaf that do not require the enactment of federal legislation.  We have been advised by the Population Council that they sent a proposed licensing agreement to Roussel Uclaf on October 11, although we do not know whether Roussel Uclaf and Hoechst will find this proposal acceptable.  In addition, the Population Council's President recently met with the President of Roussel Uclaf, and is planning to send a delegation to Germany during the first few weeks of November in the hope that if Hoechst understands that the Population Council is a serious, credible organization, Hoechst will withdraw its objections and permit Roussel Uclaf to enter into an agreement with the Population Council.  Despite these moderately positive developments, we do not think that the negotiations will be successfully concluded without pressure on Roussel Uclaf/Hoechst.

Moreover, we have learned that Hoechst is interested in using an American venture capitalist group as a partner for the Population Council; this group is thought to be able to secure funds sufficient to indemnify Hoechst at the level it desires.  However, it is our understanding that the Population Council appears unwilling to work with this group.  This issue has further complicated the negotiations.

## AVAILABLE OPTIONS TO MOVE FORWARD NEGOTIATIONS

**The negotiations between Roussel Uclaf and the Population Council have not been successfully concluded** because of the insistence of Roussel Uclaf and Hoechst that they be protected from all economic harm if they permit RU-486 to be marketed in this country.  There are two options for moving forward the stalled negotiations:

**One option is to enlist the aid of Felix Rohatyn, or someone of comparable stature, to negotiate with Roussel Uclaf and Hoechst on behalf of the United States Government.**  The negotiations require a person with extensive experience in the international business community, especially France and Germany.  In addition the person must understand the pharmaceutical industry and have the standing to participate in high-level discussions that might involve appropriate ambassadors, as well as the Health Ministers in France and Germany.

**A second option is for the United States to exercise its statutory powers of eminent domain and take over the patent for RU-486, insofar as it covers the abortifacient use of the drug.**  The Government could then contract with a company to manufacture

Page Five -- Carol Rasco

and distribute the drug.  As noted above, this option was suggested by Roussel Uclaf's lawyers in their October 5 meeting with the Department's Chief of Staff and is clearly the company's preferred approach.  While the United States government has the legal authority to take over the patent, such an approach is rare and in this case is politically complex.  Although legal, there are particular concerns about the political viability of this approach and the willingness of Congress to permit such an action to stand.  We note that Roussel Uclaf did not demand that the governments of France, England, or Sweden take such steps.

### NEXT STEPS

**Unless you object, the Department plans to engage the services of Felix Rohatyn or someone comparable as a negotiator.**  This negotiator would require the State Department's support in making appropriate diplomatic contacts, both with the United States Ambassadors to France and Germany, the French and German Ambassadors to this country, and other high-level officials in France and Germany, such as the respective Health Ministers.  The purpose of such contacts would be to assess the situation and determine what measures the United States could take to persuade Roussel Uclaf and Hoechst to make RU-486 available in the United States.  The French and German governments might be displeased to learn that their companies are not accommodating a request made by the United States Government.  In addition, a negotiator of Felix Rohatyn's caliber might identify means other than federal legislation to satisfy Roussel Uclaf's and Hoechst's concerns.

**In order for the negotiator to succeed, the Department and the Administration must be unequivocal in the position that taking over the patent for RU-486 is not an option.**  To avoid any ambiguity on this point, the negotiator should have a letter signed by the Secretary of Health and Human Services making clear on behalf of herself and the Administration that the United States government will not take over the patent.  In addition the letter should request on behalf of the Administration that Hoechst and Roussel Uclaf conclude negotiations for the entry of RU-486 onto the U.S. market expeditiously.  Roussel Uclaf will have every incentive to delay the negotiations if it thinks that the United States will ultimately take over the patent. It is the Department's position that this option should be unambiguously rejected, not only because it is controversial, but because its continued existence will make it impossible for the negotiator to obtain any other agreement.

Donna E. Shalala

# **Tab C**

Clinton Library Photocopy



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration<br>
Rockville MD 20857

September 30, 1993

NOTE TO:    The Secretary

FROM:    The Commissioner of Food and Drugs

SUBJECT:    RU-486

On January 22, 1993, President Clinton issued a memorandum directing you to assess initiatives to promote the testing, licensing, and manufacturing in the United States of RU-486 (mifepristone).[1]  The Agency has had ongoing dialogue with Roussel Uclaf to get a marketing application submitted to FDA for the drug.  Both you and the FDA are on record as stating that if RU-486 is a safe and effective alternative to surgical abortion, then women in the U.S. should have access to that drug.  The President also directed you to reassess whether RU-486 qualifies for importation under FDA's personal use importation policy.[2]

## I.  Current Marketing of the Drug

RU-486 is manufactured by the French firm Roussel Uclaf and it is approved to induce abortions in France, the United Kingdom, and Sweden.  Roussel Uclaf has stated that it can act in the United States only with the approval of its parent company, Hoechst AG.  Hoechst has historically refused to permit Roussel Uclaf to seek marketing approval for RU-486 as an abortifacient in the United States.  Both you and I have asked Hoechst to permit Roussel Uclaf to file a new drug application (NDA) for the drug.  Hoechst remains adamant in its refusal.  While some members of Congress have written to Hoechst urging the company to

---

[1]  Although there are several investigational new drug applications (INDs) on file with FDA for RU-486 for other uses, including Cushing's syndrome, diabetes, meningioma, and breast cancer, Roussel Uclaf will not pursue marketing applications for these indications until the abortion issue is resolved.  FDA representatives have met with representatives from the National Institutes of Health (NIH) to discuss initiatives to promote the testing in the United States of RU-486 and other antiprogestins.  NIH is limited in what it can do by the restrictions placed on its appropriation by the Hyde Amendment.

[2]  In accordance with the President's January 22 memorandum, FDA has reassessed whether RU-486 might qualify for importation under FDA's personal use importation policy and whether the import alert should be rescinded.  There are significant public health implications associated with rescinding the import alert, especially related to whether the drug could be safely used under these circumstances; the availability of counterfeit RU-486 on the world market for which the Agency cannot attest to purity, quality, or safety; and the fact that Roussel Uclaf's RU-486 is so tightly controlled as to be unavailable for personal importation even if the import alert were to be rescinded.  The Agency submitted its recommendation on this issue to PHS on July 14, 1993.  Because the import alert has been challenged by a woman who attempted to bring a small quantity of RU-486 into the country, the Agency is working with the Department on an appropriate response to this ongoing litigation.

The Secretary - 2

submit a marketing application for RU-486, other Congressional members have written to
Hoechst expressing their strong opposition to the marketing of RU-486 in this country. This,
and the well-publicized activities of anti-abortion groups, have provided Hoechst and Roussel
Uclaf with evidence that the U.S. population lacks cohesiveness on this issue and that the abortion
debate continues.

## II. Summary of Discussions with Roussel Uclaf Regarding Testing of the Drug

In April 1993, FDA arranged a meeting between Roussel Uclaf and the Population Council to
attempt to get those parties to agree to work together to test RU-486 and file a new drug
application for the drug. The Population Council was identified as the most likely group to
work with Roussel Uclaf because the Population Council had a contract with Roussel Uclaf
which required Roussel Uclaf to give the Population Council sufficient amounts of the drug
so that the Population Council could conduct clinical trials. The contract also appeared to
require Roussel Uclaf to license the drug to the Population Council if Roussel Uclaf was
unwilling to sell the drug in the United States. A copy of that contract, which must remain
confidential, is attached.

