```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF TEXAS
 2                         AMARILLO DIVISION

 3   ALLIANCE FOR HIPPOCRATIC        )
     MEDICINE, et al.,               )
 4           Plaintiffs,             )
                                     )
 5   VS.                             )   CAUSE NO. 2:22-CV-223-Z
                                     )
 6   U.S. FOOD AND DRUG              )
     ADMINISTRATION, et al.,         )
 7           Defendants.             )

 8

 9        ------------------------------------------------

10     HEARING ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
             BEFORE THE HONORABLE MATTHEW J. KACSMARYK,
11                  UNITED STATES DISTRICT JUDGE

12                       MARCH 15, 2023
                         AMARILLO, TEXAS
13        ------------------------------------------------

14

15

16

17

18

19

20

21

22

23   FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS
     AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
25   PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:
      ALLIANCE DEFENDING FREEDOM
 4    440 FIRST STREET NW
      SUITE 600
 5    WASHINGTON, DC 20001
      BY:  ERIK CHRISTOPHER BAPTIST
 6         ERIN MORROW HAWLEY

 7

 8    FOR THE DEFENDANTS:
      UNITED STATES DEPARTMENT OF JUSTICE
 9    CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
      1100 L STREET NW
10    WASHINGTON, DC 20005
      BY:  JULIE STRAUS HARRIS
11         DANIEL SCHWEI
           KATE TALMOR
12         CHRISTOPHER EISWERTH
           EMILY NESTLER
13

14

      FOR THE INTERVENOR DEFENDANT,
15    DANCO LABORATORIES LLC:
      HOGAN LOVELLS US LLP
16    555 13th STREET NW
      WASHINGTON, DC 20004
17    BY:  JESSICA LYNN ELLSWORTH
           CATHERINE EMILY STETSON
18

19

20

21                       *  *  *  *  *

22

23

24

25
```

1                                INDEX

2

3    PLAINTIFFS' ARGUMENT BY MS. HAWLEY.....................    8

4    PLAINTIFFS' ARGUMENT BY MR. BAPTIST...................   29

5    DEFENDANTS' ARGUMENT BY MS. STRAUS HARRIS.............   61

6    DEFENDANTS' ARGUMENT BY MR. SCHWEI...................   91

7    INTERVENOR DEFENDANT'S ARGUMENT BY MS. ELLSWORTH.......  118

8    PLAINTIFF'S REBUTTAL ARGUMENT BY MS. HAWLEY...........  137

9    PLAINTIFFS' REBUTTAL ARGUMENT BY MR. BAPTIST..........  144

10

11

12

13

14

15

16                          * * * * *

17

18

19

20

21

22

23

24

25

```
 1                       P R O C E E D I N G S
 2              THE COURT:  The Court calls Civil Action
 3    Number 2:22-CV-223-Z, Alliance for Hippocratic Medicine,
 4    et al. vs. United States Food and Drug Administration, et al.,
 5    for a hearing on the pending motion for preliminary injunction.
 6                  Are the parties ready to proceed?
 7              MS. HAWLEY:  Yes, Your Honor.
 8              THE COURT:  And if counsel for plaintiffs will
 9    announce your team for the record and the attorneys who will be
10    presenting argument.
11              MS. HAWLEY:  Yes, Your Honor.  I'm Erin Morrow
12    Hawley, and this is my colleague Erik Baptist, and we will
13    present for plaintiffs.
14              THE COURT:  And if counsel for defendants will
15    identify the counsel presenting argument to this Court.
16              MS. STRAUS HARRIS:  Yes, Your Honor.  Julie Straus
17    Harris with the U.S. Department of Justice for the
18    United States.  My colleague--
19              MR. SCHWEI:  Daniel Schwei, Your Honor, also from
20    the Department of Justice, on behalf of the United States.  And
21    the two of us will be doing the argument.
22                  We have some other colleagues here in the courtroom
23    with us: Chris Eiswerth, Emily Nestler, and Kate Talmor.  Just
24    noting their presence as well.
25                  THE COURT:  Okay.  Thank you for that
```

1    clarification.

2            And now counsel for defendant intervenor, if you'll

3    represent your client and the attorneys presenting argument.

4            MS. ELLSWORTH:  Certainly.  Good morning, Your

5    Honor.  Jessica Ellsworth on behalf of Intervenor Danco

6    Laboratories.  I will be the only person presenting argument.

7    My colleague, Kate Stetson, is here with me at counsel table.

8            THE COURT:  Okay.  Thank you for that

9    clarification.

10           The Court is holding this hearing pursuant to the

11   Northern District of Texas rules for live hearings during the

12   COVID-19 coronavirus pandemic.  Pursuant to the Twelfth Amended

13   Special Order Number 13-9 signed by Chief Judge Godbey on

14   March 9, 2023, this Court concludes and does hereby find that

15   this hearing may be conducted in person without seriously

16   jeopardizing public health and safety and cannot be further

17   delayed without serious harm to the interests of justice.

18           This Court is open to the public, both here in the

19   Amarillo Division and in an additional courtroom in the Earle

20   Cabell Federal Building in Dallas, Texas, which is securely

21   streaming the audio from this hearing.

22           Additionally, consistent with standard operating

23   procedure for the Northern District of Texas, the Court

24   reserved half of the gallery space for members of the media,

25   half for the general public.

1          Also consistent with standard operating procedure

2     for this Northern District of Texas, any disrupters will be

3     immediately escorted from the courtroom by the United States

4     Marshal's Service or Court Security Officers.  In this regard,

5     this hearing in this civil case does differ from a criminal

6     case, where disruptive defendants are typically entitled to a

7     warning for Sixth Amendment and Rule 43 reasons.  Here today,

8     disrupters will be immediately removed without warning or court

9     intervention, and counsel need not await the Court's

10    instruction on disrupters.

11         So before we begin, some brief housekeeping rules

12    that we discussed during the status conference.

13         Because the hearing is simulcast, I'll instruct

14    counsel to speak clearly into the microphone at the lectern.

15    That will facilitate a better simulcast for anybody dialing

16    into the Dallas Division.  I'll ask that you do stand at your

17    feet when addressing the Court from counsel table, and you may

18    proceed from there in exchanging counsel for turns at the

19    podium.

20         Water is allowed, but nothing else.  And regarding

21    courtroom technology, counsel, paralegals, and support staff

22    may use their laptops and courtroom technology during court

23    proceedings.  And we do have IT support from the Dallas

24    Division and the Lubbock Division present if there are any IT

25    issues.  So you may request that IT support from the Court.

1              Now, today's hearing will concern plaintiffs'

2     pending motion for preliminary injunction--that document is set

3     forth in ECF Number 6--and any issues raised by that motion.

4     As we discussed at the status conference and in the order

5     scheduling the hearing, the plaintiffs and defendants will each

6     be afforded two hours to present their arguments.  This time

7     will include answers to any questions from the Court.  And my

8     clerks will keep time, along with the courtroom deputy.  If you

9     ever need a time check, you may request it from the Court.

10             Plaintiffs and defendants shall determine how their

11    time will be allocated among each individual party and each

12    attorney, and plaintiffs may reserve time for rebuttal.

13             So at this time, plaintiffs may proceed.  And if

14    you could advise the Court of any rebuttal time you are

15    reserving.

16             MS. HAWLEY:  Your Honor, and may it please the

17    Court.  My name is Erin Hawley, and with my co-counsel, Erik

18    Baptist, we represent the plaintiffs.  We would like to reserve

19    30 minutes for rebuttal.

20             THE COURT:  And do you want a time warning on this

21    portion of your argument?

22             MS. HAWLEY:  Yes, Your Honor.  At ten minutes, if

23    possible.  I'll have--we're splitting equally, so I'll have

24    45 minutes.

25             THE COURT:  Okay.  You may proceed.

1          MS. HAWLEY:  My colleague-- As I mentioned, we're

2   dividing our argument, and my colleague is going to discuss the

3   harms of mifepristone to women, why the FDA should never have

4   granted approval of this dangerous drug, and why this Court

5   should grant relief.

6          I will discuss why the doctors who have to deal

7   with all of this fallout have standing to be here, why their

8   claims are properly presented, and the Comstock Act.

9          So to begin with standing, plaintiffs possess it in

10  at least three ways.  They meet every requirement for

11  associational, organizational, and third-party standing.

12          To start with associational standing, defendants do

13  not contest that the plaintiff associations' interests are

14  germane.  Instead, they say that the individual doctors, the

15  doctor members, do not have standing.  This is incorrect for

16  two reasons.

17          First, the declarations clearly show that the

18  doctors have already suffered concrete harm.  This is

19  sufficient under *Lujan* and a slew of other cases.  If we look

20  at the declarations, Dr. Francis, Dr. Skop, and Dr. Jester all

21  allege that they treated women who were presenting emergency

22  medical situations and were required to perform either a D&C

23  abortion or a suction aspiration in order to complete that

24  abortion.  These are concrete constitutional harms.

25          In addition, there are other examples.  Dr. Francis

1    notes two instances in which she, and another instance in which

2    a colleague, had to call additional doctors to cover their

3    regular plaintiffs--one plaintiff was critically ill--due to

4    the extra time and risk associated with treating women who have

5    been seriously harmed by mifepristone.

6         In addition, this severely impacts the ability of

7    doctors to practice medicine according to their medical oaths.

8    It's risky, as the declarations say, both more risky to the

9    doctors, as well as the patients.  It's more time-consuming.

10   It consumes an enormous amount of resources, including blood

11   transfusions and the like, and comes with an onerous adverse

12   reporting system.

13        The Supreme Court, in *Spokeo* and *TransUnion*, has

14   noted that even emotional harm can suffice for Article III

15   injury.  That is unquestionably the case here, where we have a

16   constitutional injury.  And what the FDA has done, in illegally

17   approving and then continually deregulating mifepristone, has

18   resulted in doctors being forced, contrary to their most

19   deeply-held ethical, medical, and religious convictions, to

20   participate and finish elective abortions.

21        Defendants also argue that--and they point to

22   *Clapper* and they say, well, any--you know, any future harm is

23   merely speculative.  That's dead wrong for two reasons.

24        First, *Clapper* did not involve any past harm.  No

25   one had spied on the plaintiffs in this case.  Here, we have

1    testimony after testimony from doctors who have already been

2    harmed by the FDA's approval and deregulation of mifepristone.

3              In addition, the fact that a third party might be

4    involved is no barrier to Supreme Court review--or, excuse me,

5    to federal court review when, in fact, that harm is imminent

6    and concrete.  We can take several cases to look at this.  In

7    the case *Texas vs. Becerra* just down the road, the plaintiffs

8    presented the very same case involving third-party decisions to

9    obtain an abortion.  And in that case, the district court found

10   harm.

11             Similarly, we can analogize to the abortion

12   decisions from *June Medical*, to any of those cases in which

13   plaintiff abortion providers were claiming standing based on

14   third-party decisions that would be made by women in seeking an

15   abortion.  Third-party actions are not a barrier when the

16   action of the defendant here is still fairly traceable.  Again,

17   we're not talking about a proximate causation standard, but

18   merely that it be fairly traceable.

19             In addition, with respect to future harm, Your

20   Honor, past really is prologue, and I think that that will even

21   be seen with greater harm to plaintiffs here.  If we look at

22   the FDA's own numbers, the FDA's petition that approves the

23   mifepristone at 2011--in 2011--and this is page ID 607--says

24   that between 5 to 8 percent of women--so that's 5 to 8 of every

25   100 women--will need a surgical abortion in order to complete

1    the chemical abortion by mifepristone.

2             This means that thousands of women will present to

3    the doctors in these emergency rooms.  There's no question.  We

4    know that, today, more than half of abortions take place by

5    chemical abortion.  These patients will end up with serious

6    adverse consequences in the care of plaintiff doctors and their

7    associations in this case.

8             To speak just a bit about organizational standing,

9    organizational standing exists where the organizations

10   themselves suffer harm.  Under Fifth Circuit cases like *OCA*,

11   this case really is on all fours.  Plaintiffs here can show an

12   organizational injury by alleging the diversion of resources,

13   which it has done, from its usual activities in order to lessen

14   the impacts of the challenged restrictions.

15             THE COURT:  Let's discuss that Fifth Circuit

16   precedent now.  So must plaintiffs identify specific projects,

17   which is the terminology the Fifth Circuit uses in that line of

18   cases, from which they have diverted resources to assert

19   standing under that precedent?

20             MS. HAWLEY:  Absolutely not, Your Honor.  I

21   acknowledge that there's some language in *City of Kyle* that the

22   defendant seized upon, but the Fifth Circuit's decision in *OCA*

23   specifically rejects that argument.  It says that the language

24   in *City of Kyle* was not meant to heighten any requirement under

25   *Lujan*, but merely to say that specific projects is, quote, one

1    example of a way in which harm may be shown.

2              So the harm here is the diversion of resources.  If

3    we look again at the declarations, we have all sorts of

4    resource diversion.  We have the efforts to educate member

5    doctors, patients that these member doctors see, as well as a

6    92-page petition, a 30-page response, in which Donna Harrison

7    was--petitioned the FDA, and as she puts it, sort of mildly,

8    that involved considerable effort.

9              THE COURT:  So let's camp out on that Fifth Circuit

10   jurisprudence for a while and what types of specific projects

11   qualify for that diverted resource analysis.

12             So I cannot ascertain from that Fifth Circuit case

13   law that my circuit or the Supreme Court has addressed citizen

14   petitions and whether that constitutes nonlitigation-related

15   expenses.

16             MS. HAWLEY:  Yes, sir.

17             THE COURT:  So can you argue for a different rule

18   when it comes to citizen petitions versus complaints and the

19   filings that you typically see in litigation?  Are citizen

20   petitions different for purposes of applying that Fifth Circuit

21   precedent on standing?

22             MS. HAWLEY:  So I think two responses, Your Honor.

23   First, we don't need the citizen petition.  As in the *OCA* case,

24   the diversion of resources to educate and to make sure the

25   mission is more successful, despite the defendants' actions, is

 1    itself enough harm.

 2          I do think, however, that citizens petitions are

 3    different from litigation expenses, which we acknowledge are

 4    not covered as a diverted harm.  And the reason I think they

 5    are different is because, if you look at the FDA's regulation,

 6    21 CFR 10.45(b) and (c), those regulations require plaintiffs

 7    to file a petition if they want to contest the FDA's

 8    determination.  This is the only way doctors have to tell the

 9    FDA they got it wrong.

10          THE COURT:  Okay.  I have your argument on that.

11    You may continue with any points you want to make on standing

12    to sue.

13          MS. HAWLEY:  In addition, Your Honor, I would just

14    like to remark that defendants note that the associations here

15    may not have organizational standing because they are pro-life

16    groups.  But that would really read the mission out of

17    missional standing.  Every voting organization in these cases--

18    there's *OCA*, there's *La Union*, there's *Texas State,* and each of

19    these organizations possessed an interest in voting rights and,

20    yet, were able to challenge, because of the harm to the

21    organizational mission, the regulations involving voting.  So

22    we think organizational standing is met.

23          Just a word on third-party standing.  That doctrine

24    is prudential, as Your Honor knows.  Here, we think it's

25    clearly met.  The Supreme Court, in *June Medical*, said that

1    courts have long permitted abortion providers to invoke the

2    rights of their actual or potential patients in challenges to

3    abortion-related regulations.  It, quite frankly, would be

4    passing strange to suggest that abortion providers have

5    standing but the doctors in this case do not.  They possess at

6    least as close of a personal relationship, and patients here

7    suffering from a mifepristone severe adverse consequence have

8    at least as much of a hindrance to sue.  So we would submit

9    that third-party standing applies as well.

10             THE COURT:  So you wouldn't take Justice Alito's

11   dissent to presage or preview an exception for the goose but

12   not the gander?

13             MS. HAWLEY:  Absolutely not.

14             THE COURT:  Okay.

15             MS. HAWLEY:  In regard to zone of interest, Your

16   Honor, the zone of interest test is not demanding.  The benefit

17   of the doubt goes to the plaintiff, such that a suit is

18   foreclosed--and I'm quoting from the Supreme Court's decision

19   in *Lexmark*--only when a plaintiff's interests are so marginally

20   related to or inconsistent with the purposes implicit in the

21   statute.  And this lenient review is required, the Supreme

22   Court has said, because of the presumption of reviewability of

23   administrative action, something that implicates separation of

24   powers concerns as well.

25             Here, these plaintiffs are clearly within the

1  FDA's--FDCA's, excuse me, zone of interest.  The FDCA directs

2  the FDA to make sure that drugs are, quote, safe.

3          When we're talking about the REMS provision of the

4  FDCA, what those provisions direct the FDA to do is to assess

5  drugs that are found to be effective but are unsafe unless they

6  come with restrictions on their use and distribution.  So

7  again, the REMS provisions in particular say not only safe, but

8  if they're not safe generally, then the FDCA needs to apply

9  restrictions on those use.

10          Here, the doctors who treat adverse events--

11  Again, 5 to 8 percent of every woman who has a mifepristone

12  abortion will end up with surgery, according to the FDA's own

13  numbers.  Those doctors who treat the fallout from that

14  absolutely have standing.

15          To take just one case example, in *Bennett vs.*

16  *Spear*, the Supreme Court found that ranchers and irrigation

17  districts had standing to challenge an administrative decision

18  under the Endangered Species Act, even though the Endangered

19  Species Act primary purpose was to protect endangered animals,

20  not ranchers or other landowners.

21          If there are no further questions on standing or

22  zone of interest, I can move to reopener.

23          THE COURT:  Okay.  Please do so at this time.  And

24  are different attorneys taking that portion of the argument?

25          MS. HAWLEY:  No, Your Honor.

1          THE COURT:  Okay.  You may proceed.

2          MS. HAWLEY:  With respect to reopening, the

3    reopening doctrine really exists for situations just like this.

4    It exists to prevent agency gamesmanship.  And if you look at

5    the timeline of this case, you see why the reopening doctrine

6    is a really good idea.  In 2002--or, excuse me, in 2000, the

7    FDA, we submit, illegally approved mifepristone.  In 2002, two

8    years later and well within the statute of limitations, they

9    filed--the plaintiffs here filed a citizen petition.

10         Then we wait and wait and wait until 2016, fourteen

11   years later, before the FDA responds to that citizen petition.

12   When they respond and have a blanket denial of the citizen

13   petition, what they do on the very same day is issue their 2016

14   major changes, getting rid of nearly every safeguard the FDA

15   initially placed on the safe use and distribution of

16   mifepristone.

17         Now, what this means, Your Honor, is that the FDA

18   regulations, again pointing you to 10 CFR--or, excuse me,

19   21 CFR 10.45(b) and (c), those regulations require a plaintiff

20   to file a citizen petition--as the FDA acknowledges on page 17

21   of its brief, they are required to file a citizen petition, and

22   that action is not final until the FDA responds.  And it has

23   all the time in the world under its own procedural rules.  So

24   the action on the 2016 major changes was not final until the

25   citizens petition was filed in 2019 and until the agency acted

1    on it in December of 2021.

2         So what the major questions doctrine does--  In a

3    series of cases, from *National Biodiesel vs. EPA* to

4    *Sierra Club vs. EPA*, you see cases that say time starts anew.

5    The statute of limitations clock starts afresh when an agency

6    takes an action, either explicitly or implicitly, that

7    reexamines its former choice.

8         So, here, I think one case that's particularly

9    instructive is *Sierra Club vs. EPA.*  And in *Sierra Club vs.*

10   *EPA,* what happened was the agency approved a rule in 1994.

11   Then, not unlike this case, it changed that rule in 2006 and it

12   took away the major safeguards, the necessary safeguards the

13   Court had said that were inextricably tied to the initial

14   decision in two thousand--excuse me--in 1994.  And because of

15   that, because these necessary safeguards were taken out of the

16   initial action in 1994, the D.C. Circuit said that reopens the

17   initial decision and starts the statute of limitations anew.

18        THE COURT:  So let's apply that *Sierra Club* case to

19   the facts here.  I know this has been briefed by both parties.

20   Do I take your argument to be this, that the FDA reopened the

21   2000 approval when it conducted a full review of the

22   mifepristone REMS program in 2021 and decided to remove that

23   in-person dispensing requirement?  That is something that was

24   deemed an element to assure safe use.  ETASU is the

25   abbreviation that shows up in the briefing.  Is that the

```
 1    reopening event the Court should focus on?
 2              MS. HAWLEY:  So I think there's two reopening
 3    events, Your Honor.  And I agree completely the 2021 event does
 4    reopen, because, as you said, it was a review of the entire
 5    proceeding, and it stripped away, in Sierra Club's words, one
 6    of the necessary safeguards.  An in-person visit was absolutely
 7    found to be a safeguard in 2000, because this gives an
 8    attending physician the ability to diagnose ectopic
 9    pregnancies, to gather information on gestational age or other
10    contraindications.  So a crucial safeguard was stripped away.
11              In addition, Your Honor, we also identify the 2016
12    major changes as being an agency action that triggers the
13    reopening doctrine.  The agency itself categorized those
14    changes as major.  And if you look at them, it took the
15    in-person visits from three to one.  It got rid of the
16    requirement that only physicians could dispense.  It said
17    nondoctors were also allowed to do so.  It increased the age
18    from seven to ten weeks at which mifepristone can be taken, the
19    gestational age.  And it removed adverse reporting requirements
20    unless death resulted.  It also changed the timing and the
21    dosage and the administration.  So it's hard to imagine, you
22    know, really, what is left, except that one in-person visit,
23    from 2016.  So we submit that's also a reopening event.
24              And how the timeline works, Your Honor, we think,
25    is that it's reopened in 2016, but then because of the FDA
```

 1   rules, that reopening was not final until December of '21.  So

 2   the statute of limitations does not actually begin to run until

 3   that time period.

 4            THE COURT:  Okay.  I understand that argument.

 5            Let's turn to agency decision-making and the

 6   multiple references in both briefs to various studies; which

 7   elements to assure safe use were dropped, which conditions

 8   appeared and then disappeared as you move from the 2000

 9   approval to the 2016 major changes to the '21 decision that is

10   a triggering event for a reopening analysis.

11            It appears that there is a matching theme, this

12   concept of clinical studies matching the elements and that

13   being a recurring problem as you're moving through that

14   chronology over two decades.  Specific to the FFDCA, does

15   Section 355(d) require that FDA's post-approval restrictions

16   match the clinical safety conditions and protocols in the

17   studies that FDA relied upon in its approval?

18            And here, because we're discussing those two data

19   points, the 2000 approval and the 2016 major changes, is that a

20   linchpin of your argument, that 355(d) requires that those

21   clinical conditions, which are cited in the studies relied upon

22   by the FDA, must then match the elements for safe use and any

23   other conditions that are imposed?  Must we have a one-to-one

24   matching, or is there any flex in the joints for purposes of

25   agency decision-making?

1    MS. HAWLEY:  Absolutely, Your Honor.  Our position

2  is that the FDA was required to follow the congressional

3  mandates.

4    Now, my colleague, Erik Baptist, is going to

5  discuss the merits.  Would you prefer for us to switch?  I'm

6  also ready to discuss *Heckler* or Comstock, if you would like to

7  do those first.

8    THE COURT:  Okay.  So let's reserve time for

9  Mr. Baptist to ask what I've deemed a study-match problem

10  that's been raised by the plaintiffs.  I'll put a pin in that,

11  allow Mr. Baptist to continue during his portion.  But you may

12  move on to the Comstock Act and the arguments relevant to that.

13    MS. HAWLEY:  Absolutely, Your Honor.

14    So one argument raised in response to the Comstock

15  Act is that this claim is unexhausted.  But as Your Honor

16  knows, there are a number of exceptions to the exhaustion

17  doctrine, and we submit that at least three apply here.

