**Exhibit D**

**Appendix of Exhibits to Amended Complaint**

**Vol. III of VI**

## TABLE OF CONTENTS

### Vol. III

**Exhibit 27** *Am. Coll. of Obstetrics & Gynecology Practice Bulletin No. 225: Medication Abortion up to 70 days of Gestation*, 136 Obstetrics & Gynecology 31 (Oct. 2020) ................................................. App. 000568

**Exhibit 28** Mary Gatter et al., *Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days*, 91 Contraception 269 (2015)) ..................................................... App. 000599

**Exhibit 29** 2019 Citizen Petition of AAPLOG to FDA (Mar. 29, 2019) ..................................................... App. 000605

**Exhibit 30** 2019 FDA ANDA Approval Letter to GenBioPro, Inc. (Apr. 11, 2019) ...................................................... App. 000632

**Exhibit 31** 2020 Letter from ACOG and SMFM, to FDA about Mifepristone REMS (Apr. 20, 2020) (2020 ACOG-SMFM Letter) ................................................................ App. 000639

**Exhibit 32** 2021 FDA Letter to ACOG and SMFM About Mifepristone REMS, (Apr. 12, 2021)................................... App. 000643

**Exhibit 33** 2021 FDA Center for Drug Evaluation & Research Director Patrizia Cavazzoni Letter to Dr. Graham Chelius (Dec. 16, 2021) ............................................................... App. 000646

**Exhibit 34** 2021 FDA Letter to AAPLOG and Am. Coll. of Pediatricians denying in part and granting in part 2016 Citizen Petition, Docket No. FDA-2019-P-1534 (Dec. 16, 2021) (2021 FDA Response)................................................................ App. 000648

**Exhibit 35** Questions and Answers on FDA's Adverse Event Reporting System (FAERS).................................................. App. 000689

**Exhibit 36** Kathi A. Aultman et al., *Deaths and Severe Adverse Events after the Use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 26 Law & Medicine 3 (2021) ............................................................... App. 000694

**Exhibit 37** Christiana A. Cirucci et al., *Mifepristone Adverse Events Identified by Planned Parenthood in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting System and Those Obtained Through the Freedom of Information Act*, 8 Health Servs. Rsch & Managerial Epidemiology 1 (2021) ........................... App. 000720

**Exhibit 38** FDA, *FDA Adverse Event Reporting* ....................... App. 000726

**Exhibit 39** *Specifications for Preparing and Submitting Electronic ICSRs and ICSR Attachments* (April 2021) ......................... App. 000730

**Exhibit 40** 2023 FDA Letter to Students for Life of Am. denying 2022 SFLA Petition, Docket No. FDA-2022-P-3209, (Jan. 3, 2023) ......................................................... App. 000779

**Exhibit 41** REMS Single Shared System for Mifepristone 200 mg (Jan. 2023) .................................................................. App. 000782

**Exhibit 42** Pam Belluck, *CVS and Walgreens Will Begin Selling Abortion Pills This Month*, New York Times (March 1, 2024) ...................................................... App. 000796

**Exhibit 43** Mifeprex Prescriber Agreement .............................. App. 000801

**Exhibit 44** Mifepristone Patient Agreement ........................... App. 000804

**Exhibit 45** Letter from Danco Labs to Emergency Room Doctors (Nov. 12, 2004) ....................................................... App. 000806

# EXHIBIT 27

# Medication Abortion Up to 70 Days of Gestation _ ACOG Gestation Bulletin No. 225



**ACOG** | Clinical



Medication Abortion Up to 70 Days of Gestation

Practice Bulletin ⓘ | Number 225 | October 2020

By reading this page you agree to ACOG's Terms and Conditions. Read terms

The following supplemental information has been issued for this document:

**View the Clinical Practice Update, Rh D Immune Globulin Administration After Abortion or Pregnancy Loss at Less Than 12 Weeks of Gestation**

**View the March 2024 Practice Advisory**

**View the January 2023 Practice Advisory**

Number 225 (Replaces Practice Bulletin Number 143, March 2014. Reaffirmed 2023)

**Committee on Practice Bulletins—Gynecology and the Society of Family Planning.** This Practice Bulletin was developed jointly by the Committee on Practice Bulletins—Gynecology and the Society of Family Planning in collaboration with Mitchell D. Creinin, MD, and Daniel A. Grossman, MD.

**ABSTRACT:** Medication abortion, also referred to as medical abortion, is a safe and effective method of providing abortion. Medication abortion involves the use of medicines rather than uterine aspiration to induce an abortion. The U.S. Food and Drug Administration (FDA)-approved medication abortion regimen includes mifepristone and misoprostol. The purpose of this document is to provide updated evidence-based guidance on the provision of medication abortion up to 70 days (or 10 weeks) of gestation. Information about medication abortion after 70 days of gestation is provided in other ACOG publications 1 .

# Background

## Epidemiology

App. 000569

An estimated one in four women in the United States will have an abortion in her lifetime. In 2017, an estimated 60% of abortions in the United States occurred at or before 10 weeks of gestation and medication abortion comprised 39% of all abortions  2 . Between 2006 and 2015, there was a shift in the timing of abortion, with abortions taking place at earlier gestational ages; this is likely due, in part, to availability of medication abortion  3 . From 2014 to 2017, the number of nonhospital facilities that provided medication abortion increased by 25%  2 . A recent survey of American College of Obstetricians and Gynecologists (ACOG) Fellows and Junior Fellows found that 14% had provided medication abortion in the prior year  4 .

## Medication Abortion

The medication abortion regimen supported by major medical organizations nationally and internationally includes two medications, mifepristone and misoprostol  5    6 . If mifepristone is unavailable, then a misoprostol-only regimen is an acceptable alternative  5 . Mifepristone is a selective progesterone receptor modulator that binds to the progesterone receptor with an affinity greater than progesterone itself but does not activate the receptor, thereby acting as an antiprogestin  7 . Mifepristone's known actions on a uterus during pregnancy include decidual necrosis, cervical softening, and increased uterine contractility and prostaglandin sensitivity  8    9 . Misoprostol is a prostaglandin E1 analogue that causes cervical softening and uterine contractions. It is approved by the FDA for oral administration to prevent gastric ulcers in individuals who take anti-inflammatory drugs on a long-term basis, and it is included in the FDA-approved labeling of mifepristone for use in abortion  10 .

The FDA currently restricts mifepristone access under the risk evaluation and mitigation strategy (REMS) program, which includes a requirement that the drug be "dispensed to patients only in certain health-care settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber"  10 . However, the REMS restrictions for mifepristone do not make the care safer, are not based on medical evidence or need, and create barriers to clinician and patient access to medication abortion  4    11    12 . The American College of Obstetricians and Gynecologists advocates the removal of REMS restrictions for mifepristone  12 .

# Clinical Considerations and Recommendations

### How should patients be counseled about abortion methods?

Only when patients have considered their options and decided to have an abortion does the discussion about the different methods become clinically relevant. Patients who choose abortion should be counseled about all methods available as well as the risks, advantages, disadvantages, and the different features of these options  5    6 . Most patients who initially are unsure about the method will have some preference after counseling  13 . Generally, patients are satisfied with the method they choose  12    14    15 . Patients who choose medication abortion tend to do so because of a desire to avoid a procedural intervention; a perception that medication abortion is safer, more natural, and private compared with uterine aspiration; or a combination of these reasons  16 . Compared with uterine aspiration, medication abortion takes longer to complete and requires more active patient participation as the pregnancy expels outside of a clinical setting. The uterine aspiration procedure for a first-trimester abortion takes place most commonly in one visit, is slightly more effective, and allows for direct assessment of pregnancy tissue by the clinician.

**What information and counseling should be provided to patients who are considering medication abortion?**

## Eligibility and Contraindications

Most patients at 70 days of gestation or less who desire abortion are eligible for a medication abortion. There are medical conditions for which a medication abortion may be preferable to uterine aspiration. Such examples include uterine fibroids that significantly distort the cervical canal or uterine cavity  **17**   **18** , congenital uterine anomalies  **19** , or introital scarring related to infibulation  **20** . Patients with asthma are candidates for medication abortion because misoprostol does not cause bronchoconstriction and actually acts as a weak bronchodilator  **21** . Multiple gestation pregnancy is not a contraindication; patients with twin gestations can be treated with the same regimens as those with singleton gestations  **22** .

Medication abortion is not recommended for patients with any of the following: confirmed or suspected ectopic pregnancy, intrauterine device (IUD) in place (the IUD can be removed before medication abortion), current long-term systemic corticosteroid therapy, chronic adrenal failure, known coagulopathy or anticoagulant therapy, inherited porphyria, or intolerance or allergy to mifepristone or misoprostol  **23** . Patients with significant comorbidities may still have a medication abortion but may need more monitoring during the process depending on the stability of the conditions. The safety of medication abortion in patients with anemia is unknown because studies have excluded patients with anemia who have hemoglobin levels of less than 9.5 or 10 g/dL. Although the transfusion rates associated with medication abortion are low (less than 0.1%), they exceed those reported for uterine evacuation procedures in early pregnancy (0.01%)  **24**   **25** . Patients may also not be good candidates for medication abortion if they are unable or unwilling to adhere to care instructions, desire quick completion of the abortion process, are not available for follow-up contact or evaluation, or cannot understand the instructions because of comprehension barriers.

## What to Expect

Most patients who have a medication abortion will experience bleeding and cramping, which are necessary for the process to occur. Patient counseling should emphasize that bleeding likely will be much heavier than menses (and potentially with severe cramping).

Adverse effects can occur after mifepristone administration but are more typically experienced after misoprostol administration. Adverse effects commonly associated with misoprostol use include nausea (43–66%), vomiting (23–40%), diarrhea (23–35%), headache (13–40%), dizziness (28–39%), and thermoregulatory effects such as fever, warmth, hot flushes, or chills (32–69%)  **26**   **27**   **28**   **29** . The incidence of each adverse effect varies by regimen used, the dose and route of administration of the prostaglandin analogue, and the gestational age.

Patient counseling before medication abortion should include discussion of when patients should contact their clinician in the case of heavy bleeding (soaking more than two maxi pads per hour for 2 consecutive hours) and when to access urgent intervention **5  6  30** . In rare cases, patients who undergo medication abortion may need to obtain an additional intervention, such as uterine aspiration. If the prescribing clinician does not perform the intervention, it is medically appropriate to provide a referral. In patients who receive mifepristone and vaginal misoprostol, the need for intervention within the first 24 hours of treatment is rare, occurring in 0.2% of patients **31** . The need for intervention is based on how the patient is feeling and whether the bleeding seems to be slowing. For patients with heavy bleeding, a baseline hemoglobin or hematocrit, if known, may also influence when to seek urgent care. Overall, less than 1% of patients will obtain an emergency intervention for excessive bleeding **13  14  15  32** , and the need for blood transfusion is rare (0.1% of patients or less) **24  33** . Should a rare medical emergency arise, patients should be advised to seek care at the closest emergency facility.

## Teratogenicity and Ongoing Pregnancy

Before undergoing medication abortion, patients should be counseled regarding the teratogenicity of misoprostol in the event of an unsuccessful medication abortion. All patients with a continuing pregnancy after using mifepristone and misoprostol should be provided with all pregnancy options and a thorough discussion of the risks and benefits of each. Most individuals with a continuing pregnancy opt to complete the abortion, but patients should be supported in their choice of how to proceed. No evidence exists to date of a teratogenic effect of mifepristone **34** . However, misoprostol can result in congenital anomalies, such as limb defects with or without Möbius' syndrome (ie, facial paralysis), when used during the first trimester **35  36  37  38  39** . Because misoprostol is the common agent used with every medication abortion regimen, clinicians should counsel all patients regarding potential teratogenic effects.

In the very rare case that patients change their mind about having an abortion after taking mifepristone and want to continue the pregnancy, they should be monitored expectantly **40** . There is no evidence that treatment with progesterone after taking mifepristone increases the likelihood of the pregnancy continuing **41  42** . However, limited available evidence suggests that use of mifepristone alone without subsequent administration of misoprostol may be associated with an increased risk of hemorrhage **43** .

### What evaluation and ancillary testing are needed before a medication abortion?

Before medication abortion is performed, the clinician should confirm pregnancy and estimate gestational age. For patients with regular menstrual cycles, a certain last menstrual period within the prior 56 days, and no signs, symptoms, or risk factors for ectopic pregnancy, a clinical examination or ultrasound examination is not necessary before medication abortion. Rh testing is recommended in patients with unknown Rh status before medication abortion, and Rh D immunoglobulin should be administered if indicated **44** . In situations where Rh testing and Rh D immunoglobulin administration are not available or would significantly delay medication abortion, shared decision making is recommended so that patients can make an informed choice about their care. Other laboratory evaluations are not routinely indicated but may be required by local and state laws **2** . Preoperative assessment of hemoglobin or hematocrit is indicated only when anemia is suspected.

App. 000572

Most abortion care globally is provided without ultrasound examination. Although most U.S.-based studies have used ultrasonography to confirm gestational age and intrauterine location of the pregnancy, more recent evidence has shown that a patient's certain last menstrual period when within the prior 56 to 63 days is accurate **45** **46** **47** **48** . In one study, use of certain last menstrual period alone would have resulted in medication abortion being provided to only 26 of 3,041 (0.8%) patients with pregnancies beyond 70 days of gestation **45** .

A potential concern when providing early abortion services is the possibility of an undiagnosed ectopic pregnancy. The overall ectopic pregnancy rate in the U.S. general population is low and declining and is approximately 6 per 1,000 pregnancies among insured patients and 14 per 1,000 among patients who receive Medicaid **49** **50** . However, in studies of patients who seek abortion, ectopic pregnancy rates generally are lower. A U.S. study of uterine evacuation procedures performed at less than 6 weeks of gestation found the ectopic pregnancy rate to be 5.9 per 1,000 pregnancies **51** at a time when the national rate was three times higher **52** . The largest published study of first-trimester medication abortion patients involved 16,369 patients with pregnancies of 49 days of gestation or less and yielded a calculated ectopic pregnancy rate of 1.3 per 1,000 pregnancies **53** . Although ectopic pregnancy among individuals who seek early abortion is rare, patients with a medical history of ectopic pregnancy, medical risk factors (prior tubal surgery, pregnancy with progestin-only or IUD contraception use) or symptoms (ie, unilateral pain, vaginal bleeding) suggestive of ectopic pregnancy should have pretreatment clinical evaluation, which may include ultrasonography **5** **6** .

Most patients with clinical indications for an ultrasound examination before medication abortion can be initially screened with transabdominal ultrasonography, reserving transvaginal ultrasonography for situations in which further clarification is required **54** **55** . If ultrasonography is medically indicated, transabdominal ultrasonography is sensitive for diagnosing the presence or absence of a gestational sac in patients who are not obese **54** . A randomized trial that compared the use of transabdominal ultrasonography with transvaginal ultrasonography for eligibility assessment before medication abortion found that 80% of patients who received initial transabdominal ultrasonography did not require further testing to proceed with medication abortion, thus avoiding use of more invasive and resource-intensive screening with transvaginal ultrasonography **55** .

Recommendations on whether Rh D immune globulin should be given to patients before medication abortion in early pregnancy are primarily based on expert opinion because available evidence is limited **6** **56** . Rh D alloimmunization that is left undiagnosed and untreated can lead to significant perinatal morbidity and mortality in future pregnancies **57** . And, guidelines from ACOG and various other major medical societies include recommendations for Rh D immune globulin prophylaxis for Rh D-negative patients undergoing medication abortion within the first 12 weeks of gestation **44** **58** **59** **60** . For patients undergoing medication abortion before 10 weeks of gestation, some experts recommend against routine Rh testing and anti-D prophylaxis **6** or advise that forgoing Rh typing and Rh prophylaxis can be considered **61** . Research regarding Rh alloimmunization during early pregnancy continues to evolve **62** . However, based on currently available indirect evidence and the theoretical risk of Rh D alloimmunization in future pregnancies, ACOG recommends Rh D immune globulin prophylaxis for Rh D-negative patients undergoing medication abortion. In situations where Rh testing and anti-D prophylaxis are not available or would significantly delay medication abortion, shared decision making is recommended so that patients can weigh the benefits and risks of their options and make an informed decision about their care.

*What regimens are used for medication abortion, and how do they compare in effectiveness for treatment?*

App. 000573

Combined mifepristone–misoprostol regimens are recommended as the preferred therapy for medication abortion because they are significantly more effective than misoprostol-only regimens. If a combined mifepristone–misoprostol regimen is not available, a misoprostol-only regimen is the recommended alternative **5  63  64** . Mifepristone is approved by the U.S. FDA to be used with misoprostol for medication abortion through 70 days of gestation **23** , but evidence also exists to support use with more advanced gestations **1    5** . The recommended medication abortion regimens are listed in **Table 1** . With all regimens, the mifepristone dose is the same: 200 mg taken orally. The misoprostol portion of the regimen is more variable in terms of dose, route, and timing. Oral use of misoprostol is not recommended because it may result in lower overall efficacy **65** . In general, patients prefer a shorter interval between the two medications **66** . These regimens have been extensively studied and are similarly safe and effective **5** . Offering options provides patients with flexibility in the timing of abortion and the ability to avoid possible adverse effects related to the misoprostol route. Gastrointestinal adverse effects are less common when misoprostol is administered vaginally as compared with regimens that use oral, buccal, or sublingual misoprostol **65  67** . Buccal and sublingual administration cause similar adverse effects, with the sublingual route associated with a higher rate of chills **68** .

**Table 1.** Medication Abortion Regimens Up to 70 Days of Gestation

| Regimen | Mifepristone Dose | Misoprostol Dose | Interval Between Drugs |
|---------|-------------------|------------------|------------------------|
| **Preferred** | | | |
| Combination, FDA-approved[*] | 200 mg (orally) | 800 micrograms (buccally) | 24–48 h |
| Combination, WHO recommended[†] | 200 mg (orally) | 800 micrograms (vaginally, sublingually, or buccally) | 24–48 h |
| **Alternative** | | | |
| Misoprostol only | N/A | 800 micrograms (vaginally, sublingually, or buccally) | Repeat every 3 h for up to 3 doses[‡] |

Abbreviations: h, hours; FDA, U.S. Food and Drug Administration; N/A, not applicable; WHO, World Health Organization.

[*]U.S. Food and Drug Administration. Mifeprex (mifepristone) information. Postmarket drug safety information for patients and providers. Silver Spring, MD: FDA; 2018. Available at: https://www.fda.gov/Drugs/DrugSafety/PostmarketDrug SafetyInformationforPatientsandProviders/ucm111323.htm. Retrieved March 3, 2020.

[†]World Health Organization. Medical management of abortion. Geneva: WHO; 2018. Available at: https://apps.who.int/iris/ bitstream/handle/10665/278968/9789241550406-eng.pdf?ua=1. Retrieved March 3, 2020.

[‡]Although studies typically use no more than three doses for the initial treatment regimen, the World Health Organization guidelines do not specify a maximum number of misoprostol doses (Raymond EG, Harrison MS, Weaver MA. Efficacy of misoprostol alone for first-trimester medical abortion: a systematic review. Obstet Gynecol 2019;133:137-47 and World Health Organization. Medical management of abortion. Geneva: WHO; 2018. Available at: https://apps.who.int/iris/bitstream/handle/ 10665/278968/9789241550406-eng.pdf?ua=1. Retrieved March 3, 2020).

Complete abortion rates with all regimens are highest at earlier gestational ages **Table 2** . *Medication abortion failure* (defined as the need for uterine aspiration because of ongoing pregnancy or retained tissue) increases with advancing gestational age through 70 days of gestation **Table 2** , although failure rates remain low even at this point. Clinicians should counsel patients that medication abortion failure rates, especially continuing pregnancy rates, increase as gestational age approaches 10 weeks.

**Table 2.** Outcome by Gestational Age After Mifepristone 200 mg and Misoprostol for Outpatient Medication Abortion

| | Misoprostol Dose | Interval Between Mifepristone and Misoprostol (h) | Gestational Age | | | |
|---|---|---|---|---|---|---|
| | | | ≤49 days | 50–56 days | 57–63 days | 64–70 days |
| Complete abortion | 800 micrograms buccally[*] | 24–48 | 98.1% | 96.8% | 94.7% | 92.7% |
| | 800 micrograms vaginally[†‡§‖¶#] | 24–72 | 98.3–99.7% | 95.3–98.6% | 95.1–98.3% | 94.9% |
| | 800 micrograms vaginally[§] | 6–8 | 97.1% | 94.2% | 95.2% | N/A |
| | 800 micrograms vaginally[‖¶] | 0–0.25 | 95.5–95.7% | 93.7–94.3% | 91.6–95.3% | N/A |
| | 400 micrograms sublingually[#**] | 24–48 | 95.4% | N/A | 94.8% | 91.9% |
| Ongoing pregnancy | 800 micrograms buccally[*] | 24–48 | 0.3% | 0.8% | 2.0% | 3.1% |
| | 800 micrograms vaginally[†‡§‖¶#] | 24–72 | 0–0.4% | 0–1.2% | 0–2.2% | 3.4% |
| | 800 micrograms vaginally[§] | 6–8 | 0.4% | 0 | 0.8% | N/A |
| | 800 micrograms vaginally[‖¶] | 0–0.25 | 1.4–2.3% | 1.9–2.8% | 1.6–5.0% | N/A |
| | 400 micrograms sublingually[#**††] | 24–48 | N/A | N/A | 1.8–3.5% | 2.2% |

Abbreviations: h, hours; N/A, not available.

[*]U.S. Food and Drug Administration. Mifeprex (mifepristone) information. Postmarket drug safety information for patients and providers. Silver Spring, MD: FDA; 2018. Available at: https://www.fda.gov/Drugs/DrugSafety/PostmarketDrug SafetyInformationforPatientsandProviders/ucm111323.htm. Retrieved March 3, 2020.

[†]Schaff EA, Eisinger SH, Stadalius LS, Franks P, Gore BZ, Poppema S. Low-dose mifepristone 200 mg and vaginal misoprostol for abortion. Contraception 1999;59:1–6.

[‡]Schaff EA, Fielding SL, Westhoff C. Randomized trial of oral versus vaginal misoprostol at one day after mifepristone for early medical abortion. Contraception 2001;64:81–5.

[§]Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. A randomized comparison of misoprostol 6 to 8 hours versus 24 hours after mifepristone for abortion. MOD Study Trial Group. Obstet Gynecol 2004;103:851–9.

[‖]Creinin MD, Schreiber CA, Bednarek P, Lintu H, Wagner MS, Meyn LA. Mifepristone and misoprostol administered simultaneously versus 24 hours apart for abortion: a randomized controlled trial. Medical Abortion at the Same Time (MAST) Study Trial Group. Obstet Gynecol 2007;109:885–94.

[¶]Lohr PA, Starling JE, Scott JG, Aiken AR. Simultaneous compared with interval medical abortion regimens where home use is restricted [published erratum appears in Obstet Gynecol 2018;132:219]. Obstet Gynecol 2018;131:635–41.

[#]Raghavan S, Tsereteli T, Kamilov A, Kurbanbekova D, Yusupov D, Kasimova F, et al. Acceptability and feasibility of the use of 400 μg of sublingual misoprostol after mifepristone for medical abortion up to 63 days since the last menstrual period: evidence from Uzbekistan. Eur J Contracept Reprod Health Care 2013;18:104–11.

[**]Bracken H, Dabash R, Tsertsvadze G, Posohova S, Shah M, Hajri S, et al. A two-pill sublingual misoprostol outpatient regimen following mifepristone for medical abortion through 70 days' LMP: a prospective comparative open-label trial. Contraception 2014;89:181–6.

[††]von Hertzen H, Huong NT, Piaggio G, Bayalag M, Cabezas E, Fang AH, et al. Misoprostol dose and route after mifepristone for early medical abortion: a randomised controlled noninferiority trial. WHO Research Group on Postovulatory Methods of Fertility Regulation. BJOG 2010;117:1186–96.

[‡‡]Hsia JK, Lohr PA, Taylor J, Creinin MD. Medical abortion with mifepristone and vaginal misoprostol between 64 and 70 days' gestation. Contraception 2019;100:178–81.

***Who is qualified to provide medication abortion, and in what settings can medication abortion be provided?***

Any clinician with the skills to screen patients for eligibility for medication abortion and to provide appropriate follow-up can provide medication abortion. Clinicians who wish to provide medication abortion services should be trained to perform uterine evacuation procedures or should be able to refer to a clinician who has this training **5 69** .

In addition to physicians, advanced practice clinicians, such as nurse–midwives, physician assistants, and nurse practitioners, possess the clinical and counseling skills necessary to provide first-trimester medication abortion **70** . Randomized trials in Mexico, Nepal, and Sweden have consistently found that patients randomized to receive medication abortion under the care of a nurse or nurse–midwife had a statistically equivalent risk of complete abortion compared with those under the care of a physician, without increased risk of adverse events **71** **72** **73** . In some U.S. states, advance practice clinicians can provide medication abortion; however, many states require that a physician perform an abortion and prohibit provision of medication abortion by nonphysician clinicians **2** .

According to the requirements of the FDA REMS program, clinicians who want to prescribe mifepristone must complete a "prescriber agreement form" before ordering and dispensing mifepristone, and the clinician and patient need to sign a "patient agreement form" before the drug is dispensed **10** .

The actual location of where a patient takes the medication abortion drugs has evolved over time. Although the FDA REMS program for mifepristone continues to require dispensing in the clinician's office, the U.S. labeling for mifepristone no longer indicates that the medication should be used only in the clinician's office **10** . Patients can safely and effectively use mifepristone at home for medication abortion **74** **75** **76** **77** . A clinician can prescribe misoprostol and pain medications or can maintain an office supply and directly dispense to the patient. Patients can safely and effectively self-administer misoprostol at home for medication abortion **5** **78** **79** **80** .

Medication abortion can be provided safely and effectively by telemedicine with a high level of patient satisfaction, and telemedicine improves access to early abortion care, particularly in areas that lack a health care practitioner **81** **82** . Telemedicine involves the use of video and information technology to provide a medical service at a distance. Medication abortion through telemedicine has been evaluated in observational studies and found to be equally effective as an in-person visit **33** **83** **84** **85** . In an analysis of nearly 20,000 medication abortions, adverse events were rare (0.3% overall) and did not differ between those who choose telemedicine or in-person services **33** **84** . Patients who choose telemedicine medication abortion are significantly more likely to say they would recommend the service to a friend compared with those who have an in-person visit (90% versus 83%) **83** . Telemedicine also may help reduce the rate of delays to care because of barriers in access to abortion care in remote areas **82** . After medication abortion through telemedicine was introduced in Iowa, a significant reduction in second-trimester abortion was reported, and patients in remote parts of the state were more likely to obtain a medication abortion **82** . Despite this evidence, some states have passed legislation that bans the use of telemedicine to provide medication abortion **86** .

### Should prophylactic antibiotics be used in medication abortion?

The routine use of prophylactic antibiotics is not recommended for medication abortion **6** . Following concern about serious, rare, and deadly infection with clostridial bacteria in patients undergoing medication abortion, it has since become evident that no specific connection exists between clostridial organisms and medication abortion **87** **88** . Uterine infection with medication abortion is uncommon, and published data do not support the routine use of prophylactic antibiotics in medication abortion. In a systematic review of 65 studies of heterogeneous design (prospective, retrospective, and randomized), the overall proportion of diagnosed or treated infection after medication abortion was 0.9% in more than 46,000 patients **89** . In these studies, as in most studies of abortion by uterine evacuation, the diagnostic criteria for infection were variable, leading to possible overestimation of infection.

App. 000576

Although serious infections occur rarely in patients after medication abortion, clinicians need to be aware of the signs and symptoms. Tachycardia, severe abdominal pain, or general malaise with or without fever that occur more than 24 hours after misoprostol administration **90** . Clostridial toxic shock often resembles a flu-like illness, so clinicians should have a high level of suspicion for infection when symptoms consistent with flu are present **90** . Patients with such infections typically have hemoconcentration and significant leukocytosis without fever and can rapidly progress to refractory hypotension and death **91** .

### What is the recommended pain management approach for patients undergoing medication abortion?

Nonsteroidal anti-inflammatory drugs are recommended for pain management in patients who undergo a medication abortion. Pain management during medication abortion is an important consideration because many patients report pain that requires analgesia. Studies of pain control and medication abortion have found that the duration of pain for most patients is no longer than 24 hours after misoprostol administration **92 93** . The most severe pain occurs approximately 2.5–4 hours after misoprostol use and lasts about 1 hour **94** . One randomized trial found that ibuprofen taken when needed was more effective than acetaminophen to reduce pain associated with medication abortion **95** . Another randomized trial found ibuprofen given prophylactically at the time of misoprostol administration did not significantly reduce pain associated with medication abortion compared with ibuprofen taken when needed **93** . Nonsteroidal anti-inflammatory drugs do not appear to counteract misoprostol or affect the success of the medication abortion **96** . Opioids have not been found to decrease the amount or duration of maximum pain associated with medication abortion up to 70 days of gestation **94** . Other medications, like pregabalin, have been studied for pain control but have not been effective **97** .

Patients should be sent home with appropriate instructions for analgesia with over-the-counter medications. If opioids are requested or desired, the Centers for Disease Control and Prevention (CDC) advises that "clinicians should prescribe the lowest effective dose of immediate-release opioids and should prescribe no greater quantity than needed for the expected duration of pain severe enough to require opioids" **98** .

### What kind of assessment is recommended after medication abortion?

Routine in-person follow-up is not necessary after uncomplicated medication abortion. Clinicians should offer patients the choice of self-assessment or clinical follow-up evaluation to assess medication abortion success. If medically indicated or preferred by the patient, follow-up evaluation can be performed by medical history, clinical examination, serum human chorionic gonadotropin (hCG) testing, or ultrasonography **5  6  99** .

The type of follow-up visit after medication abortion has evolved over time. The mifepristone FDA label includes recommendations for follow up **23** . However, some patients choose not to return for follow-up; this likely is due to the high success rates and because patients are able to self-assess abortion completion **100 101 102**.

Remote Assessment and Self-Assessment

Follow-up can be performed by telephone at 1 week, with subsequent at-home urine pregnancy testing at 4 weeks after treatment, which avoids the need for the patient to go to a facility **103 104 105 106**. Most studies have used a short series of questions that ask patients whether they have experienced bleeding and cramping (including how much and for how long) and whether they still feel pregnant or if they think the pregnancy has passed **104 107**. When the clinician and the patient think that expulsion has occurred based on symptomatology, they are correct 96–99% of the time **104 108**. Although urine pregnancy testing alone with standard high-sensitivity or low-sensitivity tests has not been shown to be a viable alternative to other forms of follow-up, newer semiquantitative or multilevel at-home urine hCG tests have shown promise in accurately identifying ongoing pregnancies after medication abortion **109 110 111 112**.

## Clinical Follow-Up

When a patient obtains in-person follow-up after medication abortion, transvaginal ultrasonography is commonly used, although it is not required **5**. Incorrect interpretation of ultrasound examination results can lead to unnecessary interventions such as an unneeded uterine aspiration **5**. If an ultrasound examination is performed at follow-up after medication abortion, the sole purpose is to determine whether the gestational sac is present or absent. The measurement of endometrial thickness or other findings do not predict the need for subsequent uterine aspiration **113**. In research trials, when a transvaginal ultrasound examination shows no evidence of a gestational sac 1 week after mifepristone use, only 1.6% of patients needed subsequent uterine evacuation **113**.

Serum hCG testing before treatment and 1 week after treatment is another option for follow-up examination after medication abortion; however, data about use of this approach are lacking for gestations beyond 63 days. This strategy may be more effective than ultrasonography to confirm abortion completion in patients who were below the threshold for visualization of a gestational sac at the time of their medication abortion **114**. Patients do not need to return to the same facility; they can obtain serum hCG testing at a convenient location **114 115**. The patient should then be informed of the result. A serum hCG level decrease of at least 80% over 6–7 days after initiating treatment with mifepristone and misoprostol indicates a successful abortion **114**. In a randomized trial of in-clinic transvaginal ultrasound examination or serum hCG testing follow-up, 24.5% of patients were lost to follow-up, there were no significant differences reported in unplanned visits and interventions by 2 weeks (6.6% versus 8.2%, respectively) or in uterine evacuation rates by 4 weeks (4.4% and 1.4%, respectively) **116**.

### *How is incomplete medication abortion or ongoing pregnancy managed?*

Guidelines for intervention vary for patients who have delayed expulsion, an incomplete medication abortion (ie, persistent gestational sac on ultrasonography without evidence of embryonic cardiac activity or retained tissue), or an ongoing pregnancy (ie, continuing development with embryonic cardiac activity).

## Delayed Expulsion

After induced or spontaneous expulsion, the uterus will normally contain sonographically hyperechoic tissue or "thick" endometrial stripe that consists of blood, blood clots, and decidua. Rarely does this ultrasound finding in patients who have undergone medication abortion indicate a need for intervention. In the absence of excessive bleeding or pain by patient report, clinicians can monitor such patients based on symptoms.

## Incomplete Medication Abortion

App. 000578

An incomplete medication abortion can be treated with a repeat dose of misoprostol, uterine aspiration, or expectant management, depending on the clinical circumstances and patient preference [23] [30] [117] [118]. Studies indicate that even with a retained sac at 2 weeks after medication abortion, intervention is unnecessary, and that expulsion will typically occur in the ensuing weeks [30]. However, some patients with incomplete expulsion will have bothersome symptoms, such as prolonged and irregular bleeding episodes. Patients with incomplete medication abortion 1 week after treatment can safely receive another dose of misoprostol [28] [118] or repeat misoprostol doses can be used for a persistent gestational sac [117]. Patients who prefer not to wait or do not desire medical management can choose to have a uterine evacuation at any time.

## Ongoing Pregnancy

Ongoing pregnancy after medication abortion can be treated with a repeat dose of misoprostol or uterine aspiration, depending on the clinical circumstances and patient preference. In an analysis of data from two randomized trials with 14 cases of ongoing pregnancy, treatment with a repeat dose of misoprostol, 800 micrograms administered vaginally, resulted in expulsion of the products of pregnancy in five cases (36%); in an additional four cases (29%), gestational cardiac activity was no longer present at the next follow-up visit [118]. If gestational cardiac activity persists at follow-up after a second dose of misoprostol, uterine aspiration should be performed.

**What is the recommended timing of contraception initiation after medication abortion?**

Patients undergoing medication abortion who desire contraception should be counseled that

- almost all contraceptive methods, except IUDs and permanent contraception, can be safely initiated immediately on day 1 (mifepristone intake) of medication abortion.

- all contraceptive methods can be safely initiated after successful medication abortion.

Patients who select depot medroxyprogesterone acetate (DMPA) for contraception should be counseled that administration of DMPA on day 1 of the medication abortion regimen may increase the risk of ongoing pregnancy [119].

Providing desired contraception as soon as possible to patients undergoing medication abortion enables the greatest flexibility in care and decreases barriers to initiating contraception. The CDC and World Health Organization (WHO) support the initiation of almost all methods of contraception on day 1 of the medication abortion or on the same day as mifepristone administration [5] [6] [120]. Permanent contraception procedures may be performed once abortion is confirmed complete.

App. 000579

Concern has been raised that the immediate use of hormonal contraception that contains progestins could theoretically interfere with medication abortion efficacy. Etonogestrel implant use does not affect medication abortion outcomes [121] [122]. However, DMPA injection at the time of mifepristone administration may slightly increase the risk of an ongoing pregnancy [119]. In a randomized trial that evaluated the effects of DMPA injection timing on medication abortion outcomes, ongoing pregnancy was more common among those randomized to receive DMPA injection on the day of mifepristone administration compared with those who received DMPA at a follow-up visit (3.6% versus 0.9%; 90% CI, 2.7 [0.4−5.6]), although the proportion undergoing aspiration for any reason did not significantly vary (6.4% versus 5.3%; 90% CI, 1.1 [−2.8 to 4.9]) [119]. Patients should be counseled about this small risk of ongoing pregnancy, which needs to be weighed against the risk of potentially not receiving their desired method of contraception.

Patients do not experience a higher rate of IUD expulsion with placement in the first week after medication abortion as compared with 3 to 6 weeks later [123] [124]. However, IUD placement within 6 weeks after medication abortion is associated with a higher expulsion rate compared with IUD placement remote from pregnancy; the time frame after 6 weeks at which this rate decreases is unknown. Placement of a copper or levonorgestrel IUD close to the time of abortion results in improved uptake of a desired IUD compared with placement at an additional follow-up visit several weeks after the abortion [123] [124] [125], although overall use rates at 6 months may not differ [126]. The IUD expulsion risk should be weighed against the potential for more patients to receive their desired IUD if it is placed sooner rather than later.

### How should patients be counseled about the effect of medication abortion on future fertility and pregnancy outcomes?

Patients can be counseled that medication abortion does not have an adverse effect on future fertility or future pregnancy outcomes [5] [6] . Studies consistently demonstrate that medication abortion has no negative effect on future fertility or pregnancy outcomes. A study from China found that patients who had a prior mifepristone abortion had lower odds of preterm birth compared with those who had never been pregnant (adjusted OR, 0.77; 95% CI, 0.61−0.98), and the frequencies of low-birth-weight infants and mean lengths of pregnancy were similar in both groups [127]. No significant differences were reported in risk of preterm delivery, frequency of low-birth-weight infants, or mean infant birth weight in the comparisons of patients who had previous mifepristone abortion and patients who had uterine evacuation. In a registry-based study from Scotland, no association was found between prior abortion and subsequent preterm birth during the period 2000−2008, when 68% of abortions were medication-induced [128].

## Summary of Recommendations

### The following recommendations are based on good and consistent scientific evidence (Level A):

- Combined mifepristone−misoprostol regimens are recommended as the preferred therapy for medication abortion because they are significantly more effective than misoprostol-only regimens. If a combined mifepristone−misoprostol regimen is not available, a misoprostol-only regimen is the recommended alternative.

App. 000580

- Clinicians should counsel patients that medication abortion failure rates, especially continuing pregnancy rates, increase as gestational age approaches 10 weeks.

- Any clinician with the skills to screen patients for eligibility for medication abortion and to provide appropriate follow-up can provide medication abortion.

- Patients can safely and effectively use mifepristone at home for medication abortion.

- Patients can safely and effectively self-administer misoprostol at home for medication abortion.

- Nonsteroidal anti-inflammatory drugs are recommended for pain management in patients who undergo a medication abortion.

- Routine in-person follow-up is not necessary after uncomplicated medication abortion. Clinicians should offer patients the choice of self-assessment or clinical follow-up evaluation to assess medication abortion success. If medically indicated or preferred by the patient, follow-up evaluation can be performed by medical history, clinical examination, serum human chorionic gonadotropin (hCG) testing, or ultrasonography.

- If an ultrasound examination is performed at follow-up after medication abortion, the sole purpose is to determine whether the gestational sac is present or absent. The measurement of endometrial thickness or other findings do not predict the need for subsequent uterine aspiration.

**The following recommendations are based on limited or inconsistent scientific evidence (Level B):**

- Medication abortion is not recommended for patients with any of the following: confirmed or suspected ectopic pregnancy, intrauterine device (IUD) in place (the IUD can be removed before medication abortion), current long-term systemic corticosteroid therapy, chronic adrenal failure, known coagulopathy or anticoagulant therapy, inherited porphyria, or intolerance or allergy to mifepristone or misoprostol.

- Before undergoing medication abortion, patients should be counseled regarding the teratogenicity of misoprostol in the event of an unsuccessful medication abortion.

- Before medication abortion is performed, the clinician should confirm pregnancy and estimate gestational age. For patients with regular menstrual cycles, a certain last menstrual period within the prior 56 days, and no signs, symptoms, or risk factors for ectopic pregnancy, a clinical examination or ultrasound examination is not necessary before medication abortion.

- Most patients with clinical indications for an ultrasound examination before medication abortion can be initially screened with transabdominal ultrasonography, reserving transvaginal ultrasonography for situations in which further clarification is required.

- Medication abortion can be provided safely and effectively by telemedicine with a high level of patient satisfaction.

- The routine use of prophylactic antibiotics is not recommended for medication abortion.

App. 000581

- An incomplete medication abortion can be treated with a repeat dose of misoprostol, uterine aspiration, or expectant management, depending on the clinical circumstances and patient preference.

- Ongoing pregnancy after medication abortion can be treated with a repeat dose of misoprostol or uterine aspiration, depending on the clinical circumstances and patient preference.

- Patients undergoing medication abortion who desire contraception should be counseled that

  - almost all contraceptive methods, except IUDs and permanent contraception, can be safely initiated immediately on day 1 (mifepristone intake) of medication abortion.

  - all contraceptive methods can be safely initiated after successful medication abortion.

- Patients who select depot medroxyprogesterone acetate (DMPA) for contraception should be counseled that administration of DMPA on day 1 of the medication abortion regimen may increase the risk of ongoing pregnancy.

- Patients can be counseled that medication abortion does not have an adverse effect on future fertility or future pregnancy outcomes.

*The following recommendations are based primarily on consensus and expert opinion (Level C):*

- Patients who choose abortion should be counseled about all methods available as well as the risks, advantages, disadvantages, and the different features of these options.

- Most patients at 70 days of gestation or less who desire abortion are eligible for a medication abortion.

- Patient counseling before medication abortion should include discussion of when patients should contact their clinician in the case of heavy bleeding (soaking more than two maxi pads per hour for 2 consecutive hours) and when to access urgent intervention.

- All patients with a continuing pregnancy after using mifepristone and misoprostol should be provided with all pregnancy options and a thorough discussion of the risks and benefits of each.

- In the very rare case that patients change their mind about having an abortion after taking mifepristone and want to continue the pregnancy, they should be monitored expectantly.

- Rh testing is recommended in patients with unknown Rh status before medication abortion, and Rh D immunoglobulin should be administered if indicated. In situations where Rh testing and Rh D immunoglobulin administration are not available or would significantly delay medication abortion, shared decision making is recommended so that patients can make an informed choice about their care.

- Clinicians who wish to provide medication abortion services should be trained to perform uterine evacuation procedures or should be able to refer to a clinician who has this training.

App. 000582

# References

1. Second-trimester abortion. Practice Bulletin No. 135. American College of Obstetricians and Gynecologists. Obstet Gynecol 2013; 121: 1394– 406. (Level III)
   **Article Locations:** ● ●

2. Jones RK, Witwer E, Jerman J. Abortion incidence and service availability in the United States, 2017 . New York, NY: Guttmacher Institute; 2019. Available at: https://www.guttmacher.org/report/abortion-incidence-service-availability-us-2017. Retrieved March 4, 2020. (Level II-3)
   **Article Locations:** ● ● ● ●

3. Jatlaoui TC, Boutot ME, Mandel MG, Whiteman MK, Ti A, Petersen E, et al. Abortion surveillance— United States, 2015. MMWR Surveill Summ 2018; 67: 1– 45. (Level II-3)
   **Article Locations:** ●

4. Grossman D, Grindlay K, Altshuler AL, Schulkin J. Induced abortion provision among a national sample of obstetrician-gynecologists. Obstet Gynecol 2019; 133: 477– 83. (Level II-3)
   **Article Locations:** ● ●

5. World Health Organization. Medical management of abortion . Geneva: WHO; 2018. Available at: https://apps.who.int/iris/bitstream/handle/10665/278968/9789241550406-eng.pdf?ua=1. Retrieved March 3, 2020. (Level III)
   **Article Locations:** ● ● ● ● ● ● ● ● ● ● ● ● ● ● ●

6. National Institute for Health and Care Excellence. Abortion care . London, UK: NICE; 2019. (Level III)
   **Article Locations:** ● ● ● ● ● ● ● ● ●

7. Gravanis A, Schaison G, George M, de Brux J, Satyaswaroop PG, Baulieu EE, et al. Endometrial and pituitary responses to the steroidal antiprogestin RU 486 in postmenopausal women. J Clin Endocrinol Metab 1985; 60: 156– 63. (Level III)
   **Article Locations:** ●

8. Swahn ML, Bygdeman M. The effect of the antiprogestin RU 486 on uterine contractility and sensitivity to prostaglandin and oxytocin. Br J Obstet Gynaecol 1988; 95: 126– 34. (Level II-3)
   **Article Locations:** ●

9. Johannisson E, Oberholzer M, Swahn ML, Bygdeman M. Vascular changes in the human endometrium following the administration of the progesterone antagonist RU 486. Contraception 1989; 39: 103– 17. (Level III)
   **Article Locations:** ●

App. 000583

10. U.S. Food and Drug Administration. Mifeprex (mifepristone) information. Postmarket drug safety information for patients and providers . Silver Spring, MD: FDA; 2018. Available at: https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm111323.htm. Retrieved March 3, 2020. (Level III)
Article Locations: ● ● ● ●

11. Raymond EG, Blanchard K, Blumenthal PD, Cleland K, Foster AM, Gold M, et al. Sixteen years of over-regulation: time to unburden mifeprex. Mifeprex REMS Study Group. N Engl J Med 2017; 376: 790– 4. (Level III)
Article Locations: ●

12. American College of Obstetricians and Gynecologists. Improving access to mifepristone for reproductive health indications. Position Statement . Washington, DC: American College of Obstetricians and Gynecologists; 2018. Available at: https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications . Retrieved March 4, 2020. (Level III)
Article Locations: ● ● ●

13. Creinin MD. Randomized comparison of efficacy, acceptability and cost of medical versus surgical abortion. Contraception 2000; 62: 117– 24. (Level I)
Article Locations: ● ●

14. Henshaw RC, Naji SA, Russell IT, Templeton AA. Comparison of medical abortion with surgical vacuum aspiration: women's preferences and acceptability of treatment. BMJ 1993; 307: 714– 7. (Level II-3)
Article Locations: ● ●

15. Rorbye C, Norgaard M, Nilas L. Medical versus surgical abortion: comparing satisfaction and potential confounders in a partly randomized study. Hum Reprod 2005; 20: 834– 8. (Level II-3)
Article Locations: ● ●

16. Ho PC. Women's perceptions on medical abortion. Contraception 2006; 74: 11– 5. (Level III)
Article Locations: ●

17. Creinin MD. Medically induced abortion in a woman with a large myomatous uterus. Am J Obstet Gynecol 1996; 175: 1379– 80. (Level III)
Article Locations: ●

18. Mark K, Bragg B, Chawla K, Hladky K. Medical abortion in women with large uterine fibroids: a case series. Contraception 2016; 94: 572– 4. (Level III)
Article Locations: ●

App. 000584

19. Goldthwaite LM, Teal SB. Controversies in family planning: pregnancy termination in women with uterine anatomic abnormalities. Contraception 2014; 90: 460– 3. (Level III)
Article Locations:  ●

20. Mistry H, Jha S. Pregnancy with a pinhole introitus: a report of two cases and a review of the litera-ture. Eur J Contracept Reprod Health Care 2015; 20: 490– 4. (Level III)
Article Locations:  ●

21. Rooney Thompson M, Towers CV, Howard BC, Hennessy MD, Wolfe L, Heitzman C. The use of prosta-glandin E₁ in peripartum patients with asthma. Am J Obstet Gynecol 2015; 212: 392.e1– 3. (Level II-2)
Article Locations:  ●

22. Hayes JL, Achilles SL, Creinin MD, Reeves MF. Outcomes of medical abortion through 63 days in women with twin gestations. Contraception 2011; 84: 505– 7. (Level III)
Article Locations:  ●

23. GenBioPro, Inc. Mifepristone tablets, 200mg for oral use. Highlights of prescribing information . Las Vegas, NV: GenBioPro, Inc.; 2019. Available at: https://genbiopro.com/wp-content/uploads/2019/05/genbiopro-prescribing-information.pdf. Retrieved June 2, 2020. (Level III)
Article Locations:  ●  ●  ●  ●

24. Cleland K, Creinin MD, Nucatola D, Nshom M, Trussell J. Significant adverse events and outcomes af-ter medical abortion. Obstet Gynecol 2013; 121: 166– 71. (Level III)
Article Locations:  ●  ●

25. Hakim-Elahi E, Tovell HM, Burnhill MS. Complications of first-trimester abortion: a report of 170,000 cases. Obstet Gynecol 1990; 76: 129– 35. (Level II-3)
Article Locations:  ●

26. Creinin MD, Schreiber CA, Bednarek P, Lintu H, Wagner MS, Meyn LA. Mifepristone and misoprostol administered simultaneously versus 24 hours apart for abortion: a randomized controlled trial. Medical Abortion at the Same Time (MAST) Study Trial Group. Obstet Gynecol 2007; 109: 885– 94. (Level I)
Article Locations:  ●

27. Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. A randomized comparison of misoprostol 6 to 8 hours versus 24 hours after mifepristone for abortion. MOD Study Trial Group. Obstet Gynecol 2004; 103: 851– 9. (Level I)
Article Locations:  ●

28. Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, et al. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008; 112: 1303– 10. (Level I)

App. 000585

**Article Locations:** ● ●

29. Schaff EA, Eisinger SH, Stadalius LS, Franks P, Gore BZ, Poppema S. Low-dose mifepristone 200 mg and vaginal misoprostol for abortion. Contraception 1999; 59: 1– 6. (Level II-3)
    **Article Locations:** ●

30. Creinin MD, Danielsson KG. Medical abortion in early pregnancy. In: Paul M, Lichtenberg ES, Borgatta L, Grimes DA, Stubblefield PG and Creinin MD, editors. Management of unintended and abnormal pregnancy: comprehensive abortion care . Hoboken, NJ: Blackwell Publishing Ltd; 2009. p. 111. (Level III)
    **Article Locations:** ● ● ●

31. Allen RH, Westhoff C, De Nonno L, Fielding SL, Schaff EA. Curettage after mifepristone-induced abortion: frequency, timing, and indications. Obstet Gynecol 2001; 98: 101– 6. (Level III)
    **Article Locations:** ●

32. Aubeny E, Peyron R, Turpin CL, Renault M, Targosz V, Silvestre L, et al. Termination of early pregnancy (up to 63 days of amenorrhea) with mifepristone and increasing doses of misoprostol [published erratum appears in Int J Fertil Menopausal Stud 1996;41:56]. Int J Fertil Menopausal Stud 1995; 40( suppl 2): 85– 91. (Level II-3)
    **Article Locations:** ●

33. Grossman D, Grindlay K. Safety of medical abortion provided through telemedicine compared with in person. Obstet Gynecol 2017; 130: 778– 82. (Level II-2)
    **Article Locations:** ● ● ●

34. Bernard N, Elefant E, Carlier P, Tebacher M, Barjhoux CE, Bos-Thompson MA, et al. Continuation of pregnancy after first-trimester exposure to mifepristone: an observational prospective study. BJOG 2013; 120: 568– 74. (Level II-2)
    **Article Locations:** ●

35. Yip SK, Tse AO, Haines CJ, Chung TK. Misoprostol's effect on uterine arterial blood flow and fetal heart rate in early pregnancy. Obstet Gynecol 2000; 95: 232– 5. (Level III)
    **Article Locations:** ●

36. Gonzalez CH, Vargas FR, Perez AB, Kim CA, Brunoni D, Marques-Dias MJ, et al. Limb deficiency with or without Mobius sequence in seven Brazilian children associated with misoprostol use in the first trimester of pregnancy. Am J Med Genet 1993; 47: 59– 64. (Level III)
    **Article Locations:** ●

37. Marques-Dias MJ, Gonzalez CH, Rosemberg S. Mobius sequence in children exposed in utero to misoprostol: neuropathological study of three cases. Birth Defects Res A Clin Mol Teratol 2003; 67: 1002– 7. (Level III)

App. 000586

Article Locations:  ●

38. Pastuszak AL, Schuler L, Speck-Martins CE, Coelho KE, Cordello SM, Vargas F, et al. Use of misopros-
    tol during pregnancy and Mobius' syndrome in infants. N Engl J Med 1998; 338: 1881– 5. (Level II-3)
    Article Locations:  ●

39. Wiebe ER. Abortion induced with methotrexate and misoprostol: a comparison of various protocols.
    Contraception 1997; 55: 159– 63. (Level II-3)
    Article Locations:  ●

40. National Abortion Federation. 2020 clinical policy guidelines for abortion care . Washington, DC: NAF;
    2020. Available at: https://prochoice.org/resources/clinical-policy-guidelines/. Retrieved June 1,
    2020. (Level III)
    Article Locations:  ●

41. Grossman D, White K. Abortion "reversal"—legislating without evidence. N Engl J Med 2018; 379:
    1491– 3. (Level III)
    Article Locations:  ●

42. Grossman D, White K, Harris L, Reeves M, Blumenthal PD, Winikoff B, et al. Continuing pregnancy after
    mifepristone and "reversal" of first-trimester medical abortion: a systematic review. Contraception
    2015; 92: 206– 11. (Systematic Review)
    Article Locations:  ●

43. Creinin MD, Hou MY, Dalton L, Steward R, Chen MJ. Mifepristone antagonization with progesterone to
    prevent medical abortion: a randomized controlled trial. Obstet Gynecol 2020; 135: 158– 65. (Level I)
    Article Locations:  ●

44. Prevention of Rh D Alloimmunization. Practice Bulletin No. 181. American College of Obstetricians
    and Gynecologists. Obstet Gynecol 2017; 130: e57– 70. (Level III)
    Article Locations:  ●  ●

45. Bracken H, Clark W, Lichtenberg ES, Schweikert SM, Tanenhaus J, Barajas A, et al. Alternatives to rou-
    tine ultrasound for eligibility assessment prior to early termination of pregnancy with mifepristone-
    misoprostol. BJOG 2011; 118: 17– 23. (Level II-3)
    Article Locations:  ●  ●

46. Schonberg D, Wang LF, Bennett AH, Gold M, Jackson E. The accuracy of using last menstrual period
    to determine gestational age for first trimester medication abortion: a systematic review.
    Contraception 2014; 90: 480– 7. (Systematic Review)
    Article Locations:  ●

47. Raymond EG, Bracken H. Early medical abortion without prior ultrasound. Contraception 2015; 92:
    212– 4. (Meta-Analysis)

App. 000567

**Article Locations:** ●

48. Raymond EG, Tan YL, Comendant R, Sagaidac I, Hodorogea S, Grant M, et al. Simplified medical abortion screening: a demonstration project. Contraception 2018B; 97: 292– 6. (Level III)
    **Article Locations:** ●

49. Hoover KW, Tao G, Kent CK. Trends in the diagnosis and treatment of ectopic pregnancy in the United States. Obstet Gynecol 2010; 115: 495– 502. (Level II-2)
    **Article Locations:** ●

50. Stulberg DB, Cain LR, Dahlquist I, Lauderdale DS. Ectopic pregnancy rates and racial disparities in the Medicaid population, 2004-2008. Fertil Steril 2014; 102: 1671– 6. (Level II-2)
    **Article Locations:** ●

51. Edwards J, Creinin MD. Surgical abortion for gestations of less than 6 weeks. Curr Probl Obstet Gynecol Fertil 1997; 20: 11– 9. (Level II-2)
    **Article Locations:** ●

52. Centers for Disease Control. Ectopic pregnancy—United States, 1988-1989. MMWR Morb Mortal Wkly Rep 1992; 41: 591– 4. (Level II-3)
    **Article Locations:** ●

53. Ulmann A, Silvestre L, Chemama L, Rezvani Y, Renault M, Aguillaume CJ, et al. Medical termination of early pregnancy with mifepristone (RU 486) followed by a prostaglandin analogue. Study in 16,369 women. Acta Obstet Gynecol Scand 1992; 71: 278– 83. (Level II-3)
    **Article Locations:** ●

54. Lohr PA, Reeves MF, Creinin MD. A comparison of transabdominal and transvaginal ultrasonography for determination of gestational age and clinical outcomes in women undergoing early medical abortion. Contraception 2010; 81: 240– 4. (Level II-3)
    **Article Locations:** ● ●

55. Fu A, Weber CE, Gilmore E, Davis AR, Hirsch G, Westhoff CL. A noninferiority randomized controlled trial to compare transabdominal and transvaginal sonography for eligibility assessment prior to medical abortion. Contraception 2018; 98: 199– 204. (Level I)
    **Article Locations:** ● ●

56. Karanth L, Jaafar SH, Kanagasabai S, Nair NS, Barua A. Anti-D administration after spontaneous miscarriage for preventing Rhesus alloimmunisation. Cochrane Database of Systematic Reviews 2013, Issue 3. Art. No.: CD009617. DOI: 10.1002/14651858.CD009617.pub2. (Systematic Review)
    **Article Locations:** ●

57. Management of alloimmunization during pregnancy. ACOG Practice Bulletin No. 192. American College of Obstetricians and Gynecologists. Obstet Gynecol 2018; 131: e82– 90. (Level III)

App. 000588

Article Locations: ●

58. Fung KF, Eason E. No. 133-Prevention of Rh Alloimmunization. J Obstet Gynaecol Can 2018; 40: e1– 10. (Level III)
   Article Locations: ●

59. Vayssière C, Gaudineau A, Attali L, Bettahar K, Eyraud S, Faucher P, et al. Elective abortion: clinical practice guidelines from the French College of Gynecologists and Obstetricians (CNGOF). Eur J Obstet Gynecol Reprod Biol 2018; 222: 95– 101. (Level III)
   Article Locations: ●

60. World Health Organization. Safe abortion: technical and policy guidance for health systems . 2nd ed. Geneva: WHO; 2012. Available at: https://www.who.int/reproductivehealth/publications/unsafe_abortion/9789241548434/en/. Retrieved June 1, 2020. (Level III)
   Article Locations: ●

61. Mark A, Grossman D, Foster AM, Prager SW, Winikoff B. When patients change their minds after start- ing an abortion: guidance from the National Abortion Federation's Clinical Policies Committee. Contraception 2020; 101: 283– 5. (Level III)
   Article Locations: ●

62. Horvath S, Tsao P, Huang ZY, Zhao L, Du Y, Sammel MD, et al. The concentration of fetal red blood cells in first-trimester pregnant women undergoing uterine aspiration is below the calculated thresh- old for Rh sensitization [published online March 2, 2020]. Contraception . DOI: S0010-7824(20)30064- 0. (Level III)
   Article Locations: ●

63. Kapp N, Baldwin MK, Rodriguez MI. Efficacy of medical abortion prior to 6 gestational weeks: a sys- tematic review. Contraception 2018; 97: 90– 9. (Systematic Review and Meta-Analysis)
   Article Locations: ●

64. Raymond EG, Harrison MS, Weaver MA. Efficacy of misoprostol alone for first-trimester medical abor- tion: a systematic review. Obstet Gynecol 2019; 133: 137– 47. (Systematic Review and Meta- Analysis)
   Article Locations: ●

65. Kulier R, Kapp N, Gülmezoglu AM, Hofmeyr GJ, Cheng L, Campana A. Medical methods for first trimester abortion. Cochrane Database of Systematic Reviews 2011, Issue 11. Art. No.: CD002855. DOI: 10.1002/14651858.CD002855.pub4. (Systematic Review and Meta-analysis)
   Article Locations: ● ●

App. 000589

Case 2:22-cv-00223-Z   Document 195-4   Filed 10/11/24   Page 26 of 245   PageID 10094

66. Schaff EA, Fielding SL, Westhoff C, Ellertson C, Eisinger SH, Stadalius LS, et al. Vaginal misoprostol
    administered 1, 2, or 3 days after mifepristone for early medical abortion: a randomized trial [pub-
    lished erratum appears in JAMA 2000;284:2597] JAMA 2000; 284: 1948– 53. (Level I)
    **Article Locations:** ●

67. Honkanen H, Piaggio G, Hertzen H, Bartfai G, Erdenetungalag R, Gemzell-Danielsson K, et al. WHO
    multinational study of three misoprostol regimens after mifepristone for early medical abortion. WHO
    Research Group on Post-Ovulatory Methods for Fertility Regulation. BJOG 2004; 111: 715– 25. (Level
    I)
    **Article Locations:** ●

68. Chai J, Wong CY, Ho PC. A randomized clinical trial comparing the short-term side effects of sublin-
    gual and buccal routes of misoprostol administration for medical abortions up to 63 days' gestation.
    Contraception 2013; 87: 480– 5. (Level I)
    **Article Locations:** ●

69. Abortion training and education. Committee Opinion No. 612. American College of Obstetricians and
    Gynecologists. Obstet Gynecol 2014; 124: 1055– 9. (Level III)
    **Article Locations:** ●

70. Yarnall J, Swica Y, Winikoff B. Non-physician clinicians can safely provide first trimester medical abor-
    tion. Reprod Health Matters 2009; 17: 61– 9. (Level III)
    **Article Locations:** ●

71. Warriner IK, Wang D, Huong NT, Thapa K, Tamang A, Shah I, et al. Can midlevel health-care providers
    administer early medical abortion as safely and effectively as doctors? A randomised controlled
    equivalence trial in Nepal. Lancet 2011; 377: 1155– 61. (Level I)
    **Article Locations:** ●

72. Kopp Kallner H, Gomperts R, Salomonsson E, Johansson M, Marions L, Gemzell-Danielsson K. The ef-
    ficacy, safety and acceptability of medical termination of pregnancy provided by standard care by
    doctors or by nurse-midwives: a randomised controlled equivalence trial. BJOG 2015; 122: 510– 7.
    (Level 1)
    **Article Locations:** ●

73. Olavarrieta CD, Ganatra B, Sorhaindo A, Karver TS, Seuc A, Villalobos A, et al. Nurse versus physician-
    provision of early medical abortion in Mexico: a randomized controlled non-inferiority trial. Bull World
    Health Organ 2015; 93: 249– 58. (Level I)
    **Article Locations:** ●

74. Tan YL, Singh K, Tan KH, Gosavi A, Koh D, Abbas D, et al. Acceptability and feasibility of outpatient
    medical abortion with mifepristone and misoprostol up to 70 days gestation in Singapore. Eur J
    Obstet Gynecol Reprod Biol 2018; 229: 144– 7. (Level II-3)

App. 000590

**Article Locations:** ●

75. Platais I, Tsereteli T, Grebennikova G, Lotarevich T, Winikoff B. Prospective study of home use of mifepristone and misoprostol for medical abortion up to 10 weeks of pregnancy in Kazakhstan. Int J Gynaecol Obstet 2016; 134: 268– 71. (Level II-2)
    **Article Locations:** ●

76. Conkling K, Karki C, Tuladhar H, Bracken H, Winikoff B. A prospective open-label study of home use of mifepristone for medical abortion in Nepal. Int J Gynaecol Obstet 2015; 128: 220– 3. (Level II-1)
    **Article Locations:** ●

77. Chong E, Frye LJ, Castle J, Dean G, Kuehl L, Winikoff B. A prospective, non-randomized study of home use of mifepristone for medical abortion in the U.S. Contraception 2015; 92: 215– 9. (Level II-1)
    **Article Locations:** ●

78. Winikoff B, Dzuba IG, Chong E, Goldberg AB, Lichtenberg ES, Ball C, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070– 6. (Level II-3)
    **Article Locations:** ●

79. Ngo TD, Park MH, Shakur H, Free C. Comparative effectiveness, safety and acceptability of medical abortion at home and in a clinic: a systematic review. Bull World Health Organ 2011; 89: 360– 70. (Systematic Review and Meta-analysis)
    **Article Locations:** ●

80. Raghavan S, Tsereteli T, Kamilov A, Kurbanbekova D, Yusupov D, Kasimova F, et al. Acceptability and feasibility of the use of 400 mug of sublingual misoprostol after mifepristone for medical abortion up to 63 days since the last menstrual period: evidence from Uzbekistan. Eur J Contracept Reprod Health Care 2013; 18: 104– 11. (Level II-3)
    **Article Locations:** ●

81. Hyland P, Raymond EG, Chong E. A direct-to-patient telemedicine abortion service in Australia: retrospective analysis of the first 18 months. Aust N Z J Obstet Gynaecol 2018; 58: 335– 40. (Level II-3)
    **Article Locations:** ●

82. Grossman DA, Grindlay K, Buchacker T, Potter JE, Schmertmann CP. Changes in service delivery patterns after introduction of telemedicine provision of medical abortion in Iowa. Am J Public Health 2013; 103: 73– 8. (Level II-3)
    **Article Locations:** ● ● ●

83. Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectiveness and acceptability of medical abortion provided through telemedicine. Obstet Gynecol 2011; 118: 296– 303. (Level II-3)
    **Article Locations:** ● ●

App. 000591

84. Kohn JE, Snow JL, Simons HR, Seymour JW, Thompson TA, Grossman D. Medication abortion provided through telemedicine in four U.S. States. Obstet Gynecol 2019; 134: 343– 50. (Level II-2)
Article Locations: ● ●

85. Endler M, Lavelanet A, Cleeve A, Ganatra B, Gomperts R, Gemzell-Danielsson K. Telemedicine for medical abortion: a systematic review. BJOG 2019; 126: 1094– 102. (Systematic Review)
Article Locations: ●

86. Guttmacher Institute. An overview of abortion laws . New York, NY: Guttmacher Institute; 2020. Available at: https://www.guttmacher.org/state-policy/explore/overview-abortion-laws. Retrieved March 3, 2020. (Level III)
Article Locations: ●

87. Ho CS, Bhatnagar J, Cohen AL, Hacker JK, Zane SB, Reagan S, et al. Undiagnosed cases of fatal clostridium-associated toxic shock in Californian women of childbearing age. Am J Obstet Gynecol 2009; 201: 459.e1– 7. (Level III)
Article Locations: ●

88. Chong E, Winikoff B, Charles D, Agnew K, Prentice JL, Limbago BM, et al. Vaginal and rectal clostridium sordellii and clostridium perfringens presence among women in the United States. NCT01283828 Study Team. Obstet Gynecol 2016; 127: 360– 8. (Level II-2)
Article Locations: ●

89. Shannon C, Brothers LP, Philip NM, Winikoff B. Infection after medical abortion: a review of the literature. Contraception 2004; 70: 183– 90. (Level III)
Article Locations: ●

90. Cohen AL, Bhatnagar J, Reagan S, Zane SB, D'Angeli MA, Fischer M, et al. Toxic shock associated with Clostridium sordellii and Clostridium perfringens after medical and spontaneous abortion. Obstet Gynecol 2007; 110: 1027– 33. (Level III)
Article Locations: ● ●

91. Fischer M, Bhatnagar J, Guarner J, Reagan S, Hacker JK, Van Meter SH, et al. Fatal toxic shock syndrome associated with Clostridium sordellii after medical abortion. N Engl J Med 2005; 353: 2352– 60. (Level III)
Article Locations: ●

92. Jackson E, Kapp N. Pain control in first-trimester and second-trimester medical termination of pregnancy: a systematic review. Contraception 2011; 83: 116– 26. (Systematic Review)
Article Locations: ●

93. Raymond EG, Weaver MA, Louie KS, Dean G, Porsch L, Lichtenberg ES, et al. Prophylactic compared with therapeutic ibuprofen analgesia in first-trimester medical abortion: a randomized controlled trial.

App. 000592

Obstet Gynecol 2013; 122: 558– 64. (Level I)
Article Locations: ● ●

94.  Colwill AC, Bayer LL, Bednarek P, Garg B, Jensen JT, Edelman AB. Opioid analgesia for medical abor-
     tion: a randomized controlled trial. Obstet Gynecol 2019; 134: 1163– 70. (Level I)
     Article Locations: ● ●

95.  Livshits A, Machtinger R, David LB, Spira M, Moshe-Zahav A, Seidman DS. Ibuprofen and paracetamol
     for pain relief during medical abortion: a double-blind randomized controlled study. Fertil Steril 2009;
     91: 1877– 80. (Level I)
     Article Locations: ●

96.  Creinin MD, Shulman T. Effect of nonsteroidal anti-inflammatory drugs on the action of misoprostol in
     a regimen for early abortion. Contraception 1997; 56: 165– 8. (Level III)
     Article Locations: ●

97.  Friedlander EB, Soon R, Salcedo J, Davis J, Tschann M, Kaneshiro B. Prophylactic pregabalin to de-
     crease pain during medication abortion: a randomized controlled trial. Obstet Gynecol 2018; 132:
     612– 8. (Level I)
     Article Locations: ●

98.  Dowell D, Haegerich TM, Chou R. CDC guideline for prescribing opioids for chronic pain—United
     States, 2016 [published erratum appears in MMWR Recomm Rep 2016;65:295]. MMWR Recomm Rep
     2016; 65( RR-1): 1– 49. (Level III)
     Article Locations: ●

99.  National Academies of Sciences, Engineering, and Medicine. The safety and quality of abortion care
     in the United States . Washington, DC: National Academy of Sciences; 2018. (Level III)
     Article Locations: ●

100. Creinin MD, Potter C, Holovanisin M, Janczukiewicz L, Pymar HC, Schwartz JL, et al. Mifepristone and
     misoprostol and methotrexate/misoprostol in clinical practice for abortion. Am J Obstet Gynecol
     2003; 188: 664– 9. (Level II-3)
     Article Locations: ●

101. Prine L, Lesnewski R, Berley N, Gold M. Medical abortion in family practice: a case series. J Am Board
     Fam Pract 2003; 16: 290– 5. (Level III)
     Article Locations: ●

102. Haimov-Kochman R, Arbel R, Sciaky-Tamir Y, Brzezinski A, Laufer N, Yagel S. Risk factors for unsuc-
     cessful medical abortion with mifepristone and misoprostol. Acta Obstet Gynecol Scand 2007; 86:
     462– 6. (Level II-3)
     Article Locations: ●

App. 000593

103. Baiju N, Acharya G, D'Antonio F, Berg RC. Effectiveness, safety and acceptability of self-assessment of the outcome of first-trimester medical abortion: a systematic review and meta-analysis. BJOG 2019; 126: 1536– 44. (Systematic Review and Meta-Analysis)
**Article Locations:** ●

104. Perriera LK, Reeves MF, Chen BA, Hohmann HL, Hayes J, Creinin MD. Feasibility of telephone follow-up after medical abortion. Contraception 2010; 81: 143– 9. (Level II-3)
**Article Locations:** ● ● ●

105. Cameron ST, Glasier A, Dewart H, Johnstone A, Burnside A. Telephone follow-up and self-performed urine pregnancy testing after early medical abortion: a service evaluation. Contraception 2012; 86: 67– 73. (Level II-3)
**Article Locations:** ●

106. Chen MJ, Rounds KM, Creinin MD, Cansino C, Hou MY. Comparing office and telephone follow-up after medical abortion. Contraception 2016; 94: 122– 6. (Level II-2)
**Article Locations:** ●

107. Michie L, Cameron ST. Simplified follow-up after early medical abortion: 12-month experience of a telephone call and self-performed low-sensitivity urine pregnancy test. Contraception 2014; 89: 440– 5. (Level II-3)
**Article Locations:** ●

108. Rossi B, Creinin MD, Meyn LA. Ability of the clinician and patient to predict the outcome of mifepristone and misoprostol medical abortion. Contraception 2004; 70: 313– 7. (Level II-3)
**Article Locations:** ●

109. Godfrey EM, Anderson A, Fielding SL, Meyn L, Creinin MD. Clinical utility of urine pregnancy assays to determine medical abortion outcome is limited. Contraception 2007; 75: 378– 82. (Level II-3)
**Article Locations:** ●

110. Grossman D, Berdichevsky K, Larrea F, Beltran J. Accuracy of a semi-quantitative urine pregnancy test compared to serum beta-hCG measurement: a possible screening tool for ongoing pregnancy after medication abortion. Contraception 2007; 76: 101– 4. (Level II-3)
**Article Locations:** ●

111. Raymond EG, Shochet T, Bracken H. Low-sensitivity urine pregnancy testing to assess medical abortion outcome: a systematic review. Contraception 2018A; 98: 30– 5. (Systematic Review and Meta-Analysis)
**Article Locations:** ●

112. Raymond EG, Shochet T, Blum J, Sheldon WR, Platais I, Bracken H, et al. Serial multilevel urine pregnancy testing to assess medical abortion outcome: a meta-analysis. Contraception 2017; 95: 442– 8.

App. 000594

(Meta-Analysis)

**Article Locations:** ●

113. Reeves MF, Fox MC, Lohr PA, Creinin MD. Endometrial thickness following medical abortion is not predictive of subsequent surgical intervention. Ultrasound Obstet Gynecol 2009; 34: 104– 9. (Level III)

**Article Locations:** ● ●

114. Fiala C, Safar P, Bygdeman M, Gemzell-Danielsson K. Verifying the effectiveness of medical abortion; ultrasound versus hCG testing. Eur J Obstet Gynecol Reprod Biol 2003; 109: 190– 5. (Level III)

**Article Locations:** ● ● ●

115. Pocius KD, Bartz D, Maurer R, Stenquist A, Fortin J, Goldberg AB. Serum human chorionic gonadotropin (hCG) trend within the first few days after medical abortion: a prospective study. Contraception 2017; 95: 263– 8. (Level II-2)

**Article Locations:** ●

116. Dayananda I, Maurer R, Fortin J, Goldberg AB. Medical abortion follow-up with serum human chorionic gonadotropin compared with ultrasonography: a randomized controlled trial. Obstet Gynecol 2013; 121: 607– 13. (Level I)

**Article Locations:** ●

117. Chen MJ, Creinin MD. Mifepristone with buccal misoprostol for medical abortion: a systematic review. Obstet Gynecol 2015; 126: 12– 21. (Systematic Review)

**Article Locations:** ● ●

118. Reeves MF, Kudva A, Creinin MD. Medical abortion outcomes after a second dose of misoprostol for persistent gestational sac. Contraception 2008; 78: 332– 5. (Level III)

**Article Locations:** ● ● ●

119. Raymond EG, Weaver MA, Louie KS, Tan YL, Bousieguez M, Arangure-Peraza AG, et al. Effects of depot medroxyprogesterone acetate injection timing on medical abortion efficacy and repeat pregnancy: a randomized controlled trial. Obstet Gynecol 2016a; 128: 739– 45. (Level I)

**Article Locations:** ● ● ●

120. Curtis KM, Tepper NK, Jatlaoui TC, Berry-Bibee E, Horton LG, Zapata LB, et al. U.S. medical eligibility criteria for contraceptive use, 2016. MMWR Recomm Rep 2016; 65( RR-3): 1– 103. (Level III)

**Article Locations:** ●

121. Hognert H, Kopp Kallner H, Cameron S, Nyrelli C, Jawad I, Heller R, et al. Immediate versus delayed insertion of an etonogestrel releasing implant at medical abortion-a randomized controlled equivalence trial. Hum Reprod 2016; 31: 2484– 90. (Level I)

**Article Locations:** ●

App. 000595

122. Raymond EG, Weaver MA, Tan YL, Louie KS, Bousieguez M, Lugo-Hernandez EM, et al. Effect of im-
mediate compared with delayed insertion of etonogestrel implants on medical abortion efficacy and
repeat pregnancy: a randomized controlled trial. Obstet Gynecol 2016; 127: 306– 12. (Level I)
Article Locations: ●

123. Shimoni N, Davis A, Ramos ME, Rosario L, Westhoff C. Timing of copper intrauterine device insertion
after medical abortion: a randomized controlled trial. Obstet Gynecol 2011; 118: 623– 8. (Level I)
Article Locations: ● ●

124. Saav I, Stephansson O, Gemzell-Danielsson K. Early versus delayed insertion of intrauterine contra-
ception after medical abortion - a randomized controlled trial. PLoS One 2012; 7: e48948. (Level I)
Article Locations: ● ●

125. Pohjoranta E, Suhonen S, Mentula M, Heikinheimo O. Intrauterine contraception after medical abor-
tion: factors affecting success of early insertion. Contraception 2017; 95: 257– 62. (Level I)
Article Locations: ●

126. Dewan R, Bharti N, Mittal A, Dewan A. Early IUD insertion after medically induced abortion. Eur J
Contracept Reprod Health Care 2018; 23: 231– 6. (Level II-2)
Article Locations: ●

127. Chen A, Yuan W, Meirik O, Wang X, Wu SZ, Zhou L, et al. Mifepristone-induced early abortion and out-
come of subsequent wanted pregnancy. Am J Epidemiol 2004; 160: 110– 7. (Level II-2)
Article Locations: ●

128. Oliver-Williams C, Fleming M, Monteath K, Wood AM, Smith GC. Changes in association between pre-
vious therapeutic abortion and preterm birth in Scotland, 1980 to 2008: a historical cohort study.
PLoS Med 2013; 10: e1001481. (Level II-3)
Article Locations: ●

Published online on August 14, 2020.

Published concurrently online on August 14, 2020, in *Contraception*.

Copyright 2020 by the American College of Obstetricians and Gynecologists. All rights reserved. No part of this
publication may be reproduced, stored in a retrieval system, posted on the internet, or transmitted, in any form or
by any means, electronic, mechanical, photocopying, recording, or otherwise, without prior written permission from
the publisher.

**American College of Obstetricians and Gynecologists 409 12th Street SW, Washington, DC 20024-2188**

Medication abortion up to 70 days of gestation. ACOG Practice Bulletin No. 225. American College of Obstetricians
and Gynecologists. Obstet Gynecol 2020;136:e31–47.

The MEDLINE database, the Cochrane Library, and the American College of Obstetricians and Gynecologists' own internal resources and documents were used to conduct a literature search to locate relevant articles published between January 2000 and February 2020. The search was restricted to articles published in the English language. Priority was given to articles reporting results of original research, although review articles and commentaries also were consulted. Abstracts of research presented at symposia and scientific conferences were not considered adequate for inclusion in this document. Guidelines published by organizations or institutions such as the National Institutes of Health and the American College of Obstetricians and Gynecologists were reviewed, and additional studies were located by reviewing bibliographies of identified articles. When reliable research was not available, expert opinions from obstetrician–gynecologists were used.

Studies were reviewed and evaluated for quality according to the method outlined by the U.S. Preventive Services Task Force:

- I Evidence obtained from at least one properly designed randomized controlled trial.
- II-1 Evidence obtained from well-designed controlled trials without randomization.
- II-2 Evidence obtained from well-designed cohort or case–control analytic studies, preferably from more than one center or research group.
- II-3 Evidence obtained from multiple time series with or without the intervention. Dramatic results in uncontrolled experiments also could be regarded as this type of evidence.
- III Opinions of respected authorities, based on clinical experience, descriptive studies, or reports of expert committees.

Based on the highest level of evidence found in the data, recommendations are provided and graded according to the following categories:

Level A—Recommendations are based on good and consistent scientific evidence.

Level B—Recommendations are based on limited or inconsistent scientific evidence.

Level C—Recommendations are based primarily on consensus and expert opinion.

*This information is designed as an educational resource to aid clinicians in providing obstetric and gynecologic care, and use of this information is voluntary. This information should not be considered as inclusive of all proper treatments or methods of care or as a statement of the standard of care. It is not intended to substitute for the independent professional judgment of the treating clinician. Variations in practice may be warranted when, in the reasonable judgment of the treating clinician, such course of action is indicated by the condition of the patient, limitations of available resources, or advances in knowledge or technology. The American College of Obstetricians and Gynecologists reviews its publications regularly; however, its publications may not reflect the most recent evidence. Any updates to this document can be found on acog.org or by calling the ACOG Resource Center.*

App. 000597

*While ACOG makes every effort to present accurate and reliable information, this publication is provided "as is" without any warranty of accuracy, reliability, or otherwise, either express or implied. ACOG does not guarantee, warrant, or endorse the products or services of any firm, organization, or person. Neither ACOG nor its officers, directors, members, employees, or agents will be liable for any loss, damage, or claim with respect to any liabilities, including direct, special, indirect, or consequential damages, incurred in connection with this publication or reliance on the information presented.*

*All ACOG committee members and authors have submitted a conflict of interest disclosure statement related to this published product. Any potential conflicts have been considered and managed in accordance with ACOG's Conflict of Interest Disclosure Policy. The ACOG policies can be found on acog.org. For products jointly developed with other organizations, conflict of interest disclosures by representatives of the other organizations are addressed by those organizations. The American College of Obstetricians and Gynecologists has neither solicited nor accepted any commercial involvement in the development of the content of this published product.*

Topics

| Abortifacient agents | Counseling | Diagnostic imaging | First pregnancy trimester |

| Induced abortion | Obstetric surgical procedures | Pregnancy | Pregnancy trimesters |

| Reproductive control agents | Rh-Hr blood-group system | Ultrasonography |

American College of Obstetricians and Gynecologists
409 12th Street SW, Washington, DC 20024-2188

Copyright 2024. All rights reserved.
Privacy Statement    Terms and Conditions of Use

App. 000598

# EXHIBIT 28

# Mary Gatter et al., Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days

Contraception

ELSEVIER

Contraception xx (2015) xxx–xxx

Original research article

# Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days[☆],[☆☆]

Mary Gatter[a], Kelly Cleland[b], Deborah L. Nucatola[a],*

[a]Planned Parenthood Los Angeles, 400 West 30th St., Los Angeles, CA 90007
[b]218 Wallace Hall, Office of Population Research, Princeton University, Princeton, NJ 08544

Received 24 June 2014; revised 7 January 2015; accepted 7 January 2015

### Abstract

**Objective:** The aim of this study was to report on the safety and efficacy of an evidence-based medical abortion regimen utilizing 200 mg of mifepristone orally followed by home use of 800 mcg misoprostol buccally 24–48 h later through 63 days estimated gestational age.

**Study design:** We analyzed outcomes in women presenting for medical abortion between April 1, 2006, and May 31, 2011, using an evidence-based alternative to the United States Food and Drug Administration (FDA)-approved regimen. Cases were identified for this descriptive study from our electronic practice management (EPM) database, and our electronic database on adverse events was queried for information on efficacy and safety. The primary outcome was successful abortion. Logistic regression was used to identify predictors of successful abortion.

**Results:** Among the 13,373 women who completed follow-up, efficacy of the regimen was 97.7%. Efficacy was highest at 29 to 35 days (98.8%) and 36 to 42 days (98.8%) of gestation and lowest at 57 to 63 days (95.5%). The odds of needing aspiration for any reason were greatest at higher gestational ages. Rates of infection requiring hospitalization and rates of transfusion were 0.01 and 0.03%, respectively.

**Conclusions:** An evidence-based regimen of 200 mg of mifepristone orally followed by home use of 800 mcg of buccal misoprostol 24–48 h later is safe and effective through 63 days estimated gestational age. Further, the need for aspiration for any reason was low, and hospitalization was rare.

**Implications:** This study reinforces the safety and efficacy of the evidence-based regimen for medical abortion (200 mg mifepristone orally followed by home use of 800 mcg of misoprostol buccally 24–48 h later) through 63 days estimated gestational age, and contributes to the existing evidence against restrictions requiring use of the FDA-approved regimen.
© 2015 Elsevier Inc. All rights reserved.

*Keywords:* Medical abortion; Mifepristone; First-trimester abortion; Evidence-based regimen; Buccal misoprostol; Efficacy

## 1. Introduction

The United States Food and Drug Administration (FDA) approved the use of mifepristone and misoprostol for pregnancy termination in 2000. The regimen, labeled for use through 49 days estimated gestational age, required a minimum of three visits to the healthcare provider. Six hundred milligrams of mifepristone was taken orally at Visit 1, followed in 2 days by misoprostol 400 mcg, also taken orally. A third follow-up visit was required in 14 days to ensure that the abortion was complete. The efficacy of this regimen ranged from 92 to 97% [1–3]. Publications soon followed providing an evidence base for alterations to the regimen. Alterations included a lower dose of mifepristone, different routes of administration of misoprostol, variations in the timing of misoprostol administration, home use of misoprostol, and increasing the gestational age limit for the regimen [4–11]. A recent publication confirmed the low rate of significant adverse events with use of the evidence-based regimen [11].

In 2008, a prospective study was published describing the use of 200 mg of mifepristone followed in 24 to 36 h by 800 mcg of buccal misoprostol for pregnancy termination to 63

------

[☆] Funding source: Planned Parenthood Federation of America (MG and DN) and Eunice Kennedy Shriver National Institute of Child Health and Human Development, grant no. 2R24HD047879 (KC).

[☆☆] Disclaimer: The findings and conclusions in this article are those of the authors and do not necessarily represent the views of Planned Parenthood Federation of America Inc.

* Corresponding author at: 400 W. 30th Street, Los Angeles, CA 90007. Tel.: +1 212 261 4632; fax: +1 818 986 5035.

*E-mail address:* deborah.nucatola@ppfa.org (D.L. Nucatola).

http://dx.doi.org/10.1016/j.contraception.2015.01.005
0010-7824/© 2015 Elsevier Inc. All rights reserved.

2                                    M. Gatter et al. / Contraception xx (2015) xxx–xxx

days of gestation with a success rate for the regimen of 96.2% [8]. Despite the growing literature supporting evidence-based provision of medical abortion, some providers are required by law to limit the provision of medical abortion to that regimen, which was FDA-approved more than a decade ago [12]. The goal of the current study was to assess, in a much larger cohort of patients, the safety and efficacy of an evidence-based medical abortion regimen utilizing 200 mg of mifepristone orally followed by home use of 800 mcg of misoprostol buccally 24–48 h later through 63 days estimated gestational age.

## 2. Materials and methods

### 2.1. Medical abortion protocols and monitoring

Our large network of urban healthcare centers includes 19 health centers providing approximately 15,000 abortions per year, of which about 30% are medical abortions. Demographic information, treatment dates, and diagnostic codes for all patients were retrieved using the electronic practice management (EPM) billing system. Some clinical information was retrieved from an electronic medical records (EMR) system, which was gradually implemented across all study sites between 2008 and 2010. All patients undergo an ultrasound examination for pregnancy dating prior to abortion. The clinician administering the medication abortion performed and interpreted the ultrasound. All clinicians had undergone the same standardized training and were monitored regularly to ensure accuracy and to maintain consistency. Ultrasound machines using a Hadlock scale calculated gestational age in days; herein, we analyze and report gestational age in 7-day increments (e.g., 22 to 28 days). Since April 2006, our medical abortion regimen has consisted of 200 mg of mifepristone taken orally at the health center followed by 800 mcg of buccal misoprostol used by the patient at home 24 to 48 h later. Medical protocols during the study period allowed for repeat doses of misoprostol for patients who had an incomplete medical abortion. Data on which patients received a repeat dose are not available from the EPM system, but only in the EMR system; therefore, for patients seen at sites that had not yet implemented EMR at the time of treatment, information on whether a repeat dose of misoprostol was given is not available. For the first 3 years of the study period, the upper gestational age limit for this regimen was 56 days. In February 2009, based on newly published data, the upper limit was increased to 63 days [8]. All patients were scheduled to return in 7 to 14 days for a postabortion evaluation. Beginning in 2007, all patients also received routine antibiotic coverage beginning on the day of the mifepristone administration. The standard antibiotic regimen was a 7-day course of doxycycline (100 mg twice a day), with an alternative regimen of one dose of azithromycin (1 g) for cases in which doxycycline was contraindicated.

Our EPM database contains information on all patients undergoing medical abortion, including patient demographics and the ultrasound-determined gestational age. We also maintain a separate electronic database of adverse events including ongoing pregnancy, aspiration for symptoms and/or retained products of conception, infection requiring hospitalization, and hemorrhage requiring transfusion.

### 2.2. Statistical methods

Bivariate and multivariate logistic regression were used to assess predictors of successful medical abortion. Covariates available in our data set were poverty level, race/ethnicity, gestational age, and patient age; other patient-level data were not available. Results were considered statistically significant at $p < .05$. Statistical analysis was performed using Stata/SE 11.2 (College Station, TX).

The primary outcome of interest was successful abortion. A successful abortion was defined as expulsion of the pregnancy without the need for aspiration. Patients who required aspiration for an ongoing pregnancy or symptoms such as pain or bleeding were considered to have had unsuccessful medical abortions. We queried our adverse events database to identify continuing pregnancies (those pregnancies with documented fetal growth or cardiac activity seen at the follow-up), all cases of aspiration, and hospitalization for either infection or transfusion. We cross-checked this against the list of postprocedure visits in our EPM system in order to ensure that all cases had been identified.

Institutional review board (IRB) approval was obtained from the Ethical and Independent Review Service of Independence, MO, and an exemption for analysis of the existing data was granted by the Princeton University IRB.

## 3. Results

### 3.1. Sample description

For this descriptive study, we queried our EPM database and identified 15,890 patients who had a medical abortion between April 1, 2006, and May 31, 2011. During the period under review, medical abortions were provided at 14 different clinic sites belonging to our network in one urban area, all using the same evidence-based protocol. There were 2470 (15.5%) patients who failed to return for a follow-up visit and were excluded from analysis. An additional 20 patients were excluded from the analysis due to missing data on gestational age, and a further 27 patients were excluded because they did not complete the medical abortion (these patients either changed their mind and chose a surgical abortion, were ineligible for a medical abortion because they were beyond the 63-day gestational limit, or began the regimen but did not take all of the medications). This left 13,373 patients for analysis.

Demographic characteristics of the 13,373 women who had a medical abortion between April 1, 2006, and May 31, 2011, and who returned for follow-up are shown in Table 1. Half of the women were between the ages of 18 and 24, and small proportions were under the age of 18 (4.5%) or 40 or

Table 1
Demographic characteristics of women having a medical abortion with mifepristone 200 mg and misoprostol 800 mcg buccally (N=13,373)

|  | n | % |
|---|---|---|
| **Gestational age (days)** | | |
| 22–28 | 554 | 4.1 |
| 29–35 | 1080 | 8.1 |
| 36–42 | 2495 | 18.7 |
| 43–49 | 4816 | 36.0 |
| 50–56 | 3142 | 23.5 |
| 57–63 | 1286 | 9.6 |
| **Poverty level (% FPL)** | | |
| 0–100 | 9679 | 72.4 |
| >100 | 3694 | 27.6 |
| **Race/ethnicity** | | |
| Hispanic/Latino | 6215 | 46.5 |
| White | 3235 | 24.2 |
| African American | 1263 | 9.5 |
| Asian | 1172 | 8.8 |
| Other/declined | 1487 | 11.1 |
| **Patient age (years)** | | |
| <18 | 605 | 4.5 |
| 18–24 | 6684 | 50.0 |
| 25–29 | 3317 | 24.8 |
| 30–34 | 1613 | 12.1 |
| 35–39 | 855 | 6.4 |
| 40+ | 299 | 2.2 |

older (2.2%). Nearly half of women identified as Hispanic or Latino, and 72% reported an income at or below the poverty line. The most frequent gestational age in our data set was 43 to 49 days (36.0%), and the least frequent was 22 to 28 days (4.1%).

### 3.2. Frequency and predictors of successful abortion

Termination of pregnancy with 200 mg of oral mifepristone followed by 800 mcg of buccal misoprostol 24–48 h later was successful among 97.7% of women who completed follow-up. Only 307 (2.3%) of the 13,373 women included in this study underwent aspiration for any reason. Specifically, 70 (0.5%) women had a continuing pregnancy, and 237 (1.8%) women required aspiration for reasons other than continuing pregnancy, most commonly due to reported symptoms of pain and/or bleeding. Data on the need for a repeat dose of misoprostol were available from a subset of women from clinics in which the EMR system was used, which included 7335 women (54.8% of the total sample). Of these 7335 women, 87 (1.2%) received a repeat dose of misoprostol.

Table 2 shows the proportion of patients requiring aspiration for ongoing pregnancy or for symptoms, such as heavy bleeding, by gestational age. The proportion with ongoing pregnancy ranged from 0.15% for those at 36 to 42 days of gestation to 1.63% at 57 to 63 days of gestation. Compared with the reference category (43 to 49 days), odds of ongoing pregnancy were greater for those at the highest gestational age. The proportion of women treated with aspiration for symptoms, not ongoing pregnancy, ranged from 0.65 to 2.49%. The incidence of hospitalization for

infection or hemorrhage requiring transfusion was very low (Table 3). In total, six women required hospitalization for any reason (two women were hospitalized for infection, and four were hospitalized for transfusion), and incidence was at or below 0.1% among all gestational ages.

In a multivariate logistic regression model (Table 4), poverty level and race/ethnicity were not significant predictors of successful abortion. Certain categories of gestational age were significantly associated with success; compared with the reference category (43 to 49 days), those at 36 to 42 days of gestation had greater odds of success, whereas those at 50 to 56 days and 57 to 63 days had lower odds of success. Compared with the reference category (18 to 24), those in the middle three age groups had significantly lower odds of success, but differences for those in the youngest (17 and under) and highest (40 and older) age groups were not significant.

### 3.3. Loss to follow-up

A comparison of patients who completed follow-up and those who were lost to follow-up is presented in Table 5. Compared with patients at 43 to 49 days of gestation, patients at higher gestational ages were more likely to be lost to follow-up. For patients with incomes at or below the Federal Poverty Level (FPL), the odds of being lost to follow-up were greater than those above FPL. Odds of being lost to follow-up were greater for those younger than 18 (compared with those 18 to 24) and lower for those aged 40 and older.

## 4. Discussion

### 4.1. General implications

This study demonstrates that the evidence-based regimen for medical abortion (mifepristone 200 mg orally followed by home use of misoprostol 800 mcg buccally 24–48 h later) is highly effective through 63 days estimated gestational age, with an overall success rate of 97.7%. This is higher than the efficacy rates reported in two pivotal trials used in submission for FDA approval of mifepristone,[1,2] yet utilizes one-third the dose of mifepristone (200 mg rather than 600 mg) and buccal administration and home use of misoprostol rather than oral administration in the clinic. Repeat dosing of misoprostol was administered in only 1.2% of patients for whom this information is available, and given the way in which the EMR system was implemented across study sites, we can assume that this rate would be representative of the entire sample. Although efficacy is lower at later gestational ages, even in the 57- to 63-day range, this evidence-based regimen was still more effective than rates reported in the FDA-approved regimen, which sets the upper gestational age limit at 49 days. Furthermore, the rates of unsuccessful abortion in this study are lower than the rates reported in the two trials that were initially submitted to the FDA for approval of mifepristone.

4                                     M. Gatter et al. / Contraception xx (2015) xxx–xxx

Table 2
Aspiration for ongoing pregnancy, symptoms or any indication among those who completed follow-up, by gestational age.

| Gestational age | Aspiration for ongoing pregnancy n (%) | OR | 95% CI | Aspiration for symptoms n (%) | OR | 95% CI | Aspiration for any reason * n (%) | OR | 95% CI |
|---|---|---|---|---|---|---|---|---|---|
| 22–28 days | 4 (0.72) | 2.69 | 0.87–8.27 | 11 (1.99) | 1.39 | 0.73–2.65 | 15 (2.71) | 1.39 | 0.80–2.43 |
| 29–35 days | 5 (0.46) | 1.72 | 0.61–4.83 | 7 (0.65) | 0.45 | 0.21–0.98 | 13 (1.20) | 0.61 | 0.34–1.10 |
| 36–42 days | 4 (0.16) | 0.59 | 0.19–1.82 | 25 (1.00) | 0.70 | 0.44–1.10 | 30 (1.20) | 0.61 | 0.40–0.92 |
| 43–49 days | 13 (0.27) | ref | | 69 (1.43) | ref | | 94 (1.95) | ref | |
| 50–56 days | 23 (0.73) | 2.72 | 1.38–5.39 | 64 (2.04) | 1.43 | 1.01–2.02 | 97 (3.09) | 1.60 | 1.20–2.13 |
| 57–63 days | 21 (1.63) | 6.13 | 3.06–12.28 | 32 (2.49) | 1.76 | 1.15–2.80 | 58 (4.51) | 2.37 | 1.70–3.31 |
| Totals | 70 (0.5) | | | 237 (1.8) | | | 307 (2.3) | | |

OR: odds ratio; CI: confidence interval
  * This column includes 29 cases wherein reason for aspiration is unknown.

This study adds to the growing literature supporting provision of medical abortion using evidence-based regimens, and supports the conclusion that legislative efforts to restrict medical abortion to the FDA regimen are based on political goals to restrict abortion services, not efficacy or patient safety.

### 4.2. Limitations

Our study has some limitations. It is retrospective in nature and relies on the accuracy of our EPM database. However, review of our EPM system has shown a high degree of accuracy when compared with patient records [13]. In addition, we are not a closed system, and it is possible and even likely that some patients who experienced complications did not return to us for care. However, since many patients need to pay for aftercare obtained outside our system, but not within our system, it is more likely than not that the patients who did not return for follow-up did so because they did not feel that they needed follow-up, rather than that they were experiencing a complication. In that case, excluding them from our analysis would have tended to overestimate, rather than underestimate, the need for aspiration in our population. We based our analysis of efficacy only on those patients who did return for a follow-up visit, so we cannot exclude the possibility of additional visits or treatment elsewhere.

Loss to follow-up is common in studies of medical abortion, as many patients may determine on their own that their abortion is complete and that follow-up is not needed. The rate of loss to follow-up in this study (15.5%) is lower than loss to follow-up found in other clinical medical abortion studies, which report

loss of follow-up of 18 to 45% [14–17]. We found that loss to follow-up was significantly more common among those at higher gestational ages; given that odds of success are lower among those with more advanced pregnancies, it is possible that this study underestimates the true odds of unsuccessful abortion. Loss to follow-up was significantly higher among the youngest age group and lower among the oldest age group, but as these age categories were unrelated to whether the abortion was successful, we do not believe that these differences would systematically bias our results.

### 4.3. Conclusion

In summary, an evidence-based regimen of mifepristone 200 mg orally followed by misoprostol 800 mcg buccally

Table 3
Hospitalizations for infection or transfusion in women having a medical abortion with mifepristone 200 mg and misoprostol 800 mcg buccally (N=13,373).

| Gestational age | Patients n | Infections n (%) | Transfusions n (%) |
|---|---|---|---|
| 22–28 days | 554 | 0 (0.00) | 1 (0.18) |
| 29–35 days | 1080 | 1 (0.09) | 0 (0.00) |
| 36–42 days | 2495 | 0 (0.00) | 0 (0.00) |
| 43–49 days | 4816 | 1 (0.02) | 0 (0.00) |
| 50–56 days | 3142 | 0 (0.00) | 3 (0.10) |
| 57–63 days | 1286 | 0 (0.00) | 0 (0.00) |
| Total | 13,373 | 2 (0.01) | 4 (0.03) |

Table 4
Factors associated with successful medical abortion in women using mifepristone 200 mg and misoprostol 800 mcg buccally (N=13,373).

| | Successful n (%) | Unsuccessful n (%) | OR | 95% CI |
|---|---|---|---|---|
| Gestational age (days) | | | | |
| 22–28 | 539 (97.3) | 15 (2.7) | 0.72 | 0.41–1.25 |
| 29–35 | 1067 (98.8) | 13 (1.2) | 1.68 | 0.94–3.01 |
| 36–42 | 2465 (98.8) | 30 (1.2) | 1.65 | 1.09–2.50 |
| 43–49 | 4722 (98.1) | 94 (2.0) | Ref | |
| 50–56 | 3045 (96.9) | 97 (3.1) | 0.62 | 0.47–0.83 |
| 57–63 | 1228 (95.5) | 58 (4.5) | 0.42 | 0.30–0.58 |
| Total patients | 13,066 (97.7) | 307 (2.3) | | |
| Poverty level (% FPL) | | | | |
| 0–100 | 9466 (97.8) | 213 (2.2) | 0.95 | 0.74–1.23 |
| >100 | 3600 (97.5) | 94 (2.5) | Ref | |
| Race/ethnicity | | | | |
| Hispanic/Latino | 6074 (97.7) | 141 (2.3) | Ref | |
| White | 3163 (97.8) | 72 (2.2) | 1.02 | 0.76–1.37 |
| African American | 1228 (97.2) | 35 (2.8) | 0.90 | 0.62–1.31 |
| Asian | 1146 (97.8) | 26 (2.2) | 1.02 | 0.67–1.57 |
| Other/declined | 1454 (97.8) | 33 (2.2) | 1.08 | 0.74–1.59 |
| Patient age (years) | | | | |
| <18 | 597 (98.7) | 8 (1.3) | 1.44 | 0.70–2.98 |
| 18–24 | 6560 (98.1) | 124 (1.9) | Ref | |
| 25–29 | 3233 (97.5) | 84 (2.5) | 0.72 | 0.54–0.96 |
| 30–34 | 1556 (96.5) | 57 (3.5) | 0.51 | 0.37–0.70 |
| 35–39 | 829 (97.0) | 26 (3.0) | 0.58 | 0.37–0.89 |
| 40+ | 291 (97.3) | 8 (2.7) | 0.68 | 0.33–1.40 |

OR, odds ratio; CI, confidence interval.

Table 5
Loss to follow-up analysis among women having a medical abortion with mifepristone 200 mg and misoprostol 800 mcg buccally (N=13,373)

| | Completed follow-up n (%) | Lost to follow-up n (%) | OR[a] | 95% CI |
|---|---|---|---|---|
| Gestational age (days) | | | | |
| 22–28 | 554 (85.1) | 97 (14.9) | 1.00 | 0.79–1.25 |
| 29–35 | 1080 (86.3) | 172 (13.7) | 0.91 | 0.76–1.08 |
| 36–42 | 2495 (85.6) | 419 (14.4) | 0.96 | 0.84–1.09 |
| 43–49 | 4816 (85.1) | 845 (14.9) | Ref | |
| 50–56 | 3142 (83.0) | 645 (17.0) | 1.17 | 1.05–1.31 |
| 57–63 | 1286 (81.7) | 288 (18.3) | 1.28 | 1.10–.48 |
| Poverty level (% FPL) | | | | |
| 0–100 | 9679 (83.7) | 1887 (16.3) | 1.24 | 1.12–1.38 |
| >100 | 3694 (86.5) | 579 (13.6) | | |
| Race/ethnicity | | | | |
| Hispanic/Latino | 6215 (84.1) | 1173 (15.9) | | |
| White | 3235 (83.4) | 643 (16.6) | 1.05 | 0.95–1.17 |
| African American | 1263 (82.8) | 262 (17.2) | 1.10 | 0.95–1.27 |
| Asian | 1172 (91.1) | 115 (8.9) | 0.52 | 0.43–0.64 |
| Other/declined | 1487 (84.5) | 273 (15.5) | 0.97 | 0.84–1.12 |
| Patient age (years) | | | | |
| <18 | 605 (80.0) | 152 (20.0) | 1.42 | 1.17–1.71 |
| 18–24 | 6684 (84.9) | 1186 (15.1) | | |
| 25–29 | 3317 (83.7) | 646 (16.3) | 1.10 | 0.99–1.22 |
| 30–34 | 1613 (84.8) | 289 (15.2) | 1.01 | 0.88–1.16 |
| 35–39 | 855 (84.6) | 156 (15.4) | 1.03 | 0.86–1.23 |
| 40+ | 299 (89.0) | 37 (11.0) | 0.70 | 0.49–0.99 |

OR, odds ratio; CI, confidence interval.

[a] OR represents odds of being lost to follow-up.

48–72 h later is safe and effective through 63 days estimated gestational age. Further, need for aspiration for any reason was low, the chance of needing aspiration increased with gestational age at the time of medical abortion, and the frequency of hospitalization was rare. This study reinforces the safety and efficacy of the evidence-based regimen for medical abortion, and contributes to the evidence against restrictions that require use of the FDA-approved regimen.

## References

[1] Peyron R, Aubeny E, Targosz V, Silvestre L, Renault M, Elkik F, et al. Early termination of pregnancy with mifepristone (RU-486) and the orally active prostaglandin misoprostol. N Engl J Med 1993;328:1509–13.

[2] Aubeny E, Peyron R. Termination of early pregnancy (up to and after 63days of amenorrhea) with mifepristone (RU 486) and increasing doses of misoprostol (vol 40, pg 85, 1995). Int J Fertil Menopausal Stud 1996;41:56.

[3] Spitz I, Bardin C, Benton L, Robbins A. Early pregnancy termination with mifepristone and misoprostol in the United States. N Engl J Med 1998;338:1241–7.

[4] Schaff E, Eisinger S, Stadalius L, Franks P, Gore B, Poppema S. Low-dose mifepristone 200 mg and vaginal misoprostol for abortion. Contraception 1999;59:1–6.

[5] World Health Organization Task Force on Post-Ovulatory Methods of Fertility Regulation. Comparison of two doses of mifepristone in combination with misoprostol for early medical abortion: a randomised trial. Br J Obstet Gynaecol 2000;107:524–30.

[6] Schaff E, Fielding S, Westhoff C, Ellertson C, Eisinger S, Stadalius L, et al. Vaginal misoprostol administered 1, 2, or 3 days after mifepristone for early medical abortion—a randomized trial. JAMA 2000;284:1948–53.

[7] Schaff E, Fielding S, Westhoff C. Randomized trial of oral versus vaginal misoprostol at one day after mifepristone for early medical abortion. Contraception 2001;64:81–5.

[8] Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AA, Gonzales J, et al. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstetrics & Gynecology 2008;112:1303–10.

[9] Winikoff B, Dzuba IG, Chong E, Goldberg AB, Lichtenberg ES, Ball C, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012;120:1070–6.

[10] Fjerstad M, Sivin I, Lichtenberg ES, Trussell J, Cleland K, Cullins V. Effectiveness of medical abortion with mifepristone and buccal misoprostol through 59 gestational days. Contraception 2009;80:282–6.

[11] Cleland K, Creinin MD, Nucatola D, Nshom M, Trussell J. Significant adverse events and outcomes after medical abortion. Obstet Gynecol 2013;121:166–71.

[12] Boonstra H. Medication abortion restrictions burden women and providers—and threaten US trend toward very early abortion. Guttmacher Policy Rev 2013;16:18–23.

[13] Steward R, Melamed A, Kim R, Nucatola D, Gatter M. Infection and extramural delivery with use of digoxin as a feticidal agent. Contraception 2012;85:150–4.

[14] Grossman DA, Grindlay K, Buchacker T, Potter JE, Schmertmann CP. Changes in service delivery patterns after introduction of telemedicine provision of medical abortion in Iowa. Am J Public Health 2013;103:73–8.

[15] Clark W, Bracken H, Tanenhaus J, Schweikert S, Lichtenberg ES, Winikoff B. Alternatives to a routine follow-up visit for early medical abortion. Obstet Gynecol 2010;115:264–72.

[16] Horning EL, Chen BA, Meyn LA, Creinin MD. Comparison of medical abortion follow-up with serum human chorionic gonadotropin testing and in-office assessment. Contraception 2012;85:402–7.

[17] Haimov-Kochman R, Arbel R, Sciaky-Tamir Y, Brzezinski A, Laufer N, Yagel S. Risk factors for unsuccessful medical abortion with mifepristone and misoprostol. Acta Obstet Gynecol Scand 2007;86:462–6.

**EXHIBIT 29**

**2019 Citizen Petition of AAPLOG to FDA**

## Citizen Petition

March 29, 2019

The undersigned submit this petition to request the Commissioner of Food and Drugs to: (I) restore and strengthen elements of the Mifeprex regimen and prescriber requirements approved in 2000, and (II) retain the Mifeprex Risk Evaluation and Mitigation Strategy (REMS), and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

### A.  Action Requested

I.  RESTORE AND STRENGTHEN ELEMENTS OF THE MIFEPREX REGIMEN AND PRESCRIBER REQUIREMENTS APPROVED IN 2000.

Current language and requested language for the Mifeprex Label and the Mifeprex *Risk Evaluation and Mitigation Strategy* (REMS) are included in Exhibit A.[1] Requests include:

**A. Indications and Usage**. Mifeprex, in a regimen with misoprostol, for the termination of intrauterine pregnancy, should be limited to 49 days' gestation.

**B. Dosage and Administration.**

1.  Mifeprex should be administered by or under the supervision of a physically present and certified physician who has ruled out ectopic pregnancy.

2.  The use of Mifeprex and misoprostol for the termination of pregnancy should require three office visits by the patient.

**C. Contraindications.** Mifeprex use is contraindicated for patients who do not have convenient access to emergency medical care.

**D. Adverse Event Reporting.** Certified prescribers, emergency medical personnel, physicians treating complications, and Danco Laboratories should report to FDA's MedWatch Reporting system any deaths, hospitalizations, blood transfusions, emergency room visits, failures requiring surgical completion, ongoing pregnancy, or other major complications following the use of Mifeprex and misoprostol.

---

[1] Other documents will require corresponding modifications, including the Mifeprex Medication Guide, Prescriber Agreement Form, and Patient Agreement Form.

1

**E. Additional studies.** The Mifeprex REMS should require a formal study of outcomes for at-risk populations, including: patients under the age of 18; patients with repeat Mifeprex abortions; patients who have limited access to emergency room services; and patients who self-administer misoprostol.

II.  <u>RETAIN THE MIFEPREX RISK EVALUATION AND MITIGATION STRATEGY (REMS), AND CONTINUE LIMITING THE DISPENSING OF MIFEPREX TO PATIENTS IN CLINICS, MEDICAL OFFICES, AND HOSPITALS, BY OR UNDER THE SUPERVISION OF A CERTIFIED PRESCRIBER.</u>

**A. Retain the Mifeprex REMS.**

**B. Continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.**

1.  <u>Mifeprex should be dispensed only in clinics, medical offices, and hospitals.</u>

    **a. The "TelAbortion" Direct-to-Consumer Mifeprex Study**

    **b. The Mifeprex through Pharmacy Dispensing Study**

    **c. Beyond the Current Studies**

2.  <u>Mifeprex Prescribers Should be Certified.</u>

App. 000607

## B. Statement of Grounds

I.   RESTORE AND STRENGTHEN ELEMENTS OF THE MIFEPREX REGIMEN
     AND PRESCRIBER REQUIREMENTS APPROVED IN 2000.[2]

   **A. Indications and Usage.** Mifeprex, in a regimen with misoprostol, for the
   termination of intrauterine pregnancy, should be limited to 49 days' gestation.

   In 2016, FDA increased the maximum gestational age for Mifeprex use for abortion
from 49 days (7 weeks) to 70 days (10 weeks), and changed the method of administration
of misoprostol from oral to buccal (*i.e.*, in the cheek pouch). However drug-induced
abortion[3] regimens demonstrate an increase in complications and failures after 49 days'
gestation.

   In a 2011 study of thousands of patients, the majority of whom had a drug-induced
abortion using what is now the Mifeprex regimen, the rate of infection and the rate of
failure requiring surgical intervention increased with gestational age.[4] The American
College of Obstetricians and Gynecologists (ACOG) has stated: "the risk of clinically
significant bleeding and transfusion may be lower in women who undergo medical
abortion of gestations up to 49 days compared with those who undergo medical abortion
of gestations of more than 49 days."[5]

   Further, a 2015 meta-analysis examined all the existing publications on buccal
administration of misoprostol, 20 studies in all, from November 2005 through January
2015. The failure rate of the buccal misoprostol regimen increased as the gestational age

---

[2] The FDA approved Mifeprex for use in the United States on September 28, 2000, with safeguards
considered necessary to ensure patient safety. The drug's initial approval was for termination of pregnancy,
in a regimen with misoprostol, through 49 days of pregnancy. FDA significantly modified the drug's label
at the application of the manufacturer, Danco Laboratories, in 2016, extending approved use to 70 days of
pregnancy. Additional changes included: a new dosage of both Mifeprex and misoprostol; permitting home
administration of Mifeprex and misoprostol; a new route of administration for the misoprostol (buccal, in
the cheek pouch); permitting non-physicians to become certified prescribers; a decrease from 3 to 1
mandatory office visits by the patient; and reduced reporting requirements. U.S. Gov't Accountability
Office, GAO-18-292, Food and Drug Administration: Information on Mifeprex Labeling Changes and
Ongoing Monitoring Efforts 4-7 (2018); Mifeprex Risk Evaluation and Mitigation Strategy (REMS),
https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_REMS_full.pdf; Mifeprex
Medication Guide, https://www.fda.gov/downloads/Drugs/DrugSafety/ucm088643.pdf.
[3] The terms "Medication abortion," "medical abortion," "chemical abortion," and "drug-induced abortion"
[or termination of pregnancy] share the same meaning and refer to the use of abortion-inducing drugs,
rather than surgery, to induce abortion. The current FDA-approved regimen uses two drugs, mifepristone
(a.k.a. Mifeprex or RU-486) and misoprostol.
[4] Mentula MJ, Niinimaki M, Suhonen S, Hemminki E, Gissler M, and Heinkinheimo O, *Immediate Adverse
Events after Second Trimester Medical Termination of Pregnancy: Results of a Nationwide Registry Study,*
Human Reproduction 26(4), 927-932 (2011).
[5] ACOG Practice Bulletin 143: *Medical Management of First-Trimester Abortion*, p. 5 (Mar. 2014,
reaffirmed 2016).

increased, especially at gestational ages greater than 49 days.[6] The current FDA label also acknowledges this fact.[7]

Given the serious risks of failure, hemorrhage, infection, and ongoing pregnancy that increase as pregnancy advances, the gestational limit for the Mifeprex regimen should have never been increased.

### B. Dosage and Administration.

1. Mifeprex should be administered by or under the supervision of a physically present and certified physician who has ruled out ectopic pregnancy.

The 2000 Mifeprex regimen required Mifeprex to be "provided by or under the supervision of a *physician*" who meets qualifications discussed in this section below.[8] However, the 2016 regimen replaced "physician" with "healthcare provider," thus permitting non-physicians to apply to be certified prescribers.[9] Given the regimen's serious risks, the FDA should limit the ability to prescribe and dispense Mifeprex to qualified, licensed physicians. Physicians are better trained to diagnose patients who have contraindications to Mifeprex and to verify gestational age.

The current Mifeprex Risk Evaluation and Mitigation Strategy (REMS), discussed in Section II below, continues to provide that "Mifeprex must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, *by or under the supervision of a certified prescriber*."[10] Yet, abortion providers today are promoting and performing "telemedicine abortions," where the certified prescriber's "supervision" of the dispensing of Mifeprex is limited to a videoconference.[11] This practice demonstrates a flagrant disregard for FDA safeguards.

To ensure true supervision, the FDA should require certified prescribers to be physically present when Mifeprex is dispensed so that they can appropriately examine patients and rule out contraindications to the use of Mifeprex. This requirement would be consistent with other requirements in the Mifeprex Label and REMS.

---

[6] Chen MJ, Creinin MD, *Mifepristone with Buccal Misoprostol for Medical Abortion*, Obstet. Gynecol 126 (1) July 2015 12-21.
[7] Mifeprex 2016 label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.
[8] Mifeprex 2000 label, Dosage and Administration, emphasis added.
[9] Mifeprex 2016 label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.
[10] Mifeprex 2016 REMS, emphasis added,
https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_REMS_full.pdf.
[11] *See* Planned Parenthood Releases New Educational Video on Telemedicine Abortion (Feb. 6, 2018), https://www.plannedparenthood.org/about-us/newsroom/press-releases/planned-parenthood-releases-new-educational-video-on-telemedicine-abortion.

In the Mifeprex Label, the FDA emphasizes that "Mifeprex is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS)" because of the drug's "risks of serious complications." In a bold-print box, the FDA states that before prescribing Mifeprex, a provider must inform a patient: about the risks of serious events; whom to call and what to do if certain symptoms occur; and to take the Medication Guide with her if she visits an emergency room or healthcare provider who did not prescribe Mifeprex, so that she receives appropriate, informed care.[12]

Further, a provider must sign a Provider Agreement Form, attesting that he or she can:

- **Assess the duration of pregnancy accurately.**[13] Failures and complications of Mifeprex abortion increase with increasing gestational age. Mifeprex use is approved through 70 days' gestation.[14] FDA should strengthen this requirement by mandating that gestational age be accurately assessed by ultrasound in order to both ensure compliance with FDA restrictions and adequately inform the patient of gestational age-specific risks, which rise with increasing gestational age.

- **Diagnose ectopic pregnancies**[15] (*i.e.,* extrauterine pregnancy; pregnancy outside the uterus), which Mifeprex cannot end. When an ectopic pregnancy progresses, it can rupture the fallopian tube, causing bleeding, severe pain, or death. If a woman with an extrauterine pregnancy is given Mifeprex, she may believe the symptoms for ectopic pregnancy are simply the side effects of drug-induced abortion, which are similar. As of December 31, 2017, at least 97 women with ectopic pregnancies in the United States had been given Mifeprex.[16] Of these women, at least two bled to death from an undiagnosed ectopic pregnancy.[17] They likely did not recognize that their cramps, abdominal pain, and perhaps vaginal bleeding were dangerous—not side effects expected in a Mifeprex abortion.[18]

---

[12] Mifeprex 2016 label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.

[13] Mifeprex Prescriber Agreement Form, https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_Prescriber_Agreement_Form.pdf.

[14] *See* Section I.A, *supra.*

[15] Mifeprex Prescriber Agreement Form, https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_Prescriber_Agreement_Form.pdf.

[16] Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2017, RCM # 2007-525, NDA 20-687, https://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/UCM603000.pdf).

[17] *Id.*

[18] Donna Harrison, M.D. & Michael J. Norton Testimony before the Iowa Board of Medicine, p. 3 (Aug. 21, 2013), *citing* Postmarket Drug Safety Information for Patients and Providers, Questions and Answers on Mifeprex,

App. 000610

- **Provide surgical intervention if needed, or has made plans to provide such care through others.**[19] He or she must assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.[20]

Clearly, a provider who does not physically meet with and examine a patient, but simply consults with the patient over the Internet, is not capable of fulfilling these requirements, or of ruling out additional contraindications (*i.e.*, circumstances that make a treatment or medication *unadvisable*) to Mifeprex use. These physical contraindications include pelvic infections, ovarian masses, cardiac arrhythmias, and liver abnormalities.[21] A physician bears responsibility to diagnose and rule out contraindications prior to Mifeprex use. It is inadequate to entrust this critical care to another healthcare provider who is not trained in diagnosis. Further, a healthcare provider who is not physically accessible to a patient cannot provide adequate follow-up care to patients, as required by the FDA Mifeprex regimen.

Thirty-four states permit only physicians to prescribe Mifeprex,[22] with nineteen states requiring the provider to be physically present with the patient.[23] For example, the law in Alabama states that the physical presence and care of a physician are necessary because "the failure and complications from medical abortion increase with advancing gestational age, because the physical symptoms of medical abortion can be identical to the symptoms of ectopic pregnancy, and because abortion-inducing drugs do not treat ectopic pregnancies but rather are contraindicated in ectopic pregnancies."[24]

Lawmakers in these states recognize that abortion providers cannot diagnose contraindications and cannot adequately care for their patients through a videoconference. Fundamentally, telemedicine "may be legitimate when it comes to discrete, document-based tasks such as reading X-rays," but it "is not the standard of care when it comes to abortion or the management of miscarriage."[25]

---

https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm492705.htm.
[19] Mifeprex Prescriber Agreement Form,
https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_Prescriber_Agreement_Form.pdf.
[20] *Id.*
[21] Harrison & Norton Testimony, p. 3.
[22] Donovan MK, *Self-Managed Medication Abortion: Expanding the Available Options for U.S. Abortion Care*, Guttmacher Policy Review, Vol. 21, p. 44 (2018).
[23] *Id.*
[24] Ala. Code § 26-23E-7.
[25] Harrison & Morton Testimony, p. 19.

2.   <u>The use of Mifeprex and misoprostol for the termination of pregnancy should require three office visits by the patient.</u>

The 2016 regimen significantly diminished doctor-patient interaction. While the 2000 Mifeprex label required three patient visits with the abortion provider, women may now obtain Mifeprex at a clinic and self-administer it at home. They are no longer required to return to the clinic for the administration of misoprostol, which prevents abortion providers from ensuring that they take the drugs at the correct times. Further, providers may now "confirm" that a patient's drug-induced abortion was successful without a clinic visit,[26] increasing the threat that Rh-negative patients will not receive administration of Rhogam, which is necessary to prevent serious risks in subsequent pregnancies.

The 2016 regimen directs that patients be given or prescribed misoprostol to take 24 to 48 hours after taking Mifeprex. However, without monitoring, a patient may take misoprostol before 24 hours have passed since she consumed Mifeprex, rendering the regimen ineffective and increasing the likelihood that she will experience a failed drug-induced abortion and require surgery.

Using buccal misoprostol sooner than 24 hours after administering mifepristone leads to a significantly increased failure rate. In one study investigating the timing of buccal misoprostol after mifepristone, nearly one out of every three to four women who took buccal misoprostol shortly after mifepristone failed to abort.[27] The failure rate ranged from 27% to 31%, depending on the pregnancy gestation.[28] Given these results, the authors of this study strongly recommended that buccal misoprostol not be taken immediately after mifepristone because of the very high abortion failure rate.[29] However, with home administration of misoprostol, healthcare providers have no control over when their patients consume the drug.

A woman may also choose to swallow misoprostol rather than keep the pill between her cheek and gum for 30 minutes, converting a "buccal" administration into an "oral" administration. An oral administration of misoprostol following the lower dose of mifepristone in the current regimen is not as effective in ending the pregnancy.

Further, waiting until 24 hours after Mifeprex to administer misoprostol does not guarantee success, and the failure rate of buccal misoprostol is higher than that under the 2000 regimen. A comprehensive systematic review and meta-analysis of the existing

---

[26] *See* Mifeprex 2016 label,
https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.
[27] Lohr PA, Reeves MF, Hayes JL, Harwood B, Creinin MD, *Oral Mifepristone and buccal misoprostol administered simultaneously for abortion: a pilot study*, Contraception 76 (2007) 215-220.
[28] *Id.*
[29] *Id.*

App. 000612

studies of the 2016 regimen found that women who take misoprostol earlier than 48 hours after mifepristone are more likely to fail the regimen.[30]

Under the 2000 regimen, doctors were also able to provide care to patients during the most challenging and painful time in the drug-induced abortion. According to the World Health Organization, up to 90% of women will abort within 4-6 hours after taking misoprostol.[31] The 2000 regimen permitted a patient to be in a clinic for this period of time, during which she would be under the observation and care of medical personnel. This observation period is for "both patient safety and compassion. . . . This is the time when women should be in a place where their bleeding can be monitored, their vital signs can be observed by trained medical personnel, and they can receive sufficient pain medication during the most difficult part of the expulsion."[32]

Abortion complications are also more frequent when women abort at home, without the oversight of a healthcare provider. A 2018 combined retrospective and longitudinal follow-up study of complications related to induced abortion in Sweden determined that "[t]he complication frequency [of drug-induced abortion] was significantly higher among women <7 gestational weeks who had their abortions *at home*."[33]

In-person contact with a healthcare provider is critical to post-abortion care as well. Abortion providers should perform a "follow-up [physical exam] after the use of mifepristone in order to confirm abortion and rule out life-threatening infection."[34] Before FDA approved the 2016 regimen, the follow-up visit was considered "very important to confirm by clinical examination or ultrasonographic scan that a complete termination of pregnancy has occurred."[35] In fact, the 2000 label provided that "[e]ach patient must understand the necessity of completing the treatment schedule, including a follow-up visit approximately 14 days after taking Mifeprex."[36] ACOG's current policy explains that:

> Women are not good candidates for medical abortion if they … desire quick completion of the abortion process [or] are not available for follow-up contact or evaluation….[37]

---

[30] Chen MJ, Creinin MD, *Mifepristone with Buccal Misoprostol for Medical Abortion*, Obstet.Gynecol 126 (1) July 2015 12-21.

[31] World Health Organization, *Safe Abortion: Technical and Policy Guidance for Health Systems* 45.

[32] Donna Harrison, M.D., Aff. *Okla. Coalition for Reproductive Justice v. Cline*, Case No. CV-2014-1886 (Feb. 24, 2015) ¶ 136.

[33] Carlsson I, Breding K, and Larsson PG, *Complications Related to Induced Abortion: a Combined Retrospective and Longitudinal Follow-up Study*, BMC Women's Health (2018) 18:158, p. 4 (emphasis added).

[34] Harrison & Norton Testimony, p. 18.

[35] Mifeprex 2000 label, Day 14: Post-Treatment Examination.

[36] Mifeprex 2000 label, Information for Patients.

[37] ACOG Practice Bulletin 143, p. 6.

In addition to ensuring for all drug-induced abortion patients that the uterus has been emptied of retained tissue and that they are not suffering from infection, the follow-up examination is particularly critical for Rh-negative patients. These patients must be administered Rhogam in order to prevent Rh isoimmunization in subsequent pregnancies. Without follow-up, women will not receive the Rhogam after the abortion, greatly increasing their risk of subsequent Rh isoimmunization, which can endanger future pregnancies.[38]

Nonetheless, abortion advocates strongly supported the reduction in required visits, and continue to advocate for the elimination of direct provider-patient contact. Gynuity Health Projects (an organization that "has been at the forefront of efforts to increase women's access to medical abortion in settings throughout the world")[39] has conducted at least three domestic and five international studies[40] on eliminating pelvic ultrasound or exam after drug-induced abortion. Following one study, researchers determined that "[s]emi-quantitative pregnancy tests … could be used in lieu of transvaginal ultrasound and/or serum hCG at clinic-based follow-up or by women themselves for home-based follow-up."[41]

In a more recent study, researchers asserted that the "common practice of scheduling a clinical contact after every medical abortion may not be necessary to ensure safety; enabling patients to determine for themselves whether or not a contact is needed can be a

---

[38] ACOG Practice Bulletin 181*: Prevention of Rh D Alloimmunization* (Aug. 2017); and SOGC Clinical Practice Guidelines: *Prevention of Rh Alloimmunization* (No. 133, Sept. 2003).

[39] *See* Gynuity Health Projects, Medical Abortion, https://gynuity.org/programs/medical-abortion. Founded by Beverly Winikoff, M.D, M.P.H., in 2003, Gynuity outlines on its "Medical Abortion" page the organization's research projects, including efforts to: "Develop innovative service delivery systems through telemedicine; Simplify and de-medicalize medical abortion services; Expand access to medical abortion in the 1st and 2nd trimesters of pregnancy; Conduct clinical research to develop new abortion medications; Develop a 'missed menses pill'/menstrual regulation method; Develop additional clinical indications for mifepristone." Gynuity has launched a "coalition to expand access to mifepristone in the United States," co-created a "medical abortion commodities database," "introduce[d] medical abortion in new settings," "incorporate[ed] new clinical evidence into service guidelines," and "expanded medical abortion access through education and local champions."

[40] *See, e.g., Self-Assessment of Medical Abortion Outcome Using Serial Multi-level Pregnancy Tests* [NCT02570204] (Sept. 2015 – Dec. 2016), https://www.clinicaltrials.gov/ct2/show/NCT02570204?term=Self-Assessment+of+Medical+Abortion+Outcome+Using+Serial+Multi-level+Pregnancy&rank=1; *Exploring the Role of At-home Semi-Quantitative Pregnancy Tests for Medical Abortion Follow-up* [NCT01150279] (Aug. 2009 – May 2014), https://www.clinicaltrials.gov/ct2/show/NCT01150279?term=Exploring+the+Role+of+At-home+Semi-Quantitative+Pregnancy+Tests+for+Medical+Abortion+Follow-up&rank=1; *De-Medicalizing Mifepristone Medical Abortion* [NCT00120224] (May 2005 – Apr. 2007), https://www.clinicaltrials.gov/ct2/show/NCT00120224?term=De-Medicalizing+Mifepristone+Medical+Abortion&rank=1.

[41] Lynd K, et al., *Simplified Medical Abortion Using a Semi-Quantitative Pregnancy Test for Home-Based Follow-up,* Int J Gynaecol Obstet. 2013 May;121(2):144-8.

9

App. 000614

reasonable approach."[42] They reached this conclusion even with 26% of participants failing to provide sufficient follow-up information.[43]

Gynuity researchers also conducted a recent systematic review of existing studies on "the accuracy and acceptability of a strategy for identifying ongoing pregnancy after medical abortion treatment using a low-sensitivity pregnancy test (LSPT)." While the researchers acknowledged that "the LSPT strategy had *moderate* sensitivity for identifying ongoing pregnancy" and "the LSPT itself had a limited role in the detection of treatment failures [*i.e.*, ongoing pregnancy] in the studies," they stated that the "LSPT strategy shows promise for reducing the need for in-person follow-up after medical abortion. A range of home-based options should be validated to meet the varied needs of women and abortion providers in diverse settings."[44]

In reality, a de-emphasis on follow-up care increases risks of post-abortion complications. As discussed above, the 2000 regimen's requirement that women return approximately 14 days after ingesting mifepristone was considered necessary to ensure that all pregnancy tissue had been passed.[45] This determination is crucial, because retained pregnancy tissue can lead to continued bleeding and serious intrauterine infections. The return visit permits healthcare providers to ensure that a patient is not experiencing these or other complications from the abortion procedure, and that Rh negative patients are administered Rhogam to protect future pregnancies.

Abortion advocates argue that three clinic visits make accessing abortion-inducing drugs more difficult for patients with transportation challenges; however, as noted above, ACOG acknowledges that drug-induced abortion is *contraindicated* for patients who "are not available for follow-up contact or evaluation."[46] Surgical abortion is a better choice for these patients, because it "[d]oes not require follow-up in most cases."[47]

Drug-induced abortion is a longer process that requires more attention and care from healthcare providers. Three visits to a physician in the interest of patient safety should not be sacrificed for the convenience of healthcare providers or even their patients.

---

[42] Raymond EG, et al., *Self-assessment of Medical Abortion Outcome Using Symptoms and Home Pregnancy Tests*, Contraception 97 (2018) 324-28.

[43] *Id.*

[44] Raymond EG, et al., *Low-sensitivity Urine Pregnancy Testing to Assess Medical Abortion Outcome: A Systematic Review*, Contraception (2018), https://doi.org/10.1016/j.contraception.2018.03.013 (emphasis added).

[45] Mifeprex 2000 label, Day 14: Post-Treatment Examination.

[46] ACOG Practice Bulletin 143, p. 6.

[47] *Id.*

**C. Contraindications.** Mifeprex use is contraindicated for patients who do not have convenient access to emergency medical care.

The 2000 Mifeprex Label stated:

> Because it is important to have access to appropriate medical care if an emergency develops, the treatment procedure is contraindicated if a patient does not have adequate access to medical facilities equipped to provide emergency treatment of incomplete abortion, blood transfusions, and emergency resuscitation during the period from the first visit until discharged by the administering physician.[48]

This critical language was excluded from the 2016 Mifeprex Label. Yet, studies comparing the outcome of surgical versus drug-induced abortion "have clearly demonstrated that Mifeprex abortions have a greater risk of hemorrhage, infection, continued pregnancies, retained tissue and need for emergency reoperation than surgical abortions."[49] ACOG acknowledges that "[c]ompared with surgical abortion, medical abortion takes longer to complete, requires more active patient participation, and is associated with higher reported rates of bleeding and cramping," and has lower success rates.[50]

Drug-induced abortion is optional. If a woman does not meet the criteria necessary to use abortion-inducing drugs, then surgical abortion is still an option. For women with transportation difficulties, an abortion provider can complete surgical abortion "in a predictable period of time," and the procedure "[d]oes not require follow-up in most cases."[51]

Efforts to promote abortion-inducing drugs to women in rural areas where access to emergency medical care is scarce are detrimental to women's health. It is better for a patient in a remote region to have a surgical abortion, "which requires a single visit, and is less likely to result in serious or life-threatening complications."[52]

---

[48] Mifeprex 2000 label, Contraindications.
[49] Harrison Aff. ¶ 115.
[50] ACOG Practice Bulletin 143, p. 3 & Box 1.
[51] Id.
[52] Harrison & Norton p. 9.

11

**D. Adverse Event Reporting.** Certified prescribers, emergency medical personnel, physicians treating complications, and Danco Laboratories should report to FDA's MedWatch Reporting system any deaths, hospitalizations, blood transfusions, emergency room visits, failures requiring surgical completion, ongoing pregnancy, or other major complications following the use of Mifeprex and misoprostol.

The 2016 regimen dramatically reduced accountability for Mifeprex providers by limiting adverse event reporting (AER) requirements, a critical safety mechanism.[53] While prescribers were required to report any serious adverse event associated with Mifeprex under the 2000 label, they are now required to report only deaths associated with Mifeprex.

Even with the 2000 regimen requirements, collecting accurate and complete adverse event information was highly difficult. Adverse events were often not reported or were interpreted by emergency health care providers as the results of spontaneous abortion.[54] The Mifeprex label instructs prescribers to "[a]dvise the patient to take the Medication Guide with her if she visits an emergency room or a healthcare provider who did not prescribe Mifeprex, so that the provider knows that she is undergoing a medical abortion."[55] Yet, many Mifeprex prescribers violate FDA protocol, instructing their patients to lie to emergency medical personnel. The organization Aid Access instructs patients that if they need to go to an emergency room:

> You do not have to tell the medical staff that you tried to induce an abortion; you can tell them that you had a spontaneous miscarriage. Doctors have the obligation to help in all cases and know how to handle a miscarriage. The symptoms of a miscarriage and an abortion with pills are exactly the same and the doctor will not be able to see or test for any evidence of an abortion, as long as the pills have completely dissolved.[56]

Such deception prevents emergency healthcare providers from appropriately caring for their patients, and further decreases the likelihood that adverse events will be reported.

With reduced AER reporting requirements under the 2016 label, what was previously difficult is now virtually impossible. The FDA cannot adequately assess the safety of the current Mifeprex regimen without comprehensive information on adverse events. AERs are the only objective means by which FDA has any data whatsoever on the effects of the

---

[53] Mifeprex 2016 label.
[54] *See* GAO-18-292, pp 24-25.
[55] Mifeprex 2016 label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.
[56] Aid Access, *How do you know if you have complications, and what should you do?*,
https://aidaccess.org/en/page/459/how-do-you-know-if-you-have-complications-and-what-should-you-do.

App. 000617

Mifeprex regimen on women, and the voluntary and minimal nature of the current AERs means that FDA has no accurate information about the actual number of women injured by drug-induced abortion, or the nature of complications caused by this drug.

After prescribing Mifeprex and misoprostol, certified prescribers should at minimum be required to report the following directly to the FDA Medwatch reporting system, copying Danco Laboratories: deaths, hospitalizations, blood transfusions, emergency room visits, failures requiring surgical completion, ongoing pregnancy, or other major complications. Detailed information must also be included, such as pulse, blood pressure, temperature, pre- and post-transfusion hemoglobin/hematocrit, white blood count, number of units of blood transfused, surgeries, and any other pertinent laboratory or hospital course information, as well as emergency room and hospital discharge diagnoses.

Further, FDA should provide guidance to emergency healthcare providers and physicians responsible for treating complications so that they know how to distinguish complications following drug-induced abortion from complications following spontaneous miscarriage. The guidance should also instruct these providers on how to report adverse events.[57]

The abysmal quality of the current AERs received from Danco Laboratories shows the lack of concern that Danco has demonstrated for the safety of the women who have undergone drug-induced abortion. Responsible reporting is a fundamental safety mechanism that should not be sacrificed in the interest of convenience for abortion providers.

**E. Additional Studies.** The Mifeprex REMS should require a formal study of outcomes for at-risk populations, including: patients under the age of 18; patients with repeat Mifeprex abortions; patients who have limited access to emergency room services; and patients who self-administer misoprostol.

Mifeprex was approved for use in the pediatric population in 2000 after the FDA waived, without explanation, the requirement for studies in the pediatric population. The developmental stage of puberty involves a complex interplay of both progesterone and estrogen effects on the developing female reproductive system. The use, and especially the potential multiple use, of Mifeprex, which is a powerful progesterone blocker, is

---

[57] The Self-Induced Abortion Legal Team has created a document titled "Self-Induced Abortion and the Law: What Emergency Room Staff Need to Know." This document heavily emphasizes patient privacy requirements, including the penalties that healthcare providers may face if they disclose patient information. While these concerns are valid, emergency healthcare providers should also have training on public health reporting requirements and how such reporting does not violate HIPAA or other laws regarding patient privacy. *See,* https://www.sialegalteam.org.

App. 000618

likely to significantly impact the developing reproductive system of the adolescent female.[58] It is irresponsible to allow the continued uninvestigated use of Mifeprex in the pediatric female population[59] without requiring long-term studies on the impact of Mifeprex use on pubertal development.

More than one out of every three abortions in the U.S. is a repeat abortion.[60] The repeat use of Mifeprex has been associated in some studies with adverse reproductive health outcomes in future wanted pregnancies.[61] This concern requires further study.

The adverse events of hemorrhage, retained tissue, and infection are common after Mifeprex use. The hemorrhage is often significant enough to warrant transfusion.  When patients lack access to emergency medical facilities, such complications could easily translate to deaths. Thus a study of deaths and of severe hemorrhages requiring transfusion should be done to compare outcomes in women with and without access to emergency medical facilities.

II.   RETAIN THE MIFEPREX RISK EVALUATION AND MITIGATION STRATEGY (REMS), AND CONTINUE LIMITING THE DISPENSING OF MIFEPREX TO PATIENTS IN CLINICS, MEDICAL OFFICES, AND HOSPITALS, BY OR UNDER THE SUPERVISION OF A CERTIFIED PRESCRIBER.

**A. Retain the Mifeprex REMS.**

Mifeprex, when used for abortion, is subject to a Food and Drug Administration (FDA) *Risk Evaluation and Mitigation Strategy* (REMS) with *elements to assure safe use* (ETASU). FDA determined that the Mifeprex REMS is necessary to ensure the safety and efficacy of the drug, because it carries risks of life-threatening hemorrhage, infection, continued pregnancy, retained tissue, need for emergency surgery, and death. The approved Mifeprex regimen includes the use of another potent drug, misoprostol, which carries its own risks.

Under the Mifeprex REMS with ETASU, a healthcare provider must be certified to prescribe Mifeprex by reviewing the prescribing information and completing a

---

[58] Arain M, et al., *Maturation of the adolescent brain*, Neuropsychiatric Disease and Treatment, 2013:9 449-461.

[59] Because of their immaturity, minors are also less likely to understand the importance of following prescriber instruction or of recognizing when they need to seek emergency medical treatment.

[60] Jones R, et al., *Which Abortion Patients Have Had a Prior Abortion? Findings from the 2014 U.S. Abortion Patient Survey*, Journal of Women's Health, DOI: 10.1089/jwh.2017.6410 (2014).

[61] Fang L, et al., *Repeated Abortion Affects Subsequent Pregnancy Outcomes in BALB/c Mice*, PLoS ONE 7(10): e48384. doi:10.1371/journal.pone.0048384 (2012).

App. 000619

"Prescriber Agreement Form," attesting that they can: assess the duration of pregnancy accurately; diagnose ectopic pregnancies; and provide surgical intervention in cases of incomplete abortion or severe bleeding, or designate someone else to provide that care. Further, they must agree to follow the guidelines for use of Mifeprex.

The REMS also requires Mifeprex to "be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber." Mifeprex may not be distributed or dispensed through retail pharmacies. Also, a patient must sign a "Patient Agreement Form" and be fully informed of the risks by a certified prescriber. She must receive the Mifeprex Medication Guide, informing her that she needs a "follow-up assessment" 7 to 14 days after she has taken Mifeprex to ensure that she is well and has terminated her pregnancy.[62]

The REMS remains the lone safeguard to monitor and mitigate the risks of death and adverse events from the Mifeprex regimen. Gynuity Health Projects and researchers from the University of California, San Francisco (UCSF) obtained approval from FDA through Investigational New Drug Applications (INDs) to conduct studies that *do not* comply with the Mifeprex REMS. They intend to use the results of these studies to press for the elimination of the Mifeprex REMS.[63] [See Section II.B, below.]

The Mifeprex Medication Guide acknowledges that serious risks accompany FDA's approved regimen for drug-induced abortion, which includes the use of Mifeprex and another potent drug, misoprostol. The document improperly downplays the risks, however, stating that "*rarely*, serious and potentially life-threatening bleeding, infections, or other problems can occur following . . . medical abortion." Specifically, "in about 1 out of 100 women [administered Mifeprex and misoprostol] bleeding can be so heavy that it requires a surgical procedure."[64]

In fact, the internationally used criteria for reporting complications from drugs demonstrate that complications from drug-induced abortions are common, not rare. The Council for International Organizations of Medical Sciences (CIOMS)[65] defines the word

---

[62] GAO-18-292, pp 4-7 (2018); Mifeprex Risk Evaluation and Mitigation Strategy (REMS), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_REMS_full.pdf; 21 U.S.C. § 355-1; Mifeprex Medication Guide, https://www.fda.gov/downloads/Drugs/DrugSafety/ucm088643.pdf.

[63] *See* Daniel Grossman, MD, Research Protocol: *Alternative Provision of Medication Abortion via Pharmacy Dispensing*, Version #:1.3 (July 17, 2018) p. 14.

[64] Mifeprex Medication Guide, https://www.w.fda.gov/downloads/Drugs/DrugSafety/ucm088643.pdf.

[65] The Council for International Organizations of Medical Sciences (CIOMS) is an international, non-governmental, nonprofit organization established jointly by WHO and UNESCO in 1949. Through its membership, CIOMS is representative of a substantial proportion of the biomedical scientific community. In 2013, the membership of CIOMS included 49 international, national, and associate member organizations, representing many of the biomedical disciplines, national academies of sciences, and medical research councils.

App. 000620

"rare" in adverse event reporting as an event that happens in between "1 out of 1,000" to "1 out of 10,000" uses. "Common" is the uniform term used for events that happen in between "1 out of 10" to "1 out of 100" uses.[66] Given that "about 1 out of 100 women" using Mifeprex/misoprostol require surgery, serious complications are common, not rare.[67]

Also, as discussed in Section I.C above, Mifeprex abortions carry greater risks than surgical abortions.[68] A study of over 42,000 women in Finland who had abortions from 2000 to 2006 found that "overall, medical abortion had roughly four times the rate of adverse events than surgical abortion, and hemorrhaging was experienced by 16 percent of medical abortion patients compared with 2 percent of surgical abortion patients."[69]

A combined retrospective and longitudinal follow-up study of complications related to induced abortion in Sweden published in 2018 determined that the share of complications related to drug-induced abortions at less than 12 weeks *increased* significantly during 2008-2015 without an evident cause. The increase was from 4.2% in 2008 to 8.2% in 2015, with incomplete abortion as the most common complication related to drug-induced abortions at less than 12 weeks.[70]

Abortion advocates are also attacking the REMS by advocating for mifepristone use in spontaneous miscarriage management. In a small recent study, researchers compared the efficacy and safety of using mifepristone with misoprostol for the management of early miscarriages to using misoprostol alone.[71] Notably, 6-10% of study participants had a gestational age of "4-5 weeks gestation."[72] It is not clear from the authors how participants of that gestational age could meet the published guidelines for diagnosis of non-viable pregnancy recently published by the Society of Radiologists in Ultrasound multispecialty consensus panel.[73] The panel requires the crown-rump length cutoff to 7 mm for embryos without a heartbeat and the mean sac diameter cutoff to 25 mm for

---

[66] CIOMS training manual on medicine safety,
http://www.who.int/medicines/areas/quality_safety/safety_efficacy/trainingcourses/definitions.pdf.
[67] *See* Mifeprex Medication Guide; CIOMS training manual on medicine safety, *supra.*
[68] *See* Harrison Aff. ¶ 115; ACOG Practice Bulletin 143, p. 3 & Box 1.
[69] GAO-18-292, p. 25, *discussing* Niinimaki M, et al., *Immediate Complications after Medical Compared with Surgical Termination of Pregnancy,* Obstetrics & Gynecology, vol. 114, no. 4 (October 2009): 795-804.
[70] Carlsson I, Breding K, and Larsson PG, *Complications Related to Induced Abortion: A Combined Retrospective and Longitudinal Follow-up Study*, BMC Women's Health (2018) 18:158.
[71] Schreiber CA, et al, *Mifepristone Pretreatment for the Medical Management of Early Pregnancy Loss*, N Engl J Med 2018; 378:2161-70.
[72] *Id.* Table 1.
[73] Doubilet PM, Benson CB, Bourne T, et al., *Diagnostic criteria for nonviable pregnancy early in the first trimester*, N Engl J Med 2013; 369:1443–1451.

App. 000621

"empty" sacs, in order to minimize interventions that "interrupt a pregnancy that otherwise would have had a normal outcome."[74]

The authors admit that the study "was not powered to show differences between groups in the proportions of serious adverse events,"[75] an important consideration prior to recommending a change in spontaneous abortion management protocols. Yet, the authors incorrectly stated "such events were rare."[76] Table 3 gives a total number of serious adverse events as 3.4% for the mifepristone pretreatment group, and 2.0% for the misoprostol alone group.[77] Under the CIOMS criteria for reporting complications from drugs, discussed above, the rate of 2%-3.4% of adverse events in each study arm demonstrates clearly that adverse events are common, not rare, in both misoprostol alone and mifepristone + misoprostol miscarriage management.

Further, the Mifeprex + misoprostol arm raises a concern about the need for further study of adverse events, especially hemorrhage. Mifepristone is known to inhibit endometrial hemostasis (*i.e.*, arrest of bleeding),[78] as demonstrated by many reports of hemorrhage with transfusions reported to the FDA after use of mifepristone and misoprostol for elective abortions.[79]

Of additional concern is the vaginal route of administration of misoprostol. After reports of overwhelming sepsis following vaginal administration of misoprostol, Planned Parenthood changed the route of administration of misoprostol from vaginal to buccal,[80] with subsequent decrease in reported infections. Animal studies have demonstrated that both mifepristone[81] and misoprostol[82] can profoundly suppress innate immunity and the ability to fight infections.

---

[74] Hu M, Poder L, Filly R, *Impact of New Society of Radiologists in Ultrasound Early First-Trimester Diagnostic Criteria for Nonviable Pregnancy*, J Ultrasound Med 2014; 33:1585–1588.

[75] Schreiber, *supra* p. 2168.

[76] *Id.*

[77] *Id.* p. 2169.

[78] Miech RP, *Pathopharmacology of excessive hemorrhage in mifepristone abortions*, Ann Pharmacother 2007 Dec; 41(12):2002-7.

[79] Gary MM, Harrison DJ. "Analysis of severe adverse events related to the use of mifepristone as an abortifacient." Ann Pharmacother. 2006 Feb;40(2):191-7; Food and Drug Administration "Mifepristone U.S. Postmarketing Adverse Events Summary" 2011, https://www.minnpost.com/sites/default/files/attachments/Mifeprex_April2011_AEs.pdf.

[80] Fjerstad M, Trussell J, Sivin I, Lichtenberg ES, Cullins V, *Rates of Serious Infection after Changes in Regimens for Medical Abortion*, N Engl J Med 2009; 361:145-51.

[81] Sternberg EM, Hill JM, Chrousos GP, Kamilaris T, Listwak SJ, Gold PW, Wilder RL, *Inflammatory mediator-induced hypothalamic-pituitary-adrenal axis activation is defective in streptococcal cell wall arthritis-susceptible Lewis rats*, Proc Natl Acad Sci U S A. 1989 Apr;86(7):2374-8; Miech RP, *Pathophysiology of mifepristone-induced septic shock due to Clostridium sordellii*, Ann Pharmacother. 2005 Sep;39(9):1483-8. Epub 2005 Jul 26.

[82] Aronoff DM et al., *Misoprostol impairs female reproductive tract innate immunity against clostridium sordellii*, 180 J. Immunol. 8222-8230 (2008).

17

Despite the clear methodological errors, including a failure to accurately diagnose fetal death according to accepted criteria as well as lack of adherence to the stated inclusion criteria, and despite the absence of power to evaluate safety, abortion advocates are calling for the routine use of mifepristone to manage spontaneous miscarriages.[83] Any change in spontaneous miscarriage management with mifepristone should require an FDA New Drug Application (NDA) with two randomized controlled trials (RCTs) comparing the arms of mifepristone and misoprostol, misoprostol alone, surgical management, and expectant management. Without blinded RCTs to evaluate not only efficacy but also safety, it is premature to remove the REMS for Mifeprex to facilitate mifepristone access for spontaneous miscarriage management.

Despite the presence of serious risks and contraindications to the Mifeprex regimen, Gynuity, the University of California, San Francisco (UCSF), and other abortion advocates want the FDA to eliminate the remaining safeguards that were enacted to ensure the safety and efficacy of Mifeprex. They are pursuing their goals through publication, advocacy, litigation,[84] and/or controversial research enabled by FDA.[85]

Further, as Section II.B below explains, lifting the REMS is only the starting point for abortion advocates.

**B. Continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.**

1. Mifeprex should be dispensed only in clinics, medical offices, and hospitals.

The Mifeprex REMS requires that Mifeprex "be dispensed to patients only in clinics, medical offices and hospitals, by or under the supervision of a certified prescriber." That prescriber must be capable of assessing the duration of a pregnancy accurately, diagnosing ectopic pregnancies, and providing or referring for surgical intervention in cases of incomplete abortion or hemorrhaging.[86]

Abortion advocates, however, want the FDA to permit healthcare providers to prescribe Mifeprex to pregnant patients over the Internet or phone, with the drug available at pharmacies or through the mail, and through advance provision (*i.e.*, before a patient is pregnant). Eliminating or relaxing the REMS to facilitate Internet or telephone prescriptions would be dangerous to women and adolescent girls. Healthcare providers

---

[83] Molly Walker, *Mifepristone: Better for Managing Early Miscarriage*, Medpage Today, (June 6, 2018), https://www.medpagetoday.com/obgyn/pregnancy/73336.
[84] *Chelius v. Azar*. CIV. NO. 1:17-cv-00493-DKW-KSC (Dist. Ct. HI 2018).
[85] See Section II.B, below.
[86] Mifeprex Risk Evaluation and Mitigation Strategy (REMS), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_REMS_full.pdf.

prescribing abortion-inducing drugs over the Internet or phone or before a patient is even pregnant cannot adequately evaluate patients for contraindications to the drugs.[87] Further, as discussed above, Rh-negative patients must be administered Rhogam in order to prevent Rh isoimmunization in subsequent pregnancies. Without direct patient contact, women will not receive the Rhogam after the abortion, greatly increasing their risk of subsequent Rh isoimmunization, which can endanger future pregnancies.[88] [See Section I.B.2, *supra*.]

Telemedicine abortion further distances women from the practitioners responsible for caring for them, and approval by FDA would further absolve abortion providers of responsibility for the well-being of their patients. Promoting telemedicine abortion to women and adolescent girls in rural areas with limited access to healthcare is extremely dangerous—they will have little recourse if they face known and predictable emergency complications such as severe hemorrhage.[89]

Nonetheless, Gynuity Health Projects and researchers from UCSF obtained approval from FDA through Investigational New Drug Applications (INDs) to conduct studies that *do not* comply with the Mifeprex REMS. They will use the results of these studies to press for the elimination of the Mifeprex REMS.

### a.  The "TelAbortion" Direct-to-Consumer Mifeprex Study

Gynuity Health Projects is the sponsor of the study "Feasibility of Medical Abortion by Direct-to-Consumer Telemedicine."[90] Gynuity filed an IND with the FDA.[91] The status is listed as "recruiting," with age eligibility that includes 11-year-old children and an estimated enrollment of 1,000 participants at five locations.[92] The start date is listed as March 22, 2016, and the estimated completion date was extended from June 2018 to June 2019.

The study's brief summary states: "This pilot study is designed to obtain preliminary data on the safety, acceptability, and feasibility of direct-to-consumer telemedicine

---

[87] Harrison & Norton Testimony, p. 2.
[88] ACOG Practice Bulletin 181: *Prevention of Rh D Alloimmunization* (Aug. 2017); and SOGC Clinical Practice Guidelines: *Prevention of Rh Alloimmunization* (No. 133, Sept. 2003).
[89] Harrison & Norton Testimony, p. 9.
[90] (NCT02513043), https://www.clinicaltrials.gov/ct2/show/NCT02513043?term=NCT02513043&rank=1.
[91] Raymond EG, Chong E, & Hyland P, *Increasing Access to Abortion with Telemedicine*, JAMA Internal Medicine Vol. 176, N. 5 (May 2016).
[92] Hawaii – University of Hawaii Women's Options Center; Maine – Maine Family Planning; New York – Choices Women's Medical Center (active, but not recruiting according to ClinicalTrials.gov, and not listed on TelAbortion.org); Oregon and Washington – Planned Parenthood Columbia Willamette; Oregon Health and Sciences University Women's Health Research Unit. Washington State patients may also participate because an Oregon abortion provider is also licensed in Washington State. Claire Lampen, *Webcam Abortion Services Offer Crucial Access—So What's Stopping them?* Gizmodo (Apr. 17, 2018).

abortion."[93] The study's website states that "[a] TelAbortion involves all the same steps and procedures as a regular medical abortion, but you do them without going into an abortion clinic."[94]

Women who participate in the study have a video "evaluation" with the study abortion provider over the Internet, during which they can ask questions, provide medical history, and learn about the pre-abortion tests that they need. They also electronically sign consent forms for the study. Afterwards, they are required to obtain the tests and direct the reports to be sent to the study provider.

Once a patient is determined eligible, the study provider will send her a package containing Mifeprex and misoprostol, with instructions that she must follow on her own. She is also instructed to have additional tests to verify that the abortion is complete, and later have another consultation with the study provider to review the results.[95]

Obviously, a woman may *not* take the abortion drugs in the manner prescribed, nor obtain the follow-up care that is recommended. With a doctor-patient relationship limited to online chats, she has virtually no accountability or support as she navigates a complicated procedure. The responsibility of the provider of the drugs to follow up with the patient is obviated as well.

### b. The Mifeprex through Pharmacy Dispensing Study

The University of California, San Francisco (UCSF) is the sponsor of the "Alternative Provision of Medication Abortion via Pharmacy Dispensing" study.[96] Daniel Grossman, M.D., with UCSF is listed as the study's "responsible party."[97] Like Gynuity, UCSF filed an IND with the FDA to obtain authorization for this study.[98] The status is listed as "recruiting," with July 2019 as the estimated completion date. The sponsors plan to recruit 300 patients at four study clinic sites and survey 50 pharmacists at associated study pharmacy sites.[99]

---

[93] NCT02513043, https://www.clinicaltrials.gov/ct2/show/NCT02513043?term=NCT02513043&rank=1.
[94] TelAbortion: The Telemedicine Abortion Study: FAQs, http://telabortion.org/faq/.
[95] *Id.*
[96] NCT03320057, https://www.clinicaltrials.gov/ct2/show/NCT03320057?term=NCT03320057&rank=1; Daniel Grossman, MD, Research Protocol: *Alternative Provision of Medication Abortion via Pharmacy Dispensing*, Version #:1.3 (JUL. 17, 2018) p. 5.
[97] *Id.*
[98] In a May 2018 phone conversation with a contact for the UCSF study, she stated that the study was approved through an IND application with FDA.
[99] Grossman, pp. 5-7; 16-17.

App. 000625

The stated aim of the study is to "investigate the feasibility, acceptability, and effectiveness of pharmacy dispensing of Mifeprex; safety data will also be collected. . . . *The results of this study eventually could lead to changes in the Mifeprex REMS. . . .*"[100]

The sponsors intend to measure "pharmacist satisfaction with dispensing Mifeprex and the proportion of pharmacists who refuse to dispense the medication to patients." They secondarily intend to assess patient satisfaction, describe clinical outcomes, including effectiveness and adverse events, and compare pharmacists' knowledge about medication abortion before and after.[101]

Patients enroll at one of the study clinic sites on Day 1, where they choose medication abortion, have an ultrasound if one has not been done, and obtain pre-abortion counseling. They then are prescribed Mifeprex, misoprostol, and anything else necessary to be filled at the associated study pharmacy site.[102] Some patients have serum hCG measured on the day of Mifeprex administration and again around eight days later "to assess for completion of the abortion."[103] The "follow-up" for patients "may include a follow-up visit or a phone call from clinic staff approximately 7-14 days after the initial visit."[104] However, as discussed extensively above, a clinician needs to perform an exam to rule out retained tissue—even if the patient has a negative serum hCG. A phone call that "may" be placed, or fail to connect, is not enough.

Notably, "[a]ll except one of [the participating] pharmacies is [sic] located within the same building as the clinic…."[105] While UCSF is using a community pharmacy not affiliated with the University, the other three study clinic sites are using affiliated pharmacies.[106]

---

[100] Grossman, p.14 (emphasis added). The sponsors dubiously assert that "pharmacy dispensing could [] help increase the number of clinicians willing and able to provide medication abortion by enabling them to avoid the associated costs and logistical challenges of stocking and dispensing the medication at their facilities." They reference a survey of Fellows of the American College of Obstetricians and Gynecologists that sought to determine if doctors not presently practicing abortion would prescribe Mifeprex if their patients could obtain the drug at a pharmacy. Fifty-four percent responded to the survey. Seventy-seven percent of respondents *do not* perform abortions and nine percent perform surgical abortions only—of those, 19% said they would prescribe Mifeprex if it could be obtained at a pharmacy, and an additional 18% said they were unsure. Based on this, the sponsors claim "the proportion of obstetrician-gynecologists providing [Mifeprex] would at least double (from 14% to 29%) "if the dispensing restriction in the REMS were removed and physicians could write a prescription for Mifeprex that could be dispensed at a pharmacy." The fact that 46 percent of the fellows surveyed did not take the time to respond, however, places this conclusion in doubt. *See* Grossman, pp. 12-14.

[101] Grossman, pp. 15-16.

[102] Grossman, p. 23.

[103] Grossman, p. 23.

[104] Grossman, p. 24.

[105] Grossman, p. 20.

[106] Grossman, pp 16-17.

While the rationale for the study states that pharmacy dispensing of Mifeprex could "help facilitate provision of medication abortion through telemedicine,"[107] the sponsors emphasize that the only difference between this study and FDA protocol "is that the patient would obtain the mifepristone directly from the pharmacist, rather than in a clinic facility."[108] In fact, the schedules for the participating pharmacists are "mapped" to "ensure that trained pharmacists are available to dispense to study participants during business hours."[109]

The following demonstrates the extensive assistance that the sponsors offer patients in obtaining the drugs from the participating pharmacies:

> [The patient] will be told that only a limited number of pharmacies are able to dispense Mifeprex and given information about how to get to the participating pharmacy (as well as the hours during which a participating pharmacist will be working, if needed). If there are any gaps in staffing at the pharmacy, the patient will be notified of the timing of those gaps in coverage before leaving the clinic via the pharmacy directions/handout. If this will be an issue for the patient, a solution will be found at the clinic before the patient leaves or she will not be enrolled in the study. Patients will be told that if they have any problems accessing the medications at the clinic, they should come back to the clinic [where they can obtain Mifeprex].[110]

While this assistance may ensure that the study does not deviate dramatically from FDA protocol, the study *certainly* does not model the experience a patient would have outside of this controlled environment—particularly a patient who obtains Mifeprex through telemedicine and has no physical contact with her prescriber.

The physical proximity of the study pharmacy sites to the study clinic sites, the probable professional associations between participating doctors and pharmacists, and the extensive assistance offered by the clinics to ensure that patients access abortion-inducing drugs at participating pharmacies, raise questions as to whether the study is fundamentally biased and will inaccurately forecast widespread behavior and experiences if the REMS is removed. Therefore, any results of the study cannot provide a justification for permitting pharmacy distribution of Mifeprex, much less abortion through telemedicine.

---

[107] Grossman, p. 6.
[108] Grossman, p. 6.
[109] Grossman, p. 18.
[110] Grossman, pp. 19-20.

App. 000627

Further, as discussed below, eliminating the REMS to enable pharmacy dispensing of Mifeprex is only the beginning of a long-term strategy to achieve over-the-counter status for Mifeprex, further diminishing patient care and abortion provider accountability.

### c. Beyond the Current Studies

A recent article by Dr. Grossman and colleagues reveals that they want Mifeprex access extended even beyond the parameters contained in their Pharmacy Dispensing study. They used an online survey to gauge women's "personal interest in and general support for three alternative methods for accessing abortion pills: (1) in advance from a doctor for future use, (2) over-the-counter (OTC) from a drugstore and (3) online without a prescription."[111]

None of the options in the survey require a healthcare provider to provide patient care comparable to even the *inadequate* care provided in the two studies discussed above. Only the first option requires a prescription from a doctor; however, the doctor would not know in advance when his patient actually becomes pregnant and chooses to use the drugs. The survey disingenuously stated that "[m]edication abortion, or the abortion pill, is a safe and effective way to terminate a pregnancy up to 10 weeks," without informing participants of a single risk associated with the regimen.[112]

Further, in a November, 21, 2018 op-ed, Dr. Grossman advocated for providing abortion pills before women are pregnant. He stated:

> The idea is simple: Give women abortion pills *before* they need them – "advance provision," as it's known – so that they can take them as soon as they discover a pregnancy. Women could get the pills from their gynecologist at the time of their annual exam, say, or the pills could be made available online.[113]

Incredibly, Dr. Grossman stated that he has "few medical concerns about handing out abortion pills in advance."[114] He asserts that evidence from advance provision research "could strengthen the case for making [abortion-inducing drugs] available without a prescription."[115]

---

[111] Biggs MA, et al, *Support for and interest in alternative models of medication abortion provision among a national probability sample of U.S. women,* Contraception (2018), https://doi.org/10.1016/j.contraception.2018.10.007.

[112] *See id.*

[113] Daniel Grossman, *American women should have access to abortion pills before they need them*, Los Angeles Times (Nov. 21, 2018).

[114] *Id.*

[115] *Id.*

App. 000628

In addition to his failure to address all of the dangers posed by abortion-inducing drugs, Dr. Grossman does not acknowledge the risk that women will share their abortion-inducing pills with other women. While an abortion provider may screen his patient for contraindications to Mifeprex, nothing will stop his patient from giving her stored Mifeprex to a friend who is unaware that she is Rh negative, for instance, which poses health risks for future pregnancies (See section I.B.2, *supra*).

In fact, Dr. Grossman's research program has listed a study titled "Alternative Provision of Medication Abortion Via Advance Provision" on ClinicalTrials.gov, with May 2019 listed as the estimated study start date.[116] In the study, patients who are "at risk of unintended pregnancy and with a desire to avoid pregnancy will be assessed by a clinician and provided counseling on pregnancy recognition and testing, as well as how to administer [drug-induced abortion] at home." They will then receive Mifeprex and misoprostol while *not* pregnant. If/when the patient becomes pregnant and wants to take the drugs, she is instructed to contact a study clinician for an "over-the-phone assessment of eligibility" for drug-induced abortion, "including evaluation of contraindications and gestational age" before taking the drugs, and "then attend a follow-up visit with the clinician."[117] However, it is impossible for the study sponsors to truly assess the patient for contraindications, verify gestational age, prevent patients from sharing the drugs with others, or ensure that patients attend a follow-up visit.

In a 2018 Policy Review, the Guttmacher Institute also advocated for lifting the Mifeprex REMS. However, the article did not stop there. The author argues:

> [w]hile lifting the REMS on mifepristone would open new possibilities for medication abortion access, stopping there would fall short of realizing the full potential of this method, particularly when it comes to self-managed abortion care. In a self-management model, anyone who needs to terminate a pregnancy would be able to legally access mifepristone and misoprostol without a requirement to see a health care provider or pharmacist first. . . . To fully integrate self-managed medication abortion with existing abortion practices in the United States, misoprostol and mifepristone must first become available without a prescription.[118]

These recent publications demonstrate how abortion advocates will continue to pressure FDA to eliminate the REMS and move towards over-the-counter access for Mifeprex. In spite of the serious risks and contraindications to the Mifeprex regimen, abortion advocates will not rest until Mifeprex is available to all, without a prescription

---

[116] NCT03829696, https://clinicaltrials.gov/ct2/show/NCT03829696?term=NCT03829696&rank=1.
[117] *Id.*
[118] Donovan MK, *Self-Managed Medication Abortion: Expanding the Available Options for U.S. Abortion Care*, Guttmacher Policy Review, vol. 21 (2018).

or mandatory medical management of any kind. The FDA's vigilance in protecting women from such negligence is critically important.

### 2.  Mifeprex Prescribers Should be Certified.

The 2016 regimen requires Mifeprex prescribers to be certified as qualified. This is simply common sense—only healthcare providers qualified to prescribe an abortion-inducing drug should do so. The prescriber form attests that the healthcare provider must be able to assess pregnancy duration, diagnose ectopic pregnancy, and provide or refer for surgical intervention if necessary.

Given that drug-induced abortion is contraindicated beyond 10 weeks' gestation and when the pregnancy is not in the uterus, and that *at least* 1 out of 100 women using Mifeprex need surgery,[119] these qualifications are entirely logical. Yet, abortion advocates, ignoring the best interests of their patients, claim such restrictions are onerous.[120]

CONCLUSION

The Mifeprex REMS with ETASU remains critical for patient safety. Mifeprex carries risks of life-threatening hemorrhage, infection, continued pregnancy, retained tissue, need for emergency surgery, and death. The 2000 regimen provided significantly more protections for patients than the 2016 regimen. FDA should restore and strengthen elements of the Mifeprex regimen and provider requirements, including: limiting Mifeprex use to 49 days' gestation; requiring that Mifeprex be administered only by or under the supervision of a physically present physician; requiring three office visits by a patient who has been prescribed Mifeprex; clarifying that Mifeprex use is contraindicated for patients who do not have convenient access to emergency medical care; expanding mandatory adverse event reporting; and requiring additional studies of Mifeprex use in at-risk populations.

At the very least, FDA should not further erode patient protections. The agency should retain the Mifeprex REMS, and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

---

[119] Mifeprex Risk Evaluation and Mitigation Strategy (REMS),
https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2016-03-29_REMS_full.pdf.
[120] Mifeprex REMS Study Group, *Sixteen Years of Overregulation: Time to Unburden Mifeprex*, N Engl. J. Med. 376;8 (Feb. 23, 2017).

App. 000630

### C. Environmental Impact

This petition is categorically excluded under 21 C.F.R. § 25.30.

### D. Economic Impact

Available upon Commissioner's request, pursuant to 21 C.F.R. §10.30(3).

### E. Certification

The undersigned certify, that, to the best knowledge and belief of the undersigned, this petition includes all information and views on which the petition relies, and that it includes representative data and information known to the petitioners, which are unfavorable to the petition.

**Signature:** /s/ Donna J. Harrison M.D., Executive Director

**Name of petitioner:** American Association of Pro-Life Obstetricians and Gynecologists

**Mailing address:** PO Box 395, Eau Claire, MI 49111-0395

**Telephone number:** (202) 230-0997

**Signature:** /s/ Quentin L. Van Meter, M.D., FCP, President

**Name of petitioner:** American College of Pediatricians

**Mailing address:** PO Box 357190, Gainesville, FL 32635-7190

**Telephone number:** (352) 376-1877

App. 000631

# EXHIBIT 30

# 2019 FDA ANDA Approval Letter to GenBioPro

ANDA 091178

**ANDA APPROVAL**

GenBioPro, Inc.

Attention:

Dear Sir:

This letter is in reference to your abbreviated new drug application (ANDA) received for review on February 3, 2009, submitted pursuant to section 505(j) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) for Mifepristone Tablets, 200 mg.

Reference is also made to the complete response letter issued by this office on February 23, 2018, and to any amendments thereafter.

We have completed the review of this ANDA and have concluded that adequate information has been presented to demonstrate that the drug is safe and effective for use as recommended in the submitted labeling. Accordingly, the ANDA is **approved**, effective on the date of this letter. The _____ has determined your Mifepristone Tablets, 200 mg, to be bioequivalent and, therefore, therapeutically equivalent to the reference listed drug (RLD), Mifeprex Tablets, 200 mg, of Danco Laboratories, LLC.

Under section 506A of the FD&C Act, certain changes in the conditions described in this ANDA require an approved supplemental application before the change may be made.

**RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS**

Section 505-1 of the FD&C Act authorizes FDA to require the submission of a risk evaluation and mitigation strategy (REMS), if FDA determines that such a strategy is necessary to ensure that the benefits of the drug outweigh the risks [section 505-1(a)]. In accordance with section 505-1(i) of the FD&C Act, a drug that is the subject of an ANDA under section 505(j) is subject to certain elements of the REMS required for the applicable listed drug.

The details of the REMS requirements were outlined in our letter dated June 15, 2011. In that letter, you were also notified that pursuant to section 505-1(i) of the FD&C Act, a drug that is the subject of an ANDA and the listed drug it references must use a single, shared system for elements to assure safe use (ETASU), unless FDA waives that requirement.

Your REMS, known as the Mifepristone REMS Program, submitted on May 30, 2017; is approved, and will be posted on the FDA REMS website: http://www.fda.gov/rems

The REMS consists of ETASU and an implementation system.

ANDA 091178
Page 2

Your REMS must be fully operational before you introduce Mifepristone Tablets, 200 mg, into interstate commerce.

The Mifepristone REMS uses a single, shared system for the ETASU. This single, shared system REMS Program currently includes the products listed on the FDA REMS website, available at http://www.fda.gov/rems.  Other products may be added in the future if additional NDAs or ANDAs are approved.

Under section 505-1(g)(2)(C) of the FD&C Act, FDA can require the submission of a REMS assessment if FDA determines an assessment is needed to evaluate whether the REMS should be modified to ensure the benefits of the drug outweigh the risks or to minimize the burden on the healthcare delivery system of complying with the REMS.

We remind you that you must include an adequate rationale to support a proposed REMS modification for the addition, modification, or removal of any goal or element of the REMS, as described in section 505-1(g)(4) of the FD&C Act.

We also remind you that section 505-1(f)(8) of the FD&C Act prohibits holders of an approved covered application from using any element to assure safe use to block or delay approval of an application under section 505(b)(2) or (j). A violation of this provision in 505-1(f) could result in enforcement action.

Prominently identify any submission containing a REMS assessment or proposed modifications of the REMS with the following wording in bold capital letters at the top of the first page of the submission as appropriate:

> **ANDA 091178 REMS ASSESSMENT**
>
> **NEW SUPPLEMENT FOR ANDA 091178/S-000**
> **CHANGES BEING EFFECTED IN 30 DAYS**
> **PROPOSED MINOR REMS MODIFICATION**
>
> ***or***
>
> **NEW SUPPLEMENT FOR ANDA 091178/S-000**
> **PRIOR APPROVAL SUPPLEMENT**
> **PROPOSED MAJOR REMS MODIFICATION**
>
> ***or***
>
> **NEW SUPPLEMENT FOR ANDA 091178/S-000**
> **PRIOR APPROVAL SUPPLEMENT**
> **PROPOSED REMS MODIFICATIONS DUE TO SAFETY LABELING CHANGES**
> **SUBMITTED IN SUPPLEMENT XXX**

Should you choose to submit a REMS revision, prominently identify the submission containing the REMS revisions with the following wording in bold capital letters at the top of the first page of the submission:

ANDA 091178
Page 3

### REMS REVISION FOR ANDA 091178

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, are only in PDF format, they may be submitted as such, but the preference is to include as many as possible in Word format.

## SUBMISSION OF REMS DOCUMENT IN SPL FORMAT

In addition to submitting the proposed REMS as described above, you can also submit the REMS document in Structured Product Labeling (SPL) format.  If you intend to submit the REMS document in SPL format, include the SPL file with your proposed REMS submission.

For more information on submitting REMS in SPL format, please email REMSWebsite@fda.hhs.gov

## REPORTING REQUIREMENTS

Postmarketing reporting requirements for this ANDA are set forth in 21 CFR 314.80-81 and 314.98 and at section 506I of the FD&C Act.  The Agency should be advised of any change in the marketing status of this drug or if this drug will not be available for sale after approval.  In particular, under section 506I(b) of the FD&C Act, you are required to notify the Agency in writing within 180 days from the date of this letter if this drug will not be available for sale within 180 days from the date of approval.  As part of such written notification, you must include (1) the identity of the drug by established name and proprietary name (if any); (2) the ANDA number; (3) the strength of the drug; (4) the date on which the drug will be available for sale, if known; and (5) the reason for not marketing the drug after approval.

## PROMOTIONAL MATERIALS

You may request advisory comments on proposed introductory advertising and promotional labeling materials prior to publication or dissemination.  Please note that these submissions are voluntary.  To do so, submit, in triplicate, a cover letter requesting advisory comments, the proposed materials in draft or mock-up form with annotated references, and the package insert (PI), Medication Guide, and patient PI (as applicable) to:

> OPDP Regulatory Project Manager
> Food and Drug Administration
> Center for Drug Evaluation and Research
> Office of Prescription Drug Promotion
> 5901-B Ammendale Road
> Beltsville, MD 20705

Alternatively, you may submit a request for advisory comments electronically in eCTD format.  For more information about submitting promotional materials in eCTD format, see the draft Guidance for Industry (available at: http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM443702.pdf).

ANDA 091178
Page 4

You must also submit final promotional materials and package insert(s), accompanied by a Form FDA 2253, at the time of initial dissemination or publication [21 CFR 314.81(b)(3)(i)]. Form FDA 2253 is available at http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM083570.pdf. Information and Instructions for completing the form can be found at http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM375154.pdf.  For more information about submission of promotional materials to the Office of Prescription Drug Promotion (OPDP), see http://www.fda.gov/AboutFDA/CentersOffices/CDER/ucm090142.htm.

## ANNUAL FACILITY FEES

The Generic Drug User Fee Amendments of 2012 (GDUFA) (Public Law 112-144, Title III) established certain provisions[1] with respect to self-identification of facilities and payment of annual facility fees.  Your ANDA identifies at least one facility that is subject to the self-identification requirement and payment of an annual facility fee.  Self-identification must occur by June 1st of each year for the next fiscal year.  Facility fees must be paid each year by the date specified in the *Federal Register* notice announcing facility fee amounts.

All finished dosage forms (FDFs) or active pharmaceutical ingredients (APIs) manufactured in a facility that has not met its obligations to self-identify or to pay fees when they are due will be deemed misbranded.  This means that it will be a violation of federal law to ship these products in interstate commerce or to import them into the United States.  Such violations can result in prosecution of those responsible, injunctions, or seizures of misbranded products.  Products misbranded because of failure to self-identify or pay facility fees are subject to being denied entry into the United States.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

ANDA 091178
Page 5

## <u>CONTENT OF LABELING</u>

As soon as possible, but no later than 14 days from the date of this letter, submit, using the FDA automated drug registration and listing system (eLIST), the content of labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format, as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm, that is identical in content to the approved labeling (including the package insert, and any patient package insert and/or Medication Guide that may be required). Information on submitting SPL files using eLIST may be found in the guidance for industry titled "SPL Standard for Content of Labeling Technical Qs and As" at http://www.fda.gov/downloads/DrugsGuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf. The SPL will be accessible via publicly available labeling repositories.

Sincerely yours,

*{See appended electronic signature page}*

(b) (6)

Center for Drug Evaluation and Research

---

1   Some of these provisions were amended by the Generic Drug User Fee Amendments of 2017 (GDUFA II) (Public Law 115-52, Title III).

(b) (6)

Digitally signed by (b) (6)
Date: 4/11/2019 02:22:21PM
GUID: 54078879000a1b9e15dd31ed6f0343ca

# EXHIBIT 31

# Letter from ACOG and SMFM to FDA (April 2020)


The American College of
Obstetricians and Gynecologists
WOMEN'S HEALTH CARE PHYSICIANS


Society for
Maternal·Fetal
Medicine
High-risk pregnancy experts

April 20, 2020

Stephen M. Hahn, M.D.
Commissioner
U.S. Food and Drug Administration
10903 New Hampshire Avenue NW
Silver Spring, MD 20993

Re: Docket Number: FDA-2020-D-1106; Policy for Certain REMS Requirements During the COVID-19
Public Health Emergency Guidance for Industry and Health Care Professionals

Dear Commissioner Hahn:

On behalf of more than 60,000 of the nation's primary care obstetrician-gynecologists and subspecialty
and high-risk obstetric practitioners dedicated to advancing women's health, thank you for your recent
action to suspend enforcement of Risk Evaluation and Mitigation Strategy (REMS) requirements for
certain drugs with laboratory testing or imaging requirements for the duration of the COVID-19 public
health emergency. The American College of Obstetricians and Gynecologists and the Society for
Maternal-Fetal Medicine urge the U.S. Food and Drug Administration (FDA) to immediately expand this
policy to REMS and Elements to Assure Safe Use (ETASU) requirements for certain prescription drugs
requiring in-person health care professional administration, where treatment could safely occur through
telehealth or self-administration. In addition, physicians who provide such services in accordance with
current clinical guidelines during this pandemic should not be held liable.

Obstetrician-gynecologists are serving on the front lines responding to the COVID-19 crisis. In order to
provide the safest care for their patients and themselves, in-person visits are limited to emergency and
essential physically necessary visits. We support the FDA's acknowledgment that REMS-required health
care professional in-person dispensation is difficult because patients may need to avoid public places and
patients suspected of having COVID-19 may be self-isolating and/or subject to quarantine. Under these
circumstances, undergoing in-person clinic administration in order to obtain a drug subject to a REMS
can put patients and others, including health care professionals and their families, at risk for COVID-19
transmission. As referenced in ACOG Committee Opinion #798, *Implementing Telehealth in Practice*,
evidence suggests that telehealth provides comparable health outcomes when compared with traditional
methods of health care delivery without compromising the patient–physician relationship.[1] Telehealth has
quickly become integrated into nearly every aspect of obstetrics and gynecology. During this pandemic, it
is essential to use telehealth services to limit COVID-19 transmission.

It is critical that the FDA promptly expand its recent policy to apply to the REMS and ETASU
requirements for certain drugs requiring in-person dispensation, especially mifepristone. The current
REMS and ETASU requirements for mifepristone are outdated and serve as a barrier to accessing this
safe, effective medication. Further, they cause unnecessary delays in obtaining time-sensitive health care,
without supporting improvements to patient safety or outcomes. During this federally declared public
health emergency, these antiquated and superfluous requirements put patients and their physicians at risk,
with no demonstrated benefit. As noted in the ACOG Position Statement, *Improving Access to*

*Mifepristone for Reproductive Health Indications*, mifepristone has been used by over 3 million women in the United States since FDA approval in 2000 and strong evidence exists regarding the safety of mifepristone for medication-induced abortion and medical management of early pregnancy loss.[2,3,4,5]

Restricting access to mifepristone interferes with the ability of obstetrician–gynecologists and other women's health clinicians to deliver the highest quality care for their patients, especially during the COVID-19 pandemic. Abortion is an essential component of comprehensive health care and is a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks or potentially make it completely inaccessible.[6] Temporarily waiving REMS and ETASU requirements that certain drugs be dispensed in-person by certain medical professionals is particularly important for patients who suffer from other medical conditions and are at higher risk of serious complications from COVID-19, as well as those in rural areas for whom hours of travel for in-person administration would disallow social distancing recommendations and travel advisories.

In addition, we urge you to consider waiving the requirement for health care professional administration of subcutaneous depot medroxyprogesterone acetate (DMPA). Several studies have shown patient interest in self-administration and increased continuation of DMPA via subcutaneous at-home delivery.[7,8,9] In a period when limiting patient interactions with the health care system is essential to prevent COVID-19 transmission, it is in our patients' best interest to have unencumbered access to the contraceptive method of their choice, including DMPA.

Ensuring the safety of patients and physicians during the COVID-19 pandemic requires policy changes such as those already enacted by FDA to waive the REMS requirements for certain drugs with laboratory testing or imaging requirements. We strongly urge FDA to further protect patients and their health care professionals from the risk of transmission by promptly expanding the existing policy to waive REMS and ETASU requirements that certain drugs be dispensed in-person by certain medical professionals. Thank you for your consideration. We are available to answer any questions you may have regarding these issues.

Sincerely,

Maureen G. Phipps, MD, MPH, FACOG
Chief Executive Officer
American College of Obstetricians and
Gynecologists

Judette Louis, MD, MPH
President
Society for Maternal-Fetal Medicine

Matt J. Granato, LL.M., MBA
Chief Executive Officer
Society for Maternal-Fetal Medicine

App. 000641

[1] Implementing telehealth in practice. ACOG Committee Opinion No. 798. American College of Obstetricians and Gynecologists. Obstet Gynecol 2020;135:e73–9.

[2] Improving Access to Mifepristone for Reproductive Health Indications. Position Statement. American College of Obstetricians and Gynecologists. June 2018. Available at https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications.

[3] Cleland K, Smith N. Aligning mifepristone regulation with evidence: Driving policy change using 15 years of excellent safety data. *Contraception*. 2015;92(3):179-181. doi:10.1016/j.contraception.2015.06.016.

[4] Sixteen Years of Overregulation: Time to Unburden Mifeprex. *N Engl J Med*. 2017;376(8):790-794.

[5] Song LP, Tang SY, Li CL, Zhou LJGYK, Mo XT. Early medical abortion with self-administered low-dose mifepristone in combination with misoprostol. *J Obstet Gynaecol Res*. 2018;44(9):1705-1711. doi:10.1111/jog.13716.

[6] Joint Statement on Abortion Access During the COVID-19 Outbreak. March 18, 2020. Available at https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

[7] Upadhyay UD, Zlidar VM, Foster DG. Interest in self-administration of subcutaneous depot medroxyprogesterone acetate in the United States. *Contraception*. 2016;94(4):303-313. doi:10.1016/j.contraception.2016.06.006.

[8] Kohn JE, Simons HR, Della Badia L, et al. Increased 1-year continuation of DMPA among women randomized to self-administration: results from a randomized controlled trial at Planned Parenthood. *Contraception*. 2018;97(3):198-204. doi:10.1016/j.contraception.2017.11.009.

[9] Burke HM, Chen M, Buluzi M, et al. Effect of self-administration versus provider-administered injection of subcutaneous depot medroxyprogesterone acetate on continuation rates in Malawi: a randomised controlled trial. *Lancet Glob Heal*. 2018;6(5):e568-e578. doi:10.1016/S2214-109X(18)30061-5.

# EXHIBIT 32

# 2021 FDA Letter to ACOG and SMFM About Mifepristone REMS

App. 000643



April 12, 2021

Maureen G. Phipps, MD, MPH, FACOG
Chief Executive Officer
American College of Obstetricians and Gynecologists
c/o    Rachel Tetlow, Federal Affairs Director
        rtetlow@acog.org

        Skye Perryman, General Counsel
        sperryman@acog.org

William Grobman, MD, MBA
President
Society for Maternal-Fetal Medicine
w-grobman@northwestern.edu

Dear Drs. Phipps and Grobman,

In your letter of April 20, 2020, to former Commissioner Stephen Hahn, you expressed concerns about the in-person dispensing requirements for certain prescription drugs during the current public health emergency.  In my letter to you of March 19, 2021, I indicated that staff in the Food and Drug Administration's (FDA) Center for Drug Evaluation and Research (CDER) were evaluating the issues you raised.

Following up on my March 19, 2021, letter I am writing to report the results of CDER's review and analysis.

CDER conducted a literature search for studies pertinent to the in-person dispensing requirement in the Mifepristone REMS Program during the COVID-19 pandemic.  Based on this literature search, CDER identified four publications that included relevant clinical outcome data.[1]  CDER

---

[1] Chong E, et al. Expansion of a Direct-to-Patient Telemedicine Abortion Service in the United States and Experience during the COVID-19 Pandemic. Contraception 2021 (accepted manuscript). https://www.sciencedirect.com/science/article/pii/S0010782421000913; Kerestes C, et al. Provision of medication abortion in Hawai'i during COVID-19: Practical experience with multiple care delivery models. Contraception 2021 (accepted manuscript). https://doi.org/10.1016/j.contraception.2021.03.025; Aiken A et al. Effectiveness, Safety and Acceptability of No-test Medical Abortion Provided Via Telemedicine: a National Cohort Study. British J Obstet Gynecol 2021. https://obgyn.onlinelibrary.wiley.com/doi/10.1111/1471-0528.16668; Reynolds-Wright JJ et al. Telemedicine medical abortion at home under 12 weeks' gestation: a prospective observational cohort study during the COVID-19 pandemic.  BMJ Sex Reprod Health 2021. https://srh.bmj.com/content/early/2021/02/04/bmjsrh-2020-200976

found that although there are limitations to the study designs, the overall findings from these studies do not appear to show increases in serious safety concerns (such as hemorrhage, ectopic pregnancy, or surgical interventions) occurring with medical abortion as a result of modifying the in-person dispensing requirement during the COVID-19 pandemic.

CDER also reviewed postmarketing adverse events that reportedly occurred from January 27, 2020 - January 12, 2021, with mifepristone use for medical termination of early pregnancy, along with available information about deviations or noncompliance events associated with the Mifepristone REMS Program.[2]  CDER found that the small number of adverse events reported to FDA during the COVID-19 public health emergency (PHE) provide no indication that any program deviation or noncompliance with the Mifepristone REMS Program contributed to the reported adverse events.

In summary, provided the other requirements of the Mifepristone REMS Program are met, and given that the in-person dispensing of mifepristone for medical termination of early pregnancy may present additional COVID-related risks to patients and healthcare personnel because it may involve a clinic visit solely for this purpose, CDER intends to exercise enforcement discretion during the COVID-19 PHE with respect to the in-person dispensing requirement of the Mifepristone REMS Program, including any in-person requirements that may be related to the Patient Agreement Form.  Further, to the extent all of the other requirements of the Mifepristone REMS Program are met, CDER intends to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of mifepristone through the mail either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

CDER is communicating this decision to the approved application holders subject to the Mifepristone REMS Program.

Sincerely yours,

Janet Woodcock, M.D.
Acting Commissioner of Food and Drugs

---

[2] See Mifepristone REMS Program at
https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390.  CDER's analysis covers both products that are subject to the Mifepristone REMS Program (Mifeprex and the approved generic, Mifepristone Tablets, 200 mg).

# EXHIBIT 33

# 2021 FDA Letter to Dr. Graham Chelius



**Center for Drug Evaluation and Research**          **Food and Drug Administration**

December 16, 2021

Graham Chelius, M.D.
The Society of Family Planning
The California Academy of Family Physicians

Dear Dr. Chelius:

This letter is to inform you that FDA has completed its review of the Mifepristone Risk Evaluation and Mitigation System (REMS) Program.[1]  The agency has determined that the Mifepristone REMS Program continues to be necessary to ensure that the benefits of the drug outweigh the risks.  However, we have determined that it must be modified to minimize the burden on the health care delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks.  See 21 USC 355-1(g)(4)(B).  The modifications to the REMS will consist of: (1) removing the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement"); and (2) adding a requirement that pharmacies that dispense the drug be specially certified.

A REMS Modification Notification letter has been sent to both Applicants subject to the Mifepristone REMS Program.  The letter describes the modifications and directs the Applicants to submit prior approval supplements within 120 days.  We have also answered a related citizen petition from the American Association of Pro-Life Obstetricians and Gynecologists and the American College of Pediatricians.  That response will be posted in the public docket (Docket No. FDA-2019-P-1534; available at www.regulations.gov).

Sincerely,

Patrizia A.
Cavazzoni -S
Digitally signed by Patrizia A.
Cavazzoni -S
Date: 2021.12.16 15:05:01 -05'00'

Patrizia Cavazzoni, M.D.
Director
Center for Drug Evaluation and Research

---

[1] We also note your letter of September 29, 2021 to us on this subject.

App. 000647

**EXHIBIT 34**

**FDA Letter denying in part and granting in part 2016 Citizens Petition**



Donna J. Harrison, M.D.
Executive Director
American Association of Pro-Life Obstetricians and Gynecologists
P.O. Box 395
Eau Claire, MI  49111-0395

Quentin L. Van Meter, M.D., FCP
President
American College of Pediatricians
P.O. Box 357190
Gainesville, FL 32635-7190

December 16, 2021

Re:  Docket No. FDA-2019-P-1534

Dear Drs. Harrison and Van Meter:

This letter responds to your citizen petition submitted to the Food and Drug Administration (FDA
or Agency) on March 29, 2019, on behalf of the American Association of Pro-Life Obstetricians
and Gynecologists and the American College of Pediatricians (Petition).  In the Petition, you
request that FDA: (1) restore and strengthen elements of the Mifeprex regimen and prescriber
requirements approved in 2000, and (2) retain the Mifeprex Risk Evaluation and Mitigation
Strategy (REMS) and continue limiting the dispensing of Mifeprex to patients in clinics, medical
offices, and hospitals, by or under the supervision of a certified prescriber.

Specifically, in your Petition you request that the Agency:

(1) Restore and strengthen elements of the Mifeprex regimen and prescriber requirements
approved in 2000, to include the following:

- Indications and Usage - Mifeprex, in a regimen with misoprostol, for the termination of
  intrauterine pregnancy, should be limited to 49 days gestation.

- Dosage and Administration:
  - Mifeprex should be administered by or under the supervision of a physically present
    and certified physician who has ruled out ectopic pregnancy.

  - The use of Mifeprex and misoprostol for the termination of pregnancy should
    require three office visits by the patient.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
w ww.fda.gov

Docket No. FDA-2019-P-1534

- Contraindications - Mifeprex use is contraindicated for patients who do not have convenient access to emergency medical care.

- Adverse Event Reporting - Certified prescribers, emergency medical personnel, physicians treating complications, and Danco Laboratories should report to FDA's MedWatch Reporting system any deaths, hospitalizations, blood transfusions, emergency room visits, failures requiring surgical completion, ongoing pregnancy, or other major complications following the use of Mifeprex and misoprostol.

- Additional studies - The Mifeprex REMS should require a formal study of outcomes for at-risk populations, including: patients under the age of 18; patients with repeat Mifeprex abortions; patients who have limited access to emergency room services; and patients who self-administer misoprostol.

(2) Retain the Mifeprex REMS and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

We have carefully considered the information submitted in your Petition and other relevant data available to the Agency. Based on our review of this information, your Petition is granted in part and denied in part.

## I.     BACKGROUND

### A.  Mifeprex

On September 28, 2000, FDA approved Mifeprex for the medical termination of intrauterine pregnancy through 49 days' pregnancy (new drug application (NDA) 020687). The application was approved under part 314, subpart H (21 CFR part 314, subpart H), "Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses" (subpart H). Specifically, § 314.520 of subpart H provides for approval with restrictions that are needed to assure the safe use of the drug product. In accordance with § 314.520, FDA restricted the distribution of Mifeprex as specified in the September 2000 approval letter.[1]

Subsequently, Mifeprex was identified as one of the products that was deemed to have in effect an approved REMS under the Food and Drug Administration Amendments Act of 2007 (FDAAA) because on the effective date of Title IX, subtitle A of FDAAA (March 28, 2008), Mifeprex had in effect elements to assure safe use.[2] Accordingly, in June 2011, we approved a REMS for Mifeprex, consisting of a Medication Guide, elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments of the REMS.

Elements to assure safe use included: (1) prescriber certification (ETASU A); (2) that Mifeprex is dispensed only in certain healthcare settings by or under the supervision of a certified prescriber

---

[1] See https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.pdf.
[2] 73 FR 16313 (Mar. 27, 2008).

2

App. 000650

Docket No. FDA-2019-P-1534

(ETASU C); and (3) that Mifeprex is dispensed only with documentation of safe use conditions (ETASU D).  Documentation of safe use conditions consists of a Patient Agreement Form between the prescriber and the patient indicating that the patient has received counseling from the prescriber regarding the risk of serious complications associated with Mifeprex.

On March 29, 2016, we approved an efficacy supplement (S-020) to NDA 020687 for Mifeprex submitted by the applicant Danco Laboratories, LLC (S-020 efficacy supplement). The approval included changes in the dose of Mifeprex and the dosing regimen for taking Mifeprex and misoprostol (including the dose of misoprostol and a change in the route of misoprostol administration from oral to buccal (in the cheek pouch); the interval between taking Mifeprex and misoprostol; and the location at which the patient may take misoprostol).  The approval also modified the gestational age up to which Mifeprex has been shown to be safe and effective, as well as the process for follow-up after administration of the drug.

Specifically, the following changes, among others, were made as part of the 2016 approval:[3]

- Revised the dosing regimen to consist of 200 mg of Mifeprex taken by mouth, followed in 24-48 hours by 800 mcg of misoprostol taken buccally (in the cheek pouch).  This differs from the originally approved dosing regimen of 600 mg of oral Mifeprex followed 48 hours later by 400 mcg of oral misoprostol.

- Revised the indication for use of Mifeprex, in a regimen with misoprostol, to extend the maximum gestational age for the medical termination of intrauterine pregnancy from 49 days to 70 days.

- Reduced the number of office visits by the patient under the approved regimen from three to one.

- Replaced the term "physician" with the term "healthcare provider."

In addition, after reviewing the data and information submitted by the applicant in the S-020 efficacy supplement, and after taking into consideration the safety data that had become available since the initial approval of Mifeprex in 2000, we determined the Mifeprex REMS continued to be necessary to ensure the benefits of the product outweigh the risks.  However, we approved modifications to the Mifeprex REMS that reflected the changes approved in the efficacy supplement.  These changes to the REMS included, among others:[4]

- Updating the Prescriber Agreement Form to reflect the revised indication and dosing regimen.

- Removing the Medication Guide as a REMS element (but retaining the Medication Guide as labeling).

---

[3] See https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2016/020687Orig1s020ltr.pdf and https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.
[4] See https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf.

App. 000651

Docket No. FDA-2019-P-1534

- Removing the requirement that certified prescribers report certain enumerated adverse events to the applicant (specifically, any hospitalization, transfusion or other serious adverse events), but retaining the requirement that certified prescribers report all deaths to the sponsor.

Under the March 2016 approval, the Mifeprex REMS also continued to require that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.[5]

## B. Generic Version of Mifeprex

On April 11, 2019, we approved GenBioPro, Inc.'s generic version of Mifeprex, Mifepristone Tablets, 200 mg (abbreviated new drug application (ANDA) 091178). This action took place after this Petition was submitted to the Agency. As required by 21 CFR 314.94(a)(8), GenBioPro's approved generic version of Mifeprex, Mifepristone Tablets, 200 mg, has the same labeling (with certain permissible differences) as the brand product it references, Mifeprex. Accordingly, although we refer to the Mifeprex labeling in several sections of this response, our discussions in this response apply equally to both the NDA and the generic product labeling, unless otherwise specifically noted.[6]

GenBioPro's generic version of Mifeprex is subject to the same ETASU as its listed drug (21 U.S.C. -1(i)). At the time we approved GenBioPro's generic version of Mifeprex, that ANDA product was required to use a single, shared system for the ETASU with the brand drug product, Mifeprex, unless the requirement was waived by FDA (21 U.S.C. 355-1(i)). FDA did not waive this requirement. Accordingly, at the same time that FDA approved GenBioPro's generic version of Mifeprex in 2019, FDA approved a supplemental new drug application (sNDA) for Mifeprex, approving modifications to the existing, approved REMS for Mifeprex to establish a single, shared system REMS for mifepristone products for the medical termination of intrauterine pregnancy through 70 days gestation (referred to as the Mifepristone REMS Program). In establishing the single, shared system REMS in 2019, no substantive changes were made to the ETASU in the March 2016 Mifeprex REMS. References to the REMS in this response refer to the Mifepristone REMS Program established in 2019, unless otherwise noted.

## C. In-Person Dispensing Requirement During the COVID-19 PHE

---

[5] See https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2016/020687Orig1s020ltr.pdf.

[6] We note that Korlym and the generic version of Korlym (Mifepristone Tablets, 300 mg) contain the same active ingredient – mifepristone - as Mifeprex and the generic version of Mifeprex (Mifepristone Tablets, 200 mg). Although these drug products contain the same active ingredient, their intended uses target different receptors, and the products have different strengths and use different dosing regimens. Korlym and the generic version of Korlym are approved for the control of hyperglycemia (high blood sugar levels) due to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes or glucose intolerance, and have failed surgery or are not candidates for surgery. References to mifepristone in this response refer to the use of mifepristone for the medical termination of intrauterine pregnancy through 70 days gestation, unless otherwise noted.

App. 000652

Docket No. FDA-2019-P-1534

FDA has recognized that during the COVID-19[7] public health emergency (PHE),[8] certain REMS requirements for various products may be difficult to comply with because patients may need to avoid public places and patients suspected of having COVID-19 may be self-isolating and/or subject to quarantine. The Agency has also received queries concerning products with REMS that have ETASUs, including REMS with ETASUs that restrict distribution, and the impact of such ETASUs on patient access when patients self-isolate or are subject to quarantine.

In April 2021, FDA communicated its intent to exercise enforcement discretion during the COVID-19 PHE regarding the requirement in the Mifepristone REMS Program that mifepristone used for medical termination of intrauterine pregnancy through 70 days gestation be dispensed to patients by or under the supervision of a certified prescriber only in certain healthcare settings, specifically clinics, medical offices, and hospitals (referred to as the "in-person dispensing requirement").

Specifically, FDA communicated that provided all other requirements of the Mifepristone REMS Program are met, the Agency intends to exercise enforcement discretion with respect to the in-person dispensing requirement of the Mifepristone REMS Program, including any in-person requirements that may be related to the Patient Agreement Form, during the COVID-19 PHE. This determination, which FDA made on April 12, 2021, was effective immediately. We also note that from July 13, 2020 to January 12, 2021, per a court order, FDA was enjoined from enforcing the in-person dispensing requirement of the Mifepristone REMS Program.[9]

Further, and as we also communicated on April 12, 2021, to the extent all of the other requirements of the Mifepristone REMS Program are met, the Agency intends to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of Mifeprex or the approved generic version of Mifeprex, Mifepristone Tablets, 200 mg, through the mail, either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

FDA's intent to exercise enforcement discretion with respect to these requirements during the COVID-19 PHE was the result of a thorough scientific review by experts within FDA's Center for Drug Evaluation and Research (CDER), who evaluated relevant information, including available clinical outcomes data and adverse event reports.

### D. Minor Modification

---

[7] The virus has been named "SARS-CoV-2" and the disease it causes has been named "Coronavirus Disease 2019" (COVID-19).

[8] Secretary of Health and Human Services, Determination that a Public Health Emergency Exists (originally issued Jan. 31, 2020, and subsequently renewed), *available at* https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx.

[9] *Am. Coll. of Obstetricians & Gynecologists v. FDA*, 472 F. Supp. 3d 183, 233 (D. Md. July 13, 2020), order clarified, 2020 WL 8167535 (D. Md. Aug. 19, 2020) (preliminarily enjoining FDA from enforcing the in-person dispensing requirement and any other in-person requirements of the Mifepristone SSS REMS); *FDA v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578 (Jan. 12, 2021) (staying the preliminary injunction imposed by the District Court).

App. 000653

Docket No. FDA-2019-P-1534

In response to a request submitted by the applicants, FDA approved a minor modification to the Mifepristone REMS Program on May 14, 2021. This minor modification revised the Patient Agreement Form to use gender neutral language. Specifically, the pronouns "she" and "her" in the Patient Agreement Form were replaced with "the patient." The minor modification also included revisions to the REMS document to be consistent with the revisions to the Patient Agreement Form. These changes did not affect the substance of the Patient Agreement Form, the REMS document, or the Mifepristone REMS Program.

### E. Review of the Mifepristone REMS Program

In 2021, FDA also undertook a full review of the Mifepristone REMS Program.[10]  In conducting this review, FDA reviewed multiple different sources of information, including published literature, safety information submitted to the Agency during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS) reports, the first REMS assessment report for the Mifepristone REMS Program, and information provided by advocacy groups, individuals, and the Plaintiffs in ongoing litigation, as well as information submitted by the sponsors of the NDA and the ANDA (together, the Applicants). As discussed in more detail below, based on our review of this information, FDA has determined that certain elements of the Mifepristone REMS Program remain necessary to assure the safe use of mifepristone for medical termination of intrauterine pregnancy through 70 days gestation; and therefore, the Mifepristone REMS Program continues to be necessary to ensure the benefits outweigh the risk. Specifically, we find that the healthcare provider certification and dispensing of mifepristone to patients with evidence or other documentation of safe use conditions continue to be necessary components of the REMS to ensure the benefits of mifepristone outweigh the risks for this indication.

We also find that the in-person dispensing requirement is no longer necessary to assure the safe use of mifepristone for medical termination of intrauterine pregnancy through 70 days gestation. We have concluded that mifepristone will remain safe and effective for medical abortion if the in-person dispensing requirement is removed, provided all the other requirements of the REMS are met and pharmacy certification is added.[11]  Removing the in-person dispensing requirement will render the REMS less burdensome to healthcare providers and patients, and provided all other requirements of the REMS are met, including the additional requirement for pharmacy certification, the REMS will continue to ensure that the benefits of mifepristone for medical abortion outweigh the risks. Accordingly, today we are sending a REMS Modification Notification letter to both Applicants in the Mifepristone REMS Program. As stated in that letter, FDA has concluded that a modification is necessary and must include the following changes:

- Removing the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals.

---

[10] We note that the Agency is in litigation regarding the Mifepristone REMS Program and committed to conducting a full review of the Mifepristone REMS Program, including reviewing any relevant data and evidence submitted to the Agency by the Plaintiffs in that litigation (*Chelius et al v. Becerra*, Joint Mot. to Stay Case Pending Agency Review, ECF No. 148, May 7, 2021, Civ. No. 1:17-00493 (D. Haw.)).

[11] Although we have determined that the Mifepristone REMS Program must be modified to add a requirement for pharmacy certification, this was not raised in your Petition and therefore is not discussed further in this response.

App. 000654

Docket No. FDA-2019-P-1534

- Adding a requirement that pharmacies that dispense the drug be specially certified.

## II.    DISCUSSION OF ISSUES RAISED

### A.  Mifeprex Regimen

#### 1.  Indications and Usage

In the Petition, you ask FDA to restore and strengthen elements of the Mifeprex regimen and prescriber requirements approved in 2000, to limit Mifeprex, in a regimen with misoprostol, for the termination of intrauterine pregnancy, to 49 days gestation (Petition at 1 and 3).  For the reasons explained below, we deny this request.

Citing to a 2011 study and a practice bulletin issued by the American College of Obstetricians and Gynecologists (ACOG), you state that medical abortion[12] regimens demonstrate an increase in complications and failures, including serious risks of hemorrhage, infection, and ongoing pregnancy, after 49 days gestation (Petition at 3-4).

Our review of the S-020 efficacy supplement in 2016 concluded that Mifeprex, in a regimen with misoprostol, is safe and effective for medical termination of intrauterine pregnancy through 70 days gestation.[13]  Complete medical abortion rates from the pivotal clinical trials relied on for the initial approval of Mifeprex (with an indication for medical termination of intrauterine pregnancy through 49 days gestation) were 92.1 percent and 95.5 percent in the United States and French trials, respectively.[14]  The studies reviewed in support of the 2016 approval for Mifeprex (with an indication for medical termination of intrauterine pregnancy through 70 days gestation) showed comparable efficacy. The 2016 Clinical Review of the S-020 efficacy supplement summarized clinical outcomes and adverse effects from 22 studies (7 in the United States and 15 from outside the United States) through 70 days gestation, using the currently approved regimen of 200 mg oral mifepristone with 800 mcg buccal misoprostol. The ranges of complete medical abortion rates calculated by the clinical reviewer were 93.2 percent to 98.7 percent in the United States studies, and 92 percent to 98 percent in the non-United States studies.[15]

Serious adverse events associated with the use of mifepristone through 70 days gestational age are rare.  Per the current mifepristone labeling, the rates of serious adverse events are low: transfusions are 0-0.1 percent, sepsis is less than 0.01 percent, hospitalization related to medical abortion is 0-0.7 percent, and hemorrhage is 0.1 percent.[16]  As discussed

---

[12] In this response, the terms "medical abortion" and "medication abortion" both refer to the use of mifepristone, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy.
[13]  See 2016 Clinical Review available at
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf, at 32-38 and 47-47.
[14] See 1999 Medical Officer's Review, available at
http://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_medr_P1.pdf, at 11 (Table 1) and 16.
[15] See 2016 Clinical Review, supra n. 13, at 28-31.
[16] See https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.

App. 000655

Docket No. FDA-2019-P-1534

throughout this response, the benefit/risk assessment supported our 2016 conclusion that the product is safe and effective through 70 days gestation.

In support of your assertion that medical abortion demonstrates an increase in complications after 49 days gestation, you cite to Mentula, et al.,[17] a register-based, retrospective cohort study that included 18,248 women in Finland who underwent medical abortion between January 1, 2003, and December 31, 2006 (Petition at 3).  As an initial matter, we note that the Mentula study was primarily designed to assess the immediate adverse events following medical abortion in the second trimester (13 to 24 gestational weeks as defined by the authors) and then compare those events to those identified with medical abortion in the first trimester (up to 12 gestational weeks as defined by the authors).  The study was not designed to compare rates of complications across gestational weeks within the first trimester.  It is true that the Mentula publication includes information on the percentages of women who had surgical evacuation following medical abortion and the percentages of women who had infection following medical abortion, based on weekly gestational age, from 5 weeks to 20 weeks gestation.[18]  However, the data in the Mentula study are relatively old (2003-2006); in our 2016 review of the S-020 efficacy supplement, we conducted an extensive review of more recent data[19] and concluded that Mifeprex, in a regimen with misoprostol, is safe and effective for medical termination of intrauterine pregnancy through 70 days gestation.

You also cite to ACOG Practice Bulletin No. 143, which states: "the risk of clinically significant bleeding and transfusion may be lower in women who undergo medical abortion of gestations up to 49 days compared with those who undergo medical abortion of gestations of more than 49 days."[20]  This statement is based on a 1998 publication which evaluated patients undergoing medical abortion with mifepristone 600 mg and then oral misoprostol 400 mcg two days later.[21]  The regimen studied in this 1998 publication is not the currently approved regimen for mifepristone in the United States.  Further, ACOG Practice Bulletin No. 143 has been withdrawn and replaced by Practice Bulletin No. 225, which was published in October 2020 and no longer contains this statement.[22]

You also state that the failure rate of the approved regimen (which you refer to as the "buccal misoprostol regimen") increases as the gestational age increases, especially at

---

[17] Mentula MJ, Niinimäki M, Suhonen S, et al. Immediate Adverse Events After Second Trimester Medical Termination of Pregnancy: Results of a nationwide registry study, Human Reproduction. 2011;26(4):927-932.
[18] Id. at Fig. 2 and Fig. 3. Surgical intervention after medical abortion and infection after medical abortion are two distinct adverse events. The calculation of abortion completion rates accounts for the need for surgical intervention. In clinical studies we reviewed, success of medical abortion was defined as the complete expulsion of the products of conception without the need for surgical intervention.
[19] See 2016 Cross-Discipline Team Leader Review, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020CrossR.pdf, at 37 (Table 4).
[20] Petition at 3.  See Medical Management of First-Trimester Abortion. ACOG Practice Bulletin Number 143. March 2014 (Reaffirmed 2016. Replaces Practice Bulletin Number 67, October 2005); Obstet Gynecol. 2014 Mar;123(3):676-692 at 680.
[21] Spitz I, Bardin CW, Benton L, Robbins A. Early pregnancy termination with mifepristone and misoprostol in the United States, NEJM. 1998;338 (18):1241-1247.
[22] See ACOG Practice Bulletin No. 225. Medication Abortion Up to 70 Days of Gestation. Obstetrics and Gynecology 2020; 136(4); e31 to e47.

Docket No. FDA-2019-P-1534

gestational ages greater than 49 days, relying on a 2015 meta-analysis,[23] and that the gestational limit should not have been increased (Petition at 3-4).  We agree that the failure rate of medical abortion regimens, including the currently approved regimen, generally increases with increasing gestational age.  However, the increase in failure rate with each incremental week of gestation, as described in approved mifepristone labeling and in this 2015 meta-analysis, is small, and we believe that the benefit/risk profile for medical termination of intrauterine pregnancy between 49 and 70 days gestation remains acceptable.

For these reasons, we deny your request that FDA limit mifepristone, in a regimen with misoprostol for the termination of intrauterine pregnancy, to 49 days gestation.

### 2. Dosage and Administration

#### a. Prescriber Qualifications

You state that FDA should limit the "ability" to prescribe and dispense Mifeprex to qualified, licensed physicians, rather than permitting non-physicians to apply to be certified prescribers, because of the regimen's serious risks and because physicians are better trained to diagnose patients who have contraindications to Mifeprex and to verify gestational age (Petition at 4).  We do not agree.

Healthcare providers who are licensed to prescribe can become certified in REMS programs if they are able to meet the applicable REMS requirements.  To become certified to prescribe mifepristone under the Mifepristone REMS Program, the prescriber must review the prescribing information for mifepristone and complete a Prescriber Agreement Form.  By signing the form, the prescriber agrees that they meet certain qualifications, including the ability to date pregnancies accurately and to diagnose ectopic pregnancies. These healthcare providers must also: (1) be able to provide any necessary surgical intervention or have made arrangements for others to provide for such care; or (2) be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.[24]

In our review of the S-020 efficacy supplement in 2016, we determined that available data support that Mifeprex is safe and effective when prescribed by midlevel providers, such as physician assistants and nurse practitioners, as well as by physicians.[25]  Our 2016 review included four studies that evaluated the safety and efficacy of medical abortion when performed by non-physician healthcare providers.  Two trials evaluated the currently

---

[23] Petition at 4, fn. 6 (citing Chen MJ, Creinin MD, *Mifepristone with Buccal Misoprostol for Medical Abortion*, Obstet. Gynecol 126 (1) July 2015 12-21).

[24] See https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf; see also https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390.

[25] See 2016 Clinical Review, supra n. 13, at 79; see also 2016 Cross-Discipline Team Leader Review, supra n. 19, at 17-18.  We also note that in most states, midlevel clinicians, such as physician assistants and nurse practitioners, are licensed to prescribe medications.

App. 000657

Docket No. FDA-2019-P-1534

approved Mifeprex and buccal misoprostol regimen (Olavarrieta and Kopp Kallner);[26,27] one trial studied a regimen using vaginal misoprostol (Warringer);[28] a fourth study did not specify the route of misoprostol administered (Puri).[29]  Olavarrieta reported a completion rate of 97.9 percent when medical abortion was provided by nurses as compared with 98.4 percent with physicians.  Kopp Kallner reported a completion rate of 99 percent with certified nurse midwives versus 97.4 percent with physicians.  Warriner reported an abortion completion rate of 97.4 percent with nurses as compared with 96.3 percent with physicians.  Puri reported an abortion completion rate of 96.8 percent when the service was provided by nurse-midwives as compared with 97.4 percent in the "standard care" group.[30] Our 2016 review also included a systematic review of six controlled clinical studies by Renner;[31] the authors concluded that the evidence "indicates that trained mid-level providers may effectively and safely provide first trimester surgical and medical termination of pregnancy services."  Additionally, Barnard et al., in a Cochrane systematic review, assessed the safety and effectiveness of abortion procedures administered by mid-level providers (nurse practitioners, midwives, other non-physician healthcare providers) compared to doctors.[32]  The authors concluded, based in part on two of the studies that we had reviewed in 2016,[33] that there was no statistically significant difference in the risk of failure for medical abortions performed by mid-level providers compared with doctors.

We also believe that the identification of patients for whom the use of mifepristone is contraindicated can be done by mid-level healthcare providers, as well as physicians. Mifepristone in a regimen with misoprostol for medical termination of intrauterine pregnancy through 70 days gestation is contraindicated in patients with any of the following conditions:[34]

- Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass

---

[26] Olavarrieta CD, Ganatra B, Sorhaindo A, et al. Nurse versus Physician-provision of Early Medical Abortion in Mexico: A Randomized Controlled Non-Inferiority Trial. Bull World Health Organ. 2015;93:249-258.

[27] Kopp Kallner H, Gomperts R, Salomonsson E, et al.  The efficacy, safety and acceptability of medical termination of pregnancy provided by standard care by doctors or by nurse-midwives: a randomised controlled equivalence trial. BJOG. 2015; 122: 510-517.

[28] Warriner IK, Wang D, et al. Can midlevel health-care providers administer early medical abortion as safely and effectively as doctors? A randomized controlled equivalence trial in Nepal. Lancet. 2011; 377: 1155-61.

[29] Puri M, Tamang A, Shrestha P, et al. The role of auxiliary nurse-midwives and community health volunteers in expanding access to medical abortion in rural Nepal. Reproductive Health Matters. 2015; 22(44) 94-103.

[30] 2016 Clinical Review, supra n. 13, at 43.

[31] Renner RM, Brahmi D, Kapp N. Who can provide effective and safe termination of pregnancy care? A systematic review. BJOG 2013 Jan;120(1):23-31.

[32] Barnard S, Kim C, Park MN, Ngo TD. Doctors or mid-level providers for abortion (Review). Cochran Database of Systematic Reviews. 2015, Issue 7.

[33] Of the medical abortion studies reviewed by Barnard et al (Id.), two were reviewed by the Agency as part of the review of the S-020 supplement in 2016. See Warriner et al (supra n. 28) and Kopp Kallner et al (supra n. 27). The third used a different dose of misoprostol than the currently approved regimen. See  Jejeebhoy SJ, Kalyanwalaa S, Zaviera AJF, Kumara R, Mundleb S, Tankc J, et al. Feasibility of expanding the medication abortion provider based in India to include avurvedic physicians and nurses. International Perspectives on Sexual and Reproductive Health 2012;38(3)133-42)

[34] See https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.

10

Docket No. FDA-2019-P-1534

- An intrauterine device in place
- Chronic adrenal failure
- Concurrent long-term corticosteroid therapy
- History of allergy to mifepristone, misoprostol, or other prostaglandins
- Hemorrhagic disorder or concurrent anticoagulant therapy
- Inherited porphyrias

These contraindications can be assessed by trained healthcare providers who prescribe mifepristone by obtaining a medical history, from medical records, and/or from physical examination or ultrasound if appropriate. We continue to believe that available data support the conclusion that mid-level healthcare providers, as well as physicians, possess the clinical and counseling skills necessary to provide medical abortion. We note this is consistent with ACOG's statement in its current practice bulletin that "[i]n addition to physicians, advanced practice clinicians, such as nurse-midwives, physician assistants, and nurse practitioners, possess the clinical and counseling skills necessary to provide first-trimester medical abortion."[35] Further, if necessary, ultrasound training and certification is available to nurse practitioners and physician assistants, as well as physicians.[36] In sum, available information supports that mid-level healthcare providers as well as physicians can determine whether mifepristone is an appropriate treatment for a particular patient and dispense it.

You also assert that FDA should strengthen the requirement that providers accurately assess the duration of the pregnancy by mandating that gestational age be assessed by ultrasound (Petition at 5). We refer you to FDA's 2016 Response to the citizen petition submitted to Docket No. FDA-2002-P-0364 (the "2016 CP Response"), where FDA stated that the determination of gestational age does not always require an ultrasound. In the 2016 CP Response, FDA stated it had "determined that it was inappropriate for us to mandate how providers clinically assess women for duration of pregnancy and for ectopic pregnancy. These decisions should be left to the professional judgment of each provider, as no method (including TVS [transvaginal ultrasound]) provides complete accuracy. The approved labeling for Mifeprex recommended ultrasound evaluation as needed, leaving this decision to the judgment of the provider."[37]

In the Petition, you reference the Prescriber Agreement Form, in which the provider must attest they have the ability to: (1) accurately assess the duration of the pregnancy; (2) diagnose ectopic pregnancies; and (3) provide surgical intervention if needed (or have made plans to provide such care through others), and you state that a provider who does not physically meet with and examine a patient, but simply consults with the patient over the Internet, is not capable of fulfilling these requirements, or of ruling out additional

---

[35] ACOG Practice Bulletin No. 225, supra n. 22.

[36] American Institute of Ultrasound in Medicine. Accessed November 26, 2021.
https://www.aium.org/officialStatements/70.

[37] FDA's citizen petition response dated March 29, 2016, to the citizen petition submitted by the American Association of Pro-Life Obstetricians and Gynecologists, the Christian Medical and Dental Association, and Concerned Women for America on August 20, 2002, Docket No. FDA-2002-P-0364 at 18. See
https://www.regulations.gov/document/FDA-2002-P-0364-0002.

App. 000659

Docket No. FDA-2019-P-1534

contraindications (Petition at 5-6).  You state that FDA should require certified prescribers to be physically present when Mifeprex is dispensed so that they can appropriately examine patients and rule out contraindications to the use of Mifeprex (Petition at 4).

Certified prescribers do not have to be physically present with the patient as long as they have confirmed the patient's gestational age and intrauterine pregnancy.  As noted above, in the 2016 CP response, FDA "determined that it was inappropriate for us to mandate how providers clinically assess women for duration of pregnancy and for ectopic pregnancy."[38] Moreover, the evaluation of patients for contraindications to medical abortion does not necessarily require direct physical contact with the certified prescriber and can be done in different types of healthcare settings.  A certified prescriber can also review the Patient Agreement Form[39] with the patient, fully explain the risks of the mifepristone treatment regimen, and answer any questions, as in any consent process, without physical proximity. See also section II.B.1.c (ETASU C – In-person Dispensing).

With respect to providing surgical intervention in cases of incomplete abortion or severe bleeding and assuring patient access to medical facilities equipped to provide blood transfusions and resuscitation (if necessary), the Prescriber Agreement Form does not reflect a requirement that the certified prescriber must provide such care personally; rather, the prescriber must agree that they have the ability to provide such care or that they have made plans to provide such care through others, and that they have the ability to assure the patient has access to appropriate medical facilities.  It is common practice for healthcare providers to provide emergency care coverage for other healthcare providers' patients, and in many places, hospitals employ "hospitalists" to provide care to all hospitalized patients. We also note ACOG's statement that "[i]n rare cases, a patient who undergoes a medication abortion may need to obtain an additional intervention, such as uterine aspiration.  If the prescribing clinician does not perform the intervention, it is medically appropriate to provide a referral."[40]

For these reasons, we deny your request that FDA limit the "ability" to prescribe and dispense mifepristone to licensed physicians, and we deny your request that FDA require certified providers to physically meet with and examine the patient.

### b.  Office Visits and Administration of Mifepristone/Misoprostol

In the Petition, you state that the use of mifepristone and misoprostol should require three office visits by the patient (Petition at 7).  In support of this position, you state the following:

- Drug-induced abortion is contraindicated for patients who are not available for follow-up contact or evaluation (Petition at 10).

---

[38] Id.
[39] See https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390.
[40] ACOG Practice Bulletin Number 225 supra n. 22.

App. 000660

Docket No. FDA-2019-P-1534

- Abortion complications are more frequent when women abort at home and more healthcare oversight is needed (Petition at 8).

- Home administration of misoprostol does not permit healthcare providers to control when their patients take misoprostol and without monitoring:

  o a patient may take buccal misoprostol before the minimum 24-hour period after taking Mifeprex, which leads to a significantly increased failure rate (Petition at 7).

  o a patient may swallow misoprostol rather than administer it buccally, and oral administration is not as effective as buccal administration in ending the pregnancy (Petition at 7).

- Because providers may now "confirm" that a patient's drug-induced abortion was successful without a clinic visit, this increases the threat that Rh-negative patients will not receive Rhogam, which is necessary to prevent serious risks in subsequent pregnancies (Petition at 7 and 9).

We address each of these points below.

### i.  Follow-up Care

The safe use of mifepristone when used in the approved regimen with misoprostol is not contingent on a specific number of office visits being made by the patient undergoing a medical termination of pregnancy.  The 2016 labeling change for Mifeprex regarding post-treatment assessment, including the change to the approved regimen to reduce the number of offices visits from three to one, was based on evidence reviewed in the S-020 efficacy supplement.  We concluded, upon reviewing the data, that three office visits were not necessary to assure the safe use of Mifeprex.[41]

In your Petition, you point to statements by ACOG that medical abortion is contraindicated for patients who are not available for follow-up contact or evaluation (Petition at 8, 10).  The ACOG statements you point to are from ACOG Practice Bulletin No. 143, which has been withdrawn and replaced by Practice Bulletin No. 225.[42]  Neither of the statements from the withdrawn Practice Bulletin nor Practice Bulletin No. 225 contraindicate medical abortion in women who are not available for an in-clinic follow-up visit.  The current ACOG recommendations indicate that for medical abortion, "[f]ollow-up can be performed by telephone at 1 week, with subsequent at-home urine pregnancy testing at 4 weeks after treatment, which avoids the need for the patient to go to a facility."[43]  The patient and their healthcare provider should determine the best option for follow-up as part of the consultation and consent process.[44]  As reflected in ACOG's guidance, appropriate follow-

---

[41] See 2016 Clinical Review, supra n. 13, at 44 and 64-67.
[42] ACOG Practice Bulletin Number 225, supra n. 22.
[43] Id.
[44] Id.

App. 000661

Docket No. FDA-2019-P-1534

up after medical termination of a pregnancy may be accomplished in multiple ways and not all require an in-clinic visit.

You also question findings in multiple studies that evaluated the effectiveness of semiquantitative urine pregnancy tests (multi-level pregnancy tests, or MLPT) and low sensitivity urine pregnancy tests (LSPT) to rule out on-going pregnancies and assessed the ability of patients to self-administer these tests and interpret the test results (Petition at 9-10).  Overall, these studies concluded that in the majority of women, it is feasible to use a simplified test to determine if further follow-up is necessary.  A recent systematic review and meta-analysis by Baiju assessed the effectiveness and safety of self-assessment of the outcome of medical abortion completed at home versus routine clinic follow-up after medical abortion, concluding self-assessment was not inferior to routine clinic follow-up.[45] We note that this is consistent with current ACOG recommendations, which state that "follow-up can be performed by telephone at 1 week, with subsequent at-home urine pregnancy testing at 4 weeks after treatment, which avoids the need for the patient to go to a facility."[46]

You also assert that it is important for a patient to be under observation after taking misoprostol to ensure that they are appropriately monitored and provided sufficient pain medication (Petition at 8).  You cite the World Health Organization (WHO)'s statement in guidance that up to 90 percent of women will abort within 4-6 hours after taking misoprostol; you further state that the 2000 regimen permitted patients to be in the clinic during this time period (Petition at 8).  Your reference to the WHO guidance document[47] appears to be out of context.  The WHO guidance takes no position on whether women should return to and remain in the clinic during a follow-up visit for purposes of taking misoprostol; in fact, it explicitly recognizes that post-abortion care may not require a follow-up visit if the patient is adequately counseled.[48]  In the United States, and as reflected in the approved labeling, medical termination of pregnancy usually involves patients terminating the pregnancy at home, with appropriate follow-up that may not include a return visit.

### ii.  At Home Medical Abortion and Healthcare Oversight

In addition, you cite a 2018 study to support your statement that abortion complications are more frequent when women abort at home (Petition at 8).  The study evaluated complications following medical abortion (both less than 12 weeks and more than 12 weeks gestation) as well as following surgical abortion, at one hospital in Sweden between 2008 and 2015.[49]  For the years 2008 to 2010, data were collected retrospectively; for the years

---

[45] Baiju, N, Acharya, G, D'Antonio, F, et al. 2019. Effectiveness, safety and acceptability of self-assessment of the outcome of first-trimester medical abortion: a systematic review and meta-analysis. BJOG; 126:1536-1544.

[46] ACOG Practice Bulletin Number 225, supra n. 22.

[47] World Health Organization, Safe Abortion: technical and policy guidance for health systems – 2nd edition. 2012. Page 45 and Section 2.2.2.1 Medication for pain.

[48] Id. at Section 2.3 Post-abortion care and follow-up, at 52.

[49] Carlsson I, Breding K, Larsson PG, 2018, Complications Related to Induced Abortion: A Combined Retrospective and Longitudinal Follow-up Study, BMC Women's Health 18:158.

App. 000662

Docket No. FDA-2019-P-1534

2011 to 2015, data were collected prospectively.  In this study, medical abortions after 12 gestational weeks all occurred at the hospital.  The authors report that, among medical abortions less than 12 weeks, the complication frequency increased from 5.4 percent (2008 to 2010) to 8.2 percent (2015).  However, the authors also compared the complications related to medical abortions that occurred at less than 12 gestational weeks between "at home" abortions (managed as an outpatient) and "at the hospital" abortions, in 2015 and found no statistically significant difference (8.2 percent "at home" versus 8.0 percent at the hospital).  For pregnancies less than or equal to 9 gestational weeks, the rates are similar for the "at home" group (10.0 percent) and the "at the hospital" group (9.3 percent).  Notably, as part of our review and approval of the S-020 efficacy supplement in 2016, we assessed serious adverse events by gestational age, including hospitalizations, serious infection requiring hospitalization or intravenous antibiotics, bleeding requiring transfusion, and ectopic pregnancy, as reported in the literature submitted by the Applicant.  We concluded that these serious adverse events are rarely reported in the literature and that the regimen of mifepristone 200 mg followed by buccal misoprostol 800 mcg in 24-48 hours is safe to approve for use through 70 days gestation.[50]

You also state that medical abortion is a longer process than surgical abortion and that it requires more attention and care from healthcare providers (Petition at 10).  We agree that medical abortion can be a longer process than surgical abortion,[51] but we disagree that medical abortion always requires in-person follow-up with a healthcare provider.  Not all of the complications associated with medical abortion necessarily require more intensive management from healthcare providers during a follow-up visit.  The question of whether to include an in-person follow-up visit should be discussed by the healthcare provider and the patient.  We have concluded that medical abortions are safe and effective for patients who are appropriate candidates and reducing the number of clinic visits does not compromise patient safety.

The current approved labeling for mifepristone for medical termination of pregnancy states that complete pregnancy termination "can be confirmed by medical history, clinical examination, human Chorionic Gonadotropin (hCG) testing, or ultrasonographic scan." Not all these modalities require an in-clinic assessment during a follow-up visit.  Our review of the S-020 efficacy supplement concluded that "available data support … that there are a variety of follow-up modalities that can adequately identify the need for additional intervention."[52]  We note that these findings are also consistent with ACOG guidelines, which state that "[r]outine in-person follow-up is not necessary after uncomplicated medication abortion" and recommend several methods for post-treatment follow-up, as appropriate, including serial serum hCG testing alone or telephone follow-up at one week after treatment followed by urine pregnancy testing at four weeks after treatment.[53]  Because there is more than one effective method to detect an on-going pregnancy, we conclude that the way in which post-treatment follow-up is performed may be determined by the healthcare provider and the patient.

---

[50] 2016 Clinical Review, supra n. 13, at 51-57.
[51] See ACOG Practice Bulletin Number 225, supra note 22.
[52] 2016 Cross Discipline Team Leader Review, supra n. 19, at 17.
[53] ACOG Practice Bulletin Number 225, supra note 22.

Docket No. FDA-2019-P-1534

### iii.   Misoprostol

In the Petition, you make a number of assertions regarding the use of misoprostol. We address each in turn.

First, you assert that a patient may take misoprostol before the prescribed minimum 24-hour period after taking Mifeprex, thereby rendering the regimen ineffective, and that home administration of misoprostol does not permit health providers to control when their patients take misoprostol (Petition at 7). You similarly assert that the use of buccal misoprostol sooner than 24 hours after administering mifepristone leads to significantly increased failure rates (Petition at 7).

As an initial matter, our review of the S-020 efficacy supplement in 2016 included data that evaluated the home use of misoprostol in over 30,000 women. The data showed that Mifeprex was safe and effective in a regimen with misoprostol when misoprostol was self-administered at home.[54] Therefore, any incorrect administration resulting in a failed abortion was infrequent and did not significantly affect the safety and efficacy of medical abortion. Furthermore, because the process of expelling the pregnancy may begin as soon as 2 hours after taking misoprostol, there is a benefit in allowing patients to choose when and where to start this process, to maximize the possibility of their being at a safe place at a convenient time to experience cramping and bleeding.[55]

In support of your assertion of significantly increased failure rates, you cite a pilot study by Lohr et al.[56] Lohr et al. assessed the complete abortion rate using simultaneous oral mifepristone and buccal misoprostol in three gestational age groupings (less than or equal to 49 days, 50-56 days, 57-63 days) and compared the rates with those published in previous pilot investigations[57] using simultaneous oral mifepristone and vaginal misoprostol in the same three gestational age groupings. The complete abortion rates reported by Lohr at 24 hours for oral mifepristone and buccal misoprostol were 72.5 percent, 69.2 percent, and 72.5 percent, respectively; the complete abortion rates at two weeks, however, were 97.5 percent, 100 percent, and 94.9 percent, respectively (and are consistent with the completion rates as described in the approved labeling).[58] The published complete abortion rates at 24 hours for simultaneous oral mifepristone and vaginal misoprostol administration were 90 percent, 88 percent, and 83 percent, respectively, for the gestational age groupings and the complete abortion rates at 2 weeks were 98 percent, 93 percent, 90 percent, respectively. Based on the data presented in Lohr,

---

[54] See 2016 Clinical Review, supra n. 13, at 41 and 48.

[55] Id. at 38.

[56] Petition at 7 (referencing Lohr PA, Reeves MF, Hayes JL, et al., 2007, Oral Mifepristone and Buccal Misoprostol Administered Simultaneously for Abortion: A Pilot Study, Contraception, 76:215-220).

[57] Schreiber CA, Creinin MD, Harwood B, Murthy AS. A pilot study of mifepristone and misoprostol administered at the same time for abortion in women with gestation from 50 to 63 days. Contraception 2005;71:447–50; Murthy AS, Creinin MD, Harwood B, Schreiber C. A pilot study of mifepristone and misoprostol administered at the same time for abortion up to 49 days gestation. Contraception 2005;71:333–6.

[58] See  https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.

App. 000664

Docket No. FDA-2019-P-1534

the use of buccal misoprostol at the same time as oral mifepristone does not adversely affect efficacy, although expulsion may be delayed.   As recommended in Section 2.3 of the approved labeling, follow-up at 7-14 days after administration of mifepristone is more appropriate to evaluate efficacy.[59]  It is misleading to only reference the abortion completion rates observed at the 24-hour timepoint from Lohr.  Therefore, we do not agree that data from Lohr indicate higher failure rate with misoprostol taken before the prescribed minimum 24-hour period after taking mifepristone.

Although we disagree that Lohr demonstrates a higher failure rate with misoprostol taken before 24-hours after taking mifepristone, we note that our 2016 review of the S-020 efficacy supplement referenced a 2013 systematic review by Raymond, which concluded that if the interval between mifepristone and misoprostol interval is less than or equal to 24 hours, the procedure is less effective compared to an interval of 24-48 hours.[60]  As explained above, the data reviewed in 2016 showed that Mifeprex, in a regimen with misoprostol administered at home, was safe and effective.  Therefore, incorrect administration, if it occurred, was infrequent and did not significantly affect the safety and efficacy of medical abortion.  However, in light of the data reviewed, section 2.1 of the labeling approved in 2016 (as well as the currently approved labeling and Medication Guide) states that there should be a "minimum 24-hour interval between" mifepristone and misoprostol (emphasis included in the labeling).[61]  The approved dosing regimen also states that misoprostol is taken within 24 to 48 hours after taking mifepristone and acknowledges that the effectiveness of the regimen may be lower if misoprostol is administered less than 24 hours after mifepristone administration.

In addition to your concerns that a woman may take misoprostol too soon after administering mifepristone, you also state that waiting until 24 hours after administering mifepristone does not guarantee success (Petition at 7-8).  In support of this concern, you cite a 2015 review by Chen and Creinin.  You state that this review found "women taking misoprostol earlier than 48 hours after Mifeprex are more likely to fail the regimen" (Petition at 8).  Chen and Creinin included studies in which the intervals between mifepristone and buccal misoprostol were 24 hours or 24-48 hours and stated that "based on the available literature, the overall efficacy of regimens with a 24-hour interval between mifepristone and buccal misoprostol is significantly lower than those with a 24- to 48-hour interval (94.2 percent compared with 96.8 percent)."[62]  The rate differences were statistically significant, but both regimens were more effective than the 92 percent efficacy rate of the original regimen approved in 2000 (administering misoprostol 48 hours after taking mifepristone).

Finally, you also express concern that if misoprostol is self-administered, a woman may swallow it rather than keep the pill between her cheek and gum, and oral administration of

---

[59] See  https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.
[60] 2016 Clinical Review, supra n. 13, at 31 (citing 8 Raymond EG, et al. First-trimester medical abortion with mifepristone 200 mg and misoprostol: a systematic review. Contraception 2013;87(1):26-37.)
[61] See  https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.
[62] See  Chen MJ and Creinin MD. Mifepristone with buccal misoprostol for medical abortion. Obstet Gynecol. 2015;126(1):12-21; see also 2016 Clinical Review, supra n. 13, at 21.

App. 000665

Docket No. FDA-2019-P-1534

misoprostol (i.e., swallowing the pill) following the lower dose of mifepristone in the current regimen is not as effective in ending the pregnancy (Petition at 7). Winikoff et al. specifically studied the use of oral compared to buccal misoprostol 24-36 hours after mifepristone 200 mg with overall success rates of 91.3 percent and 96.2 percent, respectively.[63]  Both regimens resulted in a greater than 91 percent successful medical abortion. Although the study showed decreased efficacy with oral versus buccal administration in 57-63 days gestational age, there were no statistical differences in other gestational age groupings. Even assuming there is a small proportion of women who are 57-63 days gestational age and use oral administration of misoprostol (rather than buccal as labeled), a small decrease in the reported efficacy in that population would not justify requiring a clinic visit for all women undergoing medical abortion.

Overall, studies support the efficacy of the mifepristone, in a regimen with misoprostol when taken by the patient at home, Therefore, we do not agree that an in-person visit is necessary to manage administration of misoprostol.

### iii.     Rh-Negative Patients

In the Petition, you state that a follow-up examination is particularly critical for Rh-negative patients and that without that follow-up examination, women will not receive Rhogam after the abortion, increasing their risk of subsequent Rh isoimmunization, which can endanger future pregnancies (Petition at 9). You suggest that a clinic visit after the administration of Mifeprex is important for Rh-negative women to receive Rhogam and that removing the required follow-up visit puts Rh-negative women at risk for isoimmunization. We do not agree.

Rh testing is standard of care in the United States and RhD immunoglobulin (such as Rhogam) should be administered if indicated. Further, administration of RhD immunoglobulin should be given within 72 hours of a sensitizing event (e.g., medical abortion).[64]  However, the facility where the RhD immunoglobulin injection occurs (clinic, hospital or laboratory) is not critical. A shift from medical clinics to hospitals for administration of injections has occurred over the years due to shortages of RhD immunoglobulin and poor reimbursement for RhD immunoglobulin injection from third-party payers.[65]  This has resulted in pregnant women frequently obtaining routine 28-week RhD immunoglobulin injections at hospitals/laboratories with a prescription provided by their healthcare providers. This same process of obtaining RhD immunoglobulin via prescription is available to patients after medical termination of pregnancy and does not require a follow-up clinic visit.

---

[63] Winikoff B, Dzuba, IG, Creinin MD, et al, 2008, Two Distinct Oral Routes of Misoprostol in Mifepristone Medical Abortion, Obstet Gynecol 112(6):1303-1310.
[64]  ACOG Practice Bulletin No. 181. Prevention of Rh D Alloimmunization. August 2017.
[65] See https://www.mdedge.com/obgyn/article/61083/practice-management/rhogam-injections-payment-levels-vary-among-insurers.

App. 000666

Docket No. FDA-2019-P-1534

In summary, the totality of data on the efficacy and safety of medical abortion at less than 70 days gestation, derived from numerous studies, has characterized the complications and rates of complications for completing medical abortion at home, and the findings show medical abortion at home is both safe and effective without three office visits.  We therefore deny your request that the use of mifepristone in a regimen with misoprostol require three office visits by the patient.

### c.   Contraindications

In the Petition, you assert that critical language contraindicating Mifeprex for patients without access to appropriate emergency medical care was excluded from the 2016 Mifeprex labeling.  You cite to a study[66] and ACOG statements as evidence that medical abortions have greater risks and more need for emergency "operation" than a surgical abortion, particularly for patients in rural areas with limited access to emergency medical care (Petition at 11).

Although inadequate access to medical facilities for appropriate care was removed from the list of contraindications in section 4 of the approved labeling when we approved the S-020 efficacy supplement, the 2016 Mifeprex labeling and the currently approved mifepristone labeling, as well as the Mifepristone REMS Program, continue to include appropriate instructions for providers regarding patient access to appropriate medical care.[67]  For example, the Boxed Warning includes language directing healthcare providers to ensure that the patient knows whom to call and what to do, including potentially going to an emergency room, if the patient experiences serious events associated with the use of mifepristone.  The labeling also directs healthcare providers, as part of the dosing regimen, to give the patient the name and phone number of a healthcare provider who will be handling emergencies.[68]  In addition, one of the required qualifications listed in the Prescriber Agreement Form is the "[a]bility to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary."[69]  Therefore, although certain language about access to medical facilities was removed from the approved labeling in 2016, we disagree that critical language about access to appropriate emergency medical care is lacking from the approved labeling.

---

[66] See Petition Reference Document No. 17 (Harrison Affidavit: Donna Harrison, M.D., Aff. *Okla. Coalition for Reproductive Justice v. Cline*, Case No. CV-2014-1886 (Feb. 24, 2015), ¶115 (referencing M. Niinimaki et al., Immediate Complications after Medical compared with Surgical Termination of Pregnancy, Obstet. Gynecol. 114:795 (Oct. 2009)).

[67] See Mifeprex labeling, approved 2016. https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf. See also current labeling at https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.

[68] Id.

[69] Mifepristone REMS Program, https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390. Emphasis added.

App. 000667

Docket No. FDA-2019-P-1534

You also cite information in Box 1, Features of Medical and Surgical Abortion (page 3) in the ACOG Practice Bulletin No. 143.[70]  As mentioned above, the ACOG Practice Bulletin No. 143 has been withdrawn and the language you cite is not included in the current Practice Bulletin No. 225.

### d.      Adverse Event Reporting

In the Petition, you assert that even under the regimen approved in 2000, it was difficult to collect accurate and complete adverse event information for Mifeprex, and that collecting such information is virtually impossible under the regimen approved in 2016 because prescribers only are required to report deaths associated with Mifeprex (Petition at 12). You also assert that FDA cannot adequately assess the safety of the current Mifeprex regimen without comprehensive information on adverse events (Petition at 12).  You state that certified prescribers should at a minimum be required to report the following to FDA's MedWatch reporting system and to the sponsor: deaths, hospitalizations, blood transfusions, emergency room visits, failures requiring surgical completion, ongoing pregnancy, or other major complications, including detailed information on these events (Petition at 13).

We acknowledge that there is always a possibility with any drug that some adverse events are not being reported, because reporting to the Agency's MedWatch program by health care professionals and patients is voluntary.  We do not agree, however, that the 2016 changes to the prescriber reporting requirements limit our ability to adequately monitor the safety of mifepristone for medical termination of pregnancy.  Prior to the 2016 approval of the S-20 efficacy supplement, we assessed approximately 15 years of adverse event reports both from the Applicant and through the MedWatch program and determined that certain ongoing additional reporting requirements under the Mifeprex REMS, such as hospitalization and blood transfusions, were not warranted.  This assessment was based on the well-characterized safety profile of Mifeprex, with known risks occurring rarely, along with the essentially unchanged safety profile of Mifeprex during this 15-year period of surveillance.  Accordingly, the Prescriber Agreement Form was amended as part of our 2016 approval of the S-20 efficacy supplement to require, with respect to adverse event reporting, only that prescribers report any cases of death to the Applicant.

We also note that the reporting changes to the Prescriber Agreement Form as part of our 2016 approval do not change the adverse event reporting requirements for the Applicants. Like all other holders of approved NDAs and ANDAs, the Applicants are required to report all adverse events, including serious adverse events, to FDA in accordance with the requirements set forth in FDA's regulations (see 21 CFR 314.98, 21 CFR 314.80, and 21 CFR 314.81). FDA also routinely reviews the safety information provided by the Applicants in the Annual Reports. As with all drugs, FDA continues to closely monitor the postmarketing safety data on mifepristone for the medical termination of pregnancy.

---

[70] Petition at 11. Medical Management of First-Trimester Abortion. ACOG Practice Bulletin Number 143. March 2014 (Reaffirmed 2016. Replaces Practice Bulletin Number 67, October 2005); Obstet Gynecol. 2014 Mar;123(3):676-692 at 680.

Docket No. FDA-2019-P-1534

You state that FDA should provide guidance to emergency healthcare providers and physicians so that they know how to distinguish complications following drug-induced abortion from complications following spontaneous miscarriage (Petition at 13). We disagree that specific guidance is needed at this time. In the past, when appropriate, FDA has worked with the NDA Applicant to issue communications to healthcare providers and emergency department providers concerning certain serious adverse events.[71] Furthermore, the approved Medication Guide advises patients to take the Medication Guide with them if they need to go to the emergency room or seek care from a healthcare provider other than the one who dispensed the medication to them, so the emergency room or healthcare provider understands the patient is having a medical abortion. We have not identified a change in the safety profile of mifepristone that would warrant additional communications to healthcare providers and emergency department providers concerning complications following medical abortion. If we become aware of safety information that merits further communications with emergency department providers or healthcare providers, or that warrants revisions to the approved labeling, we will act as appropriate.

You also assert that many Mifeprex prescribers "violate FDA protocol," instructing their patients to lie to emergency medical personnel, and that this prevents emergency healthcare providers from appropriately caring for their patients and further decreases the likelihood that adverse events will be reported (Petition at 12). Your only support for this claim is a reference to instructions from the organization Aid Access[72] to patients that they can tell emergency room staff that they had a miscarriage and do not need to tell medical staff that they had a medical abortion. The Petition does not provide any data or additional information establishing "many Mifeprex prescribers violate FDA protocol, instructing their patients to lie," or that these providers thereby prevented appropriate care and decreased the number of adverse events reported.

## B.  REMS

### 1.  Request to Retain Mifeprex REMS

In your Petition, you request that FDA retain the Mifeprex REMS (Petition at 14). We agree that a REMS is necessary to ensure that the benefits of mifepristone in a regimen with misoprostol outweigh the risks. FDA's determination as to whether a REMS is necessary

---

[71] See Historical Information on Mifepristone (Marketed as Mifeprex), available at http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm111334.htm. For example, the NDA applicant and FDA agreed that there was a need to issue a Dear Health Care Provider letter in April 2002 and a Dear Emergency Room Director letter in September 2004. The fact that these letters were issued does not imply that the approved mifepristone regimen is unsafe; it is not uncommon for drug sponsors to issue "Dear Health Care Provider" letters, and, as noted in the Mifepristone Q&A document posted on our Web site in April 2002, "[w]hen FDA receives and reviews new information, the agency provides appropriate updates to doctors and their patients so that they have essential information on how to use a drug safely."

[72] We note that Aid Access facilitated the sale of unapproved mifepristone and misoprostol to U.S. consumers and that FDA sent Aid Access a warning letter asking it to promptly cease causing the sale of unapproved and misbranded drugs to U.S. consumers. US FDA Warning Letter to Aidaccess.org, dated March 8, 2019. https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/aidaccessorg-575658-03082019.

App. 000669

Docket No. FDA-2019-P-1534

to ensure that the benefits of a drug outweigh its risks is a complex, drug-specific inquiry, reflecting an analysis of multiple, interrelated factors and of how those factors apply in a particular case.[73]  In conducting this analysis, FDA considers whether (based on premarketing or postmarketing risk assessments) there is a particular risk or risks associated with the use of the drug that, on balance, outweigh its benefits and whether additional interventions beyond FDA-approved labeling are necessary to ensure that the drug's benefits outweigh its risks.[74]

As described in the background section of this response (see section I.A.), FDA determined that interventions in addition to the FDA-approved labeling were necessary to ensure that the benefits of Mifeprex outweighed its risks when the drug was initially approved in 2000, and periodic re-evaluations of the REMS since that time have reached the same conclusion. As further described in the background section of this response (see section I.E.), FDA recently undertook a review of the Mifepristone REMS Program.  As explained below, the Mifepristone REMS Program continues to be necessary to ensure the benefits outweigh the risks.

After review of multiple different sources of information, including published literature, safety information submitted to the Agency during the COVID-19 PHE, FAERS reports, the first REMS assessment report for the Mifepristone REMS Program, and information provided by advocacy groups, individuals, and the Plaintiffs in ongoing litigation,[75] as well as information submitted by the Applicants, we have concluded that the REMS can be modified to reduce the burden on the health care delivery system without compromising patient safety. As explained below, we agree that the healthcare provider certification (ETASU A) and dispensing of mifepristone to patients with evidence or other documentation of safe use conditions (ETASU D) continue to be necessary components of the REMS to ensure the benefits outweigh the risks.  However, we have concluded that the Mifepristone REMS Program must be modified to remove the requirement under ETASU C that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals.

Below, we discuss each of these elements of the Mifepristone REMS Program.

### a.  ETASU A – Prescriber Certification/Qualifications

ETASU A under the Mifepristone REMS Program requires healthcare providers who prescribe mifepristone to be certified.  In order to become certified, prescribers must: 1) review the prescribing information for mifepristone and 2) complete the Prescriber Agreement Form. In signing the Prescriber Agreement Form, prescribers agree they meet the qualifications listed below:

---

[73] See FDA Guidance for Industry, *REMS: FDA's Application of Statutory Factors in Determining When a REMS Is Necessary* (Apr. 2019).
[74] Id.
[75] See supra n. 10.

App. 000670

Docket No. FDA-2019-P-1534

- Ability to assess the duration of pregnancy accurately

- Ability to diagnose ectopic pregnancies

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information of mifepristone (which the provider can access by phone or online).

In addition to meeting these qualifications, as a condition of certification the healthcare provider also agrees to follow the guidelines for use below:

- Review the Patient Agreement Form with the patient and fully explain the risks of the mifepristone treatment regimen. Answer any questions the patient may have prior to receiving mifepristone.
- Sign and obtain the patient's signature on the Patient Agreement Form.
- Provide the patient with a copy of the Patient Agreement Form and the Medication Guide.
- Place the signed Patient Agreement Form in the patient's medical record.
- Record the serial number from each package of mifepristone in each patient's record.
- Report deaths to the Applicant, identifying the patient by a non-identifiable patient reference and the serial number from each package of mifepristone.

Our review of the published literature did not identify any studies comparing healthcare providers who met these qualifications with healthcare providers who did not. In the absence of such studies, there is no evidence to contradict our previous finding that prescribers' ability to accurately date pregnancies, diagnose ectopic pregnancies, and provide surgical intervention either personally or through others, is necessary to mitigate the serious risks associated with the use of mifepristone in a regimen with misoprostol. Therefore, our conclusion continues to be that a healthcare provider who prescribes mifepristone in a regimen with misoprostol should meet the above qualifications. Absent these provider qualifications, we are concerned that serious and potentially fatal complications associated with medical abortion, including missed ectopic pregnancy and heavy bleeding from incomplete abortion, may not be detected or appropriately managed.

Accordingly, we have determined that ETASU A must remain an element of the Mifepristone REMS Program to ensure the benefits outweigh the risks. Maintaining the requirement for prescriber certification ensures that providers meet the necessary qualifications and adhere to the guidelines for use listed above. The burden of prescriber certification has been minimized to the extent possible by requiring prescribers to certify only one-time for each applicant.

App. 000671

Docket No. FDA-2019-P-1534

Although we agree with your request to retain the REMS for mifepristone (now the Mifepristone REMS Program) insofar as it pertains to ETASU A, as discussed in section II.A.2.a of this response, we do not agree with your request that the healthcare provider needs to be a licensed physician to meet this requirement.

### b. ETASU D – Requirement For The Drug To Be Dispensed With Evidence Or Other Documentation Of Safe-Use Conditions

ETASU D under the Mifepristone REMS Program requires mifepristone to be dispensed with evidence or other documentation of safe-use conditions. To receive mifepristone for medical termination of intrauterine pregnancy through 70 days gestation, the patient must sign a Patient Agreement Form indicating that the patient has received, read, and been provided a copy of the Patient Agreement Form and received counseling from the prescriber regarding the risk of serious complications associated with mifepristone for this indication. The Patient Agreement Form ensures that patients are informed of the risks of serious complications associated with mifepristone for this indication. In a number of approved REMS, Patient Agreement Forms or Patient Enrollment Forms ensure that patients are counseled about the risks of the product and/or informed of appropriate safe use conditions.[76]

As a condition of certification under the Mifepristone REMS Program, healthcare providers must follow the guidelines for use of mifepristone, including reviewing the Patient Agreement Form with the patient, fully explaining the risks of the treatment regimen and answering any questions the patient may have before receiving the medication. With this form, the patient acknowledges that they have received and read the form, and that they have received the counseling regarding when to take mifepristone, the risk of serious complications associated with mifepristone and what to do if they experience adverse events (e.g., fever, heavy bleeding). Both the healthcare provider and patient must sign the document and the patient must receive a copy of the signed form. In addition to the counseling described in the Patient Agreement Form, patients also receive a copy of the Medication Guide for mifepristone. Ultimately, the Patient Agreement Form serves as an important counseling component, and documentation that the safe use conditions of the Mifepristone REMS Program have been satisfied, as the prescriber is required to place the signed Patient Agreement Form in the patient's medical record.

In addition, we conducted an updated review of published literature since 2016 to assess the utility of maintaining the Patient Agreement Form as part of the Mifepristone REMS Program, and these studies do not provide evidence that would support removing ETASU D. For these reasons, we have determined that ETASU D must remain an element of the Mifepristone REMS Program to ensure the benefits outweigh the risks.

---

[76] REMS@FDA, https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm, Accessed November 15, 2021.

App. 000672

Docket No. FDA-2019-P-1534

### c. ETASU C – In-Person Dispensing

ETASU C under the Mifepristone REMS Program currently requires mifepristone to be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber. This creates what we refer to in this response as an in-person dispensing requirement under the REMS; i.e., the patient must be present in person in the clinic, medical office, or hospital when the drug is dispensed. The mifepristone REMS document currently states that mifepristone may not be distributed to or dispensed through retail pharmacies or settings other than a clinic, medical office, or hospital. As explained below, based on a recent review of the REMS, we believe that the Mifepristone REMS Program must be modified to remove the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals, because this requirement is no longer necessary to ensure that the benefits of the drug outweigh the risks. This conclusion is based on our review of information from the Mifepristone REMS Program one-year (1st) REMS[77] assessment data and postmarketing safety information, and supported by our review of the published literature.

#### i. Assessment Data

As part of our review of the REMS, we evaluated information included in the 1st REMS assessment report for the Mifepristone REMS Program, which included healthcare provider certification data, program utilization data, and non-compliance data. This 1st REMS assessment report covers a reporting period between April 11, 2019 through February 29, 2020. During this reporting period, a small number of non-compliance events were reported.

As described in section I.C. of this response, during the timeframe from January 27, 2020 through September 30, 2021, there were periods when the in-person dispensing requirement was not enforced. To better understand whether there was any impact on safety or non-compliance during the periods when the in-person dispensing requirement was not enforced, we requested additional information from the Applicants to provide for more comprehensive assessment of the REMS for the time period from January 27, 2020 (the effective date of the COVID-19 PHE) to September 30, 2021. We requested the Applicants provide a summary and analysis of any program deviation or non-compliance events from the REMS requirements and any adverse events that occurred during this time period that had not already been submitted to FDA. The NDA and the ANDA Applicants reported a total of eight cases reporting adverse events between January 27, 2020 and September 30, 2021. These eight cases were also identified in the FAERS database and are described below.

The number of adverse events reported to FDA during the COVID-19 PHE with mifepristone use for medical termination of pregnancy is small, and the data provide no

---

[77] This REMS assessment report was the first submitted following the approval of the single, shared system REMS for mifepristone.

Docket No. FDA-2019-P-1534

indication that any program deviation or noncompliance with the Mifepristone REMS Program contributed to these reported adverse events.

## ii. FAERS/Postmarketing Safety Data

FDA routinely monitors postmarketing safety data for approved drugs through adverse events reported to our FAERS database,[78] through our review of published medical literature, and when appropriate, by requesting applicants submit summarized postmarketing data. For our recent review of the REMS, we searched our FAERS database, reviewed the published medical literature for postmarketing adverse event reports for mifepristone for medical termination of pregnancy, and requested that the Applicants submit a summary and analysis of certain adverse events. Our review of this postmarketing data indicates there have not been any new safety concerns with the use of mifepristone for medical termination of pregnancy through 70 days gestation, including during the time when in-person dispensing was not enforced.

In order to evaluate the periods when in-person dispensing was and was not enforced, we conducted a search of the FAERS database and the published medical literature to identify U.S. postmarketing adverse events that reportedly occurred from January 27, 2020 through September 30, 2021 with mifepristone use for medical termination of pregnancy. The data for this time period were then further divided into the date ranges when in-person dispensing was enforced per the REMS (January 27, 2020 - July 12, 2020 and January 13, 2021 - April 12, 2021) versus when in-person dispensing was not enforced: July 13, 2020 - January 12, 2021 (in-person dispensing enforcement was temporarily enjoined) and April 13, 2021 - September 30, 2021 (enforcement discretion for in-person dispensing because of the COVID-19 PHE).

Based on the above search, a total of eight cases were identified in FAERS and no additional case reports were identified in the medical literature. Two of the eight cases reported adverse events that occurred when in-person dispensing was being enforced (i.e., January 27, 2020-July 12, 2020 and January 13, 2021-April 12, 2021). These two cases reported the occurrence of uterine/vaginal bleeding (case 1) and uterine/vaginal bleeding and sepsis (case 2). Of note, uterine/vaginal bleeding and sepsis are labeled adverse events. Five of the eight cases reported adverse events that occurred when in-person dispensing was not enforced (i.e., July 13, 2020-January 12, 2021 and April 13, 2021-September 30, 2021); however, the narratives provided in the FAERS reports for three of the five cases explicitly stated that mifepristone was dispensed in-person. These five cases reported the occurrence of ongoing pregnancy (case 3), drug intoxication and death approximately 5 months after ingestion of mifepristone (case 4), death [cause of death is currently unknown] (case 5), sepsis and death (case 6), and pulmonary embolism (case 7). Of note, ongoing pregnancy and sepsis, including the possibility of fatal septic shock, are labeled adverse events. The remaining case reported the occurrence of oral pain/soreness (case 8) in July

---

[78] FAERS is a database that contains adverse event reports, medication error reports and product quality complaints resulting in adverse events that were submitted to FDA. The database is designed to support FDA's post-marketing safety surveillance program for drug and therapeutic biologic products.

App. 000674

Docket No. FDA-2019-P-1534

2021, but did not provide sufficient information to determine the exact date of the adverse event.

As discussed in section II.A.2.d., the Applicants report adverse events, including serious adverse events, to FDA in accordance with applicable regulations.[79]  To enable additional review of adverse events, Applicants were requested to provide a summary and analysis for adverse events reported with incomplete medical abortion requiring surgical intervention to complete abortion, blood transfusion following heavy bleeding or hemorrhage, ectopic pregnancies, sepsis, infection without sepsis, hospitalization related to medical abortion, and emergency department/urgent care encounter related to medical abortion.  The Applicant for Mifeprex provided the requested summary of postmarketing safety information from March 29, 2016, when S-020 was approved, through September 30, 2021.  The Applicant for the generic provided the requested summary of postmarketing safety information from April 11, 2019 (date of initial approval) through September 30, 2021.  The information provided by the Applicants included the same cases identified in FAERS, as discussed above.

We analyzed the FAERS data referenced above to determine if there was a difference in adverse events when in-person dispensing was and was not enforced.  Based on FDA's review of this data, we concluded that there does not appear to be a difference in adverse events when in-person dispensing was and was not enforced and that mifepristone may be safely used without in-person dispensing.  FDA's review of the summary and analysis data submitted by the Applicants (which, as noted above, included the same cases identified from FAERS) did not change this conclusion.

### iii.  Published Literature

As noted above, we also conducted an extensive review of the published literature since March 29, 2016 (the date the S-020 efficacy supplement for Mifeprex was approved) through September 30, 2021.[80]  Published studies have described alternatives in location and method for dispensing mifepristone by a certified prescriber (or equivalent healthcare provider in countries other than the United States).  Some studies have examined replacing in-person dispensing in certain healthcare settings with dispensing at retail pharmacies[81]

---

[79] See 21 CFR 314.98, 21 CFR 314.80, and 21 CFR 314.81.

[80] In support of your request that we retain the REMS and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals by or under the supervision of a certified prescriber, you reference two studies that you assert do not comply with the REMS (Petition at 19-22).  Outcomes from both of the studies you reference have been reported in the published literature and are addressed in the discussion that follows. We note that as a general matter, a clinical investigation of an approved drug that is subject to a REMS can take place in healthcare settings outside those provided for in the REMS.  When an approved drug that is subject to a REMS is studied in a clinical trial, the REMS does not apply to the use of the drug in that clinical trial.  However, FDA reviews the protocol to ensure that it will be conducted in a manner that adequately addresses the risks that the REMS is intended to mitigate, such that the trial participants will not be exposed to an unreasonable and significant risk of illness or injury.  See 21 CFR 312.42(b)(1)(i) and (b)(2)(i).

[81] Grossman D, Baba CF, Kaller S, et al. Medication Abortion With Pharmacist Dispensing of Mifepristone. Obstet Gynecol 2021;137:613–22; Rocca CH, Puri M, et al. Effectiveness and safety of early medication

App. 000675

Docket No. FDA-2019-P-1534

and dispensing mifepristone from pharmacies by mail.[82]  Other studies have evaluated two modes of dispensing by prescribers: (1) prescribers mailing the medications to patients,[83] and (2) prescribers using couriered delivery of medications.[84]  Different  studies have evaluated dispensing mifepristone by mail by an entity described as "a partner organization."[85]

We note that the ability to generalize the results of these studies to the United States population is hampered by differences between the studies with regard to pre-abortion care (e.g., telemedicine versus in-person).  In addition, the usefulness of the studies is limited in some instances by small sample sizes and lack of follow-up information on outcomes with regard to both safety and efficacy.  There are also factors which complicate the analysis of the dispensing element alone.  Some of these factors are: (1) only a few studies have evaluated alternatives for in-person dispensing of mifepristone in isolation (for example, most studies on mail dispensing of mifepristone also include telemedicine consultation); and (2) because most serious adverse events with medical abortion are infrequent, further evaluation of changes in dispensing would require studies with larger numbers of participants.  We did not find any large clinical studies that were designed to collect safety outcomes in healthcare systems similar to the United States.  Despite the limitations of the studies we reviewed, we have concluded that overall the outcomes of these studies are not inconsistent with our conclusion that, based on the 1st year REMS assessment report and postmarketing safety data, mifepristone will remain safe and efficacy will be maintained if the in-person dispensing requirement is removed from the Mifepristone REMS Program.

---

abortion provided in pharmacies by auxiliary nurse-midwives: A non-inferiority study in Nepal. PLoS ONE 13(1): e0191174. https://doi.org/10.1371/journal.pone.019117; Wiebe ER, Campbell M, et al. Comparing telemedicine to in-clinic medication abortion induced with mifepristone and misoprostol. Contracept X. 2020; 2: 100023.

[82] Grossman D, Raifman S, Morris N, et.al. Mail-order pharmacy dispensing of mifepristone for medication abortion after in-person clinical assessment. Contraception 2021, ISSN 0010-7824, https://doi.org/10.1016/j.contraception.2021.09.008, Available online 20 September 2021; Upadhyay UD, Koenig LR, Meckstroth KR. Safety and Efficacy of Telehealth Medication Abortion in the US During the COVID-19 Pandemic. JAMA Network Open. 2021;4(8):e2122320, doi:10.1001/jamanetworkopen.2021.22320; Hyland P, Raymond EG, Chong E. A direct-to-patient telemedicine abortion service in Australia: Retrospective analysis of the first 18 months. Aust N Z J Obstet Gynaecol 2018;58: 335-340.

[83] See Anger HA, Raymond EG, et al. Clinical and service delivery implications of omitting ultrasound before medication abortion provided via direct-to-patient telemedicine and mail. Contraception 2021 Jul 28;S0010-7824(21)00342-5. doi: 10.1016/j.contraception.2021.07.108. Published online. Raymond E, Chong E, et al. TelAbortion: evaluation of a direct to patient telemedicine abortion service in the United States. Contraception 2019; 100:173-177.  See also Chong et al., infra n. 103  Kerestes et al., infra n. 105, and Aiken et al., infra n. 106.

[84] Reynolds-Wright JJ, et al. BMJ Sex Reprod Health 2021;0:1–6. doi:10.1136/bmjsrh-2020-200976.

[85] Endler M, Beets L, Gemzell Danielsson K, Gomperts R. Safety and acceptability of medical abortion through telemedicine after 9 weeks of gestation: a population-based cohort study. BJOG 2019;126;609-618. Norten H, Ilozumba O, Wilkinson J, Gemzell Danielsson K, Gomperts R. 10-year evaluation of the use of medical abortion through telemedicine: a retrospective cohort study. BJOG 2021; https://doi.org/10.1111/1471-0528.16765; Aiken ARA, Digol I, Trussell J, Gomperts R. Self-reported outcomes and adverse events after medical abortion through online telemedicine: population based study in the Republic of Ireland and Northern Ireland. BMJ 2017;357:j2011 http://dx.doi.org/10.1136/bmj.j2011.

Docket No. FDA-2019-P-1534

Below is a summary of our review of the literature, organized by the methods of dispensing mifepristone that were studied.

(a) Retail pharmacy dispensing

Three studies reported medical abortion outcomes for retail pharmacy dispensing of mifepristone after clinical evaluation (Grossman,[86] Rocca,[87] Wiebe[88]). Grossman conducted a US-based study in which mifepristone and misoprostol were dispensed from a pharmacy partnered with the clinic. Complete abortion without additional procedures occurred in 93.5 percent of participants with known outcomes. The reported proportion of complete abortion is within the range described in the approved mifepristone labeling. No participants experienced a serious adverse event, were hospitalized or required transfusion. Three participants had emergency department (ED) visits with treatment (intravenous hydration, pain medication, pelvic infection after uterine aspiration for incomplete abortion). The study safety and efficacy outcomes are consistent with labeled outcome frequencies. The study has limited generalizability because it was conducted in two US states and involved partnered pharmacies, some of which were in the same building as the clinic. Additionally, all participating pharmacies in this study were required to have a pharmacist on duty during clinic hours who had been trained in the study protocol and was willing to dispense mifepristone. The study conditions may not be generalizable to United States retail pharmacies; there is insufficient information to assess this.

Rocca[89] conducted an observational study evaluating participants who obtained medical abortions in Nepal by comparing the provision of medical abortion service by newly trained nurse midwives in pharmacies to medical abortion provided in government-certified clinics. The authors reported that, with respect to complete abortion (greater than 97 percent) and complications (no hospitalizations or transfusions), evaluation and dispensing in pharmacy was non-inferior to in-clinic evaluation and dispensing.

Wiebe,[90] in a retrospective, chart review study conducted in Canada, compared abortion outcomes of women who underwent medical abortion with telemedicine consult, and either received medications by courier or picked them up at a local pharmacy, with outcomes of a matched control cohort of women who received the medications at a pharmacy after an in-clinic visit. The groups had similar documented complete medical abortion outcomes (equal to or greater than 95 percent participants with known outcomes). The telemedicine group had one case of hemorrhage (0.5 percent) and one case of infection requiring antibiotics (0.5 percent) compared with no cases of hemorrhage or infection requiring antibiotics in the in-clinic cohort. The telemedicine group had more ED visits (3.3 percent compared to 1.5 percent in-clinic cohort). Both models of dispensing mifepristone resulted in efficacy and safety outcomes within labeled frequency.

---

[86] Grossman et al., supra n. 81.
[87] Rocca et al., supra n. 81.
[88] Wiebe et al., supra n. 81.
[89] Rocca et al., supra n. 81.
[90] Wiebe et al., supra n. 81.

Docket No. FDA-2019-P-1534

None of the three studies allow a determination regarding differences in safety between in-person dispensing by a certified prescriber in a health care setting and dispensing through a retail pharmacy, due to limitations on the generalizability of the results of the studies to the current retail pharmacy environment in the United States.  The outcome findings from the one United States study (Grossman)[91], in which the pharmacies were partnered with prescribers, are unlikely to be broadly generalizable to the current retail pharmacy environment and do not reflect typical prescription medication availability with use of retail pharmacy dispensing.  For the retail pharmacy dispensing study in Canada (Wiebe),[92] timely provision of medication from the retail pharmacy was accomplished by either courier to the woman or faxed prescription to the woman's pharmacy.  It is unknown whether conditions that would allow timely access to medications for medical abortion would occur in retail pharmacies throughout the United States, suggesting the findings from that study may not be broadly generalizable.  The third study (Rocca)[93] evaluated medical abortion provided in Nepali pharmacies and essentially moved the abortion provider and clinical examination into the pharmacy, a scenario that is not, at this time, applicable to the United States retail setting.

    (b) <u>Mail order pharmacy</u>

Three studies evaluated mail order pharmacy dispensing (Grossman,[94] Upadhyay,[95] Hyland[96]).  Grossman published an interim analysis of an ongoing prospective cohort study evaluating medical abortion with mifepristone and misoprostol dispensed by mail-order pharmacy after in-person clinical assessment.  Complete abortion without additional procedures occurred in 96.9 percent of participants with known outcomes.  Two (0.9 percent) participants experienced serious adverse events; one received a blood transfusion and one was hospitalized overnight.  Nine (4 percent) participants attended 10 ED visits.  In this interim analysis, the outcomes are consistent with labeled frequencies.

Upadhyay[97] reports findings from a retrospective cohort study of women undergoing medical abortion in the United States without a consultation or visit. Eligibility was assessed based on a participant-completed online form collecting pregnancy and medical history.  Participants who were considered eligible received medication delivered by a mail-order pharmacy.  Abortion outcome was determined by either an assessment on day 3 or a 4-week pregnancy test.  The investigators reported a complete abortion rate without additional procedures of 95 percent for participants with known outcomes and stated that no participants had any major adverse events.  The proportion of abortion outcomes assessed at 3 days versus 4 weeks is not reported.  Regardless, determining outcomes at 3 days is insufficient to determine outcome rates or safety findings because a 3-day follow-up period is too short.   As recommended in Section 2.3 of the approved labeling, follow-up at

[91] Grossman et al., supra n. 81.
[92] Wiebe et al., supra n. 81.
[93] Rocca et al., supra n. 81.
[94] Grossman et al, supra n. 82.
[95] Upadhyay et al., supra n. 82.
[96] Hyland et al., supra n. 82.
[97] Upadhyay et al., supra n. 82.

App. 000678

Docket No. FDA-2019-P-1534

7-14 days after administration of mifepristone is more appropriate to evaluate safety and efficacy. This study used a model with numerous deviations from standard provision of medical abortion in the United States, such as no synchronous interaction with the prescriber during informed consent or prior to prescribing medication and no confirmation of self-reported medical, surgical, and menstrual history. These deviations, limited follow-up information, and small sample size limit the usefulness of this study.

Hyland[98] describes findings from a cohort study in Australia evaluating medical abortion outcomes utilizing telemedicine and a central mail order pharmacy. Complete abortions without additional procedures occurred in 96 percent of participants with documented outcomes and is consistent with labeled efficacy. Of the participants included in the analysis, 95 percent had no face-to-face clinical encounters after medications were mailed while 3 percent were admitted to the hospital and 2 percent had an outpatient encounter. One participant who was hospitalized and underwent a surgical uterine evacuation received a transfusion. Not included in the findings are 7 hospitalizations occurring in 7 participants who did not have "full follow up." The authors do not report any other adverse events and conclude use of the telemedicine medical abortion service is safe. However, the reasons for hospitalization are not discussed by the authors; therefore, it is unknown why the patients were hospitalized. Although the reported frequency of hospitalizations (3 percent) is higher than the less than 1 percent in the FDA-approved mifepristone labeling, conclusions on the safety findings cannot be made in the absence of information about the reasons for hospitalization. Other limitations of this study include incomplete information about outcomes with face-to-face encounters.

Overall, the three studies evaluating mail order pharmacy dispensing suggest that efficacy of medical abortion is maintained with mail order pharmacy dispensing. With respect to safety, in the Grossman study[99] the interim analysis, although small, does not raise serious safety concerns. Safety findings from the Hyland[100] study are difficult to interpret. Although only one transfusion is reported and the authors state the findings demonstrate safety, a higher hospitalization rate and lack of information on the reasons for hospitalization preclude reaching any conclusions about the safety findings. Lastly, the Upadhyay[101] study had no reported adverse events, but the findings are less useful because of the limited follow-up, and because medical abortions were provided using a model with numerous deviations from standard provision of medical abortion in the United States.

   (c) <u>Clinic dispensing by mail</u>

A total of five studies evaluated clinic dispensing by mail. Gynuity Health Projects conducted a prospective cohort study (the "TelAbortion" study) evaluating use of telemedicine for remote visits and mifepristone being dispensed from clinics via overnight or regular tracked mail. Three publications reviewed have reported outcomes for the Gynuity population exclusively: Raymond (outcomes from May 2016 to December

---

[98] Hyland et al., supra n. 82.
[99] Grossman et al., supra n. 82.
[100] Upadhyay et al., supra n. 82.
[101] Hyland et al., supra n. 82.

App. 000679

Docket No. FDA-2019-P-1534

2018),[102] Chong (outcomes from May 2016 to September 2020)[103] and Anger (outcomes from March 2020 to September 2020).[104]  A fourth study, Kerestes,[105] reports outcomes of medical abortion at the University of Hawai'i from April 2020 to November 2020 and a fifth study, Aiken (2021)[106] reports outcomes of medical abortion up to 70 days gestational age in the United Kingdom before and during the COVID-19 PHE in a retrospective cohort study.

In Raymond,[107] complete abortion without additional procedures occurred in 93 percent of participants with known outcomes.  There were two hospitalizations (one participant received a transfusion for severe anemia despite having had a complete abortion) and 7 percent of participants had clinical encounters in ED/urgent care centers.  The reported outcomes are similar to outcomes described in approved labeling except the combined ED/urgent care center encounters (7 percent) exceeded the ED visits in approved labeling (2.9-4.6 percent).[108]  Of note, the authors state that half of the ED/urgent care visits did not entail any medical treatment.  In Chong,[109] approximately 50 percent of the medical abortions occurred during the period of the COVID-19 PHE.  Complete abortion without an additional procedure occurred in 95 percent of those with known outcomes.  Transfusions were 0.4 percent and hospitalizations were 0.7 percent; 6 percent of participants had unplanned clinical encounters in ED/urgent care.  Surgical interventions were required in 4.1 percent to complete abortion.  The reported outcomes in Chong (which updated the findings described in Raymond) are similar to outcomes described in approved labeling except that (as with the Raymond study it updated) the combined ED/urgent care center encounters (6 percent) exceeded the ED visits in approved labeling (2.9-4.6 percent).

Anger,[110] which compared outcomes among participants enrolled in the Gynuity study who did ("test medical abortion cohort") versus did not ("no-test medical abortion cohort")[111]

---

[102] Raymond et al., supra n. 83.

[103] Chong E, Shochet T, et al. Expansion of a direct-to-patient telemedicine abortion service in the United States and experience during the COVID-19 pandemic. Contraception 2021;104:43-48.

[104] Anger et al., supra n. 83.

[105] Kerestes C, Murayama S, et al. Provision of medication abortion in Hawai'i during COVID-19: Practical experience with multiple care delivery models. Contraception 2021 Jul;104(1):49-53. doi:10.1016/j.contraception.2021.03.025. Epub 2021 Mar 28.

[106] Aiken ARA, Lohr PA, et al. Effectiveness, safety and acceptability of no-test medical abortion (termination of pregnancy) provided via telemedicine: a national cohort study. BJOG 2021;128:1464–1474.

[107] Raymond, supra n. 83.

[108] The authors reported the combined frequency of emergency department/urgent care visits, whereas the approved labeling includes the frequency for emergency department (emergency room) visits. Therefore it is unknown whether the frequency of emergency department visits in the trial, as distinct from the combined frequency of emergency department/urgent care visits, is comparable to the frequency of emergency department visits reflected in approved labeling.

[109] Chong et al., supra n. 103.

[110] Anger et al., supra n. 83.

[111] "No-test medication abortion" refers to medical abortion provided without a pretreatment ultrasound, pelvic examination or laboratory tests when, in the judgment of the provider, doing so is medically appropriate (appropriateness based on history and symptoms); "no-test medication abortion"  does include post-abortion follow up. A sample protocol is described by Raymond et al." (Raymond EG, Grossman D, Mark A, et.al. Commentary: No-test medication abortion: A sample protocol for increasing access during a pandemic and beyond. Contraception 2020;101:361-366)

Docket No. FDA-2019-P-1534

have confirmation of gestational age/intrauterine location with an examination or ultrasound, found that those without an examination or ultrasound prior to medical abortion were more likely to require procedural interventions and had more unplanned clinical encounters.[112]  There were no reported ectopic pregnancies in either group.  The number of ED/urgent care visits and the proportion of unplanned clinical encounters that led to medical treatment were not reported.  In the "test" group, complete medical abortion was confirmed in 98 percent of participants with known outcomes; one participant was "hospitalized and/or blood transfusion" and 8 percent had an unplanned clinic encounter (participant sought in-person medical care related to abortion and the visit was not planned prior to abortion).  In the "no-test" group, complete medical abortion was confirmed in 94 percent of participants with known outcomes; two participants were "hospitalized and/or blood transfusion" and 12.5 percent had an unplanned clinical encounter.

Kerestes[113] included three different delivery models: traditional in-person visits, telemedicine consultation with in-person pick-up of medications, and telemedicine consultation with delivery of medications by mail (most of the latter were enrolled through Gynuity's TelAbortion study).  Among participants with follow-up data, the rates of successful medical abortion without surgery were consistent with outcomes in approved labeling. Blood transfusion was given to two participants (both in the telemedicine plus in-person pickup group).  Although ED visits occurred the most frequently in the telemedicine plus mail group (four participants or 5.8 percent) and the least in the in-person group (two participants or 2.1 percent), the study reported no increases in other serious adverse events.  Aiken (2021)[114] reported outcomes before and during the pandemic in a retrospective cohort study in the United Kingdom.  The study compared the two cohorts: one before the pandemic with in-person visits and dispensing (traditional model) and one during the pandemic with either an in-person visit and in-person dispensing or a telemedicine visit and dispensing by mail or picked up from the clinic (hybrid model).  Complete abortion occurred in greater than 98 percent in both cohorts; the rate was slightly higher in the telemedicine group than in the in-person group.  There were no significant differences in the rates of reported serious adverse events.  The investigators' analysis determined that the efficacy and safety were comparable between both cohorts and concluded the hybrid model for medical abortion is effective and safe.

Taken together, data from the three Gynuity study reports (Raymond, Chong, and Anger), Kerestes, and Aiken (2021) support that efficacy of medical abortion was maintained when mifepristone was dispensed by mail from the clinic.  Study reports of Raymond, Chong, and Kerestes all suggest there may be an increase in ED/urgent care visits with telemedicine visits and dispensing by mail from the clinic, but without increases in other serious adverse events.  Anger's comparative analysis suggests a pre-abortion examination may decrease the occurrence of procedural intervention and decrease the number of unplanned visits for postabortion care.  The Aiken (2021) study appears to be of sufficient

---

[112] We note that the two cohorts were not randomized in the Anger study; they had different baseline characteristics. Consequently, findings based on the comparisons between the two cohorts should be interpreted carefully.
[113] Kerestes et al., supra n. 105.
[114] Aiken et al., supra n. 106.

Docket No. FDA-2019-P-1534

sample size to determine whether safety outcomes with mail dispensing differ from in-person dispensing; however, significant limitations include that the analysis was based on deidentified information and the investigators were unable to verify the outcomes extracted. Further, the study's design did not capture all serious safety outcomes, thus limiting the certainty of the findings.

Notwithstanding the limitations discussed above, these studies overall support that dispensing by mail from the clinic is safe and effective. Although the literature suggests there may be more frequent ED/urgent care visits related to the use of mifepristone when dispensed by mail from the clinic, there are no apparent increases in other serious adverse events related to mifepristone use.

(d) Clinic dispensing by courier

Reynolds-Wright[115] reported findings from a prospective cohort study of participants at less than 12 weeks gestational age in Scotland undergoing medical abortion at home that provided mifepristone for pick up at the service or by couriered delivery to woman's home. The outcomes from this study in Scotland are consistent with the outcomes in the approved mifepristone labeling. However, the number of couriered deliveries was not reported. Thus this study does not provide abortion outcomes separately for couriered delivery of mifepristone and misoprostol. The study shares the same limitations as the Aiken (2021) study; the study's design did not capture all serious safety outcomes, thus limiting the certainty of the findings.

(e) Partner organization dispensing by mail

Women on Web (WoW), an internet group, connects patients and providers outside of the US and provides medical abortion globally, dispensing mifepristone through "a partner organization" by mail. WoW uses a model with numerous deviations from the standard provision of medical abortion in the United States. For example, this model has no synchronous interaction with the prescriber during informed consent or prior to prescribing medication and no confirmation of self-reported medical, surgical, and menstrual history or confirmed pregnancy testing. Three studies (Endler, Norten, and Aiken (2017))[116] reported outcomes based on dispensing through this model. Endler and Norten reported outcomes from WoW cohorts but do not provide relevant information on mifepristone dispensing by mail because neither provide meaningful outcomes data for consideration. Although Aiken (2017) is a large cohort study, the outcomes are self-reported and an unusually high rate of outcomes are unaccounted for; these limitations result in the data being insufficient to determine the safety of dispensing mifepristone by mail though a partner organization.

In sum, there are insufficient data from the literature we have reviewed to determine the safety and efficacy of dispensing from a retail pharmacy, by courier, or by a partner organization. With respect to dispensing mifepristone by mail, our review of the literature indicates that dispensing mifepristone by mail from the clinic or from a mail order

---

[115] Reynolds-Wright JJ, et al. BMJ Sex Reprod Health 2021;0:1–6. doi:10.1136/bmjsrh-2020-200976.
[116] Endler et al., Norten et al., and Aiken et al., supra n. 85.

App. 000682

Docket No. FDA-2019-P-1534

pharmacy does not appear to jeopardize the efficacy of mifepristone for medical abortion. While the studies we reviewed are not adequate on their own to establish the safety of the model of dispensing mifepristone by mail, the safety and efficacy outcomes reported in these studies remain within the ranges labeled for the approved mifepristone products. Although the literature suggests there may be more frequent ED/urgent care visits related to the use of mifepristone when dispensed by mail from the clinic, there are no apparent increases in other significant adverse events related to mifepristone use.

Based on the REMS assessment data, FAERS data from the time period when the in-person dispensing requirement was not being enforced, and our review of the literature, we conclude that mifepristone will remain safe and effective if the in-person dispensing requirement is removed, provided all the other requirements of the REMS are met and pharmacy certification is added. Removing the in-person dispensing requirement will render the REMS less burdensome to healthcare providers and patients, and provided all other requirements of the REMS are met, including the additional requirement for pharmacy certification, the REMS will continue to ensure that the benefits of mifepristone for medical abortion outweigh the risks. Therefore, to reduce the burden imposed by the Mifepristone REMS Program, the REMS must be modified to remove the in-person dispensing requirement, which would allow, for example, dispensing of mifepristone by mail via certified prescribers or pharmacies, in addition to in-person dispensing in clinics, medical offices and hospitals as currently outlined in ETASU C.

In your Petition, you state that "[e]liminating or relaxing the REMS to facilitate Internet or telephone prescriptions would be dangerous to women and adolescent girls" and that "health care providers prescribing abortion-inducing drugs over the Internet or phone or before a patient is even pregnant cannot adequately evaluate patients for contraindications to the drugs" (Petition at 18-19).

We do not agree that eliminating the REMS requirement for the dispensing of Mifeprex in certain healthcare settings will be dangerous to patients, nor do we agree that doing so will affect the ability of healthcare providers to evaluate women for contraindications to mifepristone in a regimen with misoprostol for medical termination of intrauterine pregnancy through 70 days gestation. There are many factors that contribute to patient safety, including evaluation of a patient, informed consent, development of a follow-up plan, and provision of a contact for emergency care. All of these can occur in many types of healthcare settings. The evaluation of patients for contraindications to medical abortion does not necessarily require direct physical contact with the certified prescriber.

You also assert that telemedicine abortion absolves abortion providers of responsibility for the well-being of their patients (Petition at 19). We do not agree. Healthcare providers who prescribe mifepristone are responsible for the well-being of their patients regardless of mode of evaluation or dispensing of medication. The Agency agrees with the American Medical Association that a healthcare provider-patient relationship is entered when the "physician serves a patient's medical needs;"[117] in the context of medical abortion, this

---

[117] See www.ama-assn.org/delivering-care/ethics/patient-physician-relationships.

Docket No. FDA-2019-P-1534

healthcare provider-patient relationship continues until resolution of the pregnancy or transfer of care to another healthcare provider.[118]

We also note that patients who are not pregnant at the time of evaluation would not be appropriate candidates for being prescribed mifepristone for medical termination of pregnancy because they do not fulfill the approved indication of having an intrauterine pregnancy of up to 70 days gestation.

### 2.    Other Safety Issues and Additional Studies

In support of your request that we retain the Mifeprex REMS, you cite the Council for International Organizations of Medical Sciences' (CIOMS) definition of "rare" to assert that because "about 1 out of 100 women" using Mifeprex and misoprostol require surgery, serious complications are common, not rare (Petition at 15-16).[119]  Although we agree that certain elements of the Mifepristone REMS Program are necessary to assure the safe use of mifepristone, we do not agree with your assertion.

In the Petition, you state that the Medication Guide improperly downplays the risks of the use of Mifeprex in a regimen with misoprostol and you cite the Medication Guide as stating "'*rarely*, serious and potentially life-threatening bleeding, infections, and other problems can occur following . . . medical abortion.' Specifically, 'in about 1 out of 100 women [administered Mifeprex and misoprostol] bleeding can be so heavy that it requires a surgical procedure." (Petition at 15). Using these two separate statements in the Medication Guide, you argue that the CIOMS's definition of rare ("1 out of 1000") means that if 1 out of 100 women using Mifeprex in a regimen with misoprostol require surgery, serious complications are common, not rare. (Petition at 16).  However, your reference to the two sentences in the Medication Guide conflates two different clinical scenarios: (1) the adverse event of serious and potentially life-threatening bleeding, and (2) treatment failure.

The first sentence you reference states: "Although cramping and bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth."  This statement refers to life-threatening adverse events that can occur during termination regardless of gestational age or during miscarriage or childbirth regardless of the mode of delivery (e.g., vaginal delivery or cesarean section).  At the time of our review of the clinical studies submitted to support the S-020 efficacy supplement, the reported rate of death in the studies reviewed, based on one death, was 0.007 percent (very rare under the CIOMS definition).[120]  The rate of infections requiring hospitalization or

---

[118] See https://www.ama-assn.org/delivering-care/ethics/ethical-practice-telemedicine.

[119] Council for International Organizations of Medical Sciences. Guidelines for Preparing Core Clinical Safety Information on Drugs Second Edition. 1999. https://cioms.ch/wp-content/uploads/2018/03/Guidelines-for-Preparing-Core-Clinical-Safety-Info-Drugs-Report-of-CIOMS-Working-Group-III-and-V.pdf.  Accessed December 13, 2021 (CIOMS).

[120] Id. at 36 (defining the "very rare" standard category of frequency as less than 0.01 percent).

App. 000684

Docket No. FDA-2019-P-1534

intravenous antibiotics was less than 0.1 percent (rare under the CIOMS definition),[121] and rates of transfusion were 0.03-0.7 percent (rare to uncommon under the CIOMS definition).[122]  Therefore, "rarely" accurately refers to the frequency of the adverse events referenced in this statement.

The second sentence you reference from the Medication Guide states: "In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical aspiration or D&C)."  This statement refers to the rate of surgical procedures for bleeding following treatment with mifepristone.  Heavy bleeding or hemorrhage after medical abortion is a small subset of bleeding and can require a surgical procedure due to ongoing pregnancy or incomplete expulsion; these are considered failed treatment rather than adverse events and are not characterized using the CIOMS definitions.  Even if heavy, bleeding after medical abortion may not be considered a serious adverse event unless clinically diagnosed as hemorrhage or requiring a transfusion.  Furthermore, in the vast majority of medical abortions, surgical intervention is not necessary.

You also cite a 2009 study and a 2018 study to assert that medical abortions carry greater risks than surgical abortions (Petition at 16).  The 2009 Niinimaki, et al.[123] study reported overall incidences of immediate adverse events (up to 42 days) in medical and surgical abortions performed in women undergoing induced abortion from 2000-2006 based on data from the Finnish national registries.  We agree that the overall incidence of adverse events for medical abortion was fourfold higher when compared with surgical abortion (20.0 percent versus 5.6 percent).  Specifically, the incidence of hemorrhage, incomplete abortion, and surgical (re)evacuation were higher for medical abortion.  However, the authors specifically noted that because medical abortion is associated with longer uterine bleeding, the high rate of events, which were pulled from a national registry reflecting both inpatient and outpatient visits, is not surprising.  They opined that uterine bleeding requiring surgical evacuation probably better reflects the severity of bleeding after termination of pregnancy; the incidence of such bleeding was relatively low, although it was more common with medical abortion.  In addition, the authors acknowledged there are inherent weaknesses in registry-based studies; there is variable reliability both of diagnoses and of severity of diagnoses.  Nevertheless, the authors concluded that both methods are generally safe and recommended discussing the adverse event profiles of different methods when counseling women seeking pregnancy termination.

We note that Ireland, et al.[124] reported findings from a more recent retrospective cohort study of 30,146 United States women undergoing pregnancy termination before 64 days of gestation from November 2010 to August 2013.  Efficacy of pregnancy termination was 99.6 percent and 99.8 percent for medical and surgical abortion, respectively.

---

[121] Id. at 36 (defining the "rare" standard category of frequency as greater than or equal to 0.01 percent and less than 0.1 percent).

[122] Id. at 36 (defining the "uncommon" standard category of frequency as greater than or equal to 0.1 percent and less than 1 percent); see also 2016 Clinical Review, supra n. 13, at 47 and 51.

[123] Niinimaki M, Pouta A, Bloigu A, et al. Immediate complications after medical compared with surgical termination of pregnancy. Obstet Gynecol. 2009;114(4):795-804.

[124] Ireland LD, Gatter, M, Chen, A. 2015. Medical Compared with Surgical Abortion for Effective Pregnancy Termination in the Frist Trimester. Obstetrics & Gynecology 126;22-28.

App. 000685

Docket No. FDA-2019-P-1534

Unanticipated aspiration for persistent pain, bleeding or both were 1.8 percent and 0.4 percent for medical and surgical abortion respectively.  These findings are compatible with the Niinimaki study findings.  There was no difference in major adverse events as defined by the authors (emergency department visit, hospitalization, uterine perforation, infection, hemorrhage requiring transfusion) between the groups.  The authors conclude medical and surgical abortion before 64 days of gestation are both highly effective with low complication rates.

The 2018 Carlsson study is addressed above in section II.A.2.b.ii. of this response; as discussed above, that study showed no statistically significant difference between the overall complication rates between an "at home" and "at the hospital" abortion.[125]

We acknowledge that medical abortion is known to have more days of bleeding and increased rates of incomplete abortion compared to surgical abortion.  However, as noted above, in the vast majority of medical abortions, surgical intervention is not necessary.  Thus, medical abortion and surgical abortion are two options; both have benefits, side effects, and potential complications.  Patients and their healthcare providers should discuss which method is preferable and safer according to each woman's unique situation.

You state that the Mifeprex REMS should require a formal study for at-risk populations, including: patients under the age of 18; patients with repeat Mifeprex abortions; patients with limited access to emergency room services; and patients who self-administer misoprostol (Petition at 13-14).  As we explain below, additional studies are not needed at this time.

In justifying your assertion that a formal study is required in patients under the age of 18, you state that Mifeprex was approved for use in the pediatric population in 2000 after the requirement for studies in the pediatric population was waived (Petition at 13-14).  The approved indication for mifepristone does not limit its use by age.  Although patients age 17 and under were not included in the clinical trials supporting the initial approval of Mifeprex in 2000, we stated at the time that the safety and efficacy were expected to be the same for postpubertal (i.e., post-menarchal) adolescents.  Our conclusion in 2000 that pediatric studies of Mifeprex were not needed for approval was consistent with FDA's implementation of the regulations in effect at that time.  Because we determined that there were sufficient data from studies of mifepristone, the original Mifeprex approval should have reflected the Agency's conclusion that the pediatric study requirements were waived for pre-menarchal females and that the pediatric study requirements were met for post-menarchal adolescents, rather than stating that the Agency was waiving the requirements for all pediatric age groups.

As currently required by the Pediatric Research Equity Act (PREA),[126] certain applications or supplemental applications must include pediatric assessments of the safety and effectiveness of the drug for the claimed indication(s) in all relevant pediatric

---

[125] Carlsson et al., supra n. 49.
[126] Section 505B of the FD&C Act (21 U.S.C. 355c).

Docket No. FDA-2019-P-1534

subpopulations, unless that requirement is waived or deferred.[127]  In accordance with PREA, when FDA reviewed the S-020 efficacy supplement, a partial waiver was granted for pediatric studies in pre-menarchal females because pregnancy does not occur in premenarchal females.  We also determined that the applicant had fulfilled the pediatric study requirement in post-menarchal adolescents.  This determination was based on data extrapolated from adults and information in literature.  Review of these findings found the safety and efficacy in this population to be similar to the safety and efficacy in the adult population.[128]  Therefore, we do not agree that a formal study is required in patients under 18.

With regard to your concerns about repeat abortions and your assertion that a study is necessary in this population, we acknowledge that published data concerning adverse reproductive health outcomes in U.S. women who undergo repeat medical abortions are limited.  We concluded in our 2016 review of the S-020 efficacy supplement that there is no evidence that repeated medical or surgical abortion is unsafe or that there is a tolerance effect.  We also noted that return to fertility after the use of mifepristone is well documented. [129]  This is reflected both in Section 17 of the approved labeling, Patient Counseling Information, which states that the provider should "inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses," and in the Medication Guide, which states "You can become pregnant again right after your pregnancy ends."  Although you state that more than one out of every three abortions in the United Sates is a repeat abortion (Petition at 14),[130] we are not aware of reports suggesting greater safety concerns in repeat abortions than a first-time abortion.  Therefore, we do not agree that a study is necessary in this population.  You also cite a published study, using a mouse model, of repeated medical termination of pregnancy that showed repeat medical abortion impaired the reproductive function of female mice (Petition at 14).[131]  Per our 2016 review, there is no evidence in available clinical data that repeated medical or surgical abortion is unsafe, or that fertility is impaired by the use of mifepristone; therefore, data from a single non-clinical study in mice are not persuasive.[132]

With respect to your request for a formal study of mifepristone for medical abortion in women without access to emergency care, we disagree that such a study is necessary.  In order to become a certified prescriber, a healthcare provider must agree that they have the ability to provide surgical intervention in cases of incomplete abortion or severe bleeding or have made plans to provide such care through others, and that they have the ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.  These prescriber qualifications ensure that mifepristone is prescribed to women for whom emergency care is available.

---

[127] Section 505B(a)(2) of the FD&C Act (21 U.S.C. 355c(a)(2)).

[128] 2016 Clinical Review, supra n. 13, at 74-76.

[129] Id. at 47.

[130] In support of this assertion, you cite Jones R, Jerman J, Ingerick M. Which abortion patients have had a prior abortion? Findings from the 2014 U.S. Abortion Patient Survey. J Womens Health.

[131] Lv F, Xu X, Zhang S, et al. Repeated abortion affects subsequent pregnancy outcomes in BALB/c mice. PLoS One. 2012;7(10):e48384. doi:10.1371/journal.pone.0048384.

[132] 2016 Clinical Review, supra n. 13, at 47.

App. 000687

Docket No. FDA-2019-P-1534

Finally, you assert that FDA should require a formal study in patients who self-administer misoprostol. As explained in section II.A.2.b.ii of this response, FDA conducted a literature review of self-administration of misoprostol at home as part of its review of the S-020 efficacy supplement and found no safety or efficacy concerns with home self-administration of misoprostol. Therefore, we disagree that a formal study is required in this population.

With regard to safety generally, in addition to the FAERS data provided above (see section II.B.1.c.ii. in this response), FDA routinely monitors adverse events reported to FAERS and published in the medical literature for mifepristone for medical termination of pregnancy through 70 days gestation. We have not identified any new safety concerns with the use of mifepristone for this indication.


### 3.      Other Articles

In your Petition, you reference several documents that discuss alternative models of providing abortion medications and advocate for the lifting of the REMS on mifepristone (Petition at 23-24). You assert that these recent publications demonstrate how abortion advocates will continue to pressure FDA to eliminate the REMS and move towards over-the-counter access for Mifeprex.[133]
We agree that the overarching message in the publications you reference appears to be advocating self-management of medical abortion. Nonetheless, as discussed in this response, we have determined that the Mifepristone REMS Program continues to be necessary for the safe use of this drug product, with some modifications.


## III.     CONCLUSION

For the reasons set forth above, we deny your request that FDA restore and strengthen elements of the Mifeprex regimen and prescriber requirements approved in 2000; and we grant in part and deny in part your request to retain the Mifepristone REMS Program. As with all approved drug products, we will continue to monitor the safety of mifepristone for the approved indication and take any appropriate actions.

Sincerely,

Patrizia A.
Cavazzoni -S      Digitally signed by Patrizia A.
                  Cavazzoni -S
                  Date: 2021.12.16 15:05:41 -05'00'

Patrizia Cavazzoni, M.D.
Director
Center for Drug Evaluation and Research

---

[133] You also reference clinical trials relating to the use of mifepristone for spontaneous miscarriage management and question the results of studies related to this use (Petition at 16-18). The use of mifepristone for the management of early miscarriage is not an approved indication for this drug product and is outside the scope of the Mifepristone REMS Program. Therefore, we do not address it in this response.

App. 000688

**EXHIBIT 35**

**Questions and Answers on FDA's Adverse Event Reporting System (FAERS)**

# Questions and Answers on FDA's Adverse Event Reporting System (FAERS)

## What is FAERS?

The FDA Adverse Event Reporting System (FAERS) is a database that contains adverse event reports, medication error reports and product quality complaints resulting in adverse events that were submitted to FDA. The database is designed to support the FDA's post-marketing safety surveillance program for drug and therapeutic biologic products. The informatic structure of the FAERS database adheres to the international safety reporting guidance issued by the International Conference on Harmonisation (ICH E2B (/drugs/guidances-drugs/international-council-harmonisation-efficacy)). Adverse events and medication errors are coded using terms in the Medical Dictionary for Regulatory Activities (MedDRA) (http://www.meddra.org/) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) terminology.

## How does FDA use the information in FAERS?

FAERS is a useful tool for FDA for activities such as looking for new safety concerns that might be related to a marketed product, evaluating a manufacturer's compliance to reporting regulations and responding to outside requests for information. The reports in FAERS are evaluated by clinical reviewers, in the Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER), to monitor the safety of products after they are approved by FDA.
 If a potential safety concern is identified in FAERS, further evaluation is performed. Further evaluation might include conducting studies using other large databases, such as those available in the Sentinel System. (/sentinel-initiative-transforming-how-we-monitor-product-safety) Based on an evaluation of the potential safety concern, FDA may take regulatory action(s) to improve product safety and protect the public health, such as updating a product's labeling information, restricting the use of the drug, communicating new safety information to the public, or, in rare cases, removing a product from the market.

## Who sends reports to FAERS?

Healthcare professionals, consumers, and manufacturers submit reports to FAERS. FDA receives voluntary reports directly from healthcare professionals (such as physicians, pharmacists, nurses and others) and consumers (such as patients, family members, lawyers and others). Healthcare professionals and consumers may also report to the products' manufacturers. If a manufacturer receives a report from a healthcare professional or consumer, it is required to send the report to FDA as specified by regulations.

## How can I report an adverse event or medication error to FDA?

The MedWatch (https://www.fda.gov/Safety/MedWatch/default.htm) website provides information about voluntary and mandatory reporting (https://www.fda.gov/Safety/MedWatch/HowToReport/default.htm).

## Can mandatory reporters submit adverse events electronically?

Yes, the FDA Adverse Events Reporting System (FAERS) Electronic Submissions (/drugs/fda-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-electronic-submissions) website provides drug and therapeutic biological product manufacturers, distributors, packers, and other interested parties with information about FDA Adverse Event Reporting System (FAERS) electronic submissions and instructions on how to electronically submit post-marketing individual case safety reports (ICSRs), with and without attachments.

App. 000690

Case 2:22-cv-00223-Z   Document 195-4   Filed 10/11/24   Page 127 of 245   PageID 10195

## Does FAERS data have limitations?

Yes, FAERS data does have limitations. First, there is no certainty that the reported event (adverse event or medication error) was due to the product. FDA does not require that a causal relationship between a product and event be proven, and reports do not always contain enough detail to properly evaluate an event. Furthermore, FDA does not receive reports for every adverse event or medication error that occurs with a product. Many factors can influence whether an event will be reported, such as the time a product has been marketed and publicity about an event. There are also duplicate reports where the same report was submitted by a consumer and by the sponsor. Therefore, FAERS data cannot be used to calculate the incidence of an adverse event or medication error in the U.S. population. For more information, please refer to the question " What points should I consider while viewing the dashboard content? (https://fis.fda.gov/extensions/fpdwidgets/2e01da82-13fe-40e0-8c38-4da505737e36.html#_Toc493751926)"

## Is FAERS data available to the public?

FAERS data is available to the public in the following ways:

- FAERS dashboard (/drugs/fda-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard): a highly interactive web-based tool that allows for the querying of FAERS data in a user friendly fashion.

- FAERS data files (/drugs/fda-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-latest-quarterly-data-files): provides raw data consisting of individual case safety reports extracted from the FAERS database. A simple search of FAERS data cannot be performed with these files by persons who are not familiar with the creation of relational databases.

- Individual case safety reports from the FAERS database can also be obtained by sending a Freedom of Information (FOI) request to FDA (/how-make-foia-request).

## How do I find or confirm my report is in FAERS?

To confirm that your report is in FAERS, please send a Freedom of Information (FOI) request to FDA (/how-make-foia-request).

## What are the benefits of the FAERS public dashboard?

This tool makes the data easier to query and produces user-friendly information and charts. For example, users can view a summary of adverse event reports received from 1968 to the present or for a specific timeframe. In addition, users can search on a product of interest within a specific timeframe.

## Will there be a tutorial so I can learn how to use this database?

Yes, a recorded webinar (/about-fda/pharmacy-student-experiential-program/fda-drug-topics-fda-adverse-events-reporting-system-faers-public-dashboard-january-30-2018) is available which reviews the capabilities, and limitations, of the FAERS public dashboard.

## Is the FAERS public dashboard accessible on an Android™ or iPhone®?

Yes, but the user interface layout may not be very user friendly. FDA will continue to work on the dashboard to make the user interface Android and iPhone friendly.

## Can I download my search results from the dashboard?

Yes, you will be able to export a limited set of search data to an Excel® spreadsheet and then download it. FDA will still continue to provide the FAERS Latest Quarterly Data Files (/drugs/fda-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-latest-quarterly-data-files) online.

Note: The data fields listed on the FAERS Dashboard currently is a subset of the data fields available in the FAERS Quarterly Data files. Future release of the FAERS Dashboard plans to make the other data fields available. Also the data displayed in the FAERS Dashboard may not be identical to the data in the FAERS Quarterly Data files due to different data extraction dates.

## Where else can I find safety information?

- Potential Signals of Serious Risks/New Safety Information Identified from the FDA Adverse Event Reporting System (FAERS): quarterly reports on potential serious side effects identified by FAERS. (/drugs/fda-adverse-event-reporting-system-faers/potential-signals-serious-risksnew-safety-information-identified-fda-adverse-event-reporting-system)

- Post-marketing Drug and Biologic Safety Evaluations (/drugs/surveillance/postmarket-drug-and-biologic-safety-evaluations): provides summary information about ongoing and completed post-marketing safety evaluations of adverse experience reports made to FDA for New Drug Applications (NDAs) and Biologic License Applications (BLAs) approved since September 27, 2007.

- Center for Drug Evaluation and Research (CDER): Drug Safety and Availability (https://www.fda.gov/Drugs/DrugSafety/default.htm)

- Post-market Drug Safety Information for Patients and Providers (https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/default.htm)

- MedWatch: The FDA Safety Information and Adverse Event Reporting Program (https://www.fda.gov/Safety/MedWatch/default.htm)

## How are versions of a case in FAERS handled?

Each unique submission of a case received is assigned a version number (for example, Case #1234567, version 1). The initial version received will be version 1. If a follow up is received on a previously submitted case, then that version of the case will be version 2, and so on. The latest version of a case represents the most current information about that case.

The data is updated quarterly.

## What points should I consider while viewing the dashboard content?

When you view the website output of reported reactions (side effects or adverse drug reactions) for a drug product, it is important to consider the following points:

- **Data Quality:** There are many instances of duplicative reports and some reports do not contain all the necessary information. Duplicate reporting occurs when the same report is submitted by the consumer and the sponsor. The information in FAERS evolves daily and the number of individual cases may increase or decrease. It is therefore possible that the information on this website may change over time.

- **Existence of a report does not establish causation:** For any given report, there is no certainty that a suspected drug caused the reaction. While consumers and healthcare professionals are encouraged to report adverse events, the reaction may have been related to the underlying disease being treated, or caused by some

Case 2:22-cv-00223-Z   Document 195-4   Filed 10/11/24   Page 129 of 245   PageID 10197

other drug being taken concurrently, or occurred for other reasons. The information in these reports reflects only the reporter's observations and opinions.

- **Information in reports has not been verified:** Submission of a report does not mean that the information included in it has been medically confirmed nor it is an admission from the reporter that the drug caused or contributed the event.

- **Rates of occurrence cannot be established with reports:** The number of suspected reactions in FAERS should not be used to determine the likelihood of a side effect occurring. The FDA does not receive reports for every adverse event or medication error that occurs with a product. Many factors can influence whether an event will be reported, such as the time a product has been marketed and publicity about an event. Therefore, information in these reports cannot be used to estimate the incidence (occurrence rates) of the reactions reported.

- **Patients should talk to their doctor** before stopping or changing how they take their medications.

- **Patient Outcomes received in FAERS**: These data describe the outcome of the patient as defined in U.S. reporting regulations (21 CFR 310.305, 314.80, 314.98, 600.80). Serious means that one or more of the following outcomes were documented in the report: death, hospitalization, life-threatening, disability, congenital anomaly, and/or other serious outcome. Documenting one or more of these outcomes in a report does not necessarily mean that the suspect product(s) named in the report was the cause of the outcomes.

Importantly, the FAERS data by themselves are not an indicator of the safety profile of the drug.

App. 000693

# EXHIBIT 36

# Kathi A. Aultman et al., Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient

App. 000694

_____

# Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019

**Kathi A. Aultman M.D.,**[*] **Christina A. Cirucci M.D.,**
**Donna J. Harrison M.D.,**[**] **Benjamin D. Beran M.D.,**[***]
**Michael D. Lockwood D.O.,**[****] **Sigmund Seiler M.D.**[*****]

**ABSTRACT:** *Objectives:* **Primary: Analyze the Adverse Events (AEs) reported to the Food and Drug Administration (FDA) after use of mifepristone as an abortifacient. Secondary: Analyze maternal intent after ongoing pregnancy and investigate hemorrhage after mifepristone alone.**

*Methods*: **Adverse Event Reports (AERs) for mifepristone used as an abortifacient, submitted to the FDA from September 2000 to February 2019, were analyzed using the National Cancer Institute's Common Terminology Criteria for Adverse Events (CTCAEv3).**

*Results*: **The FDA provided 6158 pages of AERs. Duplicates, non-US, or AERs previously published (Gary, 2006) were excluded.  Of the remaining, there were 3197 unique, US-only AERs of which there were 537 (16.80%) with insufficient information to determine clinical severity, leaving 2660 (83.20%) Codable US AERs (Figure 1). Of these, 20 were Deaths, 529 were Life-threatening, 1957 were Severe, 151 were Moderate, and 3 were Mild.**

_____

[*]  Associate Scholar with the Charlotte Lozier Institute.

[**]   Executive Director, American Association of Pro-Life Obstetricians and Gynecologists, PO Box 395 Eau Claire, Michigan 49111-0395. Ph 202 230-0997.  donna@aaplog.org.

[***]   Department of Obstetrics and Gynecology, Medical College of Wisconsin, Milwaukee, WI.

[****]  Department of Osteopathic Manipulative Medicine, Liberty University College of Osteopathic Medicine.

[*****]   Associate Professor of Family Medicine, Liberty University College of Osteopathic Medicine.

The deaths included: 9 (45.00%) sepsis, 4 (20.00%) drug toxicity/overdose, 1 (5.00%) ruptured ectopic pregnancy, 1 (5.00%) hemorrhage, 3 (15.00%) possible homicides, 1 (5.00%) suicide, 1 (5.00%) unknown (Table 1).

Retained products of conception and hemorrhage caused most morbidity. There were 75 ectopic pregnancies, including 26 ruptured ectopics (includes one death).

There were 2243 surgeries including 2146 (95.68%) D&Cs of which only 853 (39.75%) were performed by abortion providers.

Of 452 patients with ongoing pregnancies, 102 (22.57%) chose to keep their baby, 148 (32.74%) had terminations, 1 (0.22%) miscarried, and 201 (44.47%) had unknown outcomes.

Hemorrhage occurred more often in those who took mifepristone and misoprostol (51.44%) than in those who took mifepristone alone (22.41%).

*Conclusions*: Significant morbidity and mortality have occurred following the use of mifepristone as an abortifacient. A pre-abortion ultrasound should be required to rule out ectopic pregnancy and confirm gestational age. The FDA AER system is inadequate and significantly underestimates the adverse events from mifepristone.

A mandatory registry of ongoing pregnancies is essential considering the number of ongoing pregnancies especially considering the known teratogenicity of misoprostol.

At the very least, the FDA should reinstate the original 2011 REMS and strengthen the reporting requirements.

*Conflict of Interest Statement*: The authors did not report any potential conflicts of interest. Authors note that although Dr. Harrison is an associate editor for Issues in Law and Medicine, she recused herself from any involvement in the peer review process for this manuscript.

*Keywords*: Mifepristone, Mifeprex, RU-486, Misoprostol, Abortifacient, Medical Abortion, Abortion Pill, Medical Abortion Complications, No touch abortion, DIY Abortion, Self-Administered Abortion, Adverse Events, Adverse Event Reports, Post-marketing Surveillance, FAERS, Drug Safety, Emergency Medicine, FDA, REMS, Risk Evaluation Mitigation Strategy.

———————————

# Introduction

The application for mifepristone (RU-486, RU-38486, Mifeprex) as an abortifacient was submitted to the Food and Drug Administration (FDA) in 1996 by the Population Council, which was given the manufacturing and distribution rights from Roussel Uclaf.[1] The Population Council partnered with Danco Laboratories, newly created in 1995, and gave them the manufacturing, marketing, and distribution rights. The FDA approved mifepristone in September 2000 under restricted distribution regulations (Subpart H) due to the FDA's conclusion that restrictions "on the distribution and use of mifepristone are needed to ensure safe use of this product."[2]

Included in these restrictions was the requirement that all serious Adverse Events (AEs), after the use of mifepristone as an abortifacient, be reported to the FDA by Danco as part of post-marketing surveillance. According to the FDA,[3] the purpose of such post-marketing surveillance includes identification of potential risks recognized after the time of approval, identification of unexpected deaths, causal attribution of AEs based on the product's known pharmacological action, and AEs for which a Risk Evaluation Mitigation Strategy (REMS) is intended to mitigate the risk.

In 2006, in response to the deaths of 4 women from a rare bacterial sepsis from *Clostridium sordellii (C. sordellii)*, the FDA and CDC convened a workshop, during which mifepristone alteration of the immune system was detailed, and they concluded that such alteration could lead to impaired ability to respond to *C. sordellii* toxin.[4]

---

[1] Citizen petition re: Request for Stay and Repeal of the Approval of Mifeprex (mifepristone) for the Medical Termination of Intrauterine Pregnancy through 49 Day's Gestation Final. Before the Department of Health and Human Services: Food and Drug Administration. AAPLOG. 2002. 7-10. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/Documents/2002%20Aug%20%20Citizen%20Petition_Mifeprex.pdf

[2] Center for Drug Evaluation and Research. Approval Letter for Mifeprex NDA 20-687. February 18, 2000. Food and Drug Administration. p 5. Accessed November 16, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687approvable00.pdf

[3] US Department of Health and Human Services, Food and Drug Administration Center for Drug Evaluation and Research, Center for Biologics Evaluation and Research. Best Practices in Drug and Biological Product Postmarket Safety Surveillance for FDA Staff. November 2019. p 7-8. Accessed Jan 16 2021. https://www.fda.gov/media/130216/download p7-8

[4] Emerging Clostridial Disease Workshop: May 11, 2006, Atlanta, GA. Department of Health and Human Services, Centers for Disease Control and Prevention, Food and Drug Administration, National Institutes of Health. 2006. p. 109,110. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/2006%20CDC%20FDA%20Clostridial%20Disease%20Transcript.pdf

There is evidence that both mifepristone[5,6,7] and misoprostol[8] can suppress immune response to *C. sordellii* in animal models.

In response to the septic deaths, Planned Parenthood changed their off-label protocol from vaginal administration of misoprostol to buccal in 2006.[9,10] Yet, as we found in our analysis, sepsis deaths from *C. sordellii* and other bacteria continued to occur after 2007. All sepsis deaths occurred with either vaginal or buccal misoprostol, which were both off label routes of administration until the buccal route was authorized in 2016.[11]

In 2011, the FDA approved a Risk Evaluation and Mitigation Strategy (REMS) for Mifepristone incorporating the original restrictions.[12] In May 2015, Mifepristone's sponsor submitted a supplemental new drug application to the FDA to obtain approval to revise the drug's labeling, which the FDA approved in 2016.[13,14] The 2016 changes in the Regimen and Prescriber Agreement extended the original gestational age limit from 49 days to 70 days, changed the mifepristone dose from 600 mg to 200 mg orally, changed the misoprostol dose from 400 mcg orally on Day 3 to 800 mcg buccally on Day 2 or 3, allowed non-physicians to become prescribers, reduced the number of required office visits from 3 to just one initial office visit, and allowed a repeat dose of misoprostol if complete expulsion did not occur.[15] The prescriber agreement was changed so

[5] Emerging Clostridial Disease Workshop: May 11, 2006, Atlanta, GA. Department of Health and Human Services, Centers for Disease Control and Prevention, Food and Drug Administration, National Institutes of Health. 2006. p. 109, 110 Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/2006%20CDC%20FDA%20Clostridial%20Disease%20Transcript.pdf

[6] Webster JI, Sternberg EM. Role of the hypothalamic-pituitary-adrenal axis, glucocorticoids and glucocorticoid receptors in toxic sequelae of exposure to bacterial and viral products. J Endocrinol. 2004;181(2):212, 213, 216, 217. doi.org/10.1677/joe.0.1810207

[7] Hawes AS, Rock CS, Keogh CV, Lowry SF, Calvano SE. In vivo effects of the antiglucocorticoid RU 486 on glucocorticoid and cytokine responses to Escherichia coli endotoxin. Infect Immun. 1992;60(7):2645, 2646. doi:10.1128/IAI.60.7.2641-2647.1992

[8] Aronoff DM, Hao Y, Chung J, et al. Misoprostol impairs female reproductive tract innate immunity against Clostridium sordellii. J Immunol. 2008;180(12):8227-8229. https://doi.org/10.4049/jimmunol.180.12.8222

[9] Trussell J, Nucatola, D, Fjerstad, M, Lichtenberg, ES. Reduction in infection-related mortality since modifications in the regimen of medical abortion. Contraception, 2014;89(3):193-196. https://doi.org/10.1016/j.contraception.2013.11.020

[10] Fjerstad M, Trussell, J, Sivin, I, Lichtenberg, ES, Rates of Serious Infection after Changes in Regimens for Medical Abortion. N Engl J Med. 2009 July 9;361(2):148-149. July 9, 2009 N Engl J Med 2009; 361:145-151. doi:10.1056/NEJMoa0809146

[11] GAO-18-292 Revised Mifeprex Labeling: Food and Drug Administration Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts. Report to Congressional Requesters. Food and Drug Administration. 2018. p. 7. Published March 2018. Accessed November 13, 2020. https://www.gao.gov/assets/700/690914.pdf

[12] NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg: Risk Evaluation and Mitigation Strategy (REMS). Food and Drug Administration. 2011. 1-11. Reference ID: 2957855. Published June 8, 2011. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2011-06-08_Full.pdf

[13] GAO-18-292 Revised Mifeprex Labeling: Food and Drug Administration Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts. Report to Congressional Requesters. Food and Drug Administration. 2018. p. 1. Published March 2018. Accessed November 13, 2020. https://www.gao.gov/assets/700/690914.pdf

[14] NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg: Risk Evaluation and Mitigation Strategy (REMS). Food and Drug Administration. 2016. 1-8. Reference ID: 3909592. Published March 29, 2016. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf

[15] GAO-18-292 Revised Mifeprex Labeling: Food and Drug Administration Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts. Report to Congressional Requesters. Food and Drug Administration. 2018. p.7. Published March 2018. Accessed November 13, 2020. https://www.gao.gov/assets/700/690914.pdf

that instead of being required to "report any hospitalization, transfusion or other serious event to Danco Laboratories,"[16] providers were only required to report deaths.[17] The requirement to report ongoing pregnancies that are not terminated was also eliminated. "The FDA approved GenBioPro, Inc.'s abbreviated new drug application (ANDA) for generic Mifeprex on April 11, 2019" and "established a single, shared system REMS for mifepristone products" without substantially changing the REMS.[18]

During the COVID-19 pandemic the Maryland District Court issued a preliminary injunction prohibiting the FDA from enforcing the in-person dispensing and signature requirements contained in the mifepristone REMS.[19] This decision eliminated the need for an initial office visit for dispensing the medication and opened the door for dispensing of the drug via telehealth with no actual clinician contact. On January 12, 2021, the Supreme Court enabled the FDA to enforce the mifepristone REMS.[20] These requirements are essential for the safety of women and must be kept in place.

The first systematic analysis of these Adverse Event Reports (AERs) obtained by the Freedom of Information Act (FOIA), was published by Gary and Harrison in 2006.[21] This paper extends that analysis to AERs not previously published and augments the scant published literature on mifepristone safety.

## *Objectives*

Primary: To analyze and codify the significant adverse events and their treatment after the use of mifepristone as an abortifacient, extending the previously published analysis by Gary in 2006.[22] Secondary: To examine maternal decisions in the case of ongoing pregnancy after attempted mifepristone termination, and to determine if failing to take misoprostol after mifepristone increased the risk of hemorrhage.

---

[16] NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg: Risk Evaluation and Mitigation Strategy (REMS). Food and Drug Administration. 2011. p. 7. Reference ID: 2957855. Published June 8, 2011. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifeprex_2011-06-08_Full.pdf

[17] NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg: Risk Evaluation and Mitigation Strategy (REMS). Food and Drug Administration. 2016. p. 6. Reference ID: 3909592. Published March 29, 2016. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf

[18] Questions and Answers on Mifeprex. Food and Drug Administration. March 28, 2018. Updated 4-12-2019. Accessed November 13, 2020. https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifeprex

[19] American College of Obstetricians and Gynecologists, et al., v. Food and Drug Administration, et al., No. 20-1320, 2020 WL 3960625 (D. Md. July 13, 2020). Accessed November 16th, 2020. https://www.courthousenews.com/wp-content/uploads/2020/07/093111166803.pdf

[20] FDA v ACOG. SCOTUS. 20a34_3f14. Accessed January 20, 2021. https://www.supremecourt.gov/opinions/20pdf/20a34_3f14.pdf

[21] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

[22] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

## Materials and Methods

FDA AERs related to the use of mifepristone from September 2000 to February 2019 were obtained through the Freedom of Information Act (FOIA) from the FDA, and a comparison was made with FDA reports available online on the FDA Adverse Events Reporting System (FAERS) Dashboard.[23] Duplicate AERs were identified by comparing FDA case identification numbers, manufacturer identification numbers, dates of treatment, patient age, and descriptions of case scenarios to ensure that each case was included only once in this analysis. The authors excluded duplicates, cases originating outside of the United States, and cases previously published in the Gary analysis[24] (Figure 1).

One of the concerns in looking at AEs is the risk of falsely assigning causality. The FDA does not give guidance for determining causality for AEs in the AERs but does give guidance for selecting AEs for inclusion in the Adverse Reaction section of the Drug Label.[25] They recommend that, "Decisions on whether there is some basis to believe there is a causal relationship are a matter of judgment and are based on factors such as" the "frequency of reporting," "the extent to which the adverse event is consistent with the pharmacology of the drug," "the timing of the event relative to the time of drug exposure," and other factors. Although a causal relationship cannot be attributed with certainty to all reported AEs for a drug, a causal relationship seems probable for each of the categories of AEs we chose to analyze based on these factors, except for ectopic pregnancies and some of the deaths. Ectopic pregnancies were included in our analysis not because there is a causal relationship, but because ectopic pregnancy is a contraindication to the use of mifepristone and the diagnosis was missed, putting women's lives at risk. The deaths must be evaluated individually to determine causality.

Because reporting is often voluntary and sporadic, there is no denominator for how many mifepristone abortions are performed in the U.S. It was therefore impossible to calculate complication rates for mifepristone and misoprostol abortions based on AER data. For clarity, we specified the denominator used in each case. Coding for severity was done using the National Cancer Institute's Common Terminology Criteria for Adverse Events (CTCAEv3),[26] since this was

---

[23] FDA Adverse Events Reporting System (FAERS) Public Dashboard. Food and Drug Administration. Accessed November 13, 2020. https://fis.fda.gov/sense/app/d10be6bb-494e-4cd2-82e4-0135608ddc13/sheet/33a0f68e-845c-48e2-bc81-8141c6aaf772/state/analysis

[24] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

[25] Guidance for Industry Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products — Content and Format. U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER); January 2006. P. 8. Accessed January 8, 2021. https://www.fda.gov/media/72139/download

[26] Common Terminology Criteria for Adverse Events v3.0 (CTCAE). Cancer Center Therapy Evaluation Program (CTEP); 2003. 1-77. Published December 12, 2003. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/CTCAEv3.pdf

the methodology used in the original analysis of the first 607 Adverse Events.[27] The five levels of coding are: Mild, Moderate, Severe, Life-threatening, and Death.

Overall severity (Figure 1) for each unique AER was determined independently by two board-certified physicians (Obstetrics and Gynecology or Family Medicine). Since within each AER, a patient may have experienced several Adverse Events (AEs), the overall severity of the AER was based on the highest severity of its AEs.  For the diagnoses we analyzed (Table 1), each AE was coded in the same manner and stratified according to type, severity, and treatment. Disagreements were resolved by discussion or review by a third board-certified Obstetrician-Gynecologist who also reviewed coding for uniformity.  Surgeries, transfusions, providers, and location of treatment were analyzed and tabulated.

Ruptured ectopic pregnancies were coded as Life-threatening and unruptured ectopic pregnancies as Severe.

Infections were coded as Life-threatening when evidence of sepsis was present, or ICU-level treatment was required. They were coded as Severe if parenteral/IV antibiotics were given and Moderate if oral antibiotics were prescribed.

Life-threatening hemorrhage was defined, as in the previous analysis, to be transfusion of two or more units of packed red blood cells (PRBCs), hemoglobin less than 7, or documented large volume, rapid blood loss with clinical symptomatology of acute blood loss anemia (e.g., syncope, tachycardia, hypotension).  Severe hemorrhage was defined as requiring surgical intervention and/or less than 2 U PRBCs. Moderate hemorrhage was defined as management with fluids/medication alone.

Retained Products of Conception (RPOC) was coded as Severe if a dilatation and curettage/evacuation (D&C) was performed. Ongoing viable intrauterine pregnancy was considered equivalent in severity to RPOC requiring curettage and thus Severe.   When the ultimate outcome was unknown, the pregnancy was considered ongoing if "ongoing pregnancy" was noted or ultrasound showed cardiac motion or significant growth.

AEs which did not contain sufficient information to assign an accurate severity code were deemed "Uncodable."  AERs lacking any codable information were deemed overall Uncodable.

The percent of women with significant hemorrhage after mifepristone alone was compared to those who took both mifepristone and misoprostol, to investigate the validity of the assertion that lack of subsequent misoprostol administration was a causative factor in hemorrhage after mifepristone use.[28]

---

[27] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

[28] Creinin MD, Hou MY, Dalton L, Steward R, Chen MJ. Mifepristone Antagonization With Progester-one to Prevent Medical Abortion: A Randomized Controlled Trial. Obstet Gynecol. 2020;135(1):158-165. doi:10.1097/AOG.0000000000003620

# Results

## *Adverse Event Report Overall Severity*

Figure 1 summarizes the handling of the AERs provided by the FDA and their severity coding. The FDA provided 6158 pages of AERs. Of these, any duplicates, non-US, or AERs previously published in the Gary paper were excluded from the analysis. There were 3197 unique, US-only AERs of which 537 had insufficient information to determine clinical severity, leaving 2660 Codable US-only AERs. Of these, 20 were Deaths, 529 were Life-threatening, 1957 were Severe, 151 were Moderate, and 3 were Mild.

## *Deaths (Table 1)*

Our analysis identified 23 of the 24 deaths reported by the FDA as of 2018.[29] Three of those deaths were previously published in the Gary paper[30]   leaving 20 deaths (Table 1). Our analysis yielded a total of 7 sepsis deaths. These included five cases of *C. sordellii* and one case of *Clostridium perfringens*, all consistent with those reported by the FDA. There was an additional death which we categorized as a sepsis death whereas the FDA labeled this case as "delayed onset toxic shock-like syndrome" but did not include it as a sepsis death. The patient had an exploratory laparotomy revealing green pus, which was culture positive for *prevotella* and *peptostreptococcus,* and she died intraoperatively.[31]

---

[29] RCM # 2007-525 NDA 20-687 Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2018. FDA. 1-2. Reference ID: 4401215. Accessed November 13, 2020. https://www.fda.gov/media/112118/download

[30] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

[31] Individual Case Safety Report number 4734082-4-00-01. Danco Laboratories, LLC. Office of Post-marketing Drug Risk Assessment, Food and Drug Administration. Received August 4, 2005. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/Peptostreptococcus%20death%209.10277-8.pdf



# Figure 1.  AER Distribution



*Note:* From 2000 to 2016 FDA only required the manufacturer to report AEs which were severe, life-threatening or had fatal outcomes.  Since 2016, FDA only requires the manufacturer to report fatal outcomes.

We categorized two deaths as suspicious for infectious death.  One case was labeled by the FDA as "undetermined natural causes," however, the AER reported the cause of death as "acute visceral and pulmonary (1420 grams) congestion and edema," [32] which is consistent with the clinical findings for sepsis/Acute Respiratory Distress Syndrome (ARDS).  This patient had autopsy-proven retained products of conception and blood cultures which grew *Strep viridans* isolated at less than 24 hours incubation.  One additional case which the FDA labeled "methadone overdose"[33,34] we considered suspicious for sepsis. Prior to her death, this patient had fever and chills and was treated by an outside physician with cephalexin, which would have been ineffective against infections from *C. sordellii* or anaerobic gram-negative bacilli.  There was no autopsy report or toxicology report in the AER.

Non-infectious deaths include one death that the FDA listed as "natural," caused by "pulmonary emphysema."[35]  This patient was a 40-year-old chronic smoker who died within hours of misoprostol ingestion and had a contusion on her head consistent with a fall, a scenario possibly related to a cardiac event or acute respiratory reaction to misoprostol. She had an intact fetus at the time of

[32] Individual Case Safety Report number 9587011-03-00-01. Danco Laboratories, LLC. Office of Post-marketing Drug Risk Assessment, Food and Drug Administration. Received May 21, 2014. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/death%20Visc%20pul%20cong.pdf

[33] Individual Case Safety Report number 4970303-0-00-01. Danco Laboratories, LLC. Office of Post-marketing Drug Risk Assessment, Food and Drug Administration. Received April 21, 2014. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/death%2023%20yo%20meth%20overdose%20fever%20and%20chills.pdf

[34] Individual Case Safety Report number 5063156-8-00-01. Danco Laboratories, LLC. Office of Post-marketing Drug Risk Assessment, Food and Drug Administration. Received July 27, 2006. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/methadone%20AER%20(1).pdf

[35] Individual Case Safety Report number 11283049-02-00-01. Danco Laboratories, LLC. Office of Post-marketing Drug Risk Assessment, Food and Drug Administration. Received December 8, 2015. Accessed November 13, 2020. https://aaplog.wildapricot.org/resources/emphysema.pdf

autopsy.  Other non-infectious deaths included one death from a ruptured ectopic pregnancy, one from hemorrhage, 3 possible homicides, one suicide, and 4 deaths from drug toxicity/overdose. It is unknown whether the 8 women who died by homicide, suicide, or drug toxicity/overdose were screened for domestic violence, drug addiction, or depression prior to the abortion.

### Infection (Table 1)

Infection was the leading cause of mortality. There were 502 cases of infection, which included 9 Deaths, 39 had Life-threatening sepsis, 249 were Severe infections, 132 Moderate infections, and 73 infections which were Uncodable.

### Ectopic Pregnancy (Table 1)

There were 75 ectopic pregnancies. Of these, 26 were ruptured, including 1 death. Twenty-four were unruptured, and there were 25 for which the rupture status was not given. Fifty-six ectopic pregnancies were treated surgically and 11 were treated with methotrexate. The management was not documented in 7 cases. The patient who died received no treatment as she died on the way to the hospital.

### Retained Products of Conception (RPOC) (Tables 1 and 2)

RPOC was the leading cause of morbidity. There were 977 confirmed cases of RPOC, including 2 molar pregnancies, and 1506 likely cases of RPOC (documentation was inadequate for confirmation). Of the 2146 total D&Cs, most were for RPOC, including 897 for confirmed RPOC, 1058 for bleeding or presumed RPOC, but no pathology was provided, and 2 for molar pregnancy.  A small percentage of RPOC had medical treatment or no treatment.

### Hemorrhage/Bleeding (Table 1)

There were 1639 bleeding events including one death. These included 466 Life-threatening and 642 Severe events. There were also 106 events coded as Moderate, while 424 reports of bleeding were Uncodable given the information in the database.

### Ongoing Pregnancy (Table 1)

There were 452 ongoing pregnancies. Of these 102 chose to keep their baby, 148 chose termination, 1 miscarried, and 201 had an unknown outcome. Of those with an unknown outcome, there were 44 patients referred or scheduled for termination, who did not follow through (39 no-showed, 3 canceled, 2 did not schedule).

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*     *13*

## Surgeries (Table 2)

There were 2243 surgeries including 2146 D&Cs, 76 laparoscopies/laparotomies without hysterectomy, 7 hysterectomies, and 14 other surgeries. Of the hysterectomies, 3 were performed for sepsis, 2 for hemorrhage, 1 for a cervical ectopic, and 1 for placenta accreta.  There were 1291 surgeries performed in the hospital or ER and 952 in an outpatient setting. Of the 2146 D&Cs, 1194 were performed in the hospital or ER, and 952 in an outpatient setting. Of the 2146 D&Cs, 1194 were provided by the Hospital or ER, 853 by the abortion provider, and 99 by another outpatient provider.

## Transfusions (Table 2)

Four hundred and eighty-one patients required blood transfusion following medical abortions. Of these, 365 received 1 to 10 units packed red blood cells (PRBCs) alone, 1 received fresh frozen plasma (FFP) alone, 8 received a combination of PRBCs and FFP, and 107 received an unknown amount of blood product.

## Relationship of Misoprostol Use to Hemorrhage (Table 3)

The use of mifepristone with misoprostol was associated with a higher incidence of hemorrhage than the use of mifepristone alone.  Of the 3056 women who took both mifepristone and misoprostol, 1572 (51.44%) hemorrhaged, whereas, among the 58 women who did not take misoprostol, only 13 (22.41%) hemorrhaged. It was unclear whether 84 patients took misoprostol or not. Fifty-four (64.29%) of them hemorrhaged. The hemorrhage rate was higher for the mifepristone with misoprostol group as compared to the mifepristone alone group even if all the unknowns were assigned to the mifepristone alone group or vice versa.

# Table 1 - Diagnoses[a]

| Deaths | Deaths (n) | Deaths (%) | Deaths: % of (3197) Unique US AERs (%) | Organism (%) |
|---|---|---|---|---|
| Sepsis | 9 | 45.00% | 0.28% | |
| Sepsis confirmed | 7 | 35.00% | 0.22% | 100% |
| *Clostridium sordellii* | *5* | *25.00%* | *0.16%* | *71.43%* |
| *Clostridium perfringens / Peptostreptococcus* | *1* | *5.00%* | *0.03%* | *14.29%* |
| *Peptostreptococcus* | *1* | *5.00%* | *0.03%* | *14.29%* |
| Sepsis Likely, Unknown Organism | 2 | 10.00% | 0.06% | |
| *Visceral and Pulmonary Congestion consistent with ARDS / sepsis* | 1 | 5.00% | 0.03% | |
| *Fever / chills treated with cephalexin, found dead[b]* | 1 | 5.00% | 0.03% | |
| Ruptured Ectopic Pregnancy | 1 | 5.00% | 0.03% | |
| Hemorrhage | 1 | 5.00% | 0.03% | |
| Possible Homicide | 3 | 15.00% | 0.09% | |
| Suicide | 1 | 5.00% | 0.03% | |
| Drug Toxicity/Overdose | 4 | 20.00% | 0.13% | |
| Unknown[c] | 1 | 5.00% | 0.03% | |
| **Total Deaths** | **20** | **100%** | **0.63%** | |

| Infections, Level of Severity | Infections (n) | Infections  (%) | Infections: % of (3197) Unique US AERs (%) | |
|---|---|---|---|---|
| Death | 9 | 1.79% | 0.28% | |
| Life threatening infection/sepsis | 39 | 7.77% | 1.22% | |
| Severe infection (IV anitbiotics) | 249 | 49.60% | 7.79% | |
| Moderate infection (oral antibiotics) | 132 | 26.29% | 4.13% | |
| Uncodable[d] | 73 | 14.54% | 2.28% | |
| **Total Infections** | **502** | **100%** | **15.70%** | |

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient        15*

## Table 1 – Diagnoses  (Continued)

| Ectopic Pregnancies, Rupture Status | Ectopic Pregnancies (n) | Ectopic Pregnancies (%) | Ectopic Pregnancies: % of (3197) Unique US AERs (%) |
|---|---|---|---|
| Ruptured[e] | 26 | 34.67% | 0.81% |
| Unruptured[f] | 24 | 32.00% | 0.75% |
|    Surgical Treatment | 13 | 17.33% | 0.41% |
|    Methotrexate Treatment | 11 | 14.67% | 0.34% |
| Unknown Rupture Status[g] | 25 | 33.33% | 0.78% |
|    Surgical Treatment | 18 | 24.00% | 0.56% |
|    Unknown Treatment | 7 | 9.33% | 0.22% |
| **Total Ectopic Pregnancies** | **75** | **100%** | **2.35%** |

| Ectopic Pregnancies, Level of Severity | Ectopic Pregnancies (n) | Ectopic Pregnancies (%) | Ectopic Pregnancies: % of (3197) Unique US AERs |
|---|---|---|---|
| Death | 1 | 1.33% | 0.03% |
| Life Threatening (Ruptured, survived) | 25 | 33.33% | 0.78% |
| Severe (Not Ruptured) | 24 | 32.00% | 0.75% |
| Uncodable | 25 | 33.33% | 0.78% |
| **Total Ectopic Pregnancies** | **75** | **100%** | **2.35%** |

App. 000707

# Table 1 – Diagnoses  (Continued)

| Retained Products of Conception (RPOC) | RPOC (n) | RPOC (%) | RPOC:  % of (3197) Unique US AERs (%) |
|---|---|---|---|
| RPOC confirmed | 977 | 39.35% | 30.56% |
|     RPOC confirmed (by pathology or ultrasound); Had D&C | 891 | 35.88% | 27.87% |
|     RPOC confirmed by U/S but D&C not documented | 29 | 1.17% | 0.91% |
|     RPOC treated medically | 27 | 1.09% | 0.84% |
|     Tissue at os (no D&C)[h] | 27 | 1.09% | 0.84% |
|     Molar Pregnancy | 2 | 0.08% | 0.06% |
|     No Treatment, RPOC on autopsy | 1 | 0.04% | 0.03% |
| RPOC Likely | 1506 | 60.65% | 47.11% |
|     Had D&C, no pathology provided | 1056 | 42.53% | 33.03% |
|     Unknown[i] | 450 | 18.12% | 14.08% |
| **Total RPOCs** | **2483** | **100%** | **77.67%** |

| Bleeding Events, Level of Severity | Bleeding Events (n) | Bleeding Events (%) | Bleeding Events: % of (3197) Unique US AERs |
|---|---|---|---|
| Death | 1 | 0.06% | 0.03% |
| Life threatening or Disabling: 2U or more transfusion or Hgb<7 or witnessed massive blood loss | 466 | 28.43% | 14.58% |
| Severe: surgical intervention and/or 1 U transfusion | 642 | 39.17% | 20.08% |
| Moderate: medical intervention | 106 | 6.47% | 3.32% |
| Uncodable[j] | 424 | 25.87% | 13.26% |
| **Total Bleeding Events** | **1639** | **100%** | **51.27%** |

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient      17*

## Table 1 – Diagnoses  (Continued)

| Ongoing Pregnancies, Outcome | Ongoing Pregnancies (n) | Ongoing Pregnancies | Ongoing Pregnancies: % of (3197) Unique US AERs (%) | Ongoing Pregnancies with Unknown Outcome (%) |
|---|---|---|---|---|
| Desired to Keep Pregnancy | 102 | 22.57% | 3.19% | |
|    Kept Pregnancy | 101 | 22.35% | 3.16% | |
|    Kept Pregnancy but baby died in-utero | 1 | 0.22% | 0.03% | |
| Terminated Pregnancy | 148 | 32.74% | 4.63% | |
|    Surgical Termination[k] | 139 | 30.75% | 4.35% | |
|    Medical Termination | 9 | 1.99% | 0.28% | |
| Unknown Intent, miscarried[i] | 1 | 0.22% | 0.03% | |
| Unknown Outcome | 201 | 44.47% | 6.29% | 100% |
|    Referred D&C but did not show | 39 | 8.63% | 1.22% | 19.40% |
|    Referred D&C but cancelled | 3 | 0.66% | 0.09% | 1.49% |
|    Told to schedule/referred D&C did not go | 2 | 0.44% | 0.06% | 1.00% |
|    Unknown outcome, no other information[m] | 157 | 34.73% | 4.91% | 78.11% |
| **Total** | **452** | **100%** | **14.14%** | |

[a]  Because of rounding, percentages may not appear to add up exactly.
[b]  FDA attributed to methadone overdose.
[c]  40 year old smoker died within hours of misoprostol ingestion. Per FDA, "natural causes due to severe pulmonary emphysema."
[d]  Patients with documented infection but inadequate information to determine severity.
[e]  One of the ruptured ectopics died on the way to the hospital. The other 25 were treated surgically.
[f]  The unruptured ectopics include two cornual ectopics, one treated surgically and one treated medically.
[g]  Includes two cervical ectopics, one treated with D&C/Hysterectomy/massive transfusion and one with unknown treatment.
[h]  Either with path provided, or described as RPOC, placental fragments, fetus, or tissue.
[i]  Suspected RPOC indicating D&C needed, but not documented as being done.
[j]  Patients with documented bleeding but inadequate information to determine severity.
[k]  Includes one hysterotomy for pregnancy in non-communicating horn.
[l]  After no show for surgical termination.
[m]  Includes 10 with known gestational age 20-29 weeks.

*Issues in Law & Medicine, Volume 36, Number 1, 2021*

## Table 2 – Treatment[a]

| Type of Surgery | Type of surgery (n) | Type of surgery (%) | Surgery: % of (3197) Unique US AERs (%) |
|---|---|---|---|
| D&C[b] | 2146 | 95.68% | 67.13% |
| **Hysterectomy** | **7** | **0.31%** | **0.22%** |
| Sepsis (includes 2 deaths) | 3 | 0.13% | 0.09% |
| Hemorrhage after uterine perforation | 2 | 0.09% | 0.06% |
| Hemorrhage - Cervical Ectopic | 1 | 0.04% | 0.03% |
| Placenta accreta | 1 | 0.04% | 0.03% |
| **Laparoscopy/Laparotomy without hysterectomy** | **76** | **3.39%** | **2.38%** |
| Ectopic (Actual or Suspected) | 66 | 2.94% | 2.06% |
| Infection | 7 | 0.31% | 0.22% |
| Uterine Perforation | 1 | 0.04% | 0.03% |
| Salpingo oophorectomy for Torsion | 1 | 0.04% | 0.03% |
| Hysterotomy for pregnancy in non-communicating horn | 1 | 0.04% | 0.03% |
| **Other Surgeries** | **14** | **0.62%** | **0.44%** |
| Uterine Artery Embolization | 1 | 0.04% | 0.03% |
| Vaginal sutures (after 15 week surgical termination for ongoing pregnancy) | 1 | 0.04% | 0.03% |
| Paracenteses (multiple, same patient, death) | 1 | 0.04% | 0.03% |
| Necrotozing fasciitis debridement and below knee amputation | 1 | 0.04% | 0.03% |
| Upper and lower endoscopy for bright red bleeding | 1 | 0.04% | 0.03% |
| Unknown surgery for deep venous thrombosis | 1 | 0.04% | 0.03% |
| Angioplasty | 1 | 0.04% | 0.03% |
| Cholecystectomy | 2 | 0.09% | 0.06% |
| Appendectomy | 1 | 0.04% | 0.03% |
| Laceration repair (scalp, chin) | 2 | 0.09% | 0.06% |
| Unknown Surgery | 2 | 0.09% | 0.06% |
| **Total** | **2243** | **100%** | **70.16%** |

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient     19*

## Table 2 – Treatment (Continued)

| Location of Surgery | Location of Surgery (n) | Location of Surgery (%) |
|---|---|---|
| **All Surgeries** | **2243** | **100.00%** |
| Hospital or ER | 1291 | 57.56% |
| Outpatient | 952 | 42.44% |
| **D&C** | **2146** | **100.00%** |
| Hospital or ER | 1194 | 55.64% |
| Outpatient | 952 | 44.36% |
| | | |

| Surgical Provider for D&C | Surgical Provider (n) | Surgical Provider (%) |
|---|---|---|
| Hospital/ER | 1194 | 55.64% |
| Abortion Provider | 853 | 39.75% |
| Other Provider | 99 | 4.61% |
| **Total** | **2146** | **100%** |
| | | |

| Indication for D&Cs | Indication for D&C (n) | Indication for D&C (%) |
|---|---|---|
| Confirmed D&C[c] | **2146** | **100%** |
| RPOC (confirmed by pathology or ultrasound) | 897 | 41.80% |
| RPOC/Bleeding (no pathology provided) | 1058 | 49.30% |
| Ongoing pregnancy, surgical termination by D&C | 139 | 6.48% |
| RPOC ruled out | 34 | 1.58% |
| Ectopic evaluation | 12 | 0.56% |
| Molar pregnancy | 2 | 0.09% |
| Not able to take misoprostol | 4 | 0.19% |
| **Possible D&C** | **680** | |
| Possible RPOC, unknown treatment, possible D&C | 450 | |
| RPOC confirmed by U/S but D&C not documented | 29 | |
| Ongoing pregnancy Unknown outcome, possible D&C | 201 | |
| **TOTAL (Confirmed and Possible)** | **2826** | |

## Table 2 – Treatment (Continued)

| Transfusions | Transfusions (n) | Transfusions (%) | Transfusion: % of (3197) Unique US AERs (%) |
|---|---|---|---|
| **PRBC alone** | **365** | **75.88%** | **11.42%** |
| 1U | 32 | 6.65% | 1.00% |
| 1-2U | 1 | 0.21% | 0.03% |
| 2U | 246 | 51.14% | 7.69% |
| 2.5U | 1 | 0.21% | 0.03% |
| 3U | 45 | 9.36% | 1.41% |
| 4U | 27 | 5.61% | 0.84% |
| 5U | 5 | 1.04% | 0.16% |
| 6U | 5 | 1.04% | 0.16% |
| 7U | 2 | 0.42% | 0.06% |
| 10U | 1 | 0.21% | 0.03% |
| **Other Blood products** | **9** | **1.87%** | **0.28%** |
| 1 U FFP | 1 | 0.21% | 0.03% |
| 2 U PRBC/1 U FFP | 1 | 0.21% | 0.03% |
| 2 U PRBC/ 4 U FFP | 1 | 0.21% | 0.03% |
| 3 U PRBC/ 1 U FFP | 1 | 0.21% | 0.03% |
| 4 U PRBC/ 1 U FFP | 1 | 0.21% | 0.03% |
| 4 U PRBC/ 2 U FFP | 1 | 0.21% | 0.03% |
| 5 U PRBC/ 4 U FFP | 1 | 0.21% | 0.03% |
| 6 U PRBC/ 2 U FFP | 1 | 0.21% | 0.03% |
| 7 U PRBC/ FFP and Platelets unknown amount | 1 | 0.21% | 0.03% |
| **Unknown amount (documented as given, units not recorded)** | **107** | **22.25%** | **3.35%** |
| **Total[d]** | **481** | **100%** | **15.05%** |

[a]  Because of rounding, percentages may not appear to add up exactly.
[b]  With or without suction, one with hysteroscopy.
[c]  There were 8 patients who had 2 D&Cs and one who required uterine artery embolization. There were 4 perforations: two had resultant hysterectomies, one had a laparoscopy, and one received 2 U PRBCs but no documented surgery.
[d]  Additionally there were 7 patients who likely received transfusion, but was not recorded, 3 patients who refused transfusion, and 1 patient for whom transfusion was considered but not given.

*Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient*   *21*

## Table 3 – Relationship of Misoprostol to Hemorrhage[a]

|  | Mifepristone + Misoprostol | | Mifepristone alone | | Unknown | | Mifepristone + Misoprostol + unknown [b] | | Mifepristone alone + unknown [c] | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | n | % | n | % | n | % | n | % | n | % |
| No Hemorrhage | 1484 | 48.56% | 45 | 77.59% | 30 | 35.71% | 1514 | 48.23% | 75 | 52.82% |
| Hemorrhage | 1572 | 51.44% | 13 | 22.41% | 54 | 64.29% | 1625 | 51.77% | 67 | 47.18% |
|   Death | 1 | 0.03% | 0 | 0.00% | 0 | 0.00% | 1 | 0.03% | 0 | 0.00% |
|   Life threatening | 441 | 14.43% | 5 | 8.62% | 20 | 23.81% | 461 | 14.69% | 25 | 17.61% |
|   Severe | 633 | 20.71% | 3 | 5.17% | 6 | 7.14% | 639 | 20.36% | 9 | 6.34% |
|   Moderate | 101 | 3.30% | 1 | 1.72% | 4 | 4.76% | 105 | 3.35% | 5 | 3.52% |
|   Uncodable | 396 | 12.96% | 4 | 6.90% | 24 | 28.57% | 420 | 13.38% | 28 | 19.72% |
| Total US AERs | 3056 | 100% | 58 | 100% | 84 | 100% | 3139 | 100% | 142 | 100% |

[a]   Because of rounding, percentages may not appear to add up exactly.
[b]   Assumes all unknowns took both mifepristone and misoprostol.
[c]   Assumes all unknowns took mifepristone, but not misoprostol.

## Discussion

This article is critically important considering the paucity of published literature on mifepristone safety and the minimal analysis done on the AERs by the FDA.

### *Ectopic Pregnancies*

Although reported as AEs, ectopic pregnancies are not a direct adverse event from the medication, but rather a contraindication to its administration. They were reported as adverse events because the ectopic pregnancies were missed.

The American College of Obstetricians and Gynecologists (ACOG) notes that "According to the Centers for Disease Control and Prevention, ectopic pregnancy accounts for approximately 2% of all reported pregnancies. However, the true current incidence of ectopic pregnancy is difficult to estimate because many patients are treated in an outpatient setting where events are not tracked, and national surveillance data on ectopic pregnancy have not been updated since 1992. Despite improvements in diagnosis and management, ruptured ectopic pregnancy continues to be a significant cause of pregnancy-related mortality and morbidity. In 2011–2013, ruptured ectopic pregnancy accounted for 2.7% of all pregnancy-related deaths and was the leading cause of hemorrhage-related mortality."[36]

---

[36] ACOG Practice Bulletin No. 193: Tubal Ectopic Pregnancy, Obstet Gynecol: March 2018; 131(3): e91-e103. doi:10.1097/AOG.0000000000002560

Confirmed/suspected ectopic pregnancy and undiagnosed adnexal mass are contraindications to mifepristone use under current prescribing requirements. The label warnings state: "Ectopic pregnancy: exclude before treatment." [37] Unfortunately, it is difficult to rule out ectopic pregnancy by history alone because, "half of all women who receive a diagnosis of an ectopic pregnancy do not have any known risk factors."[38]  According to ACOG Practice Bulletin No. 193, "The minimum diagnostic evaluation of a suspected ectopic pregnancy is a transvaginal ultrasound evaluation and confirmation of pregnancy." Of the 75 reported ectopic pregnancies in the FDA AERs we analyzed, over a third were known to be ruptured including one death. Clearly, an ultrasound should be required prior to the administration of mifepristone to document that the pregnancy is located within the uterus. Although not 100% effective, this will screen for ectopic pregnancy, confirm gestational age, which can be inaccurate based on menstrual history alone,[39]  and screen for adnexal masses, another contraindication to mifepristone use.[40]

## Ongoing pregnancies

Of the women with an ongoing pregnancy, less than a third were known to have proceeded with termination of the pregnancy, and almost a quarter were known to have kept their pregnancy; in almost half, the outcome was unknown. The significant percentage of women with ongoing pregnancy who changed their mind and chose to keep their pregnancy, after initially choosing termination, raises concerns regarding the pre-abortion counseling and informed consent they received.   Women undergoing abortion should receive the same quality of informed consent and pre-procedural counseling that is standard of care prior to other medical treatment or surgery. It is imperative that women considering abortion be provided adequate and complete information and counseling on risks, advantages, disadvantages, and alternative options.

Additionally, the high percentage of women with ongoing pregnancies for whom there is no follow up or known outcome is concerning.  As health care providers we are to continue to care for our patients and manage any complications, yet in the AERs we reviewed this was not typically the case for the abortion provider.  Furthermore, a federal registry of known outcomes and birth defects is imperative. One of the initial FDA post-marketing requirements for

---

[37] MIFEPREX. Package insert. Danco; 2016. Approved March 2016. p. 1. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf

[38] ACOG Practice Bulletin No. 193: Tubal Ectopic Pregnancy, Obstet Gynecol: March 2018; 131(3): e91-e103. doi: 10.1097/AOG.0000000000002560

[39] Shipp, Thomas D. 2020. Overview of ultrasound examination in obstetrics and gynecology. Lit Rev current through Dec 2020. UpToDate. Edited by Barss A Vanessa. Wolters Kluwer. June 10, 2020. Accessed January 11, 2021. https://www.uptodate.com/contents/ectopic-pregnancy-clinical-manifestations-and-diagnosis/print?source=history_widget.

[40] MIFEPREX. Package insert. Danco; 2016. Approved March 2016. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf

Danco was a surveillance study of outcomes of ongoing pregnancies.[41] The FDA released them from this post-marketing commitment in January 2008 because Danco reported that only one or two ongoing pregnancies per year were followed for final outcomes in part because of consent requirements.[42] This is disturbing in light of the percentage of women in our analysis who kept their pregnancies, as well as those with ongoing pregnancy and unknown outcomes, all of whom could have been followed for final outcomes. The significant lack of follow-up of ongoing pregnancies (44.47% with unknown outcomes) and the very minimal information on those who chose to keep the pregnancy, highlights the need for a national registry especially considering the teratogenicity of misoprostol.[43]

## *Relationship of Misoprostol to Hemorrhage*

The Creinin study of abortion pill reversal was stopped for safety concerns due to hemorrhage in 3 of the 12 study participants.[44] One of the conclusions of that study was that "Patients who use mifepristone for a medical abortion should be advised that not using misoprostol could result in severe hemorrhage, even with progesterone treatment."[45] The authors hypothesized that the absence of misoprostol caused these women to hemorrhage. The women who had documented use of misoprostol in our database hemorrhaged at a higher rate than those documented not to have taken misoprostol.

## *Reporting of Adverse Events*

Although not the initial goal of this study, the analysis of the AERs revealed glaring deficiencies in the AE reporting system making it difficult to properly evaluate adverse events. When mifepristone was approved in 2000, FDA required that providers "must report any hospitalization, transfusion or other serious event to Danco Laboratories."[46] This created an inherent conflict of interest as it is not in the best interest of the entities or providers to report adverse events to those regulating them. Because only severe events were reportable, this requirement likely resulted in an underestimation of moderate and mild AEs. It

---

[41] Center for Drug Evaluation and Research. NDA 20-687. Approval Letter for MIFEPREX (mifepristone) Tablets, 200 mg to Population Council. Food and Drug Administration. Written September 28, 2000. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.htm

[42] 2016 03 20 FDA resp to Cit Pet.pdf. Docket No. FDA-2002-P-0364. FDA. March 29, 2016. p. 31. Accessed November 13, 2020.
https://aaplog.wildapricot.org/resources/2016%2003%2020%20%20FDA%20resp%20to%20Cit%20Pet.pdf

[43] Cytotec (misoprostol tablets). Package insert. G.D. Searle; Revised November 2012. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/019268s047lbl.pdf

[44] Creinin MD, Hou MY, Dalton L, Steward R, Chen MJ. Mifepristone Antagonization With Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial. Obstet Gynecol. 2020;135(1):158-165. doi:10.1097/AOG.0000000000003620

[45] Creinin MD, Hou MY, Dalton L, Steward R, Chen MJ. Mifepristone Antagonization With Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial. Obstet Gynecol. 2020;135(1):5. doi:10.1097/AOG.0000000000003620

[46] M I F E P R E X™(Mifepristone) Tablets, 200 mg Prescriber's agreement. Food and Drug Administration. September 28, 2000, 1-2. Accessed November 16, 2020. http://wayback.archive-it.org/7993/20170113112742/http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationfor PatientsandProviders/ucm111364.pdf

is also likely that some of the AEs that we coded as Mild or Moderate were actually Severe but there was not enough information in the AER for us to justify coding them as Severe. In March 2016, the FDA substantially reduced the prescribing requirements and changed the drug protocol [47] and yet at the same time eliminated reporting requirements except for deaths.[48] With the relaxation of reporting requirements, the ability to perform any relevant post-marketing evaluation of mifepristone was lost. It is imperative for the safety of women that the FDA restore and strengthen the 2011 REMS requirements.

The information in the AERs is almost exclusively obtained from abortion providers, rather than the physician treating the complication, yet in this analysis, abortion providers managed only 39.75% of surgical complications (a number which is likely much lower since these are only the cases which are known to the abortion provider). Throughout the reports, there was also a lack of detail and many patients who were simply "lost to follow-up." This resulted in 16.80% of the AERs being Uncodable as to severity and likely under-coding of many AERs and AEs, as coding could only be assigned based on the scant information provided. Many of the AEs experienced by women were unknown to the abortion provider until the follow-up examination, which is troubling considering the poor follow-up rate and elimination of the requirement for an in-office follow up visit. Some of the patient deaths were not known to the abortion provider until they saw the death in an obituary or were contacted by an outside source. Because of this, in addition to abortion providers, hospitals, emergency departments, and private practitioners should be required to report AEs.

Complications occur in the best of hands in all areas of medicine, but as physicians, we are responsible to manage those complications and follow our patients through to resolution. The findings that: 1. the most common outcome of ongoing pregnancy was unknown outcome, 2. abortion providers performed less than half the D&Cs done for complications, and 3. a third of ectopic pregnancies (missed prior to administering the abortifacient) had unknown rupture status, leave us deeply concerned regarding the care these women received. A post-marketing requirement was that there be a "cohort-based study of safety outcomes of patients having medical abortion under the care of physicians with surgical intervention skills compared to physicians who refer their patients for surgical intervention."[49] The applicant was released from this requirement because they stated that because there were so few providers

[47] GAO-18-292 Revised Mifeprex Labeling: Food and Drug Administration Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts. Report to Congressional Requesters. Food and Drug Administration. 2018. p. 7. Published March 2018. Accessed November 13, 2020. https://www.gao.gov/assets/700/690914.pdf

[48] NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg: Risk Evaluation and Mitigation Strategy (REMS). Food and Drug Administration. 2016. p. 3, 6. Reference ID: 3909592. Published March 29, 2016. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf

[49] Center for Drug Evaluation and Research. NDA 20-687. Approval Letter for MIFEPREX (mifepristone) Tablets, 200 mg to Population Council. Food and Drug Administration. Written September 28, 2000. Accessed November 13, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.htm

without surgical intervention skills, no meaningful study could be done.[50]  Yet, that same year the FDA changed the provider agreement to allow non-physicians to become prescribers.[51]  These findings highlight the importance of follow-up and management of complications by the abortion provider.  Allowing any further relaxation of mifepristone prescribing requirements will put women at an even higher risk of adverse events

## *Limitations and Strengths*

It was not possible to calculate complication rates for mifepristone and misoprostol abortions based on AER data because there is no denominator for how many mifepristone abortions are performed in the U.S. since reporting is often voluntary and sporadic. For clarity, we specified the denominators we used.

Our analysis was limited by the fact that the number of AEs for which we received reports is likely a gross underestimation of the actual number of AEs that occurred.  In our analysis, the surgical management of over half the complications was performed by someone other than the abortion provider, yet treating physicians are not required to report complications.  Few reports were generated by those in Emergency Departments and hospitals who treated the complications.

Our analysis was also limited by the lack of information in the AERs, including redaction of critical dates, a paucity of diagnosis and treatment information, and lack of follow up.

Our study has several strengths. Our data comes from information provided to the FDA and is the largest analysis of AERs for mifepristone abortions. This data is publicly available under the Freedom of Information Act so that anyone can verify the data for themselves. This analysis reviews all AERs not reported in the first study by Gary.[52] Although heavily redacted, there was sufficient information in over 80% of the AERs to evaluate severity. An objective standardized system, CTCAEv3, was used to code for severity, and each AER was coded by at least two board-certified obstetrician-gynecologists or family medicine physicians.

## **Conclusions and Relevance**

This article is important because it augments the scant published literature on mifepristone safety.

Due to the lack of adequate reporting of adverse events, especially by those treating them, these unique AERs represent a fraction of the actual adverse events occurring in American women.

---

[50] 2016 03 20 FDA resp to Cit Pet.pdf. Docket No. FDA-2002-P-0364. FDA. March 29, 2016. p. 31. Accessed November 13, 2020.
https://aaplog.wildapricot.org/resources/2016%2003%2020%20%20FDA%20resp%20to%20Cit%20Pet.pdf
[51] GAO-18-292 Revised Mifeprex Labeling: Food and Drug Administration Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts. Report to Congressional Requesters. Food and Drug Administration. 2018. p. 7. Published March 2018. Accessed November 13, 2020. https://www.gao.gov/assets/700/690914.pdf
[52] Gary M, Harrison D. Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient. Ann Pharmacother. 2006 Feb 40(2):191-7. https://doi.org/10.1345/aph.1G481

Significant morbidity and mortality have occurred with the use of mifepristone as an abortifacient, including at least 24 US deaths reported by the FDA from September 2000 to December 2018. Because of this and the significant morbidity associated with this drug, the FDA should consider at a minimum reinstating the original 2011 REMS and strengthening the reporting requirements. The reporting of transfusions, hospitalizations, and other serious adverse events are essential.

Given the morbidity and mortality of undiagnosed ectopic pregnancy, a clear contraindication to the use of mifepristone, an ultrasound to confirm pregnancy location is essential before mifepristone is dispensed.

Considering the significant percentage of women with ongoing pregnancies who chose to continue their pregnancy, there must be reasonable waiting periods, parental involvement, and adequate pre-abortion counseling on all pregnancy options. It is also critical that a pregnancy registry be established.

In our analysis, the patients who used mifepristone alone had a lower rate of hemorrhage than those using mifepristone followed by misoprostol.

The FDA Adverse Event Reporting System is woefully inadequate to determine the post-marketing safety of mifepristone due to its inability to adequately assess the frequency or severity of adverse events. The reliance solely on interested parties to report, the large percentage of uncodable events, the redaction of critical clinical information unrelated to personally identifiable information, and the inadequacy of the reports highlight the need to overhaul the current AER System.

This analysis evaluated 3197 adverse events resulting from the use of mifepristone as an abortifacient and brought to light serious concerns about the safety requirements and care of women undergoing mifepristone abortion. Although complications may occur in the best of hands, and no medical procedure is without risks, safety measures must be employed to minimize these adverse outcomes. Women undergoing abortion should receive the same quality of informed consent and pre-procedural counseling that is standard of care prior to other medical treatment or surgery. It is imperative that women considering abortion be provided adequate and complete information and counseling on risks, advantages, disadvantages, and alternative options. Although there may be disagreements about the ethics of abortion, there must be total agreement that our patients—whether undergoing a medical abortion or otherwise—deserve the highest standard of medical care.

## Acknowledgments:

Authors would like to acknowledge the other members of the American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) Mifeprex Adverse Events Coding Team: Jennifer J. Barr M.D., Brent Boles M.D., Watson A. Bowes, Jr. M.D., Steven Braatz M.D., Byron Calhoun M.D., Myles Dotto M.D., Steve Foley M.D., R. Scott French M.D., Victoria Gerthe OMSIV, Mary Jo Heinrichs M.D., Maureen Kennedy M.D., Sarah Kennedy M.D., Paul LaRose M.D., Daniel Lickness

M.D., Jenny Mao D.O., Patrick Marmion M.D., Richard Moutvic M.D., Mary O'Sullivan M.D., Catherine Reese M.D., AnnaLisa Schmitz M.D., Ingrid Skop M.D., Barbara Talamo M.D., Michael T. Valley M.D., Marilyn J. Vanover M.D., Elizabeth Wehlage M.D., Belinda Williams M.D, Jerry Wittingen M.D.

Authors would also like to acknowledge Christopher Gacek of the Family Research Council for assistance with FOIA requests to the FDA over 2 decades.

Authors would also like to acknowledge William Marshall of Judicial Watch for assistance with FOIA requests to the FDA.

Authors would also like to acknowledge The Charlotte Lozier Institute, especially Genevieve Plaster and Dr. John Fisher, for support for data processing.

# EXHIBIT 37

# Cirucci, Mifepristone Adverse Events

*Research Letter*

# Mifepristone Adverse Events Identified by Planned Parenthood in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting System and Those Obtained Through the Freedom of Information Act

Health Services Research and Managerial Epidemiology
Volume 8: 1-5
© The Author(s) 2021
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/23333928211068919
journals.sagepub.com/home/hme

$\circledS$SAGE

Christina A. Cirucci[1] , Kathi A. Aultman[2] , and Donna J. Harrison[3]

## Abstract

**Background:** As part of the accelerated approval of mifepristone as an abortifacient in 2000, the Food and Drug Administration (FDA) required prescribers to report all serious adverse events (AEs) to the manufacturer who was required to report them to the FDA. This information is included in the FDA Adverse Event Reporting System (FAERS) and is available to the public online. The actual Adverse Event Reports (AERs) can be obtained through the Freedom of Information Act (FOIA).

**Methods:** We compared the number of specific AEs and total AERs for mifepristone abortions from January 1, 2009 to December 31, 2010 from 1. Planned Parenthood abortion data published by Cleland et al. 2. FAERS online dashboard, and 3. AERs provided through FOIA and analyzed by Aultman et al.

**Results:** Cleland identified 1530 Planned Parenthood mifepristone cases with specific AEs for 2009 and 2010. For this period, FAERS online dashboard includes a total (from all providers) of only 664, and the FDA released only 330 AERs through FOIA. Cleland identified 1158 ongoing pregnancies in 2009 and 2010. FAERs dashboard contains only 95, and only 39 were released via FOIA.

**Conclusions:** There are significant discrepancies in the total number of AERs and specific AEs for 2009 and 2010 mifepristone abortions reported in 1. Cleland's documentation of Planned Parenthood AEs, 2. FAERS dashboard, and 3. AERs provided through FOIA. These discrepancies render the FAERS inadequate to evaluate the safety of mifepristone abortions.

## Keywords

mifepristone, misoprostol, adverse drug reaction reporting systems, drug-related side effects and adverse reactions, postmarketing product surveillance, induced abortion, steroidal abortifacient agents, United States food and drug administration

## Introduction

The accelerated approval of mifepristone in the United States (US) in 2000 included post-marketing restrictions to monitor safety. Prescribers were required to report any ongoing pregnancies, hospitalizations, transfusions, and other serious events to the manufacturer, who was required to submit them to the Food and Drug Administration (FDA).[1] Adverse events (AEs) are documented in the FDA Adverse Event Reporting System (FAERS), available online.[2] Copies of the actual Adverse Event Reports (AERs) can be obtained via the Freedom of Information Act (FOIA).[3]

A paper published by Cleland et al. analyzed eight adverse events/outcomes (AEs) from mifepristone abortions at 63

days and less performed by Planned Parenthood in 2009 and 2010. They analyzed hospital admissions, blood transfusions, emergency department (ED) treatments, intravenous (IV)

[1] Sewickley, PA
[2] Charlotte Lozier Institute
[3] American Association of Pro-Life Obstetricians and Gynecologists, USA

Submitted November 22, 2021. Revised December 3, 2021. Accepted December 3, 2021.

**Corresponding Author:**
Christina A. Cirucci, Sewickley, Pennsylvania, United States.
Email: chris@aaplog.org

Creative Commons Non Commercial CC BY-NC: This article is distributed under the terms of the Creative Commons Attribution-NonCommercial 4.0 License (https://creativecommons.org/licenses/by-nc/4.0/) which permits non-commercial use, reproduction and distribution of the work without further permission provided the original work is attributed as specified on the SAGE and Open Access page (https://us.sagepub.com/en-us/nam/open-access-at-sage).

antibiotics, infections requiring IV antibiotics or hospitalization, deaths, ongoing pregnancies, and ectopic pregnancies. Cleland explained that Planned Parenthood reports all significant AEs to Danco Laboratories, which submits them to the FDA, per the mifepristone prescribing information. Their analysis for these specific AEs led them to conclude that, "Among the 233 805 medical abortions provided at Planned Parenthood health centers in 2009 and 2010, significant adverse events or outcomes were reported in 1530 (0.65%) cases."[4] Unless associated with another AE, they did not include data on incomplete abortion managed at Planned Parenthood or hemorrhage without transfusion, two of the most common AEs resulting from mifepristone abortion. They also admit that "we cannot exclude the possibility that some clinically significant adverse events or outcomes were not included. Some patients may have experienced a significant adverse event or outcome but did not follow up after their medical abortion."[4] Cleland did not provide the loss to follow-up rate.

In 2021, Aultman et al. published an analysis of the AERs for mifepristone abortion from September 2000 to February 2019 (excluding those published by Gary in 2006) utilizing AERs obtained through FOIA.[5,6]

The objective of this paper was to compare the total number of AERs/cases (which may include more than one AE) and the individual AEs identified by Cleland for 2009 and 2010 mifepristone abortions from three sources: those identified by Planned Parenthood as published by Cleland, those currently posted on the FAERS dashboard, and those provided by the FDA in response to FOIA and analyzed by Aultman.

## Methods

We searched the FAERS dashboard for any US AERs related to mifepristone abortion occurring from January 1, 2009 through December 31, 2010 and tabulated the total number of AERs, hospital admissions, deaths, ongoing pregnancies, and ectopic pregnancies. The FAERS did not have enough information to evaluate for transfusion, ED visits, IV antibiotics, or infections requiring IV antibiotics or hospital admission. Since FAERS does not provide the "abortion date," we used the "event date"; in cases where there was no "event date," we used the "latest manufacturer received date." We evaluated Aultman's

AERs for the events in Cleland and confirmed any missing reports by searching the 6158 pages of AERs related to mifepristone abortion obtained by FOIA. In analyzing FOIA data, Aultman accounted for duplicates. In the FAERS data, we accounted for duplicates for deaths and ectopic pregnancies, but FAERS did not provide sufficient detail to do so for hospital admissions and ongoing pregnancies. We then compared the total number of reports, as well as hospitalizations, ongoing pregnancies, ectopic pregnancies, and deaths from Cleland, FAERS, and FOIA AERs for 2009 and 2010. Adverse events not reported by Cleland were not evaluated. The FAERS and FOIA total AERs include reports from all sources, not just from Planned Parenthood, and include all reports for those years, not just those with the eight AEs evaluated by Cleland.

## Results

Our analysis shows significant discrepancies between the number of AERs identified by Planned Parenthood as reported in Cleland, the number in the FAERS database, and the number received under FOIA. There are also discrepancies in the number of hospitalizations, ectopic pregnancies, and ongoing pregnancies.

### Total Reports (Figure 1)

Cleland identified 1530 cases involving eight specific AEs after Planned Parenthood mifepristone abortion in 2009 and 2010. The FAERS dashboard contains only 664 AERs for this period, and only 330 were provided through FOIA. Both include AERS with other types of adverse events not included by Cleland and include reports from all sources, not just Planned Parenthood.

### Specific Adverse Events/Outcomes (Table 1)

Cleland identified 548 ongoing pregnancies after mifepristone abortion in 2009, the FAERS dashboard includes just 56, and only seven were received via FOIA. For 2010, Cleland identified 610 ongoing pregnancies, FAERS contains just 39, and only 32 were obtained via FOIA. Cleland identified 70 hospital admissions in 2009 and 65 in 2010. FAERS includes 87 and 125, respectively, but the FDA only provided 14 and 94 via FOIA. Ectopic pregnancy, although not caused by mifepristone, is a contraindication to its use. Cleland reported eight ectopic pregnancies in 2009 and eight in 2010. FAERS includes eight for 2009 and nine for 2010. The FOIA AERs have only one ectopic for 2009 and eight for 2010. Cleland reported no deaths in 2009 and one in 2010. FAERS and FOIA were consistent with one death in 2009 and two in 2010.

## Discussion

The total number of AEs published in Cleland is significantly higher than the number in the FAERs database, even though Cleland did not evaluate all AEs, including



**Figure 1.** Comparison of total adverse event reports from three sources.

Cirucci et al. 3

**Table 1.** Comparison of Number of Specific Adverse Events[a] from Three Sources.

| | 2009 | | | 2010 | | | Total 2009 to 2010 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Cleland | FAERS[b] | FOIA | Cleland | FAERS[b] | FOIA | Cleland | FAERS[b] | FOIA |
| Hospital Admission | 70 | 87 | 14 | 65 | 125 | 94 | 135 | 212 | 108 |
| Transfusion | 42 | | 10 | 72 | | 59 | 114 | | 69 |
| ED Treatment | 87 | | 27 | 151 | | 105 | 238 | | 132 |
| IV Antibiotics | 23 | | 5 | 34 | | 27 | 57 | | 32 |
| Infection requiring IV Antibiotics or Admission | 14 | | 4 | 23 | | 21 | 37 | | 25 |
| Death | 0 | 1 | 1 | 1 | 2 | 2 | 1 | 3 | 3 |
| Ongoing Pregnancy | 548 | 56 | 7 | 610 | 39 | 32 | 1158 | 95 | 39 |
| Ectopic Pregnancy | 8 | 8 | 1 | 8 | 9 | 8 | 16 | 17 | 9 |

[a]Events are not mutually exclusive.
[b]If blank, FAERS dashboard does not provide this detail.

failed abortions treated at Planned Parenthood.[4] The discrepancy is particularly concerning because the total number of AEs and AERs in the FAERS should be significantly higher than Cleland since Planned Parenthood performs only 37% of US abortions.[7] It is unclear why so many cases identified by Planned Parenthood in Cleland do not appear in FAERS. Cleland states, "In accordance with the mifepristone prescribing information, Planned Parenthood Federation of America reports all significant adverse events and outcomes to Danco Laboratories, the US distributor of mifepristone, which in turn reports them to the FDA."[4] If this claim is true, then either Danco did not report a significant number of adverse events to the FDA, or the FDA did not include them in FAERS. It also raises the question of whether FAERS includes all complications reported by the other 63% of abortion providers.

We are concerned that FDA and others will continue to rely on Cleland's statement, "significant adverse events or outcomes were reported in 1530 (0.65%) cases"[4] to claim that the complication rate for the abortion pill regimen is low. Although Cleland's paper is a study of over 200 000 abortions and is cited extensively in support of the safety of medical abortion[8–11] the analysis excludes the most common adverse events (retained products of conception and hemorrhage not requiring transfusion). Additionally, Cleland's reported complication rate of 0.65% is only a report of the complications known to Planned Parenthood. Cleland does not report the percent of patients lost to follow-up.[4]

There is also concern that the FDA will continue to rely on the FAERS to make decisions about removing mifepristone REMS, despite the findings herein that FAERS does not include all the events even known to the abortion provider. To compound this problem, in 2016, the FDA eliminated the requirement to report adverse events resulting from mifepristone other than death.[12] Nevertheless, in her April 12, 2021 letter to the American College of Obstetricians and Gynecologists, FDA Commissioner Janet Woodcock stated

that, based on a review of post-marketing AEs from January 27, 2020, to January 12, 2021, the in-person dispensing requirements in the mifepristone REMS would not be enforced.[13] It is alarming that policy decisions that affect women's safety are based on a lack of information in the FAERS. Whether the inaccuracy of FAERS extends to required reporting for other medications is unknown to us, but the findings in this paper have significant implications for drug safety evaluation in general.

The ability of the FAERS to accurately identify complications from mifepristone abortion depends on 1. the abortion provider being aware of the adverse event, 2. the provider reporting the adverse event to the manufacturer, 3. the manufacturer reporting to the FDA, and 4. the FDA including the event in the FAERS. One problem inherent in this system is that adverse events unknown to the abortion provider or occurring in patients lost to follow-up will be missed. In addition, ED physicians or treating physicians other than the abortion provider were never obligated to report and may not even be aware of the system. For those events known to Planned Parenthood, it is unclear whether the error occurred in the abortion provider reporting to the manufacturer, the manufacturer reporting to the FDA, or the FDA uploading to the database.

FDA compliance in response to FOIA requests is required by law.[3] The number of AERs supplied under FOIA is much lower than the number in the FAERS database and known to the FDA at the time. Although there may be extenuating circumstances requiring that some information be withheld, withholding information, especially to this extent, interferes with independent, scientific analysis necessary to validate claims of safety and efficacy.

## Strengths and Limitations

One of the limitations of this study is that Cleland only reported on a limited number of possible AEs. Because of the scant information included in the FAERS, we could not even compare all AEs reported by Cleland. Since we do not have

access to the Planned Parenthood records, reports cannot be evaluated on a patient-by-patient basis but only as a composite.

One of the strengths of this study is that it is the first known study comparing FAERS data with an outside report of mifepristone complications.

## Conclusions

There are significant discrepancies in the number of AEs and total AERs reported for 2009 and 2010 mifepristone abortions identified by Planned Parenthood as reported by Cleland, those in FAERS, and those provided by FOIA, impugning the reliability of FAERS to evaluate the safety or efficacy of mifepristone abortions at a time when the FDA is under pressure to eliminate REMS on mifepristone.[14,15] The FDA used their review of post-marketing adverse events that occurred in 2020 and 2021 as a rationale for removing the in-person dispensing requirements for mifepristone during COVID, even though reporting requirements (other than death) were eliminated in 2016.[13] Whether Planned Parenthood did not submit all the AEs to Danco, Danco did not submit all to the FDA, or the FDA did not include all is unknown. By withholding a significant number of AERs, the FDA did not adequately comply with the FOIA request by the authors of the Aultman paper, hampering their ability to analyze the data. These discrepancies, and the fact that since 2016, reporting AEs other than deaths is no longer required,[12] demonstrate that the FAERS is inadequate to evaluate the safety of mifepristone.

### Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author(s) received no financial support for the research, authorship and/or publication of this article.

### ORCID iDs

Christina A. Cirucci  https://orcid.org/0000-0002-4681-6529
Kathi A. Aultman  https://orcid.org/0000-0002-9235-5049

### References

1. Center for Drug Evaluation and Research. NDA 20-687. Approval Letter for MIFEPREX (mifepristone), 200 mg to Population Council. Food and Drug Administration. Written September 28, 2000. Accessed November 18, 2021. https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687apltr.htm

2. *FDA Adverse Event Reporting System (FAERS) Public Dashboard*. FDA. Updated October 22, 2021. Accessed November 11, 2021. https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard

3. *What is FOIA?* US Dept of Justice. FOIA. Accessed November 16, 2021. https://www.foia.gov/about.html

4. Cleland K, Creinin MD, Nucatola D, Nshom M, Trussell J. Significant adverse events and outcomes after medical abortion. *Obstet Gynecol.* 2013;121(1):166-171. https://doi.org/10.1097/aog.0b013e3182755763

5. Aultman K, Cirucci C, Harrison D, et al. Deaths and severe adverse events after the Use of mifepristone as an abortifacient from September 2000 to February 2019. *Issues Law Med.* 2021;36(1):326. https://issuesinlawandmedicine.com/wp-content/uploads/2021/01/Deaths-and-Severe-Adverse-Events-after-the-use-of-Mifepristone-as-an-Abortifacient-from-September-2000-to-February-2019-copy5.pdf.

6. Gary MM, Harrison DJ. Analysis of severe adverse events related to the Use of mifepristone as an abortifacient. *Ann Pharmacother.* 2006;40(2):191-197. https://doi.org/10.1345/aph.1G481

7. Communities Need Clinics: The Essential Role of Independent Abortion Clinics in the United States. Abortion Care Network. 2020:2. Accessed November 15, 2021. https://abortioncarenetwork.org/wp-content/uploads/2020/12/CommunitiesNeedClinics-2020.pdf.

8. National Academies of Sciences, Engineering, and Medicine. *The Safety and Quality of Abortion Care in the United States.* The National Academies Press; 2018: Kindle Locations 1351–1367. Accessed 11–29–21. https://doi.org/10.17226/24950

9. Gill R, Norman WV. Telemedicine and medical abortion: dispelling safety myths, with facts. *Mhealth.* 2018;4(3):1–4. https://doi.org/10.21037/mhealth.2018.01.01

10. Upadhyay UD, Schroeder R, Roberts SCM. Adoption of no-test and telehealth medication abortion care among abortion providers in response to COVID-19. *Contracept X.* 2020;2-(100049):1–5. https://doi.org/10.1016/j.conx.2020.100049

11. Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. *Contraception.* 2015;91(4):269-273. https://doi.org/10.1016/j.contraception.2015.01.005

12. Food and Drug Administration. *Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts.* GAO-18-292 Report to Congressional Requesters. March 2018:8. Accessed November 30, 2021. https://www.gao.gov/assets/700/690914.pdf

13. Letter from Woodcock J. (Acting Commissioner of Food and Drugs) to Phipps MG (Chief Executive Officer ACOG) and Grobman, W (Pres Society for Fetal-Maternal Medicine). ACLU. April 12, 2021. p. 2. Accessed November 15, 2021. https://www.aclu.org/sites/default/files/field_document/fda_acting_commissioner_letter_to_acog_april_12_2021.pdf

14. Letter to Joseph R. Biden (President of the US) from the ACLU and others. Planned Parenthood. March 18, 2021. 1-5. Accessed November 30, 2021. https://www.plannedparenthood.org/uploads/filer_public/28/b2/28b21706-7f25-4cd6-b43b-ee340a6681d7/coalition_letter_to_biden_administration_re_mifepristone_3_18_21_final.pdf

15. Chelius v. Becerra, Case 1:17-cv-00493-JAO-RT. Document 148. P. 3191. (DC Hawaii) July 9, 2021. Accessed November 30, 2021. https://www.aclu.org/sites/default/files/field_document/chelius_v._becerra_-_joint_motion_for_stay_pending_agency_review_may_7_2021.pdf

## Author biographies

**Christina A. Cirucci**, MD received her Bachelor of Science in Mechanical Engineering from Virginia Tech in Blacksburg, VA and her MD from Thomas Jefferson University, Philadelphia, PA. She completed her residency in obstetrics and gynecology at the Medical College of Virginia in Richmond, VA. She is a diplomate of the American Board of Obstetrics and Gynecology and a life Fellow of the American College of Obstetricians and Gynecologists. She is a member of the Christian Medical and Dental Associations, the North American Menopause Society, the Pennsylvania Medical Society, and the Allegheny County Medical Society. She is a board member of the American Association of Pro-Life Obstetricians and Gynecologists. She worked in private practice for twenty years in Pittsburgh, PA.

**Kathi A. Aultman**, MD received her B.A. from Drew University in 1972, earned her MD at the University of Florida College of Medicine in 1977, and completed her OB/GYN Residency at the University of Florida affiliated Jacksonville Health Education Program in 1981. She is a diplomate of the American Board of Obstetrics and Gynecology and is currently an Associate Scholar with the Charlotte Lozier Institute. She is a member of the American Association of Prolife Obstetricians and Gynecologists, the Christian Medical and Dental Associations, the Florida Medical Association, and is a Life Fellow of the American College of Obstetricians and Gynecologists. She practiced medicine from 1981-2014 in Orange Park, Florida. Dr. Aultman was the co-founder and co-director of the first Rape Treatment Center in Jacksonville, Florida and performed sexual assault exams on women and children as a medical examiner for Duval and Clay Counties. She performed 1st trimester D&C with suction abortions and 2nd trimester D&Es. She also served as the Medical Director for Planned Parenthood of Northeast Florida, Inc. from 1981 to 1983.

**Donna J. Harrison**, MD received her MD from the University of Michigan and completed her OBGYN residency at a University of Michigan affiliate hospital (St. Joseph Mercy Hospital). She is a diplomate of the American Board of Obstetrics and Gynecology. She is currently CEO of the American Association of Pro-Life Obstetricians and Gynecologists.

# EXHIBIT 38

# FDA Adverse Event Reporting System (FAERS) Electronic Submissions FDA (printed 9.17.24)

# FDA Adverse Event Reporting System (FAERS) Electronic Submissions

This page is intended to assist industry when making certain regulatory submissions in electronic format to the FDA's Adverse Event Reporting System (FAERS) database for the Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER).

On January 16, 2024, FDA began accepting electronic submissions of both expedited and non-expedited postmarketing individual case safety reports (ICSRs) for human drugs, including biological products regulated by CDER, in electronic format using the E2B(R3) standard endorsed by the International Council for Harmonisation (ICH) and adopted by FDA.

In addition, on April 1, 2024, FDA began accepting electronic submissions of premarketing (IND study or IND-exempt BA/BE study) individual case safety reports (ICSRs) in electronic format using ICH E2B(R3) standard. The following timelines apply to companies submitting ICSRs electronically using database-to-database transmission (E2B).

## Timelines

- **Postmarketing Safety Reporting for human drug and biological products using the E2B standard:**

  - On January 16, 2024, FDA implemented the E2B(R3) standard for electronic transmission of ICSRs and submitters have until April 1, 2026, to implement E2B(R3) standard for electronic transmission.

  - Submitters to FAERS may continue to submit using E2B(R2) data standards for two (2) years during the E2B(R3) implementation period.

  - Continue to submit postmarketing ICSRs in E2B(R2) format as you prepare to submit ICSRs using E2B(R3) data standards.

  - Once your company has begun submitting in the E2B(R3) standard, your company may not revert to legacy methods or standards

- **If you are submitting ICSRs via the Safety Reporting Portal (SRP) no action is required.**

- FDA issued a final rule on June 10, 2014, requiring industry to submit postmarketing safety reports in an electronic format.

- **Premarketing Reporting (IND safety reports) using the E2B standard:**

  - Submitters have until April 1, 2026, (24 months after publication of the final guidance for industry, *Providing Regulatory Submissions in Electronic Format: IND Safety Reports*) to comply with electronic submission requirements for IND safety reports under 21 CFR 312.32(c)(1)(i) for serious and unexpected suspected adverse reactions.

  - As you prepare to submit ICSRs electronically during the voluntary submission period, sponsors may continue to submit a PDF copy of the Form FDA-3500A MedWatch form using the eCTD standard until April 1, 2026.

- **Premarketing Reporting (IND-exempt BA/BE safety reports) using the E2B standard:**

  - The electronic submission of the ICSRs from IND-exempt BA/BE studies is a voluntary option for submission.

App. 000727

- As you prepare to submit ICSRs electronically, continue to submit IND-exempt BA/BE safety reports on Form FDA-3500A MedWatch to ogd-premarketsafetyreports@fda.hhs.gov (mailto:ogd-premarketsafetyreports@fda.hhs.gov)

# Submitting Individual Case Safety Reports (ICSRs), Periodic Safety Reports (PSRs):

**1. Submitting ICSRs**

You have two options for submitting ICSRs electronically:

**Option A: Database-to-Database Transmission ("E2B")**

ICSRs should be submitted in XML format using the one of the standards below via  Electronic Submission Gateway (ESG):

- E2B(R3) standard (/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-electronic-submissions-e2br3-standards): in accordance with the ICH E2B(R3) and FDA's regional technical specifications.

- E2B(R2) standard (/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-electronic-submissions-e2br2-standards): **only** for postmarketing ICSRs until April 1, 2026, during the E2B(R3) implementation period.

**Option B: Safety Reporting Portal (SRP (https://www.safetyreporting.hhs.gov/SRP2/en/Home.aspx))**

Applicants for human drug products, biological products, and responsible persons for companies with reporting requirements who do not have E2B capability may submit postmarketing ICSRs and respective attachments electronically via SRP (https://www.safetyreporting.hhs.gov/SRP2/en/Home.aspx) by manually entering the data into a web form. To submit via SRP, you must first establish an SRP account. A Gateway partner (i.e., a company that submits ICSRs electronically via the ESG) cannot use SRP to submit ICSRs, and respective attachments.

**Steps for requesting an SRP account**

Contact faersesub@fda.hhs.gov (mailto:faersesub@fda.hhs.gov) to advise FDA of your intent to begin submitting via the SRP and establish an account.

**SRP account activation**

- Your account will be activated in about 7 to 10 business days from the date of request.

- You will be notified via email with the subject line "SRP Account Activation" that will include the Web link to the SRP portal along with your account information.

- After receiving this email, your account will be considered active, and you may begin submitting your ICSR via SRP.

**2. Submitting PSRs**

Please note that a PSR submission is comprised of both a descriptive portion and the non-expedited ICSRs received during the reporting interval of the PSR (21 CFR 314.80(c)(2) and 600.80(c)(2)).

- **Descriptive Portion:**

  - Use Electronic Common Technical Document (eCTD) (/drugs/electronic-regulatory-submission-and-review/electronic-common-technical-document-ectd) specifications to submit electronically.

  - Indicate in the descriptive portion that the ICSRs have been submitted electronically as XML files to the ESG or via the SRP.

- **Non-expedited ICSRs:**

  - Must be submitted as described above for electronic submission of ICSRs and on or before the PSR due date. Please do NOT re-submit any ICSRs that were previously submitted.

## Resources For You

- FAQ: CDER and CBER-Regulated Combination Products (/media/131508/download?attachment)

- FAQ: FAERS Submissions (/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/faers-submissions-frequently-asked-questions)

- Public Meeting: Electronic Submission of Adverse Event Reports to FDA Adverse Event Reporting System (FAERS) using International Council for Harmonisation (ICH) E2B(R3) Standards (/drugs/news-events-human-drugs/electronic-submission-adverse-event-reports-fda-adverse-event-reporting-system-faers-using)

- FAQs: Safety Reporting Portal (/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/faqs-safety-reporting-portal)

- FDA issues final rule on postmarketing safety report in electronic format (http://wayback.archive-it.org/7993/20170111002213/http://www.fda.gov/Drugs/DrugSafety/ucm400526.htm) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)

**EXHIBIT 39**

# Specifications for Preparing and Submitting Electronic ICSRs and ICSR Attachments

# Specifications for Preparing and Submitting Electronic ICSRs and ICSR Attachments

*Technical Specifications Document*

**Associated Guidance Documents and Conformance Guide:**

**Draft Guidance for Industry: Providing Submissions in Electronic Format – Postmarketing Safety Reports (June 2014)**

**Guidance for Industry and FDA Staff: Postmarketing Safety Reporting for Combination Products (July 2019)**

**Draft Guidance for Industry: Providing Regulatory Submissions in Electronic Format: IND Safety Reports (October 2019)**

**Electronic Submissions of IND Safety Reports Technical Conformance Guide (October 2019)**

For questions regarding this technical specifications document, contact the Office of Surveillance and Epidemiology, Center for Drug Evaluation and Research, Food and Drug Administration, at FAERSESUB@fda.hhs.gov; or Office of Communication, Outreach and Development, Center for Biologics Evaluation and Research, Food and Drug Administration, at CBERICSRSubmissions@fda.hhs.gov.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**April 2021**

App. 000731

# Specifications for Preparing and Submitting Electronic ICSRs and ICSR Attachments

### Revision History Table

| Date | Version | Summary of Changes |
|------|---------|--------------------|
| 2008-06-11 | 1.0 | Initial Version |
| 2008-08-06 | 1.1 | Added Filename format information |
| 2008-10-10 | 1.2 | Updated UTF-8 to ISO-8859-1 encoding; indicated simultaneous acceptance of ICSR and ICSR attachments; provided another acceptable file extension for SGML files; and clarified use of abbreviations (NDA, ANDA, and STN) |
| 2008-10-22 | 1.3 | Provided clarification in Section II; updated footnote 3; and added new paragraph to Section V.C. |
| 2013-07-05 | 1.4 | Updated AERS to FAERS migration changes, removed references to SGML file formatting, incorporated updates from CBER |
| 2018-02-06 | 1.5 | Added a new section to highlight data fields for reporting ICSRs on Combination Products |
| 2019-09-30 | 1.6 | Added two new sections to provide regional data elements for electronic submissions of certain IND safety reports (section I) and IND-exempt Bioavailability (BA)/Bioequivalence (BE) studies (section J). Added an appendix (II) highlighting various case scenarios for electronic submissions of IND safety reports to FAERS. |

App. 000732

| 2020-02-11 | 1.7 | Added a new value to the data element B.4.k.1 for drug characterization to accommodate a similar device. |
| | | Updated the data element B.4.k.18.2 to specify values. |
| | | Updated the data element B.4.k.18.3 to use default value. |
| 2020-12-18 | 1.8 | Added a new regional data element A.1.FDA.16 (FDA Safety Report Type) in Table 2 Detailed Description of Administrative Tags |
| | | Added section Submission Rules |
| | | Added a new value to the data element B.4.k.1 and B.4.k.19 in section J. IND-exempt BA/BE Studies |
| 2021-03-26 | 1.9 | Updated section XML Header to include DTD 3.0 for premarketing reporting |
| | | Updated the reference description to data element A.1.FDA.16 in Table 2 Detailed Description of Administrative Tags |
| | | Updated section ICSR Message Header Information to include information in premarketing reporting |
| | | Updated section AS2 Headers and Routing IDs for Premarketing Safety Report Submissions |
| | | Updated section Submission Rules |

App. 000733

# *Specifications for Preparing and Submitting Electronic ICSRs and ICSR Attachments*

**Table of Contents**

I.   ELECTRONIC SUBMISSIONS OF ICSRS AND ICSR ATTACHMENTS ................. 6

II.  SUBMISSION FILE NAME ................................................................. 7

III. ICSR ACKNOWLEDGEMENTS ......................................................... 7

   A.  ESG Acknowledgement ................................................................. 7
   B.  FAERS Acknowledgment ............................................................... 7

IV. ELECTRONIC TRANSPORT FORMAT:  XML FILES ............................. 7

   A.  AS2 Headers and Routing IDs for Postmarketing Safety Report Submissions .... 8
   B.  AS2 Headers and Routing IDs for Premarketing Safety Report Submissions ....... 8
   C.  XML Header ............................................................................. 9
   D.  ICSR Message Header Information ................................................... 10
   E.  ICSR File Extension ................................................................... 10

V.  DATA ELEMENTS FOR ELECTRONIC SUBMISSIONS ......................... 10

   A.  Minimum Data Elements Requirements ............................................. 10
   B.  Administrative and Identification Elements ....................................... 11
   C.  Authorization/ Application Number Format ........................................ 12
   D.  Unique Case Identification Numbers for Initial and Follow-Up ICSRs ............. 13
   E.  MedDRA Specific Elements ........................................................... 13
      1.  Reaction/Event ................................................................. 14
      2.  Other E2B Elements ........................................................... 14
   F.  Drug Description and Case Narrative Elements .................................. 15
      1.  Recording Multiple Drugs ..................................................... 15
      2.  Medicinal Product Name and Active Drug Substance Name ................. 15
      3.  Case Narrative ................................................................. 16
   G.  Other Data Elements .................................................................. 16
      1.  Dosage Information Field ...................................................... 16
      2.  Pharmaceutical Form Field .................................................... 16
      3.  Route of Administration Field ................................................. 16
      4.  Receiver Field (A.3.2) ......................................................... 16
      5.  Message Receiver Field (M.1.6) ............................................... 17
   H.  Data Elements for Electronic Submissions of Safety Reports for Postmarketing Combination Products .......................................... 17

I.   DATA ELEMENTS FOR ELECTRONIC SUBMISSIONS OF IND SAFETY REPORTS.................... 28
J.   DATA ELEMENTS FOR ELECTRONIC SUBMISSIONS OF ICSRs FROM IND-EXEMPT
BIOAVAILABILITY (BA)/ BIOEQUIVALENCE (BE) STUDIES........................................................ 35

**VI.  ELECTRONIC FORMAT FOR ICSR ATTACHMENTS ........................................... 38**

A.   CONVERTING THE ICSR ATTACHMENT TO PDF ............................................................. 38
B.   IDENTIFICATION INFORMATION IN THE PDF DOCUMENT INFORMATION FIELDS................ 38

**VII. SUBMISSION RULES ......................................................................................... 39**

**APPENDIX I. EXAMPLES OF CORRECT AND INCORRECT APPLICATION
NUMBER AND DRUG ELEMENT FORMATS ................................................................ 41**

**APPENDIX II. CASE SCENARIOS FOR IND SAFETY REPORTS SUBMITTED TO
FAERS ......................................................................................................................... 43**

**APPENDIX III. CASE SCENARIOS FOR SAFETY REPORTS FROM IND-EXEMPT
BA/BE STUDIES TO FAERS ....................................................................................... 47**

**List of Tables**

Table 1.   Minimum Data Elements ...................................................................... 11
Table 2.   Detailed Description of Administrative Tags[*] ........................................ 12
Table 3.   Detailed Description of Application Number Formats............................ 13
Table 4.   Additional E2B Elements for Preferred MedDRA Coding...................... 14
Table 5.   Detailed Description of Drug(s) and Narrative Elements[*†] ...................... 15
Table 6.   Receiver Information............................................................................ 17
Table 7.   Combination Product Data Elements.................................................... 18
Table 8.   Investigational New Drug Clinical Data Elements ................................. 28
Table 9.   Data Elements for IND-Exempt BA/BE Studies .................................... 35
Table 10.  Document Information Fields in ICSR Attachments............................... 39
Table 11.  Submission Rules and Acknowledgement Status .................................. 40
Table 12.  Examples of Application Number Formats and Drug Element Formats.................. 41
Table 13.  Case Scenario 1. For IND Safety Reports Submitted to FAERS ............................. 43
Table 14.  Case Scenario 2. For IND Safety Reports Submitted to FAERS ............................. 45
Table 15.  ICH E2B Data Element & Value Selections for IND-Exempt BA/BE Study
Exposures........................................................................................... 48

# Specifications for Preparing and Submitting
# Electronic ICSRs and ICSR Attachments

This document provides current specifications for submitting individual case safety reports (ICSRs) and ICSR attachments in electronic form. The specifications apply to electronic submission of ICSRs for drug and biological products studied under an investigational new drug application (IND) (including bioequivalence studies conducted under IND), ICSRs from IND-exempt bioavailability (BA)/bioequivalence (BE) studies, and ICSRs for marketed drug and biological products and combination products to the FDA Adverse Event Reporting System (FAERS). The specifications do not apply to the following marketed biological products: prophylactic vaccines, whole blood or components of whole blood, human cells, tissues, and cellular and tissue-based products (HCT/Ps) regulated by FDA.

This document discusses the technical specifications for electronic submission of ICSRs and ICSR attachments through the FDA Electronic Submissions Gateway (ESG). [1] ICSRs (and any ICSR attachments) are to be prepared in accordance with the International Council for Harmonisation (ICH) E2B(R2) data elements in extensible markup language (XML) file format for compatibility with the FAERS database. ICSRs for marketed products should not be submitted to the electronic Common Technical Document (eCTD). [2]

If you have not previously submitted an ICSR in electronic format to FAERS, you should contact the FAERS electronic submission coordinator at faersesub@fda.hhs.gov and they will assist you with submission of a test file.

## I.    ELECTRONIC SUBMISSIONS OF ICSRS AND ICSR ATTACHMENTS

Each initial ICSR or follow-up ICSR may consist of structured information and non-structured information, such as ICSR attachments.

For the FDA to process, review, and archive the ICSRs, prepare your ICSRs for electronic submission by following these steps:

- Provide a unique filename for the submission; see section II of this document.

- Add a file header and file extension; see section IV of this document.

- Populate the elements of the ICSR file; see section V of this document.

---

[1] For information on providing submissions using the ESG, refer to
https://www.fda.gov/ForIndustry/ElectronicSubmissionsGateway/default.htm.

[2] See FAERS Electronic Submissions at
https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillance/AdverseDrugEffects/ucm115894.htm.

App. 000736

- If applicable, add ICSR attachments to ICSRs; see section VI of this document.

## II.   SUBMISSION FILE NAME

Each electronic submission of ICSRs or attachments to ICSRs must have a unique filename (e.g., your named file + date and time stamp down to the second: filenameYYYYMMDDHHMMSS). You may choose your own format to maintain uniqueness.

## III.   ICSR ACKNOWLEDGEMENTS

### A. ESG Acknowledgement

After submitting an ICSR or ICSR attachment, you should receive an ESG message delivery notice (MDN) notifying the sender of the receipt of their submission, but not acknowledging the acceptance of the submission. If the MDN is not received within 2 hours, go to the ESG System Status web page. If the ESG web page is non-operational, go to the ESG Home Page for further information.

### B. FAERS Acknowledgment

The MDN is then followed by a FAERS acknowledgment within 2 hours of the ESG acknowledgement. The FAERS acknowledgement notifies the sender whether their submission has been processed. If you do not receive the FAERS acknowledgement, resubmit the ICSRs without changing the filename.

If you receive a report acknowledgement code 02, indicating that your submission did not process due to file error/s that are specified in the acknowledgment, then proceed as follows:

- For submission with a single ICSR, resubmit the corrected ICSR with a new unique filename.

- For a submission consisting of multiple ICSRs, if one or more ICSRs in the submission failed to process, separate those ICSRs from the processed ICSRs, correct them and resubmit only the corrected ICSRs as a new submission with a unique filename. For example, if there were 50 ICSRs in an original submission and 15 of them failed to process, then only those 15 ICSRs must be separated, corrected appropriately, and resubmitted with a new unique filename. The resubmission should not contain any of the previously processed ICSRs.

## IV.   ELECTRONIC TRANSPORT FORMAT:  XML FILES

FDA accepts the data elements defined in the "Guidance for Industry E2BM Data Elements for

App. 000737

Transmission of Individual Case Safety Reports (April 2002)."[3]  The ICH E2B(R2) guidance provides additional information and clarification of the previously issued guidances.[4]

The electronic transport format also known as the Document Type Definition (DTD) for XML files is described in the associated document "XML Formatted DTD" (DTD Version 2.1, DTD Version 2.2 and DTD Version 3.0) (see links to the documents below in section C).

### A. AS2 Headers and Routing IDs for Postmarketing Safety Report Submissions

For postmarketing safety report submissions, the sponsors should include the unique AS2 headers or routing IDs for safety reports and attachments in one of the two ways listed below.

- AS2 Headers
    - Destination: "CDER"
    - XML files: AERS
    - PDF's: AERS_ATTACHMENTS

or

- Routing IDs
    - XML files: FDA_AERS
    - PDF's: FDA_AERS_ATTACHMENTS

### B. AS2 Headers and Routing IDs for Premarketing[5] Safety Report Submissions

For premarketing safety report submissions, the sponsors should include the unique AS2 headers or routing IDs for premarketing safety reports and attachments, as listed below, to differentiate these reports between CDER and CBER, and from postmarketing ICSRs.

---

[3] For information on Guidance for Industry on E2BM Data Elements for Transmission of Individual Case Safety Reports, please refer to the following:

https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM073092.pdf.

[4] See the guidance for industry entitled *E2B Data Elements for Transmission of Individual Case Safety Reports* (January 1998) (E2B).  FDA currently supports use of E2B data elements in addition to the E2BM data elements. However, it is preferred that ICSRs be submitted with E2BM data elements to allow for the most efficient processing of the submissions.  For those who wish to use E2B data elements and the corresponding electronic transport format (ICH M2 Electronic Transmission of Individual Case Safety Reports Message Specification Final Version 2.3 Document Revision February 1, 2001 (ICH ICSR DTD Version 2.1)), please refer to documentation provided at https://www.fda.gov/downloads/drugs/ucm149932.pdf

[5] The term premarketing safety report refers to IND safety reports and IND-exempt BA/BE studies safety reports.

App. 000738

*1. Submitting premarketing safety reports for CDER IND and IND-Exempt BA/BE*

- AS2 Headers
  - Destination: "CDER"
  - XML files: AERS_PREMKT_CDER
  - PDF's: AERS_ATTACHMENTS_PREMKT_CDER

or

- Routing IDs
  - XML files: FDA_AERS_PREMKT_CDER
  - PDF's: FDA_AERS_ATTACHMENTS_PREMKT_CDER

*2. Submitting premarketing safety reports for CBER IND*

- AS2 Headers
  - Destination: "CBER"
  - XML files: AERS_PREMKT_CBER
  - PDF's: AERS_ATTACHMENTS_PREMKT_CBER

or

- Routing IDs
  - XML files: FDA_AERS_PREMKT_CBER
  - PDF's: FDA_AERS_ATTACHMENTS_PREMKT_CBER

## C. XML Header

The addition of an XML header enables FDA to process ICSRs in an XML format successfully. FDA supports only the ISO-8859-1 character set for encoding the submissions.

*1. For submissions of postmarketing safety reports for drug and biological products, add the following XML header to the ICSR file:*

<?xml version="1.0" encoding="ISO-8859-1"?>

<!DOCTYPE ichicsr SYSTEM "https://www.accessdata.fda.gov/xml/icsr-xml-v2.1.dtd">

*2. For submissions of postmarketing safety reports for combination products, add the following XML header to the ICSR file:*

<?xml version="1.0" encoding="ISO-8859-1"?>

<!DOCTYPE ichicsr SYSTEM "https://www.accessdata.fda.gov/xml/icsr-xml-

App. 000739

v2.2.dtd">

***3. For submissions of premarketing safety reports, add the following XML header to the ICSR file:***

<?xml version="1.0" encoding="ISO-8859-1"?>

<!DOCTYPE ichicsr SYSTEM "https://www.accessdata.fda.gov/xml/icsr-xml-v3.0.dtd">

### D. ICSR Message Header Information

***1. For submissions of postmarketing drug and biological product safety reports, use the value "2.1" for the DTD Descriptor \<messageformatversion\>:***

<messageformatversion>2.1</messageformatversion>

***2. For submissions of postmarketing combination product safety reports, use the value "2.2" for the DTD Descriptor \<messageformatversion\>:***

<messageformatversion>2.2</messageformatversion>

***3. For submissions of premarketing safety reports, use the value "3.0" for the DTD Descriptor \<messageformatversion\>:***

<messageformatversion>3.0</messageformatversion>

### E. ICSR File Extension

Use "xml" as the file extension for ICSRs in XML format.  The name of the file should be 200 characters or less, excluding the three-digit extension.  FDA does not support file names with multiple periods "." or the use of any special or foreign characters except underscore "_" and dash "-".

## V.    DATA ELEMENTS FOR ELECTRONIC SUBMISSIONS

### A. Minimum Data Elements Requirements

For a submission to be successfully processed, submit an ICSR with the minimum data elements for reporting that are appropriate for the product type.  If a sponsor submits an ICSR without the minimum data elements, they will receive a FAERS acknowledgement code 02 stating that the submission was not processed (see section III.B above).  The minimum data elements for reporting are provided in Table 1 and the bullets that follow list the data elements to include in an ICSR by product type.

App. 000740

**Table 1.        Minimum Data Elements**

| Element | Data |
|---------|------|
| B.1 | Identifiable Patient |
| A.2 | Identifiable Reporter |
| B.2 | Reaction or Event |
| B.4 | Suspect Drug Product |

- Adverse event reports submitted for unapproved prescription drug products, unapproved nonprescription drug products and products approved for marketing under an abbreviated new drug application (ANDA), biologics license application (BLA), or new drug application (NDA), including combination products should have, at a minimum, the four data elements listed in Table 1.

- Adverse event reports for compounded drugs submitted by registered outsourcing facilities should have at a minimum, a suspect product and an adverse event.

- IND safety reports should include, at a minimum, the four data elements listed in Table 1 and the IND number under which the clinical trial where the event occurred is conducted.

- Serious adverse event reports from IND-exempt BA/BE studies should include, at a minimum, the four data elements listed in Table 1 and the pre-assigned ANDA number (hereafter referred as, Pre-ANDA number).

### B.  Administrative and Identification Elements

For FDA to successfully process your electronic ICSR submissions, populate the administrative and identification elements as indicated in Table 2.

App. 000741

**Table 2.        Detailed Description of Administrative Tags**[*]

| Element | DTD Descriptor 2.1 | Length | Element Values for DTD 2.1 |
|---|---|---|---|
| A.1.9 | <fulfillexpeditecriteria> | 1N | 1= Yes (15-Day expedited)<br>2= No (non-expedited)<br>4= 5-Day<br>5= 30-Day<br>6= 7-Day expedited |
| A.1.0.1 | <safetyreportid> | 100AN | Sender's (Case) Safety Report Unique Identifier[†] |
| A.1.10.1 | <authoritynumb> | 100AN | Regulatory authority's case report number |
| A.1.10.2 | <companynumb> | 100AN | Other sender's case report number |
| A.3.1.2 | <senderorganization> | 60AN | Sender identifier |
| A.2.3.2^ | <sponsorstudynumb> | 35AN | IND or Pre-ANDA number under which the clinical trial where the event occurred is conducted |
| A.1.FDA.16[††] | <fdasafetyreporttype> | 1N | 1=IND Safety Report<br>2=IND-Exempt BA/BE Safety Report<br>3=Postmarketing Safety Report |

[*] Include either <companynumb> or <authoritynumb> values.  FDA cannot process the ICSR without one of these element values.
[†] The Sender's Safety Report Unique Identifier is comparable to the Manufacturer Report Number (also referred to as the Manufacturer Control Number (MCN)) provided on paper in FDA Form 3500A. This number is the company's unique case identification number, which is used for the life of the case.
^ For IND and IND-exempt BA/BE study safety reports only.  An IND-exempt BA/BE study refers to a BA/BE study not conducted under IND.
[††] The FDA Safety Report Type data element distinguishes premarketing (IND and IND-Exempt BA/BE) safety reports from postmarketing safety reports and is used to determine which reports are posted publicly. The FDA Safety Report Type data element is optional when using DTD 2.1 and 2.2 for postmarketing safety report submission but is mandatory when using DTD 3.0 for premarketing safety report submission.

**C.  Authorization/ Application Number Format**

In the section designated for drug and biological products information, use the following format for the "Authorization/ Application Number" element (B.4.k.4.1) <drugauthorizationnumb> as indicated in Table 3 and described below.

- For approved drug and biological products marketed under an approved application, include the acronym "NDA" or "ANDA," followed by a space and then the number for the application (e.g., NDA 012345, ANDA 012345).  For prescription drug products marketed without an approved application (Rx No Application), use "000000."  For a nonprescription drug product marketed without an approved application (Non-Rx No

Application), use "999999."  For adverse event reports for compounded drug products submitted by registered outsourcing facilities, use "COMP99."

- For marketed biological products, include the appropriate acronym "BLA," "STN," or "PLA" followed by a space and the primary six-digit number (e.g., STN 123456).

**Table 3.        Detailed Description of Application Number Formats**

| Type of Application | Recommended Format |
|---|---|
| NDA/ ANDA | NDA, ANDA 012345 |
| STN/ BLA/ PLA | STN or BLA or PLA 123456 |
| Rx No Application | 000000 |
| Non-Rx No Application | 999999 |
| Compounded Products | COMP99 |

### D.  Unique Case Identification Numbers for Initial and Follow-Up ICSRs

For the follow-up ICSR safety reports to be correctly linked to your initial ICSR report, follow these steps:

- Use the same <safetyreportid> for the E2BM elements in section A.1.0.1 for the initial ICSR and any of its follow-up ICSRs; this allows the follow-up report to be linked to the initial report in the FAERS database.

- If the initial ICSR was submitted on paper but its follow-up ICSR is submitted electronically, include the Manufacturer Control Number (MCN) listed in Box G9 of the FDA paper Form 3500A from the initial report in both A.1.0.1 <safetyreportid> and in A.1.10.2 <companynumb> field in the follow-up electronic submission.

- Always use the <safetyreportid> that was assigned to the initial ICSR when submitting follow-up reports.  If you need to change the <safetyreportid> internally, note the internally reassigned <safetyreportid> in the narrative section of the follow-up report (i.e., element B.5.1) (e.g., "This ICSR has been reassigned to the Company ID number COA12345").  Do not use the internally reassigned <safetyreportid> for any follow-up reports.

- In the event that an incorrect <safetyreportid> has been used in a follow-up report, contact the FAERS electronic submission coordinator at faersesub@fda.hhs.gov so that the follow-up ICSR can be matched to the initial ICSR.

### E.  MedDRA Specific Elements

Use the ICH Medical Dictionary for Regulatory Activities (MedDRA) to code medical

App. 000743

terminology.[6]  When possible, use the Lowest Level Term (LLT), and record the LLT as the MedDRA numeric code rather than the LLT name (e.g., the LLT name is Rash; the MedDRA numeric code for LLT Rash is 10378444).

### 1.  *Reaction/Event*

#### a)  **Reaction/Event as reported by the primary source field**

Record the original reporter's words verbatim and/or use short phrases to describe the reaction/event in element (B.2.i.0).

#### b)  **Reaction/Event MedDRA Term LLT numeric code or text field**

Record the MedDRA LLT that most closely corresponds to the term reported by the original reporter in element (B.2.i.1).

#### c)  **Reaction/Event MedDRA Preferred Term (PT) numeric code or text field**

Record the MedDRA PT that most closely corresponds to the term reported by the original reporter in element (B.2.i.2).

### 2.  *Other E2B Elements*

For the E2B elements listed in Table 4, use either MedDRA text or, preferably, the corresponding numeric code.

**Table 4.        Additional E2B Elements for Preferred MedDRA Coding**

| Element | DTD Descriptor 2.1 | Length |
|---|---|---|
| B.1.7.1a.2 | <patientepisodename> | 250 AN |
| B.1.8f.2 | <patientdrugindication> | 250 AN |
| B.1.8g.2 | <patientdrugreaction> | 250 AN |
| B.1.9.2b | <patientdeathreport> | 250 AN |
| B.1.9.4b | <patientdetermineautopsy> | 250 AN |
| B.1.10.7.1a.2 | <parentmedicalepisodename> | 250 AN |
| B.1.10.8f.2 | <parentdrugindication> | 250 AN |
| B.1.10.8g.2 | <parentdrugreaction> | 250 AN |
| B.3.1c | <testname> | 100 AN |
| B.4.k.11b | <drugindication> | 250 AN |
| B.4.k.17.2b | <drugrecuraction> | 250 AN |
| B.4.k.18.1b | <drugreactionasses> | 250 AN |
| B.5.3b | <senderdiagnosis> | 250 AN |

---

[6] Companies can license MedDRA from an international maintenance and support services organization (MSSO) (toll free number 877-258-8280; Direct 571-313-2574; fax 571-313-2345; e-mail MSSOhelp@mssotools.com).

App. 000744

### F. Drug Description and Case Narrative Elements

To ensure the successful processing of your electronic ICSR submission, applicants are advised to populate the drug description and narrative elements as indicated in Table 5.

**Table 5.    Detailed Description of Drug(s) and Narrative Elements[*][†]**

| Element | DTD Descriptor 2.1 | Length | Element Values for DTD 2.1 |
|---------|--------------------|--------|-----------------------------|
| B.4.k.1 | <drugcharacterization> | 1N | 1=Suspect<br>2=Concomitant<br>3=Interacting<br>4=Drug not administered |
| B.4.k.2.1 | <medicinalproduct> | 70AN | Proprietary Medicinal Product Name |
| B.4.k.2.2 | <activesubstancename> | 100AN | Drug Substance Name |
| B.5.1 | <narrativeincludeclinical> | 20000AN | Case Narrative |

[*]Include <medicinalproduct> and/or <activesubstancename>. FDA cannot process the ICSR without at least one of these elements.
[†]Appendix I lists various examples of correct drug element formats.

#### 1. Recording Multiple Drugs

If you are submitting safety reports for products containing multiple drugs, you should follow these steps:

- List the proprietary drug product name in element (B.4.k.2.1) and/or list the drug substance name in element (B.4.k.2.2).

- List the characterization of each reported drug's role, such as suspect, concomitant, interacting, drug not administered, or similar device in element (B.4.k.1).

#### 2. Medicinal Product Name and Active Drug Substance Name

FDA validates medicinal product names to the available Structured Product Labeling (SPL)[7], the submitted label (as ICSR attachment), and the Substance Registration System (SRS). These are further described below:

- When the product has an SPL, use the same naming convention as it appears in the SPL when submitting the ICSR.

---

[7] The SPL is a document markup standard approved by Health Level Seven (HL7) and adopted by FDA as a mechanism for exchanging product and facility information. See https://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.

*Draft Version 1.9*                                    15

- When submitting a product label as an attachment to an ICSR, use the name as it appears on the submitted product label.

- If no medicinal product is named and only the active substance is named, use the name of the active substance as it appears in the SRS.[8]

### 3. Case Narrative

#### a) Initial ICSR

Record all case narrative information including clinical course, therapeutic measures, outcome, and all additional relevant information in element (B.5.1). If the information exceeds the field length, consider describing the information using fewer words. Although the use of only the most widely used medical abbreviations is permissible if necessary, their use should be limited when possible.

#### b) Follow-up ICSR

Record both new information and corrections to previously submitted ICSRs in element (B.5.1).

## G. Other Data Elements

### 1. Dosage Information Field

If dosage information cannot be captured in the structured fields in B.4.k.5, then use the element (B.4.k.6) <drugdosagetext>.

### 2. Pharmaceutical Form Field

Record the pharmaceutical form in element (B.4.k.7) <drugdosageform>. FDA accepts the European Medicines Agency (EMA) dosage codes or text.[9]

### 3. Route of Administration Field

Code the route of administration in element (B.4.k.8) <drugadministrationroute> as described in the ICH E2B(R2) guidance.

### 4. Receiver Field (A.3.2)

Complete the receiver using the code or text listed in Table 6.

---

[8] https://www.fda.gov/ForIndustry/DataStandards/SubstanceRegistrationSystem-UniqueIngredientIdentifierUNII/default.htm.

[9] For a complete list of EMA dosage form codes and text, please refer to https://www.ema.europa.eu/documents/other/list-pharmaceutical-dosage-forms_en.xls

App. 000746

**Table 6.        Receiver Information**

| Element | DTD Descriptor 2.1 | Code or Text |
|---------|--------------------|--------------|
| A.3.2.1 | <receivertype> | 2 |
| A.3.2.2a | <receiverorganization> | FDA |
| A.3.2.2b | <receiverdepartment> | Office of Surveillance and Epidemiology |
| A.3.2.2d | <receivergivename> | FAERS |
| A.3.2.3a | <receiverstreetaddress> | 10903 New Hampshire Avenue |
| A.3.2.3b | <receivercity> | Silver Spring |
| A.3.2.3c | <receiverstate> | MD |
| A.3.2.3d | <receiverpostcode> | 20993 |
| A.3.2.3e | <receivercountrycode> | US |
| A.3.2.3l | <receiveremailaddress> | faersesub@fda.hhs.gov |

### 5.  *Message Receiver Field (M.1.6)*

The following two message receiver identifiers are used by FDA to distinguish between test and production submissions:

- Test ICSRs:  <messagereceiveridentifier>ZZFDATST</messagereceiveridentifier>

- Production ICSRs:  <messagereceiveridentifier>ZZFDA</messagereceiveridentifier>

### H.  Data Elements for Electronic Submissions of Safety Reports for Postmarketing Combination Products

To ensure the successful processing of your electronic ICSR submission for a marketed drug- or therapeutic biologic led- combination product (e.g., a combination product containing a drug/biologic and device and marketed under an NDA or a BLA), you should populate the data elements indicated in Table 7.

Note: Some of the DTD descriptors listed in Table 7 are under existing E2B(R2) header elements, and some DTD descriptors are under new data elements.  Those data element numbers that are new, have the word "FDA" incorporated into the number and are U.S.-specific regional elements related to reporting on combination products.

App. 000747

**Table 7.**　　**Combination Product Data Elements**

| Data Element | DTD Descriptor 2.2 | Title | Description | Length | Element Values for DTD 2.2 | Notes |
|---|---|---|---|---|---|---|
| M.1.2 | <messageformatversion> | Message Format Version | Version number of Message Format | 3AN | 2.2 | Use value 2.2 if using icsr-xml-v2.2.dtd<br><br>Use value 2.1 if using icsr-xml-v2.1.dtd |
| A.1 | <safetyreport> | Header/ Entity | Identification of the case safety report | | | |
| A.1.9 | <fulfillexpeditecriteria> | Does this case fulfill the local criteria for an expedited report | | 1N | 1=Yes<br>2=No<br>4=5-Day<br>5=30-Day | Element values= 1 for 15-Day Expedited* and 2 for periodic non-expedited†<br><br>Element value= 4 for remedial action to prevent an unreasonable risk of substantial harm to the public health<br><br>Element value= 5 for malfunction with no associated adverse event<br><br>Do not use element value of 3. |
| A.1.FDA.15 | <combinationproductreport> | Combination Product Report Flag | Combination Product Report Flag | 1N | 1=Yes<br>2=No | |
| A.2 | <primarysource> | Primary source(s) of information | Header/ Entity | | Area below should be a repeatable block |

App. 000748

| Data Element | DTD Descriptor 2.2 | Title | Description | Length | Element Values for DTD 2.2 | Notes |
|---|---|---|---|---|---|---|
| A.2.1 | | Primary source(s) | Header | | | |
| A.2.1.3.FDA.4 | <reporteremailaddress> | Reporter's Email Address | | 100AN | | |
| B.1.1 | <patientinitial> | Patient | Patient Identifier | 10AN | | If a single report is reported for a malfunction with no adverse event, the element value should be "NONE."<br><br>If there are multiple malfunction reports with no adverse event, then the element value should be "SUMMARY." |
| B.4 | <drug> | Drug(s) Information | Header/ Entity | | Area below should be a repeatable block | |
| B.4.k.1 | <drugcharacterization> | Characterization of drug role | | 1N | 1=Suspect 2=Concomitant 3=Interacting 5=Similar Device | If the product in the report is about a similar device, the element value should be 5=Similar Device. |
| B.4.k.2 | | Drug Identification | Header | | | |
| B.4.k.2.4.FDA.1a | <expirationdateformat> | Expiration date format | Product Expiration date | 3N | 102=CCYYMMDD 610=CCYYMM 602=CCYY | |
| B.4.k.2.4.FDA.1b | <expirationdate> | Expiration date | Product Expiration date | 8N | | |

| Data Element | DTD Descriptor 2.2 | Title | Description | Length | Element Values for DTD 2.2 | Notes |
|---|---|---|---|---|---|---|
| B.4.k.2.FDA.5 | <productavailableforevaluation> | Product available for evaluation | Indicate whether product is available for evaluation | 1N | 1=Yes<br>2=No<br>3=Return | |
| B.4.k.2.6.FDA.1a | <productreturndateformat> | Product return date format | Date Format | 3N | 102=CCYYMMDD<br>610=CCYYMM<br>602=CCYY | |
| B.4.k.2.6.FDA.1b | <productreturndate> | Product return date | Date when Product was returned | 8N | | |
| B.4.k.20.FDA.1 | <brandname> | Brand Name | The trade or proprietary name of the device constituent part of the suspect combination product as used in product labeling or in the catalog | 80AN | | At least one of the 3 must be reported <brandname> or <commondevicename> or <productcode> for the device constituent part |
| B.4.k.20.FDA.2 | <commondevicename> | Common Device Name | Generic or common name of the device constituent part of the suspect combination product or a generally descriptive name | 80AN | | At least one of the 3 must be reported <brandname> or <commondevicename> or <productcode> for device constituent part |
| B.4.k.20.FDA.3 | <productcode> | Product Code | Product code | 3AN | http://www.acce | At least one of the 3 must be |

| Data Element | DTD Descriptor 2.2 | Title | Description | Length | Element Values for DTD 2.2 | Notes |
|---|---|---|---|---|---|---|
| | | | assigned to the device constituent part based upon the medical device product classification | | ssdata.fda.gov/p remarket/ftparea /foiclass.zip | reported <brandname> or <commondevicename> or <productcode> for device constituent part |
| B.4.k.20.FDA.4 | <manufacturer> | Manufacturer | Header/ Entity | | | |
| B.4.k.20.FDA.4a | <manufacturername> | Device Manufacturer Name | Manufacturer name of the device constituent part of the suspect combination product | 100AN | | |
| B.4.k.20.FDA.4b | <manufactureraddress> | Manufacturer Address | Manufacturer address of the device constituent part of the suspect combination product | 100AN | | |
| B.4.k.20.FDA.4c | <manufacturercity> | Manufacturer City | Manufacturer city of the device constituent part of the suspect combination product | 35AN | | |
| B.4.k.20.FDA.4d | <manufacturerstate> | Manufacturer State | Manufacturer state of the device | 40AN | | |

App. 000751

| Data Element | DTD Descriptor 2.2 | Title | Description | Length | Element Values for DTD 2.2 | Notes |
|---|---|---|---|---|---|---|
| | | | constituent part of the suspect combination product | | | |
| B.4.k.20.FDA.4e | \<manufacturercountry\> | Manufacturer Country | Manufacturer country of the device constituent part of the suspect combination product | 2AN | ISO3166 | |
| B.4.k.20.FDA.5 | \<modelnumber\> | Model Number | Model number of the device constituent part | 30AN | | |
| B.4.k.20.FDA.6 | \<catalognumber\> | Catalog Number | Catalog number of the device constituent part | 30AN | | |
| B.4.k.20.FDA.7 | \<serialnumber\> | Serial Number | Serial number of the device constituent part | 30AN | | |
| B.4.k.20.FDA.8 | \<udinumber\> | Unique Identifier UDI# | Unique identifier of the device constituent part | 50AN | | |
| B.4.k.20.FDA.9a | \<dateimplantedformat\> | Device Implant Date Format | Date format of device implant in the patient | 3N | 102=CCYYMMDD 610=CCYYMM 602=CCYY | For medical devices that are implanted in the patient, provide the implant date or best estimate. If day is unknown, month and year are acceptable. If month and day are unknown, year is acceptable |

App. 000752

| Data Element | DTD Descriptor 2.2 | Title | Description | Length | Element Values for DTD 2.2 | Notes |
|---|---|---|---|---|---|---|
| B.4.k.20.FDA.9b | <dateimplanted> | Device Implant Date | Date of device implant in the patient | 8N | | For medical devices that are implanted in the patient, provide the implant date or best estimate. If day is unknown, month and year are acceptable. If month and day are unknown, year is acceptable |
| B.4.k.20.FDA.10a | <dateexplantedformat> | Device Explant Date Format | Date format of device explant from the patient | 3N | 102=CCYYMMDD 610=CCYYMM 602=CCYY | If an implanted device was removed from the patient, provide the explant date or best estimate. If day is unknown, month and year are acceptable. If month and day are unknown, year is acceptable |
| B.4.k.20.FDA.10b | <dateexplanted> | Device Explant Date | Date of device explant from the patient | 8N | | If an implanted device was removed from the patient, provide the explant date or best estimate. If day is unknown, month and year are acceptable. If month and day are unknown, year is acceptable |
| B.4.k.20.FDA.11a | <deviceage> | Approximate age of device/ product | Age of device constituent part | 5N | | |
| B.4.k.20.FDA.11b | <deviceageunit> | Approximate age unit of device/ | Age unit of device constituent part | 3N | 800=Decade 801=Year 802=Month | |

| Data Element | DTD Descriptor 2.2 | Title | Description | Length | Element Values for DTD 2.2 | Notes |
|---|---|---|---|---|---|---|
| | | product | | | 803=Week 804=Day 805=Hour | |
| B.4.k.20.FDA.12 | <labeledsingleusedevice> | Single Use Device | Indicate whether the device constituent part was labeled for single use or not | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.13a | <devicemanufacturedateformat> | Device Manufacture Date Format | Device Manufacture Date format | 3N | 102=CCYYMMDD 610=CCYYMM 602=CCYY | |
| B.4.k.20.FDA.13b | <devicemanufacturedate> | Device Manufacture Date | Device Manufacture Date | 8N | | |
| B.4.k.20.FDA.14 | | Remedial action initiated/ Remedial action taken for the product | Header | | | |
| B.4.k.20.FDA.14.1a | <remedialactionrecall> | Recall | Recall initiated | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.14.1b | <remedialactionrepair> | Repair | Repair initiated | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.14.1c | <remedialactionreplace> | Replace | Replace initiated | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.14.1d | <remedialactionrelabel> | Relabeling | Relabeling initiated | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.14.1 | <remedialactionnotify> | Notification | Notification | 1N | 1=Yes | |

App. 000754

| Data Element | DTD Descriptor 2.2 | Title | Description | Length | Element Values for DTD 2.2 | Notes |
|---|---|---|---|---|---|---|
| e | | | initiated | | 2=No | |
| B.4.k.20.FDA.14.1 f | <remedialactioninspection> | Inspection | Inspection initiated | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.14.1 g | <remedialactionpatientmonitor> | Patient monitoring | Patient monitoring | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.14.1 h | <remedialactionmodifyadjust> | Modification/ Adjustment | Modification/ Adjustment initiated | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.14.1i | <remedialactionother> | Other | Other Remedial Action initiated | 75AN | | |
| B.4.k.20.FDA.15 | <deviceusage> | Device Usage | Indicate the use of the device constituent part of the suspect combination product | 1N | 1=Initial Use of Device 2=Reuse 3=Unknown | |
| B.4.k.20.FDA.16 | <devicelotnumber> | Device Lot Number | Lot number of the device constituent part of the suspect combination product | 35AN | | |
| B.4.k.20.FDA.17 | <malfunction> | Malfunction | Malfunction of product | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.18 | | Follow-up type | Header | | | |
| B.4.k.20.FDA.18.1 a | <followupcorrection> | Correction | Correction | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.18.1 b | <followupadditionalinfo> | Additional information | Additional information | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.18.1 | <followupresponsetoFDA> | Response to | Response to FDA | 1N | 1=Yes | |

App. 000755

| Data Element | DTD Descriptor 2.2 | Title | Description | Length | Element Values for DTD 2.2 | Notes |
|---|---|---|---|---|---|---|
| c | | FDA request | request | | 2=No | |
| B.4.k.20.FDA.18.1 d | <followupdeviceevaluation> | Device Evaluation | Device Evaluation | 1N | 1=Yes 2=No | |
| B.4.k.20.FDA.19 | <deviceproblemandevaluation> | Device Problem and evaluation codes | Header/ Entity | | Area Below Should be a Repeatable Block | |
| B.4.k.20.FDA.19.1 a | <evaluationtype> | Evaluation Type | Type of problem and/or the evaluation | 2N | 01=Device Problem 02=Method 03=Result 04=Conclusion | |
| B.4.k.20.FDA.19.1 b | <evaluationvalue> | Evaluation Value | The FDA code value based on the respective evaluation type | 6N | | The value depends on the respective <evaluationtype> <br><br>If <evaluationtype> = 01 --> https://www.fda.gov/media/146825/download <br><br>If <evaluationtype> = 02 --> https://www.fda.gov/media/146827/download <br><br>If <evaluationtype> = 03 --> https://www.fda.gov/media/146828/download <br><br>If <evaluationtype> = 04 --> https://www.fda.gov/media/146829/download |
| B.4.k.20.FDA.20 | <operatorofdevice> | Operator of | Operator of the | 100AN | | Use the value "Health |

App. 000756

| Data Element | DTD Descriptor 2.2 | Title | Description | Length | Element Values for DTD 2.2 | Notes |
|---|---|---|---|---|---|---|
| | | the Device | Device | | | Professional" or "Lay User/Patient." If none applicable, then specify the "Other" value |

* 21 CFR 314.80(c)(1) and 600.80(c)(1) use the term "15-day Alert reports." In the combination product PMSR final rule (21 CFR 4.101), these reports are defined as "Fifteen-day reports."

† Periodic non-expedited ICSRs are the reports required under 21 CFR 314.80(c)(2)(ii)(B) and 21 CFR 600.80(c)(2)(ii)(B) for serious, expected and nonserious adverse drug experiences.

App. 000757

**I.   Data Elements for Electronic Submissions of IND Safety Reports**

To ensure the successful processing of your electronic IND ICSR submission, you should populate the following data elements as described in Table 8.

**Table 8.          Investigational New Drug Clinical Data Elements**

| Data Element | DTD Descriptor 3.0 | Title | Description | Field Length | Element Values for DTD 3.0 | Notes |
|---|---|---|---|---|---|---|
| A.1.4 | <reporttype> | Type of Report | | 1N | 1=Spontaneous 2=Report from Study 3=Other 4=Not Available to Sender (unknown) | Element value= 2 for Report from Study |
| A.1.9 | <fulfillexpeditecriteria> | Does this case fulfill the local criteria for an expedited report? | | 1N | 1=Yes 2=No 4=5-Day 5=30-Day 6=7-Day | Element value=1 for 15-Day Expedited\n\nElement value= 6 for 7-Day Expedited |
| A.1.12 | <linkreportnumb> | Identification Number of the report which is linked to this report | | 100AN | | Used to link all individual cases (safetyreportid) that make up an IND Safety Report submitted as a result of an Aggregate Analysis as per 312.32(c)(1)(i)(C) or for several events |

| Data Element | DTD Descriptor 3.0 | Title | Description | Field Length | Element Values for DTD 3.0 | Notes |
|---|---|---|---|---|---|---|
| | | | | | | submitted as per (312.32(c)(1)(i)(B)) when a Narrative Summary Report is provided, this field should be populated in the IND Safety Report that contains the Narrative Summary Report. |
| A.2.3.1 | <studyname> | Study Name | | 100AN | Study ID_$Abbreviated Trial Name | The Study ID should be the same value used in the study tagging file format of the eCTD submission. |
| A.2.3.2 | <sponsorstudynumb> | Sponsor Study Number | | 35AN | IND number under which the clinical trial where the event occurred is conducted

Use the "Parent" IND number* for reports submitted from an Aggregate Analysis as per (312.32(c)(1)(i)(C)) or for several events | Populate this field with the Primary IND in the first block and repeat block A.2 with elements A.2.3.2 and A.2.3.3.as noted below with element value= 5 for sponsor's other INDs evaluating suspect product (where applicable) Include the acronym "IND" followed by a space and then the IND |

| Data Element | DTD Descriptor 3.0 | Title | Description | Field Length | Element Values for DTD 3.0 | Notes |
|---|---|---|---|---|---|---|
| | | | | | submitted as per (312.32(c)(1)(i)(B)), from trials conducted under more than one IND | number for the application (e.g. IND 123456) See Appendix II (Case Scenarios) for additional information on how to submit reports from sponsor's other INDs (Cross-reporting). |
| A.2.3.3 | <observestudytype> | Study type in which the Reaction(s)/ Event(s) were observed | | 1N | 1= Clinical Trials<br><br>2= Individual Patient Use (e.g., 'Compassionate Use' or 'Named Patient Basis')<br><br>3= Other Studies (e.g., Pharmacoepidemiology, Pharmacoeconomics, Intensive Monitoring)<br><br>4= Report from | Required if element value for A.1.4 is 2=Report from Study<br><br>Repeat this field as needed with element value= 5 for each Cross-reported IND.<br><br>The first block of this element in the report must not be 5.<br><br>If element value 4 is chosen, then A.1.9= 1.<br><br>See Appendix II (Case |

App. 000760

| Data Element | DTD Descriptor 3.0 | Title | Description | Field Length | Element Values for DTD 3.0 | Notes |
|---|---|---|---|---|---|---|
| | | | | | Aggregate Analysis as per 312.32(c)(1)(i)(C) or for several events submitted as per 312.32(c)(1)(i)(B) if a Narrative Summary Report is provided<br><br>5= Cross-reported IND Safety Report | Scenarios) for additional information on how to submit reports from an Aggregate Analysis. |
| B.1.1 | <patientinitial> | Patient Identifier | | 10AN | | For a report from an Aggregate Analysis as per 312.32(c)(1)(i)(C) or for several events submitted as per 312.32(c)(1)(i)(B) if a Narrative Summary Report is provided, the element value should be "AGGREGATE" |
| B.4.k.2.1 | <medicinalproduct> | Proprietary Medicinal Product Name | | 70AN | | For investigational drug and biological products without an established name (i.e. INN or USAN |

App. 000761

| Data Element | DTD Descriptor 3.0 | Title | Description | Field Length | Element Values for DTD 3.0 | Notes |
|---|---|---|---|---|---|---|
| | | | | | | name), prior to submitting IND safety reports to FAERS, the sponsor should submit a clinical information amendment to the IND, listing the names of the active drug substance/s and the medicinal product as they will be reported in E2B file submissions. The names should fit within the established E2B character length limits. Use company product code if no established name, for multi-ingredient products, or if name exceeds character length |
| B.4.k.2.2 | <activesubstancename> | Active Drug Substance Names | | 100AN | | |
| B.4.k.18 | <drugreactionrelatedness> | Relatedness of Drug to | | | | For IND Safety Reports, at least one suspect |

| Data Element | DTD Descriptor 3.0 | Title | Description | Field Length | Element Values for DTD 3.0 | Notes |
|---|---|---|---|---|---|---|
| | | Reaction/ Event | | | | product should have relatedness of drug to reaction/ event |
| B.4.k.18.1a | <drugreactionassesmeddraversion> | MedDRA Version for Reaction Assessed | | 8AN | | |
| B.4.k.18.1b | <drugreactionasses> | Reaction Assessed | | 250AN | | |
| B.4.k.18.2 | <drugassessmentsource> | Source of Assessment | | 60AN | | Use the value "Sponsor" or "Investigator". Include sponsor and investigator assessment when reporting both in separate blocks |
| B.4.k.18.3 | <drugassessmentmethod> | Method of Assessment | | 35AN | | Use the value "FDA". |
| B.4.k.18.4 | <drugresult> | Result | | 35AN | 1=Suspected 2=Not suspected | For IND Safety Reports, at least one suspect product should have relatedness of drug to reaction/ event |
| B.5.1 | <narrativeincludeclinical> | Case Narrative Including Clinical | | 20,000 AN | | FDA strongly encourages sponsors to construct narratives that fit within the ICH E2B character |

App. 000763

| Data Element | DTD Descriptor 3.0 | Title | Description | Field Length | Element Values for DTD 3.0 | Notes |
|---|---|---|---|---|---|---|
| | | Course, Therapeutic Measures, Outcome, and Additional Relevant Information | | | | limit of 20,000 AN. If your narrative exceeds this limit, sponsors should include as much of the narrative as possible in this field and submit an ICSR attachment for any text that exceeds the character limit. Sponsors should not submit an ICSR attachment containing the entire narrative and leave the case narrative field empty. For reports from Aggregate Analysis as per 312.32(c)(1)(i)(C) or for several events submitted as per 312.32(c)(1)(i)(B) where PDF is attached, put "see attached Narrative Summary Report" in this field. |

App. 000764

| Data Element | DTD Descriptor 3.0 | Title | Description | Field Length | Element Values for DTD 3.0 | Notes |
|---|---|---|---|---|---|---|
| B.5.4 | <sendercomment> | Sender's Comments | | 2000 AN | | Identification and analysis of previously submitted events (as required by 312.32(c)(1)) should be reported in this field. |

[*] The "parent IND" is the IND under which clinical investigations were initiated in the United States. (If the drug is being evaluated in multiple INDs, this is generally the IND with the lowest number.)  NOTE: This may not be the same as the first A.2.3.2 block if the drug is being evaluated under multiple INDs.

NOTE: See FAERS Webpage for case scenario examples for reporting IND safety reports (e.g., IND safety reports where the sponsor is evaluating suspect product under more than one IND, IND safety reports that are a result of an aggregate analysis, and IND safety reports with unapproved and approved drugs listed as suspect products).

**J.  Data Elements for Electronic Submissions of ICSRs from IND-Exempt Bioavailability (BA)/ Bioequivalence (BE) Studies**

For successful processing of your electronic ICSRs submissions for a BA/BE study not conducted under an IND, you should populate the following data elements as described in Table 9.

**Table 9.       Data Elements for IND-Exempt BA/BE Studies**

| Data Element | DTD Descriptor 3.0 | Title | Description | Field Length | Element Values for DTD 3.0 | Notes |
|---|---|---|---|---|---|---|
| A.1.4 | <reporttype> | Type of Report | | 1N | 1=Spontaneous 2=Report from Study 3=Other 4=Not Available to Sender (unknown) | Element value= 2 for Report from Study |

| Data Element | DTD Descriptor 3.0 | Title | Description | Field Length | Element Values for DTD 3.0 | Notes |
|---|---|---|---|---|---|---|
| A.1.9 | <fulfillexpeditecriteria> | Does this Case Fulfill the Local Criteria for an Expedited Report? | | 1N | 1=Yes<br>2=No<br>4=5-Day<br>5=30-Day<br>6=7-Day | Element value=1 for 15-Day Expedited<br>Or<br>Element value= 6 for 7-Day Expedited |
| A.2.3.1 | <studyname> | Study Name | | 100AN | Abbreviated Trial Name | |
| A.2.3.2 | <sponsorstudynumb> | Sponsor Study Number | | 35AN | Pre-ANDA number for the IND-Exempt BA/BE Studies | Include the acronym "Pre-ANDA" followed by a space and then the Pre-ANDA number for the application (e.g. Pre-ANDA 123456) |
| A.2.3.3 | <observestudytype> | Study Type in Which the Reaction(s)/ Event(s) were Observed | | 1N | 1= Clinical Trials<br><br>2= Individual Patient Use (*e.g.,* 'Compassionate Use' or 'Named Patient Basis')<br><br>3= Other Studies (*e.g., Pharmacoepidemiology, Pharmacoeconomics, Intensive Monitoring*)<br><br>4= Report from Aggregate Analysis as per 312.32(c)(1)(i)(C) or for | Element value="1" for Clinical Trials. |

App. 000766

| Data Element | DTD Descriptor 3.0 | Title | Description | Field Length | Element Values for DTD 3.0 | Notes |
|---|---|---|---|---|---|---|
| | | | | | Several Events Submitted as per 312.32(c)(1)(i)(B) if a Narrative Summary Report is Provided<br><br>5= Cross-Reported IND Safety Report | |
| B.4.k.2.1 | <medicinalproduct> | Proprietary Medicinal Product Name | | 70AN | | |
| B.4.k.1 | <drugcharacterization> | Characterization of drug role | | 1N | 1 = Suspect<br>2 = Concomitant<br>3 = Interacting<br>4 = Drug not administered | For no exposure to a study drug use 4=Drug not administered |
| B.4.k.2.2 | <activesubstancename> | Active Drug Substance Name | | 100AN | | |
| B.4.k.19 | <drugadditional> | Additional Information on Drug | | 100AN | 1 = Test drug<br>2 = Reference drug<br>3 = Placebo/Vehicle<br>4 = Control (negative or positive)<br>5 = Other drug | Specify whether the product exposed is the Test drug, Reference drug, Placebo, Vehicle, Control or Other drug |

App. 000767

## VI.   ELECTRONIC FORMAT FOR ICSR ATTACHMENTS

FDA can accept and archive ICSR attachments in PDF format.  Currently approved formats for the non-structured component of an ICSR, such as ICSR attachments, are PDF versions 1.4 (current ICH standard) or 1.6 (current version in use at FDA).  An ICSR attachment should be electronically submitted to FAERS after the associated ICSR has been submitted and accepted by FAERS.

### A.  Converting the ICSR Attachment to PDF

Applicants should provide an individual PDF file for each ICSR attachment.  If you are submitting multiple ICSR attachments for a particular ICSR, include each attachment in the same PDF file and provide a PDF bookmark to distinguish each attachment.  For example, if you are submitting a hospital discharge summary and an autopsy report for a single ICSR, include both in a single PDF file with a bookmark to the hospital discharge summary and a bookmark to the autopsy report.

### B.  Identification Information in the PDF Document Information Fields

Each PDF file contains fields to be completed by the author of the document.  FAERS uses these fields to locate and retrieve the attachments to specific ICSRs.  To enable FDA to match the attachment(s) to the correct ICSR, applicants should fill in the PDF document information fields with the appropriate E2B(R2) data elements for the ICSR as indicated in Table 10.

**Table 10.      Document Information Fields in ICSR Attachments**

| PDF Document Information Field | Include/ Optional | Document Information* | Length |
|---|---|---|---|
| Title | Include | A.1.0.1 <safetyreportid> Sender's (Case) Safety Report Unique Identifier | 100AN |
| Subject | Include | A.1.10.1 <authoritynumb> Regulatory Authority's Case Report Number OR A.1.10.2 <companynumb> Other Sender's Case Report Number | 100AN |
| Author | Optional | A.1.11.2 <duplicatenumb> Other Identification Number | 100AN |
| Keywords | Optional | A.1.7b <receiptdate> Date of Receipt of the Most Recent Information for this ICSR | 8N |

* The information refers to the data elements in E2B(R2)

In addition:

- Use the ISO-8859-1 character set for the information fields.

- Do not exceed the character length indicated above for each information field.

- Avoid creating any custom fields with names identical to the information fields listed in Table 10.

If you need assistance, you can contact the FAERS electronic submission coordinator at faersesub@fda.hhs.gov.

## VII.   SUBMISSION RULES

The submission rules define the condition that shall result in a negative acknowledgement and not be accepted by FAERS.

App. 000769

**Table 111.    Submission Rules and Acknowledgement Status**

| Data Element | DTD Descriptor 2.1/2.2/3.0 | Rejection Rule Description | Acknowledgement |
|---|---|---|---|
| NA | NA | ICSR submitted via AS2 Header where XML file: AERS<br><br>or<br><br>Routing ID where XML file: FDA_AERS and using DTD 3.0 | reportacknowledgmentcode (B.1.8) = 02 |
| NA | NA | ICSR submitted via AS2 Header where XML file: AERS_PREMKT<br><br>or<br><br>Routing ID where XML file: FDA_AERS_PREMKT and using DTD 2.1 or 2.2 | reportacknowledgmentcode (B.1.8) = 02 |
| A.1.FDA.16 | <fdasafetyreporttype> | ICSR submitted via AS2 Header where XML file: AERS_PREMKT or<br><br>Routing ID where XML file: FDA_AERS_PREMKT using DTD 3.0 and data value is empty | reportacknowledgmentcode (B.1.8) = 02 |
| A.2.3.2 | <sponsorstudynumb> | ICSR submitted via AS2 Header where XML file: AERS_PREMKT or<br><br>Routing ID where XML file: FDA_AERS_PREMKT using DTD 3.0 and data value is empty or not prefixed with 'IND' or 'Pre-ANDA' | reportacknowledgmentcode (B.1.8) = 02 |

App. 000770

**APPENDIX I. EXAMPLES OF CORRECT AND INCORRECT APPLICATION NUMBER AND DRUG ELEMENT FORMATS**

**Table 122.     Examples of Application Number Formats and Drug Element Formats**

| | Examples of Application Number Format | Comment |
|---|---|---|
| Correct | <drugauthorizationnumb>NDA 012345</drugauthorizationnumb> | |
| Correct | <drugauthorizationnumb>BLA 123456</drugauthorizationnumb> | |
| Correct | <drugauthorizationnumb>NDA 012345</drugauthorizationnumb><br><drugauthorizationholder>COMPANYX</drugauthorizationholder> | |
| Incorrect | <drugauthorizationnumb>123456**/10300**</drugauthorizationnumb> | Use the appropriate prefix for the NDA/ ANDA/ STN/ BLA/ PLA. Do not include additional data after the application number |
| Incorrect | <drugauthorizationnumb>NDA **12-345;IND12,345** </drugauthorizationnumb> | Omit hyphens and commas in the application number. Do not populate the tag with two application numbers |
| Incorrect | <drugauthorizationnumb>**OTC Product**</drugauthorizationnumb> | For a non-prescription drug product marketed without an approved application (Non-Rx No Application), use "999999" |
| Incorrect | <drugauthorizationnumb>NDA 012345**(COMPANYX)**</drugauthorizationnumb><br><drugauthorizationholder></drugauthorizationholder> | Do not populate the company name in the <drugauthorizationnumb> tag |

App. 000771

| | Examples of Application Number Format | Comment |
|---|---|---|
| Correct | <medicinalproduct>TYLENOL</medicinalproduct> <br><br> <activesubstancename>ACETAMINOPHEN</activesubstancename> | |
| Correct | <medicinalproduct>MIRACLE WONDER DRUG</medicinalproduct> <br><br> <activesubstancename>ACETAMINOPHEN</activesubstancename> | |
| Incorrect | <medicinalproduct>AMAZING DRUG **OTC®**</medicinalproduct> <br><br> <activesubstancename>ACETAMINOPHEN **500 mg**</activesubstancename> | |
| Incorrect | <medicinalproduct>NEW DRUG **40 mcg/mL**</medicinalproduct> <br><br> <activesubstancename>NEWSUBSTANCE **Inj** </activesubstancename> | |
| Incorrect | <medicinalproduct>**MWD**</medicinalproduct> <br><br> <activesubstancename>**APAP**</activesubstancename> | Do not use abbreviations for the brand name or active substance in the <medicinalproduct> and <activesubstance> tags |

App. 000772

## APPENDIX II. CASE SCENARIOS FOR IND SAFETY REPORTS SUBMITTED TO FAERS

The following case scenarios are intended to provide examples to sponsors on the use of ICH E2B data standard elements for submission of IND safety reports to FAERS that may differ from postmarketing safety reports.

1. For any IND safety report where the sponsor is evaluating the suspect product under more than one IND (i.e. "Cross-reporting")

   a. Repeat block A.2 for each IND

      i. Use first block A.2 to designate IND where the event occurred = "primary IND"

         1. A.2.3.2 = primary IND

         2. A.2.3.3 = data value could either be 1, 2, 3, or 4

         3. Other relevant information for the report to be populated in block A.2

      ii. Repeat block A.2 as many times as needed with only the following data elements for each IND that the sponsor holds where that suspect product is being evaluated:

         1. A.2.3.2 = IND number for each cross-reported IND

         and

         2. A.2.3.3 = 5

**Table 133.    Case Scenario 1. For IND Safety Reports Submitted to FAERS**

| Data Element | DTD Descriptor 3.0 | Title | Element Values for DTD |
|---|---|---|---|
| A.2.3.2 | <sponsorstudynumb> | Sponsor Study Number | IND number under which the Clinical Trial where the event occurred is conducted |

| Data Element | DTD Descriptor 3.0 | Title | Element Values for DTD |
|---|---|---|---|
| A.2.3.3 | <observestudytype> | Study Type in Which the Reaction(s) were observed | 1= Clinical Trial<br><br>2= Individual Patient Use (*e.g. 'Compassionate Use' or 'Named Patient Basis'*)<br><br>3= Other Studies (*e.g. Pharmacoepidemiology, Pharmacoeconomics, Intensive Monitoring*)<br><br>4= Report from Aggregate Analysis 312.32(c)(1)(i)(C) or for several events submitted as per 312.32(c)(1)(i)(B) if a Narrative Summary report is provided.<br><br>5=Cross-reported IND safety report |

2. For an IND safety report that is a result of an aggregate analysis as per 312.32(c)(1)(i)(C) or for several events submitted as per 312.32(c)(1)(i)(B) if a narrative summary report is provided:

    a. Submit one IND safety report with the IND where the event occurred in A.2.3.2 <sponsorstudynumb> (or the "parent" IND if the events occurred in multiple INDs).

       For this IND safety report, populate the data elements below in addition to other relevant information regarding the event and suspect product.

       i. Use data element = 4 in A.2.3.3<observestudytype>

       ii. Use the term "AGGREGATE" in B.1.1 <patientinitial>

    b. Section VII.A.2. of the *FDA Guidance for Industry – "Safety Reporting Requirements for INDs and BA/BE Studies" (December 2012)* discusses several submission requirements for IND safety reports that are a result of an aggregate analysis. The following two sections describe these submission elements and how they are accomplished with electronic submission to FAERS.

       1. The guidance states that IND safety reports that are a result of an aggregate analysis should contain a narrative description of the event and the results of the analysis (hereafter referred to as a "narrative

summary report"). For IND reports submitted to FAERS, attach the narrative summary report to the IND safety report as a PDF attachment (do not put the narrative summary report in the E2B narrative field).

    a. These instructions also apply to several events submitted as per 312.32(c)(1)(i)(B) if a narrative summary report is provided.

2. The guidance states that all the individual cases that were analyzed in the aggregate analysis should be submitted. Use the repeatable block A.1.12 to link all the safety report numbers for the individual supportive ICSRs (i.e. the numbers in A.1.0.1 for all the individual cases that are summarized in the narrative summary report).

    a. These instructions also apply to several events submitted as per 312.32(c)(1)(i)(B) if a narrative summary report is provided.

    b. IND safety reports previously submitted as ICSRs to FAERS do not have to be resubmitted (place the safety report numbers for these previously submitted reports in A.1.12).

    c. For IND safety reports previously submitted in eCTD format, the sponsor should list the eCTD sequence number and date of submission in the narrative summary report. (The eCTD sequence number is the unique four-digit number for each IND submission the sponsor submits in the us-regional.xml file for the eCTD submission.)

    d. IND safety reports previously submitted on paper should be attached to the IND safety report as PDF attachments.

**Table 144.   Case Scenario 2. For IND Safety Reports Submitted to FAERS**

| Data Element | DTD Descriptor 3.0 | Title | Element Values for DTD |
|---|---|---|---|
| A.1.12 | <linkreportnumb> | Identification number of the report(s) which are linked to this report | Used to link all individual cases (safetyreportid) that make up an IND Safety Report submitted as a result of an Aggregate Analysis as per 312.32(c)(1)(i)(C) or for several events submitted as per 312.32(c)(1)(i)(B) if a narrative summary report is provided |
| A.2.3.2 | <sponsorstudynumb> | Sponsor Study Number | IND number under which the Clinical Trial where the event occurred is conducted |

App. 000775

| Data Element | DTD Descriptor 3.0 | Title | Element Values for DTD |
|---|---|---|---|
| A.2.3.3 | <observestudytype> | Study Type in Which the Reaction(s) were Observed | 1= Clinical Trials<br><br>2= Individual Patient Use (*e.g. 'Compassionate Use' or 'Named Patient Basis'*)<br><br>3= Other Studies (*e.g. Pharmacoepidemiology, Pharmacoeconomics, Intensive Monitoring*)<br><br>4= Report from Aggregate Analysis 312.32(c)(1)(i)(C)<br><br>5=Cross-reported IND safety report |
| B.1.1 | <patientinitial> | Patient Identifier | For a Report from an Aggregate Analysis, the element value should be "AGGREGATE" |

3. For adverse events that occur with a marketed drug being evaluated under an IND that meets both IND and post-marketing safety reporting requirements (21 CFR 312.32 and 314.80, 600.80, or 310.305), sponsors must submit two separate ICSRs:

    a. for the marketed drug for the NDA/BLA

    and

    b. for the study drug for the IND (IND number in A.2.3.2)

App. 000776

## APPENDIX III. CASE SCENARIOS FOR SAFETY REPORTS FROM IND-EXEMPT BA/BE STUDIES TO FAERS

Table 15 illustrates the ICH E2B data elements and element values for each IND-exempt BA/BE study exposure scenario described below:

Scenario 1: Exposure to a *study drug*:

This scenario applies to all drugs specified in the study protocol. For example, if a BA/BE study protocol for a generic opiate includes administration of naltrexone to each study subject prior to administration of a test or reference drug, naltrexone is a *study drug*, although it is not the test or reference drug. Similarly, a selective 5-HT3 receptor antagonist to prevent nausea and vomiting is considered a *study drug* if the BA/BE study protocol states that the drug is administered to each study subject prior to administration of a test or reference drug.

Scenario 2: Exposure to an *other drug*:

*Other drugs* are drugs taken by or administered to a subject that are not part of study conduct per protocol. For example, a subject with a diagnosis of hypertension has normal blood pressure while treated with a beta blocker. The subject meets study enrollment criteria and continues to take his beta blocker during study participation. In this situation, the beta blocker is an *other drug*. Similarly, if a subject develops symptoms of heartburn during participation in a BA/BE study and is permitted, by the investigator, to use a nonprescription antacid or H2 blocker for symptomatic relief, the nonprescription drug taken by the subject is an *other drug*.

Scenario 3: No exposure to a study drug:

A serious adverse event a subject experiences after enrollment to the study, but prior to exposure to a study drug, is subject to the expedited safety reporting requirement. To report a serious adverse event with no study drug exposure, the submitter should select values as shown in the Table 15, Scenario 3.

App. 000777

**Table 155.     ICH E2B Data Element & Value Selections for IND-Exempt BA/BE Study Exposures**

| Drug Exposure Scenario | Data Element | Element Values |
|---|---|---|
| Scenario 1:<br><br>Exposure to a *study drug* | B.4.k.1 | Select one element value |
| | B.4.k.2.1 | Proprietary medicinal product name |
| | B.4.k.2.2 | Drug substance name |
| | B.4.k.19 | Select one from the following:<br><br>1 = Test drug<br><br>2 = Reference drug<br><br>3 = Placebo/Vehicle<br><br>4 = Control (negative or positive) |
| Scenario 2:<br><br>Exposure to an *other drug* | B.4.k.1 | Select one element value |
| | B.4.k.2.1 | Proprietary medicinal product name |
| | B.4.k.2.2 | Drug substance name |
| | B.4.k.19 | 5 = Other drug |
| Scenario 3:<br><br>No exposure to a *study drug* | B.4.k.1 | 4 = Drug not administered |
| | B.4.k.2.1 | Proprietary medicinal product name |
| | B.4.k.2.2 | Drug substance name |
| | B.4.k.19 | 1 = Test drug |

App. 000778

**EXHIBIT 40**

**2023 FDA Letter to Students for Life of Am. denying
2022 SFLA Petition**



Kristan Hawkins, President
Students for Life of America
1000 Winchester Street, Suite 301
Fredericksburg, VA 22401

Kristi Hamrick, Chief Media & Policy Strategist
Students for Life of America
1000 Winchester Street, Suite 301
Fredericksburg, VA 22401

January 3, 2023

Re:  Docket No. FDA-2022-P-3209

Dear Ms. Hawkins and Ms. Hamrick:

This letter responds to your citizen petition submitted to the Food and Drug Administration (FDA or Agency) on December 13, 2022, on behalf of Students for Life of America and other signatories (Petition).  In the Petition, you request that the "2021 and 2016 modifications to mifepristone's REMS be reversed and the REMS as they were in 2011 be restored." Specifically, you request that:

(1) FDA reverse the 2021 and 2016 modifications to the risk evaluation and mitigation strategy (REMS) for mifepristone[1]  by requiring that:

   a. "Mifepristone only be administered, in a regimen with misoprostol, for the termination of intrauterine pregnancy, for up to 49 days (7 weeks) gestation" (Petition at 1).
   b. "Mifepristone only be administered by or under the supervision of a physically present physician" (Petition at 1).
   c. "the use of Mifepristone and misoprostol for the termination of pregnancy necessitate three office visits by the patient" (Petition at 1).

---

[1] Mifepristone products for medical termination of intrauterine pregnancy through 70 days gestation are subject to a single, shared system REMS known as the Mifepristone REMS Program. We note that on December 16, 2021, FDA completed its review of the Mifepristone REMS Program and determined, among other things, that the REMS must be modified to remove the in-person dispensing requirement and add pharmacy certification.  On December 16, 2021, FDA sent REMS Modification Notification letters to the applicants for Mifeprex and the approved generic version of Mifeprex, Mifepristone Tablets, 200 milligrams.  Following receipt of these letters, the applicants prepared proposed REMS modifications and submitted them to FDA. On January 3, 2022, FDA approved the REMS modifications.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

App. 000780

Docket No. FDA-2022-P-3209

(2) "Mifepristone use should be contraindicated for patients who do not have convenient access to emergency medical care," and "[t]his use should be as limited as possible" (Petition at 1).

(3) "Telehealth should not be an option to all women, but only to women in absolute need under extreme circumstances that would make access to a medical care facility impracticable, with a substantial risk that the woman would die without immediate administration of Mifepristone" (Petition at 1).

(4) "To alter the Mifepristone REMS, a formal study should be required" (Petition at 1).

The actions you request in your Petition are the same or substantially the same as the actions requested in the March 29, 2019 citizen petition submitted by the American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) and the American College of Pediatricians (ACP) (FDA-2019-P-1534) (AAPLOG/ACP petition), which were addressed in FDA's December 16, 2021 response to that petition.[2]  Your Petition does not provide any new data or evidence beyond what was provided in support of the AAPLOG/ACP Petition.  FDA carefully considered the information submitted in the AAPLOG/ACP Petition and issued a detailed response.  The December 16, 2021 citizen petition response is available at regulations.gov.

For the reasons explained above, we deny your Petition.

Sincerely,

Patrizia A. Cavazzoni -S

Digitally signed by
Patrizia A. Cavazzoni -S
Date: 2023.01.03
09:41:02 -05'00'

Patrizia Cavazzoni, M.D.
Director
Center for Drug Evaluation and Research

---

[2] Available at https://www.regulations.gov/document/FDA-2019-P-1534-0016.

App. 000781

# EXHIBIT 41

# REMS Single Shared System for Mifepristone 200mg

Initial Shared System REMS approval:  04/2019
Most Recent Modification: 01/2023

<div align="center">

Mifepristone Tablets, 200 mg
Progestin Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)
SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200 MG**

</div>

## I.   GOAL

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

a) Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

b) Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

c) Informing patients about the risk of serious complications associated with mifepristone.

## II.  REMS ELEMENTS

### A.  Elements to Assure Safe Use

1. Healthcare providers who prescribe mifepristone must be specially certified.

   a. To become specially certified to prescribe mifepristone, healthcare providers must:

      i. Review the Prescribing Information for mifepristone.

      ii. Complete a *Prescriber Agreement Form*. By signing[1] a *Prescriber Agreement Form*, prescribers agree that:

         1) They have the following qualifications:

            a) Ability to assess the duration of pregnancy accurately

            b) Ability to diagnose ectopic pregnancies

            c) Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary

         2) They will follow the guidelines for use of mifepristone (see b.i-vii below).

   b. As a condition of certification, prescribers must follow the guidelines for use of mifepristone described below:

      i. Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained.  Ensure any questions the patient may have prior to receiving mifepristone are answered.

      ii. Ensure that the healthcare provider and patient sign the *Patient Agreement Form.*

---

[1] In this REMS, the terms "sign" and "signature" include electronic signatures.

Reference ID: 5103833

iii. Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

iv. Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

v. Ensure that any deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

vi. If mifepristone will be dispensed by a certified pharmacy:

    1) Provide the certified pharmacy a signed *Prescriber Agreement Form*.

    2) Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.

    3) Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of the patient.

vii. The certified prescriber who dispenses mifepristone or who supervises the dispensing of mifepristone must:

    1) Provide an authorized distributor with a signed *Prescriber Agreement Form*.

    2) Ensure that the NDC and lot number from each package of mifepristone dispensed are recorded in the patient's record.

    3) Ensure that healthcare providers under their supervision follow guidelines i.-v.

c. Mifepristone Sponsors must:

i. Ensure that healthcare providers who prescribe their mifepristone are specially certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements.

ii. Ensure prescribers previously certified in the Mifepristone REMS Program complete the new *Prescriber Agreement Form*:

    1) Within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies.

    2) Within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

iii. Ensure that healthcare providers can complete the certification process by email or fax to an authorized distributor and/or certified pharmacy.

iv. Provide the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.

v. Ensure annually with each certified prescriber that their locations for receiving mifepristone are up to date.

The following materials are part of the Mifepristone REMS Program:

- *Prescriber Agreement Form for Danco Laboratories, LLC*

- *Prescriber Agreement Form for GenBioPro, Inc.*

- *Patient Agreement Form*

Reference ID: 5103833

2. Pharmacies that dispense mifepristone must be specially certified

   a. To become specially certified to dispense mifepristone, pharmacies must:

      i. Be able to receive *Prescriber Agreement Forms* by email and fax.

      ii. Be able to ship mifepristone using a shipping service that provides tracking information.

      iii. Designate an authorized representative to carry out the certification process on behalf of the pharmacy.

      iv. Ensure the authorized representative oversees implementation and compliance with the Mifepristone REMS Program by doing the following:

        1) Review the Prescribing Information for mifepristone.

        2) Complete a *Pharmacy Agreement Form*. By signing a *Pharmacy Agreement Form*, the authorized representative agrees that the pharmacy will put processes and procedures in place to ensure the following requirements are completed:

          a) Verify that the prescriber is certified by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with the pharmacy.

          b) Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in c) below.

          c) Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.

          d) Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.

          e) Track and verify receipt of each shipment of mifepristone.

          f) Dispense mifepristone in its package as supplied by the Mifepristone Sponsor.

          g) Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to the Mifepristone Sponsor that provided the mifepristone.  Notify the Mifepristone Sponsor that provided the dispensed mifepristone that the pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.

          h) Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.

          i) Maintain records of *Prescriber Agreement Forms*.

          j) Maintain records of dispensing and shipping.

          k) Maintain records of all processes and procedures including compliance with those processes and procedures.

          l) Maintain the identity of the patient and prescriber as confidential, including limiting access to patient and prescriber identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes.

          m) Train all relevant staff on the Mifepristone REMS Program requirements.

n)   Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

b.   Mifepristone Sponsors must:

i.   Ensure that pharmacies are specially certified in accordance with the requirements described above and de-certify pharmacies that do not maintain compliance with certification requirements.

ii.   Ensure that pharmacies can complete the certification process by email and fax to an authorized distributor.

i.   Verify annually that the name and contact information for the pharmacy's authorized representative corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, require the pharmacy to recertify with the new authorized representative.

The following materials are part of the Mifepristone REMS Program:

- *Pharmacy Agreement Form for Danco Laboratories, LLC*
- *Pharmacy Agreement Form for GenBioPro, Inc.*

3.   Mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions as ensured by the certified prescriber in signing the *Prescriber Agreement Form*.

a.   The patient must sign a *Patient Agreement Form* indicating that the patient has:

i.   Received, read and been provided a copy of the *Patient Agreement Form*.

ii.   Received counseling from the healthcare provider regarding the risk of serious complications associated with mifepristone.

**B. Implementation System**

1.   Mifepristone Sponsors must ensure that their mifepristone is only distributed to certified prescribers and certified pharmacies by:

a.   Ensuring that distributors who distribute  their mifepristone comply with the program requirements for distributors.

i.   The distributors must put processes and procedures in place to:

1)   Complete the certification process upon receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form*.

2)   Notify healthcare providers and pharmacies when they have been certified by the Mifepristone REMS Program.

3)   Ship mifepristone only to certified pharmacies or locations identified by certified prescribers.

4)   Not ship mifepristone to pharmacies or prescribers who become de-certified from the Mifepristone REMS Program.

5)   Provide the Prescribing Information and their Prescriber Agreement Form to healthcare providers who (1) attempt to order mifepristone and are not yet certified, or (2) inquire about how to become certified.

ii.   Put processes and procedures in place to maintain a distribution system that is secure,

confidential and follows all processes and procedures, including those for storage, handling, shipping, tracking package serial numbers, NDC and lot numbers, proof of delivery and controlled returns of mifepristone.

   iii.  Train all relevant staff on the Mifepristone REMS Program requirements.

   iv.  Comply with audits by Mifepristone Sponsors or a third party acting on behalf of Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed for the Mifepristone REMS Program. In addition, distributors must maintain appropriate documentation and make it available for audits.

  b.  Ensuring that distributors maintain secure and confidential distribution records of all shipments of mifepristone.

2.  Mifepristone Sponsors must monitor their distribution data to ensure compliance with the Mifepristone REMS Program.

3.  Mifepristone Sponsors must ensure that adequate records are maintained to demonstrate that the Mifepristone REMS Program requirements have been met, including, but not limited to records of mifepristone distribution; certification of prescribers and pharmacies; and audits of pharmacies and distributors. These records must be readily available for FDA inspections.

4.  Mifepristone Sponsors must audit their new distributors within 90 calendar days and annually thereafter after the distributor is authorized to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their distributor compliance if noncompliance is identified.

5.  Mifepristone Sponsors must audit their certified pharmacies within 180 calendar days after the pharmacy places its first order of mifepristone, and annually thereafter audit certified pharmacies that have ordered mifepristone in the previous 12 months, to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their pharmacy compliance if noncompliance is identified.

6.  Mifepristone Sponsors must take reasonable steps to improve implementation of and compliance with the requirements of the Mifepristone REMS Program based on monitoring and assessment of the Mifepristone REMS Program.

7.  Mifepristone Sponsors must report to FDA any death associated with mifepristone whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the Mifepristone Sponsor. This requirement does not affect the sponsors' other reporting and follow-up requirements under FDA regulations.

**C. Timetable for Submission of Assessments**

The NDA Sponsor must submit REMS assessments to FDA one year from the date of the approval of the modified REMS (1/3/2023) and annually thereafter. To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the reporting interval covered by each assessment should conclude no earlier than 90 calendar days before the submission date for that assessment. The NDA Sponsor must submit each assessment so that it will be received by the FDA on or before the due date.

Reference ID: 5103833

**MIFEPREX® (Mifepristone) Tablets, 200 mg**

**PRESCRIBER AGREEMENT FORM**

Mifeprex* (Mifepristone) Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To ***become a certified prescriber***, you must:

- **If you submit Mifeprex prescriptions for dispensing from certified pharmacies**:
  - o   Submit this form to each certified pharmacy to which you intend to submit Mifeprex prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order Mifeprex for dispensing by you or healthcare providers under your supervision:**
  - o   Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.
  - o   Healthcare settings, such as medical offices, clinics, and hospitals, where Mifeprex will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

***Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:***

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling  1-877-4 EARLY OPTION (1-877-432-7596 toll-free), or by visiting www.earlyoptionpill.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form*.

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received Mifeprex are reported to Danco Laboratories, LLC, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of Mifeprex that was dispensed to the patient.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

App. 000788

Ensure that healthcare providers under your supervision follow the guidelines listed above.

- If Mifeprex will be dispensed through a certified pharmacy:
    - o  Assess appropriateness of dispensing Mifeprex when contacted by a certified pharmacy about patients who will receive Mifeprex more than 4 calendar days after the prescription was received by the certified pharmacy.
    - o  Obtain the NDC and lot number of the package of Mifeprex the patient received in the event the prescriber becomes aware of the death of a patient.

- If Mifeprex will be dispensed by you or by healthcare providers under your supervision:
    - o  Ensure the NDC and lot number from each package of Mifeprex are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____     Title: _____

Signature: _____     Date: _____

Medical License # _____     State _____

NPI # _____

Practice Setting Address: _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343.

Approved 01/2023 [Doc control ID]



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

App. 000789

PRESCRIBER AGREEMENT FORM                              Mifepristone Tablets, 200 mg

Mifepristone Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To **become a certified prescriber**, you must:

- **If you submit mifepristone prescriptions for dispensing from certified pharmacies**:

  o   Submit this form to each certified pharmacy to which you intend to submit mifepristone prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order mifepristone for dispensing by you or healthcare providers under your supervision:**

  o   Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.

  o   Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

***Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:***

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling 1-855-MIFE-INFO (1-855—643-3463 toll-free), or by visiting www.MifeInfo.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form.*

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received mifepristone are reported to GenBioPro, Inc. that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

Ensure that healthcare providers under your supervision follow the guidelines listed above.



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.MifeInfo.com

App. 000790

Reference ID: 5103833

- If mifepristone will be dispensed through a certified pharmacy:
  - o Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.
  - o Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of a patient.
- If mifepristone will be dispensed by you or by healthcare providers under your supervision:
  - o Ensure the NDC and lot number from each package of mifepristone are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____     Title: _____

Signature: _____      Date: _____

Medical License # _____     State _____

NPI # _____

Practice Setting Address: _____

Return completed form to **RxAgreements@GenBioPro.com** or fax to 1-877-239-8036

Approved 01/2023 [Doc control ID]



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.MifeInfo.com

App. 000791

## PATIENT AGREEMENT FORM                    Mifepristone Tablets, 200 mg

**Healthcare Providers:** *Counsel the patient on the risks of mifepristone. Both you and the patient must provide a written or electronic signature on this form.*

**Patient Agreement:**

**1.**   I have decided to take mifepristone and misoprostol to end my pregnancy and will follow my healthcare provider's advice about when to take each drug and what to do in an emergency.

**2.**   I understand:
    **a.**   I will take mifepristone on Day 1.
    **b.**   I will take the misoprostol tablets 24 to 48 hours after I take mifepristone.

**3.**   My healthcare provider has talked with me about the risks, including:
- heavy bleeding
- infection

**4.**   I will contact the clinic/office/provider right away if in the days after treatment I have:
- a fever of 100.4°F or higher that lasts for more than four hours
- heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
- severe stomach area (abdominal) pain or discomfort, or I am "feeling sick," including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol
  — these symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

My healthcare provider has told me that these symptoms listed above could require emergency care. If I cannot reach the clinic/office/provider right away, my healthcare provider has told me who to call and what to do.

**5.**   I should follow up with my healthcare provider about 7 to 14 days after I take mifepristone to be sure that my pregnancy has ended and that I am well.

**6.**   I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with mifepristone and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

**7.**   If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

**8.**   I have the MEDICATION GUIDE for mifepristone.

**9.**   My healthcare provider has answered all my questions.


**Patient Signature:** _____   **Patient Name** (print): _____   **Date**: _____


**Provider Signature:** _____   **Provider Name** (print): _____   **Date**: _____

*Patient Agreement Forms may be provided, completed, signed, and transmitted in paper or electronically.*
**01/2023**

Reference ID: 5103833

**MIFEPREX®(Mifepristone) Tablets, 200mg**

**PHARMACY AGREEMENT FORM**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense Mifeprex is able to receive *Prescriber Agreement Forms* by email and fax.
- Each location of my pharmacy that will dispense Mifeprex is able to ship Mifeprex using a shipping service that provides tracking information.
- I have read and understood the Prescribing Information for Mifeprex. The Prescribing Information is available by calling 1-877-4 EARLY OPTION (1-877-432-7596 toll-free) or online at www.earlyoptionpill.com; and
- Each location of my pharmacy that will dispense Mifeprex will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting Mifeprex orders.
  - Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.
  - Dispense Mifeprex such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.
  - Confirm with the prescriber the appropriateness of dispensing Mifeprex for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.
  - Record in the patient's record the NDC and lot number from each package of Mifeprex dispensed.
  - Track and verify receipt of each shipment of Mifeprex.
  - Dispense mifepristone in its package as supplied by Danco Laboratories, LLC.
  - Report any patient deaths to the prescriber, including the NDC and lot number from the package of Mifeprex dispensed to the patient, and remind the prescriber of their obligation to report the deaths to Danco Laboratories, LLC. Notify Danco that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.
  - Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.
  - Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, and all processes and procedures including compliance with those processes and procedures.
  - Maintain the identity of Mifeprex patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance.
  - Train all relevant staff on the Mifepristone REMS Program requirements.
  - Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____    Title: _____



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

App. 000793

Reference ID: 5103833

Signature: _____   Date: _____

Email: _____   Phone: _____   Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to <u>Mifeprex@dancodistributor.com</u> or fax to 1-866-227-3343.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC

P.O. Box 4816-New York, NY 10185

1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

App. 000794

**PHARMACY AGREEMENT FORM**  **Mifepristone Tablets, 200 mg**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense mifepristone is able to receive *Prescriber Agreement Forms* by email and fax.
- Each location of my pharmacy that will dispense mifepristone is able to ship mifepristone using a shipping service that provides tracking information.
- I have read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling 1-855-MIFE-INFO (1-855-643-3463 toll-free) or online at www.MifeInfo.com; and
- Each location of my pharmacy that will dispense mifepristone will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting mifepristone orders.
  - o Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.
  - o Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.
  - o Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.
  - o Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.
  - o Track and verify receipt of each shipment of mifepristone.
  - o Dispense mifepristone in its package as supplied by GenBioPro, Inc.
  - o Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to GenBioPro, Inc. Notify GenBioPro that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.
  - o Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.
  - o Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, all processes and procedures including compliance with those processes and procedures.
  - o Maintain the identity of mifepristone patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance purposes.
  - o Train all relevant staff on the Mifepristone REMS Program requirements.
  - o Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____   Title: _____

Signature: _____   Date: _____

Email: _____   Phone: _____   Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to **RxAgreements@GenBioPro.com** or fax to **1-877-239-8036.**



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.MifeInfo.com

Reference ID: 5103833

**EXHIBIT 42**

**CVS and Walgreens Will Begin Selling Abortion Pills
This Month - The New York Times**

# CVS and Walgreens Will Begin Selling Abortion Pills This Month

The pill mifepristone will be available with a prescription at pharmacy counters in a few states to start.

 **By Pam Belluck**

March 1, 2024

The two largest pharmacy chains in the United States will start dispensing the abortion pill mifepristone this month, a step that could make access easier for some patients.

Officials at CVS and Walgreens said in interviews on Friday that they had received certification to dispense mifepristone under guidelines that the Food and Drug Administration issued last year. The chains plan to make the medication available in stores in a handful of states at first. They will not be providing the medication by mail.

Both chains said they would gradually expand to all other states where abortion was legal and where pharmacies were legally able to dispense abortion pills — about half of the states.

President Biden said in a statement on Friday that the availability of the pill at pharmacies was "an important milestone in ensuring access to mifepristone, a drug that has been approved by the Food and Drug Administration as safe and effective for more than 20 years."

"I encourage all pharmacies that want to pursue this option to seek certification," he added.

Walgreens will start providing the pill within the next week in a small number of its pharmacies in New York, Pennsylvania, Massachusetts, California and Illinois, said Fraser Engerman, a spokesman for the chain. "We are beginning a phased rollout in select locations to allow us to ensure quality, safety and privacy for our patients, providers and team members," he said.

CVS will begin dispensing in all of its pharmacies in Massachusetts and Rhode Island "in the weeks ahead," Amy Thibault, a spokeswoman for the company, said.

The chains will be monitoring the prospects in a few states, including Kansas, Montana and Wyoming, where abortion bans or strict limitations have been enacted but are enjoined because of legal challenges.

Mr. Engerman said that Walgreens was "not going to dispense in states where the laws are unclear" to protect its pharmacists and staff members.

App. 000797

As for CVS, "we continually monitor and evaluate changes in state laws and will dispense mifepristone in any state where it is or becomes legally permissible to do so," Ms. Thibault said. In some states where abortion is legal, she said, pharmacists are prohibited from dispensing mifepristone because laws require that to be done by doctors or in a hospital or clinic.

It is uncertain how much initial demand there will be for the service at brick-and-mortar pharmacies. In the states where the chains will begin dispensing, abortion pills are already available in clinics or easily prescribed through telemedicine and sent through the mail. But some women prefer to visit doctors, many of whom do not have the medication on hand. The new development will allow doctors and other eligible providers to send a prescription to a pharmacy for the patient to pick up.

"Now that doctors no longer have to stock the medicine themselves and dispense it, it increases the likelihood that a patient can go to their own doctor, the person with whom they already have a relationship, and say, 'I'm pregnant — I don't want to be,'" said Kirsten Moore, the director of the Expanding Medication Abortion Access Project.

She said it might also motivate more doctors and other health providers to obtain the special certification that the F.D.A. requires for prescribers of mifepristone. The steps to becoming a certified prescriber are simple, but some doctors have been deterred because of the paperwork and logistics of having to order and stock the pills.

As the availability in retail pharmacies expands, they may become a more popular alternative, and depending on the outcome of a case the Supreme Court will hear later this month, the pharmacy option could take on more importance.

In that case, abortion opponents have sued the F.D.A., seeking to remove mifepristone from the market in the United States. An appeals court ruling in that case did not go that far but effectively banned the mailing of mifepristone and required in-person doctor visits. If the Supreme Court upholds that ruling, it could mean that patients would have to obtain mifepristone by visiting a clinic or doctor. If such a ruling allowed pharmacies to continue dispensing, more patients might obtain the medication there.

Abortion opponents criticized the pharmacy chains' decision. "As two of the world's largest, most trusted 'health' brands, the decision by CVS and Walgreens to sell dangerous abortion drugs is shameful, and the harm to unborn babies and their mothers incalculable," Katie Daniel, the state policy director of Susan B. Anthony Pro-Life America, said in a statement.

In order to obtain certification, the pharmacy chains had to take specific steps, including ensuring that their computerized systems protected the privacy of prescribers, who are certified under a special program that the F.D.A. applies to mifepristone and several dozen other medications.

App. 000798

Pharmacy certification is granted by manufacturers of mifepristone. Walgreens was certified by the brand name manufacturer Danco Laboratories, and is seeking certification from the generic manufacturer GenBioPro, Mr. Engerman said. CVS was certified by GenBioPro.

Medication abortion is a two-drug regimen that is now the most common method of terminating pregnancies in the United States and is typically used through 12 weeks of pregnancy. Mifepristone, which blocks a hormone necessary for pregnancy development, is taken first, followed 24 to 48 hours later by misoprostol, which causes contractions that expel pregnancy tissue.

The same regimen is also used for miscarriages, and those patients can now also obtain mifepristone from the pharmacy chains.

Mifepristone has been tightly regulated by the F.D.A. since its approval in 2000. It had previously been available primarily from the prescribers or from clinics or telemedicine abortion services, in which the pills were generally shipped from one of two mail-order pharmacies that were authorized. Misoprostol has never been as tightly restricted as mifepristone and is used for many different medical conditions. It is easily obtained at pharmacies through a typical prescription process.

The American Pharmacists Association urged the F.D.A. to allow retail pharmacies to distribute mifepristone, even though the medication is unlikely to generate significant revenue. In a statement last year, the association said that it wanted the agency "to level the playing field by permitting any pharmacy that chooses to dispense this product to become certified."

Shortly after the F.D.A. policy change was announced in January 2023, Walgreens and CVS said they planned to become certified and offer mifepristone in states where laws would allow pharmacies to dispense it.

Walgreens later became the focus of a consumer and political firestorm after it responded to threatening letters from Republican attorneys general in 21 states, confirming that it would not dispense the medication in those states.

Both chains have had protests outside their stores, mostly from anti-abortion advocates, and similar protesters interrupted a meeting of shareholders at Walgreens Boots Alliance, the chain's parent company.

CVS is the nation's largest chain with over 9,000 stores in all 50 states. Walgreens has about 8,500 stores in all states except North Dakota. Neither chain would discuss the price of the medication, but both noted that some insurance policies would cover it in some states.

A handful of small independent pharmacies began dispensing mifepristone last year.

App. 000799

Case 2:22-cv-00223-Z   Document 195-4   Filed 10/11/24   Page 236 of 245   PageID 10304

**Pam Belluck** is a health and science reporter, covering a range of subjects, including reproductive health, long Covid, brain science, neurological disorders, mental health and genetics. More about Pam Belluck

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: 2 Major Chains Prepare to Sell Abortion Pills

App. 000800

# EXHIBIT 43

# Mifeprex prescriber agreement (2023)

# PRESCRIBER AGREEMENT FORM

*Mifeprex*® (Mifepristone)
Tablets, 200 mg

Mifeprex* (Mifepristone) Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

## TO *BECOME A CERTIFIED PRESCRIBER*, YOU MUST:

**If you submit Mifeprex prescriptions for dispensing from certified pharmacies:**

• Submit this form to each certified pharmacy to which you intend to submit Mifeprex prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

**If you order Mifeprex for dispensing by you or healthcare providers under your supervision:**

• Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.

• Healthcare settings, such as medical offices, clinics, and hospitals, where Mifeprex will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

*Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:*

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling our toll free number, 1-877-4 Early Option (1-877-432-7596), or logging on to our website, **www.earlyoptionpill.com**.

**In addition to having these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the Patient Agreement Form is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the Patient Agreement Form.

- Ensure that the patient is provided with a copy of the Patient Agreement Form and Medication Guide.

- Ensure that the signed Patient Agreement Form is placed in the patient's medical record.

App. 000802

- Ensure that any deaths of patients who received Mifeprex are reported to Danco Laboratories, LLC, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of Mifeprex that was dispensed to the patient.

**Ensure that healthcare providers under your supervision follow the guidelines listed above.**

**If Mifeprex will be dispensed through a certified pharmacy:**

- Assess appropriateness of dispensing Mifeprex when contacted by a certified pharmacy about patients who will receive Mifeprex more than 4 calendar days after the prescription was received by the certified pharmacy.

- Obtain the NDC and lot number of the package of Mifeprex the patient received in the event the prescriber becomes aware of the death of a patient.

**If Mifeprex will be dispensed by you or by healthcare providers under your supervision:**

- Ensure the NDC and lot number from each package of Mifeprex are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____     Title: _____

Signature: _____     Date: _____

Medical License # _____     State _____

NPI # _____

Practice Setting Address: _____

_____



Return completed form to Mifeprex@dancodistributor.com or fax to **1-866-227-3343.**

**Mifeprex®**
(Mifepristone) Tablets, 200 mg
THE ORIGINAL EARLY
OPTION PILL

**DANCO**
Danco Laboratories, LLC • P.O. Box 4816 • New York, NY 10185
1-877-4 Early Option (1-877-432-7596) • www.earlyoptionpill.com
*MIFEPREX is a registered trademark of Danco Laboratories, LLC.

1/2023

App. 000803

# EXHIBIT 44

## Mifeprex patient agreement (2023)

App. 000804

## PATIENT AGREEMENT FORM                    Mifepristone Tablets, 200 mg

**Healthcare Providers:** *Counsel the patient on the risks of mifepristone. Both you and the patient must provide a written or electronic signature on this form.*

**Patient Agreement:**

**1.**   I have decided to take mifepristone and misoprostol to end my pregnancy and will follow my healthcare provider's advice about when to take each drug and what to do in an emergency.

**2.**   I understand:
    **a.**   I will take mifepristone on Day 1.
    **b.**   I will take the misoprostol tablets 24 to 48 hours after I take mifepristone.

**3.**   My healthcare provider has talked with me about the risks, including:
    • heavy bleeding
    • infection

**4.**   I will contact the clinic/office/provider right away if in the days after treatment I have:
    • a fever of 100.4°F or higher that lasts for more than four hours
    • heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
    • severe stomach area (abdominal) pain or discomfort, or I am "feeling sick," including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol
    — these symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

My healthcare provider has told me that these symptoms listed above could require emergency care. If I cannot reach the clinic/office/provider right away, my healthcare provider has told me who to call and what to do.

**5.**   I should follow up with my healthcare provider about 7 to 14 days after I take mifepristone to be sure that my pregnancy has ended and that I am well.

**6.**   I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with mifepristone and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

**7.**   If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

**8.**   I have the MEDICATION GUIDE for mifepristone.

**9.**   My healthcare provider has answered all my questions.


**Patient Signature:** _____   **Patient Name** (print): _____   **Date**: _____


**Provider Signature:** _____   **Provider Name** (print): _____   **Date**: _____

*Patient Agreement Forms may be provided, completed, signed, and transmitted in paper or electronically.*

**01/2023**

Reference ID: 5103833

# EXHIBIT 45

# 2004 Letter from Danco Labs to Emergency Room Doctors





PO Box 4816
New York, NY  10185

infoline

1.877.4.EARLY OPTION
www.earlyoptionpill.com

November 12, 2004

Dear Emergency Room Director:

Danco Laboratories is providing this information to assist you in taking care of patients who may present in an emergency room setting following treatment with Mifeprex® (mifepristone) and misoprostol.   In particular, you should be aware of the rare events – serious infection, prolonged heavy bleeding and ruptured ectopic pregnancy – discussed below.  From September 2000, when Mifeprex* was approved in the United States for marketing, through September 2004, approximately 360,000 women have been treated with Mifeprex in the U.S.

The Mifeprex treatment, Mifeprex followed by misoprostol, is indicated for non-surgical abortion in patients who are ≤ 49 days pregnant, dated from the first day of the last menstrual period (LMP).  Medical abortion with Mifeprex and misoprostol presents no differently from a spontaneous abortion, with bleeding and cramping expected in the hours after taking misoprostol.  In clinical trials, Mifeprex was highly effective, with a 92-95% success rate in women who were ≤ 49 days pregnant.  The remainder have a surgical termination for various reasons, including ongoing pregnancy, incomplete abortion, bleeding and patient request; the vast majority of these women are treated by the physician who initially provided the Mifeprex treatment or by referral to a colleague.

However, there may be some women who present to an emergency room with serious and sometimes fatal infections and bleeding that occur rarely following spontaneous (miscarriage), surgical and medical abortions, including following Mifeprex use, and childbirth. A high index of suspicion is needed for timely diagnosis and intervention in these patients.  Danco Laboratories has updated the BOXED WARNING and WARNINGS sections of the Prescribing Information as well as the MEDICATION GUIDE and the PATIENT AGREEMENT to provide information about these topics.  Additional information is provided on ectopic pregnancy, which is a contraindication for Mifeprex (see WARNINGS).

Copies of the updated Prescribing Information, which includes the MEDICATION GUIDE and the PATIENT AGREEMENT, are enclosed, and it is important for you to read them carefully.  A summary of the updated warnings follows:

**Infection and Sepsis**
In postmarketing experience following the use of Mifeprex and misoprostol, we have received a few reports of cases of serious bacterial infection, including very rare cases of fatal septic shock (see WARNINGS).  No causal relationship between these events and the use of Mifeprex and misoprostol has been established.  Although infection following medical abortion is rare, we ask that you be alert to the possibility of infection in your patients.  In particular, a sustained fever of 100.4 degrees Fahrenheit or higher, severe abdominal pain, or pelvic tenderness in the days after taking Mifeprex and misoprostol may be an indication of infection.  Atypical presentations of serious infection and sepsis, without fever, severe abdominal pain, or pelvic tenderness, but with significant leukocytosis, tachycardia, or hemoconcentration can occur.

**Vaginal Bleeding**
Vaginal bleeding occurs in almost all patients during the treatment procedure (see WARNINGS).   According to data from the U.S. and French trials, women should expect to

* Mifeprex is a registered trademark of Danco Laboratories, LLC.

experience vaginal bleeding or spotting for an average of nine to 16 days, while up to 8% of all subjects may experience some type of bleeding for 30 days or more.  Prolonged heavy bleeding (soaking through two thick full-size sanitary pads per hour for two consecutive hours) may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed to prevent the development of hypovolemic shock.  Patients should be counseled to seek immediate medical attention if they experience prolonged heavy vaginal bleeding following a medical abortion.  Excessive vaginal bleeding usually requires treatment by uterotonics, vasoconstrictor drugs, curettage, administration of saline infusions, and/or blood transfusions.

**Ectopic Pregnancy**
Additionally, in postmarketing experience we have received a small number of reports of ruptured ectopic pregnancy.  No causal relationship between these events and Mifeprex and misoprostol has been established.  Mifeprex is contraindicated in patients with a confirmed or suspected ectopic pregnancy since Mifeprex is not effective for terminating these pregnancies (see CONTRAINDICATIONS).  Physicians should remain alert to the possibility that a patient who is undergoing a medical abortion could have an undiagnosed ectopic pregnancy since some of the expected symptoms of a medical abortion may be similar to those of a ruptured ectopic pregnancy.  The presence of an ectopic pregnancy may have been missed even if the patient underwent ultrasonography prior to being prescribed Mifeprex.

The MEDICATION GUIDE and PATIENT AGREEMENT have also been updated to reflect the new safety information.  Each patient should have received a MEDICATION GUIDE from her health care provider before taking Mifeprex and been advised to take her MEDICATION GUIDE with her if she visits an emergency room, so that you will be aware that the patient is undergoing a medical abortion.

Abortion, whether medical or surgical, is "generally very safe and is therefore infrequently associated with complications".[1]  However, we thought that the enclosed recent publication, Phillip G. Stubblefield, MD and Lynn Borgatta, MD, "Complications of Induced Abortion" in *Obstetric & Gynecologic Emergencies Diagnosis and Management* (New York: McGraw-Hill, 2004), 65-86, may be helpful to you in your practice as it includes information on the diagnosis and treatment of possible complications following abortion, including infection and ectopic pregnancy.

The safety and efficacy of Mifeprex and misoprostol were well established in clinical trials reviewed by the FDA.  The overall safety and efficacy profile remains unchanged.

We rely on medical feedback from health care professionals and therefore remind you to report serious adverse events and any on-going pregnancies following treatment with the Mifeprex regimen to us.  Please provide a brief clinical synopsis (by postal mail, email or phone):

Medical Director
Danco Laboratories, LLC
P.O. Box 4816
New York, NY 10185
Medicaldirector@earlyoptionpill.com
Toll free at 1-877-4-Early Option (1-877-432-7596)

---

[1] Phillip G. Stubblefield, MD and Lynn Borgatta, MD, "Complications of Induced Abortion" in *Obstetric & Gynecologic Emergencies Diagnosis and Management* (New York: McGraw-Hill, 2004), 65-86.

For more information on Mifeprex, please visit www.earlyoptionpill.com or call our 24-hour toll free number at 1-877-4-Early Option (1-877-432-7596).  If you have an urgent question, a physician will usually return your call within the hour.  For general questions, our Medical Director typically returns calls within 24 hours.

Sincerely,
Danco Laboratories, LLC

Enclosures