# Exhibit B

# Appendix of Exhibits to Proposed Complaint in Intervention

# Vol. I of VII

## TABLE OF CONTENTS

<u>Volume I</u>

**Exhibit 1**: Scott Calvert, *The Parties Where Volunteers Pack Abortion Pills for Red-State Women*, Wall Street Journal (Aug. 12, 2024)...........................................**App. 1**

**Exhibit 2**: FDA Center for Drug Evaluation and Research, *Summary Review of Application sNDA Number: 020687Orig1s020* (Mar. 29, 2016) (2016 Summary Review).........................................................................**App. 8**

**Exhibit 3**: FDA Center for Drug Evaluation and Research, *Summary Review of sNDA Application Number:* (Jan. 3, 2023).............................**App. 37**

**Exhibit 4**: Declaration of Dr. Donna Harrison ..............................**App. 212**

**Exhibit 5**: FDA-Approved Label for (Mifeprex) (Jan. 2023)...........**App. 226**

**Exhibit 6**: Maarit Niinimaki et al., *Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study*, BJM (Apr. 20, 2011) ..................................**App. 246**

**Exhibit 7**: HHS, New Drug, Antibiotic, and Biological Drug Product Regulations; Accelerated Approval, 57 Fed. Reg. 58,942 (Dec. 11, 1992)...........................................................................................**App. 254**

# EXHIBIT 1

**Scott Calvert, *The Parties Where Volunteers Pack Abortion Pills for Red-State Women*, Wall Street Journal (Aug. 12, 2024)**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/us-news/abortion-pill-parties-shipping-148e3c15

# The Parties Where Volunteers Pack Abortion Pills for Red-State Women

Amid risks, volunteers are mobilizing to assist networks that mail abortion medication to women in states with strict limits

*By Scott Calvert* [Follow] | *Photographs by Kayana Szymczak for WSJ*

Aug. 12, 2024 9:00 pm ET

SOMERVILLE, Mass.—The women huddling around the conference table shuttled the small cardboard boxes along, assembly-line style. Into each went medical-information paperwork and a handwritten note proclaiming, "We wish you the best!" Then came the critical addition, a two-drug regimen that ends a pregnancy.

This tiny Boston-area office represents a new bulwark in America's abortion battle. Volunteers are mobilizing with growing frequency for pill-packing parties to help strangers in faraway states circumvent strict laws. On a recent Monday evening, the group filled 350 boxes—in-home abortion kits ready for mailing to women in states such as Texas and Florida with near-total or six-week abortion bans.

Melissa Fischer, a 57-year-old internist, sees these efforts as a way to assist people tripped up by geography. "I strongly believe where somebody lives shouldn't dictate their access to critical healthcare," she said.

Retirees and professionals ate pizza, sipped Chardonnay in red plastic cups and chatted while working purposefully. Many portray the sessions as a tangible way to push back against the 2022 Supreme Court ruling that eliminated a constitutional right to abortion.

"It's a little bit of an antidote to hopelessness," said Judy Fleishman, 70, a medical educator. "There's something you can do."



Women prepare in-home abortion kits at a 'pill-packing party' at the MAP's offices.

## Growing urgency

The growing movement to send abortion pills into ban states, often for just a few dollars. The nearly year-old MAP, like similar programs, leverages a state shield law meant to protect clinicians from legal jeopardy, including extradition. Massachusetts is among eight states with such laws.

These operations are intensifying amid more heated political debates. Vice President Kamala Harris is spotlighting abortion rights in her presidential bid, while Republicans struggle to articulate a winning message.

From July 2023 to March, shield-law groups provided more than 68,000 abortion kits by mail to residents in states with tight limits on the procedure or telemedicine, according to WeCount, an abortion-data project sponsored by the Society of Family Planning, which backs abortion rights.

Shield-law providers accounted for about 9,500 medication abortions in March, up from 5,620 in July 2023, WeCount says.

"I think as long as we see states that are passing more and more restrictions, we're going to see these numbers continue to grow," said WeCount co-chair Ushma Upadhyay, a professor at the University of California at San Francisco.



Patient packages include two abortion medications, instructions and additional information.

Abortions reached nearly 100,000 nationwide in March, up from 84,000 in May 2022, according to WeCount, despite 18 states imposing near-total or six-week bans. Medication abortions now outnumber surgical procedures. Nearly 20% of all abortions are via drugs sent by mail, including from bricks-and-mortar clinics.

So far, efforts targeting telemedicine abortions have failed. The Supreme Court in June rejected a bid to restrict access to mifepristone, one of the two abortion drugs. Some Republicans in Congress, including vice presidential nominee JD Vance, have called for enforcing the 1873 Comstock Act, a federal law barring the shipping of abortion drugs. More recently Vance has said the issue should be left to states.

## Risk and pushback

App. 3

Case 2:22-cv-00223-Z    Document 254-9    Filed 08/22/25    Page 6 of 275    PageID 15420



MAP co-founder Angel Foster said the pill-packing parties are essential to its operations.

Still, legal experts say there are risks for those involved in mailing pills to states with bans.

Angel Foster, 50, a doctor who helped launch the MAP last fall, trusts the Massachusetts shield law. But because it doesn't apply in other states, she won't visit her mother and stepfather in South Carolina and avoids flights that require stopovers in Texas.

Maureen Paul, the MAP's medical director, doesn't feel safe visiting her brother in Florida, where a six-week ban took effect in May. "We are no strangers to risk. I've had my home picketed, I've had death threats," she said. "But we're not fearful, we're not paralyzed. We're determined to act."

Frustrated officials in states with stringent laws can't disrupt the mail, but some are warning providers. Arkansas Attorney General Tim Griffin, a Republican, demanded two entities in May stop helping state residents get the pills, asserting such actions violate Arkansas law.

One warning went to Choices Women's Medical Center in New York, which doesn't mail pills but removed from its website wording about Arkansans taking clinic-provided pills at home. Founder Merle Hoffman said she thinks Griffin misunderstood how her clinic operates. A cease-and-desist letter also went to Aid Access, the largest shield-law provider, which disputes the allegations.

App. 4



The Massachusetts Medication Abortion Access Project's office in Somerville, Mass.

Antiabortion groups say it is dangerous for women to take these pills without medical supervision. Providers say it's safe and that they screen for potential problems.

Pill-mailers are in new legal terrain. "No one has challenged any of these laws yet," said Rachel Rebouché, dean of the Temple University Beasley School of Law. "Texas has not tried to prosecute [clinicians], they haven't been sued, a medical board hasn't tried to discipline them. That's not to say those things aren't possible."

In Massachusetts, Paul, a 74-year-old doctor, is one of four prescribers at the MAP. In 1968, pregnant at age 18, she couldn't get a hospital abortion and feared seeking an illegal one. She carried to term and gave up her child for adoption, an experience she calls "deeply traumatic and defining."

Launched last fall, the MAP is a project of Cambridge Reproductive Health Consultants, a nonprofit co-founded by Foster that has worked to boost medication abortion access in countries including Thailand, Pakistan and Uganda—and saw a need for similar work in the U.S. MAP harnesses websites like plancpills.org to get the word out to women nationwide. Prospective patients fill out intake forms online and mainly correspond by email, although some talk by phone with Foster or a prescriber.

The program accepts patients up to the 11th week of pregnancy, aiming to get pills to them by 12 weeks. Most are earlier than nine weeks, Foster said. Despite a $250 list price, patients pay about $130 on average; a third pay $25 or less.

## The 6 p.m. party

App. 5

Case 1:22-cv-00223-Z    Document 254-8    Filed 08/22/25    Page 8 of 275    PageID 15422



Tote bags containing the MAP's patient packages are carried to a post office for mailing.

At the MAP's office, before the recent pill-packing party, Foster read aloud comments women shared on intake forms. A Nebraska mother wrote: "I was using protection, but it failed, and I cannot afford to have another child right now." A Florida woman with a diabetic 5-year-old said: "I am struggling to pay my bills, and I'm not mentally ready to bring another child into my life yet."

Nearby, a MAP staffer printed address labels for 45 boxes of pills before packing them into tote bags for the trip to the post office. They were bound for 19 states, including Texas, Georgia and Florida.

Around 6 p.m., the volunteers filed in from work or home to replenish the supply of preloaded boxes. The gatherings jumped from monthly to twice-monthly in July, the MAP's busiest month with 560 boxes shipped, and are set to go weekly this fall.

Sonia Dettmann, 81, a retired clinical social worker, hasn't missed any. "I feel that abortion care is healthcare, and this is one way of supporting healthcare for folks from states where abortion is banned. It's that simple," she said as she dropped mifepristone cartons into each box.



A handwritten card is included with each MAP package.

Another regular, Erin Gately, 47, likes to write notes in gold ink for "a little extra touch." An OB-GYN nurse practitioner, she sees "the challenges that come with an unplanned pregnancy and, whether somebody decides to continue with that unplanned pregnancy or not, it's their choice."

As boxes circulated around the table, conversation pinged from the Paris Olympics to a promising birth-control gel for men. Amid upbeat banter, the crew kept their production line humming. Though the ~~~~~~~~ Foster's

goa

"I am very impressed with us," she said.

Write to Scott Calvert at scott.calvert@wsj.com

*Appeared in the August 13, 2024, print edition as 'Abortion Fight Has New Front: Pill Parties'.*

App. 7

**EXHIBIT 2**

**FDA Center for Drug Evaluation and Research,** *Summary Review of Application sNDA Number: 020687Orig1s020* **(Mar. 29, 2016) (2016 Summary Review)**

# CENTER FOR DRUG EVALUATION AND RESEARCH

## *APPLICATION NUMBER:*

# 020687Orig1s020

# <u>SUMMARY REVIEW</u>

Summary Review for Regulatory Action

| Date | March 29, 2016 |
|---|---|
| Subject | Summary Review |
| NDA #/Supplement # | 20687/S-020 |
| Applicant name | Danco Laboratories, LLC |
| Date of submission | May 28, 2015 |
| Date of submission receipt | May 29, 2015 |
| PDUFA goal date | March 29, 2016 |
| Proprietary name/established name | Mifeprex/mifepristone |
| Dosage form/strength | Oral tablet/200 mg |
| Dosage regimen | Mifeprex 200 mg tablet orally followed in 24-48 hours by 800 mcg buccal misoprostol |
| Proposed indication | Mifeprex is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation |
| Action | Approval |

App. 10

1. **Introduction**
2. **Background**
3. **CMC**
4. **Nonclinical Pharmacology/Toxicology**
5. **Clinical Pharmacology**
6. **Clinical Microbiology**
7. **Efficacy/Statistics**
8. **Safety**
9. **Advisory Committee Meeting**
10. **Pediatrics**
11. **Other Relevant Regulatory Issues**
12. **Labeling**
13. **Decision/Action/Risk Benefit Assessment**

1. **Introduction**

Danco Laboratories, LLC, referred to hereafter as the Applicant, submitted an efficacy supplement (S-020) to NDA 20687 for Mifeprex (mifepristone). The Applicant sought the following changes to its approved application:

1.  ⟨(b) (4)⟩ Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally; see below:

    - Day One: Mifeprex Administration (oral)
      One 200 mg tablet of Mifeprex is taken in a single oral dose
    - After a 24-48 hour interval: Misoprostol Administration (buccal)(minimum 24-hour interval between Mifeprex and misoprostol)
      Four 200 mcg tablets (total dose: 800 mcg) of misoprostol are taken by the buccal route

2.  Removal of the instruction that administration of misoprostol must be done in-clinic, to allow for administration at home or other location convenient for the woman
3.  Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex
4.  Follow-up, although still needed, not restricted to in clinic at 14 days after Mifeprex
5.  Increase in the maximum gestational age from 49 days to 70 days
6.  Change of the labeled time for expected expulsion of pregnancy from 4-24 hours to 2-24 hours post misoprostol administration
7.  Addition that a repeat 800 mcg buccal dose of misoprostol may be used if needed
8.  Change of "physician" to "healthcare provider" in the label and Risk Evaluation and Mitigation Strategies (REMS) document
9.  Change in the indication statement to add reference to use of misoprostol: "Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of pregnancy through 70 days gestation."
10. Removal of references to "under Federal law" from the Prescriber's Agreement under the REMS

    11. Labeling changes addressing the pediatric requirements under the Pediatric Research Equity Act

This efficacy supplement submission includes information from published studies, review articles and additional information from the authors of some of the publications. These published studies evaluated reproductive age women in the U.S. and outside the U.S. who had early medical termination with mifepristone, in a regimen with misoprostol, including women up through 70 days of gestation.

This memorandum serves as the Division's decisional memorandum for the efficacy supplement.

## 2. Background

The active ingredient of Mifeprex, mifepristone, is a progestin antagonist.  Mifeprex, in a regimen with misoprostol, is approved for the medical termination of pregnancy up through 49 days' gestation.  The approved dosing regimen is currently labeled as follows:

- Day 1: The patient takes three 200 mg tablets of Mifeprex in a single oral dose in the clinic, medical office, or hospital.
- Day 3: The patient returns to the clinic, medical office, or hospital and takes two 200 mcg tablets of misoprostol orally.
- Day 14: The patient returns for a follow-up visit to confirm that a complete termination has occurred.

At the time of the September, 2000 approval, FDA restricted distribution of Mifeprex under 21 CFR 314.520, requiring that Mifeprex be dispensed only by or under the supervision of a physician who meets certain qualifications.  With the passage of FDAAA in 2007, Mifeprex was deemed to have in effect an approved REMS. The Applicant submitted a formal REMS, which was approved on June 8, 2011 and consisted of the following: a Medication Guide, elements to assure safe use (ETASU A [special certification of healthcare providers who prescribe Mifeprex], ETASU C [dispensing only in certain healthcare settings], and ETASU D [safe use condition of a signed Patient Agreement]), an implementation system and a timetable for assessments. The goals of the REMS were 1) To provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug and 2) To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications. The REMS for Mifeprex incorporated the restrictions under which the drug was originally approved.

Since 2011, the Applicant has submitted two REMS assessment reports.  The Agency review of these reports determined that the REMS goals were being met and that no modifications were required to the REMS at that time.

FDA held a pre-NDA meeting with the Applicant on January 29, 2015, to discuss proposed labeling and REMS changes to be submitted in this efficacy supplement. These changes were submitted with the efficacy supplement.

The Applicant submitted published literature and supportive information to support changes to the dose, dosing regimen, gestational age, revisions to labeling, modifications to the REMS document, and to address PREA requirements. The Agency accepts the use of peer reviewed literature as primary data for an application under the framework of a 505(b)(2) application.

## 3.  CMC

No new CMC information was submitted with this efficacy supplement. The CMC team determined no additional review or inspections were required. The CMC team completed a review of the labeling and found the CMC sections of labeling (sections 3, 11 and 16) acceptable (See review dated March 29, 2016). The CMC review team recommends approval of the efficacy supplement; refer also to the CMC review of the separate supplement proposing a single tablet blister pack for Mifeprex, dated January 11, 2016. There are no outstanding CMC issues or postmarketing commitments or requirements.

***Comment***: *On March 10, 2016, a separate CMC supplement was approved that allowed the packaging of individual 200 mg tablets of mifepristone; previously packaging consisted of three 200 mg tablets per blister pack (a total of 600 mg Mifeprex as administered under the originally approved dosing regimen).*

## 4.  Nonclinical Pharmacology/Toxicology

No new nonclinical information was submitted in this supplement. The Pharmacology/Toxicology team revised labeling to conform to the Pregnancy and Lactation Labeling Rule. There are no outstanding nonclinical issues. The Pharmacology/Toxicology review team recommends approval of the efficacy supplement; refer to the Pharmacology/Toxicology review dated March 4, 2016.

## 5.  Clinical Pharmacology

The Applicant did not conduct any new clinical pharmacology studies pertaining to the proposed ⬛⬛⬛ (b) (4) regimen, but provided information on pharmacokinetics (PK) of misoprostol following various routes of administration. The PK of the 200 mg Mifeprex tablet has not been characterized in women, but data are available in men and were submitted in the original NDA. The Clinical Pharmacology review team determined that the PK data were appropriate for inclusion in labeling. Review of the labeling pertinent to the Clinical Pharmacology sections is complete and labeling relevant to pharmacokinetics and pharmacodynamics is acceptable. There are no outstanding Clinical Pharmacology issues or postmarketing commitments or requirements. The clinical pharmacology review team recommends approval of the efficacy supplement; refer to the Clinical Pharmacology review dated March 29, 2016.

**6. Clinical Microbiology**

Not applicable.

**7. Efficacy/Statistics**

The Applicant submitted published literature as the primary evidence to support the efficacy (and safety) of the proposed dosing regimen (refer to the Clinical Review dated March 29, 2016, Section 9.5 for a list of submitted references). Most published articles submitted by the Applicant and reviewed by the clinical review team reported the primary efficacy endpoint as complete termination of pregnancy without further medical or surgical intervention; the Division considers this to be a clinically relevant endpoint.

The majority of the publications included a statement that the study was conducted under institutional review board (IRB) or Ethical Review Committee approval and the women gave informed consent. The clinical review team concluded that the published literature was adequate as the primary information source to support the changes proposed in the efficacy supplement. During the course of the review, the team also requested and received more detailed information from select publications from their authors via communication with the Applicant.

Although there were slight demographic differences among the published studies from the database, these differences were not expected to alter the efficacy or safety of Mifeprex. Therefore, for the majority of the proposed efficacy changes, the clinical team assessed efficacy information from a subset of publications that evaluated a given proposed change. An independent statistical review was not needed for this review of published literature.

The clinical review team identified several major proposed clinical changes in the efficacy supplement. As these major changes are interrelated, in some cases data from a given study were relied on to provide evidence to support multiple changes. These major changes as considered by the clinical team included:

1. A proposed dosing regimen consisting of mifepristone 200 mg orally followed by the buccal administration of 800 mcg misoprostol including:
   a. Use of a revised interval between mifepristone and misoprostol from 48 hours to 24-48 hours
   b. Allowing home administration of misoprostol
   c. Use of an additional dose of misoprostol
2. Support for extending the gestation age through 70 days
3. Flexibility in follow-up visit: follow-up is needed in the range of 7-14 days after Mifeprex administration; the specific nature and exact timing of the follow-up to be agreed upon by the healthcare provider and patient.
4. Change in who can provide Mifeprex from physician to healthcare provider who prescribes

5

The following section summarizes the clinical review team's evaluations that supported the above proposed changes:

1. *Support for the proposed dose and dosing regimen of 200 mg of Mifeprex orally and 800 mcg of misoprostol buccally 24-48 hours after Mifeprex administration:* The clinical review team reviewed the submission and identified studies and review articles that evaluated over 35,000 women who were treated with efficacy in the 91-98% range. For additional details on the efficacy from these studies, please refer to Section 6 of the Clinical Review.

2. *Support for extending the gestational age to 70 days:* The Applicant submitted a number of published articles and systematic reviews that supported the proposed dose and dosing regimen. Four studies and one systematic review evaluated the exact proposed dosing regimen through 70 days gestation. These include three prospective observational studies (Winikoff et al 2012[1], Boersma et al[2], Sanhueza Smith et al[3]) and one randomized controlled trial (RCT) (Olavarrieta et al[4]) that had a primary objective of evaluating medical abortion provision by non-physicians. The systematic review by Chen and Creinin[5] covered 20 studies including over 30,000 women; all but one of the studies used the proposed regimen in gestations through 70 days (the remaining study used 400 mcg of buccal misoprostol). For those publications that provided overall success rates, these were in the range of 97-98%. Other relevant publications include the systematic review by Raymond[6] of 87 studies, which covered a variety of misoprostol doses and routes of administration used with 200 mg of mifepristone. Assessing the efficacy by misoprostol dose, the paper noted that doses ≥ 800 mcg had a success rate of 96.8%, with an ongoing pregnancy rate of 0.7%.

---

[1] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6
[2] Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care 2011; 16: 61-6
[3] Sanhueza Smith P, Pena M, Dzuba IG, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters 2015; 22: 75-82
[4] Olavarrieta CD, Ganatra B, Sorhaindo A, Karver TS, Seuc A, Villalobos A, Garcia SG, Pérez M, Bousieguez M, Sanhueza P. Nurse versus physician-provision of early medical abortion in Mexico: a randomized controlled non-inferiority trial. Bull World Health Organ 2015; 93: 249-258
[5] Chen MJ, Creinin MD. Mifepristone with Buccal Misoprostol for Medical Abortion Obstet Gynecol 2015; 126(1): 12-21
[6] Raymond EG & Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol 2012; 119: 215-9

The original dosing regimen specifies taking misoprostol 2 days after Mifeprex. This efficacy supplement proposes a more flexible time frame of 24 to 48 hours between Mifeprex and misoprostol administration. Data from a review article by Wedisinghe et al[7] evaluated different time intervals using administration of misoprostol after Mifeprex. A meta-analysis of all five studies found a non-significant odds ratio for failure for shorter vs. longer dosing intervals, but a trend for lower success if a dosing interval < 8 hours is used. Chen & Creinin's systematic review[8] of 20 studies including over 33,000 women, all but one using the proposed regimen, compared the success of dosing intervals of 24 hours with intervals ranging from 24-48 hours. The success rate in six studies that used a 24-hour interval through 63 days gestation was 94.2%, compared to the rate of 96.8% in 14 studies that used a 24-48 hour interval, and this difference was statistically significant. The clinical team concluded that the efficacy of the revised dosing regimen was not compromised by revising the dosing interval to 24-48 hours. In addition, they noted that the overall rate of ongoing pregnancies did not differ significantly by dosing interval.

3. *Administration of misoprostol after Mifeprex administration at home:* Currently, the dosing regimen specifies that misoprostol is taken in the clinic setting following Mifeprex administration. No specific publication evaluated treatment outcomes with use of misoprostol at home compared to in-clinic dosing. However, one large literature review (Raymond et al[9]) evaluated a variety of mifepristone treatment regimens with different misoprostol doses, routes of administration and dosing intervals used in gestations through 63 days. Roughly half of the studies included in this review did not require women to take misoprostol in-clinic. Rates of treatment failure and of ongoing pregnancy were very similar regardless of whether misoprostol was taken in-clinic or at another location. The clinical review team concluded that the review provided sufficient data to support labeling that misoprostol does not need to be restricted to in-clinic administration.

4. *Use of a repeat misoprostol dose, if necessary:* The Applicant submitted several published studies that supported use of a repeat misoprostol dose, when complete uterine expulsion did not occur after the initial misoprostol dose following Mifeprex. In clinical practice, the usual treatment for incomplete expulsion (retained products of conception) may include either a repeat dose of misoprostol, expectant management or a surgical procedure (suction aspiration or a dilation and curettage). Studies that specifically report the success rate of a repeat dose of misoprostol are:

---

[7] Wedisinghe L and Elsandabesee D. Flexible mifepristone and misoprostol administration interval for first-trimester medical termination. Contraception 2010; 81(4): 269-74. doi: 10.1016/j.contraception.2009.09.007. Epub Oct 29, 2009

[8] Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. MOD Study Trial Group: A randomized comparison of misoprostol 6-8 hours versus 24 hours after mifepristone for abortion. Obstet Gynecol 2004; 103: 851-859

[9] Raymond EG & Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol 2012; 119: 215-9

- Winikoff et al[10] – studied the proposed regimen through 70 days gestation; of the few women who received a second dose for an incomplete abortion at follow-up, the success rate was 91% at 57-63 days and 67% at 64-70 days.
- Chen and Creinin [11] – a systematic review of 20 studies, all but one of which used the proposed regimen up through 70 days; success of a second dose ranged from 91-100%
- Boersma et al[12] – included pregnancies through 70 days treated with the proposed regimen; five of 330 women took a second dose due to absence of bleeding 48 hours after first dose; the success rate was 80%
- Louie et al[13] – studied the proposed regimen to 63 days; in 16 women (of 863) who took a second dose of misoprostol, the success rate was 100%
- Chong et al[14] – compared the proposed regimen to a lower dose of misoprostol; the success of a second dose of misoprostol was 92% overall, but the number of women in each dose arm getting a second dose was not specified.
- Winikoff et al[15] – 14 women in the proposed regimen took a second dose of misoprostol with a success rate of 92.9%.

Using the information from the above studies and other supportive data, the clinical team concluded that the available data support the efficacy of a repeat dose of misoprostol if complete expulsion has not occurred. The relatively high complete pregnancy termination rates indicate that this option is likely to reduce the need for a surgical intervention.

5. *Requirements regarding follow-up care:* Current labeling states that women will return to the clinic 14 days after Mifeprex administration for follow-up. This provision was based on the follow up regimen in the U.S. phase 3 trial that supported the initial approval in 2000. Although the Applicant submitted several studies that evaluated flexibility in the time of follow-up, the key publication identified by the review team that addressed this issue was a 2013 article by

---

[10] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6
[11] Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. MOD Study Trial Group: A randomized comparison of misoprostol 6-8 hours versus 24 hours after mifepristone for abortion. Obstet Gynecol 2004; 103: 851-859
[12] Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care 2011; 16: 61-6
[13] Louie KS, Tsereteli T, Chong E, Ailyeva F, Rzayeva G, Winikoff B. Acceptability and feasibility of mifepristone medical abortion in the early first trimester in Azerbaijan. Eur J Contracept Reprod Health Care 2014; 19(6): 457-464
[14] Chong E, Tsereteli T, Nguyen NN, Winikoff B. A randomized controlled trial of different buccal misoprostol doses in mifepristone medical abortion. Contraception 2012; 86: 251-256
[15] Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008; 112(6): 1303-1310

8

Raymond[16]. The impact of the timing of follow-up was assessed in Raymond's systematic review of studies using various treatment regimens. While some have posited that earlier follow-up may result in a higher rate of surgical intervention (for women who would have had complete expulsion had they been given a bit more time), Raymond's analyses found no difference in failure rates for women followed less than one week after mifepristone as compared to a week or more after mifepristone. As follow-up was anticipated to not alter the efficacy of the proposing dosing regimen, this change is also discussed below in Section 7.

6. *Allowing qualified healthcare providers to use Mifeprex.*

The Applicant provided data on the efficacy of medical abortion provided by non-physician healthcare providers, including four studies with 3,200 women in randomized controlled clinical trials and 596 women in prospective cohorts. These studies included a study by Warriner et al[17] that showed efficacy of 97.4% with nurses versus 96.3% by physicians.

Conclusions: I concur with the clinical review team's assessments and conclusions and these conclusions will be reflected in labeling. The data and information reviewed constitute substantial evidence of efficacy to support the proposed dosing regimen for Mifeprex for pregnancy termination through 70 days gestation. Other proposed changes to the Mifeprex labeling, including the time interval between Mifeprex and misoprostol dosing, and use of a repeat dose, were also adequately supported by evidence. Finally, I concur with the clinical review team that the information from the published literature also supported efficacious use of Mifeprex by non-physician providers.

*Comment:* Discussion was held as to whether the original dosing regimen approved in 2000 (i.e., Mifeprex 600 mg and misoprostol 400 mcg up to 49 days gestation) should remain in labeling.                                                                              (b) (4)
                                                                                                        the clinical review team and I concur with their          (b) (4) request to remove the current regimen from the labeling. Removal of the original dosing regimen simplifies labeling, and avoids any confusion regarding instructions. Therefore, the revised labeling, and REMS materials accompanying the approval of this efficacy supplement, will include only the proposed dosing regimen and instructions. It should be noted that there are no safety or efficacy concerns about the originally approved dosing regimen that led to removing it from the labeling.

---

[16]Raymond EG, et al. First-trimester medical abortion with mifepristone 200 mg and misoprostol: a systematic review. Contraception 2013;87(1):26-37.
[17] Warriner IK, Wang D, Huong NTM, Thapa K, Tamang A, Shah I et al. Can midlevel health-care providers administer early medical abortion as safely and effectively as doctors? A randomized controlled equivalence trial in Nepal. Lancet 2011; 377: 1155-61.

Reference ID: 3909594

### 8.  Safety

The safety of the proposed dosing regimen for Mifeprex was supported by the evidence from submitted published literature and postmarketing experience. The focus of the safety analysis was on published studies that evaluated the proposed dosing regimen (Mifeprex 200 mg followed by 800 mcg misoprostol buccally 24-48 hours later), with comparison to the known safety profile of the currently approved dosing regimen.

*Exposure*: Per the Applicant's submission, the clinical review concluded that there have been approximately 2.5 million uses of Mifeprex by U.S. women since the drug's approval in 2000. The clinical review team estimated that exposure to the proposed dosing regimen for their safety analysis was based on approximately 30,000 patients (refer to Table 11 for a list of references used to evaluate safety). Such exposure volume is sufficient to characterize the safety profile of the proposed dosing regimen and other proposed changes in this efficacy supplement.

*Deaths:*  Deaths with medical abortion rarely occur and causality can be difficult to determine. Most of the publications did not specifically report any deaths with medical abortion with Mifeprex. Among the seven U.S. studies submitted to support the safety profile of Mifeprex and misoprostol, only one (Grossman, et al[18]) explicitly addressed deaths and noted that there were no deaths among 578 subjects evaluated in the study. Only one observational study (Goldstone, et al[19]) from Australia contained a report of a death after a mifepristone and misoprostol dosing regimen. In this retrospective review of 13,345 pregnancy terminations, the authors identified one death from sepsis. The article stated that the death was in an individual who failed to follow-up with her healthcare provider despite showing signs of illness. Based on this information, deaths in association with abortion are extremely rare.

Deaths reported from the postmarketing experience of Mifeprex are summarized below in the Postmarketing Experience section.

*Nonfatal serious adverse events*: The clinical review team identified key nonfatal serious adverse events (SAEs) associated with the proposed dosing regimen for Mifeprex.  These SAEs include: hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy. Section 7 of the clinical review dated March 29, 2016, provides a detailed discussion of reported rates of hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy.  The latter is not an adverse reaction because an ectopic pregnancy would exist prior to the Mifeprex regimen; it represents instead a failure to diagnose an ectopic pregnancy.  Overall rates identified by the clinical review team from the published literature are as follows:
- Hospitalization:  0.04-0.6% in U.S. studies of over 14,000 women; 0-0.7% in international studies of over 1,200 women

---

[18]Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectivenesss and acceptability of medical abortion provided thorugh telemedicine. Obstet Gynecol 2011;118:296-303.
[19]Goldstone P, Michelson J, Williamson E.  Early medical abortion using low-dose mifepristone followed by buccal misoprostol: A large Australian observational study. Med J Austral 2012; 197: 282-6.

- Serious infection/sepsis: 0-0.2% in U.S. and international studies of over 12,000 women
- Transfusion: 0.03-0.5% in U.S. studies of over 17,000 women; 0-0.1% in international studies of over 12,000 women

A study by Upadhyay et al[20] reported a 0.31% rate of major complications (including incomplete or failed abortion, hemorrhage, infection or uterine perforation that required hospitalization, surgery or transfusion) for medical abortions (dosing regimen unspecified) through 63 days; this was about double the rate reported for first trimester aspiration abortions and statistically significantly higher. However, these rates were driven by higher rates of incomplete/failed abortion; rates of hemorrhage (0.14%) and infection (0.23%) did not differ from those associated with aspirations.

Only one submitted study reported an ectopic pregnancy. This study (Winikoff et al[21]) reported one ectopic among 847 women (0.12%).

*Comment:* The proposed dosing regimen has been studied extensively in the literature using U.S. and global sites. Serious adverse events including deaths, hospitalization, serious infections, bleeding requiring transfusion and ectopic pregnancy are rarely reported. The rates of these serious adverse events are well below 1% and do not suggest a safety profile different from the original approved Mifeprex dosing regimen. Although there is less serious adverse event data on women who received Mifeprex and misoprostol between 64-70 days of gestation, the data from a U.S. study of 379 women (Winikoff et al)[22] in that gestational age is reassuring that the rates of these serious adverse events are not clinically different from that of other gestational age ranges.

In summary, based on the published literature, nonfatal serious adverse events occur with Mifeprex and misoprostol use with rates generally less than 1%. Increased gestational age (64-70 weeks) was not associated with an increased incidence of nonfatal SAEs. Other submission- specific safety issues that were evaluated including uterine rupture and angioedema/anaphylaxis are discussed in the Postmarketing Experience section below.

*Loss to follow-up:* The studies included in this safety review revealed a wide range of loss to follow-up, from 0.6% loss to follow-up in the study with telephone follow-up (Ngoc et al[23]) to 22% in the Grossman et al[24] study using telemedicine to deliver medical

---

[20]Upadhyay UD, Desai S, Lidar V, Waits TA, Grossman D, Anderson P, Taylor D. Incidence of emergency department visits and complications after abortion. Obstet Gynecol 2015;125(1):175-183.
[21]Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008;112(6):1303-1310.
[22]Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012;120:1070-6.
[23] Ngoc NTN, et al. Acceptability and feasibility of phone follow-up after early medical abortion in Vietnam: A randomized controlled trial. Obstet Gynecol 2014;123:88-95.
[24] Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectivenesss and acceptability of medical abortion provided thorugh telemedicine. Obstet Gynecol 2011;118:296-303.

abortion services.

*Comment*: Based on these data reviewed by the clinical review team, there is no literature that suggests that follow-up modality alters safety. Therefore, labeling will not be directive regarding follow-up; that will be a decision left to the patient and provider.

*Common adverse events:* The clinical review team evaluated common adverse reaction data and compared U.S. and global study locations. The comparison revealed that there were differences in the frequency of common adverse reactions, with the reporting rates considerably higher among the U.S. studies. There is no reason to anticipate regional differences in the safety profile for the same treatment regimen, so these differences likely reflect lower ascertainment or subject reporting of adverse reactions in non-U.S. studies. Regardless, inclusion of this non-U.S. data in labeling would not be appropriate, as it is unlikely to be informative to the U.S. population of users. The data to be reported in labeling is outlined in Table 1 below:

**Table 1:  Common Adverse Events (≥ 15%) in U.S. Studies of the Proposed Dosing Regimen**

| Adverse Reaction | # U.S. studies | Number of Evaluable Women | Range of frequency (%) | Upper Gestational Age of Studies Reporting Outcome |
|---|---|---|---|---|
| Nausea | 3 | 1,248 | 51-75% | 70 days |
| Weakness | 2 | 630 | 55-58% | 63 days |
| Fever/chills | 1 | 414 | 48% | 63 days |
| Vomiting | 3 | 1,248 | 37-48% | 70 days |
| Headache | 2 | 630 | 41-44% | 63 days |
| Diarrhea | 3 | 1,248 | 18-43% | 70 days |
| Dizziness | 2 | 630 | 39-41% | 63 days |

Source:  Data from Middleton[25], Winikoff[26] and Winikoff[27] as outlined in Table 2 of the CDTL review dated March 29, 2016.

One concerning adverse event is severe vaginal bleeding. Severe vaginal bleeding can result in interventions such as hospitalization and transfusion and may be associated with infection. The overall rate of bleeding across publications varied between 0.5% and 4.2%. Two publications (Sanhueza Smith et al[28] and Gatter et al[29]) evaluated clinically significant bleeding by gestational age. Although the publications reported slightly different rates, there was no trend of increased bleeding requiring intervention with Mifeprex and misoprostol use with increasing gestational age.

---

[25] Middleton T, et al.  Randomized trial of mifepristone and buccal or vaginal misoprostol for  abortion through 56 days of last menstrual period.  Contraception 2005; 72: 328-32

[26] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6

[27] Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008; 112(6): 1303-1310

[28] Sanhueza Smith P, Pena M, Dzuba IG, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters 2015;22:75-82.

[29] Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.

**Comment:** While not all of the studies reported common adverse events, those that reported did not have unexpected rates of common adverse events. These common adverse events are included in labeling in section 6.1 (Clinical Trial Experience) in the ADVERSE REACTIONS section.

*Postmarketing experience – Spontaneous reports:*

The safety profile for Mifeprex includes over 15 years of postmarketing safety data available on Mifeprex due to the reporting requirements under the REMS. The Year 3 REMS Assessment report was submitted by the Applicant in June, 2015. The ⬛⬛⬛⬛ (b) (6) ⬛⬛⬛⬛ (b) (6) ⬛⬛⬛⬛ provided a comprehensive review of adverse event reports submitted from 2000 through November 17, 2015. Findings include:

- No Clostridial septic deaths reported in the U.S. since 2009, and none worldwide since 2010.
- The postmarketing rates of hospitalization, severe infection, blood loss requiring transfusion and ectopic pregnancy reported from publications and remain stable and relatively low.

*Submission-specific safety issues:*

- <u>Anaphylaxis/angioedema:</u> The ⬛⬛⬛⬛ (b) (6) ⬛⬛⬛⬛ (⬛ (b) (6) ⬛) identified a safety signal of anaphylaxis and angioedema with mifepristone administration. This signal was based on a comprehensive review of adverse event reports submitted from 2000 through November 17, 2015. A FAERS search retrieved one case of anaphylaxis and six cases of angioedema with mifepristone administration. Six of the seven cases were seen in women using mifepristone for termination of pregnancy. Six of the seven cases noted some type of medical intervention, such as treatment with an antihistamine, a histamine H2 antagonist, a corticosteroid, or a combination of various medications. Hospitalization was noted in three of the seven total cases; all three hospitalization cases occurred in patients who experienced angioedema. There were no additional cases of anaphylaxis or angioedema identified in the literature.

  **Comment:** ⬛⬛⬛⬛ (b) (6) ⬛⬛⬛⬛ and the clinical review team recommended that anaphylaxis and angioedema be described in the Contraindications and Adverse Reactions sections of labeling. These labeling sections were discussed with the Applicant and labeling was revised for those sections to describe these serious adverse events.

- <u>Uterine rupture:</u> As discussed in the clinical review, the potential risk of uterine rupture was considered because the current labeling for misoprostol includes a Boxed Warning against the use of misoprostol for gestations more than 8 weeks due to the risk of uterine rupture. Although misoprostol is used alone for various obstetric indications, including induction of labor at term, it was important to consider whether labeling about this potential risk is warranted for Mifeprex. Both the clinical reviewer and the ⬛⬛⬛⬛ (b) (6) ⬛⬛⬛⬛ (⬛ (b) (6) ⬛) reviewed the literature and ⬛ (b) (6) ⬛ searched FAERS for adverse event reports.

13

App. 22

Published literature reported three case reports[30,31,32] of uterine rupture with mifepristone/misoprostol treatment in the first trimester. Of these three reports, two patients had a risk factor for uterine rupture (prior uterine surgery). The third case was in a patient who received more than two doses of misoprostol. After consideration, the clinical review team decided that labeling should include information about this event. The FAERS search did not identify any reports of uterine rupture with use of mifepristone alone.  Of 80 reports, 77 cited use of misoprostol alone, and three of mifepristone and misoprostol.  Only two reports of uterine rupture in the first trimester were identified, both using misoprostol alone; one entailed an unspecified dose and route of misoprostol at 5 weeks gestation, and one involved vaginal administration of 800 mcg misoprostol at 8 weeks gestation for cervical preparation prior to a surgical abortion in a woman with a prior uterine scar.

Based on the available safety reports of uterine rupture, the review team from ⬚ (b) (6) and clinical review team concluded that these data demonstrated that uterine rupture with Mifeprex and misoprostol in the first ten weeks (70 days) of gestation is exceedingly uncommon, and occurs most often in the face of a risk factor (previous uterine surgery).

***Comment:*** I agree with the clinical review team and the ⬚ (b) (6) team that the risk of uterine rupture with first trimester use of mifepristone and misoprostol appears to be extremely rare, and most often associated with a prior uterine scar, a known risk factor for uterine rupture.  Labeling of these reports is included in section 2.3 of the  DOSAGE AND ADMINISTRATION and section 6.2 of the ADVERSE REACTIONS of labeling to provide additional information to healthcare providers, but no restriction of use is needed based upon this extremely rare adverse reaction.

The clinical review team also evaluated the safety for each of the following major changes proposed in this efficacy supplement:
1. Changing the dosing interval between Mifeprex and misoprostol from 48 hours to 24-48 hours
2. Home administration of misoprostol
3. Use of a repeat dose of misoprostol
4. Change in the follow-up timeframe and method of follow-up
5. Allowing providers other than physicians to provide Mifeprex

---

[30] Khan S et al. Uterine rupture at 8 weeks' gestation following 600 µg of oral misoprostol for management of delayed miscarriage. Journal of Obstet Gynaecol 2007; 27: 869-870
[31] Bika O, Huned D, Jha S, Selby K Uterine rupture following termination of pregnancy in a scarred uterus J Obstet Gynaecol 2014; 34(2): 198-9. doi: 10.3109/01443615.2013.841132
[32] Willmott F, et al. Rupture of uterus in the first trimester during medical termination of pregnancy for exomphalos using mifepristone/misoprostol. BJOG 2008;15:575-77

14

To evaluate each of these changes, the reviewers evaluated the adverse event information regarding:

- *Changing the timing interval between Mifeprex and misoprostol and change in the gestational age to 70 days:* Support for the 24-48 hour interval and use up through 70 days was primarily based on a large systematic review by Shaw et al[33]. This review evaluated studies looking at different follow-up modalities and demonstrated that there are a variety of acceptable alternatives to in-clinic follow-up that can identify cases in which there is need for additional intervention. In addition, the systematic review did not identify any significant difference in adverse events with different time intervals. Based on these findings, labeling will not be directive regarding specific details of how follow-up should be performed; this will be a decision between the patient and her healthcare provider.

- *Home administration of misoprostol:* The Applicant supplied several published studies that supported this change including Gatter et al[34] and Ireland et al[35]. These studies reported on large numbers of women in the U.S. who took misoprostol at home. The authors showed that home administration of misoprostol, as part of the proposed regimen, is associated with exceedingly low rates of serious adverse events, and with rates of common adverse events comparable to those in the studies of clinic administration of misoprostol that supported the initial approval in 2000. Given that information is available on approximately 45,000 women from the published literature, half of which incorporated home use of misoprostol, there is no clinical reason to restrict the location in which misoprostol may be taken. Given the fact that the onset of cramping and bleeding occurs rapidly (i.e., generally within 2 hours) after misoprostol dosing, allowing dosing at home increases the chance that the woman will be in an appropriate and safe location when the process begins.

- *Use of a repeat dose of misoprostol:* Safety reporting from studies that evaluated a repeat dose of misoprostol did not specifically assess the subset of women who received a second dose, but no unexpected findings were identified. One randomized controlled trial (Coyaji et al[36]) conducted in 300 women seeking medical abortion in India looked at a single misoprostol dose as compared to two misoprostol doses. Although there was no difference in the complete pregnancy termination rate in women who received a second misoprostol dose compared to those who did not, the repeat misoprostol dose reduced the need for surgical intervention. This study was reassuring in that there was no significant difference in the adverse events observed—similar percentages of women experienced

---

[33] Shaw KA, Topp NJ, Shaw JG, Blumenthal PB. Mifepristone-misoprostol dosing interval and effect on induction abortion times. Obstet Gynecol 2013;121(6):1335-1347.
[34] Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[35] Ireland LD, Gatter M, Chen AY. Medical compared with surgical abortion for effective pregnancy termination in the first trimester. Obstet Gynecol 2015;126:22-8.
[36] Coyaji K, Krishna U, Ambardekar S, Bracken H, Raote V, Mandlekar A, Winikoff B. Are two doses of misoprostol after mifepristone for early abortion better than one? BJOG 2007;114:271-278.

cramping (87% in the single dose group, 89% in the repeat dose group), nausea (both groups 1%), vomiting (both groups 0%), and diarrhea (0% in the single dose group versus 2% in the repeat dose group). A supportive systematic review by Gallo et al[37] also provided safety information on subjects who received repeat misoprostol. In this review, the only side effects discussed in the trials were diarrhea, which was more common on those groups receiving misoprostol orally than in those receiving it exclusively vaginally (26-27% versus 9%). Rash was reported <1%. Based on these findings, labeling will be changed because the misoprostol dose does not need to be restricted to in clinic administration to assure safe pregnancy termination using the proposed dosing regimen. Given the onset of bleeding and cramping after misoprostol, allowing home administration increases the likelihood that a woman will be in an appropriate and safe location when the pregnancy termination process begins.

- *Change in the follow-up timeframe and method of follow-up:* The Applicant submitted several articles that described different methodologies in follow-up including phone calls and standardized instructions. The clinical reviewers evaluated a study in Scotland by Cameron et al[38] that evaluated self-assessment as compared to standard follow-up methodologies (clinic visit or phone call). Most of the women chose self-assessment over an in-clinic visit or phone call, and there were no significant differences in adverse outcomes between women who underwent self-assessment of health compared to those who had a clinic visit or phone call. Among women with an ongoing pregnancy after Mifeprex and misoprostol, the majority self-identified and presented within two-weeks for care. Based on this information and the other data from the Raymond systematic article[39] that did not identify a difference in failure rate for earlier (less than one week) as compared to one week or greater of follow-up, sufficient support was provided to use a broadened window of 7 to 14 days for follow-up. This revised follow-up time frame will be included in labeling.

- *Allowing providers other than physicians to provide Mifeprex*: The current Prescriber's Agreement in the REMS specifies that "…Mifeprex must be provided by or under the supervision of a physician who meets the following qualifications…" In addition, current labeling states that Mifeprex will be supplied only to licensed physicians who sign and return a Prescriber's Agreement. However, labeling states that other healthcare providers, acting under the supervision of a qualified physician, may also provide Mifeprex to patients. Several published studies submitted by the Applicant indicate that health care providers such as nurse practitioners, nurse midwives, and physician assistants are

---

[37] Gallo MF, Cahill S, Castelman L, Mitchell EMH. A systematic review of more than one dose of misoprostol after mifepristone for abortion up to 10 weeks gestation. Contraception 2006;74:36-41.
[38] Cameron ST, Glasier A, Johnstone A, Dewart H, Campbell A. Can women determine the success of early medical termination of pregnancy themselves? Contraception 2015;91:6-11.
[39] Raymond EG & Grimes DA.  The comparative safety of legal induced abortion and childbirth in the United States.  Obstet Gynecol 2012; 119: 215-9

currently providing abortion services. One of these studies (Kopp Kallner et al[40] ) was a randomized controlled trial of 1,068 women in Sweden who were randomized to receive medical abortion care from two nurse midwives experienced in medical terminations and trained in early pregnancy ultrasound versus a group of 34 physicians with varying training and experience. Success rates were ≥ 96% regardless of gestational age. The nurse midwife group had few complications, though this was not statistically significant (4.1% for nurse midwives, versus 6.1% for doctors, p=0.14). No serious complications were reported and no blood transfusions were administered in the study. Based on this and other supportive studies, the information supports the efficacy and safety of allowing healthcare providers other than physicians can effectively and safely provide abortion services, provided that they meet the requirements for certification described in the REMS. The clinical team also felt that the term "healthcare provider who prescribes" would be the appropriate terminology as prescribing ability is a critical factor in dispensing Mifeprex.

The clinical review team concluded that the evidence demonstrated acceptable safety for each of the above proposed changes, and I concur with their conclusion.  The proposed dosing regimen has a similar safety profile as the original regimen approved in 2000. Adverse outcomes of interest, such as deaths, serious infection, transfusions, ectopic pregnancies and uterine rupture, remain rare, and are not necessarily attributable to Mifeprex use.  Overall, the rate of deaths and nonfatal serious adverse events are acceptably low, and data for the proposed regimen do not suggest a safety profile that deviates from that of the originally approved regimen  No association between adverse outcomes and increasing gestational age was identified. Finally, the available information supports the safety of the other proposed changes, including increasing the flexibility of the time interval between Mifeprex and misoprostol, at home use of misoprostol, use of a repeat dose of misoprostol, change in the follow-up timeframe and allowing health care providers other than physicians to prescribe and dispense Mifeprex were acceptable.

## 9.  Advisory Committee Meeting

Mifeprex is not a new molecular entity requiring discussion before an advisory committee. In addition, an advisory committee was not necessary as the application did not raise complex scientific or other issues that would warrant holding an AC before approval.

## 10. Pediatrics

This efficacy supplement triggered requirements under the Pediatric Research Equity Act (PREA).  The Agency granted a partial PREA waiver for pre-menarcheal females ages birth to 12 years because it would be impossible to conduct studies in this pediatric population, as pregnancy does not exist in premenarcheal females.

---

[40] Kopp Kallner H, Fiala C, Stephansson O, Gemzell-Danielsson K. Home self-administration of vaginal misoprostol for medical abortion at 50-63 days compared with gestation of below 50 days. Human Reprod 2010;25(5):1153-1157.

The Applicant fulfilled the remaining PREA requirement in postmenarcheal females by submitting published studies of Mifeprex for pregnancy termination in postmenarcheal females less than 17 years old. Efficacy and safety information in these adolescents was based on a U.S. study in 322 postmenarcheal adolescents (Gatter et al[41]). Of the 322 adolescents, 106 of these adolescents were under 16; see Table 2 below:

**Table 2: Age and Number of Adolescents Undergoing Medical Abortion (Gatter et al[42])**

| Age of Subject | Number of Subjects evaluated |
|---|---|
| 11 | 1 |
| 12 | 1 |
| 13 | 2 |
| 14 | 20 |
| 15 | 82 |
| 16 | 216 |

Source: Refer to Table 17 of the Medical Officer's review dated March 29, 2016

The Gatter et al[43] study reported that postmenarchal females less than 18 years old had a 98.7% pregnancy termination rate as compared to females aged 18-24, who had a rate of 98.1%. This article reported that loss to follow-up was slightly higher in those less than 18 years old, however, age did not adversely impact efficacy outcomes.

One issue was whether adolescents would comply with at home use of misoprostol. The Gatter[44] et al study incorporated at home use of misoprostol into the Mifeprex dose regimen given to all females, including postmenarchal females less than 18 years old. The overall efficacy in adolescents was similar to that of all older women. This information supports at home administration of misoprostol in postmenarchal females under 17.

Two other published studies provided additional efficacy on Mifeprex use by adolescents for pregnancy termination:

- Phelps et al[45] evaluated data from 28 adolescents aged 14 to 17, at ≤ 56 days gestation, using Mifeprex 200 mg followed 48 hours later by misoprostol 800 mcg vaginally. In this study, 100% of subjects had a complete pregnancy termination, with five not requiring misoprostol.

---

[41]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[42] Ibid.
[43]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[44]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[45]Phelps RH, et al. Mifepristone abortion in minors. Contraception 2001;64:339-343.

- Niinimaki et al[46] used data from a Finnish Registry from 2000-2006. An analysis of efficacy between adolescents under age 18 compared to the women ≥ age 18 indicated that the adolescent group had a lower rate of incomplete abortions as compared to adults. And efficacy outcomes in adolescents were similar to those of adult women.

The safety of Mifeprex in postmenarcheal adolescents was primarily supported by adverse event information from the Gatter et al[47] study.                                 (b) (6), (b) (4)



Supportive data from a Finnish registry (Niinimaki et al  ) from 3024 adolescent females under 18 years of age reported that, compared to adult women, the risks of hemorrhage (adjusted odds ratio 0.87 [95% confidence interval: 0.77 to 0.99]), incomplete abortion (0.69, [95% confidence interval: 0.59 to 0.82]), and surgical evacuation (0.78, [95% confidence interval: 0.67 to 0.90]) were lower in the adolescent cohort. In the Finnish registry study, a majority of adolescents and adults received both Mifeprex and misoprostol. Safety findings from the Gatter et al and Niinimaki et al studies are reassuring and indicate that the safety profile of Mifeprex is similar between postmenarcheal adolescents and adult women.

Additional details from this article and other published data on Mifeprex use in adolescents (females under 17) are described in the clinical review (Refer to the Medical Officer's review dated March 29, 2016).

concurred that the efficacy and safety data in postmenarcheal adolescents less than 17 years old was sufficient to support the use of Mifeprex in this pediatric population and to fulfill the PREA pediatric study requirement. The revised Mifeprex labeling will state that that efficacy and safety are similar to adult women  in the Pediatric Use section (8.4).

## 11. Other Relevant Regulatory Issues

(b) (6)

reviewed the Medication Guide in conjunction with the (b) (6)
( (b) (6) Both (b) (6) and (b) (6) found the Medication Guide to be acceptable with recommended changes (See review dated March 29, 2016). The Division considered all of the recommendations from (b) (6) in revising and updating the text in

---

[46] Niinimaki M, et al. Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study. BJM 2011;342: d2111.
[47] Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[48] Niinimaki M, et al. Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study. BJM 2011;342: d2111.

App. 28

Reference ID: 3909594

the Medication Guide and incorporated appropriate changes into the final agreed upon Medication Guide.



     reviewed the Prescribing Information (PI) in addition to the joint review with     of the Medication Guide in conjunction with     After review, provided recommended changes (See     review dated March 29, 2016). The Division considered all of the recommendations from     in revising and updating the text in the PI and incorporated appropriate changes into the final label.



    in the     ) reviewed the proposed modifications to the REMS.  The     review reflected agreement with the Applicant's proposed REMS changes which include:

- Removal of the term "under Federal law" from the Prescriber's Agreement.
- Replacement of the word "physician" with a broader term to describe appropriate healthcare professionals who may order, prescribe and administer Mifeprex.     believes that the Applicant's proposed terminology of "     is too broad and that a more appropriate description is "healthcare provider who prescribes," which limits acceptable healthcare providers to those who are licensed in their state to prescribe medications.
- Removal of the Medication Guide from the REMS.  The Medication Guide remains an important education tool for patients.  It will still be dispensed to each patient in accordance with 21 CFR part 208.  As described in the Medication Guide Guidance, a Medication Guide is not necessary to ensure that the benefits outweigh the risks of Mifeprex.
- Modification of Element to Assure Safe Use (ETASU) A, the Prescriber's Agreement.     recommends changing the name of the document to the Prescriber's Agreement Form to be consistent with other REMS programs. References to "physician" should be changed to "healthcare provider who prescribes."
-     recommends removing the Patient Agreement from the REMS for a number of reasons:
  1. The established safety profile over 15 years of experience with Mifeprex is well-characterized, stable, and known serious risks occur rarely
  2. The Medication Guide contains the same risk information addressed in the Patient Agreement, and will still be provided to patients under 21 CFR part 208
  3. The Prescriber's Agreement Form will continue to require providers to explain the treatment, its effects and risks associated with Mifeprex and to answer any questions that a patient may have
  4. Established clinical practice provides for counseling, informing the patient about follow-up, when to contact the provider/clinic, answering questions and obtaining signed informed consent before treatment. FDA has removed REMS

requirements in other programs based on the integration of the REMS safe use condition into clinical practice.

Other revisions to the REMS document will be made for consistency with changes described above and to reflect current FDA thinking and practice regarding format, language and flow in REMS documents. These changes include modification of the Mifeprex REMS goal, changes in requirements to certify prescribers (removal of the requirement to obtain a Patient Agreement) and other minor edits.

In summary, the overall _(b) (6)_ recommendation for the REMS modification for this efficacy supplement was approval (Refer to _(b) (6)_ review dated March 29, 2016).

## 12. Labeling



Carton and container labeling was reviewed by the _(b) (6)_ ( _(b) (6)_ the _(b) (6)_ ( _(b) (6)_ and the _(b) (6)_ ( _(b) (6)_ _(b) (6)_ Their comments were conveyed to the Applicant as appropriate.

The label was submitted in the format prescribed by the PLR. Although the supplement was submitted prior to when it would otherwise have been required to comply with the PLLR requirements, the review team believed it would be of value to harmonize with this labeling standard to the extent possible.

Specific issues discussed during labeling negotiations included the selection of studies for inclusion in Section 6.1 (Clinical Trial Experience in the ADVERSE REACTIONS section) and 14 (CLINICAL STUDIES section). Only studies that evaluated the specific proposed regimen were included in these sections. For the Adverse Reactions section, examination of the common adverse reaction data by U.S. compared to non-U.S. study location revealed that there were large differences in the frequency of common adverse reactions, with the reporting rate considerably higher among the U.S. studies. This may reflect differences in ascertainment or subject reporting of adverse reactions in non-U.S. studies. Regardless, inclusion of this non-U.S. data would not be appropriate, as it is unlikely to be informative to the U.S. population of users. In the case of serious adverse reactions, the reported frequency was quite similar regardless of study location; for this reason, serious adverse reaction information from global studies is reported.
Agreement on labeling was reached on March 29, 2016.

App. 30

<u>Post-Marketing Requirement/Commitment and Risk Evaluation and Mitigation Strategies</u>
<u>(REMS)</u>:

*Postmarketing Requirements/Postmarketing Commitments*: None.

*Risk Evaluation and Mitigation Strategies (REMS)*: The Applicant proposed a REMS modification for the Mifeprex REMS program with the submission of this efficacy supplement. The review teams from the ███ (b) (6) evaluated the current Mifeprex REMS program and the proposed REMS modifications to determine whether each Mifeprex REMS element remains necessary to ensure that the benefits of Mifeprex outweigh the risks. Factors that impacted the decision included findings from two REMS assessments (the more recent REMS assessment review was completed in October 2015), an unchanged safety profile, and published literature that documented adequate safeguards in clinical practice with the use of Mifeprex in a regimen with misoprostol.

The teams determined that the following REMS modifications were warranted:

1. Revisions to the Prescriber Agreement Form to reflect the new dosing regimen and to reflect current REMS formatting and language standards
2. Removal of the Medication Guide as a REMS element, as distribution of the Medication Guide is required under 21 CFR 208
3. Removal of the Patient Agreement as a Documentation of Safe Use Condition (ETASU D)
4. Updating of the REMS goals to reflect the above 3 changes.
5. Removal of the phrase "Under Federal law" from the Prescriber's Agreement
6. Replacing the term "licensed physician" with "healthcare provider who prescribes"

The above modifications to the Mifeprex REMS program were discussed with the ███ (b) (6)
 (b) (6)  on January 15, 2016, as per ███ (b) (6)
.

The ███ (b) (6) concurred with conforming changes to the Prescriber's Agreement to reflect the new dosing regimen, and with removal of the Medication Guide from the REMS. The Medication Guide would remain a part of labeling to inform patients about the risks associated with Mifeprex use. The ███ (b) (6) also concurred with revisions to the REMS goals to reflect these changes.

The ███ (b) (6) concurred with the removal of the term "under Federal law". A rationale for the original inclusion of the phrase "Under Federal law" cannot be discerned from available historical documents, nor is it consistent with REMS materials for other products. All the conditions of approval, including the REMS materials, are under Federal law; therefore, the phrase is unnecessary and it was decided that the phrase be removed from the Prescriber's Agreement.

22

App. 31

The (b) (6) concurred with use of the term "healthcare providers who prescribe." To support a change in the REMS that would allow qualified healthcare providers other than physicians to prescribe Mifeprex through the Mifeprex REMS program, the Applicant provided information from over 3,200 women in randomized controlled trials and 596 women in prospective cohort studies comparing medical abortion care by physicians versus other providers (nurses or nurse midwives). These studies were conducted in a variety of settings (international, urban, rural, and low-resource). No differences in serious adverse events, ongoing pregnancy or incomplete abortion were identified between the groups. Given that providers other than physicians are providing family planning and abortion care under supervision and that the approved labeling and REMS program stipulate that prescribers must be able to refer patients for additional care, including surgical management, allowing these prescribers to participate in the Mifeprex REMS program is acceptable.

The (b) (6) also concurred with the teams' recommendation to remove the Patient Agreement (ETASU D) from the REMS although some (b) (6) members commented that additional support for the review team's rationale for this modification was needed. The review team's rationale for this change was:

APPEARS THIS WAY ON ORIGINAL

- The safety profile of Mifeprex is well-characterized over 15 years of experience, with known risks occurring rarely; the safety profile has not changed over the period of surveillance.
- Established clinical practice includes patient counseling and Informed Consent, and, more specifically with Mifeprex, includes counseling on all options for termination of pregnancy, access to pain management and emergency services if needed.
- Medical abortion with Mifeprex is provided by a well-established group of organizations and their associated providers who are knowledgeable in this area of women's health. Their documents and guidelines cover all the safety information that also appears in the Patient Agreement.
- ETASUs A and C remain in place: The Prescriber's Agreement under ETASU A requires that providers "explain the procedure, follow-up, and risks to each patient and give her an opportunity to discuss them." The REMS will continue to require that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals. This ensures that Mifeprex can only be dispensed under the direct supervision of a certified prescriber.
- Labeling mitigates risk: The Medication Guide, which will remain a part of labeling, contains the same risk information covered under the Patient Agreement.

The Mifeprex REMS program will have a modified ETASU REMS that will continue to ensure that Mifeprex can only be prescribed by certified prescribers and be dispensed to patients in certain healthcare settings, specifically, clinics, medical offices and hospitals. The Medication Guide will continue to be distributed to patients required under 21 CFR part 208. As required for all ETASU REMS, ongoing assessments of the Mifeprex REMS program will continue to ensure that the modified Mifeprex REMS program is meeting its goals.

## 13. Decision/Action/Risk Benefit Assessment

Decision:

All regulatory and scientific requirements have been adequately addressed in this efficacy supplement. Review teams involved in this supplement have recommended approval of the supplement from their disciplines' perspective. The submitted efficacy and safety information supported approval of the proposed dosing regimen through 70 days gestation, and other changes discussed in this summary memo. This supplement will receive an Approval action.

Benefit Risk Assessment:

This efficacy supplement provided substantial evidence of efficacy for the proposed dosing regimen through 70 days gestation. The efficacy findings were similar to those that led to the approval of the original dosing regimen in 2000. In addition, the submitted published literature supported other changes sought in this efficacy supplement that will

24

be reflected in labeling: 1) a more flexible time interval of 24 to 48 hours between Mifeprex and misoprostol administration, 2) the option of at home administration of misoprostol, 3) the option of repeat misoprostol dosing, if clinically indicated, 4) flexibility in the follow–up time frame of 7 to 14 days, and 5) permitting qualified healthcare providers other than physicians to prescribe Mifeprex.

The safety findings of the proposed dosing regimen were acceptable and were similar to those seen with the original dosing regimen approved in 2000.

After review of the REMS modifications proposed by the Sponsor, I concur with the clinical team and _____ (b) (6) recommendations that:

1.      The Medication Guide can be removed from the Mifeprex REMS program. The Medication Guide requirements under 21 CFR part 208 require the Medication Guide to be distributed to patients. Mifeprex will only be dispensed by a healthcare professional who will be knowledgeable and able to provide the patient instructions on appropriate use of the drug, including what potential side effects may occur or follow-up that may be required as appropriate, and who will answer any questions the patient may have. In that setting, the Medication Guide will already be a required available tool for counseling. Therefore, given the existing requirements under 21 CFR part 208, I concur that there is no reason for the Medication Guide to specifically be a part of the REMS.

2.      The Prescriber Agreement Form (ETASU A) as revised reflects current FDA format and content to conform to current REMS programs and reflect the labeling changes that will be approved in this supplement. I concur that the changes are acceptable.

3.      Revision of the Mifeprex REMS goals (ETASU C) will adequately mitigate the risk of serious complications by requiring certification of healthcare providers who prescribe and ensuring the Mifeprex is dispensed only in certain healthcare settings by or under the supervision of a certified prescriber.

4.      Removal of the Patient Agreement Form (ETASU D): I concur with the clinical review team that the Patient Agreement Form, which requires a patient's signature, does not add to safe use conditions for the patient for this REMS and is a burden for patients. It is standard of care for patients undergoing pregnancy termination to undergo extensive counseling and informed consent. The Patient Agreement Form contains duplicative information already provided by each healthcare provider or clinic. I believe that it is much more critical for the healthcare provider who orders or prescribes Mifeprex to provide and discuss informed consent derived from their own practice so that care can be individualized for the patient.

I support that the Mifeprex REMS with ETASUs A and C remain in place to support conditions critical to the use of the drug. Therefore, the implementation system and timetable for assessments should continue.

I also agree with the clinical review team that the reporting requirements should only be required for deaths. It is important that the Agency be informed of any deaths with Mifeprex to monitor new safety signals or trends. However, after 15 years of reporting serious adverse events, the safety profile for Mifeprex is essentially unchanged. Therefore, I agree that reporting of labeled serious adverse events other than deaths can be collected in the periodic safety update reports and annual reports to the Agency.

In summary, I believe that the benefit-risk profile for Mifeprex continues to be favorable and with the agreed-to labeling changes and REMS modifications, the Mifeprex REMS program will continue to assure safe use. Therefore, I support approval of this efficacy supplement and REMS modifications.

<u>Addendum:</u>

On March 28, 2016, Dr. Janet Woodcock, the Director, Center for Drug Evaluation and Research, asked ████████████ (b) (6) and the ████████████ (b) (6) ████████████ to continue to include a Patient Agreement Form in the REMS for Mifeprex (see March 28, 2016 Memorandum from Janet Woodcock, MD, Director, Center for Drug Evaluation and Research, through the ████████████ (b) (6) ████████████ (6).

Therefore, the Patient Agreement Form will be retained and other changes will be made in the REMS to reflect that it is being retained.

-------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

-------------------------------------------------------------------------------

/s/

-------------------------------------------------

(b) (6)

03/29/2016

**EXHIBIT 3**

**FDA Center for Drug Evaluation and Research, Summary Review of sNDA Application Number: 020687Orig1s025 (Jan. 3, 2023) ("2023 Summary Review")**

# CENTER FOR DRUG EVALUATION AND RESEARCH

## Approval Package for:

### *APPLICATION NUMBER:*

### 020687Orig1s025

*Trade Name:*      Mifeprex Tablets 200 mg

*Generic or Proper Name:*      Mifepristone

*Sponsor:*      Danco Laboratories, LLC

*Approval Date:*      January 3, 2023

*Indication:*      For modification to the approved single, shared system (SSS) risk evaluation and mitigation strategy (REMS) for mifepristone 200 mg tablets, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation, as well as corresponding labeling revisions to the prescribing information and the Medication Guide to align with the modification to the Mifepristone REMS Program.

# CENTER FOR DRUG EVALUATION AND RESEARCH

# 020687Orig1s025

## CONTENTS

| Reviews / Information Included in this NDA Review. |
|:---:|

| | |
|---|:---:|
| **Approval Letter** | **X** |
| **Other Action Letters** | |
| **Labeling** | **X** |
| **REMS** | **X** |
| **Summary Review** | **X** |
| **Officer/Employee List** | |
| **Office Director Memo** | |
| **Cross Discipline Team Leader Review** | |
| **Clinical Review(s)** | |
| **Product Quality Review(s)** | |
| **Non-Clinical Review(s)** | |
| **Statistical Review(s)** | |
| **Clinical Microbiology / Virology Review(s)** | |
| **Clinical Pharmacology Review(s)** | |
| **Other Reviews** | **X** |
| **Risk Assessment and Risk Mitigation Review(s)** | **X** |
| **Proprietary Name Review(s)** | |
| **Administrative/Correspondence Document(s)** | **X** |

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

## 020687Orig1s025

## <u>APPROVAL LETTER</u>



NDA 020687/S-025

**SUPPLEMENT APPROVAL**

Danco Laboratories, LLC

(b) (4), (b) (6)

P.O. Box 4816
New York, NY 10185

Dear        (b) (4), (b) (6)        :

Please refer to your supplemental new drug application (sNDA) dated and received
June 22, 2022, and your amendments, submitted under section 505(b) of the Federal
Food, Drug, and Cosmetic Act (FDCA) for Mifeprex (mifepristone) Tablets, 200 mg.

This Prior Approval sNDA provides for modification to the approved single, shared
system (SSS) risk evaluation and mitigation strategy (REMS) for mifepristone 200 mg
tablets, in a regimen with misoprostol, for the medical termination of intrauterine
pregnancy through 70 days gestation, as well as corresponding labeling revisions to the
prescribing information and the Medication Guide to align with the modification to the
Mifepristone REMS Program. This SSS REMS is known as the Mifepristone REMS
Program.

## APPROVAL & LABELING

We have completed our review of the supplemental application, as amended.  It is
approved effective the date of this letter.

## CONTENT OF LABELING

As soon as possible, but no later than 14 days from the date of this letter, submit the
content of labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format using
the FDA automated drug registration and listing system (eLIST), as described at
FDA.gov.[1] Content of labeling must be identical to the enclosed labeling (text for the
Prescribing Information and Medication Guide), with the addition of any labeling
changes in pending "Changes Being Effected" (CBE) supplements, as well as annual
reportable changes not included in the enclosed labeling.

---

[1] http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm

App. 41

Information on submitting SPL files using eList may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As*.[2]

The SPL will be accessible from publicly available labeling repositories.

Also within 14 days, amend all pending supplemental applications that include labeling changes for this NDA, including CBE supplements for which FDA has not yet issued an action letter, with the content of labeling [21 CFR 314.50(l)(1)(i)] in Microsoft Word format, that includes the changes approved in this supplemental application, as well as annual reportable changes. To facilitate review of your submission(s), provide a highlighted or marked-up copy that shows all changes, as well as a clean Microsoft Word version. The marked-up copy should provide appropriate annotations, including supplement number(s) and annual report date(s).

We request that the labeling approved today be available on your website within 10 days of receipt of this letter.

**REQUIRED PEDIATRIC ASSESSMENTS**

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients (which includes new salts and new fixed combinations), new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication in pediatric patients unless this requirement is waived, deferred, or inapplicable.

Because none of these criteria apply to your application, you are exempt from this requirement.

**RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS**

The Mifepristone REMS Program, of which Mifeprex is a member, was originally approved on April 11, 2019, and the most recent REMS modification was approved on May 14, 2021. The Mifepristone REMS Program consists of elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS.

In order to ensure the benefits of Mifeprex outweigh its risks and to minimize burden on the healthcare delivery system of complying with the REMS, we determined that you were required to make the REMS modifications outlined in our REMS Modification

---

[2] We update guidances periodically. For the most recent version of a guidance, check the FDA Guidance Documents Database https://www.fda.gov/RegulatoryInformation/Guidances/default.htm.

Reference ID: 5103833

Notification letter dated December 16, 2021. In addition the following modifications were communicated during the course of the review:

- Revisions to the REMS goal to align with the updated REMS requirements.

- Replacing serial number with recording of NDC and lot number of mifepristone dispensed.

- Additional edits for clarification and consistency in the REMS Document and REMS materials (*Prescriber Agreement Forms, Patient Agreement Form,* and *Pharmacy Agreement Forms*).

Your proposed modified REMS, received on June 22, 2022, amended and appended to this letter, is approved. The modified REMS consists of the elements to assure safe use, implementation system, and a timetable for submission of assessments of the REMS.

The modification of the approved REMS must be fully implemented within 120 calendar days of this letter.

This shared system REMS, known as the Mifepristone REMS Program, currently includes those products listed on the FDA REMS website[3].

Other products may be added in the future if additional NDAs or ANDAs are approved.

The timetable for submission of assessments of the REMS must be revised to one year from the date of the approval of the modified SSS REMS (1/3/2023) and annually thereafter.

The revised REMS assessment plan must include, but is not limited to, the following:

**Program Implementation and Operations**

1. REMS Certification Statistics
   a. Prescribers
      i. Number of certified prescribers who have certified with the Sponsor's distributor(s) and number who have submitted *Prescriber Agreement Forms* to Certified Pharmacies
      ii. Number and percentage of newly certified prescribers
      iii. Number and percentage of active certified prescribers (i.e., who ordered mifepristone or submitted a prescription during the reporting period)

   b. Pharmacies

---

[3] https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm

Reference ID: 5103833

App. 43

       i. Number of certified pharmacies
      ii. Number and percentage of newly certified pharmacies
    iii. Number and percentage of active certified pharmacies (i.e.,  that dispensed mifepristone during the reporting period)
  c. Wholesalers/Distributors
       i. Number of authorized wholesalers/distributors
      ii. Number and percentage of newly authorized wholesalers/distributors
    iii. Number and percentage of active authorized wholesalers/distributors (i.e. that shipped mifepristone during the reporting period)

2. Utilization Data
  a. Total number of tablets shipped by wholesalers/distributors, stratified by Certified Prescriber or Certified Pharmacy location
  b. Number of prescriptions dispensed from pharmacies

3. REMS Compliance Data
  a. Audits: Summary of audit activities for each stakeholder (i.e., certified pharmacies and wholesalers/distributors) including but not limited to:
       i. A copy of the final audit plan for each stakeholder type (provide for the current reporting period)
      ii. The number of audits expected, and the number of audits performed
    iii. The number and type of deficiencies noted
    iv. For those with deficiencies noted, report the corrective and preventive actions (CAPAs) required, if any, to address the deficiencies, including the status (e.g., completed, not completed, in progress) (provide for the current reporting period)
     v. For any stakeholders that did not complete the CAPA within the timeframe specified in the audit plan, describe actions taken (provide for the current reporting period)
    vi. A summary report of all resulting changes to processes and procedures necessary to ensure compliance with the REMS requirements (provide for the current reporting period)
  b. A summary report of non-compliance, associated corrective action plans (CAPAs), and the status of CAPAs including but not limited to:
       i. A copy of the final non-compliance plans for Pharmacies and Distributors (provide for the current reporting period)
      ii. For each instance of noncompliance below (iii-v), report the following information (provide for the current reporting period):
         1. A unique, anonymized ID for the stakeholder(s) associated with the non-compliance event to enable tracking over time
         2. The source of the non-compliance data (e.g., self-reported, audit, other)
         3. A root cause analysis of the non-compliance

Reference ID: 5103833

    4. Actions to prevent future occurrences and outcomes of such actions
- iii. Prescriber compliance
    1. Number and percentage of certified prescribers who became decertified as a result of non- compliance
        - Provide a summary of reasons for decertification (provide for the current reporting period)
    2. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)
- iv. Pharmacy compliance
    1. Number and percentage of prescriptions dispensed that were written by prescriber(s) who did not submit a Prescriber Agreement to the dispensing Certified Pharmacy
    2. Number and percentage of mifepristone tablets dispensed by non-certified pharmacies
    3. Number and percentage of pharmacies that became decertified as a result of non- compliance
        - Provide a summary of reasons for decertification (provide for the current reporting period)
    4. An assessment of prescription delivery timelines, including percentage delivered more than four days after receipt of the prescription, duration and causes for delay.  A proposal for this assessment will be submitted within 60 days of the approval of the REMS Modification.
    5. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)
- v. Wholesaler/distributor compliance
    1. Number of healthcare providers who successfully ordered mifepristone who were not certified
    2. Number of non-certified pharmacies that successfully ordered mifepristone
    3. Number of shipments sent to non-certified prescriber receiving locations
    4. Number of shipments sent to non-certified pharmacy receiving locations
    5. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

**Overall Assessment of REMS Effectiveness**

The requirements for assessments of an approved REMS under section 505-1(g)(3) include with respect to each goal included in the strategy, an assessment of the extent to which the approved strategy, including each element of the strategy, is meeting the goal or whether one or more such goals or such elements should be modified.

We remind you that in addition to the REMS assessments submitted according to the timetable in the approved REMS, you must include an adequate rationale to support a

App. 45

proposed REMS modification for the addition, modification, or removal of any goal or element of the REMS, as described in section 505-1(g)(4) of the FDCA.

We also remind you that you must submit a REMS assessment when you submit a supplemental application for a new indication for use, as described in section 505-1(g)(2)(A) of the FDCA. This assessment should include:

a) An evaluation of how the benefit-risk profile will or will not change with the new indication;

b) A determination of the implications of a change in the benefit-risk profile for the current REMS;

c) *If the new indication for use introduces unexpected risks*: A description of those risks and an evaluation of whether those risks can be appropriately managed with the currently approved REMS.

d) *If a REMS assessment was submitted in the 18 months prior to submission of the supplemental application for a new indication for use*: A statement about whether the REMS was meeting its goals at the time of that last assessment and if any modifications of the REMS have been proposed since that assessment.

e) *If a REMS assessment has not been submitted in the 18 months prior to submission of the supplemental application for a new indication for use:* Provision of as many of the currently listed assessment plan items as is feasible.

f) *If you propose a REMS modification based on a change in the benefit-risk profile or because of the new indication of use, submit an adequate rationale to support the modification, including*: Provision of the reason(s) why the proposed REMS modification is necessary, the potential effect on the serious risk(s) for which the REMS was required, on patient access to the drug, and/or on the burden on the health care delivery system; and other appropriate evidence or data to support the proposed change. Additionally, include any changes to the assessment plan necessary to assess the proposed modified REMS. *If you are not proposing REMS modifications*, provide a rationale for why the REMS does not need to be modified.

If the assessment instruments and methodology for your REMS assessments are not included in the REMS supporting document, or if you propose changes to the submitted assessment instruments or methodology, you should update the REMS supporting document to include specific assessment instrument and methodology information at least 90 days before the assessments will be conducted. Updates to the REMS supporting document may be included in a new document that references previous REMS supporting document submission(s) for unchanged portions. Alternatively,

App. 46

updates may be made by modifying the complete previous REMS supporting document, with all changes marked and highlighted.

Prominently identify the submission containing the assessment instruments and methodology with the following wording in bold capital letters at the top of the first page of the submission:

**NDA 020687 REMS ASSESSMENT METHODOLOGY
(**insert concise description of content in bold capital letters, e.g.,
**ASSESSMENT METHODOLOGY, PROTOCOL, SURVEY METHODOLOGIES, AUDIT PLAN, DRUG USE STUDY)**

An authorized generic drug under this NDA must have an approved REMS prior to marketing. Should you decide to market, sell, or distribute an authorized generic drug under this NDA, contact us to discuss what will be required in the authorized generic drug REMS submission.

We remind you that section 505-1(f)(8) of FDCA prohibits holders of an approved covered application with elements to assure safe use from using any element to block or delay approval of an application under section 505(b)(2) or (j). A violation of this provision in 505-1(f) could result in enforcement action.

Prominently identify any submission containing the REMS assessments or proposed modifications of the REMS with the following wording in bold capital letters at the top of the first page of the submission as appropriate:

**NDA 020687 REMS ASSESSMENT**

*or*

**NEW SUPPLEMENT FOR NDA 020687/S-000
CHANGES BEING EFFECTED IN 30 DAYS
PROPOSED MINOR REMS MODIFICATION**

*or*

**NEW SUPPLEMENT FOR NDA 020687/S-000
PRIOR APPROVAL SUPPLEMENT
PROPOSED MAJOR REMS MODIFICATION**

*or*

**NEW SUPPLEMENT FOR NDA 020687/S-000/
PRIOR APPROVAL SUPPLEMENT**

Reference ID: 5103833

**PROPOSED REMS MODIFICATIONS DUE TO SAFETY LABELING CHANGES SUBMITTED IN SUPPLEMENT XXX**

> *or*

**NEW SUPPLEMENT (NEW INDICATION FOR USE)
FOR NDA 020687/S-000
  REMS ASSESSMENT
  PROPOSED REMS MODIFICATION (if included)**

Should you choose to submit a REMS revision, prominently identify the submission containing the REMS revisions with the following wording in bold capital letters at the top of the first page of the submission:

**REMS REVISIONS FOR NDA 020687**

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, or website screenshots are only in PDF format, they may be submitted as such, but Word format is preferred.

## SUBMISSION OF REMS DOCUMENT IN SPL FORMAT

FDA can accept the REMS document in Structured Product Labeling (SPL) format. If you intend to submit the REMS document in SPL format, as soon as possible, but no later than 14 days from the date of this letter, submit the REMS document in SPL format using the FDA automated drug registration and listing system (eLIST).

For more information on submitting REMS in SPL format, please email FDAREMSwebsite@fda.hhs.gov
.
## PATENT LISTING REQUIREMENTS

Pursuant to 21 CFR 314.53(d)(2) and 314.70(f), certain changes to an approved NDA submitted in a supplement require you to submit patent information for listing in the Orange Book upon approval of the supplement.  You must submit the patent information required by 21 CFR 314.53(d)(2)(i)(A) through (C) and 314.53(d)(2)(ii)(A) and (C), as applicable, to FDA on Form FDA 3542 within 30 days after the date of approval of the supplement for the patent information to be timely filed (see 21 CFR 314.53(c)(2)(ii)).  You also must ensure that any changes to your approved NDA that require the submission of a request to remove patent information from the Orange Book are submitted to FDA at the time of approval of the supplement pursuant to 21 CFR 314.53(d)(2)(ii)(B) and 314.53(f)(2)(iv).

App. 48

## REPORTING REQUIREMENTS

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call 

Sincerely,

*{See appended electronic signature page}*

Center for Drug Evaluation and Research

ENCLOSURE(S):
- Content of Labeling
  - Prescribing Information
  - Medication Guide
  - REMS Document
  - Prescriber Agreement
  - Patient Agreement Form
  - Pharmacy Agreement Form

App. 49

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b) (6)

01/03/2023 05:35:41 PM

Reference ID: 5103833

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

## 020687Orig1s025

## <u>LABELING</u>

HIGHLIGHTS OF PRESCRIBING INFORMATION
These highlights do not include all the information needed to use MIFEPREX safely and effectively. See full prescribing information for MIFEPREX.

MIFEPREX® (mifepristone) tablets, for oral use
Initial U.S. Approval: 2000

```
WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR
BLEEDING
    See full prescribing information for complete boxed warning.
Serious and sometimes fatal infections and bleeding occur very rarely
following spontaneous, surgical, and medical abortions, including
following MIFEPREX use.
•  Atypical Presentation of Infection. Patients with serious bacterial
   infections and sepsis can present without fever, bacteremia or
   significant findings on pelvic examination. A high index of suspicion is
   needed to rule out serious infection and sepsis. (5.1)
•  Bleeding. Prolonged heavy bleeding may be a sign of incomplete
   abortion or other complications and prompt medical or surgical
   intervention may be needed. (5.2)
MIFEPREX is only available through a restricted program called the
mifepristone REMS Program (5.3).
Before prescribing MIFEPREX, inform the patient about these risks.
Ensure the patient knows whom to call and what to do if they experience
sustained fever, severe abdominal pain, prolonged heavy bleeding, or
syncope, or if they experience abdominal pain or discomfort or general
malaise for more than 24 hours after taking misoprostol.
```

-----------------------------INDICATIONS AND USAGE--------------------------
MIFEPREX is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. (1)

----------------------DOSAGE AND ADMINISTRATION------------------------
• 200 mg MIFEPREX on Day 1, followed 24-48 hours after MIFEPREX dosing by 800 mcg buccal misoprostol. (2.1)
• Instruct the patient what to do if significant adverse reactions occur. (2.2)
• Follow-up is needed to confirm complete termination of pregnancy. (2.3)

---------------------DOSAGE FORMS AND STRENGTHS---------------------
Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card (3)

-------------------------------CONTRAINDICATIONS-----------------------------
• Confirmed/suspected ectopic pregnancy or undiagnosed adnexal mass (4)
• Chronic adrenal failure (4)
• Concurrent long-term corticosteroid therapy (4)
• History of allergy to mifepristone, misoprostol, or other prostaglandins (4)
• Hemorrhagic disorders or concurrent anticoagulant therapy (4)
• Inherited porphyria (4)
• Intrauterine device (IUD) in place (4)

----------------------WARNINGS AND PRECAUTIONS-----------------------
• Ectopic pregnancy: Exclude before treatment. (5.4)
• Rhesus immunization: Prevention needed as for surgical abortion. (5.5)

-------------------------------ADVERSE REACTIONS-----------------------------
Most common adverse reactions (>15%) are nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness. (6)

To report SUSPECTED ADVERSE REACTIONS, contact Danco Laboratories, LLC at 1-877-432-7596 or medicaldirector@earlyoptionpill.com or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.

-------------------------------DRUG INTERACTIONS-----------------------------
• CYP3A4 inducers can lower mifepristone concentrations. (7.1)
• CYP3A4 inhibitors can increase mifepristone concentrations. Use with caution. (7.2)
• CYP3A4 substrate concentrations can be increased. Caution with coadministration of substrates with narrow therapeutic margin. (7.3)

------------------------------USE IN SPECIFIC POPULATIONS-----------------------
• Pregnancy: Risk of fetal malformations in ongoing pregnancy if not terminated is unknown. (8.1)

See 17 for PATIENT COUNSELING INFORMATION, Medication Guide.

**Revised: 01/2023**

_____

FULL PRESCRIBING INFORMATION: CONTENTS*

WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING
1    INDICATIONS AND USAGE
2    DOSAGE AND ADMINISTRATION
     2.1    Dosing Regimen
     2.2    Patient Management Following Misoprostol Administration
     2.3    Post-treatment Assessment: Day 7 to 14
     2.4    Contact for Consultation
3    DOSAGE FORMS AND STRENGTHS
4    CONTRAINDICATIONS
5    WARNINGS AND PRECAUTIONS
     5.1    Infections and Sepsis
     5.2    Uterine Bleeding
     5.3    Mifepristone REMS Program
     5.4    Ectopic Pregnancy
     5.5    Rhesus Immunization
6    ADVERSE REACTIONS
     6.1    Clinical Trials Experience
     6.2    Postmarketing Experience
7    DRUG INTERACTIONS
     7.1    Drugs that May Reduce MIFEPREX Exposure (Effect of
            CYP 3A4 Inducers on MIFEPREX)
     7.2    Drugs that May Increase Exposure (Effect of CYP 3A4 Inhibitors
            on MIFEPREX)
     7.3    Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on
            CYP 3A4 Substrates)
8    USE IN SPECIFIC POPULATIONS
     8.1    Pregnancy
     8.2    Lactation
     8.4    Pediatric Use
10   OVERDOSAGE
11   DESCRIPTION
12   CLINICAL PHARMACOLOGY
     12.1   Mechanism of Action
     12.2   Pharmacodynamics
     12.3   Pharmacokinetics
13   NONCLINICAL TOXICOLOGY
     13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility
14   CLINICAL STUDIES
16   HOW SUPPLIED/STORAGE AND HANDLING
17   PATIENT COUNSELING INFORMATION

*Sections or subsections omitted from the full prescribing information are not listed.

Reference ID: 5103833

**FULL PRESCRIBING INFORMATION**

<div style="border:1px solid black; padding:10px;">

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

**Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use. No causal relationship between the use of MIFEPREX and misoprostol and these events has been established.**

- **Atypical Presentation of Infection. Patients with serious bacterial infections (e.g., *Clostridium sordellii*) and sepsis can present without fever, bacteremia, or significant findings on pelvic examination following an abortion. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. A high index of suspicion is needed to rule out serious infection and sepsis *[see Warnings and Precautions (5.1)]*.**

- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. Advise patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding *[see Warnings and Precautions (5.2)]*.**

**Because of the risks of serious complications described above, MIFEPREX is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.**

**Before prescribing MIFEPREX, inform the patient about the risk of these serious events. Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort, or general malaise (including weakness, nausea, vomiting, or diarrhea) for more than 24 hours after taking misoprostol.**

</div>

## 1    INDICATIONS AND USAGE

MIFEPREX is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.

## 2    DOSAGE AND ADMINISTRATION

### 2.1  Dosing Regimen

For purposes of this treatment, pregnancy is dated from the first day of the last menstrual period. The duration of pregnancy may be determined from menstrual history and clinical examination. Assess the pregnancy by ultrasonographic scan if the duration of pregnancy is uncertain or if ectopic pregnancy is suspected.

Remove any intrauterine device ("IUD") before treatment with MIFEPREX begins [*see Contraindications (4)*].

The dosing regimen for MIFEPREX and misoprostol is:

App. 53

- MIFEPREX 200 mg orally + misoprostol 800 mcg buccally

  - *Day One:* MIFEPREX Administration
    One 200 mg tablet of MIFEPREX is taken in a single oral dose.

  - *Day Two or Three:* Misoprostol Administration (<u>minimum</u> 24-hour interval between MIFEPREX and misoprostol)
    Four 200 mcg tablets (total dose 800 mcg) of misoprostol are taken by the buccal route.

    Tell the patient to place two 200 mcg misoprostol tablets in each cheek pouch (the area between the cheek and gums) for 30 minutes and then swallow any remnants with water or another liquid (see Figure 1).

    **Figure 1**

    

    **2 pills between cheek and gum on left side + 2 pills between cheek and gum on right side**

Patients taking MIFEPREX must take misoprostol within 24 to 48 hours after taking MIFEPREX. The effectiveness of the regimen may be lower if misoprostol is administered less than 24 hours or more than 48 hours after mifepristone administration.

Because most women will expel the pregnancy within 2 to 24 hours of taking misoprostol *[see Clinical Studies (14)]*, discuss with the patient an appropriate location for them to be when taking the misoprostol, taking into account that expulsion could begin within 2 hours of administration.

## 2.2  Patient Management Following Misoprostol Administration

During the period immediately following the administration of misoprostol, the patient may need medication for cramps or gastrointestinal symptoms *[see Adverse Reactions (6)].*

Give the patient:

- Instructions on what to do if significant discomfort, excessive vaginal bleeding or other adverse reactions occur
- A phone number to call if the patient has questions following the administration of the misoprostol
- The name and phone number of the healthcare provider who will be handling emergencies.

Reference ID: 5103833

**2.3  Post-treatment Assessment: Day 7 to 14**

Patients should follow-up with their healthcare provider approximately 7 to 14 days after the administration of MIFEPREX. This assessment is very important to confirm that complete termination of pregnancy has occurred and to evaluate the degree of bleeding.  Termination can be confirmed by medical history, clinical examination, human Chorionic Gonadotropin (hCG) testing, or ultrasonographic scan. Lack of bleeding following treatment usually indicates failure; however, prolonged or heavy bleeding is not proof of a complete abortion.

The existence of debris in the uterus (e.g., if seen on ultrasonography) following the treatment procedure will not necessarily require surgery for its removal.

Patients should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of women may experience some type of bleeding for more than 30 days. Persistence of heavy or moderate vaginal bleeding at the time of follow-up, however, could indicate an incomplete abortion.

If complete expulsion has not occurred, but the pregnancy is not ongoing, patients may be treated with another dose of misoprostol 800 mcg buccally.  There have been rare reports of uterine rupture in women who took MIFEPREX and misoprostol, including women with prior uterine rupture or uterine scar and women who received multiple doses of misoprostol within 24 hours.  Patients who choose to use a repeat dose of misoprostol should have a follow-up visit with their healthcare provider in approximately 7 days to assess for complete termination.

Surgical evacuation is recommended to manage ongoing pregnancies after medical abortion *[see Use in Specific Populations (8.1)]*.  Advise the patient whether you will provide such care or will refer them to another provider as part of counseling prior to prescribing MIFEPREX.

**2.4  Contact for Consultation**

**For consultation 24 hours a day, 7 days a week with an expert in mifepristone, call Danco Laboratories at 1-877-4 Early Option (1-877-432-7596).**

**3    DOSAGE FORMS AND STRENGTHS**

Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card. MIFEPREX tablets are light yellow, cylindrical, and bi-convex tablets, approximately 11 mm in diameter and imprinted on one side with "MF."

**4    CONTRAINDICATIONS**

- Administration of MIFEPREX and misoprostol for the termination of pregnancy (the "treatment procedure") is contraindicated in patients with any of the following conditions:

  - Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass (the treatment procedure will not be effective to terminate an ectopic pregnancy) *[see Warnings and Precautions (5.4)]*

  - Chronic adrenal failure (risk of acute adrenal insufficiency)

  - Concurrent long-term corticosteroid therapy (risk of acute adrenal insufficiency)

  - History of allergy to mifepristone, misoprostol, or other prostaglandins (allergic reactions including anaphylaxis, angioedema, rash, hives, and itching have been reported *[see Adverse Reactions (6.2)]*)

  - Hemorrhagic disorders or concurrent anticoagulant therapy (risk of heavy bleeding)

Reference ID: 5103833

- Inherited porphyrias (risk of worsening or of precipitation of attacks)

- Use of MIFEPREX and misoprostol for termination of intrauterine pregnancy is contraindicated in patients with an intrauterine device ("IUD") in place (the IUD might interfere with pregnancy termination). If the IUD is removed, MIFEPREX may be used.

## 5    WARNINGS AND PRECAUTIONS

### 5.1  Infection and Sepsis

As with other types of abortion, cases of serious bacterial infection, including very rare cases of fatal septic shock, have been reported following the use of MIFEPREX *[see Boxed Warning]*. Healthcare providers evaluating a patient who is undergoing a medical abortion should be alert to the possibility of this rare event. A sustained (> 4 hours) fever of 100.4°F or higher, severe abdominal pain, or pelvic tenderness in the days after a medical abortion may be an indication of infection.

A high index of suspicion is needed to rule out sepsis (e.g., from *Clostridium sordellii*) if a patient reports abdominal pain or discomfort or general malaise (including weakness, nausea, vomiting, or diarrhea) more than 24 hours after taking misoprostol. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. No causal relationship between MIFEPREX and misoprostol use and an increased risk of infection or death has been established. *Clostridium sordellii* infections have also been reported very rarely following childbirth (vaginal delivery and caesarian section), and in other gynecologic and non-gynecologic conditions.

### 5.2  Uterine Bleeding

Uterine bleeding occurs in almost all patients during a medical abortion. Prolonged heavy bleeding (soaking through two thick full-size sanitary pads per hour for two consecutive hours) may be a sign of incomplete abortion or other complications, and prompt medical or surgical intervention may be needed to prevent the development of hypovolemic shock. Counsel patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding following a medical abortion *[see Boxed Warning]*.

Women should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of all subjects may experience some type of bleeding for 30 days or more. In general, the duration of bleeding and spotting increased as the duration of the pregnancy increased.

Decreases in hemoglobin concentration, hematocrit, and red blood cell count may occur in patients who bleed heavily.

Excessive uterine bleeding usually requires treatment by uterotonics, vasoconstrictor drugs, surgical uterine evacuation, administration of saline infusions, and/or blood transfusions. Based on data from several large clinical trials, vasoconstrictor drugs were used in 4.3% of all subjects, there was a decrease in hemoglobin of more than 2 g/dL in 5.5% of subjects, and blood transfusions were administered to ≤ 0.1% of subjects. Because heavy bleeding requiring surgical uterine evacuation occurs in about 1% of patients, special care should be given to patients with hemostatic disorders, hypocoagulability, or severe anemia.

Reference ID: 5103833

### 5.3  Mifepristone REMS Program

MIFEPREX is available only through a restricted program under a REMS called the mifepristone REMS Program, because of the risks of serious complications *[see Warnings and Precautions (5.1, 5.2)]*.

Notable requirements of the mifepristone REMS Program include the following:

- Prescribers must be certified with the program by completing the Prescriber Agreement Form.
- Patients must sign a Patient Agreement Form.
- MIFEPREX must only be dispensed to patients by or under the supervision of a certified prescriber, or by certified pharmacies on prescriptions issued by certified prescribers.

Further information is available at 1-877-4 Early Option (1-877-432-7596).

### 5.4  Ectopic Pregnancy

MIFEPREX is contraindicated in patients with a confirmed or suspected ectopic pregnancy because MIFEPREX is not effective for terminating ectopic pregnancies *[see Contraindications (4)]*. Healthcare providers should remain alert to the possibility that a patient who is undergoing a medical abortion could have an undiagnosed ectopic pregnancy because some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy. The presence of an ectopic pregnancy may have been missed even if the patient underwent ultrasonography prior to being prescribed MIFEPREX.

Patients who became pregnant with an IUD in place should be assessed for ectopic pregnancy.

### 5.5  Rhesus Immunization

The use of MIFEPREX is assumed to require the same preventive measures as those taken prior to and during surgical abortion to prevent rhesus immunization.

### 6   ADVERSE REACTIONS

The following adverse reactions are described in greater detail in other sections:

- Infection and sepsis *[see Warnings and Precautions (5.1)]*
- Uterine bleeding *[see Warnings and Precautions (5.2)]*

### 6.1 Clinical Trials Experience

Because clinical studies are conducted under widely varying conditions, adverse reaction rates observed in the clinical studies of a drug cannot be directly compared to rates in the clinical studies of another drug and may not reflect the rates observed in practice.

Information presented on common adverse reactions relies solely on data from U.S. studies, because rates reported in non-U.S. studies were markedly lower and are not likely generalizable to the U.S. population.  In three U.S. clinical studies totaling 1,248 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally, women reported adverse reactions in diaries and in interviews at the follow-up visit. These studies enrolled generally healthy women of reproductive age without contraindications to mifepristone or misoprostol use according to the MIFEPREX product label. Gestational age was assessed prior to study enrollment using the date of the woman's last menstrual period, clinical evaluation, and/or ultrasound examination.

App. 57

About 85% of patients report at least one adverse reaction following administration of MIFEPREX and misoprostol, and many can be expected to report more than one such reaction. The most commonly reported adverse reactions (>15%) were nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness (see Table 1). The frequency of adverse reactions varies between studies and may be dependent on many factors, including the patient population and gestational age.

Abdominal pain/cramping is expected in all medical abortion patients and its incidence is not reported in clinical studies. Treatment with MIFEPREX and misoprostol is designed to induce uterine bleeding and cramping to cause termination of an intrauterine pregnancy. Uterine bleeding and cramping are expected consequences of the action of MIFEPREX and misoprostol as used in the treatment procedure. Most patients can expect bleeding more heavily than they do during a heavy menstrual period *[see Warnings and Precautions (5.2)]*.

Table 1 lists the adverse reactions reported in U.S. clinical studies with incidence >15% of women.

**Table 1**
**Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. Clinical Studies**

| Adverse Reaction | # U.S. studies | Number of Evaluable Women | Range of frequency (%) | Upper Gestational Age of Studies Reporting Outcome |
|---|---|---|---|---|
| **Nausea** | 3 | 1,248 | 51-75% | 70 days |
| **Weakness** | 2 | 630 | 55-58% | 63 days |
| **Fever/chills** | 1 | 414 | 48% | 63 days |
| **Vomiting** | 3 | 1,248 | 37-48% | 70 days |
| **Headache** | 2 | 630 | 41-44% | 63 days |
| **Diarrhea** | 3 | 1,248 | 18-43% | 70 days |
| **Dizziness** | 2 | 630 | 39-41% | 63 days |

One study provided gestational-age stratified adverse reaction rates for women who were 57-63 and 64-70 days; there was little difference in frequency of the reported common adverse reactions by gestational age.

Information on serious adverse reactions was reported in six U.S. and four non-U.S. clinical studies, totaling 30,966 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally. Serious adverse reaction rates were similar between U.S. and non-U.S. studies, so rates from both U.S. and non-U.S. studies are presented. In the U.S. studies, one studied women through 56 days gestation, four through 63 days gestation, and one through 70 days gestation, while in the non-U.S. studies, two studied women through 63 days gestation, and two through 70 days gestation. Serious adverse reactions were reported in <0.5% of women. Information from the U.S. and non-U.S. studies is presented in Table 2.

App. 58

Reference ID: 5103833

**Table 2**
**Serious Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. and Non-U.S. Clinical Studies**

| Adverse Reaction | U.S. | | | Non-U.S. | | |
|---|---|---|---|---|---|---|
| | # of studies | Number of Evaluable Women | Range of frequency (%) | # of studies | Number of Evaluable Women | Range of frequency (%) |
| Transfusion | 4 | 17,774 | 0.03-0.5% | 3 | 12,134 | 0-0.1% |
| Sepsis | 1 | 629 | 0.2% | 1 | 11,155 | <0.01%* |
| ER visit | 2 | 1,043 | 2.9-4.6% | 1 | 95 | 0 |
| Hospitalization Related to Medical Abortion | 3 | 14,339 | 0.04-0.6% | 3 | 1,286 | 0-0.7% |
| Infection without sepsis | 1 | 216 | 0 | 1 | 11,155 | 0.2% |
| Hemorrhage | NR | NR | NR | 1 | 11,155 | 0.1% |

NR= Not reported
* This outcome represents a single patient who experienced death related to sepsis.

## 6.2    Postmarketing Experience

The following adverse reactions have been identified during postapproval use of MIFEPREX and misoprostol. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Infections and infestations:* post-abortal infection (including endometritis, endomyometritis, parametritis, pelvic infection, pelvic inflammatory disease, salpingitis)
*Blood and the lymphatic system disorders:* anemia
*Immune system disorders:* allergic reaction (including anaphylaxis, angioedema, hives, rash, itching)
*Psychiatric disorders:* anxiety
*Cardiac disorders:* tachycardia (including racing pulse, heart palpitations, heart pounding)
*Vascular disorders:* syncope, fainting, loss of consciousness, hypotension (including orthostatic), light-headedness
*Respiratory, thoracic and mediastinal disorders:* shortness of breath
*Gastrointestinal disorders:* dyspepsia
*Musculoskeletal, connective tissue and bone disorders:* back pain, leg pain
*Reproductive system and breast disorders:* uterine rupture, ruptured ectopic pregnancy, hematometra, leukorrhea
*General disorders and administration site conditions:* pain

## 7    DRUG INTERACTIONS

## 7.1    Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)

CYP450 3A4 is primarily responsible for the metabolism of mifepristone. CYP3A4 inducers such as rifampin, dexamethasone, St. John's Wort, and certain anticonvulsants (such as phenytoin, phenobarbital, carbamazepine) may induce mifepristone metabolism (lowering serum concentrations of mifepristone).  Whether this action has an impact on the efficacy of the dose

Reference ID: 5103833

regimen is unknown.   Refer to the follow-up assessment *[see Dosage and Administration (2.3 )]* to verify that treatment has been successful.

## 7.2  Drugs that May Increase MIFEPREX Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)

Although specific drug or food interactions with mifepristone have not been studied, on the basis of this drug's metabolism by CYP 3A4, it is possible that ketoconazole, itraconazole, erythromycin, and grapefruit juice may inhibit its metabolism (increasing serum concentrations of mifepristone). MIFEPREX should be used with caution in patients currently or recently treated with CYP 3A4 inhibitors.

## 7.3  Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)

Based on *in vitro* inhibition information, coadministration of mifepristone may lead to an increase in serum concentrations of drugs that are CYP 3A4 substrates. Due to the slow elimination of mifepristone from the body, such interaction may be observed for a prolonged period after its administration. Therefore, caution should be exercised when mifepristone is administered with drugs that are CYP 3A4 substrates and have narrow therapeutic range.

## 8     USE IN SPECIFIC POPULATIONS

### 8.1  Pregnancy

Risk Summary

MIFEPREX is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.  Risks to pregnant patients are discussed throughout the labeling.

Refer to misoprostol labeling for risks to pregnant patients with the use of misoprostol.

The risk of adverse developmental outcomes with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol is unknown; however, the process of a failed pregnancy termination could disrupt normal embryo-fetal development and result in adverse developmental effects.  Birth defects have been reported with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol. In animal reproduction studies, increased fetal losses were observed in mice, rats, and rabbits and skull deformities were observed in rabbits with administration of mifepristone at doses lower than the human exposure level based on body surface area.

Data

*Animal Data*

In teratology studies in mice, rats and rabbits at doses of 0.25 to 4.0 mg/kg (less than 1/100 to approximately 1/3 the human exposure based on body surface area), because of the antiprogestational activity of mifepristone,fetal losses were much higher than in control animals. Skull deformities were detected in rabbit studies at approximately 1/6 the human exposure, although no teratogenic effects of mifepristone have been observed to date in rats or mice. These deformities were most likely due to the mechanical effects of uterine contractions resulting from inhibition of progesterone action.

### 8.2  Lactation

MIFEPREX is present in human milk.  Limited data demonstrate undetectable to low levels of the drug in human milk with the relative (weight-adjusted) infant dose 0.5% or less as compared to maternal dosing. There is no information on the effects of MIFEPREX in a regimen with

misoprostol in a breastfed infant or on milk production. Refer to misoprostol labeling for lactation information with the use of misoprostol. The developmental and health benefits of breast-feeding should be considered along with any potential adverse effects on the breast-fed child from MIFEPREX in a regimen with misoprostol.

### 8.4 Pediatric Use

Safety and efficacy of MIFEPREX have been established in pregnant females. Data from a clinical study of MIFEPREX that included a subset of 322 females under age 17 demonstrated a safety and efficacy profile similar to that observed in adults.

## 10    OVERDOSAGE

No serious adverse reactions were reported in tolerance studies in healthy non-pregnant female and healthy male subjects where mifepristone was administered in single doses greater than 1800 mg (ninefold the recommended dose for medical abortion). If a patient ingests a massive overdose, the patient should be observed closely for signs of adrenal failure.

## 11    DESCRIPTION

MIFEPREX tablets each contain 200 mg of mifepristone, a synthetic steroid with antiprogestational effects. The tablets are light yellow in color, cylindrical, and bi-convex, and are intended for oral administration only. The tablets include the inactive ingredients colloidal silica anhydrous, corn starch, povidone, microcrystalline cellulose, and magnesium stearate.

Mifepristone is a substituted 19-nor steroid compound chemically designated as 11ß-[*p*-(Dimethylamino)phenyl]-17ß-hydroxy-17-(1-propynyl)estra-4,9-dien-3-one. Its empirical formula is $C_{29}H_{35}NO_2$. Its structural formula is:



The compound is a yellow powder with a molecular weight of 429.6 and a melting point of 192-196°C. It is very soluble in methanol, chloroform and acetone and poorly soluble in water, hexane and isopropyl ether.

## 12    CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

The anti-progestational activity of mifepristone results from competitive interaction with progesterone at progesterone-receptor sites. Based on studies with various oral doses in several animal species (mouse, rat, rabbit, and monkey), the compound inhibits the activity of endogenous or exogenous progesterone, resulting in effects on the uterus and cervix that, when combined with misoprostol, result in termination of an intrauterine pregnancy.

During pregnancy, the compound sensitizes the myometrium to the contraction-inducing activity

App. 61

of prostaglandins.

## 12.2 Pharmacodynamics

Use of MIFEPREX in a regimen with misoprostol disrupts pregnancy by causing decidual necrosis, myometrial contractions, and cervical softening, leading to the expulsion of the products of conception.

Doses of 1 mg/kg or greater of mifepristone have been shown to antagonize the endometrial and myometrial effects of progesterone in women.

Antiglucocorticoid and antiandrogenic activity:  Mifepristone also exhibits antiglucocorticoid and weak antiandrogenic activity.  The activity of the glucocorticoid dexamethasone in rats was inhibited following doses of 10 to 25 mg/kg of mifepristone. Doses of 4.5 mg/kg or greater in human beings resulted in a compensatory elevation of adrenocorticotropic hormone (ACTH) and cortisol. Antiandrogenic activity was observed in rats following repeated administration of doses from 10 to 100 mg/kg.

## 12.3 Pharmacokinetics

Mifepristone is rapidly absorbed after oral ingestion with non-linear pharmacokinetics for Cmax after single oral doses of 200 mg and 600 mg in healthy subjects.

Absorption

The absolute bioavailability of a 20 mg mifepristone oral dose in females of childbearing age is 69%. Following oral administration of a single dose of 600 mg, mifepristone is rapidly absorbed, with a peak plasma concentration of 1.98 ± 1.0 mg/L occurring approximately 90 minutes after ingestion.

Following oral administration of a single dose of 200 mg in healthy men (n=8), mean Cmax was 1.77 ± 0.7 mg/L occurring approximately 45 minutes after ingestion. Mean $AUC_{0-\infty}$ was 25.8 ± 6.2 mg*hr/L.

Distribution

Mifepristone is 98% bound to plasma proteins, albumin, and $\alpha_1$-acid glycoprotein. Binding to the latter protein is saturable, and the drug displays nonlinear kinetics with respect to plasma concentration and clearance.

Elimination

Following a distribution phase, elimination of mifepristone is slow at first (50% eliminated between 12 and 72 hours) and then becomes more rapid with a terminal elimination half-life of 18 hours.

*Metabolism*

Metabolism of mifepristone is primarily via pathways involving N-demethylation and terminal hydroxylation of the 17-propynyl chain. *In vitro* studies have shown that CYP450 3A4 is primarily responsible for the metabolism. The three major metabolites identified in humans are: (1) RU 42 633, the most widely found in plasma, is the N-monodemethylated metabolite; (2) RU 42 848, which results from the loss of two methyl groups from the 4-dimethylaminophenyl in position 11ß; and (3) RU 42 698, which results from terminal hydroxylation of the 17-propynyl chain.

*Excretion*

By 11 days after a 600 mg dose of tritiated compound, 83% of the drug has been accounted for by the feces and 9% by the urine. Serum concentrations are undetectable by 11 days.

Reference ID: 5103833

**Table 3**
**Outcome Following Treatment with Mifepristone (oral) and Misoprostol (buccal)**
**Through 70 Days Gestation**

|  | U.S. Trials | Non-U.S. Trials |
|---|---|---|
| **N** | 16,794 | 18,425 |
| **Complete Medical Abortion** | 97.4% | 96.2% |
| **Surgical Intervention*** | 2.6% | 3.8% |
| **Ongoing Pregnancy**** | 0.7% | 0.9% |

\*  Reasons for surgical intervention include ongoing pregnancy, medical necessity, persistent or heavy bleeding after treatment, patient request, or incomplete expulsion.
\*\*  Ongoing pregnancy is a subcategory of surgical intervention, indicating the percent of women who have surgical intervention due to an ongoing pregnancy.

The results for clinical studies that reported outcomes, including failure rates for ongoing pregnancy, by gestational age are presented in Table 4.

**Table 4**
**Outcome by Gestational Age Following Treatment with Mifepristone and**
**Misoprostol (buccal) for U.S. and Non-U.S. Clinical Studies**

|  | ≤49 days | | | 50-56 days | | | 57-63 days | | | 64-70 days | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies |
| Complete medical abortion | 12,046 | 98.1 | 10 | 3,941 | 96.8 | 7 | 2,294 | 94.7 | 9 | 479 | 92.7 | 4 |
| Surgical intervention for ongoing pregnancy | 10,272 | 0.3 | 6 | 3,788 | 0.8 | 6 | 2,211 | 2 | 8 | 453 | 3.1 | 3 |

One clinical study asked subjects through 70 days gestation to estimate when they expelled the pregnancy, with 70% providing data. Of these, 23-38% reported expulsion within 3 hours and over 90% within 24 hours of using misoprostol.

## 16  HOW SUPPLIED/STORAGE AND HANDLING

is only available through a restricted program called the Mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.

MIFEPREX is supplied as light yellow, cylindrical, and bi-convex tablets imprinted on one side with "MF." Each tablet contains 200 mg of mifepristone. One tablet is individually blistered on one blister card that is packaged in an individual package (National Drug Code 64875-001-01).

Store at 25°C (77°F); excursions permitted to 15 to 30°C (59 to 86°F) [see USP Controlled Room Temperature].

Reference ID: 5103833

## 17   PATIENT COUNSELING INFORMATION

Advise the patient to read the FDA-approved patient labeling (Medication Guide), included with each package of MIFEPREX. Additional copies of the Medication Guide are available by contacting Danco Laboratories at 1-877-4 Early Option (1-877-432-7596) or from www.earlyoptionpill.com.

Serious Infections and Bleeding

- Inform the patient that uterine bleeding and uterine cramping will occur [*see Warnings and Precautions (5.2)*].

- Advise the patient that serious and sometimes fatal infections and bleeding can occur very rarely [*see Warnings and Precautions (5.1, 5.2)*].

- MIFEPREX is only available through a restricted program called the Mifepristone REMS Program [*see Warnings and Precautions (5.3)*].  Under the mifepristone REMS Program:

    o   Patients must sign a Patient Agreement Form.

    o   MIFEPREX is only dispensed by or under the supervision of certified prescribers or by certified pharmacies on prescriptions issued by certified prescribers.

Provider Contacts and Actions in Case of Complications

- Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, or if the patient experiences complications including prolonged heavy bleeding, severe abdominal pain, or sustained fever *[see Boxed Warning]*.

- 

Compliance with Treatment Schedule and Follow-up Assessment

- Advise the patient that it is necessary to complete the treatment schedule, including a follow-up assessment approximately 7 to14 days after taking MIFEPREX *[see Dosage and Administration (2.3)]*.

- Explain that

    o   prolonged heavy vaginal bleeding is not proof of a complete abortion,

    o   if the treatment fails and the pregnancy continues, the risk of fetal malformation is unknown,

    o   it is recommended that ongoing pregnancy be managed by surgical termination *[see Dosage and Administration (2.3)]*.  Advise the patient whether you will provide such care or will refer them to another provider.

Subsequent Fertility

- Inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses.

- Inform the patient that contraception can be initiated as soon as pregnancy expulsion has been confirmed, or before resuming sexual intercourse.

MIFEPREX is a registered trademark of Danco Laboratories, LLC.

Manufactured for:
*Danco Laboratories, LLC*
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596)
www.earlyoptionpill.com

01/2023

Reference ID: 5103833

---

**MEDICATION GUIDE**

**Mifeprex** (MIF-eh-prex) (mifepristone tablets, for oral use

---

Read this information carefully before taking Mifeprex and misoprostol. It will help you understand how the treatment works. This Medication Guide does not take the place of talking with your healthcare provider.

---

**What is the most important information I should know about Mifeprex?**

**What symptoms should I be concerned with?** Although cramping and bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth. Seeking medical attention as soon as possible is needed in these circumstances. Serious infection has resulted in death in a very small number of cases. There is no information that use of Mifeprex and misoprostol caused these deaths. If you have any questions, concerns, or problems, or if you are worried about any side effects or symptoms, you should contact your healthcare provider. You can write down your healthcare provider's telephone number here _____.

**Be sure to contact your healthcare provider promptly if you have any of the following:**

- **Heavy Bleeding.** Contact your healthcare provider right away if you bleed enough to soak through two thick full-size sanitary pads per hour for two consecutive hours or if you are concerned about heavy bleeding. In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical aspiration or D&C).

- **Abdominal Pain or "Feeling Sick."** If you have abdominal pain or discomfort, or you are "feeling sick," including weakness, nausea, vomiting, or diarrhea, with or without fever, more than 24 hours after taking misoprostol, you should contact your healthcare provider without delay. These symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

- **Fever.** In the days after treatment, if you have a fever of 100.4°F or higher that lasts for more than 4 hours, you should contact your healthcare provider right away. Fever may be a symptom of a serious infection or another problem.

**If you cannot reach your healthcare provider, go to the nearest hospital emergency room.**

**What to do if you are still pregnant after Mifeprex with misoprostol treatment.** If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy. In many cases, this surgical procedure can be done in the office/clinic. The chance of birth defects if the pregnancy is not ended is unknown.

**Talk with your healthcare provider.** Before you take Mifeprex, you should read this Medication Guide and you and your healthcare provider should discuss the benefits and risks of your using Mifeprex.

App. 67

**What is Mifeprex?**

**Mifeprex is used in a regimen with another prescription medicine called misoprostol, to end an early pregnancy.** Early pregnancy means it is 70 days (10 weeks) or less since your last menstrual period began. Mifeprex is not approved for ending pregnancies that are further along. Mifeprex blocks a hormone needed for your pregnancy to continue. When you use Mifeprex on Day 1, you also need to take another medicine called misoprostol 24 to 48 hours after you take Mifeprex, to cause the pregnancy to be passed from your uterus.

The pregnancy is likely to be passed from your uterus within 2 to 24 hours after taking Mifeprex and misoprostol.  When the pregnancy is passed from the uterus, you will have bleeding and cramping that will likely be heavier than your usual period. About 2 to 7 out of 100 women taking Mifeprex will need a surgical procedure because the pregnancy did not completely pass from the uterus or to stop bleeding.

**Who should not take Mifeprex?**

Some patients should not take Mifeprex. Do not take Mifeprex if you:

- Have a pregnancy that is more than 70 days (10 weeks). Your healthcare provider may do a clinical examination, an ultrasound examination, or other testing to determine how far along you are in pregnancy.

- Are using an IUD (intrauterine device or system). It must be taken out before you take Mifeprex.

- Have been told by your healthcare provider that you have a pregnancy outside the uterus (ectopic pregnancy).

- Have problems with your adrenal glands (chronic adrenal failure).

- Take a medicine to thin your blood.

- Have a bleeding problem.

- Have porphyria.

- Take certain steroid medicines.

- Are allergic to mifepristone, misoprostol, or medicines that contain misoprostol, such as Cytotec or Arthrotec.

Ask your healthcare provider if you are not sure about all your medical conditions before taking this medicine to find out if you can take Mifeprex.

**What should I tell my healthcare provider before taking Mifeprex?**

**Before you take Mifeprex, tell your healthcare provider if you:**

- cannot follow-up within approximately 7 to 14 days of your first visit

- are breastfeeding. Mifeprex can pass into your breast milk.  The effect of the Mifeprex and misoprostol regimen on the breastfed infant or on milk production is unknown.

- are taking medicines, including prescription and over-the-counter medicines, vitamins, and herbal supplements.
  Mifeprex and certain other medicines may affect each other if they are used together.  This can cause side effects.

Reference ID: 5103833

**How should I take Mifeprex?**

- Mifeprex will be given to you by a healthcare provider or pharmacy.

- You and your healthcare provider will plan the most appropriate location for you to take the misoprostol, because it may cause bleeding, cramps, nausea, diarrhea, and other symptoms that usually begin within 2 to 24 hours after taking it.

- Most women will pass the pregnancy within 2 to 24 hours after taking the misoprostol tablets.

**Follow the instruction below on how to take Mifeprex and misoprostol:**

**Mifeprex (1 tablet) orally + misoprostol (4 tablets) buccally**

**Day 1:**

- Take 1 Mifeprex tablet by mouth.

**24 to 48 hours after taking Mifeprex:**

- Take 4 misoprostol tablets by placing 2 tablets in each cheek pouch (the area between your teeth and cheek - see Figure A) for 30 minutes and then swallow anything left over with a drink of water or another liquid.

- The medicines may not work as well if you take misoprostol sooner than 24 hours after Mifeprex or later than 48 hours after Mifeprex.

- Misoprostol often causes cramps, nausea, diarrhea, and other symptoms. Your healthcare provider may send you home with medicines for these symptoms.



**Figure A** (2 tablets between your left cheek and gum and 2 tablets between your right cheek and gum).

**Follow-up Assessment at Day 7 to 14:**

- This follow-up assessment is very important.  You must follow-up with your healthcare provider about 7 to 14 days after you have taken Mifeprex to be sure you are well and that you have had bleeding and the pregnancy has passed from your uterus.

- Your healthcare provider will assess whether your pregnancy has passed from your uterus. If your pregnancy continues, the chance that there may be birth defects is unknown. If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy.

- If your pregnancy has ended, but has not yet completely passed from your uterus, your provider will talk with you about other choices you have, including waiting, taking another dose of misoprostol, or having a surgical procedure to empty your uterus.

Reference ID: 5103833

**When should I begin birth control?**

You can become pregnant again right after your pregnancy ends. If you do not want to become pregnant again, start using birth control as soon as your pregnancy ends or before you start having sexual intercourse again.

**What should I avoid while taking Mifeprex and misoprostol?**

Do not take any other prescription or over-the-counter medicines (including herbal medicines or supplements) at any time during the treatment period without first asking your healthcare provider about them because they may interfere with the treatment. Ask your healthcare provider about what medicines you can take for pain and other side effects.

**What are the possible side effects of Mifeprex and misoprostol?**

**Mifeprex may cause serious side effects. See "What is the most important information I should know about Mifeprex?"**

**Cramping and bleeding.** Cramping and vaginal bleeding are expected with this treatment. Usually, these symptoms mean that the treatment is working. But sometimes you can get cramping and bleeding and still be pregnant. This is why you must follow-up with your healthcare provider approximately 7 to 14 days after taking Mifeprex. See "How should I take Mifeprex?" for more information on your follow-up assessment. If you are not already bleeding after taking Mifeprex, you probably will begin to bleed once you take misoprostol, the medicine you take 24 to 48 hours after Mifeprex. Bleeding or spotting can be expected for an average of 9 to16 days and may last for up to 30 days. Your bleeding may be similar to, or greater than, a normal heavy period. You may see blood clots and tissue. This is an expected part of passing the pregnancy.

The most common side effects of Mifeprex treatment include: nausea, weakness, fever/chills, vomiting, headache, diarrhea and dizziness. Your provider will tell you how to manage any pain or other side effects. These are not all the possible side effects of Mifeprex.

Call your healthcare provider for medical advice about any side effects that bother you or do not go away. You may report side effects to FDA at 1-800-FDA-1088.

**General information about the safe and effective use of Mifeprex.**

**Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. This Medication Guide summarizes the most important information about Mifeprex. If you would like more information, talk with your healthcare provider. You may ask your healthcare provider for information about Mifeprex that is written for healthcare professionals.**

**For more information about Mifeprex, go to www.earlyoptionpill.com or call 1-877-4 Early Option (1-877-432-7596).**

Manufactured for: *Danco Laboratories, LLC*
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596) www.earlyoptionpill.com

This Medication Guide has been approved by the U.S. Food and Drug Administration.     Approval 01/2023

Reference ID: 5103833

# CENTER FOR DRUG EVALUATION AND RESEARCH

## *APPLICATION NUMBER:*

## 020687Orig1s025

## <u>REMS</u>

Initial Shared System REMS approval:  04/2019
Most Recent Modification: 01/2023

Mifepristone Tablets, 200 mg
Progestin Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)
SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200 MG**

## I.  GOAL

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

a)  Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

b)  Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

c)  Informing patients about the risk of serious complications associated with mifepristone.

## II.  REMS ELEMENTS

### A.  Elements to Assure Safe Use

1.  Healthcare providers who prescribe mifepristone must be specially certified.

    a.  To become specially certified to prescribe mifepristone, healthcare providers must:

        i.  Review the Prescribing Information for mifepristone.

        ii.  Complete a *Prescriber Agreement Form*. By signing[1] a *Prescriber Agreement Form*, prescribers agree that:

            1)  They have the following qualifications:

                a)  Ability to assess the duration of pregnancy accurately

                b)  Ability to diagnose ectopic pregnancies

                c)  Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary

            2)  They will follow the guidelines for use of mifepristone (see b.i-vii below).

    b.  As a condition of certification, prescribers must follow the guidelines for use of mifepristone described below:

        i.  Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained.  Ensure any questions the patient may have prior to receiving mifepristone are answered.

        ii.  Ensure that the healthcare provider and patient sign the *Patient Agreement Form.*

---

[1] In this REMS, the terms "sign" and "signature" include electronic signatures.

Reference ID: 5103833

iii. Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

iv. Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

v. Ensure that any deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

vi. If mifepristone will be dispensed by a certified pharmacy:

   1) Provide the certified pharmacy a signed *Prescriber Agreement Form*.

   2) Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.

   3) Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of the patient.

vii. The certified prescriber who dispenses mifepristone or who supervises the dispensing of mifepristone must:

   1) Provide an authorized distributor with a signed *Prescriber Agreement Form*.

   2) Ensure that the NDC and lot number from each package of mifepristone dispensed are recorded in the patient's record.

   3) Ensure that healthcare providers under their supervision follow guidelines i.-v.

c. Mifepristone Sponsors must:

   i. Ensure that healthcare providers who prescribe their mifepristone are specially certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements.

   ii. Ensure prescribers previously certified in the Mifepristone REMS Program complete the new *Prescriber Agreement Form*:

      1) Within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies.

      2) Within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

   iii. Ensure that healthcare providers can complete the certification process by email or fax to an authorized distributor and/or certified pharmacy.

   iv. Provide the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.

   v. Ensure annually with each certified prescriber that their locations for receiving mifepristone are up to date.

The following materials are part of the Mifepristone REMS Program:

- *Prescriber Agreement Form for Danco Laboratories, LLC*

- *Prescriber Agreement Form for GenBioPro, Inc.*

- *Patient Agreement Form*

App. 73

2.  Pharmacies that dispense mifepristone must be specially certified

    a.  To become specially certified to dispense mifepristone, pharmacies must:

        i.  Be able to receive *Prescriber Agreement Forms* by email and fax.

        ii.  Be able to ship mifepristone using a shipping service that provides tracking information.

        iii.  Designate an authorized representative to carry out the certification process on behalf of the pharmacy.

        iv.  Ensure the authorized representative oversees implementation and compliance with the Mifepristone REMS Program by doing the following:

            1)  Review the Prescribing Information for mifepristone.

            2)  Complete a *Pharmacy Agreement Form*. By signing a *Pharmacy Agreement Form*, the authorized representative agrees that the pharmacy will put processes and procedures in place to ensure the following requirements are completed:

                a)  Verify that the prescriber is certified by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with the pharmacy.

                b)  Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in c) below.

                c)  Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.

                d)  Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.

                e)  Track and verify receipt of each shipment of mifepristone.

                f)  Dispense mifepristone in its package as supplied by the Mifepristone Sponsor.

                g)  Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to the Mifepristone Sponsor that provided the mifepristone.  Notify the Mifepristone Sponsor that provided the dispensed mifepristone that the pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.

                h)  Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.

                i)  Maintain records of *Prescriber Agreement Forms*.

                j)  Maintain records of dispensing and shipping.

                k)  Maintain records of all processes and procedures including compliance with those processes and procedures.

                l)  Maintain the identity of the patient and prescriber as confidential, including limiting access to patient and prescriber identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes.

                m)  Train all relevant staff on the Mifepristone REMS Program requirements.

App. 74

n)   Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

b.   Mifepristone Sponsors must:

i.   Ensure that pharmacies are specially certified in accordance with the requirements described above and de-certify pharmacies that do not maintain compliance with certification requirements.

ii.   Ensure that pharmacies can complete the certification process by email and fax to an authorized distributor.

i.   Verify annually that the name and contact information for the pharmacy's authorized representative corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, require the pharmacy to recertify with the new authorized representative.

The following materials are part of the Mifepristone REMS Program:

- *Pharmacy Agreement Form for Danco Laboratories, LLC*
- *Pharmacy Agreement Form for GenBioPro, Inc.*

3.   Mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions as ensured by the certified prescriber in signing the *Prescriber Agreement Form*.

a.   The patient must sign a *Patient Agreement Form* indicating that the patient has:

i.   Received, read and been provided a copy of the *Patient Agreement Form*.

ii.   Received counseling from the healthcare provider regarding the risk of serious complications associated with mifepristone.

## B.   Implementation System

1.   Mifepristone Sponsors must ensure that their mifepristone is only distributed to certified prescribers and certified pharmacies by:

a.   Ensuring that distributors who distribute  their mifepristone comply with the program requirements for distributors.

i.   The distributors must put processes and procedures in place to:

1)   Complete the certification process upon receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form*.

2)   Notify healthcare providers and pharmacies when they have been certified by the Mifepristone REMS Program.

3)   Ship mifepristone only to certified pharmacies or locations identified by certified prescribers.

4)   Not ship mifepristone to pharmacies or prescribers who become de-certified from the Mifepristone REMS Program.

5)   Provide the Prescribing Information and their Prescriber Agreement Form to healthcare providers who (1) attempt to order mifepristone and are not yet certified, or (2) inquire about how to become certified.

ii.   Put processes and procedures in place to maintain a distribution system that is secure,

App. 75

confidential and follows all processes and procedures, including those for storage, handling, shipping, tracking package serial numbers, NDC and lot numbers, proof of delivery and controlled returns of mifepristone.

    iii. Train all relevant staff on the Mifepristone REMS Program requirements.

    iv. Comply with audits by Mifepristone Sponsors or a third party acting on behalf of Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed for the Mifepristone REMS Program. In addition, distributors must maintain appropriate documentation and make it available for audits.

  b. Ensuring that distributors maintain secure and confidential distribution records of all shipments of mifepristone.

2. Mifepristone Sponsors must monitor their distribution data to ensure compliance with the Mifepristone REMS Program.

3. Mifepristone Sponsors must ensure that adequate records are maintained to demonstrate that the Mifepristone REMS Program requirements have been met, including, but not limited to records of mifepristone distribution; certification of prescribers and pharmacies; and audits of pharmacies and distributors. These records must be readily available for FDA inspections.

4. Mifepristone Sponsors must audit their new distributors within 90 calendar days and annually thereafter after the distributor is authorized to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their distributor compliance if noncompliance is identified.

5. Mifepristone Sponsors must audit their certified pharmacies within 180 calendar days after the pharmacy places its first order of mifepristone, and annually thereafter audit certified pharmacies that have ordered mifepristone in the previous 12 months, to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their pharmacy compliance if noncompliance is identified.

6. Mifepristone Sponsors must take reasonable steps to improve implementation of and compliance with the requirements of the Mifepristone REMS Program based on monitoring and assessment of the Mifepristone REMS Program.

7. Mifepristone Sponsors must report to FDA any death associated with mifepristone whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the Mifepristone Sponsor. This requirement does not affect the sponsors' other reporting and follow-up requirements under FDA regulations.

**C. Timetable for Submission of Assessments**

The NDA Sponsor must submit REMS assessments to FDA one year from the date of the approval of the modified REMS (1/3/2023) and annually thereafter. To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the reporting interval covered by each assessment should conclude no earlier than 90 calendar days before the submission date for that assessment. The NDA Sponsor must submit each assessment so that it will be received by the FDA on or before the due date.

App. 76

**MIFEPREX® (Mifepristone) Tablets, 200 mg**

**PRESCRIBER AGREEMENT FORM**

Mifeprex* (Mifepristone) Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To **become a certified prescriber**, you must:

- **If you submit Mifeprex prescriptions for dispensing from certified pharmacies**:
  - Submit this form to each certified pharmacy to which you intend to submit Mifeprex prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order Mifeprex for dispensing by you or healthcare providers under your supervision:**
  - Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.
  - Healthcare settings, such as medical offices, clinics, and hospitals, where Mifeprex will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

*Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:*

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling  1-877-4 EARLY OPTION (1-877-432-7596 toll-free), or by visiting www.earlyoptionpill.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form*.

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received Mifeprex are reported to Danco Laboratories, LLC, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of Mifeprex that was dispensed to the patient.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.ea

App. 77

Ensure that healthcare providers under your supervision follow the guidelines listed above.

- If Mifeprex will be dispensed through a certified pharmacy:
  - o  Assess appropriateness of dispensing Mifeprex when contacted by a certified pharmacy about patients who will receive Mifeprex more than 4 calendar days after the prescription was received by the certified pharmacy.
  - o  Obtain the NDC and lot number of the package of Mifeprex the patient received in the event the prescriber becomes aware of the death of a patient.
- If Mifeprex will be dispensed by you or by healthcare providers under your supervision:
  - o  Ensure the NDC and lot number from each package of Mifeprex are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____     Title: _____

Signature: _____     Date: _____

Medical License # _____     State _____

NPI # _____

Practice Setting Address: _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343.

Approved 01/2023 [Doc control ID]



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.ea

App. 78

PRESCRIBER AGREEMENT FORM                              Mifepristone Tablets, 200 mg

Mifepristone Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To **become a certified prescriber**, you must:

- **If you submit mifepristone prescriptions for dispensing from certified pharmacies**:
  - o   Submit this form to each certified pharmacy to which you intend to submit mifepristone prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order mifepristone for dispensing by you or healthcare providers under your supervision:**
  - o   Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.
  - o   Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

***Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:***

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling 1-855-MIFE-INFO (1-855—643-3463 toll-free), or by visiting www.MifeInfo.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form*.

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received mifepristone are reported to GenBioPro, Inc. that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

Ensure that healthcare providers under your supervision follow the guidelines listed above.



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.Mi

App. 79

- If mifepristone will be dispensed through a certified pharmacy:

  o   Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.

  o   Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of a patient.

- If mifepristone will be dispensed by you or by healthcare providers under your supervision:

  o   Ensure the NDC and lot number from each package of mifepristone are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____   Title: _____

Signature:  _____   Date: _____

Medical License # _____   State _____

NPI # _____

Practice Setting Address: _____

Return completed form to **RxAgreements@GenBioPro.com** or fax to 1-877-239-8036

Approved 01/2023 [Doc control ID]



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.Mi

App. 80

Reference ID: 5103833

## PATIENT AGREEMENT FORM                    Mifepristone Tablets, 200 mg

**Healthcare Providers:** *Counsel the patient on the risks of mifepristone. Both you and the patient must provide a written or electronic signature on this form.*

**Patient Agreement:**

1.  I have decided to take mifepristone and misoprostol to end my pregnancy and will follow my healthcare provider's advice about when to take each drug and what to do in an emergency.

2.  I understand:
    a.  I will take mifepristone on Day 1.
    b.  I will take the misoprostol tablets 24 to 48 hours after I take mifepristone.

3.  My healthcare provider has talked with me about the risks, including:
    *   heavy bleeding
    *   infection

4.  I will contact the clinic/office/provider right away if in the days after treatment I have:
    *   a fever of 100.4°F or higher that lasts for more than four hours
    *   heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
    *   severe stomach area (abdominal) pain or discomfort, or I am "feeling sick," including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol
        — these symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

    My healthcare provider has told me that these symptoms listed above could require emergency care. If I cannot reach the clinic/office/provider right away, my healthcare provider has told me who to call and what to do.

5.  I should follow up with my healthcare provider about 7 to 14 days after I take mifepristone to be sure that my pregnancy has ended and that I am well.

6.  I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with mifepristone and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

7.  If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

8.  I have the MEDICATION GUIDE for mifepristone.

9.  My healthcare provider has answered all my questions.


**Patient Signature:** _____    **Patient Name** (print): _____    **Date**: _____


**Provider Signature:** _____    **Provider Name** (print): _____    **Date**: _____

*Patient Agreement Forms may be provided, completed, signed, and transmitted in paper or electronically.*

**01/2023**

App. 81

**MIFEPREX®(Mifepristone) Tablets, 200mg**

**PHARMACY AGREEMENT FORM**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense Mifeprex is able to receive *Prescriber Agreement Forms* by email and fax.
- Each location of my pharmacy that will dispense Mifeprex is able to ship Mifeprex using a shipping service that provides tracking information.
- I have read and understood the Prescribing Information for Mifeprex. The Prescribing Information is available by calling 1-877-4 EARLY OPTION (1-877-432-7596 toll-free) or online at www.earlyoptionpill.com; and
- Each location of my pharmacy that will dispense Mifeprex will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting Mifeprex orders.
  - Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.
  - Dispense Mifeprex such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.
  - Confirm with the prescriber the appropriateness of dispensing Mifeprex for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.
  - Record in the patient's record the NDC and lot number from each package of Mifeprex dispensed.
  - Track and verify receipt of each shipment of Mifeprex.
  - Dispense mifepristone in its package as supplied by Danco Laboratories, LLC.
  - Report any patient deaths to the prescriber, including the NDC and lot number from the package of Mifeprex dispensed to the patient, and remind the prescriber of their obligation to report the deaths to Danco Laboratories, LLC. Notify Danco that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.
  - Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.
  - Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, and all processes and procedures including compliance with those processes and procedures.
  - Maintain the identity of Mifeprex patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance.
  - Train all relevant staff on the Mifepristone REMS Program requirements.
  - Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____    Title: _____



*MIFEPREX is a registered trademark of Danco Laboratories, LLC

P.O. Box 4816-New York, NY 10185

1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

App. 82

Signature: _____    Date: _____

Email: _____    Phone: _____    Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC

P.O. Box 4816-New York, NY 10185

1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

App. 83

**PHARMACY AGREEMENT FORM**                                          **Mifepristone Tablets, 200 mg**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense mifepristone is able to receive *Prescriber Agreement Forms* by email and fax.
- Each location of my pharmacy that will dispense mifepristone is able to ship mifepristone using a shipping service that provides tracking information.
- I have read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling 1-855-MIFE-INFO (1-855-643-3463 toll-free) or online at www.MifeInfo.com; and
- Each location of my pharmacy that will dispense mifepristone will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting mifepristone orders.
  - Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.
  - Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.
  - Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.
  - Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.
  - Track and verify receipt of each shipment of mifepristone.
  - Dispense mifepristone in its package as supplied by GenBioPro, Inc.
  - Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to GenBioPro, Inc. Notify GenBioPro that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.
  - Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.
  - Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, all processes and procedures including compliance with those processes and procedures.
  - Maintain the identity of mifepristone patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance purposes.
  - Train all relevant staff on the Mifepristone REMS Program requirements.
  - Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____ Title: _____

Signature: _____ Date: _____

Email: _____ Phone: _____ Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to **RxAgreements@GenBioPro.com** or fax to **1-877-239-8036**.



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463)     App. 84

Reference ID: 5103833

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

**020687Orig1s025**

# SUMMARY REVIEW

 **and**

**Center for Drug Evaluation and Research (CDER)**

| | |
|---|---|
| **Application Type** | NDA and ANDA |
| **Application Number** | NDA 020687 and ANDA 091178 |
| **Supplement Number, Date Received** | NDA Supplement-025 and ANDA Supplement-004 received June 22, 2022 (sequences 18 and 87 respectively) and amended October 19, 2022 (sequences 22 and 91 respectively), November 30, 2022 (sequences 24 and 92 respectively), December 9, 2022 (sequences 25 and 93 respectively) and December 16, 2022 (sequences 26 and 95 respectively). This supplement is on a 180-Day clock. |
| **Targeted Action Date** | December 19, 2022 |
| **# (b) (6)** | 2022-1169 |
| **Reviewer Names** |  |
|  | |
|  | |
| **Review Completion Date** | January 3, 2023 |
| **Subject** | Review of proposed Major REMS Modification |
| **Established Name** | Mifepristone REMS |
| **Name of Sponsor** | Danco Laboratories, LLC and GenBioPro, Inc. |
| **Therapeutic Class** | Progestin antagonist |
| **Formulation** | Oral tablet |

1

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................................... 3

1.    Introduction .............................................................................................................. 4

2.    Background ............................................................................................................... 4

    2.1.    Product Information and REMS Information ........................................................ 4

    2.2.    Regulatory History ............................................................................................. 6

3.    Review of Proposed REMS Modification ................................................................. 8

    3.1.    REMS Goal ........................................................................................................ 8

    3.2.    REMS Document ............................................................................................... 8

    3.3.    REMS Requirements .......................................................................................... 9

        3.3.1.    Addition and Removal of ETASU .............................................................. 9

        3.3.2.    REMS Participant Requirements and Materials ........................................ 9

            3.3.2.1.    Prescriber Requirements ................................................................. 9

            3.3.2.2.    Patient Requirements .................................................................... 11

            3.3.2.3.    Pharmacy Requirements ................................................................ 12

            3.3.2.4.    Distributor Requirements .............................................................. 15

        3.3.3.    REMS Sponsor Requirements ................................................................. 15

            3.3.3.1.    Sponsor Requirements to Support Prescriber Certification ................ 15

            3.3.3.2.    Sponsor Requirements to Support Pharmacy Certification ................ 16

            3.3.3.3.    Sponsor Implementation Requirements .......................................... 16

    3.4.    REMS Assessment Timetable .......................................................................... 16

4.    Supporting Document ............................................................................................ 17

5.    REMS Assessment Plan .......................................................................................... 17

6.    Discussion .............................................................................................................. 19

7.    Conclusions and Recommendations ....................................................................... 21

8.    References .............................................................................................................. 21

9.    Appendices ............................................................................................................. 22

## EXECUTIVE SUMMARY

This is a review of the proposed modification to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program) submitted by Danco Laboratories, LLC (Danco) for new drug application (NDA) 020687 and by GenBioPro, Inc. (GBP) for abbreviated new drug application (ANDA) 091178. The Sponsors submitted proposed modification to the Mifepristone REMS Program on June 22, 2022, and amended their submissions on October 19, 2022 (Danco), October 20, 2022 (GBP), November 30, 2022 (both), December 9, 2022 (both) and December 16, 2022 (both).

The Mifepristone REMS Program was originally approved on April 11, 2019, to mitigate the risk of serious complications associated with mifepristone 200 mg. The most recent REMS modification was approved on May 14, 2021.[a] The Mifepristone REMS Program consists of elements to assure safe use (ETASU) A, C and D, an implementation system, and a timetable for submission of assessments of the REMS.

The Sponsors submitted the proposed modification to the REMS in response to the Agency's REMS Modification Notification letters dated December 16, 2021, which required removal of the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement") and the addition of certification of pharmacies that dispense the drug.

In addition, the following were addressed during the course of the review:
- revisions to the REMS goal to align with the updated REMS requirements.
- replacing serial number with recording of NDC and lot number of mifepristone dispensed.
- additional edits for clarification and consistency in the REMS Document and REMS materials (*Prescriber Agreement Forms*, *Patient Agreement Form*, and *Pharmacy Agreement Forms*).

The review team finds the proposed modification to the Mifepristone REMS Program last submitted on December 16, 2022, to be acceptable and recommends approval of the REMS modification.  The proposed REMS modification includes changes to the REMS goal, additional REMS requirements for prescribers to incorporate dispensing from certified pharmacies and new REMS requirements for pharmacy certification.

The proposed goal of the modified REMS for mifepristone 200 mg is to mitigate the risk of serious complications associated with mifepristone by:

a) Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

b) Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

c) Informing patients about the risk of serious complications associated with mifepristone.

---

[a] The May 14, 2021 REMS modification approved the inclusion of gender neutral language in the Patient Agreement Form as well as corresponding minor changes to the REMS document to be consistent with the changes made to the Patient Agreement Form.

App. 88

The timetable for submission of assessments of the REMS was modified to one year from the date of the approval of the modified REMS and annually thereafter. The assessment plan was revised to align with the changes to the REMS and capture additional metrics for drug utilization and REMS operations.

The modified REMS includes ETASU A, B and D, an implementation system, and a timetable for submission of assessments of the REMS.  Mifepristone will no longer be required to be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (referred to as the "in-person dispensing requirement" for brevity) and will be able to be dispensed from certified pharmacies.

# 1.  Introduction

This review evaluates the proposed modification to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program) submitted by Danco Laboratories, LLC (Danco) for new drug application (NDA) 020687 and by GenBioPro, Inc. (GBP) for abbreviated new drug application (ANDA) 091178.

The Sponsors initially submitted proposed modification to the Mifepristone REMS Program on June 22, 2022, in response to the Agency's REMS Modification Notification letters issued on December 16, 2021, to Danco and GBP, requiring the following modification to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks:

- removal of the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement")

- addition of certification of pharmacies that dispense the drug

Per the Agency's December 16, 2021, REMS Modification Notification letters, the proposed REMS was required to include the following ETASU to mitigate the risk of serious complications associated with mifepristone, including at least the following:

- healthcare providers have particular experience or training, or are specially certified

- pharmacies, practitioners, or health care settings that dispense the drug are specially certified

- the drug is dispensed to patients with evidence or other documentation of safe use conditions

The REMS was also required to include an implementation system and timetable for submission of assessments.

# 2.  Background

## 2.1.  Product Information and REMS Information

Mifepristone is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy (IUP) through 70 days gestation. Mifepristone is available as 200 mg tablets for oral use.

Mifeprex (mifepristone) was approved on September 28, 2000, with a restricted distribution program under 21 CFR 314.520 (subpart H)[b] to ensure that the benefits of the drug outweighed

---

[b] NDA approval letter Mifeprex (NDA 020687) dated September 28, 2000.

the risk of serious complications associated with mifepristone when used for medical abortion.[c] Mifeprex was deemed to have in effect an approved REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act of 2007 (FDAAA), and the Mifeprex REMS was approved on June 8, 2011.

On March 29, 2016, FDA approved an efficacy supplement for Mifeprex, which included changes in the dose of Mifeprex and the dosing regimen for taking Mifeprex and misoprostol, as well as a modification of the gestational age up to which Mifeprex has been shown to be safe and effective and a modification to the process for follow-up after administration of the drug. FDA also approved modification to the Mifeprex REMS that reflected the changes approved in the efficacy supplement.[1-5] On April 11, 2019, FDA approved ANDA 091178 and the Mifepristone REMS Program.[6-7] The Mifepristone REMS Program is a single, shared system REMS that includes NDA 020687 and ANDA 091178. The goal of the approved Mifepristone REMS Program is to mitigate the risk of serious complications associated with mifepristone by:

a) Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program (under ETASU A).

b) Ensuring that mifepristone is only dispensed in certain healthcare settings by or under the supervision of a certified prescriber (under ETASU C).

c) Informing patients about the risk of serious complications associated with mifepristone (under ETASU D).

The Mifepristone REMS Program was last modified and approved in 2021 to revise the *Patient Agreement Form* to include gender-neutral language; however, the goal of the Mifepristone REMS Program has not changed since the initial approval in 2019.

Under ETASU A, to become specially certified to prescribe mifepristone, a healthcare provider must review the prescribing information, complete and sign the *Prescriber Agreement Form,* and agree to follow the guidelines for use of mifepristone. Under ETASU C, in the Mifepristone REMS Program as approved prior to today's action, mifepristone was required to be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber. Under ETASU D, mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions (i.e., the patient must sign a *Patient Agreement Form*). The approved Mifepristone REMS Program includes an implementation system, and a timetable for assessments (one year from the date of the initial approval of the REMS on April 11, 2019, and every three years thereafter).

In April 2021, FDA communicated its intent to exercise enforcement discretion during the COVID-19 public health emergency (PHE) regarding the in-person dispensing requirement in the Mifepristone REMS Program. Specifically, FDA communicated that provided all other requirements of the Mifepristone REMS Program are met, the Agency intended to exercise enforcement discretion with respect to the in-person dispensing requirement of the Mifepristone REMS Program, including any in-person requirements that may be related to the *Patient Agreement Form*, during the COVID-19 PHE. This determination, which FDA made on April 12, 2021, was effective immediately. We also note that from July 13, 2020, to January 12, 2021, per a court order, FDA was enjoined from enforcing the in-person dispensing requirement of the Mifepristone REMS Program.[8]

---

[c] Mifepristone is also approved in approximately 80 other countries. https://gynuity.org/assets/resources/biblio_ref_lst_mife_en.pdf

Reference ID: 5103819

Further, and as we also communicated on April 12, 2021, to the extent all of the other requirements of the Mifepristone REMS Program are met, the Agency intended to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of Mifeprex or the approved generic version of Mifeprex, Mifepristone Tablets, 200 mg, through the mail, either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

## 2.2. Regulatory History

The following is a summary of the regulatory history relevant to this review:

- 04/11/2019: Approval of the Mifepristone REMS Program, a single, shared system REMS that includes NDA 020687 and ANDA 091178.

- 04/12/2021: The Agency issued a General Advice letter to both the NDA and ANDA Applicants, explaining that FDA intended to exercise enforcement discretion during the COVID-19 PHE with respect to the in-person dispensing requirement in the Mifepristone REMS Program, including any in-person requirements that may be related to the Patient Agreement Form.

- 05/07/2021: The Agency stated that it would be reviewing the elements of the Mifepristone REMS Program in accordance with section 505-1 of the FD&C Act.

- 12/16/2021: The Agency completed its review of the Mifepristone REMS Program and determined, among other things, that the REMS must be modified to remove the in-person dispensing requirement and add pharmacy certification.[9]

- 12/16/2021: REMS Modification Notification letters were sent to both Sponsors stating that the approved Mifepristone REMS Program must be modified to minimize the burden on the healthcare system of complying with the REMS and ensure that the benefits of the drug outweigh the risks.

- 04/08/2022: Final written responses to a Type A meeting request were provided to Danco, the point of contact for the Mifepristone REMS Program. The questions pertained to the 12/16/2021 REMS Modification Notification letter requirements.

- 04/13/2022: The Sponsors requested an extension to 6/30/2022, to submit a proposed REMS modification in response to the Agency's 12/16/2021 REMS Modification Notification letters.

- 04/15/2022: The Agency granted the Sponsors' request for an extension to submit a proposed REMS modification and conveyed that the modification must be submitted no later than 06/30/2022.[10]

- 06/22/2022: Danco and GBP submitted a proposed REMS modification to their respective applications in response to the 12/16/2021 REMS Modification Notification letters.

- 07/22/2022: An Information Request was sent to the Sponsors requesting clarification of the proposed prescriber and dispenser requirements and additional rationale to support their proposal.

- 08/26/2022: Sponsors submitted responses to 07/22/2022 Information Request.

- 09/19/2022: Teleconference was held between Agency and Sponsors where the Agency communicated the REMS requirements that are necessary to support the addition of pharmacy

Reference ID: 5103819

certification. The Agency proposed focusing on the pharmacy settings where a closed system[d] REMS could be implemented using the existing email and facsimile based system, ▨▨▨ (b) (4) ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨, as the best strategy for an approvable modification by the goal date.

- 09/22/2022: An Information Request was sent to Sponsors requesting confirmation that the Sponsors agree with the pharmacy distribution approach outlined in the 09/19/2022 teleconference so that the Agency's feedback could be appropriately tailored.

- 09/23/2022: The Sponsors confirmed via email that they were willing to pursue ▨▨▨ (b) (4) ▨▨▨▨, as discussed in the 09/19/2022 teleconference. The Sponsors also requested a teleconference to discuss the current modification ▨▨▨▨▨▨▨▨▨ (b) (4) ▨▨▨▨▨▨▨▨ ▨▨▨▨.

- 09/27/2022: Comments from the 09/19/2022 teleconference sent to Sponsors with additional comments and requests regarding what will be necessary for pharmacy certification.

- 09/29/2022: An Information request was sent to the Sponsors asking for agenda items, questions, and a request to walk through their proposed system for pharmacy certification, including dispensing through mail-order or specialty pharmacies, at the 10/06/2022 scheduled teleconference.

- 10/04/2022: Sponsors emailed that they will focus the 10/06/2022 teleconference on the 09/27/2022 Agency comments and their mail order and specialty pharmacy distribution model.

- 10/06/2022: Teleconference was held between Agency and Sponsors where Sponsors outlined their proposal for pharmacy certification, including dispensing through mail order and specialty pharmacies, as well as their concerns with certain requirements and general timelines.

- 10/19/2022: Danco submitted a REMS amendment to their pending sNDA, which included a REMS document and REMS materials. They did not submit a REMS Supporting Document.

- 10/20/2022: GBP submitted a REMS amendment to their pending sANDA, which included a REMS document and REMS materials. They did not submit a REMS Supporting Document.

- 10/25/2022: Teleconference was held between Agency and Sponsors to discuss the *Patient Agreement Form* and timing related to shipping a mifepristone prescription from a certified pharmacy to the patient.

- 11/23/2022: An Information Request was sent to Sponsors with comments on their proposed REMS Document, submitted on 10/19/2022 (Danco) and 10/20/2022 (GBP).

- 11/30/2022: Danco and GBP submitted REMS amendments, which included the REMS Document, to their respective pending supplemental applications.

- 12/01/2022: Teleconference was held between Agency and Sponsors to discuss the REMS Document.

- 12/05/2022: An Information Request was sent to Sponsors with comments on their proposed REMS Document submitted on 11/30/2022 and discussed at the teleconference on 12/01/2022, and REMS materials submitted to their applications on 10/19/2022 and 10/20/2022.

[d] "Closed system" in this case refers to a system where prescribers, pharmacies, and distributors are certified or authorized in the REMS and the certification of the stakeholder must be verified prior to distribution or dispensing, as per the REMS.

App. 92

- 12/07/2022: Teleconference was held between Agency and Sponsors to discuss the REMS Document and REMS materials the Agency sent to the Sponsors on 12/05/22.

- 12/08/2022: Danco and GBP submitted REMS amendments, including the REMS Document, *Prescriber Agreement Form, Pharmacy Agreement Form, Patient Agreement Form* and REMS Supporting Document, to their respective pending applications.

- 12/09/2022: An Information Request was sent to Sponsors with the Agency's comments on the REMS assessment plan.

- 12/14/2022: An Information Request was sent to Sponsors with the Agency's comments on the REMS Document, *Prescriber Agreement Form, Pharmacy Agreement Form*, and REMS Supporting Document.

- 12/15/2022: Two teleconferences were held between Agency and Sponsors to discuss the proposed REMS Document and REMS materials the Agency sent to the Sponsors on 12/14/22.

- 12/16/2022: Sponsors submitted a REMS amendment to their respective applications.

## 3.  Review of Proposed REMS Modification

(b) (6) has discussed the Sponsors' proposed modification with the review team, which includes members of the (b) (6) and the (b) (6) ; hereafter referred to as the review team. This review includes their input and concurrence with the analysis and proposed changes to the Mifepristone REMS Program.

### 3.1. REMS Goal

The Sponsors proposed modification to the goal for the Mifepristone REMS Program to add that mifepristone can also be dispensed from certified pharmacies on prescriptions issued by certified prescribers. The proposed REMS goal is:

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

a)  Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

b)  Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

c)  Informing patients about the risk of serious complications associated with mifepristone.

**Reviewer Comment:** *We agree with the Sponsors' proposal.*

### 3.2. REMS Document

The proposed REMS Document is not in the format as outlined in the 2017 Draft Guidance for Industry, Format and Content of a REMS Document.[11]

Reference ID: 5103819

*Reviewer Comment: To avoid the misperception that this REMS modification is making major changes to the REMS document that go beyond our December 16, 2021, determination that the REMS must be modified to remove the in-person dispensing requirement and add pharmacy certification, CDER staff and management discussed whether to change the format of the REMS document to that described in the 2017 draft guidance.[11] After internal discussion, CDER staff and management aligned not to transition the REMS document at this time to the format described in the 2017 draft guidance.*

### 3.3. REMS Requirements

#### 3.3.1.  Addition and Removal of ETASU

The December 16, 2021, REMS Modification Notification letters specified that the ETASU must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure the benefits of the drug outweigh the risks by:

- Removing the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices and hospitals (i.e., the "in-person dispensing requirement"), and;
- Adding a requirement that pharmacies that dispense the drug be specially certified.

The Sponsors proposed changes to the REMS as reflected in the subsections below.

#### 3.3.2.  REMS Participant Requirements and Materials
##### 3.3.2.1.    Prescriber Requirements

Consistent with the approved Mifepristone REMS Program prescribers must be specially certified. To become specially certified to prescribe mifepristone, healthcare providers who prescribe must review the Prescribing Information for mifepristone and complete the *Prescriber Agreement Form*. In signing the *Prescriber Agreement Form*, prescribers agree they meet certain qualifications and will follow the guidelines for use of mifepristone.  The guidelines for use include ensuring i) that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained; ii) that the healthcare provider (HCP) and the patient sign the *Patient Agreement Form*, iii) the patient receives a copy of the *Patient Agreement Form* and Medication Guide, iv) the *Patient Agreement Form* is placed in the patient's medical record; v) that any patient deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient. The language on the guidelines for use was revised from the Mifepristone REMS Program approved in 2021 to clarify that, if the certified prescriber supervises the dispensing of mifepristone, they must ensure the guidelines for use of mifepristone are followed by those under their supervision.  This clarification reflects the ongoing implementation of the approved Mifepristone REMS Program.  For example, consistent with the approved REMS, the *Patient Agreement Form* does not require the certified prescriber's signature, but rather the signature of the healthcare provider counseling the patient on the risks of mifepristone.  Additional changes were made globally to provide consistency and clarity of the requirements for certified prescribers and healthcare providers who complete tasks under the supervision of certified prescribers.

A certified prescriber may submit the *Prescriber Agreement Form* to an authorized distributor if the certified prescriber wishes to dispense or supervise the dispensing of mifepristone; this is consistent with the current requirements of the Mifepristone REMS Program. Additional requirements were

Reference ID: 5103819

added to incorporate mifepristone dispensing by a certified pharmacy. If a healthcare provider wishes to prescribe mifepristone by sending a prescription to a certified pharmacy for dispensing, the healthcare provider must become certified by providing the pharmacy a *Prescriber Agreement Form* signed by the provider. A certified prescriber must also assess the appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than four calendar days after the prescription was received by the certified pharmacy.

The NDC and lot number of the dispensed drug will be recorded in the patient's record when mifepristone is dispensed by or under the supervision of a certified prescriber, replacing the requirement that serial numbers from each package of mifepristone be recorded in the patient's record. If prescribers become aware of the death of a patient for whom the mifepristone was dispensed from a certified pharmacy, the prescribers will be required to obtain the NDC and lot number of the package of mifepristone the patient received from the pharmacy.

The following materials support prescriber requirements:

- *Prescriber Agreement Form* for Danco Laboratories, LLC
- *Prescriber Agreement Form* for GenBioPro, Inc.
- *Patient Agreement Form*

**Reviewer Comment:**  *We agree with the Sponsors' proposal.*

*Although certain activities (review of the Patient Agreement Form with patients and answering any questions about treatment, signing, providing a copy to the patient and retaining the Patient Agreement Form, providing a copy of the Medication Guide, and ensuring any deaths are reported to the Mifepristone Sponsor, recording the NDC and lot number from drug dispensed from the certified prescriber or those under their supervision) may be conducted by healthcare providers under the supervision of a certified prescriber, the certified prescriber remains responsible for ensuring compliance with the requirements of the Mifepristone REMS Program. We agree with the additional language to further clarify that the certified prescriber must ensure the guidelines for use of mifepristone are followed.*

*As proposed, certified prescribers may either, 1) continue to submit the Prescriber Agreement Form to an authorized distributor if the certified prescriber is dispensing or supervising the dispensing of the drug (as already required in the REMS), or 2) if the drug will be dispensed from a certified pharmacy, submit the Prescriber Agreement Form to the certified pharmacy that will dispense the drug (as proposed in the modification). Regarding #2, the pharmacy can only fill prescriptions written by a certified prescriber.*

*Based on our review of the proposed changes, the review team finds it acceptable for prescribers to submit their Prescriber Agreement Form directly to the certified pharmacy. Although certified prescribers still have the option of in-person dispensing of the drug, not all prescribers may want to stock mifepristone. Typically due to the number of drugs that are available and the expense associated with stocking prescription medications intended for outpatient use, most prescribers do not stock many medications, if they stock medications at all.*

*The proposal to submit a Prescriber Agreement Form to a certified pharmacy provides another option for dispensing mifepristone. The burden of providing the Prescriber Agreement Form prior to or when the prescription is provided to a certified pharmacy does not create unreasonable burden for prescribers. The burden of prescriber certification has been minimized to the extent possible. The Prescriber Agreement Form is designed to require minimal time to complete and requires that the prescriber submit it to the authorized distributor once, and if the prescriber chooses to use a certified pharmacy to dispense mifepristone, they will need to submit the form to the certified pharmacy.*

Reference ID: 5103819

*There is an additional requirement added for certified pharmacies and certified prescribers in the event that a patient will not receive their medication from the certified pharmacy within four calendar days of the pharmacy's receipt of the prescription (for example, if the medication is not in stock). In this circumstance, the pharmacy will be required to contact the certified prescriber to make them aware of the delay and will be required to obtain from the prescriber confirmation that it is appropriate to dispense mifepristone to the patient even though they will receive mifepristone more than four calendar days after the prescription was received by the certified pharmacy. This confirmation is intended to ensure timeliness of delivery in light of the labeled indication and gestational age. Additional details and rationale on the pharmacy requirements to dispense and ship drug in a timely manner are described in section 3.3.2.3.*

*If a certified prescriber becomes aware of a patient death that occurs subsequent to the use of mifepristone dispensed from a pharmacy, the certified prescriber must obtain the NDC and lot number of the package of mifepristone the patient received from the pharmacy. This information will be reported to the appropriate Mifepristone Sponsor in the same manner prescribers have done previously. This additional requirement to obtain the NDC and lot number from the pharmacy is needed to ensure consistent adverse event reporting when mifepristone is dispensed from a certified pharmacy.*

Prescriber Agreement Form

The Sponsors' proposed changes to the *Prescriber Agreement Form* aligned with those described above. The proposed *Prescriber Agreement Form* explains the two methods of certification which are: 1) submitting the form to the authorized distributor and 2) submitting the form to the dispensing certified pharmacy. Further clarification was added that healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification. The statement that certified prescribers are responsible for overseeing implementation and compliance with the REMS Program was also added. The following statement was added to the form: "I understand that the pharmacy may dispense mifepristone made by a different manufacturer than that stated on the Prescriber Agreement Form." The account set up information was removed and replaced with prescriber information response fields.

**Reviewer Comment**: *We agree with the Sponsors' proposal. Changes in the above prescriber requirements were incorporated in the Prescriber Agreement Form.*

### 3.3.2.2.    Patient Requirements

The *Patient Agreement Form* was updated to clarify that the signatures may be written or electronic, to reorganize the risk information about ectopic pregnancy, and to remove the statement that the Medication Guide will be taken to an emergency room or provided to a healthcare provider who did not prescribe mifepristone so that it is known that the patient had a medical abortion with mifepristone.

The following materials support patient requirements:

- *Patient Agreement Form*

**Reviewer Comment:** *We agree with the Sponsors' proposal.*

*The Patient Agreement Form continues to be an important part of standardizing the medication information on the use of mifepristone that prescribers communicate to their patients, and also provides the information in a brief and understandable format for patients. The requirement to counsel the*

Reference ID: 5103819

*patient, to provide the patient with the Patient Agreement Form, and to have the healthcare provider and patient sign the Patient Agreement Form, ensures that each provider, including new providers, informs each patient of the appropriate use of mifepristone, risks associated with treatment, and what to do if the patient experiences symptoms that may require emergency care. The form is signed by the patient and the provider and placed in the patient's medical record, and a copy is provided to the patient, to document the patient's acknowledgment of receiving the information from the prescriber. The Agency agrees that the further clarification that signatures can be written or electronic is appropriate for the continued use of the form.*

*The reference to ectopic pregnancy has been reorganized in the document since it is not a risk of the drug. The signs and symptoms of an untreated ectopic pregnancy that may persist after mifepristone use have been clarified in the section of the form that explains the signs and symptoms of potential problems that may occur after mifepristone use.*

*The review team agrees with removing the patient's agreement to take the Medication Guide with them if they visit an emergency room or HCP who did not give them mifepristone so the emergency room or HCP will understand that the patient is having a medical abortion. Although this statement has been in the Medication Guide for a number of years, upon further consideration, the Agency has concluded that patients seeking emergency medical care are not likely to carry a Medication Guide with them, the Medication Guide is readily available online, and information about medical conditions and previous treatments can be obtained at the point of care.*

### 3.3.2.3.    Pharmacy Requirements

The Sponsors proposed that certified pharmacies, in addition to certified prescribers and HCPs under the supervision of certified prescribers, can dispense mifepristone. In order for a pharmacy to become certified, the pharmacy must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy. The Authorized Representative must certify that they have read and understood the Prescribing Information for mifepristone. Each location of the pharmacy must be able to receive *Prescriber Agreement Forms* by email and fax and be able to ship mifepristone using a shipping service that provides tracking information.

Additionally, each dispensing pharmacy location must put processes and procedures in place to fulfill the REMS requirements. Certified pharmacies must verify prescriber certification by confirming they have obtained a copy of the prescriber's signed *Prescriber Agreement Form* before dispensing. Certified pharmacies must dispense mifepristone such that it is received by the patient within four days from the day of prescription receipt by the pharmacy. If the pharmacy will not be able to deliver mifepristone to the patient within four days of receipt of the prescription, the pharmacy must contact the prescriber to confirm the appropriateness of dispensing mifepristone and document the certified prescriber's decision. The pharmacy must also record the NDC and lot number from each package of mifepristone dispensed in the patient's record, track and verify receipt of each shipment of mifepristone, dispense mifepristone in its original package, and only distribute, transfer, loan, or sell mifepristone to certified prescribers or between locations of the certified pharmacy. The pharmacy must also report any patient deaths to the prescriber, including the NDC and lot number from the package dispensed to the patient, and remind the prescriber of their obligation under the REMS to report patient deaths to the Sponsor that supplied the mifepristone; the certified pharmacy also must notify the Sponsor that supplied the mifepristone that the pharmacy submitted a report of a patient death to the prescriber and include the name and contact information for the prescriber as well as the NDC and lot number of the dispensed

Reference ID: 5103819

product. Record-keeping requirements of the pharmacy include records of *Prescriber Agreement Forms*, mifepristone dispensing and shipping, and all processes and procedures and compliance with those processes and procedures. Pharmacies must train all relevant staff and participate in compliance audits. Pharmacies must also maintain the identity of patients and providers as confidential, including limiting access to patient and provider identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes. The requirement that mifepristone not be dispensed from retail pharmacies was removed.

The following materials support pharmacy requirements:

- *Pharmacy Agreement Form* for Danco Laboratories, LLC

- *Pharmacy Agreement Form* for GenBioPro, Inc.

*Reviewer Comment: We agree with the Sponsors' proposal. The Mifepristone REMS Program continues to require that mifepristone be prescribed only by certified prescribers. With the removal of the in-person dispensing requirement, however, mifepristone can be dispensed from a pharmacy, provided the product is prescribed by a certified prescriber and all other requirements of the REMS are met. Given this modification to the dispensing requirements in the REMS, it is necessary to add a requirement for certification of pharmacies. Adding the pharmacy certification requirement incorporates pharmacies into the REMS, ensures that pharmacies are aware of and agree to follow applicable REMS requirements, and ensures that mifepristone is only dispensed pursuant to prescriptions that are written by certified prescribers. Without pharmacy certification, a pharmacy might dispense product that was not prescribed by a certified prescriber. Adding pharmacy certification ensures that the prescriber is certified prior to dispensing the product to a patient; certified prescribers, in turn, have agreed to meet all the conditions of the REMS, including ensuring that the Patient Agreement Form is completed. In addition, wholesalers and distributors can only ship to certified pharmacies. Based on our review and our consideration of the distribution model implemented by the Sponsors during the periods when the in-person dispensing requirement was not being enforced, as well as REMS assessment data and published literature, we conclude that provided all other requirements of the REMS are met, the REMS program, with the removal of the in-person dispensing requirement and the addition of a requirement for pharmacy certification, will continue to ensure the benefits of mifepristone for medical abortion outweigh the risks while minimizing the burden imposed by the REMS on healthcare providers and patients.*

*The requirement to maintain confidentiality, including limiting access to patient and provider identity only to those personnel necessary for dispensing under the Mifepristone REMS Program or as necessary for payment and/or insurance purposes, is included to avoid unduly burdening patient access.*

*The Sponsors proposed inclusion of this requirement because of concerns that patients may be reluctant or unwilling to seek to obtain mifepristone from pharmacies if they are concerned that confidentiality of their medical information could be compromised, potentially exposing them to intimidation, threats, or acts of violence by individuals opposed to the use of mifepristone for medical abortion.[e] Further, unwillingness on the part of prescribers to participate in the Mifepristone REMS Program on the basis of*

---

[e] See e.g., *2020 Violence and Disruption Statistics,* National Abortion Federation (Dec. 16, 2021), https://prochoice.org/national-abortion-federation-releases-2020-violence-disruption-statistics/; Amanda Musa, CNN, *Wyoming Authorities Search for a Suspect Believed to Have Set an Abortion Clinic on Fire*, CNN WIRE (June 10, 2022), https://abc17news.com/news/2022/06/10/wyoming-authorities-search-for-a-suspect-believed-to-have-set-an-abortion-clinic-on-fire/.

App. 98

*similar confidentiality concerns may unduly burden patient access by limiting the number of prescribers who are willing to send prescriptions to certified pharmacies. Addition of this requirement protects patient access by requiring the pharmacy to put processes and procedures in place to limit access to confidential information to only those individuals who are essential for dispensing mifepristone under the Mifepristone REMS Program or as necessary for payment or insurance purposes. Inclusion of this requirement for certified pharmacies is consistent with the requirement in the current Mifepristone REMS Program, that distributors maintain secure and confidential records.*

*Reference to mifepristone not being available in retail pharmacies was removed from the REMS. There is no single definition of the term "retail pharmacy" and therefore the scope of the exclusion in the REMS was not well defined. Including a restriction in the Mifepristone REMS Program that retail pharmacies cannot participate in the REMS may unintentionally prohibit the participation of mail order and specialty pharmacies that could, under one or more definitions, also be considered a "retail pharmacy."*

*After reconsideration of the term, "retail," the Agency concluded that a more appropriate approach was to articulate the specific requirements that would be necessary for pharmacy certification. As modified, the REMS will not preclude the participation of any pharmacy that meets the certification requirements. However, we acknowledge that the provision in the REMS related to pharmacies' verification of prescriber enrollment will likely limit the types of pharmacies that will choose to certify in the REMS. The REMS requires that pharmacies dispense mifepristone only after verifying that the prescriber is certified. The REMS further requires that pharmacies be able to receive the Prescriber Agreement Forms by email and fax.*

(b) (4)

*The pharmacy certification requirements include that the drug reach patients within four days of the certified pharmacy receiving the prescription. During the course of the review, the review team concluded that requiring medication delivery to the patient within four days of the pharmacy's receipt of a prescription is acceptable based on the labeled indication and literature,[13] while taking into account practical shipping considerations (e.g., shipping over weekends and holidays). For patients who will not receive the drug within four calendar days of the date the pharmacy receives the prescription, the pharmacy must notify the certified prescriber and the certified prescriber must determine if it is still appropriate for the certified pharmacy to dispense the drug. The pharmacy must document the certified prescriber's decision. A prescriber's confirmation that it is appropriate to dispense mifepristone when it will not be delivered to the patient within the allotted four days is intended to ensure timeliness of delivery in light of the labeled indication and gestational age.*

Reference ID: 5103819

Pharmacy Agreement Form

The proposed *Pharmacy Agreement Form* is a new form and is the means by which a pharmacy becomes certified to dispense mifepristone. The form, which is submitted by an authorized representative on behalf of a pharmacy seeking certification, outlines all requirements proposed above. Clarification is included in the form that healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program, do not require pharmacy certification. Any new authorized representative must complete and submit the *Pharmacy Agreement Form*. Spaces for specific authorized representative information and pharmacy name and address are included.  The completed form can be submitted by email or fax to the authorized distributor.

*Reviewer Comment: We agree with the Sponsors' proposal. The Pharmacy Agreement Form aligns with the pharmacy requirements discussed above.*

### 3.3.2.4.    Distributor Requirements

The Sponsors proposed that the distributors' processes and procedures in the approved Mifepristone REMS Program be updated to ensure that mifepristone is only shipped to clinics, medical offices and hospitals identified by certified prescribers and to certified pharmacies. Distributors will continue to complete the certification process for any *Prescriber Agreement Forms* they receive and also will complete the certification process for pharmacies upon receipt of a *Pharmacy Agreement Form*, including notifying pharmacies when they become certified. FDA was removed as a potential auditor for distributors.

*Reviewer Comment:  We agree with the Sponsors' proposal. At this time, FDA does not audit distributors directly, it carries out inspections of Sponsors to monitor industry compliance with REMS requirements.*

### 3.3.3.  REMS Sponsor Requirements
### 3.3.3.1.    Sponsor Requirements to Support Prescriber Certification

The Sponsors proposed additions to this section of the REMS document, including that Sponsors will ensure prescribers can complete the certification process by email or fax to an authorized distributor and/or certified pharmacy, and that Sponsors will ensure annually with each certified prescriber that their locations for receiving mifepristone are up to date. Sponsors will also ensure prescribers previously certified in the Mifepristone REMS Program complete the new *Prescriber Agreement Form*: (1) within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies, or (2) within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

*Reviewer Comment: We agree with the Sponsors' proposal. The requirement to confirm that the locations associated with the certified prescriber are current is parallel to the pharmacy requirement that the authorized representative's contact information is up to date. In determining the pharmacy requirement, which is necessary to ensure program compliance and is consistent with other approved REMS that include pharmacy certification, the Agency also concluded that a parallel requirement for certified prescribers should be added.*

*With respect to recertification, it is important that active certified prescribers are informed of and agree to new REMS requirements to ensure the continued safe use of mifepristone. There is minimal burden to recertification and the timelines allow sufficient time to accomplish recertification.*

Reference ID: 5103819

### 3.3.3.2.    Sponsor Requirements to Support Pharmacy Certification

The Sponsors proposed the addition of Sponsor requirements to support pharmacy certification and compliance, including ensuring that pharmacies are certified in accordance with the requirements in the Mifepristone REMS Program, de-certifying pharmacies that do not maintain compliance with the certification requirements, and ensuring that pharmacy certification can be completed by email and fax to an authorized distributor. Annually, the authorized representative's name and contact information will be verified to ensure it corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, a new authorized representative must certify for the pharmacy. All reference to the requirement in the 2021 Mifepristone REMS Program that mifepristone to be dispensed to patients only in clinics, medical offices and hospitals by or under the supervision of a certified prescriber, and not from retail pharmacies, was removed.

*Reviewer Comment: We agree with the Sponsors' proposal. Changes are in line with the REMS Modification Notification letters sent December 16, 2021. Refer to section 3.3.2.3 Reviewer Comments on Pharmacy Certification for rationale for removing the statement that mifepristone is not distributed to or dispensed from retail pharmacies. Ensuring that the authorized representative's contact information is up to date is necessary to ensure that there is always a point person who is responsible for implementing the Mifepristone REMS Program in their pharmacy and can address any changes that are needed if pharmacy audits identify a need for improvement.*

### 3.3.3.3.    Sponsor Implementation Requirements

The Sponsors proposed that they will ensure that adequate records are maintained to demonstrate that REMS requirements have been met (including but not limited to records of mifepristone distribution, certification of prescribers and pharmacies, and audits of pharmacies and distributors), and that the records must be readily available for FDA inspections. The distributor audit requirement was updated to audit new distributors within 90 calendar days of becoming authorized and annually thereafter (a one-time audit requirement was previously required). The Sponsors also proposed a pharmacy audit requirement whereby certified pharmacies that order mifepristone are audited within 180 calendar days after the pharmacy places its first order of mifepristone, and annually thereafter for pharmacies that ordered in the previous 12 months.

*Reviewer's Comment: We agree with the Sponsors' proposal.*

*The number of pharmacies that will certify in the REMS is uncertain; therefore, to obtain a reliable sample size for the audits, the Sponsors will need to audit all certified pharmacies within 180 calendar days after the pharmacy places its first order and annually thereafter for pharmacies that have ordered mifepristone in the previous 12 months. Audits performed at 180 days should allow time for establishment and implementation of audit protocols and for the Sponsors to perform the audits. With the addition of more stakeholders (i.e., certified pharmacies), it is also necessary to audit distributors annually to ensure the REMS requirements are followed. The requirement to conduct audits annually may be revisited if assessment data shows that the REMS is meeting its goal.*

## 3.4. REMS Assessment Timetable

The Sponsors proposed that assessments must be submitted one year from the approval of the modified REMS and annually thereafter, instead of every three years as per the previous requirement.

Reference ID: 5103819

*Reviewer's Comment: We agree with the Sponsors' proposal. With the addition of new pharmacy stakeholders and removal of the in-person dispensing requirement, more frequent assessment after this REMS modification is needed to ensure REMS processes are being followed and that the REMS is meeting its goal. The requirement can be revisited at a later date if assessment data shows that the modified REMS is meeting its goal. The NDA applicant is required to submit assessment reports as outlined in the timetable for submission of assessments. These reports address requirements for the Mifepristone REMS Program. The Sponsors have indicated that some data will be submitted as separate reports when Sponsor-specific information is needed to address the assessment metrics.*

## 4. Supporting Document

The Sponsors' REMS Supporting Document was substantially updated to include information regarding the proposed modification under review. Background and rationale from the 12/16/21 REMS Modification Notification letters was included. An updated description of the REMS goal and the ETASU was also included to align with the changes in the REMS Document and provide further clarification. Further explanation of prescriber requirements and rationale for various pharmacy requirements was also included.

Regarding implementation of the modified REMS, the Sponsors additionally proposed that pharmacies that received and shipped mifepristone during the Agency's exercise of enforcement discretion during the COVID-19 PHE, that wish to continue to dispense mifepristone, will be required to comply with the pharmacy certification requirements within 120 days of approval of the modified REMS.

The communication strategy to alert current and future prescriber and pharmacy stakeholders was outlined. Distributors, certified prescribers that purchased mifepristone in the last twelve months, and various professional organizations will receive information about REMS changes within 120 days of modification approval. The Sponsors proposed to list pharmacies that agree to be publicly disclosed on their respective product websites but disclosure of this nature is not a requirement of the REMS. The Sponsors indicated that they anticipate certified pharmacies that do not agree to public disclosure will communicate with the certified prescribers they wish to work with.

The REMS Assessment Plan is discussed in the following section.

*Reviewer's Comment: We agree with the Sponsors' proposal. The Supporting Document addresses all REMS requirements and provides sufficient clarification of implementation and maintenance of the REMS. The implementation requirements for pharmacies currently dispensing mifepristone under FDA's exercise of enforcement discretion during the COVID-19 PHE provide for continued use of these pharmacies without breaks in service. The communication strategy is also adequate given the efforts to reach both established certified prescribers and potentially new prescribers through professional organizations.*

*The Sponsors' plan to communicate which pharmacies are certified to certified prescribers is adequate. For the reasons listed in section 3.3.2.3, confidentiality is a concern for REMS stakeholders. Disclosure of pharmacy certification status should be a choice made by individual certified pharmacies. The Sponsors have indicated that there will be some certified pharmacies that have agreed to publicly disclose their status, making this information available to certified prescribers who wish to use a pharmacy to dispense mifepristone.*

## 5. REMS Assessment Plan

Reference ID: 5103819

The REMS Assessment Plan is summarized in the REMS Supporting Document and will be included in the REMS Modification Approval letter.

The REMS Assessment Plan was revised to align with the modified REMS goal and objectives.

The goal of the Mifepristone REMS Program is to mitigate the risk of serious complications associated with mifepristone by:

a.  Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

    •  This objective will be assessed using REMS Certification Statistics and REMS Compliance metrics.

b.  Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

    •  This objective will be assessed using REMS Certification Statistics and REMS Compliance metrics.

c.  Informing patients about the risk of serious complications associated with mifepristone.
    •  This objective will be indirectly assessed using REMS Certification Statistics to avoid compromising patient and prescriber confidentiality.  As part of the certification process, healthcare providers agree to:
        •  Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained
        •  Ensure that the *Patient Agreement Form* is signed by the healthcare provider and the patient
        •  Ensure that the patient is provided with a copy of the *Patient Agreement Form* and the Medication Guide
        •  Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record

The following revisions were made from the Mifepristone REMS Assessment Plan in the April 11, 2019, Supplement Approval letter:

The Assessment Plan Categories of 1) Program Implementation and Operations and 2) Overall Assessment of REMS Effectiveness were added.

REMS Certification Statistics metrics were added to capture certification numbers for program stakeholders to assess the first objective of requiring healthcare providers who prescribe mifepristone to be certified and the second objective of ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.  The total number of certified prescribers who certified with the wholesaler/distributor and the total number of certified prescribers who submitted a *Prescriber Agreement Form* to certified pharmacies were added to capture the additional method of prescriber certification. The number of newly certified prescribers and the number of active certified prescribers (i.e., those who ordered mifepristone or submitted a prescription during the reporting period) were added. Metrics were also added to capture the total number of certified, newly certified, and active certified pharmacies as well as the total number of authorized, newly authorized, and active authorized wholesaler/distributors.

App. 103

Reference ID: 5103819

Drug Utilization Data metrics were added to obtain information on shipment and dispensing of mifepristone. Metrics were added to capture the total number of tablets shipped by the wholesaler/distributor and the number of prescriptions dispensed.

REMS Compliance Data metrics were added to assess the first objective of requiring healthcare providers who prescribe mifepristone to be certified and the second objective of ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers. These metrics capture program deviations and evaluate overall if the REMS is operating as intended. Metrics include certified pharmacies and wholesaler/distributor audit results and a summary of instances of non-compliance and actions taken to address non-compliance. Prescriber compliance metrics were added to assess if prescribers are decertified along with reasons why. Pharmacy compliance metrics were added to assess if prescriptions were dispensed that were written by non-certified prescribers or if mifepristone tablets were dispensed by non-certified pharmacies as well as the number of pharmacies that were decertified along with reasons why. Wholesaler/distributor metrics were added to assess if shipments were sent to non-certified prescribers and non-certified pharmacies and corrective actions taken. The audit plan and non-compliance plans will be submitted for FDA review within 60 days after the REMS modification approval.

The Sponsors were asked to develop an assessment of prescription delivery timelines to determine what percentage of prescriptions were delivered on time (within four calendar days) and what percentage were delivered late (more than four calendar days) along with the length of the delay and reasons for the delay (e.g., mifepristone is out of stock shipment issues, other). The protocol for this assessment will be submitted for FDA review within 60 days after the REMS modification approval.

The revised REMS Assessment Plan is in the Appendix.

*Reviewer's Comment: We agree with the Sponsors' proposed REMS Assessment Plan.*

## 6. Discussion

The Sponsors submitted changes to the REMS to remove the requirement that mifepristone be dispensed only in certain healthcare settings (i.e., the "in-person dispensing requirement") and to add that certified pharmacies can dispense the drug in order to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks. The REMS goal was updated to this effect. Changes were required for prescriber requirements and Sponsors to support the change in ETASU, and new pharmacy requirements were introduced.

The qualifications to become a certified prescriber have not changed as a result of the modification to the Mifepristone REMS Program; however, clarification has been provided for certain prescriber requirements and new prescriber requirements have been added to support pharmacy dispensing. Although certain responsibilities may be conducted by staff under the supervision of a certified prescriber, the certified prescriber remains responsible for ensuring compliance with the requirements of the Mifepristone REMS Program. In order to clarify this, revisions were made throughout the prescriber requirements and REMS materials to reflect that the certified prescriber is responsible for ensuring that the prescriber requirements are met. Additionally, the review team finds it acceptable that certified prescribers who wish to use a certified pharmacy to dispense mifepristone submit their *Prescriber Agreement Form* to the dispensing certified pharmacy                                    (b) (4)

. The burden to prescriber and

pharmacy stakeholders of having certified prescribers submit the form directly to the certified pharmacy that will be dispensing the mifepristone is not unreasonable and has been minimized to the extent possible; it does not impact the safe use of the product. Prescriber requirements necessitated by the addition of some pharmacy requirements were added as well and include prescriber responsibilities in deciding whether or not mifepristone should be dispensed if the patient will receive the drug from the certified pharmacy more than four days after the pharmacy receives the prescription, and prescriber adverse event reporting requirements if a prescriber becomes aware of a patient death and the mifepristone was dispensed from a certified pharmacy. The addition of the latter requirements will ensure consistent adverse event data is relayed to the relevant Mifepristone Sponsor.

Changes were made to the *Patient Agreement Form.* Changes to the form were added to improve clarity of the safety messages. After further consideration, the patient's agreement to take the Medication Guide with them if they visit an emergency room or HCP who did not give them mifepristone so the emergency room or HCP will understand that the patient is having a medical abortion has been removed from the *Patient Agreement Form*. The Medication Guide is not typically carried by patients and this information can be obtained at the point of care. Changes align with updates to labeling submitted with this modification.[13, 14]

The Agency and Sponsors agreed during this modification to focus on certification of pharmacies that can receive *Prescriber Agreement Forms* via email or fax to complete the prescriber certification process. The proposed pharmacy certification requirements also support timely dispensing of mifepristone. If the mifepristone is shipped to the patient, the REMS requires that it must be delivered within four calendar days from the receipt of the prescription by the pharmacy; if the patient will receive the mifepristone more than four calendar days from pharmacy receipt of prescription, the REMS requires the pharmacist to confirm with the certified prescriber that it is still appropriate to dispense the drug to the patient. This allows prescribers to make treatment decisions based on individual patient situations. A requirement to maintain confidentiality was also added to avoid unduly burdening patient access since patients and prescribers may not utilize pharmacy dispensing if they believe their personal information is at risk. Ultimately, the addition of pharmacy distribution with the proposed requirements will offer another option for dispensing mifepristone, alleviating burden associated with the REMS.

(b) (4)

The Agency reviewed the REMS in 2021, and per the review team's conclusions, a REMS modification was necessary to remove the in-person dispensing requirement and add a requirement that pharmacies that dispense the drug be specially certified; the review team concluded that these changes could occur without compromising patient safety. There have been no new safety concerns identified relevant to the REMS ETASUs that the applicants proposed modifying in their June 22, 2022 submissions since the REMS Modification Notification letters dated 12/16/2021. It is still the position of the review team that the proposed modification is acceptable.

Because the modification proposed include changes to the ETASU of the Mifepristone REMS Program, the assessment plan and timetable of assessments were changed. The assessment plan will capture information on pharmacy dispensing and provide valuable insight as to whether the program is operating as intended Annual assessments are consistent with other approved REMS modifications for major modifications necessitating extensive assessment plan changes.

Reference ID: 5103819

As part of the REMS Assessment Plan, the REMS goal and objectives are assessed using Program Implementation and Operations Metrics, including REMS Certification Statistics and REMS Compliance Data. The metrics will provide information on the number of certified prescribers, certified pharmacies, and authorized wholesalers/distributors as well as if mifepristone is dispensed by non-certified prescribers or pharmacies. The Sponsors will use the indirect measure of healthcare provider certification to address the objective of informing patients of the risk of serious complications of mifepristone, due to concerns with prescriber and patient confidentiality.  Although we typically assess whether patients are informed of the risks identified in a REMS through patient surveys and/or focus groups, we agree that the Sponsors' continued use of the indirect measure of healthcare provider certification adequately addresses the Mifepristone REMS Program objective of informing patients. In addition, because of these prescriber and patient confidentiality concerns, we believe it is unlikely that the Agency would be able to use the typical methods of assessment of patient knowledge and understanding of the risks and safe use of mifepristone.

## 7.  Conclusions and Recommendations

The review team finds the proposed REMS modification for the Mifepristone REMS Program, as submitted on June 22, 2022, and amended on October 19, 2022 (Danco) and October 20, 2022 (GBP), November 30, 2022 (both), December 9 (both), and December 16 (both) acceptable. The REMS materials were amended to be consistent with the revised REMS document. The review team recommends approval of the Mifepristone REMS Program, received on June 22, 2022, and last amended on December 16, 2022, and appended to this review.

## 8.  References

1.              (b) (6)  Clinical Review of SE-2 Efficacy Supplement for mifepristone, NDA 020687. March 29, 2016. DARRTS Reference ID: 3909590.

2.         (b) (6)  Summary Review for Regulatory Action for mifepristone, NDA 020687. March 29, 2016. DARRTS .

3.         (b) (6)  REMS Review for mifepristone, NDA 020687. March 29, 2016. DARRTS Reference ID: 3909588.

4.         (b) (6)  REMS Review for mifepristone, NDA 020687. March 29, 2016. DARRTS Reference ID: 3909587.

5.       Approval Letter for SE-2 Efficacy Supplement for mifepristone, NDA 020687. March 29, 2016. DARRTS Reference ID: 3909592.

6.     (b) (6)  REMS Review for mifepristone, NDA 020687. February 22, 2018. DARRTS Reference ID: 4224674.

7.       Approval Letter for SE-20 REMS Supplement for mifepristone, NDA 020687. March 29, 2016. DARRTS Reference ID: 4418041.

8.       *Am. Coll. of Obstetricians & Gynecologists v. FDA*, 472 F. Supp. 3d 183, 233 (D. Md. July 13, 2020), order clarified, 2020 WL 8167535 (D. Md. Aug. 19, 2020) (preliminarily enjoining FDA from enforcing the in-person dispensing requirement and any other in-person requirements of the

Mifepristone SSS REMS); *FDA v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578 (Jan. 12, 2021) (staying the preliminary injunction imposed by the District Court).

9.        ⁣(b) (6) REMS Modification Rationale Review for mifepristone, NDA 020687. December 16, 2021. DARRTS Reference ID: 4905882.

10.       General Advice Letter for the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone, NDA 020687, April 15, 2022.  DARRTS ID 4969358.

11.       Format and Content of a REMS Document Guidance for Industry https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM18 4128.pdf.  Accessed on December 18, 2022.

12.       Grossman D, Raifman S, Morris N, et.al. Mail-order pharmacy dispensing of mifepristone for medication abortion after in-person clinical assessment. Contraception 2022; 107:36-41. https://doi.org/10.1016/j.contraception.2021.09.008. This article was included in the literature review for the December 16, 2021 REMS Modification Rationale Review, while the article was still in press.

# 9.  Appendices

REMS Document

Prescriber Agreement Form for Danco Laboratories, LLC

Prescriber Agreement Form for GenBioPro, Inc.

Patient Agreement Form

Pharmacy Agreement Form for Danco Laboratories, LLC

Pharmacy Agreement Form for GenBioPro, Inc.

Mifepristone REMS Assessment Plan

Reference ID: 5103819

Initial Shared System REMS approval:  04/2019
Most Recent Modification: 01/2023

<div align="center">

Mifepristone Tablets, 200 mg
Progestin Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)
SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200 MG**

</div>

## I.   GOAL

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

    a)   Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

    b)   Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

    c)   Informing patients about the risk of serious complications associated with mifepristone.

## II.  REMS ELEMENTS

### A. Elements to Assure Safe Use

1.   Healthcare providers who prescribe mifepristone must be specially certified.

    a.   To become specially certified to prescribe mifepristone, healthcare providers must:

        i.   Review the Prescribing Information for mifepristone.

        ii.   Complete a *Prescriber Agreement Form*. By signing[1] a *Prescriber Agreement Form*, prescribers agree that:

            1)   They have the following qualifications:

                a)   Ability to assess the duration of pregnancy accurately

                b)   Ability to diagnose ectopic pregnancies

                c)   Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary

            2)   They will follow the guidelines for use of mifepristone (see b.i-vii below).

    b.   As a condition of certification, prescribers must follow the guidelines for use of mifepristone described below:

        i.   Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained.  Ensure any questions the patient may have prior to receiving mifepristone are answered.

        ii.   Ensure that the healthcare provider and patient sign the *Patient Agreement Form.*

---

[1] In this REMS, the terms "sign" and "signature" include electronic signatures.

iii. Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

iv. Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

v. Ensure that any deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

vi. If mifepristone will be dispensed by a certified pharmacy:

   1) Provide the certified pharmacy a signed *Prescriber Agreement Form*.

   2) Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.

   3) Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of the patient.

vii. The certified prescriber who dispenses mifepristone or who supervises the dispensing of mifepristone must:

   1) Provide an authorized distributor with a signed *Prescriber Agreement Form*.

   2) Ensure that the NDC and lot number from each package of mifepristone dispensed are recorded in the patient's record.

   3) Ensure that healthcare providers under their supervision follow guidelines i.-v.

c. Mifepristone Sponsors must:

i. Ensure that healthcare providers who prescribe their mifepristone are specially certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements.

ii. Ensure prescribers previously certified in the Mifepristone REMS Program complete the new *Prescriber Agreement Form*:

   1) Within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies.

   2) Within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

iii. Ensure that healthcare providers can complete the certification process by email or fax to an authorized distributor and/or certified pharmacy.

iv. Provide the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.

v. Ensure annually with each certified prescriber that their locations for receiving mifepristone are up to date.

The following materials are part of the Mifepristone REMS Program:

- *Prescriber Agreement Form for Danco Laboratories, LLC*

- *Prescriber Agreement Form for GenBioPro, Inc.*

- *Patient Agreement Form*

Reference ID: 5103819

2. Pharmacies that dispense mifepristone must be specially certified

    a. To become specially certified to dispense mifepristone, pharmacies must:

        i. Be able to receive *Prescriber Agreement Forms* by email and fax.

        ii. Be able to ship mifepristone using a shipping service that provides tracking information.

        iii. Designate an authorized representative to carry out the certification process on behalf of the pharmacy.

        iv. Ensure the authorized representative oversees implementation and compliance with the Mifepristone REMS Program by doing the following:

            1) Review the Prescribing Information for mifepristone.

            2) Complete a *Pharmacy Agreement Form*. By signing a *Pharmacy Agreement Form*, the authorized representative agrees that the pharmacy will put processes and procedures in place to ensure the following requirements are completed:

                a) Verify that the prescriber is certified by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with the pharmacy.

                b) Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in c) below.

                c) Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.

                d) Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.

                e) Track and verify receipt of each shipment of mifepristone.

                f) Dispense mifepristone in its package as supplied by the Mifepristone Sponsor.

                g) Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to the Mifepristone Sponsor that provided the mifepristone.  Notify the Mifepristone Sponsor that provided the dispensed mifepristone that the pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.

                h) Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.

                i) Maintain records of *Prescriber Agreement Forms*.

                j) Maintain records of dispensing and shipping.

                k) Maintain records of all processes and procedures including compliance with those processes and procedures.

                l) Maintain the identity of the patient and prescriber as confidential, including limiting access to patient and prescriber identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes.

                m) Train all relevant staff on the Mifepristone REMS Program requirements.

Reference ID: 5103819

n)  Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

b.  Mifepristone Sponsors must:

i.  Ensure that pharmacies are specially certified in accordance with the requirements described above and de-certify pharmacies that do not maintain compliance with certification requirements.

ii.  Ensure that pharmacies can complete the certification process by email and fax to an authorized distributor.

i.  Verify annually that the name and contact information for the pharmacy's authorized representative corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, require the pharmacy to recertify with the new authorized representative.

The following materials are part of the Mifepristone REMS Program:

- *Pharmacy Agreement Form for Danco Laboratories, LLC*
- *Pharmacy Agreement Form for GenBioPro, Inc.*

3.  Mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions as ensured by the certified prescriber in signing the *Prescriber Agreement Form*.

a.  The patient must sign a *Patient Agreement Form* indicating that the patient has:

i.  Received, read and been provided a copy of the *Patient Agreement Form*.

ii.  Received counseling from the healthcare provider regarding the risk of serious complications associated with mifepristone.

## B.  Implementation System

1.  Mifepristone Sponsors must ensure that their mifepristone is only distributed to certified prescribers and certified pharmacies by:

a.  Ensuring that distributors who distribute  their mifepristone comply with the program requirements for distributors.

i.  The distributors must put processes and procedures in place to:

1)  Complete the certification process upon receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form*.

2)  Notify healthcare providers and pharmacies when they have been certified by the Mifepristone REMS Program.

3)  Ship mifepristone only to certified pharmacies or locations identified by certified prescribers.

4)  Not ship mifepristone to pharmacies or prescribers who become de-certified from the Mifepristone REMS Program.

5)  Provide the Prescribing Information and their Prescriber Agreement Form to healthcare providers who (1) attempt to order mifepristone and are not yet certified, or (2) inquire about how to become certified.

ii.  Put processes and procedures in place to maintain a distribution system that is secure,

App. 111

confidential and follows all processes and procedures, including those for storage, handling, shipping, tracking package serial numbers, NDC and lot numbers, proof of delivery and controlled returns of mifepristone.

    iii.  Train all relevant staff on the Mifepristone REMS Program requirements.

    iv.  Comply with audits by Mifepristone Sponsors or a third party acting on behalf of Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed for the Mifepristone REMS Program. In addition, distributors must maintain appropriate documentation and make it available for audits.

  b.  Ensuring that distributors maintain secure and confidential distribution records of all shipments of mifepristone.

2. Mifepristone Sponsors must monitor their distribution data to ensure compliance with the Mifepristone REMS Program.

3. Mifepristone Sponsors must ensure that adequate records are maintained to demonstrate that the Mifepristone REMS Program requirements have been met, including, but not limited to records of mifepristone distribution; certification of prescribers and pharmacies; and audits of pharmacies and distributors. These records must be readily available for FDA inspections.

4. Mifepristone Sponsors must audit their new distributors within 90 calendar days and annually thereafter after the distributor is authorized to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their distributor compliance if noncompliance is identified.

5. Mifepristone Sponsors must audit their certified pharmacies within 180 calendar days after the pharmacy places its first order of mifepristone, and annually thereafter audit certified pharmacies that have ordered mifepristone in the previous 12 months, to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their pharmacy compliance if noncompliance is identified.

6. Mifepristone Sponsors must take reasonable steps to improve implementation of and compliance with the requirements of the Mifepristone REMS Program based on monitoring and assessment of the Mifepristone REMS Program.

7. Mifepristone Sponsors must report to FDA any death associated with mifepristone whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the Mifepristone Sponsor. This requirement does not affect the sponsors' other reporting and follow-up requirements under FDA regulations.

**C. Timetable for Submission of Assessments**

The NDA Sponsor must submit REMS assessments to FDA one year from the date of the approval of the modified REMS (1/3/2023) and annually thereafter. To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the reporting interval covered by each assessment should conclude no earlier than 90 calendar days before the submission date for that assessment. The NDA Sponsor must submit each assessment so that it will be received by the FDA on or before the due date.

App. 112

**MIFEPREX® (Mifepristone) Tablets, 200 mg**

**PRESCRIBER AGREEMENT FORM**

Mifeprex* (Mifepristone) Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To **become a certified prescriber**, you must:

- **If you submit Mifeprex prescriptions for dispensing from certified pharmacies**:
  - o   Submit this form to each certified pharmacy to which you intend to submit Mifeprex prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order Mifeprex for dispensing by you or healthcare providers under your supervision:**
  - o   Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.
  - o   Healthcare settings, such as medical offices, clinics, and hospitals, where Mifeprex will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

***Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:***

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling  1-877-4 EARLY OPTION (1-877-432-7596 toll-free), or by visiting www.earlyoptionpill.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form*.

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received Mifeprex are reported to Danco Laboratories, LLC, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of Mifeprex that was dispensed to the patient.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.ea

App. 113

Ensure that healthcare providers under your supervision follow the guidelines listed above.

- If Mifeprex will be dispensed through a certified pharmacy:
  - o Assess appropriateness of dispensing Mifeprex when contacted by a certified pharmacy about patients who will receive Mifeprex more than 4 calendar days after the prescription was received by the certified pharmacy.
  - o Obtain the NDC and lot number of the package of Mifeprex the patient received in the event the prescriber becomes aware of the death of a patient.
- If Mifeprex will be dispensed by you or by healthcare providers under your supervision:
  - o Ensure the NDC and lot number from each package of Mifeprex are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____    Title: _____

Signature: _____    Date: _____

Medical License # _____    State _____

NPI # _____

Practice Setting Address: _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343.

Approved 01/2023 [Doc control ID]



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.ea

App. 114

PRESCRIBER AGREEMENT FORM                    Mifepristone Tablets, 200 mg

Mifepristone Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To **become a certified prescriber**, you must:

- **If you submit mifepristone prescriptions for dispensing from certified pharmacies**:
  - o   Submit this form to each certified pharmacy to which you intend to submit mifepristone prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order mifepristone for dispensing by you or healthcare providers under your supervision:**
  - o   Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.
  - o   Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

***Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:***

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling 1-855-MIFE-INFO (1-855—643-3463 toll-free), or by visiting www.MifeInfo.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form*.

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received mifepristone are reported to GenBioPro, Inc. that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

Ensure that healthcare providers under your supervision follow the guidelines listed above.



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.Mi

App. 115

- If mifepristone will be dispensed through a certified pharmacy:
  - Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.
  - Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of a patient.
- If mifepristone will be dispensed by you or by healthcare providers under your supervision:
  - Ensure the NDC and lot number from each package of mifepristone are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____   Title: _____

Signature:  _____   Date: _____

Medical License # _____   State _____

NPI # _____

Practice Setting Address: _____

Return completed form to **RxAgreements@GenBioPro.com** or fax to 1-877-239-8036

Approved 01/2023 [Doc control ID]



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.Mi

App. 116

# PATIENT AGREEMENT FORM                   Mifepristone Tablets, 200 mg

**Healthcare Providers:** *Counsel the patient on the risks of mifepristone. Both you and the patient must provide a written or electronic signature on this form.*

**Patient Agreement:**

1.  I have decided to take mifepristone and misoprostol to end my pregnancy and will follow my healthcare provider's advice about when to take each drug and what to do in an emergency.

2.  I understand:
    a.  I will take mifepristone on Day 1.
    b.  I will take the misoprostol tablets 24 to 48 hours after I take mifepristone.

3.  My healthcare provider has talked with me about the risks, including:
    - heavy bleeding
    - infection

4.  I will contact the clinic/office/provider right away if in the days after treatment I have:
    - a fever of 100.4°F or higher that lasts for more than four hours
    - heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
    - severe stomach area (abdominal) pain or discomfort, or I am "feeling sick," including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol — these symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

    My healthcare provider has told me that these symptoms listed above could require emergency care. If I cannot reach the clinic/office/provider right away, my healthcare provider has told me who to call and what to do.

5.  I should follow up with my healthcare provider about 7 to 14 days after I take mifepristone to be sure that my pregnancy has ended and that I am well.

6.  I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with mifepristone and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

7.  If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

8.  I have the MEDICATION GUIDE for mifepristone.

9.  My healthcare provider has answered all my questions.


**Patient Signature:** _____    **Patient Name** (print): _____    **Date**: _____


**Provider Signature:** _____    **Provider Name** (print): _____    **Date**: _____

*Patient Agreement Forms may be provided, completed, signed, and transmitted in paper or electronically.*

**01/2023**

App. 117

**MIFEPREX®(Mifepristone) Tablets, 200mg**

**PHARMACY AGREEMENT FORM**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense Mifeprex is able to receive *Prescriber Agreement Forms* by email and fax.
- Each location of my pharmacy that will dispense Mifeprex is able to ship Mifeprex using a shipping service that provides tracking information.
- I have read and understood the Prescribing Information for Mifeprex. The Prescribing Information is available by calling 1-877-4 EARLY OPTION (1-877-432-7596 toll-free) or online at www.earlyoptionpill.com; and
- Each location of my pharmacy that will dispense Mifeprex will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting Mifeprex orders.
  - o Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.
  - o Dispense Mifeprex such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.
  - o Confirm with the prescriber the appropriateness of dispensing Mifeprex for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.
  - o Record in the patient's record the NDC and lot number from each package of Mifeprex dispensed.
  - o Track and verify receipt of each shipment of Mifeprex.
  - o Dispense mifepristone in its package as supplied by Danco Laboratories, LLC.
  - o Report any patient deaths to the prescriber, including the NDC and lot number from the package of Mifeprex dispensed to the patient, and remind the prescriber of their obligation to report the deaths to Danco Laboratories, LLC. Notify Danco that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.
  - o Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.
  - o Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, and all processes and procedures including compliance with those processes and procedures.
  - o Maintain the identity of Mifeprex patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance.
  - o Train all relevant staff on the Mifepristone REMS Program requirements.
  - o Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____    Title: _____



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

App. 118

Signature: _____    Date: _____

Email: _____    Phone: _____    Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343**.**



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

App. 119

**PHARMACY AGREEMENT FORM**                                    **Mifepristone Tablets, 200 mg**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense mifepristone is able to receive *Prescriber Agreement Forms* by email and fax.
- Each location of my pharmacy that will dispense mifepristone is able to ship mifepristone using a shipping service that provides tracking information.
- I have read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling 1-855-MIFE-INFO (1-855-643-3463 toll-free) or online at www.MifeInfo.com; and
- Each location of my pharmacy that will dispense mifepristone will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting mifepristone orders.
  - Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.
  - Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.
  - Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.
  - Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.
  - Track and verify receipt of each shipment of mifepristone.
  - Dispense mifepristone in its package as supplied by GenBioPro, Inc.
  - Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to GenBioPro, Inc. Notify GenBioPro that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.
  - Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.
  - Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, all processes and procedures including compliance with those processes and procedures.
  - Maintain the identity of mifepristone patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance purposes.
  - Train all relevant staff on the Mifepristone REMS Program requirements.
  - Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____  Title: _____

Signature: _____  Date: _____

Email: _____  Phone: _____  Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to **RxAgreements@GenBioPro.com** or fax to **1-877-239-8036.**



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463     App. 120com

The REMS Assessment Plan must include but is not limited to the following items.

**Program Implementation and Operations**

1. REMS Certification Statistics
   a. Prescribers
      i. Number of certified prescribers who have certified with the Sponsor's distributor(s) and number who have submitted *Prescriber Agreement Forms* to Certified Pharmacies
      ii. Number and percentage of newly certified prescribers
      iii. Number and percentage of active certified prescribers (i.e., who ordered mifepristone or submitted a prescription during the reporting period)

   b. Pharmacies
      i. Number of certified pharmacies
      ii. Number and percentage of newly certified pharmacies
      iii. Number and percentage of active certified pharmacies (i.e., that dispensed mifepristone during the reporting period)
   c. Wholesalers/Distributors
      i. Number of authorized wholesalers/distributors
      ii. Number and percentage of newly authorized wholesalers/distributors
      iii. Number and percentage of active authorized wholesalers/distributors (i.e. that shipped mifepristone during the reporting period)

2. Utilization Data
   a. Total number of tablets shipped by wholesalers/distributors, stratified by Certified Prescriber or Certified Pharmacy location
   b. Number of prescriptions dispensed from pharmacies

3. REMS Compliance Data
   a. Audits: Summary of audit activities for each stakeholder (i.e., certified pharmacies and wholesalers/distributors) including but not limited to:
      i. A copy of the final audit plan for each stakeholder type (provide for the current reporting period)
      ii. The number of audits expected, and the number of audits performed
      iii. The number and type of deficiencies noted
      iv. For those with deficiencies noted, report the corrective and preventive actions (CAPAs) required, if any, to address the deficiencies, including the status (e.g., completed, not completed, in progress) (provide for the current reporting period)
      v. For any stakeholders that did not complete the CAPA within the timeframe specified in the audit plan, describe actions taken (provide for the current reporting period)

1

Reference ID: 5103819

vi.    A summary report of all resulting changes to processes and procedures necessary to ensure compliance with the REMS requirements (provide for the current reporting period)

b.    A summary report of non-compliance, associated corrective action plans (CAPAs), and the status of CAPAs including but not limited to:

    i.    A copy of the final non-compliance plans for Pharmacies and Distributors (provide for the current reporting period)

    ii.    For each instance of noncompliance below (iii-v), report the following information (provide for the current reporting period):

        1.    A unique, anonymized ID for the stakeholder(s) associated with the non-compliance event to enable tracking over time

        2.    The source of the non-compliance data (e.g., self-reported, audit, other)

        3.    A root cause analysis of the non-compliance

        4.    Actions to prevent future occurrences and outcomes of such actions

    iii.    Prescriber compliance

        1.    Number and percentage of certified prescribers who became decertified as a result of non- compliance

          •    Provide a summary of reasons for decertification (provide for the current reporting period)

        2.    Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

    iv.    Pharmacy compliance

        1.    Number and percentage of prescriptions dispensed that were written by prescriber(s) who did not submit a Prescriber Agreement to the dispensing Certified Pharmacy

        2.    Number and percentage of mifepristone tablets dispensed by non-certified pharmacies

        3.    Number and percentage of pharmacies that became decertified as a result of non-compliance

          •    Provide a summary of reasons for decertification (provide for the current reporting period)

        4.    An assessment of prescription delivery timelines, including percentage delivered more than four days after receipt of the prescription, duration and causes for delay.  A proposal for this assessment will be submitted within 60 days of the approval of the REMS Modification.

        5.    Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

    v.    Wholesaler/distributor compliance

        1.    Number of healthcare providers who successfully ordered mifepristone who were not certified

        2.    Number of non-certified pharmacies that successfully ordered mifepristone

        3.    Number of shipments sent to non-certified prescriber receiving locations

        4.    Number of shipments sent to non-certified pharmacy receiving locations

2

    5.   Summary and analysis of any program deviations and corrective actions taken
        (provide for the current reporting period)

The requirements for assessments of an approved REMS under section 505-1(g)(3) include with respect to each goal included in the strategy, an assessment of the extent to which the approved strategy, including each element of the strategy, is meeting the goal or whether one or more such goals or such elements should be modified.

3

Reference ID: 5103819

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

---------------------------------------------------------------------------------------------------

/s/

---------------------------------------------------------

(b) (6)

01/03/2023 05:18:27 PM

(b) (6)

01/03/2023 05:19:15 PM

(b) (6)

01/03/2023 05:24:28 PM

(b) (6)

01/03/2023 05:27:04 PM

(b) (6)

01/03/2023 05:27:58 PM

(b) (6)

01/03/2023 05:29:45 PM

(b) (6)

01/03/2023 05:33:47 PM

Reference ID: 5103819



**Center for Drug Evaluation and Research (CDER)**

| | |
|---|---|
| **Application Type** | NDA and ANDA |
| **Application Number** | 020687 and 91178 |
| **Reviewer Names** | |

**Review Completion Date**    December 16, 2021

1

| | |
|---|---|
| **Subject** | REMS Modification Rationale Review |
| **Established Name** | Mifepristone REMS |
| **Name of Applicants** | Danco Laboratories, LLC and GenBioPro, Inc. |
| **Therapeutic Class** | Progestin antagonist |
| **Formulation** | Oral tablets |

Reference ID: 4905882

## Table of Contents

EXECUTIVE SUMMARY ........................................................................................................... 4

1.   Introduction ............................................................................................................... 5

2.   Background ................................................................................................................. 5

   2.1.   PRODUCT AND REMS INFORMATION ........................................................... 5

   2.2.   REGULATORY HISTORY AND EVENTS RELEVANT TO THIS REMS MODIFICATION RATIONALE REVIEW ...................................................................................................... 7

3.   Rationale for Proposed REMS Modification ................................................................. 9

   3.1.   CURRENT REQUIREMENTS FOR THE APPROVED REMS ................................. 10

   3.2.   EVALUATION OF THE EVIDENCE .................................................................... 10

   3.2.1.   Evaluation of the requirement for healthcare providers who prescribe the drug to be specially certified (ETASU A) ..................................................................................... 12

   3.2.2.   Evaluation of the requirement for the drug to be dispensed with evidence or other documentation of safe-use conditions (ETASU D) ............................................................. 14

   3.2.3.   Evaluation of the requirement for drug to be dispensed only in certain healthcare settings (ETASU C) ........................................................................................................ 19

4.   Discussion ................................................................................................................. 36

5.   Conclusions and Recommendations ........................................................................... 41

6.   References ................................................................................................................. 42

7.    Appendix .................................................................................................................. 45

## EXECUTIVE SUMMARY

This review provides the ⬛⬛⬛⬛⬛⬛⬛ (b) (6)  (⬛(b) (6) and ⬛⬛⬛⬛⬛ (b) (6) ⬛⬛⬛ (⬛(b) (6) rationale and conclusions regarding modifications to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (Mifepristone REMS Program) for new drug application (NDA) 20687 and abbreviated new drug application (ANDA) 91178.

ANDA 91178 was approved with the approval of the Mifepristone REMS Program on April 11, 2019 to mitigate the risk of serious complications associated with mifepristone 200 mg. The most recent REMS modification was approved on May 14, 2021. The REMS consists of elements to assure safe use (ETASU) under ETASU A, C and D, an implementation system, and a timetable for submission of assessments. To determine whether a modification to the REMS was warranted, FDA undertook a comprehensive review of the published literature; safety information collected during the COVID-19 public health emergency (PHE); the one-year REMS assessment report of the Mifepristone REMS Program; adverse event data; and information provided by advocacy groups, individuals and the Applicants. Our review also included an examination of literature references provided by plaintiffs in the *Chelius v. Becerra* litigation discussed below.

The modifications to the REMS will consist of:

- Removing the requirement under ETASU C that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (referred to here as the "in-person dispensing requirement" for brevity)

- Adding a requirement under ETASU B that pharmacies that dispense the drug be specially certified

A REMS Modification Notification letter will be sent to both Applicants in the Single Shared System.

App. 128

## 1. Introduction

In connection with the *Chelius v. Becerra* litigation, FDA agreed to undertake a full review of the Mifepristone REMS Program, in accordance with the REMS assessment provisions of the Federal Food, Drug, and Cosmetic Act (FD&C Act).[a] This review provides the analysis of the (b) (6)  ( (b) (6)  and the (b) (6)  ( (b) (6)  regarding whether any changes are warranted to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone (hereafter referred to as the Mifepristone REMS Program) for new drug application (NDA) 20687 and abbreviated new drug application (ANDA) 91178. The Mifeprex REMS was initially approved in 2011; the single, shared system REMS for mifepristone 200 mg, known as the Mifepristone REMS Program, was approved in 2019.

The last time the existing REMS elements to assure safe use (under ETASU A, C and D) were reviewed was in the context of our review of supplement S-020 to NDA 20687; these ETASU were updated following review and approval of supplement S-020 on March 29, 2016. The key changes approved in 2016 are summarized below.

Changes to labeling included:
- Changing the dosing of Mifeprex to 200 mg orally x 1
- Extension of maximum gestational age through 70 days
- Inclusion of misoprostol in the indication statement
- Replacing the term "physician" with "licensed healthcare provider"
- Removal of the phrase "Under Federal Law"

The Mifeprex REMS and REMS materials were updated to reflect the changes above, and additional changes were made including:
- Removing the Medication Guide as part of the REMS but retaining it as part of labeling.

## 2. Background

### 2.1. PRODUCT AND REMS INFORMATION

---

[a] Section 505-1(g)(2) of the FD&C Act (21 U.S.C. § 355-1(g)(2)).

Reference ID: 4905882

Mifepristone is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy (IUP) through 70 days gestation. Mifepristone is available as 200 mg tablets for oral use.

Mifeprex (mifepristone) was approved on September 28, 2000 with a restricted distribution program under 21 CFR 314.520 (subpart H)[b] to ensure that the benefits of the drug outweighed the risk of serious complications associated with mifepristone when used for medical abortion. Mifeprex was deemed to have a REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007, and the Mifeprex REMS was approved on June 8, 2011. On March 29, 2016, as noted above, a supplemental application and REMS modification was approved for Mifeprex. On April 11, 2019, ANDA 091178 was approved, and the Mifepristone REMS Program was approved. The Mifepristone REMS Program is a single, shared system REMS that includes NDA 020687 and ANDA 91178.

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

a. Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program (under ETASU A).
b. Ensuring that mifepristone is only dispensed in certain healthcare settings,  by or under the supervision of a certified prescriber (under ETASU C).
c. Informing patients about the risk of serious complications associated with mifepristone (under ETASU D).

Under ETASU A, to become specially certified to prescribe mifepristone, a healthcare provider must review the prescribing information, complete and sign the *Prescriber Agreement Form,* and follow the guidelines for use of mifepristone. Under ETASU C, mifepristone must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber. Under ETASU D, mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions (i.e., the patient must sign a *Patient Agreement Form*). The Mifepristone REMS Program also includes an implementation system, and a timetable for assessments (one year from the date of the initial approval of the REMS on April 11, 2019, and every three years thereafter).

---

[b] NDA approval letter Mifeprex (NDA 020687) dated September 28, 2000.

## 2.2. REGULATORY HISTORY AND EVENTS RELEVANT TO THIS REMS MODIFICATION RATIONALE REVIEW

The following is a summary of significant regulatory history since approval of the REMS modification on March 29, 2016:

- 03/29/2016: FDA approved an efficacy supplement (S-020) that, among other things, provided a new dosing regimen (200 mg mifepristone, followed in 24 to 48 hours by 800 mcg buccal misoprostol), increased the gestational age (GA) to which mifepristone may be used (through 70 days gestation), and modified the REMS.

- 03/29/2019: A Citizen Petition was received requesting that FDA revise the product labeling to reflect pre-2016 provisions (including limiting GA to 49 days and requiring patients to make 3 office visits) and that FDA maintain the REMS.

- 04/11/2019: ANDA 91178 was approved along with the Single Shared System REMS for Mifepristone 200 mg (Mifepristone REMS Program) for NDA 20687 and ANDA 91178.

- 01/31/2020: the COVID-19 public health emergency (PHE) was declared by the Secretary of Health and Human Services (HHS) as having existed since January 27, 2020.[c]

- 7/13/2020: The United States (US) District Court of Maryland granted a preliminary injunction in the *ACOG v. FDA* litigation to temporarily bar enforcement of the Mifepristone REMS Program in-person dispensing requirement during the COVID-19 PHE.

- 1/12/2021: US Supreme Court granted a stay of that injunction.

- 04/12/2021: FDA issued a General Advice Letter to both the NDA and ANDA Applicants, stating that provided that all other requirements of the Mifepristone REMS Program are met, and given that in-person dispensing of mifepristone for medical termination of early pregnancy may present additional COVID-related risks to patients and healthcare

---

[c] *See* Secretary of Health and Human Services, Determination that a Public Health Emergency Exists (originally issued January 31, 2020, and subsequently renewed), available at https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx

App. 131

Reference ID: 4905882

personnel because it may involve a clinical visit solely for this purpose, FDA intends to exercise enforcement discretion during the COVID-19 PHE with respect to the in-person dispensing requirement in the Mifepristone REMS Program, including any in-person requirements that may be related to the *Patient Agreement Form.* FDA further stated that to the extent all of the other requirements of the Mifepristone REMS Program are met, FDA intends to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of mifepristone through the mail, either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

- 05/07/2021: FDA stated that it would be reviewing the elements of the Mifepristone REMS Program in accordance with the REMS assessment provisions of section 505-1 of the FD&C Act.

- 05/14/2021: A modification was approved for the Mifepristone REMS Program. This modification was to revise the *Patient Agreement Form* to include gender-neutral language.

- 06/30/2021: An Information Request (IR) was sent to the Applicants for additional information on shipments and any program deviations, adverse events, or noncompliance with the REMS that occurred during the period from April 1, 2021 through September 30, 2021.

- 7/15/2021: An IR was sent to the Applicants to provide the total number of shipments during the period from April 1, 2021 to September 30, 2021 and details on whether any of those shipments were involved in any program deviation or non-compliance.

- 8/5/2021: An IR was sent to the Applicants for additional clinical and other information (e.g., adverse events and units of mifepristone shipped) for the period of March 29, 2016 through June 30, 2021, to be provided by August 31, 2021. This IR also requested information covering the period of July 1, 2021 through September 30, 2021 and an

Reference ID: 4905882

aggregate summary (for the period of March 29, 2016 through September 30, 2021), to be provided by October 12, 2021.[d]

- 8/26/2021: The ANDA Applicant submitted a response to the IR issued on 8/5/2021.

- 08/27/2021: The NDA Applicant submitted a response to the IR issued on 8/5/2021.

- 10/08/2021:  The NDA Applicant submitted a response to the June 30 and July 15, 2021 IRs as well as an aggregate summary for the period March 29, 2016 through September 30, 2021 in response to the August 5, 2021 IR. The NDA Applicant also included a follow-up to their initial response provided on August 27, 2021 to the August 5, 2021 IR.

- 10/12/2021: The ANDA Applicant submitted a response to the June 30 and July 15, 2021 IRs as well as an aggregate summary for the period March 29, 2016 through September 30, 2021 in response to the August 5, 2021 IR.

- 10/16/2021: The ANDA Applicant revised their Oct 12, 2012 response to provide a correction to the number of mifepristone tablets.

-  (b) (4)

- 11/02/2021: A                   (b) (6)   (   (b) (6)   meeting was convened to obtain CDER concurrence on the removal of the in-person dispensing requirement and the addition of a certification requirement for pharmacies. The   (b) (6)            (b) (6)  and senior CDER leadership concurred with removing the in-person dispensing and adding pharmacy certification.

## 3.  Rationale for Proposed REMS Modification

[d] Multiple Information Requests were issued to obtain additional information on drug shipments, any program deviations or noncompliance, and use of alternative methods for drug distribution during the COVID-19 PHE. These IRs are referenced as appropriate in this document and the one-year REMS Assessment Review of the Mifepristone REMS Program, December 16, 2021.

Reference ID: 4905882

### 3.1. CURRENT REQUIREMENTS FOR THE APPROVED REMS

The Mifepristone REMS Program includes elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments. Elements to assure safe use in the current REMS include a prescriber certification requirement (ETASU A), a requirement that mifepristone be dispensed only in certain healthcare settings by or under the supervision of a certified prescriber (ETASU C), and a requirement that mifepristone be dispensed only with documentation of safe use conditions (ETASU D). Documentation of safe use conditions under ETASU D consists of a *Patient Agreement Form* between the prescriber and the patient indicating that the patient has received counseling from the prescriber regarding the risk of serious complications associated with mifepristone 200 mg for medical termination of early pregnancy.

### 3.2. EVALUATION OF THE EVIDENCE

We reviewed multiple different sources of information, including published literature, safety information submitted to the Agency during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS) reports, the first REMS assessment report for the Mifepristone REMS Program, and information provided by advocacy groups, individuals, and the Applicants. Our review also included an examination of literature references provided by plaintiffs in the *Chelius v. Becerra* litigation. Below is an overview of how information relevant to the current Mifepristone REMS Program was retrieved, analyzed, and applied to each of the individual ETASUs to determine if further changes should be considered.

Methods for the literature search

(b) (6) conducted a literature search in PubMed and Embase to retrieve publications relevant to this review. The time period used for this literature search was between March 29, 2016 (when the Mifeprex labeling and REMS were last substantially revised) through July 26, 2021. The search terms used were "medical abortion" and "mifepristone" and "pregnancy termination and mifepristone."

The search retrieved 306 publications from PubMed and 613 from Embase, respectively; the search yielded 646 unique publications after eliminating duplications between the two databases. The result of our literature search was also supplemented by an examination of literature references provided by advocacy groups, individuals, plaintiffs in the *Chelius* litigation, and the Applicants, as well as letters from healthcare providers and researchers.

Reference ID: 4905882

References included in these letters were considered for inclusion in this review using identical selection criteria to the ⬛ (b) (6) literature search (outlined below).

For this review of the REMS, ⬛ (b) (6) focused on publications containing safety data related to outcomes of medical abortion (objective safety data) obtained from our literature search and from the references provided to us relevant to the REMS ETASUs. We excluded systematic reviews and meta-analyses because these publications did not include original safety data related to the outcomes of medical abortion. The following are examples of materials that were excluded from our literature search:

- Information from survey studies or qualitative studies that evaluated perspectives on and/or satisfaction with medical abortion procedures from patients, pharmacists, clinic staff, or providers, even if the study assessed REMS ETASUs. These surveys or qualitative studies did not include objective safety data related to outcomes of medical abortion.

- Opinions, commentaries, or policy/advocacy statements. These publications did not include objective safety data related to outcomes of medical abortion.

- Safety data related to mifepristone use for second trimester medical abortion. These publications reported data not applicable to the approved indication for medical abortion up to 70 days gestation.

- Safety data related to mifepristone use for spontaneous first trimester abortion (i.e., miscarriages). These publications reported data not applicable to the approved indication for medical abortion up to 70 days gestation.

- Safety data that pertained only to surgical abortion or did not separate out medical abortion from surgical abortion.

- Other safety information unrelated to the REMS elements (e.g., articles limited to case reports or those discussing unrelated gynecologic or medical issues)

- Publications for which it was not possible to conduct a full review of the methods or results, i.e., the references were limited to an abstract of the study methods and results.

- Publications that provided only general statistics on abortion care in the United States.

- Information pertinent to molecular or other basic science aspects of mifepristone.

- Data on the logistics of accessing abortion care in general, such as time to appointment or the distance traveled to obtain care.

- Publications that provided data not related specifically to abortion care or the REMS (e.g., references focused on federal poverty guidelines, poverty data, or the financial impact of the COVID-19 pandemic).

One exception to the above literature search criteria was the inclusion in Section 3.2.2 of this review, which discusses the *Patient Agreement Form*, of publications that discussed changes in provider volume. The data discussed in relation to provider volume was obtained from surveys. This data was included because changes in provider volume could only be obtained from well-conducted survey studies.

Regarding medical/scientific references submitted with letters from the plaintiffs in the *Chelius* litigation, we applied the same criteria as for the literature search, as described above.

Letters from the plaintiffs in the *Chelius* litigation included several references that preceded our 2016 review of the REMS. Two of those pre-2016 studies were not captured in our 2016 literature search. These two studies were assessed as part of our current review; their results are consistent with the existing safety profile of the approved medical abortion regimen, and therefore, support our current conclusions regarding the REMS. See Appendix A.

### 3.2.1. Evaluation of the requirement for healthcare providers who prescribe the drug to be specially certified (ETASU A)

In order to become specially certified, prescribers must: 1) review the prescribing information for mifepristone and 2) complete the *Prescriber Agreement Form*. In signing the *Prescriber Agreement Form*, prescribers agree they meet the qualifications listed below:

- Ability to assess the duration of pregnancy accurately
- Ability to diagnose ectopic pregnancies
- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to

Reference ID: 4905882

ensure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information of mifepristone (which the provider can access by phone or online).

In addition to meeting these qualifications, as a condition of certification the healthcare provider also agrees to follow the guidelines for use below:

- Review the *Patient Agreement Form* with the patient and fully explain the risks of the mifepristone treatment regimen. Answer any questions the patient may have prior to receiving mifepristone.
- Sign and obtain the patient's signature on the *Patient Agreement Form*.
- Provide the patient with a copy of the *Patient Agreement Form* and the Medication Guide.
- Place the signed *Patient Agreement Form* in the patient's medical record.
- Record the serial number from each package of mifepristone in each patient's record.
- Report deaths to the Applicant, identifying the patient by a non-identifiable patient reference and the serial number from each package of mifepristone.

The literature review was the primary source of information that contributed to our reassessment of ETASU A.

We continue to be concerned that absent these provider qualifications, serious and potentially fatal complications associated with medical abortion, including missed ectopic pregnancy and heavy bleeding from incomplete abortion, would not be detected or appropriately managed. Our review of the literature did not identify any studies comparing providers who met these qualifications with providers who did not. In the absence of such studies, there is no evidence to contradict our previous finding that prescribers' ability to accurately date pregnancies, diagnose ectopic pregnancies, and provide surgical intervention or arrange for such care through others if needed, is necessary to mitigate the serious risks associated with the use of mifepristone in a regimen with misoprostol. Therefore, our review continues to support the conclusion that a healthcare provider who prescribes mifepristone should meet the above qualifications.  We conclude it is reasonable to maintain the requirement for a one-time prescriber certification where prescribers attest to having the ability to diagnose an intrauterine

App. 137

pregnancy, to diagnose an ectopic pregnancy,[e] and to either manage serious complications themselves or arrange for other providers to provide the needed care in a timely manner.

In addition, in signing the *Prescriber Agreement Form* and placing it in the patient's medical record, the prescribers acknowledge the requirement to report patient deaths associated with mifepristone to the manufacturer. Such a requirement ensures that the manufacturer receives all reports of patient deaths and, in turn, fulfills its regulatory obligations to report those deaths to the FDA.

As discussed in Section 3.2.2 below, there is a potential for doubling of the number of prescribers of mifepristone if the in-person dispensing requirement in ETASU C is removed from the Mifepristone REMS Program. Given the potential addition of new prescribers, in addition to the considerations described above, we conclude that we should maintain the requirement for prescriber certification, to ensure that providers meet the necessary qualifications and adhere to the guidelines for use.  Our literature review supports that these requirements are still necessary, and the potential increase in new prescribers under the REMS is a further reason to maintain prescriber certification.  Healthcare provider certification continues to be a necessary component of the REMS to ensure the benefits of mifepristone for medical abortion outweigh the risks. The burden of prescriber certification has been minimized to the extent possible by requiring prescribers to certify only one time for each applicant.

### 3.2.2.   Evaluation of the requirement for the drug to be dispensed with evidence or other documentation of safe-use conditions (ETASU D)

In order to receive mifepristone for medical termination of pregnancy through 70 days gestation, the patient must sign a *Patient Agreement Form* indicating that the patient has received, read, and been provided a copy of the *Patient Agreement Form* and received counseling from the prescriber regarding the risk of serious complications associated with mifepristone for this indication. The *Patient Agreement Form* ensures that patients are informed of the risks of serious complications associated with mifepristone for this indication.

---

[e] American College of Obstetricians and Gynecologists (ACOG) Practice Bulletin Number 191, February 2018. Tubal Ectopic Pregnancy. https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2018/03/tubal-ectopic-pregnancy. Mifepristone is not effective for terminating ectopic pregnancy. Some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy. A missed ectopic pregnancy that ruptures is a medical emergency that requires immediate surgical intervention.

App. 138

In a number of approved REMS, *Patient Agreement Forms* or *Patient Enrollment Forms* ensure that patients are counseled about the risks of the product and/or informed of appropriate safe use conditions.[f]

As a condition of certification under the Mifepristone REMS Program, healthcare providers must follow the guidelines for use of mifepristone, including reviewing the *Patient Agreement Form* with the patient, fully explaining the risks of the treatment regimen, and answering any questions the patient may have before receiving the medication. With this form, the patient acknowledges that they have received and read the form, and that they have received the counseling regarding when to take mifepristone, the risk of serious complications associated with mifepristone and what to do if they experience adverse events (e.g., fever, heavy bleeding). Both the healthcare provider and patient must sign the document and the patient must receive a copy of the signed form. In addition to the counseling described in the *Patient Agreement Form*, patients also receive a copy of the Medication Guide for mifepristone. Ultimately, the *Patient Agreement Form* serves as an important counseling component, and documentation that the safe use conditions of the Mifepristone REMS Program have been satisfied, as the prescriber is required to place the signed *Patient Agreement Form* in the patient's medical record.

Prior to the March 29, 2016 approval of the S-020 efficacy supplement for Mifeprex, FDA undertook a review of all elements of the REMS. At that time, the ⬛⬛⬛⬛ (b) (6) ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ (⬛⬛⬛⬛⬛ (b) (6) ⬛), along with the ⬛⬛⬛⬛⬛ (b) (6) ⬛⬛⬛⬛⬛ (⬛⬛⬛⬛ (b) (6) ⬛), recommended removal of the *Patient Agreement Form* (ETASU D). This recommendation received concurrence from the ⬛⬛⬛⬛⬛⬛⬛⬛ (b) (6) on February 23, 2016. The rationale for this recommendation in the 2016 ⬛⬛⬛⬛⬛⬛⬛ (b) (6) review[g] is summarized here as follows:

- The safety profile of Mifeprex is well-characterized over 15 years of experience, with known risks occurring rarely; the safety profile has not changed over the period of surveillance.
- Established clinical practice includes patient counseling and documentation of informed consent and evidence shows that practitioners are providing appropriate patient

---

[f] REMS@FDA, https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm, Accessed November 15, 2021.
[g] ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ (b) (6) Clinical Review, NDA 020687/S20, dated March 29, 2016. https://darrts.fda.gov/darrts/faces/ViewDocument?documentId=090140af803dc7bd&_afrRedirect=38617557320374 5

Reference ID: 4905882

counseling and education; the *Patient Agreement Form* is duplicative of these
established practices.

- Medical abortion with Mifeprex is provided by a small group of organizations and their
  associated providers. Their documents and guidelines are duplicated in the *Patient
  Agreement Form*.

- ETASUs A and C remain in place: The *Prescriber Agreement Form* and the requirement
  that Mifeprex be dispensed to patients only in certain healthcare settings, specifically,
  clinics, medical offices, and hospitals under the supervision of a certified prescriber,
  remain in place.

In light of a memorandum from the Director of the Center for Drug Evaluation and Research, an
addendum to the ⬛⬛⬛⬛ (b) (6) March 29, 2016 review and a memorandum
from the signatory authority in ⬛⬛⬛ (b) (6) indicated that the *Patient Agreement Form* would be
retained in the REMS.[h,i]

The current review of literature from March 29, 2016 to July 26, 2021, is relevant to our
assessment of the necessity of the *Patient Agreement Form* as part of the REMS. While our
literature search yielded no publications which directly addressed this element of the REMS, we
identified the following literature that focused on the informed consent process. These studies
were reviewed for their potential relevance on this topic, though the articles do not directly
assess the need for the *Patient Agreement Form* as a condition necessary to assure safe use of
Mifepristone under ETASU D.

- Two studies[1,2] (both authored by Dr. Grossman in 2021) used the *Patient Agreement
  Form* and additional clinic-specific written informed consent forms as part of the study
  methodology. One study evaluated medical abortion with pharmacist dispensing of
  mifepristone and another evaluated mail-order pharmacy dispensing. Safety and
  efficacy outcomes were not assessed regarding the element of consent in isolation or
  the *Patient Agreement Form*.

- Several studies included use of electronic or verbal consent. Two studies were
  conducted using signed electronic consent (Chong[3], Kerestes[4]). Aiken[5] reported that
  patients had the option of providing consent verbally and the discussion had to be
  recorded in the notes. Rocca[6] described obtaining verbal informed consent from
  patients seeking medical abortion provided in pharmacies or government-certified

---

[h] ⬛⬛⬛⬛ (b) (6) Review of proposed REMS modifications to Mifeprex. March 29, 2106.
[i] ⬛⬛⬛⬛ (b) (6) Summary of Regulatory Action for Mifeprex. March
29, 2016.

Reference ID: 4905882

public health facilities by auxiliary nurse midwives (ANMs) in Nepal. Outcomes were not assessed regarding the single element of consent and its role in the efficacy of medical abortion.

- A retrospective chart review (Wiebe[7]) was conducted in Canada. This study included telemedicine abortions between January 31, 2017 and January 31, 2019 and a similar group of controls seen in the clinic during the same time frame, matched by date of initial appointment. As part of the telemedicine process, patients read a consent form (not specified whether they could view an electronic version) and gave verbal consent "witnessed by the counselor". Again, outcomes were not assessed regarding the single element of consent and its role in the efficacy of medical abortion.

After review, we conclude that there are no outcome data from these studies that address the need for the *Patient Agreement Form* as a condition necessary to assure safe use of mifepristone. Nor do any of these studies provide evidence of whether the patient's informed consent has been adequately documented under the process set out in the study protocol. Therefore, these studies do not provide evidence that would support removing ETASU D.

Although ▒▒▒▒▒ (b) (6) agrees that informed consent in medicine is an established practice, the National Abortion Federation's 2020 Clinical Policy Guidelines for Abortion Care[8] continue to include a detailed section on patient education, counseling, and informed consent. The guidelines state that these steps are essential parts of the abortion process; that they should be conducted by appropriate personnel, with accurate information, including about alternatives and potential risks and benefits; and that the patients must have an opportunity to have any questions answered to their satisfaction prior to any intervention. Under these guidelines, documentation must show that the patient affirms that they understand all the information provided and that the decision to undergo an abortion is voluntary. The guidelines specifically list the risks that must be addressed at a minimum, including those pertinent to medical abortion: hemorrhage, infection, continuing pregnancy, and death. Additionally, Practice Bulletins from ACOG[9] and the Society of Family Planning also support detailed patient counseling.

In addition, trends in US clinical practice are developing which could negatively impact adequate patient counseling about the risks of medical abortion. One survey by Jones 2017[10] of abortion providers in the United States and Canada prior to the COVID-19 pandemic did reveal strong adherence to evidence-based guidelines. However, this same survey noted continued increasing uptake of medical abortion by US providers. Grossman[11] conducted a US survey in

Reference ID: 4905882

2019 which suggested that the number of obstetrician/gynecologists providing medical abortion care may be increasing and that uptake might increase if mifepristone were dispensed by pharmacies instead of being dispensed in-person. A subsequent survey of US obstetrians/ gynecologists by Daniel in 2021[12] evaluated a subsample (n = 868) from a prior national survey of providers and found that 164 (19%) reported providing medical abortion in the previous year. Of those obstetrician/gynecologists not providing medical abortion, 171 (24%) said they would offer the method to their patients if the in-person dispensing requirement for mifepristone were removed. This indicates a potential doubling of providers (+ 104%, 95% confidence interval (CI): 97% −112%). There were geographical variations, with the largest potential increases being in the Midwest (+ 189%, 95% CI: 172% −207%) and the South (+ 118%, 95% CI: 103% −134%).

Based on the articles discussed above, removal of the in-person dispensing requirement from the Mifepristone REMS Program (as discussed below in section 3.2.3) could significantly increase the number of providers to a larger group of practitioners. The *Patient Agreement Form* is an important part of standardizing the medication information on the use of mifepristone that prescribers communicate to their patients, and also provides the information in a brief and understandable format for patients. The requirement to counsel the patient, to provide the patient with the *Patient Agreement Form*, and to have the healthcare provider and patient sign the *Patient Agreement Form*, ensures that each provider, including new providers, informs each patient of the appropriate use of mifepristone, risks associated with treatment, and what to do if the patient experiences symptoms that may require emergency care. The single-page *Patient Agreement Form* is in line with other elements of this REMS, in that it supports the requirement that certified prescribers be able to accurately assess a patient, counsel a patient appropriately and recognize and manage potential complications. The form is placed in the patient's medical record to document the patient's acknowledgment of receiving the information from the prescriber and a copy is provided to the patient. We determined, consistent with section 505-1(f)(2) of the FD&C Act, that this does not impose an unreasonable burden on providers or patients, and that the *Patient Agreement Form* remains necessary to assure the safe use of Mifepristone.

After considering potential burden on healthcare providers and patients and considering the available data discussed above, including the potential for increased prescribing of mifepristone if in-patient dispensing is removed from the REMS, we conclude that the *Patient Agreement Form* should remain a safe use condition in the REMS.

Reference ID: 4905882

### 3.2.3.  Evaluation of the requirement for drug to be dispensed only in certain healthcare settings (ETASU C)

Mifepristone applicants must ensure that mifepristone is available to be dispensed to patients only in clinics, medical offices, and hospitals by or under the supervision of a certified prescriber. This creates what we refer to in this document as an in-person dispensing requirement under the REMS; i.e., the patient must be present in person in the clinic, medical office or hospital when the drug is dispensed.  The mifepristone REMS document states that mifepristone may not be distributed to or dispensed through retail pharmacies or settings other than these.

The following information contributed to our analysis of this requirement: Mifepristone REMS Program year-one assessment data, postmarketing safety information and literature review.

**REMS Assessment Data**
*Reporting period for the Mifepristone REMS Program - April 11, 2019 through February 29, 2020*

We evaluated information included in the one-year (1st)[j] REMS assessment reports for the Mifepristone REMS Program, which included healthcare provider certification data, program utilization data, compliance data, audit results and patient exposure data.[13] The assessment reports were submitted on April 10, 2020 by the NDA Applicant and April 15, 2020 by the ANDA Applicant and cover a reporting period from April 11, 2019 through February 29, 2020. During this reporting period, the NDA Applicant reported (b) (4) newly certified healthcare providers, and the ANDA Applicant reported (b) (4) newly certified healthcare providers in the Mifepristone REMS Program. The NDA Applicant reported a total of (b) (4) certified healthcare providers (includes new and previously certified) ordered mifepristone during the assessment reporting period, and the ANDA Applicant reported a total of (b) (4) certified healthcare providers ordered mifepristone during the assessment reporting period. The NDA Applicant estimated that a total of (b) (4) patients were exposed to mifepristone during the assessment reporting period. The ANDA Applicant reported an estimated total of (b) (4) patients were exposed to mifepristone during the reporting period.

During the reporting period, a small number of non-compliance events were reported. The authorized distributor for the NDA applicant reported to the NDA Applicant that they experienced deviations with scanning of the product serial numbers which were confirmed during the February 2020 audit. The authorized distributor conducted a root cause analysis and developed a corrective and preventive action (CAPA) on February 12, 2020. The CAPA was

---

[j] This REMS assessment report was the first to be submitted following the approval of the single, shared system REMS for mifepristone.

Reference ID: 4905882

validated and deployed with monitoring of the system through April 10, 2020. The corrective action will prevent similar events from occurring in the future.

*January 27, 2020 through September 30, 2021*

During the timeframe from January 27, 2020 through September 30, 2021, there were periods when the in-person dispensing requirement was not being enforced.

- On July 13, 2020, the United States District Court for the District of Maryland granted a preliminary injunction in the *ACOG* case to temporarily bar enforcement of the in-person dispensing requirement during the COVID-19 PHE.
- On January 12, 2021, the United States Supreme Court issued a stay of the injunction.
- On April 12, 2021, the FDA issued a General Advice Letter informing the applicants of the Agency's intent to exercise enforcement discretion during the COVID-19 public health emergency regarding the in-person dispensing requirement in the Mifepristone REMS Program.[k,l]

To better understand whether there was any impact on safety or noncompliance during the periods when the in-person dispensing requirement was not being enforced, we requested additional information from the Applicants to provide for more comprehensive assessment of the REMS for the time period from January 27, 2020 (the effective date of the COVID-19 PHE) to September 30, 2021. We requested the Applicants provide a summary and analysis of any program deviation or noncompliance events from the REMS requirements and any adverse events that occurred during this time period that had not already been submitted to FDA. As part of an additional request for information for the REMS assessment report, the Applicants were also asked to submit the adverse events to FAERS and to notify FDA that the reports were submitted.

Between January 27, 2020 and September 30, 2021, the NDA Applicant distributed ▓▓ (b)(4) shipments representing ▓▓ (b)(4) tablets. The NDA Applicant reported that there were ▓▓ (b)(4) shipments representing a total of ▓▓ (b)(4) tablets sent to ▓▓ (b)(4) non-certified healthcare providers.[m,n] ▓▓ (b)(4) of these healthcare providers subsequently became certified while ▓▓ (b)(4) did not. Of the ▓▓ (b)(4) healthcare providers who were not subsequently certified, ▓▓ (b)(4) returned a total of 12 of the 13

---

[k] FDA General Advice Letter for NDA 20687, April 12, 2021.
[l] FDA General Advice Letter for ANDA 091178, April 12, 2021.

[m] NDA 020687 September 9, 2021 response to the FDA's September 2, 2021 Information Request.
[n] NDA 020687 October 8, 2021 response to the FDA's June 30, 2021 Information Request.

App. 144

Reference ID: 4905882

Mifeprex tablets to the distributor. ▨(b) (4) non-certified healthcare provider dispensed one tablet to a patient; no adverse events were reported. The NDA Applicant attributed the non-compliance observed to the authorized distributor's transition to a new platform. The NDA Applicant implemented a corrective and preventative action to address this issue, which we found to be acceptable.

The ANDA Applicant distributed ▨(b) (4) shipments representing ▨(b) (4) tablets of mifepristone from January 27, 2020 to September 30, 2021 and reported no instances of shipments to non-certified healthcare providers during this timeframe.

The NDA and the ANDA applicants reported a total of eight cases reporting adverse events between January 27, 2020 and September 30, 2021. These eight cases were also identified in the FAERS database and are described in the section below.

The number of adverse events reported to FDA during the COVID-19 PHE with mifepristone use for medical termination of pregnancy is small, and the data provide no indication that any program deviation or noncompliance with the Mifepristone REMS Program contributed to these reported adverse events. Further analysis of the adverse events is included below in the section on Pharmacovigilance Data.


**Pharmacovigilance Data**

The ▨(b) (6) (▨(b) (6) conducted a search of the FAERS database and the published medical literature to identify U.S. postmarketing adverse events that reportedly occurred from January 27, 2020 through September 30, 2021 with mifepristone use for medical termination of pregnancy.[o,p]

The data for this time period were then further divided into date ranges when the in-person dispensing requirement was being enforced per the REMS (January 27, 2020 - July 12, 2020 & January 13, 2021 - April 12, 2021) versus when the in-person dispensing requirement was not being enforced (July 13, 2020 - January 12, 2021 (in-person dispensing requirement was temporarily enjoined) & April 13, 2021 - September 30, 2021 (in-person dispensing requirement was not being enforced because of the COVID-19 PHE)).

---

[o] ▨(b) (6) . Pharmacovigilance Memorandum: Mifepristone and All Adverse Events. NDA 020687 and ANDA 091178. ▨(b) (6) # 2007-525. Finalized April 12, 2021.

[p] ▨(b) (6) Pharmacovigilance Memorandum: Mifepristone and All Adverse Events. NDA 020687 and ANDA 091178. ▨(b) (6) # 2007-525. Finalized December 16, 2021.

Reference ID: 4905882

A total of eight cases that met the search criteria were identified in FAERS and no additional case reports were identified in the medical literature. Two of the eight cases reported adverse events that occurred when the in-person dispensing requirement in the REMS was being enforced (i.e., January 27, 2020 - July 12, 2020 & January 13, 2021 - April 12, 2021). These two cases reported the occurrence of uterine/vaginal bleeding (case 1) and uterine/vaginal bleeding and sepsis (case 2). Of note, uterine/vaginal bleeding and sepsis are labeled adverse events. Five of the eight cases reported adverse events that occurred when the in-person dispensing requirement was not being enforced (i.e., July 13, 2020 - January 12, 2021 & April 13, 2021 - September 30, 2021). These five cases reported the occurrence of ongoing pregnancy (case 3), drug intoxication and death approximately 5 months after ingestion of mifepristone (case 4), death [cause of death is currently unknown] (case 5), sepsis and death (case 6), and pulmonary embolism (case 7). Although these adverse events occurred during the period when the in-person dispensing requirement was not being enforced, the narratives provided in the FAERS reports for cases 5, 6, and 7 explicitly stated that mifepristone was dispensed in-person. Of note, ongoing pregnancy, and sepsis, including the possibility of fatal septic shock, are labeled adverse events. The remaining case from July 2021 reported the occurrence of oral pain/soreness (case 8) but did not provide sufficient information to determine the exact date of the adverse event. Based upon the U.S. postmarketing data reviewed, no new safety concerns were identified by ___(b) (6)___

In addition to the FAERS data provided above, ___(b) (6)___ routinely monitors adverse events reported to FAERS and published in the medical literature for mifepristone for medical termination of pregnancy. ___(b) (6)___ has not identified any new safety concerns with the use of mifepristone for medical termination of pregnancy.

To enable additional review of adverse events, the Applicants were requested[q] to provide a summary and analysis of adverse events reported with incomplete medical abortion requiring surgical intervention to complete abortion, blood transfusion following heavy bleeding or hemorrhage, ectopic pregnancies, sepsis, infection without sepsis, hospitalization related to medical abortion, and emergency department (ED)/urgent care encounter related to medical abortion. The Applicant for Mifeprex provided a summary of postmarketing safety information from March 29, 2016, when S-020 was approved, through September 30, 2021, on August 27 and October 8, 2021. During the time period in question, ___(b) (4)___ tablets were shipped, and

---

[q] On August 5, 2021, an IR was sent to the Applicants requesting a summary and analysis of adverse events from March 29, 2016 through June 30, 2021 and from July 1, 2021 through September 30, 2021.

Reference ID: 4905882

48 adverse events were received. The 48 adverse events included 4 deaths (one of which occurred in 2010 but was reported in 2017), 25 incomplete abortions requiring surgical intervention, 17 blood transfusions following heavy vaginal bleeding, 2 ectopic pregnancies, 7 infections (1 sepsis and 6 infection without sepsis), 13 hospitalizations, and 43 ED or urgent care visits related to medical abortion. For the period between January 27, 2020 and September 30, 2021, a time frame that includes the entire period when the COVID-19 public health emergency (PHE) has been in effect, there were three adverse events reported corresponding to the above cases from FAERS identified by (b) (6) case 1 (uterine/vaginal bleeding), case 2 (uterine/vaginal bleeding and sepsis), and case 4 (drug intoxication and death).

The ANDA Applicant provided a summary of postmarketing safety information from April 11, 2019 (date of ANDA approval) through September 30, 2021. On August 26, 2021, the Applicant provided distribution and adverse event information from April 11, 2019 through June 30, 2021. During this time period, a total of (b) (4) tablets were shipped. There were 7 adverse events including 3 deaths (1 from sepsis, 1 from bilateral pulmonary artery thromboemboli, 1 in a patient who complained of not being able to breathe), 1 ongoing pregnancy treated with uterine aspiration, 2 blood transfusions, 1 sepsis (with death), 1 hospitalization, and 3 ED or urgent care visits related to medical abortion. On October 12, 2021 the Applicant provided information from July 1, 2021 to September 30, 2021; there were no additional adverse events. For the period between January 27, 2020 and September 30, 2021, there were four adverse events reported corresponding to the above cases from FAERS identified by (b) (6) case 3 (ongoing pregnancy), case 5 (death unknown cause), case 6 (sepsis and death), and case 7 (pulmonary embolism).[r]

The postmarketing data from FAERS were analyzed by (b) (6) to determine if there was a difference in adverse events between periods when the in-person dispensing requirement was being enforced and periods when the in-person dispensing requirement was not being enforced. Based on this review, we conclude that there does not appear to be a difference in adverse events between periods when the in-person dispensing requirement was being enforced and periods when the in-person dispensing requirement was not being enforced. This suggests that mifepristone may be safely used without an in-person dispensing requirement.

---

[r] The eighth FAERS case, oral pain/soreness, was not within the scope of the August 5, 2021 IR and was not considered for this review of postmarketing safety information submitted by the Applicants in response to the IRs.

(b) (6) review of the Applicants' IR responses, which included the same cases identified by (b) (6) from FAERS, did not change our conclusion.[5]

**Literature Review**

Published studies have described alternatives in location and method for dispensing mifepristone by a certified prescriber (or an equivalent healthcare provider in countries other than the US). Some studies have examined replacing in-person dispensing in certain health care settings with dispensing at retail pharmacies (Grossman[2], Wiebe[7], Rocca[6]) and dispensing mifepristone from pharmacies by mail (Grossman[1], Upadhyay[14], Hyland[15]). Other studies have evaluated two modes of dispensing by prescribers: (1) prescribers mailing the medications to women (Gynuity study [Raymond[16], Chong[3], Anger[17]], Kerestes[4], Aiken[5] (2021)) and (2) prescribers using couriered delivery of medications (Reynolds-Wright[18]). Other studies have evaluated dispensing mifepristone by mail by an entity described as "a partner organization" (Aiken[19] (2017), Norton[20], Endler[21]). For ease of review, in the sections below that describe these studies, we have separated relevant references by the methodology used to dispense mifepristone.

<u>Retail pharmacy dispensing</u>

Three studies report medical abortion outcomes for retail pharmacy dispensing of mifepristone after clinical evaluation. Grossman[2] conducted a US-based study in which mifepristone and misoprostol were dispensed from a pharmacy partnered with the clinic where the participant had an evaluation by ultrasound and counseling. Of the 266 participants enrolled, 260 had known abortion outcomes. Complete abortion without additional procedure occurred in 243 participants (93.5% of those with known outcomes). Seventeen participants (6.5% of those with known outcomes) were diagnosed with incomplete abortion and underwent uterine aspiration. The reported proportion of complete abortion is within the range described in the approved mifepristone labeling. However, the finding represents a lower-than-expected efficacy based on the cohort's GA (84% of participants were at ≤ 56 days GA, a cohort for which the labeled success rate is 96.8%). No participants experienced a serious adverse event, were hospitalized, or required transfusion. Three participants had ED visits with treatment (intravenous hydration, pain medication, pelvic infection after uterine aspiration for incomplete abortion). The study's

---

[5] The reporting period of (b) (6) assessment of the adverse events in FAERS is not identical to the time period for summaries of adverse events in the IRs to the Applicants. Therefore, the numbers of cases and adverse events summarized in (b) (6) assessment may differ from the numbers of cases and adverse events summarized by the Applicants in their responses to IRs (note that each case report may include more than one adverse event).

Reference ID: 4905882

safety and efficacy outcomes are consistent with labeled frequencies. The majority of participants (65%) were very satisfied with the experience. There were some complaints from participants about not receiving all prescribed medications at the initial pharmacy visit, privacy not being adequately maintained, and perceived negative pharmacist attitude.

Overall, we conclude that this study has limited generalizability because it was conducted in two US states and involved partnered pharmacies, some of which were in the same building as the clinic. Additionally, all participating pharmacies in this study were required to have a pharmacist on duty during clinic hours who had been trained in the study protocol and was willing to dispense mifepristone. The study conditions may not be generalizable to US retail pharmacies; there is insufficient information to assess this. Rocca[6] conducted an observational study evaluating 605 participants at ≤63 days GA who obtained medical abortions in Nepal by comparing the provision of medical abortion service by newly trained nurse midwives in pharmacies to medical abortion provided in government-certified clinics. Participants who presented to pharmacy study sites underwent clinical screening including a pelvic exam by trained nurse midwives at the pharmacy (which was equipped with an examination room) and if eligible for medical abortion, were dispensed mifepristone and misoprostol in the pharmacy at the time of their visit. Participants who presented to public health facilities underwent clinical screening including pelvic examination by abortion providers including trained nurse midwives and if eligible for medical abortion were dispensed mifepristone and misoprostol in the clinic at the time of their visit. The authors reported that, with respect to complete abortion (>97%) and complications (no hospitalizations or transfusions), evaluation and dispensing in pharmacy was non-inferior to in-clinic evaluation and dispensing.

Wiebe,[7] in a retrospective, chart review study conducted in Canada, compared abortion outcomes of 182 women at ≤ 70 days GA who underwent medical abortion with telemedicine consult, and either received medications by courier or picked them up at a local pharmacy, with outcomes of a matched control cohort of 199 women who received the medications at a pharmacy after an in-clinic visit. The groups had similar documented complete medical abortion outcomes (90%, calculated maintaining subjects with unknown outcomes in the denominator; ≥ 95% calculated with known outcomes only). The telemedicine group had one case of hemorrhage (0.5%) and one case of infection requiring antibiotics (0.5%) compared with no cases of hemorrhage or infection requiring antibiotics in the in-clinic cohort. The telemedicine group had more ED visits (3.3% compared to 1.5% in-clinic cohort). Both models of dispensing mifepristone resulted in efficacy and safety outcomes within labeled frequency.

Reference ID: 4905882

None of the three studies described above allow a determination regarding differences in safety between in-person dispensing by a certified prescriber in a health care setting and dispensing through a retail pharmacy, due to limitations on the generalizability of the studies to the current retail pharmacy environment in the US. The outcome findings from the one US study (Grossman[2]), in which the pharmacies were partnered with prescribers, may not be generalizable to much of the US as they do not reflect typical prescription medication availability with use of retail pharmacy dispensing. Although retail pharmacy dispensing of mifepristone and misoprostol in Canada has been described in the literature, there are important differences in healthcare systems between Canada and the US that render the findings from studies in Canada (Wiebe[7]) not generalizable to the US. In the Wiebe study, timely provision of medication from the retail pharmacy was accomplished by either courier to the woman or faxed prescription to the woman's pharmacy. It is unknown whether conditions that allow timely access to medications for medical abortion would occur in retail pharmacies throughout the US. Canada's federal government has reaffirmed that abortion is an essential health service[t] which may have implications affecting access to medical abortion from retail pharmacies in Canada. The Rocca[6] study evaluated medical abortion provided in Nepali pharmacies and essentially moved the abortion provider and clinical examination into the pharmacy, a scenario that is not, at this time, applicable to the US retail setting.

<u>Mail order pharmacy</u>

Grossman[1] published an interim analysis of an ongoing prospective cohort study evaluating medical abortion with mifepristone and misoprostol dispensed by mail-order pharmacy after in-person clinical assessment. All participants were evaluated for eligibility during a clinic visit with GA up to 63 days confirmed with either an ultrasound or examination; instead of receiving medication at the clinic visit, participants received medications from a mail-order pharmacy. A total of 240 participants have been enrolled; three participants did not take either medication. A total of 227 (94.6%) provided some outcome information, of whom 224 provided abortion outcome information. Complete abortion without additional procedures occurred in 217 participants (96.9% of those with known outcomes). Two (0.9%) participants experienced serious adverse events (SAE); one received a blood transfusion, and one was hospitalized overnight. Nine (4%) participants attended 10 ED visits. In this interim analysis, the outcomes are consistent with labeled frequencies. With respect to the time interval between a

---

[t] As noted in Mark[23] and Martin[24], most provincial and federal health insurance programs in Canada cover medical abortion, and covered services are free at the point of care.

Reference ID: 4905882

participant's clinic visit and receipt of medications, of the 224 participants with known abortion outcomes, 184 (82.1%) received medication within 3 days. However, 17% received between 4-7 days and one participant waited over 7 days for receipt. Seven of 216 (3.2%) participants who completed the day-3 survey reported compromised confidentiality (e.g., someone found their medication, privacy concerns).

Upadhyay[14] reports findings from a retrospective cohort study of 141 women undergoing medical abortion in the US without a consultation or visit. Eligibility was assessed based on a participant-completed online form collecting pregnancy and medical history. Participants who were considered eligible received medication delivered by a mail-order pharmacy. Three interactions via text, messaging or telephone occurred to confirm medication administration, assessment of expulsion and pregnancy symptoms, and results of a 4-week home pregnancy test. Abortion outcome was determined by either the day 3 assessment or the 4-week pregnancy test. The investigators reported a complete abortion rate without additional procedures of 95% (105 participants out of 110 for whom outcomes were known) and stated that no participants had any major adverse events. The proportion of abortion outcomes assessed at 3 days versus 4 weeks is not reported. Regardless, determining outcomes at 3 days is insufficient to determine outcome rates or safety findings because a 3-day follow-up period is too short. Additionally, a substantial number of participants (31) provided no outcomes information. Among the 141 participants enrolled, 128 had any follow-up contact with the study staff, and 110 provided outcomes information. Excluding outcomes of 22% of the cohort is a limitation of this study. This study used a model with numerous deviations from standard provision of medical abortion in the US, such as no synchronous interaction with the prescriber during informed consent or prior to prescribing medication, no confirmation of self-reported medical, surgical, and menstrual history. Further, follow-up information based on a 3-day period is insufficient to determine outcome rates or safety findings. These deviations, limited follow-up information, and small sample size limit the usefulness of this study.

Hyland[15] describes findings from a cohort study in Australia evaluating medical abortion outcomes utilizing telemedicine and a central mail order pharmacy. All participants obtained screening tests including ultrasound confirmation of GA. A total of 1010 participants completed the screening process and were provided mifepristone and misoprostol. Abortion outcomes were determined for 754 (75%) of the 1010. Outcomes for the remaining 256 participants (25%) were not included because 31 provided no relevant information after shipment, 14 reported not taking misoprostol, and 211 did not have "full follow up" (i.e., known outcome of either complete medical abortion, uterine evacuation, or ongoing pregnancy with plan to continue).

Reference ID: 4905882

Complete abortions without additional procedures occurred in 727 participants (96% of those with definitively documented outcomes) and is consistent with labeled efficacy. Of the 754 participants included in the analysis 717 (95%) had no face-to-face clinical encounters after medications were mailed while 21 (3%) were admitted to the hospital and 16 (2%) had an outpatient encounter. One participant who was hospitalized and underwent a surgical uterine evacuation received a transfusion. Not included in the findings are 7 hospitalizations occurring in 7 participants who did not have "full follow up". The authors do not report any other adverse events and conclude use of the telemedicine medical abortion service is safe. The reasons for hospitalization are not discussed by the authors; therefore, it is unknown why the patients were hospitalized. Although the reported number of hospitalizations (3%) is higher than the less than 1% in the FDA-approved mifepristone labeling, conclusions regarding the safety findings in this study cannot be made in the absence of information about the reasons for hospitalization. Other limitations of this study include incomplete information about outcomes with face-to-face encounters, and not reporting outcomes of 25% of the enrolled cohort.

Overall, the three studies evaluating mail order pharmacy dispensing suggest that the efficacy of medical abortion is maintained with mail order pharmacy dispensing. In the Grossman[1] study, the interim analysis, although small, does not raise serious safety concerns. We note that 18% of participants did not receive medications within 3 days; the potential for delay in receiving medication by mail could limit the GA eligible for medical abortion through mail order pharmacy dispensing, because women at GA closer to 70 days might not receive medication in time. A small proportion (3%) of participants raised concerns regarding the issues of confidentiality and privacy. Safety findings from the Hyland[15] study are difficult to interpret. Although only one transfusion is reported, and the authors state the findings demonstrate safety, the higher hospitalization rates, and lack of information on the reasons for hospitalization do not allow any conclusions about safety findings. Lastly, the Upadhyay[14] study had no reported adverse events, but the findings are less useful because of the limited follow-up, and because medical abortions were provided using a model with numerous deviations from standard provision of medical abortion in the US.

Clinic dispensing by mail

A total of five studies evaluated clinic dispensing by mail.[3,4,5,16, 17] Gynuity Health Projects conducted a prospective cohort study (the "TelAbortion" study) evaluating use of telemedicine for remote visits and mifepristone being dispensed from clinics via overnight or regular tracked mail. Three publications reviewed have reported outcomes for the Gynuity population

Reference ID: 4905882

exclusively: Raymond[16] from May 2016 to December 2018, Chong[3] from May 2016 to September 2020 and Anger[17] from March 2020 to September 2020. Due to the pandemic, the Gynuity study deviated from the protocol requirement of confirmation of GA by examination or ultrasound for many participants treated from March 2020 onward (although none of the three publications reported on the single element of dispensing mifepristone from the healthcare setting by mail). A fourth study, Kerestes,[4] reports outcomes of medical abortion at the University of Hawai'i from April 2020 to November 2020: seventy-five (of whom 71 were enrolled in the Gynuity study) of the 334 participants in Kerestes were dispensed mifepristone by mail after a telemedicine consult. The section below discusses these four studies from the US as well as a large UK study by Aiken[5] (2021).

Raymond [16] (2019) reported outcomes from the Gynuity study prior to the pandemic. In the TelAbortion study, participants were not required to have an in-person clinic visit; rather, they obtained screening tests at laboratories and radiology offices and then communicated with the abortion provider by videoconference. If the participant was eligible for treatment, the provider dispensed the medications by mail. Of 433 women screened, 165 (38%) either declined to schedule the videoconference or did not keep the videoconference appointment. Among the 268 participants evaluated via videoconference, medication packages were sent to 248. Abortion outcomes were determined for 190 (77%) of the 248; outcomes for 58 (23%) participants were unknown. Complete abortion without additional procedures occurred in 177 participants (93% of those with known outcomes). The investigators obtained follow-up information from 217 participants after package shipment; there were two hospitalizations (one received a transfusion for severe anemia despite having had a complete abortion), and 16 other participants (7%) had clinical encounters in ED and urgent care centers. The reported outcomes in Raymond[16] (2019) are similar to outcomes described in approved labeling except the combined ED/urgent care center encounters (7%) exceeded the ED visits in approved labeling (2.9-4.6%). The authors note that half of the ED/urgent care visits did not entail any medical treatment and opine that the increased number of visits may have been due to the study participants living farther from the abortion providers.[16] All participants received medications within 8 days.

Chong[3] updated the findings from the Gynuity study described in Raymond[16] and reported on 1157 medical abortion outcomes, of which approximately 50% occurred during the period of the COVID-19 PHE. Although a screening ultrasound was required per the protocol, sites determined in 52% (346/669) of abortions that occurred during the period of the COVID-19 PHE that, in order to avoid potential exposure to COVID-19 at a health care facility, those

Reference ID: 4905882

participants were not required to obtain a screening ultrasound. Use of urine pregnancy test to confirm abortion completion also increased from 67% (144/214) in the 6 months prior to the pandemic to 90% (602/669) in the 6 months during the pandemic. Of the 1390 participants to whom medicine packages (containing both mifepristone and misoprostol) were mailed, 1157 (83.2%) had known abortion outcomes. Complete abortion without a procedure occurred in 1103 participants (95% of the those with a known outcome). Ten women experienced an SAE (5 transfusions (0.4%) and 7 hospitalizations (0.7%)) and 70 (6%) participants had unplanned clinical encounters in ED/urgent care. Surgical interventions were required in 47 participants (4.1% of 1390) to complete abortion. The reported outcomes in this study are similar to outcomes described in approved labeling, except that the combined ED/urgent care center encounters (6%) exceeded the ED visits in approved labeling (2.9-4.6%).

Anger[17] compared outcomes among participants enrolled in the Gynuity study who did versus did not have confirmation of GA/intrauterine location with an examination or ultrasound from 10 jurisdictions across the US. These participants were screened for enrollment from March 25 through September 15, 2020. All participants had a telemedicine consultation and received mifepristone and misoprostol by mail from the healthcare facility. Determination of which participants did not require confirmation of GA by examination or ultrasound to be eligible depended on the study clinician's assessment of eligibility for "no-test medication abortion"[u] based on a sample protocol published by Raymond[22] (2020). There were two key differences between the two groups. Participants for whom the study clinician determined a pre-abortion ultrasound was required were more likely than the participants who had no ultrasound or examination to live further than 150 miles from the clinic (51.2% vs. 31.7%) and were more likely to have a GA above 63 days (12.0% vs. 1.7%). The study sites shipped 503 medication packages during the analysis period; 344 packages went to the "no test" group while 159 went to the "test" medical abortion cohort (see figure below). However, because the two cohorts were not randomized in this study, they had different baseline characteristics. Consequently, findings based on the comparisons between the two cohorts should be interpreted carefully.

[u] "No-test medication abortion" refers to medical abortion provided without a pretreatment ultrasound, pelvic examination, or laboratory tests when, in the judgment of the provider, doing so is medically appropriate (appropriateness based on history and symptoms); "no-test medication abortion" does include post-abortion follow up. A sample protocol is described by Raymond et al.[22]

App. 154



Source: Figure 1 in this publication. MA= medical abortion.

The investigators' analyses excluded 91 (18% of 503; 57 in the no-test group and 34 in the test group) participants because they did not provide a date of the last menstrual period (LMP), did not take mifepristone, or did not have a recorded abortion outcome. Overall, 410 participants (81.5% of 503) provided outcomes data. There were no reported ectopic pregnancies in either group. The number of ED/urgent care visits and the proportion of unplanned clinical encounters that led to medical treatment were not reported. In the no-test group, complete medical abortion was confirmed in 271 participants who took medications (94% among those with known outcome). In the no-test cohort, two participants were "hospitalized and/or blood transfusion," and 36 (12.5%) had an unplanned clinical encounter (participant sought in-person medical care related to abortion and the visit was not planned prior to abortion).

In the test medical abortion group, complete abortion was confirmed in 123 participants (of 125 with known outcomes); the completion rate was 98% among those with known outcomes. In the test medical abortion group, one participant was "hospitalized and/or blood transfusion," and 10 (8.0%) had an unplanned clinical encounter. The authors concluded that, compared to participants who had an ultrasound prior to medical abortion, those without an examination prior to medical abortion were more likely to require procedural interventions and had more unplanned clinical encounters.

Kerestes[4] was the only publication that linked outcomes of medical abortion with different delivery models. Participants included in the report had GA up to 77 days and received

Reference ID: 4905882

medications in Hawaii between April 2020 and January 2020. A total of 334 medication packages (to 330 unique participants) were dispensed containing mifepristone and misoprostol; three different delivery models were used concurrently: 110 (32.9%) had traditional in-person visits, 149 (44.6%) had telemedicine consultation with in-person pick-up of medications, and 75 (22.5%) were sent medications by mail (71 of these were enrolled through Gynuity's TelAbortion study). Seven participants of the 330 participants who received 334 medication packages reported that they did not take them and were excluded from analysis of the outcomes. Among participants with follow-up data, the rates of successful medical abortion without surgery were 93.6%, 96.8%, and 97.1% in the in-clinic group, telemedicine + in-person pickup group, and telemedicine + mail group, respectively; these were consistent with outcomes in approved labeling. Blood transfusion was given to two participants (both in the telemedicine + in-person pickup group). Eleven participants went to an ED. Although ED visits occurred the most frequently in the telemedicine + mail group (four participants or 5.8%) and the least in the in-person group (two participants or 2.1%), the study reported no increases in other serious adverse events.

Taken together, the three Gynuity study reports[3,16,17] and Kerestes[4] support dispensing mifepristone and misoprostol by mail after a telemedicine visit. Efficacy was maintained in all four studies. All  of the studies reported SAEs  frequencies comparable to labeled rates, except two of the Gynuity study reports (Raymond[16], Chong[3]) and Kerestes[4] report a higher frequency of ED/urgent care visits than the labeled frequency of ED visits. We do not know whether the reporting of combined ED and urgent care visits represents an increased rate of ED visits compared to the labeled rate of ED visits (2.9-4.6%). Other labeled SAEs (e.g., transfusion) occur infrequently (< 1%).

Aiken[5] (2021) reports outcomes of medical abortion up to 70 days GA in the UK before and during the pandemic in a retrospective cohort study. In the UK, prior to the COVID-19 pandemic, all patients attended an in-clinic visit where they received an ultrasound, were administered mifepristone in the clinic, and given misoprostol in-clinic for use at home (traditional model). During the pandemic, medical abortion consultations were performed remotely by telephone or video. Based on the consultation and questionnaire (including date of last menstrual period; menstrual, contraceptive and medical history; symptoms; risk for ectopic pregnancy), an assessment of eligibility for treatment via telemedicine was made. If eligible, medications were delivered to participants via mail or were made available for collection from the clinic for use at home. If the participant was assessed to be ineligible for treatment via

Reference ID: 4905882

telemedicine, an in-person assessment with ultrasound was performed and medications were provided from the clinic for home use (hybrid model).

The study compared the two cohorts: 22,158 obtained medical abortion before the pandemic and had in-person visits and dispensing (traditional model) and 29,984 obtained medical abortion during the pandemic with either in-person visit and in-person dispensing, or a telemedicine visit and dispensing by mail or picked up from the clinic (hybrid model). Outcomes were obtained from electronic records and incident databases. Outcomes of all hospitalizations related to abortion, ED visits, infection without sepsis, and hemorrhage without transfusion were not reported. The investigators' analysis for non-inferiority determined the efficacy and safety were comparable between both cohorts. Complete abortion occurred in > 98% in both cohorts. Hemorrhage requiring transfusion was reported in 0.04% and 0.02% of the traditional and hybrid cohorts, respectively; this is lower than the labeled 0.5% transfusion rate. There were no severe infections requiring hospitalization, major surgery or deaths reported.

A secondary analysis of the hybrid cohort was reported. Within the 29,984-person hybrid model cohort, 11,549 (39%) abortions were conducted in-person (in-person assessment with ultrasound was performed and medications provided from the clinic for home use) and 18,435 (61%) abortions were provided by telemedicine visit, without tests or confirmation of GA/intrauterine position by ultrasound, and medications either mailed or picked up from the clinic. Outcomes stratified by type of mifepristone dispensing were not reported. The rate of complete abortion was slightly higher in the telemedicine group (99.2%) than that in the in-person group (98.1%). There were no significant differences in the rates of reported SAEs. Adjustments for clinical and demographic characteristics were made because the two groups differed in baseline characteristics, including a higher proportion of pregnancies with GA over 6 weeks in the in-person group (68.2% compared with 55.1%). The authors conclude a hybrid model for medical abortion that includes no-test medical abortion[u] (no ultrasound, no pelvic exam, no pregnancy test) is effective and safe.

We conclude that although the Aiken[5] (2021) study has a large sample size and includes 85% of all medical abortions performed in England and Wales during the study period, the study has limitations. The authors acknowledge the main limitation of their study was that analysis was based on deidentified information in the NHS database and the investigators were unable to verify the outcomes extracted. Other limitations included that their search only captured

Reference ID: 4905882

outcomes in electronic records and incident databases that met the authors' defined threshold for SAE reporting, and that the labeled abortion outcomes considered serious, such as hospitalizations related to abortion, infection without sepsis, hemorrhage without transfusion, or ED/urgent care visits, were not all included in the authors' definition of serious adverse event.

Data from the mail order dispensing studies with telemedicine visits from Gynuity (Raymond, Chong and Anger),[3,16,17] Kerestes[4], and Aiken[5] (2021) support that efficacy of medical abortion was maintained. The Aiken[5] study appears to be of sufficient sample size to determine whether safety outcomes with mail dispensing differ from in-person dispensing; however, the study's design did not capture all serious safety outcomes, thus limiting the certainty of the findings. Study reports of Raymond[16] Chong[3], and Kerestes[4] all suggest there may be an increase in ED/urgent care visits with telemedicine visits and dispensing by mail without increases in other adverse events. Anger's[17] comparative analysis suggests a pre-abortion examination may decrease the occurrence of procedural intervention and decrease the number of unplanned visits for postabortion care. Overall, despite the limitations noted, these studies support that dispensing by mail is safe and effective. Although the literature suggests there may be more frequent ED/urgent care visits related to the use of mifepristone when dispensed by mail from the clinic, there are no apparent increases in other SAEs related to mifepristone use. One reason for the increase in frequent ED/urgent care visits in the Raymond[16] publication, according to its authors, may have been that a substantial proportion of participants lived significant distances from their providers and increased distances have been associated with higher use of ED following treatment. Raymond[16] reported that half of the participants who had an ED/urgent care visit did not require medical treatment.

Clinic dispensing by courier

Reynolds-Wright[18] reported findings from a prospective cohort study of 663 women at less than 12 weeks' GA in Scotland undergoing medical abortion at home with use of telemedicine during the pandemic (from April 1 to July 9, 2020). The majority of medical abortions (78.7%) used telemedicine visits, eliminated pre-abortion ultrasound, and provided mifepristone for pick up at the service or by couriered delivery to woman's home. The number of couriered deliveries was not reported; thus, this study does not provide abortion outcomes separately for couriered delivery of mifepristone and misoprostol. With access to NHS regional hospital databases, the investigators were able to verify pregnancy outcomes and complications. Of the 663 participants, 642 (98.2%) were under 10 weeks GA, 21 (1.8%) were between 10 and 12 weeks

Reference ID: 4905882

GA, and one participant was never pregnant. A total of 650 participants had complete abortion without requiring surgical intervention (98%), 5 (0.8%) an ongoing pregnancy and 4 (0.6%) an incomplete abortion. The outcomes from this study in Scotland are consistent with labeled mifepristone outcomes. The study shares the same limitations as the Aiken[5] (2021) study.

Partner organization dispensing by mail

Women on Web (WoW), an internet group, connects patients and providers outside of the US and provides medical abortion globally, dispensing mifepristone through "a partner organization" by mail.[v] Medical abortion eligibility is determined using an online questionnaire with asynchronous physician review. If eligible, medications are mailed to the women. WoW provides help and support by email or instant messaging.

Aiken[19] (2017) conducted a population-based study analyzing findings from 1,636 women in the Republic of Ireland and Northern Ireland who were sent medications between 2010 and 2012. Receipt of medications was confirmed for 1,181 women, among whom 1,023 confirmed use of mifepristone and misoprostol; outcome information was available for 1,000 (61% of women sent medications). Of the 1,000 women, the majority (781, 78%) were less than 7 weeks GA and 219 (22%) were at 7-9 weeks. Complete abortion without surgical intervention occurred in 947 (94.7% of 1,000 with known outcome); 7 (0.7%) women received a blood transfusion, 26 (2.6%) received antibiotics (route of administration undetermined) and 87 (8.7%) sought medical care at a hospital or clinic for symptoms related to medical abortion. Hospitalizations related to abortion were not reported. The reported proportion of complete abortion is within the range labeled for medical abortion up to 70 days (92.7-98.1%). However, the finding of 94.7% complete abortion represents a lower-than-expected efficacy based on the cohort's GA (almost 80% less than 7 weeks, labeled success for medical abortion ≤ 49 days is 98.1%). This study has limitations, including outcomes based on self-report without validation of completed abortion by examination or laboratory testing, and no known outcomes for 39% of study cohort. Additionally, the authors noted medical abortion was provided in a legally-restrictive setting, where the law provided a maximum penalty of life imprisonment for the woman undergoing the abortion, which may affect participants' self-reporting.

---

[v] In March 2019, FDA sent a WL to Aidaccess.org, a group affiliated with WoW. Aidaccess.org received this WL because it was introducing misbranded and unapproved new drugs into the U.S. In the context of this REMS review, studies involving WoW are included solely for purposes of evaluating of data regarding the methods of dispensing mifepristone.

Reference ID: 4905882

Endler[21] and Norten[20] have reported outcomes from WoW cohorts but do not provide relevant information on mifepristone dispensing by mail, because neither provide meaningful outcomes data for consideration. Endler[21] compared the outcomes of self-reported heavy bleeding and clinical visits occurring during the "first or second day of abortion" that occurred in women undergoing medical abortion at 9 weeks GA or less, with outcomes from women at more than 9 weeks GA. Outcome data from day 1 or 2 is of limited usefulness. Norten[20] describes findings from a survey of women who were sent medical abortion medication through WoW and provided self-reported outcomes. Results were based on surveys returned from only 37% of participants, a return rate that is too low for the study to be considered valid.

WoW uses a model with numerous deviations from the standard provision of medical abortion in the US. For example, this model has no synchronous interaction with the prescriber during informed consent or prior to prescribing medication and no confirmation of self-reported medical, surgical, and menstrual history or confirmed pregnancy testing. Further, although Aiken[19] (2017) is a large cohort study, the outcomes are self-reported with no verification of complete abortion by laboratory or clinical evaluation and 39% of outcomes are unaccounted for. These limitations in the Aiken study result in the data being insufficient to determine the safety of dispensing mifepristone by mail through a partner organization.

## 4. Discussion

After review of the published literature, safety information collected during the COVID-19 PHE, postmarketing data, information from the first Mifepristone REMS Program assessment report, responses to information requests to the Applicants, and information provided by advocacy groups, individuals and the plaintiffs in the *Chelius v. Becerra* litigation, we conclude that the REMS can be modified to reduce burden without compromising patient safety.

**Prescriber Certification**

None of the publications we reviewed would support a conclusion that a healthcare provider who prescribes mifepristone does not need to meet the qualifications included in the Mifepristone REMS Program as described above in section 3.2.1. Absent these provider qualifications, serious complications associated with medical abortion, including missed ectopic pregnancy and heavy bleeding from incomplete abortion, would not be detected or appropriately managed.

Reference ID: 4905882

We conclude that prescriber certification (ETASU A) should be maintained. The current process requires the prescriber to agree to the requirements of the Mifepristone REMS Program and to attest that they meet the qualifications described in section 3.2.1 above. The REMS has been structured to minimize burden to prescribers by requiring only a one-time certification by the prescriber for each Applicant. We have determined that healthcare provider certification continues to be necessary to ensure the benefits outweigh the risks, especially considering that, if the in-person dispensing requirement is removed from the Mifepristone REMS Program, the number of new providers may increase (see discussion in section 3.2.2 above).

**Drug to be dispensed with evidence or other documentation of safe use conditions**

The requirement to counsel the patient and provide them with the *Patient Agreement Form* ensures that each patient is informed of the appropriate use of mifepristone, the risks associated with treatment, and what to do if they experience symptoms that may require emergency care.

In 2016, we initially recommended eliminating the *Patient Agreement Form* (see section 3.2.2), though the form was ultimately maintained as part of the REMS. As discussed above, our current literature review has indicated that there is no basis to remove the *Patient Agreement Form* from the REMS. In addition, surveys we reviewed suggest that if the in-person dispensing requirement for mifepristone is removed, there could be a potential doubling of medical abortion providers. This potential doubling of medical abortion providers supports the continued need to ensure that patients are consistently provided patient education under the Mifepristone REMS Program regarding the use and risks of mifepristone. The *Patient Agreement Form* is an important part of standardizing the medication information that prescribers communicate to their patients, including new prescribers, and also provides the information in a brief and understandable format to patients. We determined, in accordance with section 505-1(f)(2) of the FD&C Act, that this does not impose an unreasonable burden on providers or patients.[w]

Given the likelihood of a potential increase in new prescribers if the in-person dispensing requirement is removed from the Mifepristone REMS Program, we conclude that maintaining the *Patient Agreement Form* remains necessary to assure safe use at this time.

---

[w] *The Patient Agreement Form* can be signed in person or through other means.

App. 161

**Drug to be dispensed only in certain healthcare settings**

As discussed above in section 3.2.3, our evaluation of information submitted by the applicants in the one-year (1st) REMS assessment report for the Mifepristone REMS Program and in response to follow-up requests from the Agency indicates that the number of adverse events reported to FDA during the COVID-19 PHE with mifepristone use is small, and the data provide no indication that any program deviation or noncompliance with the Mifepristone REMS Program contributed to these adverse events. We further conclude, based our review of the postmarketing safety data from FAERS during the COVID-19 PHE and information submitted by the applicants for the timeframe of January 27, 2020 through September 30, 2021, that there does not appear to be a difference in adverse events between periods during the COVID-19 PHE when the in-person dispensing requirement was being enforced and periods when the in-person dispensing requirement was not being enforced; nor have we identified any new safety concerns with the use of mifepristone for medical termination of early pregnancy.

Alternatives to in-person dispensing of mifepristone have been investigated in several studies and countries. The literature review identified 15 publications[x] that assessed safety outcomes from various medication delivery models (US, UK, Canada, Ireland, Australia, Nepal), including dispensing by retail and mail order pharmacies, prescribers mailing medications or using couriered service to deliver medications, and dispensing by "partner organizations". The ability to generalize the results of these studies to the US population is hampered by differences in pre-abortion care (e.g., telemedicine versus in-person, testing), and the usefulness of the studies is limited in some instances by small sample sizes and lack of follow-up information on outcomes with regard to both safety and efficacy.

 In addition, there are factors which complicate the analysis of the dispensing element alone. Some of these factors are: (1) only a few studies have evaluated alternatives for in-person dispensing of mifepristone in isolation; for example, most studies on mail dispensing of mifepristone also include telemedicine consultation, and (2) because most SAEs with medical abortion are infrequent, though they can be life threatening, further evaluation of changes in dispensing would require studies with larger numbers of participants. We did not find any large clinical studies that were designed to collect safety outcomes in healthcare systems similar to the US.

[x] The 15 publications correspond to endnote numbers: 1-7, 14-21.

Based on the literature identified by our review, dispensing mifepristone by mail from the clinic or from a mail order pharmacy does not appear to jeopardize the efficacy of medical abortion. The studies we reviewed are not adequate on their own to establish the safety of the model of dispensing mifepristone by mail, although the safety and efficacy outcomes reported in these studies remain within the ranges described in mifepristone labeling except for increased numbers of ED/urgent care visits and hospitalizations.

Four publications (Raymond[16], Chong[3], Anger[17] and Kerestes[4]), describe a relevant US cohort where dispensing mifepristone from the clinic by mail was paired with telemedicine visits. These studies showed that efficacy was maintained and there was no increased frequency of SAEs except for higher ED/urgent care visits. The increased ED/urgent care visits were not associated with increases of other SAEs, and in the view of one study's authors (Raymond[16]), may be associated with participants being located significant distances from their providers. The Aiken[5] (2021) study of a large UK cohort where the clinics mailed mifepristone report small (lower than labeled) occurrences of transfusion and no significant infections requiring hospitalization. In Grossman[1] and Hyland[15], where the pharmacies mailed mifepristone after prescribers confirmed GA, efficacy is maintained. Grossman's[1] interim analysis found no increases in SAEs. Hyland[15] reported higher numbers of hospitalizations but did not report increases of other SAEs. Overall, while the studies assessing mifepristone dispensing by mail suggest more frequent encounters with healthcare providers, they generally support a conclusion that dispensing by mail is safe. Despite the limitations of the studies we reviewed, we conclude that overall, the outcomes of these studies are not inconsistent with our conclusion that, based on the 1st year REMS assessment report and postmarketing safety data, mifepristone will remain safe, and efficacy will be maintained if the in-person dispensing requirement is removed from the Mifepristone REMS Program.

Based on the REMS assessment data, FAERS data from the time period when the in-person dispensing requirement was not being enforced, our review of the literature, and information provided by advocacy groups, individuals, the Applicants, and the plaintiffs in the *Chelius v. Becerra* litigation, we conclude that mifepristone will remain safe and effective for medical abortion if the in-person dispensing requirement is removed, provided all the other requirements of the REMS are met, and pharmacy certification is added as described below.

Removing the in-person dispensing requirement will render the REMS less burdensome to healthcare providers and patients and provided all other requirements of the REMS are met, including the additional requirement for pharmacy certification, the REMS will continue to

Reference ID: 4905882

ensure that the benefits of mifepristone for medical abortion outweigh the risks. Therefore, to reduce the burden imposed by the REMS, the Mifepristone REMS Program should be modified to  remove the in-person dispensing requirement, which would allow, for example, dispensing of mifepristone by mail via certified prescribers or pharmacies, in addition to in-person dispensing in clinics, medical offices and hospitals as currently outlined in ETASU C.

**New requirement to be added for pharmacy certification**

The current distribution model requires the certified prescriber to dispense mifepristone directly to the patient in a clinic, medical office, or hospital. During the periods when the in-person dispensing requirement was not being enforced, both applicants used mail order pharmacies to receive and hold mifepristone on behalf of the certified healthcare providers who had purchased the product.[j,y,z]  Pursuant to a prescription for mifepristone, the mail order pharmacy would ship the product to a named patient.

The Mifepristone REMS Program continues to require that mifepristone be prescribed only by certified prescribers. With the removal of the in-person dispensing requirement, however, the drug is no longer required to be dispensed only in a clinic, medical office or hospital. Under the REMS as modified, mifepristone can be dispensed through a pharmacy, provided the product is prescribed by a certified prescriber and all other requirements of the REMS are met. Given this modification to the dispensing requirements in the REMS, it is necessary to add a requirement for certification of pharmacies under ETASU B. Adding the pharmacy certification requirement incorporates pharmacies into the REMS, ensures that pharmacies are aware of and agree to follow applicable REMS requirements, and ensures that mifepristone is only dispensed pursuant to prescriptions that are written by certified prescribers. Without pharmacy certification, a pharmacy might dispense product that was not prescribed by a certified prescriber. Adding pharmacy certification ensures that ETASU A is met prior to dispensing the product to a patient; certified prescribers, in turn, have agreed to meet all the conditions of the REMS, including ensuring that the *Patient Agreement Form* (ETASU D) is completed. In addition, wholesalers and distributors can only ship to certified pharmacies. Based on our review of the safety data and our consideration of the distribution model implemented by the Applicants during the periods

y ANDA 091178: September 23, 2021 response to the September 15, 2021 information request;  October 11 and 16, 2021  responses to the June 30, 2021 and July 15, 2021 information requests; October 26, 2021 response to the October 22, 2021 information request; October 29, 2021 response to the October 27 information request.
z NDA 020687: September 20, 2021 response to the September 15, 2021 information request; October 26, 2021 response to the October 22 information request.

App. 164

when the in-person dispensing requirement was not being enforced, as well as REMS assessment data and published literature, we conclude that provided all other requirements of the REMS are met, the REMS program, with the removal of the in-person dispensing requirement and the addition of a requirement for pharmacy certification, will continue to ensure the benefits of mifepristone for medical abortion outweigh the risks while minimizing the burden imposed by the REMS on healthcare providers and patients.  As modified, the REMS would allow, for example, dispensing by mail order or specialty pharmacies, similar to the distribution model used by applicants during the periods when the in-person dispensing requirement was not being enforced.[aa]

The above recommendations were discussed with the _____ (b) (6) (_____ (b) (6) and senior leadership from CDER on November 2, 2021. The ____ (b) (6) _____ (b) (6) along with senior CDER leadership, concurred with removing the in-person dispensing requirement provided that all of the remaining REMS requirements are met, including but not limited to prescriber certification where prescribers need to attest to having certain qualifications, and maintaining the *Patient Agreement Form*. The ____ (b) (6) _____ (b) (6) and senior leadership from CDER were also in favor of adding pharmacy certification to assure the safe use of mifepristone.

## 5.  Conclusions and Recommendations

Based on the results of REMS assessments; our review of safety data collected during the PHE as well as data from FAERS; our literature search; and information provided by advocacy groups, individuals, the Applicants, and the plaintiffs in the *Chelius v. Becerra* litigation, ____ (b) (6) and ___ (b) (6) have concluded that a REMS modification is necessary and should include the following changes:

- Removing the requirement under ETASU C that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals.
- Adding a requirement under ETASU B that pharmacies that dispense the drug be specially certified.

---

[aa] Our current conclusion that the REMS would allow dispensing by mail order or specialty pharmacies is based on data received from Applicants relating to the periods when the in-person dispensing requirement was not enforced and mail-order pharmacies were used to dispense the product, as well as our analysis of postmarketing safety data and available literature.  At this time we do not have data (from the Applicants or from other sources) to assess the certification of retail pharmacies under the REMS. We have not yet determined the details of pharmacy certification requirements, including whether any limitations on the types of pharmacies that may dispense the product are necessary.

App. 165

(b) (6) and (b) (6) recommend the Applicants be issued a REMS Modification Notification Letter that requests submission within 120 days from the date of the letter.

## 6. References

[1] Grossman D, Raifman S, Morris N, et.al. Mail-order pharmacy dispensing of mifepristone for medication abortion after in-person clinical assessment. Contraception 2021; In press. doi:https://doi.org/10.1016/j.contraception.2021.09.008

[2] Grossman D, Baba CF, Kaller S, et al. Medication Abortion With Pharmacist Dispensing of Mifepristone. Obstet Gynecol 2021;137:613–22.

[3] Chong E, Shochet T, et al. Expansion of a direct-to-patient telemedicine abortion service in the United States and experience during the COVID-19 pandemic. Contraception 2021;104:43-48.

[4] Kerestes C, Murayama S, et al. Provision of medication abortion in Hawai'i during COVID-19: Practical experience with multiple care delivery models. Contraception 2021 Jul;104(1):49-53. doi:10.1016/j.contraception.2021.03.025. Epub 2021 Mar 28.

[5] Aiken ARA, Lohr PA, et al. Effectiveness, safety and acceptability of no-test medical abortion (termination of pregnancy) provided via telemedicine: a national cohort study. BJOG 2021;128:1464–1474.

[6] Rocca CH, Puri M, et al. Effectiveness and safety of early medication abortion provided in pharmacies by auxiliary nurse-midwives: A non-inferiority study in Nepal. PLoS ONE 2018 13(1): e0191174. https://doi.org/10.1371/journal.pone.019117

[7] Wiebe ER, Campbell M, et al. Comparing telemedicine to in-clinic medication abortions induced with mifepristone and misoprostol. Contracept X. 2020; 2: 100023.

[8] National Abortion Federation 2020 Clinical Policy Guidelines for Abortion Care, available at https://5aa1b2xfmfh2e2mk03kk8rsx-wpengine.netdna-ssl.com/wp-content/uploads/2020_CPGs.pdf

[9] American College of Obstetricians and Gynecologists Committee on Practice Bulletins—Gynecology and the Society of Family Planning. Simultaneously published as ACOG Bulletin

Reference ID: 4905882

Number 225: Medication abortion up to 70 days of gestation. Obstet Gynecol 2020;136(4): e31-e47 and in Contraception 2020; 102:225-236.

[10] Jones HE, O'Connell White K, Norman WV, Guilbert E, Lichtenberg ES, Paul M. First trimester medication abortion practice in the United States and Canada. PLoS ONE 2017; 12(10): e0186487. https://doi.org/10.1371/journal.pone.0186487

[11] Grossman D, Grindlay K, Altshuler AL, Schulkin J. Induced abortion provision among a national sample of obstetrician-gynecologists. Obstet Gynecol 2019;133:477-483.

[12] Daniel S, Schulkin J, Grossman D. Obstetrician-gynecologist willingness to provide medication abortion with removal of the in-person dispensing requirement for mifepristone. Contraception. 2021;104:73-76

[13] (b) (6) Review of the one-year REMS assessment report for the Mifepristone REMS Program, December 16, 2021.

[14] Upadhyay UD, Koenig LR, Meckstroth KR. Safety and Efficacy of Telehealth Medication Abortion in the US During the COVID-19 Pandemic. JAMA Network Open. 2021;4(8):e2122320. doi:10.1001/jamanetworkopen.2021.22320

[15] Hyland P, Raymond EG, Chong E. A direct-to-patient telemedicine abortion service in Australia: Retrospective analysis of the first 18 months. Aust N Z J Obstet Gynaecol 2018;58: 335-340.

[16] Raymond E, Chong E, et al. TelAbortion: evaluation of a direct to patient telemedicine abortion service in the United States. Contraception 2019;100:173-177

[17] Anger HA, Raymond EG, et al. Clinical and service delivery implications of omitting ultrasound before medication abortion provided via direct-to-patient telemedicine and mail. Contraception 2021 Jul 28;S0010-7824(21)00342-5. doi: 10.1016/j.contraception.2021.07.108. Published online.

[18] Reynolds-Wright JJ, Johnstone A, McCabe K, et al. Telemedicine medical abortion at home under 12 weeks' gestation: a prospective observational cohort study during the COVID-19 pandemic. BMJ Sex Reprod Health 2021;0:1–6. doi:10.1136/bmjsrh-2020-200976

Reference ID: 4905882

[19] Aiken AR, Digon I, Trussell J, et al. Self reported outcomes and adverse events after medical abortion through online telemedicine: population based study in the Republic of Ireland and Northern Ireland. BMJ 2017;357:j2011.

[20] Norten H, Ilozumba O, Wilkinson J, et.al. 10-year evaluation of the use of medical abortion through telemedicine: a retrospective cohort study. BJOG 2021; https://doi.org/10.1111/1471-0528.16765.

[21] Endler M, Beets L, Gemzell Danielsson K, Gomperts R. Safety and acceptability of medical abortion through telemedicine after 9 weeks of gestation: a population-based cohort study. BJOG 2019;126:609–618.

[22] Raymond EG, Grossman D, Mark A, et.al. Commentary: No-test medication abortion: A sample protocol for increasing access during a pandemic and beyond. Contraception 2020;101:361-366

[23] Mark A, Foster A, Perritt J. The future of abortion is now: Mifepristone by mail and in-clinic abortion access in the United States. Contraception 2021;104:38-42

[24] Martin D, Miller A, Quesnel-Vallee, A, et al. Canada's global leadership on health 1. Canada's universal health care system: achieving its potential. Lancet 2018; 391:1718-35

Reference ID: 4905882

# 7. Appendix A

References Cited in Letters from Plaintiffs

| References cited in letter from *Chelius v. Becerra* Plaintiffs (September 29, 2021) | |
|---|---|
| **References included in the REMS review** | |
| Aiken A et al. BJOG 2021: 128 (9): 1464-1474 | |
| Chong, et al. Contraception 2021; 104(1) 43-48 | |
| Daniel S. et al. Contraception 2021; 104(1): 73-76 | |
| **References excluded from the REMS review** | **Rationale for Exclusion** |
| Am. Coll. of Obstetricians & Gynecologists, *Position Statement: Improving Access to Mifepristone for Reproductive Health Indications* (June 2018), https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications | Policy/advocacy statement |
| House of Delegates, Am. Med. Ass'n., *Memorial Resolutions Adopted Unanimously No. 504 (2018)* https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/hod/a18-resolutions.pdf | Policy/advocacy statement |
| Cong. Of Delegates, Am. Acad. Of Fam. Physicians, *Resolution No. 506 (CoSponsored C) Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization of Mifepristone* (May 24, 2018) https://www.reproductiveaccess.org/wp-content/uploads/2019/02/Resolution-No.-506-REMS.pdf | Policy/advocacy statement |
| Schummers L et al, Contraception 2020; 102(4): 273 | Abstract |
| Upadhyay UD et al.) Obstet & Gynecol 2015: 125: 175 | Published prior to March 29, 2016-July 26, 2021 timeframe for current literature review. We note that the extensive literature review conducted as part of the 2016 review, which was consistent with the division's standard approach for reviewing an efficacy supplement |

Reference ID: 4905882

| | |
|---|---|
| | and encompassed 90 references, did not capture this publication. However, the authors' conclusion in this publication is consistent with our review of the safety data in 2016. |
| Kapp N et al. Best Pract Clin Obstet Gynaecol. 2020;63:37-44 | Abstract. Also outside the scope of first trimester medical abortion. |
| Fuentes L et al. J Women's Health 2019; 28 (12): 1623,  1625<br><br>Bearak JM, Lancet Pub Health 2017 Nov;2(11): e493, e495-96<br><br>Cartwright A et al 20 J Med Internet Res 2018  20(5):e10235<br><br>Barr-Walker J, et al PLoS One 2019;14(4): e0209991<br><br>Grossman et al  JAMA Network 2017;317(4):437, 437-438<br><br>Dobie S et al 31 Fam Plan Persp 1999; 31(5): 241-244<br><br>Shelton JD 8 Fam Plan Persp 1976; 8(6):260, 260-262<br><br>Norris AH et al Am J Pub Health 2020; 110 (8): 1228,1232<br><br>Upadhyay UD et al Am J Pub Health 2014; 104(9):1687, 1689 | Focused on the logistics of accessing abortion care. |
| CDC MMWR Abortion Surveillance – United States, 2018<br>https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T5_down | Contains primarily general statistics on abortion care  by state. |

| |
|---|
| **References cited in appendix from *Chelius v. Becerra* Plaintiffs (September 29, 2021)** |
| **References included in the REMS review** |
| None |

Reference ID: 4905882

| References excluded from the REMS review | Rationale for Exclusion |
|---|---|
| Jones RK et al Guttmacher Institute Abortion Incidence and Service Availability in the United States, 2017 (2019)<br><br>Guttmacher Inst, Induced Abortion in the United States (2019) | Contains primarily general statistics on abortion care and logistics of accessing abortion care. |
| University of Minnesota Healthy Youth Dev. Prevention Rsch Ctr, 2019 Minnesota Adolescent Sexual Health Report 3 (2019) | Not related specifically to abortion care. |
| Jerman J et al Guttmacher Inst, Characteristics of U.S. Abortion Patients in 2014 and Changes since 2008 (2016) | Contains figures on patient characteristics from 2008-2014. |
| Roberts CM et al  Women's Health Issues 2014; 24:e211, e215 | Focused on cost of abortion. |
| CDC MMWR Abortion Surveillance 2018<br><br>https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T7 down (last updated Nov. 7, 2020) | Contains primarily statistics on number of abortions in the US. |
| Jones RK  Persp on Sexual & Reprod Health 2017; 49:17, 20 | Focused on abortion incidence and service availability. |
| Fuentes L et al (as above)<br><br>Bearak JM et al (as above)<br><br>Cartwright A et al (as above)<br><br>Johns NE et al. BMC Health Serv Res 2017; 17: 287, 294 | Focused on logistics of accessing abortion care. |

| References cited in letter from Society of Family Planning (August 11, 2021) |
|---|
| References included in the REMS review |
| Grossman D. Obstet Gynecol 2019;133 (3): 477-483 |

Reference ID: 4905882

| | |
|---|---|
| Grossman D et al. Obstet Gynecol 2021; 137 (4): 613-622. | |
| Winikoff B et al. Obstet Gynecol 2012; 120: 1070-1076 reviewed in 2016 clinical memo | |
| Chen MJ et al. Obstet Gynecol 2015;126(1):12-21 reviewed in 2016 memo | |
| Chong et al. Contraception 2021;104(1): 43-48 | |
| Aiken A et al. BJOG 2021; 128 (9): 1464 -1474 | |
| Hyland 2018 et al. Aust New Zeal J Obstet Gynaecol 2018; 58 (3): 335-340 | |
| **References excluded from the REMS review** | **Rationale for Exclusion** |
| Schummers L et al. BMJ Sex Reprod Heal 2021;47(e1) | Abstract |
| Kapp et al. 2020 (as above) | Abstract |
| Upadhyay et al. 2015 (as above) | (See rationale above) |
| Srinivasulu et al. Contraception 2021; 104(1):92-97 | Survey on clinician perspectives on access to mifepristone. |
| Calloway D et al. Contraception 2021; 104(1): 24-28 | Primarily addresses provider stigma around abortion care. |
| Rasmussen et al. Contraception; 104(1): 98-103 | Opinion/commentary |
| Cleland et al. Obstet Gynecol 2013;121(1):166-171 | Published prior to March 29, 2016 - July 26, 2021 timeframe for current literature review. We note that the extensive literature search conducted as part of the 2016 clinical review, which was consistent with the division's standard approach for reviewing an efficacy supplement and encompassed 90 references, did not capture this publication. However, the authors' conclusion in this publication is consistent with our review of the safety data in 2016. |
| National Academy of Sciences, Engineering, and Medicine. Safety and Quality of Abortion Care in the US 2018 | General information about abortion care in the US. Did not provide safety data relevant to the elements of the REMS |
| Raymond EG. Obstet Gynecol 2012: 119(2): 215-219 | Does not separate out medical and surgical abortion. |

Reference ID: 4905882

| Bartlett LA et al. Obstet Gynecol 2004; 103(4): 729-737 | Focused on surgical abortion. |
|---|---|
| Jones RK, Jerman J. Time to appointment and delays in accessing care among U.S. abortion patients, Guttmacher 2016 | Focused on logistics of accessing abortion care. |
| Foster DG et al. Perspect Sex Reprod Health 2013; 45(4):210-218 | Focused on second trimester abortion. |
| Ely G et al. Heal Soc Work 2019;44(1):13-21 | Focused on logistics of accessing abortion care. |
| Munro S et al. Ann Fam Med 2020; 18(5):413-421. | Survey on physician perspectives on implementing medical abortion with mifepristone. |

Reference ID: 4905882

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b) (6)

12/16/2021 10:22:50 AM

(b) (6)

12/16/2021 10:25:34 AM

(b) (6)

12/16/2021 10:30:08 AM

(b) (6)

12/16/2021 10:35:53 AM

(b) (6)

12/16/2021 10:49:46 AM

(b) (6)

12/16/2021 10:59:01 AM

(b) (6)

12/16/2021 11:08:07 AM

App. 174

# CENTER FOR DRUG EVALUATION AND RESEARCH

## *APPLICATION NUMBER:*

## 020687Orig1s025

## <u>OTHER REVIEW(S)</u>

**Review of Labeling**

(b) (6)

| NDA Number/Supplement | 020687/025 |
|---|---|
| Applicant | Danco Laboratories, LLC |
| Product Name | Mifeprex (mifepristone) tablets |
| Therapeutic Class | Progestin antagonist |
| Indication | For the medical termination of intrauterine pregnancy through 70 days gestation, in a regimen with misoprostol |
| Material Reviewed | Prescribing Information and Medication Guide received December 16, 2022 |
| Date of Review | January 3, 2023 |
| Reviewer | (b) (6) |

This memorandum is the [(b) (6)] (Division's) review of the proposed revisions to the labeling and Medication Guide for Mifeprex submitted by Danco Laboratories (Applicant) on December 16, 2022. These revisions are to align the language in the Prescribing Information and the Medication Guide with the proposed modification to the Mifepristone single, shared system Risk Evaluation and Mitigation Strategy (REMS) (referred to as the Mifepristone REMS Program) submitted under NDA 020687/Supplement-025, as amended.

## 1. Background

Mifeprex (mifepristone), in a regimen with misoprostol, is indicated for the medical termination of intrauterine pregnancy through 70 days gestation. Mifeprex and its approved generic are subject to the Mifepristone REMS Program to mitigate the risk of serious complications associated with mifepristone. The Mifepristone REMS Program consists of elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments of the REMS.

The goal of the Mifepristone REMS Program is to mitigate the risk of serious complications associated with mifepristone by:

- Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program (ETASU A).
- Ensuring that mifepristone is only dispensed in certain healthcare settings by or under the supervision of certified prescribers (ETASU C).
- Informing patients about the risk of serious complications associated with mifepristone (ETASU D).

On December 16, 2021, FDA sent REMS Modification Notification letters to the Applicants for Mifeprex and the approved generic version of Mifeprex, Mifepristone Tablets, 200 mg (Danco

Reference ID: 5103810

Laboratories and GenBioPro, respectively). The letters informed the Applicants of the FDA's determination that the approved Mifepristone REMS Program must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks by: (1) removal of the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement") (ETASU C) and (2) to add the requirement for certification of pharmacies that dispense the drug (ETASU B).[1] For a detailed discussion of the modification recommendations refer to the REMS Modification Rationale Review, jointly completed by the ████████████████████ (b) (6) and the ████████████ (b) (6) on December 16, 2021.[2]

As proposed by the Applicants in their December 16, 2022, amendments to their pending supplements, the modified goal of the Mifepristone REMS Program would read as follows:

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

a) Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

b) Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

c) Informing patients about the risk of serious complications associated with mifepristone.

The Division reviewed the Applicant's proposed revisions to the approved Mifeprex labeling under NDA 020687 Supplement 025, as amended, which provides REMS document and materials to align with the changes described in the REMS Modification Notification letters. Specifically, the requirement that mifepristone must be dispensed to patients in certain healthcare settings (ETASU C) was removed and the dispensing of mifepristone through specially certified pharmacies (ETASU B) was added. This REMS modification ensures that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers. There were no changes to ETASU A and ETASU D (prescribers must be specially certified and mifepristone must be dispensed to patients with evidence of safe use conditions, respectively).

On December 16, 2022, final labeling for the Mifeprex Prescribing Information (PI) and Medication Guide (MG) were received to align with the Mifepristone REMS Program modification. This submission is reviewed below. Review of the labeling changes made in the PI

---

[1] REMS Modification Notification letter dated December 16, 2021.
https://darrts.fda.gov/darrts/faces/ViewDocument?documentId=090140af80633e9f
[2] REMS memorandum dated December 16, 2021.
https://darrts.fda.gov/darrts/faces/ViewDocument?documentId=090140af80633d74

App. 177

and in the MG for the approved generic (ANDA 091178) will be completed by the [(b) (6)] .

### 2. Review of Labeling Changes

**Prescribing Information and Medication Guide**

The following two changes were made in both the PI and MG for Mifeprex:

1. Gender neutral edits were made throughout the PI and MG.

   *Reviewer comment: The Division agrees to the use of gender-neutral language to align with such changes previously approved for documents associated with this REMS.*

2. Removal of instructions for patients to take the MG when they visit an emergency room or another healthcare provider who did not prescribe Mifeprex, so the provider knows that the patient is undergoing a medical abortion.

   *Reviewer comment: The Applicant requested this change. Removal of the instructions in the PI and MG aligns with the updated Patient Agreement Form submitted in Supplement S-025, which removes instructions for patients to take the MG to healthcare visits with providers who did not provide Mifeprex. Although these instructions were added to the MG a number of years ago, upon further consideration the Division agrees with removing them because patients seeking emergency medical care are not likely to carry a MG with them, the MG is readily available online, and information about medical conditions and previous treatments can be obtained at the point of care.*

**Prescribing Information**

Additional changes were made in the PI to include pharmacy dispensing in Section 5.3 Mifepristone REMS Program and Section 17 Patient Counseling Information. Typographical errors were corrected in Sections 16 and 17.

1. Section 5.3 Mifepristone REMS Program

   The Applicant proposed changes to one of the three bulleted ETASU requirements, to state "MIFEPREX must only be dispensed to patients by or under the supervision of a certified prescriber, or by certified pharmacies on prescriptions issued by certified prescribers."

   *Reviewer comment: The revised language is consistent with the REMS modification to include certified pharmacy dispensing. The Division agrees with the proposed language.*

2. Section 17 Patient Counseling Information

Reference ID: 5103810

The Applicant proposed changes to one of the two bulleted ETASU requirements, to state "MIFEPREX is only dispensed by or under the supervision of certified prescribers or by certified pharmacies on prescriptions issued by certified prescribers."

***Reviewer comment: As above, the revised language for the PI for the approved MIFEPREX product is consistent with the REMS modification to include certified pharmacies and the Division agrees with the proposed language.***

3. Section 16 How Supplied/Storage and Handling and Section 17 Patient Counseling Information
    a. Both Sections 16 and 17 refer to the "mifepristone REMS Program" which was edited to "Mifepristone REMS Program".
    b. In Section 17, reinstatement was made of "a" before Patient Agreement Form in the bullet "Patients must sign a Patient Agreement Form".

***Reviewer comment: The Applicant will be informed of these minor edits.***

**Medication Guide**

Additional changes were made in the MG within the section titled "How should I take Mifeprex?", as follows:
1. Addition of obtaining Mifeprex at a pharmacy: "Mifeprex will be given to you by a healthcare provider or pharmacy."
2. Removal of statement "Your healthcare provider will either give you or prescribe for you 4 misoprostol tablets to take 24 to 48 hours later."

***Reviewer comment: The proposed MG changes for Mifeprex are acceptable to*** (b) (6) ***. The addition of Mifeprex  to be dispensed at a pharmacy reflects the REMS modification change. The statement on misoprostol dispensing is removed because it is not necessary to specify in the Mifeprex labeling how misoprostol is dispensed. The directions to take misoprostol tablets 24 to 48 hours after taking mifepristone are maintained in the Mifeprex patient instructions.***

**3. Conclusion**

**We received the final proposed labeling revisions to the Prescribing Information and Medication Guide from the Applicant on December 16, 2022. The Prescribing Information and Medication Guide for Mifeprex were revised to align with the Mifepristone REMS Program modification, which include removing the requirement that Mifeprex be dispensed only in certain healthcare settings and adding the requirement for pharmacy certification. The proposed labeling revisions were reviewed and found to be acceptable with minor edits.**

**All labeling changes outlined above will be applied to the approved generic mifepristone (ANDA 091178). The** (b) (6) **will review labeling for the approved generic and ensure it mirrors the updated approved labeling for the Mifeprex product.**

Reference ID: 5103810

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-------------------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b) (6)

01/03/2023 05:09:06 PM

(b) (6)

01/03/2023 05:10:03 PM

(b) (6)

01/03/2023 05:10:49 PM

(b) (6)

01/03/2023 05:11:23 PM

MEMORANDUM                    DEPARTMENT OF HEALTH AND HUMAN SERVICES
                                        PUBLIC HEALTH SERVICE
                                   FOOD AND DRUG ADMINISTRATION
                              CENTER FOR DRUG EVALUATION AND RESEARCH

---

TO:         FILE

FROM:       [(b) (6)]          [(b) (6)]          Digitally signed by [(b) (6)]
                                                  Date: 2022.12.23 13:11:43 -05'00'

DATE:       December 23, 2022

SUBJECT:    Review of Supplemental Drug Applications Proposing Modifications to the
            Mifepristone REMS Program

FDA is currently reviewing a supplemental new drug application from Danco Laboratories, LLC
(Danco) and a supplemental abbreviated new drug application from GenBioPro, Inc. (GBP) that
propose to modify the Mifepristone Risk Evaluation and Mitigation Strategy (REMS) Program
as approved under Danco's new drug application for Mifeprex (mifepristone) (NDA 020867) and
GBP's abbreviated new drug application for Mifepristone Tablets 200 mg (ANDA 091178).
Citing the Comstock Act, 18 U.S.C. §§ 1461, 1462, Plaintiffs in *Alliance for Hippocratic
Medicine v. U.S. Food and Drug Administration*, No. 2:22-cv-00223-Z (N.D. Tex.), have alleged
that FDA's actions regarding mifepristone do not comply with "federal laws that expressly
prohibit the mailing or delivery by any letter carrier, express company, or other common carrier
of any substance or drug intended for producing abortion" and also that FDA "failed to
acknowledge and address" those laws. Complaint ¶¶ 22, 392 (Nov. 18, 2022).  This
memorandum notes that the Office of Legal Counsel of the United States Department of Justice,
which provides controlling advice to Executive Branch officials on questions of law, has
concluded that the Comstock Act provisions cited by Plaintiffs "[do] not prohibit the mailing of
mifepristone or misoprostol where the sender lacks the intent that the recipient will use them
unlawfully. And in light of the many lawful uses of mifepristone and misoprostol, the fact that
these drugs are being mailed to a jurisdiction that significantly restricts abortion is not a
sufficient basis for concluding that the mailing violates [these provisions]."  Memorandum for
Thomas J. Marshall, General Counsel, United States Postal Service, from Christopher H.
Schroeder, Assistant Attorney General, Office of Legal Counsel, *Re: Application of the
Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions*, at 15
(December 23, 2022).[1]  Thus, even if the Comstock Act provisions bear on FDA's analysis of
the pending supplemental drug applications, in light of the conclusions set forth by the Office of
Legal Counsel, they pose no issue for FDA's approval of the applications.

---

[1] The Office of Legal Counsel's analysis applies to 18 U.S.C. § 1461 and § 1462. *See id.* at 1 n.3.

Reference ID: 5100604

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-----------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b) (6)

12/23/2022 03:02:29 PM

I am placing this document in for ⬛ (b) (6)             .

This is for archiving purposes.

# CENTER FOR DRUG EVALUATION AND RESEARCH

## *APPLICATION NUMBER:*

## 020687Orig1s025

## <u>RISK ASSESSMENT and RISK MITIGATION REVIEW(S)</u>

**Risk Evaluation and Mitigation Strategy (REMS) Memorandum**
**REMS Modification: Removal of a Requirement and Addition of a Requirement**
**U.S. FOOD AND DRUG ADMINISTRATION**
**CENTER FOR DRUG EVALUATION AND RESEARCH**

(b) (6)

| | |
|---|---|
| **NDA/ANDA #s:** | NDA 20687, ANDA 91178 |
| **Products:** | Mifeprex, mifepristone, 200 mg tablets |
| **APPLICANTS:** | Danco, GenBioPro |
| **FROM:** | (b) (6) |
| **DATE:** | December 16, 2021 |

Mifepristone is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy (IUP) through 70 days gestation. Mifeprex was approved on September 28, 2000, with a restricted distribution program under 21 CFR 314.520 (subpart H) and subsequently was deemed to have a REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007. The Mifeprex REMS with elements to assure safe use (ETASU) was approved on June 8, 2011 and a supplemental efficacy application and REMS modification was approved on March 29, 2016. The Mifepristone REMS Program (a single, shared system REMS that currently includes NDA 020687 and ANDA 91178) was approved on April 11, 2019.

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone. The current Mifepristone REMS Program includes elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments. Elements to assure safe use include requirements for prescriber certification (ETASU A), that mifepristone be dispensed only in certain healthcare settings by or under the supervision of a certified prescriber (ETASU C), and that mifepristone be dispensed only with documentation of safe use conditions (ETASU D). Documentation of safe use conditions consists of a Patient Agreement Form between the prescriber and the patient, indicating that the patient has received counseling from the prescriber regarding the risk of serious complications associated with mifepristone.

The requirement under ETASU C that mifepristone be dispensed only in certain health care settings, specifically clinics, medical offices, and hospitals, is referred to as the "in-person dispensing requirement."

On January 31, 2020 the Secretary of Health and Human Services (HHS) declared COVID-19 a public health emergency (PHE) as of January 27, 2020. During the COVID-19 pandemic, there have been periods when the in-person dispensing requirement has not been enforced. From July

1

App. 184

13, 2020 until January 12, 2021, enforcement was barred by an injunction issued in the *ACOG v. FDA* litigation. More recently, on April 12, 2021, the Agency stated its intent to exercise enforcement discretion with respect to the in-person dispensing requirement during the COVID-19 PHE, which is still ongoing as of the date of this review.   These circumstances have provided additional information regarding the in-person dispensing requirement as there have been periods when the in-person dispensing requirement was not enforced.

As part of the May 7, 2021, joint motion to stay the *Chelius v. Becerra* litigation, the Agency agreed to undertake a full review the Mifepristone REMS Program, in accordance with the REMS assessment provisions of the Federal Food, Drug, and Cosmetic Act (FD&C Act).[1]

After consultations between the ████████████████████████ (b) (6) ████████████████, analyzing several different sources of information, including published literature, safety information collected during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals,  the Applicants, and the plaintiffs in the *Chelius* litigation, we determined that the approved REMS for mifepristone could be modified without adversely impacting patient safety. Importantly, our review did not identify any differences in adverse events between periods when the in-person dispensing requirement was being enforced and periods when that requirement was not being enforced. The data suggested that the requirements for prescriber certification (ETASU A) and the Patient Agreement Form (ETASU D) should be maintained, while the in-person dispensing requirement (under ETASU C) could be removed, to reduce the burden imposed by the REMS. In determining that the in-person dispensing requirement could be removed, we concluded that a new requirement for pharmacy certification (ETASU B) is necessary to ensure the benefits of the product outweigh the risks.

████ (b) (6) and ████ (b) (6) assessment and recommendations were ████ (b) (6) ████ (b) (6) ████████████ on November 2, 2021. The ████ (b) (6) unanimously agreed with our recommendations.

For more detailed information on the review and assessments of the information, refer to the REMS Modification Rationale Review, jointly completed by ████ (b) (6) and ████ (b) (6) on December 16, 2021.

In conclusion, provided all other conditions of the Mifepristone REMS Program are met and that the other elements of the REMS are maintained (ETASU A and D), the following are required:

1. Modification of the Mifepristone REMS Program to remove the requirement under ETASU C that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals.  This would allow, for example, dispensing of mifepristone by mail, via certified prescribers or pharmacies, in addition to in-person

---

[1] Section 505-1(g)(2) of the FD&C Act (21 U.S.C. § 355-1(g)(2)).

Reference ID: 4906018

dispensing in clinics, medical offices and hospitals as currently outlined in ETASU C . We find that this provision is no longer necessary to ensure that the benefits of the drug outweigh the risks and that removing it will help minimize the burden of complying with the REMS on the healthcare delivery system.

2. Modification of the Mifepristone REMS Program to add a requirement under ETASU B that pharmacies that dispense the drug be specially certified.

Based on the ⬚(b) (6) and ⬚(b) (6) determination that a modified REMS with the components described above is necessary to reduce the burden imposed by the REMS and ensure the benefits of mifepristone outweigh the risks, FDA is requiring submission of the proposed REMS modification within 120 days of the date of the notification letter.

Reference ID: 4906018

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

----------------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b) (6)

12/16/2021 11:49:15 AM

Reference ID: 4906018



**Center for Drug Evaluation and Research (CDER)**

---

| | |
|---|---|
| **Application Type** | NDA and ANDA |
| **Application Number** | NDA 020687 and ANDA 91178 |
| **Supplement Number, Date Received** | NDA Supplement-025 and ANDA Supplement-004 received June 22, 2022 (sequence 18 and 87 respectively) and amended October 19, 2022 (sequences 22 and 91 respectively), November 30, 2022, and December 9, 2022 (sequences 25 and 93 respectively) |
| **Targeted Action Date** | December 19, 2022 |
| (b) (6) **#** | 2022-1169 |
| **Reviewer Names** | (b) (6) |
| (b) (6) | (b) (6) |
| (b) (6) | (b) (6) |
| **Review Completion Date** | December 14, 2022 |
| **Subject** | Review of proposed Major REMS Modification |
| **Established Name** | Mifepristone REMS Program |
| **Name of Applicant** | Danco Laboratories, LLC and GenBioPro, Inc. |
| **Therapeutic Class** | Progestin antagonist |
| **Formulation** | Oral tablet |

App. 188

## 1. Introduction

Refer to the proposed modification to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program) submitted by Danco Laboratories, LLC (Danco) for new drug application (NDA) 020687 and by GenBioPro, Inc. (GBP) for abbreviated new drug application (ANDA) 091178.

The Applicants submitted proposed modifications to the Mifepristone REMS Program on June 22, 2022 in response to REMS Modification Notification letters issued on December 16, 2021 to Danco and GBP, requiring the following modifications to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks:

- removal of the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement")

- addition of certification of pharmacies that dispense the drug

The comments in this review focus on the Applicants' amendments that were received on December 9, 2022, which included updates to the REMS Document and materials that were discussed and edited during a teleconference between the Agency and Applicants on December 8, 2022.

## 2. Comments to the Sponsor

**General Comments**

The documents have been revised for you per the comments below.

**REMS Document**

We have revisions in the REMS document in the following sections:

II. A.2.a.iv.2) l, the language must be updated to replace "provider" with "prescriber," and to remove the phrase that ████████████████████████████████████████ (b) (4) ███████████████████████████████████████████████████████████████████████████████████ .

II.A.2.c.ii A requirement was added to ensure prescribers previously certified in the Mifepristone REMS Program complete the new *Prescriber Agreement Form* ███████████ (b) (4) ██████████████████████████████████████ .

II. A.3, we have the following edits to align with the statue. Mifepristone must be ██████████ (b) (4) dispensed ██ (b) (4) to patients with evidence or other documentation of safe use conditions as ensured by the certified prescriber in signing the *Prescriber Agreement Form*.

II.B.5 must be updated to include: Mifepristone Sponsors must audit their certified pharmacies within 180 calendar days after the pharmacy places its first order of mifepristone, and annually thereafter audit certified pharmacies that have ordered mifepristone in the previous 12 months to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their pharmacy compliance if noncompliance is identified.

**REMS Supporting Document**

We require clarification and revisions in several sections. A red-lined Supporting Document has been attached for reference.

Reference ID: 5094402

The wording in the Supporting Document was not consistent with the REMS document and REMS materials. Throughout the Supporting Document, the document was revised to align with the wording in the REMS Document, *Prescriber Agreement Form, Patient Agreement Form*, and *Pharmacy Agreement Form*.

The Supporting Document is inconsistent with respect to grammar and punctuation, as well as with respect to capitalization, italicization, and terminology. Review and revise the Supporting Document for grammar and punctuation, and for consistency in capitalization, italicization, and terminology.

The term "_____ (b) (4)" was replaced with "supervised healthcare providers" where applicable.

There was minimal information about account set up processes for the certified prescribers and pharmacies. Include explanation of how accounts will be set up and maintained and what information from the account set up process will be used for REMS assessments.

There was also minimal information about how Sponsors will communicate with each other when stakeholders report information that the other needs to know such as when stakeholders report patient deaths to the wrong Sponsor or when decertifications of pharmacies or prescribers take place. Clarify what actions require timely communication between Sponsors and the timeline in which these actions should be reported to the other Sponsor.

**Prescriber Agreement Forms for Danco Laboratories, LLC and GenBioPro, Inc.**

_____ (b) (4). This data will be available through the account set up process.

**Pharmacy Agreement Forms for Danco Laboratories, LLC and GenBioPro, Inc.**

_____ (b) (4) must be removed as it is redundant to the language later in the form. The confidentiality requirement later in the form, under the requirements that certified pharmacies must put processes and procedures in place to accomplish, must be further aligned with the confidentiality requirement added to the REMS Document (discussed above).

**Patient Agreement Form**

The Patient Agreement Form is acceptable.

**Resubmission Instructions**

Accept all track changes and submit the following revised REMS materials by 12/16/22. The next submission to the Gateway should include Clean Word, Tracked Word, and pdf formatted versions of the following documents and one clean compiled PDF file that includes the REMS Document and all REMS materials in their final format:

      REMS Document
      Prescriber Agreement Form for Danco Laboratories, LLC
      Prescriber Agreement Form for GenBioPro, Inc.
      Pharmacy Agreement Form for Danco Laboratories, LLC
      Pharmacy Agreement Form for GenBioPro, Inc
      Patient Agreement Form
      REMS Supporting Document with the Assessment Plan

**Appendix**
REMS Document
Prescriber Agreement Form for Danco Laboratories, LLC
Prescriber Agreement Form for GenBioPro, Inc.

App. 190

Pharmacy Agreement Form for Danco Laboratories, LLC
Pharmacy Agreement Form for GenBioPro, Inc
REMS Supporting Document

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-----------------------------------------------------------------------------------------------

/s/

--------------------------------------------------------

(b) (6)

12/14/2022 04:18:28 PM

(b) (6)

12/14/2022 04:22:00 PM

(b) (6)

12/14/2022 04:34:44 PM



**Center for Drug Evaluation and Research (CDER)**

| | |
|---|---|
| **Application Type** | NDA and ANDA |
| **Application Number** | NDA 020687 and ANDA 91178 |
| **Supplement Number, Date Received** | NDA Supplement-025 and ANDA Supplement-004 received June 22, 2022 (sequence 18 and 87 respectively) and amended October 19, 2022 (sequences 22 and 91 respectively), November 30, 2022 |
| (b) (6) # | 2022-1169 |
| **Review Completion Date** | December 8, 2022 |
| **Subject** | Review of Proposed Major REMS Modification: Draft REMS Assessment Plan Comments |
| **Established Name** | Mifepristone REMS Program |
| **Name of Applicant** | Danco Laboratories, LLC and GenBioPro, Inc. |
| **Therapeutic Class** | Progestin antagonist |
| **Formulation** | Oral tablet |

Reference ID: 5091040

1. **Introduction**

Refer to the proposed modification to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program) submitted by Danco Laboratories, LLC (Danco) for new drug application (NDA) 020687 and from GenBioPro Inc. (GBP) for abbreviated new drug application (ANDA) 091178.

The Applicants submitted proposed modifications to the Mifepristone REMS Program on June 22, 2022 in response to a REMS Modification Notification letter issued on December 16, 2021 to Danco and GBP, requiring the following modifications to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks:

- removal of the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement")

- addition of certification of pharmacies that dispense the drug

The comments in this review focus on revisions to the REMS Assessment Plan.


2. **Comments to the Applicant**

We have provided a draft REMS Assessment Plan as discussed on the December 7, 2022 teleconference. The proposed Agency edits have been marked in tracked changes from the Mifepristone REMS Assessment Plan in the April 11, 2019, Supplement Approval Letter.  Refer to the attached Draft REMS Assessment Plan with tracked changes. Review of the REMS proposal is ongoing; these comments should not be considered final.


We have the following comments:

1. Provide each assessment plan metric for the two previous, current, and cumulative reporting periods (if applicable) for both the NDA and ANDA unless otherwise noted.
2. The Assessment Plan Categories of 1) Program Implementation and Operations and 2) Overall Assessment of REMS Effectiveness were added.
3. A REMS Certification Statistics metric was added to capture the following:
   a. Total number of certified, newly certified, and active prescribers along with a summary of the practice setting of the certified prescribers and the method in which they became certified.
   b. Total number of certified, newly certified, and active certified pharmacies.
   c. Total number of authorized, newly authorized, and active wholesaler/distributors.
4. A Utilization Data metric was added to capture wholesaler/distributor shipment and pharmacy data.
5. A REMS Compliance Data metric was added to capture stakeholder audit results and a summary of instances of non-compliance and actions taken to address non-compliance.

**Resubmission Instructions**

Submit the revised REMS Assessment Plan in the REMS Supporting Document with your 12/9/22 submission. Accept the tracked changes in the draft REMS Assessment Plan with which you agree and only indicate any new changes you propose as tracked changes in your next submission. The submission should include clean Word, tracked changes Word, and pdf formatted versions of the following document.

Reference ID: 5091040

**Appendix**

REMS Assessment Plan

4 Pages of Draft REMS Documents Have Been Withheld in Full as B4 (CCI/TS)
Immediately Following This Page

App. 195

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-----------------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b) (6)

12/08/2022 03:27:22 PM

(b) (6)

12/08/2022 03:29:06 PM



**Center for Drug Evaluation and Research (CDER)**

| | |
|---|---|
| **Application Type** | NDA and ANDA |
| **Application Number** | NDA 020687 and ANDA 91178 |
| **Supplement Number, Date Received** | NDA Supplement-025 and ANDA Supplement-004 received June 22, 2022 (sequence 18 and 87 respectively) and amended October 19, 2022 (sequences 22 and 91 respectively), November 30, 2022 |
| **PDUFA Date** | December 19, 2022 |
| (b) (6) # | 2022-1169 |
| **Reviewer Names** | (b) (6) |
| (b) (6) | (b) (6) |
| (b) (6) | (b) (6) |
| (b) (6) | (b) (6) |
| **Review Completion Date** | December 5, 2022 |
| **Subject** | Review of proposed Major REMS Modification |
| **Established Name** | Mifepristone REMS Program |
| **Name of Applicant** | Danco Laboratories, LLC and GenBioPro, Inc. |
| **Therapeutic Class** | Progestin antagonist |
| **Formulation** | Oral tablet |

Reference ID: 5088845

1. **Introduction**

Refer to the proposed modification to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program) submitted by Danco Laboratories, LLC (Danco) for new drug application (NDA) 020687 and by GenBioPro, Inc. (GBP) for abbreviated new drug application (ANDA) 091178.

The Applicants submitted proposed modifications to the Mifepristone REMS Program on June 22, 2022 in response to REMS Modification Notification letters issued on December 16, 2021 to Danco and GBP, requiring the following modifications to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks:

- removal of the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement")

- addition of certification of pharmacies that dispense the drug

The comments in this review focus on the Applicants' amendments that were received on October 19 and 20, 2022 and November 30, 2022 (REMS Document). The comments also reflect the REMS Document that was further discussed and edited during a teleconference between the Agency and Applicants on December 1, 2022.

2. **Comments to the Sponsor**

**General Comments**

We have updated the REMS Document as discussed during the December 1, 2022 teleconference and aligned the REMS materials. Your edits, where the Agency agrees, have been accepted and Agency edits have been marked in tracked changes. Refer to the attached, red-lined REMS Document and REMS Materials. Review of the REMS proposal is ongoing; these comments should not be considered final.

- The Agency has determined that further clarification that certified prescribers are responsible for overseeing implementation and compliance with the REMS Program is appropriate in the *Prescriber Agreement Form* and has been added. This clarification provides flexibility for certified prescribers in overseeing REMS implementation and compliance. The certified prescriber may do so in a manner that may include the use of a larger healthcare team and delegation of tasks. We have determined that to make additional changes to the prescriber certification requirements would constitute a substantive modification to the REMS that would go beyond the required REMS modifications set forth in the December 16, 2021 REMS Modification Notification letters. Adequate rationale is required to support a proposed REMS modification for the addition, modification, or removal of any goal or element of the REMS, as described in section 505-1(g)(4) of the FD&C Act. Your application does not include such adequate rationale.

- We agree that healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone is dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification and have added this clarification to the *Prescriber Agreement Forms* and *Pharmacy Agreement Forms*. These clarifications negate the need for further clarification in the REMS Document as you proposed in the footnote to section II.A.2.

- Moving forward, italicize all proper names of forms e.g. *Prescriber Agreement Form* in the REMS.

**Prescriber Agreement Forms for Danco Laboratories, LLC and GenBioPro, Inc.**

Reference ID: 5088845

The instructions on the *Prescriber Agreement Forms* were revised for clarity. Prescriber information collected on the forms was updated to capture practice setting [(b) (4)] address, and an additional line for medical license state was added. Duplicative or unnecessary instructions have been removed.

**Pharmacy Agreement Forms for Danco Laboratories, LLC and GenBioPro, Inc.**

The titles of the *Pharmacy Agreement Forms* were edited to remove "[(b) (4)]." The REMS pharmacy requirements will dictate whether a pharmacy can participate in the Mifepristone REMS Program and therefore [(b) (4)]. Additional information fields regarding authorized representatives and pharmacies were added and the term "[(b) (4)]" was replaced with "pharmacy." Duplicative or unnecessary instructions have been removed.

**Patient Agreement Form**

The first paragraph of the form has been aligned with the currently approved Mifepristone REMS Program and clarification that signatures on the document can be written or electronic was added. Risk information regarding ectopic pregnancy has been reorganized. [(b) (4)]
[                                      ].

**Resubmission Instructions**

Accept all track changes and submit the following revised REMS materials by 12/08/22. The next submission to the Gateway should include Clean Word, Tracked Word, and pdf formatted versions of the following documents and one clean compiled PDF file that includes the REMS Document and all REMS materials in their final format:

- REMS Document
- Prescriber Agreement Form for Danco Laboratories, LLC
- Prescriber Agreement Form for GenBioPro, Inc.
- Pharmacy Agreement Form for Danco Laboratories, LLC
- Pharmacy Agreement Form for GenBioPro, Inc
- Patient Agreement Form
- REMS Supporting Document with the Assessment Plan
- Updated prescription label and Medication Guide

**Appendix**
REMS Document
Prescriber Agreement Form for Danco Laboratories, LLC
Prescriber Agreement Form for GenBioPro, Inc.
Pharmacy Agreement Form for Danco Laboratories, LLC
Pharmacy Agreement Form for GenBioPro, Inc
Patient Agreement Form

17 Pages of Draft REMS Documents Have Been Withheld in Full as B4 (CCI/TS)
Immediately Following This Page

App. 199

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b) (6)

12/05/2022 08:49:01 PM

(b) (6)

12/05/2022 08:53:19 PM

(b) (6)

12/05/2022 09:08:48 PM

(b) (6)

12/05/2022 09:17:13 PM

Reference ID: 5088845



**Center for Drug Evaluation and Research (CDER)**

| | |
|---|---|
| **Application Type** | NDA and ANDA |
| **Application Number** | NDA 020687 and ANDA 91178 |
| **Supplement Number, Date Received** | NDA Supplement-025 and ANDA Supplement-004 received June 22, 2022 (sequence 18 and 87 respectively) and amended October 19, 2022 (sequences 22 and 91 respectively) |
| **Action Date** | December 19, 2022 |
| (b) (6) # | 2022-1169 |
| **Reviewer Names** | (b) (6) |
| (b) (6) | (b) (6) |
| (b) (6) | (b) (6) |
| | (b) (6) |
| **Review Completion Date** | November 23, 2022 |
| **Subject** | Review of proposed Major REMS Modification |
| **Established Name** | Mifepristone REMS Program |
| **Name of Applicant** | Danco Laboratories, LLC and GenBioPro, Inc. |
| **Therapeutic Class** | Progestin antagonist |
| **Formulation** | Oral tablet |

1.  **Introduction**

Refer to the proposed modification to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program) submitted by Danco Laboratories, LLC (Danco) for new drug application (NDA) 020687 and from GenBioPro Inc. (GBP) for abbreviated new drug application (ANDA) 091178.

The Applicants submitted proposed modifications to the Mifepristone REMS Program on June 22, 2022 in response to a REMS Modification Notification letter issued on December 16, 2021 to Danco and GBP, requiring the following modifications to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks:

- removal of the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement")

- addition of certification of pharmacies that dispense the drug

Danco amended their submission on October 19, 2022 and GBP amended their submission on October 20, 2022.

2.  **Comments to the Sponsor**

**General Comments**

For clarity, we have used the approved REMS Document to provide edits. Your proposed edits and Agency edits have been marked in tracked changes. Refer to the attached, red-lined REMS Document. Review of the REMS proposal is ongoing; these comments should not be considered final.

We have additional questions that must be addressed. Refer to the red-lined REMS Document attached. You must address the following question with your next submission:

1.  Refer to the distributor requirement on page five (in all markup), "Put processes and procedures in place to maintain a distribution system that is secure, confidential and follows all processes and procedures, including those for storage, handling, shipping, tracking package serial numbers, proof of delivery and controlled returns of mifepristone" (underline added for emphasis)

Clarify whether the packages that are tracked by the distributors will still be done by serial numbers or if tracking will only use the NDC and lot numbers.

**REMS Goal**

(b) (4)

We have revised the goal to the following:

"The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

> a) Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

> b) Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers or by certified pharmacies.

> c) Informing patients about the risk of serious complications associated with mifepristone."

**REMS Document**

We have provided edits to the REMS Document to reflect the requirements communicated in the December 16, 2021 letter and to incorporate additional requirements.  We have determined that for this modification we will not be using the format for the REMS that is in the 2017 draft Guidance for Industry - Format and Content of a REMS Document, as not all requirements are easily transferred to the newer format and may result in creating unnecessary confusion to stakeholders. Note that all REMS Materials and the REMS Supporting Document must align with the REMS Document.

Prescriber requirements were edited for clarity, brevity and to align with certified prescriber qualifications in the currently approved REMS. Additional requirements were needed to address situations that may arise if a certified prescriber opts to dispense through a certified pharmacy.

Pharmacy requirements were revised: to ensure pharmacies are able to ship mifepristone using a shipping service that provides tracking information, to include the use of an authorized representative to coordinate REMS implementation on behalf of the pharmacy, to dispense mifepristone such that it is delivered to the patient within four calendar days of the date the pharmacy receives the prescription, and to confirm with the prescriber and document the appropriateness of dispensing mifepristone for patients who will not receive the drug within four calendar days of the date the pharmacy receives the prescription. Additional record-keeping and reporting requirements were also added.

Additional Sponsor requirements were added to support prescriber, pharmacy, and distributor REMS stakeholder requirements, and to ensure the REMS operates as intended.

**REMS Supporting Document**

The REMS Supporting Document must be included in your next submission and is necessary to help us understand how these changes will be implemented before we can take an action.

**Resubmission Instructions**

Submit the following revised REMS materials by 11/30/22. Accept the track changes in the REMS Document with which you agree in the Word newly redlined documents and only indicate any new changes you propose as redlined changes in your next submission. The next submission to the Gateway should include Clean Word, Tracked Word, and pdf formatted versions of the following documents:

> REMS Document
> REMS Supporting Document

**Appendix**

REMS Document

5 Pages of Draft REMS Documents Have Been Withheld in Full as B4 (CCI/TS)
Immediately Following This Page

App. 204

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-----------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b) (6)

11/23/2022 11:42:12 AM

(b) (6)

11/23/2022 11:48:25 AM

(b) (6)

11/23/2022 11:51:57 AM

(b) (6)

11/23/2022 11:53:43 AM

Reference ID: 5083134

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

## 020687Orig1s025

## ADMINISTRATIVE and CORRESPONDENCE DOCUMENTS

**FDA U.S. FOOD & DRUG**
ADMINISTRATION

NDA 020687

**REMS MODIFICATION NOTIFICATION**

Danco Laboratories, LLC
(b) (4), (b) (6)

P.O. Box 4816
New York, NY 10185

Dear        (b) (4), (b) (6)   :

We refer to your new drug application (NDA) submitted under section 505(b) of the
Federal Food, Drug, and Cosmetic Act (FDCA) for Mifeprex (mifepristone) Tablets.

## RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS

The REMS for mifepristone was originally approved on June 8, 2011, and your single
shared system REMS (SSS REMS) was approved on April 11, 2019. Your last SSS
REMS modification was approved May 14, 2021.  The SSS REMS consists of elements
to assure safe use, an implementation system, and a timetable for submission of
assessments of the REMS.

In accordance with section 505-1(g)(4)(B) of the Federal Food, Drug, and Cosmetic Act
(FDCA), we have determined that your approved REMS for mifepristone must be
modified to minimize the burden on the healthcare delivery system of complying with the
REMS and to ensure that the benefits of the drug outweigh the risks.

This determination is based on a review of published literature, safety information
collected during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS)
reports, REMS assessment reports, and information provided by advocacy groups,
individuals, the Applicants, and plaintiffs in ongoing litigation.

Your approved REMS must be modified as follows:

**Elements to Assure Safe Use:** We have determined that the requirement that
mifepristone be dispensed only in certain healthcare settings, specifically clinics,
medical offices, and hospitals (i.e., the "in-person dispensing requirement") is no longer
necessary to ensure the benefits of mifepristone outweigh the risks of serious
complications associated with mifepristone that are listed in the labeling of the drug.
Removal of the requirement for in-person dispensing will also minimize the burden on
the healthcare delivery system of complying with the REMS.

**Elements to Assure Safe Use:** Pursuant to 505-1(f)(1), we have also determined that
an additional element to assure safe use is necessary to mitigate the risk of serious

App. 207

NDA 020687
Page 2

complications associated with mifepristone listed in the labeling of the drug. Modification of the Mifepristone REMS to allow dispensing of mifepristone by pharmacies requires the addition of certification of pharmacies that dispense the drug.

Your REMS must include elements to mitigate this risk, including at least the following:

- Healthcare providers have particular experience or training, or are specially certified

- Pharmacies, practitioners, or health care settings that dispense the drug are specially certified

- The drug is dispensed to patients with evidence or other documentation of safe use conditions.

  The REMS must include an implementation system to monitor, evaluate, and work to improve the implementation of the elements to assure safe use (outlined above).  Include an intervention plan to address any findings of non-compliance with the ETASU.

The proposed REMS must include a timetable for submission of assessments. The proposed REMS modification submission should include a new proposed REMS document and appended REMS materials, as appropriate, that show the complete previously approved REMS with all proposed modifications highlighted and revised REMS materials.

In addition, the submission should also include an update to the REMS supporting document that includes a description of all proposed modifications and their potential impact on other REMS elements. Revisions to the REMS supporting document should be submitted with all changes marked and highlighted.

Because we have determined that a REMS modification as described above is necessary to minimize the burden on the health care delivery system of complying with the REMS, and to ensure that the benefits of the drug outweigh the risks, you must submit a proposed REMS modification within 120 days of the date of this letter.

Submit the proposed modified REMS as a Prior Approval supplement (PAS) to your NDA.

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

NDA 020687
Page 3

Because FDA is requiring the REMS modifications in accordance with section 505-1(g)(4)(B), you are not required to submit an adequate rationale to support the proposed modifications, as long as the proposals are consistent with the modifications described in this letter. If the proposed REMS modification supplement includes changes that differ from the modifications described in this letter, an adequate rationale is required for those additional proposed changes in accordance with section 505-1(g)(4)(A).

Prominently identify the submission with the following wording in bold capital letters at the top of the first page of the submission:

**NEW SUPPLEMENT FOR NDA 020687/S-000**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED MAJOR REMS MODIFICATION**

Prominently identify subsequent submissions related to the proposed REMS modification with the following wording in bold capital letters at the top of the first page of the submission:

**NDA 020687/S-000**
**PROPOSED REMS MODIFICATION-AMENDMENT**

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, are only in PDF format, they may be submitted as such, but the preference is to include as many as possible in Word format.

**SUBMISSION OF REMS DOCUMENT IN SPL FORMAT**

In addition to submitting the proposed modified REMS as described above, you can also submit the REMS document in Structured Product Labeling (SPL) format. If you intend to submit the REMS document in SPL format, include the SPL file with your proposed REMS modification submission.

For more information on submitting REMS in SPL format, please email FDAREMSwebsite@fda.hhs.gov.

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

Reference ID: 4906335

NDA 020687
Page 4

If you have any questions, call ⬛⬛⬛⬛ (b) (6), at ⬛⬛⬛⬛ (b) (6).

Sincerely,

*{See appended electronic signature page}*

⬛⬛⬛⬛ (b) (6)

Center for Drug Evaluation and Research

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Reference ID: 4906335

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-------------------------------------------------------------------------------------------

/s/

------------------------------------------------------------

(b) (6)

12/16/2021 03:09:07 PM

Reference ID: 4906335

# EXHIBIT 4

# Declaration of Dr. Donna Harrison

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **ALLIANCE FOR HIPPOCRATIC MEDICINE**, on behalf of itself, its members, and their members, and their members' patients; **AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS**, on behalf of itself, its members, and their patients; **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself, its members, and their patients; **CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS**, on behalf of itself, its members, and their patients; **SHAUN JESTER, D.O.**, on behalf of himself and his patients; **REGINA FROST-CLARK, M.D.**, on behalf of herself and her patients; **TYLER JOHNSON, D.O.**, on behalf of himself and his patients; and **GEORGE DELGADO, M.D.**, on behalf of himself and his patients, <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D.**, in his official capacity as Commissioner of Food and Drugs, U.S. Food and Drug Administration; **JANET WOODCOCK, M.D.**, in her official capacity as Principal Deputy Commissioner, U.S. Food and Drug Administration **PATRIZIA CAVAZZONI, M.D.**, in her official capacity as Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration; **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and **XAVIER BECERRA**, in his official capacity as Secretary, U.S. Department of Health and Human Services, <br><br> Defendants. | Case No. _____ |

1

## DECLARATION OF DR. DONNA HARRISON

I, Donna Harrison, a citizen of the United States of America and a resident of Berrien Center, Michigan, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge.

1. I am over eighteen years old and make this declaration on personal knowledge.

2. I am a board-certified obstetrician and gynecologist.

3. I received my medical degree from the University of Michigan and completed my residency at a University of Michigan affiliate hospital, St. Joseph Mercy Hospital.

4. I am a diplomate of the American Board of Obstetrics and Gynecology.

5. I serve as the Chief Executive Officer of Plaintiff American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG).

6. I also serve as the President of Plaintiff Alliance for Hippocratic Medicine (AHM).

7. I am familiar with AAPLOG, its members, their fields of practice, and AAPLOG's policies and positions, including as set forth in the complaint, which I have reviewed.

8. AAPLOG is the largest organization of pro-life obstetricians and gynecologists ("OB/Gyns") in the world and is headquartered in Indiana. AAPLOG includes OB/Gyns and other physicians, with more than 7,000 medical professionals nationwide and more than 300 members in Texas.

2

AAPLOG members oppose elective abortion and are committed to the care and well-being of their patients including both pregnant women and their unborn children. AAPLOG members are concerned about the adverse impacts of chemical abortion on their practice of medicine.

9. AAPLOG's mission includes advocating on behalf of its members, including in litigation.

10. AAPLOG sues in this case on behalf of itself and its members.

11. I am also familiar with AHM, its members, their members' fields of practice, and AHM's policies and positions, including as set forth in the complaint, which I have reviewed.

12. AHM is a nonprofit organization that upholds and promotes the fundamental principles of Hippocratic medicine. AHM is incorporated in the State of Texas and has its registered agent in Amarillo, Texas.

13. AHM's members include the membership of the American Association of Pro-Life Obstetricians and Gynecologists, American College of Pediatricians, Catholic Medical Association, Christian Medical and Dental Associations, and Coptic Medical Association of North America. In opposing chemical abortion, AHM's members are concerned about the safety and well-being of pregnant women and girls, their preborn children, and chemical abortion's adverse impacts on the practice of medicine.

14. AHM sues in this case on behalf of itself and its members.

3

15. I am familiar with chemical abortion drugs, their use, and the complications that accompany chemical abortion.

16. As part of my duties and responsibilities at AAPLOG, I have authored several studies on the approval of mifepristone as an abortifacient. Among these, I co-authored two studies with other physicians and scholars examining the adverse events associated with the use of mifepristone. Our studies of the real-world use of mifepristone concluded that significant morbidity and mortality have occurred following the use of mifepristone as an abortifacient. We recommended that a pre-abortion ultrasound should be required to rule out ectopic pregnancy and confirm the gestational age of the unborn child. We concluded that the FDA's adverse event reporting system is grossly inadequate to evaluate real-world complications and significantly underestimates adverse events from mifepristone. One major reason that the FAERS database does not reflect real world complications is that FDA only required the manufacturer to report complications, and the manufacturer in turn obtains data from the abortionists. However, as our studies of the FAERs database indicate, most complications are not handled by the abortion provider, but rather by the Emergency Department, and the Emergency Department physician has no knowledge of the reporting process or obligation to report those complications to the manufacturer or to the FDA. *See* Kathi Aultman, et al., *Deaths and Severe Adverse Events After the Use of Mifepristone as an Abortifacient from September 2000 to February 2019*, 36

4

Issues L. Med. 3 (2021), https://pubmed.ncbi.nlm.nih.gov/33939340/;

Margaret M. Gary & Donna J. Harrison, *Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient*, 40 Ann. Pharmacother. 171 (2006), https://pubmed.ncbi.nlm.nih.gov/16380436/.

17. In addition, as part of my duties and responsibilities at AAPLOG, I co-authored a paper comparing the published complications after use of mifepristone from Planned Parenthood in 2009 and 2010 and compared those numbers to the complications in the FDA Adverse Event Reporting System for the same time period. We found that Cleland identified 1,530 Planned Parenthood mifepristone cases with specific adverse events (AEs) for 2009 and 2010. For this period, FAERS online dashboard includes a total (from all providers) of only 664, and the FDA released only 330 adverse event reports (AERs) through Freedom of Information Act (FOIA) requests. Cleland identified 1,158 ongoing pregnancies in 2009 and 2010. FAERS dashboard contains only 95, and only 39 were released via FOIA requests. We concluded that there are significant discrepancies in the total number of AERs and specific AEs for 2009 and 2010 mifepristone abortions reported in 1) Cleland's documentation of Planned Parenthood AEs, 2) FAERS dashboard, and 3) AERs provided through FOIA. These discrepancies render FAERS inadequate to evaluate the safety of mifepristone abortions. *See* Christina A Cirucci, et al., *Mifepristone Adverse Events Identified by Planned Parenthood in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting*

5

*System and Those Obtained Through the Freedom of Information Act*, 8 Health Servs. Rsch. & Managerial Epidemiol. 23333928211068919 (2021), https://pubmed.ncbi.nlm.nih.gov/34993274/.

18. I also co-authored a study looking at the real-world effects of the FDA Approval of Mifeprex on Emergency Room utilization after Mifeprex abortions. The massive increased utilization of Emergency Departments to manage abortion complications is a predictable consequence of the FDA's failure to require the same qualifications of Mifeprex abortion providers as were mirrored in the clinical trial for Mifeprex approval.

19. Because the FDA abandoned the post marketing requirement that abortion providers have admitting privileges to handle their own complications and allowed abortion providers who lack the ability to handle complications to dispense Mifeprex, the predictable consequence is the explosion of Mifeprex complications including hemorrhage, adding to the current shortage of blood and blood products across the United States. *See* James Studnicki, et al., *A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999-2015*, 8 Health Servs. Rsch. & Managerial Epidemiol. 23333928211053965 (2021), https://pubmed.ncbi.nlm.nih.gov/34778493/.

20. I am familiar with the FDA's regulation of chemical abortion drugs, including mifepristone and misoprostol. As part of my duties and responsibilities at AAPLOG, I co-authored the original 2002 Citizen Petition and the 2019

6

Citizen Petition filed by AAPLOG and others to challenge the FDA's actions on chemical abortion drugs. As part of my duties and responsibilities at AAPLOG, I also co-authored a study detailing the aberrancies of the FDA Approval process as it affects real-world patients. *See* Byron C. Calhoun & Donna J. Harrison, *Challenges to the FDA Approval of Mifepristone*, 38 Ann. Pharmacother. 163 (2004), https://pubmed.ncbi.nlm.nih.gov/14742814/.

21. In a chemical abortion, women take mifepristone to terminate the pregnancy by killing the preborn child. Women then take misoprostol to expel all pregnancy tissues, including the preborn child, through contractions and cramping.

22. Women who take chemical abortion drugs experience more complications than those who have surgical abortions.

23. There are many intense side effects for women who take chemical abortion drugs, including cramping and heavy bleeding.

24. Since the FDA's 2000 Approval of Mifeprex (the chemical abortion drug regimen consisting of mifepristone and misoprostol), medical professionals have needed to treat women and girls who have suffered from chemical abortion and experienced complications.

25. Mifepristone and misoprostol are serious drugs that should not be administered without medical supervision. The FDA's actions to eliminate the necessary supervision of these drugs harm women and obstetrics professionals, including AHM, AAPLOG, and their members.

7

26. Since the FDA's 2016 Major Changes to eliminate safeguards for the use of Mifeprex, AAPLOG members have needed to treat an increasing rate of women and girls who suffer complications from chemical abortion.

27. The increase in the frequency of complications harms medical providers— including AHM and AAPLOG members—because they end up managing the increase in complications.

28. When women suffer complications from chemical abortions, it can overwhelm the medical system and consume crucial limited medical resources, including blood for transfusions, physician time and attention, space in hospital and medical centers, and other equipment and medicines.

29. The increased occurrence of complications related to chemical abortions also multiplies the workload of healthcare providers, including AHM and AAPLOG members, in some cases by astronomical amounts. This is especially true in maternity care "deserts" (i.e., geographic areas where there are not a large number of OB/Gyn providers for patients).

30. For OB/Gyn professionals, the increase in complications due to increased use of chemical abortion drugs means that the typical care given to patients goes from simple patient management to complicated patient management. Patients who suffer complications from chemical abortions require significantly more time and attention from providers than the typical OB/Gyn patient requires.

8

31. In my experience, many patients do not fully understand the nature of chemical abortion or the risks that these drugs present to them. This results in an increase in the frequency of women seeking emergency medical care for side effects such as cramping, heavy bleeding, and severe pain even if they are not suffering an adverse event.

32. I understand that the FDA has removed the requirement for abortionists to report all adverse events for mifepristone.

33. Many doctors likely do not know about the need to report adverse events related to chemical abortion to the FDA. Similarly, many doctors likely do not know how to report adverse events. This means that complications handled by practitioners other than the abortionist are rarely reported to the FDA or the manufacturer.

34. I personally know of practitioners, including AAPLOG members, who have tried to report adverse events related to chemical abortion drugs to the FDA. The process is complicated, cumbersome, and time-consuming. The adverse event reporting requirements and the FAERS submission process harm medical practices by taking away significant time from a doctor to treat and meet with patients.

35. The FDA's decision not to require abortionists to report all adverse events for mifepristone harms women and girls because this deregulatory action creates an inaccurate and false safety profile for the use of mifepristone and misoprostol.

9

36. Without an accurate picture of the adverse effects of widespread chemical abortion drug use, physicians cannot effectively practice evidence-based medicine. If the FDA is not collecting the vast majority of adverse events to understand the true risk, healthcare providers cannot assess the risks of a particular course of treatment and inform their patients accordingly.

37. The inability of providers to adequately inform women of the known risks associated with chemical abortion drugs precludes women and girls from giving informed consent to taking these drugs. The lack of information also harms the patient-doctor relationship with all medical care providers because the patients no longer trust that their healthcare providers are telling the truth. This even harms organizations and practitioners who do not support or practice chemical abortion, including AHM, AAPLOG, and their members.

38. Due to inadequate adverse event reporting, the true rates of risks associated with chemical abortion drugs remain unknown and undercounted. This prevents AHM and AAPLOG from providing the public, their members, and their members' patients with accurate statistics and complete information regarding potential risks associated with the use of chemical abortion drugs.

39. The inability to share accurate information with member physicians, their patients, and the public on the risks of chemical abortion frustrates and complicates AHM's and AAPLOG's purpose to support women's health and to educate doctors, their patients, and the public about these dangers.

40. AHM and AAPLOG need to divert limited time, energy, and resources to compensate for this lack of information by conducting their own studies and analyses of the available data. This diversion of time, energy, and resources comes to the detriment of other advocacy and educational efforts of AHM and AAPLOG, including their efforts regarding the dangers of surgical abortion, the conscience rights of doctors, and the sanctity of life at all stages.

41. On behalf of AAPLOG and serving as the chairperson for AAPLOG's Subcommittee on Mifeprex, I submitted a Citizen Petition in 2002 challenging the FDA's approval of Mifeprex and requesting an audit of the Mifeprex clinical studies. AAPLOG, as an organization, is concerned about women's health issues and recognized that the FDA's violations of its standards and rules in approving Mifeprex put women's lives and health at risk. It took considerable time, energy, and resources to draft the 92-page petition and the 30-page response to comments letter, in addition to compiling and analyzing supporting sources and studies. This effort caused AAPLOG to divert limited time, energy, and resources from its other priorities and routine functions.

42. Similarly, AAPLOG submitted another Citizen Petition in 2019 challenging the FDA's 2016 major changes to the chemical abortion drug regimen, which I also co-authored. It also took considerable time, energy, and resources to draft the 26-page petition, in addition to compiling and analyzing supporting

11

sources and studies. This effort caused AAPLOG to divert limited time, energy, and resources from its other priorities and routine functions.

43. Because abortion activists continue to file their own citizen petitions and letters with the FDA asking the agency to eliminate all protections for women and girls who take chemical abortion drugs, and knowing the Biden administration's relentless, politicized efforts to push these drugs throughout the country, AHM and AAPLOG continue to expend considerable time, energy, and resources on its public advocacy and educational activities regarding chemical abortion drugs—to the detriment of other AHM and AAPLOG priorities and functions. This diversion of time, energy, and resources will not cease until the FDA's approval and deregulation of chemical abortion drugs ceases.

44. AHM and AAPLOG members are opposed to being forced to end the life of a human being in the womb for no medical reason. The objections are both ethical and medical as they stem from the purpose of medicine itself, which is to heal and not to electively kill human beings regardless of their location. The FDA's removal of REMS for safe use—which eliminates in-person evaluations and follow-up care—places our member doctors at increased risk of being forced to violate their conscience rights. The FDA's actions could force our members into a situation where they must render treatment to a woman in the emergency department suffering complications from chemical

App. 224

abortion while she is still carrying a living fetus, and they must perform a

D&C to treat her complications—ending the life of a human being.

Executed this November __11__, 2022.

By: _Donna Harrison_ MD.
Donna Harrison, M.D.

13

# EXHIBIT 5

# FDA-Approved Label for Mifepristone (January 2023)

HIGHLIGHTS OF PRESCRIBING INFORMATION
These highlights do not include all the information needed to use MIFEPREX safely and effectively. See full prescribing information for MIFEPREX.

MIFEPREX® (mifepristone) tablets, for oral use
Initial U.S. Approval: 2000

---

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

*See full prescribing information for complete boxed warning.*

**Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use.**

- **Atypical Presentation of Infection. Patients with serious bacterial infections and sepsis can present without fever, bacteremia or significant findings on pelvic examination. A high index of suspicion is needed to rule out serious infection and sepsis. (5.1)**
- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. (5.2)**

**MIFEPREX is only available through a restricted program called the mifepristone REMS Program (5.3).**

**Before prescribing MIFEPREX, inform the patient about these risks. Ensure the patient knows whom to call and what to do if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort or general malaise for more than 24 hours after taking misoprostol.**

---

-----------------------INDICATIONS AND USAGE-----------------------
MIFEPREX is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. (1)

---------------------DOSAGE AND ADMINISTRATION---------------------
- 200 mg MIFEPREX on Day 1, followed 24-48 hours after MIFEPREX dosing by 800 mcg buccal misoprostol. (2.1)
- Instruct the patient what to do if significant adverse reactions occur. (2.2)
- Follow-up is needed to confirm complete termination of pregnancy. (2.3)

---------------------DOSAGE FORMS AND STRENGTHS---------------------
Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card (3)

-----------------------------CONTRAINDICATIONS-----------------------------
- Confirmed/suspected ectopic pregnancy or undiagnosed adnexal mass (4)
- Chronic adrenal failure (4)
- Concurrent long-term corticosteroid therapy (4)
- History of allergy to mifepristone, misoprostol, or other prostaglandins (4)
- Hemorrhagic disorders or concurrent anticoagulant therapy (4)
- Inherited porphyria (4)
- Intrauterine device (IUD) in place (4)

----------------------WARNINGS AND PRECAUTIONS----------------------
- Ectopic pregnancy: Exclude before treatment. (5.4)
- Rhesus immunization: Prevention needed as for surgical abortion. (5.5)

-----------------------------ADVERSE REACTIONS-----------------------------
Most common adverse reactions (>15%) are nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Danco Laboratories, LLC at 1-877-432-7596 or medicaldirector@earlyoptionpill.com or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch*.**

-----------------------------DRUG INTERACTIONS-----------------------------
- CYP3A4 inducers can lower mifepristone concentrations. (7.1)
- CYP3A4 inhibitors can increase mifepristone concentrations. Use with caution. (7.2)
- CYP3A4 substrate concentrations can be increased. Caution with coadministration of substrates with narrow therapeutic margin. (7.3)

-----------------------USE IN SPECIFIC POPULATIONS-----------------------
- Pregnancy: Risk of fetal malformations in ongoing pregnancy if not terminated is unknown. (8.1)

**See 17 for PATIENT COUNSELING INFORMATION, Medication Guide.**

**Revised: 01/2023**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**
**1   INDICATIONS AND USAGE**
**2   DOSAGE AND ADMINISTRATION**
    2.1   Dosing Regimen
    2.2   Patient Management Following Misoprostol Administration
    2.3   Post-treatment Assessment: Day 7 to 14
    2.4   Contact for Consultation
**3   DOSAGE FORMS AND STRENGTHS**
**4   CONTRAINDICATIONS**
**5   WARNINGS AND PRECAUTIONS**
    5.1   Infections and Sepsis
    5.2   Uterine Bleeding
    5.3   Mifepristone REMS Program
    5.4   Ectopic Pregnancy
    5.5   Rhesus Immunization
**6   ADVERSE REACTIONS**
    6.1   Clinical Trials Experience
    6.2   Postmarketing Experience
**7   DRUG INTERACTIONS**
    7.1   Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)
    7.2   Drugs that May Increase Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)
    7.3   Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)
**8   USE IN SPECIFIC POPULATIONS**
    8.1   Pregnancy
    8.2   Lactation
    8.4   Pediatric Use
**10   OVERDOSAGE**
**11   DESCRIPTION**
**12   CLINICAL PHARMACOLOGY**
    12.1   Mechanism of Action
    12.2   Pharmacodynamics
    12.3   Pharmacokinetics
**13   NONCLINICAL TOXICOLOGY**
    13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility
**14   CLINICAL STUDIES**
**16   HOW SUPPLIED/STORAGE AND HANDLING**
**17   PATIENT COUNSELING INFORMATION**

\*Sections or subsections omitted from the full prescribing information are not listed.

Reference ID: 5103833

**FULL PRESCRIBING INFORMATION**

---

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

**Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use. No causal relationship between the use of MIFEPREX and misoprostol and these events has been established.**

- **Atypical Presentation of Infection. Patients with serious bacterial infections (e.g., *Clostridium sordellii*) and sepsis can present without fever, bacteremia, or significant findings on pelvic examination following an abortion. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. A high index of suspicion is needed to rule out serious infection and sepsis *[see Warnings and Precautions (5.1)]*.**

- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. Advise patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding *[see Warnings and Precautions (5.2)]*.**

**Because of the risks of serious complications described above, MIFEPREX is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.**

**Before prescribing MIFEPREX, inform the patient about the risk of these serious events. Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort, or general malaise (including weakness, nausea, vomiting, or diarrhea) for more than 24 hours after taking misoprostol.**

---

**1    INDICATIONS AND USAGE**

MIFEPREX is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.

**2    DOSAGE AND ADMINISTRATION**

**2.1  Dosing Regimen**

For purposes of this treatment, pregnancy is dated from the first day of the last menstrual period. The duration of pregnancy may be determined from menstrual history and clinical examination. Assess the pregnancy by ultrasonographic scan if the duration of pregnancy is uncertain or if ectopic pregnancy is suspected.

Remove any intrauterine device ("IUD") before treatment with MIFEPREX begins [*see Contraindications (4)*].

The dosing regimen for MIFEPREX and misoprostol is:

- MIFEPREX 200 mg orally + misoprostol 800 mcg buccally

  - *Day One:* MIFEPREX Administration
    One 200 mg tablet of MIFEPREX is taken in a single oral dose.

  - *Day Two or Three:* Misoprostol Administration (<u>minimum</u> 24-hour interval between MIFEPREX and misoprostol)
    Four 200 mcg tablets (total dose 800 mcg) of misoprostol are taken by the buccal route.

    Tell the patient to place two 200 mcg misoprostol tablets in each cheek pouch (the area between the cheek and gums) for 30 minutes and then swallow any remnants with water or another liquid (see Figure 1).

    **Figure 1**

    

    **2 pills between cheek and gum on left side + 2 pills between cheek and gum on right side**

Patients taking MIFEPREX must take misoprostol within 24 to 48 hours after taking MIFEPREX. The effectiveness of the regimen may be lower if misoprostol is administered less than 24 hours or more than 48 hours after mifepristone administration.

Because most women will expel the pregnancy within 2 to 24 hours of taking misoprostol *[see Clinical Studies (14)]*, discuss with the patient an appropriate location for them to be when taking the misoprostol, taking into account that expulsion could begin within 2 hours of administration.

## 2.2  Patient Management Following Misoprostol Administration

During the period immediately following the administration of misoprostol, the patient may need medication for cramps or gastrointestinal symptoms *[see Adverse Reactions (6)]*.

Give the patient:

- Instructions on what to do if significant discomfort, excessive vaginal bleeding or other adverse reactions occur
- A phone number to call if the patient has questions following the administration of the misoprostol
- The name and phone number of the healthcare provider who will be handling emergencies.

Reference ID: 5103833

### 2.3  Post-treatment Assessment: Day 7 to 14

Patients should follow-up with their healthcare provider approximately 7 to 14 days after the administration of MIFEPREX. This assessment is very important to confirm that complete termination of pregnancy has occurred and to evaluate the degree of bleeding.  Termination can be confirmed by medical history, clinical examination, human Chorionic Gonadotropin (hCG) testing, or ultrasonographic scan. Lack of bleeding following treatment usually indicates failure; however, prolonged or heavy bleeding is not proof of a complete abortion.

The existence of debris in the uterus (e.g., if seen on ultrasonography) following the treatment procedure will not necessarily require surgery for its removal.

Patients should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of women may experience some type of bleeding for more than 30 days. Persistence of heavy or moderate vaginal bleeding at the time of follow-up, however, could indicate an incomplete abortion.

If complete expulsion has not occurred, but the pregnancy is not ongoing, patients may be treated with another dose of misoprostol 800 mcg buccally.  There have been rare reports of uterine rupture in women who took MIFEPREX and misoprostol, including women with prior uterine rupture or uterine scar and women who received multiple doses of misoprostol within 24 hours.   Patients who choose to use a repeat dose of misoprostol should have a follow-up visit with their healthcare provider in approximately 7 days to assess for complete termination.

Surgical evacuation is recommended to manage ongoing pregnancies after medical abortion *[see Use in Specific Populations (8.1)]*.  Advise the patient whether you will provide such care or will refer them to another provider as part of counseling prior to prescribing MIFEPREX.

### 2.4  Contact for Consultation

**For consultation 24 hours a day, 7 days a week with an expert in mifepristone, call Danco Laboratories at 1-877-4 Early Option (1-877-432-7596).**

### 3    DOSAGE FORMS AND STRENGTHS

Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card. MIFEPREX tablets are light yellow, cylindrical, and bi-convex tablets, approximately 11 mm in diameter and imprinted on one side with "MF."

### 4    CONTRAINDICATIONS

- Administration of MIFEPREX and misoprostol for the termination of pregnancy (the "treatment procedure") is contraindicated in patients with any of the following conditions:

  - Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass (the treatment procedure will not be effective to terminate an ectopic pregnancy) *[see Warnings and Precautions (5.4)]*

  - Chronic adrenal failure (risk of acute adrenal insufficiency)

  - Concurrent long-term corticosteroid therapy (risk of acute adrenal insufficiency)

  - History of allergy to mifepristone, misoprostol, or other prostaglandins (allergic reactions including anaphylaxis, angioedema, rash, hives, and itching have been reported *[see Adverse Reactions (6.2)]*)

  - Hemorrhagic disorders or concurrent anticoagulant therapy (risk of heavy bleeding)

- Inherited porphyrias (risk of worsening or of precipitation of attacks)

- Use of MIFEPREX and misoprostol for termination of intrauterine pregnancy is contraindicated in patients with an intrauterine device ("IUD") in place (the IUD might interfere with pregnancy termination). If the IUD is removed, MIFEPREX may be used.

## 5    WARNINGS AND PRECAUTIONS

### 5.1  Infection and Sepsis

As with other types of abortion, cases of serious bacterial infection, including very rare cases of fatal septic shock, have been reported following the use of MIFEPREX *[see Boxed Warning]*. Healthcare providers evaluating a patient who is undergoing a medical abortion should be alert to the possibility of this rare event. A sustained (> 4 hours) fever of 100.4°F or higher, severe abdominal pain, or pelvic tenderness in the days after a medical abortion may be an indication of infection.

A high index of suspicion is needed to rule out sepsis (e.g., from *Clostridium sordellii*) if a patient reports abdominal pain or discomfort or general malaise (including weakness, nausea, vomiting, or diarrhea) more than 24 hours after taking misoprostol. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. No causal relationship between MIFEPREX and misoprostol use and an increased risk of infection or death has been established. *Clostridium sordellii* infections have also been reported very rarely following childbirth (vaginal delivery and caesarian section), and in other gynecologic and non-gynecologic conditions.

### 5.2  Uterine Bleeding

Uterine bleeding occurs in almost all patients during a medical abortion. Prolonged heavy bleeding (soaking through two thick full-size sanitary pads per hour for two consecutive hours) may be a sign of incomplete abortion or other complications, and prompt medical or surgical intervention may be needed to prevent the development of hypovolemic shock. Counsel patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding following a medical abortion *[see Boxed Warning]*.

Women should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of all subjects may experience some type of bleeding for 30 days or more. In general, the duration of bleeding and spotting increased as the duration of the pregnancy increased.

Decreases in hemoglobin concentration, hematocrit, and red blood cell count may occur in patients who bleed heavily.

Excessive uterine bleeding usually requires treatment by uterotonics, vasoconstrictor drugs, surgical uterine evacuation, administration of saline infusions, and/or blood transfusions. Based on data from several large clinical trials, vasoconstrictor drugs were used in 4.3% of all subjects, there was a decrease in hemoglobin of more than 2 g/dL in 5.5% of subjects, and blood transfusions were administered to ≤ 0.1% of subjects. Because heavy bleeding requiring surgical uterine evacuation occurs in about 1% of patients, special care should be given to patients with hemostatic disorders, hypocoagulability, or severe anemia.

Reference ID: 5103833

**5.3  Mifepristone REMS Program**

MIFEPREX is available only through a restricted program under a REMS called the mifepristone REMS Program, because of the risks of serious complications *[see Warnings and Precautions (5.1, 5.2)]*.

Notable requirements of the mifepristone REMS Program include the following:

- Prescribers must be certified with the program by completing the Prescriber Agreement Form.
- Patients must sign a Patient Agreement Form.
- MIFEPREX must only be dispensed to patients by or under the supervision of a certified prescriber, or by certified pharmacies on prescriptions issued by certified prescribers.

Further information is available at 1-877-4 Early Option (1-877-432-7596).

**5.4  Ectopic Pregnancy**

MIFEPREX is contraindicated in patients with a confirmed or suspected ectopic pregnancy because MIFEPREX is not effective for terminating ectopic pregnancies *[see Contraindications (4)]*. Healthcare providers should remain alert to the possibility that a patient who is undergoing a medical abortion could have an undiagnosed ectopic pregnancy because some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy. The presence of an ectopic pregnancy may have been missed even if the patient underwent ultrasonography prior to being prescribed MIFEPREX.

Patients who became pregnant with an IUD in place should be assessed for ectopic pregnancy.

**5.5  Rhesus Immunization**

The use of MIFEPREX is assumed to require the same preventive measures as those taken prior to and during surgical abortion to prevent rhesus immunization.

**6    ADVERSE REACTIONS**

The following adverse reactions are described in greater detail in other sections:

- Infection and sepsis *[see Warnings and Precautions (5.1)]*

- Uterine bleeding *[see Warnings and Precautions (5.2)]*

**6.1 Clinical Trials Experience**

Because clinical studies are conducted under widely varying conditions, adverse reaction rates observed in the clinical studies of a drug cannot be directly compared to rates in the clinical studies of another drug and may not reflect the rates observed in practice.

Information presented on common adverse reactions relies solely on data from U.S. studies, because rates reported in non-U.S. studies were markedly lower and are not likely generalizable to the U.S. population.  In three U.S. clinical studies totaling 1,248 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally, women reported adverse reactions in diaries and in interviews at the follow-up visit. These studies enrolled generally healthy women of reproductive age without contraindications to mifepristone or misoprostol use according to the MIFEPREX product label. Gestational age was assessed prior to study enrollment using the date of the woman's last menstrual period, clinical evaluation, and/or ultrasound examination.

Reference ID: 5103833

About 85% of patients report at least one adverse reaction following administration of MIFEPREX and misoprostol, and many can be expected to report more than one such reaction. The most commonly reported adverse reactions (>15%) were nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness (see Table 1). The frequency of adverse reactions varies between studies and may be dependent on many factors, including the patient population and gestational age.

Abdominal pain/cramping is expected in all medical abortion patients and its incidence is not reported in clinical studies. Treatment with MIFEPREX and misoprostol is designed to induce uterine bleeding and cramping to cause termination of an intrauterine pregnancy. Uterine bleeding and cramping are expected consequences of the action of MIFEPREX and misoprostol as used in the treatment procedure. Most patients can expect bleeding more heavily than they do during a heavy menstrual period *[see Warnings and Precautions (5.2)]*.

Table 1 lists the adverse reactions reported in U.S. clinical studies with incidence >15% of women.

**Table 1**
**Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. Clinical Studies**

| Adverse Reaction | # U.S. studies | Number of Evaluable Women | Range of frequency (%) | Upper Gestational Age of Studies Reporting Outcome |
|---|---|---|---|---|
| Nausea | 3 | 1,248 | 51-75% | 70 days |
| Weakness | 2 | 630 | 55-58% | 63 days |
| Fever/chills | 1 | 414 | 48% | 63 days |
| Vomiting | 3 | 1,248 | 37-48% | 70 days |
| Headache | 2 | 630 | 41-44% | 63 days |
| Diarrhea | 3 | 1,248 | 18-43% | 70 days |
| Dizziness | 2 | 630 | 39-41% | 63 days |

One study provided gestational-age stratified adverse reaction rates for women who were 57-63 and 64-70 days; there was little difference in frequency of the reported common adverse reactions by gestational age.

Information on serious adverse reactions was reported in six U.S. and four non-U.S. clinical studies, totaling 30,966 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally. Serious adverse reaction rates were similar between U.S. and non-U.S. studies, so rates from both U.S. and non-U.S. studies are presented. In the U.S. studies, one studied women through 56 days gestation, four through 63 days gestation, and one through 70 days gestation, while in the non-U.S. studies, two studied women through 63 days gestation, and two through 70 days gestation. Serious adverse reactions were reported in <0.5% of women. Information from the U.S. and non-U.S. studies is presented in Table 2.

Reference ID: 5103833

**Table 2**
**Serious Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. and Non-U.S. Clinical Studies**

| Adverse Reaction | U.S. | | | Non-U.S. | | |
|---|---|---|---|---|---|---|
| | # of studies | Number of Evaluable Women | Range of frequency (%) | # of studies | Number of Evaluable Women | Range of frequency (%) |
| Transfusion | 4 | 17,774 | 0.03-0.5% | 3 | 12,134 | 0-0.1% |
| Sepsis | 1 | 629 | 0.2% | 1 | 11,155 | <0.01%* |
| ER visit | 2 | 1,043 | 2.9-4.6% | 1 | 95 | 0 |
| Hospitalization Related to Medical Abortion | 3 | 14,339 | 0.04-0.6% | 3 | 1,286 | 0-0.7% |
| Infection without sepsis | 1 | 216 | 0 | 1 | 11,155 | 0.2% |
| Hemorrhage | NR | NR | NR | 1 | 11,155 | 0.1% |

NR= Not reported
 * This outcome represents a single patient who experienced death related to sepsis.

## 6.2    Postmarketing Experience

The following adverse reactions have been identified during postapproval use of MIFEPREX and misoprostol. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Infections and infestations:* post-abortal infection (including endometritis, endomyometritis, parametritis, pelvic infection, pelvic inflammatory disease, salpingitis)
*Blood and the lymphatic system disorders:* anemia
*Immune system disorders:* allergic reaction (including anaphylaxis, angioedema, hives, rash, itching)
*Psychiatric disorders:* anxiety
*Cardiac disorders:* tachycardia (including racing pulse, heart palpitations, heart pounding)
*Vascular disorders:* syncope, fainting, loss of consciousness, hypotension (including orthostatic), light-headedness
*Respiratory, thoracic and mediastinal disorders:* shortness of breath
*Gastrointestinal disorders:* dyspepsia
*Musculoskeletal, connective tissue and bone disorders:* back pain, leg pain
*Reproductive system and breast disorders:* uterine rupture, ruptured ectopic pregnancy, hematometra, leukorrhea
*General disorders and administration site conditions:* pain

## 7    DRUG INTERACTIONS

## 7.1    Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)

CYP450 3A4 is primarily responsible for the metabolism of mifepristone. CYP3A4 inducers such as rifampin, dexamethasone, St. John's Wort, and certain anticonvulsants (such as phenytoin, phenobarbital, carbamazepine) may induce mifepristone metabolism (lowering serum concentrations of mifepristone).  Whether this action has an impact on the efficacy of the dose

regimen is unknown.   Refer to the follow-up assessment *[see Dosage and Administration (2.3 )]* to verify that treatment has been successful.

### 7.2  Drugs that May Increase MIFEPREX Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)

Although specific drug or food interactions with mifepristone have not been studied, on the basis of this drug's metabolism by CYP 3A4, it is possible that ketoconazole, itraconazole, erythromycin, and grapefruit juice may inhibit its metabolism (increasing serum concentrations of mifepristone). MIFEPREX should be used with caution in patients currently or recently treated with CYP 3A4 inhibitors.

### 7.3  Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)

Based on *in vitro* inhibition information, coadministration of mifepristone may lead to an increase in serum concentrations of drugs that are CYP 3A4 substrates. Due to the slow elimination of mifepristone from the body, such interaction may be observed for a prolonged period after its administration. Therefore, caution should be exercised when mifepristone is administered with drugs that are CYP 3A4 substrates and have narrow therapeutic range.

## 8    USE IN SPECIFIC POPULATIONS

### 8.1  Pregnancy

Risk Summary

MIFEPREX is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.  Risks to pregnant patients are discussed throughout the labeling.

Refer to misoprostol labeling for risks to pregnant patients with the use of misoprostol.

The risk of adverse developmental outcomes with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol is unknown; however, the process of a failed pregnancy termination could disrupt normal embryo-fetal development and result in adverse developmental effects.  Birth defects have been reported with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol. In animal reproduction studies, increased fetal losses were observed in mice, rats, and rabbits and skull deformities were observed in rabbits with administration of mifepristone at doses lower than the human exposure level based on body surface area.

Data

*Animal Data*

In teratology studies in mice, rats and rabbits at doses of 0.25 to 4.0 mg/kg (less than 1/100 to approximately 1/3 the human exposure based on body surface area), because of the antiprogestational activity of mifepristone,fetal losses were much higher than in control animals. Skull deformities were detected in rabbit studies at approximately 1/6 the human exposure, although no teratogenic effects of mifepristone have been observed to date in rats or mice. These deformities were most likely due to the mechanical effects of uterine contractions resulting from inhibition of progesterone action.

### 8.2  Lactation

MIFEPREX is present in human milk.  Limited data demonstrate undetectable to low levels of the drug in human milk with the relative (weight-adjusted) infant dose 0.5% or less as compared to maternal dosing. There is no information on the effects of MIFEPREX in a regimen with

App. 235

misoprostol in a breastfed infant or on milk production.  Refer to misoprostol labeling for lactation information with the use of misoprostol.  The developmental and health benefits of breast-feeding should be considered along with any potential adverse effects on the breast-fed child from MIFEPREX in a regimen with misoprostol.

### 8.4  Pediatric Use

Safety and efficacy of MIFEPREX have been established in pregnant females. Data from a clinical study of MIFEPREX that included a subset of 322 females under age 17 demonstrated a safety and efficacy profile similar to that observed in adults.

## 10   OVERDOSAGE

No serious adverse reactions were reported in tolerance studies in healthy non-pregnant female and healthy male subjects where mifepristone was administered in single doses greater than 1800 mg (ninefold the recommended dose for medical abortion). If a patient ingests a massive overdose, the patient should be observed closely for signs of adrenal failure.

## 11   DESCRIPTION

MIFEPREX tablets each contain 200 mg of mifepristone, a synthetic steroid with antiprogestational effects. The tablets are light yellow in color, cylindrical, and bi-convex, and are intended for oral administration only. The tablets include the inactive ingredients colloidal silica anhydrous, corn starch, povidone, microcrystalline cellulose, and magnesium stearate.

Mifepristone is a substituted 19-nor steroid compound chemically designated as 11ß-[$p$-(Dimethylamino)phenyl]-17ß-hydroxy-17-(1-propynyl)estra-4,9-dien-3-one. Its empirical formula is $C_{29}H_{35}NO_2$. Its structural formula is:



The compound is a yellow powder with a molecular weight of 429.6 and a melting point of 192-196°C. It is very soluble in methanol, chloroform and acetone and poorly soluble in water, hexane and isopropyl ether.

## 12   CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

The anti-progestational activity of mifepristone results from competitive interaction with progesterone at progesterone-receptor sites. Based on studies with various oral doses in several animal species (mouse, rat, rabbit, and monkey), the compound inhibits the activity of endogenous or exogenous progesterone, resulting in effects on the uterus and cervix that, when combined with misoprostol, result in termination of an intrauterine pregnancy.

During pregnancy, the compound sensitizes the myometrium to the contraction-inducing activity

App. 236

of prostaglandins.

## 12.2 Pharmacodynamics

Use of MIFEPREX in a regimen with misoprostol disrupts pregnancy by causing decidual necrosis, myometrial contractions, and cervical softening, leading to the expulsion of the products of conception.

Doses of 1 mg/kg or greater of mifepristone have been shown to antagonize the endometrial and myometrial effects of progesterone in women.

Antiglucocorticoid and antiandrogenic activity:  Mifepristone also exhibits antiglucocorticoid and weak antiandrogenic activity.  The activity of the glucocorticoid dexamethasone in rats was inhibited following doses of 10 to 25 mg/kg of mifepristone. Doses of 4.5 mg/kg or greater in human beings resulted in a compensatory elevation of adrenocorticotropic hormone (ACTH) and cortisol. Antiandrogenic activity was observed in rats following repeated administration of doses from 10 to 100 mg/kg.

## 12.3 Pharmacokinetics

Mifepristone is rapidly absorbed after oral ingestion with non-linear pharmacokinetics for Cmax after single oral doses of 200 mg and 600 mg in healthy subjects.

Absorption

The absolute bioavailability of a 20 mg mifepristone oral dose in females of childbearing age is 69%. Following oral administration of a single dose of 600 mg, mifepristone is rapidly absorbed, with a peak plasma concentration of 1.98 ± 1.0 mg/L occurring approximately 90 minutes after ingestion.

Following oral administration of a single dose of 200 mg in healthy men (n=8), mean Cmax was 1.77 ± 0.7 mg/L occurring approximately 45 minutes after ingestion. Mean $AUC_{0-\infty}$ was 25.8 ± 6.2 mg*hr/L.

Distribution

Mifepristone is 98% bound to plasma proteins, albumin, and $\alpha_1$-acid glycoprotein. Binding to the latter protein is saturable, and the drug displays nonlinear kinetics with respect to plasma concentration and clearance.

Elimination

Following a distribution phase, elimination of mifepristone is slow at first (50% eliminated between 12 and 72 hours) and then becomes more rapid with a terminal elimination half-life of 18 hours.

*Metabolism*

Metabolism of mifepristone is primarily via pathways involving N-demethylation and terminal hydroxylation of the 17-propynyl chain. *In vitro* studies have shown that CYP450 3A4 is primarily responsible for the metabolism. The three major metabolites identified in humans are: (1) RU 42 633, the most widely found in plasma, is the N-monodemethylated metabolite; (2) RU 42 848, which results from the loss of two methyl groups from the 4-dimethylaminophenyl in position 11ß; and (3) RU 42 698, which results from terminal hydroxylation of the 17-propynyl chain.

*Excretion*

By 11 days after a 600 mg dose of tritiated compound, 83% of the drug has been accounted for by the feces and 9% by the urine. Serum concentrations are undetectable by 11 days.

App. 237

Specific Populations

The effects of age, hepatic disease and renal disease on the safety, efficacy and pharmacokinetics of mifepristone have not been investigated.

## 13    NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Carcinogenesis

No long-term studies to evaluate the carcinogenic potential of mifepristone have been performed.

Mutagenesis

Results from studies conducted *in vitro* and in animals have revealed no genotoxic potential for mifepristone. Among the tests carried out were: Ames test with and without metabolic activation; gene conversion test in *Saccharomyces cerevisiae* D4 cells; forward mutation in *Schizosaccharomyces pompe* P1 cells; induction of unscheduled DNA synthesis in cultured HeLa cells; induction of chromosome aberrations in CHO cells; *in vitro* test for gene mutation in V79 Chinese hamster lung cells; and micronucleus test in mice.

Impairment of Fertility

In rats, administration of 0.3 mg/kg mifepristone per day caused severe disruption of the estrus cycles for the three weeks of the treatment period. Following resumption of the estrus cycle, animals were mated and no effects on reproductive performance were observed.

## 14    CLINICAL STUDIES

Safety and efficacy data from clinical studies of mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally through 70 days gestation are reported below. Success was defined as the complete expulsion of the products of conception without the need for surgical intervention. The overall rates of success and failure, shown by reason for failure based on 22 worldwide clinical studies (including 7 U.S. studies) appear in Table 3.

The demographics of women who participated in the U.S. clinical studies varied depending on study location and represent the racial and ethnic variety of American females.  Females of all reproductive ages were represented, including females less than 18 and more than 40 years of age; most were 27 years or younger.

App. 238

**Table 3**
**Outcome Following Treatment with Mifepristone (oral) and Misoprostol (buccal)**
**Through 70 Days Gestation**

|  | U.S. Trials | Non-U.S. Trials |
|---|---|---|
| N | 16,794 | 18,425 |
| Complete Medical Abortion | 97.4% | 96.2% |
| Surgical Intervention* | 2.6% | 3.8% |
| Ongoing Pregnancy** | 0.7% | 0.9% |

\* Reasons for surgical intervention include ongoing pregnancy, medical necessity, persistent or heavy bleeding after treatment, patient request, or incomplete expulsion.
\*\* Ongoing pregnancy is a subcategory of surgical intervention, indicating the percent of women who have surgical intervention due to an ongoing pregnancy.

The results for clinical studies that reported outcomes, including failure rates for ongoing pregnancy, by gestational age are presented in Table 4.

**Table 4**
**Outcome by Gestational Age Following Treatment with Mifepristone and**
**Misoprostol (buccal) for U.S. and Non-U.S. Clinical Studies**

|  | ≤49 days | | | 50-56 days | | | 57-63 days | | | 64-70 days | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies |
| Complete medical abortion | 12,046 | 98.1 | 10 | 3,941 | 96.8 | 7 | 2,294 | 94.7 | 9 | 479 | 92.7 | 4 |
| Surgical intervention for ongoing pregnancy | 10,272 | 0.3 | 6 | 3,788 | 0.8 | 6 | 2,211 | 2 | 8 | 453 | 3.1 | 3 |

One clinical study asked subjects through 70 days gestation to estimate when they expelled the pregnancy, with 70% providing data. Of these, 23-38% reported expulsion within 3 hours and over 90% within 24 hours of using misoprostol.

## 16   HOW SUPPLIED/STORAGE AND HANDLING

is only available through a restricted program called the Mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.

MIFEPREX is supplied as light yellow, cylindrical, and bi-convex tablets imprinted on one side with "MF." Each tablet contains 200 mg of mifepristone. One tablet is individually blistered on one blister card that is packaged in an individual package (National Drug Code 64875-001-01).

Store at 25°C (77°F); excursions permitted to 15 to 30°C (59 to 86°F) [see USP Controlled Room Temperature].

Reference ID: 5103833

## 17   PATIENT COUNSELING INFORMATION

Advise the patient to read the FDA-approved patient labeling (Medication Guide), included with each package of MIFEPREX. Additional copies of the Medication Guide are available by contacting Danco Laboratories at 1-877-4 Early Option (1-877-432-7596) or from www.earlyoptionpill.com.

Serious Infections and Bleeding

- Inform the patient that uterine bleeding and uterine cramping will occur [*see Warnings and Precautions (5.2)*].

- Advise the patient that serious and sometimes fatal infections and bleeding can occur very rarely [*see Warnings and Precautions (5.1, 5.2)*].

- MIFEPREX is only available through a restricted program called the Mifepristone REMS Program [*see Warnings and Precautions (5.3)*].  Under the mifepristone REMS Program:

  o Patients must sign a Patient Agreement Form.

  o MIFEPREX is only dispensed by or under the supervision of certified prescribers or by certified pharmacies on prescriptions issued by certified prescribers.

Provider Contacts and Actions in Case of Complications

- Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, or if the patient experiences complications including prolonged heavy bleeding, severe abdominal pain, or sustained fever *[see Boxed Warning]*.

-

Compliance with Treatment Schedule and Follow-up Assessment

- Advise the patient that it is necessary to complete the treatment schedule, including a follow-up assessment approximately 7 to14 days after taking MIFEPREX *[see Dosage and Administration (2.3)]*.

- Explain that

  o prolonged heavy vaginal bleeding is not proof of a complete abortion,

  o if the treatment fails and the pregnancy continues, the risk of fetal malformation is unknown,

  o it is recommended that ongoing pregnancy be managed by surgical termination *[see Dosage and Administration (2.3)]*.  Advise the patient whether you will provide such care or will refer them to another provider.

Subsequent Fertility

- Inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses.

- Inform the patient that contraception can be initiated as soon as pregnancy expulsion has been confirmed, or before resuming sexual intercourse.

MIFEPREX is a registered trademark of Danco Laboratories, LLC.

App. 240

Manufactured for:
*Danco Laboratories, LLC*
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596)
www.earlyoptionpill.com

01/2023

---

**MEDICATION GUIDE**

**Mifeprex** (MIF-eh-prex) (mifepristone tablets, for oral use)

---

Read this information carefully before taking Mifeprex and misoprostol. It will help you understand how the treatment works. This Medication Guide does not take the place of talking with your healthcare provider.

---

**What is the most important information I should know about Mifeprex?**

**What symptoms should I be concerned with?** Although cramping and bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth. Seeking medical attention as soon as possible is needed in these circumstances. Serious infection has resulted in death in a very small number of cases. There is no information that use of Mifeprex and misoprostol caused these deaths. If you have any questions, concerns, or problems, or if you are worried about any side effects or symptoms, you should contact your healthcare provider. You can write down your healthcare provider's telephone number here _____.

**Be sure to contact your healthcare provider promptly if you have any of the following:**

- **Heavy Bleeding.** Contact your healthcare provider right away if you bleed enough to soak through two thick full-size sanitary pads per hour for two consecutive hours or if you are concerned about heavy bleeding. In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical aspiration or D&C).

- **Abdominal Pain or "Feeling Sick."** If you have abdominal pain or discomfort, or you are "feeling sick," including weakness, nausea, vomiting, or diarrhea, with or without fever, more than 24 hours after taking misoprostol, you should contact your healthcare provider without delay. These symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

- **Fever.** In the days after treatment, if you have a fever of 100.4°F or higher that lasts for more than 4 hours, you should contact your healthcare provider right away. Fever may be a symptom of a serious infection or another problem.

**If you cannot reach your healthcare provider, go to the nearest hospital emergency room.**

**What to do if you are still pregnant after Mifeprex with misoprostol treatment.** If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy. In many cases, this surgical procedure can be done in the office/clinic. The chance of birth defects if the pregnancy is not ended is unknown.

**Talk with your healthcare provider.** Before you take Mifeprex, you should read this Medication Guide and you and your healthcare provider should discuss the benefits and risks of your using Mifeprex.

Reference ID: 5103833

**What is Mifeprex?**

**Mifeprex is used in a regimen with another prescription medicine called misoprostol, to end an early pregnancy.** Early pregnancy means it is 70 days (10 weeks) or less since your last menstrual period began. Mifeprex is not approved for ending pregnancies that are further along. Mifeprex blocks a hormone needed for your pregnancy to continue. When you use Mifeprex on Day 1, you also need to take another medicine called misoprostol 24 to 48 hours after you take Mifeprex, to cause the pregnancy to be passed from your uterus.

The pregnancy is likely to be passed from your uterus within 2 to 24 hours after taking Mifeprex and misoprostol.  When the pregnancy is passed from the uterus, you will have bleeding and cramping that will likely be heavier than your usual period. About 2 to 7 out of 100 women taking Mifeprex will need a surgical procedure because the pregnancy did not completely pass from the uterus or to stop bleeding.

**Who should not take Mifeprex?**

Some patients should not take Mifeprex. Do not take Mifeprex if you:

- Have a pregnancy that is more than 70 days (10 weeks). Your healthcare provider may do a clinical examination, an ultrasound examination, or other testing to determine how far along you are in pregnancy.

- Are using an IUD (intrauterine device or system). It must be taken out before you take Mifeprex.

- Have been told by your healthcare provider that you have a pregnancy outside the uterus (ectopic pregnancy).

- Have problems with your adrenal glands (chronic adrenal failure).

- Take a medicine to thin your blood.

- Have a bleeding problem.

- Have porphyria.

- Take certain steroid medicines.

- Are allergic to mifepristone, misoprostol, or medicines that contain misoprostol, such as Cytotec or Arthrotec.

Ask your healthcare provider if you are not sure about all your medical conditions before taking this medicine to find out if you can take Mifeprex.

**What should I tell my healthcare provider before taking Mifeprex?**

**Before you take Mifeprex, tell your healthcare provider if you:**

- cannot follow-up within approximately 7 to 14 days of your first visit

- are breastfeeding. Mifeprex can pass into your breast milk.  The effect of the Mifeprex and misoprostol regimen on the breastfed infant or on milk production is unknown.

- are taking medicines, including prescription and over-the-counter medicines, vitamins, and herbal supplements.
  Mifeprex and certain other medicines may affect each other if they are used together.  This can cause side effects.

App. 243

**How should I take Mifeprex?**

- Mifeprex will be given to you by a healthcare provider or pharmacy.

- You and your healthcare provider will plan the most appropriate location for you to take the misoprostol, because it may cause bleeding, cramps, nausea, diarrhea, and other symptoms that usually begin within 2 to 24 hours after taking it.

- Most women will pass the pregnancy within 2 to 24 hours after taking the misoprostol tablets.

**Follow the instruction below on how to take Mifeprex and misoprostol:**

**Mifeprex (1 tablet) orally + misoprostol (4 tablets) buccally**

**Day 1:**

- Take 1 Mifeprex tablet by mouth.

**24 to 48 hours after taking Mifeprex:**

- Take 4 misoprostol tablets by placing 2 tablets in each cheek pouch (the area between your teeth and cheek - see Figure A) for 30 minutes and then swallow anything left over with a drink of water or another liquid.

- The medicines may not work as well if you take misoprostol sooner than 24 hours after Mifeprex or later than 48 hours after Mifeprex.

- Misoprostol often causes cramps, nausea, diarrhea, and other symptoms. Your healthcare provider may send you home with medicines for these symptoms.



**Figure A** (2 tablets between your left cheek and gum and 2 tablets between your right cheek and gum).

**Follow-up Assessment at Day 7 to 14:**

- This follow-up assessment is very important.  You must follow-up with your healthcare provider about 7 to 14 days after you have taken Mifeprex to be sure you are well and that you have had bleeding and the pregnancy has passed from your uterus.

- Your healthcare provider will assess whether your pregnancy has passed from your uterus. If your pregnancy continues, the chance that there may be birth defects is unknown. If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy.

- If your pregnancy has ended, but has not yet completely passed from your uterus, your provider will talk with you about other choices you have, including waiting, taking another dose of misoprostol, or having a surgical procedure to empty your uterus.

App. 244

**When should I begin birth control?**

You can become pregnant again right after your pregnancy ends. If you do not want to become pregnant again, start using birth control as soon as your pregnancy ends or before you start having sexual intercourse again.

**What should I avoid while taking Mifeprex and misoprostol?**

Do not take any other prescription or over-the-counter medicines (including herbal medicines or supplements) at any time during the treatment period without first asking your healthcare provider about them because they may interfere with the treatment. Ask your healthcare provider about what medicines you can take for pain and other side effects.

**What are the possible side effects of Mifeprex and misoprostol?**

**Mifeprex may cause serious side effects.  See "What is the most important information I should know about Mifeprex?"**

**Cramping and bleeding.** Cramping and vaginal bleeding are expected with this treatment. Usually, these symptoms mean that the treatment is working. But sometimes you can get cramping and bleeding and still be pregnant. This is why you must follow-up with your healthcare provider approximately 7 to 14 days after taking Mifeprex. See "How should I take Mifeprex?" for more information on your follow-up assessment. If you are not already bleeding after taking Mifeprex, you probably will begin to bleed once you take misoprostol, the medicine you take 24 to 48 hours after Mifeprex. Bleeding or spotting can be expected for an average of 9 to16 days and may last for up to 30 days. Your bleeding may be similar to, or greater than, a normal heavy period. You may see blood clots and tissue. This is an expected part of passing the pregnancy.

The most common side effects of Mifeprex treatment include: nausea, weakness, fever/chills, vomiting, headache, diarrhea and dizziness. Your provider will tell you how to manage any pain or other side effects. These are not all the possible side effects of Mifeprex.

Call your healthcare provider for medical advice about any side effects that bother you or do not go away. You may report side effects to FDA at 1-800-FDA-1088.

**General information about the safe and effective use of Mifeprex.**

**Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. This Medication Guide summarizes the most important information about Mifeprex. If you would like more information, talk with your healthcare provider. You may ask your healthcare provider for information about Mifeprex that is written for healthcare professionals.**

**For more information about Mifeprex, go to www.earlyoptionpill.com or call 1-877-4 Early Option (1-877-432-7596).**

Manufactured for: *Danco Laboratories, LLC*
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596) www.earlyoptionpill.com

This Medication Guide has been approved by the U.S. Food and Drug Administration.    Approval 01/2023

Reference ID: 5103833

# EXHIBIT 6

**Maarit Niinimaki et al., *Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study*, BJM (Apr. 20, 2011)**



# RESEARCH

## Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study

Maarit Niinimäki, consultant gynaecologist,[1] Satu Suhonen, chief physician,[2] Maarit Mentula, consultant gynaecologist,[3] Elina Hemminki, research professor,[4] Oskari Heikinheimo, chief physician,[3] Mika Gissler, research professor[4,5]

[1]Department of Obstetrics and Gynecology, University Hospital of Oulu, Finland
[2]City of Helsinki Health Centre, Unit for Maternal and Child Health Care and Health Promotion, Helsinki, Finland
[3]Department of Obstetrics and Gynaecology/Kätilöopisto Hospital, Helsinki University Central Hospital, PO Box 610, 00029 HUS, Helsinki, Finland
[4]National Institute for Health and Welfare, Helsinki, Finland
[5]Nordic School of Public Health, Gothenburg, Sweden
Correspondence to: O Heikinheimo oskari.heikinheimo@helsinki.fi

Cite this as: BMJ 2011;342:d2111
doi:10.1136/bmj.d2111

## ABSTRACT

**Objective** To determine the risks of short term adverse events in adolescent and older women undergoing medical abortion.

**Design** Population based retrospective cohort study.

**Setting** Finnish abortion register 2000-6.

**Participants** All women (n=27 030) undergoing medical abortion during 2000-6, with only the first induced abortion analysed for each woman.

**Main outcome measures** Incidence of adverse events (haemorrhage, infection, incomplete abortion, surgical evacuation, psychiatric morbidity, injury, thromboembolic disease, and death) among adolescent (<18 years) and older (≥18 years) women through record linkage of Finnish registries and genital *Chlamydia trachomatis* infections detected concomitantly with abortion and linked with data from the abortion register for 2004-6.

**Results** During 2000-6, 3024 adolescents and 24 006 adults underwent at least one medical abortion. The rate of chlamydia infections was higher in the adolescent cohort (5.7% *v* 3.7%, P<0.001). The incidence of adverse events among adolescents was similar or lower than that among the adults. The risks of haemorrhage (adjusted odds ratio 0.87, 95% confidence interval 0.77 to 0.99), incomplete abortion (0.69, 0.59 to 0.82), and surgical evacuation (0.78, 0.67 to 0.90) were lower in the adolescent cohort. In subgroup analysis of primigravid women, the risks of incomplete abortion (0.68, 0.56 to 0.81) and surgical evacuation (0.75, 0.64 to 0.88) were lower in the adolescent cohort. In logistic regression, duration of gestation was the most important risk factor for infection, incomplete abortion, and surgical evacuation.

**Conclusions** The incidence of adverse events after medical abortion was similar or lower among adolescents than among older women. Thus, medical abortion seems to be at least as safe in adolescents as it is in adults.

## INTRODUCTION

Pregnancies among teenagers are mostly unplanned and offer a special challenge to family planning services. Most of all such pregnancies (up to 82% in the United States) are unintended.[1] The decision to continue or terminate a pregnancy is strongly associated with age. Besides age, being a student or being single are important factors in young women's decisions on abortion.[2] In the United States, 6% of all abortions are carried out in under 18s.[1] In the United Kingdom, 9.5% of abortions in 2009 were in adolescents.[3] Thus abortions among teenagers are common and are an important public health problem.

The medical termination of pregnancy using the antiprogestin mifepristone and a prostaglandin analogue has been widely established in several countries during the past decade. In 2009, 40% of abortions were medical in the United Kingdom.[3] In Sweden and Finland the corresponding figures were 72% and 76%.[4,5]

Increasing use of medical termination of pregnancy points to a need for appropriate studies to confirm its safety in various target groups. Using nationwide register based data we showed that both medical and surgical abortions are generally safe, with few serious complications when gestation is less than 63 days.[6] The most common adverse events were haemorrhage and incomplete abortion. However, in that study we did not assess the safety of medical abortion among adolescents.

Data on the safety of medical abortion among adolescents are limited. In a small prospective study, medical abortion was found to be highly effective and well tolerated in adolescents aged 14 to 17 when gestation was less than 56 days. Initially, half of the participants experienced stress and fear, but these emotions improved significantly within the month after abortion.[7]

In the present nationwide study we compared the safety of medical abortion between adolescents and adults. To eliminate the possible influence of previous pregnancies on the outcome of termination of pregnancy, we carried out a subgroup analysis among primigravid women. In addition we assessed the impact of a positive *Chlamydia trachomatis* test result at the time of

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from http://www.bmj.com/ on 17 September 2024 at Missouri State Library. Protected by copyright.

RESEARCH

abortion on the incidence of infections after abortion—a situation of great clinical relevance to adolescents.

## METHODS

From the national abortion register compiled by the National Institute for Health and Welfare we identified all women who had undergone induced abortion in Finland during 2000-6. The study population consisted of women who had had a medical abortion (mifepristone alone or in combination with misoprostol or other prostaglandins) at 20 weeks or less of gestation. We divided the women into two cohorts based on age at the time of abortion: adolescents (<18 years) and adults (≥18 years). To keep the observations independent, we included only the first abortion for women who had more than one during the study period. To assess the potential learning curve in the introduction of medical abortion, we analysed the results in part separately for the first years (2000-3) of its use compared with established use (2004-6). We linked the data with the care register for health institutions (later called the hospital register) and the national infectious diseases register, both compiled by the National Institute for Health and Welfare, and the cause of death register of Statistics Finland. We followed the women for 42 days after the induced abortion and linked all events recorded in the hospital register and cause of death register with the abortion register.

The Finnish national register on induced abortions and sterilisations has been maintained since 1977. In accordance with the current legislation, doctors performing induced abortions are obliged to report cases to the register within one month, using a specific data collection form. In Finland, data on induced abortions are collected from all hospitals and clinics that carry out induced abortions. The register contains data on women having termination of pregnancy. These data include information on pregnancy history, occupation, type of residence, municipality, and marital status. Data on current pregnancy include information on duration of gestation at the time of abortion, indication for abortion, and method of termination.[5]

We have previously described Finnish legislation on induced abortion.[8] Briefly, current legislation permits termination of pregnancy of up to 20 weeks' gestation

(24 weeks in cases of a medical condition of the fetus) for social, medical, or ethical reasons. A national guideline on the care of women seeking abortion was published in 2001 and updated in 2007.[9] Based on this guideline all women should be screened for *C trachomatis* and treated if it is present and screened for bacterial vaginosis at the first visit before the termination of pregnancy. Prophylactic antibiotics are not routinely used.

### Data collection

All hospitals in Finland are required by law to provide the hospital register with information on inpatient treatment (all hospitals) and outpatient visits (public hospitals). This register contains information on diagnosis (international statistical classification of diseases and related health problems, ICD-10[10]) and treatment (Nordic classification of surgical procedures[11]), as well as the dates of the treatment episodes. To analyse adverse events related to induced abortion we linked information on the study participants in the hospital register for all hospital inpatient episodes and outpatient visits within 42 days after termination of pregnancy with data in the abortion register. We selected diagnoses and codes for surgical procedures in the cohorts for those considered to be of clinical importance.

We divided the complications into eight categories (see box): haemorrhage, infection, incomplete abortion, surgical evacuation, psychiatric morbidity, injury or other reason for surgical operation, thromboembolic disease, and death. The classification was based on that reported in the joint study of the Royal College of General Practitioners and the Royal College of Obstetricians and Gynaecologists[12] and modified for this and our previous study.[6]

The cause of death register contains data from death certificates and covers all deaths of Finnish citizens and permanent residents in Finland, classified according to ICD-10 codes. All the early deaths (within 42 days of termination of pregnancy) were classified as direct, indirect, or accidental.[13]

The National Department of Infectious Disease Epidemiology and Control at the National Institute for Health and Welfare collects information on cases of detected *C trachomatis* infections. Since 1997 it has been mandatory for laboratories to report all positive cases to the national infectious diseases register based on the Communicable Diseases Act and Decree of 1987.[14] Since 2004, laboratory notifications have included personal identification numbers, enabling linkage of the data with that in other registries. Since 2004 genital *C trachomatis* has been detected by DNA or RNA testing.[14]

### Statistical analysis

To assess differences between the groups we used the Mann-Whitney test for age and the $\chi^2$ test for categorical variables. The $\chi^2$ test was also used to calculate the difference in the incidence of adverse events, except for rare ones (psychiatric morbidity, injury, thromboembolic disease, and death) when we used Fisher's

---

**Classification of adverse events**

- Haemorrhage—all reported haemorrhage
- Infection—pelvic inflammatory disease, endometritis, cervicitis, wound infections, pyrexia of unknown origin, urinary tract infections, and septicaemia
- Any reported incomplete abortion
- Surgical evacuation
- Psychiatric morbidity—depression, intoxication, psychoses (ICD-10 codes F10-F48)
- Injury or other reason for surgical operation—all injuries, cervical laceration, uterine perforation, all surgical interventions during follow-up
- Thromboembolic disease—pulmonary embolism, deep vein thrombosis
- Death—death from any cause, pregnancy related death according to the World Health Organization definition

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from http://www.bmj.com/ on 17 September 2024 at Missouri State Library. Protected by copyright.

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from http://www.bmj.com/ on 17 September 2024 at Missouri State University. Protected by copyright.

RESEARCH

**Table 1 | Characteristics of the two study cohorts. Values are numbers (percentages) unless stated otherwise**

| Characteristics | Adolescent cohort (<18 years) (n=3024) | Adult cohort (≥18 years) (n=24 006) | P value |
|---|---|---|---|
| Mean (median) age (years), range | 16.1 (16.0), 13-17 | 27.6 (26.0), 18-50 | <0.001 |
| Previous pregnancies: | | | |
| None | 2913 (96.3) | 10 474 (43.6) | |
| Yes | 111 (3.7) | 13 532 (56.4) | <0.001 |
| Previous deliveries: | | | |
| None | 2972 (98.3) | 12 059 (50.2) | |
| Yes | 52 (1.7) | 11 947 (49.8) | <0.001 |
| Previous induced abortions: | | | |
| None | 3004 (99.3) | 19 432 (80.9) | |
| Yes | 20 (0.7) | 4574 (19.1) | <0.001 |
| Marital status: | | | |
| Married | 12 (0.4) | 5634 (23.5) | |
| Cohabiting | 126 (4.2) | 4546 (18.9) | |
| Single | 2882 (95.3) | 13 785 (57.4) | <0.001 |
| Data missing | 4 (0.1) | 41 (0.2) | |
| Type of residence: | | | |
| Urban | 1979 (65.4) | 17 977 (74.9) | |
| Densely populated | 486 (16.1) | 2986 (12.4) | |
| Rural | 559 (18.5) | 3043 (12.7) | <0.001 |
| Duration of gestation (weeks): | | | |
| <9 | 2424 (80.2) | 20 143 (83.9) | |
| 9-12 | 139 (4.6) | 660 (2.7) | |
| 13-16 | 283 (9.4) | 1741 (7.3) | |
| 17-20 | 171 (5.7) | 1151 (4.8) | <0.001 |
| Data missing | 7 (0.2) | 311 (1.3) | |
| Chlamydia trachomatis positive test result* | 99/1749 (5.7) | 496/13 547 (3.7) | <0.001 |

*Data available for 2004-6.

exact test. We used the confidence interval analysis program to calculate the rates of adverse events.[15] For small proportions we used the exact binomial method. The estimated risks of adverse events were determined by logistic regression analyses, and are presented as odds ratios with 95% confidence intervals. Variables that showed statistically significant associations with complications in univariate analysis (type of residence, marital status, duration of gestation, year of abortion, and adolescent or adult cohort) were further entered in multivariate analysis. SPSS 16.0 for Windows was used for the statistical analyses.

## RESULTS

During 2000-6, 27 030 women underwent medical abortion between five and 20 weeks of gestation. Of these women, 3024 were younger than 18 (adolescent cohort) and the remaining 24 006 were older (adult cohort). Including only the first induced abortion for each woman during 2000-3, medical abortion was carried out in 1275 (29.3%) adolescents and in 10 459 (31.7%) adults. In 2004-6 the corresponding numbers were 1749 (61.9%) and 13 547 (63.3%).

The two cohorts differed significantly for various characteristics (table 1). The adolescents had fewer previous deliveries and induced abortions and were more often single and living in a non-urban setting. In both groups, most of the medical abortions (over 80%) were performed before nine weeks of gestation, but the mean duration of gestation was more advanced among adolescents. The incidence of *C trachomatis* infections, diagnosed four weeks before to six weeks after abortion, was higher in the adolescent cohort, as calculated for 2004-6.

Table 2 describes the incidence of adverse events among the two cohorts, as well as among the primigravid women. The adult cohort had a significantly higher incidence of haemorrhage (3690 (15.4%) v386 (12.8%), P<0.001), incomplete abortion (2450 (10.2%) v 212 (7.0%), P<0.001), and surgical evacuation of retained products of conception (3121 (13.0%) v 333 (11.0%), P=0.002). Odds ratios were calculated for main adverse events (haemorrhage, infection, incomplete abortion, and surgical evacuation), after adjustment for parity, previous abortions, marital status, type of residence, duration of gestation, and year of abortion. In the adolescent cohort the adjusted odds ratios were significantly lower for haemorrhage, incomplete abortion, and surgical evacuation than in the adult cohort. In addition, the adult cohort had more participants with adverse events (5535 (23.1%) v 575 (19.0%), P<0.001).

In the subgroup analysis carried out among the primigravid women, the proportion of women with haemorrhage (1505 (14.4%) v 374 (12.8%), P=0.035), incomplete abortions (887 (8.5%) v 201 (6.9%), P=0.006) and a higher overall number of adverse events (2224 (21.1%) v 552 (18.9%), P=0.031) was significantly higher in the adult cohort. After adjustment for marital status, type of residence, duration of gestation, and year of abortion, the risks for incomplete abortion and surgical evacuation were lower in the primigravid adolescents than in the primigravid adults (table 2).

The incidence of a psychiatric diagnosis was higher among the adolescents in both the cohort and the primigravid cohort, even though the overall numbers were low. Two deaths were reported during the follow-up period. Both of these occurred in adults and were unrelated to the pregnancy (intracranial trauma and melanoma).

The figure shows the results of logistic regression among the primigravid women for risk of main adverse events (haemorrhage, infection, incomplete abortion, and surgical evacuation). An increased risk of haemorrhage was associated with living in a densely populated area. The risk of bleeding after medical abortion was higher during 2004-6 than during 2000-3. Gestations of 9-12 or 13-16 weeks were associated with a lower risk of haemorrhage than gestations of less than nine weeks. The risk of haemorrhage was also significantly lower in the adolescent cohort.

Advanced duration of gestation (9-12, 13-16, and 17-20 weeks) was associated with an increased risk of infections after abortion (figure). Additionally, being married or cohabiting compared with being single was associated with an increased risk of infection.

App. 249

RESEARCH

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from http://www.bmj.com/ on 17 September 2024 at Missouri State Library. Protected by copyright.

**Table 2 | Incidence of adverse events in study cohorts for all women (3024 adolescents and 24 006 adults) and for primigravid women (2913 adolescents and 10 474 adults)**

| Adverse events | Adolescent cohort (<18 years) | % (95% CI) | Adult cohort (≥18 years) | % (95% CI) | P value | Adjusted odds ratio (95%CI)* |
|---|---|---|---|---|---|---|
| **All women** | | | | | | |
| Haemorrhage | 386 | 12.8 (11.6 to 14.0) | 3690 | 15.4 (15.0 to 16.0) | <0.001† | 0.87 (0.77 to 0.99)† |
| Infection | 60 | 2.0 (1.5 to 2.6) | 489 | 2.0 (1.9 to 2.2) | 0.742 | 0.97 (0.73 to 1.30) |
| Incomplete abortion | 212 | 7.0 (6.1 to 8.0) | 2450 | 10.2 (9.8 to 10.6) | <0.001† | 0.69 (0.59 to 0.82)† |
| Surgical evacuation | 333 | 11.0 (9.9 to 12.1) | 3121 | 13.0 (12.6 to 13.4) | 0.002† | 0.78 (0.67 to 0.90)† |
| Psychiatric morbidity | 3 | 0.10 (0.02 to 0.29) | 2 | NA | 0.012† | — |
| Injury | 4 | 0.13 (0.04 to 0.34) | 35 | 0.15 (0.10 to 0.19) | 1.000 | — |
| Thromboembolic disease | 2 | 0.07 (0.01 to 0.24) | 26 | 0.11 (0.07 to 0.15) | 0.764 | — |
| Death | 0 | NA | 2 | NA | 0.392 | — |
| **No of adverse events per woman:** | | | | | | |
| 0 | 2449 | 81.0 (79.6 to 82.4) | 18471 | 76.9 (76.4 to 77.5) | | — |
| 1 | 488 | 16.1 (14.8 to 17.4) | 4456 | 18.6 (18.1 to 19.1) | | — |
| 2 | 82 | 2.7 (2.2 to 3.4) | 994 | 4.1 (3.9 to 4.4) | <0.001† | — |
| 3 | 5 | 0.17 (0.05 to 0.39) | 83 | 0.35 (0.27 to 0.42) | | — |
| 4 | 0 | NA | 2 | NA | | — |
| **Primigravid women** | | | | | | |
| Haemorrhage | 374 | 12.8 (11.6 to 14.1) | 1505 | 14.4 (13.7 to 15.0) | 0.035† | 0.88 (0.78 to 1.00) |
| Infection | 57 | 2.0 (1.5 to 2.5) | 227 | 2.2 (1.9 to 2.5) | 0.486 | 1.01 (0.75 to 1.37) |
| Incomplete abortion | 201 | 6.9 (6.0 to 7.9) | 887 | 8.5 (7.9 to 9.0) | 0.006† | 0.68 (0.56 to 0.81)† |
| Surgical evacuation | 311 | 10.7 (9.6 to 11.8) | 1136 | 10.8 (10.3 to 11.4) | 0.794 | 0.75 (0.64 to 0.88)† |
| Psychiatric morbidity | 3 | 0.10 (0.02 to 0.30) | 1 | NA | 0.034† | — |
| Injury | 4 | 0.14 (0.04 to 0.35) | 10 | 0.10 (0.04 to 0.16) | 0.521 | — |
| Thromboembolic disease | 2 | 0.07 (0.01 to 0.25) | 10 | 0.10 (0.04 to 0.16) | 1.00 | — |
| Death | 0 | NA | 1 | NA | 0.391 | — |
| **No of adverse events per woman:** | | | | | | |
| 0 | 2361 | 81.1 (79.6 to 82.5) | 8250 | 78.8 (78.0 to 79.5) | | — |
| 1 | 468 | 16.1 (14.7 to 17.4) | 1838 | 17.5 (16.8 to 18.3) | | — |
| 2 | 79 | 2.7 (2.2 to 3.4) | 356 | 3.4 (3.1 to 3.8) | 0.031† | — |
| 3 | 5 | 0.17 (0.06 to 0.40) | 30 | 0.29 (0.18 to 0.39) | | — |
| 4 | 0 | NA | 0 | NA | | — |

NA=not applicable owing to small number of women.

*Adult cohort as reference for all women adjusted for parity, previous abortions, marital status, type of residence, duration of gestation, and year of abortion; adult cohort as reference for primigravid women adjusted for marital status, type of residence, duration of gestation, and year of abortion.

†Statistically significant.

Also, the risk was higher in the later period (2004-6) than in 2000-3. The risk of infection was similar between the two cohorts.

Advanced duration of gestation was strongly related to the risk of incomplete abortion and surgical evacuation. The risk of incomplete abortion was lower in adolescents (odds ratio 0.69, 95% confidence interval 0.58 to 0.82) than in adults. The risk of surgical evacuation was increased in women living in rural areas and in those who were married or cohabiting. When abortion was carried out in the later period (2004-6) the risk of surgical evacuation was diminished (figure).

The risk of infections after abortion as a result of concurrent chlamydia infection was assessed among women who underwent abortion during 2004-6. In logistic regression analysis of the whole cohort, the risk of infection after abortion was not associated with concurrent chlamydia infection (1.02, 0.58 to 1.78). Moreover, no significant difference in the rate of infections after abortion emerged between adolescents and

those with a positive test result for *C trachomatis* (data not shown).

## DISCUSSION

In the present study the rate of adverse events and complications after medical abortion in adolescents was similar to or lower than that in adults. Various characteristics of the two cohorts differed significantly (table 1), but the risk of adverse events was calculated after adjustment for these factors. This study covered almost all abortions carried out in Finland in all regions and hospitals during a seven year period and thus shows reliable national trends. Earlier studies assessing the completeness of the Finnish abortion register found that 99% of abortions were reported to the register and at least 95% of information matched the medical records.[16 17]

One limitation of the study is that the registry based data lack detailed information as the diagnoses were made on clinical grounds, and the severity of adverse

App. 250

bmj.com

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from http://www.bmj.com/ on 17 September 2024 at Missouri State Library. Protected by copyright.



**Logistic regression analysis of risk factors for main adverse events (haemorrhage, infection, incomplete abortion, and surgical evacuation) among primigravid women in entire cohort. Results of multivariate analysis are shown unless stated otherwise. Variables showing significance in univariate analysis are included. *Derived from univariate analysis**

events may vary substantially. Another drawback is that no conclusions can be made on the effects of abortion beyond the 42 days of follow-up. A further limitation is that data on *C trachomatis* could only be linked with registry data from 2004, when identification numbers were first archived.

More women sought help for bleeding after abortion when gestation was less than nine weeks. This finding parallels that reported in our previous study.[6] This might be explained partly by the fact that medical abortions at nine weeks or more of gestation are carried out by hospitals, and not on an outpatient basis.[9] Moreover, an increasing number of these early abortions are carried out at home using self administered misoprostol.

The risk of surgical evacuation of retained products after medical abortion decreased during 2004-6 compared with 2000-3, whereas the number of incomplete abortions remained the same. These findings probably

reflect a learning curve in providing medical abortion. However, the lower number of surgical evacuations occurred at the expense of an increased rate of consultations as a result of uterine bleeding. We took into account the possible bias caused by the differences between the study periods (2000-3 and 2004-6) by adjusting the odds ratios of adverse events by study period.

The rate of infections after abortion was higher (2.0%) than that reported in an earlier review in which medical abortion was assessed (0.9%).[18] The higher figure may in part be a result of the register based nature of the present study—that is, the diagnostic criteria lacked uniformity. In recent reviews, however, the incidence of infections after medical abortion in the second trimester has been estimated to be about 3%.[19][20] Thus in the present study, concerning pregnancies of up to 20 weeks' duration, the incidence of infections was comparable with that reported in the recent

App. 251

RESEARCH

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from http://www.bmj.com/ on 17 September 2024 at Missouri State Library. Protected by copyright.

---

## WHAT IS ALREADY KNOWN ON THIS TOPIC

Teenage pregnancies are mostly unplanned and often result in induced abortion

Medical abortion is increasingly used, albeit its safety has not been properly assessed among adolescents

## WHAT THIS STUDY ADDS

The risk of adverse events (haemorrhage, incomplete abortion, infection) after medical abortion is similar or even lower in adolescent (<18 years) compared with adult women

---

reviews. The risk of infection was increased when the abortion was carried out in the later period (2004-6). The explanation for this is unclear. The incidence of *C trachomatis* infections in the Finnish population did not change at the same time.[14]

*C trachomatis* is a notable cause of pelvic inflammatory disease. Screening for and treatment of *C trachomatis* can prevent the development of the disease after abortion.[21] To prevent infection after termination of pregnancy both prophylactic antibiotic therapy for all and screen and treat strategies are in use. In a recent study in the United States, routine provision of doximycin at the time of medical abortion was associated with a significant reduction in the rate of serious infections.[22]

We found no correlation between *C trachomatis* diagnosed at the time of abortion and subsequent infections. In Finland, systematic screening for *C trachomatis* after termination of pregnancy is enforced by national guidelines.[9] In 2004-6 the national incidence of *C trachomatis* among girls and young women aged 10-19 was 1.7% in Finland,[14] whereas a higher rate of 5.7% was detected in the present adolescent cohort. The results of this study do not rule out the possible association with infections after abortions in the cases of untreated *C trachomatis* infections, or with delayed antibiotic treatment. The present study suggests that by timely screening it is possible to treat the infection before the clinical manifestation.

In the present study psychiatric morbidity was significantly more common among adolescents than among adults, although the number of cases was small. Register based studies are not ideal for studying psychiatric disorders, as only some women seek professional help for mental disorders and only some women with mental disorders are treated in specialised healthcare. In a recent register based Danish study, the risk of a psychiatric disorder in women with no such previously detected disorders was not increased after induced abortion in the first trimester.[23] The risk of psychiatric contact was not, however, significantly affected by age. In a US survey, adolescents were not at increased risk for depression or lower self esteem after abortion than the controls during follow-up.[24] The present studies only assessed psychiatric diagnoses during the short follow-up but not possible psychiatric morbidity before abortion. Thus the association of mental disorders and termination of pregnancy among adolescents remains unresolved.

Experience of pain or satisfaction with care could not be studied in the present setting, as these outcomes are not registered in the Finnish abortion register. In a randomised study, women with higher gestational age and first pregnancy seemed to be less satisfied with medical abortion as a result of more pain during the termination.[25] The effective treatment of pain must be taken into account when adolescents, predominantly nulliparous women, undergo induced abortion.

## Conclusion

The present population based national study provides evidence that medical abortion is not associated with additional risks of adverse events among adolescents in the short term compared with adult women. The data were derived from one country with a homogeneous population but can be generalised to populations with high quality healthcare and easy access to specialist treatment.

The preliminary results of this study were presented at the International Federation of Obstetrics and Gynecology (FIGO) meeting in Cape Town, South Africa October 2009, and in the International Federation of Professional Abortion and Contraception Associates (FIAPAC) meeting in Seville Spain, October 2010 (MN). We thank Aini Bloigu (National institute for Health and Welfare, Oulu, Finland) for her professional help with the statistics.

**Contributors:** All authors participated in the design of the study. MN carried out the data analysis, wrote the first draft of the manuscript, and is a guarantor of the study. All authors contributed to the subsequent writing of the paper and gave substantial input into the study. OH obtained funding for the study. MG is in charge of the Finnish reproductive registries (including the abortion register).
**Funding:** This study was funded by Finnish Cultural Foundation (MN), Helsinki University Central Hospital Research Funds (OH, MN), and University Hospital of Oulu Research Funds (MN).
**Competing interests:** All authors have completed the Unified Competing Interest form at www.icmje.org/coi_disclosure.pdf (available on request from the corresponding author) and declare: OH has lectured at an educational event organised by Nordic Drugs and has been principal investigator in clinical studies sponsored by the Concept Foundation; no financial relationships with any organisations that might have an interest in the submitted work in the previous three years, no other relationships or activities that could appear to have influenced the submitted work.
**Ethical approval:** This study was approved by the ethics committee of the Northern Ostrobothnia Hospital District in October 2005 (No 46/2005). The Ministry of Social Affairs and Health, and Statistics Finland gave permission for the use of confidential personal level data from the registries. The data protection ombudsman was notified about the data linkage before the analyses, as required by national data protection legislation.
**Data sharing:** No additional data available.

1  Jones RK, Finer LB, Singh S. Characteristics of US abortion patients, 2008. Guttmacher Institute, 2010.
2  Sihvo S, Bajos N, Ducot B, Kaminski M. Women's life cycle and abortion decision in unintended pregnancies. *J Epidemiol Community Health* 2003;57:601-5.
3  Department of Health. Abortion statistics, England and Wales: 2009. 2010. www.dh.gov.uk/en/Publicationsandstatistics/Publications/PublicationsStatistics/DH_116039.
4  Socialstyrelsen. Statistics. 2010. www.socialstyrelsen.se/statistics.
5  National Institute for Health and Welfare. Induced abortions. 2010. www.stakes.fi/EN/tilastot/statisticsbytopic/reproduction/abortions.htm.
6  Niinimäki M, Pouta A, Bloigu A, Gissler M, Hemminki E, Suhonen S, et al. Immediate complications after medical compared with surgical termination of pregnancy. *Obstet Gynecol* 2010;115:660-1.
7  Phelps RH, Schaff EA, Fielding SL. Mifepristone abortion in minors. *Contraception* 2001;64:339-43.
8  Niinimäki M, Pouta A, Bloigu A, Gissler M, Hemminki E, Suhonen S, et al. Frequency and risk factors for repeat abortions after surgical

App. 252

compared with medical termination of pregnancy. *Obstet Gynecol* 2009;113:845-52.

9   Finnish Gynecological Association's Task Force. Abortion. *Duodecim* 2001;117:2084-94.

10  World Health Organization. International Classification of Diseases (ICD). 2010. www.who.int/classifications/icd/en/.

11  Nordic Centre for Classifications in Health Care. NCSP—the NOMESCO classification of surgical procedures. 2010. www. helsedirektoratet.no/nordclass_english/ncsp/ ncsp___the_nomesco_classification_of_surgical_proce dures_334824.

12  RCGP/RCOG. Induced abortion operations and their early sequelae. Joint study of the Royal College of General Practitioners and the Royal College of Obstetricians and Gynaecologists. *J R Coll Gen Pract* 1985;35:175-80.

13  Deneux-Tharaux C, Berg C, Bouvier-Colle MH, Gissler M, Harper M, Nannini A, et al. Underreporting of pregnancy-related mortality in the United States and Europe. *Obstet Gynecol* 2005;106:684-92.

14  National Institute for Health and Welfare. National Department of Infectious Disease Epidemiology. The statistical database of the infectious diseases register. 2010. www3.ktl.fi/.

15  Gardner MJ, Altman DG. Statistics with confidence. Confidence intervals and statistical guidelines. BMJ Publishing, 1989

16  Gissler M, Ulander VM, Hemminki E, Rasimus A. Declining induced abortion rate in Finland: data quality of the Finnish abortion register. *Int J Epidemiol* 1996;25:376-80.

17  Heikinheimo O, Gissler M, Suhonen S. Age, parity, history of abortion and contraceptive choices affect the risk of repeat abortion. *Contraception* 2008;78:149-54.

18  Shannon C, Brothers LP, Philip NM, Winikoff B. Infection after medical abortion: a review of the literature. *Contraception* 2004;70:183-90.

19  Gemzell-Danielsson K, Lalitkumar S. Second trimester medical abortion with mifepristone-misoprostol and misoprostol alone: a review of methods and management. *Reprod Health Matters* 2008;16(suppl 21):162-72.

20  Lohr PA, Hayes JL, Gemzell-Danielsson K. Surgical versus medical methods for second trimester induced abortion. *Cochrane Database Syst Rev* 2008;1:CD006714.

21  Soper DE. Pelvic inflammatory disease. *Obstet Gynecol* 2010;116:419-28.

22  Fjerstad M, Trussell J, Sivin I, Lichtenberg ES, Cullins V. Rates of serious infection after changes in regimens for medical abortion. *N Engl J Med* 2009;361:145-51.

23  Munk-Olsen T, Laursen T, Pedersen CB, Lidegaard O, Mortensen PB. Induced first-trimester abortion and risk of mental disorder. *N Engl J Med* 2011;364:332-9.

24  Warren JT, Harvey SM, Henderson JT. Do depression and low self-esteem follow abortion among adolescents? Evidence from a national study. *Perspect Sex Reprod Health* 2010;42:230-5.

25  Teal SB, Dempsey-Fanning A, Weshoff C. Predictors of acceptability of medication abortion. *Contraception* 2007;75:224-9.

Accepted: 20 February 2011

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from http://www.bmj.com/ on 17 September 2024 at Missouri State Library. Protected by copyright.

# EXHIBIT 7

**HHS, New Drug, Antibiotic, and Biological Drug Product Regulations; Accelerated Ap-proval, 57 Fed. Reg. 58,942 (Dec. 11, 1992)**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

21 CFR Parts 314 and 601

[Docket No. 91N–0278]

RIN 0905–AD66

**New Drug, Antibiotic, and Biological Drug Product Regulations; Accelerated Approval**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA) is issuing final regulations under which the agency will accelerate approval of certain new drugs and biological products for serious or life-threatening illnesses, with provisions for any necessary continued study of the drugs' clinical benefits after approval or with restrictions on use, if necessary. These new procedures are intended to provide expedited marketing of drugs for patients suffering from such illnesses when the drugs provide meaningful therapeutic benefit compared to existing treatment. Accelerated approval will be considered in two situations: (1) When approval can be reliably based on evidence from adequate and well-controlled studies of the drug's effect on a surrogate endpoint that reasonably suggests clinical benefit or on evidence of the drug's effect on a clinical endpoint other than survival or irreversible morbidity, pending completion of studies to establish and define the degree of clinical benefits to patients; and (2) when FDA determines that a drug, effective for the treatment of a disease, can be used safely only if distribution or use is modified or restricted. Drugs or biological products approved under these procedures will have met the requisite standards for safety and effectiveness under the Federal Food, Drug, and Cosmetic Act (the act) or the Public Health Service Act (the PHS Act) and, thus, will have full approval for marketing.

**EFFECTIVE DATE:** January 11, 1993.

**FOR FURTHER INFORMATION CONTACT:** Marilyn L. Watson, Center for Drug Evaluation and Research (HFD–360), Food and Drug Administration, 7500 Standish Pl., Rockville, MD 20855, 301–295–8038.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In the Federal Register of April 15, 1992 (57 FR 13234), FDA published proposed procedures under which the agency would accelerate approval of certain new drugs and biological products for serious or life-threatening illnesses, with provision for required continued study of the drugs' clinical benefits after approval or for restrictions on distribution or use, where those are necessary for safe use of the drugs. FDA provided 60 days for public comment, and, upon request, in the Federal Register of June 18, 1992 (57 FR 27202), extended the comment period for an additional 30 days until July 15, 1992. The final rule incorporates all of the provisions of the proposed rule and provides additional clarification regarding both timing and content of the submissions of promotional materials and regarding the nature of required postmarketing studies. The agency has added a new provision clarifying when certain postmarketing requirements of the rule will be terminated.

Highlights of the final rule are summarized below, followed by a summary and discussion of the comments.

**II. Highlights of the Final Rule**

This final rule establishes procedures under parts 314 and 601 (21 CFR parts 314 and 601) under which FDA will accelerate approval of certain new drugs and biological products for serious or life-threatening illnesses, with provision for required continued study of the drugs' clinical benefits after approval or for restrictions on distribution or use, where those are necessary for safe use of the drugs. These procedures are intended to provide expedited marketing of drugs for patients suffering from such illnesses when the drugs provide meaningful therapeutic advantage over existing treatment. The preamble of the proposed rule (57 FR 13234) provides a description of other mechanisms available to facilitate access, speed development, and expedite review of therapeutic products (e.g., treatment investigational new drug applications (IND's), subpart E, parallel track). Where appropriate, these mechanisms can be utilized in concert with accelerated approval. The major provisions of the final rule are as follows:

*A. Scope*

The new procedures apply to certain new drug, antibiotic, and biological products used in the treatment of serious or life-threatening diseases, where the products provide meaningful therapeutic advantage over existing treatment (21 CFR 314.500 and 601.40).

*B. Criteria for Approval*

Accelerated approval will be considered in two situations: (1) When approval can be reliably based on evidence of the drug's effect on a surrogate endpoint that reasonably suggests clinical benefit or on evidence of the drug's effect on a clinical endpoint other than survival or irreversible morbidity, pending completion of studies to establish and define the degree of clinical benefits to patients; and (2) when FDA determines that a drug, effective for the treatment of a disease, can be used safely only if distribution or use is modified or restricted. Drugs or biological products approved under this final rule will have met the requisite standards for safety and effectiveness under the act or the PHS Act and, thus, will have full approval for marketing (21 CFR 314.510, 314.520, 601.41, and 601.42). Ordinarily, products used to treat serious or life-threatening illnesses, for which approval is based on a surrogate endpoint that is recognized as validated by definitive studies, will be considered for approval under the traditional process rather than under accelerated approval.

*C. Postmarketing Studies*

Where a drug's approval under these provisions is based on a surrogate endpoint or on an effect on a clinical endpoint other than survival or irreversible morbidity, the applicant will be required to conduct clinical studies necessary to verify and describe the drug's clinical benefit and to resolve remaining uncertainty as to the relation of the surrogate endpoint upon which approval was based to clinical benefit, or the observed clinical benefit to ultimate outcomes. The requirement for any additional study to demonstrate actual clinical benefit will not be more stringent than those that would normally be required for marketing approval; it is expected that the studies will usually be underway at the time of approval. The proposed regulations have been revised to clarify that required postmarketing studies must also be adequate and well-controlled (21 CFR 314.510 and 601.41).

*D. Restrictions on Use After Marketing*

FDA may grant marketing approval of a drug or biological product shown to be effective where safe use can only be assured if distribution or use is restricted. Under this final rule, FDA may: (1) Restrict distribution to certain facilities or to physicians with special training or experience, or (2) condition distribution on the performance of

specified medical procedures. The restrictions on use will be tailored to the specific safety issue raised by the particular drug or biological product and agreed to by the applicant at the time of approval (21 CFR 314.520 and 601.42). FDA expects that the imposition of these restrictions on distribution will be rare.

### E. Promotional Materials

The final rule requires submission of planned promotional materials, including promotional labeling and advertisements, both prior to approval (reflecting the initial campaign), and following approval, unless informed by the agency that such submission is no longer necessary, at least 30 days before the intended time of initial dissemination of the promotional labeling or initial publication of the advertisement (21 CFR 314.550 and 601.45).

### F. Withdrawal of Approval

The final rule establishes an expedited procedure for the withdrawal of approval if: (1) Postmarketing clinical studies fail to verify clinical benefit; (2) the applicant fails to perform the required postmarketing study with due diligence; (3) use after marketing demonstrates that postmarketing restrictions are inadequate to ensure safe use of the drug or biological product; (4) the applicant fails to adhere to the postmarketing restrictions agreed upon; (5) the promotional materials are false or misleading; or (6) other evidence demonstrates that the drug or biological product is not shown to be safe or effective under its conditions of use (21 CFR 314.530 and 601.43).

### G. Termination of Requirements

In response to comments, the final rule provides that the requirements set forth in §§ 314.520, 314.530, and 314.550 for new drugs and antibiotics and §§ 601.42, 601.43, and 601.45 for biological products ordinarily will terminate when FDA determines that the results of required postmarketing studies have demonstrated that the drug or biological product has clinical benefit, or, where restrictions on distribution or use have been imposed, when FDA determines that safe use of the drug or biological product can be ensured without such restrictions, e.g., through appropriate labeling. FDA will notify the applicant when these requirements no longer apply (21 CFR 314.560 and 601.46).

### III. Effective Date

This regulation will become effective on January 11, 1993.

### IV. Comments on the Proposed Rule

FDA received 54 comments on the proposed rule. The comments came from individuals, specific disease organizations, universities, pharmaceutical manufacturers, trade associations, health professionals, and professional societies. The comments reflect broad support and acceptance of the goal of expediting the approval of drugs intended for the treatment of serious and life-threatening illnesses. A number of comments asked that the proposal be finalized expeditiously without change. Many comments posed specific questions and raised important concerns.

### A. General Comments

1. One comment suggested that the term "conditional approval" was less confusing and ambiguous than the term "accelerated approval." The comment also referred to the statement in the proposal that "Drugs * * * approved under this proposal will have met the requisite standards * * * under the (act)" and argued that because postmarketing conditions may be imposed, this statement can only be read to say that the requisite standards under the act can only be met by a lower standard of evidence in hand, combined with assurance that further evidence will be obtained.

Another comment expressed concern that the proposal appears to establish a standard for the evaluation of drug product effectiveness that is inconsistent with the substantial evidence requirement of section 505(d) of the act (21 U.S.C. 355(d)), which means "evidence consisting of adequate and well-controlled investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling * * *." The comment argued that, with few exceptions, the agency has consistently interpreted the "substantial evidence" requirement as an instruction that determinations of effectiveness be based on data unambiguously reflecting the clinical status of subjects evaluated under controlled conditions in bona fide clinical experiments. In the absence of compelling empirical evidence documenting that a drug-induced change in a surrogate measure reliably and consistently predicts improved

clinical outcome, a surrogate indicator is no more than a hypothetical construct. The comment asserted that the proposed rule's endorsement of the use of unvalidated surrogate endpoints, therefore, appears to represent a significant departure from traditional agency interpretations of "substantial evidence" within the meaning of the act because it allows belief rather than evidence to serve as the basis for a conclusion about the effectiveness of a new drug.

Three comments asserted that the new regulations are not needed to approve drugs intended to treat serious or life-threatening illnesses. Two comments cited FDA's approval, without new regulations, of didanosine (formerly called ddi) and zalcitabine (formerly called ddc) in combination with zidovudine (formerly called AZT) based on a surrogate marker, i.e., an increase in CD4 cell counts and the "subpart E" procedures at 21 CFR part 312, which address the need for expediting the development, evaluation, and marketing of new therapies intended to treat life-threatening or severely debilitating illnesses as examples of existing mechanisms for the expedited approval of important new drugs. One comment argued that the act requires that drugs be shown to be "safe" and "effective," and proof of effectiveness is not limited by the act to demonstration of an effect on "survival or irreversible morbidity," as the proposed rule seems to assume. The comment further argued that FDA has considerable statutory discretion to define what type of data constitutes proof of effectiveness, and demonstration of an effect on a surrogate marker is one type of such proof.

The agency believes that what the procedures are called is much less important than what the procedures are. The shorthand term selected by the agency reflects the intent of the rule, especially that part related to use of surrogate markers, which is to make drugs that provide meaningful improvement over existing therapies for serious illnesses widely available (through marketing) at the earliest time consistent with the law. The essence of the proposal is thus acceleration, not the imposition of conditions. Approval under these procedures is dependent on compliance with certain additional requirements, such as timely completion of studies to document the expected clinical benefit. The evidence available at the time of approval under this rule will meet the statutory standard, in that there must be evidence from adequate and well-controlled studies showing that the drug will have

the effect it is represented to have in its labeling. That effect will, in this case, be an effect on a surrogate endpoint that is reasonably likely to predict a clinical benefit and labeling will refer to the effect on the surrogate, not to effect on clinical outcome.

While the act does not refer to particular endpoints or state a preference for clinical, as opposed to surrogate, endpoints, it is well established that the effect shown in well-controlled studies, must, in the judgment of the agency, be clinically meaningful. Moreover, the safety standard in the act, that a drug must be shown to be safe for its intended use, implies a risk/benefit judgment. The effect shown must be such as to outweigh the risks of the treatment under the conditions of use. Approval under this rule requires, therefore, that the effect shown be, in the judgment of the agency, clinically meaningful, and of such importance as to outweigh the risks of treatment. This judgment does not represent either a "lower standard" or one inconsistent with section 505(d) of the act, but rather an assessment about whether different types of data show that the same statutory standard has been met.

Approval based on surrogate endpoints is not new, although the issue has not previously been considered in regulations. The agency has, in a number of instances, approved drugs based on surrogate endpoints. For example, drugs for hypertension have been approved based on their effects on blood pressure rather than on survival or stroke rate. Similarly, drugs for hypercholesterolemia have been approved based on effects on serum cholesterol rather than on coronary artery disease (angina, heart attacks). But, in those cases there was very good evidence from clinical trials (in the case of hypertension) and from epidemiologic and animal studies (in the case of hypercholesterolemia) that improving the surrogate would lead to or is associated with the desired effects on morbidity and mortality. Even so, there is still today considerable debate about who will benefit from cholesterol lowering. Controlled trials assessing effects on clinical endpoints of morbidity and mortality from use of cholesterol-lowering drugs have been, and are being, conducted.

Reliance on a surrogate endpoint almost always introduces some uncertainty into the risk/benefit assessment, because clinical benefit is not measured directly and the quantitative relation of the effect on the surrogate to the clinical effect is rarely known. The expected risk/benefit

relationship may fail to emerge because: (1) The identified surrogate may not in fact be causally related to clinical outcome (even though it was thought to be) or (2) the drug may have a smaller than expected benefit and a larger than expected adverse effect that could not be recognized without large-scale clinical trials of long duration. Reliance on surrogate markers therefore requires an additional measure of judgment, not only weighing benefit versus risk, as always, but also deciding what the therapeutic benefit is based upon the drug effect on the surrogate.

The sections of the final rule that address approval based upon a drug effect on a surrogate endpoint specifically clarify the regulatory approval criteria when the agency relies on a surrogate endpoint that, while "reasonably likely" to predict clinical benefit, is not so well established as the surrogates ordinarily used as bases of approval in the past. Postmarketing studies required to verify and describe actual clinical benefits would also be required to be adequate and well-controlled studies. Sections 314.510 and 601.41 have been revised to clarify this point. If, on completion of required postmarketing studies, the effect on the surrogate is not shown to correspond to a favorable effect on clinical benefit, the rule provides an expedited means of removing the drug from the market.

Approval of didanosine and zalcitabine under current procedures does not show that the rule is of no value. Although approval did rely on a surrogate endpoint that is of the kind specifically addressed by the rule, the fact that studies to define clinical benefit were nearly complete and were being conducted under the auspices of the National Institute of Allergy and Infectious Diseases made it less crucial to have additional guarantees that such studies would be conducted promptly. Moreover, the sponsors of didanosine and zalcitabine agreed prior to approval to expedited withdrawal of the drug from the market if benefit were not shown. The provisions of the final rule will ensure that appropriate safeguards exist for timely generation of data on actual clinical benefit, for appropriate promotional information about labeled indications, and for prompt withdrawal of the drug from the market if clinical benefit is not confirmed.

2. Pointing to a statement in the preamble to the proposed rule that it is in the public interest to make promising new treatments available at the earliest possible point in time for use in life-threatening and serious illnesses, one comment expressed concern that the proposed rule may lead to the marketing

of large numbers of clinically ineffective, but pharmacologically active, drugs and this may not be in the interest of the public health. The comment argued that early access to so-called "promising" drugs is not the same as early access to safe and effective drugs, and the number of potential markers that may be advanced as surrogates of clinical outcome is exceedingly large. The comment suggested that it may be more appropriate to seek adoption of the proposed requirements through an amendment to the act.

FDA agrees with the contention that providing people who have serious or life-threatening illnesses with numerous clinically ineffective drugs would not be helpful. However, the agency does not agree that the rule can be expected to have this result. Although studies using surrogate endpoints may provide less assurance of clinical benefit than studies using clinical endpoints, FDA believes compliance with all of the elements of the accelerated approval program will not result in the marketing of large numbers of clinically ineffective drugs. The new procedures apply to a limited group of circumstances, namely, to drugs intended for serious or life-threatening illnesses when the drugs provide a meaningful therapeutic benefit over existing therapy. Reliance on a surrogate endpoint is not equivalent to reliance on any evidence of pharmacologic activity. The endpoint must be reasonably likely, based on epidemiologic, therapeutic, pathophysiologic, or other evidence, to predict clinical benefit.

Whether a given endpoint is, in fact, reasonably likely to predict clinical benefit is inevitably a matter of judgment. FDA, using available internal and external expertise, will have to make informed judgments in each case presented, just as it does now. The agency acknowledges that there are well-recognized reasons for caution when surrogate endpoints are relied on. Certain putative surrogates have ultimately been shown not to correspond to clinical benefit. Perhaps the most noteworthy example is the failure of antiarrhythmic agents in the Cardiac Arrhythmia Suppression Trial (CAST) to improve survival by depressing ventricular ectopic beats; effective suppression of ectopic beats was associated with increased mortality.

A sponsor must persuasively support the reasonableness of the proposed surrogate as a predictor and show how the benefits of treatment will outweigh the risks. Such presentations are likely to be persuasive only when the disease to be treated is particularly severe (so

that considerable risk is acceptable and/or when the surrogate endpoint is well supported. In addition, it will be the sponsor's clear obligation to resolve any doubts as to clinical value by carrying out definitive studies.

FDA does not agree that it would be more appropriate to seek an amendment to the act than to adopt the proposed requirements. As discussed in the preamble to the proposed rule as well as elsewhere in this preamble to the final rule, existing provisions of the act and the PHS Act authorize promulgation of the requirements in the final regulations.

3. One comment expressed concern that because the proposed rule would establish conditions on a drug's approval, third-party payors may decline reimbursement because the so-called approval would have attributes of investigational status.

The agency expects that, because drugs approved under the accelerated approval process meet the statutory standards for safety and effectiveness, they would be eligible for reimbursement under State Medicaid programs or other third-party plans. Drug products granted accelerated approval will not be, under the law, investigational, as suggested by the comment.

4. One comment asked if all drugs considered for accelerated approval must be reviewed by an advisory committee. The comment stated that because advisory committees meet infrequently, waiting for the next meeting may slow down the approval process.

FDA is not required to consult with an advisory committee before approving an application under these accelerated approval regulations, or any other regulation. However, FDA intends to consult the appropriate committee in most instances. Advisory committee meetings can usually be scheduled to avoid significant delays in the review process. The agency will consider any request by an applicant for referral of the application to an advisory committee.

*B. Scope*

5. Four comments asked for further clarification of what diseases are covered by the rule. One comment stated that the terms "serious," and "life-threatening," are defined in the proposal by reference to 21 CFR 312.34, followed by a brief statement explaining the role of judgment and examples of diseases that are currently judged to be

serious. The comment asked that FDA also describe: (1) Diseases that are not currently included in the category of "serious," (2) examples of diseases that are currently judged "life-threatening," and (3) examples of diseases that are not currently included in the category "life-threatening."

One comment contended that the statement in the preamble that "seriousness of a disease is a matter of judgment, but generally is based on its impact on such factors as survival, day-to-day functioning, or the likelihood that the disease, if left untreated, will progress from a less severe condition to a more serious one" too narrowly limits diseases covered by the proposed rule (57 FR 13234 at 13235). The comment argued that some "less severe" diseases, even if treated, may progress to a more serious state, and that these diseases should also be covered by the rule. On the other hand, two comments argued that the language in the preamble that classifies diseases as "serious" was overly broad and subjective and far too large a number of illnesses could be eligible as being "serious."

FDA discussed the meaning of the terms "serious" and "life-threatening" in its final rules on "treatment IND's" (52 FR 19466 at 19467, May 22, 1987) and "subpart E" procedures (54 FR 41516 at 41518–41519, October 21, 1988). The use of these terms in this rule is the same as FDA defined and used the terms in those rulemakings. It would be virtually impossible to name every "serious" and "life-threatening" disease that would be within the scope of this rule. In FDA's experience with "treatment IND's" and drugs covered by the "subpart E" procedures there have not been problems in determining which diseases fall within the meaning of the terms "serious" and "life-threatening," and FDA would expect no problems under this accelerated approval program. The likelihood of progression to a serious condition with available treatments would also be considered in assessing whether the disease is within the scope of the final rule. The preamble to the proposed rule (57 FR 13234 at 13235) referred to chronic illnesses that are generally well managed by available therapy, but can have serious outcomes for certain populations or in some or all of their phases. Applicants are encouraged to consult with FDA's reviewing divisions early in the drug development process if they have questions about whether their specific product is within the scope of this rule.

The concerns expressed in these and other comments about considering too many illnesses eligible for consideration under the accelerated approval procedures may arise from the underlying fear that reliance on surrogate endpoints will become routine, the "normal" way drugs are brought to the market. This fear is groundless. The vast majority of drugs are directed at symptomatic or short-term conditions (pain, heart failure, acute infections, gastrointestinal complaints) whose response to drugs, if it occurs, is readily measured and where there is no need to consider or accept surrogate endpoints. Surrogates, with few exceptions, are of interest in the following situations: (1) Where the clinical benefit, if there is one, is likely to be well in the future; and (2) where the implications of the effect on the surrogate are great because the disease has no treatment at all or the drug seems to treat people with no alternative (e.g., because they cannot tolerate the usual effective treatment). In the first case, great care is needed, and would be given, as there would generally be no experience linking an effect on the surrogate to clinical success, and there have been conspicuous examples of lack of linkage (CAST, referred to above; drugs that increase cardiac output in patients with heart failure but that decrease survival; imperfect agreement of effects on coronary artery patency and effects on survival in patients with myocardial infarction; lack of beneficial effect on bone fracture rate despite favorable effects on bone density in patients with osteoporosis). FDA and outside experts will be aware of these examples as proposed surrogates are considered. The implications are especially great when considering prophylactic therapy, i.e., treatments to prevent chronic illness (coronary artery disease, cancer), in an essentially well population. In the second case, there will generally have been experience (with the standard therapy) to evaluate in considering linkage of the surrogate to benefit; this was, for example, the case with didanosine, where evidence from zidovudine studies of the relationship of an effect on CD4 lymphocytes and clinical outcome could be assessed. Similarly, there is considerable experience to show that durable complete responses in many cancers correspond to improved survival, so that an agent inducing them in refractory illness or in primary

disease that had previously been poorly responsive would generally be seen as reasonably likely to provide a clinical benefit.

6. One comment stated that epilepsy is a serious and life-threatening condition and asked that it be included within the scope of the proposal. The preamble cited, among other illnesses, depression and psychoses as examples of chronic illnesses that can have serious outcomes even if they are generally well managed. One comment asserted that neither depression nor psychosis is a disease, nor is either one serious or life-threatening. The comment stated that depression and psychosis are diagnoses. The comment urged the agency to remove them from the definition of life-threatening "illnesses" or "diseases."

With respect to epilepsy, FDA notes that in the "treatment IND" final rule (52 FR 19466 at 19467, May 22, 1987), the agency listed "certain forms of epilepsy" as an example of a disease or stage of disease that would normally be considered "serious." Certain forms of epilepsy may also be considered "serious" under the accelerated approval program. It is unlikely, however, that a surrogate endpoint would be utilized in such a case, as seizure frequency, a clinical endpoint, is readily measured.

FDA's reference to depression and psychoses was intended to give examples of conditions or diseases that can be serious for certain populations or in some or all of their phases. While drugs for the treatment of depression and psychosis would be examples of those that could be covered by the accelerated approval program, it is not the use of surrogate endpoints that would be expected; the symptoms and signs of these diseases are readily studied. On the other hand, some of these drugs have been quite toxic (e.g., clozapine for refractory psychoses) and might be considered for approval with restrictions to ensure safe use.

7. Two comments asked how FDA will decide that a drug is eligible for accelerated approval. One comment asserted that the decision should be an option for the applicant to consider, not a decision for FDA to make unilaterally. Pointing to a statement in the preamble (57 FR 13234 at 13235) that FDA reserves the right not to apply accelerated approval procedures when it believes in good faith that the drug's foreseeable use is reasonably likely to be outside the scope of "life-threatening diseases without meaningful therapeutic benefit over existing therapy," the comments argued that, if there are patients with life-threatening conditions

that can benefit from expedited approval, the needs of the patients should determine the procedures used to approve the drug. One comment contended that applicants of products considered candidates for accelerated approval may have their drug or biological product "forced" into the accelerated approval process and be forced to conduct a program of studies to substantiate that surrogate endpoints actually predict significant clinical benefits.

The medical reviewing divisions within FDA's Center for Drug Evaluation and Research (CDER) and Center for Biologics Evaluation and Research (CBER) will determine the type of regulatory review that FDA may apply to an application. FDA encourages sponsors to meet with FDA early in the drug development process to discuss the applicability of the accelerated approval program to their product; however, FDA reserves the discretion to determine whether these procedures are applicable to a specific product.

With respect to the preamble statement cited by one comment, the comment misreads the preamble statement, which does not say that FDA will, in all cases, apply FDA's traditional approval mechanisms rather than this accelerated process for drugs where a majority of the drug's foreseeable uses are outside the scope of "life-threatening" diseases without meaningful therapeutic benefit over existing therapy. The statement merely informs applicants that FDA will consider the possible impact of widespread use of a drug for uses other than the one supporting accelerated approval; drugs approved under this program would often have only small safety data bases so that widespread off-label use might have serious implications. The agency does not believe that such a situation would regularly lead to exclusion from these provisions.

FDA does not agree that applicants seeking approval to market drug and biological products that would be candidates for accelerated approval will be forced to use the accelerated approval mechanism. It is true, however, that some proposed surrogate endpoints would not be considered acceptable bases for approval without assurance that the clinical studies to show clinical benefit will be conducted. A sponsor that wishes the application to be considered under the traditional approval process may request and receive such consideration.

The agency wishes to clarify the circumstances in which the accelerated

approval regulations will apply. Sections 314.500 and 601.40 describe aspects of the scope of these regulations. Moreover, these regulations are intended to apply to applications based on surrogate endpoints whose validity is not fully established, to applications based on clinical endpoints that leave unanswered major questions about the product's effect on ultimate outcome, and to applications for products whose safe and effective use requires limitations on distribution or use. In all other situations, accelerated approval requirements will not apply.

Where approval is based on a surrogate endpoint that is accepted as validated to predict or correlate with clinical benefit, the product will be considered under the traditional process, and the postmarketing requirements under accelerated approval will not apply. Approvals of products for serious or life-threatening illnesses based on clinical endpoints other than survival or irreversible morbidity will usually also be considered under traditional procedures. Approvals based on such clinical endpoints will be considered under the accelerated approval regulations only when it is essential to determine effects on survival or irreversible morbidity in order to confirm the favorable risk/benefit judgment that led to approval. Applications for products for serious or life-threatening illnesses that provide a meaningful therapeutic benefit over existing therapy will receive a priority rating and expedited review, even when not considered under the accelerated approval procedures.

The agency also wishes to clarify that whenever an application is approved under § 314.510 or § 601.41, postmarketing studies confirming the product's clinical benefit will thus be required. Therefore, in order to eliminate potential confusion, the agency has amended §§ 314.510 and 601.41 to clarify these points.

FDA also recognizes that over time a particular surrogate, once acceptable as a basis for approval only under the accelerated approval regulations, could become recognized as validated by definitive studies (just as high blood pressure, for example, over time became validated as a surrogate with clinical significance). In such cases, a future application relying on such a surrogate would not require postmarketing studies confirming the surrogate's clinical benefit and the application would be considered under traditional procedures.

8. Two comments asked for clarification of the phrase "meaningful

therapeutic benefit over existing therapy" as used in the description of what drugs the accelerated approval program should apply to. Specifically, pointing to an example described in the preamble that a new therapy would be eligible for accelerated approval if there was "a clear improvement" over existing therapy in being more effective or better tolerated, one comment urged FDA to clarify the meaning of "clear improvement" to discourage applicants of "me-too" products from wasting the agency's time and resources by applying for accelerated approval of such products. The comment also asked that FDA specify that if a new drug is approved under the accelerated approval provisions because the drug exhibits a "clear improvement" over an existing drug that was also granted accelerated approval, then specific restrictions will be placed on the prior approved drug to limit its use only to patients who cannot tolerate the new drug, or whose physicians assess that a change to the new drug might involve significant risks to the patient that outweigh the benefits. One comment asked that the term "meaningful therapeutic benefit over existing therapy" be interpreted and consistently applied to both drugs and biological products.

FDA believes that the examples given to help clarify the phrase "meaningful therapeutic benefit over existing therapy" (ability to treat unresponsive or intolerant patients or improved response compared to available therapy) are readily understood illustrations of the intent of the requirement. A drug that is essentially the same as available treatment (what the comment refers to as a "me too" drug) will not have a credible claim to a meaningful therapeutic benefit over that existing treatment and this should be easily detected.

With respect to restricting use of a drug previously approved under accelerated approval procedures when a new drug granted accelerated approval is a clear improvement over the prior approved drug, this would rarely be appropriate. Although, in some instances, certain therapies are identified as "second-line," this requires essentially unequivocal evidence of an advantage of alternative therapy, not likely on the basis of a surrogate endpoint. Labeling for both drugs will be accurate, however, allowing physicians to prescribe both the newly approved drug and the prior drug properly.

9. One comment asked if a change in the route of administration would be

considered as a meaningful benefit and within the scope of the proposal.

A change in the route of administration may be a candidate for accelerated approval depending upon the particular evidence presented.

10. One comment asked if subpart E drugs currently under investigation will be considered for accelerated approval. The comment assumed that new drug applications (NDA's) and supplemental NDA's considered for accelerated approval will have the highest priority for review.

Subpart E drugs will be considered for accelerated approval if they satisfy both eligibility criteria for accelerated approval, i.e., if they are being developed for the treatment of serious or life-threatening illnesses and the products will provide meaningful therapeutic benefits to patients over existing treatment. As discussed above, applicants should consult with FDA early in the development process to determine the nature of the regulatory review. Early consultations are a critical part of subpart E procedures. Drugs being reviewed under accelerated approval procedures will receive high priority review. However, applications for drugs for acquired immunodeficiency syndrome (AIDS) and human immunodeficiency virus (HIV)-related conditions will receive the highest priority review.

## C. Criteria for Approval

11. Two comments expressed concern that the proposal did not provide enough detail on what constitutes an appropriate surrogate endpoint. One comment recommended that FDA adopt specific criteria for what constitutes an appropriate surrogate endpoint. The comment suggested that such criteria should include: (1) The surrogate endpoint must be biologically plausible in that it must be consistent with what is known about the pathophysiology and pathogenesis of the disease; (2) the surrogate endpoint must be present or abnormal in a large percentage of people who have the disease; (3) the surrogate endpoint must be a good predictor of the disease progression and should correlate closely with the significant clinical endpoint; (4) there should be a correlation between the quantitative aspect of the surrogate endpoint and the progression of the disease (e.g., the more severe the disease, the more deviant the surrogate endpoint from normal); (5) the regression of the surrogate endpoint should be significantly associated with clinical improvement (e.g., those with the greatest improvement in the surrogate endpoint should also show the greatest clinical effects); conversely, the

lack of regression of the surrogate endpoint should be commonly associated with a lack of clinical improvement; and (6) the incidence of regression or improvement in the surrogate endpoint should be significantly greater in treated than untreated patients.

One comment asked if the use of microalbuminuria data is a surrogate for diabetic nephropathy and if all drugs relying on surrogate endpoints would be eligible for accelerated approval, e.g., an angiotensin receptor antagonist with potential utility for treatment of congestive heart failure. The comment also asked what would happen if postmarketing studies demonstrate beneficial changes of surrogate endpoints but not beneficial clinical endpoints. The comment also asked if FDA will consider publishing guidelines on which surrogate endpoints would be appropriate for the diseases that may be affected by the proposed rule. Another comment expressed the belief that there is no evidence that surrogate endpoints are necessarily good indicators of therapeutic benefit. The comment stated that a drug may have an effect on a surrogate endpoint, but will not make any clinical difference because the advanced stage of the patient's disease precludes any effective therapy or the surrogate marker is not synchronous with the patient's clinical condition.

Another comment asserted that the requirement to base an approval on a surrogate endpoint that is "reasonably likely, based on epidemiologic, therapeutic, pathophysiologic, or other evidence, to predict clinical benefit other than survival or irreversible morbidity" is not restrictive enough to assure adequate consumer protection. Terms like "reasonably likely" and "or other evidence" allow drug manufacturers too much latitude for claiming that there is a correlation between surrogate endpoints effected by their drugs and clinical endpoints. The comment argued that until a correlation between a surrogate endpoint and a clinical endpoint has been established, a particular surrogate endpoint should only be used to approve subsequent drugs, without adequate clinical evidence, if there is a very strong effect of the drug on the surrogate marker or, if the effect is not sufficiently strong, there is an additional surrogate marker which corroborates the results of the first.

FDA intends to publish informal guidance concerning surrogate endpoints, but does not believe specific requirements for an appropriate surrogate should be specified by

regulation. Any given specifications may not be applicable to a particular case. For example, the thoughtful suggested criteria supplied by the comment would rarely, if ever, be applicable to the first effective drug for a disease, because criterion 5 requires that regression of the surrogate endpoint be associated quantitatively with clinical improvement. If there had never been effective treatment, this would never be known. Yet the surrogate could be persuasive on other grounds, such as a well-documented etiologic relation. In general, it is likely that one or another strongly supportive piece of evidence might outweigh gaps in other areas.

In developing informal guidance on surrogate endpoints, FDA will consider the suggestions in this comment. Interested persons will have an opportunity to comment on any guidance documents in this area developed by the agency. In some cases, new or revised drug class, or disease-specific, clinical guidelines may refer to surrogate endpoints. FDA is not prepared, at this time, to comment on the acceptability of an endpoint that it has not specifically considered, e.g., microalbuminuria.

The final regulations make it clear that not all drugs submitted for approval based on surrogate endpoint data are eligible for accelerated approval (§§ 314.500 and 601.40). The drug in question must be for a serious or life-threatening condition and must provide meaningful therapeutic benefit over existing therapy. In the case of an angiotensin receptor antagonist posed by the comment, there is existing documented life-prolonging treatment for congestive heart failure. An application for a new agent, to be eligible for accelerated approval, would have to show potential benefit over available therapy as well as identify a reasonable surrogate endpoint. This is problematic since no accepted surrogate endpoint for studies to treat congestive heart failure has been identified to date. For example, some drugs with favorable effects on hemodynamic measures in heart failure patients have been clinically ineffective.

The regulations are clear in requiring that, for drugs approved under these provisions based on surrogate endpoints, the postmarketing studies must show clinical benefit, not just the previously shown effect on the surrogate (§§ 314.510, 314.530, 601.41, and 601.43).

Surrogates, or proposed surrogates, are not always good, nor necessarily bad, indicators of therapeutic benefit and must be judged on a case-by-case basis. Even very good surrogates may

not be perfect: Blood pressure lowering has been a better predictor of effect on stroke than on coronary artery disease, cholesterol lowering has had a clearer effect on coronary artery disease than on survival. Moreover, a surrogate may be persuasive for a phase of disease with short expected survival but much less so in an earlier phase of the disease. Caution is always appropriate in evaluating surrogate endpoints and the particular therapeutic setting should always be considered. The agency believes that the evaluation of surrogate endpoint data and the safeguards built into these accelerated approval procedures will provide adequate consumer protection.

12. One comment expressed concern that if there is no accepted surrogate endpoint, an applicant's only option is to conduct a study using some clinical event as an endpoint, which may result in long, large studies that delay approval to the detriment of patients and sponsors. One comment suggested as an alternative that FDA permit approval of a drug based on a study using a clinical endpoint, but accept a less rigorous standard of statistical significance, e.g., 0.20 or 0.15 instead of 0.05. The comment further suggested that the sponsor could then complete postmarketing studies to establish statistical significance at conventional levels. The comment argued that this alternative is totally consistent with FDA's willingness to accept greater uncertainty in approving drugs for serious and life-threatening illnesses.

The intent of the rule is to allow FDA to utilize a particular kind of evidence, an effect on a surrogate endpoint, as a basis for approval, and, where appropriate, to ensure that remaining doubts about the relationship of the effect on the surrogate to clinical benefit are resolved by additional adequate and well-controlled studies with clinical endpoints. The rule is not intended to place into the market drugs with little evidence of usefulness. Although there is no statutory requirement for significance testing of any particular value, there are well-established conventions for assessing statistical significance to support the statutorily required conclusion that the well-controlled studies have demonstrated that a drug will have the effect it is represented to have. There is nothing about serious or life-threatening diseases that make them uniquely difficult to study. A meaningful effect on survival or morbidity where there is no effective therapy should be readily discerned. Such studies need be long and large only when the effect is small or difficult to detect. In that event,

proper assessment of benefit, and valid weighing of its relation to risk, is especially critical.

13. One comment asked that FDA clarify that one study could be the basis of approval and that one postmarketing study should be all that is needed to establish the link between the endpoint used for approval and some relevant clinical benefit.

FDA interprets the statute, and good science, as requiring at least two adequate and well-controlled studies to establish effectiveness. In some instances, drugs have been approved on the basis of a single well-controlled study; this has been done where the study was of excellent design, showed a high degree of statistical significance, involved multiple study centers, and showed some evidence of internal replicability, e.g., similar effects in major study subsets. FDA encourages applicants to discuss with FDA early in a drug's development the basis for the applicant's choice of a specific endpoint and, where applicable, the basis for its belief that a single study would be a sufficient basis for approval. With respect to postmarketing studies, FDA anticipates that the requirement will usually be met by studies already underway at the time of approval. As stated in the proposed rule, the requirement for any additional study to demonstrate actual clinical benefit will not be more stringent than those that would normally be required for marketing approval of the same drug for the same claim.

14. One comment expressed concern that the preamble to the proposed rule implied that a sponsor of an AIDS drug might have to do a postmarketing study to establish an effect on survival after showing an effect on such endpoints as weight or incidence of opportunistic infection (57 FR 13234 at 13235–13236). The comment stated that FDA's own advisory committee indicated that it was pleased to see an effect from a nucleoside analogue on the incidence of opportunistic infections with AIDS patients but did not suggest that further work should be done to show an effect on mortality. The comment argued that in some cases direct correlation with clinical endpoints such as mortality is difficult to prove and urged FDA to be flexible on this issue to encourage sponsors to go through the accelerated approval process.

Ordinarily, an effect on a meaningful clinical endpoint, e.g., on rate of opportunistic infections in AIDS, is a sufficient basis for approval without need for followup studies. Other endpoints, however, might leave major questions unanswered. For example, a

modest effect on weight gain in AIDS without other demonstrated benefit, if considered an adequate basis for approval, while a clinical endpoint, might leave sufficient doubt as to the ultimate value of the effect so that further studies would be necessary. FDA intends to interpret this provision of the regulations with flexibility. This provision should also serve as a reminder, however, that for life-threatening indications, the ultimate aim of therapy is improved survival as well as improved symptoms.

15. One comment asked FDA to clarify what a sponsor's obligation is to continue supplying medication on a compassionate basis if clinical efficacy is not demonstrated to FDA's satisfaction in postmarketing studies but individual patients appear to be benefiting from use of the drug.

Sponsors are not obligated to supply drugs on a "compassionate basis." Whether, if clinical studies did not show effectiveness, further availability of the drug would be appropriate under any mechanism would be determined case-by-case.

### D. Promotional Materials

16. Three comments asserted that requiring advance submissions of promotional materials is both beyond FDA's statutory authority and is unnecessary. Although FDA stated in the proposal that it does not intend specifically to approve promotional materials, two comments contended that is the likely effect of advance submission. The comment cited section 502(n) of the act (21 U.S.C. 352(n)), which provides that no regulation promulgated under that provision shall require prior FDA approval of the content of any advertisement "except in extraordinary circumstances," and asserted that the "extraordinary circumstances" language would not apply to drugs approved under the accelerated approval program. One comment argued that submission of promotional material prior and subsequent to approval is unwarranted when dealing with treatments for serious or life-threatening illnesses where dissemination of the most current and timely information is important to the treating physician. One comment questioned why there would be any greater likelihood of misleading promotional claims for products approved under the proposed accelerated approval process than for drugs intended to treat serious or life-threatening diseases that are approved under the normal NDA procedures. The comment also expressed the hope that the proposed requirement for advance

submission of promotional materials was not based upon an assumption that promotional materials for drugs intended to treat serious diseases are more likely to be misleading than promotional materials for other types of drugs because any such assumption would be unfounded. One comment argued that if an advertisement or labeling is inaccurate, the product is misbranded and FDA could then obtain injunctive relief, seize the product, and/or initiate criminal proceedings. Another comment considered requiring advance submission of promotional materials unreasonable because companies are not required to do so now. One comment questioned the legal authority for requiring presubmission of promotional material following approval of a drug product, and the reason for the requirement.

The agency believes that the requirements for submission of promotional materials in the context of accelerated approval are authorized by statute. Subsections 505(d)(4) and (d)(5) of the act provide that, in determining whether to approve a drug as safe and effective, the agency may consider not only information such as data from clinical studies but also "any other information" relevant to safety and effectiveness under the proposed conditions of use. Such information would include information about how the drug would be promoted. In determining whether the drug's proposed labeling would be "false or misleading" under section 505(d)(7) of the act, the agency is similarly authorized to evaluate "all material facts" during the approval process, including the facts about promotion.

FDA is also authorized by section 505(k) of the act to require reporting of information subsequent to approval necessary to enable the agency to determine whether there may be grounds for withdrawing the approval. Among the grounds for withdrawal specified in section 505(e) of the act are that the evidence reveals the drug is not shown to be safe and effective under its conditions of use. In addition, drug approval may be withdrawn if information shows the labeling to be false or misleading. Information on how the drug will be promoted is again relevant to whether the drug's marketing approval should be withdrawn. Section 701(a) of the act (21 U.S.C. 371(a)) generally authorizes FDA to promulgate regulations for the efficient enforcement of the act.

For biological products, additional authority in section 351 of the PHS Act (42 U.S.C. 262) authorizes the promulgation of regulations designed to

ensure the continued safety, purity, and potency of the products. The content of promotional materials is important to the continued safe and effective use of biologicals.

Therefore, the provisions of the final rule requiring submission of promotional materials prior to approval under the accelerated approval procedures and subsequent to such approval are authorized by statutory provisions. FDA might also invoke the authority of section 502(n) of the act (21 U.S.C. 352(n)) to require prior approval of the content of any prescription drug advertisement in "extraordinary circumstances." Whether FDA could appropriately rely on section 502(n) of the act in promulgating §§ 314.550 and 601.45 need not be determined, however, because FDA is not relying upon section 502(n) of the act as legal authority for these (or any other) sections of the accelerated approval regulations.

The agency believes that advance submissions of promotional materials for accelerated approval products are warranted under the accelerated approval circumstances. The special circumstances under which drugs will be approved under these provisions and the possibility that promotional materials could adversely affect the sensitive risk/benefit balance justify review of promotional materials before and after approval. For example, if the promotional materials exaggerate the known benefits of the drug, wider and inappropriate use of the drug could be encouraged, with harmful results.

Similarly, high risk drugs that are approved based on postmarketing restrictions would not have been approved for use without those restrictions because the risk/benefit balance would not justify such approval. If promotional materials were to undermine the postmarketing restrictions, the health and safety of patients could be greatly jeopardized.

Although there is potential harm from any misleading promotion, and there is no reason to believe improper promotion is more likely in this setting than in others, the risk/benefit balance is especially sensitive in this setting. The relatively small data base available and the minimal published information available also can contribute to making the physician and patient populations particularly vulnerable under accelerated approval circumstances.

Reliance on court actions (such as seizures, injunctions, and criminal prosecutions) can be effective in ending false promotions, but can only be initiated after the fact, when harm has already occurred. Corrective efforts can

be helpful but are always somewhat delayed. Under the circumstances of accelerated approval, FDA believes that it is far preferable to avoid problems by reviewing the promotional materials in advance of drug approval and of dissemination of the materials.

17. Two comments supported the provision about submission of promotional materials. One comment urged the agency to require that specific patient information be included in promotional materials to indicate the fact that the drug's clinical benefit has not yet been established. For drugs approved under the restricted use provision, the comment recommended that the labeling specify in detail the exact restrictions placed on the drug. In both cases, the comment recommended that this patient information appear as boxed warnings.

Section 502(n) of the act and regulations at § 202.1(e)(1) (21 CFR 202.1(e)(1)) require prescription drug advertisements (promotional material) to contain, among other things, a true statement of information in brief summary relating to side effects, contraindications, and effectiveness, which would include warnings, precautions, and limitations on use. The information in brief summary relating to side effects, contraindications, and effectiveness is required to be based solely on the approved labeling. Therefore, to the extent that a drug's labeling reflects the extent of clinical exposure and includes appropriate warnings, a drug's promotional material would also include this information.

FDA regulations governing prescription drug labeling (21 CFR 201.56 and 201.57) require that serious adverse reactions and potential safety hazards, as well as limitations in use imposed by them, be included in the "Warning" section of the labeling. In the case of approval based upon effect on a surrogate endpoint, the "Indications and Usage" section of the labeling would reflect the nature of the demonstrated effect. If the approval is based on use restrictions, the label would also specify the restrictions.

FDA may require boxed warnings if there are special problems associated with a drug, particularly those that may lead to death or serious injury (21 CFR 201.57(e)). The agency does not agree that information related to clinical benefit or use restrictions for accelerated approval drugs would necessarily always require a boxed warning.

As indicated by §§ 314.550 and 601.45 of the final rule, applicants will be required to submit promotional materials prior to approval and in advance of dissemination subsequent to

approval whether the product is a new drug, an antibiotic, or a biological product.

18. One comment contended that FDA review and approval of all promotional pieces before their use will indefinitely delay product marketing campaigns and other patient and physician educational activities, which are essential to market a product, thereby significantly diminishing the advantage of securing an early approval for the applicant. The comment further contended that the requirement to submit "all promotional materials * * * intended for dissemination or publication upon marketing approval" will be overly burdensome for FDA and will unnecessarily slow down the process for review of all materials, not just those for products subject to this proposed rule. The comment recommended that FDA only request for review the primary advertising pieces, such as the introductory letter to physicians, the main detail piece, and the main journal advertisement, but not the secondary materials, e.g., a letter to pharmacists, of the initial promotional campaign.

As previously discussed in this preamble, FDA will be reviewing an applicant's planned promotional materials both prior to approval of an application (reflecting the initial campaign) and subsequent to approval to ascertain whether the materials might adversely affect the drug's sensitive risk/benefit balance. Because all promotional materials, including those referred to by the comment as "secondary" materials, can have significant adverse effects if they are misleading, the agency does not agree that such materials should, as a matter of course, not be requested for review. Insofar as such materials may be directly derived from the introductory letter to physicians, or other materials characterized by the comment as "primary" materials, the additional time to review the derivative materials should not be extensive.

The agency does not agree with the comment's contention that the requirement to submit all promotional materials prior to and subsequent to approval will indefinitely delay marketing campaigns and educational activities or be overly burdensome to FDA reviewers. FDA is committed to rapid review and evaluation of all drugs considered for approval under this rule and will promptly review the promotional materials.

19. One comment suggested a passive, time-limited clearance system for review of advertising after the initial promotional campaign such as that used for review of IND's, which would allow

the sponsor to proceed to use promotional materials after an allotted timeframe, such as 30 days, unless otherwise notified by FDA.

As indicated by this comment and others, additional clarification regarding both timing and content of the submissions of promotional materials seems useful. Therefore, the agency is revising proposed §§ 314.550 and 601.45 to make it clear that, unless otherwise informed by the agency, applicants must submit during the preapproval review period copies of all promotional materials intended for dissemination or publication within the first 120 days following marketing approval. The initial promotional campaign, sometimes referred to as the "launch campaign," often has a significant effect on the climate of use for a new product. As discussed elsewhere in this preamble, the risk/ benefit balance of accelerated approval products is especially sensitive, and inappropriate promotion may adversely affect the balance with resulting harm.

There may be some instances in which promotional materials that had not been completed and submitted by the applicant prior to approval would be beneficial in fostering safe and effective use of the product during the first 120 days. Under revised §§ 314.550 and 601.45, FDA would have the discretion to consider such materials at a later time. An applicant who requested permission to include additional materials among those disseminated within the first 120 days following product approval would be notified of FDA's determination. If FDA agreed that dissemination of such materials was acceptable, the materials could then be disseminated or published upon notification.

For promotional materials intended for dissemination subsequent to the initial 120 days under §§ 314.550 and 601.45 FDA would review the submitted materials within 30 days of receipt. This 30-day period is meant to be time-limited; so that the applicant will be assured of no unnecessary delay. It will be important for the applicant to identify the materials being submitted appropriately, so that it is clear that the materials are subject to the 30-day review period. The agency intends to review all such materials promptly, and to notify the applicant of any identified problems as soon as possible. The agency expects that, if the agency notifies the applicant of significant objections to the proposed materials, no materials will be disseminated or published until the agency's objections are resolved. The applicant should plan to allow sufficient time after receiving

FDA's comments for resolving differences and incorporating requested changes in the submitted materials prior to dissemination or publication.

When FDA removes the requirement for advance submission of promotional material, the agency will continue to offer a prompt review of all voluntarily submitted promotional material.

*E. Postmarketing Restrictions*

FDA received many comments on the proposed requirement to limit distribution to certain facilities or physicians with special training or experience, or condition distribution on the performance of specified medical procedures if such restrictions are needed to counterbalance the drug's known safety concerns.

20. Several comments questioned FDA's authority to impose restrictions on distribution or use after an approved drug is marketed. Two comments disagreed with the statutory provisions cited by FDA in the proposed rule as its authority to impose restrictions on distribution or use stating that they refer only to FDA's general authority to ensure that drugs are not misbranded, which is an entirely separate issue. Another comment argued that section 503(b) of the act (21 U.S.C. 353(b)) contemplates that the issues warranting a restriction as to distribution are not factors in whether a drug product is "safe" for purposes of approval, but rather only whether the product must be limited to prescription status. Two comments said that, in the absence of specific statutory authority, the courts clearly have refused to permit FDA to impose restrictions on distribution and cited *American Pharmaceutical Association (APhA)* v. *Weinberger*, 377 F. Supp. 824, 829 n. 9 (D.D.C. 1974), *aff'd sub nom. APhA* v. *Mathews*, 530 F.2d 1054 (D.C. Cir 1976), a case concerning conditions placed on the approval of the drug methadone.

Some comments asserted that placing restrictions on the distribution of an approved drug to only certain facilities or physicians, or restricting use to certain medical procedures interferes with the practices of medicine and pharmacy, which the comments contended FDA does not have the authority to regulate.

The agency believes that the restrictions to ensure safe use contemplated for approvals under §§ 314.520 and 601.42 are authorized by statute. As discussed in the preamble to the proposed rule (57 FR 13234 at 13237), sections 501, 502, 503, 505, and 701 of the act provide broad authority for FDA to issue regulations to help

assure the safety and effectiveness of new drugs.

The agency does not agree with the comments' contention that the misbranding provisions of the act are irrelevant. Section 502(a) of the act prohibits false or misleading labeling of drugs, including (under section 201(n) of the act) failure to reveal material facts relating to potential consequences under customary conditions of use. Section 502(f) of the act requires drugs to have adequate directions for use and adequate warnings against unsafe use, such as methods of administration, that may be necessary to protect users. In addition, section 502(j) of the act prohibits use of drugs that are dangerous to health when used in the manner suggested in their labeling. Each of these misbranding provisions is intended, at least in significant part, to protect consumers against the marketing of drugs that would not be safe under certain conditions of use. Section 701(a) of the act authorizes FDA to issue regulations for the efficient enforcement of the act. The restrictions on use contemplated by §§ 314.520 and 601.42 help to ensure that products that would be misbranded under section 502 of the act are not marketed.

The restrictions on use imposed under section 503 of the act, which relate to prescription use limitations, primarily concern whether a drug is safe for use except under the supervision of a licensed practitioner. While the agency agrees that the restrictions imposed under §§ 314.520 and 601.42 concerning distribution to certain facilities or physicians with special training or experience would be in addition to ordinary prescription limitation, FDA believes these restrictions are consistent with the spirit of section 503 of the act, as well as the other provisions of the act referred to, in ensuring safe use.

New drugs may be approved under section 505(d) of the act only if they are safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling. In addition, for approval, a drug's labeling must not be false or misleading based on a fair evaluation of all material facts, which would include details about the conditions of use. For biological products, section 351(d) of the PHS Act also authorizes the imposition of restrictions through regulations "designed to insure the continued safety, purity, and potency" of the products.

The agency disagrees with the comments' implication that the courts' rulings in *American Pharmaceutical Association (APhA)* v. *Weinberger* mean

there is no statutory authority to impose restrictions on distribution for accelerated approval drugs. The situation considered in that case is readily distinguishable from the situation addressed in §§ 314.520 and 601.42 of the accelerated approval regulations. The *APhA* case concerned a regulation that withdrew approval of NDA's for methadone, but permitted distribution to certain maintenance treatment programs and certain hospital and community pharmacies. Because methadone is a controlled substance within the provisions of the Controlled Substances Act, which is implemented by the Drug Enforcement Administration with the Justice Department, the district court concluded that the question of permissible distribution of the drug was within the jurisdiction of the Justice Department, not FDA. The Court of Appeals determined that the type of misuse associated with methadone, i.e., misuse by persons who have no intent to try to use drugs for medical purposes, differed from safety issues contemplated for control under section 505 of the act. In contrast, the restrictions contemplated under §§ 314.520 and 601.42 are precisely those deemed necessary to ensure that section 505 criteria have been met, i.e., restrictions to ensure that the drug will be safe under its approved conditions of use. It is clearly FDA's responsibility to implement the statutory provisions regarding new drug approval.

Nor does FDA agree that the provisions placing restrictions on distribution to certain facilities or physicians, or conditioned on the performance of certain medical procedures, impermissibly interfere with the practice of medicine and pharmacy. There is no legal support for the theory that FDA may only approve sponsors' drugs without restriction because physicians or pharmacists may wish to prescribe or dispense drugs in a certain way. The restrictions under these provisions would be imposed on the sponsor only as necessary for safe use under the extraordinary circumstances of the particular drug and use. Without such restrictions, the drugs would not meet the statutory criteria, could not be approved for distribution, and would not be available for prescribing or dispensing. The agency, as a matter of longstanding policy, does not wish to interfere with the appropriate practice of medicine or pharmacy. In this instance, the agency believes that rather than interfering with physician or pharmacy practice, the regulations permit, in exceptional cases,

approval of drugs with restrictions so that the drugs may be available for prescribing or dispensing.

21. One comment asserted that postmarketing restrictions on distribution to certain facilities or physicians with certain training or experience should be limited to rare occasions in cases of extreme hazard to patient safety in which toxicity of a particular drug may require it, but should not be applied because of insufficient efficacy data. Some comments argued that safety issues in the context of drug use should be addressed through patient management and effective product labeling, not through restricted distribution. In support of this argument, the comments cited the labeling of oncologic drugs, which provides physicians with adequate warnings and recommendations for their use without limiting distribution.

FDA agrees with these comments in part and intends to impose restrictions on distribution or use under this rule only in those rare instances in which the agency believes carefully worded labeling for a product granted accelerated approval will not assure the product's safe use. As stated in the preamble to the proposed rule (57 FR 13234 at 13237), FDA believes that the safe use of most prescription drugs will continue to be assured through traditional patient management by health professionals and through necessary safety warnings in the drug's labeling.

22. Two comments asked who will determine if restricted distribution should occur and what facilities or physicians with special training or experience will participate. Several comments expressed concern that restricted distribution and/or conditional use may not include all health care professionals who should participate in safe and effective patient care. Two organizations representing pharmacists asked that FDA develop functional and objective criteria that clearly establish the activities of pharmacists, physicians, and others in the care of patients receiving a drug under restricted distribution. The comments asserted that any health care professional that met these criteria should be allowed to participate in distribution of the drug and care of the patient. One comment recommended that any postmarketing restrictions on distribution or use of a drug approved under the accelerated approval process be developed by appropriate FDA advisory committees or panels expanded to include physicians and pharmacists with expertise in the

therapeutic area being considered and in relevant drug distribution systems. Where appointment of pharmacists to these committees or panels is not feasible, the comment recommended that FDA use pharmacists in a consultant capacity. Another comment argued that current systems for drug distribution incorporate "checks and balances" such that prescribers and pharmacists work together to assure safe use of a drug by a patient. Two comments would oppose any restricted distribution system that allows manufacturers exclusively to deliver prescription drugs directly to patients. One comment asked whether FDA or the applicant would monitor the criteria for restricted distribution sites or physicians.

The medical reviewing divisions within FDA's CDER and CBER will determine if restricted distribution or use should be imposed. FDA will usually seek the advice of outside expert consultants or advisory committees before making this determination, and will, of course, consult with the applicant.

The agency does not agree that FDA should develop criteria that clearly establish the activities of health care professionals in the care of patients receiving a drug approved under this rule and for which restricted distribution has been imposed. Any postmarketing restrictions required under this rule will impose an obligation on the applicant to ensure that the drug or biological product is distributed only to the specified facilities or physicians. FDA will seek the advice of outside consultants with expertise in distribution systems or advisory committees when necessary in determining the need for or type of restricted distribution. The limitations on distribution or use imposed under this rule, including specific distribution systems to be used and the applicant's plan for monitoring compliance with the limitations, will have been agreed to by the applicant at the time of approval. The burden is on the applicant to ensure that the conditions of use under which the applicant's product was approved are being followed. As appropriate, FDA may monitor the sponsor's compliance with the specified terms of the approval and with the sponsor's obligations.

23. One comment recommended that proposed § 314.520 be modified to include therapeutic outcomes monitoring as a third example of a permissible postmarketing restriction. The comment defined therapeutic outcomes monitoring as the systematic and continual monitoring of the clinical and psychosocial effects of drug therapy

on a patient which achieves the objective of preventing problems with drug therapy. Some comments argued that through therapeutic outcomes monitoring, a physician, a pharmacist, and a patient can work together to prevent problems with drug therapy by being constantly alert to signs of trouble. One comment said that indicator data can be routinely reported to a central collection point for utilization review by health care professionals, followed by educational programs to further improve the efficacy of drug therapy.

The postmarketing restrictions set forth in the proposal and in this final rule are intended to enhance the safety of a drug whose risks would outweigh its benefits in the absence of the restriction. Therapeutic outcomes monitoring does not contribute to that enhancement, and would not be required under this rule.

24. Some comments asked that FDA clarify how products will move from restrictive status to a regular prescription drug status. The comments asserted that all conditions associated with accelerated approval should automatically terminate following completion of confirmatory clinical trials; one comment urged FDA to explicitly state this in the final rule. One comment asserted that restrictions should automatically be removed 180 days after a supplemental application containing the data from the postmarketing study has been filed if FDA has not yet acted upon the supplemental application and the product should be deemed approved as if by "traditional" procedures and all other provisions of the act should apply, e.g., the applicant must have a formal hearing before removal of the product from the market.

FDA will notify the applicant when a particular restriction is no longer necessary for safe use of the product. In the case of drugs approved with a requirement for postapproval studies, FDA would expect that all of the postapproval requirements set forth in this rule, i.e., submission of promotional material and use of expedited withdrawal procedures, would no longer apply after postmarketing studies have verified and described the drug's clinical benefit. Concurrent with the review of the postmarketing studies, if requested, FDA will also review the need to continue any restrictions on distribution that have been imposed. In the case where restrictions on distribution or use have been imposed, such restrictions would be eliminated only if FDA determines that safe use of the product can be assured without them, through appropriate labeling. In

some cases, however, that assurance could not be expected and the nature of the specific safety issue raised by the product might require continued restrictions. FDA has added new §§ 314.560 and 601.46 to state when postapproval requirements will no longer apply and state that the applicant may petition the agency, in accordance with 21 CFR 10.30, at any time to remove specific postapproval requirements.

With respect to the suggested time period for removing restrictions on distribution or use following submission of a supplemental application containing the data from a postmarketing study, FDA does not believe it should prescribe any specific time period. These applications will receive a priority rating and FDA is firmly committed to expedited review of an application considered for accelerated approval and all data submitted from a postmarketing study to verify clinical benefit and believes most reviews will be completed and action taken within 180 days.

25. One comment argued that, as proposed, it is not clear how accelerated approval would apply to drugs which fall under the conditions described in §§ 314.520 and 601.42, which state the postmarketing restrictions on distribution or use that FDA may apply, because the language of these sections explicitly states that the sections apply to products "shown to be effective," which are already adequately covered by the act. To the comment, the language "shown to be effective" implies that full Phase 3 efficacy trials have been conducted, assessed, and deemed to demonstrate that the drug is effective for its proposed use. If the clinical data demonstrate that the product has an acceptable safety profile, the safe use of the drug should be addressed in the product labeling. Thus, the comment argued that §§ 314.520 and 601.42 should not be included in new subpart H of part 314 and subpart E of part 601, respectively, which deal with accelerated approval because these sections explicitly apply to products shown to be effective under a full drug development program.

Sections 314.520 and 601.42 apply not only to drugs and biological products approved on the basis of an effect on a surrogate endpoint but also to drugs and biological products that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses using clinical endpoints and that have serious toxicity. In either case, if the products are so potentially harmful that their safe use cannot be assured through carefully worded labeling, FDA will approve the products for early marketing only if postmarketing restrictions on distribution or use are imposed. The phrase "shown to be effective" was not intended to distinguish drugs approved under new subpart H from drugs approved under any other subpart of the regulations. All drugs approved will have had effectiveness demonstrated on the basis of adequate and well-controlled studies, whether the endpoint of the studies is a surrogate endpoint or a clinical endpoint.

26. One comment expressed concern that the proposed restricted distribution or use provisions would restrict or eliminate the wholesale distribution of drugs approved through the accelerated approval process.

The limitations on distribution or use required under this rule are imposed on the applicant. Therefore, the burden is on the applicant to ensure that the conditions of use under which the applicant's product was approved are being followed. This rule does not specify how a manufacturer will distribute its product to those receiving the product under the approval terms. FDA will only determine which facilities or physicians may receive the drug, and the applicant will have agreed to this limitation on distribution or use.

27. One comment expressed concern that the proposed postmarketing restriction provision does not preclude a physician to whom restricted distribution applies from prescribing drugs approved under the accelerated approval process for unapproved (off-label) uses.

The comment is correct that this rule does not itself prevent a physician from prescribing a drug granted accelerated approval for an unapproved use. Under the act, a drug approved for marketing may be labeled, promoted, and advertised by the manufacturer only for those uses for which the drug's safety and effectiveness have been established and that FDA has approved. Physicians may choose to prescribe the drug for a condition not recommended in labeling. Such off-label use would, of course, be carried out under the restrictions imposed under this section. FDA also believes that physicians will be cognizant of the product's special risks and will use such drugs with particular care. The labeling of products approved under this rule will include all necessary warnings and full disclosure labeling would generally reflect the extent of clinical exposure to the drug.

*F. Postmarketing Studies*

28. Three comments argued that FDA does not have the authority to require postmarketing studies to be performed as a condition of approval based on a "surrogate" endpoint. One comment stated that it is widely accepted that the act empowered the agency to define the type and extent of efficacy data necessary to approve a product application. If a surrogate marker can be shown to be sufficiently related to actual patient benefit, then, the comment asserted, data regarding the effect of a drug on a surrogate marker constitute acceptable proof of efficacy under the act. Two comments urged FDA to continue to ask applicants to agree voluntarily to perform postmarketing studies when medically warranted as is the current policy under the traditional approval process. One comment expressed concern that requiring postmarketing studies may become the norm rather than the exception.

The agency's response to comment 1. explained the circumstances in which FDA might conclude that a drug should be marketed on the basis of an effect on a surrogate endpoint reasonably likely to predict clinical benefit only if studies were carried out to confirm the presence of the likely benefit. As discussed in the preamble to the proposed rule (57 FR 13234 at 13236), FDA believes that it is authorized by law to require postmarketing studies for new drugs and biological products. Section 505(d) of the act provides for the approval of new drugs for marketing if they meet the safety and effectiveness criteria set forth in section 505(d) of the act and the implementing regulations (21 CFR part 314). As discussed in the proposed rule, to demonstrate effectiveness, the law requires evidence from adequate and well-controlled clinical studies on the basis of which qualified experts could fairly and responsibly conclude that the drug has the effect it is purported to have. Under section 505(e) of the act, approval of a new drug application is to be withdrawn if new information shows that the drug has not been demonstrated to be either safe or effective. Approval may also be withdrawn if new information shows that the drug's labeling is false or misleading.

Section 505(k) of the act authorizes the agency to promulgate regulations requiring applicants to make records and reports of data or other information that are necessary to enable the agency to determine whether there is reason to withdraw approval of an NDA. The agency believes that the referenced reports can include additional studies to evaluate the clinical effect of a drug approved on the basis of an effect on a surrogate endpoint. Section 701(a) of the act generally authorizes FDA to issue

regulations for the "efficient enforcement" of the act.

With respect to biological products, section 351 of the PHS Act provides legal authority for the agency to require postmarketing studies for these products. Licenses for biological products are to be issued only upon a showing that they meet standards "designed to insure the continued safety, purity, and potency of such products" prescribed in regulations (42 U.S.C. 262(d)). The "potency" of a biological product includes its effectiveness (21 CFR 600.3(s)).

The agency notes that it has in the past required postmarketing studies as a prerequisite for approval for some new drugs (see 37 FR 201, January 7, 1972; and 37 FR 26790, December 15, 1972).

29. One comment recommended that FDA require that specific timelines for completion of the required postmarketing studies be included in the marketing application. The comment further suggested that, if the sponsor fails to meet its timelines, approval of its application be withdrawn, or in the event it is difficult to withdraw approval of drugs for serious or life-threatening diseases, FDA should establish substantial fines and penalties for sponsors that deliberately withhold information from FDA regarding the preliminary results and the progress of their postmarketing studies, or delay the completion of such studies. The comment also urged FDA to publish in the Federal Register identification of manufacturers who are not meeting their obligation to complete the required postmarketing studies on time. These recommendations were prompted by the comment's concern that once a manufacturer is granted approval for its product, the manufacturer will have little incentive to complete postmarketing studies in a timely manner, especially if the preliminary results of such studies indicate that the drug may not be safe and/or effective. Another comment urged FDA to include in the final rule language that requires the participation of pharmacists in postmarketing studies because pharmacists can serve as an additional source of information on therapeutic outcomes of patients taking drugs approved under this rule and monitoring for such drugs.

The agency expects that the requirement for postmarketing studies will usually be met by studies already underway at the time of approval and that there will be reasonable enthusiasm for resolving the questions posed by those studies. The plan for timely completion of the required postmarketing studies will be included

in the applicant's marketing application. In addition, in accord with the annual reporting requirements at § 314.81(b)(2)(vii) (21 CFR 314.81(b)(2)(vii)), an NDA applicant is required to provide FDA with a statement of the current status of any postmarketing studies. FDA declines to impose the sanctions suggested by the comment for failure of an applicant to meet its plans for completion of a postmarketing study. FDA believes this rule applies appropriate regulatory sanctions. Under the proposed rule and this final rule, FDA may withdraw approval of an application if the applicant fails to perform the required postmarketing study with due diligence.

FDA believes that it is not within the scope of this rule to establish the role of pharmacists in postmarketing studies. That role should more properly be defined by the clinical investigator and each institution or facility at which a postmarketing study is conducted.

30. One comment asserted that the proposal sets forth an inherent contradiction between the way FDA evaluates the benefit and risk for drugs today and the way the proposal contemplates. The comment argued that now, if postmarketing data raise questions about the risk associated with a drug product, FDA considers that data along with the other data known about the product, and determines whether, based on the overall knowledge about the drug, there is a need to seek withdrawal of approval. Under this proposal, if the postmarketing study data raised questions about the risk of the product, FDA would seek withdrawal of approval, whether or not the new data really made a fundamental difference to what is known about the benefit and risk of the product.

FDA does not agree that the contradiction described by the comment exists. Under the circumstances of accelerated approval, approval would be based on a weighing of the benefit suggested by the effect on the surrogate endpoint against known and potential risks of the drug. Should well-designed postapproval studies fail to demonstrate the expected clinical benefit, the benefit expected at the time of approval (reasonably likely to exist) would no longer be expected and the totality of the data, showing no clinical benefit, would no longer support approval. This evaluation of the data is not different from considerations that would apply in evaluating data in the case of a drug approved under other provisions of the regulations.

31. Two comments expressed the view that the proposed requirement for postmarketing studies may raise

important ethical questions because once a drug product is approved, it may be unethical, depending on the circumstances, for a physician to conduct a study using a placebo control. One comment also contended that a postmarketing study requirement could compromise the NDA holder's ability to enroll sufficient numbers of patients in the study when the new approved drug and possible alternative therapies are widely available to patients.

Usually, and preferably, because of problems suggested in the comment, the requirement for postmarketing studies will be met by studies already underway at the time of approval, e.g., by completion of studies that showed an effect on the surrogate. FDA recognizes that ethical considerations will play a central role in the type of study carried out, a choice that will depend upon the type and seriousness of the disease being treated, availability of alternative therapies, and the nature of the drug and the patient population. There often are alternatives to use of a placebo control, including active control designs and dose-response studies that can satisfy both the demands of ethics and adequacy of design.

32. One comment contended that the term "postmarketing study" is used inconsistently in the proposed rule. The comment argued that "postmarketing study" is an accepted regulatory term of art which, to this point, has referred to studies conducted to confirm safety (not efficacy), after an approval has been granted, whereas in this proposal, a "postmarketing study" refers to a study required to establish clinical efficacy (i.e., a Phase 3 study), but not necessarily safety, although safety data will be collected. To prevent confusion and to differentiate between these required postmarketing confirmatory efficacy studies and safety studies traditionally conducted after approval and to clarify that products granted accelerated approval have been approved on the basis of Phase 2 (surrogate endpoint) data, the comment suggested changing the term "postmarketing study" to "Phase 3 study" in this rule except where traditional postmarketing studies are intended. The comment also suggested that the term "Phase 3 study" be defined as a study required to confirm findings of efficacy based upon surrogate data collected in Phase 2, which will be conducted after an accelerated approval has been granted and will be required before restrictions set forth in § 314.520 are removed.

The agency does not believe that the comment has accurately described accepted meanings of various terms.

The term postmarketing study does not refer to any particular kind of study, but to studies carried out after a drug is marketed, often as part of an agreement by a sponsor to do so. These have included pharmacokinetic, drug-drug interaction, and pediatric studies, studies of dose-response or of higher doses, and studies of new uses. The term is not limited to safety studies. Moreover, Phase 2 and 3 studies are not distinguished by the endpoints chosen. Phase 3 hypertension studies, for example, still measure blood pressure, not stroke rate. The agency believes that the use of the "postmarketing study" in the final rule is appropriate and consistent.

## G. Withdrawal of Approval

33. One comment supported the proposed withdrawal of approval procedure. Other comments asserted that the proposed procedure does not provide the applicant with the procedural safeguard of a formal evidentiary hearing guaranteed by section 505 of the act and the Administrative Procedure Act (APA). As an example, the comments said that based on a finding of a single study failing to show clinical benefit or misuse of any promotional material, an approved new drug would be subject to withdrawal from the market with only a minimal opportunity for the NDA holder to be heard. The comments argued that section 505(e) of the act guarantees applicants "due notice and opportunity for a hearing" on withdrawal of an NDA in compliance with APA hearing standards, thus FDA must conduct hearings on withdrawals of NDA's using the formal adjudicatory procedures of the APA. One comment asserted that, under the proposed procedure, there is the absence of a discernible legal standard, an inability to cross-examine, the prosecuting attorney and judge are one and the same person, and there is a lack of even minimal formal evidentiary procedures. The comment expressed doubt that the proposed procedure would be sufficient to create a record suitable for review by a Court of Appeals, which must be able, on the basis of such a record, to determine whether the approval is supported by "substantial evidence."

FDA believes the withdrawal procedures set forth in proposed §§ 314.530 and 601.43 and in this final rule are consistent with relevant statutes and provide applicants adequate due process. As stated in the proposed rule, in issuing its general procedural regulations, FDA decided to afford NDA holders an opportunity for a formal evidentiary hearing even though the courts had not decided that such a hearing was necessarily legally required (see 40 FR 40682 at 40691, September 3, 1975). In promulgating its procedural regulations, FDA also determined that a formal evidentiary hearing is not required before withdrawing approval of biological products, but that it would be appropriate to apply the same procedures to biological products as to drug removal (see 40 FR 40682 at 40691).

Through the hearing process in this final rule, as in the proposed rule, applicants will be afforded the opportunity to present any data and information they believe to be relevant to the continued marketing of their product. The proposed process also would have permitted the presiding officer, the advisory committee members, a representative of the applicant, and a representative of the Center that initiates the withdrawal proceedings to question any person during or at the conclusion of the person's presentation. As discussed below in response to a comment, FDA has decided to allow up to three representatives of the applicant and of the Center to question presenters. Participants could comment on or rebut information and views presented by others. As with ordinary 21 CFR part 15 hearings, the hearing will be transcribed. Subsequent to the hearing, the Commissioner of Food and Drugs would render a final decision on the matter. The agency believes that the administrative record created through this process would be sufficient for judicial review.

The agency emphasizes that, as part of the approval process under this rule, applicants will have agreed that these withdrawal procedures apply to the drug for which they seek approval; applicants objecting to these procedures may forego approval under these regulations and seek approval under the traditional approval process. Under such circumstances, applicants would not have the benefit of accelerated approval; if the drug were subsequently approved, however, before withdrawal of the approval, the applicant would have an opportunity for a 21 CFR part 12 hearing.

34. One comment noted that the "imminent hazard" provision of section 505(e) of the act allows FDA to suspend approval of a product, immediately, if it is found to pose an imminent hazard to the public health. As an alternative to the proposed withdrawal procedure or in addition to the "imminent hazard" statutory provision, the comment suggested that, when confronted with a dangerous product on the market, FDA could request that the applicant voluntarily withdraw its product, and most applicants would comply if a legitimate hazard would exists.

As noted in the proposed rule, FDA and applicants have often reached mutual agreement on the need to remove a drug from the market rapidly when significant safety problems have been discovered. However, applicants usually have been unwilling to enter into such agreements when doubts about effectiveness have arisen, such as following the review of effectiveness of pre-1962 approvals carried out under the Drug Efficacy Study Implementation (DESI) program. For drugs approved under the accelerated procedure regulations, the risk/benefit assessment is dependent upon the likelihood that the surrogate endpoint will correlate with clinical benefit or that postmarketing restrictions will enable safe use. If the effect on the surrogate does not translate into a clinical benefit, or if restrictions do not lead to safe use, the risk/benefit assessment for these drugs changes significantly. FDA believes that if that occurs, rapid withdrawal of approval as set forth in this rule is important to the public health.

35. Under the proposed withdrawal procedures, in addition to other persons, one representative of the Center that initiates the withdrawal proceedings may question participants at a withdrawal of approval hearing. One comment objected to limiting the Center to one representative because detailed knowledge about a drug product is likely to be available from several scientists.

The proposed limitation of questioning to single representatives of the initiating Center and the applicant was intended to make the proceedings manageable. On further consideration, the agency has determined that it would be appropriate and manageable to allow up to three persons to be designated as questioners for the applicant and for FDA. Sections 314.530(e)(2) and 601.43(e)(2) have been revised accordingly.

36. Some comments questioned FDA's ability to withdraw approval under the proposed procedures efficiently or effectively because of: (1) The lack of assurance that the results of postmarketing studies will be promptly provided to FDA; (2) limited agency resources to review study results and act upon them promptly; (3) the difficulties associated with establishing that an approved drug is "ineffective;" and (4) political pressure not to rescind the approval of NDA's for drug products that may lack evidence of effectiveness,

especially if no clearly effective alternative treatments are available. One comment offered the opinion that where a drug shows only modest evidence of benefit, perhaps on a surrogate endpoint, and only shows equivocal evidence of clinical efficacy in postmarketing studies it would be difficult and socially disruptive to withdraw approval and remove the drug from the market if the drug has become well established and accepted, and there is no issue of toxicity. Another comment believed it would be difficult to withdraw approval of a drug that may be beneficial in a subpopulation but which, in fact, has not been shown to be efficacious in broader patient population studies. The comments suggested the need for a lesser sanction.

Another comment suggested that expediting removal of a product from the market could be accomplished by using a procedure like the "imminent hazard" provision of the act, i.e., immediate removal of the drug from the market if any of the conditions listed in proposed § 314.530 were met followed by a hearing.

Although the potential difficulties cited by the comments are real, they are not fundamentally different from determinations FDA regularly must make in carrying out its responsibilities. The new regulations provide for an expedited procedure to withdraw approval; they do not guarantee that results of studies will be wholly unambiguous or that FDA will always be able to prevail in its view as to the need for withdrawal, any more than current withdrawal procedures do. The studies being carried out under these provisions will be conspicuous and important and their completion will be widely known. There is no reason to believe their results would or could be long hidden. A study that fails to show clinical effectiveness does not prove a drug has no clinical effect but it is a study that, under § 314.530, will lead to a withdrawal procedure because it has failed to show that the surrogate endpoint on which approval was based can be correlated with a favorable clinical effect. This may have occurred because the study was poorly designed or conducted; while FDA will make every effort to avoid this, the commercial sponsor has the responsibility for providing the needed evidence confirming clinical benefit. As previously discussed, §§ 314.510 and 601.41 have been revised to clarify that required postmarketing studies must also be adequate and well-controlled. The possibility that an ineffective drug has become "accepted" is not a basis for continued marketing. FDA intends to

implement the provisions of § 314.530 as appropriate; data that are ambiguous will inevitably lead to difficult judgments.

A drug with clear clinical effectiveness in a subset of the population, but not in the population described in labeling, would have its labeling revised to reflect the data. Withdrawal would be inappropriate under such circumstances.

If an imminent hazard to the public health exists, the Secretary of Health and Human Services may suspend approval of an application and then afford the applicant an opportunity for an expedited hearing. In the absence of a significant hazard requiring immediate withdrawal, FDA believes the expedited procedure described in the rule satisfies the need for prompt action while, at the same time, allowing opportunity for discussion and debate before withdrawal.

37. One comment noted that the proposed rule would allow FDA to withdraw approval for failure to perform the required postmarketing studies with due diligence. The comment asserted that the act does not permit FDA to withdraw approval on this ground. Another comment, however, suggested that because proposed §§ 314.530 and 601.43 cite grounds for withdrawal of approval that are not grounds under the act, the language of these proposed sections should be revised to use language that closer aligns to that used in the act, e.g., describe a "postmarketing study" in statutory language.

FDA reaffirms the position expressed in the preamble to the proposal (57 FR 13234 at 13239) that there is adequate authority under the act to withdraw approval of an application for the reasons stated under proposed §§ 314.530 and 601.43, which include failure of an applicant to perform the required postmarketing study with due diligence. Section 505(e) of the act authorizes the agency to withdraw approval of an NDA if new information shows that the drug has not been demonstrated to be either safe or effective. Approval may also be withdrawn if the applicant has failed to maintain required records or make required reports. In addition, approval may be withdrawn if new information, along with the information considered when the application was approved, shows the labeling to be false or misleading.

For biological products, section 351(d) of the PHS Act authorizes approval of license applications under standards designed to ensure continued safety, purity, and potency. "Potency"

for biological products includes effectiveness (21 CFR 600.3(s)). The PHS Act does not specify license revocation procedures, except to state that licenses may be suspended and revoked "as prescribed by regulations."

For drugs approved under § 314.510, FDA will have determined that reports of postmarketing studies are critical to the risk/benefit balance needed for approval; if those reports are not forthcoming, then, under authority of section 505(d) of the act, the drug cannot on an ongoing basis meet the standards of safety and efficacy required for marketing under the act. Therefore, it is important to ensure that the applicant make a good faith effort to complete any required postmarketing studies in a timely manner so that FDA can rapidly determine whether the surrogate endpoint upon which the drug was approved has been confirmed to correlate with clinical benefit. Failure to submit the study results in a timely fashion would also constitute failure to make a required report. Similarly, without submission of the information from required postmarketing studies on biological products approved under these procedures, the biological product is not assured of continued safety and effectiveness. The license application may, therefore, appropriately be revoked as described in § 601.43.

FDA does not find the statements of the grounds for withdrawal of approval under §§ 314.530 and 601.43 of this rule inconsistent with statutory language or ambiguous. The agency notes that, in the event none of the grounds for withdrawal specifically listed in § 314.530 or § 601.43 applies, but another ground for withdrawal under section 505 of the act or section 351 of the PHS Act and implementing regulations at 21 CFR 314.150 or 601.5 does apply, the agency will proceed to withdraw approval under traditional procedures.

38. Two comments expressed concern that it may be difficult for the agency to enforce the requirement that postmarketing studies be pursued with due diligence. The comments asked what would happen if a sponsor using due diligence is unable to recruit enough patients, or if the sponsor questions the validity of the data from the required postmarketing study, and would clumsy data management be seen as sufficient reason to rescind approval for a marketed drug? Another comment stated that once a product is approved and, by definition, provides a "meaningful therapeutic benefit over existing therapies," study accrual may drop off dramatically as patients may refuse to receive the "old" therapy or

placebo, or physicians may consider it unethical not to treat all patients with the approved indication with the new drug or biological product. Under these circumstances, the comment expressed the opinion that neither the sponsor nor the product should be penalized, nor should there be a threat to withdraw approval. Based on FDA's past history in postmarketing studies, which one comment characterized as resulting in poorly done studies, studies conducted much later than agreed upon, or not at all, the comment expressed the opinion that the "due diligence" with which applicants are expected to carry out postmarketing studies may be an overly great expectation. One comment asked FDA to give examples of when it may withdraw approval if "other evidence demonstrates that the drug product is not shown to be safe or effective under its conditions of use" (proposed §§314.530(a)(6) and 601.43(a)(6)).

FDA does not agree that it will be difficult to enforce the "due diligence" provision of this rule. The "due diligence" provision was designed to ensure that the applicant makes a good faith effort to conduct a required postmarketing study in a timely manner to confirm the predictive value of the surrogate marker or other indicator. Any requirement for postmarketing studies will have been agreed to by the applicant at the time of approval, and if the study is not conducted in a timely manner as agreed to by the applicant, approval of the applicant's application will be withdrawn. FDA will expect any required postmarketing study to be conducted in consultation with the agency. Therefore, should the applicant encounter problems with subject enrollment in a study or ethical difficulties about the type of study to conduct, FDA expects the applicant to discuss these problems with the agency and reach agreement on their resolution.

Examples of other evidence demonstrating that the drug product is not shown to be safe and effective could include further studies of the effect of the drug and the surrogate endpoint that fail to show the effect seen in previous studies, new evidence casting doubt on the validity of the surrogate endpoint as a predictor of clinical benefit, or new evidence of significant toxicity.

39. Some comments objected to withdrawal of approval of a drug product approved under the accelerated approval process because of perceived misconduct by the applicant, such as failure to perform a required postmarketing study with due diligence or use of promotional materials that are false or misleading. The comments argued that the primary purpose of the

accelerated approval process is to provide improved treatments to desperately ill patients at the earliest possible time, and withdrawal of approval of the new treatments for reasons not directly related to safety or efficacy undermines the purpose of the proposed rule. Two comments suggested that correction of the promotional material without interruption of access to the drug would be a better approach. Another comment suggested that there may be circumstances where continued access to the drug, if accompanied by informed consent, would be appropriate even if substantial questions arise about a product's safety and effectiveness. One comment urged that anticipated withdrawal of approval be preceded by measures to ensure that patients and their physicians will have an uninterrupted supply until alternative treatment arrangements can be made.

The need for "due diligence" in conducting the agreed to postmarketing studies is discussed in paragraph 37. The reasons for concern about misleading promotional materials are discussed under paragraph 16. With respect to promotional materials, FDA expects that, in most cases, any disagreements between the applicant and FDA will be resolved through discussion and modification of the materials, so that the drug or biological product can continue to be marketed. If, however, FDA concludes that the promotional materials adversely affect the risk/benefit conclusion supporting the drug's marketing, the agency intends to minimize the risk to the public health by removing the product from the market through the withdrawal procedures in this rule.

40. One comment expressed concern that the proposed withdrawal procedure may give the appearance of bias or preconceived notions on the part of the agency because the final decision to withdraw approval of a drug would be made by the Commissioner of Food and Drugs and the intention to withdraw approval of the drug will already have been determined by the agency.

Under the withdrawal provisions of this rule, FDA's CDER or CBER, rather than the Commissioner, will initiate the withdrawal proceedings. The withdrawal process will begin with a letter from CDER or CBER notifying the applicant that the Center proposes to withdraw marketing approval and stating the reasons for the proposed action. Although separation of functions will not apply under the provisions of §§314.530 or 601.43, the Commissioner's decision regarding withdrawal would not occur until after

the applicant had an opportunity for hearing as described in those sections. The Commissioner would then expect to review the issues with objectivity and fairness having had the benefit of the presentations and discussions at the hearing and of the advisory committee's recommendations.

*H. Safeguards for Patient Safety*

41. One comment asked if drugs approved under the accelerated approval process would be held to the same standards concerning postmarketing safety as drugs approved by the traditional process.

As discussed in the preamble to the proposed rule, applicants gaining approval for new drugs through the accelerated approval procedures will also be expected to adhere to the agency's longstanding requirements for postmarketing recordkeeping and safety reporting (see 21 CFR 314.80 and 314.81). Information that comes to FDA from the applicant or elsewhere that raises potential safety concerns will be evaluated in the same manner that such information is evaluated for drugs approved under the agency's traditional procedures. If the postmarketing information shows that the risk/benefit assessment is no longer favorable, the agency will act accordingly to remove the drug from the market.

42. One comment urged FDA, if the proposed rule were adopted, to require written informed consent so that patients would know that the drugs with which they were being treated had risks and that the benefits had not been adequately established.

The agency does not agree that patients using drug products approved under the accelerated approval regulations should be asked to provide written informed consent. Drugs approved under these provisions are not considered experimental drugs for their approved uses. Like all approved drugs, drugs approved under these provisions will have both risks and benefits. As previously discussed in this preamble, for drugs approved based on studies showing an effect on a surrogate endpoint, the approved labeling will describe that effect. In addition, the labeling will contain information on known and potential safety hazards and precautionary information. As with all prescription drugs, the physician has the responsibility for appropriately advising the patient regarding the drug being prescribed.

43. One comment asked that FDA require manufacturers to maintain an updated list of names, addresses, and phone numbers of physicians prescribing their products approved

under this rule, and in the case of recall or withdrawal of approval, require manufacturers to contact these physicians and encourage them to notify their patients.

FDA does not believe such a procedure is necessary. Furthermore, maintaining such a registry for drugs prescribed through pharmacies would be very difficult. Agency experience with recalls and product withdrawals indicates that the methods of notification that have been developed for such circumstances are adequate.

44. One comment recommended that FDA require patient package inserts (PPI's) for all drugs granted accelerated approval that would state the specific restrictions placed on a drug product and/or the reason for requiring postmarketing studies. In addition, the comment recommended that FDA require the manufacturer to include an adverse drug reaction "hotline" phone number in the PPI along with an FDA phone number. The PPI should inform the patient to report immediately any adverse drug reaction experienced to his or her doctor, the manufacturer, and FDA, and the manufacturer should be required to contact FDA immediately after receiving a report of a serious adverse reaction.

FDA concludes that patient package inserts are not routinely needed for drugs granted accelerated approval, although if circumstances made one appropriate, one would be developed for a particular drug. As with any prescription drug, the approved labeling for a product granted accelerated approval will contain information about the safe and effective use of the product, including all necessary warnings and the extent of clinical exposure. In addition, the conditions of use will be carefully worded to reflect the nature of the data supporting the product's approval. Physicians have the responsibility to inform patients about the safe and effective use of an approved product. Labeling includes suggestions to the physician concerning information to be provided to patients.

The agency notes that in this final rule limited editorial changes have been made to the wording of the proposed rule. The agency has determined that these changes do not affect the intent of the proposed rule.

## V. Economic Impact

In accordance with Executive Order 12291, FDA has carefully analyzed the economic effects of this final rule and has determined that it is not a major rule as defined by the Order. Indeed, because firms will not be forced to use the accelerated approval mechanism,

applicants will most probably choose to take advantage of the program only where its use is expected to reduce net costs. Similarly, the final rule does not impose a significant economic impact on a substantial number of small entities so as to require a regulatory flexibility analysis under the requirements of the Regulatory Flexibility Act of 1980.

## VI. Environmental Impact

The agency has determined under 21 CFR 25.24(a)(8) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

## VII. Paperwork Reduction Act of 1980

This rule does not contain new collection of information requirements. Section 314.540 does refer to regulations that contain collection of information requirements that were previously submitted for review to the Director of the Office of Management and Budget (OMB) under section 3504 of the Paperwork Reduction Act of 1980 (Adverse Drug Experience Reporting, OMB No. 0190–0230).

## List of Subjects

### 21 CFR Part 314

Administrative practice and procedure, Confidential business information, Drugs, Reporting and recordkeeping requirements.

### 21 CFR Part 601

Biologics, Confidential business information.

Therefore, under the Federal Food, Drug, and Cosmetic Act, the Public Health Service Act, and under authority delegated to the Commissioner of Food and Drugs, 21 CFR parts 314 and 601 are amended as follows:

## PART 314—APPLICATIONS FOR FDA APPROVAL TO MARKET A NEW DRUG OR AN ANTIBIOTIC DRUG

1. The authority citation for 21 CFR part 314 continues to read as follows:

**Authority:** Secs. 201, 301, 501, 502, 503, 505, 506, 507, 701, 706 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321, 331, 351, 352, 353, 355, 356, 357, 371, 376).

2. Subpart H consisting of §§ 314.500 through 314.560 is added to read as follows:

**Subpart H—Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses**

Sec.
314.500   Scope.

Sec.
314.510   Approval based on a surrogate endpoint or on an effect on a clinical endpoint other than survival or irreversible morbidity.
314.520   Approval with restrictions to assure safe use.
314.530   Withdrawal procedures.
314.540   Postmarketing safety reporting.
314.550   Promotional materials.
314.560   Termination of requirements.

**Subpart H—Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses**

### § 314.500   Scope.

This subpart applies to certain new drug and antibiotic products that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments (e.g., ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy).

### § 314.510   Approval based on a surrogate endpoint or on an effect on a clinical endpoint other than survival or irreversible morbidity.

FDA may grant marketing approval for a new drug product on the basis of adequate and well-controlled clinical trials establishing that the drug product has an effect on a surrogate endpoint that is reasonably likely, based on epidemiologic, therapeutic, pathophysiologic, or other evidence, to predict clinical benefit or on the basis of an effect on a clinical endpoint other than survival or irreversible morbidity. Approval under this section will be subject to the requirement that the applicant study the drug further, to verify and describe its clinical benefit, where there is uncertainty as to the relation of the surrogate endpoint to clinical benefit, or of the observed clinical benefit to ultimate outcome. Postmarketing studies would usually be studies already underway. When required to be conducted, such studies must also be adequate and well-controlled. The applicant shall carry out any such studies with due diligence.

### § 314.520   Approval with restrictions to assure safe use.

(a) If FDA concludes that a drug product shown to be effective can be safely used only if distribution or use is restricted, FDA will require such postmarketing restrictions as are needed to assure safe use of the drug product, such as:

(1) Distribution restricted to certain facilities or physicians with special training or experience; or

Federal Register / Vol. 57, No. 239 / Friday, December 11, 1992 / Rules and Regulations    58959

(2) Distribution conditioned on the performance of specified medical procedures.

(b) The limitations imposed will be commensurate with the specific safety concerns presented by the drug product.

§ 314.530  Withdrawal procedures.

(a) For new drugs and antibiotics approved under §§ 314.510 and 314.520, FDA may withdraw approval, following a hearing as provided in part 15 of this chapter, as modified by this section, if:

(1) A postmarketing clinical study fails to verify clinical benefit;

(2) The applicant fails to perform the required postmarketing study with due diligence;

(3) Use after marketing demonstrates that postmarketing restrictions are inadequate to assure safe use of the drug product;

(4) The applicant fails to adhere to the postmarketing restrictions agreed upon;

(5) The promotional materials are false or misleading; or

(6) Other evidence demonstrates that the drug product is not shown to be safe or effective under its conditions of use.

(b) Notice of opportunity for a hearing. The Director of the Center for Drug Evaluation and Research will give the applicant notice of an opportunity for a hearing on the Center's proposal to withdraw the approval of an application approved under § 314.510 or § 314.520. The notice, which will ordinarily be a letter, will state generally the reasons for the action and the proposed grounds for the order.

(c) Submission of data and information. (1) If the applicant fails to file a written request for a hearing within 15 days of receipt of the notice, the applicant waives the opportunity for a hearing.

(2) If the applicant files a timely request for a hearing, the agency will publish a notice of hearing in the Federal Register in accordance with §§ 12.32(e) and 15.20 of this chapter.

(3) An applicant who requests a hearing under this section must, within 30 days of receipt of the notice of opportunity for a hearing, submit the data and information upon which the applicant intends to rely at the hearing.

(d) Separation of functions. Separation of functions (as specified in § 10.55 of this chapter) will not apply at any point in withdrawal proceedings under this section.

(e) Procedures for hearings. Hearings held under this section will be conducted in accordance with the provisions of part 15 of this chapter, with the following modifications:

(1) An advisory committee duly constituted under part 14 of this chapter

will be present at the hearing. The committee will be asked to review the issues involved and to provide advice and recommendations to the Commissioner of Food and Drugs.

(2) The presiding officer, the advisory committee members, up to three representatives of the applicant, and up to three representatives of the Center may question any person during or at the conclusion of the person's presentation. No other person attending the hearing may question a person making a presentation. The presiding officer may, as a matter of discretion, permit questions to be submitted to the presiding officer for response by a person making a presentation.

(f) Judicial review. The Commissioner's decision constitutes final agency action from which the applicant may petition for judicial review. Before requesting an order from a court for a stay of action pending review, an applicant must first submit a petition for a stay of action under § 10.35 of this chapter.

§ 314.540  Postmarketing safety reporting.

Drug products approved under this program are subject to the postmarketing recordkeeping and safety reporting applicable to all approved drug products, as provided in §§ 314.80 and 314.81.

§ 314.550  Promotional materials.

For drug products being considered for approval under this subpart, unless otherwise informed by the agency, applicants must submit to the agency for consideration during the preapproval review period copies of all promotional materials, including promotional labeling as well as advertisements, intended for dissemination or publication within 120 days following marketing approval. After 120 days following marketing approval, unless otherwise informed by the agency, the applicant must submit promotional materials at least 30 days prior to the intended time of initial dissemination of the labeling or initial publication of the advertisement.

§ 314.560  Termination of requirements.

If FDA determines after approval that the requirements established in § 314.520, § 314.530, or § 314.550 are no longer necessary for the safe and effective use of a drug product, it will so notify the applicant. Ordinarily, for drug products approved under § 314.510, these requirements will no longer apply when FDA determines that the required postmarketing study verifies and describes the drug product's clinical benefit and the drug product

would be appropriate for approval under traditional procedures. For drug products approved under § 314.520, the restrictions would no longer apply when FDA determines that safe use of the drug product can be assured through appropriate labeling. FDA also retains the discretion to remove specific postapproval requirements upon review of a petition submitted by the sponsor in accordance with § 10.30.

PART 601—LICENSING

3. The authority citation for 21 CFR part 601 continues to read as follows:

Authority: Secs. 201, 501, 502, 503, 505, 510, 513–516, 518–520, 701, 704, 706, 801 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321, 351, 352, 353, 355, 360, 360c–360f, 360h–360j, 371, 374, 376, 381); secs. 215, 301, 351, 352 of the Public Health Service Act (42 U.S.C. 216, 241, 262, 263); secs. 2–12 of the Fair Packaging and Labeling Act (15 U.S.C. 1451–1461).

4. Subpart E consisting of §§ 601.40 through 601.46 is added to read as follows:

Subpart E—Accelerated Approval of Biological Products for Serious or Life-Threatening Illnesses

Sec.
601.40  Scope.
601.41  Approval based on a surrogate endpoint or on an effect on a clinical endpoint other than survival or irreversible morbidity.
601.42  Approval with restrictions to assure safe use.
601.43  Withdrawal procedures.
601.44  Postmarketing safety reporting.
601.45  Promotional materials.
601.46  Termination of requirements.

Subpart E—Accelerated Approval of Biological Products for Serious or Life-Threatening Illnesses

§ 601.40  Scope.

This subpart applies to certain biological products that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments (e.g., ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy).

§ 601.41  Approval based on a surrogate endpoint or on an effect on a clinical endpoint other than survival or irreversible morbidity.

FDA may grant marketing approval for a biological product on the basis of adequate and well-controlled clinical trials establishing that the biological product has an effect on a surrogate endpoint that is reasonably likely, based on epidemiologic, therapeutic,

**58960** Federal Register / Vol. 57, No. 239 / Friday, December 11, 1992 / Rules and Regulations

pathophysiologic, or other evidence, to predict clinical benefit or on the basis of an effect on a clinical endpoint other than survival or irreversible morbidity. Approval under this section will be subject to the requirement that the applicant study the biological product further, to verify and describe its clinical benefit, where there is uncertainty as to the relation of the surrogate endpoint to clinical benefit, or of the observed clinical benefit to ultimate outcome. Postmarketing studies would usually be studies already underway. When required to be conducted, such studies must also be adequate and well-controlled. The applicant shall carry out any such studies with due diligence.

**§ 601.42   Approval with restrictions to assure safe use.**

(a) If FDA concludes that a biological product shown to be effective can be safely used only if distribution or use is restricted, FDA will require such postmarketing restrictions as are needed to assure safe use of the biological product, such as:

(1) Distribution restricted to certain facilities or physicians with special training or experience; or

(2) Distribution conditioned on the performance of specified medical procedures.

(b) The limitations imposed will be commensurate with the specific safety concerns presented by the biological product.

**§ 601.43   Withdrawal procedures.**

(a) For biological products approved under §§ 601.40 and 601.42, FDA may withdraw approval, following a hearing as provided in part 15 of this chapter, as modified by this section, if:

(1) A postmarketing clinical study fails to verify clinical benefit;

(2) The applicant fails to perform the required postmarketing study with due diligence;

(3) Use after marketing demonstrates that postmarketing restrictions are inadequate to ensure safe use of the biological product;

(4) The applicant fails to adhere to the postmarketing restrictions agreed upon;

(5) The promotional materials are false or misleading; or

(6) Other evidence demonstrates that the biological product is not shown to be safe or effective under its conditions of use.

(b) *Notice of opportunity for a hearing.* The Director of the Center for

Biologics Evaluation and Research will give the applicant notice of an opportunity for a hearing on the Center's proposal to withdraw the approval of an application approved under § 601.40 or § 601.41. The notice, which will ordinarily be a letter, will state generally the reasons for the action and the proposed grounds for the order.

(c) *Submission of data and information.* (1) If the applicant fails to file a written request for a hearing within 15 days of receipt of the notice, the applicant waives the opportunity for a hearing.

(2) If the applicant files a timely request for a hearing, the agency will publish a notice of hearing in the Federal Register in accordance with §§ 12.32(e) and 15.20 of this chapter.

(3) An applicant who requests a hearing under this section must, within 30 days of receipt of the notice of opportunity for a hearing, submit the data and information upon which the applicant intends to rely at the hearing.

(d) *Separation of functions.* Separation of functions (as specified in § 10.55 of this chapter) will not apply at any point in withdrawal proceedings under this section.

(e) *Procedures for hearings.* Hearings held under this section will be conducted in accordance with the provisions of part 15 of this chapter, with the following modifications:

(1) An advisory committee duly constituted under part 14 of this chapter will be present at the hearing. The committee will be asked to review the issues involved and to provide advice and recommendations to the Commissioner of Food and Drugs.

(2) The presiding officer, the advisory committee members, up to three representatives of the applicant, and up to three representatives of the Center may question any person during or at the conclusion of the person's presentation. No other person attending the hearing may question a person making a presentation. The presiding officer may, as a matter of discretion, permit questions to be submitted to the presiding officer for response by a person making a presentation.

(f) *Judicial review.* The Commissioner's decision constitutes final agency action from which the applicant may petition for judicial review. Before requesting an order from a court for a stay of action pending review, an applicant must first submit a

petition for a stay of action under § 10.35 of this chapter.

**§ 601.44   Postmarketing safety reporting.**

Biological products approved under this program are subject to the postmarketing recordkeeping and safety reporting applicable to all approved biological products.

**§ 601.45   Promotional materials.**

For biological products being considered for approval under this subpart, unless otherwise informed by the agency, applicants must submit to the agency for consideration during the preapproval review period copies of all promotional materials, including promotional labeling as well as advertisements, intended for dissemination or publication within 120 days following marketing approval. After 120 days following marketing approval, unless otherwise informed by the agency, the applicant must submit promotional materials at least 30 days prior to the intended time of initial dissemination of the labeling or initial publication of the advertisement.

**§ 601.46   Termination of requirements.**

If FDA determines after approval that the requirements established in § 601.42, § 601.43, or § 601.45 are no longer necessary for the safe and effective use of a biological product, it will so notify the applicant. Ordinarily, for biological products approved under § 601.41, these requirements will no longer apply when FDA determines that the required postmarketing study verifies and describes the biological product's clinical benefit and the biological product would be appropriate for approval under traditional procedures. For biological products approved under § 601.42, the restrictions would no longer apply when FDA determines that safe use of the biological product can be assured through appropriate labeling. FDA also retains the discretion to remove specific postapproval requirements upon review of a petition submitted by the sponsor in accordance with § 10.30.

Dated: December 7, 1992.

**David A. Kessler,**

*Commissioner of Food and Drugs.*

**Louis W. Sullivan,**

*Secretary of Health and Human Services.*

[FR Doc. 92–30129 Filed 12–9–92; 9:51 am]

BILLING CODE 4160-01-F