## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

**State of Missouri,** *et al.,*

    *Intervenor-Plaintiffs,* and

**State of Florida, State of Texas,**

    *Proposed Intervenor-Plaintiffs,*

 and

**Rosalie Markezich** and **State of Louisiana**, by and through its Attorney General, **Liz Murrill,**

    *Proposed Intervenor-Plaintiffs,*

v.

**United States Food and Drug Administration,** *et al.,*

    *Defendants,* and

**Danco Laboratories, LLC,**

    *Intervenor-Defendant*, and

**GenBioPro, Inc.,**

    *Intervenor-Defendant.*

Civ. No. 2:22-cv-00223-Z

## APPENDIX IN SUPPORT OF PROPOSED INTERVENOR-PLAINTIFFS ROSALIE MARKEZICH AND THE STATE OF LOUISIANA'S MOTION TO INTERVENE

## VOLUME A

App i

## INDEX

| VOLUME A | |
|---|---|
| Ex. 1: Society of Family Planning, #WeCount Report April 2022 to June 2024 (Oct. 22, 2024) | App. 1-57 |
| Ex. 2: Society of Family Planning, #WeCount Report April 2022 to December 2024 (Jun. 23, 2025) | App. 58-125 |
| Ex. 3: 2021 FDA Letter to ACOG and SMFM About Mifepristone REMS (Apr. 12, 2021) | App. 126-128 |
| Ex. 4: Dr. Margaret Carpenter indictment | App. 129-131 |
| Ex. 5: Center for Drug Evaluation and Research, Application Number: 20-687 Medical Review(s) (Jan. 27, 2000 | App. 132-175 |
| Ex. 6: Blake M. Autry & Roopma Wadhwa, *Mifepristone*, StatPearls (Feb. 28, 2024) | App. 176-184 |
| Ex. 7: *The Facts on Mifepristone,* Planned Parenthood | App. 185-188 |
| Ex. 8: *Medication Abortion: Your Questions Answered*, Yale Med. (Sept. 11, 2023 | App. 189-194 |
| Ex. 9: FDA-Approved Label for Mifepristone (Mifeprex) (Jan. 2023) ("Mifeprex 2023 Label") | App. 195-214 |
| Ex. 10: 2021 FDA Letter to AAPLOG and Am. Coll. of Pediatricians denying in part and granting in part 2016 Citizen Petition, Docket No. FDA-2019-P-1534 (Dec. 16, 2021) | App. 215-255 |
| Ex. 11: Center for Drug Evaluation and Research, Application Number: 020687Orig1s020 Summary Review (Mar. 29, 2016) ("FDA 2016 Summary Review") | App. 256-284 |
| Ex. 12: Maarit Niinimaki et al., *Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study*, BMJ (April 20, 2011) | App. 285-292 |
| Ex. 13: Jamie Bryan Hall & Ryan T. Anderson, *The Abortion Pill Harms Women: Insurance Data Reveals One in Ten Patients Experiences a Serious Adverse Event,* Ethics & Pub. Pol'y Ctr. (Apr. 28, 2025) | App. 293-299 |
| Ex. 14: James Studnicki et al., *Comparative Acuity of Emergency Department Visits Following Pregnancy Outcomes Among Medicaid Eligible Women, 2004–2015*, Int'l J. Epidemiology & Pub. Health Rsch., Apr. 2024 | App. 300-304 |
| Ex. 15: *Will a doctor be able to tell if you've taken abortion pills?* Women Help Women (Sept. 23, 2019) | App. 305-307 |
| Ex. 16: *How do you know if you have complications and what should you do?* Aid Access | App. 308-310 |

| | |
|---|---|
| Ex. 17: *Am. Coll. of Obstetricians and Gynecologists Practice Bulletin No. 181: Prevention of Rh D Alloimmunization*, 130 Obstetrics & Gynecology 481 (Aug. 2017) | App. 311-325 |
| Ex. 18: Katherine A. Rafferty & Tessa Longbons, *#AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives*, 36 Health Commc'n 1485 (2021 | App. 326-336 |
| Ex. 19: Population Council | App. 337-351 |
| Ex. 20: 2002 Citizen Petition of AAPLOG to FDA (Aug. 8, 2002) ("2002 Citizen Petition") | App. 352-444 |
| Ex. 21: Robert O'Harrow Jr., *Drug's U.S. Marketer Remains Elusive*, Wash. Post (Oct. 11, 2000) | App. 445-448 |
| Ex. 22: Hannah Levintova, *The Abortion Pill's Secret Money Men*, Mother Jones (March–April 2023) | App. 449-459 |
| Ex. 23: Letter from Center for Drug Evaluation and Research to Ann Robbins, Ph.D. (Sept. 18, 1996) | App. 460-470 |
| Ex. 24: 2000 FDA Approval Letter for Mifeprex (mifepristone) Tablets (Sept. 28, 2000) | App. 471-474 |
| Ex. 25: 2019 FDA ANDA Approval Letter to GenBioPro, Inc. (Apr. 11, 2019) | App. 475-481 |
| Ex. 26: FDA Center for Drug Evaluation & Research Letter to Population Council re: NDA (Feb. 18, 2000) | App. 482-489 |
| Ex. 27: 2000 FDA Approval Memo. to Population Council re: NDA 20-687 Mifeprex (mifepristone) (Sept. 28, 2000) | App. 490-498 |
| Ex. 28: Identification of Drug and Biological Products Deemed to Have Risk Evaluation and Mitigation Strategies for Purposes of the Food and Drug Administration Amendments Act of 2007, 73 Fed. Reg. 16313, 16314 (Mar. 27, 2008) | App. 499-501 |
| Ex. 29: 2011 FDA Supplemental Approval Letter to Danco Laboratories, LLC (June 8, 2011) ("2011 Approval Letter") | App. 502-506 |
| Ex. 30: 2011 REMS for NDA 20-687 Mifeprex (mifepristone) Tablets, 200mg (June 8, 2011) ("2011 REMS") | App. 507-517 |
| VOLUME B | |
| Ex. 31: 2016 FDA Letter to AAPLOG, Christian Medical & Dental Associations, and Concerned Women for America denying 2002 Citizen Petition, Docket No. FDA2002-P-0364 (Mar. 29, 2016) ("2016 Petition Denial") | App. 518-551 |
| Ex. 32: 2020 Letter from ACOG & SMFM to FDA about Mifepristone REMS (Apr. 20, 2020) ("2020 ACOG-SMFM Letter") | App. 552-555 |
| Ex. 33: Students for Life of America, Citizen Petition to FDA (Dec. 13, 2022) | App. 556-623 |

| | |
|---|---|
| Ex. 34: 2023 FDA Letter to Students for Life of Am. denying 2022 SFLA Petition, Docket No. FDA-2022-P-3209 (Jan. 3, 2023) | App. 624-626 |
| Ex. 35: 2021 FDA Center for Drug Evaluation & Research Director Patrizia Cavazzoni Letter to Dr. Graham Chelius (Dec. 16, 2021) | App. 627-628 |
| Ex. 36: Oral History Interview with Ruth B. Merkatz (Oct. 16, 2019) | App. 629-727 |
| Ex. 37: White House, Readout of White House Roundtable Meeting with Women's Rights and Reproductive Health Leaders (Sept. 3, 2021) | App. 728-731 |
| Ex. 38: White House, Press Briefing by Press Secretary Jen Psaki and Deputy National Security Advisor for Cyber and Emerging Technologies Anne Neuberger, September 2, 2021 (Sept. 2, 2021) | App. 732-769 |
| Ex. 39: Ian Millhiser, *It sure sounds like Roe v. Wade is doomed*, Vox (Dec. 1, 2021) | App. 770-778 |
| Ex. 40: White House, Remarks by President Biden Before Meeting with His Task Force on Reproductive Healthcare Access (Jan. 22, 2024) | App. 779-786 |
| Ex. 41: White House, Remarks by President Biden on the Supreme Court's Decision on Affirmative Action (June 29, 2023) | App. 787-794 |
| Ex. 42: White House, FACT SHEET: President Biden to Sign Executive Order Protecting Access to Reproductive Health Care Services (July 8, 2022) | App. 795-802 |
| Ex. 43: White House, Remarks by President Biden on the Supreme Court Decision to Overturn *Roe v. Wade* (June 24, 2022) | App. 803-809 |
| Ex. 44: Exec. Order No. 14076, Protecting Access to Reproductive Healthcare Services, 87 Fed. Reg. 42053 (July 8, 2022) | App. 810-813 |
| Ex. 45: Exec. Order No. 14079, Securing Access to Reproductive and Other Healthcare Services, 87 Fed. Reg. 49505 (Aug. 3, 2022) | App. 814-817 |
| Ex. 46: Presidential Memorandum, Further Efforts To Protect Access to Reproductive Healthcare Services, 88 Fed. Reg. 4895 (Jan. 22, 2023) | App. 818-821 |
| Ex. 47: White House, FACT SHEET: President Biden Announces Actions In Light of Today's Supreme Court Decision on *Dobbs v. Jackson Women's Health Organization* (June 24, 2022) | App. 822-824 |
| Ex. 48: Press Release, HHS, HHS Secretary Becerra's Statement on Supreme Court Ruling in *Dobbs v. Jackson Women's Health Organization* (June 24, 2022) | App. 825-826 |
| Ex. 49: Press Release, HHS, Remarks by Secretary Xavier Becerra at the Press Conference in Response to President Biden's Directive following Overturning of Roe v. Wade (June 28, 2022) | App. 827-830 |
| Ex. 50: Center for Drug Evaluation and Research, Application Number: 020687Orig1s025 Summary Review (Jan. 3, 2023) ("FDA 2023 Summary Review") | App. 831-920 |

App iv

| | |
|---|---|
| Ex. 51: Center for Drug Evaluation and Research, Application Numbers: 020687 and 91178 Rationale Review (Dec. 16, 2021) ("FDA 2021 Rationale Review") | App. 921-971 |
| Ex. 52: FDA Adverse Events Reporting System (FAERS) Public Dashboard | App. 972-989 |
| Ex. 53: Kathi A. Aultman et al., *Deaths and Severe Adverse Events After the Use of Mifepristone as an Abortifacient from September 2000 to February 2019,* 26 Issues in L. & Med., no. 1, Nov. 1, 2021 | App. 990-1015 |
| Ex. 54: *Specifications for Preparing and Submitting Electronic ICSRs and ICSR Attachments* (Apr. 2021) | App. 1016-1064 |
| VOLUME C | |
| Ex. 55: Christiana A. Cirucci et al., *Mifepristone Adverse Events Identified by Planned Parenthood in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting System and Those Obtained Through the Freedom of Information Act*, 8 Health Servs. Rsch & Managerial Epidemiology 1, 1 (2021) | App. 1065-1070 |
| Ex. 56: Pam Belluck, *CVS and Walgreens Will Begin Selling Abortion Pills this Month*, N.Y. Times (Mar. 1, 2024) | App. 1071-1076 |
| Ex. 57: 2019 REMS Single Shared System for Mifepristone 200MG (Apr. 2019) | App. 1077-1085 |
| Ex. 58: HHS, Marking the 50th Anniversary of Roe: Biden-Harris Administration Efforts to Protect Reproductive Health Care (Jan. 19, 2023) | App. 1086-1092 |
| Ex. 59: Press Release, HHS, HHS Releases Report Detailing Biden-Harris Administration Efforts to Protect Reproductive Health Care Since Dobbs (Jan. 19, 2023) | App. 1093-1096 |
| Ex. 60: White House, FACT SHEET: The Biden-Harris Administration's Record on Protecting Access to Medication Abortion (Apr. 12, 2023) | App. 1097-1099 |
| Ex. 61: HHS, Secretary's Report, Health Care Under Attack: An Action Plan to Protect and Strengthen Reproductive Care (Aug. 2022) | App. 1100-1123 |
| Ex. 62: Abuzz, *Abortion Pill Access in Louisiana* | App. 1124-1126 |
| Ex. 63: Abuzz, *Need abortion care at home?* | App. 1127-1133 |
| Ex. 64: A Safe Choice, *Home* | App. 1134-1140 |
| Ex. 65: A Safe Choice, *Online Consultation Form* | App. 1141-1143 |
| Ex. 66: Choices Rising, *Abortion Pill* | App. 1144-1148 |

| | |
|---|---|
| Ex. 67: MAP, *Frequently asked questions* | App. 1149-1152 |
| Ex. 68: Scott Calvert, *The Parties Where Volunteers Pack Abortion Pills for Red-State Women*, Wall St. J. (Aug. 12, 2024) | App. 1153-1160 |
| Ex. 69: Rachel Roubein, *'Shield' Laws Make it Easier to Send Abortion Pills to Banned States*, Wash. Post. (July 20, 2023) | App. 1161-1166 |
| Ex. 70: Rebecca Grant, *Group Using 'Shield Laws' to Provide Abortion Care in States That Ban It*, The Guardian (July 23, 2023) | App. 1167-1170 |
| Ex. 71: Aid Access, *Get Abortion Pill Online in Louisiana* | App. 1171-1175 |
| Ex. 72: Elissa Nadworny, I*nside a medical practice sending abortion pills to states where they're banned,* NPR (Aug. 7, 2024) | App. 1176-1183 |
| Ex. 73: Abigail Brooks & Dasha Burns, *How a network of abortion pill providers works together in the wake of new threats*, NBC News (April 7, 2024) | App. 1184-1191 |
| Ex. 74: Pam Belluck, *Abortion Shield Laws: A New War Between the States*, N.Y. Times (Feb. 22, 2024) | App. 1192-1209 |
| Ex. 75: Caroline Kitchener, *Alone in a bathroom: The fear and uncertainty of a post-Roe medication abortion*, Wash. Post (April 11, 2024) | App. 1210-1244 |
| Ex. 76: Her Safe Harbor, *Abortion Pills Online* | App. 1245-1250 |
| Ex. 77: Pam Belluck, *A day with one abortion pill prescriber*, N.Y. Times (Jun. 9, 2025) | App. 1251-1264 |
| VOLUME D | |
| Ex. 78: Abuzz, *FAQs* | App. 1265-1278 |
| Ex. 79: ACT, *Who We Are* | App. 1279-1283 |
| Ex. 80: ACT, *What We Do* | App. 1284-1288 |
| Ex. 81: ACT, *FAQs* | App. 1289-1293 |
| Ex. 82: ACT, *Resources* | App. 1294-1297 |
| Ex. 83: Alaa Elassar, *New York Doctor Indicted in Louisiana Abortion Case Recognized as a Leader in Women's Reproductive Health*, CNN (Feb. 23, 2025) | App. 1298-1311 |
| Ex. 84: Rosemary Westwood, *After Historic Indictment, Doctors Will Keep Mailing Abortion Pills Over State Lines*, NPR (Mar. 19, 2025) | App. 1312-1322 |

| | |
|---|---|
| Ex. 85: Katherine Donlevy, *Louisiana DA warns there's trove of evidence against NY doctor who allegedly mailed abortion pills to teen – who was planning gender reveal party: report*, New York Post (Feb. 15, 2025) | App. 1323-1328 |
| Ex. 86: Lorena O'Neil, *Louisiana Mother Pleads Not Guilty Following Abortion Pill Indictment*, La. Illuminator (Mar. 11, 2025) | App. 1329-1332 |
| Ex. 87: Press Release, ACT, Statement on Governor Hochul's Response to Louisiana Extradition Order (Feb. 13, 2025) | App. 1333-1334 |
| Ex. 88: Press Release, Protecting Reproductive Freedom: Governor Hochul Signs Legislation Affirming New York's Status as a Safe Haven for Reproductive Health Care (Feb. 3, 2025) | App. 1335-1345 |
| Ex. 89: Rosemary Westwood, *Louisiana Investigates Second Case Against New York Doctor Over Mailing Abortion Pills*, La. Illuminator (May 13, 2025) | App. 1346-1348 |
| Ex. 90: Governor Kathy Hochul (GovKathyHochul), X (May 13, 2025, 4:28 PM) | App. 1349-1350 |
| Ex. 91: Society of Family Planning, #WeCount Report April 2022 to December 2024 (Jun. 23, 2025) | App. 1351-1368 |
| Ex. 92: Rosalie Markezich Declaration | App. 1369-1374 |
| Ex. 93: *Exhibit 5: Medicaid as a Share of States' Total Budgets and State-Funded Budgets, SFY 2021,* Medicaid and CHIP Payment and Access Commission (MACPAC) (2023) | App. 1375-1378 |
| Ex. 94: Julie O'Donoghue, *Louisiana Medicaid Set to Grow Under Landry, Even as D.C. May Force Cuts,* La. Illuminator, (Mar. 26, 2025) | App. 1379-1384 |
| Ex. 95: Louisiana Department of Health, Medicaid Annual Report 2022/2023 | App. 1385-1510 |
| Ex. 96: Marc Roemer, HHS, Agency for Healthcare Research and Quality, *Costs of Treat-and-Release Emergency Department Visits in the United States, 2021* (September 2024) | App. 1511-1524 |
| Ex. 97: Hospital Services Provider Manual: Chapter Twenty-Five of the Medicaid Services Manual, State of Louisiana Bureau of Health Services Financing, § 25.2 (July 1, 2011) | App. 1525-1623 |
| Ex. 98: Louisiana Medicaid Hospital Ambulatory Surgery Fee Schedule: State Hospitals (Effective Jan. 1, 2025) | App.1624-1692 |
| Ex. 99: Louisiana Medicaid Hospital Ambulatory Surgery Fee Schedule: Rural Hospitals (Effective Jan. 1, 2025) | App. 1693-1760 |
| Ex. 100: Louisiana Medicaid Hospital Ambulatory Surgery Fee Schedule: Non-Rural and Non-State Hospitals (Effective Jan. 1, 2025) | App. 1761-1829 |

| | |
|---|---|
| Ex. 101: Medicaid Services, Louisiana Department of Health | App. 1830-1839 |
| Ex. 102: State Hospitals Outpatient Services Fee Schedule (Effective Jan. 1, 2025) | App. 1840-1935 |
| Ex. 103: Small Rural Hospital Outpatient Services Fee Schedule (Effective Jan. 1, 2025) | App. 1936-2031 |
| Ex. 104: Louisiana Medicaid Hospital Provider Inpatient Per Diem Rates (Effective 7/1/2024) | App. 2032-2038 |
| Ex. 105: Pam Belluck, *California Passes Bill Allowing Omission of Patients' Names from Abortion Pill Bottles*, N.Y. Times (Sept. 11, 2025) | App. 2039-2043 |
| Ex. 106: The Associated Press, *Texas Has a New Abortion Pill Law. But At Least One Provider Plans to Keep Shipping Them There,* Newsday (Sept. 18, 2025) | App. 2044-2047 |
| Ex. 107: Caroline Kitchener, *Blue-state doctors launch abortion pill pipeline into states with bans*, Wash. Post (July 19, 2023) | App. 2048-2061 |

# EXHIBIT 1

Society of Family Planning, #WeCount
Report April 2022 to June 2024
(Oct. 22, 2024)



**#WeCount Report**
April 2022 to June 2024
Released: October 22, 2024

This is the eighth in a series of reports. Please see www.SocietyFP.org/WeCount for past and future reports. Cite this report using the following DOI: 10.46621/728122kflzwf

**Introduction**

Abortion is a fundamental component of reproductive health care and an essential health service.[1] Access to abortion not only allows individuals to make critical decisions regarding their bodies and life circumstances, but also enables people to receive lifesaving and stabilizing pregnancy care when an unexpected problem arises. Access to safe and legal abortion services ensures that people can manage unplanned pregnancies, protect their health, and maintain autonomy over their reproductive choices. When individuals are denied an abortion, by way of abortion restrictions, they may face a range of serious consequences, including physical and mental health risks, financial strain, and disruptions to their education or career goals.[2–5] Being denied an abortion impacts not only the individual but also their families and communities. Ensuring access to abortion is essential for promoting overall health and well-being.

#WeCount is a national effort that aims to report the monthly number of abortions in the United States, by state and month starting in April 2022. #WeCount data include clinician-provided abortions, defined in this report as medication or procedural abortions completed by a licensed clinician within the US in a clinic, private medical office, hospital, or virtual-only clinic (ie, clinics that only provide telehealth abortions). This report does not reflect any self-managed abortions, defined as ending a pregnancy outside the formal healthcare system, including using medications, herbs, or something else, or obtaining pills from friends or online without clinician assistance. These data reflect the status of abortion provision in the US and can be used by healthcare systems, public health practitioners, and policymakers so that their decisions can be informed by evidence.

This is the 8th in the series of #WeCount reports. Since our first report we have seen significant changes in the abortion care landscape, some of which were driven by the growth of telehealth abortion care that first began during the COVID-pandemic in 2020 and some of which were driven by the *Dobbs v Jackson's Women's Health Organization* US Supreme Court decision in 2022. Following the *Dobbs* decision, some states have

banned abortion except in rare exceptions, other states have expanded access—either through state legislatures or through referendums and judicial decisions.

Aside from the first #WeCount report, each subsequent report has found a small increase in the national monthly number of abortions. While several factors may be driving this increase, one important factor visible in the #WeCount data is the expansion of telehealth models of abortion care. In the context of this report, we define a telehealth abortion as medication abortion offered by a clinician through a remote consultation with the patient (via video, phone, or messaging) that results in medications dispensed via mail.[1] All telehealth abortions are counted according to the state to which the medications are mailed. Since the start of #WeCount in April 2022, we have been reporting telehealth abortions provided by virtual-only clinics. Starting in July 2023, #WeCount began to enumerate telehealth abortion numbers provided by brick-and-mortar abortion facilities (which were previously included as part of the state and national totals) separately to provide a more comprehensive picture of the total number of telehealth abortions.

Also starting in July 2023, we began to include abortions provided by licensed clinicians in states with shield laws in place. Shield laws give some legal protections to clinicians who offer abortion care via telehealth to people living in states with total abortion bans, with 6-week bans, or with laws that explicitly or implicitly preclude a component of telehealth abortion, such as requiring in-person ultrasounds. In this report, for the first time, we provide data on the number of abortions provided under shield laws by state, including for states with abortion bans and restrictions.

**National findings**

- The monthly average national abortion volume in the first six months of 2024 was nearly 98,000 abortions, which is higher than the national monthly averages for 2022 or 2023 (Figures 1 and 2). Monthly totals across the reporting period of April 2022 to June 2024 vary modestly month-to-month. In the three most recent months of data collection, we observed between 91,510 abortions (in June 2024) and 98,920 abortions (in April 2024) (Table 1).
- Nationally, abortions increased from 260,730 in the second quarter of 2023 to 289,270 in the second quarter of 2024. This national increase of 11% is due in part to increases in telehealth abortion.
  - When we examine all abortions provided via telehealth, we observe a 155% increase (from 22,430 in the second quarter of 2023 to 57,150 in the second quarter of 2024). When we exclude abortions provided under shield laws from the counts in the second quarter of 2024, we still observe a 25% increase in telehealth abortions between these two periods.

---

[1] Although sometimes used interchangeably, the terms telehealth and telemedicine have different meanings. Briefly, telehealth is a broad term that encompasses administrative, clinical, and (patient and clinician) educational services provided remotely, while telemedicine refers specifically to the delivery of clinical services remotely.

- In the same period, the numbers of in-person abortions have stayed relatively consistent across years (over 238,000 in the second quarter of 2023 and over 232,000 in the second quarter of 2024), representing a 3% decrease.
- In comparing monthly totals across years, we note the increases in abortion provision in the US throughout 2023 and 2024. Part of the increase in 2023 is due to our inclusion of abortions that were provided under shield laws for the first time in July 2023. While some of abortion provision under shield laws represents new services, at least one large service had offered care previously, supported by clinicians outside the US.[6] Thus, while abortions provided by these services were newly counted by #WeCount as of July 2023, a significant number of abortions were obtained via this service in months prior that are not reflected in our data.
- We also note the seasonality of abortion provision (that is, abortion incidence is higher in some months and lower in others every year). For example, we see drops in February and November and peaks in January and August every year (Figure 2).

**Figure 1.** Abortions in the US from April 2022 to June 2024



**Figure 2.** Abortions in the US from April 2022 to June 2024, year over year



April 2022 to June 2024, year over year

## Telehealth findings

- In April-June 2024, we observed an average of over 19,000 telehealth abortions per month (Table 2).
- In April-June 2024, we observed an average of over 7,700 monthly telehealth abortions provided under shield laws to people in states with total abortion bans or 6-week bans, and nearly 2,000 monthly telehealth abortions provided under shield laws to people in states with restrictions that explicitly ban telehealth abortion or implicitly preclude telehealth due to in-person visit requirements. (Figure 3). This amounts to an average monthly number of telehealth abortions provided under shield laws in April-June 2024 of over 9,700.
- In April-June 2024, we observed a national average of nearly 1,800 brick-and-mortar telehealth abortions per month (Figure 4).
- The number of telehealth abortions provided by all categories of providers (for example, virtual-only, brick-and-mortar) appear to be increasing (Figure 4).
- As the number of abortions has been increasing nationally, so too has the proportion of abortions that are provided through telehealth (Figures 5 and 6).
- Telehealth represented 19% of all abortions in April 2024, 20% in May, and 20% in June. The average was 20% for the quarter. (Figures 6 and 7)
- Nationally, telehealth abortions grew from 4% of all abortions in April 2022 to 20% in June 2024 (Table 2).
- During April-June 2024, the proportion of abortions provided by telehealth (in states where permitted) ranged from 8% in New York to 55% in Wyoming. (Figure 8).

**Figure 3.** Abortions provided under shield laws in the US from July 2023 to June 2024



**Figure 4.** Telehealth abortions in the US from April 2022 to June 2024 (includes abortions provided under shield laws, July 2023 to June 2024)



*Note: Prior to July 2023, brick and mortar telehealth abortions were categorized as in-person.*

**Figure 5.** Abortions in the US from April 2022 to June 2024



*Notes: Includes abortions provided under shield laws, July 2023 to June 2024.*
*Prior to July 2023, brick and mortar telehealth abortions were categorized as in-person.*

**Figure 6.** Abortions in the US, 2022-2024 quarterly totals and distribution between in-person versus telehealth



*Note: 2023 Q3 reflects the first period in which telehealth abortions provided by brick-and-mortar facilities were disaggregated from total abortions and reported to #WeCount; additionally, 2023 Q3 reflects the start of abortion provision under shield laws.*

**Figure 7.** Abortions in the US, 2022-2024 in-person and telehealth quarterly totals



*Note: 2023 Q3 reflects the first period in which telehealth abortions provided by brick-and-mortar facilities were disaggregated from total abortions and reported to #WeCount; additionally, 2023 Q3 reflects the start of abortion provision under shield laws.*

**Figure 8.** Proportion of abortions provided by telehealth versus in-person in states where abortion is permitted from April to June 2024



April 2024 to June 2024, % provided via telehealth in states where permitted

**States where abortion remained legal but access was limited**

In April-June 2024, Florida, Georgia, and South Carolina were the three states where abortion was banned after detection of embryonic cardiac activity, also referred to as a "6-week ban," because detection of such activity usually occurs around that point in pregnancy. Florida's 6-week ban went into effect on May 1, 2024. These states also explicitly ban telehealth abortion (Florida, Georgia) or implicitly preclude telehealth due to in-person visit requirements (Iowa).

- Florida saw a large increase in abortions just before the state enacted its 6-week ban. We observed about 8,400 abortions in January, 7,900 in February, and 8,300 in March, and then the number rose to over 10,100 abortions in April 2024. In subsequent months, the monthly abortion counts declined to about 6,200 in May and further down to 5,600 in June. Between March and May, Florida saw a decline of about 2,500 in-person abortions, but an increase of only about 400 abortions provided under shield laws.
- In Georgia, in April, May, and June there was an average of nearly 2,200 in-person abortions per month, and about 750 telehealth abortions per month.

- In South Carolina, in April, May, and June 2024, there were about as many abortions provided by telehealth (average 270) as there were provided in-person (average 260).

**States where abortion via telehealth is restricted**

In April-June 2024, in Arizona, Iowa, Nebraska, South Carolina, and Wisconsin, abortion was legal beyond 6-weeks but laws either banned telehealth abortion explicitly or restrictions implicitly precluded a component of telehealth. Some of these states have severely restricted access, as described above. However, these states are being served by abortion providers operating under shield laws.

- In Arizona between April to June 2024, we observed an average of nearly 1,100 in-person abortions per month, with another 300 provided through telehealth.
- In Iowa, we observed an average of about 260 in-person abortions per month, with another 130 abortions provided through telehealth.
- In Nebraska, we observed an average of about 220 in-person abortions per month, with another 70 provided through telehealth.
- In Ohio, we observed an average of about 2,100 in-person abortions per month, with another 500 provided through telehealth.
- In Wisconsin, we observed an average of 410 in-person abortions per month, with another 150 provided through telehealth.

**States with abortion bans**

In total, 14 states (Alabama, Arkansas, Idaho, Kentucky, Louisiana, Mississippi, Missouri, North Dakota, Oklahoma, South Dakota, Tennessee, Texas, West Virginia, and Wisconsin) have had total abortion bans for the majority of the 24 months since the *Dobbs* decision. In this report, we include the number of abortions provided under shield laws to states with abortion bans, as these represent abortions provided to residents of these states without travel to another state (Table 1). These numbers reflect location of receipt, not the state from which the medications were sent.

- In Alabama, between July 2023 to June 2024, we observed a range from 220 to 440 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 433 abortions per month.
- In Arkansas, between July 2023 to June 2024, we observed a range from 130 to 260 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 240 abortions per month.

- In Idaho, between July 2023 to June 2024, we observed a range from 30 to 70 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 57 abortions per month.
- In Kentucky, between July 2023 to June 2024, we observed a range from 120 to 230 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 210 abortions per month.
- In Louisiana, between July 2023 to June 2024, we observed a range from 310 to 620 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 617 abortions per month.
- In Mississippi, between July 2023 to June 2024, we observed a range from 200 to 420 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 390 abortions per month.
- In Missouri, between July 2023 to June 2024, we observed a range from 100 to 180 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 167 abortions per month.
- In North Dakota, between July 2023 to June 2024, we observed a range from 10 to 30 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 20 abortions per month.
- In Oklahoma, between July 2023 to June 2024, we observed a range from 120 to 260 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 250 abortions per month.
- In South Dakota, between July 2023 to June 2024, we observed a range from 10 to 30 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 27 abortions per month.
- In Tennessee, between July 2023 to June 2024, we observed a range from 230 to 470 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 460 abortions per month.
- In Texas, between July 2023 to June 2024, we observed a range from 1,680 to 2,910 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 2,800 abortions per month.
- In West Virginia, between July 2023 to June 2024, we observed a range from 30 to 60 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 53 abortions per month.

- In Wisconsin, between July 2023 to June 2024, we observed a range from 100 to 160 in the number of abortions delivered via telehealth. In the most recent quarter (April to June 2024), the average number of telehealth abortions provided under shield laws was 147 abortions per month.

**Abortions provided to state residents in-state, out-of-state, and via telehealth**

This report makes available for the first time monthly counts of clinician-provided medication abortion delivered via telehealth to specific states. These numbers are actual counts collected by #WeCount of all known provider groups offering this telehealth service. We combine the numbers of medication abortions provided under shield laws with data reflecting 12-month totals from the Guttmacher Institute's Monthly Abortion Provision Study. We present a combination of #WeCount data about abortions provided under shield laws with state-of-residence data for: states with total abortion bans, states with 6-week bans, and states with restrictions that preclude a component of telehealth abortion July to December 2023. We do not provide combined data for Indiana, South Carolina, and Wisconsin because instability in the legal status of abortion in these states prevent us from dividing the 12-month abortion totals into a 6-month period.

*States with abortion bans*

In one half of 2020, we estimate Alabama residents obtained approximately 4,460 abortions; 2,415 were obtained at facilities in state and 2,045 were to Alabama residents who traveled to another state for care (Figure 9). By 2023, Alabama had implemented an abortion ban. In the second half of 2023 an estimated 3,395 residents traveled out of state for care and 1,720 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 5,115 abortions among Alabama residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 9. Alabama, six months of 2020 and 2023, respectively**



Legend:
- Provided under shield laws (#WeCount)
- Obtained through travel out of state (Guttmacher)
- Obtained in-state (Guttmacher)

Alabama, 2020: Obtained in-state 2,415; Obtained through travel out of state 2,045; total 4,460.
Alabama, 2023: Obtained through travel out of state 3,395; Provided under shield laws 1,720; total 5,115.

In one half of 2020, we estimate Arkansas residents obtained approximately 2,220 abortions; 1,425 were obtained at facilities in state and 795 were to Arkansas residents who traveled out of state for care (Figure 10). By 2023, Arkansas had implemented an abortion ban. In the second half of 2023, an estimated 1,280 residents travelled out of state for care and 970 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 2,250 abortions among Arkansas residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 10. Arkansas, six months of 2020 and 2023, respectively**



In one half of 2020, we estimate Idaho residents obtained approximately 1,030 abortions; 705 were obtained at facilities in state and 235 were to Idaho residents who traveled to another state for care (Figure 11). By 2023, Idaho had implemented an abortion ban. In the second half of 2023, an estimated 635 residents travelled out of state for care and 280 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 895 abortions among Idaho residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 11. Idaho, six months of 2020 and 2023, respectively**



In one half of 2020, we estimate Kentucky residents obtained approximately 2,805 abortions; 1,730 were obtained at facilities in the state and 1,075 were to Kentucky residents who traveled to another state for care (Figure 12). By 2023, Kentucky had implemented an abortion ban. In the second half of 2023, an estimated 2,210 residents travelled out of state for care and 950 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 3,160 abortions among Kentucky residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 12. Kentucky**



In one half of 2020, we estimate Louisiana residents obtained approximately 3,805 abortions; 3,070 were obtained at facilities in the state and 735 were to Louisiana residents who traveled to another state for care (Figure 13). By 2023, Louisiana had implemented an abortion ban. In the second half of 2023, an estimated 1,700 residents travelled out of state for care and 2,480 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 4,180 abortions among Louisiana residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 13. Louisiana, six months of 2020 and 2023, respectively**



In one half of 2020, we estimate Mississippi residents obtained approximately 2,850 abortions; 1,600 were obtained at facilities in state and 1,250 were to Mississippi residents who traveled to another state for care (Figure 14). By 2023, Mississippi had implemented an abortion ban. In the second half of 2023, an estimated 1,735 residents travelled out of state for care and 1,570 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 3,305 abortions among Mississippi residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 14. Mississippi, six months of 2020 and 2023, respectively**



In one half of 2020, we estimate Missouri residents obtained approximately 5,795 abortions; 70 were obtained at facilities in state and 5,725 were to Missouri residents who traveled to another state for care (Figure 15). By 2023, Missouri had implemented an abortion ban. In the second half of 2023, an estimated 5,800 residents were able travel out of state for care and 780 obtained abortion medications from health care providers operating under of shield laws. We calculate a possible total of 6,580 abortions among Missouri residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 15. Missouri, six months of 2020 and 2023, respectively**



In one half of 2020, we estimate Oklahoma residents obtained approximately 4,130 abortions; 3,940 were obtained at facilities in state and 190 were to Oklahoma residents who traveled to another state for care (Figure 16). It is important to note that t the Guttmacher Institute's Abortion Provider Census shows that 2020 and 2019 were unusual years, with the study showing a substantially large increase in the number of abortions in Oklahoma since its data collection in 2017. Concretely, these numbers reflect an increase in the number of abortions in Oklahoma of 103% between 2017 and 2022, compared to 8% nationally.[7,8] By 2023, Oklahoma had implemented an abortion ban. In the second half of 2023, an estimated 1,820 residents travelled out of state for care and 980 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 2,800 abortions among Oklahoma residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 16. Oklahoma, six months of 2020 and 2023, respectively**

In one half of 2020, we estimate South Dakota residents obtained approximately 325 abortions; 55 were obtained at facilities in state and 270 were to South Dakota residents who traveled to another state for care (Figure 17). By 2023, South Dakota had implemented an abortion ban. In the second half of 2023, an estimated 280 residents travelled out of state for care and 90 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 350 abortions among South Dakota residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 17. South Dakota, six months of 2020 and 2023, respectively**

In one half of 2020, we estimate Tennessee residents obtained approximately 5,140 abortions; 4,045 were obtained at facilities in state and 1,095 were to Tennessee residents who traveled to another state for care (Figure 18). By 2023, Tennessee had implemented an abortion ban. In the second half of 2023, an estimated 5,265 residents travelled out of state for care and 1,820 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 7,085 abortions among Tennessee residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 18. Tennessee, six months of 2020 and 2023, respectively**



In one half of 2020, we estimate Texas residents obtained approximately 30,625 abortions; 28,420 were obtained at facilities in state and 2,205 were to Texas residents who traveled to another state for care (Figure 19). By 2023, Texas had implemented an abortion ban. In the second half of 2023, an estimated 17,105 residents were able to travel out of state for care and 12,420 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 29,525 abortions among Texas residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 19. Texas, six months of 2020 and 2023, respectively**



In one half of 2020, we estimate West Virginia residents obtained approximately 835 abortions; 430 were obtained at facilities in state and 405 were to West Virginia residents who traveled to another state for care (Figure 20). By 2023, West Virginia had implemented an abortion ban. In the second half of 2023, an estimated 1,110 residents travelled out of state for care and 210 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 1,310 abortions among West Virginia residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 20. West Virginia, six months of 2020 and 2023, respectively**



### States with 6-week abortion bans

While several states have now have 6-week abortion bans, during the July to December 2023 period, only Georgia falls in this category. In one half of 2020, we estimate Georgia residents obtained approximately 18,115 abortions; 17,255 were obtained at facilities in state and 860 were to Georgia residents who traveled to another state for care (Figure 21). By 2023, Georgia had implemented a 6-week abortion ban. In the second half of 2023, an estimated 11,985 residents obtained abortion care in state, 6,920 travelled out of state for care, and 2,920 obtained abortion medications from health care providers operating under shield laws. We calculate a possible total of 21,825 abortions among Georgia residents in July to December 2023. Not included are an unspecified number of clinician-supported abortions provided from outside the US in 2020 and those sourced from online pharmacies or community networks without clinician support in both 2020 and 2023.

**Figure 21. Georgia, six months of 2020 and 2023, respectively**



### Methods

In early 2022, #WeCount developed a database of all clinics, private medical offices, hospitals, and virtual clinic providers in the US known to offer abortion care. We started with the Abortion Facility Database from Advancing New Standards in Reproductive Health (ANSIRH) at University of California, San Francisco. We also included providers who were participating in the Ryan Training program and the Complex Family Planning

Fellowship, as well as others identified through outreach from AbortionFinder.com, the Society of Family Planning, and the Society for Maternal-Fetal Medicine. Throughout the study period, we added new providers to our database as we became aware of them. In both January and August 2024, we conducted searches within all 50 states and Washington, DC using AbortionFinder.com and INeedanA.com to confirm that our database was updated. We added new clinics that had opened and noted clinics that had closed. This report includes abortions provided under shield laws by US-based licensed providers who are following their own state law.

The data in this report includes the monthly counts reported by providers for April 2022 through June 2024. We continued to recruit abortion providers and request reporting throughout the study period, incorporating and updating their numbers into each data release. The Society provided compensation to participating facilities for each monthly submission.

In total, 81% of the abortions we counted across the study period were based on data obtained from providers or health departments, while the remaining 19% of the data were imputed. The magnitude of imputation in each state is noted with symbols in the data tables. In 12 states, we had complete reporting from all abortion providers known to #WeCount. In four states (Idaho, Indiana, Texas, and West Virginia) we used state health department data and thus we imputed very little data for those states. In an additional five states (Alabama, Florida, Kentucky, Oklahoma, and South Dakota), we used department of health public data to inform our imputations. In some cases, we divided yearly or quarterly counts into months based on the distribution of abortion volume from sites that did report monthly numbers in that state. In 32 states, we had at least one clinic or hospital known to provide abortions that did not submit any data to #WeCount. In those states, we imputed the number of missing abortions for those clinics or hospitals. We used information from news articles, contacts known to the non-reporting clinics, knowledge of the abortion volumes by state, or the median #WeCount number for the clinic or hospital type. To compute medians, we categorized reporters to #WeCount into five types of facilities and calculated the median for April and May 2022 for each category: 1) small abortion clinics, 2) large abortion clinics, 3) primary care clinics, 4) low volume hospitals, and 5) high volume hospitals. In 39 states, we used clinic-level imputations for at least one clinic in the state that submitted most but not all 27 months of data. For these, we calculated the average percent change in abortion volume in the state and imputed values for clinics with missing months. We also developed imputations for virtual clinics that did not submit data to us, using the median number of abortions that were provided by other virtual clinics in the state

We estimated the number of abortions by state restrictiveness level using three categories: states that banned abortion, states that restricted abortion to before detection of embryonic cardiac activity, also referred to as a "6-week bans", because detection of such activity usually occurs around that point, and states that permitted abortion. These categories were based on the abortion policy in each state on the 15th of each month as reported by the New York Times. For a legal analysis of restrictions

Page **25** of 53

that prevent explicitly ban telehealth or implicitly preclude telehealth abortion, we rely on the RHITES map.

#WeCount estimates the number of abortions in all 50 states. While #WeCount is the only effort that reports the total number of abortions provided via telehealth by state and by month, complementary data collection efforts are critical to the understanding of abortion volume in the years since the *Dobbs* ruling. One such effort is the Guttmacher Institute's Monthly Abortion Provision Study which estimates the number of clinician-provided abortions that take place each month in each US state without a total ban. While #WeCount aims to survey all clinicians providing abortions in the US, the Monthly Abortion Provision Study is based on data from samples of providers, which is combined with extensive historical facility-level data on variations in caseloads over time. In addition to the number of abortions in states without a total ban, the Monthly Abortion Provision Study also systematically collects additional data beyond abortion counts, including state of residence, gestational duration, and a rotating topic relevant to the current policy landscape.

This report uses previously released state-of-residence data reflecting 12-month totals from the Guttmacher Institute's Monthly Abortion Provision Study, accessed on September 11, 2024. As previously discussed, state-of-residence data are reported for 12 months; we have presented half of the 12-month total in order to estimate the 6-month period from July to December 2023. To provide historical context, we also present publicly available data from the Guttmacher Institute's 2020 Abortion Provider Census effort, similarly transforming data from a 12-month period into an estimate of the 6-month period from July to December 2020.

#WeCount was deemed exempt by Advarra IRB. All major decisions were guided by a Research Steering Committee listed here. This research was sponsored by the Society of Family Planning. In the tables, total abortions are presented per month by state, for the US, and by state policy category (banned, 6-week bans, or permitted) for April 2022 to June 2024. Monthly state totals were rounded to the nearest 10. Data that are suppressed are represented by a dash (—) in the table. If the number of abortions for a given state was 0 to 9 for a single month, it was either rounded up to 10 or represented as a dash. Thus, any cell with a dash could represent 0 abortions provided. For states where we did not collect data for a particular time period, geographic region, or service type, we indicate this with an ellipsis (...). In all states telehealth abortions were counted as part of the total for the state to where the medications were mailed.

**Data limitations**

First, and most importantly, research has never accurately captured the underlying need for abortion. For that reason, we advise against inferring a story of access from the number of abortions alone. We are unable to estimate the number of people who were unable to access abortion care and had to carry their unwanted pregnancy to term. The

inability to access abortion was a reality for many people before total abortion bans came into place,[11,12] and remains a reality for many, even in states that permit abortion. We are documenting the number of abortions that occur, and cannot estimate the number of people who wanted and were unable to obtain abortion care. Still, these counts, alone and in conversation with other data, offer an important signal about the present reality of abortion in the US.

Measuring abortion access and use is fraught with challenges.[9] Our findings are all reported at the national or state level, so we cannot describe how smaller geographic regions or individual facilities experienced increases or decreases. Observing the raw data, it is clear that the trends we report at the state level are not universally experienced in smaller regions or by each facility. In addition, we imputed, or estimated, a large number of abortions in California, Florida, New Jersey, and New York, contributing to some uncertainty in those estimates.

In addition, providers in the healthcare system, including those protected by shield laws, are not the only source of abortion medications. We are unable to estimate the number of abortions that occurred outside clinician-provided care, including those provided by online stores that sell abortion medications, volunteer accompaniment networks, and other types of self-managed abortion.

Regarding abortion provided via telehealth, we started measuring telehealth provided by brick-and-mortar clinics in July 2023, so cannot compare to past months. Finally, while we have an accurate count of how many telehealth abortions were mailed to patients, #WeCount cannot confirm how many patients did not take the pills that were sent to them.

Telehealth provision under shield laws started in June 2023, which triggered their inclusion in #WeCount in July 2023. Clinicians were mailing medications to residents of states with abortion bans, states with 6-week bans, and states with restrictions on a component of telehealth abortion prior to June 2023, but these occurred outside the US healthcare system and were not measured by #WeCount. At this time, there is no comparison possible to previous months.[10]

Regarding the findings about abortions provided to state residents in-state, out-of-state, and via telehealth, there are important limitations to this combination of data from multiple sources. First, there is emerging evidence that not every remotely dispensed package of medication results in medications taken. As is the case with any medication compared to any medical procedure, whether the person receiving this care ultimately uses the medication is more difficult to measure as compared to a procedure completed in a medical office. There is evidence that some people seeking medication abortion in all states, including those in states with bans or severe restrictions, may order medications from multiple sources to ensure they ultimately get the care they need (there is a similar trend observed informally around in-person care, with people making

multiple appointments). Second, the Guttmacher Institute's [Monthly Abortion Provision Study](#) state-of-residence data are reported for 12 months; we have presented half of the 12-month total in order to estimate the 6-month period from July to December 2023. This approach allows us to combine the data, but representing 6 months by dividing 12 months in half does not account for specific changes during a discrete period within that year. We are using this calculation as a proxy and it may overestimate the number of abortions for the 6-month period of July to December 2023.

Additionally, we caution against making direct inferences that compare 2020 and 2023 data over time for two reasons. First, the 2020 data also divides in half underlying data that reflect 12 months, prone to the same potential lack of sensitivity to month-to-month fluctuations, and thus potentially overestimating the 2020 numbers. Second, there is an unspecified number of clinician-supported abortions provided in the US during this period, under a model of care that relied on clinicians from outside the US. As of July 2023, these services shifted to [rely on US clinicians in states with shield law protections for telehealth](#). We are mindful that the numbers of abortions provided under shield laws are quantifiable by #WeCount from July 2023, but there was also abortion care being provided for many years prior to our counting effort that was uncounted by #WeCount because it was outside the inclusion criteria for our effort.

**Implications**

Despite the dramatic declines in access in states that have enacted total abortion bans and 6-week bans, overall the national monthly abortion volume has increased, with the 2024 monthly average greater than the 2023 and 2022 monthly averages.

Increased numbers of abortions in states that permit abortion likely represent a combination of two main factors: people traveling from states where they cannot access care, and increased abortions among residents of states where abortion remains legal.[13,14] Such volume increases are likely influenced by reductions of barriers to abortion care, including reduced burden of cost[15,16] and travel by use of telehealth, increased financial support for low-income abortion seekers, and improved access via care navigation from practical support groups and public health departments.

Over the study period, monthly fluctuations can be seen at state and national levels. These changes are due to dynamic combinations of state-level changes in access (decreases and increases) and seasonal variation in the need for abortion.

The provision of medication abortion via telehealth increased across the study period and continues to increase. Telehealth, as a service-delivery model for many types of healthcare, has increased in the past few years, in part due to the COVID-19 pandemic.[17,18] The use of shield laws has brought access to telehealth abortions to residents of states where it was previously not available. While the majority of abortions occur within an in-person model of care, abortions provided via telehealth are an

important and complementary model of care. Yet many states ban the use of telehealth for abortion care even while in-person abortion care remains legal.

Nevertheless, counts do not tell the whole story. People in states with abortion bans or severe restrictions were forced to delay their abortions, travel to another state, obtain care from a provider in a shield law state and negotiate legal risk, or self-manage their abortions when they would have wanted clinical support, or continue a pregnancy, when any of these outcomes do not align with an individual preference.[19] Regardless of their outcome, lack of access to safe, legal, and local care has grave consequences for people who need abortions.

**References**

1.  Abortion is Essential Healthcare Fact Sheet [Internet]. Society of Family Planing. 2022 [cited 2024 Oct 11];Available from: https://education.societyfp.org/PdfViewer/web/viewer.html?file=https%3a%2f%2fd2kjqjey11kgz2.cloudfront.net%2fSFP%2fpdf%2f9d66c889-1cc6-4581-be4d-e398c73ed81b.pdf

2.  Foster DG, Biggs MA, Ralph L, Gerdts C, Roberts S, Glymour MM. Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States. Am J Public Health 2018;108(3):407–13.

3.  Miller S, Wherry L, Foster DG. The Economic Consequences of Being Denied an Abortion [Internet]. Cambridge, MA: National Bureau of Economic Research; 2020 [cited 2024 Oct 8]. Available from: http://www.nber.org/papers/w26662.pdf

4.  Ralph LJ, Schwarz EB, Grossman D, Foster DG. Self-reported Physical Health of Women Who Did and Did Not Terminate Pregnancy After Seeking Abortion Services: A Cohort Study. Ann Intern Med 2019;171(4):238–47.

5.  Upadhyay UD, Biggs MA, Foster DG. The effect of abortion on having and achieving aspirational one-year plans. BMC Women's Health 2015;15(1):102.

6.  USA abortion providers Aid Access started serving all USA states. [Internet]. AidAccess. [cited 2024 Oct 11];Available from: https://aidaccess.org/en/page/3767036/usa-abortion-providers-aid-access-started-serving-all-usa-states.

7.  Guttmacher Institute, Jones RK, Witwer E, Jerman J. Abortion Incidence and Service Availability in the United States, 2017 [Internet]. Guttmacher Institute; 2019 [cited 2024 Oct 11]. Available from: https://www.guttmacher.org/report/abortion-incidence-service-availability-us-2017

8.  Jones RK, Kirstein M, Philbin J. Abortion incidence and service availability in the United States, 2020. Perspect Sex Reprod Health 2022;54(4):128–41.

9.  Weitz TA, O'Donnell J. The Challenges in Measurement for Abortion Access and Use in Research Post-Dobbs. Women's Health Issues 2023;33(4):323–7.

10. Kitchener C. Blue-state doctors launch abortion pill pipeline into states with bans [Internet]. Washington Post. 2023 [cited 2024 Jul 25];Available from: https://www.washingtonpost.com/politics/2023/07/19/doctors-northeast-launch-abortion-pill-pipeline-into-states-with-bans/

11.  Aiken ARA, Wells ES, Gomperts R, Scott JG. Provision of Medications for Self-Managed Abortion Before and After the Dobbs v Jackson Women's Health Organization Decision. JAMA 2024;331(18):1558–64.

12.  Pleasants EA, Cartwright AF, Upadhyay UD. Association Between Distance to an Abortion Facility and Abortion or Pregnancy Outcome Among a Prospective Cohort of People Seeking Abortion Online. JAMA Network Open 2022;5(5):e2212065.

13.  White K, Sierra G, Lerma K, et al. Association of Texas' 2021 Ban on Abortion in Early Pregnancy With the Number of Facility-Based Abortions in Texas and Surrounding States. JAMA 2022;328(20):2048–55.

14.  Guttmacher Institute. Monthly Abortion Provision Study: Out-of-State Travel for Abortion [Internet]. 2023. Available from: https://www.guttmacher.org/monthly-abortion-provision-study

15.  Higgins JA, Lands M, Valley TM, Carpenter E, Jacques L. Real-Time Effects of Payer Restrictions on Reproductive Healthcare: A Qualitative Analysis of Cost-Related Barriers and Their Consequences among U.S. Abortion Seekers on Reddit. International Journal of Environmental Research and Public Health 2021;18(17):9013.

16.  Dickman SL, White K, Grossman D. Affordability and Access to Abortion Care in the United States. JAMA Internal Medicine 2021;181(9):1157–8.

17.  Wosik J, Fudim M, Cameron B, et al. Telehealth transformation: COVID-19 and the rise of virtual care. Journal of the American Medical Informatics Association 2020;27(6):957–62.

18.  Weigel G, Ramaswamy A, Sobel L, Salganicoff A, Cubanski J, Published MF. Opportunities and Barriers for Telemedicine in the U.S. During the COVID-19 Emergency and Beyond [Internet]. KFF. 2020 [cited 2024 Jul 25];Available from: https://www.kff.org/womens-health-policy/issue-brief/opportunities-and-barriers-for-telemedicine-in-the-u-s-during-the-covid-19-emergency-and-beyond/

19.  Bell SO. Texas' 2021 Ban on Abortion in Early Pregnancy and Changes in Live Births | Law and Medicine | JAMA | JAMA Network [Internet]. [cited 2024 Jul 25];Available from: https://jamanetwork.com/journals/jama/fullarticle/2806878

**Table 1-2022. Estimated number of abortions by state and month, April 2022 to December 2022**

| | Jan '22 | Feb '22 | Mar '22 | Apr '22 | May '22 | Jun '22 | Jul '22 | Aug '22 | Sep '22 | Oct '22 | Nov '22 | Dec '22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **All US state totals** | ... | ... | ... | 84,900 | 84,250 | 87,020 | 80,400 | 82,290 | 76,990 | 77,550 | 75,240 | 83,730 |
| Alabama* | ... | ... | ... | 650 | 620 | 520 | – | – | – | – | – | – |
| Alaska‡ | ... | ... | ... | 120 | 130 | 140 | 110 | 150 | 160 | 140 | 140 | 160 |
| Arizona* | ... | ... | ... | 1,320 | 1,470 | 1,170 | 210 | 720 | 610 | 420 | 790 | 820 |
| Arkansas | ... | ... | ... | 290 | 340 | 260 | – | – | – | – | – | – |
| California‡ | ... | ... | ... | 13,930 | 13,910 | 14,540 | 14,180 | 14,690 | 12,970 | 13,000 | 13,210 | 15,380 |
| Colorado† | ... | ... | ... | 1,620 | 1,700 | 1,810 | 1,980 | 2,230 | 2,010 | 1,970 | 1,980 | 2,140 |
| Connecticut† | ... | ... | ... | 920 | 950 | 970 | 1,000 | 960 | 880 | 880 | 900 | 990 |
| Delaware‡ | ... | ... | ... | 220 | 230 | 270 | 250 | 270 | 300 | 300 | 310 | 350 |
| District of Columbia¶ | ... | ... | ... | 920 | 880 | 870 | 870 | 940 | 830 | 890 | 810 | 830 |
| Florida¶ | ... | ... | ... | 6,160 | 6,230 | 6,750 | 6,690 | 7,150 | 6,830 | 7,430 | 6,760 | 7,940 |
| Georgia* | ... | ... | ... | 4,540 | 4,230 | 4,450 | 4,430 | 1,970 | 2,270 | 2,380 | 2,690 | 2,420 |
| Hawaii‡ | ... | ... | ... | 270 | 230 | 280 | 240 | 330 | 310 | 280 | 310 | 300 |
| Idaho§ | ... | ... | ... | 220 | 220 | 230 | 190 | 180 | – | 10 | – | – |
| Illinois‡ | ... | ... | ... | 5,590 | 5,550 | 6,170 | 6,780 | 7,250 | 6,640 | 6,620 | 6,320 | 7,190 |
| Indiana | ... | ... | ... | 920 | 850 | 860 | 1,100 | 1,060 | 710 | 480 | 670 | 550 |
| Iowa‡ | ... | ... | ... | 380 | 370 | 390 | 360 | 280 | 320 | 310 | 350 | 370 |
| Kansas‡ | ... | ... | ... | 970 | 950 | 930 | 930 | 1,280 | 1,150 | 1,260 | 1,130 | 1,310 |
| Kentucky | ... | ... | ... | 310 | 380 | 300 | 280 | – | – | – | – | – |
| Louisiana | ... | ... | ... | 760 | 810 | 540 | 310 | – | – | – | – | – |
| Maine† | ... | ... | ... | 200 | 230 | 240 | 240 | 240 | 220 | 210 | 190 | 200 |
| Maryland§ | ... | ... | ... | 2,880 | 2,860 | 2,890 | 2,770 | 2,930 | 2,990 | 3,070 | 3,080 | 3,560 |
| Massachusetts§ | ... | ... | ... | 1,790 | 1,650 | 1,760 | 1,790 | 1,790 | 1,750 | 1,700 | 1,650 | 1,840 |
| Michigan‡ | ... | ... | ... | 2,610 | 2,570 | 2,910 | 3,030 | 3,130 | 2,960 | 2,970 | 2,850 | 3,000 |
| Minnesota† | ... | ... | ... | 950 | 930 | 1,040 | 1,180 | 1,230 | 1,240 | 1,280 | 1,310 | 1,250 |
| Mississippi | ... | ... | ... | 350 | 350 | 470 | – | – | – | – | – | – |
| Missouri | ... | ... | ... | 10 | 10 | 10 | – | – | – | – | – | – |
| Montana* | ... | ... | ... | 170 | 180 | 170 | 160 | 220 | 170 | 200 | 190 | 170 |
| Nebraska | ... | ... | ... | 200 | 190 | 210 | 210 | 260 | 230 | 240 | 200 | 170 |
| Nevada§ | ... | ... | ... | 1,140 | 1,090 | 1,320 | 1,220 | 1,510 | 1,360 | 1,430 | 1,380 | 1,520 |
| New Hampshire‡ | ... | ... | ... | 230 | 200 | 220 | 210 | 230 | 220 | 200 | 200 | 240 |
| New Jersey¶ | ... | ... | ... | 3,890 | 3,830 | 3,910 | 3,950 | 4,270 | 3,680 | 3,730 | 3,910 | 4,140 |
| New Mexico‡ | ... | ... | ... | 1,230 | 1,200 | 1,430 | 1,460 | 1,530 | 1,690 | 1,730 | 1,820 | 1,930 |
| New York¶ | ... | ... | ... | 8,770 | 9,190 | 9,780 | 9,400 | 10,140 | 9,250 | 9,300 | 7,520 | 8,900 |
| North Carolina‡ | ... | ... | ... | 3,280 | 3,270 | 3,230 | 3,930 | 4,400 | 4,090 | 3,870 | 3,770 | 4,070 |
| North Dakota† | ... | ... | ... | 90 | 110 | 130 | 100 | 20 | – | – | – | – |
| Ohio† | ... | ... | ... | 2,040 | 1,990 | 1,830 | 810 | 780 | 1,070 | 1,500 | 1,510 | 1,860 |
| Oklahoma | ... | ... | ... | 480 | 140 | – | – | – | – | – | – | – |
| Oregon† | ... | ... | ... | 850 | 800 | 920 | 880 | 1,080 | 970 | 970 | 960 | 1,010 |
| Pennsylvania* | ... | ... | ... | 2,950 | 2,690 | 2,970 | 3,350 | 3,140 | 3,080 | 2,760 | 2,570 | 3,170 |
| Rhode Island† | ... | ... | ... | 330 | 300 | 280 | 290 | 310 | 300 | 320 | 210 | 240 |
| South Carolina* | ... | ... | ... | 690 | 630 | 490 | 180 | 360 | 790 | 830 | 830 | 850 |
| South Dakota | ... | ... | ... | 20 | 40 | 30 | – | – | – | – | – | – |
| Tennessee* | ... | ... | ... | 1,190 | 1,220 | 1,040 | 280 | 250 | – | – | – | – |
| Texas | ... | ... | ... | 3,190 | 2,990 | 2,600 | 70 | – | – | – | 10 | – |
| Utah* | ... | ... | ... | 320 | 400 | 360 | 270 | 310 | 320 | 280 | 320 | 340 |
| Vermont§ | ... | ... | ... | 120 | 140 | 140 | 130 | 150 | 130 | 120 | 140 | 130 |
| Virginia§ | ... | ... | ... | 2,230 | 2,280 | 2,480 | 2,700 | 2,370 | 2,380 | 2,410 | 2,360 | 2,380 |
| Washington‡ | ... | ... | ... | 1,790 | 1,740 | 1,960 | 1,760 | 1,970 | 2,020 | 2,010 | 1,840 | 1,950 |
| West Virginia | ... | ... | ... | 170 | 230 | 220 | 60 | 160 | 20 | – | – | – |
| Wisconsin§ | ... | ... | ... | 580 | 700 | 470 | – | – | – | – | – | – |
| Wyoming§ | ... | ... | ... | 50 | 50 | 60 | 60 | 60 | 50 | 70 | 50 | 60 |

| | Jan '22 | Feb '22 | Mar '22 | Apr '22 | May '22 | Jun '22 | Jul '22 | Aug '22 | Sep '22 | Oct '22 | Nov '22 | Dec '22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restrictiveness level** | | | | | | | | | | | | |
| Banned | … | … | … | – | – | – | 130 | – | 710 | 10 | 10 | – |
| 6-week ban | … | … | … | 3,190 | 2,990 | 2,600 | 990 | 3,110 | 2,270 | 2,380 | 2,690 | 2,420 |
| Permitted | … | … | … | 81,710 | 81,260 | 84,420 | 79,280 | 79,180 | 74,010 | 75,160 | 72,540 | 81,310 |
| Abortions provided under shield laws to states with telehealth restrictions | | | | … | … | … | … | … | … | … | … | … |
| Abortions provided under shield laws to states with total bans and 6-week bans | | | | … | … | … | … | … | … | … | … | … |

*National and state totals include telehealth abortions, including those provided under shield laws.*

*All numbers have been rounded to the nearest 10. Data that are suppressed are represented by '–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "…". Numbers have been corrected as needed for missingness with imputation.*

*For states marked \* there is less than 1% imputation, † 1-4% imputation, ‡ 5-14% imputation, § 15-29% imputation, ‖ 30-44% imputation, ¶ >45% imputation. States with no notation by their name have no imputation for missingness. In Florida, Indiana, Texas, and West Virginia, we used state health department data and thus we did not have to impute any data for those states.*

*Legal status is time varying, and we use the status for each state as reported by the New York Times on the 15th of each month.*

**Table 1-2023. Estimated number of abortions by state and month, January 2023 to December 2023**

| | Jan '23 | Feb '23 | Mar '23 | Apr '23 | May '23 | Jun '23 | Jul '23 | Aug '23 | Sep '23 | Oct '23 | Nov '23 | Dec '23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **All US state totals** | **86,770** | **80,910** | **93,730** | **84,460** | **88,130** | **88,140** | **88,310** | **92,810** | **85,810** | **88,610** | **86,760** | **91,710** |
| Alabama* | – | – | – | – | – | – | 220 | 250 | 250 | 300 | 340 | 360 |
| Alaska‡ | 140 | 130 | 140 | 110 | 160 | 140 | 160 | 170 | 150 | 180 | 150 | 140 |
| Arizona* | 1,120 | 990 | 1,260 | 1,000 | 1,150 | 1,090 | 1,280 | 1,350 | 1,410 | 1,310 | 1,230 | 1,270 |
| Arkansas | – | – | – | – | – | – | 130 | 140 | 140 | 180 | 200 | 180 |
| California‡ | 15,910 | 14,180 | 16,270 | 15,010 | 15,720 | 15,390 | 14,290 | 15,590 | 14,120 | 14,350 | 13,710 | 14,950 |
| Colorado† | 2,340 | 2,080 | 2,400 | 2,200 | 2,400 | 2,280 | 2,230 | 2,310 | 1,990 | 2,130 | 2,140 | 2,060 |
| Connecticut† | 1,120 | 1,000 | 1,230 | 1,250 | 1,320 | 1,290 | 1,400 | 1,240 | 1,130 | 1,260 | 1,140 | 1,260 |
| Delaware‡ | 270 | 240 | 300 | 260 | 270 | 310 | 310 | 280 | 270 | 300 | 320 | 300 |
| District of Columbia‡ | 900 | 870 | 1,080 | 920 | 1,000 | 730 | 770 | 740 | 610 | 630 | 610 | 590 |
| Florida¶ | 7,170 | 7,050 | 8,040 | 7,080 | 7,110 | 7,040 | 7,540 | 7,510 | 7,450 | 7,360 | 6,910 | 7,240 |
| Georgia‡ | 2,640 | 2,390 | 2,980 | 2,590 | 2,440 | 2,470 | 2,770 | 2,740 | 2,670 | 2,690 | 2,870 | 3,050 |
| Hawaii‡ | 330 | 290 | 310 | 340 | 330 | 290 | 310 | 330 | 300 | 310 | 310 | 280 |
| Idaho‡ | – | – | – | – | – | – | 30 | 30 | 40 | 60 | 50 | 50 |
| Illinois‡ | 7,840 | 7,310 | 8,460 | 7,640 | 7,850 | 7,930 | 7,640 | 8,320 | 7,510 | 7,520 | 7,650 | 7,810 |
| Indiana | 510 | 690 | 730 | 610 | 640 | 700 | 880 | 180 | 170 | 220 | 220 | 240 |
| Iowa | 370 | 300 | 390 | 240 | 260 | 290 | 310 | 370 | 330 | 390 | 350 | 360 |
| Kansas‡ | 1,660 | 1,560 | 1,700 | 1,740 | 1,810 | 2,020 | 1,710 | 1,820 | 1,620 | 1,720 | 1,880 | 1,830 |
| Kentucky | – | – | – | – | – | – | 140 | 130 | 150 | 180 | 190 | 180 |
| Louisiana | – | – | – | – | – | – | 310 | 380 | 320 | 480 | 470 | 520 |
| Maine‡ | 240 | 220 | 260 | 210 | 220 | 250 | 230 | 230 | 230 | 210 | 220 | 220 |
| Maryland§ | 3,580 | 3,590 | 3,570 | 3,480 | 3,810 | 3,820 | 3,780 | 3,660 | 3,190 | 3,320 | 3,590 | 3,410 |
| Massachusetts§ | 1,880 | 1,620 | 2,070 | 1,700 | 1,850 | 1,900 | 1,760 | 1,940 | 1,720 | 1,800 | 1,880 | 2,110 |
| Michigan‡ | 2,990 | 2,910 | 3,370 | 3,070 | 3,000 | 2,940 | 2,990 | 3,150 | 2,970 | 3,000 | 2,950 | 3,060 |
| Minnesota† | 1,240 | 1,110 | 1,430 | 1,210 | 1,400 | 1,360 | 1,320 | 1,410 | 1,270 | 1,250 | 1,240 | 1,180 |
| Mississippi | – | – | – | – | – | – | 200 | 210 | 220 | 280 | 300 | 360 |
| Missouri | – | – | – | 10 | – | – | 110 | 120 | 110 | 150 | 150 | 160 |
| Montana* | 210 | 170 | 190 | 180 | 190 | 200 | 210 | 250 | 210 | 220 | 230 | 220 |
| Nebraska | 320 | 280 | 250 | 280 | 180 | 240 | 180 | 270 | 210 | 190 | 210 | 290 |
| Nevada§ | 1,540 | 1,430 | 1,630 | 1,380 | 1,370 | 1,390 | 1,260 | 1,420 | 1,300 | 1,360 | 1,330 | 1,420 |
| New Hampshire‡ | 210 | 220 | 270 | 250 | 250 | 230 | 240 | 280 | 250 | 230 | 280 | 290 |
| New Jersey‡ | 4,170 | 4,020 | 4,640 | 4,220 | 4,790 | 4,640 | 4,320 | 4,630 | 3,940 | 3,880 | 3,730 | 4,420 |
| New Mexico‡ | 2,070 | 1,850 | 2,150 | 1,890 | 1,870 | 1,980 | 1,770 | 1,820 | 1,820 | 1,670 | 1,680 | 1,790 |
| New York‡ | 8,600 | 8,010 | 9,970 | 8,980 | 9,360 | 9,520 | 9,140 | 10,060 | 9,100 | 9,610 | 8,910 | 9,710 |
| North Carolina‡ | 4,510 | 4,120 | 4,730 | 4,210 | 4,560 | 4,730 | 3,390 | 3,570 | 4,190 | 4,130 | 3,540 | 3,960 |
| North Dakota† | – | – | – | – | – | – | 10 | 10 | 30 | 20 | 20 | 10 |
| Ohio‡ | 1,950 | 1,920 | 2,110 | 1,860 | 1,970 | 1,970 | 1,970 | 2,220 | 1,970 | 2,290 | 2,180 | 2,280 |
| Oklahoma | – | – | – | – | – | – | 120 | 150 | 140 | 190 | 180 | 200 |
| Oregon† | 1,050 | 880 | 1,140 | 930 | 1,060 | 1,080 | 1,020 | 1,130 | 970 | 1,030 | 970 | 990 |
| Pennsylvania* | 2,940 | 3,050 | 3,530 | 3,100 | 3,130 | 3,300 | 3,260 | 3,420 | 3,210 | 3,110 | 3,090 | 3,340 |
| Rhode Island† | 280 | 240 | 320 | 220 | 240 | 250 | 220 | 240 | 250 | 260 | 300 | 270 |
| South Carolina* | 990 | 1,000 | 1,090 | 950 | 890 | 930 | 1,060 | 960 | 350 | 440 | 440 | 480 |
| South Dakota | – | – | – | – | – | – | 10 | 10 | 10 | 20 | 20 | 20 |
| Tennessee* | – | – | – | – | – | – | 230 | 270 | 260 | 310 | 390 | 360 |
| Texas* | 10 | – | 10 | – | 10 | – | 1,780 | 1,690 | 1,780 | 2,260 | 2,410 | 2,540 |
| Utah* | 360 | 340 | 400 | 340 | 310 | 330 | 410 | 390 | 400 | 380 | 440 | 380 |
| Vermont§ | 150 | 120 | 150 | 140 | 200 | 140 | 120 | 160 | 130 | 140 | 140 | 150 |
| Virginia‡ | 3,040 | 2,770 | 3,010 | 2,930 | 2,910 | 2,880 | 2,650 | 2,980 | 2,860 | 2,770 | 2,680 | 2,950 |
| Washington‡ | 2,060 | 1,910 | 2,090 | 1,870 | 2,020 | 2,010 | 1,920 | 2,050 | 1,840 | 2,030 | 1,940 | 1,950 |
| West Virginia | – | – | – | – | – | – | 40 | 30 | 30 | 40 | 40 | 40 |
| Wisconsin§ | – | – | – | – | – | – | 100 | 110 | 150 | 370 | 460 | 400 |
| Wyoming§ | 60 | 50 | 60 | 60 | 80 | 80 | 60 | 90 | 70 | 80 | 80 | 80 |

| | Jan '23 | Feb '23 | Mar '23 | Apr '23 | May '23 | Jun '23 | Jul '23 | Aug '23 | Sep '23 | Oct '23 | Nov '23 | Dec '23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restrictiveness level** | | | | | | | | | | | | |
| Banned | 10 | – | 10 | 10 | 10 | – | 3,430 | 3,710 | 3,650 | 4,690 | 4,980 | 5,220 |
| 6-week ban | 2,640 | 2,390 | 2,980 | 2,590 | 2,440 | 2,470 | 3,080 | 2,740 | 3,020 | 3,130 | 3,310 | 3,530 |
| Permitted | 84,120 | 78,520 | 90,740 | 81,860 | 85,680 | 85,670 | 81,800 | 86,360 | 79,140 | 80,790 | 78,470 | 82,960 |
| Abortions provided under shield laws to states with telehealth restrictions | … | … | … | … | … | … | 1,720 | 1,640 | 1,650 | 2,000 | 2,180 | 2,220 |
| Abortions provided under shield laws to states with total bans and 6-week bans | … | … | … | … | … | … | 3,900 | 4,040 | 4,220 | 5,420 | 5,820 | 6,120 |

*National and state totals include telehealth abortions, including those provided under shield laws.*

*All numbers have been rounded to the nearest 10. Data that are suppressed are represented by '–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "…". Numbers have been corrected as needed for missingness with imputation.*

*For states marked \* there is less than 1% imputation, † 1-4% imputation, ‡ 5-14% imputation, § 15-29% imputation, ‖ 30-44% imputation, ¶ >45% imputation. States with no notation by their name have no imputation for missingness. In Florida, Indiana, Texas, and West Virginia, we used state health department data and thus we did not have to impute any data for those states.*

*Legal status is time varying, and we use the status for each state as reported by the New York Times on the 15th of each month.*

**Table 1-2024. Estimated number of abortions by state and month, January 2024 to March 2024**

| | Jan '24 | Feb '24 | Mar '24 | Apr '24 | May '24 | Jun '24 | Jul '24 | Aug '24 | Sep '24 | Oct '24 | Nov '24 | Dec '24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **All US state totals** | **102,590** | **95,150** | **100,430** | **98,920** | **98,840** | **91,510** | ... | ... | ... | ... | ... | ... |
| | | | | | | | ... | ... | ... | ... | ... | ... |
| Alabama* | 390 | 410 | 420 | 420 | 440 | 440 | ... | ... | ... | ... | ... | ... |
| Alaska‡ | 130 | 140 | 140 | 160 | 160 | 170 | ... | ... | ... | ... | ... | ... |
| Arizona* | 1,570 | 1,480 | 1,580 | 1,480 | 1,430 | 1,310 | ... | ... | ... | ... | ... | ... |
| Arkansas | 230 | 230 | 260 | 220 | 240 | 260 | ... | ... | ... | ... | ... | ... |
| California‡ | 17,510 | 15,590 | 16,170 | 15,620 | 16,040 | 14,560 | ... | ... | ... | ... | ... | ... |
| Colorado† | 2,320 | 2,080 | 2,150 | 2,110 | 2,110 | 2,000 | ... | ... | ... | ... | ... | ... |
| Connecticut† | 1,310 | 1,100 | 1,280 | 1,160 | 1,220 | 1,120 | ... | ... | ... | ... | ... | ... |
| Delaware‡ | 360 | 330 | 310 | 300 | 340 | 290 | ... | ... | ... | ... | ... | ... |
| District of Columbia† | 710 | 740 | 810 | 750 | 820 | 760 | ... | ... | ... | ... | ... | ... |
| Florida¶ | 8,410 | 7,920 | 8,290 | 10,120 | 6,170 | 5,560 | ... | ... | ... | ... | ... | ... |
| Georgia‡ | 3,060 | 2,700 | 3,220 | 2,990 | 3,010 | 2,780 | ... | ... | ... | ... | ... | ... |
| Hawaii‡ | 340 | 290 | 330 | 330 | 280 | 280 | ... | ... | ... | ... | ... | ... |
| Idaho§ | 70 | 50 | 40 | 60 | 60 | 50 | ... | ... | ... | ... | ... | ... |
| Illinois‡ | 8,120 | 8,100 | 8,350 | 8,090 | 8,530 | 8,110 | ... | ... | ... | ... | ... | ... |
| Indiana | 290 | 240 | 290 | 240 | 250 | 230 | ... | ... | ... | ... | ... | ... |
| Iowa | 360 | 350 | 410 | 380 | 420 | 370 | ... | ... | ... | ... | ... | ... |
| Kansas‡ | 2,130 | 2,050 | 2,250 | 1,920 | 2,130 | 1,720 | ... | ... | ... | ... | ... | ... |
| Kentucky | 230 | 180 | 220 | 220 | 220 | 210 | ... | ... | ... | ... | ... | ... |
| Louisiana | 560 | 540 | 600 | 610 | 620 | 620 | ... | ... | ... | ... | ... | ... |
| Maine† | 280 | 240 | 250 | 250 | 270 | 230 | ... | ... | ... | ... | ... | ... |
| Maryland§ | 3,860 | 3,450 | 3,560 | 3,460 | 3,590 | 3,270 | ... | ... | ... | ... | ... | ... |
| Massachusetts§ | 2,100 | 2,000 | 2,050 | 1,830 | 2,010 | 1,730 | ... | ... | ... | ... | ... | ... |
| Michigan‡ | 3,520 | 3,260 | 3,350 | 3,130 | 3,240 | 2,990 | ... | ... | ... | ... | ... | ... |
| Minnesota† | 1,340 | 1,270 | 1,310 | 1,350 | 1,360 | 1,340 | ... | ... | ... | ... | ... | ... |
| Mississippi | 390 | 380 | 420 | 390 | 400 | 380 | ... | ... | ... | ... | ... | ... |
| Missouri | 160 | 140 | 160 | 180 | 160 | 160 | ... | ... | ... | ... | ... | ... |
| Montana* | 230 | 200 | 210 | 200 | 230 | 200 | ... | ... | ... | ... | ... | ... |
| Nebraska | 270 | 260 | 270 | 280 | 300 | 310 | ... | ... | ... | ... | ... | ... |
| Nevada§ | 1,690 | 1,530 | 1,670 | 1,420 | 1,510 | 1,470 | ... | ... | ... | ... | ... | ... |
| New Hampshire‡ | 290 | 300 | 310 | 310 | 320 | 270 | ... | ... | ... | ... | ... | ... |
| New Jersey‡ | 4,580 | 3,970 | 4,460 | 4,270 | 4,720 | 4,650 | ... | ... | ... | ... | ... | ... |
| New Mexico‡ | 2,080 | 1,820 | 1,970 | 1,810 | 1,800 | 1,710 | ... | ... | ... | ... | ... | ... |
| New York‡ | 10,780 | 9,930 | 10,200 | 10,310 | 11,000 | 9,820 | ... | ... | ... | ... | ... | ... |
| North Carolina‡ | 4,310 | 4,190 | 4,400 | 4,720 | 4,510 | 4,590 | ... | ... | ... | ... | ... | ... |
| North Dakota† | 20 | 20 | 10 | 20 | 20 | 20 | ... | ... | ... | ... | ... | ... |
| Ohio† | 2,340 | 2,300 | 2,610 | 2,470 | 2,800 | 2,660 | ... | ... | ... | ... | ... | ... |
| Oklahoma | 220 | 190 | 220 | 260 | 240 | 250 | ... | ... | ... | ... | ... | ... |
| Oregon† | 1,060 | 1,100 | 1,030 | 1,050 | 1,010 | 960 | ... | ... | ... | ... | ... | ... |
| Pennsylvania* | 3,550 | 3,640 | 3,640 | 3,180 | 3,480 | 3,080 | ... | ... | ... | ... | ... | ... |
| Rhode Island† | 300 | 270 | 290 | 300 | 300 | 310 | ... | ... | ... | ... | ... | ... |
| South Carolina* | 580 | 520 | 590 | 510 | 570 | 510 | ... | ... | ... | ... | ... | ... |
| South Dakota | 30 | 20 | 20 | 20 | 30 | 30 | ... | ... | ... | ... | ... | ... |
| Tennessee* | 420 | 380 | 440 | 460 | 470 | 450 | ... | ... | ... | ... | ... | ... |
| Texas | 2,920 | 2,650 | 2,850 | 2,880 | 2,730 | 2,830 | ... | ... | ... | ... | ... | ... |
| Utah* | 450 | 420 | 420 | 440 | 460 | 400 | ... | ... | ... | ... | ... | ... |
| Vermont§ | 150 | 160 | 160 | 160 | 160 | 140 | ... | ... | ... | ... | ... | ... |
| Virginia§ | 3,620 | 3,370 | 3,660 | 3,280 | 3,810 | 3,500 | ... | ... | ... | ... | ... | ... |
| Washington‡ | 2,250 | 2,050 | 2,040 | 2,060 | 2,120 | 1,830 | ... | ... | ... | ... | ... | ... |
| West Virginia | 60 | 50 | 50 | 60 | 50 | 50 | ... | ... | ... | ... | ... | ... |
| Wisconsin§ | 550 | 480 | 590 | 600 | 610 | 460 | ... | ... | ... | ... | ... | ... |
| Wyoming§ | 90 | 70 | 100 | 80 | 70 | 70 | ... | ... | ... | ... | ... | ... |

| | Jan '24 | Feb '24 | Mar '24 | Apr '24 | May '24 | Jun '24 | Jul '24 | Aug '24 | Sep '24 | Oct '24 | Nov '24 | Dec '24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restrictiveness level** | | | | | | | | | | | | |
| Banned | 5,990 | 5,480 | 6,000 | 6,040 | 5,930 | 5,980 | ... | ... | ... | ... | ... | ... |
| 6-week ban | 3,640 | 3,220 | 3,810 | 3,500 | 9,750 | 8,850 | ... | ... | ... | ... | ... | ... |
| Permitted | 92,960 | 86,450 | 90,620 | 89,380 | 83,160 | 76,680 | ... | ... | ... | ... | ... | ... |
| Abortions provided under shield laws to states with telehealth restrictions | 2,700 | 2,220 | 2,540 | 2,700 | 1,730 | 1,580 | | | | | | |
| Abortions provided under shield laws to states with total bans and 6-week bans | 6,930 | 6,310 | 6,960 | 6,990 | 8,150 | 8,070 | | | | | | |

*National and state totals include telehealth abortions, including those provided under shield laws.*

*All numbers have been rounded to the nearest 10. Data that are suppressed are represented by '–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "...". Numbers have been corrected as needed for missingness with imputation.*

*For states marked * there is less than 1% imputation, † 1-4% imputation, ‡ 5-14% imputation, § 15-29% imputation, ‖ 30-44% imputation, ¶ >45% imputation. States with no notation by their name have no imputation for missingness. In Florida, Indiana, Texas, and West Virginia, we used state health department data and thus we did not have to impute any data for those states.*

*Legal status is time varying, and we use the status for each state as reported by the New York Times on the 15th of each month.*

**Table 2-2022a. Estimated number of in-person and telehealth abortions by state and month, April 2022 to June 2022**

| | Jan '22 | | Feb '22 | | Mar '22 | | Apr '22 | | May '22 | | Jun '22 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health |
| **All US state totals** | ... | ... | ... | ... | ... | ... | **81,250** | **3,650** | **79,670** | **4,580** | **81,660** | **5,360** |
| | | | | | | | | | | | | |
| Alabama* | ... | ... | ... | ... | ... | ... | 650 | – | 620 | – | 520 | – |
| Alaska‡ | ... | ... | ... | ... | ... | ... | 110 | 10 | 120 | 10 | 120 | 20 |
| Arizona* | ... | ... | ... | ... | ... | ... | 1,320 | – | 1,470 | – | 1,170 | – |
| Arkansas | ... | ... | ... | ... | ... | ... | 290 | – | 340 | – | 260 | – |
| California‡ | ... | ... | ... | ... | ... | ... | 13,240 | 690 | 13,040 | 870 | 13,510 | 1,030 |
| Colorado† | ... | ... | ... | ... | ... | ... | 1,400 | 220 | 1,380 | 320 | 1,440 | 370 |
| Connecticut† | ... | ... | ... | ... | ... | ... | 870 | 50 | 890 | 60 | 910 | 60 |
| Delaware‡ | ... | ... | ... | ... | ... | ... | 200 | 20 | 190 | 40 | 230 | 40 |
| District of Columbia‖ | ... | ... | ... | ... | ... | ... | 890 | 30 | 850 | 30 | 830 | 40 |
| Florida¶ | ... | ... | ... | ... | ... | ... | 6,160 | – | 6,230 | – | 6,750 | – |
| Georgia‡ | ... | ... | ... | ... | ... | ... | 3,990 | 550 | 3,710 | 520 | 3,960 | 490 |
| Hawaii‡ | ... | ... | ... | ... | ... | ... | 260 | 10 | 220 | 10 | 260 | 20 |
| Idaho§ | ... | ... | ... | ... | ... | ... | 200 | 20 | 190 | 30 | 190 | 40 |
| Illinois‡ | ... | ... | ... | ... | ... | ... | 5,260 | 330 | 5,100 | 450 | 5,610 | 560 |
| Indiana | ... | ... | ... | ... | ... | ... | 920 | – | 850 | – | 860 | – |
| Iowa | ... | ... | ... | ... | ... | ... | 360 | 20 | 360 | 10 | 380 | 10 |
| Kansas‡ | ... | ... | ... | ... | ... | ... | 970 | – | 950 | – | 930 | – |
| Kentucky | ... | ... | ... | ... | ... | ... | 310 | – | 380 | – | 300 | – |
| Louisiana | ... | ... | ... | ... | ... | ... | 760 | – | 810 | – | 540 | – |
| Maine† | ... | ... | ... | ... | ... | ... | 190 | 10 | 220 | 10 | 220 | 20 |
| Maryland§ | ... | ... | ... | ... | ... | ... | 2,740 | 140 | 2,720 | 140 | 2,710 | 180 |
| Massachusetts§ | ... | ... | ... | ... | ... | ... | 1,720 | 70 | 1,550 | 100 | 1,640 | 120 |
| Michigan‡ | ... | ... | ... | ... | ... | ... | 2,610 | – | 2,450 | 120 | 2,720 | 190 |
| Minnesota† | ... | ... | ... | ... | ... | ... | 730 | 220 | 670 | 260 | 770 | 270 |
| Mississippi | ... | ... | ... | ... | ... | ... | 350 | – | 350 | – | 470 | – |
| Missouri | ... | ... | ... | ... | ... | ... | 10 | – | 10 | – | 10 | – |
| Montana* | ... | ... | ... | ... | ... | ... | 130 | 40 | 150 | 30 | 130 | 40 |
| Nebraska | ... | ... | ... | ... | ... | ... | 200 | – | 190 | – | 210 | – |
| Nevada§ | ... | ... | ... | ... | ... | ... | 1,020 | 120 | 940 | 150 | 1,140 | 180 |
| New Hampshire‡ | ... | ... | ... | ... | ... | ... | 230 | – | 200 | – | 220 | – |
| New Jersey‖ | ... | ... | ... | ... | ... | ... | 3,750 | 140 | 3,640 | 190 | 3,730 | 180 |
| New Mexico‡ | ... | ... | ... | ... | ... | ... | 1,130 | 100 | 1,080 | 120 | 1,250 | 180 |
| New York† | ... | ... | ... | ... | ... | ... | 8,400 | 370 | 8,690 | 500 | 9,240 | 540 |
| North Carolina‡ | ... | ... | ... | ... | ... | ... | 3,280 | – | 3,270 | – | 3,230 | – |
| North Dakota† | ... | ... | ... | ... | ... | ... | 90 | – | 110 | – | 130 | – |
| Ohio† | ... | ... | ... | ... | ... | ... | 2,040 | – | 1,990 | – | 1,830 | – |
| Oklahoma | ... | ... | ... | ... | ... | ... | 480 | – | 140 | – | – | – |
| Oregon† | ... | ... | ... | ... | ... | ... | 820 | 30 | 740 | 60 | 840 | 80 |
| Pennsylvania* | ... | ... | ... | ... | ... | ... | 2,950 | – | 2,690 | – | 2,960 | 10 |
| Rhode Island† | ... | ... | ... | ... | ... | ... | 310 | 20 | 270 | 30 | 250 | 30 |
| South Carolina* | ... | ... | ... | ... | ... | ... | 690 | – | 630 | – | 490 | – |
| South Dakota | ... | ... | ... | ... | ... | ... | 20 | – | 40 | – | 30 | – |
| Tennessee* | ... | ... | ... | ... | ... | ... | 1,190 | – | 1,220 | – | 1,040 | – |
| Texas | ... | ... | ... | ... | ... | ... | 3,190 | – | 2,990 | – | 2,600 | – |
| Utah* | ... | ... | ... | ... | ... | ... | 320 | – | 400 | – | 360 | – |
| Vermont§ | ... | ... | ... | ... | ... | ... | 100 | 20 | 120 | 20 | 120 | 20 |
| Virginia§ | ... | ... | ... | ... | ... | ... | 1,990 | 240 | 2,010 | 270 | 2,160 | 320 |
| Washington‡ | ... | ... | ... | ... | ... | ... | 1,650 | 140 | 1,550 | 190 | 1,680 | 280 |
| West Virginia | ... | ... | ... | ... | ... | ... | 170 | – | 230 | – | 220 | – |
| Wisconsin§ | ... | ... | ... | ... | ... | ... | 580 | – | 700 | – | 470 | – |
| Wyoming§ | ... | ... | ... | ... | ... | ... | 10 | 40 | 10 | 40 | 20 | 40 |

| | Jan '22 | | Feb '22 | | Mar '22 | | Apr '22 | | May '22 | | Jun '22 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health |
| **Restrictiveness level** | | | | | | | – | – | – | – | – | – |
| Banned | ... | ... | ... | ... | ... | ... | – | – | – | – | – | – |
| 6-week ban | ... | ... | ... | ... | ... | ... | 3,190 | – | 2,990 | – | 2,600 | – |
| Permitted | ... | ... | ... | ... | ... | ... | 78,060 | 3,650 | 76,680 | 4,580 | 79,060 | 5,360 |
| Abortions provided under shield laws to states with telehealth restrictions | | | | | | | ... | ... | ... | ... | ... | ... |
| Abortions provided under shield laws to states with total bans and 6-week bans | | | | | | | ... | ... | ... | ... | ... | ... |

*National and state totals of telehealth abortions include those provided under shield laws.*

*All numbers have been rounded to the nearest 10. Data that are suppressed are represented by '–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "...". Numbers have been corrected as needed for missingness with imputation.*

**Table 2-2022b. Estimated number of in-person and telehealth abortions by state and month, July 2022 to December 2022**

| | Jul '22 | | Aug '22 | | Sep '22 | | Oct '22 | | Nov '22 | | Dec '22 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health |
| **All US state totals** | 74,680 | 5,720 | 74,930 | 7,360 | 70,100 | 6,890 | 70,490 | 7,060 | 67,460 | 7,780 | 74,870 | 8,860 |
| Alabama* | – | – | – | – | – | – | – | – | – | – | – | – |
| Alaska‡ | 90 | 20 | 110 | 40 | 120 | 40 | 110 | 30 | 100 | 40 | 120 | 40 |
| Arizona* | 210 | – | 720 | – | 610 | – | 420 | – | 790 | – | 820 | – |
| Arkansas | – | | | | | | | | | | | |
| California‡ | 13,050 | 1,130 | 13,210 | 1,480 | 11,610 | 1,360 | 11,630 | 1,370 | 11,750 | 1,460 | 13,680 | 1,700 |
| Colorado† | 1,470 | 510 | 1,610 | 620 | 1,440 | 570 | 1,380 | 590 | 1,400 | 580 | 1,530 | 610 |
| Connecticut† | 940 | 60 | 850 | 110 | 760 | 120 | 780 | 100 | 770 | 130 | 830 | 160 |
| Delaware‡ | 210 | 40 | 200 | 70 | 240 | 60 | 240 | 60 | 250 | 60 | 290 | 60 |
| District of Columbia∥ | 810 | 60 | 860 | 80 | 780 | 50 | 860 | 30 | 780 | 30 | 790 | 40 |
| Florida¶ | 6,690 | – | 7,150 | – | 6,830 | – | 7,430 | – | 6,760 | – | 7,940 | – |
| Georgia‡ | 4,110 | 320 | 1,970 | – | 2,270 | – | 2,380 | – | 2,690 | – | 2,420 | – |
| Hawaii‡ | 220 | 20 | 270 | 60 | 270 | 40 | 250 | 30 | 280 | 30 | 250 | 50 |
| Idaho§ | 140 | 50 | 100 | 80 | – | – | 10 | – | – | – | – | – |
| Illinois‡ | 6,220 | 560 | 6,530 | 720 | 5,970 | 670 | 5,990 | 630 | 5,600 | 720 | 6,380 | 810 |
| Indiana | 1,100 | – | 1,060 | – | 710 | – | 480 | – | 670 | – | 550 | – |
| Iowa | 340 | 20 | 260 | 20 | 300 | 20 | 280 | 30 | 310 | 40 | 330 | 40 |
| Kansas‡ | 930 | – | 1,280 | – | 1,150 | – | 1,260 | – | 1,130 | – | 1,300 | 10 |
| Kentucky | 280 | – | – | – | – | – | – | – | – | – | – | – |
| Louisiana | 310 | – | | | | | | | | | | |
| Maine† | 220 | 20 | 210 | 30 | 190 | 30 | 170 | 40 | 130 | 60 | 150 | 50 |
| Maryland§ | 2,600 | 170 | 2,630 | 300 | 2,680 | 310 | 2,740 | 330 | 2,670 | 410 | 3,090 | 470 |
| Massachusetts§ | 1,650 | 140 | 1,610 | 180 | 1,590 | 160 | 1,490 | 210 | 1,370 | 280 | 1,570 | 270 |
| Michigan‡ | 2,830 | 200 | 2,720 | 410 | 2,550 | 410 | 2,540 | 430 | 2,390 | 460 | 2,430 | 570 |
| Minnesota† | 870 | 310 | 940 | 290 | 940 | 300 | 970 | 310 | 1,020 | 290 | 960 | 290 |
| Mississippi | – | – | | | | | | | | | | |
| Missouri | – | – | | | | | | | | | | |
| Montana* | 120 | 40 | 180 | 40 | 130 | 40 | 160 | 40 | 160 | 30 | 140 | 30 |
| Nebraska | 210 | – | 260 | – | 230 | – | 240 | – | 200 | – | 170 | – |
| Nevada§ | 1,030 | 190 | 1,220 | 290 | 1,040 | 320 | 1,110 | 320 | 1,060 | 320 | 1,150 | 370 |
| New Hampshire‡ | 200 | 10 | 200 | 30 | 200 | 20 | 170 | 30 | 150 | 50 | 190 | 50 |
| New Jersey‡ | 3,700 | 250 | 3,880 | 390 | 3,310 | 370 | 3,330 | 400 | 3,450 | 460 | 3,590 | 550 |
| New Mexico‡ | 1,250 | 210 | 1,310 | 220 | 1,480 | 210 | 1,500 | 230 | 1,580 | 240 | 1,670 | 260 |
| New York‡ | 8,860 | 540 | 9,310 | 830 | 8,540 | 710 | 8,550 | 750 | 6,690 | 830 | 7,840 | 1,060 |
| North Carolina‡ | 3,930 | – | 4,400 | – | 4,090 | – | 3,870 | – | 3,770 | – | 4,070 | – |
| North Dakota† | 100 | – | 20 | – | | | | | | | | |
| Ohio† | 810 | – | 780 | – | 1,070 | – | 1,500 | – | 1,510 | – | 1,860 | – |
| Oklahoma | – | – | | | | | | | | | | |
| Oregon† | 800 | 80 | 950 | 130 | 840 | 130 | 850 | 120 | 810 | 150 | 850 | 160 |
| Pennsylvania* | 3,310 | 40 | 3,090 | 50 | 3,030 | 50 | 2,700 | 60 | 2,520 | 50 | 3,100 | 70 |
| Rhode Island† | 260 | 30 | 280 | 30 | 270 | 30 | 290 | 30 | 170 | 40 | 210 | 30 |
| South Carolina* | 180 | – | 360 | – | 790 | – | 830 | – | 830 | – | 850 | – |
| South Dakota | – | – | | | | | | | | | | |
| Tennessee* | 280 | – | 250 | – | – | – | – | – | – | – | – | – |
| Texas | 70 | – | | | | | | | 10 | – | | |
| Utah* | 270 | – | 310 | – | 320 | – | 280 | – | 320 | – | 340 | – |
| Vermont§ | 110 | 20 | 130 | 20 | 110 | 20 | 100 | 20 | 100 | 40 | 90 | 40 |
| Virginia§ | 2,310 | 390 | 1,870 | 500 | 1,870 | 510 | 1,880 | 530 | 1,740 | 620 | 1,740 | 640 |
| Washington‡ | 1,510 | 250 | 1,660 | 310 | 1,730 | 290 | 1,710 | 300 | 1,510 | 330 | 1,560 | 390 |
| West Virginia | 60 | – | 160 | – | 20 | – | – | – | – | – | – | – |
| Wisconsin§ | – | – | | | | | | | | | | |
| Wyoming§ | 20 | 40 | 20 | 30 | 20 | 50 | 10 | 40 | 20 | 30 | 20 | 40 |

| | Jul '22 | | Aug '22 | | Sep '22 | | Oct '22 | | Nov '22 | | Dec '22 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health |
| **Restrictiveness level** | | | | | | | | | | | | |
| Banned | 130 | – | – | – | 710 | – | 10 | – | 10 | – | – | – |
| 6-week ban | 990 | – | 3,110 | – | 2,270 | – | 2,380 | – | 2,690 | – | 2,420 | – |
| Permitted | 73,560 | 5,720 | 71,820 | 7,360 | 67,120 | 6,890 | 68,100 | 7,060 | 64,760 | 7,780 | 72,450 | 8,860 |
| Abortions provided under shield laws to states with telehealth restrictions | … | … | … | … | … | … | … | … | … | … | … | … |
| Abortions provided under shield laws to states with total bans and 6-week bans | … | … | … | … | … | … | … | … | … | … | … | … |

*Table 3 national totals include telehealth abortions provided under shield laws. Abortions provided under shield laws are reported in aggregate only and thus are not included in the state totals.*

*All numbers in Table 3 have been rounded to the nearest 10. Data that are suppressed are represented by '–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "...". Numbers have been corrected as needed for missingness with imputation.*

**Table 2-2023a. Estimated number of in-person and telehealth abortions by state and month, January 2023 to June 2023**

| | Jan '23 | | Feb '23 | | Mar '23 | | Apr '23 | | May '23 | | Jun '23 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health |
| **All US state totals** | 79,230 | 7,540 | 74,630 | 6,280 | 86,520 | 7,210 | 77,210 | 7,250 | 80,350 | 7,780 | 80,740 | 7,400 |
| | | | | | | | | | | | | |
| Alabama* | – | – | – | – | – | – | – | – | – | – | – | – |
| Alaska‡ | 110 | 30 | 110 | 20 | 120 | 20 | 90 | 20 | 130 | 30 | 120 | 20 |
| Arizona* | 1,120 | – | 990 | – | 1,260 | – | 1,000 | – | 1,150 | – | 1,090 | – |
| Arkansas | – | – | – | – | – | – | – | – | – | – | – | – |
| California‡ | 14,480 | 1,430 | 13,020 | 1,160 | 15,000 | 1,270 | 13,770 | 1,240 | 14,350 | 1,370 | 14,170 | 1,220 |
| Colorado† | 1,830 | 510 | 1,620 | 460 | 1,920 | 480 | 1,700 | 500 | 1,910 | 490 | 1,770 | 510 |
| Connecticut† | 970 | 150 | 890 | 110 | 1,100 | 130 | 1,100 | 150 | 1,180 | 140 | 1,150 | 140 |
| Delaware‡ | 200 | 70 | 180 | 60 | 240 | 60 | 180 | 80 | 210 | 60 | 230 | 80 |
| District of Columbia∥ | 860 | 40 | 840 | 30 | 1,030 | 50 | 870 | 50 | 940 | 60 | 680 | 50 |
| Florida¶ | 7,170 | – | 7,050 | – | 8,040 | – | 7,080 | – | 7,110 | – | 7,040 | – |
| Georgia‡ | 2,640 | – | 2,390 | – | 2,980 | – | 2,590 | – | 2,440 | – | 2,470 | – |
| Hawaii‡ | 290 | 40 | 270 | 20 | 270 | 40 | 310 | 30 | 290 | 40 | 260 | 30 |
| Idaho§ | – | – | – | – | – | – | – | – | – | – | – | – |
| Illinois‡ | 7,040 | 800 | 6,670 | 640 | 7,670 | 790 | 6,880 | 760 | 6,980 | 870 | 7,080 | 850 |
| Indiana | 510 | – | 690 | – | 730 | – | 610 | – | 640 | – | 700 | – |
| Iowa | 340 | 30 | 270 | 30 | 330 | 60 | 150 | 90 | 160 | 100 | 230 | 60 |
| Kansas‡ | 1,580 | 80 | 1,460 | 100 | 1,560 | 140 | 1,600 | 140 | 1,680 | 130 | 1,890 | 130 |
| Kentucky | – | – | – | – | – | – | – | – | – | – | – | – |
| Louisiana | – | – | – | – | – | – | – | – | – | – | – | – |
| Maine† | 180 | 60 | 180 | 40 | 220 | 40 | 170 | 40 | 180 | 40 | 210 | 40 |
| Maryland§ | 3,180 | 400 | 3,190 | 400 | 3,120 | 450 | 3,060 | 420 | 3,240 | 570 | 3,350 | 470 |
| Massachusetts§ | 1,670 | 210 | 1,470 | 150 | 1,840 | 230 | 1,530 | 170 | 1,650 | 200 | 1,680 | 220 |
| Michigan‡ | 2,700 | 290 | 2,680 | 230 | 3,120 | 250 | 2,820 | 250 | 2,760 | 240 | 2,770 | 170 |
| Minnesota† | 940 | 300 | 850 | 260 | 1,080 | 350 | 960 | 250 | 1,070 | 330 | 1,050 | 310 |
| Mississippi | – | – | – | – | – | – | – | – | – | – | – | – |
| Missouri | – | – | – | – | – | – | 10 | – | – | – | – | – |
| Montana* | 170 | 40 | 140 | 30 | 150 | 40 | 150 | 30 | 150 | 40 | 170 | 30 |
| Nebraska | 320 | – | 280 | – | 250 | – | 280 | – | 180 | – | 240 | – |
| Nevada§ | 1,230 | 310 | 1,130 | 300 | 1,320 | 310 | 1,100 | 280 | 1,060 | 310 | 1,150 | 240 |
| New Hampshire‡ | 170 | 40 | 200 | 20 | 230 | 40 | 210 | 40 | 210 | 40 | 210 | 20 |
| New Jersey‡ | 3,640 | 530 | 3,590 | 430 | 4,170 | 470 | 3,730 | 490 | 4,280 | 510 | 4,140 | 500 |
| New Mexico‡ | 1,850 | 220 | 1,650 | 200 | 1,970 | 180 | 1,710 | 180 | 1,670 | 200 | 1,790 | 190 |
| New York‡ | 7,760 | 840 | 7,350 | 660 | 9,160 | 810 | 8,090 | 890 | 8,550 | 810 | 8,740 | 780 |
| North Carolina‡ | 4,510 | – | 4,120 | – | 4,730 | – | 4,210 | – | 4,560 | – | 4,730 | – |
| North Dakota† | – | – | – | – | – | – | – | – | – | – | – | – |
| Ohio† | 1,950 | – | 1,920 | – | 2,110 | – | 1,860 | – | 1,970 | – | 1,970 | – |
| Oklahoma | – | – | – | – | – | – | – | – | – | – | – | – |
| Oregon† | 940 | 110 | 790 | 90 | 1,060 | 80 | 840 | 90 | 960 | 100 | 990 | 90 |
| Pennsylvania* | 2,940 | – | 3,050 | – | 3,530 | – | 2,980 | 120 | 3,020 | 110 | 3,130 | 170 |
| Rhode Island† | 250 | 30 | 210 | 30 | 280 | 40 | 190 | 30 | 190 | 50 | 200 | 50 |
| South Carolina* | 990 | – | 1,000 | – | 1,090 | – | 950 | – | 890 | – | 930 | – |
| South Dakota | – | – | – | – | – | – | – | – | – | – | – | – |
| Tennessee* | – | – | – | – | – | – | – | – | – | – | – | – |
| Texas | 10 | – | – | – | 10 | – | – | – | 10 | – | – | – |
| Utah* | 360 | – | 340 | – | 400 | – | 340 | – | 310 | – | 330 | – |
| Vermont§ | 120 | 30 | 100 | 20 | 110 | 40 | 120 | 20 | 170 | 30 | 120 | 20 |
| Virginia§ | 2,460 | 580 | 2,250 | 520 | 2,460 | 550 | 2,390 | 540 | 2,350 | 560 | 2,200 | 680 |
| Washington‡ | 1,730 | 330 | 1,670 | 240 | 1,840 | 250 | 1,560 | 310 | 1,710 | 310 | 1,720 | 290 |
| West Virginia | – | – | – | – | – | – | – | – | – | – | – | – |
| Wisconsin§ | – | – | – | – | – | – | – | – | – | – | – | – |
| Wyoming§ | 20 | 40 | 20 | 30 | 20 | 40 | 20 | 40 | 40 | 40 | 40 | 40 |

| | Jan '23 | | Feb '23 | | Mar '23 | | Apr '23 | | May '23 | | Jun '23 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health |
| **Restrictiveness level** | | | | | | | | | | | | |
| Banned | 10 | – | – | – | 10 | – | 10 | – | 10 | – | – | – |
| 6-week ban | 2,640 | – | 2,390 | – | 2,980 | – | 2,590 | – | 2,440 | – | 2,470 | – |
| Permitted | 76,580 | 7,540 | 72,240 | 6,280 | 83,530 | 7,210 | 74,610 | 7,250 | 77,900 | 7,780 | 78,270 | 7,400 |
| Abortions provided under shield laws to states with telehealth restrictions | … | … | … | … | … | … | … | … | … | … | … | … |
| Abortions provided under shield laws to states with total bans and 6-week bans | … | … | … | … | … | … | … | … | … | … | … | … |

*National and state totals of telehealth abortions include those provided under shield laws.*

*All numbers have been rounded to the nearest 10. Data that are suppressed are represented by '–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "…". Numbers have been corrected as needed for missingness with imputation.*

**Table 2-2023b. Estimated number of in-person and telehealth abortions by state and month, July 2023 to December 2023**

| | Jul '23 | | Aug '23 | | Sep '23 | | Oct '23 | | Nov '23 | | Dec '23 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health |
| **All US state totals** | 73,810 | 14,500 | 78,240 | 14,570 | 71,570 | 14,240 | 72,060 | 16,550 | 69,360 | 17,400 | 73,950 | 17,760 |
| Alabama* | – | 220 | – | 250 | – | 250 | – | 300 | – | 340 | – | 360 |
| Alaska‡ | 130 | 30 | 140 | 30 | 120 | 30 | 140 | 40 | 120 | 30 | 100 | 40 |
| Arizona* | 1,030 | 250 | 1,120 | 230 | 1,120 | 290 | 1,020 | 290 | 950 | 280 | 1,020 | 250 |
| Arkansas | – | 130 | – | 140 | – | 140 | – | 180 | – | 200 | – | 180 |
| California‡ | 12,790 | 1,500 | 14,030 | 1,560 | 12,800 | 1,320 | 12,780 | 1,570 | 12,150 | 1,560 | 13,370 | 1,580 |
| Colorado† | 1,690 | 540 | 1,740 | 570 | 1,440 | 550 | 1,610 | 520 | 1,580 | 560 | 1,510 | 550 |
| Connecticut† | 1,250 | 150 | 1,100 | 140 | 1,000 | 130 | 1,120 | 140 | 970 | 170 | 1,090 | 170 |
| Delaware‡ | 220 | 90 | 180 | 100 | 190 | 80 | 200 | 100 | 220 | 100 | 190 | 110 |
| District of Columbia‖ | 720 | 50 | 690 | 50 | 570 | 40 | 560 | 70 | 530 | 80 | 520 | 70 |
| Florida¶ | 7,050 | 490 | 7,060 | 450 | 6,930 | 520 | 6,740 | 620 | 6,260 | 650 | 6,530 | 710 |
| Georgia‡ | 2,400 | 370 | 2,370 | 370 | 2,250 | 420 | 2,190 | 500 | 2,250 | 620 | 2,410 | 640 |
| Hawaii‡ | 240 | 70 | 270 | 60 | 230 | 70 | 240 | 70 | 220 | 90 | 200 | 80 |
| Idaho§ | – | 30 | – | 30 | – | 40 | – | 60 | – | 50 | – | 50 |
| Illinois‡ | 6,670 | 970 | 7,320 | 1,000 | 6,630 | 880 | 6,590 | 930 | 6,690 | 960 | 6,840 | 970 |
| Indiana | 720 | 160 | 20 | 160 | 20 | 150 | 10 | 210 | 20 | 200 | 20 | 220 |
| Iowa | 190 | 120 | 270 | 100 | 240 | 90 | 270 | 120 | 190 | 160 | 190 | 170 |
| Kansas‡ | 1,540 | 170 | 1,680 | 140 | 1,510 | 110 | 1,570 | 150 | 1,720 | 160 | 1,670 | 160 |
| Kentucky | – | 140 | 10 | 120 | – | 150 | – | 180 | 10 | 180 | – | 180 |
| Louisiana | – | 310 | – | 380 | – | 320 | – | 480 | – | 470 | – | 520 |
| Maine† | 170 | 60 | 150 | 80 | 130 | 100 | 130 | 80 | 140 | 80 | 140 | 80 |
| Maryland§ | 3,270 | 510 | 3,130 | 530 | 2,660 | 530 | 2,780 | 540 | 3,040 | 550 | 2,870 | 540 |
| Massachusetts§ | 1,480 | 280 | 1,660 | 280 | 1,450 | 270 | 1,510 | 290 | 1,540 | 340 | 1,790 | 320 |
| Michigan‡ | 2,690 | 300 | 2,830 | 320 | 2,640 | 330 | 2,680 | 320 | 2,590 | 360 | 2,760 | 300 |
| Minnesota† | 970 | 350 | 1,070 | 340 | 1,010 | 260 | 960 | 290 | 940 | 300 | 840 | 340 |
| Mississippi | – | 200 | – | 210 | – | 220 | – | 280 | – | 300 | – | 360 |
| Missouri | – | 110 | – | 120 | 10 | 100 | – | 150 | 10 | 140 | – | 160 |
| Montana* | 140 | 70 | 180 | 70 | 130 | 80 | 140 | 80 | 140 | 90 | 140 | 80 |
| Nebraska | 130 | 50 | 230 | 40 | 170 | 40 | 140 | 50 | 150 | 60 | 220 | 70 |
| Nevada§ | 970 | 290 | 1,110 | 310 | 900 | 400 | 960 | 400 | 950 | 380 | 1,000 | 420 |
| New Hampshire‡ | 180 | 60 | 220 | 60 | 210 | 40 | 190 | 40 | 230 | 50 | 240 | 50 |
| New Jersey‡ | 3,810 | 510 | 4,120 | 510 | 3,500 | 440 | 3,330 | 550 | 3,210 | 520 | 3,860 | 560 |
| New Mexico‡ | 1,600 | 170 | 1,690 | 130 | 1,660 | 160 | 1,510 | 160 | 1,540 | 140 | 1,630 | 160 |
| New York‖ | 8,270 | 870 | 9,220 | 840 | 8,380 | 720 | 8,840 | 770 | 8,130 | 780 | 8,890 | 820 |
| North Carolina‡ | 3,140 | 250 | 3,340 | 230 | 3,950 | 240 | 3,790 | 340 | 3,190 | 350 | 3,600 | 360 |
| North Dakota† | – | 10 | – | 10 | – | 30 | – | 20 | – | 20 | – | 10 |
| Ohio‡ | 1,720 | 250 | 1,920 | 300 | 1,680 | 290 | 1,940 | 350 | 1,750 | 430 | 1,880 | 400 |
| Oklahoma | – | 120 | – | 150 | – | 140 | – | 190 | – | 180 | – | 200 |
| Oregon† | 890 | 130 | 1,000 | 130 | 860 | 110 | 880 | 150 | 830 | 140 | 860 | 130 |
| Pennsylvania* | 2,800 | 460 | 3,060 | 360 | 2,640 | 570 | 2,510 | 600 | 2,420 | 670 | 2,760 | 580 |
| Rhode Island† | 150 | 70 | 180 | 60 | 200 | 50 | 210 | 50 | 240 | 60 | 210 | 60 |
| South Carolina* | 870 | 190 | 760 | 200 | 160 | 190 | 240 | 200 | 270 | 170 | 270 | 280 |
| South Dakota | – | 10 | – | 10 | – | 10 | – | 20 | – | 20 | – | 20 |
| Tennessee* | – | 230 | – | 270 | – | 260 | – | 310 | – | 390 | – | 360 |
| Texas | 10 | 1,770 | 10 | 1,680 | 10 | 1,770 | – | 2,260 | 10 | 2,400 | – | 2,540 |
| Utah* | 360 | 50 | 330 | 60 | 350 | 50 | 310 | 70 | 350 | 90 | 300 | 80 |
| Vermont§ | 90 | 30 | 130 | 30 | 100 | 30 | 120 | 20 | 110 | 30 | 120 | 30 |
| Virginia§ | 1,900 | 750 | 2,190 | 790 | 2,110 | 750 | 1,940 | 830 | 1,850 | 830 | 2,060 | 890 |
| Washington‡ | 1,520 | 400 | 1,660 | 390 | 1,520 | 320 | 1,650 | 380 | 1,580 | 360 | 1,610 | 340 |
| West Virginia | 10 | 30 | – | 30 | – | 30 | – | 40 | – | 40 | – | 40 |
| Wisconsin§ | – | 100 | – | 110 | 50 | 100 | 250 | 120 | 330 | 130 | 260 | 140 |
| Wyoming§ | 30 | 30 | 50 | 40 | 40 | 30 | 50 | 30 | 40 | 40 | 50 | 30 |

| | Jul '23 | | Aug '23 | | Sep '23 | | Oct '23 | | Nov '23 | | Dec '23 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health |
| **Restrictiveness level** | | | | | | | | | | | | |
| Banned | 20 | 3,410 | 40 | 3,670 | 40 | 3,610 | 10 | 4,680 | 50 | 4,930 | 20 | 5,200 |
| 6-week ban | 2,590 | 490 | 2,370 | 370 | 2,410 | 610 | 2,390 | 740 | 2,420 | 890 | 2,610 | 920 |
| Permitted | 71,200 | 10,600 | 75,830 | 10,530 | 69,120 | 10,020 | 69,660 | 11,130 | 66,890 | 11,580 | 71,320 | 11,640 |
| Abortions provided under shield laws to states with telehealth restrictions | ... | 1,720 | ... | 1,640 | ... | 1,650 | ... | 2,000 | ... | 2,180 | ... | 2,220 |
| Abortions provided under shield laws to states with total bans and 6-week bans | ... | 3,900 | ... | 4,040 | ... | 4,220 | ... | 5,420 | ... | 5,820 | ... | 6,120 |

*National and state totals of telehealth abortions include those provided under shield laws.*

*All numbers have been rounded to the nearest 10. Data that are suppressed are represented by '–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "...". Numbers have been corrected as needed for missingness with imputation.*

**Table 2-2024a. Estimated number of in-person and telehealth abortions by state and month, January 2023 to June 2023**

| | Jan '24 | | Feb '24 | | Mar '24 | | Apr '24 | | May '24 | | Jun '24 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health |
| **All US state totals** | 82,020 | 20,570 | 77,600 | 17,550 | 81,440 | 18,990 | 79,960 | 18,960 | 79,270 | 19,570 | 72,890 | 18,620 |
| | | | | | | | | | | | | |
| Alabama* | – | 390 | – | 410 | – | 420 | – | 420 | – | 440 | – | 440 |
| Alaska‡ | 110 | 20 | 120 | 20 | 110 | 30 | 130 | 30 | 130 | 30 | 130 | 40 |
| Arizona* | 1,250 | 320 | 1,190 | 290 | 1,230 | 350 | 1,120 | 360 | 1,120 | 310 | 1,050 | 260 |
| Arkansas | – | 230 | – | 230 | – | 260 | – | 220 | – | 240 | – | 260 |
| California‡ | 15,670 | 1,840 | 14,080 | 1,510 | 14,650 | 1,520 | 14,110 | 1,510 | 14,540 | 1,500 | 13,160 | 1,400 |
| Colorado† | 1,750 | 570 | 1,560 | 520 | 1,610 | 540 | 1,540 | 570 | 1,540 | 570 | 1,460 | 540 |
| Connecticut† | 1,150 | 160 | 980 | 120 | 1,120 | 160 | 1,010 | 150 | 1,060 | 160 | 1,000 | 120 |
| Delaware‡ | 230 | 130 | 230 | 100 | 190 | 120 | 200 | 100 | 230 | 110 | 200 | 90 |
| District of Columbia‖ | 610 | 100 | 670 | 70 | 720 | 90 | 670 | 80 | 740 | 80 | 690 | 70 |
| Florida¶ | 7,640 | 770 | 7,270 | 650 | 7,510 | 780 | 9,230 | 890 | 4,980 | 1,190 | 4,470 | 1,090 |
| Georgia‡ | 2,370 | 690 | 2,090 | 610 | 2,510 | 710 | 2,260 | 730 | 2,220 | 790 | 2,040 | 740 |
| Hawaii‡ | 250 | 90 | 200 | 90 | 250 | 80 | 240 | 90 | 210 | 70 | 200 | 80 |
| Idaho§ | – | 70 | – | 50 | – | 40 | – | 60 | – | 60 | – | 50 |
| Illinois‡ | 7,150 | 970 | 7,210 | 890 | 7,410 | 940 | 7,200 | 890 | 7,570 | 960 | 7,220 | 890 |
| Indiana | 20 | 270 | 20 | 220 | 20 | 270 | 10 | 230 | 10 | 240 | 10 | 220 |
| Iowa | 160 | 200 | 210 | 140 | 230 | 180 | 240 | 140 | 280 | 140 | 250 | 120 |
| Kansas‡ | 1,930 | 200 | 1,900 | 150 | 2,090 | 160 | 1,750 | 170 | 1,970 | 160 | 1,550 | 170 |
| Kentucky | – | 230 | – | 180 | – | 220 | 10 | 210 | 10 | 210 | – | 210 |
| Louisiana | – | 560 | – | 540 | – | 600 | – | 610 | – | 620 | – | 620 |
| Maine† | 210 | 70 | 190 | 50 | 190 | 60 | 180 | 70 | 220 | 50 | 180 | 50 |
| Maryland§ | 3,210 | 650 | 2,930 | 520 | 3,000 | 560 | 2,930 | 530 | 3,000 | 590 | 2,840 | 430 |
| Massachusetts§ | 1,740 | 360 | 1,680 | 320 | 1,710 | 340 | 1,490 | 340 | 1,640 | 370 | 1,430 | 300 |
| Michigan‡ | 3,060 | 460 | 2,910 | 350 | 3,000 | 350 | 2,780 | 350 | 2,890 | 350 | 2,630 | 360 |
| Minnesota† | 980 | 360 | 900 | 370 | 960 | 350 | 990 | 360 | 1,020 | 340 | 980 | 360 |
| Mississippi | – | 390 | – | 380 | – | 420 | – | 390 | – | 400 | – | 380 |
| Missouri | – | 160 | – | 140 | – | 160 | – | 180 | – | 160 | – | 160 |
| Montana* | 140 | 90 | 130 | 70 | 130 | 80 | 130 | 70 | 150 | 80 | 120 | 80 |
| Nebraska | 200 | 70 | 200 | 60 | 190 | 80 | 210 | 70 | 220 | 80 | 240 | 70 |
| Nevada§ | 1,170 | 520 | 1,080 | 450 | 1,170 | 500 | 980 | 440 | 1,080 | 430 | 1,000 | 470 |
| New Hampshire‡ | 240 | 50 | 220 | 80 | 240 | 70 | 260 | 50 | 240 | 80 | 220 | 50 |
| New Jersey‡ | 3,850 | 730 | 3,400 | 570 | 3,830 | 630 | 3,750 | 520 | 4,180 | 540 | 4,080 | 570 |
| New Mexico‡ | 1,870 | 210 | 1,680 | 140 | 1,790 | 180 | 1,620 | 190 | 1,620 | 180 | 1,500 | 210 |
| New York‖ | 9,890 | 890 | 9,250 | 680 | 9,460 | 740 | 9,530 | 780 | 10,120 | 880 | 9,050 | 770 |
| North Carolina‡ | 3,800 | 510 | 3,830 | 360 | 3,980 | 420 | 4,300 | 420 | 4,110 | 400 | 4,220 | 370 |
| North Dakota† | – | 20 | – | 20 | – | 10 | – | 20 | – | 20 | – | 20 |
| Ohio† | 1,760 | 580 | 1,810 | 490 | 2,110 | 500 | 1,940 | 530 | 2,280 | 520 | 2,150 | 510 |
| Oklahoma | – | 220 | – | 190 | – | 220 | – | 260 | – | 240 | – | 250 |
| Oregon† | 880 | 180 | 950 | 150 | 890 | 140 | 890 | 160 | 850 | 160 | 810 | 150 |
| Pennsylvania* | 2,810 | 740 | 3,000 | 640 | 3,030 | 610 | 2,570 | 610 | 2,760 | 720 | 2,480 | 600 |
| Rhode Island† | 240 | 60 | 200 | 70 | 230 | 60 | 250 | 50 | 220 | 80 | 240 | 70 |
| South Carolina* | 300 | 280 | 280 | 240 | 310 | 280 | 250 | 260 | 300 | 300 | 230 | 280 |
| South Dakota | – | 30 | – | 20 | – | 20 | – | 20 | – | 30 | – | 30 |
| Tennessee* | – | 420 | – | 380 | – | 440 | – | 460 | – | 470 | – | 450 |
| Texas | 10 | 2,910 | 10 | 2,650 | 10 | 2,840 | 20 | 2,860 | 10 | 2,720 | 10 | 2,820 |
| Utah* | 360 | 90 | 340 | 80 | 350 | 70 | 330 | 110 | 370 | 90 | 320 | 80 |
| Vermont§ | 120 | 30 | 130 | 30 | 120 | 40 | 120 | 40 | 130 | 30 | 120 | 20 |
| Virginia§ | 2,580 | 1,040 | 2,630 | 740 | 2,870 | 790 | 2,470 | 810 | 2,940 | 870 | 2,670 | 830 |
| Washington‡ | 1,860 | 390 | 1,750 | 300 | 1,700 | 340 | 1,760 | 300 | 1,830 | 290 | 1,580 | 250 |
| West Virginia | – | 60 | – | 50 | – | 50 | – | 60 | – | 50 | – | 50 |
| Wisconsin§ | 410 | 140 | 350 | 130 | 460 | 130 | 450 | 150 | 450 | 160 | 330 | 130 |
| Wyoming§ | 40 | 50 | 30 | 40 | 60 | 40 | 40 | 40 | 30 | 40 | 30 | 40 |

| | Jan '24 | | Feb '24 | | Mar '24 | | Apr '24 | | May '24 | | Jun '24 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health | In-person | Tele-health |
| **Restrictiveness level** | | | | | | | | | | | | |
| Banned | 30 | 5,960 | 20 | 5,460 | 30 | 5,970 | 40 | 6,000 | 30 | 5,900 | 20 | 5,960 |
| 6-week ban | 2,670 | 970 | 2,370 | 850 | 2,820 | 990 | 2,510 | 990 | 7,500 | 2,250 | 6,740 | 2,110 |
| Permitted | 79,320 | 13,640 | 75,210 | 11,240 | 78,590 | 12,030 | 77,410 | 11,970 | 71,740 | 11,420 | 66,130 | 10,550 |
| Abortions provided under shield laws to states with telehealth restrictions | ... | 2,700 | ... | 2,220 | ... | 2,540 | ... | 2,700 | ... | 1,730 | ... | 1,580 |
| Abortions provided under shield laws to states with total bans and 6-week bans | ... | 6,930 | ... | 6,310 | ... | 6,960 | ... | 6,990 | ... | 8,150 | ... | 8,070 |

*National and state totals of telehealth abortions include those provided under shield laws.*

*All numbers have been rounded to the nearest 10. Data that are suppressed are represented by '–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "...". Numbers have been corrected as needed for missingness with imputation.*

**Table 3-2023 Q3 (July-September 2023). Estimated number of telehealth abortions by state and month**

| | Jul '23 | | | Aug '23 | | | Sep '23 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth |
| **All US state totals** | **13,210** | **1,290** | **14,500** | **13,070** | **1,500** | **14,570** | **12,590** | **1,650** | **14,240** |
| Alabama* | 220 | 0 | 220 | 250 | 0 | 250 | 250 | 0 | 250 |
| Alaska‡ | 30 | 0 | 30 | 30 | 0 | 30 | 30 | 0 | 30 |
| Arizona* | 250 | 0 | 250 | 230 | 0 | 230 | 290 | 0 | 290 |
| Arkansas | 130 | 0 | 130 | 140 | 0 | 140 | 140 | 0 | 140 |
| California‡ | 1,310 | 190 | 1,500 | 1,300 | 260 | 1,560 | 1,110 | 210 | 1,320 |
| Colorado† | 530 | 10 | 540 | 530 | 40 | 570 | 520 | 30 | 550 |
| Connecticut† | 150 | 0 | 150 | 140 | 0 | 140 | 130 | 0 | 130 |
| Delaware‡ | 90 | 0 | 90 | 90 | 10 | 100 | 70 | 10 | 80 |
| District of Columbia‖ | 50 | 0 | 50 | 50 | 0 | 50 | 40 | 0 | 40 |
| Florida¶ | 490 | 0 | 490 | 450 | 0 | 450 | 520 | 0 | 520 |
| Georgia‡ | 370 | 0 | 370 | 370 | 0 | 370 | 420 | 0 | 420 |
| Hawaii‡ | 40 | 30 | 70 | 40 | 20 | 60 | 50 | 20 | 70 |
| Idaho§ | 30 | 0 | 30 | 30 | 0 | 30 | 40 | 0 | 40 |
| Illinois‡ | 540 | 430 | 970 | 530 | 470 | 1,000 | 460 | 420 | 880 |
| Indiana | 160 | 0 | 160 | 160 | 0 | 160 | 150 | 0 | 150 |
| Iowa | 120 | 0 | 120 | 100 | 0 | 100 | 90 | 0 | 90 |
| Kansas‡ | 170 | 0 | 170 | 140 | 0 | 140 | 110 | 0 | 110 |
| Kentucky | 140 | 0 | 140 | 120 | 0 | 120 | 150 | 0 | 150 |
| Louisiana | 310 | 0 | 310 | 380 | 0 | 380 | 320 | 0 | 320 |
| Maine† | 50 | 10 | 60 | 50 | 30 | 80 | 70 | 30 | 100 |
| Maryland§ | 180 | 330 | 510 | 190 | 340 | 530 | 200 | 330 | 530 |
| Massachusetts§ | 270 | 10 | 280 | 260 | 20 | 280 | 240 | 30 | 270 |
| Michigan‡ | 300 | 0 | 300 | 320 | 0 | 320 | 330 | 0 | 330 |
| Minnesota† | 320 | 30 | 350 | 300 | 40 | 340 | 240 | 20 | 260 |
| Mississippi | 200 | 0 | 200 | 210 | 0 | 210 | 220 | 0 | 220 |
| Missouri | 110 | 0 | 110 | 120 | 0 | 120 | 100 | 0 | 100 |
| Montana* | 40 | 30 | 70 | 30 | 40 | 70 | 30 | 50 | 80 |
| Nebraska | 50 | 0 | 50 | 40 | 0 | 40 | 40 | 0 | 40 |
| Nevada§ | 290 | 0 | 290 | 310 | 0 | 310 | 310 | 90 | 400 |
| New Hampshire‡ | 50 | 10 | 60 | 50 | 10 | 60 | 30 | 10 | 40 |
| New Jersey‖ | 510 | 0 | 510 | 510 | 0 | 510 | 440 | 0 | 440 |
| New Mexico‡ | 140 | 30 | 170 | 110 | 20 | 130 | 140 | 20 | 160 |
| New York‡ | 870 | 0 | 870 | 840 | 0 | 840 | 720 | 0 | 720 |
| North Carolina‡ | 250 | 0 | 250 | 230 | 0 | 230 | 240 | 0 | 240 |
| North Dakota† | 10 | 0 | 10 | 10 | 0 | 10 | 30 | 0 | 30 |
| Ohio† | 250 | 0 | 250 | 300 | 0 | 300 | 290 | 0 | 290 |
| Oklahoma | 120 | 0 | 120 | 150 | 0 | 150 | 140 | 0 | 140 |
| Oregon† | 130 | 0 | 130 | 100 | 30 | 130 | 90 | 20 | 110 |
| Pennsylvania* | 370 | 90 | 460 | 340 | 20 | 360 | 360 | 210 | 570 |
| Rhode Island† | 70 | 0 | 70 | 60 | 0 | 60 | 50 | 0 | 50 |
| South Carolina* | 190 | 0 | 190 | 200 | 0 | 200 | 190 | 0 | 190 |
| South Dakota | 10 | 0 | 10 | 10 | 0 | 10 | 10 | 0 | 10 |
| Tennessee* | 230 | 0 | 230 | 270 | 0 | 270 | 260 | 0 | 260 |
| Texas | 1,770 | 0 | 1,770 | 1,680 | 0 | 1,680 | 1,770 | 0 | 1,770 |
| Utah* | 50 | 0 | 50 | 60 | 0 | 60 | 50 | 0 | 50 |
| Vermont§ | 20 | 10 | 30 | 20 | 10 | 30 | 20 | 10 | 30 |
| Virginia§ | 670 | 80 | 750 | 670 | 120 | 790 | 620 | 130 | 750 |
| Washington‡ | 400 | 0 | 400 | 370 | 20 | 390 | 310 | 10 | 320 |
| West Virginia | 30 | 0 | 30 | 30 | 0 | 30 | 30 | 0 | 30 |
| Wisconsin | 100 | 0 | 100 | 110 | 0 | 110 | 100 | 0 | 100 |
| Wyoming§ | 30 | 0 | 30 | 40 | 0 | 40 | 30 | 0 | 30 |

| | Jul '23 | | | Aug '23 | | | Sep '23 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth |
| **Restrictiveness level** | | | | | | | | | |
| Banned | 3,410 | 0 | 3,410 | 3,670 | 0 | 3,670 | 3,610 | 0 | 3,610 |
| 6-week ban | 490 | 0 | 490 | 370 | 0 | 370 | 610 | 0 | 610 |
| Permitted | 9,310 | 1,290 | 10,600 | 9,030 | 1,500 | 10,530 | 8,370 | 1,650 | 10,020 |
| Abortions provided under shield laws to states with telehealth restrictions | 1,720 | … | 1,720 | 1,640 | … | 1,640 | 1,650 | … | 1,650 |
| Abortions provided under shield laws to states with total bans and 6-week bans | 3,900 | … | 3,900 | 4,040 | … | 4,040 | 4,220 | … | 4,220 |

*National and state totals of telehealth abortions include those provided under shield laws.*

*All numbers have been rounded to the nearest 10. Data that are suppressed are represented by "–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "…". Numbers have been corrected as needed for missingness with imputation.*

**Table 3-2023 Q4 (October-December 2023). Estimated number of telehealth abortions by state and month**

| | Oct '23 | | | Nov '23 | | | Dec '23 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth |
| **All US state totals** | **14,820** | **1,730** | **16,550** | **15,580** | **1,820** | **17,400** | **16,010** | **1,750** | **17,760** |
| Alabama* | 300 | 0 | 300 | 340 | 0 | 340 | 360 | 0 | 360 |
| Alaska‡ | 40 | 0 | 40 | 30 | 0 | 30 | 40 | 0 | 40 |
| Arizona* | 290 | 0 | 290 | 280 | 0 | 280 | 250 | 0 | 250 |
| Arkansas | 180 | 0 | 180 | 200 | 0 | 200 | 180 | 0 | 180 |
| California‡ | 1,240 | 330 | 1,570 | 1,200 | 360 | 1,560 | 1,260 | 320 | 1,580 |
| Colorado† | 480 | 40 | 520 | 510 | 50 | 560 | 510 | 40 | 550 |
| Connecticut† | 140 | 0 | 140 | 170 | 0 | 170 | 170 | 0 | 170 |
| Delaware‡ | 90 | 10 | 100 | 90 | 10 | 100 | 100 | 10 | 110 |
| District of Columbia‖ | 70 | 0 | 70 | 80 | 0 | 80 | 70 | 0 | 70 |
| Florida¶ | 620 | 0 | 620 | 650 | 0 | 650 | 710 | 0 | 710 |
| Georgia‡ | 500 | 0 | 500 | 620 | 0 | 620 | 640 | 0 | 640 |
| Hawaii‡ | 50 | 20 | 70 | 70 | 20 | 90 | 60 | 20 | 80 |
| Idaho§ | 60 | 0 | 60 | 50 | 0 | 50 | 50 | 0 | 50 |
| Illinois‡ | 560 | 370 | 930 | 520 | 440 | 960 | 490 | 480 | 970 |
| Indiana | 210 | 0 | 210 | 200 | 0 | 200 | 220 | 0 | 220 |
| Iowa | 120 | 0 | 120 | 160 | 0 | 160 | 170 | 0 | 170 |
| Kansas‡ | 150 | 0 | 150 | 160 | 0 | 160 | 160 | 0 | 160 |
| Kentucky | 180 | 0 | 180 | 180 | 0 | 180 | 180 | 0 | 180 |
| Louisiana | 480 | 0 | 480 | 470 | 0 | 470 | 520 | 0 | 520 |
| Maine† | 60 | 20 | 80 | 50 | 30 | 80 | 60 | 20 | 80 |
| Maryland§ | 200 | 340 | 540 | 200 | 350 | 550 | 170 | 370 | 540 |
| Massachusetts§ | 250 | 40 | 290 | 290 | 50 | 340 | 280 | 40 | 320 |
| Michigan‡ | 320 | 0 | 320 | 360 | 0 | 360 | 300 | 0 | 300 |
| Minnesota† | 260 | 30 | 290 | 270 | 30 | 300 | 320 | 20 | 340 |
| Mississippi | 280 | 0 | 280 | 300 | 0 | 300 | 360 | 0 | 360 |
| Missouri | 150 | 0 | 150 | 140 | 0 | 140 | 160 | 0 | 160 |
| Montana* | 40 | 40 | 80 | 50 | 40 | 90 | 30 | 50 | 80 |
| Nebraska | 50 | 0 | 50 | 60 | 0 | 60 | 70 | 0 | 70 |
| Nevada§ | 340 | 60 | 400 | 360 | 20 | 380 | 390 | 30 | 420 |
| New Hampshire‡ | 30 | 10 | 40 | 50 | 0 | 50 | 40 | 10 | 50 |
| New Jersey‖ | 550 | 0 | 550 | 520 | 0 | 520 | 560 | 0 | 560 |
| New Mexico‡ | 140 | 20 | 160 | 120 | 20 | 140 | 140 | 20 | 160 |
| New York‖ | 770 | 0 | 770 | 780 | 0 | 780 | 820 | 0 | 820 |
| North Carolina‡ | 340 | 0 | 340 | 350 | 0 | 350 | 360 | 0 | 360 |
| North Dakota† | 20 | 0 | 20 | 20 | 0 | 20 | 10 | 0 | 10 |
| Ohio† | 350 | 0 | 350 | 430 | 0 | 430 | 400 | 0 | 400 |
| Oklahoma | 190 | 0 | 190 | 180 | 0 | 180 | 200 | 0 | 200 |
| Oregon† | 120 | 30 | 150 | 120 | 20 | 140 | 120 | 10 | 130 |
| Pennsylvania* | 400 | 200 | 600 | 440 | 230 | 670 | 450 | 130 | 580 |
| Rhode Island† | 50 | 0 | 50 | 60 | 0 | 60 | 60 | 0 | 60 |
| South Carolina* | 240 | 0 | 240 | 270 | 0 | 270 | 280 | 0 | 280 |
| South Dakota | 20 | 0 | 20 | 20 | 0 | 20 | 20 | 0 | 20 |
| Tennessee* | 310 | 0 | 310 | 390 | 0 | 390 | 360 | 0 | 360 |
| Texas | 2,260 | 0 | 2,260 | 2,400 | 0 | 2,400 | 2,540 | 0 | 2,540 |
| Utah* | 70 | 0 | 70 | 90 | 0 | 90 | 80 | 0 | 80 |
| Vermont§ | 10 | 10 | 20 | 20 | 10 | 30 | 20 | 10 | 30 |
| Virginia§ | 700 | 130 | 830 | 710 | 120 | 830 | 740 | 150 | 890 |
| Washington‡ | 350 | 30 | 380 | 340 | 20 | 360 | 320 | 20 | 340 |
| West Virginia | 40 | 0 | 40 | 40 | 0 | 40 | 40 | 0 | 40 |
| Wisconsin§ | 120 | 0 | 120 | 130 | 0 | 130 | 140 | 0 | 140 |
| Wyoming§ | 30 | 0 | 30 | 40 | 0 | 40 | 30 | 0 | 30 |

| Restrictiveness level | Oct '23 | | | Nov '23 | | | Dec '23 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth |
| Banned | 4,680 | 0 | 4,680 | 4,930 | 0 | 4,930 | 5,200 | 0 | 5,200 |
| 6-week ban | 740 | 0 | 740 | 890 | 0 | 890 | 920 | 0 | 920 |
| Permitted | 9,400 | 1,730 | 11,130 | 9,760 | 1,820 | 11,580 | 9,890 | 1,750 | 11,640 |
| Abortions provided under shield laws to states with telehealth restrictions | 2,000 | … | 2,000 | 2,180 | … | 2,180 | 2,220 | … | 2,220 |
| Abortions provided under shield laws to states with total bans and 6-week bans | 5,420 | … | 5,420 | 5,820 | … | 5,820 | 6,120 | … | 6,120 |

*National and state totals of telehealth abortions include those provided under shield laws.*

*All numbers have been rounded to the nearest 10. Data that are suppressed are represented by '–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "...". Numbers have been corrected as needed for missingness with imputation.*

**Table 3-2024 Q1 (January–March 2024). Estimated number of telehealth abortions by state and month**

| | Jan '24 | | | Feb '24 | | | Mar '24 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth |
| **All US state totals** | **18,680** | **1,890** | **20,570** | **15,850** | **1,700** | **17,550** | **17,290** | **1,700** | **18,990** |
| Alabama* | 390 | 0 | 390 | 410 | 0 | 410 | 420 | 0 | 420 |
| Alaska‡ | 20 | 0 | 20 | 20 | 0 | 20 | 30 | 0 | 30 |
| Arizona* | 320 | 0 | 320 | 290 | 0 | 290 | 350 | 0 | 350 |
| Arkansas | 230 | 0 | 230 | 230 | 0 | 230 | 260 | 0 | 260 |
| California‡ | 1,500 | 340 | 1,840 | 1,120 | 390 | 1,510 | 1,180 | 340 | 1,520 |
| Colorado† | 530 | 40 | 570 | 500 | 20 | 520 | 510 | 30 | 540 |
| Connecticut† | 160 | 0 | 160 | 120 | 0 | 120 | 150 | 10 | 160 |
| Delaware‡ | 110 | 20 | 130 | 100 | 0 | 100 | 110 | 10 | 120 |
| District of Columbia‖ | 100 | 0 | 100 | 70 | 0 | 70 | 90 | 0 | 90 |
| Florida¶ | 770 | 0 | 770 | 650 | 0 | 650 | 780 | 0 | 780 |
| Georgia‡ | 690 | 0 | 690 | 610 | 0 | 610 | 710 | 0 | 710 |
| Hawaii‡ | 70 | 20 | 90 | 60 | 30 | 90 | 50 | 30 | 80 |
| Idaho§ | 70 | 0 | 70 | 50 | 0 | 50 | 40 | 0 | 40 |
| Illinois‡ | 490 | 480 | 970 | 430 | 460 | 890 | 470 | 470 | 940 |
| Indiana | 270 | 0 | 270 | 220 | 0 | 220 | 270 | 0 | 270 |
| Iowa | 200 | 0 | 200 | 140 | 0 | 140 | 180 | 0 | 180 |
| Kansas‡ | 200 | 0 | 200 | 150 | 0 | 150 | 160 | 0 | 160 |
| Kentucky | 230 | 0 | 230 | 180 | 0 | 180 | 220 | 0 | 220 |
| Louisiana | 560 | 0 | 560 | 540 | 0 | 540 | 600 | 0 | 600 |
| Maine† | 50 | 20 | 70 | 40 | 10 | 50 | 50 | 10 | 60 |
| Maryland§ | 230 | 420 | 650 | 160 | 360 | 520 | 200 | 360 | 560 |
| Massachusetts§ | 310 | 50 | 360 | 270 | 50 | 320 | 280 | 60 | 340 |
| Michigan‡ | 460 | 0 | 460 | 350 | 0 | 350 | 350 | 0 | 350 |
| Minnesota† | 330 | 30 | 360 | 350 | 20 | 370 | 320 | 30 | 350 |
| Mississippi | 390 | 0 | 390 | 380 | 0 | 380 | 420 | 0 | 420 |
| Missouri | 160 | 0 | 160 | 140 | 0 | 140 | 160 | 0 | 160 |
| Montana* | 40 | 50 | 90 | 30 | 40 | 70 | 30 | 50 | 80 |
| Nebraska | 70 | 0 | 70 | 60 | 0 | 60 | 80 | 0 | 80 |
| Nevada§ | 500 | 20 | 520 | 440 | 10 | 450 | 490 | 10 | 500 |
| New Hampshire‡ | 40 | 10 | 50 | 70 | 10 | 80 | 60 | 10 | 70 |
| New Jersey‖ | 730 | 0 | 730 | 570 | 0 | 570 | 630 | 0 | 630 |
| New Mexico‡ | 190 | 20 | 210 | 120 | 20 | 140 | 150 | 30 | 180 |
| New York‖ | 890 | 0 | 890 | 680 | 0 | 680 | 740 | 0 | 740 |
| North Carolina‡ | 510 | 0 | 510 | 360 | 0 | 360 | 420 | 0 | 420 |
| North Dakota† | 20 | 0 | 20 | 20 | 0 | 20 | 10 | 0 | 10 |
| Ohio† | 580 | 0 | 580 | 490 | 0 | 490 | 500 | 0 | 500 |
| Oklahoma | 220 | 0 | 220 | 190 | 0 | 190 | 220 | 0 | 220 |
| Oregon† | 160 | 20 | 180 | 130 | 20 | 150 | 120 | 20 | 140 |
| Pennsylvania* | 570 | 170 | 740 | 460 | 180 | 640 | 480 | 130 | 610 |
| Rhode Island† | 60 | 0 | 60 | 70 | 0 | 70 | 50 | 10 | 60 |
| South Carolina* | 280 | 0 | 280 | 240 | 0 | 240 | 280 | 0 | 280 |
| South Dakota | 30 | 0 | 30 | 20 | 0 | 20 | 20 | 0 | 20 |
| Tennessee* | 420 | 0 | 420 | 380 | 0 | 380 | 440 | 0 | 440 |
| Texas | 2,910 | 0 | 2,910 | 2,650 | 0 | 2,650 | 2,840 | 0 | 2,840 |
| Utah* | 90 | 0 | 90 | 80 | 0 | 80 | 70 | 0 | 70 |
| Vermont§ | 20 | 10 | 30 | 20 | 10 | 30 | 30 | 10 | 40 |
| Virginia§ | 890 | 150 | 1,040 | 680 | 60 | 740 | 710 | 80 | 790 |
| Washington‡ | 370 | 20 | 390 | 300 | 0 | 300 | 340 | 0 | 340 |
| West Virginia | 60 | 0 | 60 | 50 | 0 | 50 | 50 | 0 | 50 |
| Wisconsin§ | 140 | 0 | 140 | 130 | 0 | 130 | 130 | 0 | 130 |
| Wyoming§ | 50 | 0 | 50 | 30 | 10 | 40 | 40 | 0 | 40 |

| | Jan '24 | | | Feb '24 | | | Mar '24 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth |
| **Restrictiveness level** | | | | | | | | | |
| Banned | 5,960 | 0 | 5,960 | 5,460 | 0 | 5,460 | 5,970 | 0 | 5,970 |
| 6-week ban | 970 | 0 | 970 | 850 | 0 | 850 | 990 | 0 | 990 |
| Permitted | 11,750 | 1,890 | 13,640 | 9,540 | 1,700 | 11,240 | 10,330 | 1,700 | 12,030 |
| Abortions provided under shield laws to states with telehealth restrictions | 2,700 | ... | 2,700 | 2,220 | ... | 2,220 | 2,540 | ... | 2,540 |
| Abortions provided under shield laws to states with total bans and 6-week bans | 6,930 | ... | 6,930 | 6,310 | ... | 6,310 | 6,960 | ... | 6,960 |

*National and state totals of telehealth abortions include those provided under shield laws.*

*All numbers have been rounded to the nearest 10. Data that are suppressed are represented by '–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "...". Numbers have been corrected as needed for missingness with imputation.*

**Table 3-2024 Q2 (April-June 2024). Estimated number of telehealth abortions by state and month**

| | Apr '24 | | | May '24 | | | Jun '24 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth |
| **All US state totals** | **17,380** | **1,580** | **18,960** | **17,690** | **1,880** | **19,570** | **17,080** | **1,540** | **18,620** |
| Alabama* | 420 | 0 | 420 | 440 | 0 | 440 | 440 | 0 | 440 |
| Alaska‡ | 30 | 0 | 30 | 30 | 0 | 30 | 40 | 0 | 40 |
| Arizona* | 360 | 0 | 360 | 310 | 0 | 310 | 260 | 0 | 260 |
| Arkansas | 220 | 0 | 220 | 240 | 0 | 240 | 260 | 0 | 260 |
| California‡ | 1,250 | 260 | 1,510 | 1,230 | 270 | 1,500 | 1,170 | 230 | 1,400 |
| Colorado† | 540 | 30 | 570 | 540 | 30 | 570 | 520 | 20 | 540 |
| Connecticut† | 140 | 10 | 150 | 150 | 10 | 160 | 110 | 10 | 120 |
| Delaware‡ | 90 | 10 | 100 | 100 | 10 | 110 | 80 | 10 | 90 |
| District of Columbia‖ | 80 | 0 | 80 | 80 | 0 | 80 | 70 | 0 | 70 |
| Florida¶ | 890 | 0 | 890 | 1,190 | 0 | 1,190 | 1,090 | 0 | 1,090 |
| Georgia‡ | 730 | 0 | 730 | 790 | 0 | 790 | 740 | 0 | 740 |
| Hawaii‡ | 60 | 30 | 90 | 50 | 20 | 70 | 60 | 20 | 80 |
| Idaho§ | 60 | 0 | 60 | 60 | 0 | 60 | 50 | 0 | 50 |
| Illinois‡ | 460 | 430 | 890 | 480 | 480 | 960 | 420 | 470 | 890 |
| Indiana | 230 | 0 | 230 | 240 | 0 | 240 | 220 | 0 | 220 |
| Iowa | 140 | 0 | 140 | 140 | 0 | 140 | 120 | 0 | 120 |
| Kansas‡ | 170 | 0 | 170 | 160 | 0 | 160 | 170 | 0 | 170 |
| Kentucky | 210 | 0 | 210 | 210 | 0 | 210 | 210 | 0 | 210 |
| Louisiana | 610 | 0 | 610 | 620 | 0 | 620 | 620 | 0 | 620 |
| Maine† | 60 | 10 | 70 | 40 | 10 | 50 | 40 | 10 | 50 |
| Maryland§ | 180 | 350 | 530 | 190 | 400 | 590 | 170 | 260 | 430 |
| Massachusetts§ | 290 | 50 | 340 | 310 | 60 | 370 | 290 | 10 | 300 |
| Michigan‡ | 350 | 0 | 350 | 350 | 0 | 350 | 360 | 0 | 360 |
| Minnesota† | 330 | 30 | 360 | 310 | 30 | 340 | 330 | 30 | 360 |
| Mississippi | 390 | 0 | 390 | 400 | 0 | 400 | 380 | 0 | 380 |
| Missouri | 180 | 0 | 180 | 160 | 0 | 160 | 160 | 0 | 160 |
| Montana* | 30 | 40 | 70 | 20 | 60 | 80 | 30 | 50 | 80 |
| Nebraska | 70 | 0 | 70 | 80 | 0 | 80 | 70 | 0 | 70 |
| Nevada§ | 430 | 10 | 440 | 410 | 20 | 430 | 440 | 30 | 470 |
| New Hampshire‡ | 40 | 10 | 50 | 60 | 20 | 80 | 50 | 0 | 50 |
| New Jersey‖ | 520 | 0 | 520 | 540 | 0 | 540 | 570 | 0 | 570 |
| New Mexico‡ | 150 | 40 | 190 | 140 | 40 | 180 | 130 | 80 | 210 |
| New York‖ | 780 | 0 | 780 | 880 | 0 | 880 | 770 | 0 | 770 |
| North Carolina‡ | 420 | 0 | 420 | 400 | 0 | 400 | 370 | 0 | 370 |
| North Dakota† | 20 | 0 | 20 | 20 | 0 | 20 | 20 | 0 | 20 |
| Ohio† | 530 | 0 | 530 | 520 | 0 | 520 | 510 | 0 | 510 |
| Oklahoma | 260 | 0 | 260 | 240 | 0 | 240 | 250 | 0 | 250 |
| Oregon† | 140 | 20 | 160 | 140 | 20 | 160 | 150 | 0 | 150 |
| Pennsylvania* | 460 | 150 | 610 | 500 | 220 | 720 | 440 | 160 | 600 |
| Rhode Island† | 50 | 0 | 50 | 70 | 10 | 80 | 60 | 10 | 70 |
| South Carolina* | 260 | 0 | 260 | 270 | 0 | 270 | 280 | 0 | 280 |
| South Dakota | 20 | 0 | 20 | 30 | 0 | 30 | 30 | 0 | 30 |
| Tennessee* | 460 | 0 | 460 | 470 | 0 | 470 | 450 | 0 | 450 |
| Texas | 2,860 | 0 | 2,860 | 2,720 | 0 | 2,720 | 2,820 | 0 | 2,820 |
| Utah* | 110 | 0 | 110 | 90 | 0 | 90 | 80 | 0 | 80 |
| Vermont§ | 30 | 10 | 40 | 20 | 10 | 30 | 20 | 0 | 20 |
| Virginia§ | 730 | 80 | 810 | 720 | 150 | 870 | 700 | 130 | 830 |
| Washington‡ | 290 | 10 | 300 | 290 | 0 | 290 | 250 | 0 | 250 |
| West Virginia | 60 | 0 | 60 | 50 | 0 | 50 | 50 | 0 | 50 |
| Wisconsin§ | 150 | 0 | 150 | 160 | 0 | 160 | 130 | 0 | 130 |
| Wyoming§ | 40 | 0 | 40 | 30 | 10 | 40 | 30 | 10 | 40 |

| | Apr '24 | | | May '24 | | | Jun '24 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth | Virtual-only | Brick and mortar | Total telehealth |
| **Restrictiveness level** | | | | | | | | | |
| Banned | 6,000 | 0 | 6,000 | 5,900 | 0 | 5,900 | 5,960 | 0 | 5,960 |
| 6-week ban | 990 | 0 | 990 | 2,250 | 0 | 2,250 | 2,110 | 0 | 2,110 |
| Permitted | 10,390 | 1,580 | 11,970 | 9,540 | 1,880 | 11,420 | 9,010 | 1,540 | 10,550 |
| Abortions provided under shield laws to states with telehealth restrictions | 2,700 | ... | 2,700 | 1,730 | ... | 1,730 | 1,580 | ... | 1,580 |
| Abortions provided under shield laws to states with total bans and 6-week bans | 6,990 | ... | 6,990 | 8,150 | ... | 8,150 | 8,070 | ... | 8,070 |

*National and state totals of telehealth abortions include those provided under shield laws.*

*All numbers have been rounded to the nearest 10. Data that are suppressed are represented by '–". Numbers 0-9 have been rounded up to 10 or are represented by "–". Data that were not collected are represented by "...". Numbers have been corrected as needed for missingness with imputation.*

**Contributors**

This report was prepared by #WeCount Co-Chairs and Society of Family Planning staff, with guidance from the Research Steering Committee, as well as the support of many members of the Society of Family Planning community.

#WeCount Co-Chairs
- Alison Norris, MD, PhD; Ohio State University
- Ushma Upadhyay, PhD, MPH; University of California, San Francisco

#WeCount Research Steering Committee
- Abigail Aiken, MD, PhD, MPH; University of Texas at Austin
- Danielle Bessett, PhD, MA; University of Cincinnati
- Anitra Beasley, MD, MPH; Baylor College of Medicine
- Angel Foster, DPhil, MD, AM; University of Ottawa
- Jenny Higgins, PhD, MPH; University of Wisconsin
- Rachel Jones, PhD; Guttmacher Institute
- Isaac Maddow-Zimet, MS; Guttmacher Institute
- Caitlin Myers, PhD; Middlebury College
- Whitney Rice, DrPH, MPH; Emory University
- Hannah Simons, DrPH; Planned Parenthood Federation of America
- Mikaela Smith, PhD; Ohio State University
- Terri-Ann Thompson, PhD; Ibis Reproductive Health
- Kari White, PhD, MPH; Resound Research for Reproductive Health

#WeCount Society of Family Planning Staff
- Jenny O'Donnell, ScD, MS; Senior Director of Research and Evaluation
- Claire Yuan, MPP; Senior #WeCount Coordinator

Please contact us with questions or comments at WeCount@SocietyFP.org.
Media inquiries can be directed to SFP@conwaystrategic.com.

# EXHIBIT 2

Society of Family Planning, #WeCount
Report April 2022 to December 2024
(Jun. 23, 2025)

# National findings

# Summary of findings

- Abortion volume is **higher in 2024** than it was in 2023 or 2022.

- The majority of abortions occur **in-person**.

- The number of abortions delivered via **telehealth continued to increase**.
    - By the end of 2024, 1 in 4 abortions was delivered via telehealth.

- **Shield laws** continue to facilitate abortion access, with an average of 12,330 abortions per month in the final quarter of 2024.

- Implications of these trends are unclear in the context of multiple changes in the service delivery environment:
    - Shifting price of abortion
    - Decreases in abortion funds to cover patient costs
    - Election-related spikes in demand
    - Ongoing financial pressure on brick-and-mortar clinics

60

# Changes in legal status since January 2024

- In **Florida**, a 6-week ban went into effect in May 2024

- In **Iowa**, a 6-week ban went into effect in August 2024

- In **North Dakota**, a total ban was ruled unconstitutional in October 2024

    No brick-and-mortar facilities providing

- States with total bans as of December 2024:

    **Alabama, Arkansas, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Oklahoma, South Dakota, Tennessee, Texas, West Virginia**

- States with 6-week bans as of December 2024:

    **Florida, Georgia, Iowa, South Carolina**



Permitted
6-week ban
Total ban

61

# Total abortions in the US have increased since *Dobbs*

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# US abortions totaled 1.14 million in 2024

January 2024 to December 2024



Source: Society of Family Planning, June 2025

# Monthly average number of abortions increased each year

April 2022 to December 2024



Source: <u>Society of Family Planning</u>, June 2025

# The monthly number of abortions increased each year

April 2022 to December 2024, year over year



Source: Society of Family Planning, June 2025

65

# By Q4 of 2024, 1 in 4 abortions were provided via telehealth

2022 Quarter 2 to 2024 Quarter 4, % in-person versus telehealth



Source: Society of Family Planning, June 2025

# In-person abortion care declined slightly, while telehealth grew

2022 Quarter 2 to 2024 Quarter 4, in-person versus telehealth



Source: Society of Family Planning, June 2025

# The majority of abortions still take place in-person



April 2022 to December 2024

Source: Society of Family Planning, June 2025

# The proportion of abortions provided via telehealth varied by state, 2024

June 2024 to December 2024, % provided via telehealth in states where permitted



Source: Society of Family Planning, June 2025

69

# Abortions provided by virtual-only clinics have increased since *Dobbs*



Virtual-only to states where telehealth is permitted (excludes abortions provided under shield laws)

Source: Society of Family Planning, June 2025

70

# Abortions provided under shield laws have increased since this route to care became available

July 2023 to December 2024



Source: Society of Family Planning, June 2025

# Legal climates appear to play an important role in telehealth use

2023 Quarter 1 to 2024 Quarter 4



Source: Society of Family Planning, June 2025

72

# Half of abortions provided via telehealth in 2024 were facilitated by shield laws

| 2024 monthly average number of abortions | | |
|---|---|---|
| | In-person | Telehealth |
| Abortion and telehealth permitted | 60,780 | 10,360 |
| Abortion permitted, telehealth restricted | 8,610 | 1,610 |
| 6-week abortion ban, telehealth restricted | 5,350 | 2,080 |
| Abortion is totally banned | 30 | 6,350 |

Source: Society of Family Planning, June 2025

73

# State-level findings

# Alabama

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Alaska

April 2022 to December 2024



Source: Society of Family Planning, June 2025

76

# Arizona

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Arkansas

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# California

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Colorado

April 2022 to December 2024



Source: Society of Family Planning, June 2025

80

# Connecticut

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Delaware

April 2022 to December 2024



Source: Society of Family Planning, June 2025

82

# District of Columbia

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Florida

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Georgia

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Hawaii

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Idaho

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Illinois

April 2022 to December 2024



Source: Society of Family Planning, June 2025

88

# Indiana

April 2022 to December 2024



Source: Society of Family Planning, June 2025

89

# Iowa

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Kansas

April 2022 to December 2024



Source: Society of Family Planning, June 2025

91

# Kentucky

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Louisiana

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Maine

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Maryland

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Massachusetts

April 2022 to December 2024



Source: <u>Society of Family Planning</u>, June 2025

# Michigan

April 2022 to December 2024



Source: Society of Family Planning, June 2025

97

# Minnesota

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Mississippi

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Missouri

April 2022 to December 2024



Source: Society of Family Planning, June 2025

100

# Montana

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Nebraska

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Nevada

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# New Hampshire

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# New Jersey

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# New Mexico

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# New York

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# North Carolina

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# North Dakota

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Ohio

April 2022 to December 2024



Source: Society of Family Planning, June 2025

110

# Oklahoma

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Oregon

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Pennsylvania

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Rhode Island

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# South Carolina

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# South Dakota

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Tennessee

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Texas

### April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Utah

April 2022 to December 2024



Source: Society of Family Planning, June 2025

119

# Vermont

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Virginia

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Washington

April 2022 to December 2024



Source: Society of Family Planning, June 2025

122

# West Virginia

April 2022 to December 2024



Source: Society of Family Planning, June 2025

123

# Wisconsin

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# Wyoming

April 2022 to December 2024



Source: Society of Family Planning, June 2025

# EXHIBIT 3

2021 FDA Letter to ACOG and SMFM
About Mifepristone REMS
(Apr. 12, 2021)



April 12, 2021

Maureen G. Phipps, MD, MPH, FACOG
Chief Executive Officer
American College of Obstetricians and Gynecologists
c/o    Rachel Tetlow, Federal Affairs Director
        rtetlow@acog.org

        Skye Perryman, General Counsel
        sperryman@acog.org

William Grobman, MD, MBA
President
Society for Maternal-Fetal Medicine
w-grobman@northwestern.edu


Dear Drs. Phipps and Grobman,

In your letter of April 20, 2020, to former Commissioner Stephen Hahn, you expressed concerns about the in-person dispensing requirements for certain prescription drugs during the current public health emergency.  In my letter to you of March 19, 2021, I indicated that staff in the Food and Drug Administration's (FDA) Center for Drug Evaluation and Research (CDER) were evaluating the issues you raised.

Following up on my March 19, 2021, letter I am writing to report the results of CDER's review and analysis.

CDER conducted a literature search for studies pertinent to the in-person dispensing requirement in the Mifepristone REMS Program during the COVID-19 pandemic.  Based on this literature search, CDER identified four publications that included relevant clinical outcome data.[1]  CDER

---

[1] Chong E, et al. Expansion of a Direct-to-Patient Telemedicine Abortion Service in the United States and Experience during the COVID-19 Pandemic. Contraception 2021 (accepted manuscript). https://www.sciencedirect.com/science/article/pii/S0010782421000913; Kerestes C, et al. Provision of medication abortion in Hawai'i during COVID-19: Practical experience with multiple care delivery models. Contraception 2021 (accepted manuscript). https://doi.org/10.1016/j.contraception.2021.03.025; Aiken A et al. Effectiveness, Safety and Acceptability of No-test Medical Abortion Provided Via Telemedicine: a National Cohort Study. British J Obstet Gynecol 2021. https://obgyn.onlinelibrary.wiley.com/doi/10.1111/1471-0528.16668; Reynolds-Wright JJ et al. Telemedicine medical abortion at home under 12 weeks' gestation: a prospective observational cohort study during the COVID-19 pandemic.  BMJ Sex Reprod Health 2021. https://srh.bmj.com/content/early/2021/02/04/bmjsrh-2020-200976

found that although there are limitations to the study designs, the overall findings from these studies do not appear to show increases in serious safety concerns (such as hemorrhage, ectopic pregnancy, or surgical interventions) occurring with medical abortion as a result of modifying the in-person dispensing requirement during the COVID-19 pandemic.

CDER also reviewed postmarketing adverse events that reportedly occurred from January 27, 2020 - January 12, 2021, with mifepristone use for medical termination of early pregnancy, along with available information about deviations or noncompliance events associated with the Mifepristone REMS Program.[2]  CDER found that the small number of adverse events reported to FDA during the COVID-19 public health emergency (PHE) provide no indication that any program deviation or noncompliance with the Mifepristone REMS Program contributed to the reported adverse events.

In summary, provided the other requirements of the Mifepristone REMS Program are met, and given that the in-person dispensing of mifepristone for medical termination of early pregnancy may present additional COVID-related risks to patients and healthcare personnel because it may involve a clinic visit solely for this purpose, CDER intends to exercise enforcement discretion during the COVID-19 PHE with respect to the in-person dispensing requirement of the Mifepristone REMS Program, including any in-person requirements that may be related to the Patient Agreement Form.  Further, to the extent all of the other requirements of the Mifepristone REMS Program are met, CDER intends to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of mifepristone through the mail either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

CDER is communicating this decision to the approved application holders subject to the Mifepristone REMS Program.

Sincerely yours,

Janet Woodcock, M.D.
Acting Commissioner of Food and Drugs

---

[2] See Mifepristone REMS Program at
https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390.  CDER's analysis covers both products that are subject to the Mifepristone REMS Program (Mifeprex and the approved generic, Mifepristone Tablets, 200 mg).

# EXHIBIT 4

Dr. Margaret Carpenter indictment

Clerk of Court Demographic Information Report for

| | |
|---|---|
| Judicial District: | 18th |
| DA Name: | Tony  Clayton |
| Judge: | |
| Parish: | West Baton Rouge |
| Defendant Name: | Dr. Margaret D Carpenter, and Nightingale Medical, PC |

| | |
|---|---|
| DOB: | 12/17/1969 |
| Race: | |
| Sex: | |
| Date of Arrest: | |
| Arr. Agency: | Attorney Generals Office |
| SID: | |
| US Citizen: | |
| Drivers License #: | |
| Drivers License State: | |
| City: | New Paltz |
| State: | NY |

Deputy Clerk:    *Sharon Paul*

Minute Clerk:    *Kelli Amond*

Charge:    14:87.9.B(1)

Plea:

Date Filed:  **JAN 3 1 2025**
Date Arraigned:

130

THE EIGHTEENTH JUDICIAL DISTRICT COURT
FOR THE PARISH OF WEST BATON ROUGE

STATE OF LOUISIANA

STATE OF LOUISIANA

FILED: _January 31, 2025_

_Sharon Paul_
Deputy Clerk of Court

VERSUS

DR. MARGARET D. CARPENTER AND
NIGHTINGALE MEDICAL, PC

NO.   **250187**

**A TRUE BILL**

Foreman _Sara V B Smith_

Date: _1-31-2025_

| **BILL OF INDICTMENT** |
| --- |

The GRAND JURY OF THE STATE OF LOUISIANA, _duly impaneled_

_sworn and charge in and for the body of the Parish of West Baton Rouge, in the name and by_
_authority of said State, upon their oath, PRESENT: that one DR. MARGARET D. CARPENTER_
_AND NIGHTINGALE MEDICAL, PC, late of the State of New York, County of Ulster, with force_
_and arms, in the Parish of West Baton Rouge, State of Louisiana, aforesaid, and within the_
_jurisdiction of the Eighteenth Judicial District Court in and for the Parish of West Baton Rouge_
_charges that_ :

**LA R.S. 14:87.9 (A) AND (B)(1) CRIMINAL ABORTION BY MEANS OF**
**ABORTION-INDUCING DRUGS,** Dr. Margaret D Carpenter, and Nightingale Medical,
PC, on or about April 5, 2024, did knowingly cause an abortion to occur by means of delivering,
dispensing, distributing, or providing a pregnant women with an abortion-inducing drug.

Contrary to the law of the State of Louisiana and against the peace and dignity of the same.

**TONY CLAYTON**
**DISTRICT ATTORNEY**

**BY:  Tony Clayton #21191**
**Assistant District Attorney**
**Eighteenth Judicial District**
**State of Louisiana**

131

# EXHIBIT 5

Center for Drug Evaluation and Research,
Application Number: 20-687 Medical
Review(s)
(Jan. 27, 2000)

CENTER FOR DRUG EVALUATION AND RESEARCH

APPLICATION NUMBER:  20-687

MEDICAL REVIEW(S)

JAN 27 2000

1

## MEDICAL OFFICER'S REVIEW OF AMENDMENTS 024 AND O33 FINAL REPORTS FOR THE U.S. CLINICAL TRIALS INDUCING ABORTION UP TO 63 DAYS GESTATIONAL AGE AND COMPLETE RESPONSES REGARDING DISTRIBUTION SYSTEM AND PHASE 4 COMMITMENTS

NDA Number:           20-687

Applicant:            Population Council
                      One Dag Hammarskjold Plaza
                      New York, New York 10017

Dates of Submission:   June 3, 1999 and August 18, 1999

Dates Submissions Received: June 4, 1999 and August 19,1999

Date Review Completed:  October 28, 1999

Date Review Revised:    November 19, 1999

Date Review Finalized:  November 22,1999

I.    General Information:

      A.    Name of Drug:
            1. Established Name: Mifepristone
            2. Trade Name: None designated as yet.

            3. Laboratory Code Name: RU 38486 (RU-486).

      B.    Pharmacologic Category: Antiprogestational and antiglucocorticoid agent.

      C.    Proposed Indication: Medical termination of intrauterine pregnancy through 49 days' pregnancy.

      D.    Dosage Form and Route of Administration: Tablet for oral administration.

      E.    Strength: Each tablet contains 200 mg of mifepristone.

      F.    Dosage: Three 200 mg tablets (600 mg) of mifepristone are taken as a single oral dose. Unless abortion has occurred, the patient takes two 200 $\mu$g tablets (400 $\mu$g) of misoprostol orally two days after ingesting mifepristone.

      G.    Related Drugs: None marketed.

134

2

H.    Table of Contents:

1.    General Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
2.    Manufacturing Controls Reference . . . . . . . . . . . . . . . . . . . . . . . . 2
3.    Pharmacology and Pharmacodynamics Reference . . . . . . . . . . . 2
4.    Clinical Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
5.    Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
6.    Statistical Consultation Reference . . . . . . . . . . . . . . . . . . . . . . . . . 6
7.    Clinical Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
8.    Reviewer's Comments, Evaluation, and Conclusions . . . . . . . . 15
9.    Labeling Evaluation Reference . . . . . . . . . . . . . . . . . . . . . . . . . . 20
10.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
11.   Recommended Phase 4 Studies . . . . . . . . . . . . . . . . . . . . . . . . . . 20
12.   Consideration of Advisory Committee Member's Comments . . 21
13.   Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

II.    Manufacturing Controls: Please refer to chemist's review for details.

III.   Pharmacology and Pharmacodynamics: Please refer to pharmacologist's review for details.

IV.    Clinical Background:

Mifepristone is a synthetic steroid that was approved for the termination of pregnancy in France in December 1988 (launched September 1989), in Sweden in 1992, in the United Kingdom in 1991, and in China in 1988. (It should be noted that mifepristone used in China is not manufactured by Roussel Uclaf but by domestic companies). When administered alone in total doses of 1400-1600 mg over 1-10 days, the success rate was 64-85%. Subsequent studies demonstrated that the administration of mifepristone followed by a synthetic prostaglandin analog increases the success rate to over 95%. In a preliminary study of 100 women, the success rate of 600 mg mifepristone and 0.2 mg misoprostol was 95% for pregnancies of no more than 49 days of amenorrhea. Misoprostol is a synthetic prostaglandin $E_1$ analog

In the                    misoprostol

Nine phase 2 clinical studies to determine the most effective dose and dosage regimen for mifepristone used alone for the interruption of pregnancy were conducted in France between 1983 and 1986. Patients in these studies were entered with a target gestational age of less than or equal to 41 days of amenorrhea. One thousand patients were exposed to doses ranging from 100 mg for one to four days to 800 mg for one day.

Following completion of the phase 2 studies, nine phase 3 clinical trials employing a single 600 mg dose of mifepristone were conducted to evaluate the efficacy and the

3

safety of this dose.  The target population was patients with pregnancies having a gestational age ≤42 days of amenorrhea.  A total of 2,459 patients were studied.

The advantage of combining mifepristone 600 mg with a prostaglandin (sulprostone 250$\mu$g I.M. 36-48 hours later)  for pregnancy interruption was demonstrated in 1985.  A series of ten clinical trials were conducted between 1987 and 1991 to confirm and extend these initial observations.  In addition to sulprostone, other prostaglandins including gemeprost, 15MePGF 2a, and prostine E$_2$ were evaluated.  During the ten studies, a total of 19,947 patients were exposed to mifepristone administered as a single 600 mg dose. One of these studies enrolled over 16,000 patients.  Very rare cases of hypotension and one myocardial infarction were reported.  Successful termination of early pregnancy was achieved in 82.6 to 100% of the patients enrolled in these studies and the safety of mifepristone was confirmed.

The efficacy and safety of mifepristone given as a single 600 mg oral dose in combination with misoprostol 0.4 mg orally administered approximately 36 to 48 hours after mifepristone for termination of pregnancy was evaluated in two historically controlled, pivotal clinical trials conducted in France.  The first study included women with intrauterine pregnancies of  ≤ 49 days and the second study included women with intrauterine pregnancies of ≤63 days.  In the second study, a second dose of 200 $\mu$g of misoprostal was given 3 hours after the first dose if complete abortion had not occurred. In the first study of 1205 evaluable patients, the complete abortion rate was 95.4% and in the second study of 1104 evaluable patients, the complete abortion rate was 92.8%. These two studies were evaluated in the review of a new drug application that was submitted March 16, 1996.

V.    Regulatory Background:

$\underline{2}$ **Page(s) Redacted**

# Deliberative Process

6

VI.   Statistical Consultation: None required

VII.  Clinical Studies:

The efficacy and safety of mifepristone was evaluated in two prospective, open-label, multicenter clinical trials in the United States according to two identical protocols (166A and 166B) at 17 centers (University hospitals, Planned Parenthood clinics, and free-standing clinics). The studies were conducted at centers that could perform abortions by either vacuum aspiration or dilatation and curettage and had access to facilities that provided blood transfusions and performed routine emergency resuscitation procedures. The studies included patients in three gestational age groups:

> Group 1:  amenorrhea of ≤49 days
> Group 2: amenorrhea of 50-56 days
> Group 3: amenorrhea of 57-63 days

Data from the two studies were combined in the following evaluation.

A.                    Investigators:

| | |
|---|---|
| Dr. Paul Blumenthal | Baltimore, Maryland |
| Dr. Lynn Borgatta | White Plains, New York |
| Dr. Mitchell Crenin | Pittsburgh, Pennsylvania |
| Dr. Catherine Dean | St. Louis, Missouri |
| Dr. Susan Haskell | Des Moines, Iowa |
| Dr. Tyrone Mallory | Atlanta, Georgia |
| Dr. Daniel Mishell, Jr. | Los Angeles, California |
| Dr. Mark Nichols | Portland, Oregon |
| Dr. Alfred Poindexter | Houston, Texas |
| Dr. Suzanne Poppema | Seattle, Washington |

7

| | |
|---|---|
| Dr. Eugene Rothenberg | Shrewsbury, New Jersey |
| Dr. Katherine Sheehan | San Diego, California |
| Dr. Laszlo Sogor | Cleveland, Ohio |
| Dr. Judith Tyson | Burlington, Vermont |
| Dr. Peter Vargas | Aurora, Colorado |
| Dr. Carolyn Westhoff | New York, New York |

B. Objectives of the Study:

The study was conducted to evaluate the effectiveness, safety, acceptability, and feasibility of using mifepristone and misoprotol in a variety of clinical settings within the United States health care system for the induction of abortion in women whose duration of amenorrhea was no more than 63 days.

C. Rationale for the Study:

Extensive experience has been gained outside the United States with the use of mifepristone and various prostaglandin analogs, including misoprostol, for the termination of pregnancies up to 63 days, with complete abortion rates ranging from 92.7% to 99%. The applicant wished to confirm the efficacy and safety of the regimen in the United States.

D. Method of Assignment to Treatment:

Eligible patients fulfilling all of the inclusion criteria and none of the exclusion criteria were assigned to one of the three treatment groups, based on gestational age.

E. Number of Subjects:

A total of 2,121 patients were enrolled including 859 patients in groups 1,722 patients in group 2, and 540 patients in group 3.

F. Duration of Clinical Trial:

Patients were to receive mifepristone on day 1 and misoprostol on day 3 and were to be observed in the clinical setting for at least 4 hours after misoprostol administration. Patients were to return for evaluation on day 15.

G. Inclusion Criteria:

1. Was at least 18 years of age and in good general health.

2. Requested a voluntary termination of pregnancy.

139

8

3. Had a positive urine pregnancy test.

4. Had an intrauterine pregnancy with a duration of amenorrhea of ≤63 days (from the first day of her last menstrual period) that was confirmed by uterine size on pelvic examination and by vaginal ultrasound evaluation.

5. Agreed to have a surgical termination of pregnancy if the study procedures failed to terminate her pregnancy.

6. Was a resident of the United States.

7. Gave written informed consent to participate in the study and was willing and able to participate.

H.    Exclusion Criteria:

1. Had evidence of any disorder which represented a contraindication to the use of mifepristone (such as adrenal disease or a condition requiring chronic corticosteroid administration) or misoprostol (such as asthma, glaucoma, mitral stenosis, arterial hypotension, sickle cell anemia, or a known allergy to prostaglandins).

2. Had a history of severe liver, respiratory, or renal disease or thromboembolism.

3. Had a cardiovascular disease, e.g. angina, valve disease, arrhythmia, cardiac failure, or insulin dependent diabetes.

4. Had hypertension that was being treated on a chronic basis or had blood pressure of greater than 140/90mmHg.

5. Was anemic (hemoglobin < 10 g/dL or hematocrit < 30%).

6. Had a known clotting defect or was receiving anticoagulants.

7. Had an IUD *in situ*.

8. Was breastfeeding.

9. Had adnexal masses or tenderness on pelvic examination that suggested pelvic inflammatory disease.

10. Had an ectopic pregnancy or threatened abortion.

11. Was over 35 years of age and smoked more than 10 cigarettes per day, and

9

had another risk factor for cardiovascular disease such as diabetes mellitus, hyperlipidemia, hypertension, or a family history of ischemic heart disease.

12. Was unlikely to understand and comply with the requirements of the study.

13. Lived or worked more than one hour from the emergency care facility that served the abortion center.

I. Trial Period:

September 13, 1994 to September 12, 1995

J. Dosage and Mode of Administration:

Patients were not to eat during the one hour before and after the administration of mifepristone. In the presence of the investigator, each patient was administered three 200 mg mifepristone tablets by mouth with no more than 240 mL of water. Patients were informed that they should not smoke during the 48 hours following mifepristone administration and on the day misoprostol was to be administered. Unless the investigator could verify unequivocally that complete abortion had occurred, patients were administered two 200 $\mu$g misoprostol tablets by mouth with no more than 240 mL of water in the presence of the investigator 36 to 60 hours after the administration of mifepristone.

K. Efficacy Assessments:

Pelvic examinations were performed before mifepristone administration at visit 1, before misoprostol administration at visit 2, during the 4 hour observation period after misoprostol administration, and at the visit 3 evaluation. At visit 1, patients also had transvaginal ultrasound examinations and quantitative hCG $\beta$ subunit pregnancy tests performed. At visits 2 and 3, ultrasound examinations were performed at the discretion of the investigator.

The outcome of treatment was classified as follows:

1.　Complete abortion: pregnancy termination and complete expulsion of the products of conception without the need of surgical intervention.

2.　Incomplete abortion: pregnancy termination with either partial expulsion or nonexpulsion of the products of conception diagnosed at visit 3 or at study end if later than visit 3 with surgery required.

3.　Ongoing pregnancy: a viable pregnancy diagnosed at visit 3 based on fetal heartbeat and/or fetal growth indicating gestations that are

10

two weeks older than at visit 1; surgery required.

4.    Medical intervention: before visit 3, the investigator judged that a
      surgical intervention was medically indicated.

5.    Patient request: before visit 3, the patient chose not to proceed with
      the medical method of abortion and requested surgical
      intervention.

In the analyses of treatment outcome, complete abortion only was
classified as a treatment success. All other categories resulted in a
surgical procedure and , therefore, were classified as treatment failures.

L.  Safety Assessments:

Adverse events were summarized and evaluated.

M.  Disposition of Patients:

A total of 2121 patients were enrolled. Of these, 2015 (95.0%) were
included in the efficacy analyses. There were 106 patients excluded from
the efficacy analyses because of failure to show up for visit 3, thus
preventing confirmation of a final outcome. For 92 of these patients, there
was some information suggesting a successful outcome. For one excluded
patient, there was evidence that suggested failure. The remaining 13
women were lost to followup; 5 had continuing pregnancies when last
seen at visit 2. All 2121 patients were evaluable for safety. A total of 827
patients in Group 1, 678 patients in Group 2, and 510 patients in Group 3
were included in the efficacy evaluation.

N.  Demographic Characteristics:

Most patients were Caucasian (71%), 20-29 years of age (61%; mean age
of 26.9 years), of normal body mass index (71%), nulliparous (55%) and
had a previous elective abortion (51%). The differences among the three
gestational age groups in race distribution and mean age, weight, and body
mass index were small and not of clinical significance.

O.  Results:

1.  Efficacy:
    Success and failure rates are summarized in Table 1.

11

### Table 1
### (Sponsor's Table 4.1)
### Treatment Outcomes by Gestational Age (Evaluable Patients)

| Treatment Outcomes | Group 1<br>≤ 49 days<br>N = 827 | Group 2<br>50-56 days<br>N = 678 | Group 3<br>57-63 days<br>N = 510 |
|---|---|---|---|
| Total Successes | 762 (92%) | 563 (83%) | 395 (77%) |
|   RU-486 alone | 40 (5%) | 12 (2%) | 4 (< 1%) |
|   Plus misoprostol | 722 (87%) | 551 (81%) | 391 (77%) |
| | | | |
| Total Failures | 65 (8%) | 115 (17%) | 115 (23%) |
|   Med intervention | 13 (2%) | 26 (4%) | 21 (4%) |
|   Patient request | 5 (< 1%) | 13 (2%) | 12 (2%) |
|   Incomplete ab | 39 (5%) | 51 (8%) | 36 (7%) |
|   Ongoing preg | 8 (< 1%) | 25 (4%) | 46 (9%) |

Failures are discussed in this review in the "Safety" section of "Results."

Complete abortion rates according to time of occurrence are displayed in Table 2 as confirmed by the investigators.

### Table 2
### (Sponsor's Table 5.1)
### Time to Occurrence of Complete Abortion

| Occurrence Time | Group 1<br>≤ 49 days<br>N=827 | Group 2<br>50-56 days<br>N=678 | Group 3<br>57-63 days<br>N=510 |
|---|---|---|---|
| Mifepristone alone | 40 (4.8%) | 12 (1.8%) | 4 (0.8%) |
| ≤ 4h after misoprostol | 376 (45.5%) | 312 (46.0%) | 178 (34.9%) |
| > 4h & < end of day 4 | 178 (21.5%) | 118 (17.4%) | 118 (23.1%) |
| After day 4 | 168 (20.3%) | 121 (17.8%) | 95 (18.6%) |
| Surgical intervention | 65 (7.9%) | 115 (17.0%) | 115 (22.5%) |

2. Safety:

    Adverse events, regardless of causality, were reported for at least 99% of the patients in each gestational age group. More than one adverse event was reported for most patients. The majority of adverse events were of mild or moderate severity. Approximately 23% of the adverse events in each gestational age group were judged to be severe. The most common adverse event was abdominal pain, including uterine cramping. This was to be expected since the treatment procedure is designed to induce the uterine cramping (and bleeding) necessary to produce an abortion.

12

Other commonly reported adverse events were nausea, vomiting, headache, diarrhea, and dizziness. No serious adverse events were reported in tolerance studies in healthy non-pregnant female and healthy male subjects where mifepristone was administered in single doses greater than threefold that recommended for termination of pregnancy. Table 3 shows that the rates of most, but not all, adverse events that occurred in patients whose gestational age was ≤ 49 days were not significantly different from the rates across all gestational age groups.

Table 3

Most Commonly Reported Adverse Events

| Adverse Event | Group 1 ≤ 49 days N=859 Percentage | Groups 1, 2, and 3 ≤ 63 days N=2121 Percentage |
|---|---|---|
| Abdominal pain (cramping) | 96 | 97 |
| Nausea | 61 | 67 |
| Headache | 31 | 32 |
| Vomiting | 26 | 34 |
| Diarrhea | 20 | 23 |
| Dizziness | 12 | 12 |
| Fatigue | 10 | 9 |
| Back pain | 9 | 9 |
| Uterine hemorrhage | 5 | 7 |
| Fever | 4 | 4 |
| Viral infections | 4 | 4 |
| Vaginitis | 3 | 4 |
| Rigors (chills/shaking) | 3 | 3 |
| Dyspepsia | 3 | 3 |
| Insomnia | 3 | 2 |
| Asthenia | 2 | 2 |
| Leg pain | 2 | 2 |
| Anxiety | 2 | 2 |
| Anemia | 2 | 2 |
| Leukorrhea | 2 | 2 |
| Sinusitis | 2 | 2 |
| Syncope | 1 | 2 |

Table 4 shows the rates of adverse events in any gestational age group which were significantly different across gestational age groups.

13

## Table 4
### Adverse Events Significantly Different Across Gestational Age Groups

| Adverse Event | Group 1<br>≤ 49 days<br>Percentage | Group 2<br>50-56 days<br>Percentage | Group 3<br>57-63 days<br>Percentage |
|---|---|---|---|
| Nausea | 61 | 71 | 72 |
| Vomiting | 26 | 38 | 41 |
| Diarrhea | 20 | 23 | 26 |
| Uterine hemorrhage | 5 | 8 | 10 |

No patient was discontinued from the study because of an adverse event and there were no deaths.

The median bleeding duration for group 1 was 14 days and 15 days for groups 2 and 3.

The proportions of patients who received any medications for bleeding increased with increasing gestational age form 5.7% in group 1 to 10.7% in group 3. A total of 146 patients (6.9%) received uterotonics ( ergot-type medications or oxytocin) for bleeding.

Fourteen patients (0.7%) were hospitalized for an adverse event. Of these patients, 2 of 4 in the ≤ 49 days group, 3 of 5 in the 50-56 days group, and 3 of 5 in the 56-63 days group had adverse events (severe excessive bleeding) which were considered to be study drug related. The other patients were hospitalized for reasons unrelated to study treatment (pneumonia, meningitis, automobile accident, depression, shooting injury, endometritis).

Nineteen patients (0.9%) had emergency room visits that did not result in hospitalization. Sixteen of these 19 patients had excessive bleeding (2, ≤ 49 days; 7, 50-56 days; 7, 57-63 days). The other three visits were for chest pain, nausea and vomiting, and cramping.

Four patients received blood transfusions (1, ≤ 49 days; 2, 50-56 days; 1, 57-63 days). Three of these patients were hospitalized.

IV fluids were administered for various reasons to 9 (1.0%) patients in the ≤ 49 days group, 19 (2.6%) in the 50-56 days group, and 18 (3.3%) in the 57-63 days group.

The following five potentially serious adverse events occurred:

A 34 year old patient with a 20 year history of seizures and a pregnancy of

14

46 days gestational age had a mild seizure (convulsion) on the day of mifepristone administration and received 250 mg of dilantin. In the opinion of the investigator, the patient's seizure was not related to treatment with mifepristone and she received misoprostol 47 hours after the mifepristone.

A 28 year old of 54 days gestational age with a negative gastrointestinal history reported possible blood in her stool a month after misoprostol administration. In the opinion of the investigator, the patient's melena was not related to study treatment.

A 23 year old of 57 days gestational age developed moderate purpura (body bruises) that lasted for one day without treatment ten days after receiving misoprostol. In the opinion of the investigator, the patient's purpura was not related to study treatment.

A 21 year old of 57 days gestational age developed severe viral meningitis 6 days after receiving misoprostol and was hospitalized. In the opinion of the investigator, the patient's meningitis was not related to study treatment.

A 27 year old of 60 days gestational age with a negative gastrointestinal history reported blood in her stool 3 days after receiving misoprostol. At the time of last contact with the patient three weeks later, no further incidents of melena had been reported. In the opinion of the investigator, the patient's melena was not related to study treatment.

The proportions of patients with a decrease in hemoglobin or hematocrit of more than 20% from their pre-mifepristone administration levels increased significantly with increasing gestational age, from 3.1% in the ≤ 49 days group to 8.0% in the 57-63 days group.

Of the 1028 patients with hemoglobin measurements before and after misoprostol administration, 131 had a decrease of at least 2mg/dL (7.8%, ≤49 days; 15.0%, 50-60 days; 17.4% 57-63 days).

Hypotension after administration of misoprostol occurred in 0.3% - 1.4% of all treated patients.

Hypertension after administration of misoprostol occurred in 1.5% - 1.7% of all treated patients.

Decrease in heart rate by > 20% after administration of misoprostol occurred in 18.2% - 21.3% of all patients.

15

Increase in heart rate by >20% after administration of misoprostol occurred in 11.8% - 14.1% of all patients.

For the subgroup of patients with a full panel of laboratory tests, the median changes were small and not of clinical significance.

Failure of the mifepristone - misoprostol procedure required surgical intervention which is an additional safety concern, albeit small. A total of 295 patients were classified as having failed medical abortion. Of these patients, 79 (27%) had ongoing pregnancies, 126 (43%) had incomplete abortions, 30 (10%) requested and had surgical terminations, and the remaining 60 (20%) patients had surgical terminations performed because of medical indications directly related to the medical procedure. In group 1 (≤ 49 days gestation), of the 65 failures, 8 (12%) patients had ongoing pregnancies, 39 (60%) patients had incomplete abortions, 5 (8%) requested and had surgical terminations performed, and the remaining 13 (20%) patients had surgical terminations directly related to the medical procedure. The failure rates for medical intervention, patient request, incomplete abortion, and ongoing pregnancy were significantly higher in groups 2 and 3 than in group 1.

For each gestational age group, the adverse event rates were highest at Planned Parenthood clinics and lowest at Free-Standing clinics, with university hospital clinics in the middle.

VIII.    Reviewer's Comments, Evaluation, and Conclusions:

Two studies were conducted according to two identical protocols at 17 centers to evaluate a mifepristone - misoprostol regimen for the termination of pregnancies in the United States health care system. The studies included patients in three gestational age groups:

Group 1: amenorrhea of ≤ 49 days
Group 2: amenorrhea of 50-56 days
Group 3: amenorrhea of 57-63 days

The studies included women who requested a voluntary termination of pregnancy, had a positive pregnancy test, and a documented intrauterine pregnancy. Women with liver, respiratory, renal, adrenal, or cardiovascular disease, thromboembolism, hypertension, anemia, insulin-dependent diabetes mellitus, coagulopathy, or allergy to prostaglandins were excluded, as were women less than 18 years of age or those more than 35 years of age who smoked more than ten cigarettes per day and had another cardiovascular risk factor. Women were also excluded if they had intrauterine devices, were breast-feeding, were receiving anticoagulation or long-term glucocorticoid therapy, had adrenal masses, had

16

ectopic pregnancies, or had signs or symptoms suggesting that they might abort spontaneously. All the women agreed to undergo surgical termination of pregnancy if the medical method failed. A total of 2,121 women were enrolled in the two studies including 859 women who were in the ≤ 49 days group, which is the gestational age which is the subject of this application.

Pregnancy was measured from the first day of the last menstrual period according to menstrual history, pelvic examination, and vaginal ultrasonography and women were assigned to the appropriate gestational age group.

Three clinic visits were scheduled. At visit 1 (day 1), the women were assessed clinically and took three 200 mg tablets of mifepristone orally in the presence of the investigator. Patients did not eat for one hour before and after the consumption of the mifepristone. At visit 2 (day 3), they took 400 $\mu$g of misoprostol orally unless a complete abortion had already occurred. Patients did not smoke during the 48 hours following mifepristone consumption and on the day misoprostol was administered. Patients then remained at the clinics under observation for at least four hours. Adverse events such as nausea, vomiting, diarrhea, abdominal pain, and vaginal bleeding were rated by the women and recorded. Blood pressure and heart rate were measured at least hourly. Vaginal bleeding was recorded on a diary card and rated by each woman on days 1 through 15 as "spotting", "normal", or "heavy." During this period, the women were also monitored for the expulsion of the conceptus. At visit 3 (day 15), the treatment outcome was assessed.

Efficacy was defined as the termination of pregnancy with complete expulsion of the conceptus without the need for a surgical procedure. The need for a vacuum aspiration or dilatation or curettage constituted a failure. A surgical procedure was performed at any time if the investigator believed there was a threat to a woman's health (medically indicated), at a woman's request, or at the end of the study for an ongoing pregnancy or incomplete abortion.

A total of 106 women were excluded from the efficacy analysis because they did not return for visit 3. Evidence suggesting a successful outcome was available for 92 of these women, and evidence of failure for 1. The remaining 13 women were lost to followup; 5 had continuing pregnancies when last seen at visit 2. The efficacy analysis, therefore, included 2015 women. No additional information is available on the outcomes of the 5 women with continuing pregnancies who were lost to followup. All other women with continuing pregnancies were aborted surgically.

Efficacy was 92% in the ≤ 49 days group with a lower 95% confidence interval of 90%. This is somewhat less than the 95.5% efficacy with a lower 95% C.I. of 94.2% reported in the pivotal French studies upon which approval of this application was recommended.

17

Efficacy was 83% in the 50-56 days group with a lower 95% confidence interval of 80%. Efficacy was 77% in the 57-63 days group with a lower 95% confidence interval of 74%.

The 92% success rate in the ≤ 49 days group is an acceptable one.

The median duration of bleeding in the ≤ 49 days group was 14 days. The average duration of bleeding was 16 days. This is considerably longer than the average duration of 9 days reported in the French studies upon which approval of this application was recommended, but is an acceptable duration.

Excessive bleeding necessitated blood transfusion in only 1 patient in the ≤ 49 days group and required hospitalization of only 2 patients in the ≤ 49 days group. An additional 2 patients in the ≤ 49 days group were treated in the emergency room for excessive bleeding. Thirteen (2%) patients in the ≤ 49 days group required surgical intervention because of excessive bleeding. Bleeding was managed by the administration of uterotonic agents such as oxytocin, methylergonovine or vasopressin in 5% of patients in the≤ 49 days group.

The adverse event rates were higher in these studies than those in the pivotal French studies upon which approval of this application was recommended. This is shown in Table 5.

Table 5

Frequent Adverse Events (≤ 49 days) in French and U.S. Trials

| Adverse Event | French Trials | U.S. Trials |
|---|---|---|
| Abdominal pain (cramping) | 83% | 96% |
| Nausea | 43% | 61% |
| Headache | 2% | 31% |
| Vomiting | 18% | 26% |
| Diarrhea | 12% | 20% |
| Dizziness | 1% | 12% |

The majority of adverse events were of mild or moderate severity. The difference in the frequency of common adverse events noted above is acceptable.

In the pivotal French trials, 5.5% of subjects had a decrease in hemoglobin of greater than 2g/dL while in the U.S. trials, 7.8 % of patients in the ≤ 49 days group had such a decrease. This difference is an acceptable one.

The U.S. clinical trials confirmed the findings of the pivotal French trials that mifepristone and misoprostol are safe and effective in terminating pregnancies of up to 49 days gestation even though the success rate in the U.S. trials was lower

18

than that of the French trials. This lower success rate might be related to the lack of experience of most of the U.S. investigators with medical abortion. The lower success rate might also be attributable somewhat to the fact that in the U.S. trials, a woman's request for a surgical termination any time after receiving mifepristone was honored and classified as a failure rather than being excluded form the efficacy analysis. However, in the ≤ 49 days group, less than 8% of the failures (5 patients) were because of patient requests.

The success of medical termination of pregnancy decreased with advancing gestational age and the incidence of adverse events increased with advancing gestational age. The majority of surgical interventions were for incomplete abortion and excessive bleeding.

This method of pregnancy termination is of limited value because of the relatively short window of opportunity, in which it can be employed. Its safety and effectiveness is based on its use during the seven weeks following the first day of the last menstrual period. This means that most women would not suspect that they are pregnant and have a confirmatory pregnancy test until at least four weeks after the beginning of their last menses. This, then, leaves only a three week period for the women to secure this method of abortion.

Another disadvantage of this method of pregnancy termination is the need for at least three visits to the medical facility including at least a four hours stay after the administration of the misoprostol.

In addition, medical follow-up is required to ensure that surgical termination is performed in case the medical termination attempt fails since misoprostol has been reported to be teratogenic in humans (limb defects and skull defects).

In the U.S. clinical trials, an increase in the incidence of some adverse events (vomiting, nausea, diarrhea, uterine hemorrhage) occurred in the 50-56 and 57-63 days gestational age groups compared to the ≤ 49 days group. The safety profile of the ≤ 49 days group in the U.S. study did not differ significantly from the pivotal French studies, even though the incidence of common adverse events in the U.S. clinical trials was higher than that of the French trials in the ≤ 49 days group. The percentage of patients in the U.S. studies and the French studies requiring hospitalization, requiring blood transfusion and experiencing heavy bleeding was about the same. However, about 1.6% of the patients in the ≤ 49 days group in the U.S. study had surgical intervention because of heavy bleeding compared to less than 1% of patients in the French studies. The average duration of bleeding was 16 days in the U.S. studies compared to 9 days in the French studies.

While the U.S. clinical trials confirm the safety and efficacy of mifepristone and misoprostol found in the pivotal French studies for women seeking medical

19

abortions with gestations of 49 days duration or less, they demonstrate that with longer durations of gestation (50-56 days and 57-63 days), the treatment regimen is less effective and the incidence of adverse events is higher.

A comparison of medical termination of pregnancy with surgical termination is of interest in a polulation of women who are given a choice to select between medical and surgical termination of early pregnancy. Such a comparative clinical trial was conducted according to a uniform protocol from 1991 to 1993 in urban clinics in China, Cuba, and India, three countries where abortion is legal and available. A total of 1373 women with amenorrhea ≤ 56 days were given a choice of surgical abortion or mifepristone and misoprostol in the same dosage regimen as used in the U.S. studies. The results of this study were published in 1997. The medical regimen had more adverse events, particularly bleeding, than did surgical abortion. Failure rates for medical abortion exceeded those for surgical abortion (8.6% versus 0.4% in China, 16.0% versus 4.0% in Cuba, and 5.2% versus 0% in India). In each site failure rates of medical abortion increased with gestational age. Specific symptoms and adverse events, including cramping, nausea, and vomiting, were far more frequent among the medical than the surgical abortion patients. The only serious complication was excessive bleeding in medical abortion patients, which is a reason for surgical intervention and for dissatisfaction among medical abortion patients. Three patients (all medical abortions) received blood transfusions. This is a serious potential disadvantage of the medical method. On the whole, medical abortion patients reported significantly more blood loss than did surgical abortion patients. Slightly higher proportions of medical than surgical patients were dissatisfied (8.8% versus 3.8%). Despite the bleeding pattern and the failure rate of the medical abortion method, particularly in China, medical abortion by the mifepristone and misoprostol regimen was said by the authors of this published study to be safe, efficacious, and highly desired by and acceptable to women in developing countries.

The results of a smaller study published in 1999 comparing mifepristone to surgical abortion in U.S. women are consistent with the findings of the larger comparative clinical trial done in China, Cuba, and India. The study was a nonconcurrent, prospective, cohort analysis of 178 mifepristone - misoprostol and 199 suction curettage abortion subjects with intrauterine pregnancies ≤ 63 days gestational age. The medical abortion cohort represents all of the subjects enrolled at one U.S. clinical site for the mifepristone clinical trial between December, 1994 and August, 1995. The surgical abortion cohort was enrolled prospectively at the same clinical site between November, 1995 and December, 1996. Overall, 18.3% of medical and 4.7% surgical patients failed their primary procedure and received an unanticipated suction curettage (R.R. 3.93; 95% CI 1.87,8.29). The risk of failure demonstrated a statistically significant upward trend from 3.3 to 4.4 with advancing gestational age. Four mifepristone patients required curettage for acute bleeding while no surgical patients did. Nine

20

mifepristone patients required curettage to manage ongoing pregnancy while no surgical patients did. Five mifepristone patients required suction curettage because of incomplete abortion while no surgical patients did. Fourteen mifepristone and eight surgical patients required suction curettage for persistent bleeding. The median time delay for therapeutic curettage was significantly longer in the mifepristone group than in the surgical group (35 days versus 8 days). Mifepristone patients experienced significantly longer postprocedure bleeding than did surgical patients. The mean difference in bleeding days between cohorts was 9.6 days (95% CI, 6.8, 12.4). Mifepristone patients reported significantly longer bleeding in all three gestational age groups. Overall, mifepristone abortion patients reported significantly higher levels of pain, nausea, vomiting, and diarrhea during the actual abortion than did surgical patients. The use of antiemetic agents during the abortion procedure was significantly more common in mifepristone patients than surgical patients (31.1% versus 1%). Mifepristone patients were routinely offered oral narcotics for expulsion-related pain, and 78.5% used them. Mifepristone patients reported more problems during the follow-up interval than did surgical patients. Post-abortion pain occurred in 77.1% of mifepristone patients compared with only 10.5% of surgical patients (RR 7.4, 95% CI 4.7, 11.5). Nausea or vomiting in the follow-up interval was common in the mifepristone group (68.6%), but rare among surgical patients (0.6%) (RR 117.9, 95% CI 16.7, 834.7).

Although the mifepristone and surgical abortion techniques are both safe and effective, the abortion and post-abortion experiences differ significantly as reported in the two published studies above that permit direct comparison of the two techniques in a prospective manner.

IX.   Labeling Evaluation:

Comments regarding labeling revisions were transmitted to the sponsor in a letter dated September 18, 1996. Revised draft labeling was submitted by the sponsor June 25, 1999 and currently is under review.

X.   Conclusion:

The results of the U.S. studies do not adversely differ significantly from the results of the two pivotal French clinical trials which were the basis for the approvable letter to the sponsor September 18, 1996.

XI.   Recommended Phase 4 Studies:

The medical officer, in his revised original NDA review, recommended that phase 4 studies with the following objectives be conducted:

A.   To monitor the adequacy of the distribution and credentialing

152

21

system.

B.    To follow-up on the outcome of a representative sample of mifepristone-treated women who have surgical abortion because of method failure.

C.    To assess the long-term effects of multiple use of the regimen.

D.    To ascertain the frequency with which women follow the complete treatment regimen and the outcome of those who do not.

E.    To study the safety and efficacy of the regimen in women (1) under 18 years of age, (2) over age 35, and (3) who smoke.

F.    To ascertain the effect of the regimen on children born after treatment failure.

The phase 4 recommendations were included in the approvable letter to the sponsor dated September 18, 1999.

XII.    Consideration of Advisory Committee Members' Comments:

Part of the review process for this application included seeking expert advice from members of the FDA Reproductive Health Drugs Advisory Committee at a public meeting July 19, 1996. The committee voted 6-0 (with two abstentions) that the pivotal studies (French studies) presented at that time showed that the benefits of a mifepristone and misoprostol regimen for terminating early pregnancies outweighed its risks. The studies presented to the committee involved women treated within 49 days of the beginning of their last menstrual period.

Preliminary safety data from recently completed U.S. trials were also presented.

The committee recommended some phase 4 studies and individual committee members offered some individual comments for consideration by the FDA staff, particularly comments regarding labeling and the drug distribution system. All comments were carefully and fully considered and, to the extent possible, implemented.

The applicant was asked September 18, 1996 to submit a comprehensive description of the proposed distribution system. The following complete response from the applicant was submitted to FDA August 18, 1999 regarding the distribution system:

153

22

"The details of the distribution system for the product are in the process of being worked out with the proposed distributor. However, the following key principles will be adhered to in the final distribution arrangements:

- Product will only be available from one or two distributors nationwide and not through retail pharmacies or direct to physicians from the manufacturer.

- Each physician interested in obtaining the product must request the product from the distributors, register with them and open an account.

- Access to the distributors will be through the distributors' general order system and through a specially established toll free telephone number with product ordering as an option.

- Aside from standard credit checks run by the distributors to open a new account, each requesting physician will be required to register by providing their BNDD # and their state Medical License #, and signing a letter that they have the following:

    - The ability to accurately confirm the duration of pregnancy

    - The ability to determine blood Rh factor

    - Access to medical facilities equipped to provide emergency care should that become necessary.

In this same letter they will also be asked to indicate their agreement to:

- Obtain signed acknowledgment from the patient that they have been provided with the product label, that they have read and understood the patient information, have had the procedure, its risks and benefits explained to them, and that they agree to follow the treatment procedure.

- Place the dose # on the acknowlegement and in the patient record.

- Maintain complete records for each patient including blood tests, ultrasound examinations and progress noted.

- Fill out and return AE (Adverse Event) cards to the distributor, identifying patient by dose # only.

- Use every effort to ensure patients return for their follow up visit 14-20 days after taking the product.

23

- Provide the distributor with as much information as possible if there is an ongoing pregnancy following completion of the treatment procedure and this pregnancy is not terminated.

In addition, the toll free telephone number will enable providers to request training materials and information, and speak to an experienced medical consultant about either a non-emergency patient issue or an urgent medical problem or possible complication. Through a separate routing on the toll free telephone number, patients will have access to general information about the product, a provider location near them and web page addresses for more information.

The final distribution system will be more fully developed in the next few months but will always attempt to insure that the drug is only supplied to qualified physician/hospitals who register with the distributor, that the patient is given access to the product label and that the product # is placed on the acknowledgment in the patient's file and that the anonymity of the patient is maintained.

Market launch will not occur until the distribution system is finalized and there are adequate systems in place to track shipment and use."

FDA requested six phase 4 studies of the applicant's August 22, 1996 (and reminded them of their commitment to perform them in the approvable letter dated September 18, 1996). The requested studies are listed below:

1. To monitor the adequacy of the distribution and credentialing system.

2. To follow-up on the outcome of a representative sample of mifepristone-treated women who have surgical abortion because of method failure.

3. To assess the long-term effects of multiple use of the regimen.

4. To ascertain the frequency with which women follow the complete treatment regimen and the outcome of those who do not.

5. To study the safety and efficacy of the regimen in women (1) under 18 years of age, (2) over age 35, and (3) who smoke.

6. To ascertain the effect of the regimen on children born after treatment failure.

155

24

The applicant's complete response was submitted to FDA August 18, 1999 regarding the requested phase 4 studies as follows:
"We are mindful of our Phase 4 commitments as outlined in the Population Council's letter to FDA dated September 16, 1996. We plan to discuss in more detail and develop a consensus with the FDA post-NDA approval.

1.    The Council recognizes the need for additional information about our proposed distribution and credentialing system and the necessity for making certain that it is designed to result in safe and efficacious abortions for women and in properly controlled access to the product. We will provide the FDA with a detailed product distribution and provider credentialing plan that describes our own monitoring indicators, and we would welcome additional discussion with the Agency at that time. We intend to monitor the distribution and credentialing system but we do not believe that the frequency of post-surgical complications will necessarily be a meaningful indicator of its effectiveness.

2.    Although the Council cannot commit to a study that follows all women who have surgical abortions following failed mifepristone abortion, we would propose to investigate treatment failures among a representative sample of providers for a mutually agreeable period of time, for instance six months or one year. In such an investigation, we would classify women undergoing medical abortion according to whether they 1) completed their abortions successfully; 2) had a failed medical abortion and required a surgical abortion; 3) required surgical intervention for other reasons; or 4) were lost to follow-up.

We are not able to commit to tracking down those women who are lost to follow-up because this would be very difficult and extraordinarily expensive. We are also concerned about the ethics of doing this, as it could violate women's privacy.

3.    A prospective study of the long-term effects of multiple use of the regimen in all American women would be unduly burdensome, might result in an invasion of women's privacy and would not likely produce a meaningful scientific result for decades. However, the Council has been informed that central registries of mifeprostone users exist in Europe. We will examine these data sources to determine what can be learned about multiple use. In addition, in future studies of the regimen carried out by the Council in the U.S., we will attempt to develop a cohort of women who report more than one use of the regimen and agree to be followed.

4.    We are willing to supply treatment failure data from a sample of providers for a mutually agreeable period to time, for instance six months or one

25

year, bearing in mind that such data will not include women lost to follow-up.

5.   The Council agrees that it is desirable to have additional information on users of the regimen who are under age 18, or over age 35 or who are smokers. From the French and United States clinical trials, we do have some data on women who were more than 35 years old and on women who smoked. The French trials also included some subjects who were under age 18 years of age. We will submit an analysis of our safety and efficacy data on these subgroups. In addition, data on women under 18 or over 35 years of age and those who smoke will be collected in the sample of women we have agreed to study, as described in item Number 2 and 4 above.

6.   Since live births are extraordinarily rare as outcomes of treatment with mifepristone (e.g. approximately 19 out of more than 250,000 in the French database) this issue is best approached by reporting through providers who utilize the regimen. We will instruct our distributor to include materials for providers that ask them to report to the distributor any treatment failure in which the woman decides to continue her pregnancy. The provider will ascertain which of these women agree to be followed to document the health of any children born of such pregnancies. In addition, any spontaneous reports of live births of children exposed to mifepristone *in utero* will be investigated."

Other issues raised by individual advisory committee members are addressed below:

While the DOSAGE AND ADMINISTRATION section of the labeling states that mifepristone may be administered by or under the supervision of a physician trained in abortion, able to assess the gestational age of an embryo and to diagnose ectopic pregnancies, and with access to emergency medical facilities, the applicant has not mentioned anything about conducting training seminars for use of mifepristone, without financial incentive to physicians, and distributing the drug only to those physicians who completed the training. Perhaps the applicant will address this point when the details of the distribution system are submitted to FDA.

The applicant should be able to assess compliance with return visits of patients in the phase 4 studies to be performed.

A surgical termination, if needed, should be provided at no additional cost to the patient. It should be part of the mifepristone-misoprostol method of abortion.

26

Reasonable attempts to contact patients who do not return to confirm the abortion should be made by the physician.

The applicant intends to monitor the distribution system to ensure that only qualified physicians are treating patients.

The applicant will monitor the number of failed medical terminations and any resulting surgical complication.

The applicant will examine central registries of mifepristone users in Europe to determine what can be learned about multiple use. In addition, the applicant proposes to attempt to develop a cohort of women in future studies in the United States who report more than one use of the regimen and agree to be followed.

The applicant has some data on women who were more than 35 years of age, on women who smoked, and on women under 18 years of age. They will submit an analysis of safety and efficacy data on these subgroups. In addition, data on these subgroups will be collected during the phase 4 studies.

The outcomes of pregnancies not terminated by medical or surgical abortion should be followed up and reported by the physician. This should be part of the credentialing and distribution system.

Conditions of exclusions in the clinical trials are in the labeling.

There is no age restriction in the labeling. Women under 18 years of age or over 35 years of age were arbitrarily excluded from the clinical trials, but there is no biologic reason to think that the efficacy and safety of drug administration to these age groups is any different from that of women 18-35 years of age.

The labeling states that misoprostol should be taken two days after ingesting mifepristone.

Women who smoked at least 10 cigarettes per day were excluded from the French studies. Women in the French studies were informed that they should neither smoke nor drink alcohol during the 48 hours following mifepristone administration and on the day misoprostol was to be administered.

Women in the U.S. studies were informed that they should not smoke during the 48 hours following mifepristone administration and on the day misoprostol was to be administered. Women were excluded from the U.S.

**BEST POSSIBLE COPY**

27

studies if they were over 35 years of age, smoked more than 10 cigarettes per day, and had another risk factor for cardiovascular disease. The labeling contains a cautionary statement that women who are more than 35 years of age and who also smoke 10 or more cigarettes per day should be treated with caution because such patients were generally excluded from clinical trials of mifepristone. The labeling does not contain a statement that alcohol and/or tobacco should be avoided during treatment. Myocardial infarction has been associated with the administration of an intramuscularly administered prostaglandin, sulprostone, but no such association has been reported with the administration of misoprostol. The labeling for misoprostol does not contain any statement regarding avoiding smoking.

Several comments regarding labeling were made by individual advisory committee members and have been throughly considered.

Overall, I do not think that the labeling imparts an impression to the physician or patient that the treatment regimen is "free of adverse effects and free of actually serious side effects."

The use of mifepristone and misoprostol extends the options available to women for the elective termination of early pregnancy, but it is inappropriate to directly compare this regimen with surgical termination in terms of adverse events. For example, bleeding and cramping are to be expected with mifepristone and misoprostol and not generally expected with surgical termination. The two methods are usually appropriate for abortion at different gestational ages. Medical abortions are done usually during the fifth to seventh weeks of gestation. Surgical terminations are usually not done before the sixth week of gestation.

Reference to drugs known to cause enzyme induction has been deleted.

The risk of malformation occurring if pregnancy is not terminated after drug administration appears in table 2 of the labeling.

The labeling states that a surgical termination must be recommended for patients who have an ongoing pregnancy because of the risk of fetal malformation resulting from the treatment procedure.

The physician labeling mentions that although specific drug interactions have not been studied, it is possible that interactions could occur with drugs like aspirin or other non-steroidal anti-inflammatory agents that modify or inhibit prostaglandin synthesis and metabolism. The only available study, however, found no evidence that non-steroidal antinflamatory drugs inhibit the ability of misoprostol to induce uterine

159

28

contractions and expulsions. In the patient labeling, the patient is instructed to advise her medical provider of all the medications she is taking and not to take any of them or any other medications during the treatment procedure without first telling her medical provider.

The mifepristone labeling states that since the effects of mifepristone on infants are unknown, and it is not known if misoprostol or its active metabolite is excreted in human milk, breast feeding women should consult with their medical provider to decide if they should discard their breastmilk for a few days following administration of the medications.

The labeling for misoprostol states that it is not known if the active metabolite (misoprostol acid) is excreted in human milk, and therefore, misoprostol should not be administered to nursing mothers because the potential excretion of misoprostol acid could cause significant diarrhea in nursing infants.

Two days is the optimal time to administer misoprostol after the administration of mifepristone because mifepristone requires 36-48 hours to sensitize the uterine muscle to prostaglandins. This information could be added to the labeling.

We do not know if, or to what extent, effectiveness decreases if administration of misoprostol is delayed past two days after the administration of mifepristone. We do know that administration of misoprostol 36-48 hours after the administration of mifepristone is well founded, based on the mechanism of action. The labeling does state that misoprostol should be administered two days after administration of the mifepristone.

Most of the data available are from women 18 years of age or older. However, the drug regimen is expected to be as safe and effective for pregnant women under the age of 18 years as it is for those over the age of 18 years.

Consideration should be given to including a statement under PRECAUTIONS in the physician labeling that the regimen is less effective and the incidence of adverse events is higher in women seeking abortion with pregnancies of greater than 49 days.

Consideration should also be given to including a statement in the patient labeling under "Are there any reasons that I should not have the treatment procedure?" that the regimen is less effective and the incidence of adverse events is higher in women seeking abortion with pregnancies greater than 49 days. This could follow the statements in the patient labeling that state,

29

"You should not have the treatment procedure if your medical provider determines that the duration of your pregnancy is more than 49 days. For many women this means that the first day of your last period was more than 49 days ago."

The physician labeling contains a PATIENT INFORMATION section that includes the statement, "Before giving you any medication, your medical provider will ask you to sign a statement that you have decided to terminate your pregnancy, and that you have read and understood this information." An ACKNOWLEGEMENT is included in the PATIENT INFORMATION section for the patient and medical provider to sign. Consideration should be given to adding the statement, "My medical provider has confirmed that I am pregnant and that the pregnancy is not greater than 49 days" and a statement that, " My medical provider has discussed with me alternatives to medical abortion including surgical abortion and continuation of this pregnancy."

Everyone who was a member of the advisory committee when mifepristone was presented and who is still a special government employee was sent the results of the U.S. studies in the form of a copy of the article, "Early Pregnancy Termination with Mifepristone and Misoprostol in the United States" by members of the Population Council published in the April 30, 1998 issue of the New England Journal of Medicine. The article accurately and succinctly summarizes the results of the studies.

XIII.  Recommendation:

Approval of this application is recommended provided that the labeling is satisfactorily revised and the complete details of the distribution system which are yet to be submitted are acceptable.

/S/

/S/                1/27/00

APPEARS THIS WAY
ON ORIGINAL

161

SEP 1 3 2000                                  September 12, 2000

*Mifepristone Tablets, 200mg*                            *Population Council*
*NDA 20-687*                                  *Safety Update Report #3*

Medical Officer's Review of Safety Update No. 3 Dated March 31, 2000

This NDA Safety Update Report summarizes the body of information which has been obtained by the Population Council since the cut-off date for the previous NDA Safety Update Report submitted August 3, 1999. The primary source of new information for this report is the Periodic Safety Update Report #9 prepared by _____ the _____ manufacturer of mifepristone, as well as from foreign clinical studies sponsored by the Population Council and from the literature. The cut-off date for this third report is February 29, 2000.

The report from _____ presents information from investigational and marketing experience with the product received by that company from worldwide sources. As stated in that report, there have been no specific actions taken with respect to the product for safety reasons such as rejection, withdrawal or suspension of marketing authorization, restrictions to distribution, suspension of clinical trials, modifications of dosage formulation, or changes in target population or indications. It is stated that in connection with new product approvals by European Union member countries via the mutual recognition procedure, some new textual changes were made to product labeling to reflect common usage practice and for purposes of accuracy and explanation.

One new area of safety concern is apparent in the new information presented in this NDA Safety Update Report. Following queries concerning the use of mifepristone in patients with acute hereditary hepatic porphyrias, _____ conducted an experiment at _____ The chick embryo liver in ovo is a validated model system and currently used to identify "inducing" effects of drugs by measuring increases in hepatic delta amino levulinate synthetase, a rate controlling enzyme, resulting in overproduction of porphyrin and cytochrome P 450. Mifepristone crystalline powder was tested on that model and appeared to be highly toxic on the chick embryo liver. Therefore, _____ concluded that the drug should be contraindicated in patients with inherited porphyrias. This contraindication has been added to the updated Master Data Sheet dated December 1999 by _____ It should be considered for inclusion in the labeling for Mifeprex as a contraindication, but since the contraindication would be based upon the results of a single nonclinical safety study, I am of the opinion that it does not warrant being in the labeling unless further confirmatory data becomes available.

The known number of subjects exposed to mifepristone in clinical studies for various indications is 32,439. Over _____ patients have received mifepristone in commercial distribution since its initial marketing in France in 1989. No clinical studies were conducted in the U.S. by the Population Council during the period covered by this NDA

2

Safety Update Report.

Protocol 171 (not conducted under an IND) has recently been completed in India for pregnancy termination in 900 women. There were no hospitalizations and no unexpected adverse events. Losses to follow-up were 3.5% and 4.4%.

Protocol [____] (not conducted under an IND) is ongoing

Records have been maintained by [____] of ongoing pregnancies following administration of mifepristone and a prostoglandin for medical termination of the pregnancies. There are now reports of 107 ongoing pregnancies. Nine cases of fetal abnormalities have been reported as having occurred in association with these pregnancies. Eight of these occurred with the use of mifepristone and gemeprost. One occurred with the use of mifepristone alone.

Mifepristone is now approved for marketing in 21 countries.

The information contained in this Safety Update Report is consistent with the cumulative experience gained to date on mifepristone and does not reveal any unexpected, unanticipated safety issues that would change the benefit to risk ratio.

/S/

APPEARS THIS WAY
ON ORIGINAL

JAN 27 2000

1

NDA 20-687                                    Mifepristone 200 mg Oral Tablets
Population Council                             Review completed November 19, 1999

Medical Officer's Review of Safety Update Report No. 2 Dated August 3, 1999

This second NDA Safety Update Report includes accumulated information relative to the safety
of mifepristone which has been obtained by the Population Council since Many 25, 1996, the
cut-off date for the first Safety Update Report submitted on June 20, 1996. The cut-off for this
second report is June 30, 1999.

Information in the report includes that obtained from recently completed and ongoing clinical
trials with the product sponsored by the Population Council and by the [        ]manufacturers,
Roussel Uclaf[                        ] Additionally, the report contains Periodic Safety
Update Reports prepared by the French manufacturers to summarize the worldwide safety
experience with the product, updated information on international regulatory approvals and new
information obtained from the literature. The report also contains a Clinical Expert Report on
mifepristone which was prepared by[        ] and which summarizes the accumulated clinical
documentation on the efficacy and safety of the product.

Five periodic safety update reports are submitted covering the period December 1, 1995 - August
31, 1998. An estimated[        ]patients received mifepristone under marketing conditions
during this period.

In addition to the periodic safety update reports, international reports of adverse reactions have
been submitted in two other formats: 1) two quarterly safety line listings of safety reports from
clinical trials and[                        ]of the drug during the period of April 1, 1996 -
September 30, 1996 when Roussel Uclaf was responsible for the drug and 2) five individual
safety reports (and one follow-up report) received form Roussel Uclaf[            ]that were
reported to IND[        ]

The periodic safety update reports provide a comprehensive summary of the safety information
received by Roussel Uclaf[            ]from worldwide sources during the covered time
periods. Three of the five individual safety reports are also included in the periodic safety
update reports. A total of 67 reports were received during a 32 month period when[        ]
patients received mifepristone. This is one report per[    ]patients treated. A total of 28 of
these adverse events were assessed as serious. This is one serious report per[    ]patients
treated. Five of these adverse events were some sort of urticaria or allergic reaction. One
instance of disseminated intravascular coagulation was reported from the United Kingdom. Five

2

of the reports were of fetal abnormalities. The other reports were diverse. No unexpected safety issues are raised by this safety update report. Overall safety results are similar to those seen in the pivotal French studies and in the U.S. studies.

In the period since 1987, Roussel Uclaf [          ] have received information on continuing pregnancies after administration of mifepristone or mifepristone and prostaglandins for medical termination of the pregnancies. A report, updated through June 1999, includes 87 reports of ongoing pregnancies, of which 26 followed the use of mifepristone alone and the remainder followed the use of mifepristone and a prostaglandin (or unknown). Nine reports of fetal anomalies have been received. Mifepristone alone was used in one report and mifepristone and gemeprost was used in eight reports. The one report of a fetal anomaly in a patient who received mifepristone alone resulted in a therapeutic termination of pregnancy with cleft palate and sirenomelia which was believed not to be drug related because of embryogenesis considerations. Of the nine reports of fetal anomalies, three occurred in babies at term. One had bilateral talipes (club foot), one had fingernail defect 3, and the third had a heart malformation. Fifteen of the 87 ongoing pregnancies were lost to followup.

A total of 33 normal babies have been born to women who received mifepristone alone (10), mifepristone plus misoprostol (11), or mifepristone plus some other prostaglandin (12). Data are too limited to determine whether mifepristone is a human teratogen.

Ninety articles published between 1996 and 1999 are submitted. These studies report the use of mifepristone in different clinical conditions, variable dosages, and for variable time durations. There is nothing reported in any of these articles that would change the safety profile of mifepristone for early abortion.

In the reports of early pregnancy termination, adverse events and efficacy reported are similar to that reported in the pivotal French studies and in the U.S. studies.

Unrelated to pregnancy termination, but of interest, are two reports where mild elevations in hepatic transaminases were noted in some subjects. Kettel reported 7 subjects with endometriosis treated with mifeprisone, 5 mg daily for six months. Subjects with liver function abnormalities were excluded from treatment. One of the 7 subjects experienced a mild increase in liver transaminases. Perrault reported 28 subjects with untreated metastatic breast carcinoma treated with mifepristone, 200 mg daily. Mild elevations of AST were reported in 6 of the 28 subjects. (Six subjects had metastatic liver disease. It is not known how many, if any, of these subjects with metastatic liver disease were among the six reports of elevated AST.) These mild elevations in hepatic transaminases are of interest because some such changes were noted very early in abortion dose finding studies. However, 248 subjects in the U.S. studies had a full panel of laboratory tests at baseline and at visit 3 including alkaline phosphatase, AST, ALT, and LDH. The median changes noted were small and not of clinical significance.

The Clinical Expert Report on Mifepristone in Termination of Pregnancy is a review of the clinical documentation forming the basis for approval, key results from the published trials, and post-marketing surveillance data. It contains no new information.

3

We are informed that mifepristone was approved in eight countries (including Germany) July 6, 1999 under the mutual recognition procedure of the European Union.

No new areas of safety concern are apparent. Information contained in this safety update report is consistent with the cumulative experience gained to date from the pivotal French studies and the U.S. studies. The risk-benefit assessment remains unchanged.

/S/

cman   /S/
1/27/00

APPEARS THIS WAY
ON ORIGINAL

166

NDA 20-687
Mifepristone

The Population Council
August 28, 1996

Medical Officer's Summary of Safety Update Dated
June 20, 1996

Included in the Safety Update Report received June 27, 1996 are two new clinical study reports as well as new information regarding study reports previously submitted.

The first new clinical study report is entitled, "The Efficacy and Safety of Mifepristone 600 mg in a Single Dose in Combination with Intravenously Administered Sulprostone (Nalador) in Therapeutic Termination of Second Trimester Pregnancy". The second new clinical report is entitled "Role of Cortisol in the Thermal Response to Alimentation: Effect of Mifepristone" and consisted of twelve healthy, male volunteers, six of whom received a single 600 mg tablet and six of whom received a placebo.

Neither of the two new clinical study reports reveal any additional safety concerns not identified in the two pivotal clinical studies.

Newly completed clinical trials include three studies of labor induction, two studies of breast cancer, and the United States clinical trials of early pregnancy termination. Laboratory data from these completed studies have not yet been analyzed and, therefore, no information on laboratory data are reported in this safety update. Final data analysis and study reports for these six studies have not been completed. The results for termination of pregnancy studies conducted in the United States are expected to be in full agreement with the two pivotal clinical studies. No unanticipated safety issues were raised in these studies. Preliminary examination of information from the United States studies as it was forwarded weekly from the clinics directly to the sponsor during the course of the trials indicates that the final, analyzed results will be similar to those obtained in similar clinical trials of the same medical regimen.

The literature update includes eleven articles published in 1995 and one article published in 1996. Three articles are of particular interest. One is the publication of one of the pivotal clinical studies (FF/92/486/24) by Aubeny et.al. The second is entitled "A Comparative Analysis of Fall in Hemoglobin Following Abortions Conducted By Mifepristone (600 mg) and Vacuum Aspiration" by Thonneau et. Al. The investigators found significant blood loss in the two weeks following abortions by the mifepristone/sulprostone protocol while hemoglobin concentrations remained stable in women who had vacuum aspiration. Women who took mifepristone experienced a mean fall of 0.7 g/dl in hemoglobin two weeks after the abortion. The third article entitled "Clinical, Hormonal, and Sonographic Predictors of Successful RU-486-Induced Abortions" was by Menashe et.al. A small hematoma, seen as a localized detachment of the gestational sac, was observed in the decidua capsularis in women who aborted successfully. A significant decrease in plasma levels of estradiol and progesterone and significantly increased cortisol levels in the plasma of the patients who aborted were observed by the seventh day following treatment.

2

Table four of the Safety Update Report contains adverse reactions from all sources reported to Roussel Uclaf which were summarized in the quarterly line listings covering July 1, 1995 to September 30, 1995; October 1, 1995 to December 31, 1995; January 1, 1996 to March 31, 1996 and reported in the Periodic Safety Update No. 3 dated January 1996 for the period June 1, 1995 to November 30, 1995.

Of a total of forty eight patient reports of adverse experiences listed in Table 4, twenty-eight were reported from patients enrolled in the United States studies (protocols 166A and B). Of these twenty-eight reports, nineteen were metrorrhagia, three were abdominal pain, two were dehydration, and there were one each of depression, viral meningitis, vomiting, and syncope. Vacuum aspiration or D&C was performed in twelve cases of metrorrhagia and a blood transfusion was given in one case of metrorrhagia. Concomitant hypotension was also reported in four patients with severe metrorrhagia. The patient with syncope presented with a marked vasovagal reaction fifteen minutes after misoprostol administration.

In the section of the Safety Update Report entitled "Tolerance of RU 486 During United States Studies" there is Table 1 which was submitted to the sponsor by Russell Uclaf June 7,1995 which indicates that there were forty-seven serious adverse events plus 8 non serious adverse events in the United States studies (protocols 166 A and B). Table 2 indicates that of the forty-seven serious adverse events forty-one were related to bleeding, two to hypotension, and one each to vomiting, chest pain, infection, and accidental injury.



Also included is a half page document entitled "Notifications Report to Roussel Uclaf from Study English PMS" which lists seven reactions occurring in five patients. There were three reports of uterine hemorrhage, one incomplete abortion with bleeding, one convulsion, one congenital nail disorder, and one report of lack of efficacy.

Also included is a section entitled "New Foreign Marketing Information" which consists only of a core product information document from the product manufacturer revised in March 1995.

Since the start of the use of mifepristone until November 30, 1995, Roussel Uclaf has recorded fifty-three cases of continued pregnancy after the intake of mifepristone for early pregnancy termination (alone or associated with a postaglandin analog).

3

Among these fifty-three cases:

Nineteen pregnancies were delivered at term (or close to it):
Fifteen were uneventful pregnancies with children normal at birth.
One was normal but born prematurely (33-34 weeks) from caesarean section
One was normal except for common slight bilateral talipes.
One case involves unilateral fingernail defects.
One child was reported as strictly normal at birth but it was known that when she was three months old, the infant was diagnosed as having an autoimmune disorder with chronic giant cell hepatitis and immunohemolytic anemia and later died of severe infectious pneumonia likely exacerbated by immuno-suppressive drugs. The reporting physician's opinion (an expert in teratogenicity) was that the onset of the autoimmune disorder was coincidental and that the role of mifepristone could be reasonably excluded.

In fifteen cases information on further condition of the fetus was made available, mainly in the cases where pregnancy is known to have been terminated later:

In nine cases, termination was performed voluntarily and information either from histologic examination or from ultrasound was that the fetus was normal.

In one case, at therapeutic termination the fetus was noted to have sirenomelia associated with other fetal malformations. The opinion of the consulting embryologists to whom the case was submitted by Roussel Uclaf was that the role of mifepristone was very unlikely. This case has been published (Pons J.C. and all : Lancet, 1991, 328: 763).

In five cases of ongoing pregnancy, the latest available information during second trimester examination indicated normal pregnancy and fetus development.

In six cases, no information on the fetus could be obtained but pregnancy was known to have been terminated later.

In thirteen cases, no further information was made available; in most cases patients were lost to follow-up, and in some cases pregnancy is still ongoing.

4

**Comment**: This Safety Update does not reveal any unexpected, unanticipated safety issues that were not made known in the original submission of the NDA.



Concur: /S/    9/11/96

APPEARS THIS WAY
ON ORIGINAL

NDA 20-687                                    The Population Council
Mifepristone                                  August 29, 1996

Medical Officer's Review of Safety Update Including a Summary Of International Post-
Marketing Surveillance Data Dated July 25, 1996.

Submission dated July 25, 1996 contains summaries of all the safety information available to the
sponsor from Roussel Uclaf International (France, Sweden, United Kingdom) post-marketing
surveillance reports, starting from 1989, the first year mifepristone was on the market in France.

Spontaneous notification of suspected adverse events reported in post-marketing surveillance of
mifepristone from June 1989 to June 1995 are listed in Table 7 of the submission. Causality by
mifepristone is judged to be "unlikely", "unrelated", "not assessable", "insufficient data",
"misuse", or "rumor" in the vast majority of cases. Adverse events that were possibly or
probably related to drug use were usually expected events such as metrorrhagia. The most
commonly used prostaglandin analogue during this period was sulprostone, given by injection.

The Mifepristone Safety Report covering the period January 1, 1991 through December 31, 1992
covers the first eighteen months since the launching of mifepristone in the United Kingdom. It
also includes the period of discontinuation of sulprostone and the introduction in France of
misoprostol as a possible alternative prostaglandin analogue. The report also contains the entire
safety information available since_____early pregnancy
termination. In July, 1992, two new indications of mifepristone were approved in France,
"therapeutic termination of second trimester pregnancy" and "labor induction in utero fetal
death".

The International Safety Report Periodic Update from January 1, 1993 to May 31, 1995 contains
no unexpected or unanticipated reports of adverse reactions that were not already known. There
were no post-marketing phase IV or surveillance studies reported in final form during this period.
There is mention of about three thousand four hundred and thirty-five patients enrolled in the
post-marketing surveillance program conducted by Roussel Uclaf in the United Kingdom during
the period of this report, but no additional information is available.

Periodic Safety Update Report No. 3 from June 1, 1995 to November 30, 1995 has been
reviewed previously by the Food And Drug Administration Medical Officer and his comments
are in his Safety Update Review dated August 28, 1996. No unexpected or unanticipated adverse
reactions were found in this periodic report.

2

**Comment:** From the cumulative experience to date, no new special areas of concern have been identified. The assessment of the risk-benefit ratio of mifepristone is unaltered by the data included in this Safety Update Report.

/S/

Concur: /S/    9/9/96

APPEARS THIS WAY
ON ORIGINAL

NDA 20-687                                    The Population Council
Mifepristone                                  August 29, 1996


Medical Officer's Review of United States Safety Data Dated July 14, 1996


Submission dated July 14, 1996 is a summary report of the serious adverse events from Protocols
166 A and B during the United States clinical trials. All of these reports have been submitted
previously in IND

A total of fifty-two subjects had at least one SAE. There was more than one adverse event
reported for most subjects. The most frequently reported SAE was hemorrhage (41 reports).
This was followed by fainting/dizziness (20 reports) which includes all of the following events:
fainting, feeling faint or lightheaded, dizziness, syncope, vasovagal reaction and passing out.
Other serious adverse events that were reported by at least four subjects are listed in the summary
below.

| Total No. of Patients | Total No. of Clinics | Total No. of Adverse Events | Total Number of Treatments | | | | Total No. Hospitalized |
|---|---|---|---|---|---|---|---|
| | | | D&C/ Asp. | Meth./ oxy. | IV Fluids | Transfusion | |
| 52 | 13 | Hemorrhage       41<br>Faint/Dizziness  20<br>Cramping         14<br>Vomiting         06<br>Hypotension      05<br>Tachycardia      04 | 34 | 15 | 28 | 04 | 26 |

These serious adverse events resulted in the hospitalization of twenty-six subjects. Four subjects
received transfusions. A total of twenty-eight subjects received IV fluids (including 3 of the
subjects that also had transfusions). A total of thirty-four subjects received a D&C or aspiration.
All but two of the subjects who had a D&C or aspiration reported hemorrhage. Fifteen subjects
recieved methergine or oxytocin for treatment of bleeding, although eleven of these subjects
eventually had a surgical procedure.

It is not possible to make a complete comparison of the serious adverse events reported in the
United States trial and the pivotal French studies in the NDA, due to different definitions of
SAEs and different adverse event reporting requirements in the two countries. Also, the safety
analysis of the United States trials has not been conducted, since the good clinical practice audit
of the clinics is currently being completed. Therefore, t this time comparisons between the
United States and NDA pivotal studies can only be made with the serious adverse events

2

reported from these fifty-two United States subjects, rather than other less serious adverse events that will be uncovered during the safety analysis of the entire United States database. However, some general comparisons can be made. The total number of subjects enrolled in United States Protocol 166A/B was 2,121. This is slightly less than the number of subjects (2480) enrolled in the pivotal French trials in the NDA. The number of transfusions is identical (4) in both studies and the number of hospitalizations is similar (26 in the United States trials and 21 in the pivotal trials). The number of reported cases of hemorrhage, metrorrhagia or excessive bleeding was similar in the two studies. Hemorrhage was reported by forty-one subjects in the United States studies. In the NDA pivotal studies, fifty-two subjects reported metrorrhagia or excessive bleeding, which was categorized as severe in twenty-one subjects. However, the manner in which the bleeding was treated differed in the two studies. In the Unites States trials, thirty-two of the thirty-four surgical interventions (D&C or aspiration) were performed on subjects experiencing hemorrhage. In the NDA pivotal trials, a total of fifteen subjects received surgical interventions for bleeding. The greater number of surgical interventions by United States investigators is not unexpected, due to their initial lack of experience in the control of bleeding during medical abortion. This was the first clinical trial of medical abortion in the United States, but medical abortion had been available in France for several years prior to the conduct of the French studies of mifepristone and misoprostol. The United States investigators have noted that as they gained experience with the bleeding that occurs during medical abortion, they were less likely to surgically intervene.

There were five cases of hypotension, in the United States trials, although blood pressure readings were given for only two of these subjects. There were seven cases of clinically relevant hypotension, one rated as severe, in the NDA pivotal trials. There were also a similar number of reports of tachycardia for United States subjects and in the pivotal trials (4 and 5 reports, respectively).

The incidence of other adverse events reported in the United States subjects, such as cramping or vomiting, cannot at this time be fairly compared to the numbers of these adverse events reported from all subjects in the NDA pivotal studies. This comparison must await the safety analysis of the United states database.

**Conclusion:**

The SAEs reported during the United States trial do not appear to differ significantly from those reported in the pivotal NDA trails, although a full comparison is not possible at this time. The higher incidence of surgical intervention in the United States trials may be explained by the initial inexperience of United States clinicians in providing medical abortion. Investigators in the United States trials have indicated that there was a learning curve associated with the treatment of bleeding during the trial. The incidence of other events such as hemorrhage, transfusions, and hospitalizations were similar in the two studies.

3

In summary, the current comparison of SAEs between the United States trial and the NDA pivotal trials indicated that medical abortion can be safely delivered in a wide variety of United States settings.

/S/

Concur: /S/    9/9/96

APPEARS THIS WAY
ON ORIGINAL

175

# EXHIBIT 6

Blake M. Autry & Roopma Wadhwa,
*Mifepristone*, StatPearls
(Feb. 28, 2024)

NCBI Bookshelf. A service of the National Library of Medicine, National Institutes of Health.

StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2025 Jan-.

# Mifepristone

**Authors**

Blake M. Autry[1]; Roopma Wadhwa[2].

**Affiliations**

[1] Cape fear Valley
[2] South Carolina Department of Mental Health

Last Update: February 28, 2024.

## Continuing Education Activity

Mifepristone, also called RU-486, is a synthetic steroid with dual FDA-approved applications. Firstly, it is utilized in combination with misoprostol for pregnancy termination up to 10 weeks of gestation, offering a medical alternative to surgical procedures for induced abortions. Secondly, mifepristone is employed in managing and treating hyperglycemia associated with Cushing syndrome. As a low-dose competitive binder, mifepristone obstructs progesterone action by binding to its intracellular receptor. Higher doses impede cortisol activity at the glucocorticoid receptor, concurrently elevating circulating cortisol levels to regulate hyperglycemia in individuals with Cushing syndrome. Apart from its predominant use in medically induced abortions, mifepristone proves valuable in addressing Cushing syndrome and uterine leiomyomas.

This activity focuses on elucidating the mechanism of action, adverse event profile, and other crucial aspects, such as dosing, pharmacodynamics, pharmacokinetics, monitoring, and relevant interactions of mifepristone. Healthcare professionals treating patients with mifepristone gain insights into its multifaceted roles, facilitating informed decision-making within the healthcare team. Noteworthy adverse reactions associated with mifepristone include bacterial infections and prolonged, heavy menstrual bleeding, underscoring the importance of comprehensive understanding and vigilance in its clinical use.

**Objectives:**

- Identify appropriate indications for mifepristone use in elective abortion procedures and other medical conditions.

- Screen patients to assess their eligibility for mifepristone therapy, considering medical history, contraindications, and potential drug interactions.

- Assess patient response to mifepristone treatment and monitor for adverse reactions or complications.

- Develop effective communication with patients, providing clear instructions and addressing their concerns regarding mifepristone treatment.

Access free multiple choice questions on this topic.

## Indications

### FDA-Approved Indications

Mifepristone, also known as RU-486, has 2 main FDA-approved indications. These are pregnancy termination combined with misoprostol through 10 weeks gestation and the management and treatment of hyperglycemia in patients exhibiting signs of Cushing syndrome.[1][2][3]

**On-Label Uses**

In addition to the above indications, mifepristone has shown efficacy with off-label uses for postcoital emergency contraception, cervical maturation, and adjunct therapy for uterine leiomyomas.[2][4][5][6]

## Mechanism of Action

Mifepristone works by antagonism of glucocorticoid and progesterone receptors. At low doses, mifepristone works by being a selective antagonist of progesterone. The drug does so by binding to the intracellular progesterone receptor. At high doses, mifepristone blocks cortisol at the glucocorticoid receptor. This action causes an effect on the hypothalamic-pituitary-adrenal axis, leading to an increase in circulating cortisol, thus controlling hyperglycemia in some patients. Mifepristone has a higher affinity for the glucocorticoid II receptor than the glucocorticoid I receptor.

For use in pregnancy termination, mifepristone works by interrupting progesterone. Progesterone is the primary hormone in preparing the endometrium for implantation and sensitizing the body to the effects of prostaglandins by increasing their synthesis and decreasing their metabolism. It causes the release of endogenous prostaglandins and an increase in the sensitivity of the myometrium to the contractile effects of prostaglandins. The increase in prostaglandins results in menstrual bleeding, disruption of the endometrium, and then termination.[1][7]

**Pharmacokinetics**

**Absorption:** Mifepristone is rapidly absorbed, and peak plasma concentrations are attained 90 minutes after administration.

**Distribution:** Mifepristone has high plasma protein binding (approximately 98%); it binds to albumin and alpha-1-acid glycoprotein. Mifepristone can cross the blood-brain barrier.[8]

**Metabolism:** Mifepristone is metabolized by CYP3A4, CY2C8, CYP2C9, and CYP2B6; it forms pharmacologically active metabolites.[9][10]

**Elimination:** The average elimination half-life of mifepristone is 18 hours (single dose). The primary route of elimination is through feces.[11][12]

## Administration

**Available Dosage Forms**

Mifepristone is generally available as an oral tablet in 200 mg and 300 mg preparations.

**Adult Dosing**

Clinicians should be enrolled in the REMS program. According to the American College of Obstetricians and Gynecologists (ACOG) guidelines for medication abortion, mifepristone can be used in the first 70 days (10 weeks) of gestation; clinicians should confirm pregnancy and estimate gestational age. Any intrauterine device present must be removed before initiating mifepristone. The regimen for termination of pregnancy involves a single mifepristone dose of 200 mg orally and misoprostol 800 μg buccally.

Initially, a 200 mg tablet of mifepristone is administered in a single oral dose. On days 2 or 3, misoprostol should be placed in the buccal pouch as 4 200 μg tablets (total 800 μg). Misoprostol should be taken within 24 to 48 hours after taking mifepristone. Misoprostol should be kept in cheek pouches for at least 30 minutes. The efficacy decreases when misoprostol is administered <24 hours or >48 hours after the administration of mifepristone.[13]

To manage and treat hyperglycemia in patients with Cushing syndrome, an initial dose of 300 mg should be given orally once daily with a meal. That dose may be increased by 300 mg every 2 to 4 weeks up to a maximum of 1200

178

mg daily. According to the Endocrine Society Guidelines, the quick onset of action of mifepristone is helpful in life-threatening hypercortisolism.[14][15]

For emergent postcoital contraception, 600 mg should be given orally in a single dose within 72 hours of intercourse. For uterine leiomyomas, 25 to 50 mg once daily by mouth can help reduce the size of the fibroids.[1][3]

**Specific Patient Populations**

**Hepatic impairment:** In patients with hyperglycemia with Cushing syndrome, the maximum dose of mifepristone is 600 mg daily for mild to moderate hepatic impairment; use is not recommended in severe hepatic impairment. According to product labeling, no studies have been conducted for mifepristone in hepatic impairment for termination of intrauterine pregnancy; caution is advised.

**Renal impairment:** In patients with hyperglycemia with Cushing syndrome, the maximum dose is 600 mg daily. According to product labeling, no studies have been conducted for mifepristone in renal impairment for termination of intrauterine pregnancy; caution is advised.

**Pregnancy considerations:** Mifepristone use for hypercortisolism is contraindicated in pregnancy due to the risk of abortion. As mifepristone is the standard medication in abortion regimens, clinicians must be aware of potential associated teratogenicity (limb defects and Moebius syndrome).[13]

**Breastfeeding considerations:** Mifepristone is distributed in human milk. Available medical information suggests that breastfeeding need not be discontinued after a single dose of mifepristone, as in medical abortion. However, long-term breastfeeding should be avoided during long-term therapy for hyperglycemia in patients with Cushing syndrome. Product labeling indicates that the decision should be based on a risk-benefit evaluation of the infant and mother.[16]

**Pediatric patients:** The safety and effectiveness of mifepristone for the termination of intrauterine pregnancy have been demonstrated in pediatric patients.

**Older patients:** Clinical trials of mifepristone for endogenous Cushing syndrome did not have a sufficient sample size to detect a statistically significant difference.

## Adverse Effects

Severe reactions include fetal death, anaphylactic reactions, toxic epidermal necrolysis, angioedema, and teratogenesis.

Moderate reactions may present as hypokalemia, peripheral edema, hypertension, dyspnea, constipation, hypoglycemia, vaginal bleeding, uterine contractions, stomatitis, hot flashes, endometrial hyperplasia, anemia, adrenocortical insufficiency, palpations, and hypotension.[17][4]

Mild reactions include nausea, abdominal pain, fever, vomiting, fatigue, headache, diarrhea, dizziness, sinusitis, pharyngitis, GERD, malaise, insomnia, maculopapular rash, pruritis, pelvic pain, chills, menstrual irregularity, emotional lability, and syncope.[3][18][19]

**Drug-Drug Interactions**

- **CYP3A4 inhibitors:** Strong inhibitors of CYP3A, such as itraconazole, ketoconazole, ritonavir, atazanavir, clarithromycin, conivaptan, saquinavir, telithromycin, and voriconazole can increase the concentration of mifepristone.[20][21] The maximum dose of mifepristone should not exceed 600 mg per day.

- **CYP3A4 inducers:** Strong CYP3A4 inducers such as carbamazepine, phenytoin, rifampin, phenobarbital, and St. John's wort can reduce concentrations of mifepristone. Concurrent use with mifepristone should be avoided. [22]

- **Drugs metabolized by CYP2C8/CYP2C9:** Fluvastatin, warfarin, and repaglinide are metabolized by CYP2C8/CYP2C9. Use the lowest dose possible during concurrent administration with mifepristone.[23] [24]

- **Drugs metabolized by CYP2B6:** Mifepristone is an inhibitor of CYP2B6 and may increase the concentration of drugs metabolized by CYP2B6, such as bupropion and efavirenz. Use with caution.[10][25]

## Contraindications

When using mifepristone to terminate a pregnancy or conception, caution is necessary to test out the patient populations with contraindications to mifepristone. Patients who have previously had a hypersensitivity reaction to mifepristone or prostaglandin therapy should not have mifepristone therapy. Hypersensitivity reactions include symptoms of anaphylaxis, angioedema, rash, hives, and pruritus. Additional contraindications include inherited porphyria, bleeding disorders, and adrenal failure. Clinicians must exclude ectopic pregnancy according to product labeling.[26]

The use of mifepristone in patients with Cushing syndrome is contraindicated with concurrent administration of simvastatin, lovastatin, and CYP3A substrates (ie, cyclosporine, dihydroergotamine, ergotamine, fentanyl, sirolimus, and tacrolimus).[27][28]

Additionally, mifepristone is contraindicated in patients who are pregnant for the control of hyperglycemia. If the patient has a history of unexplained vaginal bleeding, endometrial cancer, or endometrial hyperplasia with signs of atypia, they should not receive mifepristone. Physicians need to be watchful for symptoms of abdominal pain, infection, sepsis, and vaginal bleeding after starting mifepristone. If these symptoms develop, the clinician should stop mifepristone immediately.[4][5]

**Boxed Warning:**

**Termination of pregnancy** (mifepristone for Cushing syndrome-related hyperglycemia)

Clinicians should exclude pregnancy before stating mifepristone or if treatment is interrupted for >14 days in females of reproductive potential. Clinicians should advise patients to use non-hormonal contraceptives; no contraception is required if the patient has surgical sterilization.

**Risk of severe infections and bleeding** (mifepristone for medical termination of pregnancy)

**Infection:** After administering mifepristone, several adverse reactions require monitoring, including severe bacterial infections post-medical abortion or post-dilatation and curettage procedure where the use of mifepristone was indicated. There is no causal relationship between the drug and developing an infection, but they can occur. Before prescribing mifepristone, the patient should understand the risks, signs to look for, and a plan of action if they need help. Signs to look out for include sustained fever, severe abdominal pain, heavy bleeding, syncope, or general malaise lasting more than 24 hours after taking the medication. If a bacterial infection occurs, there is a high possibility that the pathogen is *Clostridium sordellii*, which can present atypically.[29]

**Bleeding**: Prolonged, heavy bleeding after taking mifepristone is a possibility based on the drug's mechanism of action. Mifepristone promotes endometrial proliferation, leading to endometrial thickening and heavier vaginal bleeding. Bleeding is expected on average for 9 to 16 days post-pregnancy termination. The manufacturer describes excessive bleeding as soaking through 2 thick pads every hour. If excessive bleeding occurs, it could point to an incomplete abortion or other complications. In these instances, monitoring for hypovolemic shock becomes important. [30][26]

## Monitoring

When using mifepristone in managing patients with Cushing syndrome, clinicians must consider the effects on the HPA axis. This treatment can lead to adrenal insufficiency due to persistently elevated cortisol levels. Due to this, cortisol levels should not serve as a monitoring parameter. Clinically, watch for signs of fatigue, hypoglycemia, hypotension, nausea, or weakness. If the clinician observes these, discontinue mifepristone and administer high-dose steroids. Once resolved, mifepristone may be restarted at a lower dose.

Hypokalemia needs to be monitored in these patients as well. A pre-treatment potassium level of 4.0 mEq/L is suggested to reduce the risk of hypokalemia. If the potassium is <4.0 mEq/L, consider potassium repletion. [31] Patients receiving Cushing syndrome treatment are at higher risk for developing opportunistic infections such as *Pneumocystis jirovecii* pneumonia.[4][5][32] Mifepristone can prolong the QTc interval and its use merits caution in combination with other drugs that also prolong the QT interval.[33]

According to ACOG, clinicians should evaluate patients after the administration of mifepristone for termination of pregnancy. This monitoring is crucial to ensure the complete termination of pregnancy. Termination can be confirmed by medical history, physical examination, human chorionic gonadotropin (hCG), and ultrasonography.[34]

## Toxicity

Mifepristone is metabolized in the liver by CYP3A4; thus, medications that are CYP3A4 inhibitors can result in higher concentrations of mifepristone in the patient. For patients taking multiple doses of mifepristone in managing hyperglycemia in Cushing syndrome, the medication's half-life is reportedly around 85 hours. During this time, the significant symptoms to watch for are cardiogenic. Hypokalemia is very common due to the effects of cortisol on unopposed mineralocorticoid receptors.[4]

Patients should be observed closely for signs and symptoms of adrenal insufficiency.[4] Hypokalemia and hypertension can be due to Cushing syndrome and may not always suggest excess glucocorticoid receptor antagonism due to mifepristone. Persistent and difficult-to-treat hypertension and hypokalemia may indicate excess glucocorticoid receptor antagonism, requiring discontinuation of mifepristone and rescue treatment with steroids.[31]

To avoid problems with mifepristone toxicity and adverse effects, the suggestion is to titrate the dosage gradually. Following up and monitoring the patient during the dosage escalation process is essential. Mifepristone is included in the US National Institute for Occupational Safety and Health (NIOSH) hazardous drugs list. Healthcare providers should take appropriate precautions, such as wearing gloves and safe dispensing.[35]

## Enhancing Healthcare Team Outcomes

Due to ongoing controversies, clinicians should be up-to-date with medicolegal aspects when prescribing mifepristone.[36] Mifepristone is available through the REMS (Risk Evaluation and Mitigation Strategies) program, which incorporates Ensuring Elements To Assure Safe Use (ETASU).[30] The mifepristone REMS Program was revised in January 2023.[37]

- Mifepristone can only be prescribed by a healthcare provider certified under the Mifepristone REMS Program.

- Healthcare providers need to complete a prescriber agreement form to prescribe mifepristone.

- The patient agreement form must be discussed and signed by the health care provider and patient; counseling regarding the risks of the mifepristone regimen is required.

- The patient must be given a copy of the patient agreement form and FDA-approved mifepristone medication guide.

- Mifepristone may only be dispensed by a certified pharmacy that has completed the pharmacy agreement form.

- Certified pharmacies must be competent in shipping, tracking, and delivering mifepristone to the patient on time.

The patient will receive optimal care if the interprofessional healthcare team works together in an integrated fashion with open communication channels. Collaboration and shared decision-making are the keys to a good outcome. Depending on the indication of mifepristone, patients will be treated in various locations. Healthcare providers must be aware of red flag symptoms if the patient experiences an adverse reaction. For instance, clinicians, nursing staff, lab technicians, and pharmacists should work together to ensure the patient's hemodynamic stability in cases of heavy bleeding. If the patient develops a bacterial infection, an infectious disease specialist should be consulted to provide evidence-based care. Endocrinologists should be consulted for the management of endogenous hypercortisolism-related hyperglycemia. Gynecologists should ensure the termination of pregnancy.

The entire team must work together to support the patient from all angles; this can be especially important for females after losing a pregnancy. Social work support can be crucial in this case. Patients may require both pre and post-elective abortion counseling. An interprofessional team approach and open communication between physicians, advanced practice practitioners, specialists, pharmacists, nurses, and social workers can ensure the optimum use of mifepristone in their patients.

## Review Questions

- Access free multiple choice questions on this topic.

- Comment on this article.

## References

1. Rodger MW, Baird DT. Induction of therapeutic abortion in early pregnancy with mifepristone in combination with prostaglandin pessary. Lancet. 1987 Dec 19;2(8573):1415-8. [PubMed: 2891991]
2. Hcini N, Jolivet A, Pomar L, Mchirgui A, Maamri F, Elcadhi Y, Lambert V, Carles G. Cervical maturation using mifepristone in women with normal pregnancies at or beyond term. Eur J Obstet Gynecol Reprod Biol. 2020 May;248:58-62. [PubMed: 32179287]
3. Lelaidier C, Baton-Saint-Mleux C, Fernandez H, Bourget P, Frydman R. Mifepristone (RU 486) induces embryo expulsion in first trimester non-developing pregnancies: a prospective randomized trial. Hum Reprod. 1993 Mar;8(3):492-5. [PubMed: 8473474]
4. Sai K, Lal A, Lakshmi Maradana J, Velamala PR, Nitin T. Hypokalemia associated with mifepristone use in the treatment of Cushing's syndrome. Endocrinol Diabetes Metab Case Rep. 2019 Nov 12;2019 [PMC free article: PMC6865352] [PubMed: 31743097]
5. Belokovskaya R, Ravikumar A, Arumugam D, Izadmehr S, Goddard GM, Geer EB, Levine AC. MIFEPRISTONE TREATMENT FOR MILD AUTONOMOUS CORTISOL SECRETION DUE TO ADRENAL ADENOMAS: A PILOT STUDY. Endocr Pract. 2019 Aug;25(8):846-853. [PMC free article: PMC9125788] [PubMed: 31070948]
6. Dzuba IG, Grossman D, Schreiber CA. Off-label indications for mifepristone in gynecology and obstetrics. Contraception. 2015 Sep;92(3):203-5. [PubMed: 26141817]
7. Kulier R, Gülmezoglu AM, Hofmeyr GJ, Cheng LN, Campana A. Medical methods for first trimester abortion. Cochrane Database Syst Rev. 2004;(2):CD002855. [PubMed: 15106180]
8. Hjelm BE, Grunseich C, Gowing G, Avalos P, Tian J, Shelley BC, Mooney M, Narwani K, Shi Y, Svendsen CN, Wolfe JH, Fischbeck KH, Pierson TM. Mifepristone-inducible transgene expression in neural progenitor cells in vitro and in vivo. Gene Ther. 2016 May;23(5):424-37. [PMC free article: PMC4976764] [PubMed: 26863047]
9. LiverTox: Clinical and Research Information on Drug-Induced Liver Injury [Internet]. National Institute of Diabetes and Digestive and Kidney Diseases; Bethesda (MD): Mar 10, 2018. Mifepristone. [PubMed: 31643650]
10.

Lin HL, Zhang H, Hollenberg PF. Metabolic activation of mifepristone [RU486; 17beta-hydroxy-11beta-(4-dimethylaminophenyl)-17alpha-(1-propynyl)-estra-4,9-dien-3-one] by mammalian cytochromes P450 and the mechanism-based inactivation of human CYP2B6. J Pharmacol Exp Ther. 2009 Apr;329(1):26-37. [PMC free article: PMC2670597] [PubMed: 19168709]

11. Ault TA, Braxton DR, Watson RA, Marcus AO, Fong TL. Mifepristone induced liver injury in a patient with Cushing syndrome: a case report and review of the literature. J Med Case Rep. 2023 Feb 03;17(1):33. [PMC free article: PMC9894739] [PubMed: 36732814]

12. Sarkar NN. Mifepristone: bioavailability, pharmacokinetics and use-effectiveness. Eur J Obstet Gynecol Reprod Biol. 2002 Mar 10;101(2):113-20. [PubMed: 11858883]

13. Medication Abortion Up to 70 Days of Gestation: ACOG Practice Bulletin Summary, Number 225. Obstet Gynecol. 2020 Oct;136(4):855-858. [PubMed: 32976374]

14. Johanssen S, Allolio B. Mifepristone (RU 486) in Cushing's syndrome. Eur J Endocrinol. 2007 Nov;157(5):561-9. [PubMed: 17984235]

15. Nieman LK, Biller BM, Findling JW, Murad MH, Newell-Price J, Savage MO, Tabarin A., Endocrine Society. Treatment of Cushing's Syndrome: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab. 2015 Aug;100(8):2807-31. [PMC free article: PMC4525003] [PubMed: 26222757]

16. Drugs and Lactation Database (LactMed®) [Internet]. National Institute of Child Health and Human Development; Bethesda (MD): Jul 18, 2022. Mifepristone. [PubMed: 30000782]

17. Baev OR, Rumyantseva VP, Tysyachnyu OV, Kozlova OA, Sukhikh GT. Outcomes of mifepristone usage for cervical ripening and induction of labour in full-term pregnancy. Randomized controlled trial. Eur J Obstet Gynecol Reprod Biol. 2017 Oct;217:144-149. [PubMed: 28898687]

18. LaFerla JJ. Midtrimester abortion: techniques and complications. Clin Perinatol. 1983 Jun;10(2):305-20. [PubMed: 6413116]

19. Hsia JK, Lohr PA, Taylor J, Creinin MD. Medical abortion with mifepristone and vaginal misoprostol between 64 and 70 days' gestation. Contraception. 2019 Sep;100(3):178-181. [PubMed: 31102629]

20. Dresser GK, Spence JD, Bailey DG. Pharmacokinetic-pharmacodynamic consequences and clinical relevance of cytochrome P450 3A4 inhibition. Clin Pharmacokinet. 2000 Jan;38(1):41-57. [PubMed: 10668858]

21. Kapetas AJ, Abuhelwa AY, Sorich MJ, McKinnon RA, Rodrigues AD, Rowland A, Hopkins AM. Evidence-Based Guidelines for Drug Interaction Studies: Model-Informed Time Course of Intestinal and Hepatic CYP3A4 Inhibition by Clarithromycin. AAPS J. 2021 Aug 31;23(5):104. [PubMed: 34467456]

22. Polasek TM, Lin FP, Miners JO, Doogue MP. Perpetrators of pharmacokinetic drug-drug interactions arising from altered cytochrome P450 activity: a criteria-based assessment. Br J Clin Pharmacol. 2011 May;71(5):727-36. [PMC free article: PMC3093078] [PubMed: 21223357]

23. Flora DR, Rettie AE, Brundage RC, Tracy TS. CYP2C9 Genotype-Dependent Warfarin Pharmacokinetics: Impact of CYP2C9 Genotype on R- and S-Warfarin and Their Oxidative Metabolites. J Clin Pharmacol. 2017 Mar;57(3):382-393. [PubMed: 27539372]

24. Backman JT, Filppula AM, Niemi M, Neuvonen PJ. Role of Cytochrome P450 2C8 in Drug Metabolism and Interactions. Pharmacol Rev. 2016 Jan;68(1):168-241. [PubMed: 26721703]

25. Hedrich WD, Hassan HE, Wang H. Insights into CYP2B6-mediated drug-drug interactions. Acta Pharm Sin B. 2016 Sep;6(5):413-425. [PMC free article: PMC5045548] [PubMed: 27709010]

26. Beaman J, Prifti C, Schwarz EB, Sobota M. Medication to Manage Abortion and Miscarriage. J Gen Intern Med. 2020 Aug;35(8):2398-2405. [PMC free article: PMC7403257] [PubMed: 32410127]

27. Guengerich FP. Inhibition of Cytochrome P450 Enzymes by Drugs-Molecular Basis and Practical Applications. Biomol Ther (Seoul). 2022 Jan 01;30(1):1-18. [PMC free article: PMC8724836] [PubMed: 34475272]

28. Stockmann C, Constance JE, Roberts JK, Olson J, Doby EH, Ampofo K, Stiers J, Spigarelli MG, Sherwin CM. Pharmacokinetics and pharmacodynamics of antifungals in children and their clinical implications. Clin Pharmacokinet. 2014 May;53(5):429-54. [PMC free article: PMC5564398] [PubMed: 24595533]

29.

Meites E, Zane S, Gould C., C. sordellii Investigators. Fatal Clostridium sordellii infections after medical abortions. N Engl J Med. 2010 Sep 30;363(14):1382-3. [PubMed: 20879895]

30.  American College of Obstetricians and Gynecologists' Committee on Practice Bulletins—Gynecology. ACOG Practice Bulletin No. 200: Early Pregnancy Loss. Obstet Gynecol. 2018 Nov;132(5):e197-e207. [PubMed: 30157093]

31.  Brown DR, East HE, Eilerman BS, Gordon MB, King EE, Knecht LA, Salke B, Samson SL, Yuen KCJ, Yau H. Clinical management of patients with Cushing syndrome treated with mifepristone: consensus recommendations. Clin Diabetes Endocrinol. 2020 Oct 29;6(1):18. [PMC free article: PMC7596972] [PubMed: 33292727]

32.  Castinetti F, Fassnacht M, Johanssen S, Terzolo M, Bouchard P, Chanson P, Do Cao C, Morange I, Picó A, Ouzounian S, Young J, Hahner S, Brue T, Allolio B, Conte-Devolx B. Merits and pitfalls of mifepristone in Cushing's syndrome. Eur J Endocrinol. 2009 Jun;160(6):1003-10. [PubMed: 19289534]

33.  Darpo B, Bullingham R, Combs DL, Ferber G, Hafez K. Assessment of the cardiac safety and pharmacokinetics of a short course, twice daily dose of orally-administered mifepristone in healthy male subjects. Cardiol J. 2013;20(2):152-60. [PubMed: 23558873]

34.  American College of Obstetricians and Gynecologists' Committee on Practice Bulletins—Gynecology, Society of Family Planning. Medication Abortion Up to 70 Days of Gestation: ACOG Practice Bulletin, Number 225. Obstet Gynecol. 2020 Oct;136(4):e31-e47. [PubMed: 32804884]

35.  Sproll B, Milan H, Caligiuri C, Dyck S, Rosenthal B, Raymond CB. Development and implementation of a regional program for the safe handling of hazardous drugs by hospital pharmacies. Can J Hosp Pharm. 2012 May;65(3):223-8. [PMC free article: PMC3379830] [PubMed: 22783034]

36.  Tanne JH. Opposing rulings on mifepristone in US leave access to medical abortion in jeopardy. BMJ. 2023 Apr 11;381:822. [PubMed: 37040989]

37.  Grossi P, O'Connor D. FDA preemption of conflicting state drug regulation and the looming battle over abortion medications. J Law Biosci. 2023 Jan-Jun;10(1):lsad005. [PMC free article: PMC10017072] [PubMed: 36938304]

**Disclosure:** Blake Autry declares no relevant financial relationships with ineligible companies.

**Disclosure:** Roopma Wadhwa declares no relevant financial relationships with ineligible companies.

Copyright © 2025, StatPearls Publishing LLC.

This book is distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivatives 4.0 International (CC BY-NC-ND 4.0) ( http://creativecommons.org/licenses/by-nc-nd/4.0/ ), which permits others to distribute the work, provided that the article is not altered or used commercially. You are not required to obtain permission to distribute this article, provided that you credit the author and journal.

Bookshelf ID: NBK557612    PMID: 32491544

# EXHIBIT 7

*The Facts on Mifepristone*,
Planned Parenthood



# The Facts on Mifepristone

## What is Mifepristone?

**Mifepristone is the first of two medications used in a medication abortion** (also known as the "abortion pill"). Mifepristone has been safe and legal in the United States since the U.S. Food and Drug Administration (FDA) approved the brand name Mifeprex nearly 20 years ago. In April 2019, the FDA approved the first generic form of mifepristone, following a review of the evidence that medication abortion is a safe, effective way to end an early pregnancy – with a safety record of over 99%.

## What Happens in a Medication Abortion?

The "abortion pill" is the common name in the United States for using two different medications – mifepristone and misoprostol – to end an early pregnancy. In general, it is used up to 70 days, or 10 weeks, after the first day of your last menstrual period.

1. **Mifepristone** works by blocking the hormone progesterone. Without progesterone, the lining of the uterus breaks down and the pregnancy cannot continue.

2. **Misoprostol**, the second medication, is taken either right away or up to 48 hours later and causes the uterus to empty. It's like having a heavy, crampy period and is very similar to an early miscarriage.

Medication abortion is extremely effective in ending an early pregnancy, working approximately 95-99% of the time, and gives patients the option to end their pregnancy at home or in another setting in which they feel comfortable, while still providing them with the medical support and information they need.

A growing number of patients in the United States are choosing to end their pregnancy with medication abortion. In fact, in 2014, nearly one in three people seeking abortion outside of a hospital used medication abortion.

The World Health Organization has concluded that misoprostol, taken in certain doses, can be used safely and effectively to end an early pregnancy in situations where using the combination of both mifepristone and misoprostol is not available – although taking only misoprostol is less effective than the combined mifepristone/misoprostol regimen. In the United States, the FDA-approved regimen is for patients to take both mifepristone and misoprostol.

## What Else is Mifepristone Used for?

Mifepristone is also used for evidence-based indications in (1) medical management of miscarriage, (2) cervical preparation for later 2nd trimester abortion, and (3) management of 2nd and 3rd trimester pregnancies when the fetus has died before birth.

© 2019 Planned Parenthood Federation of America, Inc. All rights reserved.
Planned Parenthood®, PPFA®, and the logomark are registered service marks of PPFA.

## Use in Miscarriage Care

Mifepristone, in combination with misoprostol, offers the most effective medication regimen for managing an early miscarriage. A 2018 study published in the New England Journal of Medicine found that adding mifepristone to the medication misoprostol was more effective for the management of early miscarriage than taking misoprostol alone and reduced the likelihood of patients needing an additional procedure.

### Claims of "Abortion Reversal"

There is no medical evidence to support the assertion that a medication abortion can be "reversed" if someone is given a high dose of progesterone after taking mifepristone. This claim is primarily led by Dr. George Delgado, an acknowledged anti-abortion activist. In recent years, his unproven concept of "abortion reversal" has been introduced into legislatures across the country by those opposed to legal abortion. In 2015, Arizona was the first state to pass a law requiring providers to tell their patients that their medication abortions could be "reversed." A number of other states have since followed suit, despite the lack of evidence.

Planned Parenthood continually reviews available research and medical evidence to inform our Medical Standards & Guidelines and patient education materials. The treatment that Delgado has proposed, as well as the legislative efforts requiring health care providers to inform people seeking abortion of that treatment, are not evidence-based. Experts such as the American College of Obstetricians and Gynecologists reject these claims, as they have not been proven in reliable medical studies. In 2019, a study testing the claim of "abortion reversal" was halted early due to patient safety concerns.

## Medically Unnecessary Restrictions on Mifepristone

Currently in the United States, patients cannot access mifepristone through a pharmacy. It remains out-of-reach for many people across the country, particularly those living in remote or rural areas, due to the FDA's Risk Evaluation and Mitigation Strategy (REMS) restrictions. **The REMS restrictions on mifepristone are not supported by research and create medically unnecessary barriers for patients accessing both medication abortion and the best method of managing a miscarriage.**

- REMS restrictions on mifepristone require that patients must be given the medication at a doctor's office, hospital, or health center from a health care provider who has pre-registered with the drug manufacturer and arranged to stock the medication at their facility (or is under the supervision of another health care provider who has).

- These unnecessary restrictions limit the number of health care providers who prescribe mifepristone and severely limit patients' access to this option, since patients aren't able to fill a prescription for the medication at a pharmacy, as they could with any other equally safe medication.

© 2019 Planned Parenthood Federation of America, Inc. All rights reserved.
Planned Parenthood®, PPFA®, and the logomark are registered service marks of PPFA.

- The REMS restrictions on mifepristone are not supported by research and are yet another example of reproductive health care – especially abortion – being treated differently than other kinds of health care in ways that only make things harder for patients.

- Because they're not supported by medical science, leading medical associations – including the American College of Obstetricians and Gynecologists and American Academy of Family Physicians – support removing REMS restrictions on mifepristone entirely.

A number of states have additional laws further regulating the administration of medication abortion. For example, there are currently 18 states that effectively ban providing medication abortion via telemedicine, even though there is no scientific basis for these bans.

Planned Parenthood believes that everyone should be able to have a safe and legal abortion, if and when they make that decision. Planned Parenthood health centers in 14 states currently use health-center-to-health-center telemedicine to provide patients with access to medication abortion. Providing medication abortion via telemedicine is just as safe and effective as when the health care provider is in the same health center as the patient. This is just one part of the work we do to ensure that all people get the reproductive health care they need, no matter where they live.

© 2019 Planned Parenthood Federation of America, Inc. All rights reserved.
Planned Parenthood®, PPFA®, and the logomark are registered service marks of PPFA.

# EXHIBIT 8

Medication Abortion: Your Questions
Answered,
Yale Med. (Sept. 11, 2023)

1-877-YALEMDS

# Medication Abortion: Your Questions Answered

SEPTEMBER 11, 2023



Medication abortion, which involves taking two medications (mifepristone and misoprostol) at specific times over a couple of days, was used for more than half of all abortions in the United States in 2020. Yale Medicine answers common questions about the medications.

Credit: Getty Images

*Editor's note: Information in this article was accurate at the time of original publication. Because information about abortion medication is changing rapidly, we encourage you to review your state laws for the latest information and consult with your doctor or health care provider for medical advice relating to the use of medication abortion.*

Since the Supreme Court overturned *Roe v. Wade* in June 2022, making it possible for states to ban abortion, there has been a heightened focus on medication abortion, often known as the "abortion pill." Medication abortion was used for more than half of all abortions in the United States in 2020.

Medication abortion involves taking two medications—mifepristone and misoprostol—at specific times over a couple of days. These medications must be prescribed by an authorized health care provider.

State law bans or restrictions on surgical or procedural abortion may also apply to medication abortion. As the legal landscape of medication abortion is changing rapidly, individuals should consult their state law to determine the legality of medication abortion as it applies to them.

Below, we answer common questions about medication abortion.

# How does medication abortion work?

For medication abortion, an individual takes mifepristone, followed by misoprostol up to 48 hours later.

Mifepristone is a medication that blocks progesterone activity in a female's body. Progesterone is a critical hormone for supporting an early pregnancy. The second medication, misoprostol, causes contractions and expels the pregnancy tissue. It typically takes 12 to 24 hours to pass the tissue.

Mifepristone, in the above described regimen with misoprostol, is currently approved by the U.S. Food and Drug Administration (FDA) to end a pregnancy through 10 weeks gestation (70 days or less since the first day of the last menstrual period).

# What does medication abortion feel like?

After individuals take mifepristone, they likely will not feel anything. After taking the second pill, misoprostol, bleeding and cramps typically arise after a couple of hours. It may feel like a very crampy period with heavy bleeding or an early miscarriage. The further along the pregnancy is, the more discomfort individuals may experience. The cramping and bleeding may be accompanied by chills, nausea, and fever, which are side effects of misoprostol. If nausea, vomiting, fever, or diarrhea persists more than 24 hours after taking the second set of pills, individuals should call their doctor. These symptoms may be a sign of infection.

In most cases, the worst of the bleeding and cramping typically lasts up to 24 hours. It is common to feel tired for one to two days after taking misoprostol, but most people are able to go back to normal activities after the bleeding and cramping have stopped. If there is no bleeding within 24 hours of taking misoprostol, individuals should call their health care provider.

# How do you know if the pregnancy has been terminated?

A person can confirm whether the medication abortion was successful by having an ultrasound or a blood test about a week after taking the medications. Because it takes time for pregnancy hormones to subside, an at home, urine based pregnancy test takes about a month after the medication abortion to show a negative result.

# How early in the pregnancy can you have a medication abortion?

If abortion is permitted under state law, a medication abortion can be started as soon as pregnancy is confirmed. Individuals seeking medication abortion should visit their doctor or health care provider, who will

take a medical history.

An ultrasound to confirm that the pregnancy is intrauterine, meaning in the uterus, may also be performed and is required in some states. Notably, a medication abortion will not treat an ectopic pregnancy, in which a fertilized egg implants outside the uterus; rather, prompt medical or surgical intervention for an ectopic pregnancy is necessary.

Individuals should check with their doctor or health care provider to determine whether an ultrasound is required or recommended.

# How effective is a medication abortion?

Medication abortion is highly effective, although the risk of its failure does increase as the pregnancy progresses. People seeking this treatment are advised to discuss all options, as well as effectiveness rates and risks, with their medical provider.

If medication abortion does not terminate a pregnancy, a procedural (surgical) abortion* may be recommended.

Or, if the pregnancy is no longer continuing to develop but the tissue has not passed, an individual could decide, in consultation with their medical provider, to either have a procedural abortion or take additional misoprostol*.

As for effectiveness rates, when taken before 64 days of gestation, medication abortion is reported to terminate a pregnancy between 91.6% and 99.7% of the time, depending on how misoprostol is administered, the interval between the dose of mifepristone and misoprostol, and gestational age. Medication abortion is generally more effective earlier in the pregnancy. A second dose of misoprostol* may be prescribed and administered starting at 64 days of gestation to increase effectiveness.

*The procedures and/or steps mentioned above may be recommended by a medical provider only if it is legal in the state in which the person resides or is present. States differ on time periods in which abortion is a legal option and whether and the extent to which there are any exceptions.*

# What are the risks of medication abortion?

Medication abortion is considered a safe procedure. Complications are rare, but they can include, but are not limited to, pregnancy tissue being left in the uterus, blood clots in the uterus, bleeding too much or for too long, infection, or an ongoing pregnancy. These issues can often be addressed with medication or other treatments.

There is less than a 0.4% risk of serious complications, according to a 2013 review article published in *Contraception*. From 2000 to June 2022, there have been 28 deaths out of 5.6 million women who have taken mifepristone, according to the FDA. However, "these events can not with certainty be causally attributed to mifepristone" for various reasons, the FDA says.

Still, individuals should watch out for an allergic reaction to either medication (rash, hives, itching, swollen or blistered skin with or without a fever, wheezing, and trouble swallowing, among others), excessive bleeding

(saturating two pads per hour for more than two hours), severe stomach pain, severe diarrhea, serious vaginal irritation, pelvic pain, and a fast heartbeat. Individuals experiencing these symptoms should consult with their doctor.

Outside of any rare or serious complications, medication abortion, according to studies, does not affect future pregnancies or overall health.

# How does medication abortion affect the menstrual cycle?

It's normal to have some vaginal bleeding and spotting for a few weeks after medication abortion. Typically, the menstrual period will return four to eight weeks later.

Individuals can have sex after a medication abortion as soon as they feel ready. Because it's possible to remain pregnant after a medication abortion, a doctor should be consulted before using birth control pills or a device.

*This article was medically reviewed by Yale Medicine obstetrician gynecologist Tessa Madden, MD.*

*Information provided in Yale Medicine articles is for general informational purposes only. No content in this article should be used as a substitute for medical advice or medical care from your doctor or health care provider. No content in this article should be construed as advice on the legality of medical abortion in the state in which you are located. Always seek the individual advice of your doctor or health care provider with any questions you have regarding a medical condition.*

YM   **Read more Yale Medicine news**

**RELATED TERMS:**

Abortion

# More news from Yale Medicine

| DOCTORS & ADVICE | | DOCTORS & ADVICE |

Testicular Cancer: Symptoms Men Should…



A doctor and a man with testicular cancer talk during an appointment.

Understanding Cancer Language: Tumor Terms Patients Should Know



A woman wearing a headscarf talks to her cancer doctor in an exam room.

A Transient Ischemic Attack (TIA) is as Urge…



A woman holds her hands to her temples because she is feeling dizzy, possibly from a transient ischemic attack (TIA).

# EXHIBIT 9

FDA-Approved Label for Mifepristone
(Mifeprex) (Jan. 2023)
("Mifeprex 2023 Label")

This label may not be the latest approved by FDA.
For current labeling information, please visit https://www.fda.gov/drugsatfda

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use MIFEPREX safely and effectively. See full prescribing information for MIFEPREX.

**MIFEPREX® (mifepristone) tablets, for oral use**
Initial U.S. Approval: 2000

---

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

*See full prescribing information for complete boxed warning.*

**Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use.**

- **Atypical Presentation of Infection. Patients with serious bacterial infections and sepsis can present without fever, bacteremia or significant findings on pelvic examination. A high index of suspicion is needed to rule out serious infection and sepsis. (5.1)**
- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. (5.2)**

**MIFEPREX is only available through a restricted program called the mifepristone REMS Program (5.3).**

**Before prescribing MIFEPREX, inform the patient about these risks. Ensure the patient knows whom to call and what to do if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort or general malaise for more than 24 hours after taking misoprostol.**

---

**-------------------INDICATIONS AND USAGE-------------------**
MIFEPREX is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. (1)

**----------------DOSAGE AND ADMINISTRATION----------------**
- 200 mg MIFEPREX on Day 1, followed 24-48 hours after MIFEPREX dosing by 800 mcg buccal misoprostol. (2.1)
- Instruct the patient what to do if significant adverse reactions occur. (2.2)
- Follow-up is needed to confirm complete termination of pregnancy. (2.3)

**----------------DOSAGE FORMS AND STRENGTHS----------------**
Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card (3)

**-------------------CONTRAINDICATIONS-------------------**
- Confirmed/suspected ectopic pregnancy or undiagnosed adnexal mass (4)
- Chronic adrenal failure (4)
- Concurrent long-term corticosteroid therapy (4)
- History of allergy to mifepristone, misoprostol, or other prostaglandins (4)
- Hemorrhagic disorders or concurrent anticoagulant therapy (4)
- Inherited porphyria (4)
- Intrauterine device (IUD) in place (4)

**-----------------WARNINGS AND PRECAUTIONS-----------------**
- Ectopic pregnancy: Exclude before treatment. (5.4)
- Rhesus immunization: Prevention same as for surgical abortion. (5.5)

**-------------------ADVERSE REACTIONS-------------------**
Most common adverse reactions (>15%) are nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Danco Laboratories, LLC at 1-877-432-7596 or medicaldirector@earlyoptionpill.com or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

**-------------------DRUG INTERACTIONS-------------------**
- CYP3A4 inducers can lower mifepristone concentrations. (7.1)
- CYP3A4 inhibitors can increase mifepristone concentrations. Use with caution. (7.2)
- CYP3A4 substrate concentrations can be increased. Caution with coadministration of substrates with narrow therapeutic margin. (7.3)

**-----------------USE IN SPECIFIC POPULATIONS-----------------**
- Pregnancy: Risk of fetal malformations in ongoing pregnancy if not terminated is unknown. (8.1)

**See 17 for PATIENT COUNSELING INFORMATION, Medication Guide.**

**Revised: 01/2023**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**
**1 INDICATIONS AND USAGE**
**2 DOSAGE AND ADMINISTRATION**
   2.1 Dosing Regimen
   2.2 Patient Management Following Misoprostol Administration
   2.3 Post-treatment Assessment: Day 7 to 14
   2.4 Contact for Consultation
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
   5.1 Infections and Sepsis
   5.2 Uterine Bleeding
   5.3 Mifepristone REMS Program
   5.4 Ectopic Pregnancy
   5.5 Rhesus Immunization
**6 ADVERSE REACTIONS**
   6.1 Clinical Trials Experience
   6.2 Postmarketing Experience
**7 DRUG INTERACTIONS**
   7.1 Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)
   7.2 Drugs that May Increase Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)
   7.3 Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)
**8 USE IN SPECIFIC POPULATIONS**
   8.1 Pregnancy
   8.2 Lactation
   8.4 Pediatric Use
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
   12.1 Mechanism of Action
   12.2 Pharmacodynamics
   12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
   13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

<div style="border:1px solid black">

### WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING

**Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use. No causal relationship between the use of MIFEPREX and misoprostol and these events has been established.**

- **Atypical Presentation of Infection. Patients with serious bacterial infections (e.g., *Clostridium sordellii*) and sepsis can present without fever, bacteremia, or significant findings on pelvic examination following an abortion. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. A high index of suspicion is needed to rule out serious infection and sepsis *[see Warnings and Precautions (5.1)]*.**

- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. Advise patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding *[see Warnings and Precautions (5.2)]*.**

**Because of the risks of serious complications described above, MIFEPREX is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.**

**Before prescribing MIFEPREX, inform the patient about the risk of these serious events. Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort, or general malaise (including weakness, nausea, vomiting, or diarrhea) for more than 24 hours after taking misoprostol.**

</div>

## 1    INDICATIONS AND USAGE

MIFEPREX is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.

## 2    DOSAGE AND ADMINISTRATION

### 2.1  Dosing Regimen

For purposes of this treatment, pregnancy is dated from the first day of the last menstrual period. The duration of pregnancy may be determined from menstrual history and clinical examination. Assess the pregnancy by ultrasonographic scan if the duration of pregnancy is uncertain or if ectopic pregnancy is suspected.

Remove any intrauterine device ("IUD") before treatment with MIFEPREX begins [*see Contraindications (4)*].

The dosing regimen for MIFEPREX and misoprostol is:

2

- MIFEPREX 200 mg orally + misoprostol 800 mcg buccally

  - *Day One:* MIFEPREX Administration
    One 200 mg tablet of MIFEPREX is taken in a single oral dose.

  - *Day Two or Three:* Misoprostol Administration (<u>minimum</u> 24-hour interval between MIFEPREX and misoprostol)
    Four 200 mcg tablets (total dose 800 mcg) of misoprostol are taken by the buccal route.

    Tell the patient to place two 200 mcg misoprostol tablets in each cheek pouch (the area between the cheek and gums) for 30 minutes and then swallow any remnants with water or another liquid (see Figure 1).

**Figure 1**



**2 pills between cheek and gum on left side + 2 pills between cheek and gum on right side**

Patients taking MIFEPREX must take misoprostol within 24 to 48 hours after taking MIFEPREX. The effectiveness of the regimen may be lower if misoprostol is administered less than 24 hours or more than 48 hours after mifepristone administration.

Because most women will expel the pregnancy within 2 to 24 hours of taking misoprostol *[see Clinical Studies (14)]*, discuss with the patient an appropriate location for them to be when taking the misoprostol, taking into account that expulsion could begin within 2 hours of administration.

## 2.2  Patient Management Following Misoprostol Administration

During the period immediately following the administration of misoprostol, the patient may need medication for cramps or gastrointestinal symptoms *[see Adverse Reactions (6)]*.

Give the patient:

- Instructions on what to do if significant discomfort, excessive vaginal bleeding or other adverse reactions occur
- A phone number to call if the patient has questions following the administration of the misoprostol
- The name and phone number of the healthcare provider who will be handling emergencies.

### 2.3  Post-treatment Assessment: Day 7 to 14

Patients should follow-up with their healthcare provider approximately 7 to 14 days after the administration of MIFEPREX. This assessment is very important to confirm that complete termination of pregnancy has occurred and to evaluate the degree of bleeding.  Termination can be confirmed by medical history, clinical examination, human Chorionic Gonadotropin (hCG) testing, or ultrasonographic scan. Lack of bleeding following treatment usually indicates failure; however, prolonged or heavy bleeding is not proof of a complete abortion.

The existence of debris in the uterus (e.g., if seen on ultrasonography) following the treatment procedure will not necessarily require surgery for its removal.

Patients should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of women may experience some type of bleeding for more than 30 days. Persistence of heavy or moderate vaginal bleeding at the time of follow-up, however, could indicate an incomplete abortion.

If complete expulsion has not occurred, but the pregnancy is not ongoing, patients may be treated with another dose of misoprostol 800 mcg buccally.  There have been rare reports of uterine rupture in women who took MIFEPREX and misoprostol, including women with prior uterine rupture or uterine scar and women who received multiple doses of misoprostol within 24 hours.   Patients who choose to use a repeat dose of misoprostol should have a follow-up visit with their healthcare provider in approximately 7 days to assess for complete termination.

Surgical evacuation is recommended to manage ongoing pregnancies after medical abortion *[see Use in Specific Populations (8.1)]*.  Advise the patient whether you will provide such care or will refer them to another provider as part of counseling prior to prescribing MIFEPREX.

### 2.4  Contact for Consultation

**For consultation 24 hours a day, 7 days a week with an expert in mifepristone, call Danco Laboratories at 1-877-4 Early Option (1-877-432-7596).**

### 3    DOSAGE FORMS AND STRENGTHS

Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card. MIFEPREX tablets are light yellow, cylindrical, and bi-convex tablets, approximately 11 mm in diameter and imprinted on one side with "MF."

### 4    CONTRAINDICATIONS

- Administration of MIFEPREX and misoprostol for the termination of pregnancy (the "treatment procedure") is contraindicated in patients with any of the following conditions:

    - Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass (the treatment procedure will not be effective to terminate an ectopic pregnancy) *[see Warnings and Precautions (5.4)]*

    - Chronic adrenal failure (risk of acute adrenal insufficiency)

    - Concurrent long-term corticosteroid therapy (risk of acute adrenal insufficiency)

    - History of allergy to mifepristone, misoprostol, or other prostaglandins (allergic reactions including anaphylaxis, angioedema, rash, hives, and itching have been reported *[see Adverse Reactions (6.2)]*)

    - Hemorrhagic disorders or concurrent anticoagulant therapy (risk of heavy bleeding)

- Inherited porphyrias (risk of worsening or of precipitation of attacks)

- Use of MIFEPREX and misoprostol for termination of intrauterine pregnancy is contraindicated in patients with an intrauterine device ("IUD") in place (the IUD might interfere with pregnancy termination).  If the IUD is removed, MIFEPREX may be used.

## 5    WARNINGS AND PRECAUTIONS

### 5.1  Infection and Sepsis

As with other types of abortion, cases of serious bacterial infection, including very rare cases of fatal septic shock, have been reported following the use of MIFEPREX *[see Boxed Warning]*. Healthcare providers evaluating a patient who is undergoing a medical abortion should be alert to the possibility of this rare event. A sustained (> 4 hours) fever of 100.4°F or higher, severe abdominal pain, or pelvic tenderness in the days after a medical abortion may be an indication of infection.

A high index of suspicion is needed to rule out sepsis (e.g., from *Clostridium sordellii*) if a patient reports abdominal pain or discomfort or general malaise (including weakness, nausea, vomiting, or diarrhea) more than 24 hours after taking misoprostol. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise.  No causal relationship between MIFEPREX and misoprostol use and an increased risk of infection or death has been established. *Clostridium sordellii* infections have also been reported very rarely following childbirth (vaginal delivery and caesarian section), and in other gynecologic and non-gynecologic conditions.

### 5.2  Uterine Bleeding

Uterine bleeding occurs in almost all patients during a medical abortion. Prolonged heavy bleeding (soaking through two thick full-size sanitary pads per hour for two consecutive hours) may be a sign of incomplete abortion or other complications, and prompt medical or surgical intervention may be needed to prevent the development of hypovolemic shock. Counsel patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding following a medical abortion *[see Boxed Warning]*.

Women should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days.  Up to 8% of all subjects may experience some type of bleeding for 30 days or more. In general, the duration of bleeding and spotting increased as the duration of the pregnancy increased.

Decreases in hemoglobin concentration, hematocrit, and red blood cell count may occur in patients who bleed heavily.

Excessive uterine bleeding usually requires treatment by uterotonics, vasoconstrictor drugs, surgical uterine evacuation, administration of saline infusions, and/or blood transfusions. Based on data from several large clinical trials, vasoconstrictor drugs were used in 4.3% of all subjects, there was a decrease in hemoglobin of more than 2 g/dL in 5.5% of subjects, and blood transfusions were administered to ≤ 0.1% of subjects.  Because heavy bleeding requiring surgical uterine evacuation occurs in about 1% of patients, special care should be given to patients with hemostatic disorders, hypocoagulability, or severe anemia.

### 5.3 Mifepristone REMS Program

MIFEPREX is available only through a restricted program under a REMS called the mifepristone REMS Program, because of the risks of serious complications *[see Warnings and Precautions (5.1, 5.2)]*.

Notable requirements of the mifepristone REMS Program include the following:

- Prescribers must be certified with the program by completing the Prescriber Agreement Form.
- Patients must sign a Patient Agreement Form.
- MIFEPREX must only be dispensed to patients by or under the supervision of a certified prescriber, or by certified pharmacies on prescriptions issued by certified prescribers.

Further information is available at 1-877-4 Early Option (1-877-432-7596).

### 5.4 Ectopic Pregnancy

MIFEPREX is contraindicated in patients with a confirmed or suspected ectopic pregnancy because MIFEPREX is not effective for terminating ectopic pregnancies *[see Contraindications (4)]*. Healthcare providers should remain alert to the possibility that a patient who is undergoing a medical abortion could have an undiagnosed ectopic pregnancy because some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy. The presence of an ectopic pregnancy may have been missed even if the patient underwent ultrasonography prior to being prescribed MIFEPREX.

Patients who became pregnant with an IUD in place should be assessed for ectopic pregnancy.

### 5.5 Rhesus Immunization

The use of MIFEPREX is assumed to require the same preventive measures as those taken prior to and during surgical abortion to prevent rhesus immunization.

## 6    ADVERSE REACTIONS

The following adverse reactions are described in greater detail in other sections:

- Infection and sepsis *[see Warnings and Precautions (5.1)]*

- Uterine bleeding *[see Warnings and Precautions (5.2)]*

### 6.1 Clinical Trials Experience

Because clinical studies are conducted under widely varying conditions, adverse reaction rates observed in the clinical studies of a drug cannot be directly compared to rates in the clinical studies of another drug and may not reflect the rates observed in practice.

Information presented on common adverse reactions relies solely on data from U.S. studies, because rates reported in non-U.S. studies were markedly lower and are not likely generalizable to the U.S. population.  In three U.S. clinical studies totaling 1,248 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally, women reported adverse reactions in diaries and in interviews at the follow-up visit. These studies enrolled generally healthy women of reproductive age without contraindications to mifepristone or misoprostol use according to the MIFEPREX product label. Gestational age was assessed prior to study enrollment using the date of the woman's last menstrual period, clinical evaluation, and/or ultrasound examination.

Reference ID: 5103833

About 85% of patients report at least one adverse reaction following administration of MIFEPREX and misoprostol, and many can be expected to report more than one such reaction. The most commonly reported adverse reactions (>15%) were nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness (see Table 1). The frequency of adverse reactions varies between studies and may be dependent on many factors, including the patient population and gestational age.

Abdominal pain/cramping is expected in all medical abortion patients and its incidence is not reported in clinical studies. Treatment with MIFEPREX and misoprostol is designed to induce uterine bleeding and cramping to cause termination of an intrauterine pregnancy.  Uterine bleeding and cramping are expected consequences of the action of MIFEPREX and misoprostol as used in the treatment procedure.  Most patients can expect bleeding more heavily than they do during a heavy menstrual period *[see Warnings and Precautions (5.2)]*.

Table 1 lists the adverse reactions reported in U.S. clinical studies with incidence >15% of women.

**Table 1**
**Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. Clinical Studies**

| Adverse Reaction | # U.S. studies | Number of Evaluable Women | Range of frequency (%) | Upper Gestational Age of Studies Reporting Outcome |
|---|---|---|---|---|
| Nausea | 3 | 1,248 | 51-75% | 70 days |
| Weakness | 2 | 630 | 55-58% | 63 days |
| Fever/chills | 1 | 414 | 48% | 63 days |
| Vomiting | 3 | 1,248 | 37-48% | 70 days |
| Headache | 2 | 630 | 41-44% | 63 days |
| Diarrhea | 3 | 1,248 | 18-43% | 70 days |
| Dizziness | 2 | 630 | 39-41% | 63 days |

One study provided gestational-age stratified adverse reaction rates for women who were 57-63 and 64-70 days; there was little difference in frequency of the reported common adverse reactions by gestational age.

Information on serious adverse reactions was reported in six U.S. and four non-U.S. clinical studies, totaling 30,966 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally.  Serious adverse reaction rates were similar between U.S. and non-U.S. studies, so rates from both U.S. and non-U.S. studies are presented.  In the U.S. studies, one studied women through 56 days gestation, four through 63 days gestation, and one through 70 days gestation, while in the non-U.S. studies, two studied women through 63 days gestation, and two through 70 days gestation.  Serious adverse reactions were reported in <0.5% of women.  Information from the U.S. and non-U.S. studies is presented in Table 2.

Reference ID: 5103833

**Table 2**
**Serious Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. and Non-U.S. Clinical Studies**

| Adverse Reaction | U.S. | | | Non-U.S. | | |
|---|---|---|---|---|---|---|
| | # of studies | Number of Evaluable Women | Range of frequency (%) | # of studies | Number of Evaluable Women | Range of frequency (%) |
| Transfusion | 4 | 17,774 | 0.03-0.5% | 3 | 12,134 | 0-0.1% |
| Sepsis | 1 | 629 | 0.2% | 1 | 11,155 | <0.01%* |
| ER visit | 2 | 1,043 | 2.9-4.6% | 1 | 95 | 0 |
| Hospitalization Related to Medical Abortion | 3 | 14,339 | 0.04-0.6% | 3 | 1,286 | 0-0.7% |
| Infection without sepsis | 1 | 216 | 0 | 1 | 11,155 | 0.2% |
| Hemorrhage | NR | NR | NR | 1 | 11,155 | 0.1% |

NR= Not reported
 * This outcome represents a single patient who experienced death related to sepsis.

## 6.2   Postmarketing Experience

The following adverse reactions have been identified during postapproval use of MIFEPREX and misoprostol. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Infections and infestations:* post-abortal infection (including endometritis, endomyometritis, parametritis, pelvic infection, pelvic inflammatory disease, salpingitis)
*Blood and the lymphatic system disorders:* anemia
*Immune system disorders:* allergic reaction (including anaphylaxis, angioedema, hives, rash, itching)
*Psychiatric disorders:* anxiety
*Cardiac disorders:* tachycardia (including racing pulse, heart palpitations, heart pounding)
*Vascular disorders:* syncope, fainting, loss of consciousness, hypotension (including orthostatic), light-headedness
*Respiratory, thoracic and mediastinal disorders:* shortness of breath
*Gastrointestinal disorders:* dyspepsia
*Musculoskeletal, connective tissue and bone disorders:* back pain, leg pain
*Reproductive system and breast disorders:* uterine rupture, ruptured ectopic pregnancy, hematometra, leukorrhea
*General disorders and administration site conditions:* pain

## 7   DRUG INTERACTIONS

### 7.1   Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)

CYP450 3A4 is primarily responsible for the metabolism of mifepristone. CYP3A4 inducers such as rifampin, dexamethasone, St. John's Wort, and certain anticonvulsants (such as phenytoin, phenobarbital, carbamazepine) may induce mifepristone metabolism (lowering serum concentrations of mifepristone).  Whether this action has an impact on the efficacy of the dose

Reference ID: 5103833

regimen is unknown.  Refer to the follow-up assessment *[see Dosage and Administration (2.3 )]* to verify that treatment has been successful.

### 7.2 Drugs that May Increase MIFEPREX Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)

Although specific drug or food interactions with mifepristone have not been studied, on the basis of this drug's metabolism by CYP 3A4, it is possible that ketoconazole, itraconazole, erythromycin, and grapefruit juice may inhibit its metabolism (increasing serum concentrations of mifepristone). MIFEPREX should be used with caution in patients currently or recently treated with CYP 3A4 inhibitors.

### 7.3 Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)

Based on *in vitro* inhibition information, coadministration of mifepristone may lead to an increase in serum concentrations of drugs that are CYP 3A4 substrates. Due to the slow elimination of mifepristone from the body, such interaction may be observed for a prolonged period after its administration. Therefore, caution should be exercised when mifepristone is administered with drugs that are CYP 3A4 substrates and have narrow therapeutic range.

## 8    USE IN SPECIFIC POPULATIONS

### 8.1 Pregnancy

Risk Summary

MIFEPREX is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.  Risks to pregnant patients are discussed throughout the labeling.

Refer to misoprostol labeling for risks to pregnant patients with the use of misoprostol.

The risk of adverse developmental outcomes with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol is unknown; however, the process of a failed pregnancy termination could disrupt normal embryo-fetal development and result in adverse developmental effects. Birth defects have been reported with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol. In animal reproduction studies, increased fetal losses were observed in mice, rats, and rabbits and skull deformities were observed in rabbits with administration of mifepristone at doses lower than the human exposure level based on body surface area.

Data

*Animal Data*

In teratology studies in mice, rats and rabbits at doses of 0.25 to 4.0 mg/kg (less than 1/100 to approximately 1/3 the human exposure based on body surface area), because of the antiprogestational activity of mifepristone,fetal losses were much higher than in control animals. Skull deformities were detected in rabbit studies at approximately 1/6 the human exposure, although no teratogenic effects of mifepristone have been observed to date in rats or mice. These deformities were most likely due to the mechanical effects of uterine contractions resulting from inhibition of progesterone action.

### 8.2 Lactation

MIFEPREX is present in human milk.  Limited data demonstrate undetectable to low levels of the drug in human milk with the relative (weight-adjusted) infant dose 0.5% or less as compared to maternal dosing. There is no information on the effects of MIFEPREX in a regimen with

misoprostol in a breastfed infant or on milk production.  Refer to misoprostol labeling for lactation information with the use of misoprostol.  The developmental and health benefits of breast-feeding should be considered along with any potential adverse effects on the breast-fed child from MIFEPREX in a regimen with misoprostol.

**8.4  Pediatric Use**

Safety and efficacy of MIFEPREX have been established in pregnant females. Data from a clinical study of MIFEPREX that included a subset of 322 females under age 17 demonstrated a safety and efficacy profile similar to that observed in adults.

# 10   OVERDOSAGE

No serious adverse reactions were reported in tolerance studies in healthy non-pregnant female and healthy male subjects where mifepristone was administered in single doses greater than 1800 mg (ninefold the recommended dose for medical abortion). If a patient ingests a massive overdose, the patient should be observed closely for signs of adrenal failure.

# 11   DESCRIPTION

MIFEPREX tablets each contain 200 mg of mifepristone, a synthetic steroid with antiprogestational effects. The tablets are light yellow in color, cylindrical, and bi-convex, and are intended for oral administration only. The tablets include the inactive ingredients colloidal silica anhydrous, corn starch, povidone, microcrystalline cellulose, and magnesium stearate.

Mifepristone is a substituted 19-nor steroid compound chemically designated as 11ß-[*p*-(Dimethylamino)phenyl]-17ß-hydroxy-17-(1-propynyl)estra-4,9-dien-3-one. Its empirical formula is $C_{29}H_{35}NO_2$. Its structural formula is:



The compound is a yellow powder with a molecular weight of 429.6 and a melting point of 192-196°C. It is very soluble in methanol, chloroform and acetone and poorly soluble in water, hexane and isopropyl ether.

# 12   CLINICAL PHARMACOLOGY

**12.1 Mechanism of Action**

The anti-progestational activity of mifepristone results from competitive interaction with progesterone at progesterone-receptor sites. Based on studies with various oral doses in several animal species (mouse, rat, rabbit, and monkey), the compound inhibits the activity of endogenous or exogenous progesterone, resulting in effects on the uterus and cervix that, when combined with misoprostol, result in termination of an intrauterine pregnancy.

During pregnancy, the compound sensitizes the myometrium to the contraction-inducing activity

of prostaglandins.

## 12.2 Pharmacodynamics

Use of MIFEPREX in a regimen with misoprostol disrupts pregnancy by causing decidual necrosis, myometrial contractions, and cervical softening, leading to the expulsion of the products of conception.

Doses of 1 mg/kg or greater of mifepristone have been shown to antagonize the endometrial and myometrial effects of progesterone in women.

Antiglucocorticoid and antiandrogenic activity:  Mifepristone also exhibits antiglucocorticoid and weak antiandrogenic activity.  The activity of the glucocorticoid dexamethasone in rats was inhibited following doses of 10 to 25 mg/kg of mifepristone. Doses of 4.5 mg/kg or greater in human beings resulted in a compensatory elevation of adrenocorticotropic hormone (ACTH) and cortisol. Antiandrogenic activity was observed in rats following repeated administration of doses from 10 to 100 mg/kg.

## 12.3 Pharmacokinetics

Mifepristone is rapidly absorbed after oral ingestion with non-linear pharmacokinetics for Cmax after single oral doses of 200 mg and 600 mg in healthy subjects.

Absorption

The absolute bioavailability of a 20 mg mifepristone oral dose in females of childbearing age is 69%. Following oral administration of a single dose of 600 mg, mifepristone is rapidly absorbed, with a peak plasma concentration of $1.98 \pm 1.0$ mg/L occurring approximately 90 minutes after ingestion.

Following oral administration of a single dose of 200 mg in healthy men (n=8), mean Cmax was $1.77 \pm 0.7$ mg/L occurring approximately 45 minutes after ingestion. Mean $AUC_{0-\infty}$ was $25.8 \pm 6.2$ mg*hr/L.

Distribution

Mifepristone is 98% bound to plasma proteins, albumin, and $\alpha_1$-acid glycoprotein. Binding to the latter protein is saturable, and the drug displays nonlinear kinetics with respect to plasma concentration and clearance.

Elimination

Following a distribution phase, elimination of mifepristone is slow at first (50% eliminated between 12 and 72 hours) and then becomes more rapid with a terminal elimination half-life of 18 hours.

*Metabolism*

Metabolism of mifepristone is primarily via pathways involving N-demethylation and terminal hydroxylation of the 17-propynyl chain. *In vitro* studies have shown that CYP450 3A4 is primarily responsible for the metabolism. The three major metabolites identified in humans are: (1) RU 42 633, the most widely found in plasma, is the N-monodemethylated metabolite; (2) RU 42 848, which results from the loss of two methyl groups from the 4-dimethylaminophenyl in position 11ß; and (3) RU 42 698, which results from terminal hydroxylation of the 17-propynyl chain.

*Excretion*

By 11 days after a 600 mg dose of tritiated compound, 83% of the drug has been accounted for by the feces and 9% by the urine. Serum concentrations are undetectable by 11 days.

Specific Populations

The effects of age, hepatic disease and renal disease on the safety, efficacy and pharmacokinetics of mifepristone have not been investigated.

## 13    NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Carcinogenesis

No long-term studies to evaluate the carcinogenic potential of mifepristone have been performed.

Mutagenesis

Results from studies conducted *in vitro* and in animals have revealed no genotoxic potential for mifepristone. Among the tests carried out were: Ames test with and without metabolic activation; gene conversion test in *Saccharomyces cerevisiae* D4 cells; forward mutation in *Schizosaccharomyces pompe* P1 cells; induction of unscheduled DNA synthesis in cultured HeLa cells; induction of chromosome aberrations in CHO cells; *in vitro* test for gene mutation in V79 Chinese hamster lung cells; and micronucleus test in mice.

Impairment of Fertility

In rats, administration of 0.3 mg/kg mifepristone per day caused severe disruption of the estrus cycles for the three weeks of the treatment period. Following resumption of the estrus cycle, animals were mated and no effects on reproductive performance were observed.

## 14    CLINICAL STUDIES

Safety and efficacy data from clinical studies of mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally through 70 days gestation are reported below. Success was defined as the complete expulsion of the products of conception without the need for surgical intervention. The overall rates of success and failure, shown by reason for failure based on 22 worldwide clinical studies (including 7 U.S. studies) appear in Table 3.

The demographics of women who participated in the U.S. clinical studies varied depending on study location and represent the racial and ethnic variety of American females.  Females of all reproductive ages were represented, including females less than 18 and more than 40 years of age; most were 27 years or younger.

**Table 3**
**Outcome Following Treatment with Mifepristone (oral) and Misoprostol (buccal)**
**Through 70 Days Gestation**

|  | U.S. Trials | Non-U.S. Trials |
|---|---|---|
| N | 16,794 | 18,425 |
| Complete Medical Abortion | 97.4% | 96.2% |
| Surgical Intervention* | 2.6% | 3.8% |
| Ongoing Pregnancy** | 0.7% | 0.9% |

\* Reasons for surgical intervention include ongoing pregnancy, medical necessity, persistent or heavy bleeding after treatment, patient request, or incomplete expulsion.
\*\* Ongoing pregnancy is a subcategory of surgical intervention, indicating the percent of women who have surgical intervention due to an ongoing pregnancy.

The results for clinical studies that reported outcomes, including failure rates for ongoing pregnancy, by gestational age are presented in Table 4.

**Table 4**
**Outcome by Gestational Age Following Treatment with Mifepristone and**
**Misoprostol (buccal) for U.S. and Non-U.S. Clinical Studies**

|  | ≤49 days | | | 50-56 days | | | 57-63 days | | | 64-70 days | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies |
| Complete medical abortion | 12,046 | 98.1 | 10 | 3,941 | 96.8 | 7 | 2,294 | 94.7 | 9 | 479 | 92.7 | 4 |
| Surgical intervention for ongoing pregnancy | 10,272 | 0.3 | 6 | 3,788 | 0.8 | 6 | 2,211 | 2 | 8 | 453 | 3.1 | 3 |

One clinical study asked subjects through 70 days gestation to estimate when they expelled the pregnancy, with 70% providing data. Of these, 23-38% reported expulsion within 3 hours and over 90% within 24 hours of using misoprostol.

## 16   HOW SUPPLIED/STORAGE AND HANDLING

is only available through a restricted program called the Mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.

MIFEPREX is supplied as light yellow, cylindrical, and bi-convex tablets imprinted on one side with "MF." Each tablet contains 200 mg of mifepristone. One tablet is individually blistered on one blister card that is packaged in an individual package (National Drug Code 64875-001-01).

Store at 25°C (77°F); excursions permitted to 15 to 30°C (59 to 86°F) [see USP Controlled Room Temperature].

## 17   PATIENT COUNSELING INFORMATION

Advise the patient to read the FDA-approved patient labeling (Medication Guide), included with each package of MIFEPREX. Additional copies of the Medication Guide are available by contacting Danco Laboratories at 1-877-4 Early Option (1-877-432-7596) or from www.earlyoptionpill.com.

Serious Infections and Bleeding

- Inform the patient that uterine bleeding and uterine cramping will occur [*see Warnings and Precautions (5.2)*].

- Advise the patient that serious and sometimes fatal infections and bleeding can occur very rarely [*see Warnings and Precautions (5.1, 5.2)*].

- MIFEPREX is only available through a restricted program called the Mifepristone REMS Program [*see Warnings and Precautions (5.3)*].  Under the mifepristone REMS Program:

   o   Patients must sign a Patient Agreement Form.

   o   MIFEPREX is only dispensed by or under the supervision of certified prescribers or by certified pharmacies on prescriptions issued by certified prescribers.

Provider Contacts and Actions in Case of Complications

- Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, or if the patient experiences complications including prolonged heavy bleeding, severe abdominal pain, or sustained fever *[see Boxed Warning]*.

- 

Compliance with Treatment Schedule and Follow-up Assessment

- Advise the patient that it is necessary to complete the treatment schedule, including a follow-up assessment approximately 7 to14 days after taking MIFEPREX *[see Dosage and Administration (2.3)]*.

- Explain that

   o   prolonged heavy vaginal bleeding is not proof of a complete abortion,

   o   if the treatment fails and the pregnancy continues, the risk of fetal malformation is unknown,

   o   it is recommended that ongoing pregnancy be managed by surgical termination *[see Dosage and Administration (2.3)]*.  Advise the patient whether you will provide such care or will refer them to another provider.

Subsequent Fertility

- Inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses.

- Inform the patient that contraception can be initiated as soon as pregnancy expulsion has been confirmed, or before resuming sexual intercourse.

MIFEPREX is a registered trademark of Danco Laboratories, LLC.

Reference ID: 5103833

Manufactured for:
*Danco Laboratories, LLC*
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596)
www.earlyoptionpill.com

01/2023

**MEDICATION GUIDE**

**Mifeprex** (MIF-eh-prex) (mifepristone tablets, for oral use)

Read this information carefully before taking Mifeprex and misoprostol. It will help you understand how the treatment works. This Medication Guide does not take the place of talking with your healthcare provider.

**What is the most important information I should know about Mifeprex?**

**What symptoms should I be concerned with?** Although cramping and bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth. Seeking medical attention as soon as possible is needed in these circumstances. Serious infection has resulted in death in a very small number of cases. There is no information that use of Mifeprex and misoprostol caused these deaths. If you have any questions, concerns, or problems, or if you are worried about any side effects or symptoms, you should contact your healthcare provider. You can write down your healthcare provider's telephone number here _____.

**Be sure to contact your healthcare provider promptly if you have any of the following:**

- **Heavy Bleeding.** Contact your healthcare provider right away if you bleed enough to soak through two thick full-size sanitary pads per hour for two consecutive hours or if you are concerned about heavy bleeding. In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical aspiration or D&C).

- **Abdominal Pain or "Feeling Sick."** If you have abdominal pain or discomfort, or you are "feeling sick," including weakness, nausea, vomiting, or diarrhea, with or without fever, more than 24 hours after taking misoprostol, you should contact your healthcare provider without delay. These symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

- **Fever.** In the days after treatment, if you have a fever of 100.4°F or higher that lasts for more than 4 hours, you should contact your healthcare provider right away. Fever may be a symptom of a serious infection or another problem.

**If you cannot reach your healthcare provider, go to the nearest hospital emergency room.**

**What to do if you are still pregnant after Mifeprex with misoprostol treatment.** If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy. In many cases, this surgical procedure can be done in the office/clinic. The chance of birth defects if the pregnancy is not ended is unknown.

**Talk with your healthcare provider.** Before you take Mifeprex, you should read this Medication Guide and you and your healthcare provider should discuss the benefits and risks of your using Mifeprex.

Reference ID: 5103833

---

**What is Mifeprex?**

**Mifeprex is used in a regimen with another prescription medicine called misoprostol, to end an early pregnancy.** Early pregnancy means it is 70 days (10 weeks) or less since your last menstrual period began. Mifeprex is not approved for ending pregnancies that are further along. Mifeprex blocks a hormone needed for your pregnancy to continue. When you use Mifeprex on Day 1, you also need to take another medicine called misoprostol 24 to 48 hours after you take Mifeprex, to cause the pregnancy to be passed from your uterus.

The pregnancy is likely to be passed from your uterus within 2 to 24 hours after taking Mifeprex and misoprostol.  When the pregnancy is passed from the uterus, you will have bleeding and cramping that will likely be heavier than your usual period. About 2 to 7 out of 100 women taking Mifeprex will need a surgical procedure because the pregnancy did not completely pass from the uterus or to stop bleeding.

---

**Who should not take Mifeprex?**

Some patients should not take Mifeprex. Do not take Mifeprex if you:

- Have a pregnancy that is more than 70 days (10 weeks). Your healthcare provider may do a clinical examination, an ultrasound examination, or other testing to determine how far along you are in pregnancy.

- Are using an IUD (intrauterine device or system). It must be taken out before you take Mifeprex.

- Have been told by your healthcare provider that you have a pregnancy outside the uterus (ectopic pregnancy).

- Have problems with your adrenal glands (chronic adrenal failure).

- Take a medicine to thin your blood.

- Have a bleeding problem.

- Have porphyria.

- Take certain steroid medicines.

- Are allergic to mifepristone, misoprostol, or medicines that contain misoprostol, such as Cytotec or Arthrotec.

Ask your healthcare provider if you are not sure about all your medical conditions before taking this medicine to find out if you can take Mifeprex.

---

**What should I tell my healthcare provider before taking Mifeprex?**

**Before you take Mifeprex, tell your healthcare provider if you:**

- cannot follow-up within approximately 7 to 14 days of your first visit

- are breastfeeding. Mifeprex can pass into your breast milk.  The effect of the Mifeprex and misoprostol regimen on the breastfed infant or on milk production is unknown.

- are taking medicines, including prescription and over-the-counter medicines, vitamins, and herbal supplements.
  Mifeprex and certain other medicines may affect each other if they are used together.  This can cause side effects.

---

**How should I take Mifeprex?**

- Mifeprex will be given to you by a healthcare provider or pharmacy.

- You and your healthcare provider will plan the most appropriate location for you to take the misoprostol, because it may cause bleeding, cramps, nausea, diarrhea, and other symptoms that usually begin within 2 to 24 hours after taking it.

- Most women will pass the pregnancy within 2 to 24 hours after taking the misoprostol tablets.

**Follow the instruction below on how to take Mifeprex and misoprostol:**

**Mifeprex (1 tablet) orally + misoprostol (4 tablets) buccally**

**Day 1:**

- Take 1 Mifeprex tablet by mouth.

**24 to 48 hours after taking Mifeprex:**

- Take 4 misoprostol tablets by placing 2 tablets in each cheek pouch (the area between your teeth and cheek - see Figure A) for 30 minutes and then swallow anything left over with a drink of water or another liquid.

- The medicines may not work as well if you take misoprostol sooner than 24 hours after Mifeprex or later than 48 hours after Mifeprex.

- Misoprostol often causes cramps, nausea, diarrhea, and other symptoms. Your healthcare provider may send you home with medicines for these symptoms.



**Figure A** (2 tablets between your left cheek and gum and 2 tablets between your right cheek and gum).

**Follow-up Assessment at Day 7 to 14:**

- This follow-up assessment is very important. You must follow-up with your healthcare provider about 7 to 14 days after you have taken Mifeprex to be sure you are well and that you have had bleeding and the pregnancy has passed from your uterus.

- Your healthcare provider will assess whether your pregnancy has passed from your uterus. If your pregnancy continues, the chance that there may be birth defects is unknown. If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy.

- If your pregnancy has ended, but has not yet completely passed from your uterus, your provider will talk with you about other choices you have, including waiting, taking another dose of misoprostol, or having a surgical procedure to empty your uterus.

| **When should I begin birth control?** |
| --- |
| You can become pregnant again right after your pregnancy ends. If you do not want to become pregnant again, start using birth control as soon as your pregnancy ends or before you start having sexual intercourse again. |
| **What should I avoid while taking Mifeprex and misoprostol?** |
| Do not take any other prescription or over-the-counter medicines (including herbal medicines or supplements) at any time during the treatment period without first asking your healthcare provider about them because they may interfere with the treatment. Ask your healthcare provider about what medicines you can take for pain and other side effects. |
| **What are the possible side effects of Mifeprex and misoprostol?** |
| **Mifeprex may cause serious side effects.  See "What is the most important information I should know about Mifeprex?"** <br><br>**Cramping and bleeding.** Cramping and vaginal bleeding are expected with this treatment. Usually, these symptoms mean that the treatment is working. But sometimes you can get cramping and bleeding and still be pregnant. This is why you must follow-up with your healthcare provider approximately 7 to 14 days after taking Mifeprex. See "How should I take Mifeprex?" for more information on your follow-up assessment. If you are not already bleeding after taking Mifeprex, you probably will begin to bleed once you take misoprostol, the medicine you take 24 to 48 hours after Mifeprex. Bleeding or spotting can be expected for an average of 9 to16 days and may last for up to 30 days. Your bleeding may be similar to, or greater than, a normal heavy period. You may see blood clots and tissue. This is an expected part of passing the pregnancy. <br><br>The most common side effects of Mifeprex treatment include: nausea, weakness, fever/chills, vomiting, headache, diarrhea and dizziness. Your provider will tell you how to manage any pain or other side effects. These are not all the possible side effects of Mifeprex. <br><br>Call your healthcare provider for medical advice about any side effects that bother you or do not go away. You may report side effects to FDA at 1-800-FDA-1088. |
| **General information about the safe and effective use of Mifeprex.** <br><br>**Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. This Medication Guide summarizes the most important information about Mifeprex. If you would like more information, talk with your healthcare provider. You may ask your healthcare provider for information about Mifeprex that is written for healthcare professionals.** <br><br>**For more information about Mifeprex, go to www.earlyoptionpill.com or call 1-877-4 Early Option (1-877-432-7596).** |
| Manufactured for: *Danco Laboratories, LLC* <br>P.O. Box 4816 <br>New York, NY 10185 <br>1-877-4 Early Option (1-877-432-7596) www.earlyoptionpill.com |

This Medication Guide has been approved by the U.S. Food and Drug Administration.     Approval 01/2023

19

# EXHIBIT 10

2021 FDA Letter to AAPLOG and Am. Coll.
of Pediatricians denying in part and granting
in part 2016 Citizen Petition,
Docket No. FDA-2019-P-1534
(Dec. 16, 2021)



Donna J. Harrison, M.D.
Executive Director
American Association of Pro-Life Obstetricians and Gynecologists
P.O. Box 395
Eau Claire, MI 49111-0395

Quentin L. Van Meter, M.D., FCP
President
American College of Pediatricians
P.O. Box 357190
Gainesville, FL 32635-7190

December 16, 2021

Re: Docket No. FDA-2019-P-1534

Dear Drs. Harrison and Van Meter:

This letter responds to your citizen petition submitted to the Food and Drug Administration (FDA or Agency) on March 29, 2019, on behalf of the American Association of Pro-Life Obstetricians and Gynecologists and the American College of Pediatricians (Petition). In the Petition, you request that FDA: (1) restore and strengthen elements of the Mifeprex regimen and prescriber requirements approved in 2000, and (2) retain the Mifeprex Risk Evaluation and Mitigation Strategy (REMS) and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

Specifically, in your Petition you request that the Agency:

(1) Restore and strengthen elements of the Mifeprex regimen and prescriber requirements approved in 2000, to include the following:

- Indications and Usage - Mifeprex, in a regimen with misoprostol, for the termination of intrauterine pregnancy, should be limited to 49 days gestation.

- Dosage and Administration:
  o Mifeprex should be administered by or under the supervision of a physically present and certified physician who has ruled out ectopic pregnancy.

  o The use of Mifeprex and misoprostol for the termination of pregnancy should require three office visits by the patient.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
w ww.fda.gov

Docket No. FDA-2019-P-1534

- Contraindications - Mifeprex use is contraindicated for patients who do not have convenient access to emergency medical care.

- Adverse Event Reporting - Certified prescribers, emergency medical personnel, physicians treating complications, and Danco Laboratories should report to FDA's MedWatch Reporting system any deaths, hospitalizations, blood transfusions, emergency room visits, failures requiring surgical completion, ongoing pregnancy, or other major complications following the use of Mifeprex and misoprostol.

- Additional studies - The Mifeprex REMS should require a formal study of outcomes for at-risk populations, including: patients under the age of 18; patients with repeat Mifeprex abortions; patients who have limited access to emergency room services; and patients who self-administer misoprostol.

(2) Retain the Mifeprex REMS and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

We have carefully considered the information submitted in your Petition and other relevant data available to the Agency. Based on our review of this information, your Petition is granted in part and denied in part.

## I.    BACKGROUND

### A.  Mifeprex

On September 28, 2000, FDA approved Mifeprex for the medical termination of intrauterine pregnancy through 49 days' pregnancy (new drug application (NDA) 020687). The application was approved under part 314, subpart H (21 CFR part 314, subpart H), "Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses" (subpart H). Specifically, § 314.520 of subpart H provides for approval with restrictions that are needed to assure the safe use of the drug product. In accordance with § 314.520, FDA restricted the distribution of Mifeprex as specified in the September 2000 approval letter.[1]

Subsequently, Mifeprex was identified as one of the products that was deemed to have in effect an approved REMS under the Food and Drug Administration Amendments Act of 2007 (FDAAA) because on the effective date of Title IX, subtitle A of FDAAA (March 28, 2008), Mifeprex had in effect elements to assure safe use.[2] Accordingly, in June 2011, we approved a REMS for Mifeprex, consisting of a Medication Guide, elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments of the REMS.

Elements to assure safe use included: (1) prescriber certification (ETASU A); (2) that Mifeprex is dispensed only in certain healthcare settings by or under the supervision of a certified prescriber

---

[1] See https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.pdf.
[2] 73 FR 16313 (Mar. 27, 2008).

Docket No. FDA-2019-P-1534

(ETASU C); and (3) that Mifeprex is dispensed only with documentation of safe use conditions (ETASU D).  Documentation of safe use conditions consists of a Patient Agreement Form between the prescriber and the patient indicating that the patient has received counseling from the prescriber regarding the risk of serious complications associated with Mifeprex.

On March 29, 2016, we approved an efficacy supplement (S-020) to NDA 020687 for Mifeprex submitted by the applicant Danco Laboratories, LLC (S-020 efficacy supplement). The approval included changes in the dose of Mifeprex and the dosing regimen for taking Mifeprex and misoprostol (including the dose of misoprostol and a change in the route of misoprostol administration from oral to buccal (in the cheek pouch); the interval between taking Mifeprex and misoprostol; and the location at which the patient may take misoprostol).  The approval also modified the gestational age up to which Mifeprex has been shown to be safe and effective, as well as the process for follow-up after administration of the drug.

Specifically, the following changes, among others, were made as part of the 2016 approval:[3]

- Revised the dosing regimen to consist of 200 mg of Mifeprex taken by mouth, followed in 24-48 hours by 800 mcg of misoprostol taken buccally (in the cheek pouch).  This differs from the originally approved dosing regimen of 600 mg of oral Mifeprex followed 48 hours later by 400 mcg of oral misoprostol.

- Revised the indication for use of Mifeprex, in a regimen with misoprostol, to extend the maximum gestational age for the medical termination of intrauterine pregnancy from 49 days to 70 days.

- Reduced the number of office visits by the patient under the approved regimen from three to one.

- Replaced the term "physician" with the term "healthcare provider."

In addition, after reviewing the data and information submitted by the applicant in the S-020 efficacy supplement, and after taking into consideration the safety data that had become available since the initial approval of Mifeprex in 2000, we determined the Mifeprex REMS continued to be necessary to ensure the benefits of the product outweigh the risks.  However, we approved modifications to the Mifeprex REMS that reflected the changes approved in the efficacy supplement.  These changes to the REMS included, among others:[4]

- Updating the Prescriber Agreement Form to reflect the revised indication and dosing regimen.

- Removing the Medication Guide as a REMS element (but retaining the Medication Guide as labeling).

---

[3] See https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2016/020687Orig1s020ltr.pdf and https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.
[4] See https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf.

Docket No. FDA-2019-P-1534

- Removing the requirement that certified prescribers report certain enumerated adverse events to the applicant (specifically, any hospitalization, transfusion or other serious adverse events), but retaining the requirement that certified prescribers report all deaths to the sponsor.

Under the March 2016 approval, the Mifeprex REMS also continued to require that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.[5]

## B. Generic Version of Mifeprex

On April 11, 2019, we approved GenBioPro, Inc.'s generic version of Mifeprex, Mifepristone Tablets, 200 mg (abbreviated new drug application (ANDA) 091178). This action took place after this Petition was submitted to the Agency. As required by 21 CFR 314.94(a)(8), GenBioPro's approved generic version of Mifeprex, Mifepristone Tablets, 200 mg, has the same labeling (with certain permissible differences) as the brand product it references, Mifeprex. Accordingly, although we refer to the Mifeprex labeling in several sections of this response, our discussions in this response apply equally to both the NDA and the generic product labeling, unless otherwise specifically noted.[6]

GenBioPro's generic version of Mifeprex is subject to the same ETASU as its listed drug (21 U.S.C. -1(i)). At the time we approved GenBioPro's generic version of Mifeprex, that ANDA product was required to use a single, shared system for the ETASU with the brand drug product, Mifeprex, unless the requirement was waived by FDA (21 U.S.C. 355-1(i)). FDA did not waive this requirement. Accordingly, at the same time that FDA approved GenBioPro's generic version of Mifeprex in 2019, FDA approved a supplemental new drug application (sNDA) for Mifeprex, approving modifications to the existing, approved REMS for Mifeprex to establish a single, shared system REMS for mifepristone products for the medical termination of intrauterine pregnancy through 70 days gestation (referred to as the Mifepristone REMS Program). In establishing the single, shared system REMS in 2019, no substantive changes were made to the ETASU in the March 2016 Mifeprex REMS. References to the REMS in this response refer to the Mifepristone REMS Program established in 2019, unless otherwise noted.

## C. In-Person Dispensing Requirement During the COVID-19 PHE

---

[5] See https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2016/020687Orig1s020ltr.pdf.
[6] We note that Korlym and the generic version of Korlym (Mifepristone Tablets, 300 mg) contain the same active ingredient – mifepristone - as Mifeprex and the generic version of Mifeprex (Mifepristone Tablets, 200 mg). Although these drug products contain the same active ingredient, their intended uses target different receptors, and the products have different strengths and use different dosing regimens. Korlym and the generic version of Korlym are approved for the control of hyperglycemia (high blood sugar levels) due to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes or glucose intolerance, and have failed surgery or are not candidates for surgery. References to mifepristone in this response refer to the use of mifepristone for the medical termination of intrauterine pregnancy through 70 days gestation, unless otherwise noted.

4

Docket No. FDA-2019-P-1534

FDA has recognized that during the COVID-19[7] public health emergency (PHE),[8] certain REMS requirements for various products may be difficult to comply with because patients may need to avoid public places and patients suspected of having COVID-19 may be self-isolating and/or subject to quarantine. The Agency has also received queries concerning products with REMS that have ETASUs, including REMS with ETASUs that restrict distribution, and the impact of such ETASUs on patient access when patients self-isolate or are subject to quarantine.

In April 2021, FDA communicated its intent to exercise enforcement discretion during the COVID-19 PHE regarding the requirement in the Mifepristone REMS Program that mifepristone used for medical termination of intrauterine pregnancy through 70 days gestation be dispensed to patients by or under the supervision of a certified prescriber only in certain healthcare settings, specifically clinics, medical offices, and hospitals (referred to as the "in-person dispensing requirement").

Specifically, FDA communicated that provided all other requirements of the Mifepristone REMS Program are met, the Agency intends to exercise enforcement discretion with respect to the in-person dispensing requirement of the Mifepristone REMS Program, including any in-person requirements that may be related to the Patient Agreement Form, during the COVID-19 PHE. This determination, which FDA made on April 12, 2021, was effective immediately. We also note that from July 13, 2020 to January 12, 2021, per a court order, FDA was enjoined from enforcing the in-person dispensing requirement of the Mifepristone REMS Program.[9]

Further, and as we also communicated on April 12, 2021, to the extent all of the other requirements of the Mifepristone REMS Program are met, the Agency intends to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of Mifeprex or the approved generic version of Mifeprex, Mifepristone Tablets, 200 mg, through the mail, either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

FDA's intent to exercise enforcement discretion with respect to these requirements during the COVID-19 PHE was the result of a thorough scientific review by experts within FDA's Center for Drug Evaluation and Research (CDER), who evaluated relevant information, including available clinical outcomes data and adverse event reports.

### D. Minor Modification

---

[7] The virus has been named "SARS-CoV-2" and the disease it causes has been named "Coronavirus Disease 2019" (COVID-19).

[8] Secretary of Health and Human Services, Determination that a Public Health Emergency Exists (originally issued Jan. 31, 2020, and subsequently renewed), *available at* https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx.

[9] *Am. Coll. of Obstetricians & Gynecologists v. FDA*, 472 F. Supp. 3d 183, 233 (D. Md. July 13, 2020), order clarified, 2020 WL 8167535 (D. Md. Aug. 19, 2020) (preliminarily enjoining FDA from enforcing the in-person dispensing requirement and any other in-person requirements of the Mifepristone SSS REMS); *FDA v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578 (Jan. 12, 2021) (staying the preliminary injunction imposed by the District Court).

Docket No. FDA-2019-P-1534

In response to a request submitted by the applicants, FDA approved a minor modification to the Mifepristone REMS Program on May 14, 2021. This minor modification revised the Patient Agreement Form to use gender neutral language. Specifically, the pronouns "she" and "her" in the Patient Agreement Form were replaced with "the patient." The minor modification also included revisions to the REMS document to be consistent with the revisions to the Patient Agreement Form. These changes did not affect the substance of the Patient Agreement Form, the REMS document, or the Mifepristone REMS Program.

### E. Review of the Mifepristone REMS Program

In 2021, FDA also undertook a full review of the Mifepristone REMS Program.[10] In conducting this review, FDA reviewed multiple different sources of information, including published literature, safety information submitted to the Agency during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS) reports, the first REMS assessment report for the Mifepristone REMS Program, and information provided by advocacy groups, individuals, and the Plaintiffs in ongoing litigation, as well as information submitted by the sponsors of the NDA and the ANDA (together, the Applicants). As discussed in more detail below, based on our review of this information, FDA has determined that certain elements of the Mifepristone REMS Program remain necessary to assure the safe use of mifepristone for medical termination of intrauterine pregnancy through 70 days gestation; and therefore, the Mifepristone REMS Program continues to be necessary to ensure the benefits outweigh the risk. Specifically, we find that the healthcare provider certification and dispensing of mifepristone to patients with evidence or other documentation of safe use conditions continue to be necessary components of the REMS to ensure the benefits of mifepristone outweigh the risks for this indication.

We also find that the in-person dispensing requirement is no longer necessary to assure the safe use of mifepristone for medical termination of intrauterine pregnancy through 70 days gestation. We have concluded that mifepristone will remain safe and effective for medical abortion if the in-person dispensing requirement is removed, provided all the other requirements of the REMS are met and pharmacy certification is added.[11] Removing the in-person dispensing requirement will render the REMS less burdensome to healthcare providers and patients, and provided all other requirements of the REMS are met, including the additional requirement for pharmacy certification, the REMS will continue to ensure that the benefits of mifepristone for medical abortion outweigh the risks. Accordingly, today we are sending a REMS Modification Notification letter to both Applicants in the Mifepristone REMS Program. As stated in that letter, FDA has concluded that a modification is necessary and must include the following changes:

- Removing the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals.

---

[10] We note that the Agency is in litigation regarding the Mifepristone REMS Program and committed to conducting a full review of the Mifepristone REMS Program, including reviewing any relevant data and evidence submitted to the Agency by the Plaintiffs in that litigation (*Chelius et al v. Becerra*, Joint Mot. to Stay Case Pending Agency Review, ECF No. 148, May 7, 2021, Civ. No. 1:17-00493 (D. Haw.)).

[11] Although we have determined that the Mifepristone REMS Program must be modified to add a requirement for pharmacy certification, this was not raised in your Petition and therefore is not discussed further in this response.

Docket No. FDA-2019-P-1534

- Adding a requirement that pharmacies that dispense the drug be specially certified.

## II.    DISCUSSION OF ISSUES RAISED

### A.  Mifeprex Regimen

### 1.  Indications and Usage

In the Petition, you ask FDA to restore and strengthen elements of the Mifeprex regimen and prescriber requirements approved in 2000, to limit Mifeprex, in a regimen with misoprostol, for the termination of intrauterine pregnancy, to 49 days gestation (Petition at 1 and 3).  For the reasons explained below, we deny this request.

Citing to a 2011 study and a practice bulletin issued by the American College of Obstetricians and Gynecologists (ACOG), you state that medical abortion[12] regimens demonstrate an increase in complications and failures, including serious risks of hemorrhage, infection, and ongoing pregnancy, after 49 days gestation (Petition at 3-4).

Our review of the S-020 efficacy supplement in 2016 concluded that Mifeprex, in a regimen with misoprostol, is safe and effective for medical termination of intrauterine pregnancy through 70 days gestation.[13]  Complete medical abortion rates from the pivotal clinical trials relied on for the initial approval of Mifeprex (with an indication for medical termination of intrauterine pregnancy through 49 days gestation) were 92.1 percent and 95.5 percent in the United States and French trials, respectively.[14]  The studies reviewed in support of the 2016 approval for Mifeprex (with an indication for medical termination of intrauterine pregnancy through 70 days gestation) showed comparable efficacy. The 2016 Clinical Review of the S-020 efficacy supplement summarized clinical outcomes and adverse effects from 22 studies (7 in the United States and 15 from outside the United States) through 70 days gestation, using the currently approved regimen of 200 mg oral mifepristone with 800 mcg buccal misoprostol. The ranges of complete medical abortion rates calculated by the clinical reviewer were 93.2 percent to 98.7 percent in the United States studies, and 92 percent to 98 percent in the non-United States studies.[15]

Serious adverse events associated with the use of mifepristone through 70 days gestational age are rare.  Per the current mifepristone labeling, the rates of serious adverse events are low: transfusions are 0-0.1 percent, sepsis is less than 0.01 percent, hospitalization related to medical abortion is 0-0.7 percent, and hemorrhage is 0.1 percent.[16]  As discussed

---

[12] In this response, the terms "medical abortion" and "medication abortion" both refer to the use of mifepristone, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy.
[13]  See 2016 Clinical Review available at
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf, at 32-38 and 47-47.
[14] See 1999 Medical Officer's Review, available at
http://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_medr_P1.pdf, at 11 (Table 1) and 16.
[15] See 2016 Clinical Review, supra n. 13, at 28-31.
[16] See https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.

throughout this response, the benefit/risk assessment supported our 2016 conclusion that the product is safe and effective through 70 days gestation.

In support of your assertion that medical abortion demonstrates an increase in complications after 49 days gestation, you cite to Mentula, et al.,[17] a register-based, retrospective cohort study that included 18,248 women in Finland who underwent medical abortion between January 1, 2003, and December 31, 2006 (Petition at 3). As an initial matter, we note that the Mentula study was primarily designed to assess the immediate adverse events following medical abortion in the second trimester (13 to 24 gestational weeks as defined by the authors) and then compare those events to those identified with medical abortion in the first trimester (up to 12 gestational weeks as defined by the authors). The study was not designed to compare rates of complications across gestational weeks within the first trimester. It is true that the Mentula publication includes information on the percentages of women who had surgical evacuation following medical abortion and the percentages of women who had infection following medical abortion, based on weekly gestational age, from 5 weeks to 20 weeks gestation.[18] However, the data in the Mentula study are relatively old (2003-2006); in our 2016 review of the S-020 efficacy supplement, we conducted an extensive review of more recent data[19] and concluded that Mifeprex, in a regimen with misoprostol, is safe and effective for medical termination of intrauterine pregnancy through 70 days gestation.

You also cite to ACOG Practice Bulletin No. 143, which states: "the risk of clinically significant bleeding and transfusion may be lower in women who undergo medical abortion of gestations up to 49 days compared with those who undergo medical abortion of gestations of more than 49 days."[20] This statement is based on a 1998 publication which evaluated patients undergoing medical abortion with mifepristone 600 mg and then oral misoprostol 400 mcg two days later.[21] The regimen studied in this 1998 publication is not the currently approved regimen for mifepristone in the United States. Further, ACOG Practice Bulletin No. 143 has been withdrawn and replaced by Practice Bulletin No. 225, which was published in October 2020 and no longer contains this statement.[22]

You also state that the failure rate of the approved regimen (which you refer to as the "buccal misoprostol regimen") increases as the gestational age increases, especially at

---

[17] Mentula MJ, Niinimake M, Suhonen S, et al. Immediate Adverse Events After Second Trimester Medical Termination of Pregnancy: Results of a nationwide registry study, Human Reproduction. 2011;26(4):927-932.
[18] Id. at Fig. 2 and Fig. 3. Surgical intervention after medical abortion and infection after medical abortion are two distinct adverse events. The calculation of abortion completion rates accounts for the need for surgical intervention. In clinical studies we reviewed, success of medical abortion was defined as the complete expulsion of the products of conception without the need for surgical intervention.
[19] See 2016 Cross-Discipline Team Leader Review, available at
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020CrossR.pdf, at 37 (Table 4).
[20] Petition at 3. See Medical Management of First-Trimester Abortion. ACOG Practice Bulletin Number 143. March 2014 (Reaffirmed 2016. Replaces Practice Bulletin Number 67, October 2005); Obstet Gynecol. 2014 Mar;123(3):676-692 at 680.
[21] Spitz I, Bardin CW, Benton L, Robbins A. Early pregnancy termination with mifepristone and misoprostol in the United Sates, NEJM. 1998;338 (18):1241-1247.
[22] See ACOG Practice Bulletin No. 225. Medication Abortion Up to 70 Days of Gestation. Obstetrics and Gynecology 2020; 136(4); e31 to e47.

Docket No. FDA-2019-P-1534

gestational ages greater than 49 days, relying on a 2015 meta-analysis,[23] and that the gestational limit should not have been increased (Petition at 3-4).  We agree that the failure rate of medical abortion regimens, including the currently approved regimen, generally increases with increasing gestational age.  However, the increase in failure rate with each incremental week of gestation, as described in approved mifepristone labeling and in this 2015 meta-analysis, is small, and we believe that the benefit/risk profile for medical termination of intrauterine pregnancy between 49 and 70 days gestation remains acceptable.

For these reasons, we deny your request that FDA limit mifepristone, in a regimen with misoprostol for the termination of intrauterine pregnancy, to 49 days gestation.

### 2. Dosage and Administration

#### a. Prescriber Qualifications

You state that FDA should limit the "ability" to prescribe and dispense Mifeprex to qualified, licensed physicians, rather than permitting non-physicians to apply to be certified prescribers, because of the regimen's serious risks and because physicians are better trained to diagnose patients who have contraindications to Mifeprex and to verify gestational age (Petition at 4).  We do not agree.

Healthcare providers who are licensed to prescribe can become certified in REMS programs if they are able to meet the applicable REMS requirements.  To become certified to prescribe mifepristone under the Mifepristone REMS Program, the prescriber must review the prescribing information for mifepristone and complete a Prescriber Agreement Form.  By signing the form, the prescriber agrees that they meet certain qualifications, including the ability to date pregnancies accurately and to diagnose ectopic pregnancies. These healthcare providers must also: (1) be able to provide any necessary surgical intervention or have made arrangements for others to provide for such care; or (2) be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.[24]

In our review of the S-020 efficacy supplement in 2016, we determined that available data support that Mifeprex is safe and effective when prescribed by midlevel providers, such as physician assistants and nurse practitioners, as well as by physicians.[25]  Our 2016 review included four studies that evaluated the safety and efficacy of medical abortion when performed by non-physician healthcare providers.  Two trials evaluated the currently

---

[23] Petition at 4, fn. 6 (citing Chen MJ, Creinin MD, *Mifepristone with Buccal Misoprostol for Medical Abortion*, Obstet. Gynecol 126 (1) July 2015 12-21).
[24] See https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf; see also https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390.
[25] See 2016 Clinical Review, supra n. 13, at 79; see also 2016 Cross-Discipline Team Leader Review, supra n. 19, at 17-18.  We also note that in most states, midlevel clinicians, such as physician assistants and nurse practitioners, are licensed to prescribe medications.

Docket No. FDA-2019-P-1534

approved Mifeprex and buccal misoprostol regimen (Olavarrieta and Kopp Kallner);[26,27] one trial studied a regimen using vaginal misoprostol (Warringer);[28] a fourth study did not specify the route of misoprostol administered (Puri).[29]  Olavarrieta reported a completion rate of 97.9 percent when medical abortion was provided by nurses as compared with 98.4 percent with physicians.  Kopp Kallner reported a completion rate of 99 percent with certified nurse midwives versus 97.4 percent with physicians.  Warrier reported an abortion completion rate of 97.4 percent with nurses as compared with 96.3 percent with physicians.  Puri reported an abortion completion rate of 96.8 percent when the service was provided by nurse-midwives as compared with 97.4 percent in the "standard care" group.[30] Our 2016 review also included a systematic review of six controlled clinical studies by Renner;[31] the authors concluded that the evidence "indicates that trained mid-level providers may effectively and safely provide first trimester surgical and medical termination of pregnancy services."  Additionally, Barnard et al., in a Cochrane systematic review, assessed the safety and effectiveness of abortion procedures administered by mid-level providers (nurse practitioners, midwives, other non-physician healthcare providers) compared to doctors.[32]  The authors concluded, based in part on two of the studies that we had reviewed in 2016,[33] that there was no statistically significant difference in the risk of failure for medical abortions performed by mid-level providers compared with doctors.

We also believe that the identification of patients for whom the use of mifepristone is contraindicated can be done by mid-level healthcare providers, as well as physicians.  Mifepristone in a regimen with misoprostol for medical termination of intrauterine pregnancy through 70 days gestation is contraindicated in patients with any of the following conditions:[34]

- Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass

---

[26] Olavarrieta CD, Ganatra B, Sorhaindo A, et al. Nurse versus Physician-provision of Early Medical Abortion in Mexico: A Randomized Controlled Non-Inferiority Trial. Bull World Health Organ. 2015;93:249-258.

[27] Kopp Kallner H, Gomperts R, Salomonsson E, et al.  The efficacy, safety and acceptability of medical termination of pregnancy provided by standard care by doctors or by nurse-midwives: a randomised controlled equivalence trial. BJOG. 2015; 122: 510-517.

[28] Warriner IK, Wang D, et al. Can midlevel health-care providers administer early medical abortion as safely and effectively as doctors? A randomized controlled equivalence trial in Nepal. Lancet. 2011; 377: 1155-61.

[29] Puri M, Tamang A, Shrestha P, et al. The role of auxiliary nurse-midwives and community health volunteers in expanding access to medical abortion in rural Nepal. Reproductive Health Matters. 2015; 22(44) 94-103.

[30] 2016 Clinical Review, supra n. 13, at 43.

[31] Renner RM, Brahmi D, Kapp N. Who can provide effective and safe termination of pregnancy care? A systematic review. BJOG 2013 Jan;120(1):23-31.

[32] Barnard S, Kim C, Park MN, Ngo TD. Doctors or mid-level providers for abortion (Review). Cochran Database of Systematic Reviews. 2015, Issue 7.

[33] Of the medical abortion studies reviewed by Barnard et al (Id.), two were reviewed by the Agency as part of the review of the S-020 supplement in 2016. See Warriner et al (supra n. 28) and Kopp Kallner et al (supra n. 27). The third used a different dose of misoprostol than the currently approved regimen. See  Jejeebhoy SJ, Kalyanwalaa S, Zaviera AJF, Kumara R, Mundleb S, Tankc J, et al. Feasibility of expanding the medication abortion provider based in India to include avurvedic physicians and nurses. International Perspectives on Sexual and Reproductive Health 2012;38(3)133-42)

[34] See https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.

Docket No. FDA-2019-P-1534

- An intrauterine device in place
- Chronic adrenal failure
- Concurrent long-term corticosteroid therapy
- History of allergy to mifepristone, misoprostol, or other prostaglandins
- Hemorrhagic disorder or concurrent anticoagulant therapy
- Inherited porphyrias

These contraindications can be assessed by trained healthcare providers who prescribe mifepristone by obtaining a medical history, from medical records, and/or from physical examination or ultrasound if appropriate. We continue to believe that available data support the conclusion that mid-level healthcare providers, as well as physicians, possess the clinical and counseling skills necessary to provide medical abortion. We note this is consistent with ACOG's statement in its current practice bulletin that "[i]n addition to physicians, advanced practice clinicians, such as nurse-midwives, physician assistants, and nurse practitioners, possess the clinical and counseling skills necessary to provide first-trimester medical abortion."[35] Further, if necessary, ultrasound training and certification is available to nurse practitioners and physician assistants, as well as physicians.[36] In sum, available information supports that mid-level healthcare providers as well as physicians can determine whether mifepristone is an appropriate treatment for a particular patient and dispense it.

You also assert that FDA should strengthen the requirement that providers accurately assess the duration of the pregnancy by mandating that gestational age be assessed by ultrasound (Petition at 5). We refer you to FDA's 2016 Response to the citizen petition submitted to Docket No. FDA-2002-P-0364 (the "2016 CP Response"), where FDA stated that the determination of gestational age does not always require an ultrasound. In the 2016 CP Response, FDA stated it had "determined that it was inappropriate for us to mandate how providers clinically assess women for duration of pregnancy and for ectopic pregnancy. These decisions should be left to the professional judgment of each provider, as no method (including TVS [transvaginal ultrasound]) provides complete accuracy. The approved labeling for Mifeprex recommended ultrasound evaluation as needed, leaving this decision to the judgment of the provider."[37]

In the Petition, you reference the Prescriber Agreement Form, in which the provider must attest they have the ability to: (1) accurately assess the duration of the pregnancy; (2) diagnose ectopic pregnancies; and (3) provide surgical intervention if needed (or have made plans to provide such care through others), and you state that a provider who does not physically meet with and examine a patient, but simply consults with the patient over the Internet, is not capable of fulfilling these requirements, or of ruling out additional

---

[35] ACOG Practice Bulletin No. 225, supra n. 22.
[36] American Institute of Ultrasound in Medicine. Accessed November 26, 2021. https://www.aium.org/officialStatements/70.
[37] FDA's citizen petition response dated March 29, 2016, to the citizen petition submitted by the American Association of Pro-Life Obstetricians and Gynecologists, the Christian Medical and Dental Association, and Concerned Women for America on August 20, 2002, Docket No. FDA-2002-P-0364 at 18. See https://www.regulations.gov/document/FDA-2002-P-0364-0002.

contraindications (Petition at 5-6). You state that FDA should require certified prescribers to be physically present when Mifeprex is dispensed so that they can appropriately examine patients and rule out contraindications to the use of Mifeprex (Petition at 4).

Certified prescribers do not have to be physically present with the patient as long as they have confirmed the patient's gestational age and intrauterine pregnancy. As noted above, in the 2016 CP response, FDA "determined that it was inappropriate for us to mandate how providers clinically assess women for duration of pregnancy and for ectopic pregnancy."[38] Moreover, the evaluation of patients for contraindications to medical abortion does not necessarily require direct physical contact with the certified prescriber and can be done in different types of healthcare settings. A certified prescriber can also review the Patient Agreement Form[39] with the patient, fully explain the risks of the mifepristone treatment regimen, and answer any questions, as in any consent process, without physical proximity. See also section II.B.1.c (ETASU C – In-person Dispensing).

With respect to providing surgical intervention in cases of incomplete abortion or severe bleeding and assuring patient access to medical facilities equipped to provide blood transfusions and resuscitation (if necessary), the Prescriber Agreement Form does not reflect a requirement that the certified prescriber must provide such care personally; rather, the prescriber must agree that they have the ability to provide such care or that they have made plans to provide such care through others, and that they have the ability to assure the patient has access to appropriate medical facilities. It is common practice for healthcare providers to provide emergency care coverage for other healthcare providers' patients, and in many places, hospitals employ "hospitalists" to provide care to all hospitalized patients. We also note ACOG's statement that "[i]n rare cases, a patient who undergoes a medication abortion may need to obtain an additional intervention, such as uterine aspiration. If the prescribing clinician does not perform the intervention, it is medically appropriate to provide a referral."[40]

For these reasons, we deny your request that FDA limit the "ability" to prescribe and dispense mifepristone to licensed physicians, and we deny your request that FDA require certified providers to physically meet with and examine the patient.

### b. Office Visits and Administration of Mifepristone/Misoprostol

In the Petition, you state that the use of mifepristone and misoprostol should require three office visits by the patient (Petition at 7). In support of this position, you state the following:

- Drug-induced abortion is contraindicated for patients who are not available for follow-up contact or evaluation (Petition at 10).

---

[38] Id.
[39] See https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390.
[40] ACOG Practice Bulletin Number 225 supra n. 22.

- Abortion complications are more frequent when women abort at home and more healthcare oversight is needed (Petition at 8).

- Home administration of misoprostol does not permit healthcare providers to control when their patients take misoprostol and without monitoring:

  o a patient may take buccal misoprostol before the minimum 24-hour period after taking Mifeprex, which leads to a significantly increased failure rate (Petition at 7).

  o a patient may swallow misoprostol rather than administer it buccally, and oral administration is not as effective as buccal administration in ending the pregnancy (Petition at 7).

- Because providers may now "confirm" that a patient's drug-induced abortion was successful without a clinic visit, this increases the threat that Rh-negative patients will not receive Rhogam, which is necessary to prevent serious risks in subsequent pregnancies (Petition at 7 and 9).

We address each of these points below.

### i. Follow-up Care

The safe use of mifepristone when used in the approved regimen with misoprostol is not contingent on a specific number of office visits being made by the patient undergoing a medical termination of pregnancy. The 2016 labeling change for Mifeprex regarding post-treatment assessment, including the change to the approved regimen to reduce the number of offices visits from three to one, was based on evidence reviewed in the S-020 efficacy supplement. We concluded, upon reviewing the data, that three office visits were not necessary to assure the safe use of Mifeprex.[41]

In your Petition, you point to statements by ACOG that medical abortion is contraindicated for patients who are not available for follow-up contact or evaluation (Petition at 8, 10). The ACOG statements you point to are from ACOG Practice Bulletin No. 143, which has been withdrawn and replaced by Practice Bulletin No. 225.[42] Neither of the statements from the withdrawn Practice Bulletin nor Practice Bulletin No. 225 contraindicate medical abortion in women who are not available for an in-clinic follow-up visit. The current ACOG recommendations indicate that for medical abortion, "[f]ollow-up can be performed by telephone at 1 week, with subsequent at-home urine pregnancy testing at 4 weeks after treatment, which avoids the need for the patient to go to a facility."[43] The patient and their healthcare provider should determine the best option for follow-up as part of the consultation and consent process.[44] As reflected in ACOG's guidance, appropriate follow-

---

[41] See 2016 Clinical Review, supra n. 13, at 44 and 64-67.
[42] ACOG Practice Bulletin Number 225, supra n. 22.
[43] Id.
[44] Id.

up after medical termination of a pregnancy may be accomplished in multiple ways and not all require an in-clinic visit.

You also question findings in multiple studies that evaluated the effectiveness of semiquantitative urine pregnancy tests (multi-level pregnancy tests, or MLPT) and low sensitivity urine pregnancy tests (LSPT) to rule out on-going pregnancies and assessed the ability of patients to self-administer these tests and interpret the test results (Petition at 9-10). Overall, these studies concluded that in the majority of women, it is feasible to use a simplified test to determine if further follow-up is necessary. A recent systematic review and meta-analysis by Baiju assessed the effectiveness and safety of self-assessment of the outcome of medical abortion completed at home versus routine clinic follow-up after medical abortion, concluding self-assessment was not inferior to routine clinic follow-up.[45] We note that this is consistent with current ACOG recommendations, which state that "follow-up can be performed by telephone at 1 week, with subsequent at-home urine pregnancy testing at 4 weeks after treatment, which avoids the need for the patient to go to a facility."[46]

You also assert that it is important for a patient to be under observation after taking misoprostol to ensure that they are appropriately monitored and provided sufficient pain medication (Petition at 8). You cite the World Health Organization (WHO)'s statement in guidance that up to 90 percent of women will abort within 4-6 hours after taking misoprostol; you further state that the 2000 regimen permitted patients to be in the clinic during this time period (Petition at 8). Your reference to the WHO guidance document[47] appears to be out of context. The WHO guidance takes no position on whether women should return to and remain in the clinic during a follow-up visit for purposes of taking misoprostol; in fact, it explicitly recognizes that post-abortion care may not require a follow-up visit if the patient is adequately counseled.[48] In the United States, and as reflected in the approved labeling, medical termination of pregnancy usually involves patients terminating the pregnancy at home, with appropriate follow-up that may not include a return visit.

ii. At Home Medical Abortion and Healthcare Oversight

In addition, you cite a 2018 study to support your statement that abortion complications are more frequent when women abort at home (Petition at 8). The study evaluated complications following medical abortion (both less than 12 weeks and more than 12 weeks gestation) as well as following surgical abortion, at one hospital in Sweden between 2008 and 2015.[49] For the years 2008 to 2010, data were collected retrospectively; for the years

---

[45] Baiju, N, Acharya, G, D'Antonio, F, et al. 2019. Effectiveness, safety and acceptability of self-assessment of the outcome of first-trimester medical abortion: a systematic review and meta-analysis. BJOG; 126:1536-1544.

[46] ACOG Practice Bulletin Number 225, supra n. 22.

[47] World Health Organization, Safe Abortion: technical and policy guidance for health systems – 2nd edition. 2012. Page 45 and Section 2.2.2.1 Medication for pain.

[48] Id. at Section 2.3 Post-abortion care and follow-up, at 52.

[49] Carlsson I, Breding K, Larsson PG, 2018, Complications Related to Induced Abortion: A Combined Retrospective and Longitudinal Follow-up Study, BMC Women's Health 18:158.

Docket No. FDA-2019-P-1534

2011 to 2015, data were collected prospectively.  In this study, medical abortions after 12 gestational weeks all occurred at the hospital.  The authors report that, among medical abortions less than 12 weeks, the complication frequency increased from 5.4 percent (2008 to 2010) to 8.2 percent (2015).  However, the authors also compared the complications related to medical abortions that occurred at less than 12 gestational weeks between "at home" abortions (managed as an outpatient) and "at the hospital" abortions, in 2015 and found no statistically significant difference (8.2 percent "at home" versus 8.0 percent at the hospital).  For pregnancies less than or equal to 9 gestational weeks, the rates are similar for the "at home" group (10.0 percent) and the "at the hospital" group (9.3 percent).  Notably, as part of our review and approval of the S-020 efficacy supplement in 2016, we assessed serious adverse events by gestational age, including hospitalizations, serious infection requiring hospitalization or intravenous antibiotics, bleeding requiring transfusion, and ectopic pregnancy, as reported in the literature submitted by the Applicant.  We concluded that these serious adverse events are rarely reported in the literature and that the regimen of mifepristone 200 mg followed by buccal misoprostol 800 mcg in 24-48 hours is safe to approve for use through 70 days gestation.[50]

You also state that medical abortion is a longer process than surgical abortion and that it requires more attention and care from healthcare providers (Petition at 10).  We agree that medical abortion can be a longer process than surgical abortion,[51] but we disagree that medical abortion always requires in-person follow-up with a healthcare provider.  Not all of the complications associated with medical abortion necessarily require more intensive management from healthcare providers during a follow-up visit.  The question of whether to include an in-person follow-up visit should be discussed by the healthcare provider and the patient.  We have concluded that medical abortions are safe and effective for patients who are appropriate candidates and reducing the number of clinic visits does not compromise patient safety.

The current approved labeling for mifepristone for medical termination of pregnancy states that complete pregnancy termination "can be confirmed by medical history, clinical examination, human Chorionic Gonadotropin (hCG) testing, or ultrasonographic scan."  Not all these modalities require an in-clinic assessment during a follow-up visit.  Our review of the S-020 efficacy supplement concluded that "available data support … that there are a variety of follow-up modalities that can adequately identify the need for additional intervention."[52]  We note that these findings are also consistent with ACOG guidelines, which state that "[r]outine in-person follow-up is not necessary after uncomplicated medication abortion" and recommend several methods for post-treatment follow-up, as appropriate, including serial serum hCG testing alone or telephone follow-up at one week after treatment followed by urine pregnancy testing at four weeks after treatment.[53]  Because there is more than one effective method to detect an on-going pregnancy, we conclude that the way in which post-treatment follow-up is performed may be determined by the healthcare provider and the patient.

[50] 2016 Clinical Review, supra n. 13, at 51-57.
[51] See ACOG Practice Bulletin Number 225, supra note 22.
[52] 2016 Cross Discipline Team Leader Review, supra n. 19, at 17.
[53] ACOG Practice Bulletin Number 225, supra note 22.

Docket No. FDA-2019-P-1534

### iii.    Misoprostol

In the Petition, you make a number of assertions regarding the use of misoprostol. We address each in turn.

First, you assert that a patient may take misoprostol before the prescribed minimum 24-hour period after taking Mifeprex, thereby rendering the regimen ineffective, and that home administration of misoprostol does not permit health providers to control when their patients take misoprostol (Petition at 7). You similarly assert that the use of buccal misoprostol sooner than 24 hours after administering mifepristone leads to significantly increased failure rates (Petition at 7).

As an initial matter, our review of the S-020 efficacy supplement in 2016 included data that evaluated the home use of misoprostol in over 30,000 women. The data showed that Mifeprex was safe and effective in a regimen with misoprostol when misoprostol was self-administered at home.[54] Therefore, any incorrect administration resulting in a failed abortion was infrequent and did not significantly affect the safety and efficacy of medical abortion. Furthermore, because the process of expelling the pregnancy may begin as soon as 2 hours after taking misoprostol, there is a benefit in allowing patients to choose when and where to start this process, to maximize the possibility of their being at a safe place at a convenient time to experience cramping and bleeding.[55]

In support of your assertion of significantly increased failure rates, you cite a pilot study by Lohr et al.[56] Lohr et al. assessed the complete abortion rate using simultaneous oral mifepristone and buccal misoprostol in three gestational age groupings (less than or equal to 49 days, 50-56 days, 57-63 days) and compared the rates with those published in previous pilot investigations[57] using simultaneous oral mifepristone and vaginal misoprostol in the same three gestational age groupings. The complete abortion rates reported by Lohr at 24 hours for oral mifepristone and buccal misoprostol were 72.5 percent, 69.2 percent, and 72.5 percent, respectively; the complete abortion rates at two weeks, however, were 97.5 percent, 100 percent, and 94.9 percent, respectively (and are consistent with the completion rates as described in the approved labeling).[58] The published complete abortion rates at 24 hours for simultaneous oral mifepristone and vaginal misoprostol administration were 90 percent, 88 percent, and 83 percent, respectively, for the gestational age groupings and the complete abortion rates at 2 weeks were 98 percent, 93 percent, 90 percent, respectively. Based on the data presented in Lohr,

---

[54] See 2016 Clinical Review, supra n. 13, at 41 and 48.
[55] Id. at 38.
[56] Petition at 7 (referencing Lohr PA, Reeves MF, Hayes JL, et al., 2007, Oral Mifepristone and Buccal Misoprostol Administered Simultaneously for Abortion: A Pilot Study, Contraception, 76:215-220).
[57] Schreiber CA, Creinin MD, Harwood B, Murthy AS. A pilot study of mifepristone and misoprostol administered at the same time for abortion in women with gestation from 50 to 63 days. Contraception 2005;71:447–50; Murthy AS, Creinin MD, Harwood B, Schreiber C. A pilot study of mifepristone and misoprostol administered at the same time for abortion up to 49 days gestation. Contraception 2005;71:333–6.
[58] See  https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.

Docket No. FDA-2019-P-1534

the use of buccal misoprostol at the same time as oral mifepristone does not adversely affect efficacy, although expulsion may be delayed.  As recommended in Section 2.3 of the approved labeling, follow-up at 7-14 days after administration of mifepristone is more appropriate to evaluate efficacy.[59]  It is misleading to only reference the abortion completion rates observed at the 24-hour timepoint from Lohr.  Therefore, we do not agree that data from Lohr indicate higher failure rate with misoprostol taken before the prescribed minimum 24-hour period after taking mifepristone.

Although we disagree that Lohr demonstrates a higher failure rate with misoprostol taken before 24-hours after taking mifepristone, we note that our 2016 review of the S-020 efficacy supplement referenced a 2013 systematic review by Raymond, which concluded that if the interval between mifepristone and misoprostol interval is less than or equal to 24 hours, the procedure is less effective compared to an interval of 24-48 hours.[60]  As explained above, the data reviewed in 2016 showed that Mifeprex, in a regimen with misoprostol administered at home, was safe and effective.  Therefore, incorrect administration, if it occurred, was infrequent and did not significantly affect the safety and efficacy of medical abortion.  However, in light of the data reviewed, section 2.1 of the labeling approved in 2016 (as well as the currently approved labeling and Medication Guide) states that there should be a "minimum 24-hour interval between" mifepristone and misoprostol (emphasis included in the labeling).[61]  The approved dosing regimen also states that misoprostol is taken within 24 to 48 hours after taking mifepristone and acknowledges that the effectiveness of the regimen may be lower if misoprostol is administered less than 24 hours after mifepristone administration.

In addition to your concerns that a woman may take misoprostol too soon after administering mifepristone, you also state that waiting until 24 hours after administering mifepristone does not guarantee success (Petition at 7-8).  In support of this concern, you cite a 2015 review by Chen and Creinin.  You state that this review found "women taking misoprostol earlier than 48 hours after Mifeprex are more likely to fail the regimen" (Petition at 8).  Chen and Creinin included studies in which the intervals between mifepristone and buccal misoprostol were 24 hours or 24-48 hours and stated that "based on the available literature, the overall efficacy of regimens with a 24-hour interval between mifepristone and buccal misoprostol is significantly lower than those with a 24- to 48-hour interval (94.2 percent compared with 96.8 percent)."[62]  The rate differences were statistically significant, but both regimens were more effective than the 92 percent efficacy rate of the original regimen approved in 2000 (administering misoprostol 48 hours after taking mifepristone).

Finally, you also express concern that if misoprostol is self-administered, a woman may swallow it rather than keep the pill between her cheek and gum, and oral administration of

---

[59] See  https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.
[60] 2016 Clinical Review, supra n. 13, at 31 (citing 8 Raymond EG, et al. First-trimester medical abortion with mifepristone 200 mg and misoprostol: a systematic review. Contraception 2013;87(1):26-37.)
[61] See  https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.
[62] See  Chen MJ and Creinin MD. Mifepristone with buccal misoprostol for medical abortion. Obstet Gynecol. 2015;126(1):12-21; see also 2016 Clinical Review, supra n. 13, at 21.

Docket No. FDA-2019-P-1534

misoprostol (i.e., swallowing the pill) following the lower dose of mifepristone in the current regimen is not as effective in ending the pregnancy (Petition at 7). Winikoff et al. specifically studied the use of oral compared to buccal misoprostol 24-36 hours after mifepristone 200 mg with overall success rates of 91.3 percent and 96.2 percent, respectively.[63] Both regimens resulted in a greater than 91 percent successful medical abortion. Although the study showed decreased efficacy with oral versus buccal administration in 57-63 days gestational age, there were no statistical differences in other gestational age groupings. Even assuming there is a small proportion of women who are 57-63 days gestational age and use oral administration of misoprostol (rather than buccal as labeled), a small decrease in the reported efficacy in that population would not justify requiring a clinic visit for all women undergoing medical abortion.

Overall, studies support the efficacy of the mifepristone, in a regimen with misoprostol when taken by the patient at home, Therefore, we do not agree that an in-person visit is necessary to manage administration of misoprostol.

### iii.  Rh-Negative Patients

In the Petition, you state that a follow-up examination is particularly critical for Rh-negative patients and that without that follow-up examination, women will not receive Rhogam after the abortion, increasing their risk of subsequent Rh isoimmunization, which can endanger future pregnancies (Petition at 9). You suggest that a clinic visit after the administration of Mifeprex is important for Rh-negative women to receive Rhogam and that removing the required follow-up visit puts Rh-negative women at risk for isoimmunization. We do not agree.

Rh testing is standard of care in the United States and RhD immunoglobulin (such as Rhogam) should be administered if indicated. Further, administration of RhD immunoglobulin should be given within 72 hours of a sensitizing event (e.g., medical abortion).[64] However, the facility where the RhD immunoglobulin injection occurs (clinic, hospital or laboratory) is not critical. A shift from medical clinics to hospitals for administration of injections has occurred over the years due to shortages of RhD immunoglobulin and poor reimbursement for RhD immunoglobulin injection from third-party payers.[65] This has resulted in pregnant women frequently obtaining routine 28-week RhD immunoglobulin injections at hospitals/laboratories with a prescription provided by their healthcare providers. This same process of obtaining RhD immunoglobulin via prescription is available to patients after medical termination of pregnancy and does not require a follow-up clinic visit.

---

[63] Winikoff B, Dzuba, IG, Creinin MD, et al, 2008, Two Distinct Oral Routes of Misoprostol in Mifepristone Medical Abortion, Obstet Gynecol 112(6):1303-1310.

[64]  ACOG Practice Bulletin No. 181. Prevention of Rh D Alloimmunization. August 2017.

[65] See https://www.mdedge.com/obgyn/article/61083/practice-management/rhogam-injections-payment-levels-vary-among-insurers.

Docket No. FDA-2019-P-1534

In summary, the totality of data on the efficacy and safety of medical abortion at less than 70 days gestation, derived from numerous studies, has characterized the complications and rates of complications for completing medical abortion at home, and the findings show medical abortion at home is both safe and effective without three office visits. We therefore deny your request that the use of mifepristone in a regimen with misoprostol require three office visits by the patient.

### c.  Contraindications

In the Petition, you assert that critical language contraindicating Mifeprex for patients without access to appropriate emergency medical care was excluded from the 2016 Mifeprex labeling. You cite to a study[66] and ACOG statements as evidence that medical abortions have greater risks and more need for emergency "operation" than a surgical abortion, particularly for patients in rural areas with limited access to emergency medical care (Petition at 11).

Although inadequate access to medical facilities for appropriate care was removed from the list of contraindications in section 4 of the approved labeling when we approved the S-020 efficacy supplement, the 2016 Mifeprex labeling and the currently approved mifepristone labeling, as well as the Mifepristone REMS Program, continue to include appropriate instructions for providers regarding patient access to appropriate medical care.[67] For example, the Boxed Warning includes language directing healthcare providers to ensure that the patient knows whom to call and what to do, including potentially going to an emergency room, if the patient experiences serious events associated with the use of mifepristone. The labeling also directs healthcare providers, as part of the dosing regimen, to give the patient the name and phone number of a healthcare provider who will be handling emergencies.[68] In addition, one of the required qualifications listed in the Prescriber Agreement Form is the "[a]bility to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary."[69] Therefore, although certain language about access to medical facilities was removed from the approved labeling in 2016, we disagree that critical language about access to appropriate emergency medical care is lacking from the approved labeling.

---

[66] See Petition Reference Document No. 17 (Harrison Affidavit: Donna Harrison, M.D., Aff. *Okla. Coalition for Reproductive Justice v. Cline*, Case No. CV-2014-1886 (Feb. 24, 2015), ¶115 (referencing M. Niinimaki et al., Immediate Complications after Medical compared with Surgical Termination of Pregnancy, Obstet. Gynecol. 114:795 (Oct. 2009)).

[67] See Mifeprex labeling, approved 2016. https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf. See also current labeling at https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf.

[68] Id.

[69] Mifepristone REMS Program, https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390. Emphasis added.

Docket No. FDA-2019-P-1534

You also cite information in Box 1, Features of Medical and Surgical Abortion (page 3) in the ACOG Practice Bulletin No. 143.[70]  As mentioned above, the ACOG Practice Bulletin No. 143 has been withdrawn and the language you cite is not included in the current Practice Bulletin No. 225.

### d.  Adverse Event Reporting

In the Petition, you assert that even under the regimen approved in 2000, it was difficult to collect accurate and complete adverse event information for Mifeprex, and that collecting such information is virtually impossible under the regimen approved in 2016 because prescribers only are required to report deaths associated with Mifeprex (Petition at 12). You also assert that FDA cannot adequately assess the safety of the current Mifeprex regimen without comprehensive information on adverse events (Petition at 12).  You state that certified prescribers should at a minimum be required to report the following to FDA's MedWatch reporting system and to the sponsor: deaths, hospitalizations, blood transfusions, emergency room visits, failures requiring surgical completion, ongoing pregnancy, or other major complications, including detailed information on these events (Petition at 13).

We acknowledge that there is always a possibility with any drug that some adverse events are not being reported, because reporting to the Agency's MedWatch program by health care professionals and patients is voluntary.  We do not agree, however, that the 2016 changes to the prescriber reporting requirements limit our ability to adequately monitor the safety of mifepristone for medical termination of pregnancy.  Prior to the 2016 approval of the S-20 efficacy supplement, we assessed approximately 15 years of adverse event reports both from the Applicant and through the MedWatch program and determined that certain ongoing additional reporting requirements under the Mifeprex REMS, such as hospitalization and blood transfusions, were not warranted.  This assessment was based on the well-characterized safety profile of Mifeprex, with known risks occurring rarely, along with the essentially unchanged safety profile of Mifeprex during this 15-year period of surveillance.  Accordingly, the Prescriber Agreement Form was amended as part of our 2016 approval of the S-20 efficacy supplement to require, with respect to adverse event reporting, only that prescribers report any cases of death to the Applicant.

We also note that the reporting changes to the Prescriber Agreement Form as part of our 2016 approval do not change the adverse event reporting requirements for the Applicants. Like all other holders of approved NDAs and ANDAs, the Applicants are required to report all adverse events, including serious adverse events, to FDA in accordance with the requirements set forth in FDA's regulations (see 21 CFR 314.98, 21 CFR 314.80, and 21 CFR 314.81). FDA also routinely reviews the safety information provided by the Applicants in the Annual Reports. As with all drugs, FDA continues to closely monitor the postmarketing safety data on mifepristone for the medical termination of pregnancy.

---

[70] Petition at 11. Medical Management of First-Trimester Abortion. ACOG Practice Bulletin Number 143. March 2014 (Reaffirmed 2016. Replaces Practice Bulletin Number 67, October 2005); Obstet Gynecol. 2014 Mar;123(3):676-692 at 680.

Docket No. FDA-2019-P-1534

You state that FDA should provide guidance to emergency healthcare providers and physicians so that they know how to distinguish complications following drug-induced abortion from complications following spontaneous miscarriage (Petition at 13). We disagree that specific guidance is needed at this time. In the past, when appropriate, FDA has worked with the NDA Applicant to issue communications to healthcare providers and emergency department providers concerning certain serious adverse events.[71] Furthermore, the approved Medication Guide advises patients to take the Medication Guide with them if they need to go to the emergency room or seek care from a healthcare provider other than the one who dispensed the medication to them, so the emergency room or healthcare provider understands the patient is having a medical abortion. We have not identified a change in the safety profile of mifepristone that would warrant additional communications to healthcare providers and emergency department providers concerning complications following medical abortion. If we become aware of safety information that merits further communications with emergency department providers or healthcare providers, or that warrants revisions to the approved labeling, we will act as appropriate.

You also assert that many Mifeprex prescribers "violate FDA protocol," instructing their patients to lie to emergency medical personnel, and that this prevents emergency healthcare providers from appropriately caring for their patients and further decreases the likelihood that adverse events will be reported (Petition at 12). Your only support for this claim is a reference to instructions from the organization Aid Access[72] to patients that they can tell emergency room staff that they had a miscarriage and do not need to tell medical staff that they had a medical abortion. The Petition does not provide any data or additional information establishing "many Mifeprex prescribers violate FDA protocol, instructing their patients to lie," or that these providers thereby prevented appropriate care and decreased the number of adverse events reported.

### B. REMS

#### 1. Request to Retain Mifeprex REMS

In your Petition, you request that FDA retain the Mifeprex REMS (Petition at 14). We agree that a REMS is necessary to ensure that the benefits of mifepristone in a regimen with misoprostol outweigh the risks. FDA's determination as to whether a REMS is necessary

---

[71] See Historical Information on Mifepristone (Marketed as Mifeprex), available at http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm111334.htm. For example, the NDA applicant and FDA agreed that there was a need to issue a Dear Health Care Provider letter in April 2002 and a Dear Emergency Room Director letter in September 2004. The fact that these letters were issued does not imply that the approved mifepristone regimen is unsafe; it is not uncommon for drug sponsors to issue "Dear Health Care Provider" letters, and, as noted in the Mifepristone Q&A document posted on our Web site in April 2002, "[w]hen FDA receives and reviews new information, the agency provides appropriate updates to doctors and their patients so that they have essential information on how to use a drug safely."

[72] We note that Aid Access facilitated the sale of unapproved mifepristone and misoprostol to U.S. consumers and that FDA sent Aid Access a warning letter asking it to promptly cease causing the sale of unapproved and misbranded drugs to U.S. consumers. US FDA Warning Letter to Aidaccess.org, dated March 8, 2019. https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/aidaccessorg-575658-03082019.

Docket No. FDA-2019-P-1534

to ensure that the benefits of a drug outweigh its risks is a complex, drug-specific inquiry, reflecting an analysis of multiple, interrelated factors and of how those factors apply in a particular case.[73]  In conducting this analysis, FDA considers whether (based on premarketing or postmarketing risk assessments) there is a particular risk or risks associated with the use of the drug that, on balance, outweigh its benefits and whether additional interventions beyond FDA-approved labeling are necessary to ensure that the drug's benefits outweigh its risks.[74]

As described in the background section of this response (see section I.A.), FDA determined that interventions in addition to the FDA-approved labeling were necessary to ensure that the benefits of Mifeprex outweighed its risks when the drug was initially approved in 2000, and periodic re-evaluations of the REMS since that time have reached the same conclusion. As further described in the background section of this response (see section I.E.), FDA recently undertook a review of the Mifepristone REMS Program.  As explained below, the Mifepristone REMS Program continues to be necessary to ensure the benefits outweigh the risks.

After review of multiple different sources of information, including published literature, safety information submitted to the Agency during the COVID-19 PHE, FAERS reports, the first REMS assessment report for the Mifepristone REMS Program, and information provided by advocacy groups, individuals, and the Plaintiffs in ongoing litigation,[75] as well as information submitted by the Applicants, we have concluded that the REMS can be modified to reduce the burden on the health care delivery system without compromising patient safety. As explained below, we agree that the healthcare provider certification (ETASU A) and dispensing of mifepristone to patients with evidence or other documentation of safe use conditions (ETASU D) continue to be necessary components of the REMS to ensure the benefits outweigh the risks.  However, we have concluded that the Mifepristone REMS Program must be modified to remove the requirement under ETASU C that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals.

Below, we discuss each of these elements of the Mifepristone REMS Program.

### a.  ETASU A – Prescriber Certification/Qualifications

ETASU A under the Mifepristone REMS Program requires healthcare providers who prescribe mifepristone to be certified.  In order to become certified, prescribers must: 1) review the prescribing information for mifepristone and 2) complete the Prescriber Agreement Form. In signing the Prescriber Agreement Form, prescribers agree they meet the qualifications listed below:

---

[73] See FDA Guidance for Industry, *REMS: FDA's Application of Statutory Factors in Determining When a REMS Is Necessary* (Apr. 2019).
[74] Id.
[75] See supra n. 10.

- Ability to assess the duration of pregnancy accurately

- Ability to diagnose ectopic pregnancies

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information of mifepristone (which the provider can access by phone or online).

In addition to meeting these qualifications, as a condition of certification the healthcare provider also agrees to follow the guidelines for use below:

- Review the Patient Agreement Form with the patient and fully explain the risks of the mifepristone treatment regimen. Answer any questions the patient may have prior to receiving mifepristone.
- Sign and obtain the patient's signature on the Patient Agreement Form.
- Provide the patient with a copy of the Patient Agreement Form and the Medication Guide.
- Place the signed Patient Agreement Form in the patient's medical record.
- Record the serial number from each package of mifepristone in each patient's record.
- Report deaths to the Applicant, identifying the patient by a non-identifiable patient reference and the serial number from each package of mifepristone.

Our review of the published literature did not identify any studies comparing healthcare providers who met these qualifications with healthcare providers who did not.  In the absence of such studies, there is no evidence to contradict our previous finding that prescribers' ability to accurately date pregnancies, diagnose ectopic pregnancies, and provide surgical intervention either personally or through others, is necessary to mitigate the serious risks associated with the use of mifepristone in a regimen with misoprostol. Therefore, our conclusion continues to be that a healthcare provider who prescribes mifepristone in a regimen with misoprostol should meet the above qualifications.  Absent these provider qualifications, we are concerned that serious and potentially fatal complications associated with medical abortion, including missed ectopic pregnancy and heavy bleeding from incomplete abortion, may not be detected or appropriately managed.

Accordingly, we have determined that ETASU A must remain an element of the Mifepristone REMS Program to ensure the benefits outweigh the risks.  Maintaining the requirement for prescriber certification ensures that providers meet the necessary qualifications and adhere to the guidelines for use listed above. The burden of prescriber certification has been minimized to the extent possible by requiring prescribers to certify only one-time for each applicant.

23

Docket No. FDA-2019-P-1534

Although we agree with your request to retain the REMS for mifepristone (now the Mifepristone REMS Program) insofar as it pertains to ETASU A, as discussed in section II.A.2.a of this response, we do not agree with your request that the healthcare provider needs to be a licensed physician to meet this requirement.

### b. ETASU D – Requirement For The Drug To Be Dispensed With Evidence Or Other Documentation Of Safe-Use Conditions

ETASU D under the Mifepristone REMS Program requires mifepristone to be dispensed with evidence or other documentation of safe-use conditions. To receive mifepristone for medical termination of intrauterine pregnancy through 70 days gestation, the patient must sign a Patient Agreement Form indicating that the patient has received, read, and been provided a copy of the Patient Agreement Form and received counseling from the prescriber regarding the risk of serious complications associated with mifepristone for this indication. The Patient Agreement Form ensures that patients are informed of the risks of serious complications associated with mifepristone for this indication. In a number of approved REMS, Patient Agreement Forms or Patient Enrollment Forms ensure that patients are counseled about the risks of the product and/or informed of appropriate safe use conditions.[76]

As a condition of certification under the Mifepristone REMS Program, healthcare providers must follow the guidelines for use of mifepristone, including reviewing the Patient Agreement Form with the patient, fully explaining the risks of the treatment regimen and answering any questions the patient may have before receiving the medication. With this form, the patient acknowledges that they have received and read the form, and that they have received the counseling regarding when to take mifepristone, the risk of serious complications associated with mifepristone and what to do if they experience adverse events (e.g., fever, heavy bleeding). Both the healthcare provider and patient must sign the document and the patient must receive a copy of the signed form. In addition to the counseling described in the Patient Agreement Form, patients also receive a copy of the Medication Guide for mifepristone. Ultimately, the Patient Agreement Form serves as an important counseling component, and documentation that the safe use conditions of the Mifepristone REMS Program have been satisfied, as the prescriber is required to place the signed Patient Agreement Form in the patient's medical record.

In addition, we conducted an updated review of published literature since 2016 to assess the utility of maintaining the Patient Agreement Form as part of the Mifepristone REMS Program, and these studies do not provide evidence that would support removing ETASU D. For these reasons, we have determined that ETASU D must remain an element of the Mifepristone REMS Program to ensure the benefits outweigh the risks.

---

[76] REMS@FDA, https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm, Accessed November 15, 2021.

Docket No. FDA-2019-P-1534

### c. ETASU C – In-Person Dispensing

ETASU C under the Mifepristone REMS Program currently requires mifepristone to be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber. This creates what we refer to in this response as an in-person dispensing requirement under the REMS; i.e., the patient must be present in person in the clinic, medical office, or hospital when the drug is dispensed. The mifepristone REMS document currently states that mifepristone may not be distributed to or dispensed through retail pharmacies or settings other than a clinic, medical office, or hospital. As explained below, based on a recent review of the REMS, we believe that the Mifepristone REMS Program must be modified to remove the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals, because this requirement is no longer necessary to ensure that the benefits of the drug outweigh the risks. This conclusion is based on our review of information from the Mifepristone REMS Program one-year (1st) REMS[77] assessment data and postmarketing safety information, and supported by our review of the published literature.

#### i. Assessment Data

As part of our review of the REMS, we evaluated information included in the 1st REMS assessment report for the Mifepristone REMS Program, which included healthcare provider certification data, program utilization data, and non-compliance data. This 1st REMS assessment report covers a reporting period between April 11, 2019 through February 29, 2020. During this reporting period, a small number of non-compliance events were reported.

As described in section I.C. of this response, during the timeframe from January 27, 2020 through September 30, 2021, there were periods when the in-person dispensing requirement was not enforced. To better understand whether there was any impact on safety or non-compliance during the periods when the in-person dispensing requirement was not enforced, we requested additional information from the Applicants to provide for more comprehensive assessment of the REMS for the time period from January 27, 2020 (the effective date of the COVID-19 PHE) to September 30, 2021. We requested the Applicants provide a summary and analysis of any program deviation or non-compliance events from the REMS requirements and any adverse events that occurred during this time period that had not already been submitted to FDA. The NDA and the ANDA Applicants reported a total of eight cases reporting adverse events between January 27, 2020 and September 30, 2021. These eight cases were also identified in the FAERS database and are described below.

The number of adverse events reported to FDA during the COVID-19 PHE with mifepristone use for medical termination of pregnancy is small, and the data provide no

---

[77] This REMS assessment report was the first submitted following the approval of the single, shared system REMS for mifepristone.

Docket No. FDA-2019-P-1534

indication that any program deviation or noncompliance with the Mifepristone REMS Program contributed to these reported adverse events.

ii. FAERS/Postmarketing Safety Data

FDA routinely monitors postmarketing safety data for approved drugs through adverse events reported to our FAERS database,[78] through our review of published medical literature, and when appropriate, by requesting applicants submit summarized postmarketing data. For our recent review of the REMS, we searched our FAERS database, reviewed the published medical literature for postmarketing adverse event reports for mifepristone for medical termination of pregnancy, and requested that the Applicants submit a summary and analysis of certain adverse events. Our review of this postmarketing data indicates there have not been any new safety concerns with the use of mifepristone for medical termination of pregnancy through 70 days gestation, including during the time when in-person dispensing was not enforced.

In order to evaluate the periods when in-person dispensing was and was not enforced, we conducted a search of the FAERS database and the published medical literature to identify U.S. postmarketing adverse events that reportedly occurred from January 27, 2020 through September 30, 2021 with mifepristone use for medical termination of pregnancy. The data for this time period were then further divided into the date ranges when in-person dispensing was enforced per the REMS (January 27, 2020 - July 12, 2020 and January 13, 2021 - April 12, 2021) versus when in-person dispensing was not enforced: July 13, 2020 - January 12, 2021 (in-person dispensing enforcement was temporarily enjoined) and April 13, 2021 - September 30, 2021 (enforcement discretion for in-person dispensing because of the COVID-19 PHE).

Based on the above search, a total of eight cases were identified in FAERS and no additional case reports were identified in the medical literature. Two of the eight cases reported adverse events that occurred when in-person dispensing was being enforced (i.e., January 27, 2020-July 12, 2020 and January 13, 2021-April 12, 2021). These two cases reported the occurrence of uterine/vaginal bleeding (case 1) and uterine/vaginal bleeding and sepsis (case 2). Of note, uterine/vaginal bleeding and sepsis are labeled adverse events. Five of the eight cases reported adverse events that occurred when in-person dispensing was not enforced (i.e., July 13, 2020-January 12, 2021 and April 13, 2021-September 30, 2021); however, the narratives provided in the FAERS reports for three of the five cases explicitly stated that mifepristone was dispensed in-person. These five cases reported the occurrence of ongoing pregnancy (case 3), drug intoxication and death approximately 5 months after ingestion of mifepristone (case 4), death [cause of death is currently unknown] (case 5), sepsis and death (case 6), and pulmonary embolism (case 7). Of note, ongoing pregnancy and sepsis, including the possibility of fatal septic shock, are labeled adverse events. The remaining case reported the occurrence of oral pain/soreness (case 8) in July

---

[78] FAERS is a database that contains adverse event reports, medication error reports and product quality complaints resulting in adverse events that were submitted to FDA. The database is designed to support FDA's post-marketing safety surveillance program for drug and therapeutic biologic products.

Docket No. FDA-2019-P-1534

2021, but did not provide sufficient information to determine the exact date of the adverse event.

As discussed in section II.A.2.d., the Applicants report adverse events, including serious adverse events, to FDA in accordance with applicable regulations.[79]  To enable additional review of adverse events, Applicants were requested to provide a summary and analysis for adverse events reported with incomplete medical abortion requiring surgical intervention to complete abortion, blood transfusion following heavy bleeding or hemorrhage, ectopic pregnancies, sepsis, infection without sepsis, hospitalization related to medical abortion, and emergency department/urgent care encounter related to medical abortion.  The Applicant for Mifeprex provided the requested summary of postmarketing safety information from March 29, 2016, when S-020 was approved, through September 30, 2021. The Applicant for the generic provided the requested summary of postmarketing safety information from April 11, 2019 (date of initial approval) through September 30, 2021. The information provided by the Applicants included the same cases identified in FAERS, as discussed above.

We analyzed the FAERS data referenced above to determine if there was a difference in adverse events when in-person dispensing was and was not enforced.  Based on FDA's review of this data, we concluded that there does not appear to be a difference in adverse events when in-person dispensing was and was not enforced and that mifepristone may be safely used without in-person dispensing.  FDA's review of the summary and analysis data submitted by the Applicants (which, as noted above, included the same cases identified from FAERS) did not change this conclusion.

### iii.  Published Literature

As noted above, we also conducted an extensive review of the published literature since March 29, 2016 (the date the S-020 efficacy supplement for Mifeprex was approved) through September 30, 2021.[80] Published studies have described alternatives in location and method for dispensing mifepristone by a certified prescriber (or equivalent healthcare provider in countries other than the United States).  Some studies have examined replacing in-person dispensing in certain healthcare settings with dispensing at retail pharmacies[81]

---

[79] See 21 CFR 314.98, 21 CFR 314.80, and 21 CFR 314.81.

[80] In support of your request that we retain the REMS and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals by or under the supervision of a certified prescriber, you reference two studies that you assert do not comply with the REMS (Petition at 19-22).  Outcomes from both of the studies you reference have been reported in the published literature and are addressed in the discussion that follows. We note that as a general matter, a clinical investigation of an approved drug that is subject to a REMS can take place in healthcare settings outside those provided for in the REMS.  When an approved drug that is subject to a REMS is studied in a clinical trial, the REMS does not apply to the use of the drug in that clinical trial.  However, FDA reviews the protocol to ensure that it will be conducted in a manner that adequately addresses the risks that the REMS is intended to mitigate, such that the trial participants will not be exposed to an unreasonable and significant risk of illness or injury.  See 21 CFR 312.42(b)(1)(i) and (b)(2)(i).

[81] Grossman D, Baba CF, Kaller S, et al. Medication Abortion With Pharmacist Dispensing of Mifepristone. Obstet Gynecol 2021;137:613–22; Rocca CH, Puri M, et al. Effectiveness and safety of early medication

Docket No. FDA-2019-P-1534

and dispensing mifepristone from pharmacies by mail.[82]  Other studies have evaluated two modes of dispensing by prescribers: (1) prescribers mailing the medications to patients,[83] and (2) prescribers using couriered delivery of medications.[84]  Different  studies have evaluated dispensing mifepristone by mail by an entity described as "a partner organization."[85]

We note that the ability to generalize the results of these studies to the United States population is hampered by differences between the studies with regard to pre-abortion care (e.g., telemedicine versus in-person).  In addition, the usefulness of the studies is limited in some instances by small sample sizes and lack of follow-up information on outcomes with regard to both safety and efficacy.  There are also factors which complicate the analysis of the dispensing element alone.  Some of these factors are: (1) only a few studies have evaluated alternatives for in-person dispensing of mifepristone in isolation (for example, most studies on mail dispensing of mifepristone also include telemedicine consultation); and (2) because most serious adverse events with medical abortion are infrequent, further evaluation of changes in dispensing would require studies with larger numbers of participants.  We did not find any large clinical studies that were designed to collect safety outcomes in healthcare systems similar to the United States.  Despite the limitations of the studies we reviewed, we have concluded that overall the outcomes of these studies are not inconsistent with our conclusion that, based on the 1st year REMS assessment report and postmarketing safety data, mifepristone will remain safe and efficacy will be maintained if the in-person dispensing requirement is removed from the Mifepristone REMS Program.

---

abortion provided in pharmacies by auxiliary nurse-midwives: A non-inferiority study in Nepal. PLoS ONE 13(1): e0191174. https://doi.org/10.1371/journal.pone.019117; Wiebe ER, Campbell M, et al. Comparing telemedicine to in-clinic medication abortions induced with mifepristone and misoprostol. Contracept X. 2020; 2: 100023.

[82] Grossman D, Raifman S, Morris N, et.al. Mail-order pharmacy dispensing of mifepristone for medication abortion after in-person clinical assessment. Contraception 2021, ISSN 0010-7824, https://doi.org/10.1016/j.contraception.2021.09.008, Available online 20 September 2021; Upadhyay UD, Koenig LR, Meckstroth KR. Safety and Efficacy of Telehealth Medication Abortion in the US During the COVID-19 Pandemic. JAMA Network Open. 2021;4(8):e2122320, doi:10.1001/jamanetworkopen.2021.22320; Hyland P, Raymond EG, Chong E. A direct-to-patient telemedicine abortion service in Australia: Retrospective analysis of the first 18 months. Aust N Z J Obstet Gynaecol 2018;58: 335-340.

[83] See Anger HA, Raymond EG, et al. Clinical and service delivery implications of omitting ultrasound before medication abortion provided via direct-to-patient telemedicine and mail. Contraception 2021 Jul 28;S0010-7824(21)00342-5. doi: 10.1016/j.contraception.2021.07.108. Published online. Raymond E, Chong E, et al. TelAbortion: evaluation of a direct to patient telemedicine abortion service in the United States. Contraception 2019; 100:173-177.  See also Chong et al., infra n. 103  Kerestes et al., infra n. 105, and Aiken et al., infra n. 106.

[84] Reynolds-Wright JJ, et al. BMJ Sex Reprod Health 2021;0:1–6. doi:10.1136/bmjsrh-2020-200976.

[85] Endler M, Beets L, Gemzell Danielsson K, Gomperts R. Safety and acceptability of medical abortion through telemedicine after 9 weeks of gestation: a population-based cohort study. BJOG 2019;126;609-618. Norten H, Ilozumba O, Wilkinson J, Gemzell Danielsson K, Gomperts R. 10-year evaluation of the use of medical abortion through telemedicine: a retrospective cohort study. BJOG 2021; https://doi.org/10.1111/1471-0528.16765; Aiken ARA, Digol I, Trussell J, Gomperts R. Self-reported outcomes and adverse events after medical abortion through online telemedicine: population based study in the Republic of Ireland and Northern Ireland. BMJ 2017;357:j2011 http://dx.doi.org/10.1136/bmj.j2011.

Docket No. FDA-2019-P-1534

Below is a summary of our review of the literature, organized by the methods of dispensing mifepristone that were studied.

(a) Retail pharmacy dispensing

Three studies reported medical abortion outcomes for retail pharmacy dispensing of mifepristone after clinical evaluation (Grossman,[86] Rocca,[87] Wiebe[88]). Grossman conducted a US-based study in which mifepristone and misoprostol were dispensed from a pharmacy partnered with the clinic. Complete abortion without additional procedures occurred in 93.5 percent of participants with known outcomes. The reported proportion of complete abortion is within the range described in the approved mifepristone labeling. No participants experienced a serious adverse event, were hospitalized or required transfusion. Three participants had emergency department (ED) visits with treatment (intravenous hydration, pain medication, pelvic infection after uterine aspiration for incomplete abortion). The study safety and efficacy outcomes are consistent with labeled outcome frequencies. The study has limited generalizability because it was conducted in two US states and involved partnered pharmacies, some of which were in the same building as the clinic. Additionally, all participating pharmacies in this study were required to have a pharmacist on duty during clinic hours who had been trained in the study protocol and was willing to dispense mifepristone. The study conditions may not be generalizable to United States retail pharmacies; there is insufficient information to assess this.

Rocca[89] conducted an observational study evaluating participants who obtained medical abortions in Nepal by comparing the provision of medical abortion service by newly trained nurse midwives in pharmacies to medical abortion provided in government-certified clinics. The authors reported that, with respect to complete abortion (greater than 97 percent) and complications (no hospitalizations or transfusions), evaluation and dispensing in pharmacy was non-inferior to in-clinic evaluation and dispensing.

Wiebe,[90] in a retrospective, chart review study conducted in Canada, compared abortion outcomes of women who underwent medical abortion with telemedicine consult, and either received medications by courier or picked them up at a local pharmacy, with outcomes of a matched control cohort of women who received the medications at a pharmacy after an in-clinic visit. The groups had similar documented complete medical abortion outcomes (equal to or greater than 95 percent participants with known outcomes). The telemedicine group had one case of hemorrhage (0.5 percent) and one case of infection requiring antibiotics (0.5 percent) compared with no cases of hemorrhage or infection requiring antibiotics in the in-clinic cohort. The telemedicine group had more ED visits (3.3 percent compared to 1.5 percent in-clinic cohort). Both models of dispensing mifepristone resulted in efficacy and safety outcomes within labeled frequency.

---

[86] Grossman et al., supra n. 81.
[87] Rocca et al., supra n. 81.
[88] Wiebe et al., supra n. 81.
[89] Rocca et al., supra n. 81.
[90] Wiebe et al., supra n. 81.

Docket No. FDA-2019-P-1534

None of the three studies allow a determination regarding differences in safety between in-person dispensing by a certified prescriber in a health care setting and dispensing through a retail pharmacy, due to limitations on the generalizability of the results of the studies to the current retail pharmacy environment in the United States. The outcome findings from the one United States study (Grossman)[91], in which the pharmacies were partnered with prescribers, are unlikely to be broadly generalizable to the current retail pharmacy environment and do not reflect typical prescription medication availability with use of retail pharmacy dispensing. For the retail pharmacy dispensing study in Canada (Wiebe),[92] timely provision of medication from the retail pharmacy was accomplished by either courier to the woman or faxed prescription to the woman's pharmacy. It is unknown whether conditions that would allow timely access to medications for medical abortion would occur in retail pharmacies throughout the United States, suggesting the findings from that study may not be broadly generalizable. The third study (Rocca)[93] evaluated medical abortion provided in Nepali pharmacies and essentially moved the abortion provider and clinical examination into the pharmacy, a scenario that is not, at this time, applicable to the United States retail setting.

(b) Mail order pharmacy

Three studies evaluated mail order pharmacy dispensing (Grossman,[94] Upadhyay,[95] Hyland[96]). Grossman published an interim analysis of an ongoing prospective cohort study evaluating medical abortion with mifepristone and misoprostol dispensed by mail-order pharmacy after in-person clinical assessment. Complete abortion without additional procedures occurred in 96.9 percent of participants with known outcomes. Two (0.9 percent) participants experienced serious adverse events; one received a blood transfusion and one was hospitalized overnight. Nine (4 percent) participants attended 10 ED visits. In this interim analysis, the outcomes are consistent with labeled frequencies.

Upadhyay[97] reports findings from a retrospective cohort study of women undergoing medical abortion in the United States without a consultation or visit. Eligibility was assessed based on a participant-completed online form collecting pregnancy and medical history. Participants who were considered eligible received medication delivered by a mail-order pharmacy. Abortion outcome was determined by either an assessment on day 3 or a 4-week pregnancy test. The investigators reported a complete abortion rate without additional procedures of 95 percent for participants with known outcomes and stated that no participants had any major adverse events. The proportion of abortion outcomes assessed at 3 days versus 4 weeks is not reported. Regardless, determining outcomes at 3 days is insufficient to determine outcome rates or safety findings because a 3-day follow-up period is too short. As recommended in Section 2.3 of the approved labeling, follow-up at

---

[91] Grossman et al., supra n. 81.
[92] Wiebe et al., supra n. 81.
[93] Rocca et al., supra n. 81.
[94] Grossman et al, supra n. 82.
[95] Upadhyay et al., supra n. 82.
[96] Hyland et al., supra n. 82.
[97] Upadhyay et al., supra n. 82.

7-14 days after administration of mifepristone is more appropriate to evaluate safety and efficacy. This study used a model with numerous deviations from standard provision of medical abortion in the United States, such as no synchronous interaction with the prescriber during informed consent or prior to prescribing medication and no confirmation of self-reported medical, surgical, and menstrual history. These deviations, limited follow-up information, and small sample size limit the usefulness of this study.

Hyland[98] describes findings from a cohort study in Australia evaluating medical abortion outcomes utilizing telemedicine and a central mail order pharmacy. Complete abortions without additional procedures occurred in 96 percent of participants with documented outcomes and is consistent with labeled efficacy. Of the participants included in the analysis, 95 percent had no face-to-face clinical encounters after medications were mailed while 3 percent were admitted to the hospital and 2 percent had an outpatient encounter. One participant who was hospitalized and underwent a surgical uterine evacuation received a transfusion. Not included in the findings are 7 hospitalizations occurring in 7 participants who did not have "full follow up." The authors do not report any other adverse events and conclude use of the telemedicine medical abortion service is safe. However, the reasons for hospitalization are not discussed by the authors; therefore, it is unknown why the patients were hospitalized. Although the reported frequency of hospitalizations (3 percent) is higher than the less than 1 percent in the FDA-approved mifepristone labeling, conclusions on the safety findings cannot be made in the absence of information about the reasons for hospitalization. Other limitations of this study include incomplete information about outcomes with face-to-face encounters.

Overall, the three studies evaluating mail order pharmacy dispensing suggest that efficacy of medical abortion is maintained with mail order pharmacy dispensing. With respect to safety, in the Grossman study[99] the interim analysis, although small, does not raise serious safety concerns. Safety findings from the Hyland[100] study are difficult to interpret. Although only one transfusion is reported and the authors state the findings demonstrate safety, a higher hospitalization rate and lack of information on the reasons for hospitalization preclude reaching any conclusions about the safety findings. Lastly, the Upadhyay[101] study had no reported adverse events, but the findings are less useful because of the limited follow-up, and because medical abortions were provided using a model with numerous deviations from standard provision of medical abortion in the United States.

(c) <u>Clinic dispensing by mail</u>

A total of five studies evaluated clinic dispensing by mail. Gynuity Health Projects conducted a prospective cohort study (the "TelAbortion" study) evaluating use of telemedicine for remote visits and mifepristone being dispensed from clinics via overnight or regular tracked mail. Three publications reviewed have reported outcomes for the Gynuity population exclusively: Raymond (outcomes from May 2016 to December

---

[98] Hyland et al., supra n. 82.
[99] Grossman et al., supra n. 82.
[100] Upadhyay et al., supra n. 82.
[101] Hyland et al., supra n. 82.

Docket No. FDA-2019-P-1534

2018),[102] Chong (outcomes from May 2016 to September 2020)[103] and Anger (outcomes from March 2020 to September 2020).[104]  A fourth study, Kerestes,[105] reports outcomes of medical abortion at the University of Hawaiʻi from April 2020 to November 2020 and a fifth study, Aiken (2021)[106] reports outcomes of medical abortion up to 70 days gestational age in the United Kingdom before and during the COVID-19 PHE in a retrospective cohort study.

In Raymond,[107] complete abortion without additional procedures occurred in 93 percent of participants with known outcomes.  There were two hospitalizations (one participant received a transfusion for severe anemia despite having had a complete abortion) and 7 percent of participants had clinical encounters in ED/urgent care centers.  The reported outcomes are similar to outcomes described in approved labeling except the combined ED/urgent care center encounters (7 percent) exceeded the ED visits in approved labeling (2.9-4.6 percent).[108]  Of note, the authors state that half of the ED/urgent care visits did not entail any medical treatment.  In Chong,[109] approximately 50 percent of the medical abortions occurred during the period of the COVID-19 PHE.  Complete abortion without an additional procedure occurred in 95 percent of those with known outcomes.  Transfusions were 0.4 percent and hospitalizations were 0.7 percent; 6 percent of participants had unplanned clinical encounters in ED/urgent care.  Surgical interventions were required in 4.1 percent to complete abortion.  The reported outcomes in Chong (which updated the findings described in Raymond) are similar to outcomes described in approved labeling except that (as with the Raymond study it updated) the combined ED/urgent care center encounters (6 percent) exceeded the ED visits in approved labeling (2.9-4.6 percent).

Anger,[110] which compared outcomes among participants enrolled in the Gynuity study who did ("test medical abortion cohort") versus did not ("no-test medical abortion cohort")[111]

---

[102] Raymond et al., supra n. 83.

[103] Chong E, Shochet T, et al. Expansion of a direct-to-patient telemedicine abortion service in the United States and experience during the COVID-19 pandemic. Contraception 2021;104:43-48.

[104] Anger et al., supra n. 83.

[105] Kerestes C, Murayama S, et al. Provision of medication abortion in Hawaiʻi during COVID-19: Practical experience with multiple care delivery models. Contraception 2021 Jul;104(1):49-53. doi:10.1016/j.contraception.2021.03.025. Epub 2021 Mar 28.

[106] Aiken ARA, Lohr PA, et al. Effectiveness, safety and acceptability of no-test medical abortion (termination of pregnancy) provided via telemedicine: a national cohort study. BJOG 2021;128:1464–1474.

[107] Raymond, supra n. 83.

[108] The authors reported the combined frequency of emergency department/urgent care visits, whereas the approved labeling includes the frequency for emergency department (emergency room) visits. Therefore it is unknown whether the frequency of emergency department visits in the trial, as distinct from the combined frequency of emergency department/urgent care visits, is comparable to the frequency of emergency department visits reflected in approved labeling.

[109] Chong et al., supra n. 103.

[110] Anger et al., supra n. 83.

[111] "No-test medication abortion" refers to medical abortion provided without a pretreatment ultrasound, pelvic examination or laboratory tests when, in the judgment of the provider, doing so is medically appropriate (appropriateness based on history and symptoms); "no-test medication abortion"  does include post-abortion follow up. A sample protocol is described by Raymond et al." (Raymond EG, Grossman D, Mark A, et.al. Commentary: No-test medication abortion: A sample protocol for increasing access during a pandemic and beyond. Contraception 2020;101:361-366)

247

have confirmation of gestational age/intrauterine location with an examination or ultrasound, found that those without an examination or ultrasound prior to medical abortion were more likely to require procedural interventions and had more unplanned clinical encounters.[112]  There were no reported ectopic pregnancies in either group.  The number of ED/urgent care visits and the proportion of unplanned clinical encounters that led to medical treatment were not reported.  In the "test" group, complete medical abortion was confirmed in 98 percent of participants with known outcomes; one participant was "hospitalized and/or blood transfusion" and 8 percent had an unplanned clinic encounter (participant sought in-person medical care related to abortion and the visit was not planned prior to abortion).  In the "no-test" group, complete medical abortion was confirmed in 94 percent of participants with known outcomes; two participants were "hospitalized and/or blood transfusion" and 12.5 percent had an unplanned clinical encounter.

Kerestes[113] included three different delivery models: traditional in-person visits, telemedicine consultation with in-person pick-up of medications, and telemedicine consultation with delivery of medications by mail (most of the latter were enrolled through Gynuity's TelAbortion study).  Among participants with follow-up data, the rates of successful medical abortion without surgery were consistent with outcomes in approved labeling. Blood transfusion was given to two participants (both in the telemedicine plus in-person pickup group).  Although ED visits occurred the most frequently in the telemedicine plus mail group (four participants or 5.8 percent) and the least in the in-person group (two participants or 2.1 percent), the study reported no increases in other serious adverse events.  Aiken (2021)[114] reported outcomes before and during the pandemic in a retrospective cohort study in the United Kingdom.  The study compared the two cohorts: one before the pandemic with in-person visits and dispensing (traditional model) and one during the pandemic with either an in-person visit and in-person dispensing or a telemedicine visit and dispensing by mail or picked up from the clinic (hybrid model).  Complete abortion occurred in greater than 98 percent in both cohorts; the rate was slightly higher in the telemedicine group than in the in-person group.  There were no significant differences in the rates of reported serious adverse events.  The investigators' analysis determined that the efficacy and safety were comparable between both cohorts and concluded the hybrid model for medical abortion is effective and safe.

Taken together, data from the three Gynuity study reports (Raymond, Chong, and Anger), Kerestes, and Aiken (2021) support that efficacy of medical abortion was maintained when mifepristone was dispensed by mail from the clinic.  Study reports of Raymond, Chong, and Kerestes all suggest there may be an increase in ED/urgent care visits with telemedicine visits and dispensing by mail from the clinic, but without increases in other serious adverse events.  Anger's comparative analysis suggests a pre-abortion examination may decrease the occurrence of procedural intervention and decrease the number of unplanned visits for postabortion care.  The Aiken (2021) study appears to be of sufficient

---

[112] We note that the two cohorts were not randomized in the Anger study; they had different baseline characteristics. Consequently, findings based on the comparisons between the two cohorts should be interpreted carefully.
[113] Kerestes et al., supra n. 105.
[114] Aiken et al., supra n. 106.

Docket No. FDA-2019-P-1534

sample size to determine whether safety outcomes with mail dispensing differ from in-person dispensing; however, significant limitations include that the analysis was based on deidentified information and the investigators were unable to verify the outcomes extracted. Further, the study's design did not capture all serious safety outcomes, thus limiting the certainty of the findings.

Notwithstanding the limitations discussed above, these studies overall support that dispensing by mail from the clinic is safe and effective. Although the literature suggests there may be more frequent ED/urgent care visits related to the use of mifepristone when dispensed by mail from the clinic, there are no apparent increases in other serious adverse events related to mifepristone use.

### (d) Clinic dispensing by courier

Reynolds-Wright[115] reported findings from a prospective cohort study of participants at less than 12 weeks gestational age in Scotland undergoing medical abortion at home that provided mifepristone for pick up at the service or by couriered delivery to woman's home. The outcomes from this study in Scotland are consistent with the outcomes in the approved mifepristone labeling. However, the number of couriered deliveries was not reported. Thus this study does not provide abortion outcomes separately for couriered delivery of mifepristone and misoprostol. The study shares the same limitations as the Aiken (2021) study; the study's design did not capture all serious safety outcomes, thus limiting the certainty of the findings.

### (e) Partner organization dispensing by mail

Women on Web (WoW), an internet group, connects patients and providers outside of the US and provides medical abortion globally, dispensing mifepristone through "a partner organization" by mail. WoW uses a model with numerous deviations from the standard provision of medical abortion in the United States. For example, this model has no synchronous interaction with the prescriber during informed consent or prior to prescribing medication and no confirmation of self-reported medical, surgical, and menstrual history or confirmed pregnancy testing. Three studies (Endler, Norten, and Aiken (2017))[116] reported outcomes based on dispensing through this model. Endler and Norten reported outcomes from WoW cohorts but do not provide relevant information on mifepristone dispensing by mail because neither provide meaningful outcomes data for consideration. Although Aiken (2017) is a large cohort study, the outcomes are self-reported and an unusually high rate of outcomes are unaccounted for; these limitations result in the data being insufficient to determine the safety of dispensing mifepristone by mail though a partner organization.

In sum, there are insufficient data from the literature we have reviewed to determine the safety and efficacy of dispensing from a retail pharmacy, by courier, or by a partner organization. With respect to dispensing mifepristone by mail, our review of the literature indicates that dispensing mifepristone by mail from the clinic or from a mail order

---

[115] Reynolds-Wright JJ, et al. BMJ Sex Reprod Health 2021;0:1–6. doi:10.1136/bmjsrh-2020-200976.
[116] Endler et al., Norten et al., and Aiken et al., supra n. 85.

Docket No. FDA-2019-P-1534

pharmacy does not appear to jeopardize the efficacy of mifepristone for medical abortion. While the studies we reviewed are not adequate on their own to establish the safety of the model of dispensing mifepristone by mail, the safety and efficacy outcomes reported in these studies remain within the ranges labeled for the approved mifepristone products. Although the literature suggests there may be more frequent ED/urgent care visits related to the use of mifepristone when dispensed by mail from the clinic, there are no apparent increases in other significant adverse events related to mifepristone use.

Based on the REMS assessment data, FAERS data from the time period when the in-person dispensing requirement was not being enforced, and our review of the literature, we conclude that mifepristone will remain safe and effective if the in-person dispensing requirement is removed, provided all the other requirements of the REMS are met and pharmacy certification is added. Removing the in-person dispensing requirement will render the REMS less burdensome to healthcare providers and patients, and provided all other requirements of the REMS are met, including the additional requirement for pharmacy certification, the REMS will continue to ensure that the benefits of mifepristone for medical abortion outweigh the risks. Therefore, to reduce the burden imposed by the Mifepristone REMS Program, the REMS must be modified to remove the in-person dispensing requirement, which would allow, for example, dispensing of mifepristone by mail via certified prescribers or pharmacies, in addition to in-person dispensing in clinics, medical offices and hospitals as currently outlined in ETASU C.

In your Petition, you state that "[e]liminating or relaxing the REMS to facilitate Internet or telephone prescriptions would be dangerous to women and adolescent girls" and that "health care providers prescribing abortion-inducing drugs over the Internet or phone or before a patient is even pregnant cannot adequately evaluate patients for contraindications to the drugs" (Petition at 18-19).

We do not agree that eliminating the REMS requirement for the dispensing of Mifeprex in certain healthcare settings will be dangerous to patients, nor do we agree that doing so will affect the ability of healthcare providers to evaluate women for contraindications to mifepristone in a regimen with misoprostol for medical termination of intrauterine pregnancy through 70 days gestation. There are many factors that contribute to patient safety, including evaluation of a patient, informed consent, development of a follow-up plan, and provision of a contact for emergency care. All of these can occur in many types of healthcare settings. The evaluation of patients for contraindications to medical abortion does not necessarily require direct physical contact with the certified prescriber.

You also assert that telemedicine abortion absolves abortion providers of responsibility for the well-being of their patients (Petition at 19). We do not agree. Healthcare providers who prescribe mifepristone are responsible for the well-being of their patients regardless of mode of evaluation or dispensing of medication. The Agency agrees with the American Medical Association that a healthcare provider-patient relationship is entered when the "physician serves a patient's medical needs;"[117] in the context of medical abortion, this

---

[117] See www.ama-assn.org/delivering-care/ethics/patient-physician-relationships.

35

Docket No. FDA-2019-P-1534

healthcare provider-patient relationship continues until resolution of the pregnancy or transfer of care to another healthcare provider.[118]

We also note that patients who are not pregnant at the time of evaluation would not be appropriate candidates for being prescribed mifepristone for medical termination of pregnancy because they do not fulfill the approved indication of having an intrauterine pregnancy of up to 70 days gestation.

###    2.    Other Safety Issues and Additional Studies

In support of your request that we retain the Mifeprex REMS, you cite the Council for International Organizations of Medical Sciences' (CIOMS) definition of "rare" to assert that because "about 1 out of 100 women" using Mifeprex and misoprostol require surgery, serious complications are common, not rare (Petition at 15-16).[119]  Although we agree that certain elements of the Mifepristone REMS Program are necessary to assure the safe use of mifepristone, we do not agree with your assertion.

In the Petition, you state that the Medication Guide improperly downplays the risks of the use of Mifeprex in a regimen with misoprostol and you cite the Medication Guide as stating "'*rarely*, serious and potentially life-threatening bleeding, infections, and other problems can occur following . . . medical abortion.' Specifically, 'in about 1 out of 100 women [administered Mifeprex and misoprostol] bleeding can be so heavy that it requires a surgical procedure." (Petition at 15).  Using these two separate statements in the Medication Guide, you argue that the CIOMS's definition of rare ("1 out of 1000") means that if 1 out of 100 women using Mifeprex in a regimen with misoprostol require surgery, serious complications are common, not rare. (Petition at 16).  However, your reference to the two sentences in the Medication Guide conflates two different clinical scenarios: (1) the adverse event of serious and potentially life-threatening bleeding, and (2) treatment failure.

The first sentence you reference states: "Although cramping and bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth."  This statement refers to life-threatening adverse events that can occur during termination regardless of gestational age or during miscarriage or childbirth regardless of the mode of delivery (e.g., vaginal delivery or cesarean section).  At the time of our review of the clinical studies submitted to support the S-020 efficacy supplement, the reported rate of death in the studies reviewed, based on one death, was 0.007 percent (very rare under the CIOMS definition).[120]  The rate of infections requiring hospitalization or

---

[118] See https://www.ama-assn.org/delivering-care/ethics/ethical-practice-telemedicine.

[119] Council for International Organizations of Medical Sciences. Guidelines for Preparing Core Clinical Safety Information on Drugs Second Edition. 1999. https://cioms.ch/wp-content/uploads/2018/03/Guidelines-for-Preparing-Core-Clinical-Safety-Info-Drugs-Report-of-CIOMS-Working-Group-III-and-V.pdf.  Accessed December 13, 2021 (CIOMS).

[120] Id. at 36 (defining the "very rare" standard category of frequency as less than 0.01 percent).

Docket No. FDA-2019-P-1534

intravenous antibiotics was less than 0.1 percent (rare under the CIOMS definition),[121] and rates of transfusion were 0.03-0.7 percent (rare to uncommon under the CIOMS definition).[122]  Therefore, "rarely" accurately refers to the frequency of the adverse events referenced in this statement.

The second sentence you reference from the Medication Guide states: "In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical aspiration or D&C)."  This statement refers to the rate of surgical procedures for bleeding following treatment with mifepristone.  Heavy bleeding or hemorrhage after medical abortion is a small subset of bleeding and can require a surgical procedure due to ongoing pregnancy or incomplete expulsion; these are considered failed treatment rather than adverse events and are not characterized using the CIOMS definitions.  Even if heavy, bleeding after medical abortion may not be considered a serious adverse event unless clinically diagnosed as hemorrhage or requiring a transfusion.  Furthermore, in the vast majority of medical abortions, surgical intervention is not necessary.

You also cite a 2009 study and a 2018 study to assert that medical abortions carry greater risks than surgical abortions (Petition at 16).  The 2009 Niinimaki, et al.[123] study reported overall incidences of immediate adverse events (up to 42 days) in medical and surgical abortions performed in women undergoing induced abortion from 2000-2006 based on data from the Finnish national registries.  We agree that the overall incidence of adverse events for medical abortion was fourfold higher when compared with surgical abortion (20.0 percent versus 5.6 percent).  Specifically, the incidence of hemorrhage, incomplete abortion, and surgical (re)evacuation were higher for medical abortion.  However, the authors specifically noted that because medical abortion is associated with longer uterine bleeding, the high rate of events, which were pulled from a national registry reflecting both inpatient and outpatient visits, is not surprising.  They opined that uterine bleeding requiring surgical evacuation probably better reflects the severity of bleeding after termination of pregnancy; the incidence of such bleeding was relatively low, although it was more common with medical abortion.  In addition, the authors acknowledged there are inherent weaknesses in registry-based studies; there is variable reliability both of diagnoses and of severity of diagnoses.  Nevertheless, the authors concluded that both methods are generally safe and recommended discussing the adverse event profiles of different methods when counseling women seeking pregnancy termination.

We note that Ireland, et al.[124] reported findings from a more recent retrospective cohort study of 30,146 United States women undergoing pregnancy termination before 64 days of gestation from November 2010 to August 2013.  Efficacy of pregnancy termination was 99.6 percent and 99.8 percent for medical and surgical abortion, respectively.

---

[121] Id. at 36 (defining the "rare" standard category of frequency as greater than or equal to 0.01 percent and less than 0.1 percent).

[122] Id. at 36 (defining the "uncommon" standard category of frequency as greater than or equal to 0.1 percent and less than 1 percent); see also 2016 Clinical Review, supra n. 13, at 47 and 51.

[123] Niinimaki M, Pouta A, Bloigu A, et al. Immediate complications after medical compared with surgical termination of pregnancy. Obstet Gynecol. 2009;114(4):795-804.

[124] Ireland LD, Gatter, M, Chen, A. 2015. Medical Compared with Surgical Abortion for Effective Pregnancy Termination in the Frist Trimester. Obstetrics & Gynecology 126;22-28.

Docket No. FDA-2019-P-1534

Unanticipated aspiration for persistent pain, bleeding or both were 1.8 percent and 0.4 percent for medical and surgical abortion respectively. These findings are compatible with the Niinimaki study findings. There was no difference in major adverse events as defined by the authors (emergency department visit, hospitalization, uterine perforation, infection, hemorrhage requiring transfusion) between the groups. The authors conclude medical and surgical abortion before 64 days of gestation are both highly effective with low complication rates.

The 2018 Carlsson study is addressed above in section II.A.2.b.ii. of this response; as discussed above, that study showed no statistically significant difference between the overall complication rates between an "at home" and "at the hospital" abortion.[125]

We acknowledge that medical abortion is known to have more days of bleeding and increased rates of incomplete abortion compared to surgical abortion. However, as noted above, in the vast majority of medical abortions, surgical intervention is not necessary. Thus, medical abortion and surgical abortion are two options; both have benefits, side effects, and potential complications. Patients and their healthcare providers should discuss which method is preferable and safer according to each woman's unique situation.

You state that the Mifeprex REMS should require a formal study for at-risk populations, including: patients under the age of 18; patients with repeat Mifeprex abortions; patients with limited access to emergency room services; and patients who self-administer misoprostol (Petition at 13-14). As we explain below, additional studies are not needed at this time.

In justifying your assertion that a formal study is required in patients under the age of 18, you state that Mifeprex was approved for use in the pediatric population in 2000 after the requirement for studies in the pediatric population was waived (Petition at 13-14). The approved indication for mifepristone does not limit its use by age. Although patients age 17 and under were not included in the clinical trials supporting the initial approval of Mifeprex in 2000, we stated at the time that the safety and efficacy were expected to be the same for postpubertal (i.e., post-menarchal) adolescents. Our conclusion in 2000 that pediatric studies of Mifeprex were not needed for approval was consistent with FDA's implementation of the regulations in effect at that time. Because we determined that there were sufficient data from studies of mifepristone, the original Mifeprex approval should have reflected the Agency's conclusion that the pediatric study requirements were waived for pre-menarchal females and that the pediatric study requirements were met for post-menarchal adolescents, rather than stating that the Agency was waiving the requirements for all pediatric age groups.

As currently required by the Pediatric Research Equity Act (PREA),[126] certain applications or supplemental applications must include pediatric assessments of the safety and effectiveness of the drug for the claimed indication(s) in all relevant pediatric

---

[125] Carlsson et al., supra n. 49.
[126] Section 505B of the FD&C Act (21 U.S.C. 355c).

Docket No. FDA-2019-P-1534

subpopulations, unless that requirement is waived or deferred.[127]  In accordance with PREA, when FDA reviewed the S-020 efficacy supplement, a partial waiver was granted for pediatric studies in pre-menarchal females because pregnancy does not occur in premenarchal females.  We also determined that the applicant had fulfilled the pediatric study requirement in post-menarchal adolescents.  This determination was based on data extrapolated from adults and information in literature.  Review of these findings found the safety and efficacy in this population to be similar to the safety and efficacy in the adult population.[128]  Therefore, we do not agree that a formal study is required in patients under 18.

With regard to your concerns about repeat abortions and your assertion that a study is necessary in this population, we acknowledge that published data concerning adverse reproductive health outcomes in U.S. women who undergo repeat medical abortions are limited.  We concluded in our 2016 review of the S-020 efficacy supplement that there is no evidence that repeated medical or surgical abortion is unsafe or that there is a tolerance effect.  We also noted that return to fertility after the use of mifepristone is well documented.[129]  This is reflected both in Section 17 of the approved labeling, Patient Counseling Information, which states that the provider should "inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses," and in the Medication Guide, which states "You can become pregnant again right after your pregnancy ends."  Although you state that more than one out of every three abortions in the United Sates is a repeat abortion (Petition at 14),[130] we are not aware of reports suggesting greater safety concerns in repeat abortions than a first-time abortion.  Therefore, we do not agree that a study is necessary in this population.  You also cite a published study, using a mouse model, of repeated medical termination of pregnancy that showed repeat medical abortion impaired the reproductive function of female mice (Petition at 14).[131]  Per our 2016 review, there is no evidence in available clinical data that repeated medical or surgical abortion is unsafe, or that fertility is impaired by the use of mifepristone; therefore, data from a single non-clinical study in mice are not persuasive.[132]

With respect to your request for a formal study of mifepristone for medical abortion in women without access to emergency care, we disagree that such a study is necessary.  In order to become a certified prescriber, a healthcare provider must agree that they have the ability to provide surgical intervention in cases of incomplete abortion or severe bleeding or have made plans to provide such care through others, and that they have the ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.  These prescriber qualifications ensure that mifepristone is prescribed to women for whom emergency care is available.

---

[127] Section 505B(a)(2) of the FD&C Act (21 U.S.C. 355c(a)(2)).
[128] 2016 Clinical Review, supra n. 13, at 74-76.
[129] Id. at 47.
[130] In support of this assertion, you cite Jones R, Jerman J, Ingerick M. Which abortion patients have had a prior abortion? Findings from the 2014 U.S. Abortion Patient Survey. J Womens Health.
[131] Lv F, Xu X, Zhang S, et al. Repeated abortion affects subsequent pregnancy outcomes in BALB/c mice. PLoS One. 2012;7(10):e48384. doi:10.1371/journal.pone.0048384.
[132] 2016 Clinical Review, supra n. 13, at 47.

Docket No. FDA-2019-P-1534

Finally, you assert that FDA should require a formal study in patients who self-administer misoprostol. As explained in section II.A.2.b.ii of this response, FDA conducted a literature review of self-administration of misoprostol at home as part of its review of the S-020 efficacy supplement and found no safety or efficacy concerns with home self-administration of misoprostol. Therefore, we disagree that a formal study is required in this population.

With regard to safety generally, in addition to the FAERS data provided above (see section II.B.1.c.ii. in this response), FDA routinely monitors adverse events reported to FAERS and published in the medical literature for mifepristone for medical termination of pregnancy through 70 days gestation. We have not identified any new safety concerns with the use of mifepristone for this indication.

### 3.    Other Articles

In your Petition, you reference several documents that discuss alternative models of providing abortion medications and advocate for the lifting of the REMS on mifepristone (Petition at 23-24). You assert that these recent publications demonstrate how abortion advocates will continue to pressure FDA to eliminate the REMS and move towards over-the-counter access for Mifeprex.[133]
We agree that the overarching message in the publications you reference appears to be advocating self-management of medical abortion. Nonetheless, as discussed in this response, we have determined that the Mifepristone REMS Program continues to be necessary for the safe use of this drug product, with some modifications.

### III.    CONCLUSION

For the reasons set forth above, we deny your request that FDA restore and strengthen elements of the Mifeprex regimen and prescriber requirements approved in 2000; and we grant in part and deny in part your request to retain the Mifepristone REMS Program. As with all approved drug products, we will continue to monitor the safety of mifepristone for the approved indication and take any appropriate actions.

Sincerely,

Patrizia A.
Cavazzoni -S

Digitally signed by Patrizia A.
Cavazzoni -S
Date: 2021.12.16 15:05:41 -05'00'

Patrizia Cavazzoni, M.D.
Director
Center for Drug Evaluation and Research

---

[133] You also reference clinical trials relating to the use of mifepristone for spontaneous miscarriage management and question the results of studies related to this use (Petition at 16-18). The use of mifepristone for the management of early miscarriage is not an approved indication for this drug product and is outside the scope of the Mifepristone REMS Program. Therefore, we do not address it in this response.

# EXHIBIT 11

Center for Drug Evaluation and Research,
Application Number: 020687Orig1s020
Summary Review
(Mar. 29, 2016)
("FDA 2016 Summary Review")

# CENTER FOR DRUG EVALUATION AND RESEARCH

## APPLICATION NUMBER:

# 020687Orig1s020

# SUMMARY REVIEW

Summary Review for Regulatory Action

| Date | March 29, 2016 |
|---|---|
| Subject | Summary Review |
| NDA #/Supplement # | 20687/S-020 |
| Applicant name | Danco Laboratories, LLC |
| Date of submission | May 28, 2015 |
| Date of submission receipt | May 29, 2015 |
| PDUFA goal date | March 29, 2016 |
| Proprietary name/established name | Mifeprex/mifepristone |
| Dosage form/strength | Oral tablet/200 mg |
| Dosage regimen | Mifeprex 200 mg tablet orally followed in 24-48 hours by 800 mcg buccal misoprostol |
| Proposed indication | Mifeprex is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation |
| Action | Approval |

1

1.  **Introduction**
2.  **Background**
3.  **CMC**
4.  **Nonclinical Pharmacology/Toxicology**
5.  **Clinical Pharmacology**
6.  **Clinical Microbiology**
7.  **Efficacy/Statistics**
8.  **Safety**
9.  **Advisory Committee Meeting**
10. **Pediatrics**
11. **Other Relevant Regulatory Issues**
12. **Labeling**
13. **Decision/Action/Risk Benefit Assessment**

**1.  Introduction**

Danco Laboratories, LLC, referred to hereafter as the Applicant, submitted an efficacy supplement (S-020) to NDA 20687 for Mifeprex (mifepristone). The Applicant sought the following changes to its approved application:

1.  <span>(b) (4)</span> Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally; see below:

    - Day One: Mifeprex Administration (oral)
      One 200 mg tablet of Mifeprex is taken in a single oral dose
    - After a 24-48 hour interval: Misoprostol Administration (buccal)(minimum 24-hour interval between Mifeprex and misoprostol)
      Four 200 mcg tablets (total dose: 800 mcg) of misoprostol are taken by the buccal route

2.  Removal of the instruction that administration of misoprostol must be done in-clinic, to allow for administration at home or other location convenient for the woman
3.  Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex
4.  Follow-up, although still needed, not restricted to in clinic at 14 days after Mifeprex
5.  Increase in the maximum gestational age from 49 days to 70 days
6.  Change of the labeled time for expected expulsion of pregnancy from 4-24 hours to 2-24 hours post misoprostol administration
7.  Addition that a repeat 800 mcg buccal dose of misoprostol may be used if needed
8.  Change of "physician" to "healthcare provider" in the label and Risk Evaluation and Mitigation Strategies (REMS) document
9.  Change in the indication statement to add reference to use of misoprostol: "Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of pregnancy through 70 days gestation."
10. Removal of references to "under Federal law" from the Prescriber's Agreement under the REMS

2

11. Labeling changes addressing the pediatric requirements under the Pediatric Research Equity Act

This efficacy supplement submission includes information from published studies, review articles and additional information from the authors of some of the publications. These published studies evaluated reproductive age women in the U.S. and outside the U.S. who had early medical termination with mifepristone, in a regimen with misoprostol, including women up through 70 days of gestation.

This memorandum serves as the Division's decisional memorandum for the efficacy supplement.

## 2. Background

The active ingredient of Mifeprex, mifepristone, is a progestin antagonist. Mifeprex, in a regimen with misoprostol, is approved for the medical termination of pregnancy up through 49 days' gestation. The approved dosing regimen is currently labeled as follows:
- Day 1: The patient takes three 200 mg tablets of Mifeprex in a single oral dose in the clinic, medical office, or hospital.
- Day 3: The patient returns to the clinic, medical office, or hospital and takes two 200 mcg tablets of misoprostol orally.
- Day 14: The patient returns for a follow-up visit to confirm that a complete termination has occurred.

At the time of the September, 2000 approval, FDA restricted distribution of Mifeprex under 21 CFR 314.520, requiring that Mifeprex be dispensed only by or under the supervision of a physician who meets certain qualifications. With the passage of FDAAA in 2007, Mifeprex was deemed to have in effect an approved REMS. The Applicant submitted a formal REMS, which was approved on June 8, 2011 and consisted of the following: a Medication Guide, elements to assure safe use (ETASU A [special certification of healthcare providers who prescribe Mifeprex], ETASU C [dispensing only in certain healthcare settings], and ETASU D [safe use condition of a signed Patient Agreement]), an implementation system and a timetable for assessments. The goals of the REMS were 1) To provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug and 2) To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications. The REMS for Mifeprex incorporated the restrictions under which the drug was originally approved.

Since 2011, the Applicant has submitted two REMS assessment reports. The Agency review of these reports determined that the REMS goals were being met and that no modifications were required to the REMS at that time.

Reference ID: 3909594

FDA held a pre-NDA meeting with the Applicant on January 29, 2015, to discuss proposed labeling and REMS changes to be submitted in this efficacy supplement. These changes were submitted with the efficacy supplement.

The Applicant submitted published literature and supportive information to support changes to the dose, dosing regimen, gestational age, revisions to labeling, modifications to the REMS document, and to address PREA requirements. The Agency accepts the use of peer reviewed literature as primary data for an application under the framework of a 505(b)(2) application.

## 3. CMC

No new CMC information was submitted with this efficacy supplement. The CMC team determined no additional review or inspections were required. The CMC team completed a review of the labeling and found the CMC sections of labeling (sections 3, 11 and 16) acceptable (See review dated March 29, 2016). The CMC review team recommends approval of the efficacy supplement; refer also to the CMC review of the separate supplement proposing a single tablet blister pack for Mifeprex, dated January 11, 2016. There are no outstanding CMC issues or postmarketing commitments or requirements.

*Comment*: *On March 10, 2016, a separate CMC supplement was approved that allowed the packaging of individual 200 mg tablets of mifepristone; previously packaging consisted of three 200 mg tablets per blister pack (a total of 600 mg Mifeprex as administered under the originally approved dosing regimen).*

## 4. Nonclinical Pharmacology/Toxicology

No new nonclinical information was submitted in this supplement. The Pharmacology/Toxicology team revised labeling to conform to the Pregnancy and Lactation Labeling Rule. There are no outstanding nonclinical issues. The Pharmacology/Toxicology review team recommends approval of the efficacy supplement; refer to the Pharmacology/Toxicology review dated March 4, 2016.

## 5. Clinical Pharmacology

The Applicant did not conduct any new clinical pharmacology studies pertaining to the proposed (b) (4) regimen, but provided information on pharmacokinetics (PK) of misoprostol following various routes of administration. The PK of the 200 mg Mifeprex tablet has not been characterized in women, but data are available in men and were submitted in the original NDA. The Clinical Pharmacology review team determined that the PK data were appropriate for inclusion in labeling. Review of the labeling pertinent to the Clinical Pharmacology sections is complete and labeling relevant to pharmacokinetics and pharmacodynamics is acceptable. There are no outstanding Clinical Pharmacology issues or postmarketing commitments or requirements. The clinical pharmacology review team recommends approval of the efficacy supplement; refer to the Clinical Pharmacology review dated March 29, 2016.

**6. Clinical Microbiology**

Not applicable.

**7. Efficacy/Statistics**

The Applicant submitted published literature as the primary evidence to support the efficacy (and safety) of the proposed dosing regimen (refer to the Clinical Review dated March 29, 2016, Section 9.5 for a list of submitted references). Most published articles submitted by the Applicant and reviewed by the clinical review team reported the primary efficacy endpoint as complete termination of pregnancy without further medical or surgical intervention; the Division considers this to be a clinically relevant endpoint.

The majority of the publications included a statement that the study was conducted under institutional review board (IRB) or Ethical Review Committee approval and the women gave informed consent. The clinical review team concluded that the published literature was adequate as the primary information source to support the changes proposed in the efficacy supplement. During the course of the review, the team also requested and received more detailed information from select publications from their authors via communication with the Applicant.

Although there were slight demographic differences among the published studies from the database, these differences were not expected to alter the efficacy or safety of Mifeprex. Therefore, for the majority of the proposed efficacy changes, the clinical team assessed efficacy information from a subset of publications that evaluated a given proposed change. An independent statistical review was not needed for this review of published literature.

The clinical review team identified several major proposed clinical changes in the efficacy supplement. As these major changes are interrelated, in some cases data from a given study were relied on to provide evidence to support multiple changes. These major changes as considered by the clinical team included:
1. A proposed dosing regimen consisting of mifepristone 200 mg orally followed by the buccal administration of 800 mcg misoprostol including:
    a. Use of a revised interval between mifepristone and misoprostol from 48 hours to 24-48 hours
    b. Allowing home administration of misoprostol
    c. Use of an additional dose of misoprostol
2. Support for extending the gestation age through 70 days
3. Flexibility in follow-up visit: follow-up is needed in the range of 7-14 days after Mifeprex administration; the specific nature and exact timing of the follow-up to be agreed upon by the healthcare provider and patient.
4. Change in who can provide Mifeprex from physician to healthcare provider who prescribes

5

The following section summarizes the clinical review team's evaluations that supported the above proposed changes:

1. *Support for the proposed dose and dosing regimen of 200 mg of Mifeprex orally and 800 mcg of misoprostol buccally 24-48 hours after Mifeprex administration:* The clinical review team reviewed the submission and identified studies and review articles that evaluated over 35,000 women who were treated with efficacy in the 91-98% range. For additional details on the efficacy from these studies, please refer to Section 6 of the Clinical Review.

2. *Support for extending the gestational age to 70 days:* The Applicant submitted a number of published articles and systematic reviews that supported the proposed dose and dosing regimen. Four studies and one systematic review evaluated the exact proposed dosing regimen through 70 days gestation. These include three prospective observational studies (Winikoff et al 2012[1], Boersma et al[2], Sanhueza Smith et al[3]) and one randomized controlled trial (RCT) (Olavarrieta et al[4]) that had a primary objective of evaluating medical abortion provision by non-physicians. The systematic review by Chen and Creinin[5] covered 20 studies including over 30,000 women; all but one of the studies used the proposed regimen in gestations through 70 days (the remaining study used 400 mcg of buccal misoprostol). For those publications that provided overall success rates, these were in the range of 97-98%. Other relevant publications include the systematic review by Raymond[6] of 87 studies, which covered a variety of misoprostol doses and routes of administration used with 200 mg of mifepristone. Assessing the efficacy by misoprostol dose, the paper noted that doses ≥ 800 mcg had a success rate of 96.8%, with an ongoing pregnancy rate of 0.7%.

---

[1] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6
[2] Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care 2011; 16: 61-6
[3] Sanhueza Smith P, Pena M, Dzuba IG, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters 2015;  22: 75-82
[4] Olavarrieta CD, Ganatra B, Sorhaindo A, Karver TS, Seuc A, Villalobos A, Garcia SG, Pérez M, Bousieguez M, Sanhueza P. Nurse versus physician-provision of early medical abortion in Mexico: a randomized controlled non-inferiority trial. Bull World Health Organ 2015; 93: 249-258
[5] Chen MJ, Creinin MD. Mifepristone with Buccal Misoprostol for Medical Abortion Obstet Gynecol 2015; 126(1): 12-21
[6] Raymond EG & Grimes DA.  The comparative safety of legal induced abortion and childbirth in the United States.  Obstet Gynecol 2012; 119: 215-9

6

The original dosing regimen specifies taking misoprostol 2 days after Mifeprex. This efficacy supplement proposes a more flexible time frame of 24 to 48 hours between Mifeprex and misoprostol administration. Data from a review article by Wedisinghe et al[7] evaluated different time intervals using administration of misoprostol after Mifeprex. A meta-analysis of all five studies found a non-significant odds ratio for failure for shorter vs. longer dosing intervals, but a trend for lower success if a dosing interval < 8 hours is used. Chen & Creinin's systematic review[8] of 20 studies including over 33,000 women, all but one using the proposed regimen, compared the success of dosing intervals of 24 hours with intervals ranging from 24-48 hours. The success rate in six studies that used a 24-hour interval through 63 days gestation was 94.2%, compared to the rate of 96.8% in 14 studies that used a 24-48 hour interval, and this difference was statistically significant. The clinical team concluded that the efficacy of the revised dosing regimen was not compromised by revising the dosing interval to 24-48 hours. In addition, they noted that the overall rate of ongoing pregnancies did not differ significantly by dosing interval.

3. *Administration of misoprostol after Mifeprex administration at home:* Currently, the dosing regimen specifies that misoprostol is taken in the clinic setting following Mifeprex administration. No specific publication evaluated treatment outcomes with use of misoprostol at home compared to in-clinic dosing. However, one large literature review (Raymond et al[9]) evaluated a variety of mifepristone treatment regimens with different misoprostol doses, routes of administration and dosing intervals used in gestations through 63 days. Roughly half of the studies included in this review did not require women to take misoprostol in-clinic. Rates of treatment failure and of ongoing pregnancy were very similar regardless of whether misoprostol was taken in-clinic or at another location. The clinical review team concluded that the review provided sufficient data to support labeling that misoprostol does not need to be restricted to in-clinic administration.

4. *Use of a repeat misoprostol dose, if necessary:* The Applicant submitted several published studies that supported use of a repeat misoprostol dose, when complete uterine expulsion did not occur after the initial misoprostol dose following Mifeprex. In clinical practice, the usual treatment for incomplete expulsion (retained products of conception) may include either a repeat dose of misoprostol, expectant management or a surgical procedure (suction aspiration or a dilation and curettage). Studies that specifically report the success rate of a repeat dose of misoprostol are:

---

[7] Wedisinghe L and Elsandabesee D. Flexible mifepristone and misoprostol administration interval for first-trimester medical termination. Contraception 2010; 81(4): 269-74. doi: 10.1016/j.contraception.2009.09.007. Epub Oct 29, 2009

[8] Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. MOD Study Trial Group: A randomized comparison of misoprostol 6-8 hours versus 24 hours after mifepristone for abortion. Obstet Gynecol 2004; 103: 851-859

[9] Raymond EG & Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol 2012; 119: 215-9

7

- Winikoff et al[10] – studied the proposed regimen through 70 days gestation; of the few women who received a second dose for an incomplete abortion at follow-up, the success rate was 91% at 57-63 days and 67% at 64-70 days.
- Chen and Creinin [11] – a systematic review of 20 studies, all but one of which used the proposed regimen up through 70 days; success of a second dose ranged from 91-100%
- Boersma et al[12] – included pregnancies through 70 days treated with the proposed regimen; five of 330 women took a second dose due to absence of bleeding 48 hours after first dose; the success rate was 80%
- Louie et al[13] – studied the proposed regimen to 63 days; in 16 women (of 863) who took a second dose of misoprostol, the success rate was 100%
- Chong et al[14] – compared the proposed regimen to a lower dose of misoprostol; the success of a second dose of misoprostol was 92% overall, but the number of women in each dose arm getting a second dose was not specified.
- Winikoff et al[15] – 14 women in the proposed regimen took a second dose of misoprostol with a success rate of 92.9%.

Using the information from the above studies and other supportive data, the clinical team concluded that the available data support the efficacy of a repeat dose of misoprostol if complete expulsion has not occurred. The relatively high complete pregnancy termination rates indicate that this option is likely to reduce the need for a surgical intervention.

5. *Requirements regarding follow-up care:* Current labeling states that women will return to the clinic 14 days after Mifeprex administration for follow-up. This provision was based on the follow up regimen in the U.S. phase 3 trial that supported the initial approval in 2000. Although the Applicant submitted several studies that evaluated flexibility in the time of follow-up, the key publication identified by the review team that addressed this issue was a 2013 article by

---

[10] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6
[11] Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. MOD Study Trial Group: A randomized comparison of misoprostol 6-8 hours versus 24 hours after mifepristone for abortion. Obstet Gynecol 2004; 103: 851-859
[12] Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care 2011; 16: 61-6
[13] Louie KS, Tsereteli T, Chong E, Ailyeva F, Rzayeva G, Winikoff B. Acceptability and feasibility of mifepristone medical abortion in the early first trimester in Azerbaijan. Eur J Contracept Reprod Health Care 2014; 19(6): 457-464
[14] Chong E, Tsereteli T, Nguyen NN, Winikoff B. A randomized controlled trial of different buccal misoprostol doses in mifepristone medical abortion. Contraception 2012; 86: 251-256
[15] Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008; 112(6): 1303-1310

8

Reference ID: 3909594

Raymond[16]. The impact of the timing of follow-up was assessed in Raymond's systematic review of studies using various treatment regimens. While some have posited that earlier follow-up may result in a higher rate of surgical intervention (for women who would have had complete expulsion had they been given a bit more time), Raymond's analyses found no difference in failure rates for women followed less than one week after mifepristone as compared to a week or more after mifepristone. As follow-up was anticipated to not alter the efficacy of the proposing dosing regimen, this change is also discussed below in Section 7.

6.  *Allowing qualified healthcare providers to use Mifeprex.*

The Applicant provided data on the efficacy of medical abortion provided by non-physician healthcare providers, including four studies with 3,200 women in randomized controlled clinical trials and 596 women in prospective cohorts. These studies included a study by Warriner et al[17] that showed efficacy of 97.4% with nurses versus 96.3% by physicians.

Conclusions: I concur with the clinical review team's assessments and conclusions and these conclusions will be reflected in labeling. The data and information reviewed constitute substantial evidence of efficacy to support the proposed dosing regimen for Mifeprex for pregnancy termination through 70 days gestation. Other proposed changes to the Mifeprex labeling, including the time interval between Mifeprex and misoprostol dosing, and use of a repeat dose, were also adequately supported by evidence. Finally, I concur with the clinical review team that the information from the published literature also supported efficacious use of Mifeprex by non-physician providers.

**Comment:** Discussion was held as to whether the original dosing regimen approved in 2000 (i.e., Mifeprex 600 mg and misoprostol 400 mcg up to 49 days gestation) should remain in labeling.                                                              (b) (4)
                                                              the clinical review team and I concur with their            (b) (4) request to remove the current regimen from the labeling. Removal of the original dosing regimen simplifies labeling, and avoids any confusion regarding instructions. Therefore, the revised labeling, and REMS materials accompanying the approval of this efficacy supplement, will include only the proposed dosing regimen and instructions. It should be noted that there are no safety or efficacy concerns about the originally approved dosing regimen that led to removing it from the labeling.

---

[16]Raymond EG, et al. First-trimester medical abortion with mifepristone 200 mg and misoprostol: a systematic review. Contraception 2013;87(1):26-37.
[17] Warriner IK, Wang D, Huong NTM, Thapa K, Tamang A, Shah I et al. Can midlevel health-care providers administer early medical abortion as safely and effectively as doctors? A randomized controlled equivalence trial in Nepal. Lancet 2011; 377: 1155-61.

9

### 8. Safety

The safety of the proposed dosing regimen for Mifeprex was supported by the evidence from submitted published literature and postmarketing experience. The focus of the safety analysis was on published studies that evaluated the proposed dosing regimen (Mifeprex 200 mg followed by 800 mcg misoprostol buccally 24-48 hours later), with comparison to the known safety profile of the currently approved dosing regimen.

*Exposure*: Per the Applicant's submission, the clinical review concluded that there have been approximately 2.5 million uses of Mifeprex by U.S. women since the drug's approval in 2000. The clinical review team estimated that exposure to the proposed dosing regimen for their safety analysis was based on approximately 30,000 patients (refer to Table 11 for a list of references used to evaluate safety). Such exposure volume is sufficient to characterize the safety profile of the proposed dosing regimen and other proposed changes in this efficacy supplement.

*Deaths:* Deaths with medical abortion rarely occur and causality can be difficult to determine. Most of the publications did not specifically report any deaths with medical abortion with Mifeprex. Among the seven U.S. studies submitted to support the safety profile of Mifeprex and misoprostol, only one (Grossman, et al[18]) explicitly addressed deaths and noted that there were no deaths among 578 subjects evaluated in the study. Only one observational study (Goldstone, et al[19]) from Australia contained a report of a death after a mifepristone and misoprostol dosing regimen. In this retrospective review of 13,345 pregnancy terminations, the authors identified one death from sepsis. The article stated that the death was in an individual who failed to follow-up with her healthcare provider despite showing signs of illness. Based on this information, deaths in association with abortion are extremely rare.

Deaths reported from the postmarketing experience of Mifeprex are summarized below in the Postmarketing Experience section.

*Nonfatal serious adverse events*: The clinical review team identified key nonfatal serious adverse events (SAEs) associated with the proposed dosing regimen for Mifeprex. These SAEs include: hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy. Section 7 of the clinical review dated March 29, 2016, provides a detailed discussion of reported rates of hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy. The latter is not an adverse reaction because an ectopic pregnancy would exist prior to the Mifeprex regimen; it represents instead a failure to diagnose an ectopic pregnancy. Overall rates identified by the clinical review team from the published literature are as follows:
- Hospitalization: 0.04-0.6% in U.S. studies of over 14,000 women; 0-0.7% in international studies of over 1,200 women

---

[18]Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectivenesss and acceptability of medical abortion provided thorugh telemedicine. Obstet Gynecol 2011;118:296-303.
[19]Goldstone P, Michelson J, Williamson E.  Early medical abortion using low-dose mifepristone followed by buccal misoprostol: A large Australian observational study. Med J Austral 2012; 197: 282-6.

Reference ID: 3909594

- Serious infection/sepsis: 0-0.2% in U.S. and international studies of over 12,000 women
- Transfusion: 0.03-0.5% in U.S. studies of over 17,000 women; 0-0.1% in international studies of over 12,000 women

A study by Upadhyay et al[20] reported a 0.31% rate of major complications (including incomplete or failed abortion, hemorrhage, infection or uterine perforation that required hospitalization, surgery or transfusion) for medical abortions (dosing regimen unspecified) through 63 days; this was about double the rate reported for first trimester aspiration abortions and statistically significantly higher. However, these rates were driven by higher rates of incomplete/failed abortion; rates of hemorrhage (0.14%) and infection (0.23%) did not differ from those associated with aspirations.

Only one submitted study reported an ectopic pregnancy. This study (Winikoff et al[21]) reported one ectopic among 847 women (0.12%).

**Comment:** The proposed dosing regimen has been studied extensively in the literature using U.S. and global sites. Serious adverse events including deaths, hospitalization, serious infections, bleeding requiring transfusion and ectopic pregnancy are rarely reported. The rates of these serious adverse events are well below 1% and do not suggest a safety profile different from the original approved Mifeprex dosing regimen. Although there is less serious adverse event data on women who received Mifeprex and misoprostol between 64-70 days of gestation, the data from a U.S. study of 379 women (Winikoff et al)[22] in that gestational age is reassuring that the rates of these serious adverse events are not clinically different from that of other gestational age ranges.

In summary, based on the published literature, nonfatal serious adverse events occur with Mifeprex and misoprostol use with rates generally less than 1%. Increased gestational age (64-70 weeks) was not associated with an increased incidence of nonfatal SAEs. Other submission- specific safety issues that were evaluated including uterine rupture and angioedema/anaphylaxis are discussed in the Postmarketing Experience section below.

*Loss to follow-up:* The studies included in this safety review revealed a wide range of loss to follow-up, from 0.6% loss to follow-up in the study with telephone follow-up (Ngoc et al[23]) to 22% in the Grossman et al[24] study using telemedicine to deliver medical

---

[20]Upadhyay UD, Desai S, Lidar V, Waits TA, Grossman D, Anderson P, Taylor D. Incidence of emergency department visits and complications after abortion. Obstet Gynecol 2015;125(1):175-183.

[21]Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008;112(6):1303-1310.

[22]Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012;120:1070-6.

[23] Ngoc NTN, et al. Acceptability and feasibility of phone follow-up after early medical abortion in Vietnam: A randomized controlled trial. Obstet Gynecol 2014;123:88-95.

[24] Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectivenesss and acceptability of medical abortion provided thorugh telemedicine. Obstet Gynecol 2011;118:296-303.

abortion services.

***Comment***: Based on these data reviewed by the clinical review team, there is no literature that suggests that follow-up modality alters safety. Therefore, labeling will not be directive regarding follow-up; that will be a decision left to the patient and provider.

*Common adverse events:* The clinical review team evaluated common adverse reaction data and compared U.S. and global study locations. The comparison revealed that there were differences in the frequency of common adverse reactions, with the reporting rates considerably higher among the U.S. studies. There is no reason to anticipate regional differences in the safety profile for the same treatment regimen, so these differences likely reflect lower ascertainment or subject reporting of adverse reactions in non-U.S. studies. Regardless, inclusion of this non-U.S. data in labeling would not be appropriate, as it is unlikely to be informative to the U.S. population of users. The data to be reported in labeling is outlined in Table 1 below:

**Table 1: Common Adverse Events (≥ 15%) in U.S. Studies of the Proposed Dosing Regimen**

| Adverse Reaction | # U.S. studies | Number of Evaluable Women | Range of frequency (%) | Upper Gestational Age of Studies Reporting Outcome |
|---|---|---|---|---|
| Nausea | 3 | 1,248 | 51-75% | 70 days |
| Weakness | 2 | 630 | 55-58% | 63 days |
| Fever/chills | 1 | 414 | 48% | 63 days |
| Vomiting | 3 | 1,248 | 37-48% | 70 days |
| Headache | 2 | 630 | 41-44% | 63 days |
| Diarrhea | 3 | 1,248 | 18-43% | 70 days |
| Dizziness | 2 | 630 | 39-41% | 63 days |

Source: Data from Middleton[25], Winikoff[26] and Winikoff[27] as outlined in Table 2 of the CDTL review dated March 29, 2016.

One concerning adverse event is severe vaginal bleeding. Severe vaginal bleeding can result in interventions such as hospitalization and transfusion and may be associated with infection. The overall rate of bleeding across publications varied between 0.5% and 4.2%. Two publications (Sanhueza Smith et al[28] and Gatter et al[29]) evaluated clinically significant bleeding by gestational age. Although the publications reported slightly different rates, there was no trend of increased bleeding requiring intervention with Mifeprex and misoprostol use with increasing gestational age.

---

[25] Middleton T, et al. Randomized trial of mifepristone and buccal or vaginal misoprostol for abortion through 56 days of last menstrual period. Contraception 2005; 72: 328-32
[26] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6
[27] Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008; 112(6): 1303-1310
[28] Sanhueza Smith P, Pena M, Dzuba IG, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters 2015;22:75-82.
[29] Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.

Reference ID: 3909594

**Comment:** While not all of the studies reported common adverse events, those that reported did not have unexpected rates of common adverse events. These common adverse events are included in labeling in section 6.1 (Clinical Trial Experience) in the ADVERSE REACTIONS section.

*Postmarketing experience – Spontaneous reports:*

The safety profile for Mifeprex includes over 15 years of postmarketing safety data available on Mifeprex due to the reporting requirements under the REMS. The Year 3 REMS Assessment report was submitted by the Applicant in June, 2015. The ████ (b) (6) ████████████ (b) (6) provided a comprehensive review of adverse event reports submitted from 2000 through November 17, 2015. Findings include:

- No Clostridial septic deaths reported in the U.S. since 2009, and none worldwide since 2010.
- The postmarketing rates of hospitalization, severe infection, blood loss requiring transfusion and ectopic pregnancy reported from publications and remain stable and relatively low.

*Submission-specific safety issues:*

- Anaphylaxis/angioedema: The ███████████████ (b) (6) ( ████ (b) (6) identified a safety signal of anaphylaxis and angioedema with mifepristone administration. This signal was based on a comprehensive review of adverse event reports submitted from 2000 through November 17, 2015. A FAERS search retrieved one case of anaphylaxis and six cases of angioedema with mifepristone administration. Six of the seven cases were seen in women using mifepristone for termination of pregnancy. Six of the seven cases noted some type of medical intervention, such as treatment with an antihistamine, a histamine H2 antagonist, a corticosteroid, or a combination of various medications. Hospitalization was noted in three of the seven total cases; all three hospitalization cases occurred in patients who experienced angioedema. There were no additional cases of anaphylaxis or angioedema identified in the literature.

  **Comment:** ████ (b) (6) and the clinical review team recommended that anaphylaxis and angioedema be described in the Contraindications and Adverse Reactions sections of labeling. These labeling sections were discussed with the Applicant and labeling was revised for those sections to describe these serious adverse events.

- Uterine rupture: As discussed in the clinical review, the potential risk of uterine rupture was considered because the current labeling for misoprostol includes a Boxed Warning against the use of misoprostol for gestations more than 8 weeks due to the risk of uterine rupture. Although misoprostol is used alone for various obstetric indications, including induction of labor at term, it was important to consider whether labeling about this potential risk is warranted for Mifeprex. Both the clinical reviewer and the ██████████████ (b) (6) ( ████ (b) (6) reviewed the literature and ████ (b) (6) searched FAERS for adverse event reports.

13

Published literature reported three case reports[30,31,32] of uterine rupture with mifepristone/misoprostol treatment in the first trimester. Of these three reports, two patients had a risk factor for uterine rupture (prior uterine surgery). The third case was in a patient who received more than two doses of misoprostol. After consideration, the clinical review team decided that labeling should include information about this event. The FAERS search did not identify any reports of uterine rupture with use of mifepristone alone.  Of 80 reports, 77 cited use of misoprostol alone, and three of mifepristone and misoprostol.  Only two reports of uterine rupture in the first trimester were identified, both using misoprostol alone; one entailed an unspecified dose and route of misoprostol at 5 weeks gestation, and one involved vaginal administration of 800 mcg misoprostol at 8 weeks gestation for cervical preparation prior to a surgical abortion in a woman with a prior uterine scar.

Based on the available safety reports of uterine rupture, the review team from (b) (6) and clinical review team concluded that these data demonstrated that uterine rupture with Mifeprex and misoprostol in the first ten weeks (70 days) of gestation is exceedingly uncommon, and occurs most often in the face of a risk factor (previous uterine surgery).

*Comment:* I agree with the clinical review team and the (b) (6) team that the risk of uterine rupture with first trimester use of mifepristone and misoprostol appears to be extremely rare, and most often associated with a prior uterine scar, a known risk factor for uterine rupture.  Labeling of these reports is included in section 2.3 of the  DOSAGE AND ADMINISTRATION and section 6.2 of the ADVERSE REACTIONS of labeling to provide additional information to healthcare providers, but no restriction of use is needed based upon this extremely rare adverse reaction.

The clinical review team also evaluated the safety for each of the following major changes proposed in this efficacy supplement:
1. Changing the dosing interval between Mifeprex and misoprostol from 48 hours to 24-48 hours
2. Home administration of misoprostol
3. Use of a repeat dose of misoprostol
4. Change in the follow-up timeframe and method of follow-up
5. Allowing providers other than physicians to provide Mifeprex

---

[30]Khan S et al. Uterine rupture at 8 weeks' gestation following 600 µg of oral misoprostol for management of delayed miscarriage. Journal of Obstet Gynaecol 2007; 27: 869-870
[31] Bika O, Huned D, Jha S, Selby K Uterine rupture following termination of pregnancy in a scarred uterus J Obstet Gynaecol 2014; 34(2): 198-9. doi: 10.3109/01443615.2013.841132
[32] Willmott F, et al. Rupture of uterus in the first trimester during medical termination of pregnancy for exomphalos using mifepristone/misoprostol. BJOG 2008;15:575-77

To evaluate each of these changes, the reviewers evaluated the adverse event information regarding:

- *Changing the timing interval between Mifeprex and misoprostol and change in the gestational age to 70 days:* Support for the 24-48 hour interval and use up through 70 days was primarily based on a large systematic review by Shaw et al[33]. This review evaluated studies looking at different follow-up modalities and demonstrated that there are a variety of acceptable alternatives to in-clinic follow-up that can identify cases in which there is need for additional intervention. In addition, the systematic review did not identify any significant difference in adverse events with different time intervals.  Based on these findings, labeling will not be directive regarding specific details of how follow-up should be performed; this will be a decision between the patient and her healthcare provider.

- *Home administration of misoprostol:* The Applicant supplied several published studies that supported this change including Gatter et al[34] and Ireland et al[35]. These studies reported on large numbers of women in the U.S. who took misoprostol at home. The authors showed that home administration of misoprostol, as part of the proposed regimen, is associated with exceedingly low rates of serious adverse events, and with rates of common adverse events comparable to those in the studies of clinic administration of misoprostol that supported the initial approval in 2000. Given that information is available on approximately 45,000 women from the published literature, half of which incorporated home use of misoprostol, there is no clinical reason to restrict the location in which misoprostol may be taken.  Given the fact that the onset of cramping and bleeding occurs rapidly (i.e., generally within 2 hours) after misoprostol dosing, allowing dosing at home increases the chance that the woman will be in an appropriate and safe location when the process begins.

- *Use of a repeat dose of misoprostol:*  Safety reporting from studies that evaluated a repeat dose of misoprostol did not specifically assess the subset of women who received a second dose, but no unexpected findings were identified. One randomized controlled trial (Coyaji et al[36]) conducted in 300 women seeking medical abortion in India looked at a single misoprostol dose as compared to two misoprostol doses. Although there was no difference in the complete pregnancy termination rate in women who received a second misoprostol dose compared to those who did not, the repeat misoprostol dose reduced the need for surgical intervention. This study was reassuring in that  there was no significant difference in the adverse events observed—similar percentages of women experienced

---

[33] Shaw KA, Topp NJ, Shaw JG, Blumenthal PB. Mifepristone-misoprostol dosing interval and effect on induction abortion times. Obstet Gynecol 2013;121(6):1335-1347.
[34] Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[35] Ireland LD, Gatter M, Chen AY. Medical compared with surgical abortion for effective pregnancy termination in the first trimester. Obstet Gynecol 2015;126:22-8.
[36] Coyaji K, Krishna U, Ambardekar S, Bracken H, Raote V, Mandlekar A, Winikoff B. Are two doses of misoprostol after mifepristone for early abortion better than one? BJOG 2007;114:271-278.

cramping (87% in the single dose group, 89% in the repeat dose group), nausea (both groups 1%), vomiting (both groups 0%), and diarrhea (0% in the single dose group versus 2% in the repeat dose group). A supportive systematic review by Gallo et al[37] also provided safety information on subjects who received repeat misoprostol. In this review, the only side effects discussed in the trials were diarrhea, which was more common on those groups receiving misoprostol orally than in those receiving it exclusively vaginally (26-27% versus 9%). Rash was reported <1%. Based on these findings, labeling will be changed because the misoprostol dose does not need to be restricted to in clinic administration to assure safe pregnancy termination using the proposed dosing regimen. Given the onset of bleeding and cramping after misoprostol, allowing home administration increases the likelihood that a woman will be in an appropriate and safe location when the pregnancy termination process begins.

- *Change in the follow-up timeframe and method of follow-up:* The Applicant submitted several articles that described different methodologies in follow-up including phone calls and standardized instructions. The clinical reviewers evaluated a study in Scotland by Cameron et al[38] that evaluated self-assessment as compared to standard follow-up methodologies (clinic visit or phone call). Most of the women chose self-assessment over an in-clinic visit or phone call, and there were no significant differences in adverse outcomes between women who underwent self-assessment of health compared to those who had a clinic visit or phone call. Among women with an ongoing pregnancy after Mifeprex and misoprostol, the majority self-identified and presented within two-weeks for care. Based on this information and the other data from the Raymond systematic article[39] that did not identify a difference in failure rate for earlier (less than one week) as compared to one week or greater of follow-up, sufficient support was provided to use a broadened window of 7 to 14 days for follow-up. This revised follow-up time frame will be included in labeling.

- *Allowing providers other than physicians to provide Mifeprex*: The current Prescriber's Agreement in the REMS specifies that "…Mifeprex must be provided by or under the supervision of a physician who meets the following qualifications…"  In addition, current labeling states that Mifeprex will be supplied only to licensed physicians who sign and return a Prescriber's Agreement.  However, labeling states that other healthcare providers, acting under the supervision of a qualified physician, may also provide Mifeprex to patients. Several published studies submitted by the Applicant indicate that health care providers such as nurse practitioners, nurse midwives, and physician assistants are

---

[37] Gallo MF, Cahill S, Castelman L, Mitchell EMH. A systematic review of more than one dose of misoprostol after mifepristone for abortion up to 10 weeks gestation. Contraception 2006;74:36-41.
[38] Cameron ST, Glasier A, Johnstone A, Dewart H, Campbell A. Can women determine the success of early medical termination of pregnancy themselves? Contraception 2015;91:6-11.
[39] Raymond EG & Grimes DA.  The comparative safety of legal induced abortion and childbirth in the United States.  Obstet Gynecol 2012; 119: 215-9

16

currently providing abortion services. One of these studies (Kopp Kallner et al[40]) was a randomized controlled trial of 1,068 women in Sweden who were randomized to receive medical abortion care from two nurse midwives experienced in medical terminations and trained in early pregnancy ultrasound versus a group of 34 physicians with varying training and experience. Success rates were ≥ 96% regardless of gestational age. The nurse midwife group had few complications, though this was not statistically significant (4.1% for nurse midwives, versus 6.1% for doctors, p=0.14). No serious complications were reported and no blood transfusions were administered in the study. Based on this and other supportive studies, the information supports the efficacy and safety of allowing healthcare providers other than physicians can effectively and safely provide abortion services, provided that they meet the requirements for certification described in the REMS. The clinical team also felt that the term "healthcare provider who prescribes" would be the appropriate terminology as prescribing ability is a critical factor in dispensing Mifeprex.

The clinical review team concluded that the evidence demonstrated acceptable safety for each of the above proposed changes, and I concur with their conclusion.  The proposed dosing regimen has a similar safety profile as the original regimen approved in 2000. Adverse outcomes of interest, such as deaths, serious infection, transfusions, ectopic pregnancies and uterine rupture, remain rare, and are not necessarily attributable to Mifeprex use.  Overall, the rate of deaths and nonfatal serious adverse events are acceptably low, and data for the proposed regimen do not suggest a safety profile that deviates from that of the originally approved regimen  No association between adverse outcomes and increasing gestational age was identified. Finally, the available information supports the safety of the other proposed changes, including increasing the flexibility of the time interval between Mifeprex and misoprostol, at home use of misoprostol, use of a repeat dose of misoprostol, change in the follow-up timeframe and allowing health care providers other than physicians to prescribe and dispense Mifeprex were acceptable.

## 9.  Advisory Committee Meeting

Mifeprex is not a new molecular entity requiring discussion before an advisory committee. In addition, an advisory committee was not necessary as the application did not raise complex scientific or other issues that would warrant holding an AC before approval.

## 10. Pediatrics

This efficacy supplement triggered requirements under the Pediatric Research Equity Act (PREA).  The Agency granted a partial PREA waiver for pre-menarcheal females ages birth to 12 years because it would be impossible to conduct studies in this pediatric population, as pregnancy does not exist in premenarcheal females.

---

[40] Kopp Kallner H, Fiala C, Stephansson O, Gemzell-Danielsson K. Home self-administration of vaginal misoprostol for medical abortion at 50-63 days compared with gestation of below 50 days. Human Reprod 2010;25(5):1153-1157.

Reference ID: 3909594

The Applicant fulfilled the remaining PREA requirement in postmenarcheal females by submitting published studies of Mifeprex for pregnancy termination in postmenarcheal females less than 17 years old.  Efficacy and safety information in these adolescents was based on a U.S. study in 322 postmenarcheal adolescents (Gatter et al[41]). Of the 322 adolescents, 106 of these adolescents were under 16; see Table 2 below:

**Table 2: Age and Number of Adolescents Undergoing Medical Abortion (Gatter et al[42])**

| Age of Subject | Number of Subjects evaluated |
|---|---|
| 11 | 1 |
| 12 | 1 |
| 13 | 2 |
| 14 | 20 |
| 15 | 82 |
| 16 | 216 |

Source: Refer to Table 17 of the Medical Officer's review dated March 29, 2016

The Gatter et al[43] study reported that postmenarchal females less than 18 years old had a 98.7% pregnancy termination rate as compared to females aged 18-24, who had a rate of 98.1%. This article reported that loss to follow-up was slightly higher in those less than 18 years old, however, age did not adversely impact efficacy outcomes.

One issue was whether adolescents would comply with at home use of misoprostol.  The Gatter[44] et al study incorporated at home use of misoprostol into the Mifeprex dose regimen given to all females, including postmenarchal females less than 18 years old. The overall efficacy in adolescents was similar to that of all older women. This information supports at home administration of misoprostol in postmenarchal females under 17.

Two other published studies provided additional efficacy on Mifeprex use by adolescents for pregnancy termination:

- Phelps et al[45] evaluated data from 28 adolescents aged 14 to 17, at ≤ 56 days gestation, using Mifeprex 200 mg followed 48 hours later by misoprostol 800 mcg vaginally.  In this study, 100% of subjects had a complete pregnancy termination, with five not requiring misoprostol.

---

[41]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[42] Ibid.
[43]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[44]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[45]Phelps RH, et al. Mifepristone abortion in minors. Contraception 2001;64:339-343.

- Niinimaki et al[46] used data from a Finnish Registry from 2000-2006. An analysis of efficacy between adolescents under age 18 compared to the women ≥ age 18 indicated that the adolescent group had a lower rate of incomplete abortions as compared to adults. And efficacy outcomes in adolescents were similar to those of adult women.

The safety of Mifeprex in postmenarcheal adolescents was primarily supported by adverse event information from the Gatter et al[47] study. (b) (6), (b) (4)

Supportive data from a Finnish registry (Niinimaki et al  ) from 3024 adolescent females under 18 years of age reported that, compared to adult women, the risks of hemorrhage (adjusted odds ratio 0.87 [95% confidence interval: 0.77 to 0.99]), incomplete abortion (0.69, [95% confidence interval: 0.59 to 0.82]), and surgical evacuation (0.78, [95% confidence interval: 0.67 to 0.90]) were lower in the adolescent cohort. In the Finnish registry study, a majority of adolescents and adults received both Mifeprex and misoprostol. Safety findings from the Gatter et al and Niinimaki et al studies are reassuring and indicate that the safety profile of Mifeprex is similar between postmenarcheal adolescents and adult women.

Additional details from this article and other published data on Mifeprex use in adolescents (females under 17) are described in the clinical review (Refer to the Medical Officer's review dated March 29, 2016).

(b) (6) concurred that the efficacy and safety data in postmenarcheal adolescents less than 17 years old was sufficient to support the use of Mifeprex in this pediatric population and to fulfill the PREA pediatric study requirement. The revised Mifeprex labeling will state that that efficacy and safety are similar to adult women  in the Pediatric Use section (8.4).

## 11. Other Relevant Regulatory Issues



reviewed the Medication Guide in conjunction with the (b) (6) (  (b) (6) Both (b) (6) and (b) (6) found the Medication Guide to be acceptable with recommended changes (See review dated March 29, 2016). The Division considered all of the recommendations from (b) (6) in revising and updating the text in

---

[46]Niinimaki M, et al. Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study. BJM 2011;342: d2111.
[47]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[48]Niinimaki M, et al. Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study. BJM 2011;342: d2111.

the Medication Guide and incorporated appropriate changes into the final agreed upon Medication Guide.



reviewed the Prescribing Information (PI) in addition to the joint review with of the Medication Guide in conjunction with After review, provided recommended changes (See review dated March 29, 2016). The Division considered all of the recommendations from in revising and updating the text in the PI and incorporated appropriate changes into the final label.



in the ) reviewed the proposed modifications to the REMS. The review reflected agreement with the Applicant's proposed REMS changes which include:

- Removal of the term "under Federal law" from the Prescriber's Agreement.
- Replacement of the word "physician" with a broader term to describe appropriate healthcare professionals who may order, prescribe and administer Mifeprex. believes that the Applicant's proposed terminology of " is too broad and that a more appropriate description is "healthcare provider who prescribes," which limits acceptable healthcare providers to those who are licensed in their state to prescribe medications.
- Removal of the Medication Guide from the REMS. The Medication Guide remains an important education tool for patients. It will still be dispensed to each patient in accordance with 21 CFR part 208. As described in the Medication Guide Guidance, a Medication Guide is not necessary to ensure that the benefits outweigh the risks of Mifeprex.
- Modification of Element to Assure Safe Use (ETASU) A, the Prescriber's Agreement. recommends changing the name of the document to the Prescriber's Agreement Form to be consistent with other REMS programs. References to "physician" should be changed to "healthcare provider who prescribes."
- recommends removing the Patient Agreement from the REMS for a number of reasons:
  1. The established safety profile over 15 years of experience with Mifeprex is well-characterized, stable, and known serious risks occur rarely
  2. The Medication Guide contains the same risk information addressed in the Patient Agreement, and will still be provided to patients under 21 CFR part 208
  3. The Prescriber's Agreement Form will continue to require providers to explain the treatment, its effects and risks associated with Mifeprex and to answer any questions that a patient may have
  4. Established clinical practice provides for counseling, informing the patient about follow-up, when to contact the provider/clinic, answering questions and obtaining signed informed consent before treatment. FDA has removed REMS

20

requirements in other programs based on the integration of the REMS safe use condition into clinical practice.

Other revisions to the REMS document will be made for consistency with changes described above and to reflect current FDA thinking and practice regarding format, language and flow in REMS documents. These changes include modification of the Mifeprex REMS goal, changes in requirements to certify prescribers (removal of the requirement to obtain a Patient Agreement) and other minor edits.

In summary, the overall ___(b)(6)___ recommendation for the REMS modification for this efficacy supplement was approval (Refer to ___(b)(6)___ review dated March 29, 2016).

## 12. Labeling



Carton and container labeling was reviewed by the ___(b)(6)___ ( ___(b)(6)___ the ___(b)(6)___ ( ___(b)(6)___ and the ___(b)(6)___ ( ___(b)(6)___ ___(b)(6)___ Their comments were conveyed to the Applicant as appropriate.

The label was submitted in the format prescribed by the PLR. Although the supplement was submitted prior to when it would otherwise have been required to comply with the PLLR requirements, the review team believed it would be of value to harmonize with this labeling standard to the extent possible.

Specific issues discussed during labeling negotiations included the selection of studies for inclusion in Section 6.1 (Clinical Trial Experience in the ADVERSE REACTIONS section) and 14 (CLINICAL STUDIES section). Only studies that evaluated the specific proposed regimen were included in these sections. For the Adverse Reactions section, examination of the common adverse reaction data by U.S. compared to non-U.S. study location revealed that there were large differences in the frequency of common adverse reactions, with the reporting rate considerably higher among the U.S. studies. This may reflect differences in ascertainment or subject reporting of adverse reactions in non-U.S. studies. Regardless, inclusion of this non-U.S. data would not be appropriate, as it is unlikely to be informative to the U.S. population of users. In the case of serious adverse reactions, the reported frequency was quite similar regardless of study location; for this reason, serious adverse reaction information from global studies is reported. Agreement on labeling was reached on March 29, 2016.

21

<u>Post-Marketing Requirement/Commitment and Risk Evaluation and Mitigation Strategies</u>
<u>(REMS)</u>:

*Postmarketing Requirements/Postmarketing Commitments*: None.

*Risk Evaluation and Mitigation Strategies (REMS)*: The Applicant proposed a REMS
modification for the Mifeprex REMS program with the submission of this efficacy
supplement. The review teams from the  evaluated the current Mifeprex REMS
program and the proposed REMS modifications to determine whether each Mifeprex
REMS element remains necessary to ensure that the benefits of Mifeprex outweigh the
risks. Factors that impacted the decision included findings from two REMS assessments
(the more recent REMS assessment review was completed in October 2015), an
unchanged safety profile, and published literature that documented adequate safeguards
in clinical practice with the use of Mifeprex in a regimen with misoprostol.

The teams determined that the following REMS modifications were warranted:

1. Revisions to the Prescriber Agreement Form to reflect the new dosing regimen
   and to reflect current REMS formatting and language standards
2. Removal of the Medication Guide as a REMS element, as distribution of the
   Medication Guide is required under 21 CFR 208
3. Removal of the Patient Agreement as a Documentation of Safe Use Condition
   (ETASU D)
4. Updating of the REMS goals to reflect the above 3 changes.
5. Removal of the phrase "Under Federal law" from the Prescriber's Agreement
6. Replacing the term "licensed physician" with "healthcare provider who
   prescribes"

The above modifications to the Mifeprex REMS program were discussed with the (b) (6)
(b) (6) on January 15, 2016, as per (b) (6)
.

The (b) (6) concurred with conforming changes to the Prescriber's Agreement to reflect
the new dosing regimen, and with removal of the Medication Guide from the REMS.
The Medication Guide would remain a part of labeling to inform patients about the risks
associated with Mifeprex use. The (b) (6) also concurred with revisions to the REMS
goals to reflect these changes.

The (b) (6) concurred with the removal of the term "under Federal law". A rationale for
the original inclusion of the phrase "Under Federal law" cannot be discerned from
available historical documents, nor is it consistent with REMS materials for other
products. All the conditions of approval, including the REMS materials, are under
Federal law; therefore, the phrase is unnecessary and it was decided that the phrase be
removed from the Prescriber's Agreement.

22

The [(b) (6)] concurred with use of the term "healthcare providers who prescribe." To support a change in the REMS that would allow qualified healthcare providers other than physicians to prescribe Mifeprex through the Mifeprex REMS program, the Applicant provided information from over 3,200 women in randomized controlled trials and 596 women in prospective cohort studies comparing medical abortion care by physicians versus other providers (nurses or nurse midwives). These studies were conducted in a variety of settings (international, urban, rural, and low-resource).  No differences in serious adverse events, ongoing pregnancy or incomplete abortion were identified between the groups. Given that providers other than physicians are providing family planning and abortion care under supervision and that the approved labeling and REMS program stipulate that prescribers must be able to refer patients for additional care, including surgical management, allowing these prescribers to participate in the Mifeprex REMS program is acceptable.

The [(b) (6)] also concurred with the teams' recommendation to remove the Patient Agreement (ETASU D) from the REMS although some [(b) (6)] members commented that additional support for the review team's rationale for this modification was needed. The review team's rationale for this change was:

APPEARS THIS WAY ON ORIGINAL

23

- The safety profile of Mifeprex is well-characterized over 15 years of experience, with known risks occurring rarely; the safety profile has not changed over the period of surveillance.
- Established clinical practice includes patient counseling and Informed Consent, and, more specifically with Mifeprex, includes counseling on all options for termination of pregnancy, access to pain management and emergency services if needed.
- Medical abortion with Mifeprex is provided by a well-established group of organizations and their associated providers who are knowledgeable in this area of women's health. Their documents and guidelines cover all the safety information that also appears in the Patient Agreement.
- ETASUs A and C remain in place: The Prescriber's Agreement under ETASU A requires that providers "explain the procedure, follow-up, and risks to each patient and give her an opportunity to discuss them." The REMS will continue to require that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals. This ensures that Mifeprex can only be dispensed under the direct supervision of a certified prescriber.
- Labeling mitigates risk: The Medication Guide, which will remain a part of labeling, contains the same risk information covered under the Patient Agreement.

The Mifeprex REMS program will have a modified ETASU REMS that will continue to ensure that Mifeprex can only be prescribed by certified prescribers and be dispensed to patients in certain healthcare settings, specifically, clinics, medical offices and hospitals. The Medication Guide will continue to be distributed to patients required under 21 CFR part 208. As required for all ETASU REMS, ongoing assessments of the Mifeprex REMS program will continue to ensure that the modified Mifeprex REMS program is meeting its goals.

## 13. Decision/Action/Risk Benefit Assessment

Decision:

All regulatory and scientific requirements have been adequately addressed in this efficacy supplement. Review teams involved in this supplement have recommended approval of the supplement from their disciplines' perspective. The submitted efficacy and safety information supported approval of the proposed dosing regimen through 70 days gestation, and other changes discussed in this summary memo. This supplement will receive an Approval action.

Benefit Risk Assessment:

This efficacy supplement provided substantial evidence of efficacy for the proposed dosing regimen through 70 days gestation. The efficacy findings were similar to those that led to the approval of the original dosing regimen in 2000. In addition, the submitted published literature supported other changes sought in this efficacy supplement that will

24

be reflected in labeling: 1) a more flexible time interval of 24 to 48 hours between Mifeprex and misoprostol administration, 2) the option of at home administration of misoprostol, 3) the option of repeat misoprostol dosing, if clinically indicated, 4) flexibility in the follow–up time frame of 7 to 14 days, and 5) permitting qualified healthcare providers other than physicians to prescribe Mifeprex.

The safety findings of the proposed dosing regimen were acceptable and were similar to those seen with the original dosing regimen approved in 2000.

After review of the REMS modifications proposed by the Sponsor, I concur with the clinical team and             (b) (6)   recommendations that:

1.      The Medication Guide can be removed from the Mifeprex REMS program. The Medication Guide requirements under 21 CFR part 208 require the Medication Guide to be distributed to patients. Mifeprex will only be dispensed by a healthcare professional who will be knowledgeable and able to provide the patient instructions on appropriate use of the drug, including what potential side effects may occur or follow-up that may be required as appropriate, and who will answer any questions the patient may have. In that setting, the Medication Guide will already be a required available tool for counseling. Therefore, given the existing requirements under 21 CFR part 208, I concur that there is no reason for the Medication Guide to specifically be a part of the REMS.

2.      The Prescriber Agreement Form (ETASU A) as revised reflects current FDA format and content to conform to current REMS programs and reflect the labeling changes that will be approved in this supplement. I concur that the changes are acceptable.

3.      Revision of the Mifeprex REMS goals (ETASU C) will adequately mitigate the risk of serious complications by requiring certification of healthcare providers who prescribe and ensuring the Mifeprex is dispensed only in certain healthcare settings by or under the supervision of a certified prescriber.

4.      Removal of the Patient Agreement Form (ETASU D): I concur with the clinical review team that the Patient Agreement Form, which requires a patient's signature, does not add to safe use conditions for the patient for this REMS and is a burden for patients. It is standard of care for patients undergoing pregnancy termination to undergo extensive counseling and informed consent. The Patient Agreement Form contains duplicative information already provided by each healthcare provider or clinic. I believe that it is much more critical for the healthcare provider who orders or prescribes Mifeprex to provide and discuss informed consent derived from their own practice so that care can be individualized for the patient.

25

I support that the Mifeprex REMS with ETASUs A and C remain in place to support conditions critical to the use of the drug. Therefore, the implementation system and timetable for assessments should continue.

I also agree with the clinical review team that the reporting requirements should only be required for deaths. It is important that the Agency be informed of any deaths with Mifeprex to monitor new safety signals or trends. However, after 15 years of reporting serious adverse events, the safety profile for Mifeprex is essentially unchanged. Therefore, I agree that reporting of labeled serious adverse events other than deaths can be collected in the periodic safety update reports and annual reports to the Agency.

In summary, I believe that the benefit-risk profile for Mifeprex continues to be favorable and with the agreed-to labeling changes and REMS modifications, the Mifeprex REMS program will continue to assure safe use. Therefore, I support approval of this efficacy supplement and REMS modifications.

<u>Addendum:</u>

On March 28, 2016, Dr. Janet Woodcock, the Director, Center for Drug Evaluation and Research, asked [redacted] (b) (6) and the [redacted] (b) (6) [redacted] to continue to include a Patient Agreement Form in the REMS for Mifeprex (see March 28, 2016 Memorandum from Janet Woodcock, MD, Director, Center for Drug Evaluation and Research, through the [redacted] (b) (6) [redacted] (6)

Therefore, the Patient Agreement Form will be retained and other changes will be made in the REMS to reflect that it is being retained.

26

--------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------

/s/

------------------------------------------------

(b) (6)

03/29/2016

# EXHIBIT 12

Maarit Niinimaki et al.,
*Comparison of rates of adverse events in adolescent
and adult women undergoing medical abortion:
population register based study*,
BMJ (April 20, 2011)



# RESEARCH

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from https://www.bmj.com/ on 23 May 2025 by guest. Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

# Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study

Maarit Niinimäki, consultant gynaecologist,[1] Satu Suhonen, chief physician,[2] Maarit Mentula, consultant gynaecologist,[3] Elina Hemminki, research professor,[4] Oskari Heikinheimo, chief physician,[3] Mika Gissler, research professor[4,5]

[1]Department of Obstetrics and Gynecology, University Hospital of Oulu, Finland

[2]City of Helsinki Health Centre, Unit for Maternal and Child Health Care and Health Promotion, Helsinki, Finland

[3]Department of Obstetrics and Gynaecology/Kätilöopisto Hospital, Helsinki University Central Hospital, PO Box 610, 00029 HUS, Finland

[4]National Institute for Health and Welfare, Helsinki, Finland

[5]Nordic School of Public Health, Gothenburg, Sweden

Correspondence to: O Heikinheimo
oskari.heikinheimo@helsinki.fi

Cite this as: *BMJ* 2011;342:d2111
doi:10.1136/bmj.d2111

## ABSTRACT

**Objective** To determine the risks of short term adverse events in adolescent and older women undergoing medical abortion.

**Design** Population based retrospective cohort study.

**Setting** Finnish abortion register 2000-6.

**Participants** All women (n=27 030) undergoing medical abortion during 2000-6, with only the first induced abortion analysed for each woman.

**Main outcome measures** Incidence of adverse events (haemorrhage, infection, incomplete abortion, surgical evacuation, psychiatric morbidity, injury, thromboembolic disease, and death) among adolescent (<18 years) and older (≥18 years) women through record linkage of Finnish registries and genital *Chlamydia trachomatis* infections detected concomitantly with abortion and linked with data from the abortion register for 2004-6.

**Results** During 2000-6, 3024 adolescents and 24 006 adults underwent at least one medical abortion. The rate of chlamydia infections was higher in the adolescent cohort (5.7% *v* 3.7%, P<0.001). The incidence of adverse events among adolescents was similar or lower than that among the adults. The risks of haemorrhage (adjusted odds ratio 0.87, 95% confidence interval 0.77 to 0.99), incomplete abortion (0.69, 0.59 to 0.82), and surgical evacuation (0.78, 0.67 to 0.90) were lower in the adolescent cohort. In subgroup analysis of primigravid women, the risks of incomplete abortion (0.68, 0.56 to 0.81) and surgical evacuation (0.75, 0.64 to 0.88) were lower in the adolescent cohort. In logistic regression, duration of gestation was the most important risk factor for infection, incomplete abortion, and surgical evacuation.

**Conclusions** The incidence of adverse events after medical abortion was similar or lower among adolescents than among older women. Thus, medical abortion seems to be at least as safe in adolescents as it is in adults.

## INTRODUCTION

Pregnancies among teenagers are mostly unplanned and offer a special challenge to family planning services. Most of all such pregnancies (up to 82% in the United States) are unintended.[1] The decision to continue or terminate a pregnancy is strongly associated with age. Besides age, being a student or being single are important factors in young women's decisions on abortion.[2] In the United States, 6% of all abortions are carried out in under 18s.[1] In the United Kingdom, 9.5% of abortions in 2009 were in adolescents.[3] Thus abortions among teenagers are common and are an important public health problem.

The medical termination of pregnancy using the antiprogestin mifepristone and a prostaglandin analogue has been widely established in several countries during the past decade. In 2009, 40% of abortions were medical in the United Kingdom.[3] In Sweden and Finland the corresponding figures were 72% and 76%.[4,5]

Increasing use of medical termination of pregnancy points to a need for appropriate studies to confirm its safety in various target groups. Using nationwide register based data we showed that both medical and surgical abortions are generally safe, with few serious complications when gestation is less than 63 days.[6] The most common adverse events were haemorrhage and incomplete abortion. However, in that study we did not assess the safety of medical abortion among adolescents.

Data on the safety of medical abortion among adolescents are limited. In a small prospective study, medical abortion was found to be highly effective and well tolerated in adolescents aged 14 to 17 when gestation was less than 56 days. Initially, half of the participants experienced stress and fear, but these emotions improved significantly within the month after abortion.[7]

In the present nationwide study we compared the safety of medical abortion between adolescents and adults. To eliminate the possible influence of previous pregnancies on the outcome of termination of pregnancy, we carried out a subgroup analysis among primigravid women. In addition we assessed the impact of a positive *Chlamydia trachomatis* test result at the time of

cv-00223-Z    Document 264-3    Filed 09/19/25    Page 295 of 525    PageID 17325

abortion on the incidence of infections after abortion—a situation of great clinical relevance to adolescents.

## METHODS

From the national abortion register compiled by the National Institute for Health and Welfare we identified all women who had undergone induced abortion in Finland during 2000-6. The study population consisted of women who had had a medical abortion (mifepristone alone or in combination with misoprostol or other prostaglandins) at 20 weeks or less of gestation. We divided the women into two cohorts based on age at the time of abortion: adolescents (<18 years) and adults (≥18 years). To keep the observations independent, we included only the first abortion for women who had more than one during the study period. To assess the potential learning curve in the introduction of medical abortion, we analysed the results in part separately for the first years (2000-3) of its use compared with established use (2004-6). We linked the data with the care register for health institutions (later called the hospital register) and the national infectious diseases register, both compiled by the National Institute for Health and Welfare, and the cause of death register of Statistics Finland. We followed the women for 42 days after the induced abortion and linked all events recorded in the hospital register and cause of death register with the abortion register.

The Finnish national register on induced abortions and sterilisations has been maintained since 1977. In accordance with the current legislation, doctors performing induced abortions are obliged to report cases to the register within one month, using a specific data collection form. In Finland, data on induced abortions are collected from all hospitals and clinics that carry out induced abortions. The register contains data on women having termination of pregnancy. These data include information on pregnancy history, occupation, type of residence, municipality, and marital status. Data on current pregnancy include information on duration of gestation at the time of abortion, indication for abortion, and method of termination.[5]

We have previously described Finnish legislation on induced abortion.[8] Briefly, current legislation permits termination of pregnancy of up to 20 weeks' gestation (24 weeks in cases of a medical condition of the fetus) for social, medical, or ethical reasons. A national guideline on the care of women seeking abortion was published in 2001 and updated in 2007.[9] Based on this guideline all women should be screened for *C trachomatis* and treated if it is present and screened for bacterial vaginosis at the first visit before the termination of pregnancy. Prophylactic antibiotics are not routinely used.

### Data collection

All hospitals in Finland are required by law to provide the hospital register with information on inpatient treatment (all hospitals) and outpatient visits (public hospitals). This register contains information on diagnosis (international statistical classification of diseases and related health problems, ICD-10[10]) and treatment (Nordic classification of surgical procedures[11]), as well as the dates of the treatment episodes. To analyse adverse events related to induced abortion we linked information on the study participants in the hospital register for all hospital inpatient episodes and outpatient visits within 42 days after termination of pregnancy with data in the abortion register. We selected diagnoses and codes for surgical procedures in the cohorts for those considered to be of clinical importance.

We divided the complications into eight categories (see box): haemorrhage, infection, incomplete abortion, surgical evacuation, psychiatric morbidity, injury or other reason for surgical operation, thromboembolic disease, and death. The classification was based on that reported in the joint study of the Royal College of General Practitioners and the Royal College of Obstetricians and Gynaecologists[12] and modified for this and our previous study.[6]

The cause of death register contains data from death certificates and covers all deaths of Finnish citizens and permanent residents in Finland, classified according to ICD-10 codes. All the early deaths (within 42 days of termination of pregnancy) were classified as direct, indirect, or accidental.[13]

The National Department of Infectious Disease Epidemiology and Control at the National Institute for Health and Welfare collects information on cases of detected *C trachomatis* infections. Since 1997 it has been mandatory for laboratories to report all positive cases to the national infectious diseases register based on the Communicable Diseases Act and Decree of 1987.[14] Since 2004, laboratory notifications have included personal identification numbers, enabling linkage of the data with that in other registries. Since 2004 genital *C trachomatis* has been detected by DNA or RNA testing.[14]

### Statistical analysis

To assess differences between the groups we used the Mann-Whitney test for age and the $\chi^2$ test for categorical variables. The $\chi^2$ test was also used to calculate the difference in the incidence of adverse events, except for rare ones (psychiatric morbidity, injury, thromboembolic disease, and death) when we used Fisher's

---

**Classification of adverse events**

- Haemorrhage—all reported haemorrhage
- Infection—pelvic inflammatory disease, endometritis, cervicitis, wound infections, pyrexia of unknown origin, urinary tract infections, and septicaemia
- Any reported incomplete abortion
- Surgical evacuation
- Psychiatric morbidity—depression, intoxication, psychoses (ICD-10 codes F10-F48)
- Injury or other reason for surgical operation—all injuries, cervical laceration, uterine perforation, all surgical interventions during follow-up
- Thromboembolic disease—pulmonary embolism, deep vein thrombosis
- Death—death from any cause, pregnancy related death according to the World Health Organization definition

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from https://www.bmj.com/ on 23 May 2025 by guest. Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

BMJ | ONLINE FIRST | bmj.com

Case 2:22-cv-00223-Z   Document 264-3   Filed 09/19/25   Page 296 of 525   Page

**Table 1 | Characteristics of the two study cohorts. Values are numbers (percentages) unless stated otherwise**

| Characteristics | Adolescent cohort (<18 years) (n=3024) | Adult cohort (≥18 years) (n=24 006) | P value |
|---|---|---|---|
| Mean (median) age (years), range | 16.1 (16.0), 13-17 | 27.6 (26.0), 18-50 | <0.001 |
| Previous pregnancies: | | | |
| None | 2913 (96.3) | 10 474 (43.6) | <0.001 |
| Yes | 111 (3.7) | 13 532 (56.4) | |
| Previous deliveries: | | | |
| None | 2972 (98.3) | 12 059 (50.2) | <0.001 |
| Yes | 52 (1.7) | 11 947 (49.8) | |
| Previous induced abortions: | | | |
| None | 3004 (99.3) | 19 432 (80.9) | <0.001 |
| Yes | 20 (0.7) | 4574 (19.1) | |
| Marital status: | | | |
| Married | 12 (0.4) | 5634 (23.5) | |
| Cohabiting | 126 (4.2) | 4546 (18.9) | <0.001 |
| Single | 2882 (95.3) | 13 785 (57.4) | |
| Data missing | 4 (0.1) | 41 (0.2) | |
| Type of residence: | | | |
| Urban | 1979 (65.4) | 17 977 (74.9) | |
| Densely populated | 486 (16.1) | 2986 (12.4) | <0.001 |
| Rural | 559 (18.5) | 3043 (12.7) | |
| Duration of gestation (weeks): | | | |
| <9 | 2424 (80.2) | 20 143 (83.9) | |
| 9-12 | 139 (4.6) | 660 (2.7) | |
| 13-16 | 283 (9.4) | 1741 (7.3) | <0.001 |
| 17-20 | 171 (5.7) | 1151 (4.8) | |
| Data missing | 7 (0.2) | 311 (1.3) | |
| *Chlamydia trachomatis* positive test result* | 99/1749 (5.7) | 496/13 547 (3.7) | <0.001 |

*Data available for 2004-6.

exact test. We used the confidence interval analysis program to calculate the rates of adverse events.[15] For small proportions we used the exact binomial method. The estimated risks of adverse events were determined by logistic regression analyses, and presented as odds ratios with 95% confidence intervals. Variables that showed statistically significant associations with complications in univariate analysis (type of residence, marital status, duration of gestation, year of abortion, and adolescent or adult cohort) were further entered in multivariate analysis. SPSS 16.0 for Windows was used for the statistical analyses.

## RESULTS

During 2000-6, 27 030 women underwent medical abortion between five and 20 weeks of gestation. Of these women, 3024 were younger than 18 (adolescent cohort) and the remaining 24 006 were older (adult cohort). Including only the first induced abortion for each woman during 2000-3, medical abortion was carried out in 1275 (29.3%) adolescents and in 10 459 (31.7%) adults. In 2004-6 the corresponding numbers were 1749 (61.9%) and 13 547 (63.3%).

The two cohorts differed significantly for various characteristics (table 1). The adolescents had fewer previous deliveries and induced abortions and were

more often single and living in a non-urban setting. In both groups, most of the medical abortions (over 80%) were performed before nine weeks of gestation, but the mean duration of gestation was more advanced among adolescents. The incidence of *C trachomatis* infections, diagnosed four weeks before to six weeks after abortion, was higher in the adolescent cohort, as calculated for 2004-6.

Table 2 describes the incidence of adverse events among the two cohorts, as well as among the primigravid women. The adult cohort had a significantly higher incidence of haemorrhage (3690 (15.4%) v 386 (12.8%), P<0.001), incomplete abortion (2450 (10.2%) v 212 (7.0%), P<0.001), and surgical evacuation of retained products of conception (3121 (13.0% v 333 (11.0%), P=0.002). Odds ratios were calculated for main adverse events (haemorrhage, infection, incomplete abortion, and surgical evacuation), after adjustment for parity, previous abortions, marital status, type of residence, duration of gestation, and year of abortion. In the adolescent cohort the adjusted odds ratios were significantly lower for haemorrhage, incomplete abortion, and surgical evacuation than in the adult cohort. In addition, the adult cohort had more participants with adverse events (5535 (23.1%) v 575 (19.0%), P<0.001).

In the subgroup analysis carried out among the primigravid women, the proportion of women with haemorrhage (1505 (14.4%) v 374 (12.8%), P=0.035), incomplete abortions (887 (8.5%) v 201 (6.9%), P=0.006) and a higher overall number of adverse events (2224 (21.1%) v 552 (18.9%), P=0.031) was significantly higher in the adult cohort. After adjustment for marital status, type of residence, duration of gestation, and year of abortion, the risks for incomplete abortion and surgical evacuation were lower in the primigravid adolescents than in the primigravid adults (table 2).

The incidence of a psychiatric diagnosis was higher among the adolescents in both the cohort and the primigravid cohort, even though the overall numbers were low. Two deaths were reported during the follow-up period. Both of these occurred in adults and were unrelated to the pregnancy (intracranial trauma and melanoma).

The figure shows the results of logistic regression among the primigravid women for risk of main adverse events (haemorrhage, infection, incomplete abortion, and surgical evacuation). An increased risk of haemorrhage was associated with living in a densely populated area. The risk of bleeding after medical abortion was higher during 2004-6 than during 2000-3. Gestations of 9-12 or 13-16 weeks were associated with a lower risk of haemorrhage than gestations of less than nine weeks. The risk of haemorrhage was also significantly lower in the adolescent cohort.

Advanced duration of gestation (9-12, 13-16, and 17-20 weeks) was associated with an increased risk of infections after abortion (figure). Additionally, being married or cohabiting compared with being single was associated with an increased risk of infection.

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from https://www.bmj.com/ on 23 May 2025 by guest. Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

cv-00223-Z    Document 264-3    Filed 09/19/25    Page 297 of 525    PageID 1732

Table 2 | Incidence of adverse events in study cohorts for all women (3024 adolescents and 24 006 adults) and for primigravid women (2913 adolescents and 10 474 adults)

| Adverse events | Adolescent cohort (<18 years) | % (95% CI) | Adult cohort (≥18 years) | % (95% CI) | P value | Adjusted odds ratio (95%CI)* |
|---|---|---|---|---|---|---|
| **All women** | | | | | | |
| Haemorrhage | 386 | 12.8 (11.6 to 14.0) | 3690 | 15.4 (15.0 to 16.0) | <0.001† | 0.87 (0.77 to 0.99)† |
| Infection | 60 | 2.0 (1.5 to 2.6) | 489 | 2.0 (1.9 to 2.2) | 0.742 | 0.97 (0.73 to 1.30) |
| Incomplete abortion | 212 | 7.0 (6.1 to 8.0) | 2450 | 10.2 (9.8 to 10.6) | <0.001† | 0.69 (0.59 to 0.82)† |
| Surgical evacuation | 333 | 11.0 (9.9 to 12.1) | 3121 | 13.0 (12.6 to 13.4) | 0.002† | 0.78 (0.67 to 0.90)† |
| Psychiatric morbidity | 3 | 0.10 (0.02 to 0.29) | 2 | NA | 0.012† | — |
| Injury | 4 | 0.13 (0.04 to 0.34) | 35 | 0.15 (0.10 to 0.19) | 1.000 | — |
| Thromboembolic disease | 2 | 0.07 (0.01 to 0.24) | 26 | 0.11 (0.07 to 0.15) | 0.764 | — |
| Death | 0 | NA | 2 | NA | 0.392 | — |
| No of adverse events per woman: | | | | | | |
| 0 | 2449 | 81.0 (79.6 to 82.4) | 18471 | 76.9 (76.4 to 77.5) | | — |
| 1 | 488 | 16.1 (14.8 to 17.4) | 4456 | 18.6 (18.1 to 19.1) | | — |
| 2 | 82 | 2.7 (2.2 to 3.4) | 994 | 4.1 (3.9 to 4.4) | <0.001† | — |
| 3 | 5 | 0.17 (0.05 to 0.39) | 83 | 0.35 (0.27 to 0.42) | | — |
| 4 | 0 | NA | 2 | NA | | — |
| **Primigravid women** | | | | | | |
| Haemorrhage | 374 | 12.8 (11.6 to 14.1) | 1505 | 14.4 (13.7 to 15.0) | 0.035† | 0.88 (0.78 to 1.00) |
| Infection | 57 | 2.0 (1.5 to 2.5) | 227 | 2.2 (1.9 to 2.5) | 0.486 | 1.01 (0.75 to 1.37) |
| Incomplete abortion | 201 | 6.9 (6.0 to 7.9) | 887 | 8.5 (7.9 to 9.0) | 0.006† | 0.68 (0.56 to 0.81)† |
| Surgical evacuation | 311 | 10.7 (9.6 to 11.8) | 1136 | 10.8 (10.3 to 11.4) | 0.794 | 0.75 (0.64 to 0.88)† |
| Psychiatric morbidity | 3 | 0.10 (0.02 to 0.30) | 1 | NA | 0.034† | — |
| Injury | 4 | 0.14 (0.04 to 0.35) | 10 | 0.10 (0.04 to 0.16) | 0.521 | — |
| Thromboembolic disease | 2 | 0.07 (0.01 to 0.25) | 10 | 0.10 (0.04 to 0.16) | 1.00 | — |
| Death | 0 | NA | 1 | NA | 0.391 | — |
| No of adverse events per woman: | | | | | | |
| 0 | 2361 | 81.1 (79.6 to 82.5) | 8250 | 78.8 (78.0 to 79.5) | | — |
| 1 | 468 | 16.1 (14.7 to 17.4) | 1838 | 17.5 (16.8 to 18.3) | | — |
| 2 | 79 | 2.7 (2.2 to 3.4) | 356 | 3.4 (3.1 to 3.8) | 0.031† | — |
| 3 | 5 | 0.17 (0.06 to 0.40) | 30 | 0.29 (0.18 to 0.39) | | — |
| 4 | 0 | NA | 0 | NA | | — |

NA=not applicable owing to small number of women.
*Adult cohort as reference for all women adjusted for parity, previous abortions, marital status, type of residence, duration of gestation, and year of abortion; adult cohort as reference for primigravid women adjusted for marital status, type of residence, duration of gestation, and year of abortion.
†Statistically significant.

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from https://www.bmj.com/ on 23 May 2025 by guest. Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

Also, the risk was higher in the later period (2004-6) than in 2000-3. The risk of infection was similar between the two cohorts.

Advanced duration of gestation was strongly related to the risk of incomplete abortion and surgical evacuation. The risk of incomplete abortion was lower in adolescents (odds ratio 0.69, 95% confidence interval 0.58 to 0.82) than in adults. The risk of surgical evacuation was increased in women living in rural areas and in those who were married or cohabiting. When abortion was carried out in the later period (2004-6) the risk of surgical evacuation was diminished (figure).

The risk of infections after abortion as a result of concurrent chlamydia infection was assessed among women who underwent abortion during 2004-6. In logistic regression analysis of the whole cohort, the risk of infection after abortion was not associated with concurrent chlamydia infection (1.02, 0.58 to 1.78). Moreover, no significant difference in the rate of infections after abortion emerged between adolescents and

those with a positive test result for *C trachomatis* (data not shown).

## DISCUSSION

In the present study the rate of adverse events and complications after medical abortion in adolescents was similar to or lower than that in adults. Various characteristics of the two cohorts differed significantly (table 1), but the risk of adverse events was calculated after adjustment for these factors. This study covered almost all abortions carried out in Finland in all regions and hospitals during a seven year period and thus shows reliable national trends. Earlier studies assessing the completeness of the Finnish abortion register found that 99% of abortions were reported to the register and at least 95% of information matched the medical records.[16 17]

One limitation of the study is that the registry based data lack detailed information as the diagnoses were made on clinical grounds, and the severity of adverse

RESEARCH



Logistic regression analysis of risk factors for main adverse events (haemorrhage, infection, incomplete abortion, and surgical evacuation) among primigravid women in entire cohort. Results of multivariate analysis are shown unless stated otherwise. Variables showing significance in univariate analysis are included. *Derived from univariate analysis

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from https://www.bmj.com/ on 23 May 2025 by guest. Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

events may vary substantially. Another drawback is that no conclusions can be made on the effects of abortion beyond the 42 days of follow-up. A further limitation is that data on *C trachomatis* could only be linked with registry data from 2004, when identification numbers were first archived.

More women sought help for bleeding after abortion when gestation was less than nine weeks. This finding parallels that reported in our previous study.[6] This might be explained partly by the fact that medical abortions at nine weeks or more of gestation are carried out by hospitals, and not on an outpatient basis.[9] Moreover, an increasing number of these early abortions are carried out at home using self administered misoprostol.

The risk of surgical evacuation of retained products after medical abortion decreased during 2004-6 compared with 2000-3, whereas the number of incomplete abortions remained the same. These findings probably

reflect a learning curve in providing medical abortion. However, the lower number of surgical evacuations occurred at the expense of an increased rate of consultations as a result of uterine bleeding. We took into account the possible bias caused by the differences between the study periods (2000-3 and 2004-6) by adjusting the odds ratios of adverse events by study period.

The rate of infections after abortion was higher (2.0%) than that reported in an earlier review in which medical abortion was assessed (0.9%).[18] The higher figure may in part be a result of the register based nature of the present study—that is, the diagnostic criteria lacked uniformity. In recent reviews, however, the incidence of infections after medical abortion in the second trimester has been estimated to be about 3%.[19][20] Thus in the present study, concerning pregnancies of up to 20 weeks' duration, the incidence of infections was comparable with that reported in the recent

1:cv-00223-Z    Document 264-3    Filed 09/19/25    Page 299 of 525    PageID 17329

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from https://www.bmj.com/ on 23 May 2025 by guest. Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

---

**WHAT IS ALREADY KNOWN ON THIS TOPIC**

Teenage pregnancies are mostly unplanned and often result in induced abortion

Medical abortion is increasingly used, albeit its safety has not been properly assessed among adolescents

**WHAT THIS STUDY ADDS**

The risk of adverse events (haemorrhage, incomplete abortion, infection) after medical abortion is similar or even lower in adolescent (<18 years) compared with adult women

---

reviews. The risk of infection was increased when the abortion was carried out in the later period (2004-6). The explanation for this is unclear. The incidence of *C trachomatis* infections in the Finnish population did not change at the same time.[14]

*C trachomatis* is a notable cause of pelvic inflammatory disease. Screening for and treatment of *C trachomatis* can prevent the development of the disease after abortion.[21] To prevent infection after termination of pregnancy both prophylactic antibiotic therapy for all and screen and treat strategies are in use. In a recent study in the United States, routine provision of doximycin at the time of medical abortion was associated with a significant reduction in the rate of serious infections.[22]

We found no correlation between *C trachomatis* diagnosed at the time of abortion and subsequent infections. In Finland, systematic screening for *C trachomatis* after termination of pregnancy is enforced by national guidelines.[9] In 2004-6 the national incidence of *C trachomatis* among girls and young women aged 10-19 was 1.7‰ in Finland,[14] whereas a higher rate of 5.7‰ was detected in the present adolescent cohort. The results of this study do not rule out the possible association with infections after abortions in the cases of untreated *C trachomatis* infections, or with delayed antibiotic treatment. The present study suggests that by timely screening it is possible to treat the infection before the clinical manifestation.

In the present study psychiatric morbidity was significantly more common among adolescents than among adults, although the number of cases was small. Register based studies are not ideal for studying psychiatric disorders, as only some women seek professional help for mental disorders and only some women with mental disorders are treated in specialised healthcare. In a recent register based Danish study, the risk of a psychiatric disorder in women with no such previously detected disorders was not increased after induced abortion in the first trimester.[23] The risk of psychiatric contact was not, however, significantly affected by age. In a US survey, adolescents were not at increased risk for depression or lower self esteem after abortion than the controls during follow-up.[24] The present studies only assessed psychiatric diagnoses during the short follow-up but not possible psychiatric morbidity before abortion. Thus, the association of mental disorders and termination of pregnancy among adolescents remains unresolved.

Experience of pain or satisfaction with care could not be studied in the present setting, as these outcomes are not registered in the Finnish abortion register. In a randomised study, women with higher gestational age and first pregnancy seemed to be less satisfied with medical abortion as a result of more pain during the termination.[25] The effective treatment of pain must be taken into account when adolescents, predominantly nulliparous women, undergo induced abortion.

## Conclusion

The present population based national study provides evidence that medical abortion is not associated with additional risks of adverse events among adolescents in the short term compared with adult women. The data were derived from one country with a homogeneous population but can be generalised to populations with high quality healthcare and easy access to specialist treatment.

The preliminary results of this study were presented at the International Federation of Obstetrics and Gynecology (FIGO) meeting in Cape Town, South Africa October 2009, and in the International Federation of Professional Abortion and Contraception Associates (FIAPAC) meeting in Seville Spain, October 2010 (MN). We thank Aini Bloigu (National institute for Health and Welfare, Oulu, Finland) for her professional help with the statistics.

**Contributors:** All authors participated in the design of the study. MN carried out the data analysis, wrote the first draft of the manuscript, and is a guarantor of the study. All authors contributed to the subsequent writing of the paper and gave substantial input into the study. OH obtained funding for the study. MG is in charge of the Finnish reproductive registers (including the abortion register).

**Funding:** This study was funded by Finnish Cultural Foundation (MN), Helsinki University Central Hospital Research Funds (OH, MN), and University Hospital of Oulu Research Funds (MN).

**Competing interests:** All authors have completed the Unified Competing Interest form at www.icmje.org/coi_disclosure.pdf (available on request from the corresponding author) and declare: OH has lectured at an educational event organised by Nordic Drugs and has been principal investigator in clinical studies sponsored by the Concept Foundation; no financial relationships with any organisations that might have an interest in the submitted work in the previous three years, no other relationships or activities that could appear to have influenced the submitted work.

**Ethical approval:** This study was approved by the ethics committee of the Northern Ostrobothnia Hospital District in October 2005 (No 46/2005). The Ministry of Social Affairs and Health, and Statistics Finland gave permission for the use of confidential personal level data from the registries. The data protection ombudsman was notified about the data linkage before the analyses, as required by national data protection legislation.

**Data sharing:** No additional data available.

1  Jones RK, Finer LB, Singh S. Characteristics of US abortion patients, 2008. Guttmacher Institute, 2010.

2  Sihvo S, Bajos N, Ducot B, Kaminski M. Women's life cycle and abortion decision in unintended pregnancies. *J Epidemiol Community Health* 2003;57:601-5.

3  Department of Health. Abortion statistics, England and Wales: 2009. 2010. www.dh.gov.uk/en/Publicationsandstatistics/Publications/PublicationsStatistics/DH_116039.

4  Socialstyrelsen. Statistics. 2010. www.socialstyrelsen.se/statistics.

5  National Institute for Health and Welfare. Induced abortions. 2010. www.stakes.fi/EN/tilastot/statisticsbytopic/reproduction/abortions.htm.

6  Niinimäki M, Pouta A, Bloigu A, Gissler M, Hemminki E, Suhonen S, et al. Immediate complications after medical compared with surgical termination of pregnancy. *Obstet Gynecol* 2010;115:660-1.

7  Phelps RH, Schaff EA, Fielding SL. Mifepristone abortion in minors. *Contraception* 2001;64:339-43.

8  Niinimäki M, Pouta A, Bloigu A, Gissler M, Hemminki E, Suhonen S, et al. Frequency and risk factors for repeat abortions after surgical

Case 2:22-cv-00223-Z    Document 264-3    Filed 09/19/25    Page 300 of 525    PageID

compared with medical termination of pregnancy. *Obstet Gynecol* 2009;113:845-52.

9  Finnish Gynecological Association's Task Force. Abortion. *Duodecim* 2001;117:2084-94.

10  World Health Organization. International Classification of Diseases (ICD). 2010. www.who.int/classifications/icd/en/.

11  Nordic Centre for Classifications in Health Care. NCSP—the NOMESCO classification of surgical procedures. 2010. www.helsedirektoratet.no/nordclass_english/ncsp/ncsp___the_nomesco_classification_of_surgical_procedures_334824.

12  RCGP/RCOG. Induced abortion operations and their early sequelae. Joint study of the Royal College of General Practitioners and the Royal College of Obstetricians and Gynaecologists. *J R Coll Gen Pract* 1985;35:175-80.

13  Deneux-Tharaux C, Berg C, Bouvier-Colle MH, Gissler M, Harper M, Nannini A, et al. Underreporting of pregnancy-related mortality in the United States and Europe. *Obstet Gynecol* 2005;106:684-92.

14  National Institute for Health and Welfare. National Department of Infectious Disease Epidemiology. The statistical database of the infectious diseases register. 2010. www3.ktl.fi/.

15  Gardner MJ, Altman DG. Statistics with confidence. Confidence intervals and statistical guidelines. BMJ Publishing, 1989

16  Gissler M, Ulander VM, Hemminki E, Rasimus A. Declining induced abortion rate in Finland: data quality of the Finnish abortion register. *Int J Epidemiol* 1996;25:376-80.

17  Heikinheimo O, Gissler M, Suhonen S. Age, parity, history of abortion and contraceptive choices affect the risk of repeat abortion. *Contraception* 2008;78:149-54.

18  Shannon C, Brothers LP, Philip NM, Winikoff B. Infection after medical abortion: a review of the literature. *Contraception* 2004;70:183-90.

19  Gemzell-Danielsson K, Lalitkumar S. Second trimester medical abortion with mifepristone-misoprostol and misoprostol alone: a review of methods and management. *Reprod Health Matters* 2008;16(suppl 21):162-72.

20  Lohr PA, Hayes JL, Gemzell-Danielsson K. Surgical versus medical methods for second trimester induced abortion. *Cochrane Database Syst Rev* 2008;1:CD006714.

21  Soper DE. Pelvic inflammatory disease. *Obstet Gynecol* 2010;116:419-28.

22  Fjerstad M, Trussell J, Sivin I, Lichtenberg ES, Cullins V. Rates of serious infection after changes in regimens for medical abortion. *N Engl J Med* 2009;361:145-51.

23  Munk-Olsen T, Laursen T, Pedersen CB, Lidegaard O, Mortensen PB. Induced first-trimester abortion and risk of mental disorder. *N Engl J Med* 2011;364:332-9.

24  Warren JT, Harvey SM, Henderson JT. Do depression and low self-esteem follow abortion among adolescents? Evidence from a national study. *Perspect Sex Reprod Health* 2010;42:230-5.

25  Teal SB, Dempsey-Fanning A, Weshoff C. Predictors of acceptability of medication abortion. *Contraception* 2007;75:224-9.

**Accepted:** 20 February 2011

BMJ: first published as 10.1136/bmj.d2111 on 20 April 2011. Downloaded from https://www.bmj.com/ on 23 May 2025 by guest. Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

292

# EXHIBIT 13

Jamie Bryan Hall & Ryan T. Anderson,
*The Abortion Pill Harms Women: Insurance Data Reveals One in Ten Patients Experiences a Serious Adverse Event*,
Ethics & Pub. Pol'y Ctr. (Apr. 28, 2025)

LIFE AND FAMILY INITIATIVE



ETHICS
AND
PUBLIC
POLICY
CENTER

*Shaping Policy,
Renewing Culture.*

# The Abortion Pill Harms Women:
# Insurance Data Reveals One in Ten Patients Experiences a Serious Adverse Event

**Jamie Bryan Hall,** Director of Data Analysis, Ethics and Public Policy Center
**Ryan T. Anderson,** President, Ethics and Public Policy Center

April 28, 2025

## Summary

- This largest-known study of the abortion pill is based on analysis of data from an all-payer insurance claims database that includes 865,727 prescribed mifepristone abortions from 2017 to 2023.
- 10.93 percent of women experience sepsis, infection, hemorrhaging, or another serious adverse event within 45 days following a mifepristone abortion.
- The real-world rate of serious adverse events following mifepristone abortions is at least 22 times as high as the summary figure of "less than 0.5 percent" in clinical trials reported on the drug label.
- The FDA should immediately reinstate its earlier, stronger patient safety protocols to ensure physician responsibility for women who take mifepristone under their care, as well as mandate full reporting of its side effects.
- The FDA should further investigate the harm mifepristone causes to women and, based on objective safety criteria, reconsider its approval altogether.

**Danco Laboratories** markets Mifeprex as "the safe and effective abortion pill," but our research shows that mifepristone abortion, as currently practiced in the U.S., is not safe and effective.[1] The manufacturer and the FDA rely on the results of 10 clinical trials with a total of 30,966 participants, less than 0.5 percent of whom reportedly experienced serious adverse reactions. In contrast, we analyzed real-world insurance claims data for 865,727 prescribed mifepristone abortions, broadly representative of women who obtain mifepristone abortions in the U.S. today, and we find a serious adverse event rate of 10.93 percent—at least 22 times as high as the summary figure reported on the drug label. In light of this research, we urge the FDA to reinstate earlier, stronger patient safety protocols and reconsider its approval of mifepristone altogether. Women deserve better than the abortion pill.

## Our Key Findings

10.93 percent of women experience sepsis, infection, hemorrhaging, or another serious or life-threatening adverse event within 45 days following a mifepristone abortion, far greater than the summary figure of "less than 0.5 percent" in clinical trials reported on the drug label. *Figure 1, next page.*

---

1  Danco Laboratories, "The Safe and Effective Abortion Pill | Mifeprix (mifepristone)," https://www.earlyoptionpill.com (accessed April 14, 2025)

### Figure 1

## Serious Adverse Events by Category

| | Number with adverse events | Serious adverse event rate |
|---|---|---|
| Sepsis | 824 | 0.10% |
| Infection | 11,707 | 1.34% |
| Transfusion | 1,257 | 0.15% |
| Hemorrhage | 28,658 | 3.31% |
| Hospitalization (related to the abortion) | 5,699 | 0.66% |
| ER visit (related to the abortion) | 40,960 | 4.73% |
| Ectopic pregnancy | 3,062 | 0.35% |
| Other life-threatening adverse events (cardiac, pulmonary, thrombosis, anaphylaxis, surgery) | 1,956 | 0.22% |
| Repeated (surgical) abortion | 24,563 | 2.84% |
| Other abortion-specific complications | 49,169 | 5.68% |
| Overall | 94,605 | 10.93% |

Note: The overall serious adverse event rate of 10.93% is adjusted for the fact that some women suffer from adverse events in multiple categories.

Simply stated, mifepristone, as used in real-world conditions, is not "safe and effective."

Our real-world post-market observational study of mifepristone is, to our knowledge, the most comprehensive study of chemical abortion safety ever conducted in the U.S.:

- We identify and include 865,727 prescribed mifepristone abortions, 28 times as many as were included in all FDA-cited clinical trials combined.
- Our dataset is more recent, no earlier than 2017, while the FDA approval of mifepristone relies entirely on data from more than a decade ago.
- The women in our dataset are broadly representative of the women who obtain mifepristone abortions in the U.S.; they are not a prescreened group of generally healthy women recruited into various clinical trials conducted at different times around the world.
- The women in our dataset receive (or fail to receive) pre- and post-abortion healthcare of the real-world quality that prevails in the U.S. today, not the carefully controlled regimen of care that ordinarily prevails in a clinical trial.

## Policy Implications

The FDA should reinstate the original patient safety protocols that were required when mifepristone was first approved. Doing so will likely reduce the harms to women and permit better monitoring to determine whether this drug should remain on the market:

- Prescribing mifepristone and misoprostol for the termination of pregnancy should require at least three in-person office visits by the patient—as originally required by the FDA.
- Mifepristone should be prescribed only by physicians—as originally required by the FDA—who have read and understood the prescribing information.
- Mifepristone should be administered only in a clinic, medical office, or hospital, by or under the supervision of a physician, able to assess the gestational age of an embryo and to diagnose ectopic pregnancies—all of which was originally required by the FDA.
- Physicians must be able to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.
- Healthcare providers should be required once again to report to the FDA (and manufacturers of mifepristone) all serious adverse events resulting from the use of mifepristone.
- Mifepristone should only be prescribed to a woman who is confirmed by a physician to be in the first seven weeks of pregnancy—as originally required by the FDA.

## Background on FDA Approval and Regulation of Mifepristone

Mifepristone was developed by the French pharmaceutical company Roussel Uclaf S.A. and brought to the United States at the urging of President Clinton and after Congressional pressure. The FDA approved it under a little-used approval process for "certain new drug products that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments."[2] Thus, to grant approval in this manner, the FDA had to consider an unwanted pregnancy a "serious or life-threatening illness" and find that mifepristone was more effective than surgical abortion in treating it. The FDA's decision cites minimal data: clinical trials with only 859 participants in the U.S. and 1,800 in France.[3]

The original FDA-approved drug label for Mifeprex (the brand name of mifepristone) from September 2000 indicated use of the drug for "the medical termination of intrauterine pregnancy through 49 days' pregnancy."[4] It required several modest safeguards for women's health:

Treatment with Mifeprex and misoprostol for the termination of pregnancy requires three office visits by the patient. Mifeprex should be prescribed only by physicians who have read and understood the prescribing information. Mifeprex may be administered only in a clinic, medical office, or hospital, by or under the supervision of a physician, able to assess the gestational age of an embryo and to diagnose ectopic pregnancies. Physicians must also be able to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.[5]

During the Obama and Biden administrations, the FDA chipped away at these initial safeguards, risking women's health in order to increase access to abortion. Under the current Risk Evaluation and Mitigation Strategy (REMS) in effect since 2023:

1. a mifepristone abortion now requires as a little as one telehealth visit with any approved healthcare provider (not necessarily a physician),

2. a woman may self-administer drugs obtained from a mail-order pharmacy, and

3. the prescriber need not report any adverse events unless he or she knows that a patient has died. *FIGURE 2.*

| FIGURE 2<br>**Weakening FDA Safeguards for Mifepristone** | 2000<br>Clinton<br>Initial<br>Approval | 2016<br>Obama<br>REMS<br>Changes | 2023<br>Biden<br>REMS<br>Changes |
|---|---|---|---|
| Required number of in-person visits | 3 | 1 | 0 |
| Maximum gestational age (LMP) | 7 weeks | 10 weeks | 10 weeks |
| Drugs prescribed only by physician | ✓ | ✗ | ✗ |
| Drugs dispensed only in office | ✓ | ✓ | ✗ |
| Drugs taken only in office | ✓ | ✗ | ✗ |
| Required in-office follow-up | ✓ | ✗ | ✗ |
| Required reporting of adverse events | ✓ | ✗ | ✗ |

---

2  Alliance for Hippocratic Medicine v. FDA, Complaint, https://adflegal.org/wp-content/uploads/2022/11/Alliance-for-Hippocratic-Medicine-v-FDA-2022-11-18-Complaint.pdf

3  Mifeprex (mifepristone) drug label, September 2000, page 3, https://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.pdf

4  Mifeprex (mifepristone) drug label, September 2000, page 6, https://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.pdf

5  Mifeprex (mifepristone) drug label, September 2000, page 14, https://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.pdf

The current FDA-approved drug label refers to the results of 10 clinical trials with a total of 30,966 participants, less than 0.5 percent of whom reportedly experienced serious adverse reactions.[6] But these figures are based entirely on data from trials taking place more than a decade ago.

## The Increasing Market Share of Chemical Abortion

Increased access to chemical abortion has coincided with a rapid increase in its prevalence. Chemical abortions—the vast majority of which are performed using a combination of mifepristone and misoprostol—now account for roughly two-thirds of all abortions in the United States. *Figure 3.*

In fact, Danco Laboratories boasts that more than 5 million U.S. women have used its abortion pill since it was approved in 2000.[7] Thus, it has become increasingly important to understand the risks and harms to women from chemical abortion in general and from mifepristone in particular.

## How We Identified Mifepristone Abortions

In our data, a mifepristone abortion was identified in one of three ways:

1. procedure code S0199: medically induced abortion by oral ingestion of medication including all associated services and supplies,

2. a prescription for mifepristone (with or without misoprostol within the next 3 days), or

3. a diagnosis code for elective termination or unwanted pregnancy, along with other billing coding consistent with manufacturer instructions for reimbursement for a mifepristone abortion for a given state and insurer combination.[8]

Following this method, we identified a total of 865,727 mifepristone abortions prescribed for a total of 692,873 women from 2017 to 2023. This includes 566,446 women, each of whom had one such abortion, and 126,427 women with multiple such abortions.



*Figure 3*
**Chemical abortion has increased rapidly since approval in 2000 and now accounts for approximately two-thirds of all abortions.**

Source: Guttmacher Abortion Provider Census and Monthly Abortion Provision Study, via https://www.guttmacher.org/2024/03/medication-abortion-accounted-63-all-us-abortions-2023-increase-53-2020

---

6  Page 7 of the drug label states, "Serious adverse reactions were reported in <0.5% of women. Information from the U.S. and non-U.S. studies is presented in Table 2." Table 2 on page 8 indicates that some categories of serious adverse reactions were observed at higher rates in some trials, but this is never discussed in the text, leaving only the previous statement with which to interpret the table. See Mifeprex (mifepristone) drug label, January 2023, https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020687Orig1s026lbl.pdf

7  Danco Laboratories, "The Safe and Effective Abortion Pill | Mifeprex (mifepristone)," https://www.earlyoptionpill.com (accessed April 14, 2025)

8  Danco Laboratories, "Mifeprex State Payer Policies," https://www.earlyoptionpill.com/how-do-i-get-mifeprex/state-payer-policies (accessed April 14, 2025)

# How We Identified Serious Adverse Events

We followed the official FDA definition of "serious adverse event."[9] To do so, we identified relevant ICD-10 diagnosis codes and CPT/HCPCS procedure codes for adverse events from multiple sources:

- CDC Severe Maternal Morbidity (SMM) indicators,[10]
- CMS Diagnosis-Related Group (DRG) 770 and 769 codes,[11]
- FDA Adverse Events Reporting System (FAERS) reports (interpreted and translated into diagnosis and procedure codes by the doctors on our team),[12] and
- a small number of (mostly gynecological) codes suggested by our doctors.

These codes were then graded by a team of physicians using the the NIH Common Terminology Criteria for Adverse Events (CTCAE version 5), which categorizes adverse events by severity on a 5-point scale.[13] We included CTCAE Grade 3 (severe) and Grade 4 (life-threatening). We did not include Grade 1 (mild) or Grade 2 (moderate). (Grade 5 is death, which would count as a serious adverse event under the FDA definition but could not necessarily be observed in the insurance claims data. We hope to show the rate of death in a subsequent report.)

For reporting, we have grouped the relevant diagnosis and procedure codes as follows:

1. The mifepristone label divides serious adverse events into six categories identified in the clinical trials: sepsis, infection, transfusion, hemorrhage, hospitalization, and emergency room visit. Only those hospitalizations and emergency room visits with abortion-related diagnosis and procedure codes are included in our analysis.

2. FAERS received reports of various events that our doctors judge to be life-threatening and have grouped into broad categories: ectopic pregnancy, surgery, cardiac, pulmonary, thrombosis, and anaphylaxis.

3. Repeated (surgical) abortion procedures are considered serious adverse events.

4. Other abortion complications include codes specifically related to an abortion or miscarriage, as well as life-threatening mental health diagnoses, etc.

We consider only serious adverse events that occurred within 45 days following the abortion. This is conservative, as some adverse events may present later (and studies relied on by the FDA used a timeframe as long as 72 days). Additionally, the likelihood of a subsequent pregnancy within this timeframe is negligible, which ensures that adverse events are related to the abortion rather than to a subsequent pregnancy.

## Our Data

Our team has purchased access to a commercially available all-payer health insurance claims database including de-identified data for all U.S. patients during the years 2017 to 2023. It includes information on hospital and office visits, diagnoses, procedures, and prescriptions processed through private health insurance, Medicaid, Medicare, TRICARE, and the Department of Veterans Affairs (VA). The data excludes transactions for which the insurer is also the provider (as is the case with some HMOs and much VA care), as well as cash pay transactions (which are disproportionately common for abortion). This dataset provides longitudinal tracking of medical diagnoses, procedures, and prescriptions for each patient and is widely used in academic and regulatory research.

---

[9]  FDA, "What is a Serious Adverse Event?," https://www.fda.gov/safety/reporting-serious-problems-fda/what-serious-adverse-event

[10]  CDC, "Identifying Severe Maternal Morbidity (SMM)," https://www.cdc.gov/maternal-infant-health/php/severe-maternal-morbidity/icd.html

[11]  CMS, "ICD-10-CM/PCS MS-DRG v37.0 Definitions Manual," https://www.cms.gov/icd10m/version37-fullcode-cms/fullcode_cms/P0287.html

[12]  FDA, "FDA Adverse Events Reporting System (FAERS) Public Dashboard," https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f-7f1c25ee/sheet/33a0f68e-845c-48e2-bc81-8141c6aaf772/state/analysis

[13]  NIH, "Common Terminology Criteria for Adverse Events (CTCAE)," https://ctep.cancer.gov/protocolDevelopment/electronic_applications/ctc.htm

## Our Research Project Team

Our research project was conducted and validated by a team of data scientists, analysts, and engineers, with assistance from our clinical team of board-certified obstetricians and gynecologists. Members have a history of academic research and peer-reviewed publication.

## Conclusion

Our research shows unequivocally that mifepristone abortion, as currently practiced in the U.S., is considerably more dangerous to women than is represented on the FDA-approved drug label. The FDA should immediately reinstate its earlier, stronger patient safety protocols to ensure physician responsibility for women who take mifepristone under their care, as well as mandate full reporting of its side effects. The FDA should further investigate the harm this drug causes to women and, based on objective safety criteria, reconsider its approval altogether. Women deserve better than the abortion pill.

*This paper is the first in a series investigating women's health and abortion using real-world data.*



# EXHIBIT 14

James Studnicki et al.,
*Comparative Acuity of Emergency Department Visits Following Pregnancy Outcomes Among Medicaid Eligible Women, 2004–2015*,
Int'l J. Epidemiology & Pub. Health Rsch.,
Apr. 2024

# ADITUM
*Enrich your Research*

International Journal of Epidemiology and Public Health Research

Research Article 

## Comparative Acuity of Emergency Department Visits Following Pregnancy Outcomes Among Medicaid Eligible Women, 2004-2015

**James Studnicki, Sc.D., M.P.H., M.B.A.[1]\*; John W. Fisher, Ph.D., J.D., M.S., M.A.[1]; Tessa Longbons Cox, B.A.[1]; Ingrid Skop, M.D., FACOG[1]; Donna J. Harrison, M.D.[2]; Christina A. Cirucci, M.D.[1]; David C. Reardon, Ph.D.[3]; Christopher Craver, M.A.[1]**

[1]Charlotte Lozier Institute, 2776 S. Arlington Mill Drive, PO Box 803, Arlington, VA 22206, USA.
[2]American Association of Pro-Life Obstetricians and Gynecologists, 1025 W. Rudisill Blvd. Box 28, Fort Wayne, IN 46807, USA.
[3]Elliot Institute, 1333 College Pkwy, Gulf Breeze, FL 32563, USA.

**Article Info**

**Received:** August 12, 2024
**Accepted:** August 16, 2024
**Published:** August 20, 2024

**\*Corresponding author:** James Studnicki, Charlotte Lozier Institute, 2776 S. Arlington Mill Drive, PO Box 803, Arlington, VA 22206, USA.

**Citation:** James Studnicki, John W. Fisher, Tessa Longbons Cox, Ingrid Skop, Donna J. Harrison, Christina A. Cirucci, David C. Reardon, Christopher Craver. (2024) "Comparative Acuity of Emergency Department Visits Following Pregnancy Outcomes Among Medicaid Eligible Women, 2004-2015". International Journal of Epidemiology and Public Health Research, 5(2); DOI: 10.61148/2836-2810/IJEPHR/075

**Copyright:** © 2024 James Studnicki. This is an open access article distributed under the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

**Abstract:**

**Objectives:** We sought to compare the acuity of emergency department (ED) visits following various pregnancy outcomes.

**Methods:** Cohorts of ED visits by continuously eligible Medicaid women between 2004-2015 were determined by the type of pregnancy outcome and a control group as follows: within 30 days of a chemical (mifepristone) abortion, surgical abortion, or live birth; and at any time for women who were never pregnant. The primary outcome was the percent of ED visits coded as either severe or critical (CPT codes 99284-99285). The study population was extracted from the 17 states where Medicaid pays for abortion services.

**Results:** All cohorts exhibited a pattern of both increasing incidence and acuity of ED visits. For the entire observation period, an ED visit following a chemical abortion was significantly more likely to have a severe or critical acuity rating than a visit following surgical abortion, live birth, or an ED visit at any time by a woman who was never pregnant. With never-pregnant women as a reference cohort, odds ratios (ORs) are as follows: chemical abortion 2.01 [1.93-2.28]; surgical abortion 1.53 [1.43-1.63]; live birth 1.01 [1.00-1.01]. With chemical abortion as the reference cohort, odds ratios (ORs) are: never-pregnant 0.48 [0.44-0.54]; live birth 0.52 [0.49-0.55]; surgical abortion 0.73 [0.68-0.77].

**Conclusion:** Consistent with national trends for ED visits, both the number and acuity of ED visits following pregnancy outcomes are increasing. ED visit acuity following chemical abortion is persistently and significantly higher than for surgical abortion or live birth.

**Keywords:** pregnancy outcomes; induced abortion; emergency department visits; patient acuity

## Introduction

Background: There is consensus that the overall incidence of adverse events and emergency department (ED) complication rates are higher following chemical abortion than surgical abortion (1,2). However, the acuity of ED visits following each type of abortion has been contested.

Importance: Some investigators have suggested that ED visits following abortion, especially chemical abortion, are frequently for observation care only rather than treatment purposes (3). This view, if demonstrated, would support the notion that the risks of chemical abortion are exaggerated by the high incidence of ED utilization. To date, no objective independently derived

*Copy right © James Studnicki*

International Journal For Epidemiology and Public Health Research ©                    Aditum Publishing –www.aditum.org

acuity methodology has been applied to ED visits following pregnancy outcomes.

Goals of This Investigation: We sought to compare the acuity of ED visits within a defined population of women who had undergone abortion or birth.

## Methods

Study Design: Analytic observational prospective cohort
Setting and Selection of Participants: Centers for Medicare and Medicaid Services (CMS) Medicaid Analytic eXtract files for the 17 states which funded abortion services were used to identify emergency department (ED) visits within 30 days following a chemical (mifepristone) abortion, surgical abortion, or live birth between 2004-2015. ED visits following a defined pregnancy outcome were determined for women who were 16 years of age in 1999 and who were enrolled in Medicaid in at least a single month in every calendar year 1999-2015. Observation years of 2004-2015 were selected based upon the availability of ED visits related to chemical abortion which was approved by the Food and Drug Administration (FDA) in 2000. The first chemical abortions (n=15) and related ED visits (n=1) appeared in the data in 2001 and were not of sufficient volume for analysis until 2004. In the first observation year, 2004, there were 1,319 chemical abortions and 198 related ED visits. A 5% sample from a control cohort of Medicaid enrollees with no history of pregnancy was also analyzed.

Exposures: The primary exposure of interest was the type of pregnancy outcome. Live births were identified using ICD-9 codes V27.0, V27.2, and V27.5x and ICD-10 codes Z37.0, Z37.2, and Z37.5x. Induced abortions were identified using ICD-9 codes 635.xx and ICD-10 codes O04.xx; CPT4 codes 59840, 59841, 59850, 59852, 59855, 59856, and 59857; and HCPCS codes S0199, S2260, S2265, S2267, X7724, X7726, S0190 and S0191.
Outcomes: The primary outcome of interest was the percent of ED visits coded as either severe or critical. The acuity determination

uses five Current Procedure Terminology (CPT) codes to stratify ED visits: nonurgent (99281), urgent (99282), moderate (99283), severe (99284) and critical (99285). ED visits were identified using Place of Service code 23. This coding considers the severity of the presenting problem and the complexity of the medical decision making required for treatment. This method is part of the Ambulatory Payment System (APC) of coding by which the federal government prospectively pays hospitals for covered services by considering resource utilization, clinical intensity and cost (4,5).

Data Analysis: We calculated the percentage change in counts of ED visits between 2004-2015. For each cohort, we derived a linear equation to express the trend in the proportion of severe and critical (99284 and 99285) visits to total visits. Coefficients of determination ($R^2$, Microsoft Excel, version 16) and Cochran-Armitage Chi-squared ($X^2$, MedCalc) trend tests were calculated for each cohort. Logistic regression adjusted odds ratios and 95% confidence limits (SAS/STAT, version 10) were calculated with chemical abortion and never-pregnant as reference cohorts.

Ethics Approval: The study has been exempted from Institutional Review Board (IRB) review pursuant to the U.S. Department of Health and Human Services Policy for the Protection of Human Research Subjects at C.F.R. 46.101(b). See IRB ID: 7269, www.sterlingirb.com.

## Results

Between 2004 and 2015, the total number of ED visits across all four cohorts increased from 51,307 to 68,798, or 17,491, which is more than a third (34.1%) larger than the 2004 number. Specific percentage increases in each of the cohorts in total visits were: no pregnancy (42.8%); surgical abortion (280.4%); chemical abortion (2649.7%); and live birth (9.2%). ED visits coded severe or critical (99284-5) increased as follows: no pregnancy (101.0%); surgical abortion (450.6%); chemical abortion (4041.1%); and live birth (20.9%) (Table 1).

| CPT codes | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2004-15 | Δ 2004-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **No Pregnancy** | | | | | | | | | | | | | | |
| 99281-83(%) | 162(61.3) | 167(66.8) | 162(62.3) | 167(53.8) | 203(57.0) | 182(56.1) | 184(51.8) | 240(50.2) | 242(50.5) | 191(48.1) | 205(44.8) | 172(45.6) | 2277(52.8) | 6.2% |
| 99284(%) | 78(29.5) | 59(23.6) | 71(27.3) | 95(30.6) | 107(30.0) | 92(28.3) | 130(36.6) | 172(35.9) | 169(35.2) | 131(33.0) | 149(32.6) | 126(33.4) | 1379(32.7) | 61.5% |
| 99285(%) | 24(09.1) | 24(09.6) | 27(10.3) | 48(15.4) | 46(12.9) | 51(15.6) | 41(11.5) | 66(13.8) | 68(14.1) | 75(18.8) | 103(22.5) | 79(20.9) | 652(14.5) | 229.2% |
| Total | 264 | 250 | 260 | 310 | 356 | 325 | 355 | 478 | 479 | 397 | 457 | 377 | 4,308 | 42.8% |
| 99284+5(%) | 102(38.6) | 83(32.3) | 98(34.7) | 143(36.7) | 153(39.8) | 143(42.3) | 171(46.3) | 238(48.1) | 237(50.2) | 206(52.1) | 252(54.5) | 205(54.0) | 2031(47.2) | 101.0% |
| **Surgical Abortion** | | | | | | | | | | | | | | |
| 99281-83(%) | 1562(56.4) | 2144(51.7) | 2565(51.3) | 2876(47.9) | 3281(47.6) | 3362(42.8) | 3530(40.4) | 3828(38.3) | 3926(34.9) | 3611(31.1) | 3228(32.5) | 3562(33.9) | 37423(39.5) | 137.2% |
| 99284(%) | 1005(36.3) | 1381(33.3) | 1692(33.8) | 2119(35.3) | 2299(33.3) | 3051(38.9) | 3444(39.3) | 3667(36.7) | 4201(37.4) | 4287(36.9) | 3600(36.2) | 3891(37.0) | 34637(36.6) | 287.2% |
| 99285(%) | 259(09.4) | 621(15.0) | 747(14.9) | 1013(16.9) | 1316(19.1) | 1434(18.3) | 1776(20.3) | 2488(24.9) | 3120(27.7) | 3719(32.0) | 3104(31.3) | 3069(29.2) | 22666(23.9) | 1084.9% |
| Total | 2766 | 4146 | 5004 | 6008 | 6896 | 7847 | 8758 | 9983 | 11247 | 11617 | 9932 | 10522 | 94,726 | 280.4% |
| 99284+5(%) | 1264(45.7) | 2002(48.3) | 2439(48.7) | 3132(52.1) | 3615(52.4) | 4485(57.2) | 5220(59.6) | 6155(61.7) | 7321(65.1) | 8006(68.9) | 6704(67.5) | 6960(66.1) | 57303(60.5) | 450.6% |
| **Chemical Abortion** | | | | | | | | | | | | | | |
| 99281-83(%) | 98(49.7) | 164(51.7) | 114(32.5) | 174(38.6) | 307(38.4) | 446(39.8) | 605(35.8) | 899(34.1) | 917(30.6) | 618(27.5) | 511(21.0) | 1317(24.3) | 6210(30.1) | 1243.9% |
| 99284(%) | 70(35.5) | 103(32.5) | 184(52.4) | 200(44.3) | 299(37.4) | 446(39.8) | 722(42.8) | 995(37.8) | 1113(37.1) | 912(40.5) | 1100(45.1) | 2269(41.9) | 8413(40.7) | 3141.4% |
| 99285(%) | 29(14.7) | 50(15.8) | 53(15.1) | 77(17.1) | 194(24.3) | 235(21.0) | 361(21.4) | 740(28.1) | 967(32.3) | 720(32.0) | 784(32.1) | 1831(33.8) | 6041(29.2) | 6213.8% |
| Total | 197 | 317 | 351 | 451 | 800 | 1121 | 1688 | 2634 | 2997 | 2250 | 2441 | 5417 | 20,664 | 2649.7% |
| 99284+5(%) | 99(50.3) | 153(48.3) | 237(67.5) | 277(61.4) | 493(61.6) | 681(60.7) | 1083(64.2) | 1735(65.9) | 2080(69.4) | 1632(72.5) | 1884(77.2) | 4100(75.7) | 14454(69.9) | 4041.4% |
| **Live Birth** | | | | | | | | | | | | | | |
| 99281-83(%) | 23505(48.9) | 26127(47.6) | 25880(45.6) | 26903(44.2) | 29780(43.6) | 31411(42.1) | 31991(41.9) | 34398(42.6) | 35383(41.3) | 33661(41.0) | 29240(44.1) | 22774(43.4) | 351053(43.5) | -3.1% |
| 99284(%) | 16244(33.8) | 18763(34.2) | 20132(35.4) | 21524(35.4) | 24606(36.0) | 27024(36.2) | 28262(37.0) | 29553(36.0) | 22447(33.9) | 17972(34.2) | 286368(35.5) | 10.6% | | |
| 99285(%) | 8331(17.3) | 9966(18.2) | 10792(19.0) | 12388(20.4) | 13969(20.4) | 16246(21.8) | 16036(21.0) | 17258(21.4) | 19595(22.8) | 18913(23.0) | 14573(22.0) | 11736(22.4) | 169803(21.0) | 40.9% |
| Total | 48080 | 54856 | 56804 | 60815 | 68355 | 74681 | 76407 | 83974 | 87090 | 93803 | 100490 | 96391 | 79090 | 52482 | 807224 | 9.2% |
| 99284+5(%) | 24575(51.1) | 28729(52.4) | 30924(54.4) | 33912(55.8) | 38575(56.4) | 43270(57.9) | 44298(58.1) | 46310(57.4) | 50384(58.7) | 48466(59.0) | 37020(55.9) | 29708(56.6) | 456171(56.5) | 20.9% |
| **Grand Total** | 51307 | 59569 | 62419 | 67584 | 76407 | 83974 | 87090 | 93803 | 100490 | 96391 | 79090 | 68798 | 926922 | 34.1% |
| Grand Total 99284+5 (%) | 26040(50.7) | 30967(51.9) | 33698(53.9) | 37464(55.4) | 42836(56.0) | 48579(57.8) | 50772(58.2) | 54438(58.0) | 60022(59.7) | 58310(60.4) | 45860(57.9) | 40973(59.5) | 529959(57.1) | 57.3% |

**Table 1:** ED visit acuity by pregnancy outcome

Copy right © James Studnicki

302

International For Epidemiology and Public Health Research ©

Aditum Publishing –www.aditum.org

The percentage of total visits coded severe or critical (99284-85) increased for all cohorts from 2004-2015: no pregnancy (38.6%-54.0%); surgical abortion (45.7%-66.1%); chemical abortion (50.3%-75.7%); and live birth (51.1%-56.6%). The trends in the proportion of severe and critical visits are all significant ($X^2$, p<.0001) for each cohort: never-pregnant (58.80); surgical abortion (1848.18); chemical abortion (347.88); and live birth (818.02) (Figure 1).



**Figure 1:** Post pregnancy outcome ED visits rated severe or critical, by pregnancy outcome

The logistic multiple regression adjusted odds ratios for the entire observation period (2004-2015) with never-pregnant as the reference cohort are: chemical abortion, OR 2.01 [1.93-2.28]; surgical abortion, OR 1.53 [1.43-1.63]; and live birth, OR 1.01 [1.00-1.01]. The adjusted odds ratios with chemical abortion as the reference cohort are: never-pregnant, OR 0.48 [0.44-0.54]; live birth, OR 0.52 [0.49-0.55]; surgical abortion, OR 0.73 [0.68-0.77].

## Limitations

Findings from a Medicaid population may not be generalizable to populations of a different socioeconomic and demographic composition. The use of administrative claims data has recognized limitations including inconsistent and mistaken coding which may vary from state to state, the exclusion of codes considered unnecessary for billing purposes, and the possible upcoding to maximize revenue (6,7,8). Acuity increases may reflect a pattern of ED use by sicker patients (9). The use of a comprehensive measure of total acuity does not allow for comparison of specific complication rates between cohorts.

## Discussion

This pattern of increasing ED utilization and acuity aligns with previous research (10). Both the volume and acuity of ED visits by Medicaid eligible women following a pregnancy outcome increased between 2004 and 2015. ED visits following chemical abortion had the greatest comparative increase in incidence, likely reflecting the rapidly growing percentage that they represented of all abortions during the observation period (11). Similarly, the growth in the percentage of high acuity ED visits was the largest for the chemical abortion cohort followed by the surgical abortion cohort. Increases in both incidence and acuity were smallest following live birth.

While multiple factors may influence these results, persistently and significantly higher ED visit acuity following chemical abortion is clearly evident. ED visit acuity for either method of abortion is significantly higher than for visits following a live birth. The increasing preference for this method of induced abortion, along with this evidence of the growing acuity of related ED visits, suggests that a greater level of surveillance will enhance patient safety for these patients.

**Financial Support:** Access to the Medicaid data was funded by the Charlotte Lozier Institute

**Conflicts of Interest:** None declared

**Author Contributions:** conceptualization (J.S.); data collection (J.S., J.W.F., C.C.); data analysis (J.S., J.W.F., C.C.); critical review and evaluation of results (all authors); primary authorship of paper (J.S.); review and editing of paper (all authors); study supervision (J.S.); procurement of funding (J.S.).

International Jor Epidemiology and Public Health Research ©    Aditum Publishing –www.aditum.org

## References

1. Niinimäki M, Pouta A, Bloigu A, et al. Immediate complications after medical compared with surgical termination of pregnancy. *Obstet Gynecol*. 2009;114(4):795-804.

2. Upadhyay UD, Desai S, Zlidar V, et al. Incidence of emergency department visits and complications after abortion. *Obstet Gynecol*. 2015;125(1):175-183.

3. Upadhyay UD, Johns NE, Barron R, et al. Abortion-related emergency department visits in the United States: An analysis of a national emergency department sample. *BMC Med*. 2018;16(1):88.

4. Yiadom MYAB, Baugh CW, Barrett TW, et al. Measuring Emergency Department Acuity. *Acad Emerg Med*. 2018;25(1):65-75.

5. Averill RF, Goldfield NI, Wynn ME, et al. Design of a prospective payment patient classification system for ambulatory care. *Health Care Financ Rev*. 1993;15(1):71-100.

6. Research Data Assistance Center (ResDAC). Strengths and Limitations of CMS Administrative Data. March 16, 2021. Accessed March 11, 2024.

7. Hicks J. The Potential of Claims Data to Support the Measurement of Health Care Quality. Dissertation, RAND; 2003

8. Romano PS. Using administrative data to identify associations between implanted medical devices and chronic diseases. *Ann Epidemiol*. 2000;10(4):197-199.

9. Pitts SR. Higher-complexity ED billing codes--sicker patients, more intensive practice, or improper payments? *N Engl J Med*. 2012;367(26):2465-2467.

10. Ruxin T, Feldmeier M, Addo N, Hsia RY. Trends by acuity for emergency department visits and hospital admissions in California, 2012 to 2022. *JAMA Netw Open*. 2023;6(12):e2348053.

11. Jatlaoui TC, Boutot ME, Mandel MG, et al. Abortion Surveillance — United States, 2015. *MMWR Surveill Summ* 2018;67(No. SS-13):1–45.

*Copy right © James Studnicki*

# EXHIBIT 15

*Will a doctor be able to tell if you've
taken abortion pills?*
Women Help Women (Sept. 23, 2019)

# Will a doctor be able to tell if you've taken abortion pills?

Monday, September 23, 2019  blog (/en/blog)                                              ⬆ Share

---

**Can a doctor tell if someone has used abortion pills?**



(/en/page/1094/woman-with-laptop-and-mug)

There are many reasons one might choose to take abortion pills, as opposed to seeking abortion care in a clinical setting. Because 90% of US counties (https://data.guttmacher.org/states/table?state=US&topics=58&dataset=data) lack an abortion clinic, she may be unable to afford the cost of travel, which also may involve taking one or more days off of work (depending on the abortion regulations in her state), finding childcare, lodging, and more. She may prefer to control where and when she takes the pills, and where she experiences cramping, bleeding (https://womenhelp.org/en/page/1045/how-much-and-for-how-long-should-you-bleed-after-taking-misoprostol), and other symptoms. She may not want her abusive partner (https://womenhelp.org/en/page/976/what-reproductive-coercion-has-to-do-with-abortion-access), her parents (https://womenhelp.org/en/page/904/parental-notification-laws-are-toxic-for-young-people-seeking-abortion-care), or anyone in her life to find out about her pregnancy or her abortion. If this is the case, she will likely be anxious that, even once her abortion is complete (https://womenhelp.org/en/page/991/how-do-i-know-if-my-medical-abortion-was-successful), that someone in the future, namely a doctor, will learn that she's had an abortion.

306

*Can* a doctor tell if someone has used abortion pills? The answer is no, if they have been taken orally. (If the pills are inserted into the vagina, a doctor may be able to tell if there are traces remaining.) If one took the mifepristone/misoprostol combination, or misoprostol on its own, and she does seek medical care because of complications (https://consult.womenhelp.org/en/page/416/signs-of-complication), she does not need to tell a health care provider that she took abortion pills. The symptoms of a miscarriage and a medical abortion are the same, and there are no tests that can prove one has had a medical abortion(s). (https://nwhn.org/abortion-pills-vs-miscarriage-demystifying-experience/)

So a doctor can't tell if one has had a medical abortion, and in situations where one fears for her personal safety, or doesn't trust her health care provider with this information, that's a good thing. But if neither of these is the case,  it's important to consider why someone would not want her doctor to know her entire medical history, including abortions. Is she holding back this information out of shame? Does she secretly fear that abortion has endangered her fertility? Abortion doesn't impact future fertility, and doctors who traffic in actual medicine know this, and should make sure their patients know it as well.

Abortion stigma (https://womenhelp.org/en/page/946/abortion-stigma-101-and-how-it-interferes-with-access-to-self-managed-abortion), or ideas and beliefs about abortion that are medically inaccurate and negative, can result in those who take abortion pills not seeking medical care if they need it, taking the pills incorrectly, or getting the pills from sources that aren't safe, since they don't want anyone to know that they're seeking abortion. Health care providers should not in any way contribute to the perpetuation of abortion stigma; in fact, it's their job to ensure that people get accurate information and medical care regardless of their personal beliefs.

To learn more about about abortion pills, how they work, what to expect, and more, check out Women Help Women's FAQs (https://consult.womenhelp.org/en/page/377/questions-and-answers).



(https://consult.womenhelp.org/en/page/3/get-abortion-pills-landing)
get abortion pills

(https://consult.womenhelp.org/get-contraceptives-landing-en)
get contraceptives

(/en/page/359/4-reasons-why-your-donation-really-matters)
donate

(https://consult.womenhelp.org/?language=en)
access
reproductive health services

(/en/information)
information

(/en/blog)
activism

# EXHIBIT 16

*How do you know if you have complications and*
*what should you do?*
Aid Access

← Back to FAQs Complications

# How do you know if you have abortion complications?

If performed in the first 13 weeks, a medical abortion carries a very small risk of complications. This risk is the same as when a woman has a miscarriage.

## What are the possible abortion pill complications and what should you do?

These are the possible complications, their symptoms and treatment:

### Heavy bleeding (occurs in less than 1% of medical abortions)

- **Symptom**: Bleeding that lasts for more than 2 hours and soaks more than 2 maxi sanitary pads per hour. Feeling dizzy or light-headed can be a sign of too much blood loss. This is dangerous to your health and must be treated by a doctor.
- **Treatment**: a vacuum aspiration (curettage.) When available, a woman should start taking 2 Misoprostol under the tongue immediately at home before going to the hospital.  Very rarely (less than 0.2%) a blood transfusion is needed.

### Incomplete abortion

- **Symptoms**: heavy or persistent bleeding and/or persistent severe pain.
- **Treatment**: 2 tablets of Misoprostol or/ and a vacuum aspiration (curettage)

### Infection

- **Symptom**: If you have a fever (more than 100.4 degrees Fahrenheit) for more than 24 hours, or you have a fever of more than 102.2 degrees Fahrenheit, there might be an infection that needs treatment.
- **Treatment**: antibiotics and/or vacuum aspiration.

If you think you might have a complication you should go to a doctor immediately. You do not have to tell the medical staff that you tried to induce an abortion; you can tell them that you had a spontaneous miscarriage. Doctors have the obligation to help in all cases and know how to handle a miscarriage.

# Miscarriage vs abortion symptoms

The symptoms of a miscarriage and an abortion with pills are exactly the same and the doctor will not be able to see or test for any evidence of an abortion, as long as the pills have completely dissolved. If you used the Misoprostol under the tongue as our protocol recommends, the pills should have dissolved within 30 minutes. If you took the pills vaginally, you must check with your finger to make sure that they are dissolved. Traces of the pills may be found in the vagina up to four days after inserting them.

## Ongoing pregnancy

Less than 1% of women experience ongoing pregnancy.[1] This can be determined by a pregnancy test after 3 weeks or an ultrasound within 10 days. If the medical abortion treatment failed, there is a slight increase in the risk of birth defects such as deformities of the hands or feet and problems with the nerves of the fetus. To treat an ongoing pregnancy, you must repeat a medical or surgical abortion.

[1] "Low-dose Mifepristone Regimens are Effective and Safe for Early Abortion." The Guttmacher Institute. https://www.guttmacher.org/journals/ipsrh/2013/07/low-dose-mifepristone-regimens-are-effective-and-safe-early-abortion

# EXHIBIT 17

*Am. Coll. of Obstetricians and Gynecologists Practice Bulletin No. 181: Prevention of Rh D Alloimmunization,*
130 Obstetrics & Gynecology 481 (Aug. 2017)

The American College of
Obstetricians and Gynecologists
WOMEN'S HEALTH CARE PHYSICIANS

# ACOG PRACTICE BULLETIN

## Clinical Management Guidelines for Obstetrician–Gynecologists

NUMBER 181, AUGUST 2017 *(Replaces Practice Bulletin Number 4, May 1999)*

**Committee on Practice Bulletins—Obstetrics.** This Practice Bulletin was developed by the American College of Obstetricians and Gynecologists' Committee on Practice Bulletins—Obstetrics in collaboration with Robert M. Silver, MD.

# Prevention of Rh D Alloimmunization

*Advances in the prevention and treatment of Rh D alloimmunization have been one of the great success stories of modern obstetrics. There is wide variation in prevalence rates of Rh D-negative individuals between regions, for example from 5% in India to 15% in North America (1). However, high birth rates in low prevalence areas means Rh hemolytic disease of the newborn is still an important cause of morbidity and mortality in countries without prophylaxis programs (1). In such countries, 14% of affected fetuses are stillborn and one half of live born infants suffer neonatal death or brain injury (1). The routine use of Rh D immune globulin is responsible for the reduced rate of red cell alloimmunization in more economically developed countries. First introduced in the 1970s, the postpartum administration of Rh D immune globulin reduced the rate of alloimmunization in at-risk pregnancies from approximately 13–16% to approximately 0.5–1.8% (2, 3). The risk was further reduced to 0.14–0.2% with the addition of routine antepartum administration (2, 3). Despite considerable proof of efficacy, there are still a large number of cases of Rh D alloimmunization because of failure to follow established protocols. In addition, there are new data to help guide management, especially with regard to weak D phenotype women. The purpose of this document is to provide evidence-based guidance for the management of patients at risk of Rh D alloimmunization.*

## Background

### Nomenclature

Nomenclature for red blood cell surface proteins is complex and can be confusing. The red cell membrane contains many anchored surface proteins. Many of these proteins are polymorphic and carry different blood groups. A blood group system consists of one or more antigens controlled at a single gene locus, or by two or more closely linked homologous genes with little or no observable recombination between them. Most blood group antigens are glycoproteins, and their specificity is mostly determined either by the oligosaccharide or amino acid sequence. The 30 human blood group system genes have been identified and sequenced, and all the polymorphisms are known (4).

A variety of terminologies has been used to denote human blood groups since their discovery in 1900. In 1980, the International Society of Blood Transfusion established a Working Committee to devise and maintain a genetically-based numerical terminology for red cell surface antigens. The numerical terminology was devised for computer storage of information on blood groups antigens and to provide a framework for genetic classification. The numerical terminology is not suitable for everyday communication, which has led to a variety of alternative names being used for some blood group antigens. In an attempt to introduce some uniformity, a recommended list of alternative names for antigens is available through the International Society of Blood Transfusion (4). In most cases the name or symbol is identical to that originally published, but in a few cases the more commonly used name is provided, as with ABO and Rh. Specific subtypes or polymorphisms use a second designation (eg, Rh D, Rh C, Rh E). This document uses the designation Rh D to signify the erythrocyte antigen. Women who carry the Rh D antigen are identified as Rh D positive. Those who do not carry the Rh D

**Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.**



312

antigen are identified as Rh D negative. Details regarding the nomenclature for partial D or weak D antigens are described as follows (see "How should a weak D blood type be interpreted and what management should be undertaken?"). The frequency of the Rh D-negative phenotype is most common in individuals of European and North American descent (15–17%), is comparatively decreased in the regions of Africa and India (3–8%), and is rarest in Asia (0.1–0.3%) (1, 5). The immune globulin used specifically to bind the Rh D antigen is referred to as Rh D immune globulin or anti-D immune globulin. Alloimmunization refers to an immunologic reaction against foreign antigens that are distinct from antigens on an individual's cells. In this case, it refers to the maternal formation of antibodies against fetal Rh D. Fetal–maternal hemorrhage is the term used to identify varying amounts of fetal cells in the maternal circulation from small interruptions at the fetal–maternal placental interface (6).

### Causes of Rh D Alloimmunization

Rh D alloimmunization occurs when a Rh D-negative woman is exposed to red cells expressing the Rh D antigen. Although the fetal and maternal circulations are separate, there is often some antenatal mixing of fetal and maternal blood, even in asymptomatic women. Events such as miscarriage, ectopic pregnancy, antenatal bleeding, and delivery, as well as procedures such as chorionic villus sampling, amniocentesis, pregnancy-related uterine curettage, and surgical treatment of ectopic pregnancy can lead to maternal exposure to fetal red blood cells and, consequently, Rh D alloimmunization (Box 1). Between 3% and 11% of women with threatened abortion in the first trimester, and approximately 45% giv-

ing birth in the third trimester, have a fetal–maternal hemorrhage (7, 8). The volume of fetal–maternal hemorrhage leading to Rh D alloimmunization can be as small as 0.1 mL or as large as 30 mL (7, 8).

Fetal–maternal hemorrhage also may take place in the first and second trimesters in association with spontaneous pregnancy loss or uterine instrumentation (eg, dilation and curettage or evacuation). The risk of Rh D alloimmunization is estimated to be 1.5–2% in susceptible women after spontaneous miscarriage and 4–5% after dilation and curettage (3, 7). There are insufficient data from studies that evaluated the efficacy of administration of anti-D immune globulin after spontaneous miscarriage and, although alloimmunization appears rare, it is possible and recommendations continue to include administration of anti-D immune globulin after such losses (3, 9, 10). Ectopic pregnancy also may lead to Rh D alloimmunization, although data regarding the probability are lacking. Until further evidence is available, expert advice continues to recommend administration of anti-D immune globulin within 72 hours of suspected breach of the choriodecidual space (9).

Historically, chorionic villus sampling has been estimated to carry a 14% risk of fetal–maternal hemorrhage of 0.6 mL or more (11). Later studies corroborate these earlier findings and continue to support the administration of anti-D immune globulin to Rh D-negative women who have chorionic villus sampling (12, 13). Traditionally, amniocentesis led to a 2–6% rate of fetal–maternal hemorrhage, even if the placenta was not traversed (14, 15). Recent studies suggest the rate of fetal–maternal hemorrhage may be lower than previously thought but not negligible (16, 17) and alloimmunization is possible. Similarly, other invasive procedures such as cordocentesis also can cause fetal–maternal hemorrhage (16) and warrant anti-D immune globulin prophylaxis. Although not invasive, external cephalic version (regardless of success) is associated with a 2–6% risk of fetal–maternal hemorrhage and anti-D immune globulin is indicated for unsensitized Rh D-negative patients (18, 19).

### Anti-D Immune Globulin to Prevent Alloimmunization

Anti-D immune globulin is extracted by cold alcohol fractionation from plasma donated by individuals with high-titer anti-D immune globulin G antibodies. Original work in the 1960s noted maternal sensitization to fetal Rh-positive blood could be prevented by administering anti-D immune globulin. A prophylactic dose of 300 micrograms of anti-D immune globulin can prevent Rh D alloimmunization after exposure to up to 30 mL of Rh D-positive fetal whole blood or 15 mL of fetal red

---

> **Box 1. Potential Sensitizing Events in Rh D-Negative Women in Pregnancy** ⇦
>
> - Chorionic villus sampling, amniocentesis, cordocentesis
> - Threatened miscarriage or miscarriage
> - Ectopic pregnancy
> - Evacuation of molar pregnancy
> - Therapeutic termination of pregnancy
> - Antepartum hemorrhage
> - Abdominal trauma
> - Intrauterine fetal death
> - External cephalic version
> - Delivery

---

**Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.**



blood cells (20). Subsequently anti-D immune globulin became more widely available and a single dose given to susceptible Rh D-negative women within 72 hours of delivery reduced the rate of Rh D alloimmunization by 80–90% (7, 21, 22). However, it became clear that asymptomatic fetal–maternal hemorrhage during the third trimester triggered alloimmunization in 2% of at-risk women before delivery. This rate was shown to be reduced to less than 0.2% with routine antenatal administration of anti-D immune globulin at 28 weeks of gestation (7).

In the United States, a recommendation for the administration of anti-D immune globulin was introduced in the 1970s. The current practice of administering a single antenatal dose of 300 micrograms of anti-D immunoglobulin at 28 weeks of gestation followed by a second dose after birth when newborn Rh D typing has identified the infant as Rh positive, based on recommendations from a conference at McMaster University in 1977, is associated with less than a 0.2% rate of Rh alloimmunization (7, 23). In the United Kingdom, recommendations have differed somewhat from those in the United States in that antenatal Rh D immune globulin using different doses may be given as two injections at 28 weeks of gestation and at 34 weeks of gestation, or as a single administration at 28 weeks of gestation (24, 25). There is no trial comparing the two-dose regimens with a single dose, and no evidence of a difference in efficacy between these regimens (24). However, an observational study from the United Kingdom noted better adherence with the single-dose compared with the two-dose protocol (26). There is also potential cost reduction with a single dose (27). Thus, there are no compelling data indicating a change from the single-dose procedure currently used in the United States to the two-dose regimen.

Although administration of anti-D immune globulin at 28 weeks of gestation is highly effective, pharmacokinetic studies suggest that levels of anti-D vary between patients and some may not have adequate anti-D levels at delivery (28). In the past, some authorities advised giving a second dose of Rh D immune globulin in women who have not given birth 12 weeks after receiving their antenatal dose (29). However, the vast majority of women who give birth more than 12 weeks after receiving antenatal Rh D immune globulin do not become alloimmunized. Because of this low risk of alloimmunization and the fact that 40% of infants of Rh D-negative women will be Rh D negative, most guidelines do not recommend that a second dose of anti-D immune globulin be given until after delivery when newborn Rh D typing becomes available. Additional anti-D immune globulin is needed to prevent

alloimmunization for exposures larger than 30 mL of Rh D-positive fetal whole blood. Rarely, in 2–3 per 1,000 deliveries, a fetal–maternal hemorrhage may be greater than 30 mL (6, 7). For this reason, Rh D-negative women who give birth to Rh D-positive infants should undergo additional testing to assess the volume of fetal–maternal hemorrhage and guide the amount of Rh D immune globulin required to prevent alloimmunization (5, 25, 30, 31). It is advised that all women undergo such screening after delivery because a policy of only screening deliveries with high-risk conditions for excess fetal–maternal hemorrhage, such as abruptio placentae or manual removal of the placenta, will fail to identify a large number of cases requiring more than the standard postpartum dose of Rh D immune globulin (32).

Screening for fetal–maternal hemorrhage in routine situations typically begins with the rosette fetal red blood cell assay. The erythrocyte rosette screen is a sensitive, qualitative test that can detect greater than 2 mL of fetal whole blood in the maternal circulation (32). The rosette test is performed by incubation of a maternal blood sample with Rh immunoglobulin that will bind fetal Rh D-positive red blood cells, followed by the addition of enzyme-treated reagent indicator red blood cells. Rh D-positive fetal red blood cells present in maternal circulation result in forming aggregates (rosettes) that can be visualized by light microscopy. A positive rosette test should be followed with a method to determine the percentage of fetal red blood cells in maternal circulation, such as the Kleihauer–Betke test or flow cytometry. The Kleihauer–Betke acid elution test relies on the principle that fetal red blood cells contain mostly fetal hemoglobin F, which is resistant to acid elution, whereas adult hemoglobin is acid sensitive. Although the Kleihauer–Betke test is inexpensive and requires no special equipment, it lacks standardization and precision, and may not be accurate in conditions in which the mother has a coexistent medical condition that is associated with red blood cells containing an increased percentage of hemoglobin F, such as sickle-cell disease and the thalassemias. Flow cytometry is a specialized technique that is an alternative method available in some hospitals for quantification of fetal–maternal hemorrhage, although its use is limited by equipment and staffing costs. Flow cytometry uses monoclonal antibodies to hemoglobin F or the Rh D antigen with quantification of fluorescence, and is highly sensitive and accurate in identifying fetal red blood cells in maternal blood (32). In clinical situations in which fetal–maternal hemorrhage has occurred in a volume that is not covered by the standard 300 microgram dose of Rh immune globulin (greater than 30 mL of fetal whole blood or 15 mL of fetal red cells) additional vials of Rh immune globulin can be administered at one

Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



314

time (up to eight full vials). These additional doses can be administered intramuscularly at separate sites every 12 hours until the desired dosage has been reached (33, 34). An intravenous Rh immune globulin is available that also may be used in these cases and provides more comfort for the patient (34).

Because Rh D immune globulin is obtained from human plasma, there is a theoretical risk of transmission of viral infection. In the 1990s, it was discovered that immune globulin contaminated with hepatitis C virus had been administered to women from 1977 to 1979 in Ireland and Germany (35). Most of these exposed women showed only slight to moderate hepatic inflammation 17–35 years later (35, 36). A later analysis of samples manufactured between 1991 and 1994 again demonstrated a low potential for transmission of the hepatitis C virus, with 0.59% of potential exposures showing evidence of seroconversion (37). Regardless, because the product is a purified immune globulin, the risk of viral infection from anti-D immune globulin is exceedingly low. Since 1985, all plasma used for the production of anti-D immune globulin has been tested for viral infections, and several fractionation and purification steps, including micropore filtration, are used to remove and inactivate viruses. Other contaminations and inadvertent exposures have not been reported, and anti-D immune globulin has been manufactured without mercury-containing thimerosal since 2001 (38).

### Failure to Prevent Rh D Alloimmunization

Rh alloimmunization during pregnancy in Rh D-negative women may still occur. This might be because of a failure of administering antenatal prophylaxis in the third trimester of pregnancy, insufficient dosage or timely administration (within 72 hours) of anti-D immune globulin given after a known sensitizing event during pregnancy (or after birth), or an unrecognized fetal–maternal hemorrhage at some point in the pregnancy (39). In spite of recommendations for immunoprophylaxis, approximately 0.1–0.4% of women at risk become sensitized during pregnancy (22). A recent retrospective study from New Zealand identified reasons for continued cases of sensitization, including omission of immune globulin after a recognized sensitizing event in 41% of cases and administration outside of recommended guidelines in 13% of cases (40). An additional reason for Rh D alloimmunization is the small rate (0.1–0.2%) of spontaneous immunization despite adherence to the recommended prophylaxis protocol (22). These cases most often occur in pregnancies during which there have been no prior overt sensitizing events. In other words, prophylaxis is not 100% effective (41).

### Potential Shortage of Anti-D Immune Globulin

Anti-D immune globulin is collected by apheresis from volunteer donors who have high titers of circulating anti-Rh D antibodies. The donated plasma is pooled and fractionated by commercial manufacturers, and anti-D immune globulin is prepared in varying doses. In the 1990s, concerns were raised regarding future supplies of anti-D immune globulin for worldwide demands because the number of potential donors may dwindle (42). At that time, experts in the United Kingdom estimated that supplies of anti-D immune globulin would be inadequate for immunoprophylaxis of all susceptible Rh D-negative women if standard recommendations were followed (43). In Australia in 1995, a shortage prompted importation of anti-D immune globulin. Subsequently, some physicians proposed strictly limiting the dose given for first-trimester indications and discontinuing administration of anti-D immune globulin after external cephalic version (unless fetal–maternal hemorrhage is documented), ectopic pregnancy, or threatened miscarriage (44). Others disagreed, considering it unethical to withhold anti-D immune globulin in any situation. Estimates regarding future needs compared with potential supply in the United States have not been published. No reports of supply shortages of anti-D immune globulin have been published since initial concerns were expressed 20 years ago. Despite these earlier concerns, national guidelines from the United States, United Kingdom, and Canada still recommend routine administration of anti-D immune globulin to all Rh D-negative nonsensitized women in the third trimester, within 72 hours of delivery in women giving birth to a Rh-positive infant, or when a sensitizing event occurs (eg, ectopic pregnancy, external cephalic version, or invasive obstetric procedures such as chorionic villus sampling or amniocentesis) (5, 25, 31).

Other sources of anti-D immune globulin have been explored. There is the potential to generate recombinant Rh D immune globulin, which would alleviate any future shortages of donors. No commercially available, efficacious recombinant products are currently available. Nonetheless, a monoclonal antibody (Roledumab) and a recombinant antibody mixture (Rozrolimupab) are being designed for prevention of hemolytic disease of the newborn and are in phase II clinical trials (45, 46).

### Cost Effectiveness of Rh D Prophylaxis Programs

The cost effectiveness of different screening strategies to guide the administration of Rh D immune globulin to Rh D-negative pregnant women in circumstances where fetal–maternal hemorrhage may occur have been mixed.

Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



Strategies of selective administration of Rh D immune globulin depending on partner's blood type have been shown to be cost equivalent to systematic prophylaxis (47, 48). If the Rh type of the partner is not known, and given that immunological typing of the father would probably not be carried out by most clinicians, routine antenatal prophylaxis remains the preferred option (48). Although initial economic analysis of antenatal anti-D immune globulin prophylaxis suggested that it was only cost effective in primigravid women (27, 47), more recent data indicate that prophylactic administration to all women at risk is cost beneficial (48).

Noninvasive determination of fetal Rh status is now possible through the analysis of cell-free DNA in maternal plasma. Up to 40% of Rh D-negative pregnant women will carry an Rh D-negative fetus. In this clinical situation, antenatal anti-D immune globulin administration is unnecessary. Concerns have been raised about the unwarranted exposure of these pregnant women to a plasma-based product (49). Some parts of the world now are using circulating cell-free DNA testing to ascertain the fetal Rh D status and to establish candidates for antenatal anti-D immune globulin prophylaxis (50). Recent retrospective and prospective observational studies have reported that fetal Rh D status determination in the first trimester has a sensitivity greater than 99% and a specificity of greater than 95% (51–53). However, concerns have been noted because of the rate of inconclusive results (range 2–6%), which are influenced by race (52, 53).

Despite the improved accuracy of noninvasive fetal RHD genotyping, cost comparisons with current routine prophylaxis of anti-D immunoglobulin at 28 weeks of gestation have not shown a consistent benefit. Four cost analyses from North America and Europe have shown no economic benefit at current test-cost levels (48, 54–56), whereas a single report from Canada suggested it would be cost effective, although the estimated cost of performing the cell-free DNA was based on a low-cost, high-throughput method (57). As the cost of this technology diminishes, this may become an attractive and cost-effective strategy. However, at current costs, noninvasive assessment of fetal Rh D status is not recommended for routine use at present.

# Clinical Considerations and Recommendations

### ▶ Is anti-D immune globulin indicated in a sensitized pregnancy?

All pregnant women should be tested at the time of the first prenatal visit for ABO blood group and Rh D type and screened for the presence of erythrocyte antibodies.

If anti-D antibody is identified, further history should be obtained and investigation undertaken to determine whether this is immune mediated or passive (as a result of previous injection of anti-D immune globulin). If it is clear that the origin of the anti-D antibodies detected is a previous routine antenatal anti-D immune globulin prophylaxis or anti-D immune globulin given for a potentially sensitizing event, then the woman should continue to be offered anti-D prophylaxis (25). If Rh D antibodies are present because of sensitization, anti-D immune globulin is not beneficial, and management should proceed in accordance with protocols for Rh D-alloimmunized pregnancies (58).

### ▶ How should one deal with the issue of paternity?

Reliable rates of nonpaternity are difficult to ascertain but a recent review indicates that the mean rate among population studies is approximately 3% (59). Strategies of selective administration of Rh D immune globulin depending on the partner's blood type have been shown to be cost equivalent to systematic prophylaxis (47, 48). If paternity is certain and the father is known to be Rh D negative, antenatal prophylaxis is unnecessary. If the Rh type of the partner is not known, and given that immunological typing of the father would probably not be carried out by most clinicians, routine antenatal prophylaxis remains the preferred option (48). An alternative strategy is to assess fetal RHD genotype with noninvasive testing and only administer Rh D immune globulin if the fetus is Rh D positive. Despite the improved accuracies noted with noninvasive fetal RHD genotyping, cost comparisons with current routine prophylaxis of anti-D immunoglobulin at 28 weeks of gestation have not shown a consistent benefit and, thus, this test is not routinely recommended (48, 54–56).

### ▶ How should a weak D blood type be interpreted, and what management should be undertaken?

In the past, a woman whose blood was typed as weak D (formerly known as Du) was thought to have blood cells positive for a variant of the Rh D antigen (60). The prevalence of serologic weak D phenotypes varies by race and ethnicity. Serologic weak D phenotypes are the most common D variants detected in Europe and the United States. An estimated 0.2–1.0% of Caucasians inherit RHD genes that code for serologic weak D phenotypes and, in the United States, 80% are associated with weak D type 1, 2, or 3 (60). Some of these individuals express reduced numbers of normal Rh D antigens whereas others express partial or abnormal Rh D antigens. It

Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



316

is possible for the latter group to develop antibodies against the part of the Rh D antigen that they are missing, and several cases of clinically severe Rh D alloimmunization have been reported in weak D phenotype women (60). Accordingly, the American Association of Blood Banks (AABB) recommends that testing for weak D is unnecessary in individuals who will be transfusion recipients of red blood cells (5). This approach categorizes individuals with weak D as Rh D negative for transfusion, and if pregnant, they are considered a candidate for anti-D immune globulin, hence avoiding potential Rh D alloimmunization.

However, the AABB requires that blood donors be assessed for weak D and if detected, the donors are interpreted to be Rh D positive. This policy prevents the transfusion of Rh D-negative individuals with weak D-positive blood, avoiding cases of Rh D alloimmunization. These seemingly contradictory policies likely have helped to avoid potential cases of Rh D alloimmunization. However, it can be extremely confusing for patients and clinicians. For example, the same individual may be variably characterized as Rh D positive or Rh D negative depending upon whether they are a potential donor or recipient and if weak D is or is not assessed (60). This could easily lead to errors and potential cases of Rh D alloimmunization.

An attractive solution to this problem is to perform molecular genetic RHD typing in weak D phenotype individuals as suggested by the Work Group on RHD Genotyping (60). This would allow for consistency in Rh D typing for individuals during their lifetime. In addition, the administration of Rh D immune globulin could be avoided in the Rh D individual with serologic weak D type 1, 2, or 3, because these are not associated with risk of Rh D alloimmunization, which could potentially reduce the need for tens of thousands of units of Rh D immune globulin each year (60). Currently, there is a lack of comprehensive cost-benefit analysis for this clinical approach. Clinicians are advised to administer Rh D immune globulin to patients with weak D blood type in appropriate clinical situations, by the same rationale as that for Rh D typing blood donors, until further scientific and economic studies are available.

#### ▶ Is threatened pregnancy loss an indication for anti-D immune globulin prophylaxis?

Whether to administer anti-D immune globulin to a patient with threatened pregnancy loss and a live embryo or fetus at or before 12 weeks of gestation is controversial, and no evidence-based recommendation can be made. The Rh D antigen has been reported on fetal erythrocytes as early as 38 days from fertilization or 7 3/7 weeks of estimated gestational age (61), and fetal–maternal hemorrhage, although rare, has been documented in 3–11% of women with threatened pregnancy loss from 7 weeks to 13 weeks of gestation (7, 8).

Recommendations regarding anti-D immune globulin with threatened miscarriage have been inconsistent. Several national guidelines recommend against giving anti-D immune globulin to women with threatened pregnancy loss, particularly if bleeding stops before 12 weeks of gestation (25, 30, 62). Other guidelines recommend that anti-D immune globulin should be given (as described below) to all Rh D-negative women with a threatened miscarriage or when vaginal bleeding is heavy, repeated, or associated with abdominal pain, particularly if these events occur as gestational age approaches 12 weeks (25, 31). Because of insufficient evidence that a threatened pregnancy loss before 12 weeks of gestation requires anti-D immune globulin, no recommendation can be made at this time.

#### ▶ Should anti-D immune globulin be given in cases of molar pregnancy?

Although alloimmunization has been reported with hydatidiform mole (63), the risk is unknown. In theory, Rh D alloimmunization should not occur in cases of classic complete molar pregnancy because organogenesis does not occur, and Rh D antigens are probably not present on trophoblast cells, although this theory has been disputed (64–66). In partial and transitional molar pregnancies, however, the embryonic development may cease after erythrocyte production has begun, making maternal exposure to the Rh D antigen possible (67). Given that the diagnosis of partial versus complete molar pregnancy depends on pathologic and cytogenetic evaluations, it is reasonable to administer anti-D immune globulin to Rh D-negative women who are suspected of molar pregnancy and who undergo uterine evacuation (25, 31).

#### ▶ How much anti-D immune globulin should be given for first- or second-trimester events (eg, spontaneous abortion, therapeutic abortion, ectopic pregnancy) and invasive obstetric procedures (eg, chorionic villus sampling, amniocentesis)?

Although the optimal dose of anti-D immune globulin for potentially sensitizing events in the first and second trimesters is unknown, because of the smaller fetal red cell mass at these gestations, the recommended dosage is typically less than that used for routine antenatal prophylaxis in the third trimester. At 12 weeks of gestation, the

Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



317

total fetal–placental blood volume is 3 mL or 1.5 mL of fetal red cells (44). Regardless, this volume is adequate to sensitize some patients, and the risk of Rh D alloimmunization is estimated to be 1.5–2% in susceptible women after spontaneous miscarriage and 4–5% after dilation and curettage (3).

There are no adequate data to support an evidence-based recommendation, and expert opinion varies on whether anti-D immune globulin should be given with a spontaneous abortion. Because of the small volume of fetal blood and the low incidence of alloimmunization, some groups do not recommend prophylactic anti-D immunoglobulin in cases of spontaneous complete miscarriage before 12 weeks of gestation when the uterus is not instrumented (25, 62). Other experts recommend that either 50 micrograms or 120 micrograms of anti-D immune globulin be given after a complete miscarriage during the first 12 weeks of gestation (30, 31). Although the risk of alloimmunization is low, the consequences can be significant, and administration of Rh D immune globulin should be considered in cases of spontaneous first-trimester miscarriage, especially those that are later in the first trimester. If given, a dose of at least 50 micrograms should be administered. Because of the higher risk of alloimmunization, Rh D-negative women who have instrumentation for their miscarriage should receive Rh D immune globulin prophylaxis. Patients who have a miscarriage after 12 weeks of gestation should receive 300 micrograms of Rh D immune globulin.

Rh D immune globulin should be given to Rh D-negative women who have pregnancy termination, either medical or surgical. Most consensus guidelines have recommended 50 micrograms or 120 micrograms of anti-D immune globulin up to 12 weeks of gestation (25, 30, 31, 62), and a dose of 300 micrograms after 12 weeks of gestation (31).

Alloimmunization has been reported to occur in 24% of women with a ruptured tubal pregnancy (68). Again, guidelines differ with regard to the recommended dose of anti-D immune globulin up to 12 weeks of gestation, ranging from 50 micrograms to 120 micrograms (25, 30, 31, 62). After 12 weeks of gestation, 300 micrograms Rh D immune globulin is recommended (31). One expert group differentiates whether anti-D immune globulin should be administered depending upon the treatment method used for the unruptured ectopic pregnancy. Without clear evidence to support the distinction, they do not recommend anti-D immune globulin for women who solely receive medical management, but a dose of 50 micrograms is recommended in women who have a surgical procedure to manage an ectopic pregnancy (62). This notwithstanding, until additional data are available, administration of Rh D immune globulin for all cases of ectopic pregnancy in Rh D-negative women is recommended.

Administration of Rh D immune globulin is recommended with all invasive diagnostic procedures, such as chorionic villus sampling or amniocentesis, in Rh D-negative women when the fetuses could be Rh D positive. Doses from 50 micrograms to 120 micrograms have been recommended before 12 weeks of gestational age (25, 30, 31). For chorionic villus sampling and amniocentesis performed after 12 weeks of gestation, 125 micrograms or 300 micrograms is recommended (30, 31).

▶ **Is second- or third-trimester antenatal hemorrhage an indication for anti-D immune globulin prophylaxis?**

In patients with antenatal hemorrhage after 20 weeks of gestation, the risk of Rh D alloimmunization is uncertain. However, consensus guidelines recommend that susceptible women with bleeding receive anti-D prophylaxis (25, 30, 31). Anti-D immune globulin is recommended for Rh D-negative women who experience antenatal hemorrhage after 20 weeks of gestation. Management of the patient with persistent or intermittent antenatal bleeding is complex. The most conservative approach may be to assess the volume of fetal–maternal hemorrhage with a quantitative test (such as the Kleihauer–Betke test). The appropriate amount of Rh D immune globulin then can be administered to cover the estimated volume of fetal–maternal hemorrhage. In cases of chronic or episodic bleeding this approach may need to be repeated. An intuitive but unproven strategy is to monitor the Rh D-negative patient with continuing antenatal hemorrhage with serial indirect Coombs testing for anti-D approximately every 3 weeks. If the result is positive, indicating the persistence of anti-D immune globulin, then theoretically no additional treatment with anti-D immune globulin is necessary. If the Coombs test result is negative, excessive fetal–maternal hemorrhage may have occurred, and a Kleihauer–Betke test should be performed in order to determine the amount of additional anti-D immune globulin necessary. However, the most conservative approach is to administer additional Rh D immune globulin as needed based on the quantity of fetal–maternal hemorrhage with some authorities recommending an estimation of fetal–maternal hemorrhage be carried out at 2-week intervals (25). Finally, it has been proposed in this clinical situation to use cell-free DNA testing to ascertain the fetal Rh D status and, thus, avoid repeated administration of doses of anti-D immune globulin with an Rh D-negative fetus (25).

Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



318

▶ *Is it necessary to repeat antibody screening in patients at 28 weeks of gestation before the administration of anti-D immune globulin?*

Current U.S. Preventive Services Task Force guidelines recommend repeated Rh D antibody testing for all unsensitized Rh D-negative women at 24–28 weeks of gestation, unless the biological father is known to be Rh D negative (grade B recommendation) (69). Consensus guidelines from around the world recommend that a routine antenatal antibody screen should be obtained at 28 weeks of gestation before administration of anti-D immune globulin (25, 30, 31). The primary rationale for repeating the antibody screen is to identify women who have become alloimmunized before 28 weeks of gestation in order to manage their pregnancies properly. The cost effectiveness of routinely repeating the antibody screen has been questioned because of the low incidence of Rh D alloimmunization occurring before 28 weeks of gestation (70). Regardless, routine antibody screening before anti-D immune globulin administration is advised.

▶ *How long does the effect of anti-D immune globulin last?*

The median half-life of anti-D immune globulin is 23 days in the third trimester (28). If delivery occurs within 3 weeks of the standard antenatal anti-D immune globulin administration, the postnatal dose may be withheld in the absence of excessive fetal–maternal hemorrhage (29). The same is true when anti-D immune globulin is given for antenatal procedures, such as external cephalic version or amniocentesis, or for third-trimester bleeding. An excessive number of fetal erythrocytes not covered by anti-D immune globulin administration can be assumed to have entered maternal blood if the results of a Kleihauer–Betke test are positive, and an appropriate dose of Rh-immune globulin should be administered.

▶ *When should routine antenatal anti-D prophylaxis be given during pregnancy to prevent alloimmunization?*

Studies comparing the routine antenatal administration of anti-D immune globulin to historic controls have shown significant reductions in the incidence of maternal sensitization to the Rh D antigen. Women originally were offered targeted anti-D immunoglobulin with the aim of preventing sensitization after the birth of a Rh-positive infant and after other potentially sensitizing events such as miscarriage, termination of pregnancy, or invasive obstetric procedures. With this approach, the incidence of hemolytic disease of the newborn was substantially reduced (7). In a meta-analysis of six trials with more than 10,000 women that compared postpartum anti-D immune globulin prophylaxis within 72 hours of birth with no treatment or placebo, anti-D immune globulin greatly lowered the incidence of Rh D alloimmunization 6 months after birth (risk ratio [RR], 0.04; 95% CI, 0.02–0.06), and in a subsequent pregnancy (RR, 0.12; 95% CI, 0.07–0.23) (71). However, because of concerns of alloimmunization occurring before delivery, experts advocated for prophylactic antenatal anti-D immune globulin to be given in the third trimester (7). Several clinical trials have been conducted; however, the studies have been criticized for being of poor quality and varying substantially in study design with many of the studies using historical rather than concurrent controls (72). In a meta-analysis of two randomized controlled trials of 3,902 Rh D-negative women that compared anti-D immune globulin at 28 weeks and 34 weeks of gestation with no antenatal treatment (but all women who delivered a Rh-positive infant received postpartum anti-D immune globulin), there was no clear difference in the incidence of Rh D alloimmunization during pregnancy, after the birth of a Rh-positive infant, or within 12 months after the birth of a Rh-positive infant. No outcome information was available on the incidence of Rh D alloimmunization in a subsequent pregnancy (22). However, methods for performing bias-adjusted meta-analysis, which enables adjustment for differences in quality and design and, thus, allows all available evidence to be synthesized, are available. A meta-regression using these techniques was performed to estimate the association between the observed effectiveness of different anti-D dose regimens (73). In a bias-adjusted meta-analysis of 10 studies, the pooled odds ratio for a reduction of sensitization was estimated as 0.31 (95% CI, 0.17–0.56). The authors interpreted this result as providing strong evidence for the effectiveness of routine antenatal anti-D immune globulin prophylaxis in preventing sensitization of pregnant Rh D-negative women. Prophylactic anti-D immune globulin should be offered to unsensitized Rh D-negative women at 28 weeks of gestation. Following birth, if the infant is confirmed to be Rh D positive, all Rh D-negative women who are not known to be sensitized should receive anti-D immune globulin within 72 hours of delivery.

▶ *Is anti-D immune globulin prophylaxis indicated after abdominal trauma in susceptible pregnant women?*

Although the exact risk of Rh D alloimmunization is unknown, abdominal trauma is sometimes associated

Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



with fetal–maternal hemorrhage, which may lead to alloimmunization (74). The efficacy of anti-D immune globulin in this clinical situation has not been tested in properly designed trials. However, authorities agree that anti-D immune globulin should be administered to Rh D-negative women who have experienced abdominal trauma (25, 30, 74). In Rh D-negative pregnant patients who have experienced abdominal trauma, quantification of fetal–maternal hemorrhage should be done to determine the need for additional doses of anti-D immune globulin (74).

▶ **Should anti-D immune globulin be given in cases of intrauterine fetal death occurring in the second or third trimester?**

Fetal death occurs in fetal–maternal hemorrhage in up to 13% of cases in which no obvious other cause (eg, hypertensive disease, fetal anomalies) is found (75–77). Rh D alloimmunization has been reported in cases of fetal death from massive fetal–maternal hemorrhage (78), although the contribution of this cause to the overall problem of Rh D alloimmunization is unknown. The efficacy of anti-D immune globulin in this clinical situation has not been tested in properly designed trials. However, because the benefits are thought to outweigh the risk, anti-D immune globulin should be administered to Rh D-negative women who experience fetal death in the second or third trimester. All such cases should be screened for excessive fetal–maternal hemorrhage at the time of diagnosis of fetal death to determine if additional anti-D immune globulin is required (25).

▶ **Should administration of anti-D immune globulin be repeated in patients with a pregnancy greater than 40 weeks of gestation?**

Anti-D immune globulin appears to persist for approximately 12 weeks in most patients, based on pharmacokinetic studies using modern assay methods (28). In the past, some authorities advised giving a second dose of Rh D immune globulin to women who have not given birth 12 weeks after receiving their antenatal dose (29). However, the vast majority of women who give birth more than 12 weeks after receiving antenatal Rh D immune globulin do not become alloimmunized. There is insufficient evidence at this time to make a recommendation for or against administering another dose of anti-D immune globulin to a Rh D-negative woman who remains undelivered at 40 weeks of gestation. Current consensus guidelines either have no recommendation (25, 30) or state that a repeat antepartum dose of anti-D immune globulin is generally not required at 40 weeks

of gestation, provided the routine antenatal prophylaxis was given no earlier than 28 weeks of gestation (31).

▶ **Should all Rh D-negative women be screened for excessive fetal–maternal hemorrhage after delivery of a Rh D-positive infant?**

The risk of excessive fetal–maternal hemorrhage exceeding 30 mL of Rh D-positive fetal whole blood (the amount covered by the standard 300-microgram dose of anti-D immune globulin) at the time of delivery is approximately 2 to 3 per 1,000 (6, 7). Screening only pregnancies designated as high risk of excessive fetal–maternal hemorrhage, including cases of abruptio placentae, placenta previa, intrauterine manipulation, or fetal death detects only 50% of patients who require additional anti-D immune globulin (79). For this reason, it is recommended that all Rh D-negative women giving birth to Rh D-positive infants undergo additional testing initially with a qualitative screening test (such as the rosette assay) and, if indicated, quantitative testing (such as the Kleihauer–Betke test) to determine the number of doses of Rh D immune globulin required (5, 25, 30, 31).

▶ **Should anti-D immune globulin be withheld from a woman undergoing postpartum sterilization?**

Although a primary reason to prevent alloimmunization is to reduce risk in future pregnancies, there are other indications as well. Pregnancies occur despite sterilization procedures, and most are intrauterine. In addition, alloimmunization complicates crossmatching of blood products in the future (80). Thus, Rh D-negative women who are undergoing postpartum tubal sterilization are candidates for treatment with anti-D immune globulin. The downside of this approach is the low cost effectiveness of the strategy because of the low probabilities of sensitization with the just-completed pregnancy, of sterilization failure, and of a need to receive Rh D incompatible blood in the future (81). If an Rh D-negative woman who has had a sterilization procedure does become pregnant later, even with a miscarriage or ectopic pregnancy, she should be offered anti-D immune globulin in a similar manner as women without sterilization.

▶ **What should be done if an Rh D-negative patient is discharged without receiving anti-D immune globulin after a potentially sensitizing event?**

The ideal time to administer anti-D immune globulin is within 72 hours of a potentially sensitizing event.

Copyright © by The American College of Obstetrics and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



However, volunteers have received a range of partial to complete protection when anti-D immune globulin was given as late as 13 days after exposure (82). The longer prophylaxis is delayed the less it will be protective, but it has been suggested that a patient may still receive some benefit from anti-D immune globulin as late as 28 days postpartum (29, 31).

# Summary of Recommendations and Conclusions

*The following recommendations are based on good and consistent scientific evidence (Level A):*

▸ Prophylactic anti-D immune globulin should be offered to unsensitized Rh D-negative women at 28 weeks of gestation. Following birth, if the infant is confirmed to be Rh D positive, all Rh D-negative women who are not known to be sensitized should receive anti-D immune globulin within 72 hours of delivery.

*The following recommendations are based on limited or inconsistent scientific evidence (Level B):*

▸ Administration of Rh D immune globulin is recommended with all invasive diagnostic procedures such as chorionic villus sampling or amniocentesis in Rh D-negative women when the fetuses could be Rh D positive.

*The following recommendations are based primarily on consensus and expert opinion (Level C):*

▸ External cephalic version (regardless of success) is associated with a 2–6% risk of fetal–maternal hemorrhage, and anti-D immune globulin is indicated for unsensitized Rh D-negative patient.

▸ It is reasonable to administer anti-D immune globulin to Rh D-negative women who are suspected of molar pregnancy and who undergo uterine evacuation.

▸ Although the risk of alloimmunization is low, the consequences can be significant, and administration of Rh D immune globulin should be considered in cases of spontaneous first-trimester miscarriage, especially those that are later in the first trimester.

▸ Because of the higher risk of alloimmunization, Rh D-negative women who have instrumentation for

their miscarriage should receive Rh D immune globulin prophylaxis.

▸ Rh D immune globulin should be given to Rh D-negative women who have pregnancy termination, either medical or surgical.

▸ Administration of Rh D immune globulin for all cases of ectopic pregnancy in Rh D-negative women is recommended.

▸ Anti-D immune globulin is recommended for Rh D-negative women who experience antenatal hemorrhage after 20 weeks of gestation.

▸ Anti-D immune globulin should be administered to Rh D-negative women who have experienced abdominal trauma.

▸ Anti-D immune globulin should be administered to Rh D-negative women who experience fetal death in the second or third trimester.

# References

1. Zipursky A, Paul VK. The global burden of Rh disease. Arch Dis Child Fetal Neonatal Ed 2011;96:F84–5. (Level III) ⇔

2. de Haas M, Finning K, Massey E, Roberts DJ. Anti-D prophylaxis: past, present and future. Transfus Med 2014;24:1–7. (Level III) ⇔

3. Bowman J. Thirty-five years of Rh prophylaxis. Transfusion 2003;43:1661–6. (Level III) ⇔

4. International Society of Blood Transfusion. Available at: http://www.isbtweb.org. (Level III) ⇔

5. Fung MK, Grossman BJ, Hillyer CD, Westhoff CM, editors. Technical manual. 18th ed. Bethesda (MD): American Association of Blood Banks; 2014. (Level III) ⇔

6. Sebring ES, Polesky HF. Fetomaternal hemorrhage: incidence, risk factors, time of occurrence, and clinical effects. Transfusion 1990;30:344–57. (Level III) ⇔

7. Bowman JM. The prevention of Rh immunization. Transfus Med Rev 1988;2:129–50. (Level III) ⇔

8. Von Stein GA, Munsick RA, Stiver K, Ryder K. Fetomaternal hemorrhage in threatened abortion. Obstet Gynecol 1992;79:383–6. (Level II-2) ⇔

9. Karanth L, Jaafar SH, Kanagasabai S, Nair NS, Barua A. Anti-D administration after spontaneous miscarriage for preventing Rhesus alloimmunisation. Cochrane Database of Systematic Reviews 2013, Issue 3. Art. No.: CD009617. (Systematic Review) ⇔

10. Howard HL, Martlew VJ, McFadyen IR, Clarke CA. Preventing Rhesus D haemolytic disease of the newborn by giving anti-D immunoglobulin: are the guidelines being adequately followed? Br J Obstet Gynaecol 1997;104:37–41. (Level II-3) ⇔

11. Blakemore KJ, Baumgarten A, Schoenfeld-Dimaio M, Hobbins JC, Mason EA, Mahoney MJ. Rise in maternal

Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



serum alpha-fetoprotein concentration after chorionic villus sampling and the possibility of isoimmunization. Am J Obstet Gynecol 1986;155:988–93. (Level III) ⇐

12. Katiyar R, Kriplani A, Agarwal N, Bhatla N, Kabra M. Detection of fetomaternal hemorrhage following chorionic villus sampling by Kleihauer Betke test and rise in maternal serum alpha feto protein. Prenat Diagn 2007;27:139–42. (Level III) ⇐

13. Pelikan DM, Kanhai HH, De Groot-Swings GM, Mesker WE, Tanke HJ, Scherjon SA. Fetomaternal hemorrhage in relation to chorionic villus sampling revisited. Prenat Diagn 2006;26:201–5. (Level III) ⇐

14. Lele AS, Carmody PJ, Hurd ME, O'Leary JA. Fetomaternal bleeding following diagnostic amniocentesis. Obstet Gynecol 1982;60:60–4. (Level III) ⇐

15. Bowman JM, Pollock JM. Transplacental fetal hemorrhage after amniocentesis. Obstet Gynecol 1985;66: 749–54. (Level II–3) ⇐

16. Meleti D, De Oliveira LG, Araujo Junior E, Caetano AC, Boute T, Nardozza LM, et al. Evaluation of passage of fetal erythrocytes into maternal circulation after invasive obstetric procedures. J Obstet Gynaecol Res 2013;39:1374–82. (Level III) ⇐

17. Subira D, Uriel M, Serrano C, Castanon S, Gonzalo R, Illan J, et al. Significance of the volume of fetomaternal hemorrhage after performing invasive prenatal tests. Cytometry B Clin Cytom 2011;80:38–42. (Level II–3) ⇐

18. Scholz C, Kachler A, Hermann C, Weissenbacher T, Toth B, Friese K, et al. Flowcytometric assessment of fetomaternal hemorrhage during external cephalic version at term. J Perinat Med 2009;37:334–7. (Level III) ⇐

19. Boucher M, Marquette GP, Varin J, Champagne J, Bujold E. Fetomaternal hemorrhage during external cephalic version. Obstet Gynecol 2008;112:79–84. (Level II–3) ⇐

20. Pollack W, Ascari WQ, Kochesky RJ, O'Connor RR, Ho TY, Tripodi D. Studies on Rh prophylaxis. 1. Relationship between doses of anti-Rh and size of antigenic stimulus. Transfusion 1971;11:333–9. (Level II–1) ⇐

21. Freda VJ, Gorman JG, Pollack W, Bowe E. Prevention of Rh hemolytic disease–ten years' clinical experience with Rh immune globulin. N Engl J Med 1975;292:1014–6. (Level III) ⇐

22. McBain RD, Crowther CA, Middleton P. Anti-D administration in pregnancy for preventing Rhesus alloimmunisation. Cochrane Database of Systematic Reviews 2015, Issue 9. Art. No.: CD000020. (Systematic Review) ⇐

23. McMaster conference on prevention of Rh immunization. 28–30 September, 1977. Vox Sang 1979;36:50–64. (Level III) ⇐

24. National Institute for Health and Care Excellence. Routine antenatal anti-D prophylaxis for women who are rhesus D negative. Technology appraisal guidance TA156. London (UK): NICE; 2008. (Level III) ⇐

25. Qureshi H, Massey E, Kirwan D, Davies T, Robson S, White J, et al. BCSH guideline for the use of anti-D immunoglobulin for the prevention of haemolytic disease of the fetus and newborn. British Society for Haematology. Transfus Med 2014;24:8–20. (Level III) ⇐

26. MacKenzie IZ, Dutton S, Roseman F. Evidence to support the single-dose over the two-dose protocol for routine antenatal anti-D Rhesus prophylaxis: a prospective observational study. Eur J Obstet Gynecol Reprod Biol 2011;158:42–6. (Level II–3) ⇐

27. Vick S, Cairns J, Urbaniak S, Whitfield C, Raafat A. Cost-effectiveness of antenatal anti-D prophylaxis. Health Econ 1996;5:319–28. (Cost-Effectiveness Analysis) ⇐

28. Tiblad E, Wikman A, Rane A, Jansson Y, Westgren M. Pharmacokinetics of 250 mug anti-D IgG in the third trimester of pregnancy: an observational study. Acta Obstet Gynecol Scand 2012;91:587–92. (Level III) ⇐

29. Bowman JM. Controversies in Rh prophylaxis. Who needs Rh immune globulin and when should it be given? Am J Obstet Gynecol 1985;151:289–294 (Level III) ⇐

30. Royal Australian and New Zealand College of Obstetricians and Gynaecologists. Guidelines for the use of Rh(D) immunoglobulin (Anti-D) in obstetrics in Australia. East Melbourne: RANZCOG; 2015. (Level III) ⇐

31. Fung Kee Fung K, Eason E, Crane J, Armson A, De La Ronde S, Farine D, et al. Prevention of Rh alloimmunization. Maternal–Fetal Medicine Committee, Genetics Committee. J Obstet Gynaecol Can 2003;25:765–73. (Level III) ⇐

32. Welsh KJ, Bai Y. Pathology consultation on patients with a large Rh immune globulin dose requirement. Education Committee of the Academy of Clinical Laboratory Physicians and Scientists. Am J Clin Pathol 2016;145:744–51. (Level III) ⇐

33. Hartwell EA. Use of Rh immune globulin: ASCP practice parameter. American Society of Clinical Pathologists. Am J Clin Pathol 1998;110:281–92. (Level III) ⇐

34. Sandler SG, Gottschall JL. Postpartum Rh immunoprophylaxis. Obstet Gynecol 2012;120:1428–38. (Level III) ⇐

35. Wiese M, Fischer J, Lobermann M, Gobel U, Grungreiff K, Guthoff W, et al. Evaluation of liver disease progression in the German hepatitis C virus (1b)-contaminated anti-D cohort at 35 years after infection. East German HCV Study Group [published erratum appears in Hepatology 2015;61:1446–7]. Hepatology 2014;59: 49–57. (Level II–3) ⇐

36. Kenny-Walsh E. Clinical outcomes after hepatitis C infection from contaminated anti-D immune globulin. Irish Hepatology Research Group. N Engl J Med 1999;340:1228–33. (Level II–3) ⇐

37. Smith DB, Lawlor E, Power J, O'Riordan J, McAllister J, Lycett C, et al. A second outbreak of hepatitis C virus infection from anti-D immunoglobulin in Ireland. Vox Sang 1999;76:175–80. (Level III) ⇐

38. U.S. Food and Drug Administration. Mercury in plasma-derived products. Silver Spring (MD): FDA; 2009. (Level III) ⇐

39. Fyfe TM, Ritchey MJ, Taruc C, Crompton D, Galliford B, Perrin R. Appropriate provision of anti-D prophylaxis to RhD negative pregnant women: a scoping review. BMC Pregnancy Childbirth 2014;14:411. (Level III) ⇐

Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



322

40. Badami KG, Parker J, Kenny A, Warrington S. Incidence of maternal sensitisation to Rh(D) in Christchurch, New Zealand and reasons for prophylaxis failures. N Z Med J 2014;127:40–6. (Level II–3) ⇐

41. Hughes RG, Craig JI, Murphy WG, Greer IA. Causes and clinical consequences of Rhesus (D) haemolytic disease of the newborn: a study of a Scottish population, 1985–1990. Br J Obstet Gynaecol 1994;101:297–300. (Level III) ⇐

42. Beveridge HE. Dwindling supplies of anti-D. Med J Aust 1997;167:509–10. (Level III) ⇐

43. Robson SC, Lee D, Urbaniak S. Anti-D immunoglobulin in RhD prophylaxis. Br J Obstet Gynaecol 1998;105:129–34. (Level III) ⇐

44. de Crespigny L, Davison G. Anti-D administration in early pregnancy - time for a new protocol. Aust N Z J Obstet Gynaecol 1995;35:385–7. (Level III) ⇐

45. Stasi R. Rozrolimupab, symphobodies against rhesus D, for the potential prevention of hemolytic disease of the newborn and the treatment of idiopathic thrombocytopenic purpura. Curr Opin Mol Ther 2010;12:734–40. (Level III) ⇐

46. Yver A, Homery MC, Fuseau E, Guemas E, Dhainaut F, Quagliaroli D, et al. Pharmacokinetics and safety of roledumab, a novel human recombinant monoclonal anti-RhD antibody with an optimized Fc for improved engagement of FCgammaRIII, in healthy volunteers. Vox Sang 2012;103:213–22. (Level I) ⇐

47. Torrance GW, Zipursky A. Cost-effectiveness of antepartum prevention of Rh immunization. Clin Perinatol 1984;11:267–81. (Cost-Benefit) ⇐

48. Duplantie J, Martinez Gonzales O, Bois A, Nshimyumukiza L, Gekas J, Bujold E, et al. Cost-effectiveness of the management of rh-negative pregnant women. J Obstet Gynaecol Can 2013;35:730–40. (Cost-Benefit) ⇐

49. Kent J, Farrell AM, Soothill P. Routine administration of Anti-D: the ethical case for offering pregnant women fetal RHD genotyping and a review of policy and practice. BMC Pregnancy Childbirth 2014;14:87. (Level III) ⇐

50. Clausen FB, Christiansen M, Steffensen R, Jorgensen S, Nielsen C, Jakobsen MA, et al. Report of the first nationally implemented clinical routine screening for fetal RHD in D- pregnant women to ascertain the requirement for antenatal RhD prophylaxis. Transfusion 2012;52:752–8. (Level II–3) ⇐

51. de Haas M, Thurik FF, van der Ploeg CP, Veldhuisen B, Hirschberg H, Soussan AA, et al. Sensitivity of fetal RHD screening for safe guidance of targeted anti-D immunoglobulin prophylaxis: prospective cohort study of a nationwide programme in the Netherlands. BMJ 2016;355:i5789. (Level II–2) ⇐

52. Vivanti A, Benachi A, Huchet FX, Ville Y, Cohen H, Costa JM. Diagnostic accuracy of fetal rhesus D genotyping using cell-free fetal DNA during the first trimester of pregnancy. Am J Obstet Gynecol 2016;215:606.e1–5. (Level II–3) ⇐

53. Moise KJ Jr, Gandhi M, Boring NH, O'Shaughnessy R, Simpson LL, Wolfe HM, et al. Circulating cell-free DNA to determine the fetal RHD status in all three trimesters of pregnancy. Obstet Gynecol 2016;128:1340–6. (Level II–3) ⇐

54. Szczepura A, Osipenko L, Freeman K. A new fetal RHD genotyping test: costs and benefits of mass testing to target antenatal anti-D prophylaxis in England and Wales. BMC Pregnancy Childbirth 2011;11:5. (Cost-Benefit) ⇐

55. Hawk AF, Chang EY, Shields SM, Simpson KN. Costs and clinical outcomes of noninvasive fetal RhD typing for targeted prophylaxis. Obstet Gynecol 2013;122:579–85. (Cost-Benefit) ⇐

56. Neovius M, Tiblad E, Westgren M, Kublickas M, Neovius K, Wikman A. Cost-effectiveness of first trimester noninvasive fetal RHD screening for targeted antenatal anti-D prophylaxis in RhD-negative pregnant women: a model-based analysis. BJOG 2016;123:1337–46. (Cost-Benefit) ⇐

57. Teitelbaum L, Metcalfe A, Clarke G, Parboosingh JS, Wilson RD, Johnson JM. Costs and benefits of non-invasive fetal RhD determination. Ultrasound Obstet Gynecol 2015;45:84–8. (Cost-Benefit) ⇐

58. Management of alloimmunization during pregnancy. ACOG Practice Bulletin No. 75. American College of Obstetricians and Gynecologists. Obstet Gynecol 2006;108:457–64. (Level III) ⇐

59. Voracek M, Haubner T, Fisher ML. Recent decline in nonpaternity rates: a cross-temporal meta-analysis. Psychol Rep 2008;103:799–811. (Meta-analysis) ⇐

60. Sandler SG, Flegel WA, Westhoff CM, Denomme GA, Delaney M, Keller MA, et al. It's time to phase in RHD genotyping for patients with a serologic weak D phenotype. College of American Pathologists Transfusion Medicine Resource Committee Work Group. Transfusion 2015;55:680–9. (Level III) ⇐

61. Bergstrom H, Nilsson LA, Nilsson L, Ryttinger L. Demonstration of Rh antigens in a 38-day-old fetus. Am J Obstet Gynecol 1967;99:130–3. (Level III) ⇐

62. National Institute for Health and Care Excellence. Ectopic pregnancy and miscarriage: diagnosis and initial management. Clinical guideline CG154. London (UK): NICE; 2012. (Level III) ⇐

63. Price JR. Rh sensitization by hydatidiform mole. N Engl J Med 1968;278:1021. (Level III) ⇐

64. Fischer HE, Lichtiger B, Cox I. Expression of Rh0(D) antigen in choriocarcinoma of the uterus in an Rh0(D)-negative patient: report of a case. Hum Pathol 1985;16:1165–7. (Level III) ⇐

65. van't Veer MB, Overbeeke MA, Geertzen HG, van der Lans SM. The expression of Rh-D factor in human trophoblast [letter]. Am J Obstet Gynecol 1984;150:1008–10. (Level III) ⇐

66. Goto S, Nishi H, Tomoda Y. Blood group Rh-D factor in human trophoblast determined by immunofluorescent method. Am J Obstet Gynecol 1980;137:707–12. (Level III) ⇐

67. Morrow CP, Curtin JP. Tumors of the placental trophoblast. Tumors of the placental trophoblast. Synopsis of gynecologic oncology. 5th ed. 5th ed. New York (NY): Churchill Livingstone; 1998. p. 315–51. (Level III) ⇐

Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



323

68. Katz J, Marcus RG. The risk of Rh isoimmunization in ruptured tubal pregnancy. Br Med J 1972;3:667–9. (Level II) ⇐

69. U.S. Preventive Services Task Force. Rh(D) incompatibility: screening. Available at https://www.uspreventiveservicestaskforce.org/Page/Document/RecommendationStatementFinal/rh-d-incompatibility-screening. (Level III) ⇐

70. Abbey R, Dunsmoor-Su R. Cost-benefit analysis of indirect antiglobulin screening in Rh(D)-negative women at 28 weeks of gestation. Obstet Gynecol 2014;123:938–45. (Cost-Benefit) ⇐

71. Crowther CA, Middleton P. Anti-D administration after childbirth for preventing Rhesus alloimmunisation. Cochrane Database of Systematic Reviews 1997, Issue 2. Art. No.: CD000021. (Systematic Review) ⇐

72. Pilgrim H, Lloyd-Jones M, Rees A. Routine antenatal anti-D prophylaxis for RhD-negative women: a systematic review and economic evaluation. Health Technol Assess 2009;13:iii, ix–xi, 1–103. (Systematic Review) ⇐

73. Turner RM, Lloyd-Jones M, Anumba DO, Smith GC, Spiegelhalter DJ, Squires H, et al. Routine antenatal anti-D prophylaxis in women who are Rh(D) negative: meta-analyses adjusted for differences in study design and quality. PLoS One 2012;7:e30711. (Meta-Analysis) ⇐

74. Jain V, Chari R, Maslovitz S, Farine D, Bujold E, et al. Guidelines for the management of a pregnant trauma patient. Maternal Fetal Medicine Committee. J Obstet Gynaecol Can 2015;37:553–74. (Level III) ⇐

75. Laube DW, Schauberger CW. Fetomaternal bleeding as a cause for "unexplained" fetal death. Obstet Gynecol 1982;60:649–51. (Level III) ⇐

76. Owen J, Stedman CM, Tucker TL. Comparison of predelivery versus postdelivery Kleihauer–Betke stains in cases of fetal death. Am J Obstet Gynecol 1989;161:663–6. (Level III) ⇐

77. Causes of death among stillbirths. Stillbirth Collaborative Research Network Writing Group. JAMA 2011;306: 2459–68. (Level II–2) ⇐

78. Stedman CM, Quinlan RW, Huddleston JF, Cruz AC, Kellner KR. Rh sensitization after third-trimester fetal death. Obstet Gynecol 1988;71:461–3. (Level III) ⇐

79. Ness PM, Baldwin ML, Niebyl JR. Clinical high-risk designation does not predict excess fetal–maternal hemorrhage. Am J Obstet Gynecol 1987;156:154–8. (Level II–3) ⇐

80. Gorman JG, Freda VJ. Rh immune globulin is indicated for Rh-negative mothers undergoing sterilization. Am J Obstet Gynecol 1972;112:868–9. (Level III) ⇐

81. Scott JR, Guy LR. Is Rh immunoglobulin indicated in patients having puerperal sterilization? Obstet Gynecol 1975;46:178–80. (Level III) ⇐

82. Samson D, Mollison PL. Effect on primary Rh immunization of delayed administration of anti-Rh. Immunology 1975;28:349–57. (Level II–1) ⇐

The MEDLINE database, the Cochrane Library, and ACOG's own internal resources and documents were used to conduct a literature search to locate relevant articles published between January 1980 and February 2017. The search was restricted to articles published in the English language. Priority was given to articles reporting results of original research, although review articles and commentaries also were consulted. Abstracts of research presented at symposia and scientific conferences were not considered adequate for inclusion in this document. Guidelines published by organizations or institutions such as the National Institutes of Health and the American College of Obstetricians and Gynecologists were reviewed, and additional studies were located by reviewing bibliographies of identified articles. When reliable research was not available, expert opinions from obstetrician–gynecologists were used.

Studies were reviewed and evaluated for quality according to the method outlined by the U.S. Preventive Services Task Force:

I     Evidence obtained from at least one properly designed randomized controlled trial.

II-1     Evidence obtained from well-designed controlled trials without randomization.

II-2     Evidence obtained from well-designed cohort or case–control analytic studies, preferably from more than one center or research group.

II-3     Evidence obtained from multiple time series with or without the intervention. Dramatic results in uncontrolled experiments also could be regarded as this type of evidence.

III     Opinions of respected authorities, based on clinical experience, descriptive studies, or reports of expert committees.

Based on the highest level of evidence found in the data, recommendations are provided and graded according to the following categories:

Level A—Recommendations are based on good and consistent scientific evidence.

Level B—Recommendations are based on limited or inconsistent scientific evidence.

Level C—Recommendations are based primarily on consensus and expert opinion.

Copyright August 2017 by the American College of Obstetricians and Gynecologists. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, posted on the Internet, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without prior written permission from the publisher.

Requests for authorization to make photocopies should be directed to Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400.

The American College of Obstetricians and Gynecologists
409 12th Street, SW, PO Box 96920, Washington, DC 20090-6920

Prevention of Rh D alloimmunization. Practice Bulletin No. 181. American College of Obstetricians and Gynecologists. Obstet Gynecol 2017;130:e57–70.

Copyright © by The American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



324

This information is designed as an educational resource to aid clinicians in providing obstetric and gynecologic care, and use of this information is voluntary. This information should not be considered as inclusive of all proper treatments or methods of care or as a statement of the standard of care. It is not intended to substitute for the independent professional judgment of the treating clinician. Variations in practice may be warranted when, in the reasonable judgment of the treating clinician, such course of action is indicated by the condition of the patient, limitations of available resources, or advances in knowledge or technology. The American College of Obstetricians and Gynecologists reviews its publications regularly; however, its publications may not reflect the most recent evidence. Any updates to this document can be found on www.acog.org or by calling the ACOG Resource Center.

While ACOG makes every effort to present accurate and reliable information, this publication is provided "as is" without any warranty of accuracy, reliability, or otherwise, either express or implied. ACOG does not guarantee, warrant, or endorse the products or services of any firm, organization, or person. Neither ACOG nor its officers, directors, members, employees, or agents will be liable for any loss, damage, or claim with respect to any liabilities, including direct, special, indirect, or consequential damages, incurred in connection with this publication or reliance on the information presented.

**Copyright © by The American College of Obstetricians
and Gynecologists. Published by Wolters Kluwer Health, Inc.
Unauthorized reproduction of this article is prohibited.**

# EXHIBIT 18

Katherine A. Rafferty & Tessa Longbons,
*#AbortionChangesYou: A Case Study to
Understand the Communicative Tensions in Women's
Medication Abortion Narratives*,
36 Health Commc'n 1485 (2021)

HEALTH COMMUNICATION
2021, VOL. 36, NO. 12, 1485–1494
https://doi.org/10.1080/10410236.2020.1770507





OPEN ACCESS    Check for updates

# #AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives

Katherine A. Rafferty[a] and Tessa Longbons[b]

[a]Iowa State University; [b]Charlotte Lozier Institute

**ABSTRACT**
One out of four women in the United States will have an abortion by age 45. While abortion rates are steadily declining in the United States, the rate of medication abortions continues to increase, with 39% of all abortions being medication abortions. Our study is one of the first to analyze women's narratives after having had a medication abortion. Using relational dialectics theory, we conducted a case study of the nonpartisan website, *Abortion Changes You*. Our contrapuntal analysis rendered four sites of dialectical tension found across women's blog posts: *only choice* vs. *other alternatives, unprepared* vs. *knowledgeable, relief* vs. *regret,* and *silence* vs. *openness.* Each site of struggle characterized a different noteworthy moment within a woman's medication abortion experience: the decision, the medication abortion process, identity after abortion, and managing the stigmatizing silence before and after the abortion. We discuss theoretical and practical implications about how the larger politicized discourses prevalent within the abortion debate impact the liminality of women who are contemplating a medication abortion and affect their own narrative construction about the medication abortion experience.

One out of four women will undergo an abortion procedure in the United States by age 45 (R. K. Jones & Jerman, 2017), and 862, 320 reported abortions occur each year (Jones et al., 2019). Despite its frequency, abortion remains a highly contested and stigmatized biopolitical public health issue in the United States (Altshuler et al., 2017). The historic *Roe v. Wade* case has resulted in two nationalized political movements – Right to Life and Right to Choice – that have juxtaposed stances on the legality of abortion. However, the stigma and shame associated with abortion precede and transcend this historic case. Stormer (2010) concluded that a collective memory of secrets and shame has characterized the topic of abortion since Planned Parenthood's 1955 conference, "Abortion in the United States".

While abortion rates are steadily declining in the U.S. (Jones et al., 2019), the rate of medication abortions continues to increase. In 2000, the U.S. Food and Drug Administration (FDA) approved mifepristone to be used in combination with misoprostol as a form of medication abortion. Since then, the annual number of medication abortions has risen steadily: less than 6% of all abortions in 2001 to 39% of all abortions in 2017 (Jones et al., 2019, 2008). Between 2014–2017, the number of medication abortions provided at facilities other than hospitals increased by 25% (Jones et al., 2019). Presently, over one-third of all reported abortions in the U.S. are medication abortions (Jones et al., 2019). In 2016, the FDA protocol expanded provider eligibility for dispensing mifepristone to women. Thus, abortion provision is transitioning from formalized medical procedures conducted in health care settings

to a protocol where most of the abortion occurs individually at home with limited clinician assistance (Biggs et al., 2019). Given the privatization of abortion provision, research is needed to examine the distinct experiences of women who have undergone this type of abortion. After all, researchers have found that women often elect to have a medication abortion over a surgical abortion because of more privacy, convenience, and the perception of having more control (Newton et al., 2016). However, medication abortion has been found to have a higher complication rate that results in more emergency department visits post-medication abortion compared to post-surgical abortion (Upadhyay et al., 2015).

Medication abortion practices in the U.S. adhere to the following evidence-based guidelines: using mifepristone in combination with a prostaglandin to carry success rates up to 99% for early pregnancy termination with rare occurrence of serious adverse events. However, the focus of this research is on successful terminations, increases in abortion access, and reductions of in-person clinic visits (H. E. Jones et al., 2017). There remains a dearth of research, particularly in the U.S., that examines women's personal experiences with having this type of abortion procedure (e.g., acknowledging their emotions, understanding their self-efficacy with completing the abortion at home, being aware of whether they are adequately informed about the process). To our knowledge, the only study is from Sweden; researchers used semi-structured telephone interviews with 119 women who had a medication abortion (Hedqvist et al., 2016). They found that almost half (43%) experienced more bleeding than expected, and one-

**CONTACT** Katherine A. Rafferty    rafferty@iastate.edu    Communication Studies Program, Department of Psychology, Iowa State University, USA

© 2020 The Author(s). Published with license by Taylor & Francis Group, LLC.
This is an Open Access article distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivatives License (http://creativecommons.org/licenses/by-nc-nd/4.0/), which permits non-commercial re-use, distribution, and reproduction in any medium, provided the original work is properly cited, and is not altered, transformed, or built upon in any way.

fourth (26%) bled for more than four weeks. In addition, one-third (34%) stated that they received insufficient information about what to expect. Women who had never had an abortion nor had gone through childbirth were more likely to feel misinformed.

Scholars know that the medication abortion process is distinct from surgical abortions, with the features of medication abortion (e.g., lack of medical presence, time required for abortion completion, personal experiences with pain and bleeding) influencing women's perception and satisfaction (Newton et al., 2016). Yet, this research on women's satisfaction with medication abortion is often conflicting (Kimport et al., 2012) and limited (Hedqvist et al., 2016). Given that women increasingly prefer medication abortion over surgical abortion (Newton et al., 2016), the need for studying women's experiences post-medication abortion becomes imperative.

### Importance of analyzing unsolicited blogging narratives about one's abortion

To understand women's medication abortion experiences, it is important to study platforms where women engage in unsolicited talk. Unsolicited talk is ideal for collecting formative research that can be studied to explore individual and cultural experiences (Baxter, 2011). First, the audience of these texts is a "generalized other" (Mead, 1982), or culture, rather than a specific individual with whom the author has a relationship (Langellier & Peterson, 2004). The absence of a specific audience encourages narrators to provide an unadulterated account of their experience, rather than tailor their story to specific individuals (e.g., a friend who has had a certain stance on the abortion issue). Similarly, anonymity allows for potentially muted or stigmatized groups to post information without fear of sanctioning. In a culture where abortion remains highly contested and talk about having had an abortion is often muted or stigmatized (Altshuler et al., 2017), it is likely that women may prefer to self-disclose their medication abortion experiences online rather than via face-to-face channels. Furthermore, because women traditionally constitute a co-culture who have historically been muted and must strategically use communication to participate in a dominant patriarchal society (M. Orbe, 2005; M. P. Orbe, 1998), scholars must study platforms where women are sharing unsolicited stories in back-channel outlets (e.g., online blogs).

### Online blogs as a platform for unsolicited talk

One backchannel platform of unsolicited talk is online blogs. Blogs provide a computer-mediated platform where people can self-disclose their personal thoughts, feelings, and experiences to others online. The proliferation of blogs in the last decade has transformed the way that we, as a society, "share, create, and curate information with individuals and communities" (Becker & Freburg, 2014, p. 415). Blogs often resemble online personal journal entries that enable writers to freely express themselves in ways that may be less face-threatening or stigmatizing (M. Jones & Alony, 2008). One of the many applications and uses of blogs is to share experiences and events through storytelling.

### Relational Dialectics Theory (RDT)

Because talking about one's abortion experience remains stigmatized and muted (Cockrill & Nack, 2013), examining women's stories after having had a medication abortion may illuminate the competing discourses surrounding this debated moral and social issue (e.g., largely evident in the two polarized movements: Right to Choice v. Right to Life), as well as some of the larger dominant discourses from the polarized political movements that influence how women tell their own medication abortion story. Given this goal, RDT (Baxter, 2011) is a relevant framework to assess the competing cultural norms and expectations, which are also referred to as discourses. At any given moment, discourses may be dominant/centripetal or marginalized/centrifugal (i.e., anything that deviates from the dominant discourse). Scholars use RDT as a framework to examine the interplay between certain discourses that then construct social meaning and reality for individuals. Within the theory, there are four types of utterances (i.e., speaking chains) from which dialectical tensions (i.e., centripetal vs. centrifugal) may stem: *distal already-spokens* – utterances reflecting the cultural meaning and discourses that cultural members give voice to in their talk; *proximal already-spokens* – utterances conveying past meanings and discourses within a given relationship; *proximal not-yet-spokens* – immediate response from the hearer in the interaction; and *distal not-yet-spokens* – anticipated responses of a generalized other within the culture. The purpose of this paper is to examine how, if at all, these four types of utterance chains are present within women's medication abortion narratives.

A second aspect of RDT (Baxter, 2011) is to understand how social reality is created discursively through power. Power is located in the struggle between marginalized/centrifugal and dominant/centripetal discourses. There are three ways that power can be located within discourses: diachronic separation, synchronic interplay, and discursive transformation. Diachronic separation occurs when discourses emerge in different texts or locations. Synchronic interplay is when discourses negate (total rejection of a competing discourse), counter (offer limited legitimacy to a discourse), and/or entertain (consider multiple worldviews/discourses or general ambivalence toward discourses) one another. Finally, discursive transformations occur when the interplay of competing discourses creates new meanings rather than remaining in opposition to one another (Baxter, 2011). This current study will focus on examining the synchronic interplay among the centripetal and centrifugal discourses.

### A case study of women who have experienced medication abortion

To analyze women's personal narratives and the larger discourses influencing their talk about their own medication abortion, we conducted a case study of the website www. abortionchangesyou.com. We selected this website for several reasons: it is not openly politicized, bloggers do not interact with others, bloggers post anonymously, bloggers do not need to create an account in order to post, and the platform is a space for unsolicited stories with no reward or

compensation to those who post. Furthermore, from a strategic storytelling standpoint (Tyler, 2007), it is important to study women's blogs from an organization that recognizes and respects each woman's individual narrative, as opposed to propagating narratives that openly align with the agenda of only one political movement. The woman who created this website has had an abortion herself and openly shares this information on the "About Us" page. The naming of her own abortion experience grounds co-cultural theorizing (M. Orbe, 2005; M. P. Orbe, 1998) such that other women who feel muted may be empowered and capable of finding similar language strategies.

In this case study, we explore the complexity and consequentiality of women's language choices with anonymously telling their own medication abortion story, as well as offer the potential to capture the interplay of individual, organizational, and social discourses surrounding the abortion debate. The current divisiveness surrounding the socio-political climate in the U.S. about abortion provides further exigency and credence for this research. Our critical analysis is rooted in the interpretive paradigm with the purpose of explaining, describing, and illustrating the stories that women share on this website (Tracy, 2013). The following research questions guide our iterative analysis:

*RQ1*: What topics are women disclosing to the "generalized other" in their blog?

*RQ2*: What (if any) sites of struggle characterize women's abortion narrative?

## Methods

We conducted a case study approach (Arden Ford et al., 2014) of one website, www.abortionchangesyou.com. Case studies are a contextual examination used to understand a phenomenon within a particular context "and with respect to multiple perspectives within that context" (Arden Ford et al., 2014, p. 118). By employing a case study approach, we were able to draw on multiple perspectives (e.g., 98 different blog stories) that were rooted in a specific context. This methodological choice is common in other communication research, where the unit of analysis is an organization and the goals are to provide an in-depth understanding of the unique particulars and complexities of the case within a larger social context (Norander & Brandhorst, 2017).

Our case study included 98 blogs from women who have had a medication abortion and shared their story on the website. We included all blogs posted between October 2007 – February 2018. This date range reflects the time period between the submission of the first medication abortion blog on the website in 2007, and the point at which we extracted our data for analysis in 2018. Women's blogs ranged in length from one paragraph to three pages of text, single-spaced (the average number of words for the 98 blogs was 655 words). All 98 blogs included content about one's own medication abortion; the vast majority (91 women; 93%) also discussed the events and emotions experienced before and after their medication abortion.

### Data analysis and synthesis

The case study approach allows for different data analysis strategies (Norander & Brandhorst, 2017). Because the purpose of our case study is to develop a thick description of the case, using an interpretive analytic strategy is most prudent. We selected Baxter's (2011) contrapuntal analysis to study the meanings circulating around individual and relational identities evidenced within the language choices of the women blogging about their own medication abortion. Given the larger competing discourses about the legality of abortion in the U.S., we felt that the struggle of competing and contradictory discourses would likely be apparent in women's personal blogging narratives. Further, contrapuntal analysis (Baxter, 2011) offered a critical perspective to our analysis as we studied the voices of marginalized women (e.g., women who have had a medication abortion) whose perspectives are often muted and stigmatized in society.

To understand the competing discourses and how meaning was constructed through their interplay, we conducted the first stages of thematic analysis to identify the discourses evident within each blog post (Braun & Clarke, 2006). This process required the three coders to independently familiarize themselves with the entire data set: reading the blogs several times and conducting line-by-line coding that captured the essence of the story in each line. Many of the inductive analytic codes applied to the text were descriptive (e.g., uncertainty; not ready), process (e.g., discovering pregnancy, taking the pills), or in vivo codes (e.g., wanted baby; alone; Saldaña, 2013). The coders met regularly for five months to discuss the codes independently applied to each blog post. During this time, codes emerged into themes as processes were identified in the data and repetitively noticed by all three coders (e.g., changing self perception, silence, responsibility, good parenting). Discrepancies in coding were discussed during coding meetings and resolved through group consensus (Strauss & Corbin, 1990).

During the third and fourth months of data analysis, we went back to the data set to identify where discourses competed (e.g., culpability; justification). Here, we paid particular attention to where the bloggers used instances of negating (e.g., claiming another discourse as irrelevant or rejecting it), countering (e.g., offering a particular discursive position in replacement of another), and entertaining (e.g., not completely rejecting a discourse, but instead noting the potential possibilities with different discourses; Baxter, 2011). Women used negating when saying, "can't," "not," "couldn't," and "never." Examples of countering were most apparent when women used the word "but." Entertaining often occurred when women used the words "possibility" and "could have." Finally, we identified where and how competing discourses interpenetrated (Baxter, 2011). Dialogically contractive discursive practices are silenced discourses. Examples of these discursive practices included negating talk, such as: "can't talk about the abortion," or "there was no other choice." In contrast, dialogically expansive discursive practices are discourses that are encouraged and amplified. Women used these discourses when saying things like: "I don't want the procedure, but I don't want the baby" or "hoping for a brighter future now that it is over."

Data were analyzed until the point of theoretical saturation (i.e., no new thematic categories were present in the blog posts; Strauss & Corbin, 1990), which occurred after the 54th blog post. However, we continued to analyze the remaining blog posts in an effort to verify that our analysis of the discourses evident in the 54 posts accurately reflected all of the posts within the entire data set. Further, we wanted to extract the best exemplars from the entire case study and desired that quotations within all posts be considered for representation. Clear and concise exemplars of competing discourses within women's narratives were then selected and agreed upon by all coders.

### Trustworthiness and rigor

Evaluation of the quality of case study research should be determined by criteria associated within the naturalistic paradigm (Arden Ford et al., 2014). Trustworthiness is the criterion that assesses the credibility, transferability, dependability, and confirmability of the data collection and analysis processes (Lincoln & Guba, 1985). We upheld these principles when conducting this study by beginning with a careful design that clearly defined its purpose, research questions, and notion of "boundedness" (i.e., establishing the limits and context of the case; Arden Ford et al., 2014). Second, we spent sufficient time developing and analyzing the case: our analysis transpired over five months. Third, we upheld the principles of reflexivity by using inductive coding for all blog posts and writing individual and group memos throughout the entire coding process as a way to remain transparent and keep a data audit. Fourth, we had a team of three female coders, which allowed for the presence of multiple feminine perspectives.

### Findings

Our research questions focused on the topics that women discussed in their personal online blogging narrative posted to www.abortionchangesyou.com (RQ1), and what (if any) sites of struggle were evident in these narratives (RQ2). Our contrapuntal analysis (Baxter, 2011) rendered four sites of dialectical tension: *only choice* vs. *other alternatives*, *unprepared* vs. *knowledgeable*, *relief* vs. *regret*, and *silence* vs. *openness*. Each site of struggle characterized a different noteworthy moment within a woman's medication abortion experience: the decision, the medication abortion process, identity after the abortion, and managing the stigmatizing silence before and after the abortion. When recounting their decision to have an abortion, women referenced the struggle of *only choice* vs. *other alternatives*. As women discussed the medication abortion process, the competing discourse of *unprepared* vs. *knowledgeable* was evidenced. Women's narratives about their identity after the abortion indicated the dialectical struggle of *relief* vs. *regret*. Finally, the challenges with managing the tension between *silence* vs. *openness* pervaded women's narratives. Below we discuss each site of struggle using exemplar quotes from women's blogs. Quotes were not edited from their original post.

### The decision: Only choice vs. other alternatives

Part of women's narratives included a detailed account of their decision to have a medication abortion. This decision was described as being rife with contradiction, and not a flippant choice. Women enumerated various reasons that were influential in their decision-making process: bad timing, financial instability, relationship problems, lack of family support, not married, too young, too many other children, not prepared to be a parent yet, and/or best decision given the circumstances. After stating one of the aforementioned reasons, 92 women (94%) also explained that abortion was the only or best option given the circumstances. For example, one woman said: "I felt the child growing inside of me. I was rubbing my stomach without me even knowing. I felt the doubt in my heart, but kept telling myself this is the best decision I needed to make" (6–18-17). A different woman recounted:

> "I always leaned more towards keeping the baby and my boyfriend more towards abortion. I knew I could have the baby but it would be difficult. We both work jobs that barely pay over minimum wage and we both were scared to grow up and care for a child" (10-24-17).

Collectively, these exemplars illustrate how any possibility of keeping the baby was negated by one of the reasons that warranted the need for having a medication abortion. Many of the reasons women cited for choosing abortion align with the discourses from the Right to Choice movement: "A pregnancy to a woman is perhaps one of the most determinative aspects of her life. It disrupts her body. It disrupts her education. It disrupts her employment. And it often disrupts her entire family life" (*Roe v. Wade*).

However, the decision to have a medication abortion was not always independently made by the woman. In fact, 52 women (53%) reported that the father to their child or other family members (e.g., parents) negated women's own desires to keep the baby. For example, one woman said:

> "I remember my husband telling me, 'well, don't expect me to be too happy with the idea of having it if you decide to keep it. I won't be too loving.' That was a knife through my heart and I made the tough decision to go through with the abortion" (7-6-12).

Other family members also influenced women's medication abortion decision, albeit her own desires to keep her baby:

> "But my father on the other hand was a different story. He is an old school Puerto Rican who told me that I had to leave if I kept the baby. I had 2 weeks to get an abortion or else he would disown me forever" (3-8-2018).

In both accounts, women communicated their personal choice to have their baby; yet, their choice was negated by family and friends who advocated that abortion was necessary. Centrifugal discourses about others influencing or pressuring women to have an abortion are marginalized discourses.

Finally, when making their decision, 48 women (49%) reported vacillating between keeping their baby and having a medication abortion. Ultimately, outside circumstances or other people influenced their decision to abort. As mentioned earlier, 92 women (94%) shared that abortion was the best or

only option available given the circumstances. In many of these narratives, women did not believe nor realize that other alternatives, besides abortion, were tenable options until after having the abortion. For instance, one woman said:

> "They all tell you 'it's your choice' in the moment, but you don't feel that it is. Being unable to afford it, unable to tell your loved ones, not having the help or feeling unable to support a child. When your partner doesn't want it like you do. All these things push you, blind you to a decision that you don't realize will destroy you" (8-23-17).

Similarly, another woman recounted: "I was kind of excited but I was so scared to tell my family …. I told my mom and her first response was I hope you're getting an abortion. You're going to be a terrible mom" (11-5-17). Both exemplars illustrate the distal and proximal already-spoken discourses that influenced each woman's decision to have a medication abortion. Ultimately, these centripetal discourses (coming from society, the pro-choice movement, other people in their lives, or their own fears) negated the centrifugal discourse that other alternatives (adoption or keeping their baby) were justifiable options available to them.

### The medication abortion process: Unprepared vs. knowledgeable

Medication abortions where women undergo most of the process individually at home with limited assistance from a medical provider are becoming more commonplace (Biggs et al., 2019; H. E. Jones et al., 2017). While this process is generally reported to be safe and adhere to evidence-based guidelines (H. E. Jones et al., 2017), little is known about women's personal experiences with having this type of abortion. All women in this case study reported having had a medication abortion. Forty-eight women (49%) provided detailed accounts of their actual medication abortion experience at home. Women said things like: "I felt her come out" (1-8-16). Some women detailed the hardships of this process by saying: "I was in so much pain on the bathroom floor" (3–15-18); "the pills made me vomit, lose control of my bowels, sweat, faint, pass out, and go into full labor" (10-9-09); and "I lay on my bed in the fetal position, holding my stomach" (9-5-15). Other women did not self-report such negative experiences: "The actual process of taking the pill was frightening but not as bad as I imagined" (9-8-15) and "I just popped some pills and got a period" (7-1-15).

In analyzing women's talk about the medication abortion process, a second site of struggle was identified: *knowledgeable vs. unprepared*. In this struggle, women discussed how they were told certain information about the medication abortion process (e.g., when to take the pills, what the pills do, the need to contact a provider if complications arise), but ultimately this information was insufficient, limited, or misleading. Fourteen women (14%) reported being inadequately prepared about what to expect during the medication abortion process. For example, one woman said:

> "They lied to me and said they would give me some pills that would make it just like a late period with a little cramping … The pain of the contractions was so intense I felt like my intestines were pulled out slowly. I collapsed screaming on my bathroom floor, sweat, tears, blood, vomit, and shit all over me" (10-9-09).

Similarly, a different woman recounted:

> "They told me, if you by chance are in pain you can take these pain relievers. If by chance I'm in pain? That sounded like the process would be easy and not so painful. Well NO that was not the case, within 30 minutes I felt really bad cramping. It just kept getting worse and worse. I was crying and moaning from the pain. I literally thought I was dying" (9-2-17).

In both instances, women's personal abortion experiences did not align with the proximal-already-spoken messages (e.g., "it's just a pill") that they were told by their medical providers.

When women's personal experiences contradicted what they were originally told by health care providers, family, or friends women felt deceived. One woman communicated her frustration by saying: "They told me it wouldn't hurt and I wouldn't feel a thing. THAT WAS SUCH A LIE. I felt everything, I heard everything, I seen everything. I ended up blacking out from the pain and puking all over myself" (11-5-17). Similarly, another woman said:

> "We were told we would go back to normal and it won't affect us but they were wrong!!! All I feel is emptiness and hatred. I used to be the happiest most positive girl. All I want is to take it back" (12-15-14).

Even if women did not explicitly report feeling deceived, many women stated that they were inadequately prepared about what to expect. For instance, one woman said: "I knew to expect blood clotting, but nothing could've prepared me for seeing her body. It was the color of my own skin, and was actually starting to look like a person" (1-8-16). Within women's narratives, they expressed a desire for more detailed information about things such as: potential side effects, the intensity of cramping and bleeding, what to do after passing the baby, and potential negative emotions (e.g., fear, uncertainty, sadness, pain) felt after the abortion. When this comprehensive information was not communicated to them prior to taking the pills at home, women reported feeling misled, misinformed, and even deceived. These types of experiences and feelings after having had a medication abortion remain centrifugal discourses that are muted within the abortion debate.

### Identity after medication abortion: Relief vs. regret

A third site of dialectical struggle was found in women's talk about their identity after the medication abortion. Most women (N = 81; 83%) reported that their medication abortion changed them, which is not surprising given the name of the website: *Abortion Changes You*. Of noteworthy significance is understanding *how* women talked about these changes and the tension evident in this part of their narrative. Of the 81 women (83%) who stated feeling *changed* after their medication abortion, 75 women (77%) reported being changed in a negative way. Here, women said things like: "I really thought that I could somehow go back to the way things were before finding out I was pregnant. But I cannot. I am not the same person, and my husband is certainly not the same either" (7–11-11). Negative changes often occurred when women's

actual abortion experience did not align with their preconceived ideas about what to expect. These ideas were informed by larger discourses from society, as well as messages from others (e.g., health care providers). Three women indicated a positive change after their abortion by noting something like:

> "Abortion did change my life … As soon as the stomach cramps (only slightly worse than regular menstrual pains) went away, I felt like a whole new person. I couldn't believe how much energy I had again. It was like waking out of a deep depression" (7-1-15).

Positive changes were denoted by experiencing an initial sense of relief with no longer being pregnant. Finally, three women were ambivalent or didn't report their change as positive or negative. One woman said: "I truly believe there is no right and wrong with this situation, it is a life changer but it's your choice" (9-7-10).

Women discussed various issues when talking about change: impact on their emotional health as a result of the abortion, differences in their relationship with their partner/spouse, and new perspectives on their general views of abortion. However, conflicting emotions were evident across all women's blog posts. For instance, one woman said:

> "I went home and confessed to my mother … She helped pull the gigantic blood clots from my body … No one told me it would be like this; the clinic simply gave me what I asked for without telling me what it entailed" (7-20-16).

Similarly, another woman recounted: "I thought maybe after the due date I would feel better, but it doesn't end there. It NEVER ends! The pain and emptiness stays there forever" (4–30-17). In these different accounts, the women alluded to their initial expectations of what the medication abortion would entail or what others told them would happen after their abortion. When a woman's actual medication abortion experience did not align with these messages, women felt disempowered, vulnerable, lost, upset, and sometimes deceived.

When discussing the changes experienced after the abortion, many women talked about emotional changes. One woman said:

> "At first it all seemed like a weight had been lifted and everything was okay then I started to feel really sad and low and now all I do is think about how many weeks pregnant I would have been and what my baby would look like and I miss so much" (4-26-10).

As mentioned, processing one's abortion experience was emotional and took time. Some women wrestled with experiencing negative and difficult emotions after having their abortion. In fact, 37 women (38%) explicitly stated problems with anxiety, depression, drug abuse, and suicidal thoughts as a result of the abortion. For example, one woman said: "I am haunted by the image of my tiny baby. I always will be. I cut myself and even wanted to die" (3–22-13). Another woman recounted: "Looking at my kids thinking of another beautiful child. Couldn't live with myself. Wishing God would take my life" (12–16-11). Collectively, these exemplars illustrate women's emotional changes about processing of their medication abortion.

Finally, 75 women (77%) explicitly stated that they regretted their decision to have an abortion. However, the term regret was rife with contradiction and also included talk about initial relief. For instance, one woman said: "I know I did the right thing for myself and it would be a lot harder for me right now. But I still would give anything to go back in time and keep my baby" (11–19-12). Regret was regarded as a process that was realized over time and through one's life experience. One woman stated: "Had I known how badly I would feel now, I would have kept the baby, even if I had to go through it alone" (10–21-15). Another woman elaborated upon this process by saying:

> "Knowing what I know now at almost a year later I would not have the abortion. That was my child and I should have done what I needed to do to give them a great life. I thought I had no options but I did. I should have put my child first. No matter how early the abortion is its still a growing life and i wish i had done things differently" (4-30-17).

In both accounts, women defined regret as the emotional pain, suffering, remorse, and guilt felt after the medication abortion. Yet, these emotions were often coupled with initial feelings of relief from no longer being pregnant. In sum, the decision to have a medication abortion was significant, transformative, and lifechanging for these women. One woman noted this change by saying: "From the outside, our life looks exactly the same as it would have. But on the inside, everything has changed for me" (10–21-15). Collectively, these accounts expose how the different emotional changes resulted in a lived, dialectical tension between their life before the abortion and their life after the abortion.

### Managing the comprehensive stigmatizing silence: Silence vs. openness

Across women's narratives, there existed an overarching dialectical tension of *silence* vs. *openness*, which was difficult for many women to manage when interacting with others. In this struggle, women shared how their medication abortion was often a solo, private experience that was not openly shared with others. Many women decided *not* to inform certain family members about their pregnancy and abortion. Women noted feelings of shame, embarrassment, worry, or fear as some of the reasons for not telling others. Along with stating these emotions, women said things like: "I never told the father and I don't intend to" (8-4-17); "I don't know if I will ever tell my husband and children about what I did" (2–11-12); or "I couldn't talk to my family" (3–16-17). The initial decision to remain silent made it difficult to talk openly with others about their feelings and experiences after their medication abortion. Silence was also experienced in other ways: one woman was glad she was home alone during her abortion so no one could hear her, while a different woman left the abortion clinic and began crying and said, "why is there so much silence here?" as she was taking her pill alone in her bathroom at home.

Even if women did allow certain family members to become privy to their abortion decision, openly discussing their feelings after the abortion remained difficult. When talking with others, one woman said: "I love my husband but it is beyond difficult for me to talk to him about this,

because I know he wants nothing more than to just move on from this" (4–28-18). A different woman recounted: "My close friends know here but I don't really feel I can talk to them about it. I don't feel like i can talk to anyone about it" (2-9-13). Despite these women's desires to talk about their abortion, others (e.g., the baby's father, their husband, family members) refused to engage in conversation with them. As a result, women said things like: "I feel like I have no one to speak to about it since he doesn't think about it the way I do" (9-8-15), and "I try to talk about it with my family and the baby's dad but they all tell me it's in the past" (10–28-17).

Oftentimes, certain dates (such as their child's due date) or friends with other babies who are of similar age to their "would-have-been child" led to triggering events where women desired to express their feelings with others, but felt like they couldn't talk openly. For instance, one woman said: "But I haven't really been able to share the true regret and near constant jealousy of my loved ones engagements or pregnancies" (11–21-16). Another woman stated: "I knew I had to have an abortion, but these feelings I have right now I never imagined I'd have. I don't want to go out, I don't want to tell anyone, all I feel like doing is crying" (7-8-18). Thus, the isolation and silence leading up to her own medication abortion continued to pervade after the abortion, creating additional communication challenges with freely expressing her emotions with family and friends.

Silence was often described as being frustrating and challenging. In fact, 59 women (60%) reported feelings of isolation and alienation. As a result, some women personally attacked themselves. For example, one woman said: "I feel like I'm living a lie I get up get ready for work get my family up like normal the days go on like normal but I'm not normal I killed my baby I'm a monster!!" (3–14-17). Similarly, a different woman wrote: "As a mom I feel like a monster and I have to act like nothing happened" (4–18-17). These demeaning language choices (e.g., monster, killer) are present in the distal-already-spoken societal discourses about abortion. Women's awareness of these larger discourses led some women to write about their intentional use of selective language choices when talking about their abortion with others. One woman shared: "I tried to find an OBGYN that could see me ASAP. I went in and told them I had a miscarriage because I was ashamed of the truth of what I did" (3–21-18). Finally, some women reported struggling in silence by saying things like: "I am in desperate need of assistance and I am too embarrassed to attend an in person support group" (11–21-16), and "And when I got home, I had to hold it all in. I was so ashamed of my choice. I couldn't let anyone know" (2–11-11). Even though these women were able to anonymously write about their abortion on this website, they felt muted by their loved ones because of the centripetal discourses of shame and embarrassment associated with abortion.

## Discussion

A national study that assessed women's support for and interest in alternative models of abortion provision found that about half of U.S. women are supportive of and nearly one-third are interested in medication abortion (Biggs et al., 2019). The growing interest and practice in this type of abortion provision warrant scholars to understand women's experiences. Our study is the first in the U.S. to conduct a case analysis of women's online blogging narratives about having had a medication abortion. We focused on understanding the discursive dynamics and contradictions that influenced and shaped women's talk about their own experiences. Our analysis rendered four sites of dialectical tension: *only choice* vs. *other alternatives, unprepared* vs. *knowledgeable, relief* vs. *regret,* and *silence* vs. *openness.* Each site of struggle characterized a different stage of women's medication abortion narrative: the decision, the medication abortion process, after-abortion identity, and the general stigmatizing silence associated with abortion.

As other scholars have noted (Kimport & Doty, 2019), we found that women relied upon language choices that aligned with the existing ideological frameworks from both the Right to Life and Right to Choice movements. For instance, some women used the words "fetal tissue," while other women used the word "baby" when referencing their pregnancy. Women also explicitly mentioned distal already-spoken messages from both movements about how they were told "it's just a pill" or "I've killed my baby." Such language choices are not idle linguistic distinctions, but rather indicate a woman's awareness of the different semantics and terminology surrounding the larger cultural narratives about abortion. This awareness was particularly evident when women discussed the overarching silence stigmatizing one's abilities to openly talk with family and friends about their medication abortion experience. Thus, women's talk about their own personal experiences, their justification for having an abortion, and their own sense-making after the medication abortion were shaped by the available heuristics and frames from larger cultural discourses and political movements (Kimport & Doty, 2019).

Cultural narratives of abortion are powerful and construct meaning and truth (Ludlow, 2008). While a woman's personal story about her medication abortion is individual and now occurs in a more private setting (e.g., at home), this experience remains social and political, defined, and reified by larger cultural narratives and semantics (Beynon-Jones, 2017; Cockrill & Nack, 2013). The sexual liberalism script that reflects positive attitudes toward nontraditional sexual behaviors influences individual's attitudes about abortion (Tokunaga et al., 2015), as well as their own narratives about medication abortion. We found evidence of these larger discourses within women's talk about their own medication abortion, and in particular, their rationale for their decision, their description of the medication abortion process, their reflections on their identity after the abortion, and the overall stigmatizing silence resulting in a muted voice and the public illegitimacy of their own narrative. For instance, many of the justifiable reasons recounted by women in this case study for having an abortion align with the centripetal discourses of the Right to Choice movement regarding bodily rights and a woman's freedom of choice. Among women having abortions in the U.S., finances and lack of readiness are the most commonly cited reasons for choosing abortion (Finer et al., 2005).

The presence of larger cultural narratives can result in dialectical tensions as one seeks to construct her own abortion narrative and considers disclosing that narrative to others. In

particular, many women described experiencing both relief and regret after their abortion. Historically, these two emotions have been juxtaposed and positioned as binary emotions that are socially and politically aligned (Ehrlich & Doan, 2019). The Right to Choice movement discourse aligns with the notion that abortion proffers emotional relief, whereas the Right to Life movement discourse positions itself with abortion resulting in regret. This polarized alignment and framing results in both movements speaking different languages and never fully listening nor engaging with the other (Wiederhold, 2014). One proposed origin of this framing dates back to the legal reasoning of the 2007 U.S. Supreme Court case *Gonzales v. Carhart*, where the federal partial-birth abortion ban was upheld. However, our analysis of women's narratives post-medication abortion exposes the complex duality of these two emotions often being experienced in tandem, as opposed to being simplistic binaries. The either-or, unidimensional script from both the Right to Choice and Right to Life movements – abortion provides either relief or results in regret – fueled a sense of tension for many of the women as they processed their identity after the abortion and considered openly disclosing those private experiences with others. Thus, these women's narratives illustrate that one's individual experiences with having had a medication abortion may result in a both/and: initial relief coupled with later regret. A reliance upon political movement discourses to construct one's own narrative may continue to marginalize or invalidate one's own private medication abortion experience when the larger scripts remain politically charged and polarized (LaRoche & Foster, 2018).

The stigma and risk that characterize the topic of abortion are influenced and shaped by the larger centrifugal discourses from both the Right to Choice and Right to Life movements (Beynon-Jones, 2017; Cockrill & Nack, 2013). For example, Cockrill and Nack (2013) found that women seeking an abortion often attempt to manage the stigma of abortion through non-disclosure, stating their reasons for having an abortion as "exceptional" and necessary, or condemning the Right to Life perspectives about abortion. In a different study on Southside Chicago African-American adolescent females, the majority of sexually active teens never talked with their parents about the topic of abortion, and almost 20% expressed fears of harm or eviction if their parent were to learn of an abortion in their past (Sisco et al., 2014). In our case study, we found that women also experienced stigma, silence, and fear that led them to remain private and/or secretive with certain individuals throughout their medication abortion experience. Silence before or during the medication abortion process resulted in women experiencing additional challenges later on with talking openly about one's experiences. Altogether, these findings align with communication scholars who have found that when private health information disclosures are deemed as being threatening or stigmatizing, one's private health information remains concealed (Baxter & Akkoor, 2011; Ebersole & Hernandez, 2016). This is important because secrecy of one's abortion is associated with poorer coping (Major & Gramzow, 1999; Major et al., 1997), and may result in further isolation and lack of social support from others (Cockrill & Biggs, 2017).

Recent movements such as Shout Your Abortion and #YouKnowMe have tried to dispel the stigma and silence surrounding abortion. However, these movements remain politically aligned and purport the "American Dream" abortion narrative: I was able to go to college/graduate/get a good job due to my abortion. These more recent public narratives frame abortion as a restitution or quest experience (Frank, 1995), where women are portrayed as being able to return to normalcy and good health, or regard their abortion story as one part of their personal journey that they were able to overcome. While such discourses were evident in some women's blogs and have been shown to reduce abortion stigma when openly disclosed (Cockrill & Biggs, 2017), many women's narratives within this case study characterized chaos narratives (Frank, 1995) where the abortion experience interrupted their daily lives and left them feeling out of control. Most notably, over 50% of the sample reported that the father to their child or other family members used negating language as a means to justify a woman's need for an abortion, albeit her own desires to keep her baby. In addition, 75 women (77%) regretted their decision, and 37 women (38%) reported struggling with mental illness and suicidal thoughts after the abortion. While previous scholarship has also found evidence of some women experiencing negative outcomes after an abortion due to a lack of decision-making power and limited social support (Kimport et al., 2011), as well as possible significant relationships between abortion and mental health problems (see Fergusson et al., 2013; Reardon, 2018), these centrifugal discourses remain muted and marginalized in the U.S. abortion debate.

### Limitations and directions for future research

As with all scholarship there are limitations. Most notably, there is a lack of generalizability due to the limited scope: we only analyzed women's medication abortion narratives anonymously posted to one website. However, it is important to note that the purpose of this project was to make analytic generalizations based on gathering an in-depth descriptive understanding of these women's medication abortion narratives. Second, all qualitative case studies are limited by the sensitivity and integrity of the investigators. We attempted to surmount this obstacle by having three qualitatively trained female researchers who completed independent coding and collectively participated in the contrapuntal analysis process. Third, case study research is criticized for not having a clear set of systematic procedures (Yin, 2014). To address this concern, we sought to clarify and provide transparency with the methodological techniques used. Fourth, the anonymity of women's blog submissions to the website did not allow us to gather and report the social demographics of the women who anonymously shared their abortion narratives, which again hinders the generalizability of our findings. Finally, the population of women who write an anonymous post about their abortion experience may be different from those who do not.

All of these limitations provide avenues for future research. Most importantly, this single case study demonstrates the need for a broader, pluralistic, mixed-method research strategy that

HEALTH COMMUNICATION    335

assesses women's medication abortion narratives, particularly given its increased popularity amongst women seeking this type of abortion provision. Such research could interview women who have had a medication abortion, as well as use surveys to assess different variables such as demographic factors, health literacy, and privacy management strategies employed when talking about one's medication abortion.

## Conclusion

n sum, our findings show that the medication abortion experience is rife with tension and contradiction. This complexity and duality are not evident in much of the larger cultural discourses and political debates about abortion. Many women in this case study noted that their decision to have a medication abortion was not a flippant decision or an easy choice where women remained unscathed. Women's narratives about their medication abortion experience were complex, and no singular narrative fully encapsulated or defined what women experienced during and after their medication abortion. Therefore, it is critical to transcend the silence in order to expose both sides of the debate and understand how these larger discourses influenced women's personal language choices when constructing their own abortion narrative and anonymously sharing it with others online. The tensions and dialectical struggles experienced after having a medication abortion and attempting to share it with others remain silent from public discourse and debate (Hallgarten, 2018). Presently, this silence positions one's abortion story as an either-or, binary experience that is politically aligned with one movement or another. The larger discourses prevalent within both the Right to Life and Right to Choice movements impact the liminality of women who are contemplating a medication abortion and affect their own narrative reconstruction and sense-making after their private medication abortion.

## Acknowledgments

We would like to thank Chuck Donovan, Michaelene Fredenburg, and Genevieve Plaster for their support and assistance throughout the entire research process. We also want to thank Caroline Funk for her assistance with data analysis. In addition, we would like to recognize the women, who through their own accord and as separate from this research study, chose to publicly share their story online.

## References

Abortion Changes You. (n.d.). Stories. https://www.abortionchangesyou.com/stories

Altshuler, A. L., Ojanen-Goldsmith, A., Blumenthal, P. D., & Freedman, L. R. (2017). A good abortion experience: A qualitative exploration of women's needs and preferences in clinical care. Social Science Medicine, 191(1), 109–116. https://doi.org/10.1016/j.socscimed.2017.09.010

Arden Ford, L., Golden, M. A., & Berlin Ray, E. (2014). The case study in health communication research. In B. B. Whaley (Ed.), Research methods in health communication: Principles and application (pp. 41–56). Routledge.

Baxter, L. A. (2011). Voicing relationships: A dialogic perspective. Sage.

Baxter, L. A., & Akkoor, C. (2011). Topic expansiveness and family communication patterns. Journal of Family Communication, 11(1), 1–20. https://doi.org/10.1080/15267431003773523

Becker, K. A., & Freburg, K. (2014). Medical student storytelling on an institutional blog: A case study analysis. Medical Teacher, 36(5), 415–421. https://doi.org/10.3109/0142159X.2014.891007

Beynon-Jones, S. M. (2017). Untroubling abortion: A discourse analysis of women's accounts. Feminism & Psychology, 27(2), 225–242. https://doi.org/10.1177/0959353517696515

Biggs, M. A., Ralph, L., Raifman, S., Foster, D. G., & Grossman, D. (2019). Support for and interest in alternative models of medication abortion provision among a national probability sample of U.S. women. Contraception, 99(2), 118–124. https://doi.org/10.1016/j.contraception.2018.10.007

Braun, V., & Clarke, V. (2006). Using thematic analysis in psychology. Qualitative Research in Psychology, 3(2), 77–101. https://doi.org/10.1191/1478088706qp063oa

Cockrill, K., & Biggs, A. (2017). Can stories reduce abortion stigma? Findings from a longitudinal cohort study. Culture, Health & Sexuality, 20(3), 335–350. https://doi.org/10.1080/13691058.2017.1346202

Cockrill, K., & Nack, A. (2013). "I'm not that type of person": Managing the stigma of having an abortion. Deviant Behavior, 34(12), 973–990. https://psycnet.apa.org/doi/10.1080/01639625.2013.800423

Ebersole, D. S., & Hernandez, R. A. (2016). "Taking good care of our health": Parent-adolescent perceptions of boundary management about health information. Communication Quarterly, 64(5), 573–595. https://doi.org/10.1080/01463373.2016.1176939

Ehrlich, J. S., & Doan, A. E. (2019). Abortion regret: The new attack on reproductive freedom. Praeger. http://publisher.abc-clio.com/9781440839856

Fergusson, D. M., Horwood, J. L., & Boden, J. M. (2013). Does abortion reduce the mental health risks of unwanted or unintended pregnancy? A re-appraisal of the evidence. Australian & New Zealand Journal of Psychiatry, 47(9), 819–827. https://doi.org/10.1177/0004867413484597

Finer, L. B., Frohwirth, L. F., Dauphinee, L. A., Singh, S., & Moore, A. M. (2005). Reasons U.S. women have abortions: Quantitative and qualitative perspectives. Perspectives on Sexual and Reproductive Health, 37(3), 110–118. https://doi.org/10.1363/psrh.37.110.05

Frank, A. W. (1995). The wounded storyteller: Body, illness and ethics. University of Chicago Press.

Hallgarten, L. (2018). Abortion narratives: Moving from statistics to stories. The Lancet, 391(10134), 1988–1989. https://doi.org/10.1016/S0140-6736(18)31036-5

Hedqvist, M., Brolin, L., Tydén, T., & Larsson, M. (2016). Women's experiences of having an early medical abortion at home. Sexual & Reproductive Healthcare, 9(1), 48–54. https://doi.org/10.1016/j.srhc.2016.07.003

Jones, H. E., O'Connell White, K., Norman, W. V., Guilbert, E., Lichtenberg, E. S., & Paul, M. (2017). First trimester medication abortion practice in the United States and Canada. PloS One, 12(10), e0186487. https://doi.org/10.1371/journal.pone.0186487

Jones, M., & Alony, I. (2008). Blogs – The new source of data analysis. Journal of Issues in Informing Science and Information Technology, 5(1), 433–446. https://doi.org/10.28945/1019

Jones, R. K., & Jerman, J. (2017). Population group abortion rates and lifetime incidence of abortion: United States, 2008–2014. American Journal of Public Health, 107(12), 1904–1909. https://doi.org/10.2105/AJPH.2017.304042

Jones, R. K., Zolna, M. R. S., Henshaw, S. K., & Finer, L. B. (2008). Abortion in the United States: Incidence and access to services, 2005. Perspectives on Sexual and Reproductive Health, 40(1), 6–16. https://doi.org/10.1363/4000608

Jones, R. K., Witwer, E., & Jerman, J. (2019, September). Abortion incidence and service availability in the United States, 2017. Guttmacher institute. https://www.guttmacher.org/report/abortion-incidence-service-availability-us-2017

Kimport, K., Cockrill, K., & Weitz, T. A. (2012). Analyzing the impacts of abortion clinic structures and processes: A qualitative analysis of women's negative experience of abortion clinics. Contraception, 85(2), 204–210. https://doi.org/10.1016/j.contraception.2011.05.020

Kimport, K., & Doty, C. (2019). Interpreting the truth: How people make sense of new information about abortion. Women's Health Issues, 29(2), 182–187. https://doi.org/10.1016/j.whi.2019.01.004

Kimport, K., Foster, K., & Weitz, T. A. (2011). Social sources of women's emotional difficulty after abortion: Lessons from women's abortion narratives. *Perspectives on Sexual and Reproductive Health*, 43(2), 103–109. https://doi.org/10.1363/4310311

Langellier, K. M., & Peterson, E. E. (2004). *Performing narrative: Storytelling in daily life*. Temple University Press.

LaRoche, K. J., & Roche, A. M. (2018). *Exploring Canadian women's multiple abortion experiences: Implications for reducing stigma and improving patient-centered care*.

Lincoln, Y., & Guba, E. (1985). *Naturalistic inquiry*. Sage.

Ludlow, J. (2008). The things we cannot say: Witnessing the traumatization of abortion in the United States. *WSQ: Women's Studies Quarterly*, 36(1–2), 28–41. https://doi.org/10.1353/wsq.0.0057

Major, B., & Gramzow, R. H. (1999). Abortion as stigma: Cognitive and emotional implications of concealment. *Journal of Personality and Social Psychology*, 77(4), 735–745. https://psycnet.apa.org/doi/10.1037/0022-3514.77.4.735

Major, B., Zubek, J., Cooper, L. M., Cozzarelli, C., & Richards, C. (1997). Mixed messages: Implications of social conflict and social support within close relationships for adjustment to a stressful life event. *Journal of Personality and Social Psychology*, 72(6), 1349–1363. https://psycnet.apa.org/doi/10.1037/0022-3514.72.6.1349

Mead, H. (1982). *The individual and the social self: Unpublished work of George Herbert Mead* (D. L. Miller, Edited by). University of Chicago.

Newton, D., Bayly, C., McNamee, K., Hardiman, A., Bismark, M., Webster, A., & Keogh, L. (2016). How do women seeking abortion choose between surgical and medical abortion? Perspectives from abortion service providers. *Australian and New Zealand Journal of Obstetrics and Gynecology*, 56(5), 523–529. https://doi.org/http://dx.doi.org/10.1111/ajo.12506

Norander, S., & Brandhorst, J. (2017). Case Study. In M. Allen (Ed.), *The SAGE encyclopedia of communication research methods* (pp. 117–119). Sage.

Orbe, M. (2005). Continuing the legacy of theorizing from the margins: Conceptualizations of co-cultural theory. *Women & Language*, 28(2), 65–66.

Orbe, M. P. (1998). From the standpoint(s) of traditionally muted groups: Explicating a co-cultural communication theoretical model.

*Communication Theory*, 8(1), 1–26. https://doi.org/10.1111/j.1468-2885.1998.tb00209.x

Reardon, D. C. (2018). The abortion and mental health controversy: A comprehensive literature review of common ground agreements, disagreements, actionable recommendations, and research opportunities. *SAGE Open Medicine*, 6(1), 1–38. https://doi.org/10.1177/2050312118807624

Saldaña, J. (2013). *The coding manual for qualitative researchers* (2nd ed.). Sage.

Sisco, K. M., Martins, S. L., Kavanagh, E. K., & Gilliam, M. L. (2014). Parent-daughter communication about abortion among non-pregnant African-American adolescent females. *Journal of Adolescent Health*, 55(6), 835–841. https://doi.org/10.1016/j.jadohealth.2014.07.010

Stormer, N. (2010). A likely past: Abortion, social data, and a collective memory of secrets in 1950s America. *Communication and Critical/Cultural Studies*, 7(4), 337–359. https://doi.org/10.1080/14791420.2010.523430

Strauss, A., & Corbin, J. (1990). *Basics of qualitative research: Grounded theory procedures and techniques*. Sage.

Tokunaga, R. S., Wright, P. J., & McKinley, C. J. (2015). U.S. adults' pornography viewing and support for abortion: A three-wave panel study. *Health Communication*, 30(6), 577–588. https://doi.org/10.1080/10410236.2013.875867

Tracy, S. J. (2013). *Qualitative research methods: Collecting evidence, crafting analysis, communicating impact*. Wiley-Blackwell.

Tyler, J. A. (2007). Incorporating storytelling into practice: How HDR practitioners foster strategic storytelling. *Human Resource Development Quarterly*, 18(4), 559–587. https://doi.org/10.1002/hrdq.1219

Upadhyay, U. D., Desai, S., Zlidar, V., Weitz, T. A., Grossman, D., Anderson, P., & Taylor, D. (2015). Incidence of emergency department visits and complications after abortion. *Obstetrics and Gynecology*, 125(1), 175–183. https://doi.org/10.1097/AOG.0000000000000603

Wiederhold, A. M. (2014). Narrative spaces between intractability outside the clinic. *Health Communication*, 29(7), 741–744. https://doi.org/10.1080/10410236.2013.769661

Yin, R. K. (2014). *Case study research: Design and methods*. Sage.

# EXHIBIT 19

Population Council

NON-PROFIT

# Population Council

*For more on population control, see John Holdren (https://www.influencewatch.org/person/john-holdren/)*

The Population Council is a nonprofit founded in 1952 by John D. Rockefeller III to address supposed world overpopulation. The council conducts demographic research and analysis to support and promote the global use of artificial birth control and abortion; biomedical research to discover and develop new contraceptive drugs and technologies; and demographic analysis in support of population control experiments, policies, and programs in underdeveloped countries.[1]

The Population Council grew from a conference convened by Rockefeller which was attended by "population activists," the director of Planned Parenthood Federation of America (https://www.influencewatch.org/non-profit/planned-parenthood-federation-of-america/), and several well-known eugenicists, among others.[2] Lamenting that "modern civilization had reduced the operation of natural selection by saving more 'weak' lives and enabling them to reproduce," resulting in "a downward trend in… genetic quality," the conferees agreed that an organization needed to be created that would be devoted to the "reduction of fertility."[3][4] Rockefeller formally launched the council with a personal grant of $100,000 and served as the organization's first president. American Eugenics Society (AES) members Frederick Osborn and Frank Notestein were chosen as the council's next two presidents.[5] Early donors to the council included the Rockefeller Brothers Fund (https://www.influencewatch.org/non-profit/rockefeller-brothers-fund/) and the Ford Foundation (https://www.influencewatch.org/non-profit/ford-foundation/), but the U.S. and foreign governments would become the council's biggest financial backers.[6]

The Population Council has been responsible for the development of several controversial contraceptives and abortifacients used throughout the world. In 1962, for instance, the council had been warned by its own research doctors about the acute adverse side effects of the original models of the intrauterine device (IUD). Nonetheless, the council collaborated with the Ford Foundation and the International Planned Parenthood Federation (IPPF) (https://www.influencewatch.org/non-profit/planned-parenthood-federation-of-america/) on large-scale IUD programs throughout the 1960s in India, Pakistan, South Korea, and Taiwan. Reported side effects included severe pain, protracted bleeding, pelvic inflammatory disease, and perforated uteruses.[7]

The original French manufacturer of the RU-486 abortifacient pill donated the rights to manufacture and market the drug in the U.S. to the Population Council in 1994. The council then transferred the rights in exchange for undisclosed royalties to Danco, which *The Washington Post* has called a "secretive and obscure" company in the Cayman Islands.[8] Now called Mifeprex, RU-486 was responsible for about 40 percent of the nearly 900,000 abortions performed in the U.S. in 2016.[9]

The council was also responsible for the development of the hormonal contraceptive implant Norplant. In 1999, the company licensed to manufacture Norplant agreed to a $50 million settlement in response to a class-action lawsuit brought by more than 30,000 women who say they suffered severe side effects using the device.[10]

## History

### EARLY YEARS

The Population Council was incorporated in November 1952 by John D. Rockefeller III, and funded initially by the Rockefeller Brothers Fund, Ford Foundation, Markle Foundation, the National Institutes of Health, and Rockefeller personally.[6] The new council funded demographic and biomedical research and made grants to researchers and institutions to study "knowledge, attitudes, and practices related to family planning" and artificial birth control in countries throughout the world.[11] Early grants supported studies in embryonic development, funded research into "differential fertility among social classes," and paid for sterilization experiments on "women with bad hereditary history."[12] In 1956, the council established a biomedical research lab at the Rockefeller Institute for research on the human reproductive system and to facilitate the development of new contraceptives.[11]

Historian Donald T. Critchlow wrote that the Population Council "cultivated elite connections and avoided public controversy by identifying itself as a neutral, scientific organization." From its very beginning, however, "the council was policy oriented" and "played a principal role in establishing an international network of population experts who shared a set of assumptions about population dynamics and a consensus as to population intervention."[13]

Founding member of the council and secretary of the American Eugenics Society (AES) Frederick Osborn was Rockefeller's successor as president in 1957. Osborn was a leading proponent of "reform eugenics," which sought to distance itself from the racism and anti-Semitism of the eugenics movements popular in the U.S. prior to World War II and embraced by the Nazi regime in Germany. Osborn "did not hesitate to endorse compulsory eugenic sterilization of the mentally ill or restrictions on immigration, and to voice caution against miscegenation."[14] Osborn had written earlier that, "It is evident that the social conditions which affect reproduction might be modified in a number of ways, so that the dynamic influences of population change would be more in line with conscious social objectives. Eventually, if our dream of human progress is to be realized, rational social action must replace the operation of blind forces in this as in other fields."[15] Under Osborn's leadership, the council made regular direct grants to the AES.[12]

## THE IUD

Osborn's colleague at the AES, Frank Notestein, became the council's third president in 1959. Impatient with the cost and bureaucracy involved with widespread dissemination of the birth control pill in undeveloped countries, Notestein and Rockefeller convened an international conference in 1962 on intrauterine devices (IUDs) to gather information on the contraceptive method and encourage further development. Despite hearing from doctors about frequent adverse side effects like pain, protracted bleeding, pelvic inflammatory disease, and perforated uteruses, the council collaborated with the Ford Foundation and the International Planned Parenthood Federation (IPPF) on large-scale IUD programs in Pakistan, Taiwan, South Korea, and India where enthusiastic and often authoritarian leaders made population control a national priority. By 1968, the council had invested more than $2.5 million in manufacturing and distributing the new "Lippes Loop" IUD worldwide.[16]

By 1965, the first program launched in Taiwan revealed that 28 percent of test women had their IUDs removed because of pain or excessive bleeding and 10 percent had become pregnant. This suggested that across Taiwan and South Korea, tens of thousands of women would soon be suffering adverse consequences. In India, writes historian Matthew Connelly, "the number would be orders of magnitude greater." Meanwhile, a new local IUD plant was preparing to produce twenty thousand devices a day and the Indian government announced its plan to supply twenty-nine million women with IUDs over a five-year period.[17]

A year later, significantly adverse side effects of the IUD had become systemic in Taiwan, South Korea, India, Pakistan, Puerto Rico, and the United States. By 1967 in India, 58 percent of women reported some pain after IUD insertion, 24 percent reported severe pain, and 43 percent had prolonged bleeding. That same year, Notestein acknowledged that "mistakes have been made, but the overall gains have been valuable and highly significant."[18]

## "BEYOND FAMILY PLANNING"

In 1969, the Population Council's fourth president, Bernard Berelson, published an article entitled "Beyond Family Planning" in the council's quarterly *Studies in Family Planning*.[19] Ostensibly, an effort to promote discussion about the "problem" of continued population growth, the document offered legitimacy to the most draconian policy suggestions, such as adding "fertility control agents" to water supplies in urban areas, temporary sterilization of all young women "via time-capsule contraceptives," and compulsory sterilization of men with three or more children. While Berelson did not necessarily recommend these extreme measures, he included them in his essay as "programs or policies more or less responsibly suggested," and he encouraged further research.[20] Ten years later Berelson would write, "The familiar choice presented in the policy literature—that voluntarism is good and 'coercion' bad—is clearly simplistic. We are all of us 'coerced' daily by both culture and law, in countless accepted ways [...] the term itself is neutral: the issue turns on what end is served by a coercive policy and the participatory conditions under which it is implemented."[21]

Revealing perhaps his true motive for considering harsher measures, Berelson suggested in "Beyond Family Planning" that the "more extreme of controversial proposals tend to legitimate more moderate advances." Berelson noted that abortions were getting easier to perform by "the so-called suction device now being utilized in Eastern Europe and the U.S.S.R.," and might not require hospitalization. These advances would, in turn, allow for even more possibilities like an abortion "camp" where the procedure could be conducted on numerous women simultaneously.[22]

About the same time that Bereleson published "Beyond Family Planning," Population Council's biomedical division director Sheldon Segal was training doctors at the All-India Institute of Medical Sciences (AIIMS) in Delhi how to determine sex in humans "for its general usefulness in reproductive biomedicine." While Segal claimed he never intended his training to facilitate sex-selective abortions, the procedures he taught were already being used to do that.[23] Testifying before Congress in 2016, reporter and author Mara Hvistendahl alleged that a few years after Segal's training "AIIMS became the site of shocking medical experiments." Hvistendahl continued, "Doctors offered poor pregnant women in Delhi sex determination and then tracked whether they aborted—and wrote up the results in a medical journal. Of course, women tended to abort if they were carrying girls. That was how sex selection was introduced to India."[24] Segal would later go on record as a proponent of sex determination as a means of population control.[25]

Fearing boycotts led by American pro-life groups, Roussel-Uclaf, the French company which developed the RU-486 chemical abortifacient pill, chose not to bring the drug to the American market itself and sought to find an American company to buy the rights to RU-486. This proved a long and fruitless effort as the French company was unable to find a single American company willing to take on the politically risky drug. Impatient with the lack of progress, then-U.S. Representative Ron Wyden (D-Oregon) threatened the seizure of Roussel-Uclaf's patent rights. In May 1994, Roussel-Uclaf donated RU-486 rights to the Population Council, which would be responsible for running clinical trials, obtaining Food and Drug Administration (FDA) approval, and finding a manufacturer. [26][27]

While waiting for FDA approval, the Population Council transferred rights to manufacture and distribute RU-486 to Danco Laboratories in exchange for undisclosed royalties. *The Washington Post* reported that "secretive and obscure" Danco was formed in the Cayman Islands in 1995.[8] Danco then contracted with Chinese firm Hua Lian to produce the compounds for RU-486, a deal which, according to a research director at the Shanghai Family Planning Commission, was encouraged by the Rockefeller Foundation.[28]

Marketed by Danco as Mifeprex, the "Abortion Pill" was responsible for 6 percent of all abortions in 2001 and 31 percent by 2014, according to the pro-abortion Guttmacher Institute (https://www.influencewatch.org/non-profit/guttmacher-institute/).[29] That percentage has already grown to more than 40 percent since a 2016 FDA ruling extending the use of the abortion drug through 10 weeks of pregnancy.[9]

### NORPLANT

Norplant is a contraceptive consisting of six silicone capsules containing the hormone levonorgestrel that are inserted under the skin of a woman's upper arm. Levonorgestrel thickens cervical mucus so that sperm cannot get through to any eggs and also prevents the regular release of eggs. These effects can last for up to five years. The product was developed by Sheldon Segal and Horatio Croxatto of the Population Council in 1966. As with the IUDs, clinical trials were held outside the U.S. in 17 countries in Latin America, Asia, and Africa.[30][31] In 1990, the FDA approved Norplant.

The council sold the rights to manufacture and market Norplant to Wyeth-Ayerst Laboratories, a division of the American Home Products Corporation. By 1992, Norplant sales reached $141 million and a year later the device had been implanted in 1 million women in the U.S.[31] Over the next few years, however, tens of thousands of women brought lawsuits against Wyeth-Ayerst charging that the company downplayed the severe side effects of Norplant. By 1999, Wyeth-Ayerst agreed to a settlement in which the company admitted no wrong but agreed to pay $1,500 to each of approximately 36,000 women. Sales of Norplant plummeted, and Wyeth-Ayerst discontinued sales in 2000.[32][33]

## Activities

The Population Council funds and conducts biomedical research on contraceptive and HIV-prevention drugs and delivery systems; contraceptive product development; policy research and analysis to provide governments and international organizations "evidence-based" justification for contraception and abortion; and demographic analysis in support of population control experiments, policies, and, programs in underdeveloped countries.[1]

The council administers its programs in 50 countries through offices in Africa, Asia, Latin America, and the Middle East.[34] In 2016, the Population Council took in $84.5 million in support, the majority, approximately 60%, from governments. In that year, 46% of Population Council contributions came from the U.S. government through the Agency for International Development (USAID), Centers for Disease Control and Prevention (CDC), and the National Institutes of Health (NIH). The council also received 21% of its support from foundations, corporations, nongovernmental organizations, and individuals, and another 4% from multilateral organizations. In 2016, the council spent $85.2 million on "program services," which included Reproductive Health (37%), HIV and AIDS (27%), and Poverty, Gender, and Youth (17%).[35]

The Population Council developed the non-hormonal copper ParaGard IUD in 1984 and the levonorgestrel-releasing Mirena IUD in 2000.[36] ParaGard is also widely regarded as the most effective "emergency contraceptive" — even more so than the "morning-after" pill. Advocates of using ParaGard in this manner, typically do not mention or downplay the product's abortifacient potential, preventing the implantation of a fertilized egg.

The council has a long history of providing research, analysis, and advocacy to efforts at legitimizing and expanding access to abortion in underdeveloped countries. Population Council participated in the Consortium for Safe Abortions in India, which launched a program of "community-level sensitization using murals, community theater, home health visits, and local media to raise awareness" about the legal right to abortion and the location of abortion providers. The council reported that the program

successfully dispelled misperceptions about abortion-related issues" and "significantly increased the availability of abortion in rural areas.[37] Similarly, working with the National Pro-Choice Alliance for Mexico, the council "played a key role in the passage of the 2007 law decriminalizing early abortion in Mexico City.[38]

## CURRICULUM PROGRAM

In collaboration with pro-abortion organizations including International Planned Parenthood Federation and International Women's Health Coalition, the Population Council in 2009 published *It's All One*, a curriculum for sex education teachers "from Africa to the Pacific, from Asia to the Americas, from Europe to the Arab World." Topics include gender, sexual health, HIV, sexuality, relationships, communication, intimate-partner violence, puberty, reproduction, contraception, and abortion. Recommended activities include having students pair-off to role-play situations such as, "communicating one's HIV status, sharing what feels pleasurable and what does not, or deciding whether and how to communicate one's experience of same-sex attraction."[39]

## Leadership

As of 2023, Patricia C. Vaughan and James Sailer are the Interim co-Presidents of the Population Council following the previous president, Julia Bunting, stepping away from her position. [40]

Patricia C. Vaughan serves as the interim co-president as well as General Counsel for the Population Council. Vaughan previously served as board chair of the Kenya-based African Population Health and Research Center as well as the South Africa-based Solutions for Innovative Policies, Programs and Technologies, NPC. She also serves on the Council on Foreign Relations (https://www.influencewatch.org/non-profit/council-on-foreign-relations/) (CFR). [41]

James Sailer is the Interim co-president of the Population Council as well as the executive director of the organization's Center for Biomedical Research. He was previously worked as vice-president of corporate affairs for the Population Council as well as the former Board Chair for international non-government organization (NGO) coalition InsideNGO. [42]

## References

- Return of Organization Exempt from Income Tax (Form 990). Population Council. 2022. Part I. https://projects.propublica.org/nonprofits/organizations/131687001/202343199349307609/full (https://projects.propublica.org/nonprofits/organizations/131687001/202343199349307609/full)

1. "Capabilities." Population Council. Accessed February 1, 2018. http://www.popcouncil.org/about/capabilities (http://www.popcouncil.org/about/capabilities)

2. Connelly, Matthew. *Fatal Misconception: The Struggle to Control World Population*. The Belknap Press of Harvard University Press. Cambridge, Massachusetts. 2008. PP. 156.

3. Rockefeller, John D. "On the Origins of the Population Council." Population and Development Review 3, no. 4 (1977): 493-502. doi:10.2307/1971690. Published by: Population Council. Stable URL: http://www.jstor.org/stable/1971690 (http://www.jstor.org/stable/1971690)

4. "Family Planning – The Rockefeller Foundation: A Digital History." The Rockefeller Foundation. Accessed January 24, 2018. https://rockfound.rockarch.org/family-planning (https://rockfound.rockarch.org/family-planning)

5. Connelly, Matthew. *Fatal Misconception: The Struggle to Control World Population*. The Belknap Press of Harvard University Press. Cambridge, Massachusetts. 2008. P. 155-159.

6. 1957 Annual Report. The Population Council. P. 16. https://library.ucsd.edu/dc/object/bb5974338p/_1.pdf (https://library.ucsd.edu/dc/object/bb5974338p/_1.pdf)

7. Connelly, Matthew. *Fatal Misconception: The Struggle to Control World Population*. The Belknap Press of Harvard University Press. Cambridge, Massachusetts. 2008. P. 219-225.

8. "Drug's U.S. Marketer Remains Elusive." *The Washington Post*. Published October 12, 2000.  Accessed January 23, 2018. https://www.washingtonpost.com/archive/politics/2000/10/12/drugs-us-marketer-remains-elusive/8b7b732b-0f23-4c96-9051-714cd3d9f6f8/?utm_term=.e68b60a1e027 (https://www.washingtonpost.com/archive/politics/2000/10/12/drugs-us-marketer-remains-elusive/8b7b732b-0f23-4c96-9051-714cd3d9f6f8/?utm_term=.e68b60a1e027)

9. "Exclusive: Abortion by prescription now rivals surgery for U.S. women." Reuters. Published October 31, 2016. Accessed January 23, 2018. https://www.reuters.com/article/us-usa-healthcare-abortion-exclusive/exclusive-abortion-by-prescription-now-rivals-surgery-for-u-s-women-idUSKBN12VoCC?utm_sour+ce=twitter&utm_medium=Social (https://www.reuters.com/article/us-usa-healthcare-abortion-exclusive/exclusive-abortion-by-prescription-now-rivals-surgery-for-u-s-women-idUSKBN12VoCC?utm_sour+ce=twitter&utm_medium=Social)

10. "Norplant makers to settle claims." CNNMoney. Accessed February 1, 2018. http://money.cnn.com/1999/08/26/companies/norplant/ (http://money.cnn.com/1999/08/26/companies/norplant/)

11. "Timeline." Population Council. Accessed January 24, 2018. http://www.popcouncil.org/about/timeline (http://www.popcouncil.org/about/timeline)

12. Connelly, Matthew. *Fatal Misconception: The Struggle to Control World Population*. The Belknap Press of Harvard University Press. Cambridge, Massachusetts. 2008. P. 160.

13. Critchlow, Donald T. *The Politics of Abortion and Birth Control in Historical Perspective*. The Pennsylvania State University Press. University Park, PA. P. 9.

14. Lombardo, Paul A. *"The American Breed": Nazi eugenics and the origins of the Pioneer Fund*. Albany Law Review. February 2002. Georgia State University. P. 800.

15. Lorimer, Frank & Osborn, Frederick. *Dynamics Of Population: Social And Biological Significance Of Changing Birth Rates In The United States*. PP. 345-348. The Macmillan Company. New York. 1934.

16. Connelly, Matthew. *Fatal Misconception: The Struggle to Control World Population*. The Belknap Press of Harvard University Press. Cambridge, Massachusetts. 2008. PP. 204-206.

17. Connelly, Matthew. *Fatal Misconception: The Struggle to Control World Population*. The Belknap Press of Harvard University Press. Cambridge, Massachusetts. 2008. PP. 218-224.

18. Connelly, Matthew. *Fatal Misconception: The Struggle to Control World Population*. The Belknap Press of Harvard University Press. Cambridge, Massachusetts. 2008. PP. 225-236.

19. Berelson, Bernard. "Beyond Family Planning." *Studies in Family Planning*. #38. February 1969. The Population Council. http://uscl.info/edoc/doc.php?doc_id=83&action=inline (http://uscl.info/edoc/doc.php?doc_id=83&action=inline)

20. Berelson, Bernard. "Beyond Family Planning." *Studies in Family Planning*. #38. February 1969. The Population Council. P. 3. http://uscl.info/edoc/doc.php?doc_id=83&action=inline (http://uscl.info/edoc/doc.php?doc_id=83&action=inline)

21. Berelson, Bernard, and Lieberson, Jonathan. "Government Efforts to Influence Fertility: The Ethical Issues." Population and Development Review 5, no. 4 (1979). P. 599. doi:10.2307/1971973.

22. Berelson, Bernard. "Beyond Family Planning." *Studies in Family Planning*. #38. February 1969. The Population Council. P. 4. http://uscl.info/edoc/doc.php?doc_id=83&action=inline (http://uscl.info/edoc/doc.php?doc_id=83&action=inline)

23. Hvistendahl, Mara. *Unnatural Selection: Choosing Boys over Girls, and the Consequences of a World Full of Men*. PublicAffairs. Perseus Books Group. New York. 2011. PP. 82-85.

24. Statement of Mara Hvistendahl. Gendercide: China's Missing Girls. Hearing before the Congressional-Executive Commission on China. February 3, 2016. https://www.cecc.gov/sites/chinacommission.house.gov/files/CECC%20Hearing%20-%20Gendercide%20-%203Feb16%20-%20Mara%20Hvistendahl.pdf (https://www.cecc.gov/sites/chinacommission.house.gov/files/CECC%20Hearing%20-%20Gendercide%20-%203Feb16%20-%20Mara%20Hvistendahl.pdf)

25. Hvistendahl, Mara. *Unnatural Selection: Choosing Boys over Girls, and the Consequences of a World Full of Men*. PublicAffairs. Perseus Books Group. New York. 2011. P. 86.

26. "The Pill Arrives." CNN. Published October 2, 2000. Accessed January 22, 2018. http://www.cnn.com/ALLPOLITICS/time/2000/10/09/pill.html (http://www.cnn.com/ALLPOLITICS/time/2000/10/09/pill.html)

27. "Abortion Pill's U.S. Debut Snagged by Business Dispute." *The Washington Post*. Published January 12, 1997. Accessed January 22, 2018. https://www.washingtonpost.com/archive/politics/1997/01/12/abortion-pills-us-debut-snagged-by-business-dispute/8e500dd4-3aba-40b7-b342-3bff7fcd4850/?utm_term=.e16bdd3e18e4 (https://www.washingtonpost.com/archive/pol

itics/1997/01/12/abortion-pills-us-debut-snagged-by-business-dispute/8e560dd4-3aba-40b7-b3a2-3bff7fcd4856/?utm_ter
m=.e16bdd3e18e4)

28. "Abortion Pill Maker Revealed." CBS News. Published October 13, 2000. Accessed January 23, 2018. https://www.cbsnews.c
om/news/abortion-pill-maker-revealed/ (https://www.cbsnews.com/news/abortion-pill-maker-revealed/)

29. "Induced Abortion in the United States." Guttmacher Institute. Published January 26, 2018. Accessed January 29, 2018. https
://www.guttmacher.org/fact-sheet/induced-abortion-united-states#1 (https://www.guttmacher.org/fact-sheet/induced-abor
tion-united-states#1)

30. "Pre-introductory clinical trials of Norplant implants: a comparison of seventeen countries' experience." *Contraception*. Volu
me 52, Issue 5. November 1995. P. 287.

31. Institute of Medicine. *Contraceptive Research, Introduction, and Use: Lessons from Norplant*. Washington, DC: The Nation
al Academies Press. 1998. P. 107. https://doi.org/10.17226/5946 (https://doi.org/10.17226/5946).

32. "Will the Lawyers Kill Off Norplant?" *The New York Times*. Published May 27, 1995. Accessed January 30, 2018. http://www.
nytimes.com/1995/05/28/business/will-the-lawyers-kill-off-norplant.html (http://www.nytimes.com/1995/05/28/business
/will-the-lawyers-kill-off-norplant.html)

33. "Maker of Norplant Offers a Settlement In Suit Over Effects." *The New York Times*. Published August 26, 1999. Accessed Jan
uary 30, 2018. http://www.nytimes.com/1999/08/27/us/maker-of-norplant-offers-a-settlement-in-suit-over-effects.html (ht
tp://www.nytimes.com/1999/08/27/us/maker-of-norplant-offers-a-settlement-in-suit-over-effects.html)

34. "Strategic Priorities." Population Council. Accessed January 22, 2018. http://www.popcouncil.org/about/strategic-priorities (
http://www.popcouncil.org/about/strategic-priorities)

35. 2016 Annual Report. The Population Council. P. 10-12. http://www.popcouncil.org/uploads/pdfs/AR2016.pdf (http://www.p
opcouncil.org/uploads/pdfs/AR2016.pdf)

36. Cleland K, Zhu H, Goldstuck N, Cheng L, Trussell J. "The efficacy of intrauterine devices for emergency contraception: a syste
matic review of 35 years of experience." *Human Reproduction* (Oxford, England). 2012;27(7):1994-2000. doi:10.1093/humre
p/des140.

37. "Increasing Access to Comprehensive Abortion Care Services in India." Population Council. Accessed January 31, 2018. http:/
/www.popcouncil.org/research/increasing-access-to-comprehensive-abortion-care-services-in-india (http://www.popcouncil
.org/research/increasing-access-to-comprehensive-abortion-care-services-in-india)

38. "Shaping Abortion Reform in Mexico City." Population Council. Accessed January 31, 2018. http://www.popcouncil.org/news
/shaping-abortion-reform-in-mexico-city (http://www.popcouncil.org/news/shaping-abortion-reform-in-mexico-city)

39. *It's All One Curriculum, Volume 1: Guidelines for a Unified Approach to Sexuality, Gender, HIV, and Human Rights Educati
on*. Population Council. New York 2009. P. 141 https://www.popcouncil.org/uploads/pdfs/2011PGY_ItsAllOneGuidelines_e
n.pdf (https://www.popcouncil.org/uploads/pdfs/2011PGY_ItsAllOneGuidelines_en.pdf)

40. "The Population Council announces Interim Co-Presidents." Population Council, Accessed February 4, 2024. https://popcou
ncil.org/media/the-population-council-announces-interim-co-presidents/ (https://popcouncil.org/media/the-population-co
uncil-announces-interim-co-presidents/)

41. "Patricia C. Vaughan." Population Council, Accessed February 2, 2024. https://popcouncil.org/staff/patricia-c-vaughan/ (htt
ps://popcouncil.org/staff/patricia-c-vaughan/)

42. "James Sailer." Population Council, Accessed February 2, 2024. https://popcouncil.org/staff/james-sailer/ (https://popcoun
cil.org/staff/james-sailer/)

🛈 *See an error? Let us know! (/contribute-to-influencewatch/#report-error)*

---

## Nonprofit Information

- **Accounting Period:** December - November
- **Tax Exemption Received:** December 1, 1953

*Available Filings*

## 2021 Dec

| | |
|---|---|
| **Form Type** | Form 990 |
| **Total revenue** | $58,213,127 |
| **Total functional expenses** | $60,962,900 |
| **Total assets (EOY)** | $168,124,790 |
| **Total liabilities (EOY)** | $29,200,620 |
| **Unrelated business income?** | N |
| **Total contributions** | $44,753,562 |
| **Program service revenue** | $112,836 |
| **Investment income** | $2,283,339 |
| **Comp. of current officers, directors, etc.** | $2,174,686 |
| **Form 990** | |

## 2020 Dec

| | |
|---|---|
| **Form Type** | Form 990 |
| **Total revenue** | $57,674,221 |
| **Total functional expenses** | $61,473,136 |
| **Total assets (EOY)** | $165,937,710 |
| **Total liabilities (EOY)** | $34,866,284 |
| **Unrelated business income?** | N |

| | |
|---|---|
| **Total contributions** | $43,773,375 |
| **Program service revenue** | $127,349 |
| **Investment income** | $1,761,612 |
| **Comp. of current officers, directors, etc.** | $2,324,655 |
| **Form 990** | |

## 2019 Dec

| | |
|---|---|
| **Form Type** | Form 990 |
| **Total revenue** | $82,631,863 |
| **Total functional expenses** | $71,080,422 |
| **Total assets (EOY)** | $169,859,882 |
| **Total liabilities (EOY)** | $37,917,673 |
| **Unrelated business income?** | N |
| **Total contributions** | $54,165,671 |
| **Program service revenue** | $82,171 |
| **Investment income** | $3,473,373 |
| **Comp. of current officers, directors, etc.** | $2,919,661 |
| **Form 990** | **PDF (HTTPS://PROJECTS.PROPUBLICA.ORG/NONPROFITS/DOWNLOAD-FILING?PATH=04_2021_PREFIXES_06-13%2F131687001_201912** |

## 2018 Dec

| | |
|---|---|
| **Form Type** | Form 990 |

| Total revenue | $97,604,680 |
|---|---|
| Total functional expenses | $82,590,271 |
| Total assets (EOY) | $145,312,264 |
| Total liabilities (EOY) | $38,681,586 |
| Unrelated business income? | N |
| Total contributions | $70,001,047 |
| Program service revenue | $134,800 |
| Investment income | $2,981,831 |
| Comp. of current officers, directors, etc. | $2,533,591 |
| Form 990 | PDF (HTTPS://PROJECTS.PROPUBLICA.ORG/NONPROFITS/DOWNLOAD-FILING?PATH=02_2020_PREFIXES_05-13%2F131687001_201812 |

## 2017 Dec

| Form Type | Form 990 |
|---|---|
| Total revenue | $91,365,529 |
| Total functional expenses | $86,668,211 |
| Total assets (EOY) | $140,903,775 |
| Total liabilities (EOY) | $41,299,941 |
| Unrelated business income? | N |
| Total contributions | $71,764,136 |
| Program service revenue | $67,711 |

346

| | |
|---|---|
| **Investment income** | $1,800,315 |
| **Comp. of current officers, directors, etc.** | $2,617,615 |
| **Form 990** | PDF (HTTPS://PROJECTS.PROPUBLICA.ORG/NONPROFITS/DOWNLOAD-FILING?PATH=02_2019_PREFIXES_11-13%2F131687001_201712_ |

## 2016 Dec

| | |
|---|---|
| **Form Type** | Form 990 |
| **Total revenue** | $82,733,727 |
| **Total functional expenses** | $85,432,557 |
| **Total assets (EOY)** | $142,820,494 |
| **Total liabilities (EOY)** | $52,748,972 |
| **Unrelated business income?** | N |
| **Total contributions** | $72,427,240 |
| **Program service revenue** | $0 |
| **Investment income** | $1,856,838 |
| **Comp. of current officers, directors, etc.** | $2,863,685 |
| **Form 990** | PDF (HTTPS://PROJECTS.PROPUBLICA.ORG/NONPROFITS/DOWNLOAD-FILING?PATH=IRS%2F131687001_201612_990_201711281498237 |

## 2015 Dec

| | |
|---|---|
| **Form Type** | Form 990 |
| **Total revenue** | $79,012,374 |
| **Total functional expenses** | $84,157,365 |

347

| Total assets (EOY) | $144,875,451 |
|---|---|
| Total liabilities (EOY) | $54,254,931 |
| Unrelated business income? | N |
| Total contributions | $71,368,781 |
| Program service revenue | $0 |
| Investment income | $3,706,919 |
| Comp. of current officers, directors, etc. | $3,074,268 |
| Form 990 | PDF (HTTPS://PROJECTS.PROPUBLICA.ORG/NONPROFITS/DOWNLOAD-FILING?PATH=2017_03_EO%2F13-1687001_990_201512.PDF) |

## 2014 Dec

| Form Type | Form 990 |
|---|---|
| Total revenue | $88,192,984 |
| Total functional expenses | $86,700,897 |
| Total assets (EOY) | $138,846,469 |
| Total liabilities (EOY) | $32,791,971 |
| Unrelated business income? | N |
| Total contributions | $75,254,425 |
| Program service revenue | $0 |
| Investment income | $4,437,539 |

| | |
|---|---|
| **Comp. of current officers, directors, etc.** | $2,888,531 |
| **Form 990** | PDF (HTTPS://PROJECTS.PROPUBLICA.ORG/NONPROFITS/DOWNLOAD-FILING?PATH=2015_09_EO%2F13-1687001_990_201412.PDF) |

## 2013 Dec

| | |
|---|---|
| **Form Type** | Form 990 |
| **Total revenue** | $81,701,469 |
| **Total functional expenses** | $87,349,595 |
| **Total assets (EOY)** | $139,324,151 |
| **Total liabilities (EOY)** | $29,917,362 |
| **Unrelated business income?** | N |
| **Total contributions** | $74,820,045 |
| **Program service revenue** | $0 |
| **Investment income** | $2,609,105 |
| **Comp. of current officers, directors, etc.** | $2,657,069 |
| **Form 990** | PDF (HTTPS://PROJECTS.PROPUBLICA.ORG/NONPROFITS/DOWNLOAD-FILING?PATH=2014_09_EO%2F13-1687001_990_201312.PDF) |

## 2012 Dec

| | |
|---|---|
| **Form Type** | Form 990 |
| **Total revenue** | $66,071,100 |
| **Total functional expenses** | $78,369,608 |
| **Total assets (EOY)** | $130,952,524 |

| Total liabilities (EOY) | $31,803,832 |
|---|---|
| Unrelated business income? | N |
| Total contributions | $55,236,787 |
| Program service revenue | $0 |
| Investment income | $2,804,602 |
| Comp. of current officers, directors, etc. | $2,645,870 |
| Form 990 | PDF (HTTPS://PROJECTS.PROPUBLICA.ORG/NONPROFITS/DOWNLOAD-FILING?PATH=2013_09_EO%2F13-1687001_990_201212.PDF) |

## 2011 Dec

| Form Type | Form 990 |
|---|---|
| Total revenue | $70,889,544 |
| Total functional expenses | $85,080,839 |
| Total assets (EOY) | $135,947,611 |
| Total liabilities (EOY) | $32,055,273 |
| Unrelated business income? | N |
| Total contributions | $59,340,421 |
| Program service revenue | $0 |
| Investment income | $1,700,869 |
| Comp. of current officers, directors, etc. | $2,475,622 |

| Form 990 | PDF (HTTPS://PROJECTS.PROPUBLICA.ORG/NONPROFITS/DOWNLOAD-FILING?PATH=2012_10_EO%2F13-1687001_990_201112.PDF) |

## *Additional Filings (PDFs)*

- 2010 Dec Form 990 (https://projects.propublica.org/nonprofits/download-filing?path=2011_09_EO%2F13-1687001_990_201012.pdf)
- 2009 Dec Form 990 (https://projects.propublica.org/nonprofits/download-filing?path=2011_02_EO%2F13-1687001_990_200912.pdf)
- 2008 Dec Form 990 (https://projects.propublica.org/nonprofits/download-filing?path=2009_10_EO%2F13-1687001_990_200812.pdf)
- 2007 Dec Form 990 (https://projects.propublica.org/nonprofits/download-filing?path=2009_01_EO%2F13-1687001_990_200712.pdf)
- 2006 Dec Form 990 (https://projects.propublica.org/nonprofits/download-filing?path=2008_03_EO%2F13-1687001_990_200612.pdf)
- 2005 Dec Form 990 (https://projects.propublica.org/nonprofits/download-filing?path=2007_12_EO%2F13-1687001_990_200512.pdf)
- 2004 Dec Form 990 (https://projects.propublica.org/nonprofits/download-filing?path=2005_12_EO%2F13-1687001_990_200412.pdf)
- 2003 Dec Form 990 (https://projects.propublica.org/nonprofits/download-filing?path=2004_12_EO%2F13-1687001_990_200312.pdf)
- 2002 Dec Form 990 (https://projects.propublica.org/nonprofits/download-filing?path=2003_12_EO%2F13-1687001_990_200212.pdf)
- 2001 Dec Form 990 (https://projects.propublica.org/nonprofits/download-filing?path=2002_11_EO%2F13-1687001_990_200112.pdf)

## Population Council

ONE DAG HAMMARSKJOLD PLAZA
NEW YORK, NY 10017-2201

🌐 https://popcouncil.org/ (https://popcouncil.org/)

*Copyright 2025 InfluenceWatch. All Rights Reserved.*

# EXHIBIT 20

2002 Citizen Petition of AAPLOG to FDA
(Aug. 8, 2002)
("2002 Citizen Petition")

**BEFORE THE DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION**

5     **Citizen Petition re: Request for**      )
       **Stay and Repeal of the Approval of**    )
       **Mifeprex (mifepristone) for the Medical**   )
       **Termination of Intrauterine Pregnancy**   )
       **through 49 Days' Gestation**             )
10

## CITIZEN PETITION AND REQUEST FOR ADMINISTRATIVE STAY

The American Association of Pro Life Obstetricians and Gynecologists ("AAPLOG"),

15   the Christian Medical Association ("CMA"), and Concerned Women for America ("CWA")

(collectively, "the Petitioners") submit this Petition pursuant to 21 C.F.R. §§ 10.30 and 10.35;

21 C.F.R. Part 314, Subpart H (§§ 314.500-314.560); and Section 505 of the Federal Food, Drug

and Cosmetic Act (21 U.S.C. § 355).[1]  The Petitioners urge the Commissioner of Food and Drugs

to impose an immediate stay of the approval by the Food and Drug Administration ("FDA" or

20   "agency") of Mifeprex™ (mifepristone; also, "RU-486"),[2] thereby halting all distribution and

marketing of the drug, pending final action on this Petition.  In addition the Petitioners urge the

Commissioner to revoke FDA's approval of Mifeprex and request a full FDA audit of the

Mifeprex clinical studies.[3]

---

[1]  Federal Food, Drug, & Cosmetic Act of 1938 ("FD&C Act"), Pub. L. No. 75-717, 52 Stat. 1040 (1938) (codified as amended at 21 U.S.C. §§ 301 *et seq.*).

[2]  The New Drug Application for Mifeprex, which was filed by the Population Council, was approved on September 28, 2000.  Mifeprex is distributed by Danco Laboratories, a licensee of the Population Council.

[3]  The Petitioners will, at times, cite to documents contained in FDA's January 31, 2002 public release of documents (approximately 9,000 pages in 94 files) made pursuant to a Freedom of Information Act request ("FDA FOIA Release") filed by the non-profit organization, Judicial Watch.  These bracketed citations will reflect the page numbering FDA has stamped on the bottom of each page, for example: [FDA FOIA Release: MIF 000001-05].  The FDA webpage posting the 94 files is: <http://www.fda.gov/cder/archives/mifepristone/default.htm>.  Since the initial release FDA has edited some of the 94 files.  However, the stamped page numbers have not changed.  Additionally, many footnotes refer to Appendix A to this Petition, which contains a selected bibliography.

## I.  ACTION REQUESTED

The Petitioners respectfully request that the Commissioner immediately stay the approval of Mifeprex, thereby halting all distribution and marketing of the drug pending final action on this Petition.  They urge the Commissioner to revoke market approval for Mifeprex in light of the legal violations and important safety concerns explained below.  In addition, they request a full FDA audit of all records from the French and American clinical trials offered in support of the Mifeprex NDA.

## II.  INTEREST OF THE PETITIONERS

While it is true that the Petitioners have consistently opposed abortion and continue to do so, a careful examination of the claims made in this petition should alert people of conscience on either side of this issue that women are being harmed.  Regardless of one's position on abortion, FDA's violations of its standards and rules have put women's health and lives at risk.  The Petitioners are non-profit organizations that share a great concern about women's health issues. The American Association of Pro-Life Obstetricians and Gynecologists ("AAPLOG") is a recognized interest group of the American College of Obstetricians and Gynecologists ("ACOG"), currently representing over 2,000 obstetricians and gynecologists throughout the United States of America.  The Christian Medical Association, founded in 1931, is a professional organization with thousands of physician members representing every medical specialty. Concerned Women for America ("CWA"), founded in 1979, is the largest public policy women's organization in the United States with members in every State and a total membership exceeding 500,000.

5

10

15

20

25

## III.  STATEMENT OF GROUNDS

### A.    SUMMARY OF THE PETITIONERS' ARGUMENTS

5        Good cause exists to grant an immediate stay of the agency's September 28, 2000 Mifeprex approval.[4]  Good cause also exists for the subsequent revocation of that approval.[5]  As established herein, (1) the approval of Mifeprex violated the Administrative Procedure Act's prohibition on agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;[6] (2) FDA's approval of Mifeprex violated 21 U.S.C. § 355 because the

10      drug does not satisfy the safety and labeling requirements of that section; and (3) the agency approved Mifeprex despite the presence of substantial risks to women's health.

         This Petition represents the latest attempt by members of the medical community and other concerned observers to warn FDA of the dangers posed by Mifeprex abortions to the health of women.[7]  Women undergoing Mifeprex abortions risk, among other problems, uncontrolled

15      fatal hemorrhage and serious bacterial infections.  Mifeprex abortions particularly endanger women with ectopic pregnancies and those whose pregnancies have progressed beyond 49 days.[8]

---

[4]  When FDA approved the Population Council's NDA for mifepristone, it approved the drug for use in conjunction with misoprostol.  In this Petition, "Mifeprex Regimen" will refer to the combined use of Mifeprex and misoprostol to effect an abortion.

[5]  *See* 21 C.F.R. § 314.530 ("Withdrawal Procedures").

[6]  5 U.S.C. § 706(2)(A).

[7]  On February 28, 1995, Americans United for Life and other groups and individuals filed a Citizen Petition with FDA requesting it to "refuse to approve any NDA for RU 486 for use as a pharmaceutical abortifacient that does not contain adequate evidence that the drug has undergone nonclinical and clinical safety and effectiveness trials."  The petitioners also set forth a number of factors for the agency to consider.  Americans United for Life *et al.*, Citizen Petition (Feb. 28 1995)[FDA FOIA Release: MIF 006144-6248]; *see also*, Letter, Ronald G. Chesemore, Associate Commissioner for Regulatory Affairs, FDA, to Gary L. Yingling, McKenna & Cuneo (March 20, 1995) (one-page letter suggesting that the petition was prematurely filed and claiming to be a "full response")[FDA FOIA Release: MIF 006250].

[8]  The gestational age of a pregnancy is based on the first day of a woman's last menstrual period, which is designated as Day 1 of the pregnancy.  On Day 49, a woman is deemed to be seven weeks pregnant, which means she has experienced 49 days of amenorrhea (time elapsed since the beginning of her last menstrual period).

3

Warnings about these dangers, together with FDA's own concerns about the safety of the abortion regimen, went unheeded. On September 28, 2000, FDA approved the new drug application ("NDA") for Mifeprex.[9] The initial reports of life-threatening and fatal adverse events appear to bear out the safety concerns underlying the pre-approval warnings. The Petition highlights a number of agency actions that were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. These serious departures from standard agency practice allowed the NDA for Mifeprex, a drug that is not safe for its intended use, to be approved by FDA.[10]

    First, the approval of Mifeprex violated the legal requirements of FDA's Accelerated Approval Regulations found in Subpart H.[11] Mifeprex is not a drug for the treatment of a serious or life-threatening illness. It does not demonstrate the potential to address an unmet medical need because a less dangerous and more effective alternative for performing abortions already exists. It appears that FDA's decision to use Subpart H was motivated by its concern that, without restrictions, the drug could not be used safely. Rather than attempting to compensate for

---

Ovulation for the small percentage of woman with a perfect 28 day cycle typically takes place between Days 12 and 14 and fertilization typically takes place 24 to 48 hours later.

[9] *See* U.S. Department of Health and Human Services, *HHS News*, Press Release P00-19, "FDA Approves Mifepristone for the Termination of Early Pregnancy," September 28, 2000. A selection of FDA documents relevant to its approval of Mifeprex may found at: <http://www.fda.gov/cder/drug/infopage/mifepristone>; and on a second page: <http://www.fda.gov/cder/foi/nda/2000/20687_mifepristone.htm>.

[10] FDA's unlawful approval of Mifeprex may not be unprecedented. The medical-scientific community and the mainstream press have called attention to a number of other instances in which one could question whether drugs and medical devices have been improperly approved. *See, e.g.*, Richard Horton, "Lotronex and the FDA: A Fatal Erosion of Integrity," *Lancet* 357 (May 19, 2001): 1544-1545; David Willman, "How a New Policy Led to Seven Deadly Drugs," *Los Angeles Times* (Dec. 20, 2000): at A1; Kit R. Roane, "Replacement Parts: How the FDA Allows Faulty, and Sometimes Dangerous, Medical Devices onto the Market," *U.S. News & World Report* (July 29, 2002): 54-59 (discussing FDA's recent approval policies regarding medical devices).

[11] 21 C.F.R. §§ 314.500-314.560. FDA's Accelerated Approval Regulations are set forth at 21 C.F.R. Part 314, Subpart H ("Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses") ("Accelerated Approval Regulations" or "Subpart H"). The Accelerated Approval Regulations were promulgated by FDA after notice and comment: New Drug, Antibiotic, and Biological Product Regulations; Accelerated Approval, *Proposed Rule*, 57 Fed. Reg. 13234 (April 15, 1992) ("*Subpart H Proposed Rule*") and New Drug, Antibiotic, and Biological

---

the inherent dangerousness of Mifeprex by inappropriately resorting to the Subpart H approval mechanism, FDA should simply have refused to approve Mifeprex.  (*See* Section III.D., *infra*.)

Second, Mifeprex was not proven to be "safe and effective" as required by law.[12]  The scientific quality of the trials used to support the NDA was undeniably deficient according to Congress's statutory requirements and FDA's well-established standards.[13]  The trials were not blinded, randomized, or concurrently controlled.  FDA failed to explicitly waive its rules or offer a reasoned explanation for defying its own standards.  (*See* Section III.E., *infra*.)

Third, the Mifeprex Regimen requires that Mifeprex be used in conjunction with another drug, misoprostol.  FDA, however, has never approved misoprostol as an abortifacient.  Although FDA normally opposes the promotion of off-label uses, in connection with the Mifeprex NDA, the agency sanctioned and itself participated in the promotion of the off-label use of misoprostol.  Mifeprex, the label of which creates the false impression that misoprostol is approved for use as an abortifacient, is misbranded. (*See* Section III.F., *infra*.)

Fourth, and most critically, the Mifeprex Regimen is dangerous.  FDA sought, without success, to convince the drug sponsor to place safety restrictions on Mifeprex.  When that failed, on June 1, 2000, FDA itself proposed restrictions intended to reduce the unacceptable health risks associated with mifepristone abortions.  Nevertheless, the agency, under concerted pressure from abortion advocates and politicians, ultimately approved mifepristone for use in a deregulated regimen that lacks key safeguards.  For example, the regimen does not include a requirement that transvaginal ultrasound be used to date pregnancies and rule out ectopic

---

Product Regulations; Accelerated Approval, *Final Rule*, 57 Fed. Reg. 58942 (Dec. 11, 1992) ("*Subpart H Final Rule*") (available at: <http://www.fda.gov/cder/fedreg/fr19921211.txt>).

[12] *See* 21 U.S.C. § 355.

[13] *See* 21 C.F.R. § 314.126.

pregnancies, which cannot be treated with the Mifeprex Regimen.  In addition, FDA failed to restrict access to mifepristone to physicians trained in the provision of Mifeprex and surgical abortions and capable of treating complications arising from abortions.    Concerns about the dangers of Mifeprex were confirmed when Danco and FDA announced publicly on April 17, 2002, a number of serious adverse events, including two deaths.  (*See* Section III.G., *infra*.)

Fifth, the drug's sponsor has neglected to require Mifeprex providers to adhere to the limited restrictions contained in the approved regimen.  The sponsor's inaction is surprising in light of the fact that these restrictions are being flouted openly.  Section 314.530 authorizes FDA to withdraw the approval of a Subpart H drug if a drug's sponsor does not fulfill its responsibility of ensuring compliance with the restrictions on the use of the drug.  (*See* Section III.H., *infra*.)

Sixth, the safeguards employed in the U.S. Clinical Trial are not mirrored in the regimen that FDA approved.  Transvaginal ultrasounds, for example, although employed in the U.S. Clinical Trial, are not required under FDA's approved regimen.  Nor are the trial requirements governing emergency care reproduced in the approved regimen.  (*See* Section III.I., *infra*.)

Seventh, FDA's waiver of its rule, 21 C.F.R. § 314.55, requiring the testing of all new drugs for their potential effects on children, has jeopardized the health and safety of American teenage girls who may have abortions.  FDA expressly contemplated the pediatric use of Mifeprex, but waived, without an adequately reasoned justification, the requirement that the drug undergo pediatric testing.  (*See* Section III.J., *infra*.)

Eighth, FDA did not require the sponsor of Mifeprex to honor its commitments for Phase IV studies, which provide the opportunity to study in-depth the drug's safety and effectiveness after approval.  When FDA approved Mifeprex, the agency permitted the Population Council to replace the six Phase IV study commitments it had made in 1996 with two much narrower

commitments.  The modified studies will not adequately address outstanding questions, such as the effects of mifepristone abortions on women outside the tested age range of 18 to 35 years. (*See* Section III.K., *infra*.)

In sum, FDA, in approving Mifeprex, acted in a manner inconsistent with its statutory authorization, regulations, and well-established policies.  FDA did not provide a contemporaneous explanation of its numerous departures from past practice.[14]  Its aberrant actions coupled with the absence of explanations violated a fundamental principle of administrative law; an agency must either adhere to prior policies or fully explain why it is not doing so.[15]  The approval of Mifeprex was, therefore, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  It must be reversed.

### B.     FDA APPROVAL OF THE MIFEPREX REGIMEN
#### 1.     The Introduction of Mifepristone into the United States

Roussel Uclaf, a French pharmaceutical firm, first developed and tested mifepristone ("RU-486") as an abortifacient.  By April 1990 the drug had become permanently available in

---

[14]  An agency must explain its reasons for acting in a particular manner.  *See, e.g., Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) (noting that a court should not "be compelled to guess at the theory underlying the agency's action," but rather "[i]f the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.").  *Post hoc* rationalizations cannot salvage the agency's action with respect to Mifeprex.  *See, e.g., Martin v. Occupational Safety and Health Review Commission*, 499 U.S. 144, 156-57 (1991) (*post hoc* rationalizations of counsel "do not constitute an exercise of the agency's delegated lawmaking powers"); *Investment Company Institute v. Camp*, 401 U.S. 617, 628 (1971) ("Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.").

[15]  *See, e.g., Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.") (footnote omitted) (citing approvingly *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 57 (1983)); *JSG Trading Corp. v. USDA*, 176 F.3d 535, 544 and 545 (D.C. Cir. 1999) (remanding agency action where "the agency manifestly failed to explain its abrupt departure from prior precedent" and noting that the agency "was obligated to articulate a principled rationale for departing from [its prior] test") (citations omitted); *Gilbert v. National Labor Relations Board*, 56 F.3d 1438, 1445 (D.C. Cir. 1995) ("It is, of course, elementary that an agency must conform to its prior decisions or explain the reason for its departure from such precedent.").

France.  According to Dr. André Ulmann, the Roussel project manager for the development of RU-486, Roussel prohibited the commencement of any new studies in the United States and took the position that "under no circumstance[s]" would it permit a new drug application to be filed with FDA.[16]  In fact, "the chairman of Hoechst [the parent company to Roussel] had officially

5   declared that mifepristone was not compatible with the ethics of the company."[17]

Undeterred by Hoechst's reluctance to bring the drug to the United States, on January 22, 1993, President Clinton directed Department of Health and Human Services ("HHS") Secretary Donna Shalala to assess initiatives to promote the testing and licensing of mifepristone or other antiprogestins in the United States.[18]  Further signaling that approval of mifepristone by FDA

10   was a top priority of his Administration, President Clinton reportedly "wrote to Hoechst asking the company to file a new drug application with the FDA (an unprecedented situation in the pharmaceutical industry!), which Hoechst intransigently refused to do."[19]

In early 1993, Secretary Shalala and FDA Commissioner David Kessler "communicated with senior Roussel Uclaf officials to begin efforts to pave the way for bringing RU-486 into the

15   American marketplace."[20]  On May 16, 1994, the Population Council reached an agreement with Roussel Uclaf, pursuant to which the European drug maker transferred "without remuneration,

---

[16]  *See* André Ulmann, M.D., "The Development of Mifepristone: A Pharmaceutical Drama in Three Acts," *Journal of the American Medical Women's Association* 55 (Supplement 2000): 117-20, at 119.  In 1994 Roussel Uclaf joined with the German pharmaceutical firm, Hoechst AG, to form Hoechst Roussel Ltd.  In 1995, this entity merged with a third firm, Marion Merrell Dow, to form Hoechst Marion Roussel.  In December 1999 Hoechst and Rhône-Poulenc combined to form Aventis, S.A., headquartered in Strasbourg, France.

[17]  Ulmann, *infra* Appendix A, at 120.

[18]  *See* Memorandum for the Secretary of Health and Human Services, "Importation of RU-486," *Public Papers of the Presidents: Administration of William J. Clinton, 1993* (Jan. 22, 1993) at 11.

[19]  Ulmann, *infra* Appendix A, at 120 (emphasis in original).

[20]  HHS Fact Sheet, "Mifepristone (RU-486): Brief Overview," (rel. May 16, 1994).  Available at: <http://www.hhs.gov/news/press/pre1995pres/940516.txt>.

its United States patent rights for mifepristone (RU-486) to the Population Council . . . ."[21]

Secretary Shalala was instrumental in bringing about the transfer of the patent rights to the

Population Council[22] and even set a deadline – May 15, 1994 – for the transfer.[23]

     After obtaining the American patent rights to mifepristone, the Population Council

5   conducted clinical trials in the United States and filed a new drug application in 1996.  The

Population Council established a non-profit corporation, American Health Technologies

("AHT"), to assist in the effort to bring the drug to the market.[24]  The Population Council

ultimately granted Danco Laboratories, LLC ("Danco"), which was incorporated in the Cayman

Islands in 1995, "an exclusive license to manufacture, market, and distribute Mifeprex in the

10  United States."[25]  Danco, after a difficult search,[26] selected the Chinese drug manufacturer,

---

[21]  HHS Press Release, "Roussel Uclaf Donates U.S. Patent Rights for RU-486 to Population Council," (rel. May 16, 1994).  Available at: <http://www.hhs.gov/news/press/pre1995pres/940516.txt>.

[22]  *Id.* ("Shalala commended Roussel Uclaf and the Population Council for coming to closure after months of complex negotiations amid repeated urging from the Clinton administration.")

[23]  *See* William J. Eaton, "Path Cleared for Abortion Pill Use Medicine: French Maker of RU-486 Gives Patent Rights to a Nonprofit Group," *Los Angeles Times*, May 17, 1994, at A1 ("Negotiations between the French manufacturer and the Population Council dragged on for more than a year until Shalala set a May 15 deadline, producing the agreement . . . .").

[24]  Dr. Susan Allen, who once served as president and CEO of American Health Technologies, joined the staff of the Reproductive and Urologic Drug Products Division in FDA's Center for Drug Evaluation and Research in 1998 as a medical officer and was promoted to team leader for reproductive drugs in January 1999.  *See* "RU-486 Action Date Is Sept. 30; Allen Named Reproductive Division Director," *The Pink Sheet* 62 (June 12, 2000): at 14.  Dr. Allen became acting director of the Division in January 2000 and permanent director on June 18, 2000.  *See id.*  *The Pink Sheet* also commented, "Allen is presumably recused from the mifepristone review as a result of her prior experience with the product."  *Id.*

[25]  Danco, "The History of Mifeprex,"available at <http://www.earlyoptionpill.com/history.php3>.  (Danco has dubbed mifepristone "the Early Option Pill" for marketing purposes.)  Little information about Danco is available.  *See* Robert O'Harrow, "RU-486 Marketer Remains Elusive," *Washington Post* (Oct. 12, 2000): at A18 ("Secretive and obscure, Danco is one of the most enigmatic companies in the pharmaceutical industry.").  Danco is apparently a successor entity to Advanced Health Technology.  *See* "RU-486 Action Date Is Sept. 30; Allen Named Reproductive Division Director," *The Pink Sheet* 62 (June 12, 2000): at 14 (reporting that Advanced Health Technologies had become Neogen, which, in turn, had become Danco, according to the Population Council and Danco, "with some management and investor changes").

[26]  In 1995 Danco contracted with a Hungarian pharmaceutical firm, Gideon Richter, to manufacture mifepristone for American distribution.  After Gideon Richter reneged on the contract in February 1997, Danco sued Gideon Richter for breach of contract and began searching for a new producer.  *See* "RU-486: U.S. Partners Sue European Manufacturer," *Kaiser Daily Reproductive Health Report* (June 12, 1997) (available at: <http://www.kaisernetwork.org/reports/1997/06/a970612.1.html>).  This was one of a number of lawsuits stemming

Shanghai Hua Lin Pharmaceutical Company, to manufacture the drug.[27]  Abortion advocates

eagerly awaited the approval of mifepristone in the United States because, among other reasons,

they anticipated that it would enhance women's access to abortion.[28]

5

## 2.    FDA Approval of Mifepristone

The Population Council filed a new drug application for "mifepristone 200 mg tablets"

on March 18, 1996.[29]  FDA initially accorded the drug standard review, but in a letter dated

May 7, 1996, FDA's Center for Drug Evaluation and Research notified the Population Council

that mifepristone would receive priority review.[30]  On September 18, 1996, FDA issued a letter

---

from attempts to bring mifepristone to the United States.  *See* "Ru-486: Litigation Could Cause Delay For U.S. Introduction," *Kaiser Daily Reproductive Health Report* (Dec. 17, 1996) (available at: <http://www.kaisernetwork.org/reports/1996/12/a961217.9.html>) (describing some of the legal problems encountered by the Population Council in bringing the drug to market).

[27]  Pamela Wiley, "Chinese Plant to Make RU-486 for U.S.," (Oct. 15, 2000) (available at: <http://www.nurseweek.com/news/00-10/1015-486.asp>).

[28]  *See* Margaret Talbot, "The Little White Bombshell," *New York Times Magazine* (July 11, 1999): at 39-43 ("'One of my real, and I think realistic, hopes for this method,' says Carolyn Westhoff, an OB-GYN at Columbia University medical school who offers medical abortion as part of a clinical trial, 'is that it will help get abortion back into the medical mainstream and out of this ghettoized place it's been in.'  And if that is indeed the scenario we're looking at – a scenario in which abortion is folded far more seamlessly into regular medical practice – then it has implications not only for women's experience of abortion but for the politics of abortion as well."); *id.* ("Not only are mifepristone abortions, by nature, more discreet than their surgical equivalents (like vacuum aspiration), but the practitioners who prescribe them will almost certainly constitute a larger and a more varied group than the dwindling corps of OB-GYNs willing to do surgical abortions.")  In fact, access to medical abortion, will continue to depend on the availability of surgical abortion, which serves as a back-up in FDA's approved Mifeprex regimen.  Thus, it is spurious to suggest that Mifprex abortions can safely be made available in places in which surgical abortion is not offered.

[29]  The application was dated March 14, 1996 and received by FDA on March 18, 1996.  *See* Letter, FDA/CDER to Ann Robbins, Population Council (Sept. 18, 1996): at 1 ("1996 Mifepristone Approvable Letter").

[30]  *See* Letter, FDA/CDER to Ann Robins, Population Council (May 7, 1996)[FDA FOIA Release: MIF 006431].  The Population Council filed its complete response on March 30, 2000, which gave FDA until September 30, 2000 to act on the application.  In fiscal year 2000 a "standard" designation would have given FDA at least ten months to consider the application.  FDA accorded mifepristone "priority review," which typically required FDA to act within six months.  *See* FDA/CDER, "PDUFA Reauthorization Performance Goals and Procedures" (Nov. 16, 1997) (available at: <http://www.fda.gov/cder/news/pdufagoals.htm>) ("Fiscal Year 2000").  Of 98 approvals in 2000, only 20 were Priority Review drugs.  *See* FDA/CDER, *Report to the Nation* (2000): at 6.  FDA's use of priority review appears inappropriate when considered in light of the agency's current guidance on the issue, which states that priority review is appropriate when "[t]he drug product, if approved, would be a significant improvement compared to marketed products [approved (if such is required), including non-"drug" products/therapies] in the treatment, diagnosis, or prevention of a disease."  *See* FDA/CDER, "Review Management: Priority Review Policy," Manual of Policies and Procedures (MAPP) 6020.3, at 1 (Apr. 22, 1996) (text bracketed as in original).

stating that the application was approvable and requested more information from the sponsor.[31] FDA issued a second approvable letter for mifepristone, dated February 18, 2000, setting forth the remaining prerequisites for approval.[32]  The 2000 Mifepristone Approvable Letter announced that FDA had "considered this application under the restricted distribution regulations contained in 21 CFR 314.500 (Subpart H) and [had] concluded that restrictions as per [21] CFR 314.520 on the distribution and use of mifepristone are needed to assure safe use of this product."[33]

On September 28, 2000, FDA approved mifepristone ("Mifeprex™") "for the medical termination of intrauterine pregnancies through 49 days' pregnancy."[34]  Mifeprex was approved under Subpart H, which, FDA explained, "applies when FDA concludes that a drug product shown to be effective can be safely used only if distribution or use is restricted, such as to certain physicians with certain skills or experience."[35]  The approved regimen requires at least three office visits.[36]  FDA required the Population Council to include, on the Mifeprex Label, a "black box warning for special problems, particularly those that may lead to death or serious injury."[37]

---

[31]  1996 Mifepristone Approvable Letter at 1.

[32]  2000 Mifepristone Approvable Letter at 1.

[33]  2000 Mifepristone Approvable Letter at 5.

[34]  Letter, FDA/CDER to Sandra P. Arnold, Population Council (Sept. 28, 2000): at 1 ("Mifeprex Approval Letter"). In conjunction with the Mifeprex Approval Letter, FDA issued a memorandum that expanded upon the basis for and the restrictions on the approval of Mifeprex.  *See* Memorandum, FDA/CDER to "NDA 20-687 MIFEPREX (mifepristone) Population Council" (Sept. 28, 2000): at 6 ("Mifeprex Approval Memo").

[35]  Mifeprex Approval Memo at 6.

[36]  Pursuant to the approved regimen, on "Day One: Mifeprex Administration" the patient reads the Medication Guide, signs the Patient Agreement, and ingests 600 mg of Mifeprex; on "Day Three: Misoprostol Administration" the patient ingests 400 micrograms of misoprostol orally (unless abortion has occurred and been confirmed by clinical examination or ultrasonographic scan); and, on or about "Day 14: Post-Treatment Examination" the patient returns to the practitioner for verification through a clinical examination or ultrasound that the pregnancy has been successfully terminated.  *See* Mifeprex Label ("Dosage and Administration")(available at: <http://www.fda.gov/cder/foi/label/2000/20687lbl.pdf>).

[37]  Mifeprex Approval Memo at 2 (citing 21 CFR 201.57(e), which authorizes FDA to require such a warning).  The terms "label," "labeling," and "package insert" are often used interchangeably in food and drug law literature.  In this Petition, "Label" describes the fine-print "package insert" that accompanies a drug when it is purchased. However, the FD&C Act defines "label" as "a display of written, printed, or graphic matter upon the immediate container of any article . . . ."  21 U.S.C. § 321(k).  The term "labeling," which will also appears in this Petition,

FDA also outlined the Population Council's post-approval, Phase IV study commitments[38] and waived, without explanation, FDA's regulations providing that all new drugs must be tested for safety and effectiveness in children.[39]

5

### C.    BACKGROUND ON FDA'S DRUG APPROVAL PROCESS
#### 1.    FDA's Default Rules for Establishing Drug Safety and Effectiveness

FDA's regulations state that "[t]he purpose of conducting clinical investigations of a drug is to distinguish the effect of a drug from other influences, such as spontaneous change in the

10    course of the disease, placebo effect, or biased observation."[40]  FDA's default criteria for establishing safety and effectiveness are commonly referred to as the agency's "gold standard."[41] At the core of this default standard is FDA's recognition, reflecting the development of the scientific method and its application to pharmacology, that human bias and misperceptions are pervasive and that every precaution must be taken to avoid them.  "The history of experimental

15    medicine and research psychology," Michael Greenberg writes, "had demonstrated that uncontrolled, unblinded clinical trials were systematically vulnerable to experimenter bias, placebo effects, and the like."[42]  Consequently, rigorous policies have been set forth by FDA and,

---

encompasses "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). "Labeling" may even describe promotional materials used by the drug manufacturer including "[b]rochures, booklets, mailing pieces, . . . price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, . . . and reprints and similar pieces of printed, audio or visual matter descriptive of a drug and references published (for example, the Physician's Desk Reference) for use by medical practitioners, pharmacists, or nurses . . . ." 21 C.F.R. § 202.1(l)(2).  FDA has provided more information on this terminology at: <http://www.fda.gov/cder/handbook/adverdef.htm>.

[38]  *See* Mifeprex Approval Memo at 7.

[39]  *See* FDA Mifeprex Approval Letter at 3.

[40]  21 C.F.R. § 314.126(a).

[41]  *See* Jennifer Kulynych, "Will FDA Relinquish the 'Gold Standard' for New Drug Approval? Redefining 'Substantial Evidence' in the FDA Modernization Act of 1997," *Food and Drug Law Journal* 54 (1999): 127-149, at 129.  We will refer to these criteria as the "default standard."

[42]  Michael D. Greenberg, "AIDS, Experimental Drug Approval, and the FDA New Drug Screening Process," *Legislation and Public Policy* 3 (2000): 295-350, at 308.

more recently, by the International Conference on Harmonisation ("ICH") to eliminate bias from the evaluation of drug safety and effectiveness.[43]

FDA has been criticized for its zealous implementation of this policy,[44] but there is widespread recognition of the value of the default standard. The 1962 statutory amendments to the FD&C Act "authorized the agency to review all NDAs, not only to assess drug safety, but also to determine whether a manufacturer has provided 'substantial evidence' from 'adequate and well-controlled investigations' that a drug is effective for its intended use."[45] In implementing regulations, FDA "required that the evidence include at least one (and usually two) well-controlled (preferably 'blind') trials showing statistically significant results for treatment of humans with the new drug."[46] "[B]arring unusual circumstances, the agency ordinarily requires two successful and well-controlled clinical trials for new drug approval."[47] FDA's mandate for clinical trials "has two very important elements:"

> (1) a "controlled" trial, in which an experimental drug is compared to a placebo, or a known effective treatment in order to establish the comparative efficacy of the drug, and (2) a "double-blind" trial, which involves random assignment of research subjects to the

---

[43] FDA, "International Conference on Harmonisation; Guidance on General Considerations for Clinical Trials," *Notice*, 62 Fed. Reg. 66113 (Dec. 17, 1997) (*FDA Guidance (ICH: E8): General Considerations*). The homepage, (www.ich.org), for the ICH describes the organization as follows: "The International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH) is a unique project that brings together the regulatory authorities of Europe, Japan and the United States and experts from the pharmaceutical industry in the three regions to discuss scientific and technical aspects of product registration. The purpose is to make recommendations on ways to achieve greater harmonisation in the interpretation and application of technical guidelines and requirements for product registration in order to reduce or obviate the need to duplicate the testing carried out during the research and development of new medicines. The objective of such harmonisation is a more economical use of human, animal and material resources, and the elimination of unnecessary delay in the global development and availability of new medicines whilst maintaining safeguards on quality, safety and efficacy, and regulatory obligations to protect public health."

[44] *See, e.g.*, Henry I. Miller, "Failed FDA Reform," *Regulation* 21 (Summer 1998): 24-30.

[45] Kulynych, *infra* Appendix A, at 129 (citing 21 U.S.C. § 355(d)).

[46] Greenberg, *infra* Appendix A, at 307 (citing 21 C.F.R. § 314.126 (1999). FDA comprehensively revised NDA evaluation rules in what is commonly referred to as the "NDA Rewrite." *See Final Rule*, "New Drug and Antibiotic Regulations," 50 Fed. Reg. 7452 (Feb. 22, 1985). Section 314.126 was promulgated in that final rule. *Id*. at 7506-7.

[47] Kulynych, *infra* Appendix A, at 130.

experimental and control groups, under conditions in which neither the doctors nor the research subjects know who is getting the experimental drug and who the control.[48]

Each of the mandated features helps to eliminate bias in trial results.  First, in "double-blinded" studies neither the patient nor the provider team (physician, nurse, etc.) knows the identity of the drug administered.  If that is not possible, the person evaluating the trial results will not know which treatment has been administered to which subject.  Second, a "randomized" study requires a random determination of which subject receives which treatment.  This determination is often effected through computer-generated assignments done before clinical testing begins.  Finally, comparison-control (also known as "comparator-control") requires that the experimental drug be compared *concurrently* to the current best treatment, or, alternatively, to a placebo.  A placebo is used when the drug being tested represents the first treatment of its kind for the particular indication and no established treatment exists.

### 2.    FDA Initiatives to Expedite the Approval of Drugs for the Very Sick

Largely in response to FDA's perceived slowness in approving drugs for human immunodeficiency virus ("HIV") patients, the agency undertook several initiatives to either expedite the ability of seriously or terminally-ill patients to have access to experimental drugs or to provide processes "intended to move drugs to market more quickly by compressing clinical development and FDA review times."[49]  In 1988, FDA adopted an interim rule establishing Subpart E of 21 C.F.R. Part 312 ("Drugs Intended to Treat Life-Threatening and Severely-

---

[48]  Greenberg, *infra* Appendix A, at 307-8 (footnotes omitted).

[49]  Sheila R. Shulman and Jeffrey S. Brown, "The Food and Drug Administration's Early Access and Fast-Track Approval Initiatives: How Have They Worked?" *Food and Drug Law Journal*  50 (1995): 503-531, at 503-4.

Debilitating Diseases").[50]  Subpart E embodied several of the new procedures that FDA had used

to bring the HIV medication, AZT (zidovudine), to market quickly.[51]  Subpart E also created a

"collaborative framework in which early and repeated consultation between the FDA and

pharmaceutical manufacturers served to facilitate clinical trials, and to insure ex ante that

5    prospective research designs would meet with subsequent regulatory approval."[52]  "Taken

together," the innovations found in Subpart E, "served to radically alter the new drug approval

process with regard to life-threatening illnesses, particularly for AIDS."[53]

On April 15, 1992, FDA took its procedural innovations further when it proposed an

"Accelerated Approval" process (*i.e.*, Subpart H).  Shulman and Brown believe that Subpart H

10    "represent[ed] the most significant departure from the traditional FDA standards for drug

approval."[54]  Subpart H's "major point of departure" from previously existing approval regimes

was its focus on granting drug approval "on the basis of the drug's effect on a surrogate endpoint

that is reasonably likely to predict clinical benefit over time."[55]  A "surrogate end point" or

"surrogate marker" is "a laboratory parameter or physical sign that is used in a clinical trial as a

15    substitute for a clinically meaningful end point, such as mortality."[56]  The value of surrogate

---

[50]  *See Interim Rule*, "Investigational New Drug, Antibiotic, and Biological Drug Product Regulations; Procedures for Drugs Intended To Treat Life-Threatening and Severely Debilitating Illnesses," 53 Fed. Reg. 41,516 (Oct. 21, 1988).  The Subpart E rules may be found at 21 C.F.R. §§ 312.80-88.

[51]  *See* Greenberg, *infra* Appendix A, at 321.

[52]  Greenberg, *infra* Appendix A, at 321 (citation omitted).

[53]  Greenberg, *infra* Appendix A, at 323.

[54]  Shulman and Brown, *infra* Appendix A, at 514.

[55]  Shulman and Brown, *infra* Appendix A, at 514.  Likewise, Greenberg observed that the "essential element of the accelerated approval regulations [*i.e.*, Subpart H] was the provision that 'surrogate endpoints' could be employed as the empirical basis for FDA approval of a new drug."  Greenberg, *infra* Appendix A, at 323 (citation omitted).

[56]  Dennis F. Thompson, "Surrogate End Points, Skepticism, and the CAST Study," editorial, *Annals of Pharmacotherapy*, 36 (Jan. 2002): 170-71, at 170 (citations omitted).

367

endpoints lies in their ability to predict clinical outcomes.[57]  As "examples of surrogate end

points that have been proven to be excellent predictors of clinical outcomes and, hence, have

saved both money and precious time expediting drugs to the patient care arena," Dean Dennis

Thompson cites "a diverse group of antihypertensive drugs approved on the basis of reduced

5    blood pressure effects [that] has shown clear benefits in reducing cardiovascular events and

mortality."[58]  With the passage of the Food and Drug Administration Modernization Act of 1997

("FDAMA"), Congress effectively codified Section 314.510, the surrogate endpoint provision of

Subpart H.[59]

Neither Shulman and Brown nor Greenberg focused on a second type of drug approval

10    included in Subpart H – codified now at 21 C.F.R. § 314.520.[60]  This second avenue for

Subpart H approval is reserved for circumstances in which "FDA determines that a drug,

effective for the treatment of a disease, can be used safely only if distribution or use is modified

or restricted."[61]  Pursuant to this provision "FDA may approve a treatment subject to special

---

[57]  *See* Thompson, *infra* Appendix A, at 170.

[58]  Thompson, *infra* Appendix A, at 170.

[59]  This codification was part of Congress's major reauthorization and modernization of the Federal Food, Drug & Cosmetic Act.  Section 506(b) of FDAMA (21 U.S.C. § 356) "in effect, codifie[d] in statute FDA's Accelerated Approval Rule . . . , made final in 1992, which allows expedited marketing of certain new drugs or biological products intended to treat serious or life-threatening illnesses and that appear to provide meaningful therapeutic benefits to patients compared with existing treatments."  FDA Centers for Drug Evaluation and Research and for Biologics Evaluation and Research, *Guidance for Industry: Fast Track Drug Development Programs – Designation, Development, and Application Review*, at 2 (Sept. 1998) (footnote omitted).  While clearly codifying Subpart H's surrogate endpoint provision at 21 U.S.C. § 356(b)(1), Congress does not appear to have enacted a parallel provision to Section 314.520, which pertains to "restricted use" drugs, under which Mifeprex was approved.

[60]  Section 314.520 (Approval with restrictions to ensure safe use.) states:

(a) If FDA concludes that a drug product shown to be effective can be safely used only if distribution or use is restricted, FDA will require such postmarketing restrictions as are needed to ensure safe use of the drug product, such as:
(1) Distribution restricted to certain facilities or physicians with special training or experience; or
(2) Distribution conditioned on the performance of specified medical procedures.
(b) The limitations imposed will be commensurate with the specific safety concerns presented by the drug product.

[61]  *Subpart H Final Rule*, 57 Fed. Reg. at 58942.

16

distribution or use restrictions that address outstanding safety issues."[62]  Section 314.520

balanced FDA's desire to bring clinically beneficial drugs to the market with the agency's

concern that "[s]ome drugs, however, are so inherently toxic or otherwise potentially harmful

that it is difficult to justify their unrestricted use."[63]  The agency explained "that some clinically

5    beneficial drugs can be used safely only if distribution and use are modified and restricted."[64]

Section 314.520 is intended for drugs that are vitally necessary, but which may impose

greater than normal risks for the patient.[65]  FDA was willing "to approve such high risk drugs for

early marketing if the agency can be assured that postmarketing restrictions will be in place to

counterbalance the known safety concerns."[66]  Postmarketing restrictions would be designed "to

10    enhance the safety of a drug whose risks would outweigh its benefits in the absence of the

restriction."[67]  FDA intended to employ restrictions on distribution "only in those rare instances

in which the agency believes carefully worded labeling for a product granted accelerated

approval will *not* assure the product's safe use."[68]  In the absence of restrictions, which "may

vary with the circumstances of each drug[,] . . . the drug would be adulterated under Section 501

15    of the act, misbranded under Section 502 of the act, or not shown to be safe under Section 505 of

the act."[69]  In short, "[w]ithout such restrictions, the drugs would not meet the statutory criteria,

---

[62]  Geoffrey M. Levitt, James N. Czaban, and Andrea S. Paterson, "Chapter 6: Human Drug Regulation" in *Fundamentals of Law and Regulation: An In-Depth Look at Therapeutic Products* (David G. Adams, Richard M. Cooper, and Jonathan S. Kahan, eds.), vol. II (Washington, D.C.: Food and Drug Law Institute, 1997): at 200.

[63]  *Subpart H Proposed Rule*, 57 Fed. Reg. at 13236.

[64]  *Subpart H Proposed Rule*, 57 Fed. Reg. at 13236.

[65]  Of course, "[v]irtually all drug[s] can be toxic to humans, and no drug is completely free of risk," but, as the seriousness of an illness and the effect of the drug on that illness increase, "the greater the acceptable risk from the drug."  *Subpart H Proposed Rule*, 57 Fed. Reg. at 13236.

[66]  *Subpart H Proposed Rule*, 57 Fed. Reg. at 13237.

[67]  *Subpart H Final Rule*, 57 Fed. Reg. at 58952.

[68]  *Subpart H Final Rule*, 57 Fed. Reg. at 58952 (emphasis added).

[69]  *Subpart H Proposed Rule*, 57 Fed. Reg. at 13237.

could not be approved for distribution, and would not be available for prescribing or dispensing."[70]  Mifeprex was the third of four drugs approved pursuant to Section 314.520.[71]

### D.    FDA'S APPROVAL OF MIFEPREX UNDER ITS ACCELERATED APPROVAL REGULATIONS (SUBPART H) WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, OR OTHERWISE NOT IN ACCORDANCE WITH LAW

FDA's accelerated approval regulations (Subpart H) apply to certain new drug products "that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments (e.g., ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy.)"[72]  When it proposed Subpart H in 1992, FDA observed that the following types of illness would fall within the reach of Subpart H:

> The terms "serious" and "life-threatening" would be used as FDA has defined them in the past.  The seriousness of a disease is a matter of judgment, but generally is based on its impact on such factors as survival, day-to-day functioning, or the likelihood that the disease, if left untreated, will progress from a less severe condition to a more serious one.  Thus, acquired immunodeficiency syndrome (AIDS), all other stages of human immunodeficiency virus (HIV) infection, Alzheimer's dementia, angina pectoris, heart failure, cancer, and many other diseases are clearly serious in their full manifestations.  Further, many chronic illnesses that are generally well-managed by available therapy can have serious outcomes.  For example, inflammatory bowel disease,

---

[70] *Subpart H Final Rule*, 57 Fed. Reg. at 58951.  The agency continued: "The agency, as a matter of longstanding policy, does not wish to interfere with the appropriate practice of medicine or pharmacy.  In this instance, the agency believes that rather than interfering with physician or pharmacy practice, the regulations permit, in exceptional cases, approval of drugs with restrictions so that the drugs may be available for prescribing or dispensing."  *Id*. at 58951-52.

[71] On June 7, 2002, the drug Lotronex (alosetron hydrochloride) was reintroduced to the market after a *Supplemental* NDA was approved pursuant to Subpart H's redistricted distribution provision.  *See* Letter, FDA/CDER, Florence Houn, M.D., Director, Office of Drug Evaluation III to Olivia Pinkett, Product Director, Regulatory Affairs, GlaxoSmithKline (June 7, 2002): at 1 ("This supplemental application, considered for approval under 21 CFR 314, Subpart H at your request, narrows the original approved indication to use of the drug in a population for whom the benefits of the drug may outweigh the risks and provides for a risk management program. . . .  You have indicated your agreement with approval under restricted conditions.").

[72] 21 C.F.R. § 314.500.  The rule was amended in 1999 to remove the words "and antibiotic."  *See* Conforming Regulations Regarding Removal of Section 507 of the Federal Food, Drug, and Cosmetic Act, *Final Rule*, 64 Fed. Reg. 396, 402 (Jan. 5, 1999).

370

asthma, rheumatoid arthritis, diabetes mellitus, systemic lupus, erythematosus, depression, psychoses, and many other diseases can be serious for certain populations or in some or all of their phases.[73]

5    According to FDA, the agency has approved 38 NDAs, including the Mifeprex application, under Subpart H.[74]  Of these approvals, 20 were for the treatment of HIV and HIV-related diseases, nine were for the treatment of various cancers and their symptoms, four were for severe bacterial infections, one was for erythema nodosum leprosum (leprosy), one was for hypotension, and, finally, one was for the termination of unwanted pregnancies.[75]

10    Pregnancy, without major complications, is not a "serious or life-threatening illness" for purposes of Subpart H.  It is, rather, a normal physiological state experienced by most females one or more times during their childbearing years, and it is rarely accompanied by complications that threaten the life of the mother or the child.  Following delivery, almost all women return to a normal routine without disability.  Thus, pregnancy is not the kind of exceptional circumstance

15    that falls within the scope of Subpart H.  The fact that the Mifeprex Regimen is intended for healthy women provides further evidence of this point.

---

[73] *Subpart H Proposed Rule*, 57 Fed. Reg. at 13235.  In the *Subpart H Final Rule*, FDA asserted that "serious and life-threatening illnesses" would be readily identifiable: "FDA discussed the meaning of the terms 'serious' and 'life-threatening' in its final rules on 'treatment IND's' (52 FR 19466 at 19467, May 22, 1987) and 'subpart E' procedures (54 FR 41516 at 41518-41519, October 21, 1988).  The use of these terms in this rule is the same as FDA defined and used the terms in those rulemakings.  It would be virtually impossible to name every 'serious' and 'life-threatening' disease that would be within the scope of this rule.  In FDA's experience with 'treatment IND's' and drugs covered by the 'subpart E' procedures there have not been problems in determining which diseases fall within the meaning of the terms 'serious' and 'life-threatening,' and FDA would expect no problems under this accelerated approval program."  *Subpart H Final Rule*, 57 Fed. Reg. at 58945.

[74] These estimates are based on the version of FDA's webpage, dated February 5, 2002, listing Subpart H approvals, *infra* Appendix A.

[75] *See* FDA/CDER webpage, "NDAs Approved under Subpart H," *infra* Appendix A.  A copy of the most recently available version is reproduced in Appendix C (available at: <http://www.fda.gov/cder/rdmt/accapp.htm>).  *See also* "NDA Supplements Approved under Subpart H" (available at: <http://www.fda.gov/cder/rdmt/accappr1.htm>) (supplemental approvals are not included in the figures set forth in the text because they refer to FDA actions regarding drugs that have already been approved).

       In fact, the Population Council argued strenuously that its application for mifepristone did not fall within the scope of Subpart H.[76]  In a letter to FDA written approximately three weeks before the final approval of the mifepristone NDA, the Population Council's Sandra P. Arnold protested, ". . . it is clear that the imposition of Subpart H is unlawful, unnecessary, and

5  undesirable.  We ask FDA to reconsider."[77]  Arnold argued correctly that "[n]either pregnancy nor unwanted pregnancy is an illness, and Subpart H is therefore inapplicable for that reason alone."[78]  She continued, stating, "Neither is pregnancy nor unwanted pregnancy a 'serious' or 'life-threatening' situation as that term is defined in Subpart H."[79]  In the next paragraph, after directly quoting the *Subpart H Final Rule*, Ms. Arnold asserted that "[t]he plain meaning of these

10  terms does not comprehend normal, everyday occurrences such as pregnancy and unwanted pregnancy."[80]  She added that, unlike HIV infection, pulmonary tuberculosis, cancer, and other illnesses, "pregnancy and unwanted pregnancy do not affect survival or day-to-day functioning as those terms are used in Subpart H."[81]  She continued that, "although a pregnancy 'progresses,'" the development of a pregnancy "is hardly the same as the worsening of a disease

15  that physicians call progression."[82]

---

[76]  The Population Council appears to have been concerned about getting the drug approved "without invoking the Subpart H regulatory provisions that signal 'big deal' to the pharmaceutical industry."  Letter, Sandra Arnold to FDA/CDER, Office of Drug Evaluation III, Division of Reproductive and Urologic Products (Sept. 6, 2000): at 4 [FDA FOIA Release: MIF 001333-49]("Sandra Arnold Letter").  Sandra Arnold was "Vice President, Corporate Affairs" of the Population Council.

[77]  Sandra Arnold Letter at 1.

[78]  Sandra Arnold Letter at 1-2.

[79]  Sandra Arnold Letter at 2.

[80]  Sandra Arnold Letter at 2.

[81]  Sandra Arnold Letter at 2.

[82]  Sandra Arnold Letter at 2.  Ms. Arnold also warned the agency that extending the scope of Subpart H to include pregnancy and unwanted pregnancy by exercising agency "judgment" was not defensible; the exercise of such judgment should go to whether or not "a particular disease actually is serious, not [act as] a means of stretching the meaning of serious to cover entirely new categories of non-serious situations."  *Id.*

Additionally, Mifeprex fails to meet the second requirement set forth in Section 314.500 that drugs approved under Subpart H "provide meaningful therapeutic benefit to patients over existing treatments (e.g., ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy.)"  As was noted above, the

5    Mifeprex Approval Memo contends "that the termination of an unwanted pregnancy is a serious condition within the scope of Subpart H [and] [t]he meaningful therapeutic benefit over existing surgical abortion is the avoidance of a surgical procedure."[83]  By defining the "therapeutic benefit" solely as the avoidance of the current standard of care's delivery mechanism, FDA effectively guarantees that a drug will satisfy this second prong of Subpart H as long as it

10    represents a different method of therapy.[84]  It does not appear that such considerations formed the basis of any other Subpart H approval.

When FDA adopted Subpart H, it cited as "readily understood illustrations of the intent of the [meaningful therapeutic benefit] requirement" an "improved response compared to available therapy" and the "ability to treat unresponsive or intolerant patients."[85]  Based on these

15    illustrations, Mifeprex does not fall within the intent of the requirement.  First, there is a less dangerous, more effective alternative to Mifeprex available for the termination of pregnancies: namely, surgical abortions.  Dr. Jeffrey Jensen conducted a study to compare the safety and

---

[83]  Mifeprex Approval Memo at 6.

[84]  The view that merely making a different mode of therapy available *per se* produces a benefit  is inconsistent with the position the agency has articulated elsewhere.  MAPP 6020.3, which defines eligibility for FDA priority review, suggests that drug therapies are not inherently superior to non-drug therapies.  Specifically, a drug may be afforded priority review if it would provide a significant improvement when compared with "marketed products . . . including non-"drug" products/therapies."  *See* FDA/CDER, "Review Management: Priority Review Policy," MAPP 6020.3, at 1 (Apr. 22, 1996).

[85]  *Subpart H Final Rule*, 57 Fed. Reg. at 58947.

efficacy of medical abortion with that of surgical abortion.[86]  The study compared 178 patients

who, as participants in the U.S. clinical trial in support of the Mifeprex NDA, underwent

mifepristone/misoprostol abortions, with 199 patients who later received surgical abortions at the

same clinical site.  The primary procedure failed (*i.e.*, there was a subsequent surgical

intervention) in 18.3 percent of the mifepristone/misoprostol patients and 4.7 percent of the

surgical patients.[87]  Of the mifepristone/misoprostol patients who failed their primary procedure,

12.5 percent required surgical intervention for acute bleeding, 43.8 percent for persistent

bleeding, 15.6 percent for incomplete abortion, and 28.1 percent for ongoing pregnancy.[88]  By

contrast, the sole cause for surgical intervention among the surgical patients who failed their

primary procedure was persistent bleeding.[89]  In addition, mifepristone/misoprostol patients

"reported significantly longer bleeding" and "significantly higher levels of pain . . . , nausea . . . ,

vomiting . . . , and diarrhea" than their surgical counterparts.[90]

       Second, Mifeprex does not treat a subset of the female population that is unresponsive to,

or intolerant of surgical abortion.  To the contrary, because "medical abortion failures should be

managed with surgical termination" the option for surgical abortion must be available for any

Mifeprex patient.[91]  As the U.S. trial conducted in support of the NDA indicated, the possibility

---

[86]  Jeffrey T. Jensen, Susan J. Astley, Elizabeth Morgan, and Mark D. Nicols, "Outcomes of Suction Curettage and Mifepristone Abortion in the United States: A Prospective Comparison Study," *Contraception* 59 (1999): 153-159 ("Jensen Study")[FDA FOIA Release: MIF 000438-44].

[87]  *See* Jensen Study, *infra* Appendix A, at 155, Table 2.

[88]  *See* Jensen Study, *infra* Appendix A, at 156, Table 3.

[89]  *See* Jensen Study, *infra* Appendix A, at 156, Table 3.

[90]  Jensen Study, *infra* Appendix A, at 156.

[91]  Mifeprex Label ("Warnings").

for failure is substantial.[92]  Thus, any patient who would be intolerant of surgical abortion, if such a class of patients exists, cannot use the Mifeprex Regimen.

As discussed below, FDA approved Mifeprex pursuant to Section 314.520 in order to impose safety restrictions to counteract the risks it had identified.  FDA, confronted by the sponsor's refusal to establish voluntary restrictions on distribution,[93] viewed Subpart H as the only available regulatory vehicle that had the potential to make Mifeprex safe.[94]  The inappropriate application of Section 314.520 served the agency's immediate need of conditioning the drug's approval on certain safety measures.  However, Mifeprex fails to satisfy the Subpart H requirements because, although it presents great risk to the user, it neither treats a serious or life-threatening illness nor provides a therapeutic benefit above existing treatments.  A drug with such characteristics should not have been approved.

_____

[92]  FDA, "Medical Officer's Review of Amendments 024 and 033: Final Reports for the U.S. Clinical Trials Inducing Abortion up to 63 Days Gestational Age and Complete Responses Regarding Distribution System and Phase 4 Commitments," at 11 (Table 1) (reporting a failure rate of 8% for pregnancies less than or equal to 49 days' duration) ("Medical Officer's Review").

[93]  Early in the approval process, FDA anticipated that the Population Council would cooperate, thus obviating the need for Subpart H restrictions: "[B]ecause the applicant has voluntarily proposed a system of limited distribution, imposition of further distribution restrictions under the Agency's Subpart H regulations does not appear warranted." *See* Memorandum, FDA/CDER to NDA 20-687 File (Sept. 16, 1996): at 2 [FDA FOIA Release MIF 000560-62]. The voluntary restrictions placed on the drug Accutane, a drug for severe acne, illustrate that a cooperative drug sponsor may be able to obviate the need for Subpart H restrictions.  Because Accutane can cause birth defects, the restrictions are designed to ensure that women taking the drug are not and do not become pregnant.  The "System to Manage Accutane Related Teratogenicity™ (S.M.A.R.T.™)," controls the distribution of the drug through the issuance of yellow Accutane Qualification Stickers.  These stickers are distributed to physicians who meet a number of qualifications and they, in turn, distribute them to patients, who must undergo two tests to confirm they are not pregnant and must commit to use two forms of contraception.  Pharmacists may fill prescriptions for the drug only if they bear the qualification sticker, were issued within the past week, and prescribe no more than 30 days' worth of the drug.  *See* Accutane Label.

[94]  This interpretation of the agency's actions is supported by FDA spokeswoman Crystal Rice, who said "that outside of Subpart H, the FDA does not have another regulatory program to mandate safety restrictions on drug marketing for drugs used to treat 'serious or life-threatening illnesses'" and "that 'other agreements [or restrictions on the drug] not under Subpart H worked out between FDA and a sponsor would be essentially voluntary.'"  "Danco Medical Director Explains Mifepristone's FDA Approval Not Fast-Tracked or Accelerated, Despite Media Reports," *Kaiser Daily Reproductive Health Report* (March 29, 2001) (available at: <http://report.kff.org/archive/repro/2001/3/kr010329.5.htm>).

### E.   THE CLINICAL TRIALS DID NOT PRESENT "SUBSTANTIAL EVIDENCE" THAT THE MIFEPREX REGIMEN IS SAFE AND EFFECTIVE

5        FDA's approval of the Mifeprex NDA ran counter to Congress's statutory requirements, the agency's regulations and guidance documents, and FDA's well-established standards for the quality and quantity of scientific evidence needed to support an agency finding that a new drug is safe and effective.  The clinical trials submitted by the Population Council to support its NDA did not use the full set of design features FDA typically requires to produce unbiased

10      investigations of drug safety and effectiveness.  Because these trials were not blinded, randomized, or concurrently controlled, they did not establish the safety and effectiveness of the Mifeprex Regimen.  Inexplicably, FDA failed to perform a statistical analysis of the data from the American trial.  Furthermore, FDA's approval of Mifeprex pursuant to Subpart H compounds the deficiencies in the trials because sponsors of Subpart H drugs must demonstrate that the drug

15      for which approval is being sought provides a "meaningful therapeutic benefit over existing therapy."  Because Mifeprex was approved in reliance on French and American trials that did not compare the Mifeprex Regimen with the existing standard of care for ending pregnancies (*i.e.*, surgical abortion), the trials cannot support this Subpart H approval.

20              **1.      The Clinical Trials Underlying FDA's Approval of Mifeprex**

         FDA based its approval of Mifeprex on safety and effectiveness data derived from two French clinical trials ("French Clinical Trials") and one U.S. clinical trial ("U.S. Clinical Trial").[95]  Neither the French Clinical Trials nor the U.S. Clinical Trial was blinded, randomized,

---

[95] *See* Mifeprex Approval Memo, *infra* Appendix A, at 1.

or concurrently controlled – the hallmarks of unbiased, scientific analysis generally relied upon by FDA.

### a.  The French Clinical Trials

5        The French Clinical Trials, which formed the basis for the Population Council's original NDA submission in 1996, were open-label, multi-center studies.[96]  One of these trials consisted of 1,286 patients at 24 centers in France ("French Trial I").[97]  The trial was limited to women who had pregnancies of no more than 49 days' gestational age, as established by ultrasound, if available, or by the patient's estimate.[98]  On the first day of the procedure, the patient received

10      600 mg of mifepristone orally "in the presence of a study investigator."[99]  Approximately 48 hours later, she returned and, unless the abortion had already taken place, ingested 400 micrograms of misoprostol "in the presence of a study investigator."[100]  The patient remained under observation for four hours or more after the ingestion of misoprostol and returned for "a final assessment of the pregnancy termination procedure" eight to 15 days later.[101]

---

[96]  FDA's Reproductive Health Drugs Advisory Committee ("FDA Advisory Committee"), which met in July 1996 to consider the mifepristone NDA, based its conclusion primarily on the French trial along with preliminary data from the U.S. Clinical Trial.  *See* FDA Advisory Committee, *Hearings on New Drug Application for the Use of Mifepristone for Interruption of Early Pregnancy*, at 6, 132-33 (July 19, 1996) (*FDA Hearings Transcript*)[FDA FOIA Release: MIF 005200-90].  Committee member Dr. Mary Jo O'Sullivan asked why the Committee meeting was being held "at this time when the data is not finalized."  *Id.* at 37.  Dr. C. Wayne Bardin, who was responsible for overseeing the Population Council's NDA preparation, responded that "we have sufficient data . . . [f]rom the non-U.S. data to allow us to submit an application to the FDA."  *Id.*

[97]  *See* FDA, Statistical Review and Evaluation, at 2-4 (May 21, 1996) ("Statistical Review").  This French trial is referred to as FFR/91/486/14.

[98]  *See* Statistical Review, *infra* Appendix A, at 2.  "Since the ultrasound estimate of gestational age was more reliable than the patient's estimate . . . gestational age based on the ultrasound examination was used if available."  *Id.*  Investigators, in violation of study protocol, included some women with pregnancies of more than 49 days.  *See* Statistical Review, *infra* Appendix A, at 3.

[99]  *See* Statistical Review, *infra* Appendix A, at 2.

[100]  *See* Statistical Review, *infra* Appendix A, at 2.

[101]  *See* Statistical Review, *infra* Appendix A, at 2.

The efficacy analysis of French Trial I encompassed only 1,205 patients, while the safety analysis included all 1,286 participants.[102]  The regimen resulted in "complete expulsion" in 95.4 percent of the 1,189 participants whose pregnancies were 49 days or less.[103]  The rate of complete expulsion declined with increased gestational age.[104]  Sixty-one women had complete expulsions before taking misoprostol.[105]  Almost 86 percent of patients in French Trial I experienced at least one adverse event as a result of the procedure.[106]

The second French clinical trial ("French Trial II") enrolled 1,194 patients at 11 centers.[107]  The trial was limited to women who had pregnancies of no more than 63 days' gestational age, as established by ultrasound, if available, or by the patient's estimate.[108]  The regimen used in French Study II was essentially the same as that described above in connection with French Study I, except that an additional 200 micrograms of misoprostol was administered if complete expulsion did not occur within three hours after taking the initial 400 microgram dose of misoprostol.[109]  Patients who received the second dose of misoprostol remained under observation for a total of five hours.[110]

---

[102]  *See* Statistical Review, *infra* Appendix A, at 3.

[103]  *See* Statistical Review, *infra* Appendix A, at 3.  Patients for whom expulsion of the embryo was complete at the end of the process were categorized as successes, while patients with incomplete expulsions (2.8%), ongoing pregnancies (1.5%), and those who needed surgical procedures for bleeding (.3%) were classified as failures.  *See id.* at 3 and 9 (Table 1).

[104]  *See* Statistical Review, *infra* Appendix A, at 3 ("[T]here was a statistically significant . . . inverse relationship between gestational age and the success rate as the success rate generally declined with increasing gestational age.").

[105]  *See* Statistical Review, *infra* Appendix A, at 3.  Twenty-six of these women received misoprostol anyway, because the investigators did not realize that they had had complete abortions.  *See id.*

[106]  *See* Statistical Review, *infra* Appendix A, at 4.

[107]  *See* Statistical Review, *infra* Appendix A, at 4-7.  This French trial is designated as FF/92/486/24.

[108]  *See* Statistical Review, *infra* Appendix A, at 4-5.

[109]  *See* Statistical Review, *infra* Appendix A, at 5.

[110]  *See* Statistical Review, *infra* Appendix A, at 5.

The efficacy analysis of French Trial II encompassed only 1,104 patients, while the safety analysis included all 1,194 participants.[111]  The regimen resulted in "complete expulsion" in 92.8 percent of the participants.[112]  The rate of complete expulsion declined with increased gestational age.[113]  Twenty-six women had complete expulsions before taking misoprostol.[114]

5    Almost 93 percent of patients in French Trial II experienced at least one adverse event as a result of the procedure.[115]

Among the deficiencies that characterized both French Clinical Trials was the absence of an appropriate control group.  Consequently, as an FDA statistician concluded after reviewing the data from the French Clinical Trials: "In the absence of a concurrent control group in each of

10    these studies, it is a matter of clinical judgment whether or not the sponsor's proposed therapeutic regimen is a viable alternative to uterine aspiration for the termination of pregnancy."[116]

### b.    <u>The U.S Clinical Trial</u>

15    The U.S. Clinical Trial was carried out from September 13, 1994 to September 12, 1995 at various qualified university hospitals and clinics.[117]  Patients had to satisfy a number of criteria

---

[111]    *See* Statistical Review, *infra* Appendix A, at 5.

[112]    *See* Statistical Review, *infra* Appendix A, at 6.  As in French Study I, patients for whom expulsion of the embryo was complete at the end of the process were categorized as successes, while patients with incomplete expulsions (4.0%), ongoing pregnancies (2.3%), and those who needed surgical procedures for bleeding (.9%) were classified as failures.  *See id.* at 5 and 12 (Table 4).

[113]    *See* Statistical Review, *infra* Appendix A, at 6.

[114]    *See* Statistical Review, *infra* Appendix A, at 6.

[115]    *See* Statistical Review, *infra* Appendix A, at 7.

[116]    Statistical Review, *infra* Appendix A, at 7-8.

[117]    *See* Medical Officer's Review, *infra* Appendix A, at 6.  More specifically, the U.S. Clinical Trial consisted of "two prospective, open-label, multicenter clinical trials in the United States according to two identical protocols." Medical Officer's Review, *infra* Appendix A, at 6 and 9.  In this Petition, the trials will be referred to as "the U.S. Clinical Trial," because the protocols employed were identical, the results of the two trials were analyzed jointly, and the results were published in the same article.  *See* Irving M. Spitz, M.D., C. Wayne Bardin, M.D., Lauri

to be included in the study.[118]  All patients were screened by pelvic examination and ultrasound

to ensure that their pregnancies were not too advanced for the procedure.[119]  On their first visit,

patients took 200 mg of mifepristone orally "[i]n the presence of the investigator."[120]  Patients

returned 36 to 60 hours later to ingest 400 micrograms of misoprostol orally in the presence of

5   the investigator, unless the investigator determined that the termination was already complete.[121]

Following ingestion of misoprostol, patients were observed for a minimum of four hours.[122]

Patients were instructed to return again 12 days later for a follow-up assessment.[123]  A patient's

pregnancy was terminated surgically "at any time if the investigator believed there was a threat

to a woman's health (medically indicated), at a woman's request, or at the end of the study for an

10   ongoing pregnancy or incomplete abortion."[124]

---

Benton, M.D., and Ann Robbins, "Early Pregnancy Termination with Mifepristone and Misoprostol in the United States," *New England Journal of Medicine* 338 (Apr. 30, 1998): 1241-47 ("Spitz Article" )"[FDA FOIA Release: MIF 006692-97].  The members of the FDA Advisory Committee who were still working for FDA at the time of publication received a copy of the Spitz Article.  *See* Medical Officer's Review, *infra* Appendix A, at 29.  Although FDA considered data from the entire U.S. Clinical Trial, it appears that the agency formally approved Mifeprex based only on the portion of the U.S. Clinical Trial data that was generated among women whose pregnancies were no more than 49 days' gestational age.  *See* Mifeprex Approval Memo, *infra* Appendix A, at 1 ("The U.S. trial consisted of 859 women providing safety data and 827 women providing effectiveness data for gestations of 49 days or less, dated from the last menstrual period.").  *See also* Mifeprex Label ("Clinical Studies").

[118]   Among the inclusion criteria were requirements that a patient be at least 18 years old, be in good health, have an intrauterine pregnancy of no more than 63 days (confirmed by a pelvic examination *and* ultrasound), and have agreed to a surgical abortion if the mifepristone-misoprostol abortion failed.  Medical Officer's Review, *infra* Appendix A, at 7-8.  The study excluded women with certain health problems, such as liver, respiratory, or renal disease, cardiovascular disease, chronic hypertension, anemia, clotting problems, pelvic inflammatory disease, and ectopic pregnancies.  *See id.* at 8.  In addition, women who were over 35 and smoked, had IUDs, were breastfeeding, were unlikely to comply with study requirements, or who "[l]ived or worked more than one hour from the emergency care facility" were excluded.  *See id.* at 8-9.

[119]   *See* Medical Officer's Review, *infra* Appendix A, at 8.

[120]   Medical Officer's Review, *infra* Appendix A, at 9.

[121]   *See* Medical Officer's Review, *infra* Appendix A, at 9.

[122]   *See* Medical Officer's Review, *infra* Appendix A, at 7.

[123]   *See* Medical Officer's Review, *infra* Appendix A, at 7.

[124]   Medical Officer's Review, *infra* Appendix A, at 16.

The U.S. Clinical Trial consisted of 2,121 subjects.[125]  Of these patients, 2,015 were evaluated for efficacy,[126] which "was defined as the termination of pregnancy with complete expulsion of the conceptus without the need for a surgical procedure."[127]  The remaining 106 patients did not return for the third visit.[128]  The mifepristone-misoprostol combination was effective in 92 percent of patients with pregnancies no greater than 49 days, 83 percent of patients with pregnancies between 50 and 56 days, and 77 percent of women with pregnancies between 57 and 63 days.[129]  All 2,121 subjects were evaluated for safety.[130]  Ninety-nine percent of patients experienced adverse events and most of these experienced multiple adverse events.[131]  Twenty-three percent of the adverse effects experienced by each gestational age group were "severe."[132]

Finally, FDA did not conduct a statistical review of the results of the U.S. Clinical Trial.  FDA's statistical reviewer explained this failure by noting that "[a] statistical evaluation of the European studies was completed previously "and "[t]he clinical results of the supporting U.S.

---

[125] *See* Medical Officer's Review, *infra* Appendix A, at 10.

[126] *See* Medical Officer's Review, *infra* Appendix A, at 10.

[127] Medical Officer's Review, *infra* Appendix A, at 16.  The failure to establish a pre-trial, statistical definition for drug efficacy was a defect in trial design.

[128] *See* Medical Officer's Review, *infra* Appendix A, at 16.  It would have been appropriate to include these 106 patients in the efficacy analysis as "failures," if for no other reason than that they did not appear for all three required visits.  Although "[f]or 92 of these patients, there was some information suggesting a successful outcome," *id.* at 10, there was neither definitive evidence of complete abortion nor, apparently, any information with respect to whether these women subsequently experienced any adverse effects.  In fact, during their second visit, five of these 106 women were diagnosed as having continuing pregnancies.  *Id.* at 10.  *See also* Spitz Article, *infra* Appendix A, at 1246 ("The ultimate outcome of these pregnancies is unknown, despite our repeated attempts to contact the women.").

[129] *See* Medical Officer's Review, *infra* Appendix A, at 11 (Table 1).

[130] *See* Medical Officer's Review, *infra* Appendix A, at 10.

[131] *See* Medical Officer's Review, *infra* Appendix A, at 11.

[132] *See* Medical Officer's Review, *infra* Appendix A, at 11.

studies . . . are similar enough to the results of the European studies that, in the opinion of the medical reviewer, a statistical evaluation of the results of the U.S. studies is not required."[133]

### 2.    Requirements for Proving Drug Safety and Effectiveness

5    FDA has developed a rigorous default standard for scientific demonstrations of safety and effectiveness of human drug products.[134]  Section 505(d)(5) of the FD & C Act provides, in relevant part, that FDA shall refuse to approve a new drug application when "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under

10    the conditions of use prescribed, recommended, or suggested in the proposed labeling."[135] Section 505(d) defines "substantial evidence" to mean "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved . . . ."[136]  FDA has stated that "substantial evidence" requires a showing of clinically significant evidence of

15    effectiveness rather than mere statistical evidence of significance.[137]  No such showing was made for Mifeprex, which has been demonstrated to be less effective than surgical abortion for all segments of the population.

---

[133]  FDA, "Statistical Comments on Amendment 024," Memorandum to File NDA 20-687 (Feb. 14, 2000).  This document is available along with the agency's Statistical Review.  *See* Statistical Review, *infra* Appendix A.

[134]  *See* the discussion of the development and requirements of FDA's "gold standard," *supra* Section III.C.1.

[135]  21 U.S.C. § 355(d)(5).

[136]  21 U.S.C. § 355(d) ("the term 'substantial evidence' means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.").

[137]  *See Warner-Lambert Co. v. Heckler*, 787 F.2d 147, 155 (D.C. Cir. 1986) ("It is important to note that the Commissioner does not contend that the effectiveness shown must amount to a 'medical breakthrough', as ARW complains, but contends in his brief that he would be satisfied with even a modest clinical or therapeutic effect.").

Section 314.126 of FDA's rules states that "[r]eports of adequate and well-controlled investigations provide the primary basis for determining whether there is 'substantial evidence' to support the claims of effectiveness for new drugs."[138]  The rule states that a major purpose of an adequate and well-designed study is to "permit[ ] a valid comparison with a control to provide

5    a quantitative assessment of drug effect."[139]  According to Section 314.126(b), an adequate and well-controlled study serves to ensure that the subjects of the trial have the disease or condition being studied,[140] that the method of assigning patients to treatment and control groups minimizes bias (*e.g.*, using randomization),[141] and, that "[a]dequate measures are taken to minimize bias on the part of the subjects, observers, and analysts of the data" (*e.g.*, blinding).[142]  The criteria that

10    the rule establishes "have been developed over a period of years and are recognized by the scientific community as the essentials of an adequate and well-controlled clinical investigation."[143]

Agency guidance provides that FDA may approve an NDA based on only one, not two, effectiveness trials for drugs in one of the following three categories:

15        1) when effectiveness may be demonstrated adequately with existing studies of another
            claim or dose (e.g., approval for pediatric use on the basis of studies in adults); 2) when a
            controlled trial of a specific new use is supported by evidence from adequately controlled
            trials from related uses, dosages, or endpoints; and 3) when a single multicenter trial
            provides statistically convincing and clinically meaningful evidence of effectiveness,
20          supported by confirmatory research.[144]

---

[138]  21 C.F.R. § 314.126(a) ("Adequate and well-controlled studies.").

[139]  21 C.F.R. § 314.126(b)(2) (describing "placebo concurrent control," "dose-comparison concurrent control," "no treatment concurrent control," "active treatment concurrent control," and "historical control").

[140]  21 C.F.R. § 314.126(b)(3).

[141]  21 C.F.R. § 314.126(b)(4).

[142]  21 C.F.R. § 314.126(b)(5).

[143]  21 C.F.R. § 314.126(a).

[144]  Kulynych, *infra* Appendix A, at 146 (citing FDA, *Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* (May 1998) at 5-17 (*FDA Effectiveness Guidance*).

383

Mifepristone did not fall within any of these categories.  The first and second categories were inapposite because mifepristone had not been approved for any use in any population in the United States; additionally, no evidence from adequate and well-controlled trials had ever been presented to FDA regarding any use for mifepristone.  Because neither the French Clinical Trials nor the U.S. Clinical Trial was randomized, blinded,[145] or comparator-controlled, none of these trials could provide the type of data necessary for the third category either.  Furthermore, these studies lacked "clear, prospectively determined clinical and statistical analytic criteria."[146]

Even though FDA takes the position elsewhere that the extent to which a trial's design controls for various types of bias "is a critical determinant of its quality and persuasiveness,"[147] neither the French Clinical Trials nor the U.S. Clinical Trial were randomized, concurrently controlled, or blinded.  A control group "allow[s for] discrimination of patient outcomes (for example, changes in symptoms, signs, or other morbidity) caused by the test treatment from outcomes caused by other factors, such as the natural progression of the disease, observer or patient expectations, or other treatment."[148]  Control groups also enable investigators to

---

[145]  Blinding is the normal method by which those who evaluate a medication's effectiveness and side effects, are kept unaware of whether they are evaluating the comparator drug (sometimes a placebo), or the new medication (or procedure) under study.  If possible, the patient is also blinded and not allowed to know which treatment she is receiving ("double-blinding").  According to standard scientific and medical practice and the standards to which FDA holds pharmaceutical sponsors, all clinical research studies investigating the effects of new drugs should be subjected to an assessment by a blinded evaluator.  Conducting a concurrently-controlled, randomized trial comparing surgical abortion with the mifepristone-misoprostol regimen is readily achievable.  There are study designs that would have also allowed for blinding.  Had blinding proved too difficult to perform, the requirement could have been waived based upon a satisfactory showing by the sponsor.

[146]  *FDA Effectiveness Guidance*, *infra* Appendix A, at 12.

[147]  FDA, "Guidance for Industry: E10 Choice of Control Group and Related Issues in Clinical Trials," (Rockville, Md.: May 2001) at 3 (§ 1.2.1) (*FDA Guidance (ICH: E10): Choice of Control Group*).  FDA's publication of "E10" is available at: <http://www.fda.gov/cder/guidance/4155fnl.pdf>.

[148]  *FDA Guidance (ICH: E10): Choice of Control Group*, *infra* Appendix A, at 3 (§ 1.2) (Introduction, "Purpose of Control Group").

determine "what would have happened to patients if they had not received the test treatment or if they had received a different treatment known to be effective."[149]

A trial that employs a concurrent control group drawn from the same population yields the most robust data.  Concurrent control groups are chosen from the same population as the test group and are "treated in a defined way as part of the same trial that studies the test treatment, and over the same period of time."[150]  When concurrent control groups are used, the treatment and non-treatment groups are similar in all baseline and non-treatment variables that could influence the outcome or introduce bias into the study.[151]

By contrast, in a trial using external or historical controls "the control group consists of patients who are not part of the same randomized study as the group receiving the investigational agent; i.e., there is no concurrently randomized control group."[152]  FDA cautions:

> "The external control may be defined (a specific group of patients) or non-defined (a comparator group based on general medical knowledge of outcome).  Use of the latter comparator is particularly treacherous (such trials are usually considered uncontrolled) because general impressions are so often inaccurate."[153]

In such a trial, "[t]he control group is thus not derived from exactly the same population as the treated population."[154]  If, as is most common, the external control group is composed of "a well-documented population of patients observed at an earlier time," the trial is said to be

---

[149] *FDA Guidance (ICH: E10): Choice of Control Group, infra* Appendix A, at 3 (§ 1.2).

[150] *FDA Guidance (ICH: E10): Choice of Control Group, infra* Appendix A, at 3 (§ 1.2).

[151] *See FDA Guidance (ICH: E10): Choice of Control Group, infra* Appendix A, at 3 (§ 1.2).  "Bias here . . . means the systematic tendency of any aspects of the design, conduct, analysis, and interpretation of the results of clinical trials to make the estimate of a treatment effect deviate from its true value."  *Id.*

[152] *FDA Guidance (ICH: E10): Choice of Control Group, infra* Appendix A, at 26 (§ 2.5.1).

[153] *FDA Guidance (ICH: E10): Choice of Control Group, infra* Appendix A, at 5 (§ 1.3.5).

[154] *FDA Guidance (ICH: E10): Choice of Control Group, infra* Appendix A, at 26 (§ 2.5.1).

"historically" controlled.[155]  Blinding and randomization are also not available to minimize bias when external or historical controls are used.[156]

According to FDA, the "[i]nability to control bias is the major and well-recognized limitation of externally controlled trials and is sufficient in many cases to make the design

5    unsuitable."[157]  A legal commentator recently cautioned courts about the scientific validity of experiments and trials that have no concurrent control.[158]  She explained that "historically controlled subjects have not been subjected to exactly the same conditions as the test subjects."[159] Consequently, "one must be wary of" non-concurrently controlled studies (*i.e.*, historical, external, or uncontrolled studies) because their conclusions can be manipulated more easily than

10   if concurrent controls are used.[160]

### 3.    FDA's Acceptance of the French and U.S. Clinical Trial Data Violated Section 314.126(e) of the Agency's Rules

15       Section 314.126(e) of FDA's rules states unequivocally that "[u]ncontrolled studies or partially controlled studies *are not acceptable* as the *sole* basis for the approval of claims of effectiveness."[161]  The section authorizes the use of uncontrolled trials merely to present supporting evidence for controlled trials; uncontrolled trials, if they are "carefully conducted and

---

[155]  *See FDA Guidance (ICH: E10): Choice of Control Group, infra* Appendix A, at 26 (§ 2.5.1) ("but it could be a group at another institution observed contemporaneously, or even a group at the same institution but outside the study.").

[156]  *FDA Guidance (ICH: E10): Choice of Control Group, infra* Appendix A, at 27 (§ 2.5.2).

[157]  *FDA Guidance (ICH: E10): Choice of Control Group, infra* Appendix A, at 26 (§ 2.5.2).

[158]  Erica Beecher-Monas, "The Heuristics of Intellectual Due Process: A Primer for Triers of Science," *New York University Law Review* 75: 1563-1657, 1628.

[159]  Beecher-Monas, *infra* Appendix A, at 1628, n.357.

[160]  Beecher-Monas, *infra* Appendix A, at 1628, n.357 (" 'you can prove anything with selective controls,' so one must be wary of historical controls," Beecher-Monas quoting Jon Cohen, "Cancer Vaccines Get a Shot in the Arm," 262 Science 841, 843 (1993)).

[161]  21 C.F.R. § 314.126(e)(emphasis added).

documented, may provide corroborative support of well-controlled studies regarding efficacy and may yield valuable data regarding safety of the test drug."[162]

FDA recognizes a limited role for external, historically controlled studies. The agency takes the position that "[h]istorical (external) controls can be justified in some cases, but

5    particular care is important to minimize the likelihood of erroneous inference."[163] Similarly, Section 314.126 cautions that "[b]ecause historical control populations usually cannot be as well assessed with respect to pertinent variables as can concurrent controlled populations, historical control designs are usually reserved for special circumstances."[164] FDA cites as an example, "studies of diseases with high and predictable mortality (for example, certain malignancies),"[165]

10    in which a decision might be made to offer all trial participants a potentially effective drug. Externally controlled studies also may suffice because "the effect of the drug is self-evident (general anesthetics, drug metabolism)."[166]

The French and U.S. Clinical Trials, which did not employ either external or historical control groups, were uncontrolled. During the Advisory Committee Hearings, FDA's Dr.

15    Ridgley C. Bennett, who summarized the data from the French Clinical Trials, stated:

> There are very few studies comparing medical methods and vacuum aspiration for termination of early pregnancy. To date, no large randomized controlled trials have compared mifepristone plus misoprostol with suction curettage abortion. However, large published series have demonstrated morbidity rates associated with mifepristone plus

20    > prostaglandin to be similar to those of suction-curettage.[167]

---

[162]  21 C.F.R. § 314.126(e).

[163]  *FDA Guidance (ICH: E8): General Considerations*, *infra* Appendix A, 62 Fed. Reg. at 66117 (§ 3.2.2.2). According to FDA guidance, the "main advantage" of an externally controlled trial "is that all patients can receive a promising drug, making the study more attractive to patients and physicians." *FDA Guidance (ICH: E10): Choice of Control Group, infra* Appendix A, at 27 (§ 2.5.6).

[164]  21 C.F.R. § 314.126(b)(2)(v) ("Historical control.").

[165]  21 C.F.R. § 314.126(b)(2)(v).

[166]  21 C.F.R. § 314.126(b)(2)(v).

[167]  FDA Hearings Transcript, *infra* Appendix A, at 130. Jensen and his fellow researchers conducted "[a] prospective, noncurrent, single center cohort comparison." *See* Jensen Study, *infra* Appendix A, at 153. The study

"Published series" and uncontrolled studies cannot serve as a substitute for the well-controlled clinical trials that FDA requires. A concurrent control group would have been feasible because the trial participants were prepared to receive surgical abortion in the event of a failed

5     mifepristone abortion.

The unusual circumstances that sometimes justify relying on externally controlled trials are not applicable with respect to pregnancy termination, generally, or the termination using mifepristone and misoprostol, specifically. Randomized, concurrently-controlled, blinded trials would have allowed investigators to compare not only the relative rates of complete termination

10     and expulsion, but also the nature, intensity, and duration of the numerous side effects. In the absence of concurrent controls and blinding, the duration and intensity of cramping, nausea, bleeding, pain, and any emotional or psychological effects of the treatments would be subject to investigator and patient bias. The design of the U.S. Clinical Trial precluded unbiased comparison groups that could have helped analysts arrive "at a complete understanding of

15     potential advantages, disadvantages and differences" between medical and surgical abortion.[168] FDA's *de facto* waiver of Section 314.126(e) constituted a gross departure from its past practice and announced standards for the conduct of adequate and well-controlled clinical trials.[169]

---

compared the data from Mifeprex patients at one of the sites that participated in the U.S. Clinical Trial with data from patients who subsequently underwent surgical abortions at the same site. Although the methodological quality of this study is arguably superior to either the French or U.S. Clinical Trials, had it been offered as trial data it also would have been a weak substitute for a randomized controlled trial establishing equivalent or superior efficacy to surgical abortion.

[168] *See* Jensen Study, *infra* Appendix A, at 156. Dr. Cassandra Henderson, a member of the FDA Advisory Committee, wondered about this point as well: "Since this regimen is not without any side effects and we know that spontaneous abortion is not an infrequent occurrence, is it appropriate to use historical controls in trying to evaluate the efficacy of this regimen and not a randomized placebo trial?" FDA Hearings Transcript, *infra* Appendix A, at 131 (FDA's Dr. Ridgely C. Bennett gave the following puzzling response: "Well, I think it would be difficult to do a randomized trial of this nature. But I think it is fair to use a historical control for efficacy.").

[169] There is no evidence that FDA formally issued a waiver under Section 314.126(c) of the requirement for well-controlled studies or that the Population Council ever requested such a waiver.

### 4.    Subpart H's Standard for Proving Drug Effectiveness

The approval of a drug under Subpart H does not lower the applicable standards for proving the drug's effectiveness.  As FDA stated when it adopted Subpart H, "[a]ll drugs approved [under Subpart H] will have had effectiveness demonstrated on the basis of adequate and well-controlled studies."[170]  In fact, Subpart H is available only for drugs "that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients *over existing treatments* (e.g., ability to treat patients unresponsive to, or intolerant of, available therapy, or improved patient response over available therapy)."[171]  Neither the French nor the U.S. Clinical Trials yielded scientifically valid comparisons with the existing therapy, surgical abortion, to support a finding of a "meaningful therapeutic benefit over existing treatments."  FDA should have required the concurrent testing of mifepristone with surgical abortion to test the proposition that mifepristone has a meaningful therapeutic benefit over the standard method for terminating pregnancies.  FDA did not require the drug sponsor to perform such trials for Mifeprex, which departs from FDA's normal treatment of Subpart H drugs generally and for the other drugs approved under the restricted distribution provisions in Section 314.520.

Mifeprex appears to be the only drug that FDA has approved under Section 314.520 of Subpart H without requiring compliance with the statutory and regulatory requirements that safety and efficacy be scientifically demonstrated through blinded, comparator-controlled, and randomized clinical trials capable of providing data for subjection to rigorous statistical analysis.

---

[170]  *Subpart H Final Rule*, 57 Fed. Reg. at 58953.

[171]  21 C.F.R. § 314.500 (emphasis added).  The class of "existing treatments" to which there must be a comparison, as specified in this rule section, is not limited to pharmaceuticals.  For example, a potential chemotherapeutic agent might be compared to radiation therapy.

Aside from Mifeprex, only four drugs have been approved pursuant to Section 314.520, the restricted distribution prong of Subpart H. Each of these drugs, Xeloda,[172] Thalomid,[173] Actiq,[174] and Tracleer,[175] was an appropriate candidate for approval under Section 314.520. Moreover, in each case, studies were performed that allowed for a meaningful statistical analysis of the

5   effectiveness of this drug in comparison with the current available standard of care. FDA's decision to require randomized, comparator-controlled, blinded trial design for each drug, even in the face of urgent need for the treatments at issue, supports the claim that FDA's treatment of the mifepristone NDA was aberrant.

Xeloda™ (capecitabine) was approved for use in treating patients with widely metastatic

10   ("Stage IV") terminal breast cancer, for whom all other modalities of chemotherapy have failed or are contraindicated.[176] The average lifespan of a patient with multi-drug resistant tumors participating in the clinical trials for this drug was only 8.5 months. Because Xeloda was only modestly effective (25% of the recipients improved for an average of five months), exhibited significant toxicity, and was a last resort treatment for dying patients, FDA approved it under

15   Section 314.520 with use restrictions and commitments to further study the drug. Subsequent randomized, concurrent controlled, blinded evaluator trials demonstrated Xeloda's statistical superiority to the standard of care for metastatic colon and breast cancers.[177]

---

[172]  NDA 20896.

[173]  NDA 20785.

[174]  NDA 20747.

[175]  NDA 21290.

[176]  *See* "NDAs Approved under Subpart H," *infra* Appendix A. The current version of the Subpart H approval chart (updated Aug. 8, 2002) indicates that Xeloda is a "surrogate endpoint" drug, rather than a restricted distribution drug. However, the two previous postings of the chart state the opposite. Furthermore, FDA's approval letter states that the NDA "[was] approved under 21 CFR 314.520." Letter, FDA/CDER to Cynthia Dinella, Group Director, Regulatory Affairs, Hoffman-La Roche Inc. (Apr. 30, 1998).

[177]  *See* Xeloda package insert.

Thalidomide (Thalomid™) was approved under Section 314.520 for the treatment of leprosy, a disfiguring, chronically disabling, and often lethal skin infection.[178]  Thalidomide is a drug the severe toxicity of which, particularly to fetuses, is well-documented.  Children exposed to this drug *in utero* suffer dramatic birth defects, namely the partial absence of hands, feet, arms

5   and legs.  The public outcry following the discovery that thalidomide causes these alarming malformations helped to spur the scientific modernization of FDA drug approval policy and practices in the 1960s.  Clinical trials involving leprosy are difficult and require long periods of time because the disease is very rare in the United States.  Three randomized, double-blinded comparator-controlled clinical trials were performed to support the Thalomid NDA.[179]

10   Oral fentanyl citrate (Actiq™) was approved under Section 314.520 as a powerful sedating narcotic painkiller, primarily for use to relieve the suffering of dying cancer patients.[180]  Actiq can be lethal, particularly to children, because it quickly abolishes a patient's drive to breathe, unless the patient is already accustomed to narcotic analgesics.  Moreover, Actiq, a powerful narcotic, has a high potential for abuse and diversion into the illegal drug market.

15   Actiq was evaluated in a "double blinded, placebo controlled" study for the treatment of breakthrough cancer pain and was shown to "produce statistically significantly more pain relief compared with placebo."[181]  Actiq is restricted for use only by oncologists and pain specialists who are familiar with the management of the side effects and complications of the drug's use as approved.

---

[178]  *See* "NDAs Approved under Subpart H," *infra* Appendix A.

[179]  *See* Thalomid package insert.

[180]  *See* "NDAs Approved under Subpart H," *infra* Appendix A.

[181]  Actiq package insert.

Tracleer™ (bosentan tablets) was approved pursuant to Section 314.520 for use in treating pulmonary hypertension, a life threatening and frequently progressive condition of excessively high blood pressure in the lung blood vessels resulting from chronic scarring and injury of the lung tissue.[182]  Tracleer can cause liver damage and major birth defects.  Two

5    randomized, double-blinded, placebo-controlled clinical trials demonstrated the superiority of the drug over a placebo.  Tracleer was compared to a placebo because there is no alternate standard of care for pulmonary hypertension.  Despite its potential toxicity, Tracleer was approved subject to usage restrictions under Section 314.520 because it is the only treatment available for a life threatening and debilitating condition.[183]

10

### 5.    FDA Failed to Require a Comprehensive Audit of French Clinical Trial Data after Discovering Violations of Good Clinical Practices

In June 1996, FDA inspected the trial records of a "French government-supported

15    abortion clinic" that participated in the French Clinical Trials.  FDA issued a Form 483 detailing problems uncovered during the inspection.  The problems identified by the investigator suggested carelessness, fraud, evidence tampering, and the systematic under-reporting of serious adverse events.  The inspection "revealed a failure to maintain complete and accurate records." The violations that were discovered included: "laboratory reports that were missing" for 11

20    patients, "missing ultrasound documents" for 20 patients, "pages missing from the case record files and unreported aspirations," inclusion of 4 ineligible patients, and "consent forms were dated after the start of study for some subjects, and the investigator had signed consent form

---

[182]  *See* "NDAs Approved under Subpart H," *infra* Appendix A.

[183]  *See* Tracleer package insert.

sometimes in advance, up to 4 days before the subjects had signed."[184]  There were also "under-reported side effects" such as "a patient bleeding with two subsequent aspirations; convulsions reported as fainting; and expulsion which was actually a surgical evacuation; bleeding, nausea and contractions, or bleeding and pelvic pain."[185]  After elaborating on the deficiencies found, the

5   FDA inspector concluded: "Notwithstanding these objectionable conditions, [redacted name of an FDA official] assured Dr. Aubeny that he would not recommend that the studies not be included in the evaluation of the NDA application."[186]

FDA should not have allowed tainted data to support the Mifeprex NDA.  A complete audit of all French Clinical Trial data is warranted to determine whether another set of clinical

10  trials must be performed to replace the tainted French trial data.

### F.  THE AGENCY'S DE FACTO APPROVAL OF MISOPROSTOL'S NEW USE WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, OR OTHERWISE NOT IN ACCORDANCE WITH LAW

15  When FDA approved Mifeprex, it also took action with respect to a second drug – misoprostol.  Taken alone, mifepristone is ineffective as an abortifacient.[187]  In order to achieve an abortion rate greater than 90 percent, the administration of mifepristone is followed approximately two days later by a prostaglandin to complete the abortion.  In the U.S. Clinical

---

[184] Summary of Findings, Memorandum Accompanying FDA Form 483 Issued to Dr. Elizabeth Aubeny (June 28, 1996): at 1 [FDA FOIA Release: MIF 004135-45].

[185] Summary of Findings, Memorandum Accompanying FDA Form 483 Issued to Dr. Elizabeth Aubeny (June 28, 1996): at 1.

[186] Summary of Findings, Memorandum Accompanying FDA Form 483 Issued to Dr. Elizabeth Aubeny (June 28, 1996): at 9.

[187] Although some studies using mifepristone alone have produced completion rates as high as 60 to 80 percent, it is widely recognized that, on its own, mifepristone is not a viable substitute for surgical abortion.  *See, e.g.,* Mitchell D. Creinin, "Early Medical Abortion with Mifepristone or Methotrexate: Overview," *Early Medical Abortion with Mifepristone or Methotrexate: Overview and Protocol Recommendations* (Washington, D.C.: National Abortion Federation, 2001) at 3 (reporting that "[f]or gestations up to 49 days, complete abortion occurs in approximately 60% to 80%" of women using mifepristone alone); Helena von Hertzen, M.D., "Research on Regimens for Early Medical Abortion," *Journal of the American Medical Women's Association* 55 (Supplement 2000): 133-36.

Trial, the prostaglandin used was misoprostol, which was distributed by G.D Searle & Co.

("Searle") as the anti-ulcer drug Cytotec™.[188]  Ultimately, FDA based its approval of Mifeprex

on the combined action of a mifepristone and misoprostol regimen.  On the day FDA approved

mifepristone, it notified Searle that "[t]he drug mifepristone is now approved in a regimen with

5    misoprostol for termination of pregnancy of 49 days or less."[189]

Searle, which opposed the use of its drug in conjunction with Mifeprex as an

abortifacient,[190] did not file a Supplemental NDA for the use of misoprostol as part of an abortion

regimen.[191]  Absent such an application, FDA lacked the basis for sanctioning a new indication

for misoprostol.  As Peter Barton Hutt, former FDA general counsel, observed, the agency's

10    treatment of misoprostol "set[ ] an extraordinary precedent" because FDA was "seemingly

---

[188]  After a series of corporate transactions, Searle is now part of Pharmacia Corporation, which is headquartered in Peapack, New Jersey.  In 1985, G.D. Searle & Co. became the pharmaceutical unit of Monsanto.  In April 2000, Monsanto merged with Pharmacia & Upjohn to create the Pharmacia Corporation.  Pharmacia & Upjohn had been created in 1995 when Pharmacia AB and the Upjohn Company merged.  On July 15, 2002, Pfizer Inc. announced that it would purchase Pharmacia.

[189]  Letter, Dr. Lilia Talarico, M.D., Director, FDA/CDER, Division of Gastrointestinal and Coagulation Drug Products, Office of Drug Evaluation III to Dr. Mary Jo Pritza, G.D. Searle & Co. (Sept. 28, 2000): at 1 [FDA FOIA Release: MIF 008847-48].  The Talarico Letter came in response to the August 8, 2000 application by Searle to obtain approval for changes that would have bolstered the Cytotec label's discussion of adverse effects (presumably in anticipation of FDA's approval of the mifepristone NDA).  FDA chided Searle for attempting to make the proposed changes and summarily rejected them.  *Id.* at 1.  When it announced the Mifeprex approval, FDA referred to the "approved treatment regimen." *See* FDA, Press Release, "FDA Approves Mifepristone for the Termination of Early Pregnancy" (Sept. 28, 2000).  *See also* FDA webpage, *infra* Appendix A, "Mifepristone Questions and Answers 4/17/2002," at Question 4 (referring to the "mifepristone treatment regimen").

[190]  In fact, on August 23, 2000, Searle wrote an open letter to all health care practitioners stating that "Cytotec is not approved for the induction of labor or abortion."  The letter listed a number of potential "[s]erious adverse events reported following off-label use of Cytotec in pregnant women includ[ing] maternal or fetal death."  Michael Cullen, M.D., Medical Director U.S., Searle, Open Letter to Health Care Providers (Aug. 23, 2000)[FDA FOIA Release: MIF 008022].  Officials of the American College of Obstetricians and Gynecologists, among others, decried Searle's lack of cooperation.  *See* Ralph W. Hale, M.D., and Stanley Zinberg, M.D., "The Use of Misoprostol in Pregnancy," editorial, *New England Journal of Medicine* 344 (Jan. 4, 2001): 59-60.  FDA's approval of the Mifeprex Regimen in the face of Searle's opposition appears to have usurped Searle's rights to control the distribution of its drug.

[191]  Because Searle's patent on misoprostol did not expire until July 2000, no other party would have been able to file a timely supplemental NDA for the use of a generic form of misoprostol as an abortifacient.

encouraging a drug's unapproved use."[192]  He added that the agency is in an "embarrassing and uncomfortable position."[193]  FDA did more than encourage the unapproved use of misoprostol; it *mandated* the unapproved use.

5

### 1.    Misoprostol's Use as an Abortifacient is a New Indication for which the Requisite Supplemental New Drug Application Was Not Filed

A drug that differs in any material way (including in composition, effect, or intended use) from an approved drug is a new drug that must independently be established to be safe and

10    effective.[194]  Furthermore, a drug already being used to treat one disease or part of the body may be a new drug when used to treat another disease or part of the body.[195]  Misoprostol's new use as an abortifacient, therefore, marks it as a "new drug."[196]

New drugs must be shown to be safe and effective.  Specifically, FDA requires that "[a]ll indications shall be supported by substantial evidence of effectiveness based on adequate and

15    well-controlled studies as defined in § 314.126(b) . . . unless the requirement is waived . . . ."[197]

---

[192]  Rachel Zimmerman, "Clash Between Pharmacia and FDA May Hinder the Use of RU-486," *Wall Street Journal* (Oct. 18, 2000): at B1.

[193]  Zimmerman at B1.

[194]  *See Thompson  v. Western Medical Center*, Brief for the Petitioners (filed by the Solicitor General of the United States), No. 01-344 (Dec. 2001): at 4 ("See *United States v. Generix Drug Corp.*, 460 U.S. 453, 460-461 (1983) (determination whether a product is a new drug takes into account both active and inactive ingredients); 21 C.F.R. 310.3(h) (discussing factors that make a drug a 'new drug').

[195]  A drug may be deemed "new" because of "[t]he newness of use of such drug in diagnosing, curing, mitigating, treating, or preventing a disease, or to affect a structure or function of the body, even though such drug is not a new drug when used in another disease or to affect another structure or function of the body."  21 C.F.R. § 310.3(h)(4).

[196]  The "newness" of misoprostol in this indication was heightened by the fact that, when Mifeprex was approved, misoprostol was explicitly contraindicated for pregnant women.  The misoprostol label included the following black-box warning: "CYTOTEC (MISOPROSTOL) ADMINISTRATION BY ANY ROUTE IS CONTRAINDICATED, BECAUSE IT CAN CAUSE ABORTION, IN WOMEN WHO ARE PREGNANT . . . ."  In April 2002, the Cytotec label was changed to "remove[ ] the contraindication and precaution that Cytotec should not be used in women who are pregnant."  FDA, "Major Changes to Cytotec Labeling" (April 17, 2002).  The label now restricts the contraindication to pregnant women who are using Cytotec as a non-steroidal anti-inflammatory drug ("NSAID").  The revised Cytotec label and, more specifically, the "Indications and Usage" section, however, continue to lack any reference to the use of misoprostol in the Mifeprex Regimen.

[197]  21 C.F.R. § 201.57(c)(2).  To the best of the Petitioners' knowledge, FDA did not formally waive the requirement for misoprostol as part of an abortion regimen.

A Supplemental NDA provides the necessary evidence in support of a new indication.[198]  Absent

a waiver, a Supplemental NDA permits FDA to consider the evidence in support of the proposed

change and approve related labeling changes in advance.[199]  Even though a new use for

misoprostol is an integral part of the Mifeprex Regimen, FDA sanctioned this new misoprostol

5    indication without having received and considered a Supplemental NDA.

Among the changes for which FDA approval is necessary are changes to statements in a

drug's labeling indicating whether "[t]he drug, if used for a particular indication only in

conjunction with a primary mode of therapy, e.g., diet, surgery, or some other drug, is an adjunct

to the mode of therapy."[200]  A well-known treatment regimen illustrates how FDA has typically

10   dealt with the labeling of two drugs that have been approved for combined use.  The regimen

pairs methotrexate and Leucovorin Rescue.  Methotrexate, a chemotherapeutic agent, kills cancer

cells by depriving them of folic acid which is necessary for DNA synthesis, but, in the process,

methotrexate deprives normal bone marrow cells of the folic acid they need.  Leucovorin Rescue

serves as an antidote to the toxic effects of methotrexate.  The labeling for Leucovorin Rescue

15   refers to its use "after high-dose methotrexate therapy in osteosarcoma," which is an approved

---

[198]  A recent article noted: "To obtain FDA approval for an additional use of a previously approved drug, the sponsor must submit a supplemental application (sNDA, sBLA, or sPMA) demonstrating the safety and efficacy of the drug when used in the new way or for the new indication.  The supplemental application typically requires clinical data similar to those in the original application, but does not require the same extensive chemistry, manufacturing and controls, and preclinical pharmacology and toxicology data as in the original application."  Shane M. Ward, "*Washington Legal Foundation* and the Two-Click Rule: The First Amendment Inequity of the Food and Drug Administration's Regulation of Off-Label Drug Use Information on the Internet," *Food and Drug Law Journal* 56 (2001): 41-56, at 44 (citations omitted).

[199]  *See* 21 C.F.R. § 314.70(b).  *See also* Richard A. Merrill, "The Architecture of Government Regulation of Medical Products," *Univ. of Virginia Law Review* 82 (1996): 1753-1866, at 1775 ("FDA takes the position, which no manufacturer has sought to challenge in court, that any potentially significant modification of an approved new drug [application] likewise requires advance agency approval.  As a consequence, not only attempts to expand the indications for a drug but other changes in labeling, in inactive ingredients, in the method or location of manufacture, or in packaging must first be the subject of an approved Supplemental New Drug Application.").

[200]  *See* 21 C.F.R. § 201.57(c)(1)(iv).

indication for methotrexate.[201]  Similarly, methotrexate's labeling refers to an approved use of Leucovorin Rescue.[202]

By contrast, in the Mifeprex labeling, an *unapproved* indication for misoprostol is discussed.  In approving such labeling, FDA has taken the aberrant position that the maker of one drug (Mifeprex) can secure approval of a new indication for another company's drug (misoprostol) merely by describing that new use as part of a combined therapy.  FDA circumvented its own regulations by failing to require that both drugs in the Mifeprex Regimen be approved for the indication in question – pregnancy termination.[203]

---

[201]  *See* Leucovorin Calcium for Injection Package Insert ("Indications and Usage") ("Leucovorin calcium rescue is indicated after high-dose methotrexate therapy in osteosarcoma.  Leucovorin calcium is also indicated to diminish the toxicity and counteract the effects of impaired methotrexate elimination and of inadvertent overdosages of folic acid antagonists.").  The package insert is available at: <http://www.xanodyne.com/leucovorin_calcium_pl_2002.pdf>.

[202]  The methotrexate package insert states that "[m]ethotrexate in high doses followed by leucovorin rescue in combination with other chemotherapeutic agents is effective in prolonging relapse-free survival in patients with non-metastatic osteosarcoma who have undergone surgical resection or amputation for the primary tumor."  The package insert is available at: <http://www.rxlist.com/cgi/generic/mtx_ids.htm>.

[203]  A recent approval of a biologic product also illustrates the principle that FDA-approved labeling lists only approved indications.  On February 19, 2002, FDA approved Zevalin for use in combination with Rituxan (rituximab) to treat low-grade B-cell non-Hodgkins Lymphoma (NHL).  Rituxan had been approved previously and was already indicated "for the treatment of patients with relapsed or refractory, low-grade or follicular, CD20-positive, B-cell non-Hodgkin's lymphoma."  *See* Rituxan Package Insert ("Indications and Usage").  Rituxan and Zevalin are monoclonal antibodies that can significantly shrink tumors by targeting white blood cells (B-cells) including malignant B cells.  The "Indications and Usage" section of Zevalin's label describes the drug as being "part of the ZEVALIN therapeutic regimen (see Dosage and Administration)."  The "Dosage" section directs that Rituxan be administered and then followed by Zevalin on Day One and then again seven to nine days later.  After the Zevalin NDA was approved, detailed information about the administration of the "Zevalin Therapeutic Regimen" was added to the Rituxan label.  On February 19, 2002, FDA's Center for Biologics Evaluation and Research approved a supplement to the Rituximab biologics license application "to revise the dosage and administration section of  the package insert to include information regarding the use of Rituximab as a component of the Zevalin therapeutic regimen . . . ."  Letter, Dr. Karen D. Weiss, M.D., Director, Division of Clinical Trial Design and Analysis, Office of Therapeutics Research and Review, Center for Biologics Evaluation and Research, to Alice Wei, IDEC Pharmaceuticals (Feb. 19, 2002) (*see* <http://www.fda.gov/cber/approvltr/rituide021902L.htm>).

## 2.    FDA Sanctioned the Promotion of Misoprostol for an Unapproved Use as Part of the Mifeprex Regimen

The use of misoprostol as an abortifacient is an unapproved or "off-label" use.[204]  FDA objects to the *promotion* of off-label uses of drugs by manufacturers.[205]  "Off-label" uses of drugs are common as physicians explore new ways of using approved drugs, but normally FDA strives to ensure that physicians and patients are not misled into believing that FDA has approved such uses.  In an effort to curb the promotion of off-label uses by pharmaceutical manufacturers, FDA issued regulatory guidance in 1996 pertaining to the dissemination of off-label use information.[206]  In this case, however, FDA not only sanctioned, but participated in, the promotion of an off-label use of misoprostol.  FDA oversaw the creation of the promotional materials for Mifeprex,[207] which discussed the off-label use of misoprostol.[208]  FDA itself disseminated information about

---

[204]  *See generally* James M. Beck and Elizabeth D. Azari, "FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions," *Food & Drug Law Journal*  53 (1998): 71-104, at 71 n.2, which explains "off-label" use as follows:

"Off-label" has more accurately been termed "extra label" use.  It means only that a product is used for a condition or in a way not appearing on its FDA-regulated labeling, not that the agency has judged the use adversely.  *See, e.g.*, *Washington Legal Found. v. Kessler*, 880 F.Supp. 26, 28 n.1 (D.D.C. 1995). . . .  Off-label can mean many things.  "[U]sing an approved drug to treat a disease that is not indicated on its label, but is closely related to an indicated disease, treating unrelated, unindicated diseases, and treating the indicated disease but varying from the indicated dosage, regimen, or patient population may all be considered off-label use."  William L. Christopher, *Off-Label Drug Prescription: Filling the Regulatory Vacuum*, 48 FOOD & DRUG L.J. 247, 248 (1993) (footnotes omitted).

[205]  *See, e.g., Subpart H Final Rule*, 57 Fed. Reg. at 58,953 ("Under the act, a drug approved for marketing may be labeled, promoted, and advertised by the manufacturer only for those uses for which the drug's safety and effectiveness have been established and that FDA has approved.").

[206]  *See* FDA, "Advertising and Promotion; Guidances," Notice, 61 Fed. Reg. 52,800 (Oct. 8, 1996) (publishing two guidance documents: "Guidance to Industry on Dissemination of Reprints of Certain Published, Original Data" and "Guidance for Industry Funded Dissemination of Reference Texts").

[207]  FDA reminded the Population Council in the Mifeprex Approval Letter that, pursuant to 21 C.F.R. § 314.550, the drug sponsor is obligated to submit Mifeprex promotional material for review by the agency prior to dissemination to physicians and the public.  *See* Mifeprex Approval Letter at 3.

[208]  A Danco Laboratories webpage, for example, contains the following question and answer:

Q: How Does Mifeprex Work?

A: Mifeprex blocks progesterone, a hormone necessary for a pregnancy to continue. You take Mifeprex followed by a prostaglandin, misoprostol, which causes uterine contractions that help to end pregnancy.
  In more detail, Mifeprex blocks progesterone, a naturally produced hormone that prepares the lining of the uterus for a fertilized egg and helps maintain pregnancy.  Without progesterone, the lining of the uterus

the off-label use of misoprostol in documents such as the press release announcing the approval

of Mifeprex for use in conjunction with misoprostol.[209]  Recently it did so again when the agency

emphasized the importance of adhering to the approved regimen, including the off-label use of

misoprostol.[210]

5

### 3.    Mifeprex Is Misbranded: Its Labeling Promotes an Unapproved Use of Another Drug

The labeling for Mifeprex is misleading because it directs physicians to use misoprostol for a

10    purpose that FDA never approved.[211]  FDA's ability to regulate the marketing and distribution of

drugs rests largely on its legal capacity to strictly control the content of a drug's labeling.  A

fundamental tenet of drug regulation is that FDA requires approval for every indication listed in the

labeling of a drug.[212]  FDA would undercut its own authority if it did not also apply this rule to uses

for a drug referenced on another drug's labeling.

15     The Mifeprex labeling creates false expectations about misoprostol.  Physicians and

patients are justified in believing that any use or indication for a drug, included in the "Indication

---

softens, breaks down and bleeding begins.  Mifeprex is followed by a prostaglandin that causes the uterus to contract, which helps to complete the process. . . .  The prostaglandin used following Mifeprex is misoprostol, a drug already available in the United States.

"Using Mifeprex: Frequently Asked User Questions," Danco Laboratories website at <http://www.earlyoptionpill.com/may_faqs.php3>.  The electronic version of the Mifeprex Label contains a hyperlink to the Danco Laboratories website, <www.earlyoptionpill.com>, which contains the above-referenced webpage.  (When printed, the hyperlink appears to be ordinary text.)

[209]  *See*, FDA, Press Release, "FDA Approves Mifepristone for the Termination of Early Pregnancy" (Sept. 28, 2000) ("Under the approved treatment regimen, a woman first takes 600 milligrams of mifepristone (three 200 milligram pills) by mouth. Two days later, she takes 400 micrograms (two 200-microgram pills) of misoprostol, a prostaglandin.").

[210]  *See* FDA webpage, *infra* Appendix A, "Mifepristone Questions and Answers 4/17/2002," at Question 6.  In this same document, however, FDA cautions health care providers against "using misoprostol 'off-label,' in other words, using misoprostol vaginally at different doses . . . ."  *Id*. at Question 9.

[211]  Misoprostol receives more than a passing mention on the Mifeprex Label; the word "misoprostol" appears 34 times (compared to 57 appearances of "mifepristone" and 34 appearances of "Mifeprex").

and Usage" section of an FDA-approved label, has been subjected to the rigorous approval process set forth in Section 505 of the FD&C Act.  Section 201.6(a) of the Agency's rules states that misbranding may arise from "a false or misleading representation with respect to another drug."[213]  "When a physician, manufacturer, or *other third party* steps in to promote an

5    unapproved use of a drug by advertising or distribution to other physicians, the drug may become unlawful under Section 301(k) the FD&C Act, 21 U.S.C. § 331(k)(1994), which prohibits misbranding, and Section 502(f)(1), 21 U.S.C. § 352(f)(1)(1994), which requires a drug's labeling to bear 'adequate directions for use.'"[214]  Mifeprex is, therefore, misbranded.

Mifeprex is also misbranded because it is unsafe when used as directed in the approved

10    labeling.  Section 502(j) of the FD& C Act states that "[a] drug or device shall be deemed to be misbranded . . . [i]f it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."[215]  As discussed in the next section, FDA's approved regimen is unsafe because it lacks important safeguards.

15

---

[212]  *See* Elizabeth A. Weeks, "Is It Worth the Trouble?  The New Policy on Dissemination of Information on Off-Label Drug Use under the Food and Drug Modernization Act of 1997," *Food and Drug Law Journal* 54 (1999): 645-65, at 647 n.13 (citing Merrill, (*infra* Appendix A), at 1853).

[213]  *See* 21 C.F.R. § 201.6(a).

[214]  Merrill, *infra* Appendix A, at n.318 (emphasis added).  *See also* 21 C.F.R. § 314.530(a)(5) (authorizing the Secretary to withdraw approval of a Subpart H drug if "[t]he promotional materials are false or misleading").

[215]  21 U.S.C. § 352(j).  *See also* Jeffrey N. Gibbs and Judith E. Beach, "Chapter 7: Adulteration and Misbranding of Drugs" in *Fundamentals of Law and Regulation: An In-Depth Look at Therapeutic Products* (David G. Adams, Richard M. Cooper, and Jonathan S. Kahan, eds.), vol. II (Washington, D.C.: Food and Drug Law Institute, 1997): at 229 ("When the drug is dangerous to the health of the user even when used as recommended on the label, it is misbranded.").

### G.    WOMEN'S LIVES ARE BEING ENDANGERED BY THE LACK OF SAFEGUARDS IN FDA'S APPROVED REGIMEN

5          On February 18, 2000, FDA informed the Population Council that "adequate information ha[d] *not* been presented to demonstrate that [mifepristone], when marketed in accordance with the terms of distribution proposed [by the Population Council], is safe and effective for use as recommended."[216]  Over the next several months, the Population Council and Danco refused to supplement its distribution plan with a meaningful patient safety component.  This prompted

10        FDA, on June 1, 2000, to privately convey to the sponsor a set of proposed restrictions intended to rectify the sponsor's omission.  The agency's proposed restrictions were soon leaked to the public.  Amidst a vigorous political and editorial backlash, the sponsor not only rejected FDA's proposal but, in what was described by FDA as a "very significant change," repudiated restrictions the sponsor itself had proposed in 1996.[217]  FDA succumbed and soon approved a

15        regimen that did not embody restrictions sufficient to address the agency's legitimate safety concerns.

          Early in the approval process, FDA expressed its intention to place restrictions on the use of mifepristone.[218]  FDA's position was informed, in part, by the international experience with

---

[216]  2000 Mifepristone Approvable Letter, *infra* Appendix A, at 5 (emphasis added).

[217]  *See* FDA Email (June 23, 2000): at 1 (explaining that the Population Council's attorney "affirmed that the 1996 proposals for distribution system as presented by the Pop Council then and agreed to by the [FDA Advisory Committee] and FDA are NOT what the Pop Council wants today.  I explained that this change is very significant and that they need to provide their justification/rationale.")[FDA FOIA Release: MIF 002523].

[218]  In order to allay concerns of the drug's European owner, FDA pledged, in the course of securing the U.S. patent rights for the Population Council, to "take appropriate measures . . . to assist through the NDA-approval process in the creation of a regime for the distribution and use that will protect against misuse of the drug."  Letter, David A. Kessler, Commissioner of Food and Drugs, to the President & CEO of Roussel Uclaf [name redacted] and to Margaret Catley-Carlson, President of Population Council (May 16, 1994): at 1 [FDA FOIA Release: MIF 004992-93].

mifepristone.[219]  The NDA submitted by the Population Council on March 14, 1996 included a plan that would have limited distribution of mifepristone to "licensed physicians (with prior training in assessing the length of pregnancy, in diagnosing ectopic pregnancy, and [redacted]), who will attend educational seminars on the safe use of this regimen."[220]

5          The FDA Advisory Committee, when it met in July 1996, was not satisfied with the restrictions proposed by the Population Council and expressed "serious reservations on how [the proposed drug distribution system] is currently described in terms of assuring safe and adequate credentialing of providers."[221]  The Committee recommended additional restrictions designed to ensure "that this drug not be expanded to hands of physicians who are not already skilled in

10    managing pregnancies, terminations, and complications of both."[222]  Accordingly, FDA's 1996 Approvable Letter required the submission of "a comprehensive description of the proposed distribution system."[223]

          In subsequent submissions, however, the Population Council insisted that the drug was safe and proffered restrictions designed primarily to control the manufacturing and retailing of the drug product.  On August 18, 1999, the Population Council proposed to:[224] (i) limit the

15    number and type of distributors; (ii) limit distribution to distributor-registered physicians who

---

[219]  In Europe, for example, mifepristone is used under more highly controlled conditions than were ultimately required in the United States.  *See* Amendment to NDA 20-687, International Product Labeling with English Translations (submitted March 21, 2000) (presenting English translation of mifepristone product label, approved July 6, 1999, used in Austria, Belgium, Denmark, France, Germany, Greece, the Netherlands and Spain)[FDA FOIA Release: MIF 000493-506].

[220]  Memorandum, FDA/CDER to NDA 20-687 File (Sept. 16, 1996): at 2 [FDA FOIA Release MIF 000560-62].

[221]  FDA Advisory Committee, Minutes of July 19, 1996 Meeting (approved July 23, 1996): at 7 [FDA FOIA Release: MIF 000539-45].

[222]  FDA Memorandum, "Highlights of the July 19, 1996 Reproductive Health Products Advisory Committee (AC) Meeting on Mifepristone: Outstanding Issues for FDA to Address" (undated): at 3-4 [FDA FOIA Release: MIF 000534-38].

[223]  1996 Mifepristone Approvable Letter , *infra* Appendix A, at 1.

had provided certain assurances;[225] and, (iii) make available "training materials and information" and medical consultation to health care providers and product information to patients.[226]  On January 21, 2000, Danco opined that "[r]egardless of the distribution system for mifepristone, the medical safety of this drug is well documented."[227] and proposed a distribution system that was

5    designed only to ensure that Danco would "exert[ ] positive control over distribution of Mifeprex® through all phases of manufacturing, storage, shipment and administration from manufacturer to patient."[228]

In reaction to the sponsor's recalcitrance, FDA took the position "that restrictions as per CFR 314.520 on the distribution and use of mifepristone are needed to assure safe use of this

10   product."[229]  The agency nevertheless continued to encourage the sponsor to take an active role in devising appropriate restrictions on the use of mifepristone.  Instead, in March 2000, the Population Council again protested that such restrictions were unwarranted.[230]  It submitted a

---

[224]  *See* Medical Officer's Review, *infra* Appendix A, at 21-23 (setting forth the Population Council's complete response submitted to FDA on August 18, 1999).

[225]  The physician would be required to provide a *self*-attestation covering the physician's ability to accurately date pregnancies and determine the patient's blood Rh factor and the physician's access to emergency medical facilities. Registering physicians would also agree to obtain from each patient an acknowledgement that she has received full information and is willing to comply with the treatment regimen, to maintain certain records (including ultrasound and blood test records) for each patient, to report adverse events and information about ongoing pregnancies, and to "[u]se every effort to ensure patients return for their follow up visit 14-20 days after taking the product."  *See* Medical Officer's Review, *infra* Appendix A, at 22-23.

[226]  *See* Medical Officer's Review, *infra* Appendix A, at 23.

[227]  Amendment 039 to the NDA, Cover Letter, Danco to FDA (Jan. 21, 2000): at 1 [FDA FOIA Release: MIF 000525-26].  Danco attempted to attribute any deleterious effects of mifepristone abortions to misoprostol: "More serious adverse events are quite rare and are related to the entire treatment (not mifepristone *per se*), almost always following the use of the prostaglandin."  *Id.* at 2.

[228]  *See* Amendment 039 to the NDA, Mifeprex Distribution Plan Executive Summary (Jan. 21, 2000): at 3 [FDA FOIA Release: MIF 000530-31].

[229]  *See* 2000 Mifepristone Approvable Letter, *infra* Appendix A, at 5.  *See supra* Section III.C.2 and III.D. for a discussion of Subpart H, Section 314.520, which is reserved for drugs that are so inherently dangerous that their distribution and use must be restricted.

[230]  In the course of objecting to the approval of the drug under subpart H, which is "likely to falsely 'mark' mifepristone as a highly toxic and risky drug," the Population Council insisted that "the FDA knows, [Mifeprex] is

distribution plan that it characterized as "detailed and comprehensive" and "surely equal to its

purpose."[231]  Once again, the plan consisted of restrictions intended only to control the

manufacturing and retailing of the drug product.[232]  Again FDA objected that "[t]he proposed

distribution system as submitted primarily addresses security for the manufacturer and

5    distributor; it must also include safeguards for the patient."[233]  The agency requested "that

sponsor present a proposal regarding provider qualifications that addresses safety concerns of

patients receiving the drug product."[234]

On June 1, 2000, FDA proposed the following set of "Qualifications for Physician

Recipients:" (1) the physician must demonstrate that she is licensed to practice medicine; (2) the

10    physician must be "trained and authorized by law" to perform surgical abortions; (3) the

physician must have "been trained to and ha[ve] the ability to assess the age of a pregnancy

accurately by ultrasound examination, to monitor abortion by ultrasound examination, and to

diagnose an ectopic pregnancy by ultrasound examination;" (4) the physician must have

"satisfactorily completed training certified by the distributor in the mifepristone treatment

15    procedure, including mechanism of action, appropriate use, proper administration, follow-up,

efficacy, adverse events, adverse event reporting, complications, and surgical indications;" and

---

exceptionally safe and effective."  Responses by Population Council to "FDA Letter, [redacted] to Arnold, Sandra
(February 18, 2000)" (Mar. 2000): at 1 [FDA FOIA Release: MIF 000523-24]("March 2000 Response").

[231]  March 2000 Response, *infra* Appendix A, at 2.

[232]  Specifically, the plan provided for "secure manufacturing and shipping procedures, controlled returns, tracking of
distribution of individual packages to the patient level, use of a limited number of distributors [redacted], account
registration and other detailed ordering requirements for practitioners, direct distribution only to practitioners (not
through retail pharmacies), and the use of signed patient agreements."  March 2000 Response, *infra* Appendix A, at 2.

[233]  Teleconference Meeting Minutes (between FDA staff and representatives of Population Council and Danco)
(May 19, 2000): at 1 [FDA FOIA Release: MIF 007811-13].

[234]  Teleconference Meeting Minutes (between FDA staff and representatives of Population Council and Danco)
(May 19, 2000): at 1.  FDA wanted the sponsor to provide a set of auditable provider qualifications, a plan for
auditing providers to ensure that they were meeting these criteria, and an arrangement for discontinuing distribution
to unqualified providers.  *See id.* at 2.

(5) the physician must have "continuing access (e.g., admitting privileges) to a medical facility equipped for instrumental pregnancy termination, resuscitation procedures, and blood transfusion at the facility or [one hour's] drive from the treatment facility."[235]  FDA's proposals were intended to address concerns about the safety of the women undergoing mifepristone-

5    misoprostol abortions that the Population Council and Danco had refused to take into account in crafting restrictions for the drug.[236]

The Population Council and Danco objected strenuously to the proposed restrictions and aired their complaints in public.[237]  FDA reprimanded the Population Council for leaking the restrictions to the public and misrepresenting the nature of the restrictions.[238]  The Executive Vice

10    President of the American College of Obstetricians and Gynecologists submitted an analysis of the leaked restrictions to FDA.[239]  The editorial and political reaction,[240] together with the

---

[235]  *See* FDA, "FDA Proposed Restricted Distribution System for NDA 20-687 on 6/1/00" (June 1, 2000)[FDA FOIA Release: MIF 000522].  *See also* American College of Obstetricians and Gynecologists, "Analysis of the Possible FDA Mifepristone Restrictions" (July 27, 2000): at 1 (setting forth FDA's second proposed restriction, which is redacted in the publicly available copy of FDA's proposal; also providing the redacted portion of the fifth restriction)[FDA FOIA Release: MIF 001366-69].

[236]  It should be noted, that even these restrictions would not have been sufficient to make mifepristone-misoprostol abortions safe.  Among the key safeguards missing from FDA's proposal were requirements that every prospective patient undergo an ultrasound and that prescribing physicians be required to have admitting privileges at facilities able to provide emergency care.

[237]  Paul Blumenthal, M.D., Jane Johnson, and Felicia Stewart, M.D., "The Approval of Mifepristone (RU486) in the United States:  What's Wrong with this Picture?" *Medscape Women's Health* 5 (2000) (reproduced in an internal FDA email)[FDA FOIA Release: MIF 00002597-99] ("At a meeting of early abortion providers and abortion advocates, the Population Council and Danco revealed that the U.S. Food and Drug Administration (FDA) had made a series of proposals regarding the labeling and distribution of mifepristone that would severely limit women's access to the drug if and when it is approved.").

[238]  *See* Teleconference Meeting Minutes (between FDA staff and representatives of the Population Council and Danco) (June 7, 2000): at 1 ("Meeting Objective: . . . to discuss the misrepresentations by the Press regarding the proposed distribution system, and to agree on the need for serious, candid, and confidential discussions to resolve deficiencies of the application.")[FDA FOIA Release: MIF 002136-37]; FDA internal email (June 23, 2000): at 1 (re: telephone conversation with Population Council attorney, Nancy Buc, on 6/23/00) ("I also said that we were looking to Pop Council to be a responsible entity in manufacturing, distributing, and shepherding this drug and that most responsible entities make proposals rather than expect FDA to write labels and distribution systems and obtain comments through the media.")[FDA FOIA Release: MIF 002523].

[239]  *See* Letter, Ralph Hale, M.D. (Executive Vice President, ACOG) to Jane Henney, M.D. (July 24, 2000) and enclosure: ACOG, "Analysis of the Possible FDA Mifepristone Restrictions" (July 27, 2000)[FDA FOIA Release: MIF 001366-69].  ACOG and the American Medical Association ("AMA") also attempted to secure a meeting with

impending approval deadline of September 30, 2000,[241] however, had the desired effect of undermining FDA's resolve.

At a meeting on July 19, 2000, FDA yielded to the Population Council and Danco on a number of important issues.[242]  FDA abandoned its proposal for auditable physician qualifications and agreed instead to permit physicians to attest to their own qualifications.[243]  Instead of requiring formal training, FDA merely "request[ed] that the physician also attest to having read and understood the training materials and labeling."[244]  FDA also agreed not to

---

Dr. Jane Henney, FDA Commissioner, and her staff, in order to further discuss their opinion of the restrictions.  *See* Letter, Ralph Hale, M.D. (Executive Vice President, ACOG) and E. Ratcliffe Anderson, Jr., M.D. (Executive Vice President, AMA) to Jane Henney, M.D. (July 24, 2000): at 1 ("The undersigned organizations . . . are very concerned about restrictions . . . [FDA] has proposed for . . . mifepristone. . . .  We would like the opportunity to meet with you and your staff to discuss this important issue.  It's imperative that the FDA fully understands the effect that these proposals would have on the quality of health care.  It's equally imperative that the FDA's work be based solely on evidence from the drug's clinical trials, and be entirely from political influence.")[FDA FOIA Release: MIF 001363).  They were permitted only to meet with officials in FDA's Office of Women's Health, an office within the agency that was not involved in reviewing the NDA.  *See* Letter, Jane Henney to Hale and Anderson (Aug. 11, 2000): at 1-2 [FDA FOIA Release: MIF 001361].  The questionable scientific basis for this challenge to FDA's proposed restrictions was recently brought to the attention of ACOG by one of the Petitioners.  Letter, Donna Harrison, M.D. (Chairperson, AAPLOG Committee on Mifeprex Use) to Ralph Hale, M.D. (Executive Vice President, ACOG) (May 23, 2002) (available at <http://www.aaplog.org/acogmifeprexletter.htm>).

[240]  *See, e.g*, Letter, U.S. Senator Barbara Boxer to Dr. Jane Henney (June 9, 2000): at 1 ("According to news reports, the FDA is considering placing draconian restrictions on the accessibility of RU-486 as a condition of its approval . . . .  In 1996, the FDA found RU-486 to be safe and effective.  Therefore, it is a mystery to me why the FDA would even consider restricting access to it.")[FDA FOIA Release: MIF 006376]; Letter, Mark Green, Public Advocate for the City of New York, to Dr. Jane Henney (Sep. 22, 2000): at 1 ("Earlier this week Planned Parenthood of New York City, NARAL-New York, the Access Project and Physicians for Reproductive Health and Choice joined me in convening a public hearing in New York City on pending action by [FDA] on mifepristone . . . . [I am] also concerned about the restrictions on access to RU-486 that FDA is said to be considering.")[FDA FOIA Release: MIF 001288-1302]; Sheryl Gay Stolberg, "F.D.A. Adds Hurdles in Approval of Abortion Pill," *New York Times* (June 8, 2000): at A21 ("The long-running effort to bring the French abortion pill to women in this country has encountered yet another obstacle: a suggestion by [FDA] that it may place tight restrictions on how the drug, RU-486, is distributed and who can prescribe it."); Letter, U.S. Representative Lynn Woolsey to Dr. Jane Henney (June 22, 2000): at 1 ("However, I am deeply concerned about recent press reports about proposed restrictions.") [FDA FOIA Release: MIF 006372].

[241]  As noted above, because FDA had accorded priority review to mifepristone, the approval process was slated for completion by September 30, 2000.

[242]  *See* Meeting Minutes, re: Approvability Issues Related to Labeling and Distribution Plan for Mifepristone (July 19, 2000): at 2-4 [FDA FOIA Release: MIF 004661-65].

[243]  *See id.* at 2.

[244]  *Id.* at 2.

require pre-procedure ultrasounds.[245]  Furthermore, FDA stated "that it is not necessary to require the patient to take the drugs in the presence of health care provider."[246]

Among the unresolved issues at the conclusion of the July 19, 2000 meeting was the question of whether prescribing physicians should be limited to those who were able to perform surgical abortions, a provider qualification FDA believed was necessary:

> FDA requests that the ability to perform vacuum aspirations and/or D&Cs be added to provider qualifications.  Providers also need to have access to emergency services.  The need for surgical intervention is predictable unlike with other drugs.  All OB/GYNs and other practitioners of women's health have these skills.  The countries with experience with mifepristone have tight provision of complete services and have a long record of good outcomes.[247]

The Population Council later rejected FDA's request,[248] and the agency acquiesced.[249]

Despite its persistent concerns, FDA approved a regimen that posed the very risks to women's health that the agency had previously identified.  When it approved Mifeprex, FDA stated that "[u]nder 21 CFR 314.520, distribution of the drug is restricted as follows:"

> Mifeprex™ must be provided by or under the supervision of a physician who meets the following qualifications:
> - Ability to assess the duration of pregnancy accurately.
> - Ability to diagnose ectopic pregnancies.
> - Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through other qualified physicians, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.
> - Has read and understood the prescribing information of Mifeprex™.

---

[245] *See id.* at 3.

[246] *Id.* at 3.

[247] *Id.* at 3.

[248] *See* Amendment 054 to the NDA, re: Further Response Regarding Labeling and Distribution: Follow up to July 19, 2000 Meeting (July 27, 2000): at 6 (arguing that bolstering the provider qualifications in this way would be "not only unnecessary, but also in fact potentially counterproductive for patients")[FDA FOIA Release: MIF 0001373-81].

[249] *See* Teleconference Meeting Minutes, re: status of pending review issues pertaining to this drug product (Aug. 11, 2000): at 1 [FDA FOIA Release: MIF 004587-88].

- Must provide each patient with a Medication Guide and must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and Patient Agreement, give her an opportunity to read and discuss both the Medication Guide and the Patient Agreement, obtain her signature on the Patient Agreement, and must sign it as well.
- Must notify the sponsor or its designate in writing as discussed in the Package Insert under the heading DOSAGE AND ADMINISTRATION in the event of an ongoing pregnancy, which is not terminated subsequent to the conclusion of the treatment procedure.
- Must report any hospitalization, transfusion or other serious events to the sponsor or its designate.
- Must record the Mifeprex™ package serial number in each patient's records.[250]

In addition, the restrictions include a requirement that distribution be carried out in accordance with the plan submitted to FDA by the Population Council in a March 30, 2000 submission.[251] Even as it assented to a regimen that lacked critical safeguards, FDA took a number of steps that indicated its lingering concerns about the safety of the drug. First, FDA ultimately decided to rely on an infrequently used provision in Subpart H in hopes of ensuring that mifepristone would be used safely and, if necessary, could be withdrawn from market rapidly.[252] Second, the staff insisted that the mifepristone label "include a black boxed warning describing the major requirements and conditions for use."[253] "FDA generally reserves boxed warnings for serious or

---

[250] Mifeprex Approval Letter at 2.

[251] *See* Mifeprex Approval Letter at 2.

[252] *See* 21 C.F.R. 530 ("Withdrawal Procedures"). *See also* FDA, Memorandum, re: NDA 20-687 (Feb. 17, 2000): at 3 [FDA FOIA Release: MIF 000583-85]. As late as July 19, 2000, the question of whether to use Subpart H was deemed to be an "Outstanding Issue." *See* Meeting Minutes, re: Approvability Issues (July 19, 2000): at 4 [FDA FOIA Release: MIF 004661-65].

[253] FDA, Memorandum, re NDA 20-687 (Feb. 17, 2000): at 2. The Population Council, which opposed the inclusion of such a warning, ultimately persuaded FDA to agreed to a pared-down Black Box Warning, which would merely direct the prescribing physician (i) to plan in advance for emergency care, and (ii) to make available to the patient and provide her with the opportunity to discuss the patient information and patient agreement. *See* Amendment 054 to the NDA, re: Further Response Regarding Labeling and Distribution: Follow up to July 19, 2000 Meeting (July 27, 2000): at 1-2 [FDA FOIA Release MIF 0001373-81].

life-threatening risks that best can be minimized by conveying critical information to the prescribing doctor in a highlighted manner."[254]

FDA's willingness to tailor the restrictions on Mifeprex to suit the demands of the Population Council and Danco will continue to manifest itself in serious adverse events among the women who use the Mifeprex Regimen. Some of the most critical flaws in the approved regimen are discussed below along with serious adverse events that have already been reported.

1.    **The Approved Regimen Is Unsafe Because It Does Not Require Ultrasound**

a.    <u>Ultrasound Is Necessary to Accurately Date Pregnancies</u>

The gestational age of a woman's pregnancy is a critical factor in determining whether she is an appropriate candidate for a mifepristone abortion. In order to minimize the risks of hemorrhage, incomplete abortion and continuing pregnancy, the gestational age of the pregnancy must be less than or equal to 49 days.[255] The authors of the Spitz Article, for example, found that "[f]ailures, defined as cases requiring surgical intervention for medical reasons or because the patient requested it, the abortion was incomplete, or the pregnancy was ongoing, increased with increasing duration of the pregnancy."[256] Through the combination of mifepristone and

---

[254] Judith E. Beach et al., "Black Box Warnings in Prescription Drug Labeling: Results of a Survey of 206 Drugs," *Food and Drug Law Journal* 53 (1998): 403-412, at 403 (available at: <http://www.fdli.org/pubs/Journal%20Online/53_3/art2.pdf>). *See also* 21 C.F.R. § 201.57(e) ("Warnings").

[255] As noted above, the gestational age of a pregnancy is based on the first day of a woman's last menstrual period, which is designated as Day 1 of the pregnancy.

[256] Spitz Article, *infra* Appendix A, at 1241. "The largest increase was in failures representing ongoing pregnancy, which increased from 1 percent in the [less than or equal to] 49-days group to 9 percent in the 57-to-63 days group (P<0.001)." Children born from ongoing pregnancies, after a failed application of the Mifeprex Regimen, may suffer birth defects, fertility problems, or other health problems later in life. Researchers have found evidence linking misoprostol and birth defects such as missing or deformed limbs and misshapen skulls. Much of this research was conducted in Brazil, where numerous women have attempted to induce abortions using misoprostol alone. *See, e.g.,* Sylvia Pagán Westphal, "Birth Defects Caused by Ulcer Drug Abortions," *NewScientist.com* (29 Aug. 2001) ("Several studies in Brazil, where up to 75 percent of clandestine abortions involve misoprostol, suggest the drug causes birth defects such as fused joints, growth retardation and a condition known as Möbius syndrome, which is characterised by paralysis of the face."); Iêda M. Orioli and Eduardo E. Castilla, "Epidemiological

misoprostol, "pregnancy was terminated in 762 of the 827 women pregnant for [less than or

equal to] 49 days (92 percent), 563 of the 678 women pregnant for 50 to 56 days (83 percent),

and 395 of the 510 women pregnant for 57 to 63 days (77 percent) . . . ."[257]  The study also found

that "[a]bdominal pain, nausea, vomiting, diarrhea, and vaginal bleeding also increased with

5    advancing gestational age."[258]  Due to the significant increase in failures and complications with

increasing gestational age, FDA approved Mifeprex only for pregnancies of less than or equal to

49 days' gestation.[259]

     The only way to date a pregnancy with the degree of accuracy necessary to exclude

women whose pregnancies are beyond 49 days' gestation is by use of transvaginal ultrasound.

10    FDA severely undermined the limitation on gestational age, however, when it failed to require

---

Assessment of Misoprostol Tetratogenicity," *British Journal of Obstetrics and Gynaecology* 107 (April 2000): 519-23, at 522 (". . . there is an association of prenatal use of misoprostol as an abortifacient and congenital defects of vascular disruption type."); F.R. Vargas *et al.*, "Prenatal Exposure to Misoprostol and Vascular Disruption Defects: A Case-Control Study," *American Journal of Medical Genetics* 95 (2000): 302-306, at 306 ("add[ing] epidemiological basis to the growing body of evidence that prenatal exposure to misoprostol is related to the occurrence of vascular disruption defects in some exposed fetuses.").  FDA determined that data submitted by the Population Council from a survey of fetal abnormalities in 82 pregnancies that were exposed to mifepristone alone or in combination with misoprostol was inconclusive.  *See* FDA Mifeprex Approval Memorandum, *infra* Appendix A, at 4.  FDA acknowledged, however, the possible link between misoprostol and birth defects.  *See* Medical Officer's Review, *infra* Appendix A, at 18 (". . . medical follow-up is required to ensure that surgical termination is performed in case the medical termination attempt fails since misoprostol has been reported to be teratogenic in humans (limb defects and skull defects).").  The need for a study of the possible joint effects of mifepristone and misoprostol on babies born after a failed application of the Mifeprex Regimen was highlighted by the abnormalities discovered in a fetus exposed to misoprostol and mifepristone.  *See* Office of Postmarketing Drug Risk Assessment, AERS Report, ISR Number 3877547-X (March. 1, 2002) (French report of numerous deformities in fetus that was exposed to mifepristone and misoprostol but survived until a subsequent surgical abortion was performed; "The anatomopathology examination showed a meningo-encephalocele.  The left hand was constituted of only two fingers (oligodactylia), left and right foot were constituted of only one finger (monodactylia).  There was a facial dysmorphia.").

[257]  Spitz Article*, infra* Appendix A, at 1241.

[258]  Spitz Article, *infra* Appendix A, at 1241.  In order to treat vaginal bleeding, "[t]wo percent of the women in the [less than or equal to] 49-days group, as compared with 4 percent in each of the other two groups, were hospitalized, underwent surgical intervention, and received intravenous fluids (P=0.008)." *Id.*

[259]  FDA's Medical Officer's Review noted: "The success of medical termination of pregnancy decreased with advancing gestational age and the incidence of adverse events increased with advancing gestational age." Medical Officer's Review, *infra* Appendix A, at 18.  The review stated further: "This method of pregnancy termination is of limited value because of the relatively short window of opportunity, in which it can be employed.  Its safety and effectiveness is based on its use during the seven weeks following the first day of the last menstrual period."  *Id.*

the ultrasound dating of pregnancies.  FDA's approved regimen relies instead on a patient's recollection of her menstrual history and a physical examination.  Dating based on menstrual history is inherently inaccurate because women may not have a perfect 28-day menstrual cycle[260] and because 25 percent of women experience bleeding during the early stages of pregnancy.[261]

5 Gestational dating through physical examination, even when carried out by experienced clinicians, can also be inaccurate.[262]  Factors such as patient body size, uterine fibroids, previous parity, and uterine position may impair a clinician's ability to assess uterine size.[263]  Transvaginal ultrasound, by contrast, is accurate within plus or minus 3 days at gestational ages of 5 to 7 weeks.[264]  "Transvaginal ultrasonographic examination is necessary to ensure accurate gestational

---

[260]  *See, e.g.,* Leon Speroff, M.D., Robert H. Glass, M.D., and Nathan G. Kase, M.D., *Clinical Gynecologic Endocrinology and Infertility*, 5th ed. (Baltimore: Lippincott Williams and Wilkins, 1994) at 219 ("The perfect 28 day cycle is indeed the most common mode, but it totaled only 12.4% of Vollman's cycles.  Overall, approximately 15% of reproductive age cycles are 28 days in length.  Only 0.5% of women experience a cycle less than 21 days long, and only 0.9% a cycle greater than 35 days.  Most women have cycles that last from 24-35 days, but at least 20% of women experience irregular cycles.").

[261]  *See* Peter W. Callen, M.D., *Ultrasonography in Obstetrics and Gynecology* 2nd ed. (Phila, Pa: W.B.Saunders Company; Harcourt, Brace, Jovanovich, 1988) at 32 ("Threatened abortion is a common complication that occurs in approximately 25% of clinically apparent pregnancies.");  Speroff, *et al, Clinical Gynecologic Endocrinology and Infertility*, 5th ed. (Baltimore: Lippincott Williams and Wilkins, 1994) at 536 (noting that "pregnancy and pregnancy-related problems such as ectopic pregnancy or spontaneous abortion" can cause uterine bleeding).

[262]  Steven R. Goldstein, M.D., Francis R. M. Jacot, M.D., Claude Poulin, M.D., and D. Scott Poehlmann, M.D., "Documenting Pregnancy and Gestational Age," Chapter 4, in Maureen Paul et al., eds., *A Clinician's Guide to Medical and Surgical Abortion* (Philadelphia: Churchill Livingstone / Harcourt Brace, 1999) ("*A Clinician's Guide*"): at 41 ("Although clinical sizing of the uterus during the first trimester can provide a rough estimate of gestational age, it is imprecise; misestimation of gestational age by uterine sizing alone can occur even in the hands of experienced clinicians.").

[263]  *See A Clinician's Guide*, *infra* Appendix A, at 41 ("a number of conditions such as leiomymas, multiple gestation, and obesity may severely limit the accuracy of gestational age assessment by physical examination, warranting preprocedure assessment by ultrasonography in known or suspected cases") (footnotes omitted).

[264]  *See* Salim Daya, M.B., "Accuracy of Gestational Age Estimation Using Fetal Crown-rump Measurements," *American Journal of Obstetrics and Gynecology* 168 (March 1993): 903–908; Ivar K. Rossavik, M.D., George O. Torjusen, M.D., and William E. Gibbons, M.D., "Conceptual Age and Ultrasound Measurements of Gestation Age and Crow-Rump Length in *in Vitro* Fertilization Pregnancies," *Fertility and Sterility* 49 (1988): 1012-17.  *See also* Mitchell D. Creinin, M.D. and Heather Jerald, "Success Rates and Estimation of Gestational Age for Medical Abortion Vary with Transvaginal Ultrasonographic Criteria," *American Journal of Obstetrics and.Gynecology* 180 (1999): 35-41.  In this study comparisons of gestational age estimates based on the last reported menstrual period to those generated through ultrasound in patients presenting for medical abortion, revealed the former method to be significantly inaccurate in approximately half the cases.  The authors observed:  "It is interesting that in this population of women seeking abortion the gestational age according to the LMP [last menstrual period] was verified

59

411

dating for provision of medical abortion according to current standards in clinical guidelines established by the National Abortion Federation."[265]

### b. Ultrasound Is Necessary to Identify Ectopic Pregnancies

5        Approximately two percent of all pregnancies in the United States are "ectopic pregnancies," in which the pregnancy is located outside the uterus – often in the fallopian tube.[266] Mifeprex does not terminate ectopic pregnancies.[267]  Therefore, if a woman who has an ectopic pregnancy undergoes a mifepristone-misoprostol abortion, she is at risk for tubal rupture and subsequent hemorrhage due to delay in diagnosis and delay in treatment.  The symptoms of an

10      ectopic pregnancy – vaginal bleeding, pelvic pain, and cramping – are confusingly similar to certain side effects of the Mifeprex Regimen.[268]  A woman with an ectopic pregnancy is at risk of suffering massive intra-abdominal hemorrhage, damage to her reproductive organs, permanent

---

by the transvaginal ultrasonographic examination only 48% to 56% of the time when a gestational sac was present and only 55% to 64% of the time when an embryonic pole was present . . . .  These results, though, do not even include those women who were excluded from the studies because the ultrasonographic examination findings were so different from the dates by LMP that the estimation of gestational age was changed too much for them to be included."  *Id.*

[265] Mitchell D. Creinin, M.D. and Heather Jerald, "Success Rates and Estimation of Gestational Age for Medical Abortion Vary with Transvaginal Ultrasonographic Criteria," *American Journal of Obstetrics and.Gynecology* 180 (1999): at 35-41 (text preceding n. 8) (citation omitted).

[266] Centers for Disease Control, "Ectopic pregnancy – United States, 1990-1992," *Morbidity and Mortality Weekly Report* (*MMWR*) 44 (No. 3) (Jan. 27, 1995): at 46.  The number of ectopic pregnancies may be even higher now because sexually transmitted diseases and other causes of ectopic pregnancy are more widespread than they were in 1992 – the latest year for which the Centers for Disease Control have reported the number of ectopic pregnancies. *Id.* at 46-7.

[267] *See, e.g.*, Beth Kruse *et al.*, "Management of Side Effects and Complications in Medical Abortion," *American Journal of Obstetrics and Gynecology* 183 (2000): S65-S75, at S72 ("Mifepristone has not proved effective in treating extrauterine pregnancy . . . .").

[268] *See* American College of Obstetricians and Gynecologists, "Medical Management of Abortion," *ACOG Practice Bulletin: Clinical Management Guidelines for Obstetrician-Gynecologists* 26 (April 2001): at 6 (noting that in medical abortions, "women may even experience symptom resolution consistent with a complete medical abortion and still have a persistent gestational sac or even an ectopic pregnancy") ("ACOG Practice Bulletin").  Vaginal bleeding, for example, is a normal consequence of the Mifeprex Regimen and may continue for weeks after a woman ingests Mifeprex and misoprostol.  *See, e.g.,* Spitz, *infra* Appendix A, at 1243 ("Vaginal bleeding is a natural consequence of the abortion process, and it occurred in all the women whose pregnancies were terminated

sterility, and even death if not promptly treated by emergency surgery.  The authors of a French

mifepristone study in which a participant with an ectopic pregnancy underwent emergency

surgery to stop heavy bleeding, concluded that:

> The case of undiagnosed ectopic pregnancy, which ruptured suddenly 2 days after
> misoprostol intake, indicates that (1) mifepristone plus misoprostol is not an effective
> treatment of ectopic pregnancies and should not be used for this purpose, and (2) all
> medical means of detecting an ectopic pregnancy should be used before prescribing
> mifepristone plus misoprostol.[269]

Although the Mifeprex Label states that the Mifeprex Regimen is contraindicated for

women with a "[c]onfirmed or suspected ectopic pregnancy,"[270] FDA did not require that

ultrasound be used to exclude women with ectopic pregnancies.  Instead, the approved regimen

relies solely on a self-certification by the prescribing physician that she has the "[a]bility to

diagnose ectopic pregnancies."[271]  A physical examination alone cannot accurately identify

ectopic pregnancies.  Ultrasound, "[i]n addition to providing the best information for gestational

age determination . . . can also provide useful diagnostic information regarding a wide variety of

pathologies of early pregnancy," including ectopic pregnancies.[272]

---

medically.  The median duration of bleeding or spotting was 13 days in the [less than or equal to] 49-days group and 15 days in the other two groups (P<0.001).").

[269] Elizabeth Aubény, *et al.*, "Termination of Early Pregnancy (Up to 63 Days of Amenorrhea) with Mifepristone and Increasing Doses of Misoprostol," *International Journal of Fertility & Menopausal Studies* 40 (1995): 85-91, at 91.

[270] *See* Mifeprex Label ("Contraindications").

[271] *See* Mifeprex Prescriber's Agreement.

[272] *A Clinician's Guide*, *infra* Appendix A, at 47-8.

### 2.    FDA's Approved Regimen Is Not Restricted to Properly Trained Physicians who Have Admitting Privileges to Emergency Facilities

5      FDA's approved regimen lacks any objective qualifications for prescribing physicians and administering health care providers.[273]  The health care provider administering the Mifeprex Regime need not undergo training, may not necessarily be an obstetrician or gynecologist, may not have any surgical training or training in the management of abortion complications, and may not even be a physician.[274]  For example, the Mifeprex Regimen could be administered by a nurse

10    untrained in any type of abortion and under the remote supervision of a family practitioner who does not regularly practice obstetrics and is incapable of providing emergency care.

       Physicians and the health care staff that they supervise require formal training in both pharmaceutical and surgical abortion to minimize the morbidity inherent in performing mifepristone abortions.[275]  National Abortion Federation guidelines provide that "[a]ll personnel

15    performing abortions must receive training in the performance of abortions and in the prevention,

---

[273]  Self-certifications do not provide an effective substitute for imposing objective, auditable requirements.  The Mifeprex Prescriber's Agreement, for example, merely requires that the prescribing physician profess to have the "[a]bility to assess the duration of pregnancy accurately."  The vacuity of this stipulation is illustrated in remarks made by Dr. Susan Allen (who later became an FDA official) before the FDA Advisory Committee.  Dr. Allen stated, "If you also recall when you go through medical school you learn how to date a pregnancy."  FDA Hearings Transcript, *infra* Appendix A, at 319.

[274]  *See* Teleconference Meeting Minutes, re: status of pending review issues pertaining to this drug product (Aug. 11, 2000): at 1 ("the distribution system would allow for physicians to obtain the drug product after meeting all qualifications, but Mifeprex could be administered by someone who is under the supervision of that physician such as midwives or nurse practitioners")[FDA FOIA Release: MIF 004587-88]; *see also*, Mifeprex Approval Memo, *infra* Appendix A, at 4-5 ("Thus, physicians remain the initial population who will receive this drug for dispensing. This does not preclude another type of health care provider, acting under the supervision of a qualified physician from dispensing the drug to patients, provided state laws permit this.").

[275]  A survey of methotrexate abortion providers underscores the necessity of training in both medical and surgical abortion.  *See* S. Marie Harvey, Linda J. Beckman, and Sarah J. Satre, "Experiences and Satisfaction with Providing Methotrexate-Induced Abortions among U.S. Providers," *Journal of the American Medical Women's Association* 55 (2000): 161-63, at 162 (In a study comparing methotrexate and surgical abortion, "[m]ost providers felt strongly that all clinic staff should be familiar with both procedures and, thus, the training needs would be equivalent. This thought was echoed not only by physicians, who must be prepared to perform an emergency surgical abortion if methotrexate fails, but also by other clinic personnel.  Thirty-nine percent of providers thought that medical abortion

recognition, and management of complications."[276]  Additionally, ACOG recommends that "[c]linicians other than obstetrician-gynecologists who wish to provide medical abortion services should work in conjunction with an obstetrician-gynecologist or be trained in surgical abortion in order to offer medical abortion treatment."[277]  The necessity for training in surgical abortion as well as mifepristone abortion stems primarily from the high failure rate of the Mifeprex Regimen.  In the U.S. Clinical Trial, the Mifeprex Regimen failed for 8 percent of women with pregnancies of less than or equal to 49 days' gestational age.[278]

Excessive bleeding, which is much more common following a Mifeprex abortion than a surgical abortion, is particularly likely to necessitate urgent surgical intervention.  Based on an international study comparing surgical and medical abortion, FDA's Medical Officer noted that "[o]n the whole, medical abortion patients reported significantly more blood loss than did surgical abortion patients" and characterized this as a "serious potential disadvantage of the medical method."[279]  In the U.S. Clinical Trial among patients whose pregnancies were of no more than 49 days' gestation, excessive bleeding resulted in one blood transfusion, two hospitalizations, two emergency room treatments, and thirteen surgical interventions.[280]  In

---

required more training; specifically, learning to do a vaginal ultrasound and to handle the unpredictable outcomes of methotrexate abortion required lengthy training.").

[276]  National Abortion Federation, "National Abortion Federation Clinical Policy Guidelines, 1998," Appendix, in Maureen Paul et al., eds., *A Clinician's Guide to Medical and Surgical Abortion* (Philadelphia: Churchill Livingstone / Harcourt Brace, 1999): at 256 ("*A Clinician's Guide*").

[277]  ACOG Practice Bulletin, *infra* Appendix A, at 6.

[278]  *See* Medical Officer's Review, *infra* Appendix A, at Table 1.  Seventeen percent of women with pregnancies of between 50 and 56 days' gestational age and 23 percent of women with pregnancies between 56 and 63 days were failures.  *See id.*   In an international study reviewed by the Medical Officer, failure rates for mifepristone abortion were 5.2 percent, 8.6 percent and 16 percent in India, China and Cuba respectively, while comparable failure rates for surgical abortion were 0, 0.4 percent, and 4.0 percent. *See* Medical Officer's Review, *infra* Appendix A, at 19.

[279]  Medical Officer's Review, *infra* Appendix A, at 19 (no citation by FDA Medical Officer).

[280]  Medical Officer's Review, *infra* Appendix A, at 17.

addition, 5 percent of the patients in this group received uterotonic agents to stem bleeding.[281]  A

delay in intervention may be life-threatening,[282] as was illustrated by the experience of one of the

participants in the U.S. Clinical Trial.  The treating physician described the incident to the FDA

Advisory Committee:

5          In November of 1994, I was called to the [emergency room] for a woman who
        was bleeding due to a miscarriage, and was in obvious shock.  A blood test showed that
        she had lost between one-half to two thirds of her blood volume . . . .
                I had thought she was having an incomplete miscarriage, but her husband . . . told
        me that she had taken RU486 approximately 2 weeks before.  It was my clinical opinion
10      that she would die soon if she did not have an immediate [dilation and curettage].
                Without even doing the routine preparation we normally do for surgery, I realized
        that I had to take her immediately to surgery to save her life.  I took her to the operating
        room and removed the contents of her uterus surgically.  I gave her two units of packed
        red blood cells intraoperatively.
15              Even later that evening, . . . [s]he required two more units of blood because she
        was still orthostatic and symptomatic.[283]

        The Mifeprex Regimen is contraindicated for "any patient who does not have adequate

access to medical facilities equipped to provide emergency treatment."[284]  FDA's approved

20  regimen, however, does not require prescribing physicians to have *admitting* privileges to

emergency facilities.  The approved regimen requires only that a physician who is not able "to

provide surgical intervention in cases of incomplete abortion or severe bleeding . . . ma[k]e plans

to provide such care through others, and [be] able to assure patient access to medical facilities

equipped to provide blood transfusions and resuscitation, if necessary."[285]  Plans for back-up care

---

[281]  Medical Officer's Review, *infra* Appendix A, at 17.

[282]  When surgery is indicated because of acute bleeding, significant, or even life threatening blood loss, has already taken place.  The preoperative preparation of the patient is often compromised in the rush to complete the surgery, which results in higher infection rates and more anesthetic complications, such as aspiration during intubation.

[283]  FDA Hearings Transcript, *infra* Appendix A, at 223-25 (testimony of Dr. Mark Louviere).

[284]  *See* Mifeprex Label ("Contraindications").

[285]  Mifeprex Prescriber's Agreement.  FDA, however, took two steps that suggested that it has lingering concerns about the absence of a surgical intervention qualification for Mifeprex prescribers.  First, the Mifeprex Label includes a "black box" warning governing surgical back-up.  Second, FDA required the Population Council to perform a post-approval study "[t]o ensure that the quality of care is not different for patients who are treated by

may be nothing more than "having the ability and responsibility to direct patients to hospitals, if needed."[286]  Moreover, the approved regimen does not include an objective geographical limitation to ensure that the patient has easy access to the designated emergency care facility.[287]

5        ### 3.    The Sponsor's Recent "Dear Doctor Letter" and FDA's Explanatory Webpage Announcing Serious Adverse Events Validate the Petitioners' Concerns

On April 17, 2002,[288] Danco, with FDA's assistance, issued a letter to health care

10    providers to alert them to "New Safety Information," to remind them that Mifeprex was approved for use in a prescribed regimen, and to encourage them to provide patient counseling and report adverse events.[289]  The "New Safety Information" consisted of a number of reports of serious adverse events that had been experienced by women who were undergoing or had

---

physicians who have the skill for surgical intervention (as in the clinical trials) compared to those treated by physicians who must refer patients for surgical intervention . . . ."  Mifeprex Approval Memo, *infra* Appendix A, at 5.

[286] Mifeprex Approval Memo, *infra* Appendix A, at 5.  FDA's decision not to include a requirement that the prescribing physician have admitting privileges at a hospital could delay the patient's admission for emergency care. Another likely consequence of not requiring the prescribing physician to have admitting privileges is underreporting of serious adverse events related to the Mifeprex Regimen.  The treating physician, not privy to the Prescriber's Agreement, may not file a serious adverse event report or notify the abortion provider of the complications that arose from the Mifeprex Regimen.

[287] The Chinese experience with mifepristone suggests that mifepristone should not be administered in facilities unable to provide potentially necessary emergency services.  Thus, recently, the Chinese State Drug Administration responded to concerns that women were suffering as a result of lax controls on mifepristone by reiterating its policy that the drug "can only be administered at a hospital under a doctor's supervision and cannot be sold at pharmacies even with a prescription."  *See* Kaiser Family Foundation, "China Reaffirms Restrictions on Unsupervised Mifepristone Use," *Kaiser Daily Reproductive Health Report* (Oct. 15, 2001) (available at: <http://www.kaisernetwork.org/daily_reports/rep_index.cfm?hint=2&DR_ID=7453>) (reporting also that, "[t]hree years ago, the Shanghai Health Bureau restricted the use of mifepristone to certain hospitals in the area because of fears of complications").

[288] The letter bears the date, April 19, 2002, but was disseminated to the public on April 17, 2002.

[289] Danco Laboratories, Open Letter to Health Care Providers (Apr. 19, 2002) ("Dear Doctor Letter") (available at: <http://www.fda.gov/medwatch/SAFETY/2002/mifeprex_deardoc.pdf>).  Coincidentally, on the same day FDA and Danco publicized these serious adverse events, the agency also announced major changes to the Cytotec (misoprostol) label.  *See* FDA, "Major Changes to Cytotec Labeling" (April 17, 2002).  Pursuant to these labeling changes, pregnancy was removed from the list of contraindications on the Cytotec label and the black box warning cautioning pregnant women not to take the drug was also removed.

recently completed the Mifeprex Regimen.[290]  A number of patients had suffered from ruptured

ectopic pregnancies and one of these women died from hemorrhage.[291]  The letter also reported

"[t]wo cases of serious systemic bacterial infection (one fatal)."[292]  The fatality apparently

precipitated a halt in the Population Council's Canadian clinical trials of mifepristone.[293]  Finally,

5    a 21 year old woman suffered a heart attack three days after she completed the Mifeprex

Regimen.[294]  These and other adverse events had been reported to FDA through its Adverse

Event Reporting System (AERS).[295]  Two of the patients who were reported to have suffered life-

threatening adverse events were 15 years old.[296]  These incidents bear out the concerns about the

safety of the regimen detailed above, and the relatively high rate of serious adverse events among

10   adolescents is of particular concern.

---

[290]  The letter did not specify the number of adverse events about which Danco had been informed, but five individual cases were discussed.

[291]  *See* Dear Doctor Letter, *infra* Appendix A, at 1.

[292]  *See* Dear Doctor Letter, *infra* Appendix A, at 1.

[293]  It appears that the woman reported to have died from a systemic bacterial infection was a Canadian trial subject. *See* Marnie Ko, "A Volunteer Dies While Testing a Controversial New Drug, Bringing the Trial to a Halt," The Report (Oct. 8, 2001) (available at: <http://report.ca/archive/report/20011008/p48ai011008f.html>). *See also* Henry P. Kaiser Family Foundation, "Population Council Announces Death of Woman Involved in Canadian Mifepristone/Misoprostol Trial," Daily Reproductive Health Report (Sept. 11, 2001) (available at: <http://www.kaisernetwork.org/Daily_reports/rep_index.cfm?DR_ID=6877>).  A *Clostridium sordellii* infection apparently caused the woman to suffer septic shock.  *See generally* G.L. Mandell, J.E. Bennett, and R. Dolin, *Principles and Practice of Infectious Diseases* (5th ed. 2000): at 2551 (explaining that a disease process in which "clostridia clearly play a major pathogenic role i[s] uterine gas gangrene, now a rare complication that was previously seen in the setting of septic abortion."  "*C. sordellii* has been reported as a cause of uterine gas gangrene . . . .").  *See also* FDA Q & A's, *infra* Appendix A, at Question 3 ("Serious systemic bacterial infection is a severe life-threatening infection that spreads throughout the body and can cause death.").

[294]  *See* Dear Doctor Letter, *infra* Appendix A, at 1.

[295]  *See, e.g.,* Office of Postmarketing Drug Risk Assessment, AERS Report, ISR Numbers 3819498-2 (Nov. 2, 2001) (intervention to prevent permanent impairment or damage); 3806144-7 (Oct. 9, 2001) (death of a patient with an ectopic pregnancy); 3769840-6 (July 30, 2001) (hospitalization of patient with an ectopic pregnancy); 3769842-X (July 30, 2001) (intervention to prevent permanent impairment or damage); 3719885-7 (May 8, 2001) (death in conjunction with the use of misoprostol and Mifegyne, which is the trade name of mifepristone distributed in France); 3713452-7 (Apr. 27, 2001) (intervention to prevent permanent impairment or damage); and, 3769838-8 (July 30, 2001) (intervention to prevent permanent impairment or damage).  The AERS depends on voluntary reporting and the accuracy of these reported adverse events cannot be verified, nor can the cause of these events be identified with certainty.  There may have been other adverse events that were not reported.

Simultaneously with Danco's distribution of the *Dear Doctor Letter*, FDA published a webpage with 14 questions and answers related to mifepristone in an attempt to answer some of the questions likely to be prompted by the letter and to urge health care providers to adhere to the approved regimen.[297]  FDA's answers, however, leave much to be desired from a medical and scientific standpoint.

First, FDA has understated the possibility that the Mifeprex Regimen caused the serious adverse events reported in the letter.[298]  FDA did not adequately explain why women who were apparently healthy prior to undergoing the Mifeprex Regimen experienced life-threatening or fatal complications such as ruptured ectopic pregnancies, heart attacks, and systemic bacterial infections.

Second, FDA inappropriately attempted to link these adverse events to the unapproved vaginal administration of misoprostol.[299]  It was reckless for FDA to suggest that the vaginal administration of misoprostol caused these adverse events while overlooking critical flaws in the

---

[296] *See* Office of Postmarketing Drug Risk Assessment, AERS Report, ISR Numbers 3803789-5 (Oct. 3, 2001) and 3815629-9 (Oct. 26, 2001).

[297]  FDA, "Mifepristone Questions and Answers 4/17/2002" ("FDA Q & As") (available at: <http://www.fda.gov/cder/drug/infopage/mifepristone/mifepristone-qa_4_17_02.htm>).

[298]  *See* Dear Doctor Letter, *infra* Appendix A, at 1 ("No causal relationship between any of these events and use of Mifeprex and misoprostol has been established.").  An FDA official interviewed (without attribution) downplayed the connection between the Mifeprex Regimen and the adverse events.  *See* Susan Okie, "Physicians Sent Abortion Pill Alert: Six Women Using RU-486 Taken Ill, and Two Died, Letter Says," *Washington Post* (Apr. 18, 2002): at A2 ("These are, in fact, a very small number of events.  Some of them were clearly not caused by the drug regimen.").

[299]  The repeated references to the unapproved vaginal use of misoprostol in the FDA Q & As give rise to the inference that the reported adverse events are attributable to this single departure from the Mifeprex Regimen.  *See, e.g.,* FDA Q & As, *infra* Appendix A, at Question 1 ("In all of these cases, misoprostol was given vaginally, not orally, which is the approved regimen.  FDA has not reviewed data on the safety and effectiveness of vaginal administration of misoprostol."); *id.* at Question 4 ("We do not know what role, if any, Mifeprex and 'off-label' use of vaginal misoprostol may have in developing serious infections."); *id* at Question 9 ("Why are physicians using misoprostol 'off-label,' in other words, using misoprostol vaginally at different doses?  There are published studies of the use of mifepristone with vaginal administration of misoprostol for abortion.  The misoprostol doses used in these studies are higher than those described in the Mifeprex labeling . . . ."); *id.* at Question 10 ("Are there risks with vaginal use of misoprostol?").

approved regimen for Mifeprex use in the United States.  FDA should have first assessed essential aspects of this regimen.

It is clear, for example, that absent ultrasonographic screening for ectopic pregnancy, there is increased risk that an intact or rupturing ectopic pregnancy will be misdiagnosed as a normally progressing Mifeprex abortion.  Additionally, Mifeprex abortions may be performed by practitioners who are not physicians, who cannot perform surgical abortions, or who are unable to diagnose ectopic pregnancies and their complications.

Nor is there reason to believe that systemic bacterial infection is more likely to occur following vaginal, rather than oral, administration of misoprostol.  Misoprostol is commonly administered vaginally for the induction of labor without higher reported rates of either intrauterine or systemic infection when compared to orally administered misoprostol or other methods of labor induction.  Rather, the occurrence of life-threatening infection in women undergoing a Mifeprex abortion should raise questions about whether prolonged genital tract bleeding in the artificial hormonal milieu created by the Mifeprex Regimen might foster or promote infectious complications.  In addition, infection might occur in women who, believing that their abortion is complete and unaware that their uterus actually contains dead tissue, fail to return for follow-up visits.[300]  This may be a particular problem when the Mifeprex Regimen is prescribed to adolescents.

The occurrence of a heart attack in a 21 year old woman is always cause for significant concern.  A French woman undergoing a mifepristone abortion suffered a fatal heart attack in

---

[300]  A. Karen Kreutner, M.D., "Postabortion Infections," *Contemporary Ob/Gyn* 1 (2001): at 37-42 (". . . because medical termination may be incomplete in between 3% and 23% of patients, retained tissue and subsequent infection may go unrecognized in those lost to follow up.  . . .  Some experts fear there will be compliance problems with the third visit, especially when the patient terminates early.  In these cases, retained tissue, thought by the patient to be normal bleeding, could lead to endometritis.").

1991.  A different prostaglandin (Sulprostone) administered by injection was used in that case.[301]

This new case highlights the need for further investigation into a possible causal link between

mifepristone-prostaglandin abortions and myocardial infarction.[302]

The ratio of serious adverse events to total uses of the Mifeprex Regimen cannot be

5  ascertained because serious adverse event reporting is likely incomplete and because it is not

publicly known how many times the Mifeprex Regimen has been used.  Regardless of the

relative number of serious adverse events, the nature of these events demands immediate FDA

action to prevent future patient injuries and deaths.[303]  The Joint Commission on the

Accreditation of Healthcare Organizations[304] ("JCAHO" or "Joint Commission") has developed

10  an approach for investigating adverse events similar in gravity to those that prompted the

issuance of the Dear Doctor Letter.  The JCAHO looks for "sentinel events" which are

"unexpected occurrence[s] involving death or serious physical or psychological injury, or the

risk thereof."[305]  "Sentinel events" *signal* the need for the commencement of a "root cause

---

[301]  *See* "Noticeboard: A Death Associated with Mifepristone/Sulprostone," *Lancet*  337 (April 20, 1991): at 969-70 ("A spokeswoman for Roussel-Uclaf SA, the company that manufactures mifepristone, said 'the death was clearly from cardiovascular shock following 'Nalador' (Schering) injection.'").

[302]  The Mifeprex Regimen should be contraindicated for women with cardiovascular risk factors until further clinical experience indicates that such contraindication is unnecessary.

[303]  Even FDA acknowledged the rarity of the events referenced in the Dear Doctor Letter.  With respect to bacterial infection, for example, FDA observed that "the rate of serious infection as a complication of pregnancy is 3.5 per 1000 pregnancies.  Uterine infection occurs in 0.1-4.7% of first trimester surgical abortions and in 0.0-6.1% of medical abortions.  In the past, it was most often associated with illegal abortions.  It rarely occurs with pelvic surgery or even with otherwise normal childbirth."  FDA Q & A's, *infra* Appendix A, at Question 3.  FDA similarly noted the unusual nature of a heart attack in a young woman: "The single heart attack occurred in a 21 year old.  A heart attack in very young women is extremely rare. . . .  In 1997, the rate among US women aged 20-24 years was 0.19 per 100,000 women."  *See id.* at Question 4.

[304]  The Joint Commission "evaluates and accredits nearly 18,000 health care organizations and programs in the United States.  An independent, not-for-profit organization, JCAHO is the nation's predominant standards-setting and accrediting body in health care.  Since 1951, JCAHO has developed state-of-the-art, professionally based standards and evaluated the compliance of health care organizations against these benchmarks."  Joint Commission webpage at: <http://www.jcaho.org/whatwedo_frm.html>.

[305]  Joint Commission webpage at: <http://www.jcaho.org/sentinel/se_pp.html#I. Sentinel Events>.

analysis" of the event(s),[306] with the goal of developing an appropriate administrative response from the health care organization that will prevent the occurrence of future serious adverse events.  A root cause analysis of sentinel events is performed before a statistically significant number of injuries or deaths occurs.  It seeks to discern the facts surrounding each occurrence, distinguish factors peculiar to individuals from those pointing to procedural or administrative deficiencies, and recommend corrective measures to such systemic failures in the delivery of a particular therapy.

It is particularly important that FDA react to these sentinel events because the clinical trials underlying the approval of the Mifeprex Regimen did not adhere to FDA's endorsed scientific methodology for such trials.  The substandard trial design of the U.S. and French Clinical Trials precluded an accurate estimation of the safety of the Mifeprex Regimen compared to the existing available alternatives.  Moreover, FDA did not require the sponsor to conduct rigorous Phase IV studies, which could have compensated for some of these deficiencies by generating additional safety data.  The agency has not performed a root cause analysis, but has instead hastily postulated that the vaginal administration of misoprostol is the underlying cause of the adverse events.[307]  The Petitioners believe that there are probably more scientifically sound explanations for these adverse events and that the supposed safety of the Mifeprex Regimen has been called into question.  The occurrence of the adverse events related to ectopic pregnancies and life-threatening systemic bacterial infections adds significant weight to the concerns of those

---

[306]  The Joint Commission defines "root cause analysis" as "a process for identifying the basic or causal factors that underlie variation in performance, including the occurrence or possible occurrence of a sentinel event.  A root cause analysis focuses primarily on systems and processes, not individual performance.  It progresses from special causes in clinical processes to common causes in organizational processes and identifies potential improvements in processes or systems that would tend to decrease the likelihood of such events in the future, or determines, after analysis, that no such improvement opportunities exist."  Joint Commission webpage at: <http://www.jcaho.org/sentinel/se_pp.html#Root cause analysis>.

who have long warned that mifepristone-misoprostol abortions are dangerous. FDA has previously dismissed such concerns but now must respond to the accumulating evidence and act accordingly. Withdrawal of the approval is warranted.[308]

5      ### H.    FDA'S APPROVAL OF MIFEPREX SHOULD BE WITHDRAWN BECAUSE THE SPONSOR IS NOT ENFORCING THE LIMITED RESTRICTIONS ON THE USE OF MIFEPREX

Mifeprex abortion providers openly flout the restrictions included in the approved

10    regimen without any reaction from FDA, Danco, or the Population Council.[309] Shortly after approval, FDA asserted that "[i]f restrictions are not adhered to, FDA may withdraw approval."[310] Subpart H authorizes FDA to withdraw approval of a drug approved under Section 314.520 if "[t]he applicant fails to adhere to the postmarketing restrictions agreed upon."[311] When it adopted Subpart H, FDA explained that "[t]he burden is on the applicant to ensure that

---

[307] *See* FDA Q & As, *infra* Appendix A, at Nos. 1, 4, 9, 10, and 11.

[308] The Secretary of HHS is authorized by 21 C.F.R. § 314.530(a) to withdraw approval of a Subpart H drug, subject to the applicant's right to a hearing, if, among other things, "(3) [u]se after marketing demonstrates that postmarketing restrictions are inadequate to assure safe use of the drug; (4) [t]he applicant fails to adhere to the postmarketing restrictions agreed upon; (5) [t]he promotional materials are false or misleading; or (6) [o]ther evidence demonstrates that the drug product is not shown to be safe or effective under its conditions of use."

[309] The absence of a reaction from Danco may not be surprising in light of the cavalier attitude towards the FDA approval process exhibited by Dr. Richard Hausknecht, who is Danco's medical director. As early as July 1994, Dr. Hausknecht, had used methotrexate and misoprostol in clinical tests in the U.S. that Dr. Mitchell Creinin, a prominent abortion researcher, described as "downright unethical" and which Sandra Waldman of the Population Council described as being "very risky." Dr. Hausknecht stopped these experiments in September 1994 when the FDA told him to "stop performing the abortions unless he gets the backing of a medical institution and submits his data and procedures to the FDA for review." Carol Jouzaitis, "Doctor's Abortion-Drug Technique Draws Fire," *Chicago Tribune* (Sept. 12, 1994): at 1 & 14. Dr. Hausknecht admitted, " 'This is a little bit uncharted.' . . . . But he declared: 'Damn it. I'm not going to wait. This is a step forward. This is important. I want to see this available to women where it's not available now.' " *Id.* In addition, Dr. Hausknecht's website explains step two of the Mifeprex procedure that he employs: "At the conclusion of the [first] visit, the patient receives a packet containing tablets of misoprostol which are to be taken orally or placed in the vagina depending on the regimen you and Dr. Hausknecht choose." Available at: <http://www.safeabortion.com/procedure.htm> (visited July 7, 2002). Both the home use and the vaginal administration of misoprostol contravene FDA's approved regimen.

[310] *See* Letter, Melinda K. Plaisier, Associate Commissioner for Legislation (FDA) to Senator Tim Hutchinson (Oct. 20, 2000): at 2 [FDA FOIA Release: MIF 002648-52].

[311] 21 C.F.R. § 314.530(a)(4).

the conditions of use under which the applicant's product was approved are being followed."[312]
FDA should exercise its authority to withdraw its approval for Mifeprex.

Among the common departures from the approved regimen is the practice of offering the
Regimen to women with pregnancies beyond seven weeks.[313]  The "Mifepristone Medication

5    Guide" directs women not to take Mifeprex if "[i]t has been more than 49 days (7 weeks) since
your last menstrual period began."  Moreover, women who use the Mifeprex Regimen sign a
Patient Agreement, which includes a representation by the patient that "I believe I am no more
than 49 days (7 weeks) pregnant.").[314]  Thus, the practice of offering Mifeprex to women beyond
seven weeks not only contravenes the approved regimen, but it also effectively requires patients

10   to make an untruthful representation in the Patient Agreement.  The *Los Angeles Times* explained
that, "[B]y offering mifepristone up to the ninth week of pregnancy," Family Planning
Associates, "the nation's largest for-profit abortion chain," "obtains a competitive edge over
Planned Parenthood, which stays within the seven-week guideline."[315]

In another common deviation from the approved regimen, some abortion providers have

15   eliminated the second of the three prescribed visits.  During the initial visit, these providers give

---

[312]  *Subpart H Final Rule*, 57 Fed. Reg. at 58952.

[313]  Liberty Women's Health Care of Queens, NY, openly acknowledges its use of Mifeprex beyond seven weeks:
"While the FDA has approved mifepristone for non-surgical abortions only up to 7 weeks, we use a modified
method to extend this period of eligibility in selected patients an additional 14 days up to 9 weeks."  Available at:
<http://www.abortbypill.com/2.html> (visited Dec. 31, 2001).  Likewise, Preterm, an abortion clinic in Cleveland,
Ohio, states that abortion using Mifeprex "is effective in terminating pregnancies up to 63 days (9 weeks) from the
last normal menstrual period."  Available at: <http://www.preterm.org/nonsurg.htm> (visited July 7, 2002).

[314]  *See* Item 4 of the Patient Agreement for Mifeprex (mifepristone) Tablets ("Patient Agreement").

[315]  Denise Gellene, "RU-486 Abortion Pill Hasn't Caught on in U.S.," *Los Angeles Times* (May 31, 2000): at A1
(quoting Family Planning Associates' official as saying, "You can catch a lot of women in those two [extra] weeks").
Family Planning Associates' website confirmed that the abortion provider offers Mifeprex to women with pregnancies
up to nine weeks' gestational age.  Available at: <http://www.webworldinc.com/fpamg/abortion_pill.htm> (visited
July 7, 2002) ("Medical abortion is limited to patients less than nine weeks pregnant as verified by ultrasound.").

the patient misoprostol, typically with instructions to administer it to herself vaginally[316] at home two days later.[317]  Yet home administration of misoprostol runs counter to what patients agree to in the Patient Agreement, which states that "I will . . . return to my provider's office in 2 days (Day 3) to check if my pregnancy has ended.  My provider will give me misoprostol if I am still pregnant."[318]  The Population Council argued in favor of and FDA considered the benefits of self-administration at home, chief among which is the reduced burden on abortion providers and their facilities, but the agency concluded that these benefits are outweighed by the significant risks to women.[319]  The second visit affords the physician the opportunity to monitor the status of

5

---

[316]  The likely reason that FDA's approved regimen calls for oral administration is that it is the only mode of administering misoprostol that is currently approved by the FDA.  As discussed above, however, the use of misoprostol in conjunction with mifepristone to effect abortions is itself an unapproved indication.

[317]  Presidential Women's Center in West Palm Beach, Florida, for example, gives women "four Misoprostol 200 mcg tablets to take home.  Forty eight hours after the Mifepristone tablets have been administered the woman moistens four Misoprostol tablets with tap water and inserts them high into her vagina with her fingers."  Available at: <http://www.presidentialcenter.com/medical.html> (visited July 7, 2002).  See also: <http://www.heritageclinic.com/abortion/medical_abortion_pill.htm> (visited July 4, 2002) (Two days after the patient takes mifepristone, she "inserts Cytotec vaginally, which causes the uterus to contract and expel the embryo.  This is very similar to the procedure that was FDA approved in 2000 and is approximately 98% effective.  Note: The FDA approved protocol calls for 3 Mifeprex pills taken orally the first day and 2 Cytotec pills taken orally two days later.  However, subsequent studies have show[n] 1 oral Mifeprex and 4 vaginal Cytotec to be as effective with less gastro-intestinal upset."); see also: <http://www.fwhc.org/concord/pages/mifepristone.html> (visited July 7, 2002) (Concord Feminist Health Center's web site describes the second phase of the procedure: "In a few days she inserts misoprostol tablets into her vagina.  The pregnancy usually ends at home within four hours."); see also: <http://www.gynemed.org/ru.html> (visited July 7, 2002) (Gynemed Surgi-Center's web site states: "You will be given two doses of Misoprostol tablets and instructions on how to insert them into your vagina, which you wil[l] do 48 hours after taking RU486."); see also: <http://www.hopeclinic.com/medab.htm> (visited July 7, 2002) (Hope Clinic for Women, Ltd. Explains: "You will receive pills, misoprostol ("miss o pross tul") to take home with you.  You will be instructed when to use them; they are placed vaginally.").  Even the National Abortion Federation, which initiated a nationwide advertising campaign for Mifeprex, sanctions home administration of misoprostol in its "Medical Abortion Start-Up Packet."  See National Abortion Federation, "Protocol Recommendations for Use of Mifepristone and Misoprostol in Early Abortion," Early Medical Abortion with Mifepristone or Methotrexate: Overview and Protocol Recommendations (Washington, D.C.: National Abortion Federation, 2001) at 36 ("Home administration of vaginal misoprostol has been found to be safe and effective up to 63 days' gestation and is highly acceptable to patients.").

[318]  See Patient Agreement, Item 14.  See also Mifeprex Medication Guide, which explains that on "Day 3 at your provider's office," "your provider will check to see if you are still pregnant," and "[i]f you are still pregnant, take 2 misoprostol tablets."

[319]  FDA, which in its 2000 Mifepristone Approvable Letter, agreed to the Population Council's proposal to allow home administration of misoprostol, rejected that option after reconsideration of the issue.  See Mifeprex Approval Memo, infra Appendix A, at 2-3 ("The approvable letter issued by FDA on 2/18/2000 agreed to the Population Council's statement that women could have the option of taking misoprostol on Day 3 either at home or at the

the termination[320] and assess the need for misoprostol – tasks which cannot be delegated to the patient.[321]  In addition, the second visit enables patients whose abortions are complete to avoid having to take misoprostol.[322]

Danco and the Population Council have not effectively constrained providers of Mifeprex to adhere to the approved regimen.  It appears instead that Danco and the Population Council have ignored well-publicized departures from that regimen.  Deviations from the approved regimen are particularly troubling because the patient is told to disregard the regimen that she reads about in the Medication Guide and pledges to follow in the Patient Agreement.  When a drug is approved under Subpart H, the drug's sponsor is responsible for ensuring compliance

---

prescriber's office.  However, data provided by the Population Council supporting home use was re-reviewed and found not to provide substantial evidence for safety and efficacy. . . .  Returning to the health care provider on Day 3 for misoprostol, as in the U.S. clinical trial, assures that the misoprostol is correctly administered.  This requirement has the additional advantage of contact between the patient and health care provider to provide ongoing care and to reinforce the need to return on Day 14 to confirm that expulsion has occurred.").

[320]  Because of the complications that can arise, periodic monitoring during the termination process is important.  For the significant percentage of patients that fail to return for the third visit, the second visit may be the last opportunity for a health care provider to monitor the termination.  In the U.S. Clinical Trial, five percent of patients failed to return for the third visit.  *See* Medical Officer's Review, *infra* Appendix A, at 10.  In other studies, the "loss to follow-up has ranged from three to eleven percent."  *See* Spitz Article, *infra* Appendix A, at 1246 (citations omitted).  The rate of patients who do not complete the entire regimen in routine clinical practice is likely to be even higher as they will not necessarily be subject to the U.S. Clinical Trial's exclusion criteria, which, among other things, excluded women who were "unlikely to understand and comply with the requirements of the study."  Medical Officer's Review, *infra* Appendix A, at 9.

[321]  *See* ACOG Practice Bulletin, *infra* Appendix A, at 6 (*citing* Mitchell Creinin, *et al.*, "Methotrexate and Misoprostol for Early Abortion: A Multicenter Trial," *Contraception* 53 (1996): at 321-27) ("Women as well as their practitioners are often unable to judge correctly if the women have aborted by evaluating symptomatology.  In clinical trials with methotrexate and misoprostol, only about half of women who thought they had aborted actually had done so."); Beth Kruse *et al.,* "Management of Side Effects and Complications in Medical Abortion," *American Journal of Obstetrics and Gynecology* 183 (2000): S65-375, S73 ("Studies demonstrate that women may be unable to judge correctly on the basis of symptoms whether abortion has occurred.").

[322]  For those patients whose abortions are not complete, the benefits of in-clinic misoprostol use would be enhanced if patients were required to spend several hours afterward in the abortion facility, where they would have ready access to pain medication and other medical help even if the abortion does not occur during the observation period.  The Population Council persuaded FDA not to include this requirement, which was included in the protocol for the U.S. Clinical Trial.  Forty-nine percent of the participants expelled their pregnancies during the four-hour observation period after the administration of misoprostol.  *See* Spitz Article, *infra* Appendix A, at 1243.  Nevertheless, a post-misoprostol waiting period was likely disfavored because the protracted presence of large numbers of bleeding and cramping women could place a strain on abortion facilities.

74

with the restrictions included in the approved regimen for use of the drug.[323]  The Population Council and Danco have shirked this responsibility.  FDA, therefore, should withdraw its approval of Mifeprex.

5

## I.    THE U.S. CLINICAL TRIAL FOR MIFEPRISTONE DID NOT MIRROR THE ANTICIPATED CONDITIONS FOR THE ULTIMATE USE OF THE DRUG

As a general rule, "Phase 3 trials are usually [conducted] in settings similar to those

10  anticipated for the ultimate use of the drug."[324]  FDA, however, approved a regimen that does not

contain important safeguards that were employed in the U.S. Clinical Trial.[325]  In the U.S.

Clinical Trial, for example, the investigators relied on transvaginal ultrasonography (along with

menstrual history and pelvic examination) to confirm the gestational age of each pregnancy.[326]

The use of ultrasonography also excluded women with ectopic pregnancies.  Moreover,

15  physicians participating in the U.S. Clinical Trial had experience in performing surgical

abortions, were trained in the administration of the mifepristone-misoprostol procedure, and had

admitting privileges at medical facilities that could provide emergency care and

hospitalization.[327]  In addition, "[a]ll patients were within one hour of emergency facilities or the

---

[323]  *See Subpart H Final Rule*, 57 Fed. Reg. at 58953 ("The limitations on distribution or use required under this rule are imposed on the applicant.  Therefore, the burden is on the applicant to ensure that the conditions of use under which the applicant's product was approved are being followed.").

[324]  Bertram G. Katzung, M.D., Ph.D., and Barry A. Berkowitz, Ph.D., "Basic & Clinical Evaluation of New Drugs" in Bertram G. Katzung, ed., *Basic and Clinical Pharmacology*, 4th ed. (Norwalk: Appleton & Lange, 1989): at 56.

[325]  The French Clinical Trials, which were not performed by the Population Council, are not discussed here because they were not conducted for the purpose of supporting the mifepristone NDA and, therefore, were not designed to reflect American conditions of use.

[326]  *See* Spitz Article, *infra* Appendix A, at 1242.

[327]  "The types of skills physicians had in the U.S. clinical trial were: 1) the ability to use ultrasound and clinical examination to date pregnancies and diagnose ectopic pregnancies, 2) the ability to perform surgical procedures, including dilation and curettage, vacuum suction, and /or surgical abortions, for bleeding or incomplete abortion, and, 3) they had privileges at medical facilities to provide emergency resuscitation, transfusion, hospitalization, etc.  Physicians were trained to use the drug per protocol.  Fourteen of the seventeen physicians in the U.S. clinical trial were obstetricians/gynecologists."  Mifeprex Approval Memo, *infra* Appendix A, at 5.  Medical Officer's Review,

facilities of the principle [*sic*] investigator."[328]  In the U.S. Clinical Trial, after taking

misoprostol, "women were monitored for four hours for adverse events."[329]  FDA has not

retained these requirements governing physician training, ultrasound, the post-misoprostol

waiting period, or physician privileges at facilities that provide emergency care.[330]  FDA should

5    not have extrapolated conclusions about the safety and efficacy of FDA's approved regimen

from data generated under trial conditions not mirroring the approved regimen.  Effectively,

therefore, the agency approved a drug regimen that it had not tested.

### J.  BY WAIVING THE PEDIATRIC STUDY REQUIREMENT, FDA MAY HAVE ENDANGERED THE HEALTH OF ADOLESCENT GIRLS

10         FDA's approval of Mifeprex violated FDA's regulations, effective April 1, 1999,

requiring that new drugs be tested for safety and effectiveness in the pediatric population

(collectively, the "*Pediatric Rule*").[331]  Requiring data on girls age 18 and under also would have

15    been consistent with the guidelines for trials in the pediatric population that FDA accepted at the

---

*infra* Appendix A, at 6 (The U.S. Clinical Trial was "conducted at centers that could perform abortions by either vacuum aspiration or dilatation and curettage and had access to facilities that provided blood transfusions and performed routine emergency resuscitation procedures.").

[328]  Mifeprex Approval Memo, *infra* Appendix A, at 5.  The "one hour travel distance restriction in the clinical trial was intended to ensure access by patients to emergency or health care services."  *Id.*  FDA contends that concerns arising from the elimination of the geographical proximity rule have "been dealt with through labeling, which makes it clear that if there isn't adequate access to emergency services, the medication is contraindicated."  Mifeprex Approval Memo at 5.

[329]  *See* Spitz Study, *infra* Appendix A, at 1242.

[330]  The Prescriber's Agreement requires only that the supervising physician be "able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary."  By contrast, the protocol for the U.S. Clinical Trial required that the physician have "privileges at medical facilities to provide emergency resuscitation, transfusion, hospitalization, etc."  Mifeprex Approval Memo, *infra* Appendix A, at 5.  The shift in focus from access by the provider of the abortion to access by the woman who has the abortion, attenuated the link between the abortion provider and the emergency care provider, a link that is critical to ensuring that women receive timely emergency care.

[331]  *See* Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *Final Rule*, 63 Fed. Reg. 66632 (Dec. 2, 1998) (*Pediatric Adopting Release*).  The notice of proposed rulemaking was released as: Regulations Requiring Manufacturers to Assess the Safety and Effectiveness of New Drugs and Biological Products in Pediatric Patients, *Proposed Rule*, 62 Fed. Reg. 43900 (Aug. 15, 1997).

International Conference on Harmonization.[332]  Nevertheless, in the Mifeprex Approval Letter, FDA stated, "We are waiving the pediatric study requirement for this action on this application."[333]  Thus, FDA approved Mifeprex for use without requiring safety and effectiveness testing for the pediatric population.[334]

5        As FDA noted when it adopted the *Pediatric Rule*, "many of the drugs and biological products that are widely used in pediatric patients carry disclaimers stating that safety and effectiveness in pediatric patients have not been established."[335]  FDA observed that "the absence of pediatric labeling information poses significant risks for children."[336]  The ICH has noted that adolescence "is a period of sexual maturation; medicinal products may interfere with the actions

10     of sex hormones and impede development."[337]  Such hormonal changes may "influence the results of clinical studies."[338]  These concerns for the health of infants, children, and adolescents

---

[332] *FDA Guidance: E11 Clinical Testing for Pediatric Uses* at 9 and 11 (Heading for Section 2.5.5).  FDA, cognizant of the need for such studies, obtained a commitment from the sponsor in 1996 to conduct Phase IV studies to examine the safety and efficacy of the regimen in girls under 18 years of age.  FDA subsequently curtailed this Phase IV study requirement when it approved the Mifeprex NDA.

[333] Mifeprex Approval Letter at 3.

[334] The Mifeprex Label accordingly included the standard disclaimer employed in drug labeling when the drug sponsor has not provided sufficient information to support a pediatric use for the drug: "Safety and effectiveness in pediatric patients have not been established."

[335] *Pediatric Adopting Release*, 63 Fed. Reg. at 66632.

[336] *Pediatric Adopting Release*, 63 Fed. Reg. at 66632.

[337] FDA, "Guidance for Industry: E11 Clinical Investigation of Medicinal Products in the Pediatric Population" (Rockville, Md.: Dec. 2000): at 11 (§ 2.5.5) ("*FDA Guidance: E11 Clinical Testing for Pediatric Uses*").  Section 2.5.5 states that the adolescent subgroup should extend from "12 to 16-18 years (dependent on region)."  *Id.* at 11-12 (§ 2.5.5).

[338] *See FDA Guidance (ICH: E11): Clinical Testing for Pediatric Uses* at 12 (§ 2.5.5).  These ICH concerns, quoted below, pertaining to the difficulty of testing drugs in the adolescent population amplify the need for FDA to have required clinical study of the difficulties that might arise when teenage girls undergo the Mifeprex Regimen:

> Many diseases are also influenced by the hormonal changes around puberty (e.g., increases in insulin resistance in diabetes mellitus, recurrence of seizures around menarche, changes in the frequency and severity of migraine attacks and asthma exacerbations).  Hormonal changes may thus influence the results of clinical studies.

> Within this age group, adolescents are assuming responsibility for their own health and medication. Noncompliance is a special problem, particularly when medicinal products (for example, steroids) affect

---

prompted FDA to begin the rulemaking that culminated with the issuance of the *Pediatric Rule*, establishing "a presumption that all new drugs and biologics will be studied in pediatric patients" unless the requirement is waived.[339]  More specifically, the *Pediatric Rule* requires that applicants seeking approval for new chemical entities, new biological products, new active ingredients, new indications, new dosage forms, new dosing regimens, and new routes of administration contain safety and effectiveness information on relevant pediatric age groups.[340]

> FDA made clear that the Mifeprex NDA was covered by the *Pediatric Rule*.[341]

Nevertheless, FDA fully waived the rule for Mifeprex without explanation.  Full or partial

---

appearance.  In clinical studies compliance checks are important.  Recreational use of unprescribed drugs, alcohol, and tobacco should be specifically considered.

The upper age limit varies among regions.  It may be possible to include older adolescents in adult studies, although issues of compliance may present problems.  Given some of the unique challenges of adolescence, it may be appropriate to consider studying adolescent patients (whether they are to be included in adult or separate protocols) in centers knowledgeable and skilled in the care of this special population.").

*Id*. at 12 (§ 2.5.5).

[339]  *Pediatric Adopting Release*, 63 Fed. Reg. at 66634 (introduction to "II. Highlights of the Final Rule").  The importance of testing drugs in children was highlighted during the recent controversy surrounding FDA's attempt to suspend the *Pediatric Rule*.  FDA's planned two-year suspension came in response to the passage of the Best Pharmaceuticals for Children Act, which offers incentives for manufacturers to test drugs in children.  Public Law No. 107-109, 115 Stat. 1408 ("BPCA").  *See also* Association of American Physicians and Surgeons, Inc. v. FDA, Defendants' Motion for Stay of Proceedings, Civil Action No. 00-2898 (HHK) (Mar. 18, 2002).  FDA later reversed its position in response to criticism from physicians and members of Congress.  FDA's attempt to suspend the *Pediatric Rule* prompted the introduction of identical legislation in the House of Representatives and the Senate to codify the *Pediatric Rule*.  *See* S. 2394, 107th Congress, 2nd Session (2002) (co-sponsors: Senators Hillary Rodham Clinton (D-NY), Mike DeWine (R-OH), and Chris Dodd (D-CT)); and H.R. 4730, 107th Congress, 2nd Session (2002) (co-sponsors: Representatives John D. Dingell (D-MI), Henry A. Waxman (D-CA), Rosa DeLauro (D-CT), Anna Eshoo (D-CA) and Sherrod Brown (D-OH)).  As Senator Hillary Rodham Clinton, a co-sponsor of the Senate bill explained, "if we want to protect our children over the long term, then we in Congress need to step in and make the Pediatric Rule the law of the land.  Short of taking that action, we risk denying children the protection that we require for adults."  Press Release, "Senators Will Introduce Legislation to Codify Pediatric Rule" (Apr. 17, 2002) (available at: <http://clinton.senate.gov/~clinton/news/2002/04/2002417811.html>).  *See also* Marc Kaufman and Ceci Connolly, "U.S. Backs Pediatric Tests In Reversal on Drug Safety," *Washington Post* (April 20, 2002): at A3.

[340]  *Pediatric Adopting Release*, 63 Fed. Reg. at 66634 ("A. Scope of the Rule"), and as required pursuant to 21 C.F.R. § 314.55(a).

[341]  The Mifeprex Approval Letter stated:  "Be advised that, as of April 1, 1999, all applications for new active ingredients, new dosage forms, new indications, new routes of administration, and new dosing regimens are required to contain an assessment of the safety and effectiveness of the product in pediatric patients unless this requirement is waived or deferred (63 *FR* 66632).  We are waiving the pediatric study requirement for this action on this application."  Mifeprex Approval Letter at 3.  Because the Mifeprex NDA was filed before the Pediatric Rule went

waivers of the pediatric study requirement may be granted either upon request of the applicant or by FDA on its own motion.[342]  Both FDA-initiated and sponsor-requested waivers must satisfy certain criteria.  FDA is required to grant a full or partial waiver "if the agency finds that there is a reasonable basis on which to conclude that one or more of the grounds for waiver … have been

5    met."[343]

Section 314.55 provides three procedural tracks by which an applicant may obtain a waiver of the study requirement.  The first requires that two conditions being met:[344] (1)"[t]he drug product does not represent a meaningful therapeutic benefit over existing treatments for pediatric patients," *and* (2) the drug product "is not likely to be used in a substantial number of

10    pediatric patients."  With respect to this basis for waiver, FDA has "emphasize[d] that the study requirement applies to a product that offers a meaningful therapeutic benefit even if it is not used in a substantial number of pediatric patients, and vice versa."[345]  As noted above, FDA, in connection with its determination to approve Mifeprex under Subpart H, concluded that the Mifeprex Regimen provides a therapeutic benefit over the existing treatment – surgical

---

into effect, if a waiver had not been granted, the Population Council would have had until December 2, 2000 to submit "an assessment of pediatric safety and effectiveness."  *See Pediatric Adopting Release*, 63 Fed. Reg. at 66658-59 ("V. Implementation Plan").

[342]  Although it appears that FDA waived the rule *sua sponte*, FDA should have required the manufacturer to provide certain information to support the waiver.  The agency has not released such documents to the public in response to FOIA requests.  When it adopted the *Pediatric Rule*, the agency noted: "FDA agrees that the burden is on the manufacturer to justify waivers, but believes that the rule already adequately imposes that burden.  The rule requires both a certification from the manufacturer that the grounds for waiver have been met and an adequate justification for the waiver request."  *Pediatric Adopting Release*, 63 Fed. Reg. at 66648 (§ 29).

[343]  21 C.F.R. § 314.55(c)(4)("FDA action on waiver.").

[344]  21 C.F.R. § 314.55(c)(2)(i).

[345]  *Pediatric Adopting Release*, 63 Fed. Reg at 66635 ("II.D.2. Waiver of the Study Requirement," *see* first paragraph).

abortion.[346]  This conclusion by itself precludes FDA from using the first method for granting

waiver of the *Pediatric Rule*.[347]

Even if FDA had not judged the Mifeprex Regimen to offer a "meaningful therapeutic

benefit," the second requirement for waiver in this first track is not met because Mifeprex can be

expected to be used in a "substantial number of pediatric patients," which FDA defines as

"50,000 pediatric patients with the disease for which the drug or biological product is

indicated."[348]  In the *Pediatric Adopting Release*, FDA stated that the "relevant age groups

will . . . be defined flexibly."[349]  With respect to Mifeprex, it would have been appropriate to

classify girls under the age of 18 as pediatric patients because safety and effectiveness in this

population had not been studied.[350]  If the pediatric population comprises all girls age 17 and

under, then we estimate that there were 357,200 pediatric pregnancies per year from 1995 to

1997 in the United States.[351]  If the pediatric population comprises all girls age 16 and under, then

we estimate that there were a total of 196,520 pregnancies per year from 1995 to 1997.[352]  Even if

the pediatric population encompasses only girls age 15 and under, we estimate that there were

---

[346]  *See* Mifeprex Approval Memo at 6.

[347]  FDA noted that, for purposes of the *Pediatric Rule*, it would rely "in part, on CDER's current administrative definition of a 'Priority' drug, applied to pediatric populations" to define "meaningful therapeutic benefit."  The phrase, "meaningful therapeutic benefit," appears identical in the Subpart H and Priority review contexts.  As noted above, Mifeprex was accorded priority review.  The modifications to "meaningful therapeutic benefit" for purposes of the *Pediatric Rule* appear to have broadened the scope of the phrase.  *See Pediatric Rule*, 63 Fed. Reg. at 66646.

[348]  *Pediatric Adopting Release*, 63 Fed. Reg. at 66647.

[349]  *Pediatric Rule*, 63 Fed. Reg. at 66634 ("C. Age Groups").  After noting comments to the proposed rule that argued for flexibility in setting age definitions (including a comment arguing for "pediatric patient" to include those "from 0 to 21 years"), FDA stated that "the age ranges identified in the proposal may be inappropriate in some instances" and that it had "deleted the references in the rule to specific age ranges."  *Id*. at 66651.

[350]  Although FDA acknowledged that the safety and effectiveness of Mifeprex were not studied in girls under age 18 and required a statement to that effect in the labeling, the agency anticipated and even encouraged use in this population when it stated that: "there is no biological reason to expect menstruating females under age 18 to have a different physiological outcome with the regimen.  The Spitz data actually suggests a trend towards increased success of medical abortion with younger patients."  Mifeprex Approval Memo at 7.

[351]  *See infra* Appendix B at B-3.

[352]  *See infra* Appendix B at B-4.

85,960 pregnancies per year from 1995 to 1997 in this age range.[353]  Thus, under any definition

of the pediatric population, the 50,000 patient cut-off set forth in the *Pediatric Adopting Release*

is exceeded.  In sum, *neither* of the requisite conditions for a waiver of the *Pediatric Rule* under

the first waiver track provided in Section 314.55 is satisfied.[354]

5          Second, FDA may also waive the pediatric study requirements if the "necessary studies

are impossible or highly impractical because, *e.g.*, the number of such patients is so small or

geographically dispersed."[355]  FDA explained that "that this ground for waiver [must] be

interpreted narrowly":[356]

> Although the number of patients necessary to permit a study must be decided on a case-
10 > by-case basis, FDA agrees that there are methods available to conduct adequate studies in
> very small populations.  . . .  Because of the speed and efficiency of modern
> communications tools, geographic dispersion will justify a waiver only in extraordinary
> circumstances and will generally have to be coupled with very small population size.
> FDA is not persuaded that inability to recruit patients because of parental fears associated
15 > with administration of the drug is an adequate basis to conclude that studies are
> impractical where there is also evidence that similar products are regularly prescribed to
> pediatric patients outside of clinical trials.[357]

Pediatric Mifeprex studies would not have been either "impossible or highly impractical."  As

20 described above and in Appendix B, the population of pediatric females that becomes pregnant

each year is large and the female population is evenly distributed throughout the United States.

Thus, this second waiver track available under Section 314.55 could not have been satisfied (and

FDA apparently has not taken a position to the contrary).

          FDA may waive the pediatric study requirement under Section 314.55's third waiver

25 track when "[t]here is evidence strongly suggesting that the drug product would be ineffective or

---

[353]  *See infra* Appendix B at B-4.

[354]  *See* 21 C.F.R. § 314.55(c)(2)(i).

[355]  *See* 21 C.F.R. § 314.55(c)(2)(ii).

[356]  *Pediatric Adopting Release*, 63 Fed. Reg. at 66647 (§ 26, final paragraph).

unsafe in all pediatric age groups."[358]  As noted above, FDA endorsed the proposition that "there is no biological reason to expect menstruating females under age 18 to have a different physiological outcome with the regimen."[359]  Thus, by suggesting that Mifeprex could be used appropriately in the pediatric population, FDA eliminated this third track as a possible basis for

5    waiver.

    Absent a waiver or deferral, the *Pediatric Rule* requires any drug application to "contain data that are adequate to assess the safety and effectiveness of the drug product for the claimed indication in all relevant pediatric subpopulations . . . ."[360]  FDA is authorized instead to extrapolate such data from adult studies "[w]here the course of the disease and the effects of the

10    drug are sufficiently similar in adults and pediatric patients."[361]  The underlying adult studies, however, must be "adequate and well-controlled."[362]  As noted above, the Population Council did not provide evidence from adequate and well-controlled studies as to the safety and effectiveness of Mifeprex in the *adult* population.  Reliance on these flawed adult studies for a determination of the safety and effectiveness of Mifeprex in the pediatric population was inappropriate.

15    Furthermore, to assume that the effects of a potent antiprogesterone, mifepristone, and a

---

[357] *Pediatric Adopting Release*, 63 Fed. Reg. at 66647 (§ 26, final paragraph).

[358] 21 C.F.R. § 314.55(c)(2)(iii).

[359] Mifeprex Approval Memo at 7.

[360] 21 C.F.R. § 314.55(a).  FDA stated that it was waiving the *Pediatric Rule*.  Mifeprex Approval Letter at 3.  The agency did not assert that it had made a determination that pediatric studies were not required because the adult trials were sufficient to support extrapolation of conclusions as to safety and effectiveness in the pediatric population. However, because FDA failed to provide any justification for its waiver, it is difficult to determine whether the agency was, in fact, relying on this provision to eliminate the pediatric study requirement for Mifeprex.

[361] *See* 21 C.F.R. § 314.55(a).

[362] *See* 21 C.F.R. § 314.55(a).

82

434

powerful prostaglandin analogue, misoprostol, in pregnant adults can be extrapolated to pregnant adolescents, who are still developing physiologically and anatomically, is medically unsound.[363]

FDA violated its own rules when it waived the Pediatric Rule in the face of explicit criteria that necessitated compliance with the rule.[364]  Furthermore, FDA offered no explanation

5 for its determination to waive the rule.  As FDA's treatment of other drugs illustrates, a waiver would have been appropriate only if Mifeprex had already been tested in children and labeled accordingly, or if the *Pediatric Rule's* criteria for waiver were satisfied.[365]  Because FDA waived the study requirement in the face of explicit criteria that appear to prohibit such action in this instance, the agency violated its rule.  In addition to violating Section 314.55, FDA's

10 unexplained waiver of the *Pediatric Rule* for the Mifeprex NDA constitutes agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[366]

---

[363] The Mifeprex Regimen acts upon the reproductive system, which changes dramatically during adolescence. Adolescents, for example, could face disruptions in ovulatory function as a result of concentrations of mifepristone in developing ovarian follicles, or other health problems.  Moreover, teenagers may face heightened risks arising from decreased compliance with the full regimen, poor recall of their last menstrual period, and their reluctance to tell others about their pregnancies.

[364] Of course, a partial waiver of the study requirement is appropriate for the non-adolescent pediatric sub-groups. *See* 21 C.F.R. § 314.55(c)(3).  According to *FDA Guidance (ICH: E11): Clinical Testing for Pediatric Uses*, the pediatric sub-populations other than "adolescents" are: 1) preterm newborn infants; 2) term newborn infants (0 to 27 days); 3) infants and toddlers (28 days to 23 months); 4) children (2 to 11 years).  *FDA Guidance (ICH: E11): Clinical Testing for Pediatric Uses* at 9 (§ 2.5).

[365] In April 2000, FDA approved a suitability petition for Pamidronate Disodium Injection, 3 mg/mL, 10 mL vials, and 9 mg/mL, 10 mL vials, the listed drug products for which are Aredia (Pamidronate Disodium for Injection), 30 mg/vial and 90 mg/vial, and determined that the "proposed change in dosage form is subject to the Pediatric Rule but that a full waiver of the pediatric study requirement . . . is appropriate."  *See* Letter, FDA to Mitchall G. Clark (April 18, 2000): at 1 (Docket No. 00P-0091/CPI) (concluding "that investigations are not necessary to demonstrate the safety and effectiveness of your proposed product in the pediatric population since the necessary studies are impossible or highly impractical because the number of patients is small and geographically dispersed").  *See also* Letter, FDA to The Weinberg Group, Inc. (June 13, 2000): at 1-2 (Docket No. 99P-5447/CPI) (approving a generic manufacturer's petition to file an Abbreviated New Drug Application for Cefaclor Chewable Tablets, 125 mg, 187 mg, 250 mg, and 375 mg, the listed drug products for which are Ceclor (Cefaclor) for Oral Suspension, 125 mg/5mL, 187 mg/5mL, 250 mg/5mL, and 375 mg/5mL because FDA determined that the "proposed change in dosage form is subject to the Pediatric Rule" but "that investigations are not necessary to demonstrate the safety and effectiveness of your proposed products in the pediatric population, because the specific drug products that you reference are adequately labeled for pediatric use").

[366] FDA has required numerous drug sponsors to comply with the *Pediatric Rule*, but it approved Mifeprex without stating its basis for waiving the requirement.  *See, e.g.*, Letter, FDA to King & Spalding (June 13, 2000): at 1

### K. FDA'S UNEXPLAINED REDUCTION OF THE SPONSOR'S PHASE IV REQUIREMENTS WAS ARBITARY, CAPRICIOUS, AN ABUSE OF DISCRETION, OR OTHERWISE NOT IN ACCORDANCE WITH LAW

5      Not only did FDA improperly and without explanation waive its own pediatric testing requirements, but it also inexplicably narrowed the scope of the Population Council's commitments to conduct post-approval Phase IV studies. As a general rule, the clinical trials required by FDA to support an NDA are adequate to establish short-term drug safety and

10    effectiveness. The standard pre-approval clinical trials, however, are typically incapable of providing either the amount or type of data necessary to assess a drug's long-term effects.[367] Phase IV, which occurs after a drug is approved, provides the opportunity to "monitor[ ] the safety of the new drug under actual conditions of use in large numbers of patients."[368] Not only

---

(Docket No. 99P-2776/CPI) (denying a generic manufacturer's petition to file an Abbreviated New Drug Application for Oxycodone Hydrochloride and Acetaminophen Oral Solution, 7.5 mg/500 mg per 15 mL, the listed drug product for which is Oxycodone and Acetaminophen Tablets 7.5 mg/500 mg, based on the fact that FDA "has determined that your proposed change in dosage form is subject to the Pediatric Rule and has concluded that investigations are necessary to demonstrate the safety and effectiveness in the pediatric population . . . . Therefore, the Agency concludes that the proposed product should be evaluated for safety and efficacy in the pediatric population."); Letter, FDA to Abbott Laboratories (Sept. 29, 1999): at 1-2 (Docket No. 98P-0821/CPI) (denying a generic manufacturer's petition to file an Abbreviated New Drug Application for Hydromorphone Hydrochloride Injection, 0.2 mg/mL, 30 mL vials, the listed drug product for which is Dilaudid-HP Injection, 10 mg/mL, 5 mL ampoules and 50 mL vials, because the "proposed change in route of administration is subject to the Pediatric Rule," "clinical trials are required for this specific drug product," and "investigations are necessary to demonstrate the safety and effectiveness in the pediatric population").

[367] A.G. Gilman, T.W. Rall, A.S. Nies, P. Taylor, eds., *The Pharmacological Basis of Therapeutics*, 8th ed. (New York: Pergamon Press, 1990): at 77 ("Although assessment of risk is a major objective of [clinical trials], this is far more difficult than is the determination of whether a drug is efficacious for a selected condition. Usually about 500 to 300 carefully selected patients receive a new drug during phase-3 clinical trials . . . . Thus, the most profound and overt risks that occur almost immediately after the drug is given can be detected in a phase-3 study, if these occur more often than once per 100 administrations. Risks that are medically important but delayed or less frequent than 1 in 1000 administrations may not be revealed prior to marketing. It is thus obvious that a number of unanticipated adverse and beneficial effects of drugs are only detectable after the drug is used broadly.").

[368] Bertram G. Katzung, M.D., ed., *Basic and Clinical Pharmacology*, 4th ed. (Norwalk, CT: Appleton & Lange, 1989): at 56. "Final release of a drug for general prescription use should be accompanied by a vigilant postmarketing surveillance program. The importance of careful and complete reporting of toxicity after marketing approval by the FDA can be appreciated by noting that many drug-induced effects have an incidence of 1:10,000 or less. . . . Because of the small numbers of subjects in phases 1-3, such low-incidence drug effects will not generally be detected before Phase 4, no matter how carefully the studies are executed. Phase 4 has no fixed duration." *Id.* at 56-7.

did FDA approve the NDA on the basis of clinical trials so defective with respect to their design and execution as to render them insufficient to establish short-term safety and effectiveness, but FDA also permitted the Population Council to substantially pare down the Phase IV trials that it would perform.

5      In response to an FDA request, on September 16, 1996, the Population Council agreed to conduct a set of Phase IV studies.[369]  FDA "reminded" the Population Council of these commitments in both the 1996 and 2000 Approvable Letters.[370]  The Population Council agreed to perform studies with the following objectives:

10
1.  To monitor the adequacy of the distribution and credentialing system.
2.  To follow-up on the outcome of a representative sample of mifepristone-treated women who have surgical abortion because of method failure.
3.  To assess the long-term effects of multiple use of the regimen.
4.  To ascertain the frequency with which women follow the complete treatment regimen and the outcome of those who do not.
15
5.  To study the safety and efficacy of the regimen in women (1) under 18 years of age, (2) over age 35, and (3) who smoke.
6.  To ascertain the effect on children born after treatment failure.[371]

These studies would have addressed some of the health issues that were not evaluated during pre-approval testing.

20      The Mifeprex Approval Letter released on September 28, 2000, however, contains only two Phase 4 study obligations, a radical curtailment of the earlier commitments.[372]  The letter

---

[369]  FDA made its request on August 22, 1996, after it had received Phase IV study recommendations from the FDA Advisory Committee.  *See* Medical Officer's Review, *infra* Appendix A, at 20-24.

[370]  *See* 1996 Mifepristone Approvable Letter, *infra* Appendix A, at 7-8 and 2000 Mifepristone Approvable Letter, *infra* Appendix A, at 5.

[371]  1996 Mifepristone Approvable Letter, *infra* Appendix A, at 7-8 and 2000 Mifepristone Approvable Letter, *infra* Appendix A, at 5.

[372]  *See* Mifeprex Approval Letter, *infra* Appendix A, at 2-3.

stated that "the following Phase 4 commitments, specified in [the Population Council's]

submission dated September 15, 2000 . . . *replace all previous commitments* . . . ."[373]

> (1) "A cohort-based study of safety outcomes of patients having medical abortion under the care of physicians with surgical intervention skills compared to physicians who refer their patients for surgical intervention."[374]
> (2) "A surveillance study on outcomes of ongoing pregnancies."[375]

FDA stated that "[p]revious study questions related to age, smoking, and follow-up on day 14

(compliance with return visit) will be incorporated into this cohort study, as well as an audit of

signed Patient Agreement forms."[376]  The agency, thus, compounded its failure to require the

Population Council and Danco to comply with the strictures of the Pediatric Rule when it

permitted them to consider the effect of the Mifeprex Regimen on patients under 18 as part of

another study rather than as a separate Phase IV study.[377]  The Approval Letter explained that

---

[373]  Mifeprex Approval Letter, *infra* Appendix A, at 2.

[374]  Mifeprex Approval Letter, *infra* Appendix A, at 3.  The Population Council acknowledged three weaknesses of this study.  First, the sample size would be limited so that the sponsor "will only be able to determine whether the combined safety rates of hospitalizations, medically necessary surgical interventions, and IV fluids in each of the two cohorts are within plus or minus 5 percentage points of the expected 2% rate.  We will not be able to detect differences of individual safety outcomes such as blood transfusions and deaths."  *See* Amendment 062 to the NDA, Revised Materials (Sept. 19, 2000): at 3. [FDA FOIA Release: MIF 007896-7903].  Second, the Population Council predicted that it might have difficulty finding women who were referred to another provider for care.  *Id.* at 3-4.  Third, it might be difficult to find women who did not return for their follow-up visit.  *Id.* at 4.  These three study weaknesses appear, at least in part, to stem from faulty selection criteria for study subjects.  Patients should not be enrolled in a study unless they are willing to comply with follow-up visits and telephone inquiries.  Additionally, informed consent forms authorize investigators to request medical records from other health care providers.

[375]  Mifeprex Approval Letter, *infra* Appendix A, at 3.

[376]  Mifeprex Approval Letter, *infra* Appendix A, at 3.  These issues were characterized by the sponsor as "Secondary Study Objectives."  *See* Amendment 062 to the NDA (Sept. 19, 2000): at 1.  The failure to consider each issue in a separate study is likely to compromise the quality of the data generated.  Because the study is primarily focused on a provider-level variable (ability to provide surgical intervention), the study will not necessarily yield a meaningful sample size for each of the relevant patient-level variables (age and smoking status).  Patients will be enrolled "consecutively from each provider until the provider's quota is met."  *See id.* at 2.

[377]  The Population Council submitted data from the Spitz Study on 106 women age 35 and older and 51 patients under age 20.  *See* Mifeprex Approval Letter, *infra* Appendix A, at 7.  However, the effects and potential age-specific risks of the Mifeprex Regimen on women outside the tested age range deserve separate consideration in studies with far more subjects.  Approximately 279,000 girls nineteen and younger and more than 84,000 women over the age of 35 obtain abortions in the United States annually.  *See* Appendix B, *infra*, at B-4 (§§ 5 and 6).  The Mifeprex Regimen, which directly interacts with the reproductive system, could conceivably interfere with pubertal development, as discussed above, and might pose unique risks to women who are nearing the end of their reproductive years.

"the changes in postmarketing commitments reflect current postmarketing questions given establishment of final labeling, Medication Guide, and distribution system, along with availability of additional clinical data with the drug since 1996."[378]

It appears, however, that the modifications came largely in response to the Population Council's unwillingness to explore the ramifications of the Mifeprex Regimen.  On August 18, 1999, the Population Council acknowledged its Phase IV commitments, but stated that "[w]e plan to discuss in more detail and develop a consensus with the FDA post-NDA approval."[379] The Population Council complained, for example, that "[a] prospective study of the long-term effects of multiple use of the regimen in all American women would be unduly burdensome, might result in an invasion of women's privacy and would not likely produce a meaningful scientific result for decades."[380]  Similarly, the Population Council informed FDA that it was "not able to commit to tracking down those women who are lost to follow-up because this would be very difficult and extraordinarily expensive.  We are also concerned about the ethics of doing

---

[378] Mifeprex Approval Memo, *infra* Appendix A, at 7.  FDA's conclusion that the reduction to only two Phase IV studies "reflect[s] current postmarketing questions" ignores a number of issues about Mifeprex that remain unexplored.  Because mifepristone interferes with pregnancy by binding to the progesterone receptor in the placenta, there is concern that the drug may affect not only the uterus, but the brain, breasts, adrenal glands, ovaries, and immune cells, all of which also have progesterone receptors.  Concerns that mifepristone may have a carcinogenic effect on breast tissue have also been expressed. *See, e.g.,* Testimony of Dr. Joel Brind, FDA Hearings Transcript, *infra* Appendix A, at 172-175.  Mifepristone also could affect the pituitary gland, the adrenal glands, and immune cells, all of which have glucocorticoid receptors.  In addition, it is unclear whether a woman who undergoes multiple mifepristone-misoprostol abortions could suffer adverse effects. *See* ACOG Practice Bulletin, *infra* Appendix A, at 9 ("No well-designed prospective studies address the issue of repeat medical abortion.").  Questions also remain about possible effects on the children born to women who have terminated a previous pregnancy with the Mifeprex Regimen. *See, e.g.,* P. Van der Schoot and R. Baumgarten, "Effects of Treatment of Male and Female Rats in Infancy with Mifepristone on Reproductive Function in Adulthood," *Journal of Reproduction and Fertility* 90 (1990): 255-66 (finding that rats exposed to mifepristone in their infancy suffered infertility in adulthood)[FDA FOIA Release: MIF 007165- 007176].

[379] Medical Officer's Review, *infra* Appendix A, at 24 (quoting from the Population Council's submission to FDA on Aug. 18, 1999).

[380] Medical Officer's Review, *infra* Appendix A, at 24 (quoting from the Population Council's submission to FDA on Aug. 18, 1999); s*ee also* Mifeprex Approval Memo at 7 (agreeing with the Population Council's reasoning).

this, as it could violate women's privacy."[381]  The Population Council's concerns about privacy lack merit.  Patients who participate in clinical trials give their consent to participate and to be monitored, thus eliminating concerns about privacy.  Similarly, FDA should not have accorded undue weight to the Population Council's protestations about the potential expense of the trials;

5    drug sponsors, who stand to profit from a drug's sales, are responsible for bearing the expenses incurred in establishing the safety and efficacy of a drug.[382]

FDA's acquiescence in the Population Council's reduction in its Phase IV commitments compounded the Agency's earlier failure to require the sponsor to conduct clinical trials in accordance with the requirements of Section 314.126 of FDA's rules.  FDA's inadequately

10   justified curtailment of the sponsor's Phase IV study commitments was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

---

[381]  Medical Officer's Review, *infra* Appendix A, at 24 (quoting from the Population Council's submission to FDA on Aug. 18, 1999).  The necessity of long-term monitoring is particularly critical to compensate for the unusually short tracking periods employed in the U.S. Clinical Trial, in which investigators generally did not track patients after their third visit.  *See* Spitz Article, *infra* Appendix A, at 1242.  "Follow-up was extended beyond visit 3 if there was uncertainty about the completeness of the abortion or if bleeding persisted."  *Id.*  Five percent of the participants in the U.S. Clinical Trial were not tracked through the third visit (which would have occurred on Day 15) because they failed to return for it, suggesting that each of these women was last seen on Day 3, only 2 days after the initial administration of mifepristone.  *See* Medical Officer's Review, *infra* Appendix A, at 10.  Abbreviated follow-up periods run counter to ICH standards, which state that in clinical trials of drugs intended for use during pregnancy, "followup of the pregnancy, fetus, and child is very important."  *FDA Guidance (ICH: E8): General Considerations*, *infra* Appendix A, 62 Fed. Reg. at 66117 (§ 3.1.4.3) ("Special populations").

[382]  In fact, the sponsors of Mifeprex received substantial outside funding to support their efforts.  *See* "Mifepristone: FDA Approval Imminent, Advocates Predict," *Kaiser Daily Reproductive Health Report* (Sept. 28, 2000) (available at: <http://www.kaisernetwork.org/reports/2000/09/kr000928.3.htm>) ("Danco Laboratories, LLC, a small New York-based company, will market the drug with funding from billionaire financier Warren Buffet and hedge-fund czar George Soros and a $10 million loan from the David and Lucile Packard Foundation."); Sharon Bernstein, "Persistence Brought Abortion Pill to U.S.," *Los Angeles Times* (Nov. 5, 2000): at A1 ("The Population Council raised $16 million from like-minded foundations, including the Open Society Institute of New York, which is the philanthropic arm of billionaire George Soros, and the California-based Kaiser Family Foundation.").

## IV.  PETITIONERS SEEK LEAVE TO AMEND

The Petitioners respectfully inform FDA that they may file amendments to this Petition

as information becomes available from Freedom of Information Act requests made before the

5   filing date of this document.[383]


## V.  CONCLUSION

10

For the foregoing reasons, the Petitioners respectfully request that the Commissioner

immediately enter an administrative stay to halt any further distribution and marketing of

Mifeprex until final agency action is taken on this Petition.  The Petitioners also respectfully

request that the Commissioner revoke approval of Mifeprex for the medical termination of

15   pregnancies less than 49 days' gestation.  On the basis of the evidence presented above, the

Petitioners respectfully request a full FDA audit of the French and U.S. Clinical Trials.[384]

---

[383]  The Petitioners have filed numerous Freedom of Information Act ("FOIA") requests with FDA that remain unanswered, including: 1) FOIA Request, filed by Wendy Wright, Director of Communications, CWA (Aug. 31, 2001) (seeking "an entire copy of FDA's letter to the Population Council dated, or mailed, on or about June 1, 2000, along with any attachments, appendices, and other accompanying materials"); 2)  FOIA Request, filed by Wendy Wright, Director of Communications, CWA (Aug. 31, 2001) (seeking "an entire copy of the new drug application . . . filed . . . on or about March 18, 1996 (NDA 20-687)"); 3) FOIA Request, filed by Wendy Wright, Director of Communications, CWA (Sept. 14, 2001) (seeking a copy of data submitted by the sponsor "related to the use of mifepristone by women over the age of thirty-five, females under the age of eighteen, and women who smoke" and of the Phase IV study protocols submitted by the Sponsor and any Phase IV trial data); and, 4) FOIA Request, filed by Wendy Wright, Director of Communications, CWA (Feb. 6, 2002) (seeking a correct listing of all drug applications approved pursuant to 21 C.F.R. § 314.520 and documents detailing FDA's reasoning for approving drugs under this section of its rules).

[384]  An audit of the U.S. Clinical Trial is additionally warranted because of an unusual data management decision made by the Population Council with the apparent approval of the FDA:

> Thank you for speaking with me the other day about our data dilemma.  In response to our conversation, we have decided to create two versions of our electronic database from the mifepristone study.  The first will reflect exactly the physical copies of the patient record forms, and will be used as the basis for our regulatory submissions to you.  The second version will closely match the first, particularly on safety and efficacy indicators, but certain variables will be modified to create an internally consistent database that we can use easily for our planned scholarly publications on the topic.  We will keep careful track of the changes we make and we will be able to explain them to an FDA auditor should the need arise.  One result

## VI.  ENVIRONMENTAL IMPACT

This Petition for withdrawal of approval of an NDA is categorically excluded under 21

5    C.F.R. § 25.31(d).  An environmental impact statement is, thus, not required.


## VII.  ECONOMIC IMPACT

10    The Economic Impact information shall be submitted only when and if requested by the

Commissioner following review of the Petition, in accordance with 21 C.F.R. § 10.30.

## CERTIFICATIONS AND SIGNATURES

15    On behalf of the petitioner organizations listed below, we the undersigned hereby certify
that, to the best of petitioners' knowledge, this Citizen Petition is true and accurate.  It includes
all available information relevant to this Petition, including information both favorable and
unfavorable to Petitioners' position in this matter.


20

So executed this _____ day of August 2002.         _____

                                                   Donna Harrison, M.D.
                                                   Chairperson, Subcommittee on Mifeprex
25                                                 American Association of Pro-Life
                                                       Obstetricians and Gynecologists
                                                   P.O. Box 414
                                                   Eau Claire, MI  49111
                                                   Phone:  (616) 921-2513

30

---

of this approach to handling the data is that certain aspects of our future publications may differ from
tabulations that appear in our regulatory submissions.

Letter, Charlotte Ellertson, Population Council, to [Redacted], FDA/CDER (July 28, 1997): at 1 [FDA FOIA Release:
MIF 006489].

90

442

So executed this _____ day of August 2002.

/S/_____

Gene Rudd, M.D.

Associate Executive Director

Christian Medical Association

P.O. Box 7500

Bristol, TN 37621

Phone:  (423) 844-1000

5

443

So executed this _____ day of August 2002.          /S/_____

5
Sandy Rios, President
Concerned Women for America
1015 Fifteenth Street, N.W.
Suite 1100
Washington, D.C.  20005
Phone:  (202) 488-7000

10

92

444

# EXHIBIT 21

Robert O'Harrow Jr.,
*Drug's U.S. Marketer Remains Elusive*,
Wash. Post (Oct. 11, 2000)

*Democracy Dies in Darkness*

# Drug's U.S. Marketer Remains Elusive

## Fearing Abortion Foes, Danco Keeps Location, Phone Number Secret

October 11, 2000    More than **24 years ago**

By Robert O'Harrow Jr.

NEW YORK -- When many pharmaceutical companies win federal approval to market a new drug, they rush out predictions of potential riches for investors. Not so with Danco Laboratories LLC.

"A lot of what we're about is not driven by the profit motive," explained Richard Hausknecht, medical director of the firm, which just received permission to market the abortion pill known as RU-486.

"I'm not in this to get rich, because it's not going to make me any money," said Hausknecht, who said he is paid by the hour for his part-time work at Danco. "Here's a chance to offer to American women a real new option, something that has been denied to them for political reasons for 15 years."

Secretive and obscure, Danco is one of the most enigmatic companies in the pharmaceutical industry. It has worked for years and spent millions of dollars to bring to market a drug that investors knew would immediately face intense resistance--and they feared possibly violent intervention--from people opposed to abortion.

Danco has only a handful of employees. For security reasons, company officials say, Danco's telephone number is unlisted and the details of its whereabouts are carefully guarded. Company officials will say only that Danco is housed in an ordinary suite of offices somewhere in midtown Manhattan.

They say Danco intends to make a profit eventually. Its immediate plan is to make RU-486 available in the United States within a month as an early alternative to surgical abortion. The cost of the procedure, which includes two drugs and three office visits, is expected to be about $300, around the same as a surgical abortion.

The company also intends to research the possibility that the drug could also be a treatment for ovarian cancer and other life-threatening ailments.

Food and Drug Administration officials agree that Danco is not the usual pharmaceutical company. The agency "followed all normal" procedures in approving the drug, including inspecting the manufacturing facilities, officials said. But regulators determined that information about the manufacturer was confidential under statutes governing trade secrets and freedom of information.

446

FDA Commissioner Jane E. Henney said the agency broke with precedent by not publishing the names of the experts who reviewed RU-486 for the agency. In another first, it did not publish the name or location of the company that will manufacture the drug.

Some antiabortion activists fear that because of Danco's secretive approach, it will not be held accountable the way other drug companies have.

"This company seems rather clandestine and, I believe, suspicious," said Judie Brown, president of the American Life League, an antiabortion group based in Stafford, Va. "Women should be able to know immediately who the provider of a particular product is."

Danco has a close relationship with the Population Council, a nonprofit reproductive-rights group that sponsored the drug for approval. In 1994, the Population Council was given the rights to sell RU-486 by French drugmaker Roussel-Uclaf SA, which was put off by the controversy surrounding the drug in the United States.

The council, supported by the Buffett Foundation and others intent on making abortion more accessible, in turn gave Danco the rights to manufacture and distribute the drug.

According to records filed in Delaware on Feb. 7, Danco was formed in the Cayman Islands on July 25, 1995. On those papers, Hausknecht was listed as vice president--a formality, he said, that lasted only a week.

Apart from some basic facts, company officials are chary with details about Danco's structure, its investors and its plans.

The chief executive is Roy Karnovsky, a former marketing executive for the Merck Human Health Division of Merck & Co. Through a spokesman, he declined to discuss the company.

Medical director Hausknecht is an associate professor of obstetrics and gynecology at Mount Sinai School of Medicine in New York. He also serves on an advisory board for Planned Parenthood and was the medical director for Planned Parenthood of New York City.

Danco's director of public affairs is Heather M. O'Neill, who has helped prepare materials for FDA hearings about the drug. O'Neill, a graduate of Harvard University's John F. Kennedy School of Government, previously worked as a consultant at the Population Council.

O'Neill, who joined Danco in 1997, declined to provide the names of individual investors. But she acknowledged that supporters generally share the company's desire to make RU-486 available.

Instead of talking about company profits, she refers to its "project."

"Everyone here is committed to this project, to making Mifeprex [the trade name for RU-486] available to all women," she said. "We've been singleminded in our determination in making Mifeprex an option American woman can have."

447

"It's extremely unusual," Kevin Schulman, director of the Center for Clinical and Genetic Economics at the Duke Clinical Research Institute. "Only people who are truly dedicated to 'the cause' would have stuck with it. The unique thing here is how everybody [involved] has a shared vision."

O'Neill said the company may eventually try to market RU-486 abroad but has no plans to do so now. "We, I think, would be interested in looking at certain other countries around the world," she said.

She said the company will soon have a higher profile at medical conferences and will begin providing educational material on how to use the drug safely and effectively.

The fact the manufacturer is not named would not prevent someone from filing an RU-486-related lawsuit. The target would be Danco, O'Neill said. "Danco is responsible for all aspects of the drug's introduction into the United States, from FDA compliance to manufacturing, marketing and distribution," she said.

O'Neill acknowledged that crucial financial support over the past decade came from several foundations.

The Buffett Foundation, which was begun by investor Warren E. Buffett and places a strong emphasis on reproductive issues, made at least $2 million in interest-free loans to the Population Council, according to tax documents filed in 1995. That money was in turn used to conduct clinical trials of RU-486.

One of Danco's main backers has been the David and Lucile Packard Foundation, which lent Danco $10 million in 1998 to support approval and marketing of RU-486.

Sarah Clark, director of the Packard Foundation's Population Program, said her group and other Danco backers share an array of motivations for taking on responsibility for such a controversial drug.

"We're trying to make sure this choice is available and is not kept out for the wrong reasons," she said. If it were up to more profit-oriented drug companies alone, she added, RU-486 would probably not be on the market: "We wouldn't have to make loans to Danco if the commercial market were there."

448

# EXHIBIT 22

Hannah Levintova,
*The Abortion Pill's Secret Money Men,*
Mother Jones (March–April 2023)



**REPRODUCTIVE RIGHTS**

# The Abortion Pill's Secret Money Men

*The untold story of the private equity investors behind Mifeprex—and their escalating legal battle to cash in post-Dobbs.*

**HANNAH**

**LEVINTOVA    MARCH+APRIL 2023**

*Get your news from a source that's not owned and controlled by oligarchs. Sign up for the free* Mother Jones Daily.

**In 1993, a group of activists** rented a warehouse in suburban Westchester County, New York. It was smaller than they'd hoped and had limited ventilation, but the two other locations they'd tried to rent belonged to universities and required jumping through too many bureaucratic hoops   the exact sort of paper trail this group was trying to avoid.

Led by renowned pro-choice activist Lawrence Lader, their goal was to replicate RU-486, the revolutionary abortion pill developed in the 1980s by French manufacturer Roussel-Uclaf—which was unwilling to navigate American abortion politics to bring the pill stateside. Lader's group, code named ARM Research Council, set up shop just months after Dr. David Gunn was shot and killed outside his Florida clinic, the first US physician to be murdered by an anti abortion activist. Perhaps unsurprisingly, no US manufacturer wanted to wade into the increasingly fraught abortion debate to bring the medication to American women, either. So with the help of lawyers and activists, Lader had smuggled RU-486 into the United States, and his group was going to try to reproduce it.

In their warehouse, they got to work building an underground drug laboratory, complete with a huge, customized ventilation hood, fire prevention devices, and specially designed sinks. The whole project "had the trappings of a CIA operation," Lader would later write. They figured out a system for replenishing their near constant need for dry ice from a supplier 15 miles away, and crafted a strategy to avoid detection by anti-abortion groups, the garbage collector, and their landlord. If anyone asked what they were up to, the group—which included a doctor who lived 1,000 miles away and asked to go by Dr. X; a Columbia University chemist working for free; and two assistants   agreed on a cover story: They were working on a new treatment for cancer.

Meanwhile, Roussel Uclaf and its parent company were in a drawn out negotiation with a Manhattan based reproductive health nonprofit, called the Population Council, over the official patent for RU-486. The same month

that the French company finally agreed to give the Council the patent, Lader's secret lab announced that it had successfully developed its own copy of the drug, whose scientific name is mifepristone. The two groups knew of each other's work, and Lader had even reached out to the Population Council about collaborating, but the Council had demurred.

---

## *The tale of who funded this effort to legally bring mifepristone to women across the country, and what benefits those funders might reap, has been mostly kept quiet.*

Lader's group knew American women could not wait the many years it would take for the Council to arrange an official manufacturing operation with full approval from the Food and Drug Administration. So, it got its own permission from the FDA to conduct limited testing, which would allow it to start distributing small batches of the drug to a network of 10 clinics. There, patients could get both mifepristone and misoprostol, a common ulcer drug, which, when taken in tandem, can cause a medication abortion. For the few who were able to try it, it was an emotional and physical relief: It meant they could have an abortion privately and without a vacuum aspiration machine, whose suction "feels like you're getting the life sucked out of you," as one early mifepristone recipient described it to the *Boston Globe*.

All the while, the Council was working to find a manufacturer willing to make the drug, win full FDA authorization, and sell it across America.

When the FDA finally approved mifepristone seven years later, the Council's distribution venture, which came to be called Danco Labs, was ready to go. Within two months, the drug was shipped out to doctors. At the clinics brave enough to be early adopters, women began showing up from farther and farther away; in some places the medicine was double the cost of a surgical abortion, but that hardly seemed to matter. By 2020, the pill had become the most popular way to get an abortion in the United States.

### How Private Equity Looted America

Read more from our May+June 2022 issue on vulture capitalists, their political enablers, and the working people fighting back:

- The Smash and Grab Economy

- Real Estate Predators Tried to Cash In on the Pandemic. Then Tenants Fought Back.

- Everything Everywhere All at Once: How Private Equity Rules Your World

- Biden and Trump Both Trashed Private Equity's Favorite Tax Dodge. Surprise! It's Still Here.

- These Are Congress' Biggest Private Equity Investors

- The Fight to Keep Their "Poor People's Paradise" out of Private Equity's Hands
- My Newspaper Was Gutted by Journalism's Biggest Bogeyman

Over the last two decades, mifepristone's dramatic origin story has made its way into books and the pages of the *New York Times*. But the tale of who funded this effort to legally bring it to women across the country, and what benefits the funders might reap from their investments, has been mostly kept quiet. This was in part because the 1990s were the apex of anti abortion violence, so investors required secrecy. It was also because the funding sources seemed like a minor plot point in a project that had the potential to transform reproductive health care for millions.

"I don't think anybody thinks they're going to make a lot of money," Peg Yorkin, one of the activists crucial to the US mifepristone campaign, told the *Los Angeles Times* when the pill became available. "We're just happy that it's going to be happening."

But the small group of investors who backed the Population Council's drive to manufacture and distribute the drug since its earliest days have made a lot of money on the mifepristone business—tens of millions of dollars, according to court filings. Their windfall has come through a byzantine corporate structure set up in the 1990s by a private equity fund, now called MedApproach Holdings, to allow investors to pour money into Danco Labs   until 2019 the only US retailer of mifepristone—without disclosing their identities. As states have imposed ever-stricter limits on abortion access, their investments have generated hefty returns.

On the heels of the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization* last June, undoing the federal right to abortion   and the FDA's announcement, in January, that retail pharmacies can now sell abortion pills   these investors are likely to earn even more, as medication abortion becomes the only option for millions of women living in the 26 states where abortion is now illegal or severely restricted. The potential is so promising that two of the primary investors have engaged in a bitter court battle to take control of the investment, and Danco itself.

Their story has a dizzying plot that involves Cayman Islands shell companies, LLCs named after racehorses, a shadowy priest, a disbarred attorney, and a finance whiz behind an infamous Wall Street hedge fund collapse. The legal battle, which has been fought in three states and cost millions in attorneys' fees, shows how investors have come to view the desperation of pregnant women as an important problem to solve—but also a golden ticket.

**In 1986, a North Carolina** lawyer named Joseph Pike purchased one of the earliest manufacturers of intrauterine devices for $1.1 million. The company, Finishing Enterprises Inc., was making IUDs for another business called GynoPharma. At the time, GynoPharma wasn't selling IUDs in the United States   American women shunned them after the Dalkon Shield, a different IUD, was found to cause severe injuries in the '80s. Its copper IUDs were primarily being purchased by governments and NGOs for distribution in developing nations, but Pike spent the next five years helping to bring this IUD, the Paragard, to the United States. After it hit the market, he sold FEI for a reported $65 million—an astounding return of more than 5,800 percent. "It was a good play for me," he says.

A multimillionaire at just 41, Pike ditched his lawyer job and moved to La Jolla, one of San Diego's most exclusive neighborhoods, to "enjoy life." He took up golf and played as often as he felt like it. But soon Pike heard from the Population Council about a business proposition: It wanted to develop and market medication abortion in the United States. At that time, advocates were flying lobbyists to Europe and picketing outside the New Jersey office of the French pill's parent company to get them to sell the drug in America. As Pike saw it, it was another opportunity to make some real money   and do some good along the way.

Pike was the Council's go to because they'd worked together on the copper IUD. The Council had developed it and then granted GynoPharma the license, and it collected royalties as Pike successfully built up the IUD business and sold it. Pike had proved himself to be a businessman who could breathe life, and dollars, into a controversial women's health product. The Council gave him the exclusive right to sell mifepristone in the US and tasked him with drumming up investors.

---

## The controversy surrounding mifepristone meant that neither the government nor mainstream companies would go anywhere near it.

Typically, drugs in the United States are not funded by private individuals. Instead, the federal government finances initial research, while later stages of development are paid for by pharmaceutical companies. Venture capitalists and private equity investors usually only get involved in drugs developed to treat rare diseases—those that affect fewer than 200,000 people per year   because pharma companies are unlikely to invest in these typically less profitable treatments. But mifepristone was far from a "rare disease" drug—in the 1990s, about 1.5 million American women were having abortions annually. (That number has since come down to just under a million, thanks to the growing availability of contraceptives.) Yet the controversy surrounding mifepristone meant that neither the government nor mainstream companies would go anywhere near it.

In 1994, Pike got to work, traveling the country with Susan Allen, a doctor and abortion provider he'd brought on to be the face of the abortion pill effort. Pike recalls that they spent their time pitching wealthy liberals, including Susan Buffett, Gloria Vanderbilt, a George Soros representative, and a handful of other celebrities. His fundraising overlapped with the O.J. Simpson murder trial, and Pike says he even met with one of Simpson's defense lawyers, Bob Shapiro. Pike won't say which, if any, of these people invested in the project, but he estimates that altogether there were about 50 pitch meetings.

One of the investors who did sign on was Greg Hawkins, a veteran of the major investment bank Salomon Brothers, who was then helping run the hedge fund Long Term Capital Management. (Hawkins did not comment for this story.) Pike met Hawkins in New York City in 1995 and told him what he'd told everyone else: To protect investors' privacy, he would craft a corporate structure that would be based offshore and involve a slew of sub entities   in essence, a Russian nesting doll of holding companies that would quietly fund the mifepristone effort. The project did not have FDA authorization yet, which meant there was no immediate way to bring in revenue. But eventually, they would pay back their investors, and then some. Hawkins decided he wanted in.



Pike set about creating a dizzying chain of intermediate companies registered around the world. First, he filed paperwork to create Danco Laboratories Inc. as a Cayman Islands company, also registered in Delaware. (Danco was named after Pike's son.) Then he listed an intermediate company in California, Danco LP. He also registered another intermediate company, ND Management, in the Cayman Islands.

Each entity controlled the next one: ND Management oversaw Danco LP, which owned Danco Labs, the company that would actually sell the abortion drug whose backers this tangle of entities was set up to obscure. The secrecy was para mount, given the threat of reputational or financial consequences—or worse—for anyone publicly tied to the project; anti abortion violence was continuing to escalate. Extremists murdered abortion providers in Florida and Massachusetts, and anti abortion groups threatened a boycott of more than 70 medications made by affiliates of RU 486's manufacturer, Roussel. Pike, who'd been identified in news stories, got death threats himself.

Pike had already found someone to help build this financial vehicle: an experienced health care financier from Nashville named Brad Daniel. Daniel had started two biotech hedge funds, as well as a private equity fund, called Bio-Pharm Investments, that specialized in providing seed money to pharmaceutical ventures. Like Pike, Daniel would later recall that his motivations were twofold: He believed in the social benefits of mifepristone, and in the enormous financial potential. (Daniel did not comment for this story.)

454

Daniel created a fund, MedApproach, where investors would plunk their money in Danco's mifepristone business. His private equity fund, Bio-Pharm, would oversee MedApproach, receiving a 1 percent management fee and 20 percent of all profit distributions that MedApproach's investors got from their stakes in Danco's business.

All this was happening when private equity investing was becoming in vogue. It began in the 1980s, when a generation of shrewd financiers popularized a type of business takeover, called a leveraged buyout, that secured private equity's status as a new place for wealthy investors to grow their money. They had also kicked off a broader philosophical shift —one where the main value of a business lies less in the benefit a product offered customers and other stakeholders, and more in the financial returns extracted for its shareholders.

By the 1990s, when the mifepristone venture was getting off the ground, this new attitude had propelled private equity investment into new sectors, like health care, technology, and pharmaceuticals. The pill presented an obvious financial opportunity: the rare sort of drug that they'd never have trouble selling, for a condition that would never cease to exist.

---

## *The pill presented an obvious financial opportunity: the rare sort of drug that they'd never have trouble selling, for a condition that would never cease to exist.*

Within two years, Pike and Daniel found a handful of willing investors who together put more than $13 million into MedApproach. Hawkins was the largest investor funding the Russian nesting doll of financial entities, pitching in $1.5 million, so that, by 1996, he owned three quarters of MedApproach. Over the next two years, he loaned the Danco project an additional $4 million, according to his declarations in court.

But then the project hit a roadblock. The Population Council discovered in 1997 that Pike had an unsavory history that they worried could tank the abortion pill project just as it was in the middle of clinical trials and its campaign for FDA approval. The prior year, as he'd been ramping up the mifepristone investments, Pike had pleaded guilty to a misdemeanor forgery charge in North Carolina, tied to a 1985 real estate deal. He'd gotten a suspended two-year sentence, 18 months of probation, and a fine. He had also been stripped of his law license.

(Pike explains that the charge came from a disgruntled former client he'd once helped buy land. When the client wanted to get rid of it years later, Pike couldn't help because he had retired from practicing law. The client claimed Pike had misrepresented facts; Pike says he pleaded guilty to make the case go away.)

The Population Council wanted the mifepristone project to be squeaky clean. If Pike stayed on, they felt that years of work, the $13.3 million in investments he'd secured, and FDA approval could all be in danger. Keeping him involved in the project, they said, would mean that "another weapon with which to attack [the abortion pill] will be furnished to its ideological opponents."

**It took a lawsuit** to get Pike off the project. As part of his exit, the Population Council insisted that the investors Pike had found have the chance to leave, since the Council could no longer guarantee the promises Pike had made to them. Spooked by the disarray and the fact that Danco still did not have government approval to sell its only product, many investors opted to pull their funds. But Hawkins stayed in and paid $3.5 million to buy out most of Pike's investment. Daniel also stayed involved, securing more control over the company and further compensation that would amount to hundreds of thousands annually. (Pike, meanwhile, fought to keep a 25 percent stake, $1.5 million in consulting fees, and a portion of the future profits on the shares he'd given up, capped at $21 million.) Hawkins also pledged up to $13.7 million to buy up shares ditched by other investors, potentially giving him a majority of the entire investment.

Three months later, in July 1998, Hawkins invited Daniel to visit him at his home in Saratoga, New York. Over lunch at the Saratoga Race Course's private club, he told Daniel that something was "terribly wrong." His hedge fund was having liquidity issues and would have little or no additional funds to invest in MedApproach   meaning he would not be able to cover the nearly $14 million commitment he'd made to buy out investors.

Hawkins asked to transfer his existing stake to his wife, Sharon—to protect himself, his family, and that investment from whatever might come next at his hedge fund. Daniel agreed. Later, Hawkins told Daniel that he would solicit other investors to cover the millions he'd committed to MedApproach but now could not come up with.

Over the next two months, Hawkins' hedge fund, Long Term Capital Management, collapsed. Famed on Wall Street for sophisticated math that delivered huge returns, it lost billions in a matter of weeks, thanks to a mix of events that included Russia's default on a chunk of its Treasury debt, which LTCM had heavily invested in. At its peak, LTCM had controlled 5 percent of assets on the global market, so its downfall roiled the worldwide financial system. Soon, the Federal Reserve stepped in to organize a $3.5 billion bailout financed by the leading Wall Street banks.

Amid all that, Daniel and Hawkins began having weekly talks to figure out how to move forward with the mifepristone investment. The buyout of the original investors would wrap up in the summer of 1999, and Hawkins was scouting new funders.

---

## *According to Daniel, Hawkins said that he had heard from a Catholic priest who wanted to invest in medication abortion but required absolute anonymity.*

In these calls, Hawkins told Daniel about an idea: He'd created five different LLCs, several named after his racehorses, where new investors could put money for the abortion pill project while staying unidentified. One LLC in particular, Shiroyama, he said, required extra care. According to Daniel, Hawkins said that he had heard from a Catholic priest who wanted to invest in medication abortion but required absolute anonymity. So sensitive was this investment that Hawkins needed to entice the priest with a $320,000 sweetener. He asked Daniel to move that sum from his wife's stake into the Shiroyama LLC   forfeiting some of the Hawkinses' own investment in the deal and passing it to the priest to entice the clergyman to invest further. By approving the transfer, Daniel said he was also losing out financially: Less of the money invested this way would end up in his pocket, because the LLC would not have to pay his private equity fund's 1 percent management fee (or 20 percent of any profits it accrued). But it seemed that both Daniel and Hawkins were giving something up to help the project get on its feet, in hopes of reaping the rewards later.

After the sweetener, the priest seemed to come through   according to Daniel, Shiroyama LLC invested just shy of $950,000 over the next year. Later on, Hawkins asked Daniel to move another $1.7 million of his wife's interest into three of the LLCs, as additional enticements for more investors he was drumming up. Yet another LLC plowed $700,000 into the project.

The LLC investments came just in time: On September 28, 2000, the FDA officially approved Mifeprex, the commercial name for Danco's mifepristone pill. These investors' financial bet was finally on track to pay dividends.

**Within three years,** the Danco project had earned enough on Mifeprex to start repaying investors. Several Supreme Court cases soon made it easier for states to enact abortion restrictions, an opportunity that conservative states took up with gusto   sending ever more women looking for the discreet pill they could take at home. By 2010, about a quarter of early abortions were done with mifepristone, and Danco had paid everyone back. Now that everyone had been made whole, it was time to finally start making a profit, which was great news for both investors and Daniel's

456

private equity fund, now named MedApproach Holdings, which would get somewhere between 10 and 20 percent of profits made by investors, as well as the management fees it had deferred while the project got off the ground.

Daniel contacted Hawkins to get clearer information on all of the investors so he could pay them their portions of the profits. He says he sent multiple emails, heard nothing for five months, and eventually mailed him a letter. That's when Hawkins called Daniel, who recalls Hawkins angrily reiterating that Shiroyama's investor was a priest who required absolute confidentiality. "You are never going to find out who he is," he said, "and it is none of your business!" In a second call, Daniel says Hawkins offered to pay him money instead of providing any documentation revealing the identities of the investors he'd brought in. (A source with knowledge of the proceedings says that Hawkins never made this offer.)

That started a snowball of suspicion, and within a matter of months, Daniel filed a lawsuit against Hawkins in federal court. The proceedings led to a stunning revelation: There never was a priest. The money that had passed through the Shiroyama LLC had been from the purportedly broke Hawkinses. (In federal court documents, Hawkins maintained that he never called the investor a priest; rather, he had merely said he was a religious friend. This friend had planned to invest but backed out due to his faith and fear of anti-abortion reprisals, forcing Hawkins to use his own money to cover the investment. The friend filed a declaration in court supporting much of Hawkins' account, though he contests that he'd ever committed to an investment in the first place.) The whole thing looked like a scheme by the Hawkinses to expand their investment in medication abortion and reap its returns—while paying less in management fees and sharing fewer profits. Daniel claimed that the demise of LTCM had been a hit on the Hawkinses' wealth, and the tale of the secret, abortion-supporting priest was a way to make some of it back. The Hawkinses disagreed, saying they'd never misled Daniel, and that their investment in the Shiroyama LLC was aboveboard and never intended as a profitable runaround. Eventually, Daniel and the Hawkinses opted to settle for an undisclosed amount.

---

## Documents filed by Daniel as part of a lawsuit say that the Hawkinses' investment in MedApproach has made a return on investment of 228.79 percent.

Both parties have made a fortune on Mifeprex. Documents filed by Daniel as part of a different lawsuit say that the Hawkinses' investment in MedApproach has made a return on investment of 228.79 percent. The actual dollar amount has been fastidiously redacted in all the case's legal filings, but based on the Hawkinses' disclosures of their total investment in the mifepristone project—between $9 million and $11 million—their earnings would come to between $20.5 million and $25.1 million. (A source familiar with the suit disputes this return on investment, arguing it is far lower.)

Those same filings say that the average return on investment for everyone who invested in Danco was about 452 percent over 23 years. Even in the high flying world of private equity   where the average annual return over the last 20 years has been about 10.5 percent—that's nothing to sneeze at. In a 2022 deposition, the CFO of Danco confirmed that "the Project has ultimately become quite successful," and investments have "been extremely profitable."

**Since the Supreme Court** gutted *Roe*, demand for medication abortion has skyrocketed. One study analyzed nearly 43,000 medication requests from 30 states and found the average number of daily requests nearly tripled, driven primarily by increases in the 12 states where lawmakers have banned abortion completely. Meanwhile, two of the main digital health startups offering medication abortion by mail—Hey Jane and Choix—reported enormous jumps in interest from potential customers. Choix raised $1 million in venture capital funding in the weeks following the leak of the Supreme Court decision. In October, Hey Jane raised $6.1 million from venture capital investors, after seeing a

ninefold increase in new telehealth patients per day. During the fundraising round, venture capitalists wanted to invest more in the company than Hey Jane had asked for.

All of that suggests that Danco's business is set to remain profitable, even as a cheaper generic version of mifepristone has cut into Mifeprex's business over the past few years. Just how profitable is anyone's guess — but valuable enough that Daniel and the Hawkinses have kept fighting about it. In May 2021, the Hawkinses filed a lawsuit in Delaware to wrest control of Danco from Daniel. Their goal was to put an end to what they see as Daniel's extractive, autocratic management of the company by installing a proper board to oversee him. The lawsuit also had the potential to secure more profits for the Hawkinses.

When the Danco project was restructured in the '90s and the Hawkinses' shares got moved around, a restriction was appended to their stake: Daniel, whose private equity fund controlled the investment, would hold votes attached to the shares. In other words, the Hawkinses' investment gave them the right to partake in Danco's profits, but they could not have a say in the operations of the company. That right stayed with Daniel, in the form of a proxy vote. The Hawkinses' lawsuit sought to win back their votes, ostensibly to sell their stake at a better price. (Shares that don't have votes attached are worth a lot less.)



For Daniel, the stakes are enormous. His proxy vote affords him control over company operations and, combined with his role as executive chair of Danco's board of directors — which gives him final approval of the company's budget

earns him about $455,000 in annual fees and compensation. He earns an extra $75,000 each year for work related to particular entities that are part of Danco's complex financing structure, as well as tens of thousands more for other Danco related business. All told, Daniel has earned about $10.3 million in fees alone.

This past January, the Delaware Supreme Court sided with the Hawkinses. The consequences of the decision are still unfolding. But now that the Hawkinses have regained their shares' voting power, they have additional authority to push for changes at Danco. "This has been an incredibly challenging ordeal for Mrs. Hawkins," her spokesperson said in a statement. "Her focus has always been on preserving women's right to safe, reproductive health care. The battle over corporate governance has threatened women's ability to receive the full benefit of this impactful medicine. We are deeply grateful that the courts in Delaware have cleared the way for that to happen."

For both sides, each of these lawsuits have been a fight to preserve the wealth they've built through the mifepristone project, and to pave the way for earning even more   while keeping the other party from wresting away money and control. A source close to the Hawkinses, for example, called Daniel a "control freak" who hoards money from Danco for himself. Meanwhile, one of Danco's other major investors accused the Hawkinses of trying to steal the business.

Pike told me something similar. "Greg, this is basically his only asset," he said. "His billion dollars he thought he had [through LTCM], he doesn't have, and he's obsessed with not being able to control his destiny."

That destiny could not be more promising. The end of *Roe v. Wade*, mixed with the FDA's new approval of retail sales for mifepristone, could unlock immense profit. Their product's mission may be a social good, but creating value for investors   themselves   seems to have become a driving motivation: one where women faced with impossible circumstances are reduced to the impersonal language of customer capture.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Copyright © 2025 Mother Jones and the Center for Investigative Reporting. All Rights Reserved.

# EXHIBIT 23

Letter from Center for Drug Evaluation and
Research to Ann Robbins, Ph.D.
(Sept. 18, 1996)

# CENTER FOR DRUG EVALUATION AND RESEARCH

### Approval Package for:

**Application Number:**             **20-687**

**Trade Name:**            **Mifeprex**

**Generic Name:**         **mifepristone**

**Sponsor:**                **Population Council**

# CENTER FOR DRUG EVALUATION AND RESEARCH

## APPLICATION NUMBER:      20-687

## APPROVABLE LETTER

NDA 20-687

SEP 1 8 1996

The Population Council
Attention: Ann Robbins, Ph.D.
Scientist
1230 York Avenue
New York, NY 10021

Dear Dr. Robbins:

Please refer to your new drug application dated March 14, 1996, received March 18, 1996, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Mifepristone Tablets, 200 mg.

We acknowledge receipt of your amendments dated April 19, June 20, July 25, August 15, and September 16 (telefacsimile), 1996.

We have completed the review of this application as submitted with draft labeling, and it is approvable. Before this application may be approved, however, it will be necessary for you to submit the following information:

Clinical

Please submit a comprehensive description of the proposed distribution system.

Chemistry, Manufacturing, and Controls

   Drug Substance:

NDA 20-687

Drug Product:

## Biopharmaceutics

To support the rationale for using the stated dissolution medium and volume plus the selected ⎡_____⎤ for the proposed dissolution method, please provide the following information:

1.    pH solubility data for mifepristone;

2.    ⎡____⎤ condition information at ⎡____⎤ for various media;

3.    Tablet dissolution profiles (including raw data and mean data) in various media (i.e., simulated gastric fluid and simulated intestinal fluid, at a range of pH's representative of physiological conditions) that provide adequate ⎡____⎤ conditions with appropriate sampling times to characterize the profile; and

4.    Raw data and profiles at different ⎡_____⎤ in the dissolution media cited above.

NDA 20-687                                                                    Page 3

## Physician Labeling

### General Comments

1.    Please excerpt and incorporate sections from the approved labeling for
      misoprostol that are relevant for single-dose use of misoprostol as provided for
      in this labeling.

2.    Since mifepristone is not an established name as described under section
      502(e)(3) of the Federal Food, Drug, and Cosmetic Act, you should apply to
      the USAN Council for adoption of a name that will comply with that section of
      the act.  They can be reached at the following address:

              United States Adopted Names (USAN) Council
              American Medical Association
              535 North Dearborn Street
              Chicago, IL  60610

3 **Page(s) Redacted**

Draft

Labeling



## Phase 4 Commitments

We remind you of your commitments dated September 16, 1996, to perform the following Phase 4 studies:

1.  To monitor the adequacy of the distribution and credentialing system.

2.  To follow-up on the outcome of a representative sample of mifepristone-treated women who have surgical abortion because of method failure.

3.  To assess the long-term effects of multiple use of the regimen.

NDA 20-687

Page 8

4.    To ascertain the frequency with which women follow the complete treatment regimen and the outcome of those who do not.

5.    To study the safety and efficacy of the regimen in women (1) under 18 years of age, (2) over age 35, and (3) who smoke.

6.    To ascertain the effect of the regimen on children born after treatment failure.

Under 21 CFR 314.50(d)(5)(vi)(*b*), we request that you update your NDA by submitting all safety information you now have regarding your new drug. Please provide updated information as listed below:

1.    Retabulate all safety data including results of trials that were still ongoing at the time of NDA submission. The tabulation can take the same form as in your initial submission. Tables comparing adverse reactions at the time the NDA was submitted versus now will facilitate review.

2.    Retabulate drop-outs with new drop-outs identified. Discuss, if appropriate.

3.    Provide details of any significant changes or findings, if any.

4.    Summarize worldwide experience on the safety of this drug product.

5.    Submit case report forms for each patient who died during a clinical study or who did not complete a study because of an adverse event.

Please also update the new drug application with respect to reports of relevant safety information, including all deaths and any adverse events that led to discontinuation of the drug, and any information suggesting a substantial difference in the rate of occurrence of common but less serious adverse events. The update should cover all studies and uses of the drug including: (1) those involving indications not being sought in the present submission, (2) other dosage forms, (3) other dose levels, etc.

In addition, we have the following requests for information that should be addressed:

Clinical:

We remind you of your commitment to submit full study reports of the U.S. trials promptly after their completion. We anticipate that you will revise your labeling to incorporate U.S. data at that time.

NDA 20-687

Drug Substance:

NDA 20-687

Page 10

Drug Product:

In addition, please submit three copies of the introductory promotional material that you propose to use for this product. All proposed materials should be submitted in draft or mock-up form, not final print. Please submit one copy to the Division of Reproductive and Urologic Drug Products, and two copies of both the promotional material and the package inserts directly to:

> Food and Drug Administration
> Division of Drug Marketing, Advertising, and Communications, HFD
> 5600 Fishers Lane
> Rockville, Maryland 20857

Within 10 days after the date of this letter, you are required to amend the application, notify us of your intent to file an amendment, or follow one of your other options under 21 CFR 314.110. In the absence of such action FDA may take action to withdraw the application.

The drug product may not be legally marketed until you have been notified in writing that the application is approved.

Should you have any questions, please contact:

Sincerely yours,



/S/

9/18/96

# EXHIBIT 24

2000 FDA Approval Letter for Mifeprex
(mifepristone) Tablets
(Sept. 28, 2000)

Sep 28 2000

NDA 20-687

Population Council
Attention: Sandra P. Arnold
Vice President, Corporate Affairs
1230 York Avenue
New York, NY 10021

Dear Ms. Arnold:

Please refer to your new drug application (NDA) dated March 14, 1996, received March 18, 1996, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for MIFEPREX™ (mifepristone) Tablets, 200 mg.

We acknowledge receipt of your submissions dated April 19, June 20, July 25, August 15 and September 16 and 26, 1996; January 30, March 31, July 28, August 5, September 24, November 26, 1997; January 30 (2), February 19, Aril 27, June 25, October 26, December 8, 1998; February 8 and 22, March 31, April 28, May 10 and 20, June 3 (2), 15, 23, 25, and 30, July 14 (2) and 22, August 3, 13, 18 and 30, September 3, 8, 13 and 30, October 5, 26 and 28, November 16 and 29 (2), December 6, 7 and 23, 1999; and January 11, 21 and 28 (2), February 16 and 24, March 3, 6, 9, 10, 30 and 31 (2), April 20, May 3, 11 and 17, June 22 and 23, July 11, 13, 25 and 27, August 18, 21 and 24, September 8, 12, 15 (2), 19 (2), 20, 21, 22, 26 (2), and 27 (2), 2000. Your submission of March 30, 2000 constituted a complete response to our February 18, 2000 action letter.

This new drug application provides for the use of Mifeprex™ for the medical termination of intrauterine pregnancy through 49 days' pregnancy.

We have completed the review of this application, as amended, and have concluded that adequate information has been presented to approve Mifeprex™ (mifepristone) Tablets, 200 mg, for use as recommended in the agreed upon labeling text. The application is approved under 21 CFR 314 Subpart H. Approval is effective on the date of this letter. Marketing of this drug product and related activities are to be in accordance with the substance and procedures of the referenced regulations.

The final printed labeling (FPL) [including the professional labeling (Package Insert), the Medication Guide required for this product under 21 CFR Part 208, the Patient Agreement Form, and the Prescriber's Agreement Form] must be identical to the submitted draft labeling (Package Insert, Medication Guide, Patient Agreement Form, and the Prescriber's Agreement Form submitted September 27, 2000; and the immediate container and carton labels submitted July 25, 2000). Marketing the product with FPL that is not identical to the approved labeling text may render the product misbranded and an unapproved new drug.

Please submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is printed. Please individually mount ten of the copies on heavy-weight paper or similar material. Alternatively, you may submit the FPL electronically according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format - NDAs* (January 1999). For administrative purposes, this submission should be designated "FPL for approved NDA 20-687." Approval of this submission by FDA is not required before the labeling is used.

Under 21 CFR 314.520, distribution of the drug is restricted as follows:

Mifeprex™ must be provided by or under the supervision of a physician who meets the following qualifications:

- Ability to assess the duration of pregnancy accurately.

472

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through other qualified physicians, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the prescribing information of Mifeprex™.

- Must provide each patient with a Medication Guide and must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and Patient Agreement, give her an opportunity to read and discuss both the Medication Guide and the Patient Agreement, obtain her signature on the Patient Agreement and must sign it as well.

- Must notify the sponsor or its designate in writing as discussed in the Package Insert under the heading DOSAGE AND ADMINISTRATION in the event of an ongoing pregnancy, which is not terminated subsequent to the conclusion of the treatment procedure.

- Must report any hospitalization, transfusion or other serious events to the sponsor or its designate.

- Must record the Mifeprex™ package serial number in each patient's record.

With respect to the aspects of distribution other than physician qualifications described above, the following applies:

- Distribution will be in accordance with the system described in the March 30, 2000 submission.

  This plan assures the physical security of the drug product and provides specific requirements imposed by and on the distributor including procedures for storage, dosage tracking, damaged product returns, and other matters.

We also note the following Phase 4 commitments, specified in your submission dated September 15, 2000. These commitments replace all previous commitments cited in the September 18, 1996 and the February 18, 2000 approvable letters. These Phase 4 commitments are:

1. A cohort-based study of safety outcomes of patients having medical abortion under the care of physicians with surgical intervention skills compared to physicians who refer their patients for surgical intervention. Previous study questions related to age, smoking, and follow-up on day 14 (compliance with return visit) will be incorporated into this cohort study, as well as an audit of signed Patient Agreement forms.
2. A surveillance study on outcomes of ongoing pregnancies.

You have agreed to provide the final Phase 4 protocols for these studies within six months.

Protocols, data, and final reports should be submitted to your IND for this product and a copy of the cover letter sent to this NDA. If an IND is not required to meet your Phase 4 commitments, please submit protocols, data and final reports to this NDA as correspondence. In addition, under 21 CFR 314.81(b)(2)(vii), we request that you include a status summary of each commitment in your annual report to this NDA. The status summary should include the number of patients entered in each study, expected completion and submission dates, and any changes in plans since the last annual report. For administrative purposes, all submissions, including labeling supplements, relating to these Phase 4 commitments must be clearly designated "Phase 4 Commitments."

We also remind you that, under 21 CFR 314.550, after the initial 120 day period following this approval, you must submit all promotional materials, including promotional labeling as well as advertisements, at least 30 days prior to the intended time of initial dissemination of the labeling or initial publication of the advertisement.

Be advised that, as of April 1, 1999, all applications for new active ingredients, new dosage forms, new indications, new routes of administration, and new dosing regimens are required to contain an assessment of the safety and effectiveness of the product in pediatric patients unless this requirement is waived or deferred (63 *FR* 66632). We are waiving the pediatric study requirement for this action on this application.

Please submit one market package of the drug product when it is available.

We remind you that you must comply with the requirements for an approved NDA set forth under 21 CFR 314.80 and 314.81.

If you have any questions, call **[Redacted] .**

<div style="margin-left:40%">

Sincerely,

**[Redacted]**


Center for Drug
Evaluation and Research

</div>

# EXHIBIT 25

2019 FDA ANDA Approval Letter to
GenBioPro, Inc.
(Apr. 11, 2019)

ANDA 091178

**ANDA APPROVAL**

(b) (6), (b) (4)

GenBioPro, Inc.

(b) (6), (b) (4)

Attention: (b) (6), (b) (4)

Dear Sir:

This letter is in reference to your abbreviated new drug application (ANDA) received for review on February 3, 2009, submitted pursuant to section 505(j) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) for Mifepristone Tablets, 200 mg.

Reference is also made to the complete response letter issued by this office on February 23, 2018, and to any amendments thereafter.

We have completed the review of this ANDA and have concluded that adequate information has been presented to demonstrate that the drug is safe and effective for use as recommended in the submitted labeling. Accordingly, the ANDA is **approved**, effective on the date of this letter. The (b) (6) has determined your Mifepristone Tablets, 200 mg, to be bioequivalent and, therefore, therapeutically equivalent to the reference listed drug (RLD), Mifeprex Tablets, 200 mg, of Danco Laboratories, LLC.

Under section 506A of the FD&C Act, certain changes in the conditions described in this ANDA require an approved supplemental application before the change may be made.

**RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS**

Section 505-1 of the FD&C Act authorizes FDA to require the submission of a risk evaluation and mitigation strategy (REMS), if FDA determines that such a strategy is necessary to ensure that the benefits of the drug outweigh the risks [section 505-1(a)]. In accordance with section 505-1(i) of the FD&C Act, a drug that is the subject of an ANDA under section 505(j) is subject to certain elements of the REMS required for the applicable listed drug.

The details of the REMS requirements were outlined in our letter dated June 15, 2011. In that letter, you were also notified that pursuant to section 505-1(i) of the FD&C Act, a drug that is the subject of an ANDA and the listed drug it references must use a single, shared system for elements to assure safe use (ETASU), unless FDA waives that requirement.

Your REMS, known as the Mifepristone REMS Program, submitted on May 30, 2017; is approved, and will be posted on the FDA REMS website: http://www.fda.gov/rems

The REMS consists of ETASU and an implementation system.

ANDA 091178
Page 2

Your REMS must be fully operational before you introduce Mifepristone Tablets, 200 mg, into interstate commerce.

The Mifepristone REMS uses a single, shared system for the ETASU. This single, shared system REMS Program currently includes the products listed on the FDA REMS website, available at http://www.fda.gov/rems.  Other products may be added in the future if additional NDAs or ANDAs are approved.

Under section 505-1(g)(2)(C) of the FD&C Act, FDA can require the submission of a REMS assessment if FDA determines an assessment is needed to evaluate whether the REMS should be modified to ensure the benefits of the drug outweigh the risks or to minimize the burden on the healthcare delivery system of complying with the REMS.

We remind you that you must include an adequate rationale to support a proposed REMS modification for the addition, modification, or removal of any goal or element of the REMS, as described in section 505-1(g)(4) of the FD&C Act.

We also remind you that section 505-1(f)(8) of the FD&C Act prohibits holders of an approved covered application from using any element to assure safe use to block or delay approval of an application under section 505(b)(2) or (j). A violation of this provision in 505-1(f) could result in enforcement action.

Prominently identify any submission containing a REMS assessment or proposed modifications of the REMS with the following wording in bold capital letters at the top of the first page of the submission as appropriate:

**ANDA 091178 REMS ASSESSMENT**

**NEW SUPPLEMENT FOR ANDA 091178/S-000
CHANGES BEING EFFECTED IN 30 DAYS
PROPOSED MINOR REMS MODIFICATION**

*or*

**NEW SUPPLEMENT FOR ANDA 091178/S-000
PRIOR APPROVAL SUPPLEMENT
PROPOSED MAJOR REMS MODIFICATION**

*or*

**NEW SUPPLEMENT FOR ANDA 091178/S-000
PRIOR APPROVAL SUPPLEMENT
PROPOSED REMS MODIFICATIONS DUE TO SAFETY LABELING CHANGES
SUBMITTED IN SUPPLEMENT XXX**

Should you choose to submit a REMS revision, prominently identify the submission containing the REMS revisions with the following wording in bold capital letters at the top of the first page of the submission:

ANDA 091178
Page 3

**REMS REVISION FOR ANDA 091178**

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, are only in PDF format, they may be submitted as such, but the preference is to include as many as possible in Word format.

## SUBMISSION OF REMS DOCUMENT IN SPL FORMAT

In addition to submitting the proposed REMS as described above, you can also submit the REMS document in Structured Product Labeling (SPL) format. If you intend to submit the REMS document in SPL format, include the SPL file with your proposed REMS submission.

For more information on submitting REMS in SPL format, please email REMSWebsite@fda.hhs.gov

## REPORTING REQUIREMENTS

Postmarketing reporting requirements for this ANDA are set forth in 21 CFR 314.80-81 and 314.98 and at section 506I of the FD&C Act. The Agency should be advised of any change in the marketing status of this drug or if this drug will not be available for sale after approval. In particular, under section 506I(b) of the FD&C Act, you are required to notify the Agency in writing within 180 days from the date of this letter if this drug will not be available for sale within 180 days from the date of approval. As part of such written notification, you must include (1) the identity of the drug by established name and proprietary name (if any); (2) the ANDA number; (3) the strength of the drug; (4) the date on which the drug will be available for sale, if known; and (5) the reason for not marketing the drug after approval.

## PROMOTIONAL MATERIALS

You may request advisory comments on proposed introductory advertising and promotional labeling materials prior to publication or dissemination. Please note that these submissions are voluntary. To do so, submit, in triplicate, a cover letter requesting advisory comments, the proposed materials in draft or mock-up form with annotated references, and the package insert (PI), Medication Guide, and patient PI (as applicable) to:

> OPDP Regulatory Project Manager
> Food and Drug Administration
> Center for Drug Evaluation and Research
> Office of Prescription Drug Promotion
> 5901-B Ammendale Road
> Beltsville, MD 20705

Alternatively, you may submit a request for advisory comments electronically in eCTD format. For more information about submitting promotional materials in eCTD format, see the draft Guidance for Industry (available at: http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM443702.pdf).

ANDA 091178
Page 4

You must also submit final promotional materials and package insert(s), accompanied by a
Form FDA 2253, at the time of initial dissemination or publication [21 CFR 314.81(b)(3)(i)].
Form FDA 2253 is available at
http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM083570.pdf.
Information and Instructions for completing the form can be found at
http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM375154.pdf.  For
more information about submission of promotional materials to the Office of Prescription Drug
Promotion (OPDP), see http://www.fda.gov/AboutFDA/CentersOffices/CDER/ucm090142.htm.

## ANNUAL FACILITY FEES

The Generic Drug User Fee Amendments of 2012 (GDUFA) (Public Law 112-144, Title III)
established certain provisions[1] with respect to self-identification of facilities and payment of
annual facility fees.  Your ANDA identifies at least one facility that is subject to the
self-identification requirement and payment of an annual facility fee.  Self-identification must
occur by June 1st of each year for the next fiscal year.  Facility fees must be paid each year by
the date specified in the *Federal Register* notice announcing facility fee amounts.

All finished dosage forms (FDFs) or active pharmaceutical ingredients (APIs) manufactured in a
facility that has not met its obligations to self-identify or to pay fees when they are due will be
deemed misbranded.  This means that it will be a violation of federal law to ship these products
in interstate commerce or to import them into the United States.  Such violations can result in
prosecution of those responsible, injunctions, or seizures of misbranded products.  Products
misbranded because of failure to self-identify or pay facility fees are subject to being denied
entry into the United States.

ANDA 091178
Page 5

## **CONTENT OF LABELING**

As soon as possible, but no later than 14 days from the date of this letter, submit, using the FDA automated drug registration and listing system (eLIST), the content of labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format, as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm, that is identical in content to the approved labeling (including the package insert, and any patient package insert and/or Medication Guide that may be required).  Information on submitting SPL files using eLIST may be found in the guidance for industry titled "SPL Standard for Content of Labeling Technical Qs and As" at http://www.fda.gov/downloads/DrugsGuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.  The SPL will be accessible via publicly available labeling repositories.

Sincerely yours,

*{See appended electronic signature page}*

(b) (6)

Center for Drug Evaluation and Research

---

[1]  Some of these provisions were amended by the Generic Drug User Fee Amendments of 2017 (GDUFA II) (Public Law 115-52, Title III).

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov



(b) (6)

Digitally signed by [         ] (b) (6)
Date: 4/11/2019 02:22:21PM
GUID: 54078879000a1b9e15dd31ed6f0343ca

# EXHIBIT 26

FDA Center for Drug Evaluation & Research
Letter to Population Council re: NDA
(Feb. 18, 2000)

/S/

NDA 20-687

FEB 1 8 2000

Population Council
Attention: Sandra P. Arnold
1230 York Avenue
New York, NY 10021

Dear Ms. Arnold:

Please refer to your new drug application (NDA) dated March 14, 1996, received March 18, 1996, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for mifepristone 200 mg tablets.

We acknowledge receipt of your submissions dated September 18 and 26, 1996; January 30, March 6 and 31, July 28, August 5, September 3 and 24, November 26, 1997; January 30, February 19, April 27, June 25, October 26, December 7 and 8, 1998; February 8, 22, March 31, April 28, May 10, 20, June 3 (2), 15, 25, 30, July 14, 22, August 3, 13, 18, 30, September 3, 8, 13, 30, October 5, 26, 28, November 16, 29 (2), December 6, 7, 23, 1999; January 21, 28 (2), and February 16, 2000. Your submission of August 18, 1999 constituted a complete response to our September 18, 1996 action letter.

We have completed the review of this application, as amended, and it is approvable. Before this application may be approved, however, it will be necessary for you to address the following:

**Chemistry**

Drug Substance

NDA 20-687
Mifepristone
Population Council
Page 2

Drug Product

Redacted _____ |

pages of trade

secret and/or

confidential

commercial

information

NDA 20-687
Mifepristone
Population Council
Page 4

**Labeling**

Address the recommendations in the enclosed draft labeling for the Physician Insert and Patient
Package Insert.
It will be necessary for you to submit revised draft labeling for the drug.  We recommend that the

NDA 20-687
Mifepristone
Population Council
Page 5

labeling be identical in content to the enclosed draft labeling (text for the Physician Package Insert and Patient Package Insert).

If additional information relating to the safety or effectiveness of this drug becomes available, revision of the labeling may be required.

**Phase 4 Commitments**

We remind you of your commitments dated September 16, 1996, to perform the following Phase 4 studies:

1.  To monitor the adequacy of the distribution and credentialing system,

2.  To follow-up on the outcome of a representative sample of mifepristone-treated women who have surgical abortion because of the method failure,

3.  To assess the long-term effects of multiple use of the regimen,

4.  To ascertain the frequency with which women follow the complete treatment regimen and the outcome of those who do not,

5.  To study the safety and efficacy of the regimen in women (1) under 18 years of age, (2) over age 35, and (3) who smoke,

6.  To ascertain the effect of the regimen on children born after treatment failure.

**Distribution Plan**

We have completed our review of this application, including the restrictions on the distribution and use of this product proposed in your January 21, 2000 submission, entitled "Distribution Plan". We have concluded that adequate information has not been presented to demonstrate that the drug, when marketed in accordance with the terms of distribution proposed, is safe and effective for use as recommended. The restrictions on distribution will need to be amended.

We have thus considered this application under the restricted distribution regulations contained in 21 CFR 314.500 (Subpart H) and have concluded that restrictions as per CFR 314.520 on the distribution and use of mifepristone are needed to assure safe use of this product.

487

NDA 20-687
Mifepristone
Population Council
Page 6

## Promotional Activities

Please note that promotional activities for this NDA are subject to 21 CFR 314.550. As such, please submit three copies of the introductory promotional materials that you propose to use for this product. All proposed materials should be submitted in draft or mock-up form, not final print. Please send one copy to the ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯and two copies of both the promotional materials and the package insert directly to:

Division of Drug Marketing, Advertising, and Communications, HFD-40
Food and Drug Administration
5600 Fishers Lane
Rockville, Maryland 20857

Under 21 CFR 314.50(d)(5)(vi)(b), we request that you update your NDA by submitting all safety information you have regarding your new drug. Please provide updated information as

listed below. The update should cover all studies and uses of the drug including: (1) those involving indications not being sought in the present submission, (2) other dosage forms, and (3) other dose levels, etc.

1. Retabulation of all safety data including results of trials that were still ongoing at the time of NDA submission. The tabulation can take the same form as in your initial submission. Tables comparing adverse reactions at the time the NDA was submitted versus now will certainly facilitate review.
2. Retabulation of drop-outs with new drop-outs identified. Discuss, if appropriate.
3. Details of any significant changes or findings.
4. Summary of worldwide experience on the safety of this drug.

5. Case report forms for each patient who died during a clinical study or who did not complete a study because of an adverse event.

6. English translations of any approved foreign labeling not previously submitted.

7. Information suggesting a substantial difference in the rate of occurrence of common, but less serious, adverse events.

Within 10 days after the date of this letter, you are required to amend the application, notify us of your intent to file an amendment, or follow one of your other options under 21 CFR 314.110. In the absence of any such action FDA may proceed to withdraw the application. Any amendment should respond to all the deficiencies listed. We will not process a partial reply as a major amendment nor will the review clock be reactivated until all deficiencies have been addressed.

NDA 20-687
Mifepristone
Population Council
Page 7

The drug product may not be legally marketed until you have been notified in writing that the application is approved.

If you have any questions, call

Sincerely,

/S/

Center for Drug Evaluation and Research

Enclosure

APPEARS THIS WAY
ON ORIGINAL

489

# EXHIBIT 27

2000 FDA Approval Memo. to Population
Council re: NDA 20-687 Mifeprex
(mifepristone)
(Sept. 28, 2000)

**M E M O R A N D U M**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH

DATE: September 28, 2000

FROM: /S/

SUBJECT:

TO: NDA 20-687 MIFEPREX (mifepristone) Population Council

This memo documents the approval action concerning the Population Council's NDA for mifepristone for the medical termination of intrauterine pregnancy through 49 days' pregnancy. The application was initially submitted to the Food and Drug Administration (FDA) on March 14, 1996. The Reproductive Health Drugs Advisory Committee met on July 19, 1996 and voted that benefits exceeded risk for this drug product with 6-yes, 0-no, and 2 abstentions. An approvable action letter was issued September 18, 1996 citing deficiencies in areas of Clinical (distribution system), Chemistry/Manufacturing and Controls, Biopharmaceutics, and Labeling. A complete response was received August 18, 1999. The last action by the Office was on February 18, 2000. That approvable action letter listed application deficiencies consisting of Chemistry/Manufacturing and Controls, Labeling, and the Distribution System issues. The Population Council submitted a complete response on March 30, 2000. After a brief summary of effectiveness and safety, this memo addresses those outstanding issues listed in the last action letter, Phase 4 commitments, and other issues.

Summary of Effectiveness and Safety
Effectiveness and safety data were derived from one U.S. clinical trial and two French trials. Effectiveness was defined as the complete expulsion of products of conception without the need for surgical intervention.

The U.S. trial consisted of 859 women providing safety data and 827 women providing effectiveness data for gestations of 49 days or less, dated from the last menstrual period. Demographic data showed racial composition of the U.S. trial was similar to the overall U.S. general population. Medical abortion was complete in 92.1% of 827 subjects. Surgical intervention was performed in 7.9% of subjects: 1.6% had medically indicated interventions (1.2% for heavy bleeding), 4.7% had incomplete abortions, 1.0% had ongoing pregnancies, and 0.6% had intervention at the patient's request. One of the 859 patients received a blood transfusion.

The two French trials enrolled a total of 1,681 women providing effectiveness outcomes and 1,800 women providing safety information. Medical abortion was complete in 95.5% of the 1681 subjects. Surgical intervention was performed in 4.5% of subjects: 0.3% for bleeding, 2.9% for incomplete abortions, and 1.3% for ongoing pregnancies. Of the 1,800 women, 2 patients received blood transfusions.

The Advisory Committee reviewed the French data in 1996 and voted 6-yes and 2-no for data supporting efficacy, 7-yes and 1-abstention for data supporting safety. As stated above, the overall vote for benefits exceeding risk was 6-yes, 0-no, and 2-abstentions. During the second review cycle in 1999, the committee received a copy of the U.S. study report, as they requested, to provide FDA with comments. None were received. The U.S. trial data confirms the effectiveness and safety of the product.

1

Chemistry/Manufacturing

In May, 2000 the Population Council informed the Division of Reproductive and Urologic Drug Products that the bulk drug substance maker had changed manufacturing processes last summer. New analytic, physical, and stability data were received and reviewed and found to be adequate to ensure the quality of the drug manufacturing was preserved.

An inspection of the bulk drug substance maker was performed on July 24-28, 2000. Deficiencies were cited and the manufacturer corrected these. These corrections were found acceptable.

Because the drug is being distributed directly to qualified physicians, there is minimal chance for drug name confusion and I agree with the name, Mifeprex.

Labeling

Labeling is important to educate prescribers and patients about the safe and effective use of the drug and to inform health professionals about adverse event risks. The 1996 Advisory Committee strongly supported education of users of mifepristone. By coupling professional labeling with other educational interventions such as the Medication Guide, Patient Agreement, and Prescriber's Agreement, along with having physician qualification requirements of abilities to date pregnancies accurately and diagnose ectopic pregancies (and other requirements), goals of safe and appropriate use may be achieved. The drug's labeling is now part of a total risk management program that will be summarized below. The professional labeling, Medication Guide, Patient Agreement, and Prescriber's Agreement will together constitute the approved product labeling to ensure any future generic drug manufacturers will have the same risk management program.

The labeling for mifepristone has been revised to provide information about how to report adverse events. FDA and the Population Council agree that a black box will highlight special items related to the drug. In addition, FDA has determined that a Medication Guide for this drug will help ensure dispensers provide important information to patients to enhance compliance with the regimen for safety and efficacy. Furthermore, a patient agreement fosters active patient education and participation in this regimen. The Population Council will provide these educational materials (the professional labeling, the Medication Guide, the patient agreement form, and the Prescriber's Agreement form). The professional labeling, Medication Guide, Patient Agreement, and Prescriber's Agreement must be read, understood, and attested to by physicians who meet prescribing qualifications (discussed below).

Black Box

21 CFR 201.57(e) permits FDA to require a black box warning for special problems, particularly those that may lead to death or serious injury. The Population Council agreed in its July 5, 2000 submission to a black box warning. It was agreed that the box would contain the following:

"If Mifeprex results in incomplete abortion, surgical intervention may be necessary. Prescribers should determine in advance whether they will provide such care themselves or through other providers. Prescribers should also give patients clear instructions of whom to call and what to do in the event of an emergency following administration of Mifeprex.

Prescribers should make sure the patients receive and have an opportunity to discuss the Medication Guide and Patient Agreement."

Misoprostol Administration

The approvable letter issued by FDA on 2/18/2000 agreed to the Population Council's statement that women could have the option of taking misoprostol on Day 3 either at home or at the prescriber's office. However, data provided by the Population Council supporting home use was re-reviewed and found not to provide substantial evidence for safety and efficacy. The data were anecdotal off-label experience with

2

a vaginal misoprostol regimen, an observational study about home use in Guadeloupe, and a U.S. clinical study of home use of a different regimen with different drug doses. The only study that commented on whether home use led to correct use was the Guadeloupe study reporting that 4% of patients who took misoprostol at home did it incorrectly. Returning to the health care provider on Day 3 for misoprostol, as in the U.S. clinical trial, assures that the misoprostol is correctly administered. This requirement has the additional advantage of contact between the patient and health care provider to provide ongoing care and to reinforce the need to return on Day 14 to confirm that expulsion has occurred.

Early in drug development, a mandatory observation period of 3-4 hours was instituted in clinical trials worldwide when a prostaglandin analogue, sulprostone, was used with mifepristone and felt to have some cardiovascular risk. This drug is no longer being used with mifepristone and is not a marketed drug in the U.S.; therefore, the rationale for an observation period is moot. There is no more likelihood of an adverse event occurring in the few hours after misoprostol administration than during the entire study period.

Therefore, as a consequence of this re-evaluation, the labeling currently reads that the patient returns on Day 3 for misoprostol and is given instructions about adverse events and whom to contact for questions and emergencies.

### Access to Health Care and Emergency Services

FDA agreed with the Population Council that access to health care and emergency services is critical for the safe and effective use of the drug. The clinical trials ensured access to services. The labeling has a black box highlighting the possible need for surgical intervention and either the provision of access to these services by the prescriber or through referral. The labeling has a contraindication if there is no access to medical facilities for emergency services. The Patient Agreement emphasizes the need to know what to do in the case of an emergency.

### Patient Agreement Form

Patients should be informed about the indication of the drug and how it is given. They must understand the type of regimen they are about to commit to and its risks and benefits. The signed agreement form will be given to the patient for her reference and another kept in the medical record. The Population Council has committed to auditing prescribers to ascertain whether they have obtained signed copies of the Patient Agreement forms.

### Biopharmaceutics

This review cycle, the clinical biopharmaceutical reviewers evaluated new data in the published literature regarding the metabolism of mifepristone by the P450 3A4 system. Mifepristone is a substrate and this may inhibit drug metabolism of certain drugs and induce metabolism of others. This information was placed in the professional labeling and patients are instructed in the Medication Guide that use of other drugs may interfere with actions of mifepristone and misoprostol.

### Pharmacology-Toxicology

Current literature on the effects of human fetal exposure to mifepristone and misoprostol or mifepristone alone was reviewed to ensure risk information was current. Many of the case reports of malformation concern the unsuccessful use of misoprostol for abortion, resulting in limb, facial, cranial, and other abnormalities. Many reports were retrospective in nature, subject to reporting and recall bias. Nevertheless, the risk of malformation is very important to address. This drug's indication is for pregnancy termination. The labeling, Medication Guide, process of obtaining patient agreement on medical abortion, and the commitment of the physicians through their signed Prescriber's Agreement are all meant to ensure women are completely informed about the process and make a commitment to follow through.

3

493

The labeling for Mifeprex states that it is used with misoprostol for termination of pregnancy of 49 days or less. Human data on mifepristone and misoprostol used in this timeframe is available. Safety Update Report #3 submitted on March 31, 2000 contains _____ Periodic Safety Update Report #9 for the period of September 1, 1998 to November 30, 1999. It lists 38 on-going pregnancies with mifepristone plus misoprostol. The Lancet published a letter in July 1998 from _____ in which they mention that they had reviewed 71 cases of continuing pregnancies after failed early termination of pregnancy occurring from 1987 to 1998 and found no reported cases of malformation associated with use of mifepristone and misoprostol. There was one report of sirenomelia and cleft palate in a patient who had a therapeutic termination at week 7 gestation associated with mifepristone use alone. On July 6, 1999 the European Summary of Product Characteristics contains a statement for mifepristone that in humans, the reported cases do not allow a causality assessment for mifepristone alone or used with a prostaglandin. On August 21, 2000 the sponsor provided _____ 12/1/99 to 5/31/00 Periodic Safety Update on pregnancy outcomes following early pregnancy exposure. The current labeling has these new data on 82 pregnancies exposed to mifepristone only (40) and mifepristone used with misoprostol (42). FDA agrees that no conclusion can be made from the data at this time. Information on the possibility of a risk of malformation, including the above information as well as the anecdotal reports, is nevertheless included in the professional labeling, Medication Guide, and Patient Agreement. The Population Council has committed to continuing ongoing surveillance of human malformation risk.

### Medication Guide

This product will be approved with a Medication Guide which dispensers must provide with the drug. It is important for patients to be fully informed about the drug, as well as the need for follow up, especially on Day 14 to confirm expulsion. A Medication Guide was determined to be necessary to patients' safe and effective use of the drug. The drug product is important to the health of women and the Medication Guide will encourage patient adherence to directions for use. Patient adherence to directions for use and visits is critical to the drug's effectiveness and safety.

### Distribution System

Since 1996, FDA and the Population Council have agreed, as publicly discussed with the Reproductive Drug Products Advisory Committee, that once approved, the drug will be distributed directly to physicians. It will not be available from pharmacies. There were also discussions about the qualifications of the physicians receiving mifepristone for dispensing. The Committee also stated it was important that women have access to medical abortion as this new therapeutic option may offer women avoidance of a surgical procedure.

In January 2000, the Population Council provided its initial plan for drug distribution. This plan was resubmitted in its complete response of March 30, 2000. This plan had acceptably addressed the issue of physical security of the drug. The distribution system plan stated specific requirements imposed on and by distributors of the drug, including procedures for storage, dosage tracking, damaged product returns, and other matters. See Subpart H of this memo for more details. Other aspects of the distribution system are addressed below.

### Physician Qualifications

Physician qualifications were discussed within CDER, the Agency, and with the Population Council. FDA also discussed physician qualifications with a special government employee with expertise in early pregnancy. The Population Council proposed that the drug be directly distributed to qualified physicians, as opposed to other types of health care professionals (midwives, physician's assistants, nurse practitioners, etc.). This restriction was supported by the discussions of the 1996 Advisory Committee. In fact, the clinical trial data was derived from the experience of physicians using this drug. Thus, physicians remain the initial population who will receive this drug for dispensing. This does not preclude another type of health care provider, acting under the supervision of a qualified physician, from

4

494

dispensing the drug to patients, provided state laws permit this. Should data be provided to amend the restriction to physicians, FDA will consider them.

The types of skills physicians had in the U.S. clinical trial were: 1) the ability to use ultrasound and clinical examination to date pregnancies and diagnose ectopic pregnancies, 2) the ability to perform surgical procedures, including dilation and curettage, vacuum suction, and/or surgical abortions, for bleeding or incomplete abortion, and, 3) they had privileges at medical facilities to provide emergency resuscitation, transfusion, hospitalization, etc. Physicians were trained to use the drug per protocol. Fourteen of the seventeen physicians in the U.S. clinical trial were obstetricians/gynecologists. All patients were within one hour of emergency facilities or the facilities of the principle investigator.

The role of ultrasound was carefully considered. In the clinical trial, ultrasound was performed to ensure proper data collection on gestational age. In practice, dating pregnancies occurs through using other clinical methods, as well as through using ultrasound. Ultrasound information can be provided to the prescribing physicians to guide treatment, but this information can be obtained through consultation referral from an ultrasound provider and does not necessarily need to be obtained by the prescriber him/herself. The labeling recommends ultrasound evaluation as needed, leaving it to the medical judgement of the physician.

The Population Council proposed that any physician who could date pregnancies and diagnose ectopic pregnancies should be able to receive the drug from the distributor. These two qualifications alone limit the number of physicians who will be eligible to receive mifepristone from the Population Council's distributor(s) to those physicians who are very familiar with managing early pregnancies. These two qualifications also are performance-based standards and do not limit providers of mifepristone to specific medical subspecialties. Education about the use of the drug is described above in the Labeling section of this memo. Because qualified physicians will be using this drug, there is no need for special certification programs. The current labeling and distribution system states physician need not have skills for handling surgical interventions, but could provide referral to services for incomplete abortion and emergency care. The Population Council stated that current medical practice is structured on referral of patients who need surgery (for example, women with a spontaneous incomplete abortion or a cardiologist's patient who needs by-pass grafts) to a physician possessing the skills to address the problem. Moreover, within the U.S. clinical trial, 11 patients out of roughly 850 patients needed surgical intervention to handle bleeding, the most important urgent adverse event associated with this drug, and 3 of these patients were handled by non-principal investigators such as the emergency room and non-study gynecologist. This suggests that patients will get the needed surgical intervention by either their physician or another physician with the needed skills. Referral to a hospital for emergency services does not mean having admitting privileges, but having the ability and the responsibility to direct patients to hospitals, if needed. The professional labeling and the Medication Guide highlight that surgery may be needed and patients need to know if the provider of mifepristone will furnish surgical intervention or if the patient will be referred. If the latter, the treating health care provider must give the patient the name, address, and phone number of this referred provider. To ensure that the quality of care is not different for patients who are treated by physicians who have the skill for surgical intervention (as in the clinical trials) compared to those treated by physicians who must refer patients for surgical intervention, FDA has proposed and the Population Council has agreed to structure a Phase 4 monitoring study. This monitoring study incorporates study questions of four of the original six Phase 4 commitments. See Phase 4 Commitments for additional information.

Finally, the one hour travel distance restriction in the clinical trial was intended to ensure access by patients to emergency or health care services. This concern has been dealt with through the labeling, which makes it clear that if there isn't adequate access to emergency services, the medication is contraindicated.

5

Subpart H

In the February 18, 2000 approvable letter, FDA stated that the eventual approval of this drug would be under Subpart H. (21 CFR 314.500-314.560). This subpart applies to certain new drugs that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments. FDA has determined that the termination of an unwanted pregnancy is a serious condition within the scope of Subpart H. The meaningful therapeutic benefit over existing surgical abortion is the avoidance of a surgical procedure. Subpart H applies when FDA concludes that a drug product shown to be effective can be safely used only if distribution or use is restricted, such as to certain physicians with special skills or experience. In the case of mifepristone, the Population Council proposed and FDA agreed that this drug will be directly distributed via an approved plan that ensures the physical security of the drug to physicians who meet specific qualifications. Under 21 CFR 314.520, distribution of mifepristone is restricted as described below.

- Mifepristone must be provided by or under the supervision of a physician who meets the following qualifications:
  - Ability to assess the duration of pregnancy accurately
  - Ability to diagnose ectopic pregnancies
  - Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through other qualified physicians, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary
  - Has read and understood the prescribing information of Mifeprex
  - Must provide each patient with a Medication Guide and must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and Patient Agreement, given her an opportunity to read and discuss both the Medication Guide and the Patient Agreement, obtain her signature on the Patient Agreement and must sign it as well
  - Must notify the sponsor or its designate in writing as discussed in the Package Insert under the heading DOSEAGE AND ADMINISTRATION in the event of an on-going pregnancy, which is not terminated subsequent to the conclusion of the treatment procedure
  - Must report any hospitalization, transfusion or other serious events to the sponsor or its designate
  - Must record the Mifeprex package serial number in each patient's record

- With respect to the aspects of distribution other than physician qualifications described above, distribution of Mifeprex will be in accordance with the system described in the Population Council's submission of March 30, 2000, which includes the following:
  - Secure manufacturing, receiving, and holding areas for the drug
  - Secure shipping procedures, including tamper-proof seals
  - Controlled returns procedures
  - Tracking system ability to trace individual packages to the patient level, while maintaining patient confidentiality
  - Use of authorized distributors and agents with necessary expertise to handle distribution requirements for the drug
  - Provision of drug through a direct, confidential physician distribution system that ensures only qualified physicians will receive the drug for patient dispensing

The Population Council agreed to approval under Subpart H in their letter of September 15, 2000.

6

Phase 4 Commitments

In 1996, the Population Council committed to 6 post-marketing studies: 1) to monitor the adequacy of the distribution and credentialing system; 2) to follow up on the outcome of a representative sample of mifepristone treated women who have surgical abortion because of method failure; 3) to assess the long term effects of multiple use of the regimen; 4) to ascertain frequency with which women follow the complete treatment regimen and the outcome of those who do not; 5) to study the safety and efficacy of the regimen in women under age 18, over age 35, and who smoke; 6) to ascertain the effect of the regimen on children born after treatment failure.

During this review cycle, items 1, 2, 4 and 5 were revised and integrated into a monitoring study to ensure providers who did not have surgical intervention skills and referred patients for surgery had similar patient outcomes as those patients under the care of physicians who possessed surgical skills (such as those in the clinical trial). This study specifically addresses adequacy of qualifications (#1). FDA reviewed the protocols from the Population Council submitted on September 7, 2000 and provided a revised protocol on September 13, 2000 in which the investigators collect data on safety outcomes (#2), return for their follow up visits (#4), and include all ages (#5) and collect smoking status (#5). Commitment #2 was defined by the Advisory Committee discussions of 1996 surrounding the question of whether certain physician specialties would have higher rates of problems encountered with medical abortion. This study specifically will investigate the performance of specialties with surgical skills compared to those that refer for surgical interventions with respect to incidence of medical abortion failures.

The Population Council agrees to study ongoing pregnancies and their outcomes through a surveillance, reporting, and tracking system (#6). This protocol summary and a summary for the monitoring system was received on September 19, 2000 and both were found to be adequate.

The Population Council asked that Commitment #3 (to assess the long term effects of multiple use of the regimen) be waived because it would not be feasible to identify and enroll sufficient numbers of repeat users of the drug, especially given privacy issues. In addition, the pharmacology of mifepristone does not suggest any carry over effect after one-time administration. The Agency agrees with this assessment.

As a note, this cycle the Population Council provided new data concerning Commitment #5 (to study the safety and efficacy of the regimen in women under age 18, over age 35, and who smoke), from Spitz et al. This study had 106 women ages 35 years or older as well as 51 subjects under age 20, all of whom were 49 days or less since their last menstrual period. The data on the older women is informative and of meaningful sample size. FDA agrees there is no biological reason to expect menstruating females under age 18 to have a different physiological outcome with the regimen. The Spitz data actually suggests a trend towards increased success of medical abortion with younger patients. However, as these age groups were not part of the NDA indication and the data on safety and effectiveness were only reviewed for the indication's age group (18-35 years of age), the trials excluded patients younger than 18 years old, and the raw data from Sptiz have not been submitted for review, the labeling states the safety and efficacy in these groups have not been studied. The Population Council will collect outcomes in their Phase 4 studies of women of all ages to further study this issue. With respect to smokers, the Population Council will study smokers of various ages to collect safety information. In sum, the changes in postmarketing commitments reflect current postmarketing questions given establishment of final labeling, Medication Guide, and distribution system, along with availability of additional clinical data with the drug since 1996.

The postmarketing audit of signed Patient Agreement forms was discussed above.

7

407

Public Comments Considered

The Food and Drug Administration received over 1,000 letters or emails from the public about mifepristone. Most comments objected to various restrictions of the drug's distribution. For example, many letters opposed press reports of an alleged FDA public registry of doctors who dispense mifepristone. Other letters focused on the research uses of mifepristone for neurologic and oncologic diseases and the concern that restricting distribution after approval would constrain off-label uses. Still other letters expressed misunderstanding that experimental indications that are subject to INDs would be limited by an approval of mifepristone with distribution restrictions. These comments were reviewed and considered.

Risk Management Program

Risk management for a drug has the goal of optimizing the use of a product by maximizing its benefits and minimizing its risks. Interventions to manage risk include education to physicians, patients, and the public, labeling (including warnings, precautions, contraindications, dosage and administration, and Medication Guide), restriction of product use or supply, and packaging changes. This drug is being approved under Subpart H (restrictions on distribution) as part of the risk management program. The Population Council and FDA have identified the areas below, among others, that contribute to drug safety and effectiveness:

1. Proper selection of patients via physicians who are qualified to do so by dating pregnancies and diagnosing ectopics,
2. Qualified physicians to administer or supervise the administration of the medication
3. Compliance with the regimen by physicians and patients through education and monitoring
4. Safety and effectiveness information that fully informs patients and physicians about the risks and benefits of the treatment
5. Evaluation of physician qualifications through Phase 4 studies has been discussed in above sections.
6. Physical packaging in unit of dosing to ensure proper dose and provision of Medication Guide with each dose
7. Active patient participation in the treatment through the Patient Agreement and Medication Guide with an audit of signed Patient Agreement to ensure compliance
8. Active programs to get physicians to report adverse events and ongoing pregnancies to provide accurate risk information
9. Commitment to review and revise the risk management program for improved public health

All components of this risk management program have been discussed above, including the Medication Guide, the labeling that includes the Prescriber's and Patient Agreement forms, approval under Subpart H, and Phase 4 studies to evaluate risk management interventions and to gather data on risks.

In summary, all approval issues related to the NDA have been addressed adequately.

APPEARS THIS WAY
ON ORIGINAL

8

# EXHIBIT 28

Identification of Drug and Biological
Products Deemed to Have Risk Evaluation
and Mitigation Strategies for Purposes of
the Food and Drug Administration
Amendments Act of 2007,
73 Fed. Reg. 16313, 16314 (Mar. 27, 2008)

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Food and Drug Administration

[Docket No. FDA–2008–N–0174]

## Identification of Drug and Biological Products Deemed to Have Risk Evaluation and Mitigation Strategies for Purposes of the Food and Drug Administration Amendments Act of 2007

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is issuing this notice to notify holders of certain prescription new drug and biological license applications that they will be deemed to have in effect an approved risk evaluation and mitigation strategy (REMS) under the Food and Drug Administration Amendments Act of 2007 (FDAAA). Holders of applications deemed to have in effect an approved REMS are required to submit a proposed REMS to FDA.

**DATES:** Submit proposed REMSs to FDA by September 21, 2008.

**ADDRESSES:** Written communications regarding the applicability of this notice to a specific product should be identified with Docket Number FDA–2008–N–0174 and submitted to the Division of Dockets Management (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852. Submit electronic communications to *http://www.regulations.gov.* Information about FDA implementation of FDAAA is available on the Internet at *http://www.fda.gov/oc/initiatives/advance/fdaaa.html.*

**FOR FURTHER INFORMATION CONTACT:** Mary Dempsey, Center for Drug Evaluation and Research, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 22, rm. 4326, Silver Spring, MD 20993–0002, 301–796–0147.

**SUPPLEMENTARY INFORMATION:**

## I. Introduction

On September 27, 2007, the President signed into law FDAAA (Public Law 110–85). Title IX, subtitle A, section 901

of FDAAA created new section 505–1 of the Federal Food, Drug, and Cosmetic Act (the act) (21 U.S.C. 355–1). Section 505–1(a) of the act authorizes FDA to require persons submitting certain applications[1] to submit and implement a REMS if FDA determines that a REMS is necessary to ensure that the benefits of a drug outweigh the risks of the drug and informs the holder of the application for the drug of the determination. Section 909 of FDAAA provides that Title IX, subtitle A takes effect 180 days after its enactment, which is March 25, 2008.

FDAAA also contains REMS requirements for drug and biological products approved before the effective date of Title IX, subtitle A. Section 909(b)(1) of FDAAA specifies that a ''drug that was approved before the effective date of this Act is * * * deemed to have in effect an approved risk evaluation and mitigation strategy under section 505–1 of the Federal Food, Drug, and Cosmetic Act * * * if there are in effect on the effective date of this Act elements to assure safe use— (A) required under section 314.520 or section 601.42 of title 21, Code of Federal Regulations; or (B) otherwise agreed to by the applicant and the Secretary [of Health and Human Services] for such drug.''

Section 909(b)(3) of FDAAA states: ''Not later than 180 days after the effective date of this Act, the holder of an approved application for which a risk evaluation and mitigation strategy is deemed to be in effect * * * shall submit to the Secretary a proposed risk evaluation and mitigation strategy. Such proposed strategy is subject to section 505–1 of the Act as if included in such application at the time of submission of the application to the Secretary.''[2]

Section 909(b)(2) of FDAAA states that a REMS for a drug deemed to have a REMS consists of the timetable required under section 505–1(d) of the act and any additional elements under section 505–1(e) and (f) of the act in effect for the drug on the effective date of FDAAA.

The purpose of this notice is to identify those drugs that FDA has determined will be deemed to have in effect an approved REMS and to notify holders of applications for such drugs that they are required to submit a proposed REMS by September 21, 2008.

FDA is developing guidance on the preferred content and format of a proposed REMS required to be submitted under section 909(b) of FDAAA and will issue it as soon as possible.

## II. List of Drug and Biological Products Deemed to Have a REMS

Drug and biological products deemed to have in effect an approved REMS are those that on March 25, 2008 (the effective date of Title IX, subtitle A of FDAAA), had in effect ''elements to assure safe use.'' ''Elements to assure safe use'' include the following: (1) Health care providers who prescribe the drug have particular training or experience, or are specially certified; (2) pharmacies, practitioners, or health care settings that dispense the drug are specially certified; (3) the drug is dispensed to patients only in certain health care settings, such as hospitals; (4) the drug is dispensed to patients with evidence or other documentation of safe use conditions, such as laboratory test results; (5) each patient using the drug is subject to certain monitoring; or (6) each patient using the drug is enrolled in a registry (see section 505–1(f)(3) of the act).

Some applications approved before the effective date of FDAAA Title IX, subtitle A contain these elements to assure safe use.[3] Some of these applications were approved under § 314.520 (21 CFR 314.520) or § 601.42 (21 CFR 601.42). Others were not approved under part 314, subpart H or part 601, subpart E, but still contain elements to assure safe use that were agreed to by the applicant and the Secretary for such drug. Since 2005, these elements typically appeared in approved risk minimization action plans (RiskMAPs) (see the guidance for industry entitled ''Development and Use of Risk Minimization Action Plans'' (70 FR 15866, March 29, 2005)).

FDA has reviewed its records to identify applications that were approved before the effective date of Title IX of FDAAA with elements to assure safe use and has identified the drug and biological products listed in table 1 of this document as those that will be deemed to have in effect an approved REMS.

---

[1] Section 505(p)(1) of the act (21 U.S.C. 355(p)(1)) states that section 505–1 of the act applies to applications for prescription drugs approved under section 505(b) or (j) of the act and applications approved under section 351 of the Public Health Service Act (42 U.S.C. 262).

[2] Title IX, subtitle A of FDAAA, which includes section 909, takes effect March 25, 2008; 180 days after that date is September 21, 2008.

[3] These plans sometimes contain other elements to minimize risk such as a Medication Guide (21 CFR part 208) or a communication/educational plan

for health care providers or patients. A drug will not be deemed to have a REMS if it has only a Medication Guide, patient package insert, and/or communication plan (see section 505–1(e)(2) and (e)(3) of the act).

TABLE 1.—PRODUCTS DEEMED TO HAVE IN EFFECT AN APPROVED REMS

| Generic or Proper Name | Brand Name | Application Number[1] | Date of Approval[2] |
|---|---|---|---|
| Abarelix | Plenaxis[3] | NDA 21–320 | 11/25/2003 |
| Alosetron | Lotronex | NDA 21–107 | 02/09/2000 |
| Ambrisentan | Letairis | NDA 22–081 | 06/15/2007 |
| Bosentan | Tracleer | NDA 21–290 | 11/20/2001 |
| Clozapine | Clozaril | NDA 19–758 | 09/26/1989 |
| | | ANDA 74–949 | 11/26/97 |
| | | ANDA 75–417 | 5/27/99 |
| | | ANDA 75–713 | 11/15/02 |
| | | ANDA 75–162 | 4/26/05 |
| | | ANDA 76–809 | 12/16/05 |
| | Fazaclo ODT | NDA 21–590 | 02/09/2004 |
| Dofetilide | Tikosyn | NDA 20–931 | 10/01/1999 |
| Eculizumab | Soliris | BLA 125166 | 03/16/2007 |
| Fentanyl PCA | Ionsys[3] | NDA 21–338 | 05/22/2006 |
| Fentanyl citrate | Actiq | NDA 20–747 | 11/04/1998 |
| Isotretinoin | Accutane | NDA 18–662 | 05/07/1982 |
| | Amnesteem | ANDA 75–945 | 11/2002 |
| | Claravis | ANDA 76–135 | 04/2003 |
| | | ANDA 76–356 | 04/2003 |
| | Sotret | ANDA 76–041 | 12/2002 |
| | | ANDA 76–503 | 06/2003 |
| Lenalidomide | Revlimid | NDA 21–880 | 12/27/2005 |
| Mifepristone | Mifeprex | NDA 20–687 | 09/28/2000 |
| Natalizumab | Tysabri | BLA 125104 | 11/23/2004 |
| Small pox (Vaccinia) Vaccine, Live | ACAM2000 | BLA 125158 | 08/31/2007 |
| Sodium oxybate | Xyrem | NDA 21–196 | 07/17/2002 |
| Thalidomide | Thalomid | NDA 20–785 | 07/16/1998 |
| | | NDA 21–430 | |

[1] New drug application (NDA), abbreviated new drug application (ANDA), biologics license application (BLA).
[2] The original date of approval of the drug. FDA may have required elements to assure safe use at a later date.
[3] Product is not currently marketed in the United States.

FDA is further asking members of the public to please notify the agency if they are aware of applications that have not been identified in this document and that they believe should be deemed to have in effect an approved REMS. Please provide the information to Mary Dempsey, Risk Management Coordinator (see the **FOR FURTHER INFORMATION CONTACT** section of this document).

Any application holder that believes its product identified in this notice should not be on the list of drug or biological products that will be deemed to have in effect an approved REMS should submit a letter identified with Docket Number FDA–2008–N–0174 to the Division of Dockets Management (see **ADDRESSES**) stating why the application holder believes its product was improperly identified in this notice.

FDA will notify the application holder within 30 days of receipt of the letter of its determination.

Dated: March 19, 2008.

**Jeffrey Shuren,**

*Associate Commissioner for Policy and Planning.*

[FR Doc. E8–6201 Filed 3–26–08; 8:45 am]

**BILLING CODE 4160–01–S**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**Joint Meeting of the Anesthetic and Life Support Drugs Advisory Committee and the Drug Safety and Risk Management Advisory Committee; Notice of Meeting**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

This notice announces a forthcoming of a public advisory committee of the Food and Drug Administration (FDA). The meeting will be open to the public.

*Name of Committees:* Anesthetic and Life Support Drugs Advisory Committee and the Drug Safety and Risk Management Advisory Committee.

# EXHIBIT 29

2011 FDA Supplemental Approval Letter to
Danco Laboratories, LLC
(June 8, 2011)
("2011 Approval Letter")

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Food and Drug Administration
Silver Spring  MD  20993

NDA 020687/S-014

**SUPPLEMENT APPROVAL**

Danco Laboratories, LLC
(b) (6)

P.O. Box 4816
New York, NY 10185

Dear (b) (6):

Please refer to your Supplemental New Drug Application (sNDA) dated September 16, 2008, received September 17, 2008, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FDCA) for MIFEPREX® (mifepristone) Tablets.  We note that NDA 020687 is approved under the provisions of 21 CFR 314.520 (Subpart H).

This supplemental application provides for a proposed risk evaluation and mitigation strategy (REMS) for MIFEPREX (mifepristone) and was submitted in accordance with section 909(b)(1) of the Food and Drug Administration Amendments Act of 2007 (FDAAA).  Under section 909(b)(1) of FDAAA, we identified MIFEPREX (mifepristone) as a product deemed to have in effect an approved REMS because there were in effect on the effective date of FDAAA, March 25, 2008, elements to assure safe use required under 21 CFR 314.520.

We acknowledge receipt of your amendments dated December 9, 2008, November 8, 2010, and May 19 and 27, 2011.

In accordance with section 505-1 of the FDCA, we have determined that a REMS is necessary for MIFEPREX (mifepristone) to ensure the benefits of the drug outweigh the risks of serious complications by requiring prescribers to certify that they are qualified to prescribe MIFEPREX (mifepristone) and are able to assure patient access to appropriate medical facilities to manage any complications.

Your proposed REMS, as amended and appended to this letter, is approved.  The REMS consists of a Medication Guide, elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS.

We remind you that section 505-1(f)(8) of FDCA prohibits holders of an approved covered application with elements to assure safe use from using any element to block or delay approval of an application under section 505(b)(2) or (j).  A violation of this provision in 505-1(f) could result in enforcement action.

The REMS assessment plan will include the information submitted to FDA on May 27, 2011, and should include the following information:

a.  Per section 505-1(g)(3)(A), an assessment of the extent to which the elements to assure safe use are meeting the goal or goals to mitigate a specific serious risk listed in the labeling of the drug, or whether the goal or goals or such elements should be modified.

b.  Per section 505-1(g)(3)(B) and (C), information on the status of any postapproval study or clinical trial required under section 505(o) or otherwise undertaken to investigate a safety issue.  With respect to any such postapproval study, you must include the status of such study, including whether any difficulties completing the study have been encountered.  With respect to any such postapproval clinical trial, you must include the status of such clinical trial, including whether enrollment has begun, the number of participants enrolled, the expected completion date, whether any difficulties completing the clinical trial have been encountered, and registration information with respect to requirements under subsections (i) and (j) of section 402 of the Public Health Service Act.  You can satisfy these requirements in your REMS assessments by referring to relevant information included in the most recent annual report required under section 506B and 21 CFR 314.81(b)(2)(vii) and including any updates to the status information since the annual report was prepared.  Failure to comply with the REMS assessments provisions in section 505-1(g) could result in enforcement action.

We remind you that in addition to the assessments submitted according to the timetable included in the approved REMS, you must submit a REMS assessment and may propose a modification to the approved REMS when you submit a supplemental application for a new indication for use as described in Section 505-1(g)(2)(A) of FDCA.

Prominently identify future submissions containing the REMS assessments or proposed modifications with the following wording in bold capital letters at the top of the first page of the submission:

**NDA 020687 REMS ASSESSMENT**

**NEW SUPPLEMENT FOR NDA 020687**
**PROPOSED REMS MODIFICATION**
**REMS ASSESSMENT**

**NEW SUPPLEMENT (NEW INDICATION FOR USE) FOR NDA 020687**
**REMS ASSESSMENT**
**PROPOSED REMS MODIFICATION (if included)**

If you do not submit electronically, please send 5 copies of REMS-related submissions.

As part of the approval under Subpart H, as required by 21 CFR 314.550, you must submit all promotional materials, including promotional labeling as well as advertisements, at least 30 days

NDA 020687/S-014
Page 3

before the intended time of initial distribution of the labeling or initial publication of the advertisement.  Send one copy to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (b) (6) and two copies of the promotional materials and the package insert directly to:

      Food and Drug Administration
      Center for Drug Evaluation and Research
      Division of Drug Marketing, Advertising, and Communications
      Food and Drug Administration
      5901-B Ammendale Road
      Beltsville, MD 20705-1266

## REPORTING REQUIREMENTS

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (b) (6)
▮▮▮▮▮▮▮

                    Sincerely,

                    *{See appended electronic signature page}*

                    (b) (6)

ENCLOSURES:
      REMS Document
      REMS Materials

--------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------

/s/

-------------------------------------------------

(b) (6)

06/08/2011

# EXHIBIT 30

2011 REMS for NDA 20-687 Mifeprex
(mifepristone) Tablets, 200mg
(June 8, 2011)
("2011 REMS")

NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg

Danco Laboratories, LLC PO Box 4816
New York, NY 10185

RISK EVALUATION AND MITIGATION STRATEGY (REMS)

## I.    GOALS

A.   To provide information to patients about the benefits and risks of MIFEPREX before they make a decision whether to take the drug.

B.   To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe MIFEPREX and are able to assure patient access to appropriate medical facilities to manage any complications.

## II.   REMS ELEMENTS

A.   <u>Medication Guide</u>

1.   A Medication Guide will be dispensed with each MIFEPREX prescription in accordance with 21 CFR 208.24.

2.   Please see the appended Medication Guide.

B.   <u>Elements to Assure Safe Use</u>

1.   Healthcare providers who prescribe MIFEPREX will be specially certified.

Danco will ensure that healthcare providers who prescribe MIFEPREX are specially certified.

a.   To become specially certified, each prescriber must complete and fax to the MIFEPREX distributor the one-time Prescriber's Agreement, agreeing that they meet the qualifications and will follow the guidelines outlined in the Prescriber's Agreement.

b.   The following materials are part of the REMS and are appended:

i.   Prescriber's Agreement.

ii.   Patient Agreement.

2.  MIFEPREX will be dispensed only in certain health care settings, specifically clinics, medical offices, and hospitals.

Danco will ensure that MIFEPREX will only be available to be dispensed in a clinic, medical office, or hospital, by or under the supervision of a specially certified prescriber.  MIFEPREX will not be distributed to or dispensed through retail pharmacies.

3.  MIFEPREX will only be dispensed to patients with documentation of safe use conditions.

Danco will ensure that MIFEPREX will only be dispensed to patients with documentation of the following safe use conditions:

a.  The patient has completed and signed the Patient Agreement, and the Patient Agreement has been placed in the patient's medical record.

b.  The patient has been provided copies of the signed Patient Agreement and the Medication Guide.

C.  <u>Implementation System</u>

The Implementation System will include the following:

1.  Distributors who distribute MIFEPREX will be certified.  To become certified, distributors must agree to:

a.  Ship drug only to site locations identified by specially certified prescribers in signed Prescriber's Agreements, and maintain secure and confidential records of shipments.

b.  Follow all distribution guidelines, including those for storage, tracking package serial numbers, proof of delivery, and controlled returns.

2.  Danco will assess the performance of the certified distributors with regard to the following:

a.  Whether a secure, confidential and controlled distribution system is being maintained with regard to storage, handling, shipping, and return of MIFEPREX.

b.  Whether MIFEPREX is being shipped only to site locations identified by specially certified prescribers in the signed Prescriber's Agreement and only available to be dispensed to patients in a clinic, medical office, or hospital by or under the supervision of a specially certified prescriber.

Reference ID: 2957855

3.  If Danco determines the distributors are not complying with these requirements, Danco will take steps to improve their compliance.

D.  <u>Timetable for Submission of Assessments</u>

Danco will submit REMS assessments to the FDA one year from the date of the approval of the REMS and every three years thereafter.  To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the assessment reporting interval covered by each assessment should conclude no earlier than 60 days before the submission date for that assessment.  Danco will submit each assessment so that it will be received by the FDA on or before the due date.

3

## MEDICATION GUIDE

**Mifeprex**® (MIF-eh-prex)
(mifepristone)

Read this information carefully before taking Mifeprex* and misoprostol.  It will help you understand how the treatment works. This MEDICATION GUIDE does not take the place of talking with your health care provider (provider).

# What is Mifeprex?

**Mifeprex is used to end an early pregnancy.**  It blocks a hormone needed for your pregnancy to continue.  It is not approved for ending later pregnancies.  Early pregnancy means it is 49 days (7 weeks) or less since your last menstrual period began.  When you use Mifeprex (Day 1), you also need to take another medicine misoprostol, 2 days after you take Mifeprex (Day 3), to end your pregnancy.  But, about 5-8 out of 100 women taking Mifeprex will need a surgical procedure to end the pregnancy or to stop too much bleeding.

# What is the most important information I should know about Mifeprex?

**What symptoms should I be concerned with?**  Although cramping and bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth. Prompt medical attention is needed in these circumstances.  Serious infection has resulted in death in a very small number of cases; in most of these cases misoprostol was used in the vagina.  There is no information that use of Mifeprex and misoprostol caused these deaths.  If you have any questions, concerns, or problems, or if you are worried about any side effects or symptoms, you should contact your provider.  Your provider's telephone number is _____.

**Be sure to contact your provider promptly if you have any of the following:**

> **Heavy Bleeding.**  Contact your provider right away if you bleed enough to soak through two thick full-size sanitary pads per hour for two consecutive hours or if you are concerned about heavy bleeding.  In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical abortion/D&C) to stop it.

> **Abdominal Pain or "Feeling Sick".**  If you have abdominal pain or discomfort, or you are "feeling sick", including weakness, nausea, vomiting or diarrhea, with or without fever, more than 24 hours after taking misoprostol, you should contact your provider without delay.  These symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

> **Fever.**  In the days after treatment, if you have a fever of 100.4°F or higher that lasts for more than 4 hours, you should contact your provider right away.  Fever may be a symptom of a serious infection or another problem (including an ectopic pregnancy).

**Take this MEDICATION GUIDE with you.**  When you visit an emergency room or a provider who did not give you your Mifeprex, you should give them your MEDICATION GUIDE so that

they understand that you are having a medical abortion with Mifeprex.

**What to do if you are still pregnant after Mifeprex with misoprostol treatment.** If you are still pregnant, your provider will talk with you about the other choices you have, including a surgical procedure to end your pregnancy.  There is a chance that there may be birth defects if the pregnancy is not ended.

**Talk with your provider.**  Before you take Mifeprex, you should read this MEDICATION GUIDE and sign a statement (PATIENT AGREEMENT).  You and your provider should discuss the benefits and risks of your using Mifeprex.

## Who should not take Mifeprex?

Some women should not take Mifeprex.  Do not take it if:
- It has been more than 49 days (7 weeks) since your last menstrual period began.
- You have an IUD.  It must be taken out before you take Mifeprex.
- Your provider has told you that you have a pregnancy outside the uterus (ectopic pregnancy).
- You have problems with your adrenal glands (chronic adrenal failure).
- You take a medicine to thin your blood.
- You have a bleeding problem.
- You take certain steroid medicines.
- You cannot return for the next 2 visits.
- You cannot easily get emergency medical help in the 2 weeks after you take Mifeprex.
- You are allergic to mifepristone, misoprostol, or medicines that contain misoprostol, such as Cytotec or Arthrotec.

Tell your provider about all your medical conditions to find out if you can take Mifeprex.  Also, tell your provider if you smoke at least 10 cigarettes a day.

## How should I take Mifeprex?

- **Day 1 at your provider's office:**
  - Read this MEDICATION GUIDE.
  - Discuss the benefits and risks of using Mifeprex to end your pregnancy.
  - If you decide Mifeprex is right for you, sign the PATIENT AGREEMENT.
  - After getting a physical exam, swallow 3 tablets of Mifeprex.
- **Day 3 at your provider's office:**
  - If you are still pregnant, take 2 misoprostol tablets.
  - Misoprostol may cause cramps, nausea, diarrhea, and other symptoms.  Your provider may send you home with medicines for these symptoms.
- **About Day 14 at your provider's office:**
  - This follow-up visit is very important. You must return to the provider about 14 days after you have taken Mifeprex to be sure you are well and that you are not pregnant.
  - Your provider will check whether your pregnancy has completely ended.  If it has not ended, there is a chance that there may be birth defects.  If you are still pregnant, your provider will talk with you about the other choices you have, including a surgical procedure to end your pregnancy.

## What should I avoid while taking Mifeprex and misoprostol?

Do not take any other prescription or non-prescription medicines (including herbal medicines or supplements) at any time during the treatment period without first asking your provider about them because they may interfere with the treatment. Ask your provider about what medicines you can take for pain.

If you are breastfeeding at the time you take Mifeprex and misoprostol, discuss with your provider if you should stop breastfeeding for a few days.

## What are the possible and reasonably likely side effects of Mifeprex?

Cramping and bleeding are expected with this treatment. Usually, these symptoms mean that the treatment is working. But sometimes you can get cramping and bleeding and still be pregnant. This is why you must return to your provider on Day 3 and about Day 14. See "How should I take Mifeprex?" for more information on when to return to your provider. If you are not already bleeding after taking Mifeprex, you probably will begin to bleed once you take misoprostol, the medicine you take on Day 3. Bleeding or spotting can be expected for an average of 9–16 days and may last for up to 30 days. Your bleeding may be similar to, or greater than, a normal heavy period. You may see blood clots and tissue. This is an expected part of ending the pregnancy.

Other common symptoms of treatment include diarrhea, nausea, vomiting, headache, dizziness, back pain, and tiredness. These side effects lessen after Day 3 and are usually gone by Day 14. Your provider will tell you how to manage any pain or other side effects.

Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

## When should I begin birth control?

You can become pregnant again right after your pregnancy ends. If you do not want to become pregnant again, start using birth control as soon as your pregnancy ends or before you start having sexual intercourse again.

*   *   *

Medicines are sometimes prescribed for purposes other than those listed in a MEDICATION GUIDE. For more information, ask your provider for the information about Mifeprex that is written for health care professionals. Ask your provider if you have any questions.

This MEDICATION GUIDE has been approved by the U.S. Food and Drug Administration.

Rev 3: 4/22/09
*Mifeprex is a registered trademark of Danco Laboratories, LLC.

M I F E P R E X®
(Mifepristone) Tablets, 200 mg

## PRESCRIBER'S AGREEMENT

We are pleased that you wish to become a provider of Mifeprex* (Mifepristone) Tablets, 200 mg, which is indicated for the medical termination of intrauterine pregnancy through 49 days from the first day of the patient's last menstrual period (see full prescribing information). Prescribing Information, Mifeprex Medication Guides and PATIENT AGREEMENT forms will be provided together with your order of Mifeprex.

Prior to establishing your account and receiving your first order, you must sign and return this letter to the distributor, indicating that you have met the qualifications outlined below and will observe the guidelines outlined below. If you oversee more than one office facility, you will need to list each facility on your order form prior to shipping the first order.

By signing the reverse side, you acknowledge receipt of the PRESCRIBER'S AGREEMENT and agree that you meet these qualifications and that you will follow these guidelines for use. You also understand that if you do not follow these guidelines, the distributor may discontinue distribution of the drug to you.

Under Federal law, Mifeprex must be provided by or under the supervision of a physician who meets the following qualifications:

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the prescribing information of Mifeprex. The prescribing information is attached to this letter, and is also available by calling our toll free number, 1-877-4 Early Option (1-877-432-7596), or logging on to our website, www.earlyoptionpill.com.

In addition to these qualifications, you must provide Mifeprex in a manner consistent with the following guidelines.

- Under Federal law, each patient must be provided with a Medication Guide. You must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and PATIENT AGREEMENT, give her an opportunity to read and discuss them, obtain her signature on the PATIENT AGREEMENT, and sign it yourself.

- The patient's follow-up visit at approximately 14 days is very important to confirm that a complete termination of pregnancy has occurred and that there have been no complications. You must notify Danco Laboratories in writing as discussed in the Package Insert under the heading DOSAGE AND ADMINISTRATION in the event of an on-going pregnancy which is not terminated subsequent to the conclusion of the treatment procedure.

- While serious adverse events associated with the use of Mifeprex are rare, you must report any hospitalization, transfusion or other serious event to Danco Laboratories, identifying the patient solely by package serial number to ensure patient confidentiality.

- Each package of Mifeprex has a serial number. As part of maintaining complete records for each patient, you must record this identification number in each patient's record.

Danco Laboratories, LLC
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596)
www.earlyoptionpill.com
*MIFEPREX is a registered trademark of Danco Laboratories, LLC.

Reference ID: 2957855

# ACCOUNT SETUP FORM
**MIFEPREX™ (Mifepristone) Tablets, 200 mg; NDC 64875-001-03**

**To set up your account:**

**1**

Read the Prescriber's Agreement on the back of this Account Setup Form.

**2**

Complete and sign this form.

**3**

Fax the completed Account Setup Form to the Danco distributor at 1-866-227-3343. Your account information will be kept strictly confidential.

**4**

The distributor will call to finalize your account setup and take your initial order.

**5**

Subsequent orders may be phoned in and are usually shipped within 24 hours.

**6**

Unopened, unused product may be returned for a refund or exchange up to a year after the expiration date.

## Billing information

Bill to Name _____

Address _____

City _____  State _____ ZIP _____

Phone _____  Fax _____

Attention _____

## Shipping information  (❏ Check if same as above)

Ship to Name _____

Address _____

City _____  State _____ ZIP _____

Phone _____  Fax _____

Attention _____

## Additional site locations

I will also be prescribing Mifeprex* at these additional locations:

| Name _____ | Address _____ |
|---|---|
| City _____ | State _____ ZIP _____ |
| Phone _____ | Fax _____ |

| Name _____ | Address _____ |
|---|---|
| City _____ | State _____ ZIP _____ |
| Phone _____ | Fax _____ |

(Any additional sites may be listed on an attached sheet of paper.)

## Request additional materials

❏ Medication Guides          ❏ Patient Agreements

❏ State Abortion Guidelines   ❏ Patient Brochures

## Establishing your account (required only with first order)

Each facility purchasing Mifeprex must be included on this form (see additional site locations box above) before the distributor can ship the product. Please read the Prescriber's Agreement on the reverse of this form and sign below.

**By signing below, you acknowledge receipt of the Prescriber's Agreement and agree that you meet these qualifications and that you will follow these guidelines for use.**

Print Name _____  Signature _____

Medical License # _____  Date _____

## Fax this completed Account Setup Form to the authorized distributor. Fax: 1-866-227-3343

Please fax any questions to the above number or call 1-800-848-6142.

*Mifeprex is a trademark of Danco Laboratories, LLC.

MIFEPREX™
(Mifepristone) Tablets, 200 mg

OWEB
515

Mifeprex® (Mifepristone) Tablets, 200 mg

## PATIENT AGREEMENT
Mifeprex* (mifepristone) Tablets

1. I have read the attached MEDICATION GUIDE for using Mifeprex and misoprostol to end my pregnancy.
2. I discussed the information with my health care provider (provider).
3. My provider answered all my questions and told me about the risks and benefits of using Mifeprex and misoprostol to end my pregnancy.
4. I believe I am no more than 49 days (7 weeks) pregnant.
5. I understand that I will take Mifeprex in my provider's office (Day 1).
6. I understand that I will take misoprostol in my provider's office two days after I take Mifeprex (Day 3).
7. My provider gave me advice on what to do if I develop heavy bleeding or need emergency care due to the treatment.
8. Bleeding and cramping do not mean that my pregnancy has ended.  Therefore, I must return to my provider's office in about 2 weeks (about Day 14) after I take Mifeprex to be sure that my pregnancy has ended and that I am well.
9. I know that, in some cases, the treatment will not work.  This happens in about 5 to 8 women out of 100 who use this treatment.
10. I understand that if my pregnancy continues after any part of the treatment, there is a chance that there may be birth defects.  If my pregnancy continues after treatment with Mifeprex and misoprostol, I will talk with my provider about my choices, which may include a surgical procedure to end my pregnancy.
11. I understand that if the medicines I take do not end my pregnancy and I decide to have a surgical procedure to end my pregnancy, or if I need a surgical procedure to stop bleeding, my provider will do the procedure or refer me to another provider who will.   I have that provider's name, address and phone number.
12. I have my provider's name, address and phone number and know that I can call if I have any questions or concerns.
13. I have decided to take Mifeprex and misoprostol to end my pregnancy and will follow my provider's advice about when to take each drug and what to do in an emergency.
14. I will do the following:
- contact my provider right away if in the days after treatment I have a fever of 100.4°F or higher that lasts for more than 4 hours or severe abdominal pain.
- contact my provider right away if I have heavy bleeding (soaking through two thick full-size sanitary pads per hour for two consecutive hours).
- contact my provider right away if I have abdominal pain or discomfort, or I am "feeling sick", including weakness, nausea, vomiting or diarrhea, more than 24 hours after taking misoprostol.
- take the MEDICATION GUIDE with me when I visit an emergency room or a provider who did not give me Mifeprex, so that they will understand that I am having a medical abortion with Mifeprex.
- return to my provider's office in 2 days (Day 3) to check if my pregnancy has ended.  My provider will give me misoprostol if I am still pregnant.
- return to my provider's office about 14 days after beginning treatment to be sure that my pregnancy has ended and that I am well.


Patient Signature: _____

Patient Name (print): _____

Date: _____

The patient signed the PATIENT AGREEMENT in my presence after I counseled her and answered all her questions.  I have given her the MEDICATION GUIDE for mifepristone.

Provider's Signature: _____

Name of Provider (print): _____

Reference ID: 2957855

516

Date: _____

After the patient and the provider sign this PATIENT AGREEMENT, give 1 copy to the patient before she leaves the office and put 1 copy in her medical record.  Give a copy of the MEDICATION GUIDE to the patient.

Rev 2: 7/19/05
*Mifeprex is a registered trademark of Danco Laboratories, LLC.

-2-

517