## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| **State of Missouri,** *et al.*, <br><br>    *Intervenor-Plaintiffs,* and <br><br> **State of Florida, State of Texas,** <br><br>    *Proposed Intervenor-Plaintiffs,* and <br><br> **Rosalie Markezich** and **State of Louisiana,** by and through its Attorney General, **Liz Murrill**, <br><br>    *Proposed Intervenor-Plaintiffs,* <br> v. <br><br> **United States Food and Drug Administration,** et al., <br>    *Defendants,* <br><br> **Danco Laboratories, LLC,** <br><br>    *Intervenor-Defendant*, and <br><br> **GenBioPro, Inc.,** <br><br>    *Intervenor-Defendant.* | **Civ. No. 2:22-cv-00223-Z** |

## ROSALIE MARKEZICH AND THE STATE OF LOUISIANA'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR LEAVE TO INTERVENE

Rosalie Markezich and the State of Louisiana, by and through its Attorney General Liz Murrill, in support of their Motion for Leave to Intervene under Fed. R. Civ. P. 24(a) and (b), state as follows.

# **TABLE OF CONTENTS**

Introduction ...................................................................................................... 1

Procedural History............................................................................................. 4

Additional Facts Relevant to Intervention ...................................................... 5

Analysis .............................................................................................................. 8

I.    Movants have a right to intervene under Fed. R. Civ. P. 24(a)(2). ................... 8

    A.    The motion is timely.............................................................................. 9

        1.    A reasonable length of time has passed since Movants had
            reason to believe their interests are not adequately
            protected........................................................................................ 9

        2.    Intervention will prevent prejudice to Movants without
            causing any to existing parties. ................................................... 15

        3.    Given the unusual circumstances, intervention is now both
            timely and justified...................................................................... 17

    B.    Movants have an interest relating to the property or transaction at
        the heart of this action. ......................................................................... 18

    C.    The disposition of this action could impair Movants' ability to
        protect their interests. .......................................................................... 20

    D.    Movants' interests are not adequately represented by Plaintiffs. ....... 20

II.    In the alternative, the Court should allow permissive intervention under
    Fed. R. Civ. P. 24(b)(1)(B). ................................................................................ 21

    A.    The motion is timely.............................................................................. 22

    B.    Movants' claims share questions of law and fact with the main
        action...................................................................................................... 22

    C.    Intervention will not cause undue delay or prejudice. ......................... 23

    D.    The Court should exercise its discretion to allow Movants to
        intervene. ............................................................................................... 24

Conclusion.......................................................................................................... 24

ii

## **TABLE OF AUTHORITIES**

### **Cases**

*Alliance for Hippocratic Medicine v. FDA,*
    No. 2:22-CV-223-Z, 2024 WL 1260639 (N.D. Tex. Jan. 12, 2024) ................. 23

*Association of Professional Flight Attendants v. Gibbs,*
    804 F.2d 318 (5th Cir. 1986) ............................................................................ 15

*Brumfield v. Dodd,*
    749 F.3d 399 (5th Cir. 2014) ...................................................................... 19, 20

*Comprehensive Health of Planned Parenthood Great Plains v. State,*
    No. 2416-CV31931, 2025 WL 1898975 (Mo. Ct. App. July 03, 2025).......... 8, 13

*Comprehensive Health of Planned Parenthood Great Plains v. State,*
    No. SC 101176, 2025 WL 2346611 (Mo. Aug. 12, 2025) ................................. 13

*Edwards v. City of Houston,*
    78 F.3d 983 (5th Cir. 1996) ................................................................ 15, 16, 17

*EEOC v. Commercial Coating Service, Inc.,*
    220 F.R.D. 300 (S.D. Tex. 2004) ..................................................................... 24

*EEOC v. Wellpath LLC,*
    No. 5:20-CV-1092-DAE, 2021 WL 4096556 (W.D. Tex. Mar. 15, 2021) .......... 23

*FDA v. Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024) .......................................................................................... 4

*General Land Office v. Trump,*
    No. 24-40447, 2025 WL 1410414 (5th Cir. May 15, 2025)............................... 16

*Heaton v. Monogram Credit Card Bank of Georgia,*
    297 F.3d 416 (5th Cir. 2002) ........................................................................... 20

*Hodes & Nauser, MDs, P.A. v. Kobach,*
    551 P.3d 37 (Kan. 2024) ............................................................................. 8, 14

*John Doe No. 1 v. Glickman,*
    256 F.3d 371 (5th Cir. 2001) .................................................................. passim

*McDonald v. E. J. Lavino Co.,*
    430 F.2d 1065 (5th Cir. 1970) .................................................................. 16, 24

*National Horsemen's Benevolent and Protective Association v. Black,*
    No. 5:21-cv-071, 2022 WL 974335 (N.D. Tex. Mar. 31, 2022) ........................ 23

*Newby v. Enron Corp.,*
    443 F.3d 416 (5th Cir. 2006) ............................................................. 22

*Purl v. Health and Human Services,*
    No. 2:24-CV-228-Z, 2025 WL 1708137 (N.D. Tex. June 18, 2025) ................. 17

*Sierra Club v. City of San Antonio,*
    115 F.3d 311 (5th Cir. 1997) ...................................................... 18, 19

*Sierra Club v. Espy,*
    18 F.3d 1202 (5th Cir. 1994) ................................................... passim

*Stallworth v. Monsanto Company,*
    558 F.2d 257 (5th Cir. 1977) ................................................ 9, 22, 24

*Students for Fair Admissions, Inc. v. University of Texas at Austin,*
    338 F.R.D. 364 (W.D. Tex. 2021) .................................................... 23

*Texas v. United States,*
    805 F.3d 653 (5th Cir. 2015) ............................................. 18, 22, 24

*Texas v. United States,*
    No. 4:18-CV-00167-O, 2018 WL 10562846 (N.D. Tex. May 16, 2018) ........... 21

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ........................................................................ 17

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverages Commission,*
    834 F.3d 562 (5th Cir. 2016) .......................................... 9, 16, 18

## **Other Authorities**

A.B 250, 2025–2026 Reg. Sess. (Cal. 2025)................................................ 13

## **Rules**

Federal Rule of Civil Procedure 24 ......................................... 8, 22, 23, 24

## INTRODUCTION

"I mourned the child I thought I was going to have."[1]

Rosalie Markezich did not want to have an abortion.[2] She had told her boyfriend that she wanted to raise their unborn child.[3] Yet he went online, filled out a form with her information, and had chemical abortion drugs sent to her home in Louisiana.[4] Rosalie wanted to keep the baby and pleaded with him, "[d]on't make me do this."[5] But he became angry and started shouting at her.[6] Under immense pressure and terrified for her safety, she felt that she had no choice but to take the abortion drugs.[7]

Abortion drugs are illegal in Louisiana. But with the click of a few buttons and in just days, a man easily obtained them through the U.S. Postal Service from a doctor in California and coerced his girlfriend to take them. This is the devastating reality of mail-order abortion drugs.