At the April meeting, Dr. Edouard Sakiz, president of Roussel Uclaf, raised the issue of
federal legislation to indemnify Roussel Uclaf from any damages it might suffer from
permitting RU-486 to go onto the United States market. Dr. Sakiz was worried about product
liability actions against Roussel Uclaf if a woman had an incomplete abortion and a deformed
fetus. Dr. Sakiz was also concerned about consequential damages, such as the economic costs
from boycotts of Roussel Uclaf (or Hoechst) products, bombings of Roussel Uclaf/Hoechst
facilities, etc. by right-to-life groups. Dr. Sakiz's view was that if the United States
Government wanted RU-486 on the U.S. market, then the United States Government should
make Roussel Uclaf whole for any damages Roussel Uclaf might suffer because it had agreed
to the United States Government's request.

Dr. Sakiz was told quite clearly at the April meeting that such legislation would never be
enacted and the FDA would not support Roussel Uclaf in its advancement of that idea.

Despite being told that there was no possibility of obtaining favorable legislation, Dr. Sakiz
committed Roussel Uclaf to go forward with the Population Council to bring RU-486 onto the
United States market. Specifically, at the April meeting Roussel Uclaf and the Population
Council agreed:

o      That Roussel Uclaf would license RU-486 to the Population Council, which would
        conduct a clinical trial involving 2000 women pursuant to an investigational new drug
        (IND) application;

Clinton Library Photocopy

The Secretary - 3

o    That the Population Council would ultimately submit an NDA to FDA, based on the
     results of the clinical trial and on other studies that have been conducted by Roussel
     Uclaf; and

o    That the Population council, with the concurrence of Roussel Uclaf, would choose a
     new manufacturer for the drug, and that Roussel Uclaf would transfer its technology
     for making the drug to that manufacturer, because Roussel Uclaf does not want to
     manufacture the drug for sale in this country.

It was then left for the Population Council and Roussel Uclaf to revise the terms of their
contract, while Roussel Uclaf began sending scientific information to FDA and the Population
Council. The contract negotiations continued from sometime after the April meeting until
recently. As of late July 1993, the Population Council thought the contract negotiations were
proceeding smoothly, though slowly. In those negotiations the Population Council was
represented by Jim Boynton of Christy and Viener and Roussel Uclaf was represented by Joe
Orsini, its corporate council in Paris.

On August 2, 1993, Jim Boynton, the Population Council's lawyer, notified FDA that Roussel
Uclaf had recently demanded that the Population Council obtain a commitment from the U.S.
Government that the U.S. would enact legislation that would protect all persons who had
anything to do with RU-486. This was described as similar to "right-to-access" legislation
that would make it a crime for any person to hurt or harass any doctor administering RU-486,
their patients, and the manufacturers, distributors, and salespersons for the drug. Roussel
Uclaf also demanded that the Department of Justice promise to expend its resources to
enforce this law, if enacted. Roussel Uclaf also asked for legislation that would indemnify
Roussel Uclaf against any product liability exposure as a result of the use of RU-486 in this
country or, as an alternative, that would ban any product liability actions against Roussel
Uclaf for RU-486. Finally, Roussel Uclaf asked for legislation that would indemnify Roussel
Uclaf against consequential damages. Roussel Uclaf's principal assertion is that it is willing
to give the Population Council a royalty-free license, because it has decided (given a push by
Hoechst), that it will forego any monetary gain from entering the U.S. market. In short,
because Roussel Uclaf does not expect to make any money off of RU-486 in the U.S. market,
and sees itself as permitting RU-486 to enter the U.S. market only because asked to do so by
the United States Government, then it should not incur any liability exposure on account of
the drug.

FDA advised Mr. Boynton that the FDA could not make a commitment to seek such
legislation, pointing out that Congress had recently reenacted the Hyde Amendment and that
other than the swine flu situation, the United States had never agreed to indemnify any drug
manufacturer. The FDA further explained that it would go far beyond FDA's appropriate role
to seek such protection for a drug company. The FDA offered to advance the idea within the
Department, but was advised by Mr. Boynton that the answer given was sufficient.

Clinton Library Photocopy

The Secretary - 4

In mid-September, Roussel Uclaf hired legal counsel (allegedly, Lester Hyman and John Hoff of Swindler and Berlin) to lobby the federal government at levels above FDA to obtain legislation protecting the company from potential losses, as described above.

## III.  Analysis

The FDA's principle objection to Roussel Uclaf's request for indemnification and related relief has been pragmatic--we did not (and do not) think Congress would ever pass such legislation.  Having said that, we also think that there are other policy reasons for refusing to seek indemnification of a drug manufacturer, for example:

o    It would create an unacceptable precedent for any manufacturer of a significant vaccine or drug to seek indemnification as a condition for bringing the product to market.  There is little basis to distinguish RU-486 from a breakthrough AIDS drug or unique vaccine.  The swine flu indemnification plan proved very problematic for the United States Government.

o    If public health problems were to occur post-approval, the interest of the United States as an indemnifying party would be to disprove that problems had occurred, while FDA's obligation would be to objectively investigate and take appropriate actions to protect the public health.  This would be an untenable conflict for the United States Government.

Roussel Uclaf's liability and boycott concerns should not be underestimated.  Because Roussel Uclaf is willing to give the Population Council a royalty-free license, it wants to eliminate any potential for expenses due to the drug's introduction into the United States market.  Roussel Uclaf has also expressed its willingness to give a royalty-free license to any other major U.S. pharmaceutical company, but has found no company willing to take the license.  Roussel Uclaf could, possibly, sell the drug to the Population Council (or to others) but it appears unwilling to do so, perhaps because the drug may have important other therapeutic benefits in the future, and it may want to maintain the right to sell to those markets.  However, Hoechst may be willing to simply abandon the patent or give it to the United States.

There are some that suggest that Roussel Uclaf is simply playing a delaying game--waiting until the very staunchly Catholic Hoechst CEO (Prof. Wolfgang Hilger) retires in April 1994-- so that then Roussel Uclaf would be free to exploit the drug in the United States and elsewhere for all uses.  Others suggest that Roussel Uclaf does not want to reach agreement with the Population Council, but is merely stalling until an international foundation is created by Dr. Etienne Balieu, the inventor of the drug and a former Roussel Uclaf employee, to which Roussel Uclaf could then sell the rights to the drug.

Clinton Library Photocopy

The Secretary - 5

The speculation is fueled by the essentially unanswered question--as to why Roussel Uclaf is willing to manufacture and sell RU-486 to some markets (England, France, and Sweden) but not to others (e.g., the United States).  The common thinking is that Hoechst is only willing to permit Roussel Uclaf to sell RU-486 in a country when Hoechst is forced to do so politically, and, therefore, the only way to get RU-486 onto the U.S. market is to exercise political pressure on Roussel Uclaf and on Hoechst.

This thinking appears borne out by the circumstances here--Roussel Uclaf was willing to come to the table (at FDA) when it had received pressure from President Clinton (the January 23, 1993, Executive Order), you (your March 12, 1993, letter to Prof. Hilger at Hoechst), and FDA, but that since that pressure has waned the incentive to come to an agreement has also waned.

Another possibility is that the Population Council is simply attempting to reach an agreement that leaves Roussel Uclaf with too little, and that if the Population Council were willing to settle for less (e.g., the ability to study, but not to market the drug or to indemnify Roussel Uclaf) then a deal could be reached.

## IV.  Recommendation for Expert Advisor

This situation calls for someone of Felix Rohatyn's caliber for several reasons.  At the outset, we must make it clear that the FDA cannot take this issue too far without compromising its role as objective reviewers of the safety and efficacy of the drug.  But equally as important is the fact that this is an issue where business and politics intersect quite dramatically.  Because of the abortion debate, Roussel Uclaf is left alone to promote its drug.  Other major U.S. drug manufacturers have, to date, refused to join forces with Roussel Uclaf--either by agreeing to go forward with their own abortifacient drug products, or by agreeing to be the manufacturer or distributor of RU-486.  Therefore, Roussel Uclaf feels isolated (and vulnerable) by the U.S. demands.  It will take an experienced person, familiar with the drug industry, to sort out these issues.