18    First of all, it would have been entirely futile

19  for the plaintiffs here to raise Comstock.  If you look at

20  page ID 2266--that is the FDA's December 2022 memorandum--it

21  specifically mentions this case by name.  It adopts the OLC's

22  interpretation of the Comstock memorandum--or Comstock law,

23  excuse me, as, quote, controlling advice.  And it notes that,

24  even if the FDA would have considered the Comstock Act, it

25  would not have changed its regulatory decision-making one iota.

1    So under the futility test, it is hard to imagine the agency

2    being any more clear that it would have been absolutely futile

3    to raise Comstock.

4              In addition, another futility--or, excuse me,

5    another exhaustion exception comes into play when the agency

6    action is patently unlawful.  The agency has no discretion

7    simply to ignore the law.  The Comstock Act plainly prohibits

8    the mailing of drugs that are designed, manufactured, or

9    intended for use as abortions.  We submit that plainly applies

10   to the FDA's actions here.

11             If you look at the 2000 approval, the Danco

12   distribution plan includes shipping.  It talks about packages.

13   It includes the idea that these will be shipped, in direct

14   contravention to the Comstock laws.  In addition, if you look

15   at the 2021 petition, that clearly strips away any of the

16   in-person requirements and expressly authorizes mail-order

17   abortions, really.  It dispenses with the in-person dispensing

18   requirement, allowing and directing that those drugs be mailed

19   vis-a-vis the U.S. Postal Service and other common carriers,

20   thereby patently violating the Comstock Act.

21             In addition, Your Honor, there are exceptions to

22   the exhaustion requirement when the interests of justice

23   require.  We submit here that the FDA's practice of delaying

24   and then mooting out claims filed by citizens petitions is

25   another reason that any of its claims, including its Comstock

1    Act claim, are unexhausted.  The 2000 petition, we submit, is

2    open for this reason, in addition to the Comstock Act claim,

3    because here, you've got undue delay, the fourteen years where

4    the petitioners simply had to sit on their petition, waiting

5    and hoping that the FDA would, at some point, act.

6            And if you look at Federal Practice and Procedures

7    Section 8363, in that section, the authors write that

8    irreparable injury can be harm due to delay, which can, itself,

9    be an equitable exception.

10           So we think that there are at least three

11   exceptions to futility for the Comstock Act.  We think a number

12   of those exceptions also would apply to defendants' other

13   exhaustion arguments vis-a-vis the other specific claims.

14           As to the merits on Comstock, Your Honor had asked

15   whether the OLC's memorandum was specifically clear.

16           THE COURT:  Well, and here, I want to make sure for

17   record purposes--because Department of Justice attorneys

18   reference OLC memoranda all the time.  I want to make sure that

19   we have identified for the record the memo that is referenced

20   here.

21           So this is the memorandum dated December 23rd,

22   2022, Application of the Comstock Act to the Mailing of

23   Prescription Drugs That Can Be Used for Abortion.  It is styled

24   as a Memorandum Opinion for the General Counsel, United States

25   Postal Service, and it is signed by the Assistant Attorney

1    General in the Office of Legal Counsel.

2              So this is what we're referring to as the OLC memo.

3              MS. HAWLEY:  Yes, Your Honor.  Thank you.

4              THE COURT:  Okay.  All right.  You may proceed.

5              MS. HAWLEY:  So the OLC memo itself is a broad

6    application.  It is applied to the U.S. mails because the

7    request for legal advice was made by the United States Postal

8    Service.  But the memorandum itself is a broad application that

9    would apply both to Section 1461 and 1462 in its legal

10   reasoning.

11             In addition, the memo is quite broad in trying to

12   absolve any person from shipping abortion drugs, even contrary

13   to state law.  The memorandum's conclusion is that there is no

14   liability under the Comstock laws where the sender, quote,

15   lacks the intent that the recipient of the drugs will use them

16   unlawfully.

17             So we think that that memorandum is sufficiently

18   clear to trigger futility.  It is unquestionably clear to

19   trigger futility when you couple it with the FDA's own December

20   2022 memorandum, again, at page ID 2266 of the FDA's own

21   attachment.

22             And on the merits of Comstock, you know, what is

23   the OLC's rationale for really rewriting the Comstock law?

24   Section 1461 of the Comstock law prohibits the, quote, knowing

25   mailing of any article, quote, designed, adapted, or intended

 1    for producing abortion.

 2              OLC says, you know, we're going to supplement that

 3    knowing requirement with actually an intent, that you know that

 4    the person will use it for unlawful activity.

 5              But there are a number of reasons this fails.

 6    First, congressional text.  Second, what OLC relies on here is

 7    really congressional acquiescence based on a smattering of

 8    Federal Court of Appeals decisions, I think four Federal Courts

 9    of Appeals.  Acquiescence is always a tough sale, as this Honor

10    knows, but especially here where it involves a minority of

11    circuits.

12              In addition, only one of the cases cited by the OLC

13    memorandum involves abortion at all.  The others involve

14    contraceptives.  And that case, *Bours vs. United States,*

15    recognizes a, quote, national policy of discountenancing

16    abortion as inimical to national life.

17              So it's hard to find in those cases any sort of

18    uniform national federal court policy that would be able to

19    override clear congressional text.

20              THE COURT:  So you would agree with the amicus

21    brief of the Ethics and Public Policy Center that there is no

22    emergent consensus supporting OLC's position?

23              MS. HAWLEY:  Absolutely, Your Honor.  And I think

24    the final nail in that--and not to put too fine of a point on

25    it, but Congress rejected this very limitation in 1972.  So the

1    idea that we can rely on congressional acquiescence when

2    Congress itself rejected this, I think, does not fit within the

3    acquiescence doctrine.

4              THE COURT:  Okay.  And in *Brown vs. Gardner*, the

5    Court explained, when dealing with acquiescence arguments,

6    reenactment, ratification style arguments, that you can't

7    invoke those doctrines where the law is plain and subsequent

8    reenactment does not constitute an adoption of a previous

9    administrative construction.

10             Are we far afield of those reenactment arguments

11   where the construction of the Comstock Act remains disputed and

12   there just is no emergent consensus among the circuits?

13             MS. HAWLEY:  I think that's correct.  And I think

14   what those cases you cited, as well as the *SWANCC* decision,

15   would suggest is that when you have clear text, congressional

16   acquiescence really can't get around that at all.  But it

17   certainly can't get around it in cases where you only have four

18   circuits making decisions that might impact or--under the

19   Comstock laws but certainly have nothing approaching a uniform

20   federal court rationale for narrowing the Comstock law,

21   contrary to its very text.

22             THE COURT:  Okay.  And you believe, under Supreme

23   Court precedent and circuit precedent, this question of

24   Comstock Act construction has been raised with sufficient

25   clarity so that this Court can decide based on plain text and

1    tools of textualism and typical canons of construction, like,

2    this has been raised with clarity; it's been percolating

3    through the circuits; and this is an exception to any

4    reenactment acquiescence doctrines that would give additional

5    weight to that OLC memo?

6              MS. HAWLEY:  Absolutely, Your Honor.  This is

7    really bread-and-butter statutory interpretation.  Your Honor

8    has the OLC memorandum.  Your Honor obviously has the text of

9    Section 1461 and Section 1462, and I agree that it's properly

10   presented.

11             THE COURT:  What do you perceive to be the

12   defendants' best argument for ratification, and how would you

13   respond?

14             MS. HAWLEY:  Again, I think ratification is a

15   really hard sale.  I think the only thing OLC has to argue on

16   and rely on here, and what defendants rely on as well, is these

17   lower court decisions.  But the lower court decisions I think

18   would be a slim read.  Even if they said what OLC says they

19   say, I don't think it's enough.  OLC cites Justice Scalia's

20   book, but, of course, later on, Justice Scalia talks about a

21   minority of circuits and that not being sufficient.

22             In addition, I think you would have a really

23   difficult time finding ratification when we have a House

24   committee report that specifically recommends the change that

25   the OLC memorandum says happened by ratification and, yet,

1    that's defeated in Congress.  If Congress had actually intended

2    to change the language through the sort of implicit sort of

3    ratification, then surely it would have done that formally when

4    asked to do so in 1972.

5              THE COURT:  Okay.  And so back to your argument on

6    important public policy and exceptions that apply where

7    important public policies are implicated.  In addition to the

8    arguments of the plaintiffs in this case, we have 22 states

9    joining as amici, arguing that FDA's action is a harm to the

10   public interest and it does undermine their ability, as

11   sovereign states, to enforce their own laws regulating abortion

12   in the post-*Dobbs* era.  So this is an intervening event that

13   has sort of changed the field of federal-state relations

14   vis-a-vis regulation of abortion.

15             Is your case to this Court that the public policy

16   arguments on reviewability and exhaustion are supported by that

17   briefing, and how would you pair your arguments against

18   ratification, against exhaustion to those 22 states and how

19   should the Court give weight to those 22 states who have filed

20   briefs in this case?

21             MS. HAWLEY:  Absolutely, Your Honor.  I think there

22   are a couple of things going on here.  One, if, you know, the

23   OLC memorandum is correct, you really are seeing a sea change

24   in federal-state relations.  The *Dobbs* decision said that it

25   left to the people, the elected representatives the power to

1     protect life.  The OLC memorandum says that unless a shipper

2     knows that it's going to be intended for an unlawful purpose--

3     which it can't know, the OLC memo says, because there's

4     different ways--  Mifepristone can be used for treating a

5     miscarriage, for example.  So it's virtually unknowable, so it

6     strips Comstock entirely of any effect.

7             I think this is an affront not only to

8     congressional texts and enactments and a separation of powers

9     sort of analysis, but, as well, it's an affront to the states

10    in being denied the ability to exercise their traditional state

11    powers to protect the health and welfare of women and children

12    within their boundaries.

13            And I think the way this relates to the exhaustion

14    arguments is a couple of fold.  First, I think that it's

15    absolutely clear, given the FDA's memo, the 2022 memo, that it

16    would have been futile to raise Comstock.  The FDA says it

17    wouldn't have changed its mind at all.

18            Second, I think it's patently--that Comstock Acts

19    patently apply, that there's no provision that gives the FDA

20    the power to ignore federal law.

21            And, third, there is this irreparable injury

22    exception, which I think you can talk about in terms of

23    federal-state relations, you can talk about federalism and the

24    need for clarity when a federal agency is changing that

25    dynamic.

1          In addition, Your Honor, I think the delay here
2    really does come into play.  Again, if you look at Federal
3    Practice and Procedure 8363, what that says is that an agency's
4    delay--and here, the FDA's own regulations require a citizen to
5    file; then require them to wait fourteen years before an action
6    is even final; and then, on that same day, they moot out the
7    challenge.  So I think that, itself, would be an exhaustion
8    exception for Comstock, as well as our other claims.
9          THE COURT:  Okay.  Thank you, Counselor.  I have
10   your argument.
11         At this time, I'll direct Mr. Baptist to begin his
12   portion of plaintiffs' argument to the Court.  Mr. Baptist, you
13   may proceed.
14         MR. BAPTIST:  May it please the Court.  Your Honor,
15   my name is Erik Baptist with Alliance Defending Freedom on
16   behalf of plaintiffs.
17         Now that my colleague has discussed the procedural
18   questions of this case, I'm going to proceed to the merits of
19   plaintiffs' motion for preliminary injunction.  I'll start off
20   talking about the merits, the substantial likelihood of success
21   on the merits; then proceed to the final two factors under
22   preliminary injunction: irreparable harm and public interest.
23   And then finally, if the Court were inclined to grant
24   plaintiffs' motion for preliminary injunction, I will discuss
25   the remedies available to the Court.

1          I want to jump right in and go--answer your

2    question that you asked Ms. Hawley.  Yes, that is our--exactly

3    our position under 21 U.S.C. Section 355(d).  The FDA had a

4    requirement to study and evaluate the safety of mifepristone

5    under the labeled conditions of use, or, as Congress wrote,

6    under the conditions prescribed in the proposed labeling.

7          That--complying with the requirements from Congress

8    is not a matter of agency deference.  There is no discretion to

9    ignore congressional directives, but that's exactly what the

10   defendants are arguing here.  And it's important to see how it

11   played out in the 2000 approval, and again in the 2016 major

12   changes; finally, in the 2021 petition response in the initial

13   approval, with this--then the taking away of basic protections

14   of women and girls who do take mifepristone.  And I'm going to

15   start with the 2000 approval.

16         The clinical investigations upon which the FDA

17   relied all required the women subject in that trial to go

18   through an ultrasound before she took mifepristone and

19   misoprostol to have a chemical abortion.  That was important

20   for two reasons.  One, ultrasounds are vital.  They are the

21   best way to determine gestational age of the baby inside the

22   woman.  That's important because, initially, the FDA only found

23   it to be safe for seven weeks, and secondarily, in 2016, they

24   expanded to ten weeks.  But everybody agrees the further along

25   a woman is in her pregnancy and, if she has a chemical

1    abortion, the more likely she will have complications, and it's

2    important to get that age correct.

3            Secondarily, ultrasounds help identify and they are

4    the best means to identifying a life-threatening ectopic

5    pregnancy.  Ectopic pregnancies occur in 1 in 50 pregnancies,

6    and, if not diagnosed, they can rupture and end with the life

7    of the woman as well.

8            And the problem here is, when a woman is not

9    properly screened with an ultrasound for an ectopic pregnancy

10   and she takes mifepristone while having an ectopic pregnancy,

11   one, mifepristone will not treat and resolve her ectopic

12   pregnancy; but, two, she will exhibit the same symptoms as a--

13   with mifepristone as with a ruptured ectopic pregnancy.  So she

14   is going to have severe bleeding and severe pain, and she will

15   not know, necessarily, that she has an ectopic pregnancy,

16   because she did not have that lifesaving ultrasound at the end

17   of the day.

18           And there's evidence in the record, I believe an

19   amicus brief submitted, that told the story of a woman who was

20   misdiagnosed, did not have a proper ultrasound, and died

21   because she had an ectopic pregnancy.

22           That's important, because these are essential

23   safety protocols that were in the studies.  And so when the FDA

24   relies on studies, it must--those--it must include the

25   essential safety protocols that were embedded in those studies

1   on the approved label regimen.  Otherwise, the FDA is

2   evaluating oranges and then declaring apples to be safe.  This

3   apples-to-oranges analysis is simply inappropriate and,

4   frankly, contrary to the congressional mandate to review the

5   labeled conditions of use and then determine safety.

6          We're not necessarily going after the safety

7   finding but the parameters and the guardrails that FD--that

8   Congress set for the FDA in how to determine a drug is safe.

9   And they fail to do that here, and they went off the rails and

10  off the cliff here, because they failed to include lifesaving

11  protocols at the beginning that were in the investigations and

12  not transferred over to the label.

13         And again, the same thing happened in 2016.  My

14  colleague talked about at least nine different changes that the

15  FDA did in 2016 to the chemical drug regimen.  But there is not

16  a single study in the record that the FDA relied upon that

17  evaluated the regimen pre-2016 changes versus the nine changes

18  after 2016.  There is not a single study.  Those studies also

19  didn't match other conditions too.  They had safety protocols

20  embedded in them as well.

21         And that, again, is contrary to the direct

22  congressional mandate to the FDA to have those guardrails, to

23  follow the labeled conditions of use on necessary safety

24  protocols, which at least evaluate whether those safety--those

25  changes are safe--

```
 1                THE COURT:  And that--

 2                MR. BAPTIST:  --and the FDA took a piecemeal

 3      approach.

 4                Yes, Your Honor.

 5                THE COURT:  That's the crux of my question which I

 6      have labeled the study-match thesis or problem.  The Court can

 7      do the work of matching apples to oranges, study to label and

 8      things of that sort.  Do I understand your argument to be a

 9      textual or statutory argument?

10                You have used the terminology of congressional

11      mandate.  So where we're construing Section 355(d) and we find

12      that there is this mismatch between the safety protocols and

13      conditions that were part of the clinical studies underlying

14      the FDA's action, and those are arguably mismatched with

15      labeling regimes and the dispensation of that drug through

16      subsequent FDA action, is that a textual statutory FFDCA

17      violation so that this Court can use tools of textualism to

18      judge that question, or is it your position that the FDA may

19      depart from those clinical safety conditions and protocols but

20      may not do so arbitrarily and capriciously in violation of

21      administrative law principles that apply?  So am I applying the

22      rules of textualism to a statutory violation, or am I applying

23      agency law, administrative law to something that is arguably

24      arbitrary and capricious?  So which toolkit am I using?

25                MR. BAPTIST:  This is a pure textual application of
```

1  the law.  Looking at the directive from Congress, it says, if

2  the FDA lacks sufficient information, adequate testing,

3  substantial evidence in indicating the safety and effectiveness

4  of these drugs under the labeled condition of use, the FDA must

5  reject those--excuse me--must refuse those applications.

6          And that is exactly what other courts have done in

7  different contexts, not with this specific provision under

8  355(d), but there are cases out there where the district courts

9  have reviewed, under 35--excuse me, let me--35(j)--Court's

10 indulgence, please--35(j)(4), where, again, it says, when

11 approving generic drugs, or otherwise known as abbreviated new

12 drug applications, or ANDAs, and ANDA has to tell the

13 Secretary--under subpart (4) there, "The Secretary shall

14 approve an application for a drug unless the Secretary finds,"

15 and there's a list of things the Court has to find, and if they

16 don't exist, the Court--I'm sorry--the FDA must reject it.  And

17 there's a subpart (H) there that says, information submitted in

18 the application or any other information available to the

19 Secretary shows that the inactive ingredients of the drug are

20 unsafe for use under the conditions prescribed, recommended, or

21 suggested in the labeling proposed for the drug.

22          Now, there is a case I'll cite for the record

23 today, because it's not before the Court right now in the

24 briefings.  It is *Serono Labs, Inc. vs. Shalala*--

25          THE COURT:  Could you spell Serono, please.

1          MR. BAPTIST:  Yes.  S-e-r-a-n-o, *Laboratories*,

2   comma, *Incorporated vs. Shalala.*  That's found at

3   974 F.Supp. 29.

4          THE COURT:  It's Donna Shalala, the previous HHS

5   Secretary?

6          MR. BAPTIST:  Yes, sir.

7          THE COURT:  Okay.  Spelled like that.  Okay.  You

8   may proceed.

9          MR. BAPTIST:  It's a district court from the

10  District of Columbia, a 1988 decision.  In that case, there was

11  similar language, which I just read to you, where the Court

12  found that the FDA was required to reject the ANDA because it

13  did not have the information required under this provision.

14         And in that case--we'll talk about remedies at the

15  end, but as a preview, the Court there enjoined the FDA and

16  compelled the FDA to take the designation for that approval off

17  the marketplace.

18         THE COURT:  Okay.  Going back to Section 355(d)--

19  I have your argument on subsection (j), but going back to the

20  Court's initial question on 355(d) and working through a very

21  lengthy paragraph of conditional clauses and phrases, it begins

22  with, "If the Secretary finds."  I'm assuming here, to apply

23  rules of textualism to the facts and exhibits in the

24  administrative record, where I see that word "finds" in the

25  first opening sentence, you would direct the Court to ECF

1    Number 1, Attachment 124.  That's the FDA letter dated

2    February 18, 2000, where there are findings that are relevant

3    to the subclauses that require that the Secretary, quote, shall

4    issue an order refusing to approve.

5            So as I apply the text of subsection (d), that

6    finding which is relevant to adequate testing, methodology,

7    et cetera, occurred with ECF Number 1, Attachment 124, FDA

8    letter dated February 18, 2000, and thereby triggered what

9    follows, subpart (7), he shall issue an order refusing to

10   approve the application.

11           I take it that is how you think this should have

12   been applied all the way back to the 2000 approval?

13           MR. BAPTIST:  Yes.

14           THE COURT:  Okay.  Now, in looking at amicus briefs

15   filed in support of the FDA actions from the 2000 approval

16   forward, some of those briefs make reference to language in

17   subpart (4), where there appears to be some discretion in the

18   language, "or upon the basis of any other information."

19           How would you respond to the terminology, "or upon

20   the basis of any other information," when drug approval and

21   labeling rulemaking and agency decision-making does involve

22   continued study?  Is that not the sort of any other information

23   that would obviate the mandate that the Secretary shall issue?

24   Does any other information weaken your argument in any other

25   way, and what construction would you give to that potential

1    wiggle room granted thereby?

2            MR. BAPTIST:  Two responses to that.  That

3    subclause (4) still is tied to "under such conditions."  That's

4    going to be in the conditions under the approved label.  So

5    they can't--whatever other information is out there, the FDA

6    still has to demonstrate that it was evaluating the safety

7    under the approved label conditions.

8            But plaintiffs also have a broader focus.  It's not

9    just that subsection that we are bringing this claim.  It's

10   all--well, it would be (1), (2), (4), and (5), not just (4).

11   So--and again, this is--the FDA needs to find all of these or

12   it must refuse.  It's not just one of the others and the FDA

13   can approve.  This is mandatory requirements for approval of

14   the new drug.

15           THE COURT:  Okay.  I have your argument, and I did

16   want further clarification on whether this argument sounds in

17   statutory construction and the tools of textualism apply or

18   it's just a strict agency administrative law argument that

19   requires a finding that certain actions were arbitrary and

20   capricious and that certain clinical studies were not properly

21   applied or ignored.

22           So I take it that you're making the statutory

23   argument and then, in the alternative, an agency administrative

24   law argument that even if there was textual authority using any

25   of the language of those subparts, the exercise of that

1    discretion was arbitrary and capricious?

2             MR. BAPTIST:  Yes, Your Honor.  That's precisely

3    our argument.

4             THE COURT:  And even if--  Okay.  All right.  You

5    may proceed.

6             MR. BAPTIST:  I'll finish with one other--on 2021.

7    The same applies there.  The FDA relied on two data sets for

8    approving or taking away the in-person dispensing requirement.

9    One was the FDA's adverse event reporting system.  Again, this

10   is 2021, five years after, as my colleague noted, the FDA took

11   away a significant reporting requirement for reporting nonfatal

12   adverse events, rendering even more useless the FAERS, what we

13   call the F-A-E-R-S, or the FDA's Adverse Event Reporting

14   System.

15            And, secondarily, they rely on literature that--to

16   support that finding as well.  That was problematic for

17   multiple reasons but in violation of the FDCA, because that

18   literature--the FDA, in its own words, was unable to prove the

19   safety on its own, and therefore, the FDA had to rely on the

20   inadequate FAERS data.

21            But either way, it does not meet the strict

22   standards of Section 355(d) of the FDCA, and it definitely does

23   not meet the substantial evidence that Congress required the

24   FDA have when approving an application.

25            I'm going to travel back in time to the year 2000,

1   because I want to talk about Subpart H and how the FDA first

2   went about approving mifepristone for use in the United States,

3   unless Your Honor has questions further on the FDCA

4   Section 355(d) argument.

5          THE COURT:  I'll follow you into the time machine.

6   Go ahead.

7          MR. BAPTIST:  Thank you.

8          In 2000, the FDA used its Subpart H approval

9   authority to approve the Population Council's application for

10  mifepristone use in the United States for chemical abortion

11  purposes.  Subpart H reads in the text--and that's

12  21 CFR Section 314.500.  It says that the scope only applies to

13  certain drugs that treat serious or life-threatening illnesses

14  and that provide a meaningful therapeutic benefit to patients

15  over existing treatment.

16         The text, again, is clear on its face.  It only

17  deals with illnesses.  What the FDA did in 2000 was use this

18  drug and this mechanism to approve this drug.  Mifepristone is

19  to terminate a pregnancy, and pregnancy is not an illness.  And

20  chemical abortion drugs don't provide a meaningful therapeutic

21  benefit over surgical abortion.  Frankly, mifepristone doesn't

22  treat anything.

23         And so the FDA and the other defendant, Danco

24  Laboratories, has to rely on nontextual language or arguments

25  to justify the approval in 2000, and those arguments are

1    threefold.