Although *Dobbs v. Jackson Women's Health Organization* promised to return the issue of abortion to the states—and many states have acted on that pledge—the number of abortions nationwide has, in fact, increased.[8] Newly available data from abortion providers reveal that the number of mail-order abortions in Louisiana has steadily grown to nearly 800 per month.[9] That number should be approaching zero.

---

[1] Ex. 92, Declaration of Rosalie Markezich ¶ 17, App. 1373.

[2] *Id.* ¶ 16, App. 1373.

[3] *Id.* ¶¶ 5, 10, App. 1371–72.

[4] *Id.* ¶¶ 7, 9, App. 1371–72.

[5] *Id.* ¶ 11, App. 1372.

[6] *Id.* ¶ 12, App. 1372.

[7] *Id.* ¶¶ 10–13, App. 1372.

[8] Ex. 2, Society of Family Planning, #WeCount Report April 2022 to December 2024 at PowerPoint slide 4 (Jun. 23, 2025), perma.cc/RM6F-H2Q9, App. 0062.

[9] *Id.* at PowerPoint slide 35, App. 0093.

But it continues to grow due to the Biden Food and Drug Administration's unlawful decision in 2023 to permanently authorize the mail-order dispensing of abortion drugs. Now out-of-state doctors and other activists send hundreds of abortion drugs into Louisiana each month for the express purpose of violating Louisiana's pro-life laws and destroying its unborn children. No matter the consequences.

During much of this case, Louisiana was unaware of specific evidence quantifying the scope of this problem in the State, and so it sought to enforce abortion regulations against individual doctors and activists in other states.[10] But new data show that the problem far outpaces individual enforcement efforts. In the meantime, individual enforcement actions have not proven successful, as pro-abortion states have refused to enforce judgments or extradite mail-order abortion-drug providers to Louisiana.[11] A growing number of states have also started anonymizing abortion drug prescriptions—making enforcement at this granular level all but impossible.[12] Some even omit the names of the drug recipients, emboldening abusers who intend to coerce or trick women—and washing away inculpatory evidence.[13]

At the same time, abortion drugs remain high-risk. FDA acknowledges that roughly 1 in 25 women who use mifepristone *as directed* will end up in the emergency room and up to 7% will require a "surgical procedure because the pregnancy did not

---

[10] *See, e.g.*, Ex. 4, Dr. Margaret Carpenter Indictment, App. 0130–31.

[11] *See, e.g.*, Ex. 85, Katherine Donlevy, *Louisiana DA warns there's trove of evidence against NY doctor who allegedly mailed abortion pills to teen – who was planning gender reveal party: report*, N.Y. Post (Feb. 15, 2025), perma.cc/N6UV-2VF5, App. 1324–28.

[12] Ex 88, Press Release, *Protecting Reproductive Freedom: Governor Hochul Signs Legislation Affirming New York's Status as a Safe Haven for Reproductive Health Care* (Feb. 3, 2025), perma.cc/ZSH6-J6HW, App.1337.

[13] *See, e.g.*, Ex. 105, Pam Belluck, *California Passes Bill Allowing Omission of Patients' Names from Abortion Pill Bottles*, N.Y. Times (Sept. 11, 2025), perma.cc/U25B-S4M2, App. 2040–42.

completely pass from the uterus or to stop bleeding."[14] And a new 2025 study of insurance-claims data suggests that the real-world complication rate is far higher: over 10% of women who take abortion drugs may suffer a "serious adverse event" like sepsis or hemorrhaging.[15]

This case is about whether FDA's 2023 removal of in-person safeguards on abortion drugs was unlawful. Rosalie and other women like her have an interest in continuing their pregnancies without risking coercion. They have an interest in protecting the lives of their unborn children. And Louisiana has strong interests in rolling back this harmful Biden Administration action—to protect its women and unborn children. It also makes sense for this issue to be resolved in a single forum where the issue is already live, rather than litigate it piecemeal across multiple states, with duplicate discovery and briefing, and the risk of inconsistent judgments.

None of the existing or proposed Plaintiff-Intervenor States can stand in for Rosalie. Nor can anyone else speak for Louisiana and its sovereign interests. And while Plaintiff States Missouri, Kansas, and Idaho originally appeared poised to seek prospective relief that would benefit the shared interests of other states, recent legal and factual developments suggest that they may no longer be in a long-term position to do so. Rosalie and Louisiana thus seek to intervene in this action to preserve their interests and promote judicial efficiency.[16]

---

[14] Ex. 9, FDA-Approved Label for Mifepristone (Mifeprex) at 8, Table 2, & 17 (Jan. 2023), perma.cc/2UJ5-8WVF, App. 0202.

[15] Ex. 13, Jamie Bryan Hall & Ryan T. Anderson, *The Abortion Pill Harms Women: Insurance Data Reveals One in Ten Patients Experiences a Serious Adverse Event*, Ethics & Pub. Pol'y Ctr. at 1 (Apr. 28, 2025), perma.cc/YH5F-9R6C, App. 0294.

[16] The Court should rule on the intervention motions in the order filed. Given the complex procedural posture of this case, it could be that, if intervention for Florida and Texas occurs, their complaint may be construed as a new case. Movants thus seek to intervene in both the original action and in any new action from Florida and Texas. If the latter, Movants request that this motion be considered anticipatory and filed nun pro tunc as of the date of Florida and Texas's complaint.

## PROCEDURAL HISTORY

After several doctors and medical organizations sued FDA in November 2022 over various FDA actions about mifepristone, Compl., Dkt. No. 1 (Nov. 18, 2022), Danco, the manufacturer of brand-name mifepristone (Mifeprex), filed an unopposed motion for leave to intervene as a defendant in January 2023, Mot. to Intervene, Dkt. No. 19 (Jan. 13, 2023). Later that year, while this case was stayed pending appeal, Missouri, Kansas, and Idaho moved to intervene as plaintiffs. Mot. to Intervene, Dkt. No. 151 (Nov. 3, 2023). The Court granted the motion on January 12, 2024, over Defendants' objection. Resp. and Object., Dkt. No. 163 (Dec. 16, 2023); Resp. and Object., Dkt. No. 164 (Dec. 18, 2023); Order Granting States' Mot. to Intervene, Dkt. No. 175 (Jan. 12, 2024).