Second, there are pragmatic, economic concerns to be faced.  Roussel Uclaf's concerns about indemnification are realistic concerns that need to be satisfied.  Someone with extensive experience in the business community (in France and Germany as well as in the United States) will have a better understanding of the various ways this concern can be overcome.

Finally, there are diplomatic issues that may need to be addressed.  It may be that France and Germany would be unhappy to learn that their companies were not accommodating a request made by the United States Government.  The U.S. Ambassadors to France and Germany will

Clinton Library Photocopy

The Secretary - 6

need to be consulted on these issues, and your counterparts in France and Germany may also need to be involved. We think that someone familiar to these circles would advance the Administration's goal to bring a safe and effective abortifacient to the U.S. market.

*Mary Pendergast*

for David A. Kessler, M.D.

Attachment:  Contract

cc:     Dr. Philip Lee
        Mr. Kevin Thurm

Clinton Library Photocopy

THE WHITE HOUSE

WASHINGTON

January 22, 1993

MEMORANDUM FOR THE SECRETARY OF HEALTH AND HUMAN SERVICES

SUBJECT:          Importation of RU-486

In Import Alert 66-47, the Food and Drug Administration ("FDA") excluded the drug Mifepristine -- commonly known as RU-486 -- from the list of drugs that individuals can import into the United States for their "personal use," although the drugs have not yet been approved for distribution by the FDA.  (See FDA Regulatory Procedures Manual, Chapter 9-71.)  Import Alert 66-47 effectively bans the importation into this Nation of a drug that is used in other nations as a nonsurgical means of abortion.

I am informed that in excluding RU-486 from the personal use importation exemption, the FDA appears to have based its decision on factors other than an assessment of the possible health and safety risks of the drug.  Accordingly, I hereby direct that you promptly instruct the FDA to determine whether there is sufficient evidence to warrant exclusion of RU-486 from the list of drugs that qualify for the personal use importation exemption.  Furthermore, if the FDA concludes that RU-486 meets the criteria for the personal use importation exemption, I direct that you immediately take steps to rescind Import Alert 66-47.

In addition, I direct that you promptly assess initiatives by which the Department of Health and Human Services can promote the testing, licensing, and manufacturing in the United States of RU-486 or other antiprogestins.

You are hereby authorized and directed to publish this memorandum in the Federal Register.

# **<u>Tab D</u>**

Clinton Library Photocopy

MAY 11 1994

TO:        Carol Rasco

FROM:      Kevin Thurm

SUBJECT:   RU 486

## Background

Roussel Uclaf, a French subsidiary of the German company,
Hoechst, holds two United States patents for its product, RU 486,
which has abortifacient and potentially scores of other medical
uses.  The French company has engaged the Population Council, a
not-for-profit organization, in over 14 months of negotiations
designed to transfer Roussel Uclaf's United States patent rights
to the Population Council which would then take steps to bring RU
486 to market in this country.  Those negotiations are on-going.

On May 9, 1994, Roussel Uclaf wrote a letter to Secretary Shalala
stating the company's wish, instead, to offer the RU 486 United
States patent rights to the American government insofar as the
abortifacient and other gynecological uses are concerned.  The
company proposes voluntarily to assign its patent rights, as so
limited, to the government free of charge, asking nothing in
return.

Were the government willing to accept the "gift" offer,
negotiations with the Population Council would be discontinued,
and the patents, as so delimited, would be made available for
assignment to the United States.

Alternatively, Roussel Uclaf has advised that should its
bilateral negotiations with the not-for-profit be resolved, the
deal cannot be finally closed unless and until the President of
the United States writes a letter to the French company asking,
on behalf of the women in America, that the patents be assigned
to a non-profit entity in this country.

Roussel Uclaf strongly favors the gift to the government
arrangement.  Your advisors strongly favor the bilateral
arrangement and have taken steps consistently and firmly to so
insist.

## Issues for Decision

       **One:**  Whether the President is willing to write a
letter to the manufacturer of RU 486 asking that the United
States patents for that product be assigned to a not-for-profit
entity in this country.  A suitable letter might read as follows:

            It is important for the health of women in
            the United States that they have access to
            the widest possible range of safe and
            effective medical treatments.  In support of

Clinton Library Photocopy

that goal, in January 1993, I asked the
Secretary of Health and Human Services to
promote the testing and licensing of
mifepristone [RU 486] and other
antiprogestins in the United States.

To permit the appropriate testing,
development and distribution of RU 486 in the
United States, I ask that your company give
its mifepristone patent rights in the United
States to a non-profit organization that
would take all necessary steps to file a new
drug application with the Food and Drug
Administration [FDA], so that the FDA can
determine whether the drug is safe and
effective for use in the United States.

**Two:**  If the bilateral negotiations between Roussel
Uclaf and the not-for-profit entity fail, and the only option
then currently on the table is the gift offer, is the government
of the United States willing, and if so, under what conditions,
to accept the offer of the patent rights for RU 486?

**Three:**  If the government is not willing to accept the
offer of the patent rights, on what is that decision to decline
based, and how will it be communicated to the American people?

\* \* \* \* \* \* \* \* \* \* \* \* \*

The following tabs set forth discussion of the various factors
that may be brought to bear on the decision-making:

| | |
|---|---|
| Tab 1: | History and background of RU 486 in this Administration |
| Tab 2: | Legal issues |
| Tab 3: | Bringing RU 486 to market [timing, available entities, administrative hurdles] |
| Tab 4: | Political considerations |
| Tab 5: | Press strategies and concerns |

The following documents are attached for your reference;

| | |
|---|---|
| Exhibit 1: | The President's Memorandum of January 22, 1993 |
| Exhibit 2: | Roussel Uclaf's May 9, 1994 letter to Secretary Shalala attaching a draft offer of the gift |
| Exhibit 3: | Roussel Uclaf's draft letter to the President |
| Exhibit 4: | Minutes in French and translation of the April 26, 1994 Roussel Uclaf board meeting setting out the need for a letter from the President |

Clinton Library Photocopy

**BACKGROUND**

Roussel Uclaf, a French subsidiary of the German company, Hoechst, holds two United States patents for its product RU 486, which has abortifacient and various other medical uses. The patents will expire in the years 2000 and 2001. Hoechst, the parent company, is co-owned by the Celanese Corporation, whose direct or indirect product lines include Nike sneakers and seat belts; the company does about $8 billion worth of business per year in the United States.

On January 22, 1993, the President directed the Secretary to "assess initiatives by which the Department of Health and Human Services can promote the testing, licensing, and manufacturing in the United States of RU 486 or other antiprogestine" (Exhibit 1). Within the month, the FDA, through Commissioner David Kessler, requested both Roussel Uclaf and Hoechst to expedite the process and met with representatives of Roussel to discuss issues. In March 1993, Secretary Shalala wrote to the president of Hoechst urging him to eliminate all corporate barriers to introduction of RU 486 in the United States.

Roussel Uclaf identified the Population Council, a non-profit organization based in New York, as the most likely vehicle through which to produce, distribute and test RU 486; the two parties have a 1982 contract which gives the Population Council some limited rights to license Roussel Uclaf product in this country.

Over the past fourteen months, the two parties have conducted on-again/off-again negotiations over a distribution scheme, liability insurance (product and damage to property), and insurance for lost profits due to economic boycotts of non-related products. During these talks, Roussel, in addition to the three main issues, occasionally raised subsidiary matters; these bumps in the road served to delay the negotiations (some believe that Roussel was in a holding pattern in anticipation of corporate leadership changes in January and April of this year). In several newspaper stories on this issue during this period, representatives of the two parties have been quoted saying they expected a deal shortly. Obviously this has yet to materialize.