2            First, they say the FDA is afforded deference under

3    *Kisor vs. Wilkie*.  But that's Step 2 under *Kisor*.  *Kisor*'s

4    first step is that the language actually has to have ambiguity.

5    Neither defendant has alleged or demonstrated that "illnesses"

6    is an ambiguous term.  And, as *Kisor* noted, if uncertainty does

7    not exist, there is no plausible reason for deference.

8            And defendants' interpretation here is not even

9    reasonable.  The FDA knew how to write conditions into its

10   regulatory text if it had wanted to include conditions, and

11   that's how the FDA justified it.  They said, we said illnesses,

12   but we really meant conditions; we should be afforded

13   deference.  But again, the FDA knows how--  Under standard

14   canons of interpretation, if the FDA wanted to include both

15   terms, it would have done so.

16           Second, the FDA relies on the preamble and says

17   that broadened the interpretation or the definition of

18   illnesses, despite what the regulatory text said.  Again, we

19   noted in our briefing, a preamble can never override a

20   regulatory text, nor does it actually give the broader

21   definition.  We don't see the same reading that they did where

22   they argue the FDA expanded the scope.  We just don't see that.

23   There's some discussion of diseases, illnesses, and a couple of

24   references to conditions, but it doesn't give any clarity that

25   that's what the FDA intended to do.

1          And finally, the FDA relies on the 2007 Food and

2    Drug Administration Amendments Act, or I'm going to refer to

3    the FDAAA.  And they say that codified and ratified the

4    previous 2000 approval, so whatever infirmities were associated

5    with that approval, the FDA was cured by Congress.

6          Nothing could be further than the truth.  This law,

7    the 2007 FDAAA, merely grandfathered in previous restrictions

8    under Subpart H, and different Subpart E, which is located at

9    21 CFR Section 601.42, and other voluntary restrictions agreed

10   to by the sponsor.

11         Congress did not ratify the FDA's approvals, let

12   alone even the FDA's decisions to impose those post-marketing

13   restrictions on those drugs that were affected.  It was merely

14   saying, in 2007, if there are post-marketing restrictions on

15   drugs, under these provisions, where, voluntarily, they can be

16   carried over and grandfathered and deemed to have a risk

17   evaluation and mitigation strategy--in other words, a REMS,

18   R-E-M-S--  And that's it.  It made no decision, no

19   determination in terms of the--on whether it was right for the

20   FDA to approve those drugs or it imposed those post-marketing

21   restrictions.  So the 2007 FDAAA does not provide the

22   defendants with an out as well.

23         If Your Honor does not have any other questions

24   with regard to the Subpart H approval, I want to move over to

25   talk about the Pediatric Research Equity Act of--

 1          THE COURT:  I do have one follow-up.  So as we walk

 2   through this chronology and, using your time machine, we go

 3   from Subpart H, FDAAA to REMS and then ETASU, going back to

 4   that time period when Subpart H was the operative regulation--I

 5   believe this was 1992 to 2008.  Is there anything in the

 6   briefing by plaintiffs or any of the amicus briefs that

 7   identify the categories of drugs that were approved under

 8   Subpart H and whether those provide any analogues to this

 9   Court's determination whether that 2000 approval was a proper

10   exercise of Subpart H regulatory authority?

11          What other types of drugs in those preceding years,

12   roughly eight years, received that sort of accelerated

13   Subpart H treatment?  Were these pregnancy-related?  Were any

14   of these related to other naturally-occurring physiological or

15   biological conditions, or were these primarily fast-tracked HIV

16   drugs and things affecting things like cancer?

17          MR. BAPTIST:  There's one amicus brief in

18   particular I'll point your attention to.  It's filed by

19   Judicial Watch.  It's located at Docket 65-1 beginning

20   page ID 2999.  In that, it describes what the FDA did prior to

21   the 2000 approval in terms of approving other new drugs under

22   Subpart H, and then it also discussed the drugs post-2000 that

23   were approved under Subpart H, as well.

24          And that analysis, which is also found on the FDA's

25   own website, was that prior to the 2000 approval of

1     mifepristone, the FDA granted accelerated approval, pursuant to

2     Subpart H, 37 times.  Of these 37 accelerated approvals,

3     21 related to HIV drugs, and 10 related to cancer drugs.  The

4     remaining approvals related to chronic low blood pressure,

5     tuberculosis, leprosy, and bacterial infections.

6              And then going further, beyond the 2000 approval,

7     the FDA granted Subpart H approvals 26 times.  Of those

8     26 approvals, 9 related to HIV drugs, 10 related to cancer

9     drugs, 3 related to hypertension, and 2 to blood disorders.

10    The remaining approvals related to a problem with a pituitary

11    and narcolepsy.

12              The contrast between these illnesses and the FDA's

13    jamming of pregnancy into Subpart H cannot be more stark.

14    There is simply no correlation between the two.

15              THE COURT:  Okay.  And so in giving construction to

16    314.500 and that terminology of serious life-threatening

17    illness, you would direct the Court to the agency's own

18    decisions and actions in approving drugs.  In those prior

19    categories, you would ask the Court to give some adjudicative

20    weight to--almost like a canon of construction, give weight to

21    all of the other drugs that were approved under that

22    accelerated program, that this Court should deem one of these

23    not like the others?

24              MR. BAPTIST:  Yes, Your Honor.  The plain text is

25    clear that it applies to illnesses, and everything the FDA did

1    before 2000 and after 2000 showed that it was intended to deal

2    with illnesses, and not pregnancy.

3              THE COURT:  Okay.  I think I have your argument on

4    that.  And I did recall that there was an amicus brief that set

5    out that history of other approved drugs under Subpart H, and I

6    just wanted to clarify that you do endorse that analysis.

7              MR. BAPTIST:  Yes.

8              THE COURT:  Okay.  And now you may proceed, I

9    believe to remedies.  Is that next in the queue, or what were

10   you going to address next?

11             MR. BAPTIST:  I was going to discuss the Pediatric

12   Research Equity Act of 2003, which is an amendment to the FDCA,

13   but it wasn't the complete part.  When I talked about the FDCA,

14   I didn't finish that part.  Then I'm going to talk about

15   irreparable harm and the public interest and then get to

16   remedies.  But, Your Honor, I'm happy to go in whatever order

17   you--

18             THE COURT:  No, we'll take your order of operation.

19   It tracks the elements for injunction nicely.

20             I do want to make clear for record purposes that

21   PREA here is a reference to the Pediatric Research and Equity

22   Act.  That's 21 U.S.C. Section 355(c).  But you may refer to it

23   as PREA from this point forward.

24             MR. BAPTIST:  Yes, Your Honor.

25             Plaintiffs' opening brief in support of their

1    motion for preliminary injunction highlighted how the FDA

2    ignored the potential impacts of this hormone-blocking regimen

3    on developing bodies of adolescent girls.  But because

4    plaintiffs did not brief this requirement for the FDA to assess

5    the safety of mifepristone in adolescent girls, if it's okay

6    with Your Honor, I'm going to spend a little more time just

7    going over the history and background of this requirement and

8    how the FDA failed to comply with it.

9          The FDA, in the late 1990's, issued a rule called

10   the Pediatric Rules, a regulation that was issued in 1998 and

11   required an assessment specifically powered to determine the

12   safety and effectiveness of a new drug on pediatric patients.

13   This rule allowed for full or partial waivers of its pediatric

14   assessment requirement if certain conditions were met.

15         This was the rule that was operating and governing

16   the FDA at the time of its decision to approve mifepristone in

17   2000, and the FDA explicitly and expressly told the Population

18   Council that it was waiving this requirement.  And, again, the

19   waiver factors were to--these were to--  For necessary studies

20   that are impossible or highly impractical, which does not

21   apply, there is evidence strongly suggesting that the drug or

22   biological product would be ineffective or unsafe in all

23   pediatric age groups--the FDA didn't take that position--or the

24   drug does not represent a meaningful therapeutic benefit over

25   existing therapies for pediatric patients and is not likely to

1    be used in a substantial number of pediatric patients.  Again,

2    clearly, that would not apply based on how the FDA approved and

3    justified its approval in 2000.

4           We would note that this requirement was imposed

5    on--the FDA imposed it through it rule in 1998, carried over to

6    2000.  The district court vacated that rule and set it aside.

7    In 2003, in response, that's when Congress passed PREA

8    codifying that previous rule and said, any waivers granted

9    between a certain time period, including the approval of

10   mifepristone, would be deemed to be a full or partial waiver.

11   So that waiver carried over.

12          Again, that waiver was illegal under PREA.  It was

13   illegal under the FDA's own regulations.  And again, what the

14   FDA did, in 2016--they didn't waive it this time in 2016 for

15   the major changes.  The FDA justified it by saying, we're going

16   to extrapolate, and extrapolate that we are going to assume

17   that a 13-year-old girl will have the same safety and

18   effectiveness outcome as a 35-year-old woman who takes this

19   drug.

20          We simply don't think that's true, but it's not

21   plaintiffs' obligation to demonstrate that.  It was incumbent

22   and required by Congress for the FDA to determine that

23   assessment.  But the FDA made that extrapolation.  That

24   extrapolation provision, in and of itself, is inapplicable to

25   the FDA.  That is going to be found at

1    21 U.S.C. Section 355c(a)(2)(B)(i).  And that discusses when

2    the FDA may extrapolate the safety and effectiveness of a drug

3    for safety and effectiveness on pediatric populations.

4              If Your Honor would want me to wait for you to--

5              THE COURT:  Oh, no.  You may proceed.

6              MR. BAPTIST:  And this says--the statute says:  If

7    the course of the disease and the effects of the drug are

8    sufficiently similar in adults and pediatric patients, the FDA

9    may conclude that pediatric effectiveness can be extrapolated

10   from adequate and well-controlled studies in adults, usually

11   supplemented with other information obtained in pediatric

12   populations.

13             Your Honor, again, for the same reasons the

14   Subpart H approval was inappropriate, the extrapolation in 2016

15   was inappropriate, because pregnancy is not a disease.  This

16   provision is not available for mifepristone.  It could be

17   available to other medications that actually treat and cure

18   diseases, but it's not this one.

19             THE COURT:  And so between the pediatric rule and

20   President Bush signing PREA into law, there was an intervening

21   D.D.C. case; is that correct?

22             MR. BAPTIST:  Correct.

23             THE COURT:  So this is a little bit like RFRA,

24   where Congress passes federal RFRA; *City of Boerne* is decided;

25   and then Congress responds with RLUIPA.  So it's a little bit

1    of a similar trajectory where there's a pediatric rule in

2    place; that's deemed violative of law for various reasons; and

3    then Congress acts.

4            Did the 2000 approval happen within that gap period

5    between a pediatric rule and then the codified statute later?

6            MR. BAPTIST:  No.  The approval in 2000 occurred

7    before the Court vacated the pediatric rule, and then Congress

8    came back and codified that time period for waivers and said

9    those waivers can be deemed, moving forward, full or partial.

10           THE COURT:  Okay.  I recall that there was a D.D.C.

11   case in between those two events triggering congressional

12   action.  I couldn't recall the precise chronology, but your

13   brief correctly states the chronology of those events and how

14   the pediatric rule migrates from rule to statute and then

15   through further FDA legislation.

16           MR. BAPTIST:  Correct.  I would point you to our

17   complaint located at page ID 26 through 28, 57 to 58, 59,

18   page 60, 97 through 100, 104 through 105, and then again at

19   106, where we discuss this chronology and the events that

20   unfolded for mifepristone--

21           THE COURT:  Okay.  And then that intervening case

22   was *Physicians and Surgeons vs. FDA*, 226 F.Supp.2d 204.  That

23   was a D.D.C. case from 2002.  This prompted Congress to enact

24   PREA, which was signed into law I believe in 2003.  Is that

25   correct?

1          MR. BAPTIST:  That sounds correct to me, Your

2    Honor.

3          THE COURT:  Okay.  So I'll double-check all the

4    dates there, but as I'm walking through the time machine and

5    all these various chronologies, start with pediatric rule; then

6    we have D.D.C. intervention; PREA; and then everything from

7    there follows as far as which rules have to apply to pediatric

8    determinations and sub-populations.  But thank you for

9    reminding me of that D.D.C. case.  I wanted to make sure that

10   chronology was correct in my mind.

11         You may proceed to your next topic.

12         MR. BAPTIST:  Thank you, Your Honor.  If Your Honor

13   is done discussing substantial likelihood of success on the

14   merits, I want to move to the next preliminary injunction

15   factor of irreparable harm.

16         In Administrative Procedure Act cases, the Fifth

17   Circuit has stated that complying with an agency order later

18   held invalid almost always produces irreparable harm of

19   nonrecoverable compliance cost.  When determining whether

20   injuries are irreparable, it is not so much the magnitude, but

21   the irreparability that counts.  That's *Texas vs. EPA*,

22   829 F.3d 405, a Fifth Circuit decision from 2006.

23         And other district courts have said, it is well

24   established in the Fifth Circuit that injuries are irreparable

25   only if it cannot be undone through monetary damages.  Where

1    the costs are nonrecoverable because a government defendant

2    enjoys sovereign immunity from monetary damages, irreparable

3    harm is generally satisfied.

4            Here, because if the Court were to find that any or

5    all of the plaintiffs are injured, it is inevitable that they

6    will suffer irreparable harm under the APA.  And whether it's

7    the organizational harm to the plaintiff medical associations

8    or the harms to plaintiff doctors or their patients, as my

9    colleague outlined, the courts have recognized these harms are

10   also irreparable, as well.

11           And then the Fifth Circuit has also allowed medical

12   doctors to assert the irreparable harms of their patients,

13   recognizing third-party irreparable harm, and that's *Deerfield*

14   *Medical Center*, a Fifth Circuit case from 1981 referenced in

15   our reply brief.

16           If Your Honor doesn't have any questions, I want to

17   make sure I address everything within my remaining time.  The

18   public interest factor as well.  Everybody agrees that the

19   third and fourth preliminary injunction factors balancing the

20   harms and public interest merge together when the defendant is

21   the government.  And public interest favors holding agencies

22   accountable for failing to follow the law.  Indeed, there is

23   generally no public interest in the perpetuation of unlawful

24   agency action.  And the public interest in having governmental

25   agencies abide by federal laws that govern their existence and

1    operations also is an important factor as well.

2            And the FDA is not entitled to deference when it

3    ignores statutory mandates established by Congress and the will

4    of the American people.  Courts have recognized that the public

5    interest has an interest in preventing dangerous drugs from

6    entering the marketplace.  And as you discussed with my

7    colleague earlier, 22 states filed an amicus brief, led by the

8    State of Mississippi, demonstrating why the public interest

9    favors granting an injunction here as we restore the proper

10   balance of police power for the states to determine how best to

11   protect the health and welfare of their citizens.

12           Finally, granting the plaintiffs' motion here helps

13   stop the federal government from illegally subverting these

14   states' laws and regulations designed to protect their people

15   from dangerous chemical abortion drugs and promote life.

16           THE COURT:  Okay.  So moving back to

17   irreparability.  So defendants argue and some amicus argue that

18   there's a type of reliance interest that has developed over a

19   two-decade period of time where practitioners and patients have

20   used mifepristone as part of clinical practices across the

21   country.

22           Can you point the Court to analogue cases where

23   other drugs on the shelf for similar periods of time have been

24   subject to court intervention and either suspended, withdrawn,

25   set aside, vacated--whatever remedy, which we'll discuss next,

1    can you point to analogues where courts have intervened in such

2    a way where a drug has been in use for so long?

3                    MR. BAPTIST:  My answer to your question is, no, I

4    can't.  But the answer to those briefs that say that is because

5    this is the FDA's own doing.  As my colleague highlighted, the

6    FDA stonewalled our clients for, combined, over 16 years.  This

7    drug has been on the marketplace and maybe created reliance

8    interest, but that was because of the FDA's own delay tactics

9    and strategic denials of our petitions over time.  So the

10   reliance interest that may have been created, again, is not due

11   to any fault but the FDA's, and they can't assert that argument

12   now.

13                   THE COURT:  What is your best case for application

14   of the reopening doctrine where there have been a series of

15   agency actions and a long duration of time and the Court did

16   intervene under principles of administrative law and did grant

17   relief despite these long gaps of time between actions and then

18   final court action?

19                   MR. BAPTIST:  The best case would be

20   *Sierra Club vs. EPA.*  That one was starting from the 1990's

21   into the 2000's.  And so there was a long period where a

22   regulation was on the books, and there may have been reliance

23   interest by industry for those regulations.  And that was

24   subsequently vacated by the D.C. Circuit.

25                   THE COURT:  Okay.  And I know Ms. Hawley made

1    reference to *Sierra* earlier in her portion of the argument.

2              So at this time, are we ready to discuss my

3    questions on remedies?

4              MR. BAPTIST:  Yes, we are, Your Honor.

5              THE COURT:  Okay.  So I will sort of reframe your

6    complaint as follows.

7              Here, you have six claims regarding different

8    stages of FDA action, as that's understood at administrative

9    law.  And by my inventory, that includes the 2000 approval, the

10   2016 major changes, the 2019 ANDA generic approval--  And for

11   record purposes, ANDA is Abbreviated New Drug Application, as

12   that's applied to generic drugs under 21 U.S.C. Section 355(j).

13   The 2021 removal of in-person dispensing requirement, and then,

14   of course, the responses to the citizen petition.

15             So those are six claims that are structured that

16   way in your prayer for relief.  Working in reverse

17   chronological order, can the plaintiff discuss each action,

18   starting with that 2021 removal of in-person dispensing

19   requirement, all the way back to the 2000 approval, and inform

20   the Court of a proper remedy per action?  Or is this Court

21   dealing with a domino effect, where it makes a decision on the

22   2000 approval and there's this cascading effect of court

23   intervention on each one?

24             Can you address each one and identify a remedy for

25   each FDA agency action in backwards, reverse chronological

1    order?  If so, make your argument there, or if you need to

2    argue that, instead, this Court must definitively decide that

3    the 2000 approval was against law for the various reasons

4    briefed by the parties.  Which approach should this Court take

5    in fashioning remedies, should plaintiffs prevail?

6            MR. BAPTIST:  Sure.  I'll start in reverse

7    chronological order, as you requested.

8            So the 2021 removal of in-person dispensing

9    requirements, there are multiple options available to the Court

10   to, we would say, set aside and vacate under the APA.  And that

11   would be our preferred and recommended approach, that that

12   REMS, or the Risk Evaluation and Mitigation Strategy, REMS,

13   changes in 2021 to remove in-person dispensing requirement

14   because it violated the Comstock Act, it violated the FDCA, and

15   it violated the PREA of 2003 should be set aside.

16           And this is going to be a general theme throughout

17   my discussion, so I just want to make sure we're on the same

18   page, just because 706 under--Section 706 under the APA

19   requires a Court to hold unlawful and set aside agency action

20   found to be arbitrary, capricious, and abuse of discretion or

21   otherwise not in accordance with law.  Our claims are saying

22   that the FDA acted not in accordance with law in 2021,

23   through--and all the previous agency actions that we'll go

24   over, each individually.

25           And as a textual matter, the mandatory language of

1   the APA has led the courts to make remand and vacatur the

2   default remedy for courts where they find that an agency action

3   violates the APA.  And we would submit to the Court that would

4   be the easiest lift, because I think--I would say the Fifth

5   Circuit has generally observed that vacating an agency action

6   is the less drastic approach versus injunctive relief and

7   enjoining.  But both are available here.

8           And so again, for 2021, if the Court were not to

9   want to use its authority under the Section 706 of the APA and

10  set aside and vacate the 2021 removal of in-person dispensing

11  requirement, it can also compel the agency to take an action,

12  as well, to take down the changes and remove the actions that

13  perpetuated the 2021 removal of in-person--

14          THE COURT:  And, Mr. Baptist, I have been advised

15  that you have ten minutes remaining in your portion.

16          MR. BAPTIST:  Okay.  Thank you for that reminder.

17          That is going to be true throughout.  So I will

18  say, for the challenge to the 2019 ANDA, again, set it aside or

19  vacate it, because it was in violation of the law, because the

20  underlying approval upon which it relied lacked the necessary

21  safety studies under 735--I'm sorry--355(d) of the FDCA.  But

22  again, the Court can compel the agency to withdraw or suspend

23  that approval as well.  That has been done in other contexts.

24  I'll give you a couple of examples, and I should have given you

25  an example for vacatur of a drug approval by the FDA as well.

1          The first case for demonstrating that there's

2    precedent for both of these types of remedies is *American*

3    *Bioscience, Incorporated vs. Thompson*, found at 269 F.3d 1077.

4    It's a D.C. Circuit case from 2001.  In that case, the

5    D.C. Circuit--  Again, this is at the preliminary injunction

6    stage.  The D.C. Circuit directed the district court to vacate

7    the FDA's order approving a drug and remanded it back to the

8    agency.

9          So there is precedent for such an action here.  But

10   also, as I just described, there is also precedent to suspend

11   or withdraw an approval of a new drug by the FDA.  And I can

12   give you a couple of examples of that.  And there's *Bayer*

13   *Health*--that's B-a-y-e-r--*Healthcare, LLC vs. FDA*.  That can be

14   found at 942 F.Supp.2d, page 17.  That is a district court of

15   D.C. case from 2013.  And then the Court found that the FDA has

16   shown no attention to the congressional mandate that it

17   withhold approval of a drug.  This is in the animal drug

18   context.  But it also found that you can suspend there.

19          And another suspend case is *Mova Pharmaceutical*

20   *Corporation vs. Shalala*.  *Mova*, M-o-v-a, *Pharmaceutical*

21   *Corporation vs. Shalala*--that's S-h-a-l-a-l-a--found at

22   955 F.Supp. 128, D.D.C. 1997.  There again, the Court ordered

23   that the FDA suspend its approval of a drug.

24          So there's a couple of ways to address an illegal

25   approval of a new drug by the FDA that the courts within the

1    D.C. Circuit have found.  They have both done vacatur on the

2    APA and compelling the FDA to withdraw or suspend those drugs

3    at that preliminary stage.

4         THE COURT:  I've been to the Supreme Court and back

5    on those APA sections, so I'm familiar with the developing

6    jurisprudence on what vacatur is and isn't and what those

7    sections confer upon the district court and what those sections

8    do not confer.

9         But I do want to focus my last line of questions on

10   suspension versus withdrawal.  So, here, are you making

11   reference to 21 U.S.C. Section 355(e) as this Court's statutory

12   authority to order suspension or withdrawal?

13        MR. BAPTIST:  That is a provision within FDCA.

14   It's entitled Withdrawal of Approval.  That gives the grounds

15   for the FDA to withdraw, on its own accord, a drug that is not

16   shown to be safe under the conditions of used, prescribed,

17   recommended, or suggested in the labeling.  I've kind of

18   paraphrased and culled down what those provisions may be.  Or

19   if there's an imminent hazard to the public health, and it can

20   suspend that approval as well.

21        So that authority is available to the Court.  I

22   would say that if you compel the agency to do it, you have that

23   authority to do it.  Courts have done that in other contexts.

24   But I believe there is some briefing on this where--that limits

25   the Court's power to--you just can, say, initiate this

1    proceeding, which could take many years, and frankly, given the

2    claims in this case and the harms that our doctors have seen

3    firsthand in the emergency rooms across the country treating

4    women and girls who have been harmed by these dangerous drugs,

5    that the time cannot last, and that cannot be an appropriate

6    remedy in this case.

7             THE COURT:  Okay.  So at this stage, at this

8    preliminary injunction stage, what is your reading of

9    Section 355(e) jurisprudence that the appropriate remedy under

10   that provision--is it suspension or withdrawal?

11            MR. BAPTIST:  The case law has said suspension,

12   but--I mean, sorry--but I think the better textual reading is

13   withdrawal.

14            THE COURT:  Okay.  So, here, plaintiffs would argue

15   first that 355(e) confers upon this Court the right to order

16   withdrawal and, in the alternative, a suspension of agency

17   action, in that sequence?  That is how plaintiffs are arguing

18   that particular remedy under that particular statute?