On June 13, 2024, the United States Supreme Court held that the doctors and medical organizations lacked standing. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 374, 385–93, 396 (2024). Plaintiff States then sought leave to file an amended complaint. Mot. for Leave to File Am. Compl., Dkt. No. 195 (Oct. 11, 2024). The Court granted the motion on January 16, 2025. Order Granting Mot. for Leave to File Am. Compl., Dkt. No. 215 (Jan. 16, 2025); Am. Compl., Dkt. No. 217 (Jan. 16, 2025). FDA and Danco moved to dismiss it. FDA's Mot. to Dismiss Am. Compl., Dkt. No. 218 (Jan. 18, 2025); Danco's Mot. to Dismiss Am. Compl., Dkt. No. 221 (Jan. 28, 2025). FDA and Danco filed replies supporting their motions to dismiss on May 5, 2025, but this Court has yet to rule on those motions. FDA's Reply, Dkt. No. 247 (May 5, 2025); Danco's Reply, Dkt. No. 248 (May 5, 2025); *see also* GenBioPro's Notice Regarding Position, Dkt. No. 249 (May 5, 2025).

GenBioPro, the generic manufacturer of mifepristone, also moved to intervene as a defendant, explaining that Danco no longer adequately represented its interests because the amended complaint challenged the 2019 approval of generic mifepristone without challenging the 2000 approval of Mifeprex. Mot. to Intervene, Dkt. No. 229

(Feb. 25, 2025). Plaintiff States objected. Resp. to Mot. to Intervene, Dkt. No. 243 (Mar. 18, 2025). The Court granted GenBioPro's motion on April 28, 2025. Memo. Op. and Order Granting Mot. to Intervene, Dkt. No. 246 (Apr. 28, 2025).

On August 22, 2025, the States of Florida and Texas moved to intervene as plaintiffs, explaining that Plaintiff States Missouri, Idaho, and Kansas no longer adequately represent their interests. Br. in Supp. of Mot. to Intervene, Dkt. No. 255 (Aug. 22, 2025). Rosalie and Louisiana now do the same.

### ADDITIONAL FACTS RELEVANT TO INTERVENTION

Five new developments are relevant to Rosalie and Louisiana's intervention.

*First*, Rosalie became a victim of FDA's recklessness in late 2023. The State found out about Rosalie's circumstances in 2024, and it issued a warrant for the arrest of the California-based doctor from whom Rosalie's boyfriend ordered the abortion drugs. That warrant remains outstanding. Rosalie learned about this case and the opportunity to seek relief against FDA in 2025.

*Second*, newly released, state-specific data from pro-abortion activists have uncovered the hitherto-unproven extent of Louisiana's ongoing injuries.

On June 23, 2025, the Society of Family Planning published a nationwide #WeCount report, which draws data from clinics, private medical offices, hospitals, and virtual providers. It shows how many mail-order abortion drugs are being sent into states with abortion restrictions. Among its principal findings: the share of abortions conducted via telehealth rose from 5% in the second quarter of 2022 to 25% by December 2024—with huge numbers of mail-order abortion drugs flooding states with pro-life laws.[17]

---

[17] Ex. 2, Society of Family Planning, #WeCount Report April 2022 to December 2024 at PowerPoint slide 9 (Jun. 23, 2025), perma.cc/RM6F-H2Q9, App. 0067.

In Louisiana, the numbers are staggering. Even after Dobbs and when Louisiana's abortion prohibition (with narrow exceptions) took effect, FDA's approval of mifepristone-by-mail increased the number of abortions Louisianans obtained.[18] An October 2024 #WeCount report was the first to report state-specific data. It found that, "between July 2023 to June 2024," there were "from 310 to 620" mail-order abortions per month in Louisiana.[19] Then the June 23, 2025, report revealed that from April to June 2024, the average number of mail-order abortions reached 617 per month in the State.[20] In December 2024 alone, the monthly count of mail-order abortions in Louisiana reached 800.[21]

It was possible at the time of #WeCount's initial October 2024 report for this trend to reverse (such as if individual enforcement actions succeeded) or it was possible that doubts would arise as whether publication of this limited data set would continue. But then the second report in June 2025 came out showing a steady increase in the number of mail-order abortions in Louisiana. This problem isn't going away.

*Third,* individual enforcement efforts have proven unable to stop this deluge. For example, on January 31, 2025, a Louisiana grand jury indicted New York doctor Margaret Carpenter, for mailing FDA-approved mifepristone into Louisiana.[22] In April 2024, Dr. Carpenter allegedly prescribed and mailed abortion drugs to a woman in Louisiana who then forced her pregnant teenage daughter to take the drugs alone

---

[18] Louisiana has enacted sovereign laws prohibiting (with narrow exceptions) abortion. *See, e.g.*, La. Stat. Ann. §§ 40:1061(C), 14:87.9(A), 40:1061.11(A). So each pill of mifepristone that is mailed directly to a person in Louisiana to cause an abortion directly violates Louisiana's laws.

[19] Ex. 1, Society of Family Planning, #WeCount Report April 2022 to June 2024 at 10, App. 0011.

[20] *Id.*

[21] Ex. 2, Society of Family Planning, #WeCount Report April 2022 to December 2024 at PowerPoint slide 35, App. 0093.

[22] Ex. 4, Dr. Margaret Carpenter indictment, App. 0131.

at home, despite the daughter's apparent desire to keep her child.[23] The daughter experienced a medical emergency, called 911, and was taken to the hospital in an ambulance.[24] But New York Governor Kathy Hochul refused to extradite Dr. Carpenter,[25] even though Dr. Carpenter and others are being investigated for more violations of Louisiana law.[26] Governor Hochul expressed her defiance on X: "Let me be clear: we will never comply with Louisiana's extradition request. Not now, not ever."[27]

*Fourth*, pro-abortion states are taking steps to obstruct the enforcement of pro-life states' laws—and to hinder women from seeking redress against abortion-drug providers. Eight states have recently passed laws allowing abortion-drug prescribers to prescribe abortion drugs anonymously. California's anonymity provision—passed just last week—even allows the *recipient* to remain anonymous.[28] Not only does this attempt to shield providers who send abortion drugs illegally into pro-life states from liability, but omitting basic information from drug bottles also provides cover for abusers. These anonymity laws prevent women like Rosalie and states like Louisiana

---

[23] Ex. 84, Rosemary Westwood, *After Historic Indictment, Doctors Will Keep Mailing Abortion Pills Over State Lines*, NPR (Mar. 19, 2025), perma.cc/CQ6Z-SVL7, App. 1315; Ex. 85, Katherine Donlevy, *Louisiana DA warns there's trove of evidence against NY doctor who allegedly mailed abortion pills to teen – who was planning gender reveal party: report*, N.Y. Post (Feb. 15, 2025), perma.cc/N6UV-2VF5, App. 1326.