Last fall, lawyers representing Roussel Uclaf met with HHS officials to discuss ways the federal government might help the negotiations. Over a series of meetings, the corporation's lawyers presented a variety of requests, including whether the Administration would seek legislation indemnifying Roussel for all potential damages or would seize the patents. HHS officials repeatedly told Roussel's lawyers that neither was a possibility, and that the deal should be done through the private parties.

On April 14, 1994, the Secretary, along with other HHS officials, met with representatives of the two parties, including Professor

Clinton Library Photocopy

Ernst Afting (current CEO of Roussel), Dr. Edouard Sakiz (past CEO and current Board Chair of Roussel), and Margaret Carlson (head of the Population Council).   The Secretary stated that the U.S. government would neither seek legislation indemnifying Roussel nor seize the patents.   She made clear to the parties the importance she attached to the introduction of the product in the U.S. through an agreement between them.   She ended the meeting by imposing a May 15, 1994 deadline for successful completion of their negotiations.

In light of this deadline and hearings scheduled by Congressman Ron Wyden for 10:00 a.m. on May 16 to obtain a status report, the parties have continued their negotiations.   Although many issues have been resolved, some remain: the extent of insurance coverage for product liability and damage to property, and a "pull the plug" option which would give Roussel the authority to require the Population Council to withdraw the product from the market if the potential liability from all lawsuits exceeded a specified amount.

On April 26, 1994, the Board of Roussel Uclaf passed a resolution authorizing under certain circumstances the assignment of patent rights to either the United States government or to a non-profit organization (Exhibit 4).   If the rights are to be given to a non-profit, the President of the United States must so request by letter on behalf of the women of the country (see draft letter in cover memo).

By letter of May 9, 1994, Roussel notified the Secretary that it was prepared to assign the patent rights (for abortifacient and other gynecological uses) to the government and attached a draft letter to the President from Professor Afting, the president and CEO of Roussel (Exhibits 2 and 3).   This draft letter closely mirrored an earlier informal draft discussed with Kevin Thurm, Harriet Rabb and David Kessler during the prior week.

Discussions between the parties are scheduled to continue through the end of the week.   If the private arrangement is not concluded, we must be prepared to have an answer to Roussel's letter which we believe the company would send (or at least publicize).   There is some "buzz" among pro-choice and women's groups about this issue so there is a chance developments will leak before the deal is finished or the letter is formally sent.

Clinton Library Photocopy

## LEGAL ISSUES DISCUSSION

I. **Gift Acceptance.** The first question is whether the government should insist that any gift be for all known medical uses, not just abortifacient and gynecological [including, perhaps, "morning after"] uses. On the one hand, the broader rights may make the patent more attractive to potential licensees. On the other hand, some potential licensees may be appropriate repositories of the government's patent rights for the designated uses, but not the full range of known medical uses. Finally, the burden of testing and bringing forward the product for abortifacient and gynecological uses may be more than enough obligation. The responsibility of pursuing research and testing on all the known medical uses to bring the promising ones to fruition may be more than the government and any licensee want to assume.

The Secretary has statutory authority to accept a gift, such as a patent, on behalf of HHS's Public Health Service. Alternatively, the directors of the national research institutes at HHS's National Institutes of Health (NIH) have statutory authority to accept gifts to support the activities of their institutes. Each option has pluses and minuses.

A. Secretarial gift acceptance. Because patents are intangible property, by statutory directive, the evidence of the gift (in this case, the original patent assignments), must be lodged with the Department of the Treasury. Treasury has the discretion to hold the property or liquidate it at HHS's request. There is unlikely to be a problem raised by Treasury, but, to date, that Department has had no part in the RU 486 issue and must be consulted should this route be chosen.

B. NIH gift acceptance. No involvement of Treasury is required. Gifts to NIH institutes must be made to support the activities of the receiving institute - so a showing of such purpose would have to be made. This is not likely to pose a problem, but no work has been done to identify a likely institute recipient or to prepare the gift justification.

Finally, with regard to gift acceptance, since Roussel Uclaf is an entity doing business with HHS, including specifically the Public Health Service and its components, the government will have to be sure that accepting the gift does not give rise to a public perception concern. There is no ethical impediment to accepting gifts from entities so positioned, but care must be taken to weigh the benefits and consequences so that the public can be assured that no favor has been curried or promised. In fact, it has not.

II. **Transfer of the Gift.** Roussel Uclaf has offered to __assign__ its rights to the abortifacient and gynecological patent uses to the government. Were the United States to accept the assignment

Clinton Library Photocopy

from Roussel Uclaf, the government would in turn find a licensee or licensees willing and able to take responsibility for obtaining FDA approval and bringing the product to market. Although it is conceivable that the government could perform these tasks itself, only the Department of Defense now manufactures drugs on a large scale.

Since, by law, federal agencies are authorized to grant licenses in federally owned patents, were the government to have the patents by assignment, subsequent licensing arrangements are possible. Additionally, patent law provides the patent owner (or, in this case, the patent assignee) with the right to sue for patent infringement. Such capacity to bring suit could be consequential if counterfeit product began to appear in the United States.

III.   **Licensing the United States Patent Rights.**  Government agencies are authorized by law to grant non-exclusive, exclusive or partially exclusive licenses under federally-owned patents. Licenses to PHS-owned inventions are negotiated by the NIH Office of Technology Transfer in accordance with government-wide regulations.

Under the regulations, non-exclusive licenses can be given by the government relatively easily and directly to any applicants, generally speaking, whose capacity to act responsibly regarding the license has been demonstrated.

Exclusive or partially exclusive licenses are subject to a different, but not much more difficult process. Notice of the patent's availability must be published in the Federal Register, and a sixty day period for filing written objections must be allowed. No less than three months after the date of publication, and after consideration of any objections received, an exclusive or partially exclusive license may be granted. In that event, the agency must make determinations regarding the necessity for an exclusive license, rather than a nonexclusive one, the effect of the license on competition, and whether small business firms have been given first preference in accordance with the statute and regulations.

If and once the United States accepts the gift, it will be critically important that some bidder(s) come forward seeking a license to bring the product to market. Roussel Uclaf's efforts to shop this product around to United States pharmaceutical companies to get one or more to take up the responsibility of bringing RU 486 to market have been unsuccessful. Roussel Uclaf reports that the reluctance reflects other companies' unwillingness to bear (i) the product liability risks associated with the abortifacient or (ii) the political pressure from anti-abortion forces.

IV.   **Possible United States Tort Liability.**  The likelihood of United States tort liability depends, in large measure, on the

Clinton Library Photocopy

government's role in bringing RU 486 to market.  Through
sovereign immunity, the United States government is not subject
to liability except to the extent that it consents to be sued.
The Federal Tort Claims Act (FTCA) is a statutory limited waiver
of sovereign immunity and, thus, acts as consent to being sued.
Under the FTCA, the government is liable for personal injury
caused by the negligent or wrongful act or omission of a Federal
employee under circumstances where the government, if a private
party, would be liable to the plaintiff.  It would be unlikely
for a court to allow a suit to go forward against the government
under the FTCA if the government merely performed the
"discretionary functions" of accepting a gift, licensing the
patents, and acting on an application for FDA to approve a drug.

However, were the government to become enmeshed in facilitating
or playing a direct role in the transfer of the technical
background information that makes it possible actually to make
RU 486, for example, the government risks being drawn into
liability.  An approach which limits the government's role in
bringing RU 486 to market, while solving the lion's share of the
potential government liability risk, creates other problems.
Without the backup technical "know how," it would be years before
any government licensee could create the product.  Since it is
unlikely that a licensee would bid for these patent rights
without the actual prospect of bringing the product into
existence, the United States could be left holding the patents
with no licensee willing to step up and take them.