19            MR. BAPTIST:  Yes, Your Honor.

20            THE COURT:  Okay.  I have your argument on that.

21   You have four minutes remaining.  Is there any additional

22   argument plaintiffs seek to make, or are they reserving the

23   rest of their arguments for rebuttal?

24            MR. BAPTIST:  I'll spend a couple of minutes--  Any

25   relief that you grant, Your Honor, it must be complete.  The

1    scope of plaintiffs'--of this relief needs to be universal and

2    nationwide.  The harms of chemical abortion drugs know no

3    bounds.

4            Dr. Jester, one of our named individual plaintiffs

5    in this case, had to save the life of a woman who obtained

6    these drugs in New Mexico, who came and had an emergency

7    situation here, back near this courthouse.

8            Dr. Johnson, who is another named plaintiff here in

9    this case, needed to treat a woman who took the drugs in

10   Chicago, drove back to his Indiana hospital, and then he had to

11   save her life there.

12           The four medical associations--three of the four of

13   these medical associations have members in every country--I

14   mean every state in this country.  The only practical and

15   reasonable way to grant relief in this is to provide complete

16   relief and make it universal.

17           THE COURT:  Okay.

18           MR. BAPTIST:  Thank you, Your Honor.

19           THE COURT:  Thank you, Mr. Baptist.

20           Ms. Hawley, I have your argument, and you have

21   reserved 30 minutes for rebuttal; is that correct?

22           MS. HAWLEY:  Yes, Your Honor.

23           THE COURT:  Okay.  So at this time, the Court will

24   recess for 15 minutes to allow the defendants and intervenor to

25   reconfigure the courtroom, to make ready any IT technology that

```
1    they deem necessary.  I'll instruct the parties to reappear for
2    continuation of this hearing at 10:50, and at that point, we
3    will begin with the defendants FDA and HHS, to be followed by
4    the intervenor in the time segments that have been announced to
5    the Court: 45 minutes total for Ms. Straus Harris, 45 minutes
6    total for Mr. Schwei, and then, for intervenor, 30 minutes
7    total.
8              So that will be the sequence the Court anticipates.
9    If there's any deviation from that, just notify the Court if
10   there's any substitution of counsel.
11             And you may take your breaks.  You may make your
12   phone calls during this period.  I just ask that you obey the
13   instructions of the marshals and the court security officers at
14   all times, since we do have many people moving in and out of
15   the building.
16             I'll also caution that the magistrate court also
17   has prisoner hearings today, so there will be prisoner
18   transport in and out of this building.  So be especially
19   careful to mind those rules and obey the marshals and the CSO's
20   at all time, less you run into a prisoner in the hallway.
21             So at this time, we stand in recess.  Parties are
22   instructed to reappear at 10:50 for resumption of the hearing.
23        (RECESS TAKEN)
24             THE COURT:  The court is back on the record in Case
25   Number 2:22-CV-223-Z for continuation of the hearing on the
```

1    pending motion for preliminary injunction.

2            At this point, the defendants may proceed with

3    their arguments.  And it's my understanding that Ms. Straus

4    Harris will begin for the government.  Is that correct?

5            MS. STRAUS HARRIS:  Yes, Your Honor.

6            THE COURT:  You may approach.

7            MS. STRAUS HARRIS:  Good morning, Your Honor, and

8    may it please the Court.  I will be addressing the government's

9    threshold defenses, including all of the topics listed in the

10   Court's order next to standing and reviewability, with the

11   exception of *Heckler v. Chaney*.  I will also address the

12   equitable factors, including all of the topics listed next to

13   harm and public interest.

14           Then I will turn the podium to my colleague,

15   Mr. Schwei, who will address all other merits issues, including

16   Subpart H and agency decisions, plus *Heckler v. Chaney* and all

17   of the topics listed under remedies.

18           THE COURT:  Okay.  Thank you for being so organized

19   and for that preview, and you may proceed according to plan.

20           MS. STRAUS HARRIS:  Thank you, Your Honor.

21           Plaintiffs seek the extraordinary relief of a

22   preliminary injunction that upends the status quo by banning a

23   drug that has been on the market for 22 years.  That relief is

24   not available for a host of reasons, including that the

25   plaintiffs themselves ask the Court to hold off on entering any

1    relief until after a trial on the merits.

2         Congress authorized the Food and Drug

3    Administration to determine, based on its scientific expertise,

4    whether drugs are safe and effective.  More than two decades

5    ago, the FDA approved the drug mifepristone as safe and

6    effective for the medical termination of intrauterine pregnancy

7    under certain conditions.

8         In this unprecedented action, plaintiffs ask this

9    Court to overturn that longstanding scientific determination

10   based on speculative allegations of harm offered in support of

11   claims and arguments that are untimely, unexhausted, and

12   without merit.  Plaintiffs' motion for a preliminary injunction

13   satisfies none of the requirements for the extraordinary relief

14   they seek and should be denied.

15        First, plaintiffs cannot demonstrate a likelihood

16   of success on the merits of their claims, because they fail for

17   several threshold reasons.  As I will explain, with one

18   possible exception, review of their claims is barred, because

19   their claims are unexhausted, time barred, or both.  Further,

20   as I will discuss, plaintiffs fail to demonstrate a cognizable

21   injury sufficient to establish standing to bring their claims,

22   let alone a substantial threat of irreparable injury sufficient

23   to justify the extraordinary relief they seek today.

24        Second, in contrast with plaintiffs' failure to

25   show irreparable harm, the government has demonstrated that the

1    balance of harms and the public interest would be irreparably

2    injured by a preliminary injunction here.  As the Fifth Circuit

3    has cautioned in *City of Dallas vs. Delta Airlines*, the purpose

4    of a preliminary injunction is to preserve the status quo

5    during the pendency of litigation.

6            But an injunction here would upend the status quo

7    and the reliance interest of patients, doctors, and businesses

8    involved in the pharmaceutical industry.  An injunction would

9    cause significant public harm, depriving patients and doctors

10   of a safe and effective drug that has been on the market for

11   more than two decades.

12           I'll begin by discussing the statute of limitations

13   and exhaustion issues.  First, all of plaintiffs' claims are

14   untimely or unexhausted except their challenge to the FDA's

15   December 16th, 2021, response to the 2019 citizen petition.

16   The statute of limitations plainly bars their challenge to

17   FDA's underlying approval of mifepristone, including its

18   response to the 2002 citizen petition, because the initial

19   approval and the response to the citizen petition each occurred

20   more than six years before plaintiffs brought suit.

21           As to the ANDA approval for the generic version of

22   mifepristone, plaintiffs fail to exhaust this claim because

23   they did not file a citizen petition on it.

24           Plaintiffs have invoked the reopening doctrine to

25   put the original approval of mifepristone back on the table,

1   but that doctrine does not apply here, where FDA did not

2   undertake a serious substantive reconsidering of its 2000

3   approval of mifepristone.  And that language comes from

4   *Texas vs. Biden*, 20 F.4th 951.

5           Plaintiffs assert that the *Sierra Club* case is

6   particularly relevant to their reopening claim, but there are

7   key differences between that case and the case here.  In

8   *Sierra Club*, the D.C. Circuit said that the agency there, the

9   EPA, had constructively reopened an earlier decision because it

10  had completely--and "completely" is italicized in the case

11  decision--changed the regulatory context.  It went from a

12  situation where prior approval from the agency was required to

13  one in which no approval from the agency was required.

14          Here, the agency did not alter that the drug was

15  approved with conditions.  It simply altered some of those

16  conditions.  That does not constitute a complete change in the

17  regulatory context that the D.C. Circuit found was sufficient

18  for constructive reopening.

19          Plaintiffs argue that there are reasons to excuse

20  their failure to exhaust claims to the agency.  There are two

21  different types of exhaustion that are relevant here.  One is

22  exhaustion as to challenging a particular agency action; here,

23  the 2019 ANDA approval.  Plaintiffs never filed a citizen

24  petition, and so that--any claim related to that petition is

25  unexhausted and cannot be brought to this Court.

1          But there are also issues related to issue

2    exhaustion with respect to whether the plaintiffs or the--in

3    their posture as petitioners to the agency, raised particular

4    issues in the citizen petition that they filed, and that

5    specifically relates to their effort now to challenge the 2000

6    approval.

7          In their citizen petition to the 2016 decision by

8    the agency, plaintiffs never asked the agency to reconsider or

9    withdraw the 2000 approval, and so that decision cannot be a

10   basis for reopening the 2000 approval decision.  It also means

11   that any challenge to the 2000 approval decision would be

12   unexhausted on the basis of the 2016 citizen petition.

13         Plaintiffs argue that there are three reasons why

14   the exhaustion requirement should be excused here, and I'll go

15   through and explain why each of them does not apply.

16         First, they argue that it would have been futile to

17   raise certain of the issues; in particular, the Comstock issue.

18   And specifically, they say that the 2022 OLC decision makes

19   clear why it would have been futile.  But in a case cited by

20   plaintiffs in their brief, the *Tesoro Refining* case *vs. FERC*--

21   and plaintiffs cite this in ECF Number 120 at 22--the

22   D.C. Circuit made clear that a subsequent decision by an agency

23   cannot be the basis for invoking the futility exception to

24   exhaustion.

25         Second, they argue that there is an exception on

1    the basis of the agency's action being patently unlawful.

2    There, they cite a case that, itself, cites--that, itself, only

3    acknowledges a single time when this excuse was used to excuse

4    exhaustion.  It was a 1952 case.  But what the Court explained

5    there was that the agency had to be acting fully outside its

6    authority.

7            And what the agency did here, the action that

8    plaintiffs challenge, is the agency's determination to grant

9    pre-market approval on the basis of safety and effectiveness to

10   a drug.  That is precisely the authority that Congress has

11   vested in the FDA, and so this idea that the agency acted so

12   far afield from its authority given by Congress is simply

13   inapplicable here.

14           Third, they argue that the interests of justice

15   require excusing exhaustion.  And on this, they say that it was

16   the FDA's delay in deciding their 2002 citizen petition that

17   requires excusing exhaustion in order to overcome the--what

18   they say was injustice from that delay.

19           The problem with this argument is that, first of

20   all, they do not point to a specific case where, after a party

21   has allowed the agency administrative process to conclude,

22   exhaustion was excused on the basis of the time that it took

23   the agency to decide a case.

24           And if the delay was a true concern for the

25   petitioners that submitted that citizen petition, the law

1    provides a mechanism for them to remedy that alleged harm by

2    the agency.  And that is in 5 U.S.C. 706(1), which allows a

3    party, under the APA, to seek relief for agency action

4    unlawfully withheld or unreasonably delayed.

5             They did not invoke that here, so to now, more than

6    six years later, after the agency completed review of that

7    citizen petition, to now come in and say that justice requires

8    excusing any exhaustion requirement on the basis of the FDA's

9    delay is simply--simply can't be credited in this case.

10            THE COURT:  So let me go back to futility briefly,

11   because in December of 2022, the OLC issued the memorandum

12   opinion on the Comstock Act.  What is this Court to make of the

13   government's reliance upon that OLC memorandum and the fairly

14   definitive reading of that statute?  How should the Court weigh

15   your agency's reliance on the OLC memorandum in determining

16   this exception for futility?

17            MS. STRAUS HARRIS:  Your Honor, as I just

18   explained, the D.C. Circuit has held that a subsequent decision

19   by the government cannot excuse futility for failing to present

20   an issue to the government in an earlier action.  So the

21   plaintiffs here presented arguments to the agency in 2019.

22   They did not present any argument on the basis of Comstock.

23   They similarly did not present any argument on the basis of

24   Comstock in 2002.

25            It's quite telling that no party raised the issue

1    of Comstock with the FDA for all of those 22 years following

2    the agency's approval of mifepristone as suggestion that,

3    perhaps, it was not the impediment to the agency's action that

4    plaintiffs suggest it is.

5            But most important is that plaintiffs have not

6    pointed to a single case in which a subsequent action by the

7    federal government could excuse an agency requirement to

8    exhaust an issue before the agency.  And, in fact, the case

9    that plaintiffs cite actually says the opposite, which is that

10   a subsequent decision by the agency cannot excuse presenting

11   the issue on the basis of futility.

12           THE COURT:  Okay.  I have your argument on that.

13           Now, regarding that same category of the Comstock

14   Act, so the Fifth Circuit, in *Myron vs. Martin*--I believe this

15   is cited by both parties--670 F.2d 49, the Court there held

16   that courts can review for the first time a particular

17   challenge to an agency's decision which was not raised during

18   the agency where it is contrary to important public policy.

19           So it's been variously referred to during this

20   hearing as public interest, public policy.  So what weight does

21   the government give to roughly half the states filing an amicus

22   brief in a post-*Dobbs* environment citing important state

23   interests and the balance of the federal government and state

24   police powers?  What weight should this Court give to roughly

25   half the states joining the plaintiffs in arguing that this is

1    a matter of important public policy and, therefore, might be an

2    exception to exhaustion?

3          MS. STRAUS HARRIS:  Your Honor, with respect to

4    that argument about important public policy, I think it's

5    important to step back and think about what is the specific

6    action that the agency took here.  What the agency did was

7    grant pre-market approval to the drug mifepristone in a

8    particular regimen as safe and effective under certain

9    conditions.  In doing so, the agency did not obligate or

10   require anyone to prescribe or take mifepristone.  It did not

11   impose any penalty on a person for not prescribing or taking

12   mifepristone.  It simply said, we are giving it our grant of--

13   that it is safe and effective.

14          And the argument that the states proffer and that

15   the plaintiffs here also, you know, seem to be agreeing with

16   today is simply beside the point of the action that the

17   plaintiffs are challenging.  The plaintiffs here--the states

18   argue that somehow the FDA's determination of safety and

19   effectiveness imposes some obligation on states or their

20   residents.  But, in fact, it does not.  It does not, in that

21   regard, set any national policy that affects their state

22   powers.  But the plaintiffs are the ones here who are trying to

23   dictate national policy by asking this Court to withdraw the

24   agency's determination as to safety and effectiveness.

25          THE COURT:  Okay.  And I know you mentioned the

1    statutory provision governing citizen petitions.  Can you point

2    the Court to any jurisprudential authority on what sort of

3    duration constitutes a permissible delay in responding to a

4    petition?

5            So it is true that both parties come to this Court

6    citing chronology spanning over two decades, but a portion of

7    that chronology is attributable to a delayed response to a

8    petition that sat for sixteen years.  So can you point to some

9    circuit precedent, Supreme Court precedent that advises this

10   Court on how long that response may be delayed under the

11   relevant statutes or regs?

12           MS. STRAUS HARRIS:  Your Honor, the courts that

13   have addressed the question of unreasonable delay have done so

14   when presented with a claim under that provision of the APA,

15   706(1).  Plaintiffs never brought that claim to this court or

16   any other court with respect to the agency's action,

17   suggesting, perhaps, that they didn't believe it was an

18   unreasonable delay at the time.  It is incumbent upon the

19   plaintiffs to assert what government action they believe was

20   unlawful, and that action was never asserted while the agency

21   was working to determine the 2002 citizen petition.

22           The case law under that statute shows that there

23   are a variety of circumstances that a court would consider, and

24   it is often very fact specific.  But plaintiffs here have

25   simply not presented that question to the Court.  They are

1    invoking the delay to suggest that exhaustion should be

2    excused.

3              The problem is that-- Well, there are several

4    problems with that.  The first is that by sitting on this

5    decision from the agency for more than six years, plaintiffs

6    really undercut their suggestion that the delay by the agency

7    was causing a substantial harm that must be addressed

8    immediately now, more than six years after that decision by the

9    agency.

10             But I think the more important point is that the

11   agency decided the citizen petition more than six years ago, in

12   March of 2016, more than six years before plaintiffs filed

13   their suit.  They are out of time to challenge that decision.

14   So it's not a matter of exhaustion; it's a matter of the

15   statute of limitations.

16             When the plaintiffs presented a separate citizen

17   petition to the agency in 2019, they did not raise any

18   arguments to the agency with respect to the initial approval.

19   In fact, they asked the agency specifically to restore the

20   conditions under which the agency approved the drug in 2000.

21             So the agency's decision in 2016, for which it is

22   now also too late for them to bring a new claim-- They never

23   argued to the agency that that decision should undo the initial

24   approval, which is what they are asking this Court to do.

25   Having never raised that to the agency, they can't raise it now

1    to the Court.

2            And if you were to excuse exhaustion, you would

3    simply get back to the fact that the agency made the decision

4    more than six years before they filed suit.  So excusing

5    exhaustion, plaintiffs would just run headlong into a statute

6    of limitations problem.

7            THE COURT:  Well, this entire case is something of

8    a nightmarish law-school question on tolling.  I know that's a

9    more generic phrase.  But one party has a backward tolling

10   problem under reopening doctrine and various administrative law

11   theories.  Another party has a forward-looking sort of approval

12   action tolling problem.  Specific to pediatric care, the

13   pediatric rule starts at this time; then it's incorporated by

14   reference into PREA, and then REMS, and then ETASU.

15           So what is your best case on the reasonableness or

16   unreasonableness of the delay for that 16-year period?  I

17   understand all the parties have briefed to this Court various

18   intervals and where lines can be drawn.  But from 2016 back to

19   2000, what the plaintiffs have termed the 2016 major changes,

20   what is your best argument explaining the delay for that

21   16-year interval for the pendency of that original petition?

22           MS. STRAUS HARRIS:  Just to be clear on the record,

23   the citizen petition wasn't filed until 2002, and the agency's

24   decision on that petition was in 2016.

25           THE COURT:  Fourteen years.  I'm sorry.  Fourteen

1   years, not sixteen.  You are correct.

2          MS. STRAUS HARRIS:  So I--rather than pointing to a

3   particular case, I will say that the problem is really one of

4   plaintiffs' own inaction.  There are remedies that federal law

5   allows for a party that believes that they have been harmed by

6   an agency's delay, and the plaintiffs didn't invoke that--

7   those remedies in a timely way.  They could have referenced the

8   delay before the agency issued its decision.

9          And that is actually similar to the *Bracco* case

10  that the plaintiffs cite.  There, the Court found that the

11  irreparable harm that would accrue to the plaintiffs in that

12  case excused the plaintiffs' obligation to complete an

13  administrative process that they had begun but that the agency

14  had not yet concluded.

15         But that's not the situation here.  The plaintiffs

16  here let the agency complete its process, however long that

17  took.  Plaintiffs had mechanisms before then to go in, and they

18  did not invoke those.  And then once the agency made that

19  decision, the plaintiffs had six years to challenge it.  They

20  could have challenged it perhaps on the basis that the agency

21  took too long and maybe there was some impropriety there, but

22  they didn't do that.

23         And it's not really argued here that the delay,

24  like, exposed some other impropriety.  They just are arguing

25  that the delay in that decision should excuse exhaustion for a

1     later argument that they didn't make or should somehow allow

2     the Court to reopen the original decision.

3            But because they have sort of two fatal defects in

4     their claim laid on top of each other, they do not satisfy an

5     excuse for the exhaustion requirement, and they are too late to

6     bring their claims in the first instance.  They simply can't--

7     they simply haven't offered a basis for the Court to do what

8     they are asking it to do in terms of revisiting that original

9     decision.

10            THE COURT:  Okay.  And I took it from your

11     introduction that Mr. Schwei is going to address whether this

12     decision-making was committed to agency discretion and the

13     *Heckler* line of cases?

14            MS. STRAUS HARRIS:  Yes, he will.

15            THE COURT:  So I'll reserve those cases for

16     Mr. Schwei.

17            MS. STRAUS HARRIS:  Thank you, Your Honor.

18            THE COURT:  You may continue.

19            MS. STRAUS HARRIS:  Yes.  I'll turn now to

20     plaintiffs' standing.

21            So plaintiffs assert several bases on which they

22     argue that they have standing.  As to the organizational

23     plaintiffs, plaintiffs cannot proceed on an associational

24     standing theory for the same reasons which I'll discuss in a

25     moment, that none of their complaining physicians have alleged

1    injury for standing purposes.

2             But I'll talk now about specifically organizational

3    standing, their organizational standing theory.  The problem

4    with their organizational standing theory arguments is that

5    they have simply not alleged the type of diversion of resources

6    that's necessary to satisfy Article III.  And the separate

7    informational injury that they allege in the briefing, but I

8    don't think was discussed much today, is not cognizable.  And

9    absent a cognizable injury, in fact, there is no irreparable

10   harm.

11            As to diversion of resources, the plaintiffs focus

12   on the language about needing to identify specific projects to

13   which they would be spending their resources but the resources

14   would have allegedly been diverted.  And--

15            THE COURT:  And I think that specific projects

16   terminology comes from the Fifth Circuit--

17            MS. STRAUS HARRIS:  Yes.

18            THE COURT:  --itself.  That's the terminology that

19   they use for this diverted resource concept.

20            MS. STRAUS HARRIS:  Yes.  Correct.

21            I think the problem with thinking about how

22   plaintiffs have pled their claim and the allegations that they

23   have asserted as relates to diversion of resources is that

24   while, in the briefing, the parties might have focused on this

25   language about there's not a need to identify specific

1    alternative projects, the problem here is that the plaintiffs

2    have not identified specific--have not identified sort of an

3    overarching mission projects that they generally engage in that

4    are different from the activities to which they claim they have

5    diverted their resources here.

6            What I mean by that is that they allege to have

7    diverted resources to activities that are right in the

8    wheelhouse and right within the basic mission of the

9    organization.  They speak about needing to educate physicians,

10   their physician members, educate the public or, you know,

11   potential plaintiffs about the harms of abortion generally, and

12   they speak specifically about mifepristone.  But that is

13   specifically the mission, as they describe their own mission in

14   the declarations that they provide.

15           I'll just give one example here of the alignment

16   between what they claim to have diverted their resources to and

17   what they say is their specific--the core of their mission.

18   The ACOP group, A-C-O-P, says that its purpose is to educate

19   doctors, their patients, and the public about dangers of

20   chemical abortion.  This is in ECF Number 1-7 at 6.  But then

21   they complain that they are spending resources on their, quote,

22   public advocacy and educational activities, exposing the risk

23   of harm to women from FDA's unlawful approval and deregulation

24   of chemical abortion drugs.  That's in ECF Number 1-7 at 6

25   to 7.

1              They are perfectly aligned.  So there's simply no

2     diversion of resources here.  The activities that they have

3     engaged in, including preparation of citizens petition and the

4     educational efforts, are right within the core of their

5     mission.

6              THE COURT:  So I take your argument to be, on

7     diverted resource concepts, if the Court ascertains that an

8     identifiable specific project also allies with an item listed

9     in the core mission statement of the organization, if those

10    lists match--  Here's yet another matching problem.  If those

11    match, we don't have the sort of diversion of resources that

12    would allow for organizational standing.  Is that basically the

13    government's argument?

14             MS. STRAUS HARRIS:  Generally.  It's that the--if

15    the agencies--if the activities that the agency claims it is

16    engaging in by virtue of the agency action that they are

17    challenging are the very activities that the agency describes

18    as their core activities generally, there's no diversion of

19    resources for the purposes of organizational standing.

20             THE COURT:  Okay.  I have your argument on that.

21             And then I could not find Fifth Circuit authority

22    on whether a citizens petition is like a complaint that is

23    often prepared in litigation, other filings that are submitted

24    to the district court, or whether a citizen petition, for some

25    sort of regulatory compulsion reason, may be counted as a

1    diverted resource event.  What's the government's position on

2    that?

3           MS. STRAUS HARRIS:  Your Honor, I don't believe

4    that there is specific Fifth Circuit authority on that.  I do

5    think that what's relevant here is why the mechanism of the

6    citizen--how the mechanism of the citizen petition fits into

7    the overall structure of the agency action and judicial review

8    here.