[24] Ex. 86, Lorena O'Neil, *Louisiana Mother Pleads Not Guilty Following Abortion Pill Indictment*, La. Illuminator (Mar. 11, 2025), perma.cc/CQ6Z-SVL7, App. 1331.

[25] Ex. 90, Governor Kathy Hochul (@GovKathyHochul), X (May 13, 2025, 4:28 PM), perma.cc/ZA4U-G2CY, App. 1350.

[26] Ex. 89, Rosemary Westwood, *Louisiana Investigates Second Case Against New York Doctor Over Mailing Abortion Pills*, La. Illuminator (May 13, 2025), perma.cc/D4BR-RKFC, App. 1347.

[27] Ex. 90, Governor Kathy Hochul (@GovKathyHochul), X (May 13, 2025, 4:28 PM), perma.cc/ZA4U-G2CY, App. 1350.

[28] *See, e.g.*, Ex. 105, Pam Belluck, *California Passes Bill Allowing Omission of Patients' Names from Abortion*, App. 2040–42.

from holding accountable those whose actions harm women, destroy human life, and blatantly violate the law.

*Fifth*, recent changes to Plaintiff States' abortion laws are creating an asymmetry of interests for the pursuit of prospective relief. On June 24, 2025, the Idaho Supreme Court approved the fiscal impact statement and ballot title for an initiative proposing a constitutional right to elective abortion until viability for the November 2026 general election ballot.[29] On July 3, 2025, a state court enjoined the enforcement of many of Missouri's abortion regulations after a constitutional amendment was approved in November 2024. Under this injunction, Missouri may not enforce its prohibition on elective abortion and its regulations requiring in-person dispensing of abortion drugs, admitting privileges for abortion providers, pathological examinations, waiting periods, informed consent, and even facility licensing. *Comprehensive Health of Planned Parenthood Great Plains v. State*, No. 2416-CV31931, 2025 WL 1898975, at *11 (Mo. Ct. App. July 03, 2025). And in 2024, the Kansas Supreme Court affirmed that, even after *Dobbs*, it would require state officials to hew to its earlier discovery of a broad, unenumerated right to abortion in the Kansas Constitution. *Hodes & Nauser, MDs, P.A. v. Kobach*, 551 P.3d 37, 44 (Kan. 2024)

## ANALYSIS

### I.    Movants have a right to intervene under Fed. R. Civ. P. 24(a)(2).

To intervene as of right under Rule 24(a)(2), a party must satisfy four requirements: (1) the motion must be timely; (2) the party must claim an interest relating to the property or transaction that is the subject of the lawsuit; (3) the party must be so situated that the action's outcome may practically impair or impede the

---

[29] Substitute Op., *Idahoans United for Women and Families v. Labrador et al.*, No. 52636-2025 (Idaho June 24, 2025).

ability to protect that interest; and (4) the party's interest must not be adequately represented by existing parties. *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverages Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016). Movants meet each criterion.

### A.    The motion is timely.

In this circuit, timeliness turns not only on the calendar but on "all the circumstances." *Stallworth v. Monsanto Co.*, 558 F.2d 257, 263 (5th Cir. 1977). The touchstone of this inquiry is not "how far the litigation has progressed when intervention is sought, [or] the amount of time that may have elapsed since the institution of the action[, or] the likelihood that intervention may interfere with orderly judicial processes." *John Doe No. 1 v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001). Rather, to judge timeliness, a court considers (1) how long the prospective intervenor knew or reasonably should have known of his interest in the case; (2) the degree of prejudice, if any, that existing parties may suffer due to the intervenor's delay in moving to intervene; (3) the prejudice, if any, the prospective intervenor may face if intervention is denied; and (4) any unusual circumstances bearing on the question of timeliness. *Stallworth*, 558 F.2d at 264–66.

A motion may be timely even if not every *Stallworth* factor weighs in its favor. *Glickman*, 256 F.3d at 376. But here each factor supports timeliness.

### 1.    A reasonable length of time has passed since Movants had reason to believe their interests are not adequately protected.

This motion is timely based on the interval between when the Movants knew or reasonably should have known of their interest in the litigation and when they sought to intervene. *See Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994). This time period is measured not from the outset of the litigation, but from the point at which the Movants "became aware that its interests would no longer be protected by the original parties." *Id.* The reasonableness of any delay depends on context,

including the litigation's posture, the nature of the intervenors' interests, and any prejudice to existing parties. *Glickman*, 256 F.3d at 376. These considerations ensure that courts "discourage premature intervention that wastes judicial resources." *Espy*, 18 F.3d at 1206.

Legal and factual developments have made Rosalie and Louisiana aware just recently that Plaintiffs may no longer adequately represent their interests.

*First*, Rosalie became a victim of FDA's mail-order abortion regime only in late 2023, and she learned of the opportunity for prospective relief only in 2025.

*Second*, data released from the pro-abortion Society of Family Planning on October 22, 2024, and, most recently, June 23, 2025, shows that the number of abortions in Louisiana has skyrocketed since *Dobbs* due to FDA's approval of mail-order abortion drugs. This alarming data on the ongoing loss of unborn life in Louisiana, not hitherto available, confirms the staggering magnitude of sovereign, quasi-sovereign, and economic harms stemming from FDA's 2023 Risk Evaluation and Mitigation Strategy ("REMS"). The group's October 2024 report "for the first time ... provide[d] data on the number of abortions provided under shield laws *by state*, including for states with abortion bans and restrictions."[30] The report defines abortions provided under shield laws as mail-order "abortions to residents of these states without travel to another state," reflecting the "location of receipt," not origination.[31] And it excludes abortion drugs sent "outside the formal healthcare system," including instances where, for example, a woman receives a remotely dispensed FDA-approved abortion drug from a friend or family member.[32] In other

---

[30] Ex. 1, Society of Family Planning, #WeCount Report April 2022 to June 2024 at 11 (Oct. 22, 2024), perma.cc/WRW3-PMWK (emphasis added), App. 0003.