Alternatively, if a European or other off-shore manufacturer made
the product in a fashion that meets FDA standards, the product is
potentially importable by a government licensee.  One wrinkle on
this process results from the technology transfer regulations
referenced above which note that normally, licensees of United
States patents have to agree that the product will be produced
substantially in the United States.

In short, to the extent the government refuses to become involved
in actually transferring the technology, tort liability is kept
at bay.  But licensees may be kept at bay as well, leaving the
government holding the patents with no prospect of bringing
RU 486 to the women in America.

Clinton Library Photocopy

## BRINGING RU 486 TO MARKET

A.  Direct Patent Transfer to Population Council

If Roussel Uclaf agrees to license its patent rights in
RU 486 to the Population Council, the Population Council would
then have to take the following steps:

o  Locate a drug manufacturer that would be willing to
manufacture RU 486 for the United States market (we are advised
that such a manufacturer has been identified by the Population
Council).

o  Obtain information from Roussel Uclaf on how Roussel
Uclaf manufactures RU 486 and on its testing of the drug, so that
the new manufacturer could follow parallel processes and the
Population Council could refer to Roussel Uclaf's animal and
human testing of RU 486 in any submission to the Food and Drug
Administration.  If Roussel Uclaf provides this information and
technology transfer, it will significantly shorten the amount of
time it will take to bring the drug to the United States market
(assuming the drug is found to be safe and effective by FDA).
With Roussel Uclaf's information, it might take six to twelve
months for the Population Council's manufacturer to begin
production of the drug, and for the Population Council to file
its marketing application with the FDA.  If Roussel Uclaf refuses
to provide such information, it will take the Population Council
eighteen months to two years to begin production, and up to five
years to repeat the animal and human tests that show whether the
drug is safe and effective.

Roussel Uclaf has stated that they will transfer the technology
to the Population Council, but we do not consider this a strong
assurance.

o  Begin some clinical testing of the drug in the United
States.  Clinical trials, though not absolutely necessary for FDA
approval, would permit women in the United States to have access
to the drug, and for United States physicians to become familiar
with the drug, while the Population Council prepared its
marketing application for the FDA.

If Roussel Uclaf were to provide French-made RU 486 to the
Population Council for the clinical trials, such trials could
begin in the United States in approximately six months (five
months for the Population Council to design its trials and find
physicians willing to do the trials, and one month for FDA
approval).  If Roussel Uclaf were not willing to provide the drug
for clinical trials, such trials would have to wait until (1) the
Population Council's manufacturer could begin production of the
drug, and (2) either Roussel Uclaf gave the Population Council
its animal studies or the Population Council did its own animal
studies.

Roussel Uclaf has stated that it would provide the French-made
RU 486 to the Population Council for the clinical trials, but
again we do not consider this a strong assurance.

    o  File a marketing application with the FDA.  As indicated
above, if Roussel Uclaf provides information and transfers its
technology to the Population Council, a marketing application
could be filed with the FDA within six to twelve months.  FDA
review would take no longer than six months.  Many of the
scientific decisions on the proper use and distribution of the
drug have already been considered by the FDA, based on
information already provided to FDA by Roussel Uclaf and the
Population Council.  Roussel Uclaf would not need to finish its
United States clinical trials before filing a marketing
application with FDA; such trials could be used to refine the use
of the drug at a later time.

B.  Patent Transfer to the United States

If Roussel Uclaf gives its patents to the United States, the
United States would have to take the following steps:

    o  The United States would have to determine the scope of
the rights given to the United States -- are the rights only in
the abortifacient and other gynecological uses of the drug, or in
all uses of the drug (e.g., gynecological uses, Cushing's
disease, breast cancer).

    o  The United States would then need to transfer its rights
in the patents to a third party.  This process is discussed at
Tab 2, and would take at least six months.

    o  The license holder would then need to take all of the
steps outlined above, i.e., find a manufacturer, conduct the
necessary tests, and file a marketing application with the FDA.
The length of time these steps will take depends on whether
Roussel Uclaf is willing to transfer its information, technology,
and the drugs necessary for clinical trials to the license
holder.  Roussel Uclaf has advised the government that it would
provide the information and French-made RU 486 for clinical
trials to the United States' licensee, but it could change its
mind.

It is difficult to determine whether the United States's license
holder would take appreciably longer to bring RU 486 to market
than the Population Council would need if the Population Council
received a direct transfer of rights from Roussel Uclaf.
Obviously, if the United States licensee is the Population
Council, little time will be lost above that associated with the
transfer of the patent rights from the United States to the
Population Council.  If another group becomes the United States's

2

Clinton Library Photocopy

licensee, that group might be able to bring the drug to the
United States market slightly faster than the Population Council
(if the group chosen was very familiar with the drug, had a good
manufacturing facility, the cooperation of Roussel Uclaf,
experience in FDA marketing applications, and excellent contacts
with United States physicians) or much slower (if the group falls
short on any factor).

We anticipate that if Roussel Uclaf gives its patent to the
United States, it will add at least six months, and quite
possibly twelve to eighteen months, onto the time needed to bring
the drug to the United States market.  This estimate excludes any
additional time generated by litigation (see Tab 2).

3

## POLITICAL ISSUE DISCUSSION

In viewing the various options, it is important to place them in a broader political context, particularly as they relate to health care reform, given the likelihood that Congress will narrow the current Health Security Act provisions that provide for abortions under pregnancy-related services.

Because of this situation with the Health Security Act, the introduction of RU 486 will be of greater significance to the pro-choice and women's groups. If the Administration is viewed as closing the door or rejecting an apparently reasonable offer on RU 486, then the path toward reaching a non-confrontational agreement with the advocates on the Health Security Act could become much more difficult. It is, therefore, extremely important that the decision concerning RU 486 be placed in the context of promoting women's health and maintaining the close relationship of the Administration to these groups.

With regard to other political considerations, the acceptance of RU 486 by the federal government, as opposed to by a private non-profit organization, would most certainly lead to a floor amendment on the Labor, HHS appropriations bill, or other legislative vehicle to prohibit federal funds from being used in conjunction with RU 486. It is difficult to predict the exact nature of the amendment. However, in the last Congress, Representatives Dornan, Dannemeyer, Lent, Bartlett, Bunning and Hunter co-sponsored a bill to prohibit federal funds from being used for clinical studies of RU 486 as an abortifacient. Given the likelihood of another Hyde-type amendment on the House and Senate floors this year, as well as the expected abortion-related amendments on health care reform, the members of the House and Senate will be frustrated at having to face another abortion-related vote (on RU 486 appropriation limits). The outcome of such a vote is difficult to predict.

To date, we have worked very cooperatively with Congressman Ron Wyden, the chief Congressional advocate in providing access to RU 486 to women in this country. We expect to be able to continue this close working relationship through the upcoming hearing on May 16. Because Congressman Wyden has postponed past hearings, and is very frustrated by the fourteen months of negotiations, it is unlikely that he would be willing to postpone the May 16 hearing. He is convinced that Roussel Uclaf and Hoechst have been stalling for time, and that it is important to remain firm on the hearing date in order to force agreement or to make it clear to the American public that the companies have no intention of providing RU 486 to the American market.

Finally, regardless of the precise wording of the President's
January 22, 1993 memorandum, the expectation it created among the
pro-choice and women's groups is that the federal government will
do everything possible to get RU 486 introduced in this country.
Leaders of these groups will be concerned with Administration
action on health care reform and other issues, including the
choice to replace Justice Blackmun.  Saying "no" to a facially
reasonable offer by Roussel Uclaf weakens our political base and
may subject the President to criticism that he is not sticking to
his original position.