9           The agency regulations require submission of a

10   citizen petition as a precursor to judicial review.  And in

11   that regard, it is the very definition of a prelitigation

12   activity, because it is a necessary precursor to bringing an

13   action in court.

14          And in that way, the plaintiffs here, by filing

15   citizens petitions, are directly aligned with the plaintiffs in

16   the *City of Kyle* case that the Fifth Circuit described--the

17   Fifth Circuit decided that case but also describes that case in

18   the *OCA-Greater Houston* case in contrasting why the plaintiffs

19   in the *City of Kyle* case lacked organizational standing but the

20   *OCA-Greater Houston* plaintiffs possessed it.

21          THE COURT:  Okay.  Thank you for that

22   clarification.  I understand the government's argument on that.

23   You may continue.

24          MS. STRAUS HARRIS:  Sure.  I'll move now to the

25   individual physicians' standing arguments, which would also

1    underlie their associational standing arguments.

2             Here, no individual physician plaintiff or

3    association member has standing for at least three fundamental

4    reasons.  The first is that a past exposure to harm cannot

5    support standing to obtain prospective injunctive relief.  This

6    is clear from the *City of Los Angeles vs. Lyons* case from the

7    Supreme Court.  And the allegations that plaintiffs present in

8    the declarations all relate to past examples of times when

9    individual physicians allegedly experienced harm by virtue of

10   the agency's action.

11            The second reason they lack standing is because

12   continuing or threatened future effects must be certainly

13   impending, and allegations of possible future injury, including

14   what the Supreme Court has called a someday injury, are not

15   sufficient.  And here, I refer the Court specifically to the

16   *Clapper* case from the Supreme Court.

17            The plaintiffs' argument that they have standing on

18   this basis is based on what they call the likelihood of

19   complications from a patient consuming mifepristone.  This is

20   at ECF Number 120 at 13.  But this idea, the likelihood of

21   complications, runs counter to the clear precedent as explained

22   in *Clapper*.

23            And specifically, the Supreme Court, in *Clapper*--

24   and this is at pincite 410 of that case--explained that an

25   objectively reasonable standard is inconsistent with the

1    requirement to show that threatened injury must be certainly

2    impending to constitute injury in fact.

3         But that objectively reasonable standard is

4    precisely what plaintiffs seek to rely on here.  They are using

5    sort of a statistical argument or a likelihood argument to

6    suggest that their members could be forced to care for a

7    patient experiencing complications.  And the "could be forced"

8    language comes, for example, from ECF Number 1-5 at 13, but it

9    appears in several of their declarations.

10        This is an argument that, on the basis of, really,

11   the law of large numbers, they are likely to experience harm.

12   And that's precisely the type of objectively reasonable

13   standard that the Supreme Court has said does not suffice to

14   establish standing in *Clapper*.

15        THE COURT:  And you mentioned a third reason.

16        MS. STRAUS HARRIS:  The third--yes, thank you, Your

17   Honor--is that any alleged injuries must be fairly traceable to

18   the challenged action of the defendant and not the result of

19   the independent action of some third party that's not before

20   the Court.

21        And here, the plaintiffs' contention is that they

22   would be injured in some roundabout way because a different

23   doctor would prescribe mifepristone to a patient; that patient

24   would experience an adverse event; that patient would then seek

25   care from one of the physicians that's complaining in this

1    case; and then that complaining physician would have to divert

2    their time and resources from other patients; that they may

3    then be subjected to some sort of liability exposure or

4    increased insurance costs and maybe cause them some--what they

5    allege are emotional--is emotional harm.

6              THE COURT:  Okay.  I wanted to give you your

7    15-minute warning.  And then I've got your arguments on

8    post-exposure, future effects, and then traceability.  I wanted

9    to ask a follow-up question.  It might need to go to defendant

10   intervenor.  But I already addressed this during plaintiffs'

11   argument-in-chief that Justice Alito, interpreting *Powers v.*

12   *Ohio*, that the second prong of third-party standing, which

13   requires the litigant to have a close relationship, might need

14   to be reevaluated in light of the actual facts of abortionist/

15   patient relationships.  Specifically in *June Medical*, in his

16   dissent, he says:  A woman who obtains an abortion typically

17   does not develop a close relationship with the doctor who

18   performs the procedure.  On the contrary, their relationship is

19   generally brief and very limited.

20             Obviously this is written in dissent.  This hasn't

21   been dogmatized in any sort of new rule or exception to

22   third-party standing.

23             If a doctor doesn't have a close relationship with

24   the patient, how can that possibly reconcile with the cases

25   finding third-party standing in so many other abortion cases?

1    So beginning in 1973, moving forward, we don't see litigants

2    struggling to establish third-party standing in *June Medical*,

3    the *Whole Woman's* line of cases.  So what is the Court to take

4    from intervenor's argument that we don't have the requisite

5    close relationship between doctor and patient?

6              MS. STRAUS HARRIS:  Your Honor, I'll point the

7    Court specifically to what the Supreme Court--the majority in

8    *June Medical* did find was the basis for third-party standing,

9    because that is the governing rule at this time.  And in that

10   case, the Court found that on the basis of a very specific set

11   of factual circumstances that are not present here, that there

12   was third-party standing for the physicians.

13             The laws at issue in that case directly regulated

14   the physicians themselves and imposed criminal penalties that

15   ran directly against the physicians.  Here, the physicians are

16   not, themselves, regulated by FDA, and there is no criminal or

17   civil penalty that flows to them from the agency.  They also

18   don't purport to prescribe the drug, the approval of which they

19   challenge here.

20             Second, in *June Medical,* it is very relevant to the

21   Court's decision and important to the Court's decision was that

22   the plaintiff physicians and the patients in that case had

23   interests that were directly aligned.  The physicians there

24   wanted to provide a specific type of care, and the patients

25   there wanted to receive that specific type of care.  And so the

1    patients that were at issue there actively wanted and were

2    deprived of the exact same thing that the physician plaintiffs

3    there actually wanted and were deprived of, and that was what

4    the relief sought.

5           The plaintiffs here seek to prevent access to a

6    form of health care that the group of affected patients wants

7    to receive.  And so their interests are not only unaligned, but

8    they are actually diametrically opposed.

9           That is the governing law on third-party standing

10   that, you know, must govern this case.  And we argue, on the

11   basis of this case, it's clear that the plaintiffs have not

12   established that third-party standing would apply here.

13          THE COURT:  Okay.  And then briefly back to your

14   second argument on associational standing, what you have termed

15   and, I think, other circuit courts have used the language of

16   the prospective someday injury.  With mail-in abortion now

17   approved under the FDA actions at issue, does the government

18   assert that it continues to be unlikely that plaintiff

19   physicians will be harmed in the way described in the

20   complaint, in the declarations?  Now that that mail-in protocol

21   has been approved by agency action, how should this Court apply

22   *Lyons*, L-y-o-n-s, to that future harm or someday-injury

23   inquiry?  Is that a game-changer for that particular

24   associational argument now that that intervening event has

25   occurred, or are you still arguing that these are the sort of

1     someday injuries that are noncognizable under the PI standards

2     that we must apply?

3              MS. STRAUS HARRIS:  Your Honor, these are still the

4     same sort of someday harms, potential someday harms that are

5     not sufficient.  And the reason for that--

6              THE COURT:  So *Clapper*--your *Clapper* argument still

7     applies?

8              MS. STRAUS HARRIS:  *Clapper* still applies.  The

9     agency, in its recent--more recent decisions adjusting the

10    conditions under which--the conditions that would apply to the

11    approval of mifepristone, in doing so, the agency's

12    determination was that the use of mifepristone for a

13    termination of intrauterine pregnancy was safe and effective

14    under the different conditions that they--you know, the change

15    in the conditions that they implemented with that recent

16    decision.

17             The prior decision had been that, similarly, the

18    drug was safe for that indication under certain conditions.

19    The agency determined that the conditions--those conditions

20    could change but didn't--but in order to do that, the agency

21    determined that the safety and effectiveness would be

22    maintained with a different set of conditions.

23             And in that regard, the agency's decision doesn't

24    actually alter the idea that, while there--you know, like

25    with--when the agency--when the FDA approves a drug as safe and

1    effective, it is not making a determination that no patient

2    will ever experience a complication from that drug.  That's not

3    what the standard is that's applied.  And that continues.  They

4    have simply determined that these new conditions maintain the

5    requisite safety and effectiveness.

6           So plaintiffs here have not suggested that there

7    would be some--they don't have a basis for saying--a basis in

8    fact or in past experience for saying that their harms would

9    certainly inure to them under these current conditions.

10          THE COURT:  But understanding, from *Clapper* and

11   other cases, that you can't just do a probabilistic analysis

12   and throw statistics at the Court to prove the necessary harm,

13   here, we have intervening events that might have changed some

14   of the probabilities.  So in 2000, we have all of the in-person

15   dispensation requirements, the follow-up visits.  Moving into

16   2016, those are suspended or removed, and then now we have a

17   mail-in option that's available.

18          When there isn't this intervening physician

19   monitoring on the back end or on the dispensation side, does

20   that not alter your analysis of whether those harms are purely

21   speculative?  Now that there's a regime by which this

22   medication can be distributed, absent end physician

23   dispensation and absent subsequent visits for monitoring, does

24   that not change the calculation on what is and isn't

25   speculative?

1          When things were monitored by doctors in each

2     instance, I can see where, you know, just playing the law of

3     averages isn't inadequate under *Clapper* and other cases, but

4     doesn't mailing and the removal of that conduit of a physician

5     change those laws of averages, and is that the sort of delta

6     that this Court may consider in considering whether alleged

7     harms are speculative?

8          MS. STRAUS HARRIS:  It doesn't change that the

9     plaintiffs are still relying on a law of averages.  There may

10    be--  I do not concede that there's any change in the

11    likelihood of complications that may occur.  But if you were to

12    credit plaintiffs' suggestion that there are, they are still

13    relying on statistics, and the Supreme Court has been

14    completely clear that that is not a sufficient basis to find

15    standing.  So they don't--the Supreme Court doesn't draw a line

16    in saying, well, if the probability is this amount versus this

17    amount, when you're relying on the law of averages, then you

18    have reached standing.  They say definitively that you cannot

19    rely on an objectively reasonable standard such as that.

20         THE COURT:  Okay.  And the declarations attached to

21    the complaint and part of the record are inadequate to allege

22    particular harm because these are past exposures to harm, and

23    that's argument number one.  Correct?

24         MS. STRAUS HARRIS:  Yes.  And I'll just add one

25    additional point, which is that the FDA approved this drug as

1   safe and effective for use more than two decades ago.  And

2   plaintiffs assert that they have members throughout the

3   country, thousands of members.  The plaintiffs' declarations

4   cite just a handful of examples of situations in which they

5   allege to have experienced harm from this.

6           And over that full amount of time, there's just a

7   tremendous body of evidence and experience showing that, in

8   fact, the numbers are not likely to create the overwhelming

9   sort of burden on their practice or on the healthcare system

10  that they allege is there.  That's simply belied by the number

11  of examples that the thousands of members of plaintiffs groups

12  could even amass.

13          THE COURT:  I know you're well acquainted with the

14  Courts of Appeal.  Unfortunately we don't have the light

15  system; red, yellow, green.  So you are now at your 5-minute

16  warning.

17          MS. STRAUS HARRIS:  I'll turn then to public

18  interest.

19          THE COURT:  You may proceed.

20          MS. STRAUS HARRIS:  Before I say public interest,

21  I'll just note that all of the arguments that I've made with

22  respect to standing go to irreparable harm.  And to the extent

23  that a party has not alleged injury for standing purposes, they

24  certainly have not alleged the requisite harm, irreparable harm

25  that's necessary to invoke the Court's powers to grant a

1    preliminary injunction.  So for that reason, the relief that

2    they seek is not warranted here.

3            Turning to the public interest, an injunction here

4    would interfere with the interests of every state in the

5    country, for in every state, since 2000 and through today,

6    abortion is lawful under circumstances where mifepristone may

7    be the best treatment option, including cases of fetal

8    nonviability or cases of a pregnancy resulting from rape.  It

9    may differ, the circumstances, from state to state, but every

10   state has an allowance under which mifepristone would be

11   lawfully used in that state.

12           The public interest here would be dramatically

13   harmed by effectively withdrawing from the marketplace a safe

14   and effective drug that has lawfully been on the market for

15   22 years.  And the public interest is paramount when an

16   injunction would deprive the public of an important medical

17   benefit.  That's from the *Pharmacia Corporation vs. Alcon Labs*

18   case that we cited.

19           Removing access to mifepristone would cause worse

20   health outcomes for patients who rely on the availability of

21   the drug to safely and effectively terminate their pregnancies,

22   including, as I noted, cases of fetal nonviability or rape

23   victims.

24           And our declarants cite examples of this.  The

25   Kieltyka declaration, the Lindo declaration, the Glaser

1    declaration are just some examples citing cases where the

2    specific medical indication for mifepristone is based on a

3    patient's unique needs that cannot be satisfied as well by a

4    different option for that plaintiff.

5            THE COURT:  Okay.  I take that as your response to

6    the 22 states that have filed an amicus brief supporting the

7    plaintiffs in this case.  This isn't an instance where we're

8    comparing 22 to 28, but instead, that there's an overarching

9    public policy interest in all 50, because, in some of those

10   earlier term procedures, this drug would affect all 50 states?

11           MS. STRAUS HARRIS:  Precisely.  There is an

12   interest throughout the country.

13           THE COURT:  Okay.  You may proceed.

14           MS. STRAUS HARRIS:  A preliminary injunction here

15   would also undermine the capacity of state healthcare systems,

16   because it would lead to overcrowding and delays at both

17   surgical abortion clinics, and also general practitioners who

18   would be servicing patients.  And the Lindo declaration

19   provides evidence for this.

20           An injunction would interfere with the reliance

21   interests of businesses that are involved in the sale and

22   distribution of mifepristone.  But, more generally, it would

23   leave pharmaceutical companies unable to confidently rely on

24   FDA approval decisions to develop the pharmaceutical drug

25   infrastructure that Americans depend on to treat a variety of

1    health conditions.

2          Finally, a preliminary injunction would interfere

3    with Congress's decision to entrust the FDA with the

4    responsibility to make determinations about the safety and

5    effectiveness of drugs.  And allowing the plaintiffs to

6    supplant the FDA's considered judgment here with their cursory

7    and speculative allegations of harm would undermine the

8    administrative framework that Congress designed for the

9    pre-market approval of pharmaceutical drugs.

10          I'll note specifically, as to public interest, if

11   the Court grants the relief that plaintiffs seek, there will be

12   a significant disruption.  There have been reports that some

13   providers may have begun considering taking alternative actions

14   to ensure lawful access in the event that this Court grants the

15   relief that plaintiffs seek.  Indeed, one of our declarants,

16   Maine Family Planning, has articulated publicly that it started

17   considering an alternative protocol.  But even as to Maine

18   Family Clinic, they make clear that it's unclear to them

19   whether such a protocol would be practical or available if the

20   Court entered an adverse order.

21          What we know for certain is that even if there were

22   an alternative protocol, an order along the lines that

23   plaintiffs seek would significantly disrupt lawful access,

24   access that is lawful under certain circumstances in every

25   state in the country.

1     THE COURT:  Okay.  And, Ms. Straus Harris, you are

2 at the close of your time.  Thank you for your argument.

3     At this time, I'll invite Mr. Schwei to approach

4 the podium.  And for time management, I do intend to ask

5 questions on the *Heckler* line of cases, and then also what was

6 revealed today as a textual statutory argument that plaintiffs

7 present construing Subpart H.  So if we reach a point, I may

8 interrupt for those questions.

9     You may proceed.

10    MR. SCHWEI:  Understood, Your Honor.  And just one

11 housekeeping matter.  My name is pronounced actually Schwei,

12 so--

13     THE COURT:  Schwei.  Okay.  With my last name, I'm

14 sensitive to mispronunciations, so I apologize for that.

15    MR. SCHWEI:  I appreciate that, Your Honor.

16    THE COURT:  Mr. Schwei, you may proceed.

17    MR. SCHWEI:  Thank you.

18    The FDA has approved mifepristone for medication

19 abortion for over two decades based on extensive scientific

20 data confirming the drug's safety and efficacy.  Plaintiffs now

21 seek to overturn the FDA's expert judgments, contrary to

22 fundamental principles of administrative law.

23     Plaintiffs' case is built upon portraying

24 mifepristone as a dangerous, unproven drug.  But as FDA has

25 repeatedly explained, that is simply not true.  The current

1 label for mifepristone highlights that it is extremely

2 effective.  In U.S. trials, the success rate is over

3 97 percent.  And in terms of safety, serious adverse events are

4 rare.  Hospitalization related to medical abortion occurs in

5 less than one percent of all cases.

6   Plaintiffs now ask this Court to second-guess FDA's

7 judgments, arguing that the numerous studies relied upon by FDA

8 simply were not good enough.  But there is absolutely nothing

9 in the Food, Drug and Cosmetic Act limiting the Secretary's

10 discretion to approve drugs only when the clinical trials are a

11 perfect match to the full set of approved conditions.

12   And I think, with that, I'll turn directly into the

13 plaintiffs' arguments about the FDCA, because I think this

14 Court asked them a question to capture essentially the thrust

15 of their argument, which is, are they claiming that there needs

16 to be a one-to-one match between the protocols in the clinical

17 trials and the ultimate set of conditions approved by FDA.

18   And their answer was, yes, there needs to be an

19 identical set of conditions, but there is nothing in the

20 statute that can plausibly be read as imposing such a mandate.

21 And I think turning to the actual text of 355(d) underscores

22 that.

23   First, as the Court noted, the very first words of

24 355(d) are, quote, if the Secretary finds.  That is a

25 delegation of discretion to the Secretary for him or her to

1  make fact finding.  It is a grant of wide discretion, not a

2  ministerial duty simply to compare, are these conditions

3  exactly the same as what was in any of the clinical trials.

4           And if you go beyond even just the opening

5  language, it becomes even more clear--

6           THE COURT:  Let's stay with that first sentence on

7  that opening language.  So during the plaintiffs'

8  argument-in-chief, I read aloud that exact opening sentence and

9  focused on the word "finds."  And from what I can ascertain,

10 plaintiffs allege that that finding was made in Attachment 124,

11 which is the FDA letter dated February 18, 2000.

12          Are those findings not adverse to your argument as

13 applied to the subparts that follow?  In other words, has that

14 finding not happened in a way that supports plaintiffs'

15 argument?

16          MR. SCHWEI:  I think the finding here is that

17 mifepristone is safe and effective under the conditions

18 imposed.  It depends obviously on, you know, what moment in

19 time we're talking about.  But, I think, regardless of what

20 moment in time, it's the finding under 355(d) that it's safe

21 and effective under the conditions imposed.

22          But to understand what that finding means, it

23 requires looking at the various subparagraphs within 355(d).

24 The ones relevant here all confirm that there's no mandate for

25 an identicality of clinical trials and ultimate conditions

1    approved.

2              THE COURT:  And here, the plaintiffs identified

3    with particularity subpart (1), which is what I'll call the

4    adequate test; subpart (2), which relates to tests showing the

5    drug is unsafe for use, or do not show that it's safe, kind of

6    a floor-ceiling concept; and then Subpart (4), which I called

7    particular attention to the "any other information" language.

8              If you could just respond to plaintiffs' arguments

9    that these subparts in particular give this Court authority to

10   order either suspension or withdrawal and that these subparts

11   support their case that that work was not done by statutory

12   mandate.

13             MR. SCHWEI:  Certainly, Your Honor.  So with

14   respect to paragraph (1), I think Your Honor highlighted the

15   important language.  It's about whether the investigations

16   include adequate tests by all methods reasonably applicable.

17   That language cannot be understood as requiring every single

18   protocol to match perfectly.  That language, again, is

19   consistent with the grant of discretion to the Secretary to

20   determine, are these studies sufficient to make the finding I

21   need to make under 355(d).

22             I would note that the only case cited in

23   plaintiffs' PI motion about this is the Seventh Circuit's

24   decision in *United States vs. One Article*--or *One Device of*

25   *Diapulse*.  And that case itself confirms that plaintiffs'

```
 1    argument is wrong, because there, the Seventh Circuit framed

 2    the inquiry as simply whether the studies were, quote, similar

 3    to the ultimate conditions imposed.  And so whatever the--

 4    whatever the studies show, plaintiffs' argument that there

 5    needs to be a one-to-one match cannot be correct, even under

 6    their own cited authority.

 7            But returning to the statutory text,

 8    subparagraph (2) talks about, quote, the results of such tests.

 9    So, again, it's a delegation of authority to the Secretary to

10    interpret the results.  It's not simply the Step One imposition

11    of, are the clinical trials the same.  It's Step Two, are the

12    results adequate to support a finding.

13            And then in subparagraph (4), I think Your Honor

14    again highlighted the key language, which is, the first part of

15    it acknowledges that the Secretary can make a decision upon the

16    basis of the information submitted to him as part of the

17    application, which would include all of the clinical trials.

18    But then it goes on to say, or upon the basis of any other

19    information before him with respect to such drug.

20            THE COURT:  So I think the parties are in agreement

21    that the record accurately reflects the first part, the

22    information that was submitted as part of the application.  I

23    asked a specific question on what that second part, after "or,"

24    that "any other information."  How would the government

25    construe that language and how that defeats plaintiffs'
```

1    argument that they can continue to review and not necessarily

2    match all the clinical conditions and preconditions

3    study-by-study in the sort of apple-orange way described by

4    plaintiffs?

5            MR. SCHWEI:  I think that language disproves

6    plaintiffs' argument about there needing to be a one-to-one

7    match, because if that was the sole inquiry, the only

8    information the Secretary would need is in that first part

9    about the information submitted as part of the application.

10   And so the fact that the Secretary can consider additional

11   information proves that Congress was not contemplating a

12   mandate of just asking a simple question, is there a one-to-one

13   match.

14           And then I also want to point out subparagraph (5),

15   which talks about substantial evidence.  And this is again a

16   long paragraph of statutory text, but the term "substantial

17   evidence" is later defined, and it includes an acknowledgement

18   that data from one adequate and well-controlled clinical

19   investigation may be sufficient to establish effectiveness

20   under the substantial evidence standard.

21           And the terms "adequate and well-controlled

22   clinical investigation" are terms of art within the FDCA.  They

23   are defined by regulation at 21 CFR 314.126.  And there's an

24   extensive list of what must be shown for a clinical trial to be

25   adequate and well-controlled, and that requirement is not

1    simply a one-to-one match.  And so their statutory argument

2    here on the FDCA has to be wrong based on the text of 355(d)

3    and their own case.

4         I read the PI motion as presenting solely a

5    statutory argument.  I think they try to build in some level of

6    arbitrary and capricious review in response to the Court's

7    question, but even if that claim is properly presented, it

8    would have to be an extraordinarily deferential type of review,

9    given that what is essentially at issue is FDA's scientific

10   judgment.  And I think each of the issues that they flag as

11   warranting that type of review just demonstrate how in the

12   weeds they are trying to second-guess FDA's expert judgments.

13        And one that I'd like to touch on, because the

14   plaintiffs discussed on it this morning, is the imposition of

15   an ultrasound requirement.  They say that the clinical trials

16   required an ultrasound but the ultimate conditions imposed by

17   the Secretary did not.

18        As a factual matter, that's not correct.  There

19   were three clinical trials at issue supporting the 2000

20   approval of the drug.  The two French clinical trials actually

21   did not require an ultrasound.  Only one of the three clinical

22   trials did require an ultrasound.  And the cite for that

23   proposition is ECF Number 1-28 at page 19, footnote 47.

24        But in any event, setting aside their argument as

25   just wrong, FDA specifically addressed this issue and explained

1    why they did not need to impose an ultrasound requirement.  In

2    the 2000 approval memorandum, they note that they had carefully

3    considered the issue but that they noted in the clinical trial

4    where, in order to gain certain data, it was really important

5    to use the ultrasound.  In practice, other clinical methods are

6    adequate for dating gestational age and diagnosing an ectopic

7    pregnancy.