[31] *Id.* at 9, App. 0010.

[32] *Id.* at 1. App. 0002.

words, for the first time, ongoing reliable data quantifies the harm the State had long suspected but lacked the means to confirm.

Although the state-specific October 2024 data were staggering, they were unprecedented and limited to a single year (July 2023 to June 2024). Louisiana reasonably required time to assess their ongoing significance. But with the release of additional data in June 2025, it became evident that the harm was not only substantial but escalating. In sum, these new data reveal that "between July 2023 to June 2024," the group observed a range of "from 310 to 620" mail-order abortions *per month* in Louisiana. From April to June 2024, the average number of mail-order abortions reached 617 per month in the State. In December 2024, the number of mail-order abortions reached 800.[33]

It is also clear why that number is not approaching zero. Louisiana law prohibits abortion, with narrow exceptions. *See* Proposed Compl. Sec. VII.A. Yet FDA's approval of mifepristone-by-mail *increased* the number of abortions in Louisiana. This is what the Biden Administration intended. The day *Dobbs* was issued, "[i]n the face of threats from state officials saying they will try to ban or severely restrict access to medication for reproductive health care, the President directed the Secretary of Health and Human Services to identify all ways to ensure that mifepristone is as widely accessible as possible," including by mail-order.[34] The same day, HHS Secretary Becerra announced HHS's "commitment to ensure every

---

[33] *Id.* at 10, App. 0011.

[34] Ex. 47, White House, FACT SHEET: President Biden Announces Actions In Light of Today's Supreme Court Decision on Dobbs v. Jackson Women's Health Organization (June 24, 2022), perma.cc/66T6-BL87, App. 0824 (emphasis added).

American has access to … medication abortion."[35] These directives culminated in the permanent removal of the in-person dispensing requirement.

Louisiana now has an assuredly "accurate" depiction of just how substantial an injury it suffers from FDA's 2023 REMS, straight from the activists' mouths.[36] Not only do these data provide new means to prove the State's injury-in-fact, but they also show that other efforts to resolve this problem on an individual basis are unlikely to succeed—making relief against FDA all the more imperative.

*Third*, recent legal developments out of New York show that Louisiana's state-court efforts are unlikely to stop the mailing of FDA-approved abortion drugs into the State. On January 31, 2025, a Louisiana grand jury indicted Dr. Margaret Carpenter—co-founder of the Abortion Coalition for Telemedicine (ACT)—for knowingly causing an abortion by delivering, dispensing, distributing, or providing a pregnant woman with an abortion-inducing drug in violation of Louisiana law.[37] But despite the indictment, in February 2025, New York refused to extradite Dr. Carpenter[38] and, in response, amended its laws to allow doctors and activists like Carpenter to anonymize their prescriptions—an attempt to make it impossible to prosecute individual doctors who illegally dispense abortion drugs to states that prohibit them.[39]

---

[35] Ex. 48, Press Release, HHS, HHS Secretary Becerra's Statement on Supreme Court Ruling in Dobbs v. Jackson Women's Health Organization (June 24, 2022), perma.cc/89AZ-RFL4, App. 0826.

[36] *See* Ex. 1, Society of Family Planning, #WeCount Report April 2022 to June 2024 at 27, App. 0028.

[37] Ex. 4, Dr. Carpenter indictment, App. 0131.

[38] Ex. 85, Katherine Donlevy, Louisiana DA warns there's trove of evidence against NY doctor who allegedly mailed abortion pills to teen – who was planning gender reveal party: report, N.Y. Post (Feb. 15, 2025), perma.cc/N6UV-2VF5, App. 1327.

[39] Ex 88, Press Release, Protecting Reproductive Freedom: Governor Hochul Signs Legislation Affirming New York's Status as a Safe Haven for Reproductive Health Care (Feb. 3, 2025), perma.cc/ZSH6-J6HW, App. 1337.

New York is not the only state to pass or consider passing such a law. California just passed its own law on September 11, 2025, allowing abortion drugs to be sent in the mail without prescribers', pharmacists', or even recipients' names. A.B 250, 2025–2026 Reg. Sess. (Cal. 2025). The law is "intended to make it harder for states with abortion bans to develop evidence to make legal cases against doctors and others operating under shield laws that were adopted by many states to protect abortion pill prescribers after the Supreme Court revoked the national right to abortion."[40] These provisions are the 2023 REMS's direct, foreseeable consequence. And they fulfill the Biden Administration's purpose: to create a de facto 50-state abortion-drug scheme despite the promise of *Dobbs*. Faced with these obstacles, women like Rosalie and states like Louisiana have little hope of pursuing legal action against either the prescribers who send the drugs or other bad actors.

On top of these Louisiana-specific developments, key developments have emerged out of Idaho and Missouri in June and July 2025 that have altered the strategic and legal landscapes in their respective states. In June, the Idaho Supreme Court approved a fiscal impact statement and ballot title for an initiative petition proposing a constitutional right to elective abortion through viability. Substitute Op., *Idahoans United for Women and Families v. Labrador et al.*, No. 52636-2025 (Idaho June 24, 2025). The initiative could appear on the Idaho ballot in November 2026. Shortly after the Idaho Supreme Court's decision, a court in Missouri enjoined that state's abortion regulations under a newly adopted state constitutional amendment. *Comprehensive Health*, 2025 WL 1898975 at *11. That decision has since been appealed. *See Comprehensive Health of Planned Parenthood Great Plains v. State*, No. SC 101176, 2025 WL 2346611, at *2 (Mo. Aug. 12, 2025) (transferring appeal).

---

[40] Ex. 105, Pam Belluck, *California Passes Bill Allowing Omission of Patients' Names from Abortion*, App. 2040.

13

And the Kansas Supreme Court has refused to abandon its declaration of an unenumerated right to elective abortion, even after *Dobbs. See Hodes & Nauser, MDs, P.A. v. Kobach*, 551 P.3d 37 (2024). These developments could jeopardize Plaintiff States' claim to standing or reduce their ability to provide evidence showing future prospective injury and irreparable harm.