Given the expression of Presidential support for RU 486 in
January 1993, a "yes" adds marginal political cost (separate from
issues like health care reform).  For 1996 purposes, we probably
lose few friends and anger few voters not already positioned on
this or related issues.

A "yes", however, also means the Administration will have this
issue on its front burner for a significant period of time.
Anticipated floor amendments in Congress, rallying at HHS or
other government buildings by pro-life groups, and the
necessarily public process to secure licensees will provide ample
opportunity for Republicans and others opposed to the
Administration to focus attention on this decision and on its
aftermath.

Clinton Library Photocopy

LIST OF MEMBERS INTERESTED IN THE RU-486 ISSUE


HOUSE

Ron Wyden
Henry Waxman
Michael McNulty (D-NY)
Jim Bunning (R-KY)
Robert Dornan (R-CA)
Duncan Hunter (R-CA)


SENATE

Carol Moseley Braun (D-IL)
Paul Simon (D-IL)   (wrote on behalf of constituent)
John Breaux (D-LA)  (wrote on behalf of constituent)


BACKGROUND

For five years Wyden has been by far the most active and vocal
Member on RU-486.  He has held numerous hearings and cosponsored
a bill with Waxman in the last Congress to overturn the FDA
import ban.  Also in the last Congress, 6 Republicans (Dornan,
Dannemeyer, Lent, Bartlett, Bunning, and Hunter) cosponsored a
bill to prohibit federal funds from being used for clinical
studies of RU-486 as an abortifacient.  No one in the Senate is
consistently active on this issue.

Obviously, the womens' caucus will be interested in any actions
taken on Ru-486 as will the pro-life caucus (especially Hyde,
Helms, and C. Smith).  However, in the last four years the
Department has not received RU-486 letters from either group.

Very little mail has been received by the Clinton Administration
on RU-486.  A typical letter is the attached C. Moseley-Braun
letter inquiring as to the status of the President's Directives.

In the Bush Administration a typical letter is the attached
California delegation letter on RU-486 as an important option for
American women.  Also, letters often stressed the importance of
allowing research on RU-486 to go forward in areas of breast
cancer, glaucoma, Cushing's disease, etc.


Please let me know if I can get additional information for you.

Clinton Library Photocopy

## PRESS ISSUES DISCUSSION

If negotiations with the Population Council collapse, the Clinton Administration will be left with two possible courses of action. The following is an examination of the public relations ramifications of both choices:

**If the Administration decides to accept the gift of the patent from Roussel Uclaf**, for purposes of insulating the White House, it should be accepted by Secretary Donna Shalala at the direction of the President of the United States and on behalf of the women in America.  This could be done in a press conference on Friday, May 13, 1994, with up to four principals:  Secretary Shalala, Roussel Uclaf President, Population Council (if they would agree to run the clinical trials) and possibly Congressman Ron Wyden (who has been pushing this issue on Capitol Hill).

It would be made very clear that this step is the result of the process that was set in motion by President Clinton's memorandum of January 22, 1993, and that it is being taken because it was impossible for Roussel Uclaf to come to closure with a private sector entity.  Because a non-surgical (and sometimes safer) abortion alternative would thus be available to women in the United States (as it is to many women in Europe), accepting the patent gift should be touted as a reproductive rights victory for American women and another example of the Clinton Administration's commitment to deliver on its promises.  However, Secretary Shalala's remarks would be tempered by caution about the long and difficult road ahead and the potential roadblocks to bringing RU 486 to the marketplace.

While it should not be a part of the formal press conference, there should be a concerted effort on the part of the HHS Public Affairs team to place stories that outline the hurdles that must be overcome to shield the Administration against the fallout from our allies in the event efforts to get RU 486 to market become stalled in bureaucratic process, in Congress or for other reasons.

Because the Clinton Administration would actually be in possession of the RU 468 patent for a period of time while the licensing process moves foreward, during that time, the Administration may well be the focus of protest by conservative organizations that have become increasingly vocal and militant. These groups have suffered recent setbacks in court (e.g. a ruling that has imposed massive fines and barred them from physically blocking access to abortion facilities).  They would welcome an extremely high visibility focal point for their activities.  Protest marches in front of the White House and HHS are imaginable, and the conservative talkshow circuit would help to sustain the furor.  This could go on while other abortion-related issues are before Congress, including debate on the Health Security Act and the FY 1995 enactment of the Hyde

Clinton Library Photocopy

Amendment.  In the worst case, it could put the abortion issue
centerstage, with the Clinton Administration as a high-profile
player right up through the kick-off of the 1996 re-election
campaign.

It would also be necessary to recruit a cadre of lawmakers,
pro-choice and women's advocates willing and able to speak up for
the Administration over the course of this heated debate.  That
is critically important for holding our own on the conservative
talkshow circuit.

**If the Administration decides to reject the gift of the patent
from Roussel Uclaf,** news of that decision should be disclosed in
a press conference on Friday, May 13, 1994, by Secretary Shalala
and FDA Commissioner David Kessler.  It will be necessary to
construct a rationale for why that course of action is better
than the alternative one for American women.  The argument will
have to be that giving the patent to the United States government
does not speed the drug to the American marketplace.  In fact, it
does just the opposite.  Administrative regulatory process and
the potential for legislative stonewalling could be very time
consuming and could ultimately prevent the women in America from
gaining access to
RU 486.

We should also highlight in the Secretary's statement the
unprecedented nature of what Roussel Uclaf was attempting to
position the United States to do.  Never before has a patent been
accepted by the government.  The novelty of the situation makes
the issue potentially more likely to be tied up in litigation or
legislative maneuvering.  One of the speakers would provide
details of the formidable obstacles that may delay or even
prevent the United States from moving the drug onto the market.

If Roussel Uclaf is willing to grant the United States patent
rights for using RU 486 only for abortifacient and other
gynecological purposes, another potential argument we could
embrace is the position that we wanted more than the rights they
were willing to grant because our interest in this drug goes
beyond the issue of abortion, the need for which we are committed
to making as rare as possible.

We would stress that a private sector deal is the only viable
option for getting RU 486 quickly through clinical trials and
into the market place.  We should outline in detail all that the
Population Council did to try and close the deal during the 14-
month negotiations with Roussel Uclaf.  The message, either
implicitly or explicitly, is that Roussel Uclaf does not really
want to close a deal with an entity that clearly has the
potential to bring RU 486 to the marketplace because the company
fears pressure from American conservatives.

Our position should be publicly to challenge Roussel Uclaf to go back to the bargaining table with the Population Council or to open negotiations with another entity; to stop playing games; and to get serious about responding to the request that President Clinton made of them almost a year and a half ago.

Without a doubt, a "no" will subject the Administration to a firestorm of protest by pro-choice and women's groups; and there will be few natural political allies vocally defending this decision, particularly in light of the relative difficulty of explanation.

* * * * * * *

It should be noted that Roussel Uclaf has already begun, informally, to circulate word of its potential offer to the United States. Many representatives of the pro-choice community already know about the potential gift offer. We may be forced to confront a news account of the issue prior to the Congressional hearings on May 16, 1994. Such a story will, undoubtedly, be presented from the Roussel Uclaf perspective as opposed to the Administration's point of view.

THE WHITE HOUSE

WASHINGTON

January 22, 1993

MEMORANDUM FOR THE SECRETARY OF HEALTH AND HUMAN SERVICES

SUBJECT:          Importation of RU-486

In Import Alert 66-47, the Food and Drug Administration ("FDA") excluded the drug Mifepristine -- commonly known as RU-486 -- from the list of drugs that individuals can import into the United States for their "personal use," although the drugs have not yet been approved for distribution by the FDA. (See FDA Regulatory Procedures Manual, Chapter 9-71.) Import Alert 66-47 effectively bans the importation into this Nation of a drug that is used in other nations as a nonsurgical means of abortion.