8            And I think the way plaintiffs have framed this

9    issue as, FDA simply imposed no requirements at all--  But

10   that's not accurate.  FDA still required as one of the

11   conditions that prescribers must be able to accurately diagnose

12   the gestational age and be able to diagnose ectopic

13   pregnancies.  The only thing that FDA did was leave it up to

14   each individual prescriber's judgment about how exactly to do

15   that.  And so sometimes, that might require an ultrasound, but

16   other times, it might not.

17           And again, the fact that we are at this level of

18   minutia of the protocol highlights how this is far from

19   arbitrary and capricious review, which simply requires the

20   agency to adequately explain its reasoning, which they did

21   here.

22           My colleagues also mentioned the *Serono Labs*

23   decision as perhaps supporting this Court's ability to make

24   safety and efficacy decisions.  I appreciate their candor that

25   it was not cited in the briefs, and so I say that only to say

1    that I'm not 100 percent familiar with the decision at this

2    moment, but--

3           THE COURT:  I'll afford you the same courtesy, by

4    the way.  If you have found good case law in these intervening

5    days and weeks, you may submit them to the Court.  It's not

6    like the Fifth Circuit where you have to file a 28(j) letter or

7    anything like that.  Just let me have it.  So I afforded them

8    the courtesy to go beyond the four corners of the briefing.  If

9    there's any additional authority, you may present that to the

10   Court and it will be considered, so--

11          MR. SCHWEI:  I appreciate that, Your Honor.  I

12   would just note that on *Serono Labs*, as best I can tell in this

13   moment, that decision appears to have been vacated by the

14   D.C. Circuit.  Vacatur appears at 158 F.3d 1313.  So I don't

15   think the decision stands for much of anything relevant here.

16   But as I understand it, that case arose in the context of

17   generic drugs and the separate approvals under 355(j).

18          And so the types of questions that the agency is

19   answering in connection with approval of a generic drug, about

20   whether the ingredients match the brand-name drug, that's far

21   afield from the type of safety and efficacy decision that

22   plaintiffs are challenging here, and so I don't think it

23   supports their claim here.  So whether it's a statutory or

24   arbitrary and capricious claim, I don't think they have

25   established any cognizable violation of the Food, Drug and

1    Cosmetic Act.

2            And I'll turn now to Subpart H, unless the Court

3    has questions on the FDCA.

4            THE COURT:  Please proceed with that next part.

5            MR. SCHWEI:  Thank you, Your Honor.

6            So with respect to Subpart H, I think the most

7    practically relevant thing here is that none of it really

8    matters, because in 2007, Congress enacted a law that took

9    mifepristone's approval out of the Subpart H framework.

10   Congress deemed mifepristone to have a REMS, directed that REMS

11   to continue, mandated that the parties submit--or that the

12   manufacturer submit a proposed new REMS.  They did, in fact, do

13   that.  The agency approved that new REMS.  And since 2007,

14   since that time period, everything regarding mifepristone's

15   approval has been governed under REMS.

16           So even assuming, hypothetically, that there was

17   some violation of--or some improper invocation of Subpart H

18   initially, that error is clearly harmless in light of the new

19   statutory framework.

20           THE COURT:  And I have that argument and, as I have

21   described, these sort of chain-reaction, domino events and this

22   sort of law review, law school-type tolling question where both

23   parties are sort of sequencing different events to retain their

24   authority to decide or litigate a question.  So I have that

25   part of it, but let's go back to the hypothetical.

1          So assuming this Court must decide whether

2     Subpart H was violated in any statutory way, that section, that

3     Subpart H refers to serious and life-threatening terms.  And

4     the 1988 rulemaking explained that life-threatening disease or

5     condition is, quote, defined as one in which the likelihood of

6     death is high unless the course of the disease is interrupted.

7          They cite as an example progression from

8     asymptomatic HIV infection to symptomatic HIV infection.  Of

9     course, HIV treatments are part of the reasons for this

10    accelerated process under Subpart H.  That's all codified at

11    53 Federal Register at 41517.

12         Is this initial rulemaking and those definitions

13    consistent with how defendants would ask this Court to

14    interpret Subpart H if the Court must answer the statutory

15    challenge?  Is the determination first reached through the 2000

16    approval and every FDA agency action since that?  How would you

17    reconcile the listing of mifepristone and what indications are

18    prescribed for that with this definition, which preceded that

19    2000 approval in a 1988 rulemaking?

20         MR. SCHWEI:  Your Honor, I think there are a couple

21    of parts to the Court's question.  One is, is pregnancy a

22    serious or life-threatening condition, and I think the answer

23    is yes, as FDA explained.  Pregnancy is not life-threatening

24    for everyone, to be sure, but the important thing is that for

25    some patients, it can be life-threatening.  And there's no

1   requirement that a condition be life-threatening for everyone

2   in which it presents, but FDA specifically noted the conditions

3   of preeclampsia and eclampsia potentially developing that can

4   threaten a pregnant person's life.

5          But then-- And I don't take plaintiffs really to

6   be challenging whether pregnancy is serious or life-threatening

7   for at least some patients.  I think their challenge on

8   Subpart H relates to the regulation's use of the word "illness"

9   and not "conditions."  And I think, looking at the NPRM and the

10   final rule in appropriate context, it becomes clear that

11   Subpart H encompasses life-threatening conditions regardless of

12   whether they would colloquially be called illnesses.

13          And just to walk through the regulatory history of

14   that, in the notice of proposed rulemaking, FDA listed some of

15   the diseases and conditions that they thought would qualify.

16   Some of those are things like HIV or cancer that sort of easily

17   fall within the bucket of diseases or conditions.  But some--

18          THE COURT:  Could you give me a citation for that

19   NPRM?

20          MR. SCHWEI:  Yes, Your Honor.  57 Federal Register

21   at 13235.

22          THE COURT:  Okay.  You may proceed.

23          MR. SCHWEI:  And in addition to things like HIV and

24   cancer, they also listed things like asthma, depression,

25   psychosis, which perhaps not everyone considers to actually be

1    an illness.  And, in fact, during the notice and comment

2    period, one commenter challenged whether depression and

3    psychosis were actually diseases that properly fall within

4    Subpart H.

5            And FDA's response was that it doesn't really

6    matter how people think of them, as whether they are diseases

7    or conditions.  They clearly fall within Subpart H.  And this

8    is at 57 Federal Register 58946.  FDA states:  Drugs for the

9    treatment of depression and psychosis would be examples of

10   those that could be covered by the accelerated approval

11   program, referring to Subpart H.  And later in the final rule,

12   at page 58948, FDA says, quote:  The drug in question must be

13   for a serious or life-threatening condition and must provide

14   meaningful therapeutic benefit over existing therapy.

15           And so I think the preamble here, read in context,

16   does demonstrate that, regardless of how the term "illness" is

17   colloquially used, things like pregnancy can be encompassed

18   within that.  And that's also consistent with FDA's regulation

19   of other drugs under Subpart H.

20           In 2008, the Government Accountability Office

21   undertook a review of FDA's approval of mifepristone under

22   Subpart H and concluded that FDA acted consistent with its

23   normal processes, and they noted other types of drugs that had

24   been approved under Subpart H.  I think plaintiffs mentioned

25   one for low blood pressure, which I think most people do not

1    naturally think of as an illness as opposed to a condition.  I

2    believe some types of fentanyl were approved under Subpart H,

3    and those are approved for pain management, which is sort of a

4    condition associated with an illness but not an illness itself.

5         And so I think FDA's consistent practice reflects

6    that it treated Subpart H as applying more broadly than

7    colloquial usage.  And Congress ratified that usage in 2007 by

8    enacting the REMS provision, which uses diseases or condition.

9         So even if the Court is not convinced about

10   harmless error, I think there still is statutory congressional

11   ratification argument about why FDA's implementation of

12   Subpart H was correct.

13        And there's no dispute here that FDA has statutory

14   authority under the REMS to approve mifepristone.  And so in

15   that world, I don't think the plaintiffs' Subpart H challenge

16   moves things forward or justifies going all the way back in the

17   time machine to 2007--or 2000 to analyze the legality of

18   something that doesn't matter post-2007.

19        THE COURT:  Okay.  And so I downloaded from the FDA

20   website all of the Subpart H approvals from '92 to 2008.

21   Obviously we move on into different statutory and regulatory

22   regimes after that.  And I'll read aloud--not the medications

23   by name, but specifically the purpose or the disease treated.

24   So HIV, tuberculosis, HIV, heart failure, cancer, AIDS, HIV,

25   HIV, HIV, HIV, HIV, HIV, cancer, cancer, HIV, AIDS.  Then we

1    get to orthostatic hypotension--low blood pressure--HIV, HIV,

2    HIV, cancer.  Then there's a wound treatment medication,

3    tuberculosis, leprosy, HIV, HIV, cancer, HIV, HIV, cancer, HIV,

4    HIV, brain tumors, strep, cancer, HIV, HIV.

5            And understanding that Subpart H was, in part,

6    developed as an accelerated process specifically to address the

7    HIV epidemics, it's not surprising that you see that disease

8    featured so prominently.  But your best argument for why

9    mifepristone is not, unlike the others--is the depression

10   psychosis medication--which one was that?

11           MR. SCHWEI:  So I'm not--

12           THE COURT:  Did that occur after 2000?  After the

13   2000 approval?

14           MR. SCHWEI:  I'm not sure whether any Subpart H

15   drug was actually approved for depression or psychosis.  I

16   think it was an example--

17           THE COURT:  Right.  But the regs do reflect that

18   the FDA made the determination that it could qualify under the

19   Subpart H nomenclature that we're adjudicating here.

20           MR. SCHWEI:  Correct, Your Honor.

21           THE COURT:  I'm only curious because, in private

22   practice, I worked on the Seroquel docket, which was an

23   AstraZeneca drug, and it treats sort of that category of

24   psychosis, bipolar, mania, schizophrenia, things like that.  So

25   I was interested to see if that somewhat controversial category

1    of drugs was part and parcel of the drugs that were approved up

2    until the 2000 approval for mifepristone, but I didn't see that

3    listed.

4              But thank you for the reference to the Federal

5    Register.  The Court will review those.  You can continue with

6    your argument.

7              MR. SCHWEI:  I'll turn next to the PREA argument,

8    the Pediatric Research Equity Act argument, that has come up at

9    today's hearing.  I think, again, with--  I appreciate my

10   colleague's candor that this issue--this claim was not

11   addressed in their PI motion, and so our first response is, we

12   don't think it's properly before the Court today.  The Court

13   should not rule on it.  It's particularly inappropriate to do

14   so because, to our knowledge, there's really no case law about

15   PREA.  It's a very complicated--it has a very complicated

16   history about, as the Court was discussing, the rule, the

17   injunction, the congressional action.  I think unpacking all of

18   that without briefing would be inappropriate, and so it

19   doesn't--and so the claim is not properly before the Court.

20   But I'll just say two points just to make sure that our

21   position is clear that the claim is meritless.

22              The first is that, with respect to the 2000

23   approval, the statute that is invoked as the basis for their

24   claims did not apply to the 2000 approval.  There was the

25   regulation in effect.  Of course, the regulation was later

 1    enjoined and invalidated, so I don't think that regulation can

 2    meaningfully serve as the basis for a claim.

 3              But with respect to the statute, in Public Law

 4    Number 108-155--Section 4 is the effective date--notes that it

 5    applies to applications submitted after--or on or after

 6    April 1st, 1999.  And here, although the approval of

 7    mifepristone occurred in 2000, the application was submitted in

 8    1996, before the effective date of the statute itself.  And so

 9    I don't think the 2000 Act--or the 2000 approval is even

10    relevant to this claim.  A citation for the application being

11    submitted in 1996 is ECF Number 1-24 at 2.

12              With respect to the 2016 changes, PREA did apply.

13    My colleagues on the other side attempt to characterize FDA's

14    action as extrapolating from adult studies to justify

15    adolescent data.  I'm not sure that's actually right.  I'm

16    looking at ECF Number 28-1, pages 78 to 81, which includes

17    discussion of this issue, and I'll just read a quote from

18    page 81:  Medical abortion in adolescents appears to be at

19    least as safe, if not safer, as in adult women.

20              And that's based on four studies addressing

21    adolescents.  And so I'm not sure it's right to even consider

22    it an extrapolation as opposed to just a determination that the

23    necessary adolescent studies exist and support safety and

24    efficacy data.

25              And so even if the Court has some questions about

1   this claim, it's not in the PI motion.  There hasn't been full

2   briefing on it.  The parties haven't addressed the full record,

3   and so I don't think the Court should consider it for purposes

4   of today, an emergency preliminary injunction hearing.

5           THE COURT:  I have your procedural argument.  I

6   have a preview of a substantive argument.  You can move on to

7   your next point.

8           MR. SCHWEI:  Thank you, Your Honor.  I'll turn next

9   to the Comstock Act.

10          So the first and most fundamental point is that

11  plaintiffs identify no reason why FDA should consider the

12  Comstock Act as part of the agency actions challenged in this

13  case.  The Comstock Act is a federal criminal law.  FDA's

14  approval is about the safety and efficacy of the drug.

15          Under 355(d), as we discussed, it lists extensively

16  what FDA should consider.  If those factors do not exist,

17  application denied.  If they do exist, application approved.

18  Nothing in the text of 355(d) explains why FDA needs to

19  consider unrelated portions of the U.S. Code and then

20  incorporate those unrelated portions into the drug approval

21  decision that FDA makes under this highly structured statutory

22  scheme.

23          And that argument makes particularly little sense

24  here when all of the agency actions at issue occurred before

25  *Dobbs*, so, in other words, when the framework of *Roe* and *Casey*

 1    were still good law and the Comstock Act was unenforceable.

 2           And so plaintiffs' argument is--that even when this

 3    law was constitutionally unenforceable, the agency was

 4    nonetheless required to consider that law and impose

 5    unconstitutional restrictions in the approval decision makes--

 6    is simply unfounded for these agency actions challenged, and

 7    the legality of the agency actions needs to be judged at the

 8    time of the decision, all of which occurred when *Roe* and *Casey*

 9    were still good law.

10           But setting aside sort of the procedural argument,

11    turning to the substance of what does the Comstock Act mean,

12    plaintiffs argue that OLC's interpretation is wholly atextual

13    and just based on case law.  Respectfully, I think that's

14    incorrect.

15           And I think the basis for this is Footnote 6 of the

16    OLC opinion, which talks about how, when Comstock Act was first

17    enacted by Congress, there were three relevant sections.

18    Section 1 had certain prohibitions for articles that applied to

19    any article for producing an abortion.  Section 2 had certain

20    prohibitions applying to articles for producing unlawful

21    abortion.  And then Subsection 3 prohibited certain acts with

22    respect to the, quote, hereinbefore mentioned articles.

23           And so there's obviously some question about what

24    are the hereinbefore mentioned articles that are referred to in

25    Section 3, given that Subsection 1 talks about abortion and

1    Subsection 2 talks about unlawful abortion.

2              THE COURT:  Okay.  And I recall that Footnote 6,

3    and I'm tracking with you on that OLC memorandum.  Let's go to

4    the phrase, "nonmailable."  So the Comstock Act declares

5    nonmailable every, quote, article, instrument, substance, drug,

6    medicine or thing which is advertised in a manner calculated to

7    lead another to use it or apply it for producing abortion.

8              This is just a straightforward reading of

9    Section 1461.

10             Is there--  And I understand your argument about

11   these intervening years under *Roe* and *Casey*.  But is there any

12   dispute on just pure statutory construction that chemical

13   abortion drugs at issue in this case and labeled as such by the

14   FDA are drugs, quote, for producing abortion?

15             MR. SCHWEI:  As a statutory matter, we dispute that

16   the--as--statutorily, we think OLC's interpretation is correct,

17   because the correct reading of those phrases in 1461 is about

18   drugs intended to be used for unlawful abortions.  And the

19   statutory basis for that relates back to 1873 and the

20   definition of hereinbefore mentioned articles, and then in

21   1874, when Congress answered that question of what they were

22   referring to by referring--by changing that phrase to be about

23   articles capable of producing unlawful abortions.

24             So Congress itself textually said that the prior

25   two subsections were about unlawful abortion.  I believe it's

1   Subsection 1 that has now been codified over the years into

2   1461, but I think that text from the 1874 Congress confirms

3   that 1461 is intended to be read in a manner consistent with

4   the OLC memo.

5          And that's also true based on, you know, not just

6   the ratification of these Courts of Appeals decisions, which is

7   an important part of the analysis, but also, Congress itself

8   understood Comstock in this manner.  That's clear from the 1948

9   historical revision note that specifically called Congress's

10  attention to these Courts of Appeals decisions that interpreted

11  Comstock consistent with the OLC opinion.  It cited a number of

12  the Courts of Appeals decisions and said that this is what

13  Comstock Act means, and Congress then recodified that

14  provision.  And I think that is, again, a clear basis for

15  interpreting the current versions, as they have been recodified

16  over time, consistent with the 1874 Congress's textual action.

17         THE COURT:  Okay.  So I wanted to give you a

18  10-minute warning.  I promised 15 minutes, but I didn't want to

19  interrupt you, so you're at the 10-minute mark.

20         And I do understand Footnote 6, and also the

21  government to rely upon that OLC memorandum.  I'm also guided,

22  however, by the Supreme Court in *Brown vs. Gardner* to this

23  point of ratification or reenactment.  There, the Court said,

24  quote:  There's an obvious trump to the reenactment argument.

25  In the rule where the law is plain, subsequent reenactment does

1    not constitute an adoption of a previous administrative

2    construction.

3          Back to my initial question on whether that

4    Section 1461 language, which refers to producing abortion--  If

5    I refer back to the FDA's own labeling regime, which this is

6    the current post-2021 label, it just refers to spontaneous

7    surgical and medical abortions.  It refers to termination of

8    pregnancy.  It lists a series of contraindications affecting

9    abortion.  But it is the government's case that that Footnote 6

10    should be given greater weight than FDA's own label?

11          MR. SCHWEI:  Apologies for being unclear, Your

12    Honor.  I agree that mifepristone is a drug that can cause

13    abortion, but I do not agree that that--

14          THE COURT:  The "unlawful" qualifier is what you

15    would add, pursuant to that OLC memo?

16          MR. SCHWEI:  Right.  I do not agree that it

17    necessarily falls within the Comstock Act under--as properly

18    understood and interpreted.

19          And I'll just make one last point on Comstock

20    before turning to the other issues.  You know, again, the 2007

21    act is important here, because, as plaintiffs conceded, the

22    2000 approval had a distribution scheme in place.  That

23    distribution system contemplated distribution in a manner that

24    plaintiffs say violates the Comstock Act.

25          But in 2007, when Congress deemed mifepristone to

1    have a REMS and directed that the existing REMS and the

2    existing distribution scheme continue going forward and be

3    immediately enforceable, the legal effect of that was to

4    require the distribution scheme to continue, and the legal

5    effect of that forecloses plaintiffs' argument here.  It is

6    simply inconsistent with that congressional action for them to

7    argue that every mailing of mifepristone is necessarily

8    unlawful, because Congress affirmatively directed that result

9    in 2007.

10            So, with that, I'm happy to turn--

11            THE COURT:  Let's turn--  You were designated by

12   co-counsel as the *Heckler* expert.  And so, here, we needed to

13   discuss whether this decision-making was committed to agency

14   discretion and the administrative law consequences of that.

15   Because you have just five minutes left or less, I want to get

16   right to the Court's questions.

17            Section 355-1(f)(3) states the Secretary can

18   determine, quote, elements to assure safe use may be required

19   for drugs, quote, with known serious risks.  And then among

20   these elements is that the drug, quote, be dispensed to

21   patients only in certain healthcare settings, such as

22   hospitals.  So this is subpart (3)(c).

23            Additionally, the Secretary must publicly explain,

24   quote, how such elements will mitigate the observed safety

25   risk.  This is part (f)(2).  And then the Secretary must

1    consider whether the elements would, quote, be unduly

2    burdensome on patient access to the drug and must also, quote,

3    minimize the burden on the healthcare delivery system.

4              Finally, 355-1(f)(3) specifies one or more goals to

5    mitigate a specific serious concern.

6              Given what the Court has read aloud, which is

7    reflected in that section, is there not law to apply, as we

8    apply *Heckler* and other cases, to that 2021 nonenforcement

9    decision?  Do we not have law to apply such that the argument

10   that it's fully committed to the agency discretion is

11   undermined by the *Heckler* line of cases?

12             MR. SCHWEI:  So two responses, Your Honor.  The

13   first is a procedural one, but the second, I promise, will

14   answer the Court's question.

15             The first is procedural, that this claim is moot,

16   because the policy of nonenforcement was with respect to an

17   in-person dispensing requirement that now no longer exists.

18   And so the enforcement discretion aspect no longer exists

19   either, because it was with respect to a requirement that

20   doesn't exist.

21             And even if the Court doesn't agree that it's moot

22   right now, the claim is imminently going to become moot

23   because, as even plaintiffs acknowledge, the April 2021

24   statement was that this would last during the COVID public

25   health emergency, which the Administration has announced is

1    currently scheduled to end in May of this year.  And so I don't

2    think it makes sense for this Court to issue an emergency

3    preliminary injunction on a claim that, at a minimum, is

4    imminently going to become moot.

5              But setting aside those threshold responses and

6    answering the Court's question directly, the statutory

7    framework regarding whether FDA should impose a REMS, that has

8    a number of legal requirements.  And, you know, plaintiffs here

9    aren't challenging the imposition of the REMS.  What this claim

10   is about is whether FDA has to enforce those REMS against

11   providers who may violate one of the previously imposed REMS

12   during a public health emergency and for most of the time when

13   FDA has determined that it will soon remove that dispensing

14   requirement.

15             And so regardless of the structure of the--whether

16   to impose the REMS, it's a wholly separate question whether to

17   enforce the REMS against anyone else, which is what *Heckler v.*

18   *Chaney*--when that comes into play.

19             And I would note that this is a pure passive

20   enforcement policy.  It's unlike some of the government

21   programs that the Supreme Court or the Fifth Circuit have held

22   to be reviewable that confer affirmative relief, such as in the

23   immigration context.  There's no affirmative benefits from this

24   enforcement policy.  It's a pure passive nonenforcement policy

25   that remains nonreviewable under *Heckler*.

1          Recognizing that I have very little time, I did
2     want to make sure we addressed remedies and just one point that
3     I wanted to state at the outset.  In our brief regarding the
4     Court's question about consolidation, at the end, the
5     United States did request that, hypothetically, if the Court
6     does enter any sort of adverse order, that that order be stayed
7     pending appeal or, at a minimum, for a short administrative
8     stay for any appeal that's authorized.  We recognize that the
9     Court previously did that in the Remain in Mexico set of cases
10    to allow some immediate appellate proceedings.
11          I think our brief suggested a minimum of 21 days
12    for the administrative stay.  I think the Court's time frame,
13    as extended by Justice Alito in Remain in Mexico, was something
14    like 11 days.  But, at a minimum, we would request that if the
15    Court gets to any sort of adverse order.  So just wanted to put
16    that on the record.
17          But to--but with respect to remedies, I think, you
18    know, the Court needs to keep in mind the governing equitable
19    principles that any remedy would have to be tailored to the
20    precise harm that plaintiffs have established and the
21    irreparable harm that they have established.  I think, even if
22    they can establish standing or some form of harm, it's for a
23    select few plaintiffs that could not, under the equitable
24    factors, govern nationwide, broad relief.
25          And I think, you know, even at final judgment, the

1    most that plaintiffs could obtain is remand without vacatur.