*Fourth*, Louisiana also awaited clarity from the new presidential administration about its position, which the State reasonably hoped would decline to defend the prior administration's unlawful actions. Unopposed Mot. for Ext. of Time, Dkt. No. 238 ¶ 5 (Mar. 3, 2025). That hope dissolved in May 2025 when FDA doubled down and filed a reply in support of its motion to dismiss contesting Plaintiffs' standing and venue. Reply, Dkt. No. 247 (May 5, 2025). When Louisiana saw that FDA had moved in January to dismiss the three Plaintiff States for lack of standing, Louisiana started to consider its litigation options, given the indisputable injuries that Louisiana has suffered due to FDA's approval of mail-order abortion drugs. Still, intervention between November 2024 and May 2025 would have been premature. At that time, the Department of Justice routinely sought to stay all existing litigation about federal programs to allow the new administration to consider its position. *See, e.g.*, Order, *McComb Children's Clinic, Ltd. v. Kennedy*, No. 5:24-cv-00048 (S.D. Miss. Feb. 6, 2025), Dkt. No. 48.

*Fifth*, less than a month ago, Florida and Texas moved to intervene in this case, resolving any prior disputes over venue and bringing a new, expanded set of claims. *See* Mot. to Intervene, Dkt. No. 254 (Aug. 22, 2025). But the scope of Movants' challenge deviates slightly from the other parties and proposed intervenors. Like the other states, Movants challenge the 2023 REMS dispensing changes. Movants do not, however, challenge any of the other earlier FDA actions that the other States challenge, making representation by these states inadequate to cover Movants' more focused challenge.

Louisiana had been preparing its own independent complaint, and it acted promptly upon learning of Florida and Texas's motion. As the parties here well know, assembling corroborating evidence of harm takes time—particularly in a case where the parties have vigorously contested standing from the outset.

Viewed collectively—and consistent with the Fifth Circuit's guidance, as well as the Court's prior intervention rulings—it has been at most four months since the first development favoring intervention, and mere days since the last. But even if the clock started when Plaintiff States filed their amended complaint in January, the delay is justified due to the time required to prepare a complaint of this complexity and to obtain supporting evidence. Any delay is simply the mere inconvenience of litigation, not unfair prejudice.

The Fifth Circuit has found longer delays justified under a totality of circumstances and has cautioned against placing an "undue emphasis" on the first of the *Stallworth* factors. *See, e.g.*, *Ass'n of Pro. Flight Attendants v. Gibbs*, 804 F.2d 318, 321 (5th Cir. 1986) (allowing intervention after five months). What matters is not the length of the delay in days, but whether that delay has prejudiced the existing parties. *Id.* And here it has not.

### 2. Intervention will prevent prejudice to Movants without causing any to existing parties.

Louisiana's intervention will not prejudice existing parties. In general, this circuit's approach is that motions to intervene filed "before trial and any final judgment" do not cause prejudice. *Glickman*, 256 F.3d at 377. That is because this inquiry focuses solely on prejudice from delay—not on any harm from allowing intervention. *Edwards v. City of Houston*, 78 F.3d 983, 1002 (5th Cir. 1996). Put another way, the court assesses whether the parties to the lawsuit would have suffered any *less* prejudice if the movants filed sooner. *See Glickman*, 256 F.3d at 378 (disregarding inconveniences that "would have occurred whether the delay was one

week or one year," such as increased costs and discovery). Although prejudice is the second factor, it "may well be the only significant consideration when the proposed intervenor seeks intervention of right." *McDonald v. E. J. Lavino Co.*, 430 F.2d 1065, 1073 (5th Cir. 1970).

Movants' intervention will not prejudice the parties because they do not seek to "reopen or relitigate any issue which ha[s] previously been determined." *Id.* at 1071. Rather, discovery has yet to begin, no dispositive motion has been resolved, and trial remains far off—all factors favoring intervention. *See Glickman*, 256 F.3d at 378; *Edwards*, 78 F.3d at 1001; *Wal-Mart Stores*, 834 F.3d at 565–66.

On balance, their intervention yields a net benefit. Absent intervention, Movants' only alternative is to file a separate suit—duplicating efforts and increasing costs. Allowing Movants to intervene avoids the possibility of competing injunctions from other forums and allows this Court to resolve all related legal and factual issues in a single proceeding. That promotes judicial efficiency.

Conversely, denying this motion would significantly prejudice Movants.

*First*, an adverse ruling could impair Louisiana's sovereign authority to regulate public health and protect its fiscs. Even absent binding precedent, such a ruling may carry stare decisis weight in parallel litigation. *See Espy*, 18 F.3d at 1207.

*Second*, even a favorable injunction here could fall short of protecting Movants' interests or even "limit the relief available in separate future litigation." *Gen. Land Off. v. Trump*, No. 24-40447, 2025 WL 1410414, at *6 (5th Cir. May 15, 2025). In that event, the injunction could foreclose meaningful relief in a separate court, even if it finds Louisiana's contentions meritorious. More importantly, even if this case yields a favorable judgment for the Plaintiffs, it remains uncertain whether that relief will extend more broadly to other parties, as the Department of Justice seeks to end nationwide vacatur and to limit any relief to the parties, even in the Administrative

16

Procedure Act context.[41] Without intervention, Movants risk being bound by a remedy that neither reflects their interests nor leaves room to assert them later. And no state can stand in for Rosalie, who possesses individual rights and interests that no state—whether party to the case or not—can adequately represent or vindicate on her behalf.

*Third*, formal intervention secures rights unavailable to nonparties: briefing, evidence, appeal, and even an "adequate opportunity to set forth a factual basis for their challenges." *Espy*, 18 F.3d at 1207; *Glickman*, 256 F.3d at 379; *Edwards*, 78 F.3d at 1003.

*Fourth*, intervention *benefits* Defendants and Defendant-Intervenors by combining all the states' cases in a single forum, avoiding duplicative briefing and repetitive discovery, and requiring them to achieve victory only once to resolve all the claims.

### 3. Given the unusual circumstances, intervention is now both timely and justified.

The unusual circumstances of this case—including its procedural posture, the benefits to the parties, and the relevant but highly complex factual and legal developments—strongly favor intervention. *See Espy*, 18 F.3d at 1207.

The issues here are far-reaching: a decision allowing or stopping mail-order abortions affects not just one state, but every state, on an incredibly important issue. Principles of federalism and comity thus provide important structural constitutional reasons to consider the claims and perspectives of other states, no matter the passage of time. The FDA actions at issue regulate in an area of "great political significance" and traditionally under the "domain of state law." *See Purl v. HHS*, No. 2:24-CV-228-

---

[41] The Supreme Court has declined to consider "whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action" under 5 U.S.C. § 706(2). *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025).