I am informed that in excluding RU-486 from the personal use importation exemption, the FDA appears to have based its decision on factors other than an assessment of the possible health and safety risks of the drug. Accordingly, I hereby direct that you promptly instruct the FDA to determine whether there is sufficient evidence to warrant exclusion of RU-486 from the list of drugs that qualify for the personal use importation exemption. Furthermore, if the FDA concludes that RU-486 meets the criteria for the personal use importation exemption, I direct that you immediately take steps to rescind Import Alert 66-47.

In addition, I direct that you promptly assess initiatives by which the Department of Health and Human Services can promote the testing, licensing, and manufacturing in the United States of RU-486 or other antiprogestins.

You are hereby authorized and directed to publish this memorandum in the Federal Register.

William J Clinton

Clinton Library Photocopy

**ROUSSEL UCLAF**

Professeur Ussel-Günter Afting
Président du Directoire

Paris, May 9, 1994

Honorable Donna SHALALA
Secretary of Health and Human Services
Room 615 F
Hubert Humphrey Building
200 Independence Avenue SW
WASHINGTON, D.C. 20201
USA

Attention : Mr. Kevin THURM

Dear Secretary Shalala,

Following various meetings with your Staff and with FDA officers, the latest on May 6, 1994 with Dr. Kessler, we would like to confirm that we are ready to assign our US patent rights on RU 486 in accordance with the attached draft letter from us to the President of the United States of America.

This document is substantially similar to the draft that was given to Mr. Kevin Thurm, on April 29, 1994, by our counsel Lester Hyman, to allow a review of the situation by your Administration.

Of course we will continue to work with you and all relevant people in a constructive spirit and we look forward to meet you personally by the end of this week, as planned.

Sincerely,

Pr. E-G. AFTING
President & CEO

cc. Dr. KESSLER

33, Boulevard des Invalides 75325 Paris Cedex 07

**ROUSSEL UCLAF** ▲

DRAFT

Paris, May ..., 1994

Honorable William J. CLINTON
President of the United States
The White House
1600 Pennsylvania Avenue NW
WASHINGTON, D.C. 20500
USA

Attention : Ms. Nancy HERNREICH

Dear Mr. President,

You have requested that ROUSSEL UCLAF allow the RU 486 compound to be used in your country.

We have been working to react to that request in a responsible manner.

I now am pleased to inform you that we have decided to contribute mifepristone (RU 486) for abortifacient purposes (and other gynecological uses) to the people of the United States of America, completely free of charge, by voluntarily assigning our relevant patent rights to the US Government.

This an unconditional gift, we ask for nothing in return.

Sincerely,

Pr. F-G. AFTING
President & CEO

PROJET 80.05.04

**ROUSSEL UCLAF**
Société anonyme à Directoire et Conseil de Surveillance
au capital de 544.740.560 F.
Siège social : 35, Boulevard des Invalides 75007 PARIS
R.C.S. Paris B 542 068 681

Extrait du Projet de Procès-Verbal
de la séance du Conseil de Surveillance du 4 Mai 1994
à 17 h 30

**Présents**

Membres du Conseil de Surveillance :

Dr. H. SARIZ, Président,
Dr. M. FRUEHAUF, Vice-Président,
MM. P. BOISSON, C. de CROISSET, le Pr. J. DAUSSET, B. ESAMBERT,
le Pr. G. MILHAUD, H. MONOD, E. de ROYERE, le Dr. E.G. SEIFERT.

Sans voix délibérative :

Pr. R.G. APTING, Président du Directoire,
M. G. JACQUINSON, Directeur Général, Membre du Directoire,
M. D. CAMUS, Membre du Directoire,
M. B. WINICKI, Membre du Directoire.

M. J.F. CHAVANCE et Mme D. PIERRON, Délégués du Comité Central d'Entreprise.

M. F. DISCOURS, Secrétaire du Conseil.

**Absents excusés**

M. le Dr. G. METZ, Membre du Conseil de Surveillance,
M. J. MISCHE, Membre du Conseil de Surveillance,
MM. F. BRECHARD et D. GAILLET, Délégués du Comité Central d'Entreprise.

.../...

**PROJET 09.05.94**

2.


## MIFEPRISTONE - ÉTATS-UNIS

Le Docteur E. SAKIZ informe le Conseil de Surveillance que son assentiment est demandé sur les décisions que le Directoire va être amené à prendre à propos de la mifepristone aux États-Unis d'Amérique, compte tenu des exigences pressantes formulées au plus haut niveau par les autorités gouvernementales fédérales de ce pays.

Étant donné les caractères très particuliers du système médical des États-Unis par comparaison à celui des pays d'Europe où la mifepristone est actuellement utilisée, et considérant également le climat hautement conflictuel créé autour de ce produit aux États-Unis, la Directoire estime que ROUSSEL UCLAF ne saurait en aucune façon s'impliquer elle-même dans la production ou la diffusion de la mifepristone aux États-Unis.

Toutefois, prenant acte de la volonté du gouvernement américain de procurer aux citoyennes des États-Unis cette alternative médicale à l'interruption chirurgicale de la grossesse, le Directoire s'est résolu à offrir au gouvernement des États-Unis de lui céder, sans rémunération, les deux brevets référencés "U.S. Patents Nos. 4,386,085 et 4,447,424".

Au cas où ce gouvernement déclinerait cette offre pour lui-même tout en la jugeant recevable par une institution qu'il désignerait à cet effet, ROUSSEL UCLAF accepterait de poursuivre dans cette voie et de passer les accords nécessaires, à condition d'en être formellement requise par une lettre officielle, portant la signature du Président des États-Unis, et d'obtenir un certain nombre de garanties contractuelles.

Le Conseil de Surveillance prend acte de cette position qui n'appelle de sa part aucune objection, et manifeste ainsi au Directoire l'assentiment de principe sollicité.

..............................................................

Clinton Library Photocopy

[Translation of Fax from Dr. Sakiz to Mary Pendergast
of draft minutes of the Supervisory Board Meeting
of May 4, 1994]


## MIFEPRISTONE - UNITED STATES

Dr. E. SAKIZ informed the Supervisory Board ("Conseil de
Surveillance") that its assent is requested concerning decisions
that the Director ["le Directoire"] is being led to take a propos
mifepristone in the United States of America, taking account of
pressing exigencies formulated at the highest level by
authorities of the federal government of that nation.

Given the very particular characteristics of the U.S. medical
system, in comparison to that of the European countries where
mifepristone is currently used, and considering equally the
highly conflicted climate created around this product in the
U.S., the Director deems that ROUSSEL UCLAF would be in no way
implicated itself in the production or distribution of
mifepristone in the United States.

Nevertheless, considering the wish of the American government to
procure for U.S. citizens this medical alternative to the
surgical termination of pregnancy, the Director has resolved to
offer to cede to the government of the United States, without
remuneration, the two patents referred to as "U.S. Patents Nos.
4,386,085 and 4,447,424."

In the event that the government should decline this offer for
itself and at the same time judging it receivable by an
institution that it would designate to this end, ROUSSEL UCLAF
would accept this path and would adopt the necessary agreements,
on the condition of being formally required by an official
letter, bearing the signature of the President of the United
States, and of obtaining a certain number of contractual
guarantees.

The Supervisory Council acknowledged this position, which
generated no objections, and manifested to the Director its
assent to the principle being offered.