2    And the types of remedies they are asking for here, as

3    suspending, withdrawing, vacating, those go beyond what they

4    could even obtain at final judgment, which is just

5    fundamentally inconsistent with the purpose of a PI of

6    maintaining the status quo.

7         And all of the cases that my colleague cited in his

8    response to justify these extraordinary remedies, my

9    understanding is that those arose in the context of generic

10   drugs and a brand-name drug trying to keep the generic version

11   off the market, which is fundamentally different than what

12   plaintiffs are requesting here, which is the wholesale

13   withdrawal of a safe and effective drug that has been approved

14   for over two decades.  And so those cases do not support any

15   judicial action that would remove a class of drugs entirely

16   from the market over the agency's objection.

17        THE COURT:  Okay.  I have your argument on

18   remedies, and I'll also note that you have preserved the right

19   to request stay in the event of an adverse ruling.  So that is

20   preserved for this Court and for the appellate review.

21        MR. SCHWEI:  Your Honor, just to clarify, I think

22   we would hereby request that stay if the Court enters it and

23   have--we would prefer that the Court address that stay question

24   in the order itself, but understand the--

25        THE COURT:  If I require additional briefing, I'll

1    extend any deadlines for supplemental briefing--

2             MR. SCHWEI:  Thank you, Your Honor.

3             THE COURT:  --in such an event.  Okay.

4             MR. SCHWEI:  Thank you, Your Honor.

5             THE COURT:  I just wanted to let you know that you

6    have properly preserved it for my review and appellate review.

7             MR. SCHWEI:  I appreciate the reassurance.

8             THE COURT:  Okay.  Thank you.

9             And at this time, I'll invite argument from

10   Ms. Ellsworth.  It's my understanding that you have 30 minutes.

11   And which time warning did you request?

12            MS. ELLSWORTH:  I requested ten minutes and five

13   minutes, please, Your Honor.

14            THE COURT:  Okay.  Ten and five.  You will have

15   those warnings at those intervals.  You may proceed.

16            MS. ELLSWORTH:  Good afternoon, Your Honor, and may

17   it please the Court.  Jessica Ellsworth on behalf of Intervenor

18   Danco Laboratories.

19            We have heard a lot today, and so I want to just

20   take a step back to start and think about what the plaintiffs

21   need to show here to get the relief that they are asking for.

22   They need to run the table on a list of issues, each of which

23   has significant questionable law supporting their arguments.

24            First, they need to show standing, despite having

25   only an attenuated chain of independent actors and no certainly

1    impending harm to them.

2            Then they need to show that they are also in the

3    zone of interest for FDA approvals, which no court has found a

4    doctor who seeks to not prescribe a drug is in that zone of

5    interest.

6            Third, they need to show that the reopening

7    doctrine applies and they can overcome a statute of limitations

8    defense, even though FDA never reconsidered the 2000 approval

9    in making the 2016 REMS adjustments or the 2021 REMS

10   adjustments.

11           They next need to show an exception to

12   administrative exhaustion applies.  And then we go on from

13   there.  Once they get past that, they need to show some sort of

14   likelihood of success on the merits.

15           On their Subpart H argument, that's particularly

16   difficult, because the approved REMS has set the distribution

17   restrictions since 2008.  And there's also nothing in the PI

18   record--and I would note here we do not have the full

19   administrative record.  But there's nothing in the PI record

20   that shows FDA would have ever denied the NDA if it was somehow

21   foreclosed from using Subpart H during that time period of 2000

22   to 2008.

23           On their arguments about the FDA's assessment of

24   the scientific and medical evidence, their new argument today

25   is that it somehow violated 355(d), which I don't think the

1    text supports at all.  But beyond that, they would need to show

2    a lack of reasoned decision-making, despite hundreds of pages

3    of reasoned explanation that are already before the Court in

4    the PI record.

5              On Comstock, they would need to show that FDA was

6    somehow obligated to consider a criminal law it is not

7    authorized to implement or enforce in assessing Danco's

8    applications about the safety and efficacy of a drug during a

9    time when the law was unconstitutional to enforce.

10             Once we get past that, we get to what this Court

11   has identified as perhaps the most important requirement for a

12   preliminary injunction: irreparable harm.  Here, they would

13   need to show that despite waiting all of this time to sue,

14   really 22 years after this drug was approved, and despite

15   having only an attenuated multistep claim of potential future

16   harm, and despite having told this Court they're willing to

17   wait a number of months for a ruling that would be based on

18   administrative record, somehow they will be irreparably harmed

19   by waiting for this Court to resolve this case on the merits.

20             Finally, they need to show that the harms to Danco,

21   my client, and the 96-plus percent of women who take

22   mifepristone for a medication abortion with no complications do

23   not outweigh the delayed, attenuated, and speculative harms

24   they assert.

25             I said finally, but there's one more.  The public

1    interest.  They would need to show that the public interest is

2    served by judicially limiting the availability of a product

3    that, at the end of this case, the only remedy available on the

4    claims that have been brought would be a remand without vacatur

5    for the agency to address and potentially cure any concerns

6    with the agency's reasoned analysis.

7            To say this list out loud, Your Honor, is to show

8    how improbable it is that the plaintiffs have made the

9    necessary showing to get the especially disfavored remedy of a

10   mandatory injunction here.

11           I'd like to start with the irreparable harm.  And I

12   know that this Court has identified it as perhaps the most

13   important element of the PI inquiry, and yet, the plaintiffs

14   spent less than one minute describing their irreparable harm to

15   you.  That's for good reason.  They don't have any.

16           There are two sets of facts that completely

17   undermine any asserted irreparable harm.  Those facts relate to

18   the delay in bringing this suit and the attenuated chain of

19   events on which their speculative claim of potential harm

20   depends.

21           So let's start with delay.  They waited 22 years to

22   sue.  They waited 2,438 days after their citizen petition was

23   denied.  They waited 337 days after their second citizen

24   petition was denied.  And, as the government noted, there are

25   remedies they could have pursued to bring these claims sooner,

1    had they chosen to, but they chose to delay.  There is no case

2    law I am aware of that would find irreparable harm in light of

3    these facts of delay.

4           There's also the speculative chain that their

5    argument depends on, and I'd like to just walk through those

6    steps.

7           Step one, a hypothetical patient goes to another

8    physician and decides, in consultation with that physician, to

9    have a medication abortion.

10          Step two, the hypothetical patient taking

11   mifepristone is one of the very small number of patients who

12   does not have complete treatment success or who experiences an

13   adverse event.  And I'd like to just focus on how small a

14   number this is.  The average treatment success rate in the data

15   is more than 96 percent.  You can see that at ECF 28-1, page

16   ID 2097 to 2101.  The average rate of termination across more

17   than twenty studies without surgical intervention is

18   97.4 percent for the U.S. studies, and 96.1 percent for the

19   ex-U.S. studies.  Treatment without adverse events is even more

20   rare.  It's 99.9 percent of uses of this medication.  You can

21   see that at ECF 28-1, page ID 2116.

22          You can also see in the provider declarations that

23   are in the PI record at ECF 28-3, ECF 28-5, 28-6 and 28-7, the

24   consistent record of safety that this drug has had.  Their

25   argument to the contrary that there will, in fact, be patients

```
 1    injured rests on their declarations which identify a handful of

 2    instances across all of these doctors and these medical

 3    associations and five studies, none of which conclude

 4    mifepristone is unsafe, and three of which expressly endorse

 5    mifepristone.  Two of them found higher rates of complication

 6    in second trimester abortions.  Those are not at stake in this

 7    case.  One found a higher rate of complications with surgical

 8    abortions.  Well, that undercuts their argument that somehow

 9    the medication abortion presents irreparable harm.  And one

10    found a rate at which the hospitalization rate was within the

11    same percentage that's identified on the label.  3.6 percent of

12    women look for some sort of follow-up.

13              So we have a hypothetical patient going to a

14    hypothetical other doctor.  We have a tiny number of those

15    patients percentage-wise who will require follow-up.  And at

16    step three, we now have a hypothetical patient who chooses not

17    to follow up with the prescribing doctor but to go to one of

18    the hospitals where they will be treated by one of these

19    plaintiffs on a day where one of these plaintiffs is working

20    and that doctor is the one who treats her.

21              That, Your Honor, does not amount to anything other

22    than speculative injuries that depend on independent actions of

23    third parties.

24              THE COURT:  So what is defendant intervenor's read

25    of *Clapper* in this someday-injury concept that defense counsel
```

1   raised?  In light of the falling limits and restrictions as you

2   move from the 2000 approval to the 2016 major changes, there

3   was previously a dispensation only by supervising physicians,

4   previously in-person administration of a drug regimen.  There

5   was a follow-up in-person evaluation required, and then

6   prescribers are required to report the data on nonfatal serious

7   adverse events.  This is then followed by the 2021 agency

8   action which confirms all of these changes and then adds to

9   that dispensation by mail.

10          At what point are we beyond the realm of playing

11   with statistics and probabilities and approaching a level of

12   certitude about reasonably foreseeable injuries?

13          MS. ELLSWORTH:  Your Honor, I don't think we're at

14   that level in any way.  The language that Justice Alito used in

15   the *Clapper* decision was very clear in rejecting the

16   objectively reasonable likelihood standard that the Second

17   Circuit had used.

18          We still have a highly attenuated chain of

19   possibilities.  We still have speculation about the decisions

20   of independent actors, and we still have an approval that, at

21   most, authorizes--this is a quote--but does not mandate or

22   direct a particular action, which makes allegations based on

23   that action, quote, necessarily conjectural.  That's in *Clapper*

24   at 412.  As in *Clapper*, this Court would have to speculate

25   about how some other person or entity will exercise their

 1    discretion.  None of that changes based on any of the facts

 2    that Your Honor asked about.

 3           *Clapper*, I think, really does resolve the standing

 4    questions in this case.  Standing requires a certainly

 5    impending injury.  And I think it's worth noting that

 6    plaintiffs suggested at one point in their brief and at one

 7    point to you this morning that past harm was somehow enough.

 8    But that is not true when they are seeking injunctive relief,

 9    and that's the *Lyons* decision from the Supreme Court.

10           On organizational standing, they have put all their

11    eggs in the *OCA* basket, but I think that really misreads the

12    body of Fifth Circuit precedent that's relevant here.  After

13    the *OCA* decision was decided, in the *Tenth Street Residential*

14    case in 2020 and the *Texas State LULAC* case from the Fifth

15    Circuit in 2022, the Fifth Circuit found no standing where

16    organizations failed to identify specific projects they had put

17    on hold because of diverted resources.

18           In the Tenth Circuit Residential case, the Court

19    also found no injury in fact where the organization's work

20    aligned with its mission.  That's similar to what the Fifth

21    Circuit held in the *El Paso County vs. Trump* case also in 2020.

22    There, the Fifth Circuit said that an organization must be

23    engaged in something different from its routine activities.

24           And finally, the *OCA* case itself is

25    distinguishable, because there, the organization was

1    complaining about the cost of complying with the law, the cost

2    that it imposed on them to conduct their work.  That is not

3    what's being argued here.

4              Your Honor asked about citizen petitions and

5    whether they are prelitigation costs.  I don't think there's

6    any way, under Fifth Circuit precedent, including *City of Kyle*

7    and including *OCA*, that they are not prelitigation costs.

8    Otherwise, literally anyone could file a citizen petition and

9    somehow claim standing based on a self-inflicted financial cost

10   of having had to do that.

11             On associational standing, the plaintiffs'

12   arguments aren't any better.  They rely on at least two

13   independent third parties who are not before the Court and

14   neither of which have sued in their own right.  Under *Clapper*,

15   that is not acceptable.  No court has held that the past

16   treatment of a patient or two who experienced a known side

17   effect from a drug another doctor prescribed has standing to

18   challenge a drug approval.  All drugs have side effects.

19             On third-party standing, this Court asked about

20   *June Medical*.  For one thing, in *June Medical*, the providers

21   themselves were also regulated, and they faced sanctions.  So

22   there was that separate component that's not here.

23             But in addition, these physicians, in their

24   declarations, these plaintiffs, actually walk through their

25   lack of existing relationship, their lack of close relationship

1    with patients.  They express concern about patients not being

2    forthright with them, and they do nothing to identify an

3    obstacle for a patient to come forward.

4         Under the *Kowalski vs. Tesmer* case from the Supreme

5    Court, I don't think there's any way that they can assert

6    third-party standing where their interests deviate so much from

7    that of the patients on whose behalf they would be suing.

8         The last standing-related issue is the zone of

9    interest.  The closest point--the closest case on point here is

10   the *Association of American Physicians* case from D.C., from the

11   D.D.C. in 2008, which found no prudential standing for

12   physicians or pharmacists who were trying to challenge the

13   FDA's approval of emergency contraception.  That Court found--

14   and I think it's exactly the same as in this case--that those

15   physicians' interests were, at most, marginally related--that's

16   a quote--to the purpose of the new drug approval provisions,

17   and that put them outside the zone of interest.

18        If we could turn to Comstock briefly.  The most

19   important thing I think this Court needs to think about when it

20   looks at Comstock is that the FDA is not charged with enforcing

21   the Comstock Act or many other criminal prohibitions that apply

22   to pharmaceutical manufacturers in the U.S. Code.  There are

23   customs laws.  There are environmental laws.  There are drug

24   laws.  There are employment laws.

25        The FDA is tasked with enforcing the FDCA's rules

1    on drug approvals, and, by statute, Congress specifically told

2    FDA what it may consider in approving or denying an NDA.  We've

3    been talking about those requirements this morning.

4    Section 505(c) sets out the fact that the FDA must approve an

5    NDA if none of the grounds are--none of the grounds for denying

6    it apply.  The language is very explicit.  Quote, FDA shall

7    issue an order approving the application.  That's in

8    21 U.S.C. 355(d).

9              Consider the consequences of plaintiffs' argument.

10   It would require an agency like the FDA or the SEC or the EPA

11   to reach far outside of its own lane and mandate or preclude

12   action by a regulated entity based on other statutes assigned

13   to other agencies where the acting agency has no interpretive,

14   implementation, or enforcement authority over that statute.

15             The next point I'd like to address is Subpart H.

16   As the government said, Subpart H is essentially irrelevant at

17   this point in time, and it could not be a basis for any

18   injunctive relief today.  It has no impact today.  The REMS

19   governs.  The REMS has governed since 2008 when it was deemed

20   to be in effect, and since 2011 when it was approved.

21             I think the simplest way to see this, Your Honor,

22   is that if Danco were to submit an NDA for Mifeprex today or if

23   it had submitted it in 2008 or later, this approval would have

24   run through the REMS approval authority in 355-1 without any

25   reference or need to rely on the agency's regulations in

1     Subpart H.

2            We are not aware of any instance in which the FDA

3     has used Subpart H as a basis to impose distribution

4     restrictions since the FDAAA was enacted.  And even in the 2000

5     time frame, Subpart H was not the only way the distribution

6     restrictions could be imposed.  The letter from Danco to the

7     FDA that plaintiffs submitted with their reply--you can see

8     this at ECF 121, page ID 4185.  It expressly says Danco was

9     willing to voluntarily agree to distribution restrictions

10    without the need to impose them through Subpart H.

11           At other times, FDA has put restrictions directly

12    into a label, or it has reached some other kind of agreement

13    with the sponsor.  Without the administrative record, we don't

14    know FDA's views on these alternative ways of approving

15    mifepristone that would have led to the same restrictions even

16    back in 2000.  And in any event, it would not be a basis to

17    question the drug's approval today, which depends on the REMS.

18           If I could turn to the FDCA.  There is no

19    requirement under the FDCA that clinical trials and other

20    studies must mirror conditions of use in the approved labeling.

21    That makes sense, Your Honor.  Imagine someone applying for a

22    new drug.  It's unclear, for example, how long the drug stays

23    in your system, so a clinical trial is set up that does blood

24    testing every two hours for the first 24 hours after you take

25    the drug.  It turns out that clinical trial shows that the drug

1    leaves your system in eight hours.

2            There is no reason that the FDA would not have

3    discretion to say in the label that drug testing every two

4    hours for 24 hours is not required.  They have achieved the

5    answer to their question.  They have gotten the information

6    they need to make the medical and scientific judgment about

7    what labeling is appropriate for a drug, and that is exactly

8    what 355(d) suggests they should do.

9            In this case, just as one example, if you look at

10   the CDER clinical review and the cross-discipline team leader

11   review--that's ECF 28-1, page ID 2069 to 2264--that is

12   200 pages of explanation for the 2016 changes.  It walks

13   through every study that the agency considered, the adverse

14   event reports, and all of the other information the agency used

15   to inform its judgment about whether the revisions were

16   appropriate.

17           THE COURT:  And, Ms. Ellsworth, you are at your

18   10-minute mark.

19           MS. ELLSWORTH:  Thank you, Your Honor.

20           One point on adverse events, because I think in the

21   briefing, the plaintiffs suggest that, somehow, FDA has given

22   mifepristone a free pass on adverse event reporting, and that's

23   not true.  In 2016, FDA changed the terms of the prescriber

24   agreement form to require a more limited number of reports

25   through that provider agreement form based on 15 years of the

1    agency's experience with how that provider agreement form

2    worked and what those reports were.

3            But what the agency said in the very next sentence,

4    the applicant--that's Danco--will still be required by law, as

5    is every NDA holder, to report serious, unexpected, adverse

6    events as 15-day safety reports and to submit nonexpedited

7    individual case safety reports and periodic adverse drug

8    experience.

9            THE COURT:  And I know that we don't have the

10   complete administrative record at this point in the litigation,

11   but there were multiple references to the FAERS system, the FDA

12   Adverse Event Reporting System.  Do you know or can you point

13   to any part of the trial record that reflects how many

14   instances your client accessed that FAERS system to report

15   adverse events?

16           MS. ELLSWORTH:  I do not have the exact number of

17   times.  But the obligation--when a manufacturer, like Danco,

18   receives an adverse event report, it is obligated to

19   investigate that report, and it is obligated to pass certain

20   information on in response to having received that.  And in all

21   honesty, that's why I think the agency requires this periodic

22   reporting and then sort of reassessment based on what is there.

23           One of the other elements for a preliminary

24   injunction is the consideration of harm to other parties and

25   the balancing of the equities.  Danco is a small pharmaceutical

1    company.  It faces serious irreparable harm from a court order

2    that does any of the things that plaintiffs are asking this

3    Court to do on an expedited basis without waiting for the

4    administrative record.

5           Danco's harm is certain, it is great, it is actual,

6    and it is unrecoverable.  There is no dispute of fact about

7    that in the record that is before the Court.

8           The public interest is important here too.

9    Granting a PI is not in the public interest.  99.9 percent of

10   patients who take the drug will not experience an adverse

11   event.  That's Docket 28-1 at 2116.  96-plus percent of

12   patients will have a completely successful treatment with no

13   complications.  That's at 28-1, page 2097 to 2101.

14          The public interest is always supported by allowing

15   patients access to drugs FDA has found to be safe and effective

16   in consultation with their doctors when they may choose to seek

17   that treatment.  Mifepristone is the standard of care for

18   medical abortion in the United States and in 82 countries

19   around the world.  It has been on the World Health

20   Organization's model list of essential medicines for more than

21   15 years.

22          The public interest is supported here by allowing

23   FDA to continue its medical and professional judgment to make

24   determinations about how to review scientific evidence, whether

25   to approve certain drugs, and under what circumstances,

1    including, if necessary, on remand from this Court.

2          That brings us to the remedies.  In our view--

3          THE COURT:  And here's where I do want to ask

4    defendant intervenor about drawing lines around each of the six

5    claims reflected in the plaintiffs' complaint.  I've asked this

6    question, I believe, of all attorneys at the podium.

7          So, here, we have prayers for relief for six

8    claims: the 2000 approval, the 2016 major changes, the 2019

9    ANDA generic approval, and then the 2021 agency action.  This

10   is followed by requested relief relevant to the petition

11   responses.

12         Is there any reverse chronology where you could

13   group relief for individual claims, or is it your reading of

14   the complaint that this Court must begin and end its analysis

15   with the 2000 approval and then there's just this cascading

16   effect of injunctive relief or vacatur relief, withdrawal or

17   suspension that follows from there?  Do you perceive that the

18   Court can draw any lines or parameters around each of those

19   claims?

20         MS. ELLSWORTH:  The line I think Your Honor has to

21   draw is between a question of whether the ultimate merits

22   conclusion on any of these claims would lead to remand with

23   vacatur or remand without vacatur, because if the ultimate

24   merits conclusion on all six of them would be remand without

25   vacatur, which the Fifth Circuit has said is generally

1    appropriate where there is at least a serious possibility the

2    agency will cure whatever the issue is and sustain its decision

3    given an opportunity to do so--  That's the *Central and*

4    *Southwest Services* case from the Fifth Circuit in 2000.

5            Here, there's no question that the agency has put

6    considerable thought into this over the years, and I think

7    there is no question that the agency would have the opportunity

8    at that point in time, once we've had a full administrative

9    record, once the Court has identified if it thinks there are

10   flaws in the reasoning, on remand, without vacatur, it would be

11   able to analyze those issues.  But in the meantime, there would

12   be no basis, on a preliminary injunction, to do anything that

13   would give the plaintiffs greater relief than they would be

14   entitled to at that time.

15           The *Allied Signal* decision from the D.C. Circuit I

16   think is the case that I'm most familiar with that talks

17   through the factors that courts look at in determining whether

18   to vacate an agency decision and ultimately concludes that only

19   if it is an uncurable error.

20           On top of that, what the plaintiffs are asking for

21   is a mandatory injunction.  Mandatory injunctions are even more

22   strongly disfavored.  And I don't think there is any question

23   that this is not about preserving the status quo.  They want

24   very much to upend the status quo, and they want to do so by

25   pointing this Court to cases that are patent cases, where there

1   really was no way to cure.  Those cases are not like this one.

2   The *Serono vs. Shalala* case, I agree with the government that

3   the decision they cited to you was vacated.  The preliminary

4   injunction was vacated.

5           And I'd also note that, in that case, there was

6   statutory language that actually required a, quote, same active

7   ingredient for a generic.  So that use of the word "same" is

8   quite different from any of the statutory provisions that

9   plaintiffs have cited to you this morning that don't use that

10  term and, in fact, are much more discretionary about how FDA

11  gets to exercise--

12          THE COURT:  You agree with the government that the

13  *Serono* opinion, which I did not have before this hearing, holds

14  that "same" is different?  That that terminology of "same"

15  would be different than your case?

16          MS. ELLSWORTH:  Than this case, yes.

17          THE COURT:  Just trying to be clever.

18          MS. ELLSWORTH:  That's why I had to stumble for a

19  minute.

20          THE COURT:  Yeah, sorry.  That was a strange curve

21  ball.

22          So you're at the end of your time, but because I

23  did interrupt with a bad joke, any closing remark would be

24  welcome.

25          MS. ELLSWORTH:  Your Honor, as the government said,

1    this is a case about a drug that has been on the market for

2    22 years.  Preliminary injunctive relief should be denied in

3    this case.  It can move forward to an administrative record.

4    It can move forward to a merits ruling.  But at this point in

5    time, the plaintiffs have not come close to meeting any, let

6    alone all, of the requirements that they would need to meet for

7    preliminary injunctive relief.

8            THE COURT:  And if I recall, defendant intervenor

9    did not oppose consolidation if it were summary judgment and

10   not trial on the merits.  Is that correct?

11           MS. ELLSWORTH:  It is, Your Honor.  I think summary

12   judgment in an APA case is essentially trial on the merits, so

13   yes.

14           THE COURT:  I think you agreed with the Court on

15   that concept, at least on the papers.  Okay.

16           MS. ELLSWORTH:  Yes, Your Honor.

17           THE COURT:  So I have your argument.  Thank you for

18   your time at the podium.

19           At this time, we'll turn to the reserve rebuttal

20   for plaintiffs.  And who will be taking the rebuttal?