Z, 2025 WL 1708137, at *24 (N.D. Tex. June 18, 2025) (noting the major import of federal regulations concerning abortion-related disclosure regulations). These considerations favor intervention.

### B. Movants have an interest relating to the property or transaction at the heart of this action.

To intervene as of right, a party must demonstrate a concrete, personalized, and legally protectable interest related to the property or transaction at issue. *Texas v. United States*, 805 F.3d 653, 658 (5th Cir. 2015). Under this standard intervention is appropriate when "the economic interests of the movants are at stake," *Espy*, 18 F.3d at 1207, or when the movants' claims are "based on economic interests" that are "directly related to the litigation." *Wal-Mart*, 834 F.3d at 567–68. Intervention is also appropriate for cases encompassing non-property interests, provided the movants meet the same threshold of specificity and legal protection. In that situation, "the inquiry turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way," such as when it seeks to intervene solely for "ideological, economic, or precedential reasons." *Texas*, 805 F.3d at 657. A state's interest in preserving its regulatory schemes—including enforcement of legislation—qualifies as a legally protectable interest. *Sierra Club v. City of San Antonio*, 115 F.3d 311, 315 (5th Cir. 1997).

Rosalie has direct interests in holding the FDA accountable for its reckless deregulation of high-risk abortion drug. After all, Rosalie and her unborn child became victims of abortion drugs only because of FDA's unlawful actions. Rosalie has an interest in having federal agencies follow lawful procedures designed to protect her from harm. Rosalie has an interest, as a matter of bodily autonomy, in not being subjected to abortion-drug coercion again—coercion that is only possible because of FDA's regulatory action. Rosalie also has an interest in pursuing legal action against the government agencies who turned a blind eye to the risks that mail-order abortion

18

drugs pose to women like her. And, importantly, Rosalie has a right to protect her future unborn children. These interests do not represent a "generalized preference" in how this case ends. Rather, they are legally protectable interests specific to Rosalie that the court can address.

Louisiana also has strong interests qualifying for intervention.

*First*, Louisiana has an interest in avoiding the federal government undermining its pro-life laws—in "seeing that the scheme passed by the legislature is properly enforced." *City of San Antonio*, 115 F.3d at 315. FDA's 2023 REMS has enabled doctors and activists to send vast quantities of mifepristone by mail into Louisiana for the express purpose of causing thousands of illegal abortions in Louisiana every year. Proposed Compl. ¶ 4. This mail-order abortion scheme violates Louisiana's abortion laws, preventing Louisiana from protecting the lives of unborn babies despite the promise of *Dobbs*, and generating emergencies that harm Louisiana women. Proposed Compl. ¶ 107.

*Second*, Louisiana has an interest in stopping the harm to women from the FDA's reckless decision to allow mail-order abortion drugs. While every abortion takes an unborn life and can cause incalculable distress to each mother, that harm also strikes the State's fiscs—driving up emergency-room visits from women who took drugs received by mail, with the resulting care costs falling on Medicaid and the State. Proposed Compl. ¶¶ 127–144.

Because this case affects significant public interests, Louisiana benefits from "a more lenient standard" in evaluating the state's claim to intervene. *Brumfield v. Dodd*, 749 F.3d 399, 344 (5th Cir. 2014). But lenient standard or no, this case strikes at the core of Louisiana's state interests, and any ruling on the lawfulness of FDA's 2023 REMS will directly impact Rosalie and Louisiana.

### C.    The disposition of this action could impair Movants' ability to protect their interests.

To intervene, a movant must show that the case's outcome may practically impair or impede its ability to protect its interests. *Brumfield*, 749 F.3d at 341. But intervenors need not prove certain impairment—only a possibility of it. *Id.* It would be unfair to force prospective intervenors to "wait on the sidelines" until adverse rulings undermine their rights. *Id.* at 345.

A district court's judgment may carry a stare decisis effect sufficient to meet this requirement. *Espy*, 18 F.3d at 1207. Although this Court's rulings may not bind other courts, they are "undoubtedly . . . relied upon as precedent in future actions." *Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 424 (5th Cir. 2002). Moreover, any injunction here could impact injunctive relief available in related proceedings. *See supra* Sec. I.A.2. Thus, the case's disposition may impair Movants' ability to protect their interests in separate actions.

### D.    Movants' interests are not adequately represented by Plaintiffs.

The final requirement for intervention as of right is that the applicant's interest is inadequately represented by existing parties. *Espy*, 18 F.3d at 1207. The applicant must show only that representation may be inadequate—a "minimal" burden. *Id.*; *Brumfield*, 749 F.3d at 345. Movants satisfy this standard.

*First*, no state can stand in for Rosalie, who possesses individual rights and interests that no state can adequately represent or vindicate on her behalf.

*Second*, a sovereign should be able to pursue its own interests in its own claims as a matter of comity and federalism. Intervention has not yet occurred for Florida and Texas, making their representation of other parties uncertain at best. In addition, Louisiana has recently learned of a series of cascading developments in Idaho, Missouri, and Kansas that present potential new hurdles for Plaintiffs' long-term ability to seek prospective relief. *See supra* Sec. I.A.1. These evolving legal

landscapes may ultimately make the States unable to prove in the long term ongoing particularized harms.

*Third*, Plaintiffs' injuries and litigation focus differ from Movants'. The extent to which mail-order abortion drugs are flooding Louisiana—especially when measured against the strength of its pro-life laws—is shocking. *See supra* Sec. I.A.1. Rosalie and Louisiana have thus focused their challenge on FDA's 2023 REMS—the key action that left Rosalie defenseless, undermines Louisiana's ability to enforce pro-life laws, and has destroyed thousands of unborn Louisiana lives. At this stage, Movants have not challenged the 2016 REMS changes or the earlier 2000 approval, as other States have.

What's more, Movants' theories of standing also differ. That's because Louisiana's overall legal landscape differs from those of other states and because Rosalie is an individual. At bottom, although the states endure similar economic and sovereign injuries arising from a common source, and each state's claim is individually well-founded, their legal theories will inevitably diverge, reflecting differences in their respective laws and the particular harms they have sustained. As a private citizen and as a separate sovereign, Movants should be able to intervene to advance their own distinct theories in court.