[translated by L. Bachorik, 5/10/94]

# **<u>Tab E</u>**

Clinton Library Photocopy

THE WHITE HOUSE

WASHINGTON

May 16, 1994

Dr. Edouard Sakiz
Chairman, Supervisory Board
Roussel Uclaf
35, boulevard des Invalides
75323 Paris Cedex 07
FRANCE

Dear Dr. Sakiz:

It is important for the health of women in the United States that
they have access to the widest possible range of safe and effective
medical treatments.  In support of that goal, in January 1993, I
asked the Secretary of Health and Human Services to promote the
testing and licensing of mifepristone (RU 486) and other
antiprogestins in the United States.

I understand that since at least that time, your company has been
in negotiations with The Population Council, Inc., a nonprofit
organization with whom you have had dealings on mifepristone since
early in the last decade.  Those discussions, I understand, have been
directed toward the purpose on which I charged the Secretary.  I am
grateful for the effort those negotiations represent.

In order to permit the appropriate testing, development, and
distribution of your product, I urge, at the conclusion of your
negotiations, that you bring your plans to fruition.  I understand
that your company will assign without remuneration your United States
patent rights on mifepristone to The Population Council, Inc. which
has been studying this product since 1982 and which would take all
necessary steps to file a new drug application with the Food and Drug
Administration, so that the agency can determine whether the drug is
safe and effective for use in the United States.

On behalf of the government of the United States and for the women in
America, I thank you for your work.

Sincerely,

Bill Clinton

# **Tab F**



Clinton Library Photocopy



Jeffrey M. Friedman
James R. (Ron) Weddington

Shari L. Nichols
Kirk W. Tate

Friedman & Weddington, Attorneys, L.L.P.

502 W. 13th Street
Austin, Texas 78701
(512) 477-9641
Fax: (512) 320-8312

January 6, 1992

Betsey Wright
Director for Public Outreach
Transition Team
P. O. Box 615
Little Rock, AR 72203

Dear Betsey,

    Enclosed is a "letter" to your boss, which I am going
to try to get published.  If I am unsuccessful, I may try to
raise the money to print it as an ad in The N. Y. Times and
other places.
    Sarah and I have been discussing the notion of our
setting up a non-profit corporation to license and
distribute R U 486.  Being non-profit would eliminate the
need for products liability insurance, which is a major
hang-up for a company thinking about marketing a new drug.
    It's possible that such an endeavor could be the
vehicle for a number of birth control efforts.  Something's
got to be done very quickly.  26 million food stamp
recipients is more than the economy can stand.
    Congratulations on your work for Clinton.  It's good to
see a UTYD doing good.  I hope the new President can find
the time to deal with the issues I raise in my letter.
Please give it to him if you get a chance.

                              Sincerely,

                              Ron

                              Ron Weddington

Clinton Library Photocopy



Jeffrey M. Friedman
James R. (Ron) Weddington

Shari L. Nichols
Kirk W. Tate

502 W. 13th Street
Austin, Texas 78701
(512) 477-9641
Fax: (512) 320-8312

Friedman & Weddington, Attorneys, L.L.P.

Dear President-To-Be Clinton,

Some years ago another Southern Governor, when asked about the possibilities for prison reform, supposedly said something to the effect of, "Well, I don't think we're going to get very far until we get a better class of prisoner."

Well, I don't think you are going to get very far in reforming the country until we have a better educated, healthier, wealthier population.

Face it, you know that anything that even resembles the programs of Democratic Presidents in the past is going to make you a one term President.  Reagan spent all our money on bombs and even if there were money for programs such as pre-natal health care, job training and day care centers it would be years before we would see any dramatic results. And, as anyone who follows education can see, more money doesn't necessarily translate into better educated kids.

But you can start immediately to eliminate the barely educated, unhealthy and poor segment of our country.  No, I'm not advocating some sort of mass extinction of these unfortunate people.  Crime, drugs and disease are already doing that.  The problem is that their numbers are not only replaced but increased by the birth of millions of babies to people who can't afford to have babies.

There, I've said it.  It's what we all know is true, but we only whisper it, because as liberals who believe in individual rights, we view any program which might treat the disadvantaged differently as discriminatory, mean-spirited and...well...so Republican.

Clinton Library Photocopy

2

In 1989, 27 percent of all births were to unmarried mothers, a huge percentage of whom were teenagers. If current trends continue, soon a majority of the babies born will be born into poverty and one half of the country cannot support the other half, no matter how good our intentions.

I am not proposing that you send federal agents armed with Depo-Provera dart guns to the ghetto. You should use persuasion rather than coercion. You and Hillary are a perfect example. Could either of you have gone to law school and achieved anything close to what you have if you had three or four or more children before you were 20? No! You waited until you were established and in your 30's to have one child. That is what sensible people do. For every Jesse Jackson who has fought his way out of the poverty of a large family there are millions mired in poverty, drugs and crime.

If Ronald Reagan could use the media to convince the American public that a trillion dollars of borrowed money needed to be spent to combat the "Evil Empire," then you ought to be able to persuade people to only have children when they are able to afford them. Point out that only people like George Bush who inherit money can pay for more than one or two kids in today's economy. (And even then, some of the kids grow up to do embarassing things like loot savings and loans.)

You made a good start when you appointed Dr. Elders, but she will need a lot of help. You will have to enlist the aid of sports and entertainment stars to counteract the propaganda spread by church officials seeking parishioners, generals seeking cannon fodder and businessmen seeking cheap labor that, throughout the ages, has convinced the poor that children are necessary to fulfillment as a person.

It wouldn't hurt to point out that while only 11.1 percent of three person families are below the poverty level, 20.2 percent of six person families and 28.6 percent of families of seven or more are poor. (1992 Statistical Abstract of the United States, p. 459)

Clinton Library Photocopy

3

And, having convinced the poor that they can't get out
of poverty when they have all those extra mouths to feed,
you will have to provide the means to prevent the extra
mouths, because abstinence doesn't work.  The religious
right has had 12 years to preach their message.  It's time
to officially recognize that people are going to have sex
and what we need to do as a nation is prevent as much
disease and as many poor babies as possible.

Condoms alone won't do it.  Depo-Provera, Norplant and
the new birth control injection being developed in India are
not a complete answer, although the savings that could be
effected by widespread government distribution and
encouragement of birth control would amount to billions of
dollars.

No, government is also going to have to provide
vasectomies, tubal ligations and abortions...RU 486 and
conventional abortions.  Even if we make birth control as
ubiquitous as sneakers and junk food, there will still be
unplanned pregnancies.  There have been about 30 million
abortions in this country since Roe v. Wade.  Think of all
the poverty, crime and misery ...and then add 30 million
unwanted babies to the scenario.  We lost a lot of ground
during the Reagan-Bush religious orgy.  We don't have a lot
of time left.

You could do it, Mr. President-To-Be.  You are
articulate and you've already alienated the religious right
with your positions on abortion and homosexuals.  The
middle-class taxpayer will go along with this plan because
it will mean fewer dollars for welfare.  The retirees will
also go along because because poor people contribute very
little to Social Security.

And the poor?  Well, maybe if we didn't have to spend
so much on problems like low birth weight babies and trying
to educate children who come to school hungry, we might have
some money to help lift the ones already born, out of their
plight.

Clinton Library Photocopy

4

The biblical exhortation to "Be fruitful and multiply," was directed toward a small tribe, surrounded by enemies. We are long past that.  Our survival depends upon our developing a population where everyone contributes.  We don't need more cannon fodder. We don't need more parishioners. We don't need more cheap labor.  We don't need more poor babies

Very truly yours,

*Ron Weddington*

P.S. I was co-counsel in Roe V. Wade, have sired zero children and one fetus, the abortion of which was recently recounted by my ex-wife in her book, A Question Of Choice. (Grosset/Putnam, 1992)  I had a vasectomy in 1969 and have never had one moment of regret.