21           MS. HAWLEY:  Is it okay if we--

22           THE COURT:  So I do have questions on this

23   study-match questions.  I've got a hypothetical--

24           MS. HAWLEY:  Your Honor, one question--one

25   preliminary question.  Is it okay if we split rebuttal half and

1    half?  Would that be permissible?

2              THE COURT:  That's fine.  So 15/15?

3              MS. HAWLEY:  Yes, sir.

4              THE COURT:  Okay.  So, Ms. Hawley, I do want to ask

5    a question about this mirror imaging, the study-match

6    hypothetical.  We've bandied it about between counsel and

7    Court.  I have a hypo on that--

8              MS. HAWLEY:  Can we--

9              THE COURT:  --and then I have three questions on

10   remedy.  So how would you like to allocate attorney time?

11             MS. HAWLEY:  So those, actually, questions all go

12   to my co-counsel.

13             THE COURT:  Okay.  So you may begin with your

14   15-minute segment, and unfortunately, Mr. Baptist is going to

15   be hit with question after question after question.

16             MS. HAWLEY:  Okay.

17             THE COURT:  You may proceed.

18             MS. HAWLEY:  Thank you, sir.

19             I wanted to respond briefly to each of the standing

20   arguments made by my friends on the other side.  To begin with

21   *Clapper*, I would refer the Court to Footnote 5 of *Clapper*.

22   Footnote 5 clarifies that in other cases, the Court has, in

23   fact, found standing based on what is known as a substantial

24   risk.  So that is Footnote 5.

25             And then if you look at the Supreme Court's

1    decision--recent decision in *TransUnion*, the Court says that

2    it--what qualifies for Article III standing purposes is a

3    material risk of future harm.  They say sufficiently imminent

4    and substantial.

5           So I really think that the argument made on the

6    other side rewrites the standing jurisprudence vis-a-vis

7    injunctions.  It is simply not the case that, in order to

8    obtain a preliminary injunction, you have to have a certitude

9    of harm.  That's never been the case.  If we go back to cases

10   like *Bennett vs. Spear*, if we go back to cases like

11   *Massachusetts vs. EPA* or *Babbitt* and *Farm Workers*, what the

12   Court said in those cases, Your Honor, was actually equating

13   the certitude of harm with imminence.  And that makes abundant

14   sense.

15          To sort of trace that line of cases on, if you look

16   at the decision--2019 decision of the Supreme Court in

17   *Department of Commerce*, what the Court says is that standing is

18   permissible if the plaintiff can show that harm is either,

19   quote, certainly impending or there's a substantial risk that

20   harm will occur.  *SBA List* from 2014 says the very same thing.

21   So we just simply can't cherry-pick out this certainly

22   impending harm and apply basically a certitude requirement.

23          THE COURT:  What is your best case against

24   defendant and intervenor's argument construing *Clapper*?  I know

25   that you've given me Footnote 5 and *TransUnion*.  What is your

1    best case responding to that, whether it's D.C. Circuit,

2    Supreme Court, or somebody who does administrative law?

3              MS. HAWLEY:  I think it would be the *Department of*

4    *Commerce vs. New York*.  That's a 2019 case.  It's also an

5    administrative law case.  That citation is

6    139 S.Ct. Reporter 2551, and the standing quote is at 2565.

7              THE COURT:  Okay.  I'm familiar with

8    *Massachusetts vs. EPA* and *TransUnion*, but I didn't recall that

9    case, so thank you for that clarification.

10             MS. HAWLEY:  Absolutely.

11             So under that proper standard, is there a

12   substantial risk of harm, is it sufficiently imminent.  There's

13   various ways the Supreme Court has described it.  But what the

14   Court is looking at is, is there enough of a risk of harm.

15             Here, that is certainly true.  As Your Honor noted,

16   the 2011 medication protocol or approval noted that there were

17   5 to 8 percent of women who would be harmed.  The FDA has since

18   removed nearly every restriction.  There are no in-person

19   doctor requirements, none.  So a person--  We have several

20   declarations noting that patients that have been treated from

21   suffering adverse consequences of mifepristone--one received

22   the drugs from India; another received it online without

23   consultation with a doctor.  Presumably someone was required,

24   but these patients could not recall.  In addition, there is no

25   follow-up visit.  So this idea that this is going to be

1   well-supervised under the new rules is simply untrue.

2             And again, I would point this Court to *Texas vs.*

3   *Becerra*.  In that case, we have the very same third-party

4   issues.  We have the very same issue with women ending up in

5   emergency care due to taking mifepristone, and the Court found

6   standing in that case.

7             To turn briefly to organizational standing, again,

8   my friends on the other side really read missional harm--they

9   read the mission out of missional harm.  And it's perfectly

10  okay, under the Fifth Circuit's organizational standing cases,

11  in order for an organization to advocate against defendants'

12  conduct that has harmed it in a related field.

13            So if you take the cases of *La Union*, if you take

14  *Texas State LULAC*, if you take *OCA*, all of those were voting

15  rights organizations that challenged various voting rights

16  provisions.  And the harm that was alleged there and the harm

17  the Court found in *OCA* was that requiring more education was

18  enough.  It diverted resources from the plaintiff's ordinary

19  activities to something else and made them less effective at

20  that second work.

21            And I think the only way that we can say that the

22  plaintiffs' harms here are the same or are routine, as the

23  Court found in *City of Kyle* or *Tenth Street Residential*

24  *Association*, is by looking to today, to 2023, rather than 2000.

25  Today, we have the approval of mifepristone.  But in 2000, we

1    did not.  And what these missions have always been oriented

2    toward is saving lives.  The pro-life organizations, they state

3    in their declaration that their missional purposes are to

4    preserve life, to advocate against the dangers of surgical

5    harm, in addition to advocating for conscience protectives--

6    conscience protections.  Excuse me, Your Honor.

7           Those three harms do not neatly overlap and are no

8    different than the voting rights associations in these other

9    cases.

10          Your Honor, with respect to AC PEDS, they do

11   mention the danger of chemical abortion.  If that's too closely

12   aligned, there are three other organizations whose missions are

13   not that closely aligned.

14          THE COURT:  You have five minutes remaining,

15   Ms. Hawley.

16          MS. HAWLEY:  Thank you, Your Honor.

17          With respect to the zone of interest test, as Your

18   Honor notes, it's a prudential test, and the Supreme Court, in

19   *Lexmark* and other cases, has recently remarked that the federal

20   courts have a virtually unflagging obligation to exercise

21   jurisdiction.

22          Would refer the Court again to *Bennett vs. Spear*.

23   This is the EPA case in which the Supreme Court found that the

24   regulated entities in that case--well, the affected entities,

25   ranchers and irrigation districts, were, in fact, within the

1   zone of interest of the Endangered Species Act.  Very similar
2   to this case and, again, from the Supreme Court.
3           On Comstock, Your Honor, the colleagues on the
4   other side basically say that there's the sort of the standard
5   that the FDA can ignore a statute if they think it might be
6   unconstitutional.  They refer, of course, to *Roe* and *Casey,*
7   which were overruled in *Dobbs*.  But as Judge Easterbrook noted
8   in denying a petition for rehearing, what the undue burden
9   standard means was really anyone's guess, and I don't think--
10  I'm not aware of any case which says a federal agency may
11  ignore a federal law because they think it is unconstitutional.
12          With respect to the specific text, I appreciate
13  very much your *Brown vs. Gardner* citation.  In addition, the
14  best textual evidence that the other side puts forward has been
15  relegated to a footnote in the OLC memorandum.  And I would
16  actually suggest the opposite.  When Congress chose to keep one
17  provision, they kept the abortion provision, not the unlawful
18  abortion provision.  And as we know, when Congress says
19  something in one statute and not in another provision, it knows
20  how to say what it means.
21          The only other thought on Comstock, Your Honor, is
22  that the 2007 FDAAA amendments simply deemed them to have
23  preexisting regulations, so it was a pass-through sort of to
24  smooth the regulatory transition from Subpart H to the REMS
25  provision.  It in no way validated any particular REMS.  It

1    just noted the fact and, quote, deemed them to have REMS.  So I

2    don't think the 2007 amendment in any way obviates the Comstock

3    claim.

4              And then finally, on *Heckler vs. Chaney*, I did not

5    address this in my first presentation, but we run, of course,

6    into the APA's presumption of judicial review.  In the

7    *Weyerhaeuser* case from the Supreme Court, it said that the

8    Section 701(a)(2) committed to the agency's discretion must be

9    interpreted narrowly, or else it runs into 706(a)(2), which

10   requires courts to review for an abuse of discretion.  If that

11   abuse of discretion review is nonexistent, then we read 706 out

12   of there.

13             So for those reasons on standing, as well as

14   exhaustion and *Heckler*, we submit plaintiffs in this case, and

15   my colleague will address remedies now.

16             THE COURT:  Okay.  Mr. Baptist, you may approach.

17   And because it's late in the hearing, why don't I begin with a

18   question.

19             So I've referred to this as a study-match problem.

20   I think defense counsel discussed a mirror image metaphor.  So

21   I devised a hypothetical to illustrate the problem, and I'll

22   allow you to respond.

23             So suppose FDA clinical trials relied on by the FDA

24   for an NDA approval involved a safety protocol requiring all

25   1,000 study participants to have a follow-up physician visit,

1    and suppose FDA finds that all 1,000 patients had no negative

2    symptoms warranting a follow-up.

3              Is it plaintiffs' position that Section 355(d)

4    would still nevertheless require FDA to retain that follow-up

5    requirement despite those findings?

6              MR. BAPTIST:  Yes, only because, in the real world,

7    we see the complications that are associated with ultrasound--

8    the lack of ultrasounds being a requirement.  In the

9    hypothetical scenario that you have--and you said there's zero

10   complications post those trials, with just a follow-up visit

11   that shows that no one had a complication.  I would posit maybe

12   plaintiffs wouldn't have a case or standing because no one

13   would actually be hurt in the real world.

14             But in the sense there's essential safety

15   protocols, such as an ultrasound in this case, and the safety--

16   Well, you just can't tell or know without having a test

17   conducted at any point in time, since the beginning to the end,

18   of whether the approved regimen is safe.

19             THE COURT:  Okay.  I think I have your argument on

20   that.

21             So during your argument-in-chief, we discussed

22   remedies.  And both of my law clerks attended the University of

23   Virginia.  The preeminent expert here is Doug Laycock, so they

24   may have to rush back and dust off their outlines.  But, here,

25   the Court is trying to ascertain plaintiffs' argument for

1  suspension or withdrawal under Section 355(e).  And this has to

2  be framed in light of the stage of litigation we're at, at the

3  preliminary injunction phase.

4  So at that stage, why is the preferred remedy or

5  the recommended remedy withdrawal, and not suspension?  I think

6  your practical argument was that you were wanting full relief,

7  but from a statutory perspective, doesn't suspension seem more

8  appropriate at the injunctive phase than withdrawal?

9  MR. BAPTIST:  Your Honor, counsel takes your point

10 on that, and, in theory, that would be correct in terms of

11 imminent harm and irreparable harm.  Those sound like similar

12 terms.  And so in our prayer for relief, we did say suspend or

13 withdraw, but recognizing "suspend" at this stage sounds more

14 like a preliminary injunctive-type of action and it would be

15 consistent with the statutory text at this stage.  But at the

16 same time, as you know, the plaintiffs have a long-term goal of

17 setting aside, vacating, or having this approval withdrawn, so

18 that is why we put that forward as well.

19 THE COURT:  Okay.  And to make certain that I heard

20 your argument correctly--  I have your prayer for relief.  It

21 uses the terminology we're all accustomed to for a vacatur, set

22 aside, all these different concepts.  But at the level of

23 granularity on what this Court could order were you to receive

24 the relief you request, is it that you expect this Court to

25 order the FDA to begin a suspension or withdrawal, almost like

1  a writ-type scenario, or that the Court itself can withdraw or

2  suspend on its own accord?

3          MR. BAPTIST:  The latter.  We take the position

4  that the Court, on its own accord, can order the FDA to

5  withdraw or suspend the approval of the drug.

6          THE COURT:  Okay.  And explain to me your argument

7  on why this Court has that sweeping authority.

8          MR. BAPTIST:  It goes back to the case law that we

9  cite.  I know we've talked about one case maybe has been

10 vacated.  I believe it was on other grounds.  But it's the

11 power of the Court to enjoin and take whatever action to

12 prevent harm.  And so it's with that to compel where--we have

13 seen that in past cases where an FDA approval, whether under

14 the ANDA context or not, is what we would do, but--

15         THE COURT:  Okay.  And it's also--I recall your

16 argument that this is simply conferred as construction of the

17 statute that's being applied here, 355(e)?

18         MR. BAPTIST:  Yes, Your Honor.

19         THE COURT:  Okay.  Now, I think I have your case,

20 your papers, your argument here today on an appropriate remedy

21 vis-a-vis FDA and HHS and what I have termed the government

22 defendants in this case.  What is your full position on a

23 remedy vis-a-vis Defendant Danco should the Court reach that

24 result?

25         MR. BAPTIST:  With regards to their drug approval?

1    I'm sorry.

2            THE COURT:  With regard to the intervenor.  So far,

3    most of the briefing that you have submitted refers to

4    intervenor and defendant agencies collectively as defendants.

5    Are you requesting any different remedy vis-a-vis the

6    intervenor here, who doesn't stand in the same sort of shoes as

7    a governmental agency?

8            MR. BAPTIST:  There's nothing that we are asking

9    the Court to do specifically with regards to Danco.  Danco may

10   be affected by what we're asking the Court to do if their drug

11   approval has been set aside, enjoined in some capacity.

12           THE COURT:  Okay.  So there's no specific order

13   that you're requesting vis-a-vis the intervenor; you just

14   assume, should you prevail on the motion for preliminary

15   injunction, that it would apply with equal force to Danco and

16   that there's no special relief specific to the intervenor

17   defendant?

18           MR. BAPTIST:  Yes, Your Honor.

19           THE COURT:  Okay.  You may proceed with whatever

20   argument you wanted to make in the remaining 10 minutes of your

21   rebuttal.

22           MR. BAPTIST:  I wanted to go back to--just about

23   remedies.  You asked about the domino or the reverse domino,

24   and I wanted to make sure I answered that one appropriately.

25           If you were to decide to grant the entire relief

 1    from plaintiffs with regards to the 2000 approval and beyond,

 2    it would be important not just to rule on Subpart H and the

 3    unlawful approval that occurred in that year, because there

 4    were also other problems with it, whether it was under the

 5    FDCA, PRA.  And, again, Comstock pervades throughout this

 6    entire drug's history.  It would be important because if the

 7    FDA merely says we just--we can put you right back in line and

 8    approve you with the same flawed studies or irrelevant studies

 9    or without a pediatric assessment, that would be problematic

10    from a practical standpoint and from our plaintiffs'

11    standpoint.

12         And again, just to make sure I was clear, you

13    have--plaintiffs would say, if you want to enjoin or vacate the

14    2021 decisions, the 2019, 2016, it can be singular, separate,

15    apart.  It doesn't have to be all-encompassing where, if one

16    domino falls, they all have to fall.

17         THE COURT:  Okay.  I understand your argument

18    better there.

19         And as to intervenor's argument that you

20    essentially have to run the table to get to the relief

21    requested at the end of your complaint, I think that also

22    answers that question.  I know you're arguing for total relief

23    on all six claims, but it is your case to this Court that,

24    should claims be adjudicated differently for various reasons,

25    this Court can draw lines around each claim?  You don't

```
1    necessarily need to run the table to prevail at all?

2              MR. BAPTIST:  That is correct, Your Honor.  That is

3    our position.

4              THE COURT:  Okay.  Anything else from the

5    plaintiffs?

6              MR. BAPTIST:  Yes.  I want to briefly touch on

7    public interest based on what defendants collectively said.

8    It's important to remember that mifepristone actually does not

9    provide a medical benefit.  It is not a medication that treats

10   any illness or disease.  At best, what defendants characterize

11   chemical abortion drugs or mifepristone is that it prevents

12   complications in pregnancies from occurring because it ends the

13   life of an unborn baby before those complications present

14   themselves.  Because there are other medications to treat

15   underlying pregnancy complications or surgical procedures to

16   treat related complications as well, mifepristone is not going

17   to be diagnosed to treat any related issues with that.

18             So in terms of thinking about the public interest

19   and who is relying on it and how to rely on it, there are--in

20   the areas where abortion is legal, those other options are

21   going to be available.  And again, plaintiffs are only focusing

22   on chemical abortion in this lawsuit.  To the degree surgical

23   abortion is legal in those countries and on the circumstances

24   that defendants say are available in all 50 states, that will

25   still be available.
```

1          To the degree it's going to constrain where those

2     procedures occur because there are rural areas that may not

3     have access directly within an hour's drive of a surgical

4     abortion, that's exactly one of the reasons why plaintiffs

5     maintain that mail-order abortion is dangerous, because those

6     are exactly the women who should not be receiving those drugs,

7     because that means they are likely to be far away from

8     hospitals and emergency treatment.  So that does not

9     necessarily go in the government's favor.

10          And, as well, the congressional brief found at--and

11     amicus brief found at page ID 3417 talks about the

12     congressional interest and how it entrusted the FDA to serve as

13     the nation's gatekeeper and protect Americans from dangerous

14     drugs.  Defendants talked about how this lawsuit could

15     undermine Congress's confidence in the FDA.

16          One, that would be only because of FDA's own doing.

17     But second, Congress filed the--the only congressional brief

18     filed said they want to see FDA follow their instructions and

19     their directives.  So the public interest would weigh in favor

20     of Congress here, as opposed to undermine it.

21          And I want to note--

22          THE COURT:  Just real quickly, because of all the

23     argument about public interest and which way that cuts, can you

24     point me to any portion of your briefing or declarations or any

25     part of the record thus far that would address the parade of

1    horribles raised by defendant intervenor, all 50 states--

2    Actually, defendant made the point about all 50 states, and

3    then intervenor made the point about some of these early-term

4    procedures that would be jeopardized by an order specific to

5    mifepristone.

6            Is there anything in your brief or in the

7    attachments or the declarations or any part of the record that

8    refer to alternatives?  So any references to Title X, OPA

9    programs, state programs, anything like Plan B or other drugs?

10   Is there a reference point there so the Court can have a full

11   view of what the public interest looks like vis-a-vis the

12   alternatives available to patients in this category?

13           MR. BAPTIST:  To my immediate knowledge, nothing in

14   the plaintiffs' briefs or filings.  But I again would direct

15   your attention to the 22-state amicus brief where it talks

16   about how states have crafted their laws and regulations to

17   reflect certain types of exceptions to the laws and how they

18   have defended their citizens on abortion in general.  So they

19   have highlighted certain parts of that.  And I may have a

20   specific reference, if I have your indulgence.  But for the

21   sake of time, I may want to keep moving as well.

22           THE COURT:  Okay.

23           MR. BAPTIST:  One thing I would note, there was a

24   declaration in support of the FDA's opposition brief by Maine

25   Family Planning.  I believe it was the Kieltyka, or Kieltyka,

1    declaration.  They talked today--the FDA talked about how they

2    may be doing an alternative protocol in response to any type of

3    decision in favor of plaintiffs here.

4            I'll note that that's a little change of a position

5    than what the declaration stated.  The declaration stated that

6    17 of 18 clinics would close.  But as of last week, there are

7    public press statements by their executives at Maine Family

8    Planning that that would not necessarily have to happen, that

9    they would just go to a one-drug chemical abortion treatment

10   and just focus on misoprostol as opposed to mifepristone.

11           So circumstances may change.  I commend the FDA for

12   discussing that and bringing it up as they're talking about an

13   alternative protocol that may not happen.  But that is at least

14   something that I--was important to bring, because I believe

15   that was the only declaration talking about what clinics may

16   have to shut down in specificity--

17           THE COURT:  I believe from 2000 approval, to 2016

18   major changes, to the 2020 agency action, although the dosage

19   changed from 400 to 800, misoprostol is a continuing

20   requirement through all of those agency actions, and you are

21   not challenging the FDA's treatment of misoprostol; is that

22   correct?

23           MR. BAPTIST:  That is correct, in the sense that

24   the separate drug approval of misoprostol is not at issue here.

25   I will note that Danco Laboratories' approval--  And GenBioPro

1    is the generic manufacturer of the drug.  They have a labeled

2    use of misoprostol.  When FDA approved mifepristone for use in

3    chemical abortion purposes, it had to necessarily include both

4    drugs as the approved labeled regimen.

5           So to the degree that the FDA has approved it, we

6    have asked, I think, in our briefs, with sufficient clarity--if

7    not, I apologize--that we would want the Court to set aside,

8    vacate, enjoin, withdraw, or suspend at this point that

9    approval to the degree that those two drug manufacturers have

10   approvals with both drugs in it.

11          But plaintiffs acknowledge misoprostol is used, you

12   know, on label to treat gastric ulcers.  It's one of the top

13   ways to induce labor and delivery.  Those uses are not within

14   the scope of this lawsuit.  But if Maine Family Planning

15   tomorrow wants to go and start using misoprostol only, our case

16   wouldn't necessarily directly impact that, but it may be

17   implicating Comstock, in addition, if they have to comply with

18   that, obviously, depending how they ship and transfer that

19   drug.

20          THE COURT:  Okay.  You may wrap up with any final

21   statement to the Court you deem necessary.

22          MR. BAPTIST:  Your Honor, the FDA's unlawful

23   actions have harmed women and girls for far too long.  The

24   agency has prolonged these harms by stonewalling plaintiffs on

25   their citizen petitions and then removing necessary safeguards

1    on the same day each time the agency denied those petitions.

2    How many more women must die or come close to death before the

3    FDA takes mifepristone off the market?  Plaintiffs need not

4    keep asking this question.  Therefore, plaintiffs respectfully

5    request that the Court hold the FDA accountable for its actions

6    and grant our motion.

7                  Thank you, Your Honor.

8                  THE COURT:  Thank you, Counselor.  I have your

9    argument.

10                 So, here, neither party requested this hearing.

11   The Court held the hearing on its own accord to afford all

12   parties an adequate opportunity to make arguments before the

13   Court reaches a decision on the pending motion.

14                 I do want to thank those who endured the necessary

15   planes, trains, and automobiles to travel from D.C. to Dallas

16   to Amarillo.  I know there are considerable logistics to reach

17   this courthouse at this destination.  So thanks to all of you

18   that endured that.

19                 I also want to thank the parties for excellent

20   briefing all around, and excellent argument.  This was superb

21   appellate-grade efficacy at the writing phase, and also at oral

22   argument today.  So thank you for excellent work product all

23   around.

24                 They are not here, I don't imagine, but I would

25   also like to thank the 77 amici who have submitted additional

1   research from both sides, in support of plaintiffs and in

2   support of defendant and intervenors.  That, too, is excellent

3   briefing.  This is just a smorgasbord of excellent

4   appellate-grade work from all involved.  So I extend the thanks

5   of the Court for that.

6          Now that I have your oral arguments, in addition to

7   the written papers before the Court, the Court will take this

8   matter under advisement and issue--this Court will issue an

9   order and opinion as soon as possible.  We are adjourned in

10  this matter.  Counsel are excused.  You may return home, and

11  you may do lunch now at 1:30.  So I apologize for that late

12  hour.

13         We are adjourned.

14     (END OF HEARING)

15

16     I, Mechelle Daniel, Federal Official Court Reporter in and
    for the United States District Court for the Northern District
17  of Texas, do hereby certify pursuant to Section 753,
    Title 28, United States Code, that the foregoing is a true and
18  correct transcript of the stenographically reported proceedings
    held in the above-entitled matter and that the transcript page
19  format is in conformance with the regulations of the Judicial
    Conference of the United States.

20

21   /s/ Mechelle Daniel                **DATE** MARCH 17, 2023

22  MECHELLE DANIEL, CSR #3549
    FEDERAL OFFICIAL COURT REPORTER
23

24

25