## II.    In the alternative, the Court should allow permissive intervention under Fed. R. Civ. P. 24(b)(1)(B).

Permissive intervention is proper when three conditions are met: (1) the motion is timely; (2) the intervenor raises a claim or defense that shares a common question of law or fact with the main action; and (3) intervention will neither unduly delay the proceedings nor prejudice the original parties' rights. *See Texas v. United States*, No. 4:18-CV-00167-O, 2018 WL 10562846, at *2 (N.D. Tex. May 16, 2018). Though permissive intervention is a matter of the court's discretion, the Fifth Circuit has routinely advised that intervention should be permitted "where no one would be

hurt and the greater justice could be obtained." *Texas*, 805 F.3d at 657. That is the case here.

### A.    The motion is timely.

For the same reasons as discussed above, Movants acted promptly upon becoming aware that their interests in this action may no longer be adequately represented by Plaintiffs. *See supra* Sec. I.A.1.

### B.    Movants' claims share questions of law and fact with the main action.

To intervene under Rule 24(b)(1)(B), a party must assert a claim or defense that raises "a common question of law or fact" with the main action. The Fifth Circuit has interpreted this threshold requirement "liberally." *Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006); *Stallworth*, 558 F.2d at 269 (citing cases).

Louisiana's claims align with the legal and factual issues already before the Court. Everyone—Plaintiffs Missouri, Idaho, and Kansas, existing proposed intervenors Texas and Florida, and Movants Rosalie and Louisiana—seeks judicial review of FDA's 2023 REMS, and each assert that FDA acted arbitrarily, capriciously, and abused its discretion by eliminating the in-person dispensing requirement for mifepristone based on sources that it conceded did not independently support its decision. Each also claim that the 2023 REMS is otherwise not in accordance with law because the Comstock Act explicitly prohibits the mailing of abortion-producing drugs. Although the precise contours of these arguments may vary, the core questions that Louisiana presents are already before the Court. And the Court will assess the same record, the same agency justifications, and the same regulatory history to evaluate those claims.

Resolving all challenges to the agency's action in a single case thus reduces the risk of inconsistent judgments and promotes judicial economy—precisely the type of circumstance Rule 24(b) is designed to accommodate.

## C.    Intervention will not cause undue delay or prejudice.

Whether intervention will unduly delay or prejudice the original parties largely tracks the timeliness analysis. *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 338 F.R.D. 364, 372 (W.D. Tex. 2021). There is usually no prejudice when intervention was sought before discovery, trial, or judgment. *See, e.g.*, *EEOC v. Wellpath LLC*, No. 5:20-CV-1092-DAE, 2021 WL 4096556, at *2 (W.D. Tex. Mar. 15, 2021). Nor is there prejudice here, when this case has not reached discovery, much less trial, and no dispositive motions have yet been ruled on.

Movants' intervention will not delay these proceedings. *First*, the issues Movants now press have been previewed at every level: in this Court, in the court of appeals, and before the Supreme Court. Reintroducing them does not "inject significant unrelated questions of law and fact" into the proceedings. *All. for Hippocratic Med. v. FDA*, No. 2:22-CV-223-Z, 2024 WL 1260639, at *7 (N.D. Tex. Jan. 12, 2024). *Second*, the Court is already weighing the motion to intervene filed by Florida and Texas. And while allowing Florida and Texas to intervene may prompt new motions to dismiss, efficiency would be served, and no prejudice would ensue, from permitting Movants to also join prior to the filing or resolution of such motions. *See Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*, No. 5:21-cv-071, 2022 WL 974335, at *7 (N.D. Tex. Mar. 31, 2022). Intervention could in fact streamline the case by eliminating threshold disputes, including over standing and venue. *See* Reply, Dkt. No. 247 at 1–6 (May 5, 2025); Dkt. No. 248 at 1–4 (May 5, 2025).

**D.**    **The Court should exercise its discretion to allow Movants to intervene.**

The Court should exercise its discretion in favor of intervention. Intervention promotes obtaining "greater justice" and judicial economy. *Texas*, 805 F.3d at 657. Rule 24 aims to ensure that claims arising from the same underlying facts are resolved in a single proceeding—avoiding the inefficiency and expense of duplicative litigation. *See E.E.O.C. v. Com. Coating Serv., Inc.*, 220 F.R.D. 300, 302–03 (S.D. Tex. 2004). This case exemplifies the principle that when two groups assert related rights, those claims should be resolved together, not in separate actions. *Stallworth*, 558 F.2d at 270. As *Stallworth* observed, "[w]ith little strain on the court's time and no prejudice to the litigants, the controversy can be stilled and justice completely done." *Id.* (quoting *McDonald*, 430 F.2d at 1074). The same is true here.

## <u>CONCLUSION</u>

Because Rosalie and Louisiana's participation will streamline procedural disputes, refocus the case on the merits, and will not prejudice the parties, the Court should grant Movants' motion to intervene.

24

Respectfully submitted this 19th day of September, 2025.

Respectfully submitted,

*/s/ Erik C. Baptist*
Erik C. Baptist
  VA Bar No. 99148
Erin M. Hawley*
  VA Bar No. 100848
Julie Marie Blake
  VA Bar No. 97891
Frank W. Basgall*
  Kansas Bar No. 25073
Gabriella M. McIntyre*
  DC Bar No. 1672424
Dalton A. Nichols*
  Indiana Bar No. 37499-71
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
P: (571) 707-4655
F: (571) 707-4790
ebaptist@adflegal.org
ehawley@adflegal.org
jblake@adflegal.org
fbasgall@adflegal.org
gmcintyre@adflegal.org
dnichols@adflegal.org

Charles Eric Vickers
  Texas Bar No. 24118577
VICKERS LAW FIRM
600 S Taylor St, Suite 2100
Amarillo, TX 79101
P: (806) 414-0966
eric@vickersfirm.com

*Counsel for Proposed Intervenor-
Plaintiffs Rosalie Markezich and State
of Louisiana*

*pro hac vice forthcoming

LIZ MURRILL
  Attorney General
J. Benjamin Aguiñaga*
  Solicitor General
Caitlin Huettemann*
  LA Bar No. 40402
  Assistant Solicitor General
OFFICE OF THE LOUISIANA
ATTORNEY GENERAL
1885 N. Third Street
Baton Rouge, LA 70804
P: (225) 326-6766
AguinagaB@ag.louisiana.gov
HuettemannC@ag.louisiana.gov

*Counsel for Proposed Intervenor-
Plaintiff State of Louisiana*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 19, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent electronic notification to all counsel of record.


<u>/s/ Erik C. Baptist</u>
Erik C. Baptist